# 10-3429-cv

## In The United States Court of Appeals for the Second Circuit

BROADCAST MUSIC, INC.,

*Petitioner-Appellant*,

*v.*

DMX INC.,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York (Stanton, J.)

**JOINT APPENDIX
VOLUME I OF V, PAGES A1-A232**

R. BRUCE RICH
BENJAMIN E. MARKS
TODD D. LARSON
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Counsel for Respondent-Appellee*

SETH P. WAXMAN
JONATHAN E. NUECHTERLEIN
CATHERINE M.A. CARROLL
ERIC F. CITRON
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

MARVIN L. BERENSON
JOSEPH J. DIMONA
BROADCAST MUSIC, INC.
7 World Trade Center
250 Greenwich Street
New York, NY 10007

December 20, 2010

*Counsel for Petitioner-Appellant*

# TABLE OF CONTENTS

## <u>VOLUME I</u>

### RELEVANT DOCKET ENTRIES, PLEADINGS, AND ORDERS

Page

Docket sheet, No. 08 Civ. 216 (LLS) (S.D.N.Y) .................................................. A-1

Notice of Appeal, Dkt. No. 38, August 24, 2010 ................................................. A-6

Consent Decree entered in *United States v. Broadcast Music, Inc.*,
    1966 Trade Cas. (CCH) ¶71,941 (S.D.N.Y. 1966), *as amended*
    *by* 1966-1 Trade Cas. (CCH) ¶71,378 (S.D.N.Y. 1994) ......................... A-11

Petition for Determination of Reasonable License Fees, Dkt. No. 1,
    Jan. 10, 2008 ......................................................................................... A-19

Memorandum and Order re Interim Fee, Dkt. No. 30, Aug. 19, 2010 .............. A-24

Consent Pre-Trial Order, Part I: Agreed Findings of Fact, Dkt. No. 31,
    unsealed Aug. 19, 2010 [Excerpt—pp. 1-15] .......................................... A-31

Consent Pre-Trial Order, Part II, Sections H and I: BMI Fee Proposal,
    Dkt. No. 31, unsealed Aug. 19, 2010 [Excerpt—pp. 36-68] .................... A-46

Consent Pre-Trial Order, Part III, Section M: DMX Fee Proposal,
    Dkt. No. 31, unsealed Aug. 19, 2010 [Excerpt—pp. 118-132] ................ A-79

### EXHIBITS SUBMITTED AT INTERIM-FEE STAGE

Deposition of Benjamin M. Hanson, Sept. 25, 2008
    [Excerpt— pp. 118, 152-153, 173-174] .................................................. A-94

Deposition of Ronald Gertz, Sept. 22, 2008
    [Excerpt—pp. 21-23, 126-127] ............................................................. A-101

Email chain between Ulman and Torrence, May 16-22, 2006,
    unsealed Aug. 26, 2010 ........................................................................ A-108

## EXPERT REPORTS

Interim Phase Declaration of Bruce M. Owen, Aug. 27, 2008..........................A-116

Interim Phase Declaration of Amy Bertin Candell, Aug. 27, 2008..................A-131

Interim Phase Declaration of Adam B. Jaffe, Aug. 26, 2008 ...........................A-150

Interim Phase Reply Declaration of Bruce M. Owen,
    Oct. 23, 2008, Dkt. No. 42.....................................................................A-166

Interim Phase Reply Declaration of Amy Bertin Candell,
    Oct. 24, 2008, Dkt. No. 44.....................................................................A-187

Interim Phase Reply Declaration of Adam B. Jaffe,
    Oct. 24, 2008, Dkt. No. 46.....................................................................A-218

## <u>VOLUME II</u>

### TRIAL TRANSCRIPTS

Trial Transcript, Jan. 19, 2010 .......................................................................A-233

Trial Transcript, Jan. 20, 2010 .......................................................................A-269

Trial Transcript, Jan. 21, 2010 .......................................................................A-318

Trial Transcript, Jan. 22, 2010 .......................................................................A-366

## <u>VOLUME III</u>

Trial Transcript, Jan. 25, 2010 .......................................................................A-408

Trial Transcript, Jan. 26, 2010 .......................................................................A-455

Trial Transcript, Jan. 27, 2010 .......................................................................A-505

Trial Transcript, Jan. 28, 2010 .......................................................................A-549

Trial Transcript, Jan. 29, 2010 .......................................................................A-574

Trial Transcript, Feb. 1, 2010 ........................................................................A-612

# VOLUME IV

## JOINT TRIAL EXHIBITS

License Agreement between Broadcast Music, Inc. and PlayNetwork, Inc., June 16, 2005 (JX-95) ................................................... A-630

License Agreement between Broadcast Music, Inc. and TruSonic, Inc., June 28, 2007 (JX-127) ................................................. A-639

License Agreement between Broadcast Music, Inc. and Muzak, Inc., Dec. 31, 2004 (JX-132) .......................................................... A-649

License Agreement between DMX, Inc. and AMRA, Nov. 15, 2007 (JX-171) .................................................................................. A-674

License Agreement between THP Capstar Acquisition Corp. and Cherry Lane Music Publishing Company, Inc., Oct. 1, 2006 (JX-219) .................................................................................. A-679

License Agreement between DMX, Inc. and Sony/ATV Music Publishing, Inc., Nov. 14, 1007 (JX-449) ............................... A-704

License Agreement between DMX, Inc. and Williamson Music Co., July 1, 2009 (JX-513) ......................................................... A-721

Letter Agreement between BMI and Muzak LLC (and Muzak Affiliates), Dec. 31, 2004 (JX-723) ......................................... A-727

Muzak Affiliate License Agreement form (undated) (JX-733) ........................ A-733

Letter from Annastas to Zendan, Aug. 20, 2003 (JX-739) ............................... A-742

Chart re "Muzak Proposal" history with handwritten notes, Apr. 7, 2004 (JX-743) ....................................................................... A-744

Chart re "Muzak June 2004 & July 2004 Proposal," July 9, 2004 (JX-745) .................................................................................. A-745

Letter from Zendan to Berenson, Apr. 4, 2003 (JX-759) ................................. A-747

Email chain between Eudeikis and Stafford-Scherer et al., Jan. 23-31, 2005 (JX-774) ........................................................................ A-750

BMI's Hotel/Motel Music Performance Agreement Form (undated) (JX-780) ......................................................................... A-756

BMI's Music License for Eating & Drinking Establishments Form (undated) (JX-781).................................................................... A-760

BMI's Retail Establishments Music Performance Agreement Form (undated) (JX-782).................................................................... A-764

Letter from Hoag to Larson with spreadsheet (Response to DMX Interrogatory No. 9), Feb. 24, 2009 (JX-0789) ....................................... A-768

Email from Hanson to Lowenberg with attached draft Term Sheet, Mar. 11, 2008 (JX-827) ......................................................... A-773

Term sheet to Primary Wave Musical Composition Catalog License Term Sheet (undated) (JX-828) ............................................... A-774

Letter from Hayward to Dahl enclosing Background/Foreground Music Service License Agreement between ASCAP and AEI Music Network, Inc., Mar. 14, 1995 (JX-840)...................................... A-775

Email from Knittel to Ulman re Abkco & Mother Bertha:  License Proposal for the DMX background music service, Aug. 1, 2006 (JX-874) ............................................................................ A-780

DMX, Inc.'s 2nd Quarter 2009 Royalty Statement—Sony/ATV Music Publishing LLC, Aug. 14, 2009 (JX-925) [Excerpt] ............................. A-782

DMX, Inc.'s 2nd Quarter 2008 Royalty Statement—Sony/ATV Songs LLC, Aug. 19, 2008 (JX-927) [Excerpt] ................................... A-783

DMX, Inc.'s Summary of Royalties, All Payees—1st Quarter 2008, Aug. 14, 2009 (JX-929)........................................................ A-785

DMX, Inc.'s Summary of Royalties, All Payees—2nd Quarter 2008, Aug. 19, 2008 (JX-930)........................................................ A-787

DMX, Inc.'s Summary of Royalties, All Payees—2nd Quarter 2009,
Aug. 14, 2009 (JX-931) ......................................................... A-790

DMX's Responses and Objections to BMI's Second Set of
Interrogatories, Mar. 17, 2009 (JX-934) [Excerpt] ................. A-794

DMX, Inc.'s 4th Quarter 2008 Royalty Statement—Sony/ATV Music
Publishing LLC, Feb. 10, 2009 (JX-935) [Excerpt]............... A-795

DMX, Inc.'s 1st Quarter 2009 Royalty Statement—Sony/ATV Music
Publishing LLC, May 12, 2009 (JX-936) [Excerpt] .............. A-796

DMX, Inc.'s 3rd Quarter 2008 Royalty Statement—Sony/ATV Music
Publishing, Nov. 14, 2008 (JX-937) [Excerpt]........................ A-797

DMX, Inc.'s Summary of Royalties, All Payees—3rd Quarter 2008,
Nov. 14, 2008 (JX-938) ......................................................... A-798

DMX, Inc.'s Summary of Royalties, All Payees—4th Quarter 2008,
Feb. 10, 2009 (JX-939) ......................................................... A-801

DMX, Inc.'s Summary of Royalties, All Payees—1st Quarter 2009,
May 12, 2009 (JX-940) ......................................................... A-804

Email from Smith to Levin re DMX-AMRA—License Proposal for
Background Music Service, Aug. 8, 2007 (JX-947) [Excerpt].............. A-808

Email from Hunsaker to Knittel re Cherry Lane—DMX Proposal
(JX-968) ................................................................................ A-809

Email from Ulman to Hunsaker re Cherry Lane License Proposal for
DMX Background Music Service—Quote # 14424, June 16,
2006 (JX-0969) ..................................................................... A-810

DMX, Inc.'s 1st Quarter 2008 Royalty Statement—Sony/ATV Music
Publishing, May 13, 2008 (JX-1050) ..................................... A-813

Email chain between Ulman and Knittel re Manatt—DMX License
Proposal, July 5, 2006 (JX-1061) .......................................... A-814

Settlement Agreement between ASCAP and Muzak LLC re pre-2005
    claims and 2005-2009 blanket license, Jan. 14, 2005 (JX-1110)........... A-818

Email from Knittel to Taylor re ASCAP reports, January 2007,
    attaching ASCAP Monthly Statement of Account for January
    2008 through June 2008, Mar. 1, 2007 (Hanson Dep. Exhibit 8)
    (JX-1145) ................................................................................................ A-821

License Agreement between DMX, Inc. and Sony/ATV Music
    Publishing, Inc., Nov. 14, 2007 (JX-1148)............................................. A-828

Email from Knittel to Engel re Royalty Advances to Sony/ATV,
    attaching Royalty Advance Payments, Nov. 30, 2007 (JX-1149) ......... A-849

Letter Agreement between DMX, Inc. and Sony/ATV Music
    Publishing, Nov. 14, 2007 (JX-1150)..................................................... A-851

Email from Knittel to Gertz re DMX-w-Sony ATV/Catalog License,
    June 19, 2006 (JX-1154) ........................................................................ A-853

Charts re BMI Proposals (undated) (JX-1164)................................................. A-854

Email chain between Knittel and Ulman et al., Aug, 2, 2006
    (JX-1167) ................................................................................................ A-859

Letters enclosing Amendment to Musical Composition Catalog
    License (Background/Foreground Music Service), Apr. 2009
    (JX-1170) ................................................................................................ A-861

Email from Gertz to Arrow re direct license proposal, May 4, 2006
    (JX-1184) ................................................................................................ A-868

Email from Knittel to Arrow re Direct License Agreement between
    Universal Publishing Group and DMX Music, attaching
    proposed license agreement, Oct. 3, 2006 (JX-1185) ........................... A-870

Email from Arrow to Knittel re ASCAP DMX, Jan. 4, 2007 (JX-1186) ......... A-876

Email from Arrow to Knittel re ASCAP DMX, Jan. 4, 2007 (JX-1187) ......... A-878

Email from Knittel to Arrow re DMX proposal to Universal Music
    Publishing Group, Feb. 2, 2007 (JX-1188) ............................................. A-881

Email from Arrow to Renzer re DMX proposal to Universal Music
    Publishing Group, Feb. 28, 2007 (JX-1189) .......................................... A-888

Email from Arrow to Knittel re Publishers Licensing Proposal, July
    26, 2007 (JX-1190) ................................................................................... A-890

BMI/CMS Music Performance Agreement form 1987-1993 (JX-1215) ......... A-893

Letter Agreement between BMI, Muzak LLC, and Muzak Affiliates,
    Aug. 2, 2004 (JX-1234) ........................................................................... A-897

## <u>VOLUME V</u>

Email from Hunsaker to Burns re License Proposal, June 14, 2006
    (JX-1240) .................................................................................................. A-911

BMI Local Television Station Music Performance Per Program
    License form (undated) (JX-1242) ......................................................... A-913

ASCAP Local Station Per-Program License (undated) (JX-1249) .................. A-937

ASCAP Local Station Per-Program License (undated) (JX-1254) .................. A-958

Chart re Commercial Music Service Licensees (undated) (JX-1257).............. A-982

Table re Muzak Off-Premise Channels Q1 2008 (JX-1265) ........................... A-985

BMI Royalty Information Booklet (Oct. 15, 2009) (JX-1266) ........................ A-990

DMX's Suppl. Response to Request No. 26 of BMI's First Request
    for Production of Documents, Sept. 19, 2008 (JX-1276)..................... A-1011

DMX Responses and Objections to BMI's First Set of Interrogatories
    (JX-1277) ............................................................................................... A-1014

BMI Commercial Music Service License Agreement (undated) (JX-
    1291) ...................................................................................................... A-1032

Chart re Commercial Music Service Annual Fees (Revised) (JX-1293) ....... A-1041

DMX, Inc.'s 3rd Quarter 2009 Royalty Statement—Sony/ATV Music
  Publishing, Nov. 11, 2009 (JX-1296) [Excerpt] .................................. A-1056

DMX, Inc.'s Summary of Royalties, All Payees—3rd Quarter 2009,
  Nov. 11, 2009 (JX-1299) ...................................................... A-1057

Redacted Confidential Memorandum from DiMona & Howland-
  Kruse to Bryant et al., June 28, 2006 (JX-1310) ................................ A-1062

Chart re Per BMI License Fee Definition & Calculation, June 27,
  2006 (JX-1311) ............................................................... A-1080

Amendment to Commercial Music Service License Agreement
  between BMI and TruSonic, Inc. (JX-1312) ....................................... A-1081

Redacted email chain between Salzman and O'Neill re DMX line
  item, 2007 (JX-1313) ......................................................... A-1082

Email chain between Annastas, Shaker, and Berenson, July 9, 2004
  (JX-1318) .................................................................... A-1084

Analysis re Muzak Proposal, Apr. 9, 2003 (JX-1321) .................................. A-1086

Email from Annastas to Stafford-Scherer et al., July 9, 2004 (JX-
  1324) ........................................................................ A-1087

Letter Agreement between PlayNetwork, Inc. and BMI, Apr. 29, 2005
  (JX-1328) .................................................................... A-1088

Email from Arrow to Renzer forwarding email from Smith to Arrow,
  Aug. 2, 2007 (JX-1331) ....................................................... A-1091

DMX, Inc.'s 1st Quarter 2008 Royalty Statement—Bug Music, Inc.,
  May 13, 2008 (JX-1347) [Excerpt] ............................................. A-1092

## PETITIONER TRIAL EXHIBITS

BMI/Muzak Meeting Notes, July 9, 2002 (PX-11) ........................................ A-1093

Letter from DiMona to Marks re BMI/DMX Commercial Music
  Service, Carve-Out License Quote, Oct. 4, 2007 (PX-101) ................ A-1095

Letter Agreement between Music Reports, Inc. and THP Capstar
  Acquisition Corp., Jan. 31, 2006 (PX-104) ........................................ A-1099

Letter Ageement between Music Reports, Inc. and THP Capstar
  Acquisition Corp., Oct. 4, 2007 (PX-105).......................................... A-1107

Letter Ageement between Music Reports, Inc. and THP Capstar
  Acquisition Corp., Apr. 4, 2008 (PX-106) ......................................... A-1114

Letter Ageement between Music Reports, Inc. and THP Capstar
  Acquisition Corp., July 4, 2008 (PX-107).......................................... A-1116

Muzak Holdings LLC and Muzak Holdings Finance Corp. 2007
  Annual Report (undated) (PX-112) [Excerpt—pp. 5-6] ..................... A-1118

Charts re Percent of Identified Show Hours Containing BMI Music,
  Jan. 21, 2009 (PX-126).................................................................... A-1121

Updated Response of BMI to DMX's First Set of Interrogatories No.
  6, June 22, 2009 (PX-153) .............................................................. A-1123

Letter from Hoag to Larson attaching spreadsheet re AFBL-DMX
  Support Reporting, Sept. 3, 2009 (PX-171) ...................................... A-1133

Reply Affidavit of L. Barry Knittel on Behalf of ASCAP (PX-173) ............. A-1137

DMX Title-Usage Summary: On- Versus Off-Premises: 2008 Third
  Quarter (PX-200) ............................................................................. A-1146

Charts re 2nd Quarter 2009 Summary—Off Premises Only and 2nd
  Quarter 2009 Summary—On Premises Only (PX-201)...................... A-1147

Email chain between McKinley, Hill, et al. re 2007 Price Increase,
  July 14, 2008 (PX-205) .................................................................... A-1148

# RESPONDENT TRIAL EXHIBITS

Email from D. O'Neill to Stafford-Scherer re Trusonic, Mar. 13, 2007
     (RX-19) ...................................................................................... A-1151

Letter from Unger to Stafford-Scherer re executed contract, July 19,
     2005 (RX-20) ............................................................................. A-1152

Email exchange between O'Neill and Sweeney re DMX Proposal,
     Aug. 15, 2006 (RX-22) .............................................................. A-1153

Email from O'Neill to Bryant et al. attaching DMX Payments to
     Major Pubs, Oct. 26, 2007 (RX-24) ....................................... A-1154

Email from O'Neill to Cody re DMX payments, Oct. 29, 2007 (RX-27) ....... A-1157

Request to PRRC for Approval of Guarantee, Dec. 3, 2007 (RX-31) ........... A-1161

Letter Agreement between BMI and Songs of Universal Inc., Dec. 7,
     2007 (RX-32) ............................................................................... A-1163

Emails between Sweeney, Smith, O'Neill, and Roberts, Apr. 16, 2008
     (RX-43) ....................................................................................... A-1165

Email from Stafford-Scherer to Annastas and Stevens re Muzak, LLC
     location review, June 22, 2004 (RX-50) ............................... A-1167

Email from Stafford-Scherer to Annastas, July 9, 2004 (RX-51) ................. A-1168

Redacted email from Annastas to Stafford-Scherer and Stevens,
     forwarding email from Calhoun to Berenson re Music
     Choice/BMI Commercial Proposal, Oct. 24, 2005 (RX-53) ............... A-1170

Redacted email from Annastas to Stafford-Scherer and Stevens,
     forwarding email from Calhoun to Berenson re Music
     Choice/BMI Commercial Proposal, Nov. 1, 2005 (RX-54) ................ A-1172

Chart re Per BMI License Fee Definition & Calculation Summaries,
     Proposal A (Original) (undated) (RX-57) ........................... A-1175

Email from D. O'Neill to Stafford-Scherer, Nov. 16, 2006 (RX-59) ............. A-1179

Redacted email from D. O'Neill to Stafford-Scherer re Trusonic, Mar. 12, 2007 (RX-62)................................................................... A-1180

Emails between Pattillo and Stafford-Scherer re contract agreement, Sept. 27, 2006 (RX-67)...................................................... A-1181

Email from Arrow to Smith re DMX, Aug. 9, 2006 (RX-74)........................ A-1187

Email from Smith to Blue re DMX-Helene Blue Musique license proposal, Mar. 26, 2009 (RX-82) [Excerpt] ......................................... A-1189

Emails between Knittel and Levin re AMRA Clients, August 2-6, 2007 (RX-86)....................................................................... A-1190

Emails between Smith, Levin, and Knittel re AMRA Clients, Aug. 24, 2007 (RX-088)..................................................................... A-1191

Letter from Stafford-Scherer to Johnson re BMI New Form Agreements, July 26, 2006 (RX-157)................................................... A-1193

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:08–cv–00216–LLS

Broadcast Music, Inc. v. DMX Inc.
Assigned to: Judge Louis L. Stanton
Related Case: 1:64–cv–03787–LLS
Cause: 28:1331 Fed. Question

Date Filed: 01/10/2008
Jury Demand: None
Nature of Suit: 410 Anti–Trust
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 01/10/2008 | 1 | PETITION FOR DETERMINATION OF REASONABLE LICENSE FEES. (Filing Fee $ 350.00, Receipt Number 637948).Document filed by Broadcast Music, Inc.(jpo) (jpo). (Entered: 01/14/2008) |
| 01/10/2008 | | SUMMONS ISSUED as to DMX Inc. (jpo) (Entered: 01/14/2008) |
| 01/10/2008 | | CASE REFERRED TO Judge louis L. Stanton as possibly related to 64cv3787. (jpo) (Entered: 01/14/2008) |
| 01/10/2008 | | Case Designated ECF. (jpo) (Entered: 01/14/2008) |
| 01/10/2008 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Gannett Co., Inc. as Corporate Parent. Document filed by Broadcast Music, Inc.(jpo) (jpo). (Entered: 01/14/2008) |
| 01/15/2008 | 3 | SUMMONS RETURNED EXECUTED. DMX Inc. served on 1/11/2008, answer due 1/31/2008. Service was accepted by Mark Ribaudo, Assistant Managing Clerk at Weil Gotshal &Manges. Document filed by Broadcast Music, Inc.. (Attachments: # 1 Affidavit of Service)(Fitzpatrick, James) (Entered: 01/15/2008) |
| 01/17/2008 | 4 | ORDER FOR CONFERENCE PURSUANT TO RULE 16 (b): A Conference is scheduled for 4/11/2008 at 12:30 PM in Courtroom 21C, 500 Pearl Street, New York, NY 10007 before Judge Louis L. Stanton. (Signed by Judge Louis L. Stanton on 1/16/2008) (jar) (Entered: 01/17/2008) |
| 01/17/2008 | | CASE ACCEPTED AS RELATED. Create association to 1:64–cv–03787–LLS. Notice of Assignment to follow. (laq) (Entered: 01/30/2008) |
| 01/17/2008 | 7 | NOTICE OF CASE ASSIGNMENT to Judge Louis L. Stanton. Judge Unassigned is no longer assigned to the case. (laq) (Entered: 01/30/2008) |
| 01/17/2008 | | Magistrate Judge Henry B. Pitman is so designated. (laq) (Entered: 01/30/2008) |
| 01/22/2008 | 5 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying DMX Holdings, Inc. as Corporate Parent. Document filed by DMX Inc..(Rich, Robert) (Entered: 01/22/2008) |
| 01/22/2008 | 6 | NOTICE OF APPEARANCE by Robert Bruce Rich on behalf of DMX Inc. (Rich, Robert) (Entered: 01/22/2008) |
| 01/30/2008 | | Mailed notice to the attorney(s) of record. (laq) (Entered: 01/30/2008) |
| 04/25/2008 | 8 | SCHEDULING ORDER: Deposition due by 2/16/2009. Fact Discovery due by 2/16/2009, see document for other diocovery dates. Dispositive Motions due by 6/16/2009. Pretrial Order due by 7/24/2009. Final Pretrial Conference set for 7/31/2009 at 12:00 PM before Judge Louis L. Stanton. (Signed by Judge Louis L. Stanton on 4/25/08) (cd) (Entered: 04/25/2008) |
| 04/25/2008 | 9 | STIPULATION AND PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material.... (Signed by Judge Louis L. Stanton on 4/25/08) (js) (Entered: 04/25/2008) |
| 04/25/2008 | | Minute Entry for proceedings held before Judge Louis L. Stanton: Pretrial Conference held on 4/25/2008( Pretrial Conference set for 7/31/2009 at 12:00 PM before Judge Louis L. Stanton.) (jw) (Entered: 04/28/2008) |

| | | |
|---|---|---|
| 10/06/2008 | 10 | AMENDED SCHEDULING ORDER: Dispositive Motions due by 6/16/2009. Discovery due by 5/19/2009 (fact discovery by 2/16/09 or 90 days after the Court's interim–fee decision) See document for other discovery deadlines. Final Pretrial Conference set for 7/31/2009 at 12:00 PM before Judge Louis L. Stanton. Pretrial Order due by 7/24/2009. (Signed by Judge Louis L. Stanton on 9/30/08) (cd) (Entered: 10/06/2008) |
| 12/05/2008 | | Minute Entry for proceedings held before Judge Louis L. Stanton: Interim Pretrial Conference held on 12/5/2008. (mro) (Entered: 12/09/2008) |
| 12/29/2008 | 13 | MEMORANDUM and ORDER. The annual per–location rate for the adjustable fee blanket license shall, as an interim measure, be $25 per location. DMX's proposal for the implementation of the direct licensing process shall be placed into operation, again as an interim measure subject to retroactive readjustment. (Signed by Judge Louis L. Stanton on 12/19/08) (djc) (Entered: 12/29/2008) |
| 01/27/2009 | 15 | ORDER that the redacted public versions of the Memorandum of Broadcast Music, Inc. in support of its Interim Fee Proposal for DMX's Commercial Music Service dated 10/23/08 and Respondent DMX's Memorandum in Support of Its Interim Fee Proposal dated 10/24/08 shall be accepted for public filing and docketed by the Clerk. (Signed by Judge Louis L. Stanton on 1/26/09) (dle) (Entered: 01/27/2009) |
| 03/27/2009 | | Minute Entry for proceedings held before Judge Louis L. Stanton: Discovery Hearing held on 3/27/2009. (mro) (Entered: 03/30/2009) |
| 04/17/2009 | 16 | SECOND AMENDED SCHEDULING ORDER: All fact depositions will be completed by 6/20/2009. Fact discovery will be completed by 6/10/2009. Expert discovery, including all expert depositions, will be completed by 9/11/2009. The deadline for the filing of dispositive motions is 9/18/2009. The parties will submit a pre–trial order in a form confirming with the Court's instructions together with trial briefs and proposed findings of fact and law on 10/22/2009. A Final Pretrial Conference pursuant to F.R.C.P. 16(d) will take place on 10/30/2009 at 12:00 PM before Judge Louis L. Stanton. The Parties anticipate the trial of this matter will take 5–7 days. This case will be tried to the Court. (Signed by Judge Louis L. Stanton on 4/16/09) (tro) (Entered: 04/17/2009) |
| 07/09/2009 | 17 | THIRD AMENDED SCHEDULING ORDER: Dispositive Motions due by 9/25/2009. Expert Discovery due by 9/18/2009(fact discovery by 7/24/09), see document for other deadlines. Final Pretrial Conference set for 11/13/2009 at 12:00 PM before Judge Louis L. Stanton. Pretrial Order due by 11/6/2009. (Signed by Judge Louis L. Stanton on 7/9/09) (cd) (Entered: 07/09/2009) |
| 11/13/2009 | | Minute Entry for proceedings held before Judge Louis L. Stanton: Scheduling Conference held on 11/13/2009. (mro) (Entered: 11/16/2009) |
| 11/24/2009 | 18 | PRETRIAL SCHEDULING ORDER: Pretrial Order due by 1/13/2010. Final Pretrial Conference set for 1/15/2010 at 12:00 PM before Judge Louis L. Stanton. The trial will begin on January 19, 2010 and continued daily until completed. The parties anticipate that the trial of this matter will take 6–9 trial days. This case will be tried to the Court. (Signed by Judge Louis L. Stanton on 11/24/2009) (jpo) (Entered: 11/24/2009) |
| 01/13/2010 | 19 | SEALED DOCUMENT placed in vault.(nm) (Entered: 01/13/2010) |
| 01/13/2010 | 20 | SEALED DOCUMENT placed in vault.(nm) (Entered: 01/13/2010) |
| 01/14/2010 | 21 | SEALED DOCUMENT placed in vault.(nm) (Entered: 01/14/2010) |
| 01/15/2010 | | Minute Entry for proceedings held before Judge Louis L. Stanton: Final Pretrial Conference held on 1/15/2010. Bench Trial to begin on Tuesday, January 19, 2010 at noon. (mro) (Entered: 01/25/2010) |
| 02/09/2010 | 22 | TRANSCRIPT of proceedings held on January 19, 20, 21, 22, 25, 2010 before Judge Louis L. Stanton. (eef) (Entered: 02/11/2010) |
| 02/09/2010 | 23 | TRANSCRIPT of proceedings held on January 26, 27, 28, 29 and February 1, 2010 before Judge Louis L. Stanton. (eef) (Entered: 02/11/2010) |

**A-2**

| 04/13/2010 | 24 | FILING ERROR – WRONG DOCUMENT TYPE SELECTED FROM MENU – BRIEF (Memorandum of the United States on Decree Construction Issues). Document filed by Justice Department, United States Of America.(Reed, Christopher) Modified on 4/14/2010 (KA). (Entered: 04/13/2010) |
| 04/14/2010 | | ***NOTE TO ATTORNEY TO RE–FILE DOCUMENT – EVENT TYPE ERROR. Note to Attorney Christopher S Reed to RE–FILE Document 24 Brief. Use the event type Memorandum of Law(non–motion) found under the event list Other Answers. (KA) (Entered: 04/14/2010) |
| 04/14/2010 | 25 | MEMORANDUM OF LAW *Memorandum of the United States on Decree Construction Issues*. Document filed by United States Of America. (Reed, Christopher) (Entered: 04/14/2010) |
| 04/21/2010 | 26 | MEMORANDUM OF LAW re: 25 Memorandum of Law *Memorandum of Broadcast Music, Inc. in Response to Memorandum of the United States on Decree Construction Issues*. Document filed by Broadcast Music, Inc.. (Salzman, Michael) (Entered: 04/21/2010) |
| 07/26/2010 | 27 | OPINION AND ORDER: #99221 The AFBL between BMI and DMX shall have an annual Blanket Fee of $18.91 per location and an annual Floor Fee of $8.66 per location. The Direct License Ratio shall be calculated using DMX's off–premises performances as a proxy for all of its performances. So much of the petition as seeks inclusion of bowling centers in the AFBL is denied. (Signed by Judge Louis L. Stanton on 7/14/2010) (jfe) Modified on 7/27/2010 (ajc). (Entered: 07/26/2010) |
| 07/26/2010 | 28 | ENDORSED LETTER addressed to Judge Louis L. Stanton from Michael E. Salzman dated 7/26/2010 re: Counsel writes in respond to Mr. Rich's letter on behalf of DMX Inc., dated 7/22/2010 to explain BMI's reasoning for requesting the confidentiality of the exact dollar amount of the guarantee in BMI's agreement with Sings of Universal, Inc. ENDORSEMENT: Denied. See colloquy at transcript pp. 236.7. So Ordered. (Signed by Judge Louis L. Stanton on 7/26/2010) (jfe) (Entered: 07/26/2010) |
| 08/19/2010 | 29 | ORDER: Accordingly, the parties shall file publicly all material previously filed under seal in connection with the interim fee phase of this proceeding with the redactions approved above, and the Clerk of the Court is directed to unseal my Memorandum and Order dated 12/19/2008, which was filed under seal on 12/29/2008 and recorded in docket entry 14. (Signed by Judge Louis L. Stanton on 8/19/2010) (tro) (Entered: 08/19/2010) |
| 08/19/2010 | | Transmission to Sealed Records Clerk. Transmitted re: 29 Order, to the Sealed Records Clerk for the sealing or unsealing of document or case. (tro) (Entered: 08/19/2010) |
| 08/19/2010 | 30 | MEMORANDUM and ORDER: The annual per–location rate for the adjustable fee blanket license shall, as an interim measure, be $25 per location. DMX's proposal for the implementation of the direct licensing process shall be placed into operation, again as an interim measure subject to retroactive readjustment. (This document was previously filed under seal in envelope #14 and unsealed by Order dated 8/19/10.) (Signed by Judge Louis L. Stanton on 12/19/08) (mro) Modified on 8/23/2010 (mro). (Entered: 08/23/2010) |
| 08/19/2010 | 31 | CONSENT PRETRIAL ORDER. (Document previously filed under seal in envelope #19 and unsealed by Order dated 8/19/10.) ***The PDF included on a CD did not comply with Rule 14.3 of the Electronic Case Filing Rules &Instructions of this courthouse and was larger than 2.5 megabytes; Please see court file.(mro) (Entered: 08/23/2010) |
| 08/19/2010 | 32 | PRE–TRIAL MEMORANDUM OF BROADCAST MUSIC, INC. Document filed by Broadcast Music, Inc. (This document was previously filed under seal in envelope # 19 and was unsealed by Order dated 8/19/10.) (mro) (Entered: 08/23/2010) |
| 08/19/2010 | 33 | SUMMARY OF EXPECTED TESTIMONY of Bruce M. Owen. Document filed by Broadcast Music, Inc. (Document was previously filed under seal in envelope #19 and unsealed by Order dated 8/19/10.) (mro) (Entered: 08/23/2010) |

**A-3**

| 08/19/2010 | 34 | TRIAL BRIEF of Respondent DMX, Inc. Document filed by DMX Inc. (Document previously filed under seal in envelope #20 and unsealed by Order dated 8/19/10.) ***The PDF included on a CD did not comply with Rule 14.3 of the Electronic Case Filing Rules &Instructions of this courthouse and was larger than 2.5 megabytes; Please see court file.(mro) (Entered: 08/23/2010) |
| 08/19/2010 | 35 | SUMMARY OF ANTICIPATED DIRECT TESTIMONY of Adam B. Jaffe. Document filed by DMX Inc. (Document previously filed under seal in envelope #20 and unsealed by Order dated 8/19/10.) (mro) (Entered: 08/23/2010) |
| 08/19/2010 | 36 | SUMMARY OF ANTICIPATED DIRECT TESTIMONY of Amy Bertin Candell. Document filed by DMX Inc. (Document previously filed under seal in envelope #20 and unsealed by Order dated 8/19/10.) (mro) (Entered: 08/23/2010) |
| 08/19/2010 | 37 | (CORRECTED) TRIAL BRIEF of Respondent DMX, Inc. Document filed by DMX Inc. (Document previously filed under seal in envelope #21 and unsealed by Order dated 8/19/10.) (mro) (Entered: 08/23/2010) |
| 08/24/2010 | 38 | NOTICE OF APPEAL from 27 Memorandum &Opinion,. Document filed by Broadcast Music, Inc.. Filing fee $ 455.00, receipt number E 912953. (nd) (Entered: 08/25/2010) |
| 08/25/2010 | | Transmission of Notice of Appeal to the District Judge re: 38 Notice of Appeal. (nd) (Entered: 08/25/2010) |
| 08/25/2010 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 38 Notice of Appeal. (nd) (Entered: 08/25/2010) |
| 08/25/2010 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 2 Rule 7.1 Corporate Disclosure Statement filed by Broadcast Music, Inc., 9 Protective Order, 32 Memorandum of Law filed by Broadcast Music, Inc., 3 Summons Returned Executed, filed by Broadcast Music, Inc., 36 Affidavit filed by DMX Inc., 27 Memorandum &Opinion, 38 Notice of Appeal filed by Broadcast Music, Inc., 25 Memorandum of Law filed by United States Of America, 6 Notice of Appearance filed by DMX Inc., 8 Scheduling Order, 29 Order, 37 Trial Brief filed by DMX Inc., 1 Petition (Other) filed by Broadcast Music, Inc., 33 Affidavit filed by Broadcast Music, Inc., 17 Scheduling Order, 26 Memorandum of Law filed by Broadcast Music, Inc., 16 Scheduling Order,, 10 Scheduling Order, 5 Rule 7.1 Corporate Disclosure Statement filed by DMX Inc., 13 Order, 28 Endorsed Letter, 18 Order, Set Deadlines/Hearings,, 7 Notice of Case Assignment/Reassignment, 35 Affidavit filed by DMX Inc., 4 Order, Set Deadlines/Hearings, 15 Order, 30 Order,, were transmitted to the U.S. Court of Appeals. (nd) (Entered: 08/25/2010) |
| 08/26/2010 | 39 | MEMORANDUM OF LAW in Support *of Interim Fee Proposal for DMX's Commercial Music Service (Document previously filed under seal and unsealed by Order dated 8/19/10)*. Document filed by Broadcast Music, Inc.. (Fitzpatrick, James) (Entered: 08/26/2010) |
| 08/26/2010 | 40 | DECLARATION of Margaret J. Hoag *(Document previously filed under seal and unsealed by Order dated 8/19/10)*. Document filed by Broadcast Music, Inc.. (Fitzpatrick, James) (Entered: 08/26/2010) |
| 08/26/2010 | 41 | DECLARATION of Michael O'Neill *Rebuttal Declaration of Michael O'Neill ((Document previously filed under seal and unsealed by Order dated 8/19/10)*. Document filed by Broadcast Music, Inc.. (Fitzpatrick, James) (Entered: 08/26/2010) |
| 08/26/2010 | 42 | DECLARATION of Bruce M. Owen *Rebuttal Declaration of Bruce M. Owen (Document previously filed under seal and unsealed by Order dated 8/19/10)*. Document filed by Broadcast Music, Inc.. (Fitzpatrick, James) (Entered: 08/26/2010) |
| 09/03/2010 | 43 | MEMORANDUM OF LAW in Support *of Repondent's Interim Fee Proposal (Part 1 of 3)*. Document filed by DMX Inc.. (Attachments: # 1 Exhibit Memorandum (Part 2 of 3), # 2 Exhibit Memorandum (Part 3 of 3))(Rich, Robert) (Entered: 09/03/2010) |

**A-4**

| 09/03/2010 | <u>44</u> | REPLY *DECLARATION of Amy Bertin Candell (Part 1 of 6)*. Document filed by DMX Inc.. (Attachments: #<u>1</u> Exhibit Reply Declaration (Part 2 of 6), #<u>2</u> Exhibit Reply Declaration (Part 3 of 6), #<u>3</u> Exhibit Reply Declaration (Part 4 of 6), #<u>4</u> Exhibit Reply Declaration (Part 5 of 6), #<u>5</u> Exhibit Reply Declaration (Part 6 of 6))(Rich, Robert) (Entered: 09/03/2010) |
|---|---|---|
| 09/03/2010 | <u>45</u> | REPLY *DECLARATION of Ronald H. Gertz re: Interim Fee Proposal*. Document filed by DMX Inc.. (Rich, Robert) (Entered: 09/03/2010) |
| 09/03/2010 | <u>46</u> | REPLY *DECLARATION of Adam B. Jaffe re: Interim Fee Proposal*. Document filed by DMX Inc.. (Rich, Robert) (Entered: 09/03/2010) |
| 09/09/2010 | <u>47</u> | ENDORSED LETTER addressed to Judge Louis L. Stanton from Todd D. Larson dated 9/8/10 re: Request for permission to file public versions of the various interim–phase materials previously filed under seal in hard copy. ENDORSEMENT: So Ordered. (Signed by Judge Louis L. Stanton on 9/9/10) (db) (Entered: 09/09/2010) |

**A-5**

HUGHES HUBBARD & REED LLP
Michael E. Salzman
James C. Fitzpatrick
One Battery Park Plaza
New York, New York 10004
(212) 837-6000
salzman@hugheshubbard.com
fitzpat@hugheshubbard.com



Attorneys for Petitioner Broadcast Music, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x

BROADCAST MUSIC, INC.,                          :
                                                :   08 Civ. 216 (LLS)
                               Petitioner,       :
                                                :   Related to *United States v.*
                    -against-                     :   *Broadcast Music, Inc.,*
                                                :   64 Civ. 3787 (LLS)
DMX INC.,                                        :
                                                :   **NOTICE OF APPEAL**
                               Respondent.        :
                                                :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - x

   Notice is hereby given that Broadcast Music, Inc., Petitioner in the above-named

case, hereby appeals to the United States Court of Appeals for the Second Circuit from the Opinion

and Order dated July 14, 2010 and entered on July 26, 2010 in this action and from all of the prior

orders, opinions and rulings leading thereto and embodied therein.

Dated: New York, New York
       August 24, 2010

                              Respectfully submitted,

                              HUGHES HUBBARD & REED LLP

                              By: _____
                                        James C. Fitzpatrick
                              Michael E. Salzman
                              One Battery Park Plaza
                              New York, NY 10004
                              (212) 837-6000
                              salzman@hugheshubbard.com
                              fitzpat@hugheshubbard.com


                                      -and-

                              Marvin L. Berenson
                              Joseph J. DiMona
                              Stuart Rosen
                              7 World Trade Center
                              250 Greenwich Street
                              New York, NY 10007

                              *Attorneys for Petitioner Broadcast Music, Inc.*

To:    The Clerk
       United States District Court for the
       Southern District of New York
       500 Pearl Street
       New York, New York 10007

       R. Bruce Rich, Esq.
       Benjamin E. Marks, Esq.
       Todd D. Larson, Esq.
       Weil, Gotshal & Manges LLP
       767 Fifth Avenue
       New York, New York 10153

       *Attorneys for Respondent DMX Inc.*

Christopher S. Reed, Esq.
United States Department of Justice
Anitrust Division, Litigation III Section
450 5th Street, N.W., Suite 4000
Washington, D.C.  20530

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - x

BROADCAST MUSIC, INC.,     :

    :    08 Civ. 216 (LLS)

    Petitioner,  :

    :    Related to *United States v.*

    -against-    :    *Broadcast Music, Inc.,*

    :    64 Civ. 3787 (LLS)

DMX INC.,     :

    :

    Respondent. :

    :

    :

- - - - - - - - - - - - - - - - - - - - - - - x

## CERTIFICATE OF SERVICE

     I, Jaime Winkelman, an attorney at Hughes Hubbard & Reed LLP, hereby certify

that I am over eighteen years old, that I am not a party to this action, and that on the 24th day of

August, 2010, I caused to be served by e-mail a copy of the attached Notice of Appeal by

Broadcast Music, Inc. upon:

       R. Bruce Rich, Esq.
       Benjamin E. Marks, Esq.
       Todd D. Larson, Esq.
       Weil, Gotshal & Manges LLP
       767 Fifth Avenue
       New York, New York 10153
       bruce.rich@weil.com
       benjamin.marks@weil.com
       todd.larson@weil.com

       Christopher S. Reed, Esq.
       United States Department of Justice
       Anitrust Division, Litigation III Section
       450 5th Street, N.W., Suite 4000
       Washington, D.C. 20530
       christopher.reed@usdoj.gov

I certify under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York, on August 24, 2010.

**A-10**



LEXSEE 1966 TRADE CAS (CCH) 71941

**United States v. Broadcast Music, Inc. and RKO General, Inc.**

**Civil No. 64 Civ. 3787.**

**United States District Court for the Southern District of New York.**

*1966 U.S. Dist. LEXIS 10449*; *1966 Trade Cas. (CCH) P71,941*

**December 29, 1966.**

**OPINION BY:** [*1] MCLEAN

**OPINION**

Final Judgment

MCLEAN, D.J.: Plaintiff, United States of America, having filed its complaint herein on December 10, 1964, and defendant having filed its answer denying the substantive allegations of such complaint, and the parties by their respective attorneys having consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein and without this Final Judgment constituting evidence or an admission by either party with respect to any such issue:

Now, therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law herein, and upon the consent of the parties hereto, it is hereby

Ordered, adjudged and decree as follows:

I.

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states claims for relief against the defendant under Section 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II.

As used in this Final Judgment:

(A) "Defendant" means the defenant Broadcast Music, Inc., [*2] a New York Corporation;

(B) "Programming period" means a fifteen minute period of broadcasting commencing on the hour and at fifteen, thirty and forty-five minutes past the hour without regard to whether such period contains one or more programs or announcements.

III.

The provisions of this Final Judgment shall apply to defendant and to each of its subsidiaries, successors, assigns, officers, directors, servants, employees and agents, and to all persons in active concert or participation with defendant who recive actual notice of this Final Judgment by personal service or otherwise. None of the provisions of this Final Judgment shall apply outside the United States of America, its territories, and possessions.

IV.

Defendant is enjoined and restrained from:

(A) Failing to grant permission, on the written request of all writers and publishers of a musical composition including the copyright proprietor thereof, allowing such persons to issue to a music user making direct performances to the public a non-exclusive license permitting the making of specified performances of such musical composition by such music user directly to the public, provided that the defendant shall [*3] not be required to make payment with respect to performances so licensed.

(B) Engaging in the commercial publication or recording of music or in the commercial distribution of sheet music or recordings.

V.

1966 U.S. Dist. LEXIS 10449, *; 1966 Trade Cas. (CCH) P71,941

(A) Defendant shall not refuse to enter into a contract providing for the licensing by defendant of performance rights with any writer who shall have had at least one copyrighted musical composition of his writing commercially published or recorded, or with any publisher of music actively engaged in the music publishing business whose musical publications have been commercially published or recorded and publicly promoted and distributed for at least one year, and who assumes the financial risk involved in the normal publication of musical works; provided, however, that defendant shall have the right to refuse to enter into any such contract with any writer or publisher who does not satisfy reasonable standards of literacy and intergrity if the defendant is willing to submit to arbitration in the County, City and State of New York the reasonableness and applicability of such standards, under the rules then prevailing of the American Arbitration Association, with any writer [*4] or publisher with whoi defendant has refused so to contract.

(B) Defendant shall not enter into any contract with a writer or publisher requiring such writer or publisher to grant to defendant performing rights for a period in excess of five years, provided, however, that defendant may continue to license, as if under the contract, all musical compositions in which the defendant has performing rights at the dates of termination of any such contract until all advances made by defendant to such writers and publishers shall have been earned or repaid.

(C) Upon the termination, at any time hereafter, of any contract with a writer or publisher relating to the licensing of the right publicly to perform any musical composition, defendant shall continue to pay for performances of the musical compositions of such writer or publisher licensed by defendant upon the basis of the current performance rates generally paid by defendant to writers and publishers for similar performance of similar compositions for so long as such performing rights are not otherwise licensed.

VI.

(A) Defendant shall not acquire rights of public performance in any musical compositions from any publisher under [*5] a contract which requires the officers, directors, owners or employees of such publisher to refrain from publishing or promoting musical works licensed through another performing rights organization, provided that nothing contained in this paragraph shall prevent defendant from entering into a contract with a publishing entity which requires such entity not to license any performance rights through any other performing rights organization during the terms of the contract, and requiring that any works licensed by such officers, directors, owners or employees through another perform-

ing rights organization be licensed by a separate publishing entity which does not have a name identical with or similar to the name of any publishing entity with which defendant has contracted.

(B) Defendant shall not enter into any agreement for the acquisition or the licensing of performing rights which requires the recording or public performance of any stated amount or percentage of music, the performing rights in which are licensed or are to be licensed by defendant.

VII.

(A) Defendant shall make available at reasonable intervals, to all writers and publishers who have granted performance rights [*6] to it, a complete statement of the performance rates (to writers, those applicable to writers, and to publishers, those applicable to publishers), currently utilized by it for all classifications of performance and musical compositions.

(B) Defendant will not offer or agree to make payments in advance for a stated period for future performing rights which are not either repayable or to be earned by means of future performance to any writer or publisher who, at the time of such offer or agreement, is a member of or under direct contract for the licensing of such performing rights with any other United States performing rights licensing organization, provided that this restriction shall not apply (1) in the case of any such writer or publisher who at any time prior to said offer or agreement had licensed performing rights through defendant or (2) in the case of any such writer or publisher who is a member of or directly affiliated with any other United States performing rights licensing organization which makes offers or makes payments similar to those forbidden in this subparagraph to writers or publishers then under contract to defendant.

(C) Defendant shall include in all contracts [*7] which it tenders to writers, publishers and music users relating to the licensing of performance rights a clause requiring the parties to submit to arbitration in the City, County and State of New York under the then prevailing rules of the American Arbitration Association, all disputes of any kind, nature or description in connection with the terms and conditions of such contracts or arising out of the performance thereof or based upon an alleged breach thereof.

VIII.

(A) Defendant shall not enter into, recognize as valid or perform any performing rights license agreement which shall result in discriminating in rates or terms between licensees similarly situated; provided, however, that differentials based upon applicable business factors

Case: 10-3429    Document: 62-1    Page: 25    01/05/2011    180347    117

Page 3

1966 U.S. Dist. LEXIS 10449, *; 1966 Trade Cas. (CCH) P71,941

which justify different rates or terms shall not be considered discrimination within the meaning of this section; and provided further that nothing contained in this section shall prevent changes in rates or terms from time to time by reason of changing conditions affecting the market for or marketability of performing rights.

(B) Defendant shall, upon the request of any unlicensed broadcaster, license the rights publicly to perform its [*8] repertory by broadcasting on either a per program or per programming period basis, at defendant's option. The fee for this license shall relate only to programs (including announcements), or to programming periods, during which a licensed composition is performed. The fee shall be expressed, at defendant's option, either (1) in dollars, (2) as a percentage of the revenue which the broadcaster received for the use of its broadcasting facilities or (3), in the case of sustaining programs or programming periods, as a percentage of the applicable card rate had the program or programming period been commercially sponsored. In the event defendant offers to license broadcasters on bases in addition to a per program or per programming period basis, defendant shall act in good faith so that there shall be a relationship between such per program or such per programming period basis and such other bases, justifiable by applicable business factors including availability, so that there will be no frustration of the purpose of this section to afford broadcasters alternative bases of license compensation.

IX.

(A) Defendant shall not license the public performance of any musical composition [*9] or compositions except on a basis whereby, insofar as network broadcasting by a regularly constituted network is concerned, the issuance of a single license, authorizing and fixing a single license fee for such performance by network broadcasting, shall permit the simultaneous broadcasting of such performance by all stations on the network which shall broadcast such performance, without requiring separate licenses for such several stations for such performance.

(B) With respect to any musical composition in defendant's catalogue of musical compositions licensed for broadcasting and which is or shall be lawfully recorded for performance on specified commercially sponsored programs on an electrical transcription or on other specially prepared recordation intended for broadcasting purposes, defendant shall not refuse to offer to license the public performance by designated broadcasting stations of such compositions by a single license to any manufacturer, producer or listributor of such transcription or recordation or to any advertiser or advertising agency on whose behalf such transcription or recordation

shall have been made who may request such license, which single license shall [*10] authorize the broadcasting of the recorded composition by means of such transcription or recordation by all stations enumerated by the licensee, on terms and conditions fixed by defendant, without requiring separate licenses for such enumerated stations.

(C) Defendant shall not, in connection with any offer to license by it the public performance of musical compositions by music users other than broadcasters, refuse to offer a license at a price or prices to be fixed by defendant with the consent of the copyright proprietor for the performance of such specific (i.e., per piece) musical compositions, the use of which shall be requested by the prospective licensee.

X.

(A) Defendant shall not assert or exercise any right or power to restrict from public performance by any licensee of defendant any copyrighted musical composition in order to exact additional consideration for the performance thereof, or for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition; provided, however, that nothing in this paragraph shall prevent defendant from restricting performances of a musical composition in order reasonably to protect [*11] the work against indiscriminate performance or the value of the public performance rights therein or to protect the dramatic performing rights therein, or, as may by reasonably necessary in connection with any claim or litigation involving the performance rights in any such composition.

(B) Defendant, during the term of any license agreements with any class of licensees, shall not make any voluntary reductions in the fees payable under any such agreements, provided, however, that nothing herein shall prevent defendant from lowering any fees or rates to any or all classes of licensees in response to changing conditions affecting the value or marketability of its catalogue to such class or classes, or where necessary to meet competition.

XI.

For the purpose of securing or determining compliance with this Final Judgment, and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access, during office [*12] hours of such defendant, to all books, ledgers, accounts, correspondent,

A-13

1966 U.S. Dist. LEXIS 10449, *; 1966 Trade Cas. (CCH) P71,941

memoranda, and other records and documents in the possession or under the control of defendant relating to any matters contained in this Final Judgment;

(B) Subject to the reasonable convenience of defendant and without restraint or interference from it, to interview officers or employees of defendant, who may have counsel present regarding any such matters.

Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, defendant shall submit such reports in writing with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

No information obtained by the means permitted in this Section XI shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the Plaintiff, except in the course of legal proceedings in which the United States is a party for the purpose of se-

curing compliance with this Final Judgment, or as otherwise required by law.

XII.

All of the provisions of this [*13] Final Judgment shall become effective on the entry thereof, except as to paragraph C of Article VII, which shall not become effective until 90 days after the date of entry of this Final Judgment.

XIII.

Jurisdiction is retained by this Court for the purpose of enabling either of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.



LEXSEE 1994 U.S. DIST. LEXIS 21476

**UNITED STATES OF AMERICA, Plaintiff, -against- BROADCAST MUSIC, INC., et al., Defendants.**

**64 Civ. 3787**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1994 U.S. Dist. LEXIS 21476; 1996-1 Trade Cas. (CCH) P71,378*

**November 18, 1994, Decided**

**SUBSEQUENT HISTORY:** Motion denied by, in part, Motion granted by, in part *United States v. Broadcast Music, Inc., 2000 U.S. Dist. LEXIS 2872 (S.D.N.Y., Mar. 9, 2000)*
Related proceeding at *1330 Old River, LLC v. Broad. Music Inc., 2009 U.S. Dist. LEXIS 129336 (S.D. Ohio, Apr. 13, 2009)*

**COUNSEL:**  [*1]  For UNITED STATES OF AMERICA, plaintiff: James J. Tierney, United States Department of Justice, Washington, D.C.

For BROADCAST MUSIC, INC., defendant: Michael E. Salzman, Hughes Hubbard & Reed, Washington, DC.

For BROADCAST MUSIC, INC., defendant: Marvin L. Berenson, Law Off: Marvin L. Berenson, New York, NY.

**JUDGES:** Robert P. Patterson, U.S.D.J.

**OPINION BY:** Robert P. Patterson

**OPINION**

*ORDER MODIFYING THE 1966 CONSENT DECREE HEREIN*

Defendant Broadcast Music, Inc. ("BMI") having moved this Court for an order modifying the Consent Decree entered herein against BMI on December 29, 1966, and notice of the motion having been published in two consecutive issues of the national edition of *The Wall Street Journal*, two consecutive issues of *Broadcasting & Cable*, and two consecutive issues of the weekly edition of *Variety*, and proof of such publication having been filed with the Court; and all interested persons having been given an opportunity to submit comments concerning the proposed modifications and plaintiff, the United States of America, having consented to all but the proposed modification of Article XIII thereof, as to which it is neutral, and the Court having considered [*2]  all the papers that have been filed in connection with the motion, and the Court finding that it is in the public interest to grant the motion, it is

ORDERED, ADJUDGED and DECREED that the 1966 Consent Decree be and hereby is modified as follows:

I. Add the following new Article XIV:

(A) Subject to all provisions of this Final Judgment, defendant shall, within ninety (90) days of its receipt of a written application from an applicant for a license for the right of public performance of any, some or all of the compositions in defendant's repertory, advise the applicant in writing of the fee which it deems reasonable for the license requested. If the parties are unable to agree upon a reasonable fee within sixty (60) days from the date when defendant

A-15

1994 U.S. Dist. LEXIS 21476, *; 1996-1 Trade Cas. (CCH) P71,378

advises the applicant of the fee which it deems reasonable, the applicant may forthwith apply to this Court for the determination of a reasonable fee and defendant shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Assistant Attorney General in charge of the Antitrust Division. If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when [*3] defendant advises the applicant of the fee which it deems reasonable and no such filing by applicant for the determination of a reasonable fee for the license requested is pending, then defendant may forthwith apply to this Court for the determination of a reasonable fee and defendant shall promptly give notice of its filing of such application to the Assistant Attorney General in charge of the Antitrust Division. In any such proceeding, defendant shall have the burden of proof to establish the reasonableness of the fee requested by it. Should defendant not establish that the fee requested by it is a reasonable one, then the Court shall determine a reasonable fee based upon all the evidence. Pending the completion of any such negotiations or proceedings, the applicant shall have the right to use any, some or all of the compositions in defendant's repertory to which its application pertains, without payment of any fee or other compensation, but subject to the provisions of Sub-

section (B) hereof, and to the final order or judgment entered by this Court in such proceeding;

(B) When an applicant has the right to perform any compositions in defendant's repertory pending the completion [*4] of any negotiations or proceedings provided for in Subsection (A) hereof, either the applicant or defendant may apply to this Court to fix an interim fee pending final determination of what constitutes a reasonable fee. It is the purpose of this provision that an interim fee be determined promptly, and without prejudice as to the final determination of what constitutes a reasonable fee. It is further intended that interim fee proceedings be completed within 120 days of the date when application is made to fix an interim fee, subject to extension at the request of defendant or the applicant only in the interest of justice for good cause shown. If the Court fixes such interim fee, defendant shall then issue and the applicant shall accept a license providing for the payment of a fee at such interim rate from the date the applicant requested a license. If the applicant fails to accept such license or fails to pay the interim fee in accordance therewith, such failure shall be ground for the dismissal of its application. Where an interim license has been issued pursuant to this Subsection (B), the reasonable fee finally determined by this Court shall be retroactive to the

A-16

Case: 10-3429    Document: 62-1    Page: 29    01/05/2011    180347    117

Page 3

1994 U.S. Dist. LEXIS 21476, *; 1996-1 Trade Cas. (CCH) P71,378

date the applicant [*5] requested a license;

(C) When a reasonable fee has been finally determined by this Court, defendant shall be required to offer a license at a comparable fee to all other applicants similarly situated who shall thereafter request a license of defendant, but any license agreement which has been executed without any Court determination between defendant and another applicant similarly situated prior to such determination by the Court shall not be deemed to be in any way affected or altered by such determination for the term of such license agreement;

(D) Nothing in this Article XIV shall prevent any applicant from attacking in the aforesaid proceedings or in any other controversy the validity of the copyright of any of the compositions in defendant's repertory nor shall this Judgment be construed as importing any validity or value to any of said copyrights.

II. Add to Article II the following subsection:

(C) "Defendant's repertory" means those compositions, the right of public performance of which defendant has or hereafter shall have the right to license or sublicense.

III. Amend Article VII(C) to read as follows (adding the underscored section to the already existing [*6] language):

Defendant shall include in all contracts which it tenders to writers, publishers and music users relating to the licensing of performance rights a clause requiring the parties to submit to arbitration in the City, County and State of New York under the then prevailing rules of the American Arbitration Association, all disputes of any kind, nature or description in connection with the terms and conditions of such contracts or arising out of the performance thereof or based upon an alleged breach thereof, *except that in all contracts tendered by defendant to music users, the clause requiring the parties to submit to arbitration will exclude disputes that are cognizable by the Court pursuant to Article XIV hereof.*

IV. Amend Article IX(A) to read as follows (adding the underscored section to the already existing language):

Defendant shall not license the public performance of any musical composition or compositions except on a basis whereby, insofar as network broadcasting by a regularly constituted network *so requesting* is concerned, the issuance of a single license, authorizing the fixing of a single license fee for such performance by network broadcasting, [*7] shall permit the simultaneous broadcasting of such performance by all stations on the network which shall broadcast such performance, without requiring separate licenses

1994 U.S. Dist. LEXIS 21476, *; 1996-1 Trade Cas. (CCH) P71,378

for such several stations for such performance.

V. Add to Article XIII the following language at the end thereof:

To best preserve the independent conduct of defendant's music licensing activities, the jurisdiction retained by this Court over this Final Judgment shall be exercised by a Judge of this Court other than one to whom has been assigned any action in which a judgment has been entered retaining jurisdiction over any music performing rights licensing organization (e.g. ASCAP) other than defendant. No reference or assignment of any issue or matter under this Final Judgment shall be made to a Magistrate Judge or Master to whom has been referred or assigned any pending issue or matter in which any music performing rights licensing organization other than defendant as to which this Court has entered judgment retaining jurisdiction, (e.g. ASCAP) is a party.

AND IT IS FURTHER ORDERED, ADJUDGED and DECREED that with respect to any music user heretofore licensed by defendant the license agreement [*8] of which expressly provides for determination by this Court of reasonable license fees or other terms for any period covered by such license, either defendant or such music user may apply to this Court for such determination provided that such license agreement provision has not otherwise expired.

Dated: New York, New York

November 18, 1994

Robert P. Patterson

U.S.D.J.

James C. Fitzpatrick
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Attorneys for Petitioner
Broadcast Music, Inc.

**08 CV 00216**

**RECEIVED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - X

BROADCAST MUSIC, INC.,

                    Petitioner,

       -against-

DMX INC.,

                   Respondent.

- - - - - - - - - - - - - - - - - - - - - - - X

Related to *United States v. Broadcast Music, Inc.*, 64 Civ. 3787 (LLS)

08 Civ. _____ (LLS)

**PETITION FOR DETERMINATION OF REASONABLE LICENSE FEES**

       Petitioner Broadcast Music, Inc. ("BMI"), by its attorneys, Hughes Hubbard & Reed LLP, for its petition states as follows:

       1.     BMI seeks an order from the Court, pursuant to Article XIV(B) of the BMI Consent Decree, setting reasonable fees and terms for licenses authorizing performances of music in the BMI repertoire by DMX Inc. ("DMX") in its music service to commercial establishments ("commercial service") in the United States, its commonwealths, territories and possessions, effective as of June 3, 2005 and continuing through June 30, 2009.

       2.     Pursuant to the Order of Judge Stanton dated April 25, 2001 in *United States v. Broadcast Music, Inc.*, 64 Civ. 3787 (a copy of which is attached hereto as Exhibit 1), BMI

**A-19**

brings this proceeding by separate petition and notes that this proceeding is related to 64 Civ.

3787.

**The Parties**

3.      BMI is a music performing right licensing organization, with its headquarters at

320 West 57th Street, New York, New York 10019.  BMI is a New York corporation that

operates on a non-profit-making basis, licensing the public performing right in approximately 6.5

million musical works on behalf of over 350,000 composers, songwriters and music publishers to

a wide variety of music users.

4.      Upon information and belief, DMX is a corporation, with its principal place of

business at 600 Congress Avenue, Suite 1400, Austin Texas 78701.  For many years, DMX and

its corporate predecessor have been engaged in the business of programming and licensing

original music programs for use by customers operating commercial establishments throughout

the United States.  Upon information and belief, THP Capstar Acquisition Corp, an affiliate of

Capstar Partners, LLC ("Capstar"), a private investment company, acquired the business of DMX

effective as of June 3, 2005 in a bankruptcy proceeding.

**DMX's Commercial Music Service**

5.      Today, DMX is in the business of distributing audio-only and audiovisual[1] music

programming to commercial establishments such as retail stores, restaurants, hotels, offices and

airlines.  DMX programs and transmits multiple commercial-free music channels that make use

---

[1]      DMX has not applied to BMI for a license for the public performance of musical works in its audiovisual programming, and so those performances are not licensed by BMI.  To the extent that DMX should apply separately for such a BMI license that would be a different category of BMI license with different rates and terms.

**A-20**

of many genres of music

      6.     DMX's music service programming is transmitted to its customers by satellite or made available on site through distribution to its customers of physical media such as compact disks (CDs) playable through proprietary equipment.

      7.     DMX's customers pay a monthly subscription fee to receive the service. Upon information and belief, DMX currently provides its service to tens of thousands of customer locations throughout the United States.

**Article XIV(A) Application of DMX**

      8.     By letter dated June 3, 2005, DMX applied for a through-to-the-listener license to perform publicly all of the compositions in BMI's repertoire by means of its commercial service.

      9.     By letter dated September 1, 2005, BMI formally responded to DMX's license fee request, offering proposed rates and terms for a license, among other things.

      10.    In response to a further demand by DMX for a license fee quote for a license that took into account that some BMI-repertoire music might be directly licensed by DMX (a "carve-out" blanket license), on October 4, 2007, BMI made a carve-out license fee quote to DMX.

      11.    Although the parties have been negotiating since June 2005 to try and reach agreement on final fees and terms, to date, BMI has been unable to reach agreement with DMX on a definitive license agreement.

      12.    DMX has been operating under an interim license agreement with BMI dated November 4, 2005. The final fees to be established by this Court will be retroactive to the date of application, June 3, 2005, with credit for any fees provided and paid under that interim agreement.

13.    DMX has made no filing before this Court seeking determination pursuant to the BMI Consent Decree of a reasonable license fee.

**Jurisdiction**

14.    Jurisdiction is proper in this Court pursuant to the Court's rate-setting authority under Article XIV of the BMI Consent Decree. *United States v. Broadcast Music, Inc.*, 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), *as amended by* 1996-1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. 1994) (the "BMI Consent Decree"). (A copy of the BMI Consent Decree is attached hereto as Exhibit 2.)

15.    Pursuant to Article XIV of the BMI Consent Decree, the Court has jurisdiction over the instant Petition because: (i) DMX has made written application for a reasonable fee pursuant to Article XIV of the BMI Consent Decree; (ii) BMI has advised DMX of the fee it deemed reasonable for the licenses requested; and (iii) more than 90 days have passed since BMI advised DMX of the fee it deemed reasonable, and DMX has not made a filing in this Court seeking determination of a reasonable fee. Accordingly, BMI may, pursuant to Article XIV of the BMI Consent Decree, seek this Court's determination of a reasonable interim and final license fee with respect to DMX's Commercial music service.

16.    Venue is proper in this district as a result of the express consent of DMX in applying for a license pursuant to Article XIV of the BMI Consent Decree.

**Relief Requested**

25.    WHEREFORE, BMI respectfully requests that the Court enter an Order:

(a) directing DMX to pay license fees at the rates and on the terms requested by BMI for a license covering performances of BMI-repertoire music by DMX to customers at

commercial establishments in the United States, its commonwealths, territories and possessions,

effective as of June 3, 2005 and continuing through and including June 30, 2009.

        (b)  for such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
        January 10, 2008

                        HUGHES HUBBARD & REED LLP

                        By _____
                                James C. Fitzpatrick
                        One Battery Park Plaza
                        New York, New York  10004
                        (212) 837-6000

                                  and –

                        Marvin L. Berenson
                        Joseph J. DiMona
                        Stuart Rosen
                        320 West 57th Street
                        New York, New York 10019
                        (212) 830-2533

                        Attorneys for Petitioner Broadcast Music, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/19/10
```

------------------------------------------

BROADCAST MUSIC, INC.,         :      **FILED UNDER SEAL**

           Petitioner,    :

       -against-          :    08 Civ. 0216 (LLS)

DMX, INC.,                : **MEMORANDUM and ORDER**

          Respondent.    :

------------------------------------------X


This application for the setting of an interim annual fee to be paid by a member of the commercial music services ("CMS") industry for a Broadcast Music, Inc. blanket license which allows "carve-outs" for direct licenses (an "adjustable fee blanket license") presents two questions: What should the base annual rate for such an adjustable license be? How should the deductions for carve-outs be calculated and administered?

As in all interim applications under the BMI decree,[1] an interim fee is "intended as a temporary measure to ensure a reasonable flow of funds to [the licensor] for the use of copyrighted music while the parties negotiate or litigate a binding fee." United States v. ASCAP (Application of the National Cable Television Ass'n, No. 13-95, 1999 WL 335376, at *3 (S.D.N.Y. May 26, 1999). It is to be set promptly, as a rough, tentative and temporary determination, subject to retroactive adjustment when the

---

[1] United States v. Broadcast Music, Inc., 1966 Trade Cases (CCH) ¶ 71,941 (SDNY 1966), modified by 1966-1 Trade Cases (CCH) ¶ 71,378 (SDNY 1994).

final fee is determined, and may bear little resemblance to the final fee. <u>United States v. Broad. Music Inc. (In re Music Choice)</u>, No. 64 Civ. 3787 (LLS), slip. op. (S.D.N.Y. Nov. 15, 1999).

1.

At present DMX pays a blended rate of approximately $16 per location (stemming from a 20-year old arrangement BMI last extended in 2005) which it proposes be adopted as representing the current arrangement between the parties. BMI suggests a rate of $36.36 per location, the amount to which Muzak, and thereafter all the rest of DMX's CMS competitors, agreed in their current license agreements with BMI.

However, because of an allowed "organic growth" of 8% per year in the number of locations covered by those licenses, the potential effective rate per location can drop by steps from $36.36 to $24.75 in the final year of the competitors' current licenses, a prospect viewed by BMI and its expert Bruce M. Owen as reasonable (O'Neill Dep. 79-81; Owen Dep. 106).

Taking into account Muzak's avoidance of retroactive payments of 14-17% in the negotiations of its lead contract with BMI for the 2004-2009 period, which set the pattern for the other DMX competitors, DMX's expert Dr. Amy Candell calculates that with continued growth in the number of subscribers at 8% each year, the average effective per-location rate over the five-year period is between $23.91 and $24.68. BMI argues that taking into account

2

**A-25**

organic growth in the number of locations, its current average per-location rate across all commercial music service providers is over $33 per location.[2]  (O'Neill Rebuttal Decl. at ¶ 11.)

For the direct licenses it has obtained, DMX has agreed to pay its direct licensors an annual fee of $25 per service location, with the salient special case of its crucial license with SONY, its first significant contract with a major publisher.  To obtain that license DMX had to guarantee SONY $2.4 million during the license's three-year term, with a side agreement to pay SONY an additional $300,000 in the first year.  BMI understandably views those side arrangements as proof that the real value of the license is much higher than the base $25 (it says the total SONY payments amount to an annual $61.25 per location), but for present purposes those increments will be treated as a premium DMX had to pay to buy its way into the large publisher market.

Thus, for the tentative and approximate purposes of an interim fee, it seems reasonable to

(1)    Regard the 2004-09 BMI-Muzak agreement as having contemplated the prospect of $24.75 per location as a reasonable fee,

(2)    Apply the same analysis to BMI's similar license agreements with the other (except for DMX) members of the CMS industry,

---

[2] DMX asserts that in imposing its $36.36 fee on commercial music service providers BMI had a monopolistic advantage; it was the only supplier.

3

**A-26**

(3)   Take the $25 per-location rate in DMX's agreements with its own direct licensors (including SONY when the side agreements are disregarded) as confirming the general prevalence of that rate,

(4)   Conclude that DMX's $16 blended rate reflected in the November 4, 2005 interim extension is an out-dated outlier, no longer indicative of market conditions, and

(5)   Set the interim per-location annual fee for the adjustable blanket fee license at $25.

In the final determination of a reasonable fee, it will be necessary also to establish a reasonable "floor" amount to reflect those benefits and costs of a blanket license which are independent of its usage, and should be paid by even a licensee who has directly licensed all its music performances.   In the following discussion, that floor fee is set at 11.7% of the full blanket fee as an interim measure, based tentatively on BMI's actual administrative expense ratio in fiscal year 2008.

2.

BMI proposes that a 15% credit off the per-location base fee be allowed to DMX during the interim period, to account for DMX's direct licenses, with the percentage to be adjusted at six-month intervals.   As BMI stresses, the virtue of that method is its simplicity, which follows from its deferral of the practical problems of direct-licensing fee determination to the final fee proceeding.

4

**A-27**

DMX's proposal parallels BMI's in general, but diverges in three respects. First, it is "dynamic": DMX's actual payments to BMI will vary quarterly, depending on how much is carved out because of directly licensed performances. Second, it includes the 11.7% floor fee as an integral element of the direct-license fee reduction calculation. Third, it puts the process into operation immediately.

Under DMX's proposal the amount of the annual per-location fee is calculated by applying a "direct license ratio" (the number of DMX's directly-licensed performances of works in the BMI repertory, divided by the total number of performances of works in the BMI repertory) to the blanket fee, after subtraction of the floor fee. The floor fee is subtracted from the blanket fee before application of the direct-license ratio, so that the floor fee is not diminished by the number of direct licenses, and is paid even if all of the performances are directly licensed. This protects that portion of the blanket fee which covers BMI's fixed and variable costs attributable to the adjustable blanket license.

Under this protocol, DMX's fees for each licensed location are to be calculated and paid quarterly as follows: Annual Per-Location Fee = Blanket Fee - [(Blanket Fee - Floor Fee) x Direct License Ratio].

BMI protests that this structure is complex, expensive, and disproportionate for adoption on this interim application. However, DMX's proposal offers salient practical advantages. Payments for performances that are carved out will flow directly to

5

**A-28**

the music publisher principals rather than through BMI. DMX's quarterly payments to BMI will reflect the actual volume of direct licenses obtained, according to their proportion of performances of the BMI repertory. Actual market transactions will have actual effect, providing DMX with better cash flow and the parties with practical experience which will be useful in connection with the setting of a reasonable final fee.

Two minor but significant points should be mentioned. The first is that DMX's proposed use of its programming via satellite ("off-premises") as a proxy for all performances of its commercial music service seems pragmatic and acceptable to music publishers in the market place. The second is that Music Reports Inc. ("MRI") which will administer the license reports to BMI from DMX, appears to be ready, experienced and reliable, with reasonable validation by BMI of its work. On these and similar matters it seems preferable to implement the proposed system at this interim stage, so that necessary adjustments can be made before the setting of a final "reasonable" fee for the new form of blanket lease.

<u>Conclusion</u>

The annual per-location rate for the adjustable fee blanket license shall, as an interim measure, be $25 per location. DMX's proposal for the implementation of the direct licensing process shall be placed into operation, again as an interim measure subject to retroactive readjustment.

So ordered.

DATED:     New York, New York
           December _19_, 2008


                                        _____
                                          _Louis L. Stanton_
                                          LOUIS L. STANTON
                                            U. S. D. J.

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| BROADCAST MUSIC, INC., : | |
| : | Case No. 08 Civ. 216 (LLS) |
| Petitioner, : | |
| : | Related to *United States v.* |
| -against- : | *Broadcast Music, Inc.,* |
| : | 64 Civ. 3787 (LLS) |
| DMX, INC., : | |
| : | **CONSENT PRE-TRIAL ORDER** |
| Respondent. : | |
| : | **FILED UNDER SEAL** |
| : | SUBJECT TO PROTECTIVE ORDER - Contents hereof are subject to a court-ordered protective order governing its use and dissemination |

- - - - - - - - - - - - - - - - - - - - - - -x

The parties, having exchanged proposed findings and counter-findings of fact in accordance with the pre-trial procedures of United States District Judge Louis L. Stanton, and in accordance with the November 24, 2009 Pre-Trial Scheduling Order, hereby submit the following:

## I.    AGREED FINDINGS OF FACT

The following facts will not be disputed by any party hereto at the trial:

### A.    **Broadcast Music, Inc.**

1.    Petitioner Broadcast Music, Inc. ("BMI") is a music performing right licensing organization, with headquarters at 320 West 57th Street, New York, New York. BMI is a New York corporation that operates on a non-profit-making basis. Broadcasters founded BMI in 1939.

2.    Songwriters, composers, and music publishers affiliated with BMI (hereinafter BMI's "affiliates") grant BMI the non-exclusive right to license the non-

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

dramatic public performing right in their musical works under section 106(4) of the Copyright Act, 17 U.S.C. § 106(4).

3.     BMI issues licenses to music users, collects license fees from them, and distributes royalties to its affiliated songwriters, composers, and music publishers.  BMI's licensees include approximately 1,300 commercial local television stations, over 10,000 commercial radio stations, commercial music services, concert halls, concert promoters, universities, restaurants, nightclubs, and airlines.

4.     BMI's repertoire consists of approximately 6.5 million musical works from the catalogs of approximately 400,000 affiliates, including thousands of foreign works which are part of BMI's repertoire as a result of reciprocal representation agreements with over 80 foreign performing rights societies.  BMI's repertoire covers the entire range of musical styles.  BMI has tens of thousands of publisher affiliates.

5.     The music industry consists of four major publishers and a large number of independent publishers.  The four major publishers are Sony/ATV Music Publishing, Inc. ("Sony"), Universal Music Publishing Group, EMI Music Publishing, and Warner-Chappell Music.  They represent the majority of performances by most music users, including CMS providers such as DMX, when including the works of the hundreds of smaller publishers whose works they administer.  Independent publishers range in size from famous or obscure songwriters – who publish their own works – to substantial enterprises with many employees and catalogues of thousands of works by various composers and songwriters.

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

**B.**     <u>The BMI Consent Decree</u>

      6.     In 1941, the United States Department of Justice ("DOJ") commenced a civil antitrust action challenging certain of BMI's licensing activities, which the parties agreed to settle pursuant to a consent decree that was approved by the court. (See <u>United States</u> v. <u>Broadcast Music, Inc.</u>, 1940-43 Trade Cas. ¶ 56,096 (E.D. Wisc. 1941) ("<u>1941 Consent Decree</u>")). The substantive terms of the 1941 Consent Decree were similar to the consent decree previously entered into by ASCAP in that same year.

      7.     In 1964, the DOJ commenced another civil antitrust action against BMI. The parties subsequently settled this matter pursuant to another consent decree, which was approved by this Court in 1966. (See <u>United States</u> v. <u>BMI</u>, 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966) (the "1966 Consent Decree").) The 1966 Consent Decree incorporated and updated many of the provisions of the 1941 Consent Decree (which was subsequently vacated). (See <u>id.</u>) In 1994, BMI moved to modify the 1966 BMI Consent Decree and the DOJ and BMI amended the decree again. (See <u>United States</u> v. <u>BMI</u>, 1996-1 Trade Cases ¶ 71,378 (S.D.N.Y. 1994) (the "<u>Consent Decree</u>").)

      8.     Since the Consent Decree was amended in 1994 to create the BMI Rate Court, a party requesting a BMI license has the right to apply in writing to BMI for a license pursuant to the provisions of the Consent Decree. Under those provisions, the requesting party, upon making its written application for a license from BMI, is automatically licensed from the date of the receipt by BMI of the written application to perform publicly all the compositions in the BMI repertoire, and either the requesting party or BMI may move the Court as specified by the Consent Decree to set final rates

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

and terms for the license retroactive to the date of BMI's receipt of the written application.

9.      BMI's Consent Decree entitles BMI's affiliates to directly license their works to music users making direct performances to the public on a non-exclusive basis in accordance with the Consent Decree's terms.  (Consent Decree ¶ IV.)

10.      The Consent Decree provides, *inter alia*, that BMI "shall not enter into, recognize as valid or perform any performing rights license agreement which shall result in discriminating in rates or terms between licensees similarly situated" in the absence of "differentials based upon applicable business factors which justify different rates or terms."  (Consent Decree ¶ VIII(A).)

11.      In a rate proceeding such as this under Section XIV(A) of the Consent Decree, the Decree states that:

> In any such proceeding, defendant shall have the burden of proof to establish the reasonableness of the fee requested by it.  Should defendant not establish that the fee requested by it is a reasonable one, then the Court shall determine a reasonable fee based upon all the evidence.

12.      In negotiations between BMI and a knowledgeable music user, both parties are aware of the rate court mechanism.  Negotiated agreements between such parties are conditioned in part by the parties' expectations as to what terms such a Court is likely to conclude are reasonable.

C.      **DMX, Inc. and the Commercial Music Services Industry**

13.      The commercial music services ("CMS") industry, sometimes also referred to as the background/foreground music industry, is made up of a large number of competitors that, collectively, provide pre-programmed music programming to hundreds

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

of thousands of business establishments, such as restaurants, bars, hotels, offices, and retail stores.  The programming of music is an essential element of a commercial music service.  The music utilized by the business establishments serves a number of purposes, ranging from providing background music to creating a brand-specific sound.

14.     DMX is a member of the CMS industry, which contains many established competitors that provide generally similar services to business customers.  There are several larger members of this industry, including Muzak, DMX, Music Choice, and PlayNetwork, mid-size members, such as In-Store Broadcasting and Trusonic, and many smaller members of the industry, including affiliates of some services such as Muzak.

15.     DMX delivers its music service to customers in one of two ways typically used by members of the CMS industry.  The first, which is referred to as "off-premises" delivery, involves a digital audio transmission from DMX to its customers via direct broadcast satellite ("DBS").  Off-premises customers have a DMX device installed in their establishment that receives the broadcast signal and plays it within the establishment.  The second mode of delivery, known as "on-premises" delivery, often involves the distribution of physical media such as CDs to customers, who play the discs on proprietary DMX devices installed in their establishments.  In addition, some on-premises customers now receive programming updates via the Internet, with the programming being stored on a hard-drive in their DMX device rather than a separate disc.

16.     Both DMX's off-premises and on-premises delivery of music involve millions of music performances of compositions, with DMX estimating that it uses somewhere between 100,000 to 150,000 or more unique works per year.  For 2008, DMX

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

estimates that 14,381 publishers owned and/or controlled rights to musical works performed on its commercial music services.  For the first quarter of that same year, DMX reported more than 3.4 million transmitted performances for its off-premises service alone.  There are also many millions of performances per quarter at DMX's on-premises locations.

17.     DMX's on-premises locations currently account for approximately 65% of all locations and off-premise locations account for approximately 35%.

18.     As part of its off-premises satellite service, DMX transmits more than 100 digital commercial-free all-music channels reflecting a broad range of music genres. DMX does not know which subscribers are listening to which channels, but DMX does not believe that all of these channels are equally popular across DMX's customer base.

19.     For subscribers to its on-premises delivery (*e.g.*, the distribution of discs and/or hard drives), DMX offers several players, each of which provides customers with a selection of musical works, which are periodically updated depending on the customer's agreement with DMX.

20.     Certain of DMX's devices allow DMX's customers to play different songs in different "audio zones," which means that these customers can simultaneously play different songs in different parts of the same business location (*e.g.*, different music in the bar than the dining area).

21.     DMX also offers customers the option of custom programming, which is programming for a specific customer.  In most cases, custom programming is provided by DMX through its on-premises devices, but DMX does provide some custom programming to off-premises customers.

22.     In 2008, approximately 20,700 DMX customer locations received custom programming.

23.     The importance of music is a central theme of DMX's marketing to potential customers.  According to DMX's former Senior Vice President of Content, "Music is what we do, so it's a big part of what our marketing does, yes."

24.     One of the ways that DMX has attempted to differentiate itself from its competitors is by advertising the greater variety of music that it programs on its services as compared to other services.  DMX has also differentiated itself from broadcasters by emphasizing that it is commercial free and all music, all the time.

25.     Like competing CMS providers, DMX markets the fact that it obtains and pays for performing rights licenses for its customers that those establishments would otherwise have to obtain for themselves.  A page on the DMX website entitled "Copyright and Licensing - We've Got You Covered" states that:  "At DMX, we not only design and deliver powerful music and music video solutions.  We take care of the licensing so you can focus on running your business."

### *The Proposed Merger Between Muzak and DMX*

26.     Muzak and DMX had discussions about merging their two CMS services for sale to a third party as a combined entity and entered into an agreement regarding the potential merger.  In April 2008, the United States Department of Justice closed its investigation and provided clearance for the proposed merger of DMX and Muzak.  To date, the proposed merger has not been consummated.

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

**D.    BMI's Licensing History with the CMS Industry**

27.    BMI has been licensing music performance rights to commercial music services for decades.

28.    After the prior final agreements between BMI and the CMS industry for the period 1987-1993 (the "1987 CMS License") expired in 1993, BMI and an industry negotiating group representing the CMS industry began negotiating at arm's length for a new license covering the period from January 1, 1994 forward.

29.    Several years of negotiations did not lead to an agreement between BMI and the CMS industry.  In December 1998, BMI petitioned this Court for determination of reasonable license fees to be paid by several members of the CMS industry, including DMX (under prior ownership), Muzak, AEI, Music Choice, and 3M, retroactive to January 1, 1994.  As part of this rate court litigation, certain members of the CMS industry requested a variety of types of BMI licenses, including a license with fees that were adjustable based on the direct licenses that they obtained from BMI affiliates (an "adjustable fee blanket license" or "AFBL").  In March 2000, this Court found that BMI was not obligated by its Consent Decree to offer such licenses, but in December 2001, the Court of Appeals for the Second Circuit reversed.  United States v. Broadcast Music, Inc. (In re AEI Music Network, Inc.), 275 F.3d 168, 171 (2d Cir. 2001), aff'g in part, vacating and remanding in part, United States v. Broadcast Music, Inc. (In re AEI Music Network, Inc.), 64 Civ. 3787 (LLS), 2000 U.S. Dist. LEXIS 2872 (S.D.N.Y. March 9, 2000).

30.    After the Second Circuit's decision, BMI and Muzak re-commenced negotiations.  During the negotiations, Muzak made clear that it did not want to pay a separate, additional amount to retroactively settle fee obligations for periods prior to July

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

2004. For the period January 1994 through June 2004, Muzak paid BMI $20.50 for on-premises locations and 2.25% of revenue for off-premises locations.

31.    Muzak's many independently owned affiliates (*i.e.*, those not owned and operated by Muzak) also participated in contemporaneous negotiations with BMI, and were jointly represented by an attorney named Jack Carroll. Dozens collectively signed the same form of license as Muzak.

32.    Subsequently, BMI entered into license agreements with other commercial music services for the July 1, 2004 to June 30, 2009 time period.

33.    BMI does not have final fee arrangements with any commercial music service for the period July 1, 2009 to date.

## E.    BMI's Licensing of Business Establishments

34.    Business establishments that do not obtain the right to perform music from a CMS provider can obtain that right directly from BMI, as well as the American Society of Composers, Authors & Publishers ("ASCAP") and SESAC, Inc. BMI licenses tens of thousands of business establishments, both individually and through chain accounts, including approximately 40,000 restaurants and thousands of retail stores.

35.    In 2008, BMI sent cease-and-desist letters to approximately 1300 general business establishments.

36.    For the year 2007, restaurants and bars paid BMI an annual fee (subject to discounts for timely payment) of at least $309 for the right to play recorded music or the radio, with some locations paying higher annual fees, depending on their size. Using BMI's 2008 License Fee Schedule, a retailer with fewer than 10 licensed stores paid an annual fee of at least $199.92 per store for a license from BMI to play CDs or the radio.

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

This fee varies by square footage, ranging up to an annual fee of $1,705.13 per store location.

37.    Historically, CMS providers have paid lower per-location rates than individual business establishments.

**F.    ASCAP Commercial Music Services Licenses with DMX and Muzak**

38.    ASCAP is the other major United States performing rights organization.

39.    In 2005, Muzak and ASCAP entered into a new blanket license agreement for the period January 1, 2005 through December 31, 2009.  Under this license, Muzak LLC agreed to pay annual license fees to ASCAP of $6.8 million dollars until that agreement was amended as part of Muzak's 2009 bankruptcy.  Using the estimates of locations contained in the agreement, on a per-location basis, Muzak agreed to pay about $41.21 to ASCAP, or 13.3% more than the implied starting per-location rate under the 2004-2009 BMI/Muzak License.

40.    The 2005-2009 ASCAP/Muzak license covers a similar, though not identical, time period and covers the same commercial music services offered by Muzak as the 2004-2009 BMI/Muzak license.  The ASCAP/Muzak license also contains a provision similar to the BMI/Muzak license relating to adjustments to the license fee based on "organic" customer growth, using the same 8% growth factor.

**G.    Negotiations Between DMX and BMI Leading to This Rate Court Proceeding**

41.    On June 3, 2005, DMX (then known as THP Capstar Acquisition Corp.) requested from BMI a license through to the end listener in connection with the DMX background/foreground music service.  The license period at issue in this proceeding

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

begins on that date. DMX sought a license that would cover its performances of BMI repertory music to the extent such performances were not otherwise licensed.

42.      On November 4, 2005, DMX and BMI agreed to the terms of an interim license for DMX covering the period from June 3, 2005, forward. The interim terms and fees under this agreement were identical to those that former DMX owners Maxide Acquisition, Inc. and its predecessors had been paying since 1993. Specifically, the rates were those effective in 1993 under the 1987 CMS License: $20.50 per customer location for DMX's on-premises delivery of music and 2.25% of gross billings for DMX's off-premises delivery.

43.      DMX also requested a quote for an Adjustable Fee Blanket License (AFBL). On October 4, 2007 BMI provided DMX with the requested fee quote. The parties subsequently were unable to reach agreement, and BMI applied to this Court under the Consent Decree for a fee determination on January 10, 2008.

44.      On December 19, 2008, after interim-fee discovery and briefing by the parties, this Court entered an interim fee order setting interim fees from January 1, 2008, forward at $25 per location with a dynamic carve-out for directly licensed performances. See Broadcast Music, Inc. v. DMX, Inc., Memorandum and Order (S.D.N.Y. December 19, 2008). Interim Fees will be adjusted retroactively once the Court sets a final license fee.

## H.      DMX's Direct License Initiative

45.      DMX proposes its direct licenses with publishers as benchmarks in support of its per-location rate for the BMI blanket license of between $11.32 and $19.57.

46.    Beginning in 2006, DMX commenced an initiative to acquire public performance rights directly from music publishers.  Since that time and through the present, DMX has entered into direct licenses covering a subset of the publishers, musical works, and music performances that it uses on its commercial music services.

47.    The first direct license between DMX and a music publisher, Leiber-Stoller, was signed in May 2006.  The license term began October 1, 2006, and has a term of three years.

48.    The DMX direct licenses each contain a "Royalty Pool" provision providing that, per quarter, DMX will pay the publisher for its ASCAP and BMI works "royalties equal to Publisher's pro rata share of a pool of royalties calculated by multiplying a fee of Six Dollars and Twenty Five Cents ($6.25) by the number of Service Locations."  The $6.25 per-location pool is per quarter year, so it translates to $25 per location annually.  The quarterly "Royalty Formula" by which each DMX direct licensor's royalties are supposed to be calculated is as follows:

> Publisher's Pro Rata Share:  For each quarter of the Term, Publisher's pro rata share of royalties will be determined by multiplying the Royalty Pool for that quarter by a fraction, the numerator of which is the total number of identified musical compositions from Publisher's Catalog which are digitally transmitted by [DMX] to Locations as part of Service programming in that quarter, and the denominator of which is the total number of musical compositions from all publisher catalogs which are digitally transmitted by [DMX] to Locations as part of Service Programming in that quarter (the "Royalty Formula").

49.    The direct licenses place no limit on the types of businesses that DMX can service.  All of the licenses, for example, allow DMX to provide its service to a bowling center for the same royalty fee as a restaurant, bar or retail establishment.

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

50.    DMX's direct licenses also all contain "most favored nations" clauses (with some variance in language between licenses) representing that the Royalty Formula will be the same for each publisher.  For example:

> <u>Most Favored Nations</u>:  [DMX] represents and warrants that the Royalty Formula will be the same as the Royalty Formula for calculating royalties payable to any third party publisher or administrator (a "Third Party"), under any catalog license between [DMX] and any such Third Party which is entered into during the Term, for the same rights, Territory, and Term as provided herein. . . .

51.    In some cases the most favored nations clause also requires that the "schedule for accounting for . . . royalties" will be the same as any other directly licensing publisher.  In at least one case this was specifically negotiated by the publisher.

52.    On November 14, 2007, DMX entered into a direct license agreement with Sony/ATV Music Publishing, Inc., one of the four "major" U.S. music publishers.  The agreement commenced on January 1, 2008.   The Sony agreement originally covered a three-year period.

53.    The formula for Sony's guaranteed payments was calculated by taking Sony's representations regarding its 2006 royalty distributions from ASCAP and BMI, doubling that number to account for Sony's songwriters' share of performing rights organization royalties, and then adding a 50% premium to that amount.

54.    Sony/ATV's catalog is among the most prominent in the world, including among many other famous songwriters the Beatles, Hank Williams, and Duke Ellington.  In November 2009, Sony/ATV won its eighth consecutive BMI Country Publisher of the Year title.

55.    The existence of a direct license agreement with a major like Sony was an important inducement for some other publishers to sign direct licenses with DMX.

**RESTRICTED – SUBJECT
TO PROTECTIVE ORDER**
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

56.    As of June 2009, DMX has paid approximately $816,000 to MRI in connection with its direct license program.

57.    On December 3, 2007, at Universal's request, BMI agreed to pay it a guarantee of royalties for performances on DMX from 2008-2010.

58.    On September 12, 2008, counsel for BMI informed DMX that it needed to share with BMI personnel the identities of the publishers with whom DMX had entered into direct licenses, and represented that such information was necessary so that BMI could stop paying royalties to those publishers and writers already receiving direct-license payments from DMX.

***Other Issues Related to the Direct License Ratio***

59.    A reasonable crediting ratio should be subject to the following two rules on which the Parties agree: (1) BMI will credit DMX with both the writer's share and the publisher's share of a performance on the basis of a direct license between DMX and that publisher, unless notified by either the writer or publisher that the writer's share is not covered by the direct license; and (2) In the case of a direct license between DMX and a third-party agent for a BMI affiliate, such as a law firm, BMI will credit the affiliate's shares unless notified by either the agent or affiliate that the affiliate is not covered by the direct license.

60.    It is appropriate to add into the *Floor Fee* any net additional or incremental costs created for BMI to implement and administer the blanket-carve-out license.  It is important, however, to be scrupulous in ensuring that only true incremental costs are added in this way, and to make sure that this cost is calculated appropriately.

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

## I.    Facts Related to the Licensing of Bowling Centers

61.    DMX has requested a license that covers bowling centers, and while the parties dispute whether the fee for bowling centers should be different from other types of business locations, the parties agree that the Court should set reasonable fees and terms for a DMX license covering bowling centers as part of this proceeding.

62.    As of December 31, 2008, DMX had 47 bowling center locations.

63.    The DMX direct licenses contain no exclusions for bowling centers and allow DMX to use the publishers' music in any location.

64.    BMI offers a bowling license to individual bowling centers with a per-lane rate that is adjusted annually for inflation.  For 2009, the per-lane rate under this license is $26.60.

65.    BMI negotiated a license with the Bowling Proprietors Association of America ("BPAA") in 1997, which was subsequently adjusted.  Under this license, BPAA members pay $14.40 per lane in 2009, which is adjusted annually for inflation. This rate reflects a discount based on the number of bowling centers represented by the BPAA.

66.    BMI currently licenses over 2,500 bowling centers representing more than 69,000 lanes on final agreements.  This market pays fees over $1 million annually to BMI.

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

**H.**     **BMI's Adjustable Fee Blanket License Proposal**

66.     BMI's AFBL proposal includes three major components:  (a) the Full Fee,

(b) the Base Fee, and (c) the crediting mechanism.  (Anticipated Testimony of Bruce

Owen; Anticipated Testimony of Michael O'Neill.)

**The Full Fee Proposed by BMI**

67.     For the AFBL at issue, BMI proposes that DMX pay an annual *Full Fee* of

$41.81 per location.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of

Michael O'Neill.)  This Full Fee is composed of the traditional (*i.e.*, non-adjustable)

blanket license fee of $36.36 annually per DMX location based on the benchmark

BMI/CMS License, plus a 15% premium to account for the AFBL's option value to

DMX and its additional costs to BMI.  (Anticipated Testimony of Bruce Owen;

Anticipated Testimony of Michael O'Neill.)

68.     The Full Fee represents the total license fee before any credits are

calculated and applied for performances covered by direct licenses.  (Anticipated

Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill.)  It is therefore

the fee DMX would pay for the AFBL if it relied 100% on the BMI license and did not

license any performances directly.  (Anticipated Testimony of Bruce Owen.)  A

reasonable Full Fee must take into account the following elements of the AFBL:  first, the

license conveys all of the benefits of the blanket license, including immediate access to

all works in the BMI repertoire (including the newest works created every day),

substantial potential savings in transactions costs, and indemnification against copyright

infringement; second, the license provides DMX with an additional valuable option,

namely the ability to reduce the fee it pays to BMI by obtaining licenses directly from

BMI-affiliated songwriters, composers, or music publishers; and third, the license is more

complex and burdensome for BMI to administer than the traditional blanket license, and

therefore will result in additional administrative expenses to BMI over and above those

associated with the blanket license. (Anticipated Testimony of Bruce Owen.) Because of

the option value and additional cost components of the license, the reasonable starting fee

for the adjustable fee blanket license is higher than the traditional blanket license fee.

(Anticipated Testimony of Bruce Owen.)

*A Full AFBL Fee Should Start With an Annual Blanket License Fee of $36.36 Per
Location*

69.     The best available benchmark for the traditional blanket license element of

the AFBL Full Fee is the BMI/CMS License first negotiated at arm's length between

Muzak and BMI for the 2004-2009 time period, and subsequently adopted by virtually

the entire CMS industry other than DMX. (Anticipated Testimony of Bruce Owen; *see*

Paragraphs 46, 50, 51, *supra*.)

70.     The BMI/CMS License is the best benchmark for the blanket license

portion of the full AFBL fee because:

a.      It covers the same set of rights as the blanket license element of the AFBL

(albeit the AFBL also has additional option value to DMX) (Anticipated

Testimony of Bruce Owen; *see* Paragraphs 68, *supra*, and 71 and 72, *infra*.);

b.      It was negotiated at arm's length between BMI and Muzak, the largest

entity in this industry and a longtime major competitor of DMX. Muzak was

assisted by DMX's current counsel in its negotiations and understood that it had access to the rate court if negotiations were not successful (indeed, a rate court case was pending during the negotiations) (Anticipated Testimony of Bruce Owen; *see* Agreed Fact 14, Paragraphs 49 and 50, *supra*.);

c.    The original $36.36 agreement between Muzak and BMI achieved broad market acceptance.  The BMI/CMS License was agreed to by virtually the entire CMS industry other than DMX, at a time when they too had access to the rate court (Anticipated Testimony of Bruce Owen; *see* Paragraphs 41-43 and 51-52, *supra*.);

d.    DMX is similarly situated to Muzak and the other members of the CMS industry that agreed to the BMI/CMS License and there are no applicable business factors which justify different rates or terms for DMX (Anticipated Testimony of Bruce Owen; *see* Paragraph 17, *supra*.);

e.    The BMI/CMS License covers the same approximate term (July 2004 to June 2009) at issue in this case (June 2005 to June 2010), minimizing the need to make adjustments to the benchmark to account for disparities in economic circumstances that might exist in different time periods (Anticipated Testimony of Bruce Owen.);

f.    The agreement between Muzak and ASCAP – at a rate of more than $41 annually per Muzak customer location – confirms the reasonableness of the

$36.36 BMI/CMS License as a benchmark (Anticipated Testimony of Bruce
Owen; *see* Agreed Fact 39 and Paragraph 60, *supra*.); and

g.      BMI's past agreement with XM Satellite Radio also confirms the
reasonableness of the BMI/CMS per-location rate as a benchmark.  DMX
considers satellite radio providers to be its competitors.  (*See, e.g.*, Knittel Dep. at
35:8-12)  BMI does not consider XM to be a traditional CMS provider because,
among other reasons, unlike DMX and other CMS providers, XM does not use
proprietary equipment.  However, XM and BMI entered into a settlement
agreement for the period January 1, 2002 through December 31, 2007 that
provided for an annual per-location fee of $44 per commercial customer location.
(Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Bruce
Owen; JX-1231, CMS-BMI-PROD 010091-010100 (RESTRICTED).)

*A Premium of 15% Above the Traditional Blanket License Fee is Reasonable for
the AFBL*

71.      The BMI blanket license has significant value to DMX whether or not
DMX uses, or intends to use, every song in the BMI repertory.  (Anticipated Testimony
of Bruce Owen.)  For example, it provides DMX with unplanned, rapid and indemnified
access to BMI's entire repertory without the necessity of individually negotiating for a
song from the BMI repertory that a DMX programmer wants to play.  (Anticipated
Testimony of Bruce Owen.)

72.      In addition to its blanket license, the AFBL also provides DMX with an
option to reduce its fees by licensing directly some of the BMI works it uses on its

commercial music services at any time during the license period, while continuing to use the traditional BMI blanket license for the remaining BMI-affiliated works that it uses. (Anticipated Testimony of Bruce Owen.) Such an option is inherently valuable, (Anticipated Testimony of Bruce Owen; Jaffe Dep. at 62:16-63:6, 141:16-142:13), and this value would be reflected in the price that a willing buyer would pay for the AFBL. (Anticipated Testimony of Bruce Owen.)

73.    The AFBL also imposes additional costs on BMI.  (*E.g.*, Anticipated Testimony of Milt Laughlin.)  These costs are discussed more fully at Paragraphs 86-99, *infra*, in relation to a reasonable Base Fee for the AFBL.

74.    Given the greater value of the AFBL to DMX and the higher cost to BMI, it is reasonable for the AFBL to incorporate a premium over the traditional blanket license rate.  (Anticipated Testimony of Bruce Owen.)

*Television Per-Program Licenses Are The Best Benchmark for the AFBL Premium*

75.    The best available benchmarks for the amount of the AFBL premium are the additional incremental costs of administering the AFBL license and the premiums associated with analogous per-program licenses negotiated at arm's length between ASCAP and BMI on the one hand and the Television Music License Committee ("TMLC"), an industry-wide committee representing local television stations on the other ("TV PPL licenses").  (Anticipated Testimony of Bruce Owen.)  Numerous television stations have chosen these per-program options.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill.)

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

76.     These TV PPL licenses show that a premium of between 18 and 38% percent is reasonable for the AFBL over the traditional blanket license fee.  (Anticipated Testimony of Bruce Owen.)  BMI is asking for a 15% premium in the AFBL Full Fee over the traditional benchmark blanket license fee.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill.)  Given these benchmarks, this 15% premium is reasonable.  (Anticipated Testimony of Bruce Owen.)

77.     The TV PPL is analogous to the AFBL because the TV PPL provides the licensee with similar increased flexibility – the ability to reduce its BMI licensing costs by changing its programming mix or by licensing works directly.  (Anticipated Testimony of Bruce Owen.)  Like the AFBL licensee, a TV PPL licensee can continue to use BMI to enjoy the benefits of indemnity and immediate access to the BMI repertoire, while licensing some of its rights from sources other than BMI.  (Anticipated Testimony of Bruce Owen.)  Local television stations can make selective use of alternative licensing options under the TV PPL (and appear actually to do so), similarly to what DMX will be able to do under the AFBL.  (Anticipated Testimony of Bruce Owen.)

**The Base Fee Proposed by BMI**

*Overview of the Base Fee*

78.     The AFBL should include a *Base Fee*.  (Anticipated Testimony of Bruce Owen.)

79.     The Base Fee is the portion of the Full Fee that DMX pays to BMI under the Adjustable Fee Blanket License regardless of how many performances of BMI works DMX directly licenses.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

of Michael O'Neill.)  It is the only fee that DMX pays if it directly licenses 100% of its performances of BMI works.  (Anticipated Testimony of Bruce Owen.)  The Base Fee compensates BMI for the overhead and administrative expenses associated with the adjustable fee license.  It thus includes DMX's fair share of the cost of assembling the BMI repertoire and having it ready for DMX to use.  (Anticipated Testimony of Bruce Owen.)

80.    The Base Fee also represents the value of the AFBL to DMX regardless of how many performances of directly licensed BMI works it makes.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill.)  This would include the value of copyright infringement indemnity, the right to access the entire BMI repertoire at any time during the term, and the use made by DMX of the benefits of the AFBL option.  (Anticipated Testimony of Bruce Owen.)

81.    BMI proposes a Base Fee of 22.78% of the Full Fee for each year of the AFBL.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill.)  This Base Fee is reasonable.  (Anticipated Testimony of Bruce Owen.)

*Components of a Reasonable AFBL Base Fee*

82.    BMI's proposed Base Fee is comprised of (a) BMI's domestic overhead rate (applied against the traditional blanket license fee), plus (b) the incremental costs to BMI of administering the AFBL.  (Anticipated Testimony of Bruce Owen.)

BMI's Customary Domestic Overhead

83.    BMI's domestic overhead rate, applied to the blanket license fee of $36.36 per-location annually, should be used as the first component of the Base Fee.

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

(Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Bruce Owen.)

BMI's average domestic overhead rate in recent years (2005-2007) has been

approximately 17%. (Anticipated Testimony of Michael O'Neill; Anticipated Testimony

of Bruce Owen.)

84.    BMI's domestic overhead rate is higher than its overall company-wide

overhead rate. (Anticipated Testimony of Michael O'Neill.) (In a 2008 press release,

BMI reported that its overall overhead was 11.7%. (JX-1263, CMS-BMI-PROD 021796

- 021798.)) This is because BMI's overall overhead rate includes revenues BMI receives

from foreign performing right societies for performances occurring outside the United

States. (Anticipated Testimony of Michael O'Neill.) These are revenues for which BMI

incurs very little expense as contrasted with its domestic performances. (Anticipated

Testimony of Michael O'Neill.) For such foreign performances, BMI has arrangements

with performing rights societies around the world, each of which monitors performances

of musical works in its particular country, and remits to BMI royalties for performances

of works in the BMI repertoire (which have been reduced by the foreign societies' own

overhead costs. (Anticipated Testimony of Michael O'Neill.) BMI in turn distributes

those royalties to its affiliates in the U.S. (Anticipated Testimony of Michael O'Neill.)

Because the administrative costs associated with this process for BMI are much lower

than the administrative costs associated with BMI's domestic licensing activities, it is

reasonable to use BMI's domestic overhead rate, rather than an overhead rate that

includes revenues and costs related to foreign performances, as part of the AFBL Base

Fee. (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Bruce

Owen.)

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

85.    BMI applies its customary domestic overhead rate (not its overall overhead rate) to the license fees it receives from Muzak, DMX, and the entire CMS industry prior to distributing those fees to its affiliates.  (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Alison Smith.)

### Incremental Costs of the AFBL

86.    In addition to BMI's customary domestic overhead rate, the AFBL will impose additional incremental development and ongoing administrative costs on BMI. (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)  A reasonable Base Fee should include an amount to compensate BMI for these incremental costs.  (Anticipated Testimony of Bruce Owen; Jaffe Dep. at 64:9-75:24, 131:2-19.)

87.    The incremental costs to BMI include both (a) upfront costs to develop the AFBL, and (b) ongoing costs associated with the implementation of the AFBL over the course of the license.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)

### Upfront Incremental Costs

88.    The AFBL at issue in this case is a new form of license that BMI has never used for any licensee.  (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin.)  BMI intends to use its existing infrastructure to the greatest extent feasible, but it will need to develop new software programs to administer

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

and implement the AFBL and to integrate the AFBL into BMI's existing systems. (Anticipated Testimony of Milt Laughlin.)

89.    With respect to *upfront development costs*, BMI will need to (a) develop and program new computer software applications and database structures to analyze the DMX music use and direct license data that will be used to calculate DMX's direct license credits, and (b) integrate that system with BMI's current distribution system to ensure that BMI does not distribute DMX royalties to those affiliates that have directly licensed their works to DMX.  (Anticipated Testimony of Milt Laughlin.)

90.    BMI will also need to input a large amount of required initial data elements from the direct licenses submitted by DMX to BMI into the newly created AFBL system.  (Anticipated Testimony of Milt Laughlin.)

91.    These tasks will include the use of current employee time.  BMI will also be required to use the services of a programming consultant (to assist with the programming of the new systems needed for the AFBL) and one or more temporary workers (to input direct license data into the new systems).  (Anticipated Testimony of Milt Laughlin.)

92.    The complexity of the systems required for the AFBL is compounded by the fact that many of the relevant data elements – such as the terms of each direct license and the catalogues covered by each direct license – are constantly changing.  (Anticipated Testimony of Milt Laughlin.)  Loss of and/or acquisition and administration of copyrights and catalogues by music publishers is an almost daily occurrence in the business.

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

(Anticipated Testimony of Alison Smith; June 19, 2009 Deposition of Ronald Gertz ("Second Gertz Dep.") at 64:7-65:10.)  Moreover, DMX's direct licenses are for varying periods and can expire on any given date.  (Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)  The costs associated with these tasks are independent of and in addition to those associated with administering a traditional blanket license.  (Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)

93.    Based on the required tasks, the upfront costs for BMI for the AFBL for DMX will be between $350,000 to $400,000.  (Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Bruce Owen.)  This equates to annual costs of between $116,667 and $133,333 (ignoring interest), assuming that the costs are recovered over the three-year period (July 1, 2007 through June 30, 2010) for which BMI expects DMX to operate under the AFBL.  (Anticipated Testimony of Bruce Owen.)

Ongoing Incremental Costs

94.    In addition to the upfront costs of development, BMI estimates that at least $250,470 of *ongoing annual costs* will be incurred by BMI to administer the AFBL. (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)

95.    The tasks associated with the ongoing administration of the AFBL fall into the following general categories:

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

a.      Ongoing input of direct license information (including catalog information) into the new AFBL systems, including monitoring automated processes to add or remove direct license "flags" from BMI works (Anticipated Testimony of Milt Laughlin);

b.      Ongoing manual identification and research of individual works to, among other things, (i) identify the relevant rights holders, (ii) verify the share ownership of songs where there are unknown shares or discrepancies between DMX data and BMI records, and (iii) match reported works to BMI's records manually where the systems created by BMI are unable to do so (Anticipated Testimony of Milt Laughlin);

c.      Monitoring the accuracy of automated AFBL systems in order for BMI to calculate credits against and adjustments to BMI distributions (Anticipated Testimony of Milt Laughlin);

d.      Manual attorney review of initial and subsequent direct licenses submitted to BMI by DMX for legal sufficiency and validity (*e.g.*, ensure that the direct license conveys the performing right, is signed by both parties to the direct license, and contains all material terms, including a license period).  (Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)  BMI's initial review of the direct licenses submitted by DMX shows that there are many instances of deficiencies such as blank license period provisions (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith);

47
**A-57**

**RESTRICTED – SUBJECT
TO PROTECTIVE ORDER**
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

e.      Ongoing communications with BMI affiliates that sign direct licenses to, among other things, notify them that BMI distributions will stop with respect to DMX's commercial music service as a result of their direct license with DMX (Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith); and

f.      Ongoing dispute resolution and communications with DMX/MRI relating to adjustments to DMX's claimed credits based on any individual song issues, such as discrepancies in the claimed ownership shares of particular works between DMX's and BMI's records.  (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)

96.      These ongoing administrative tasks will require BMI to hire three new employees, in addition to requiring time from existing employees.  (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)

97.      Altogether, annual upfront costs (spread over three years) plus the estimated ongoing yearly costs of the AFBL will be between $367,137 (using the low-end estimate) and $383,803 (using the high-end estimate).  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

98.    The amount of ongoing incremental costs (such as those associated with monitoring direct licenses and resolving disputes over credits) is likely to increase to the extent that DMX increases its reliance on directly licensed works and/or enters into additional direct licenses.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)

99.    For the license at issue, BMI is proposing $250,000 per year as the incremental portion of the Base Fee.  This $250,000 assumption is significantly lower than its actual estimated incremental costs.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill.)

100.    Taking the two parts of BMI's proposed Base Fee – the domestic overhead contribution (17% of the estimated fees DMX would pay BMI at the traditional blanket benchmark, or $462,224) and BMI's proposed portion of incremental costs ($250,000) – BMI's AFBL incremental costs for the contract year July 1, 2007 to June 30, 2008 would be $712,218.95, which is equal to 22.78% of the Full Fee.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Michael O'Neill.)

<u>BMI's Experience with the TV PPL</u>

101.    The likelihood of BMI incurring significant incremental costs in connection with the AFBL is supported by BMI's past experience with licenses such as the Local Television Station Music Performance Per Program License.  (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Alison Smith.)  The Local TV Per Program license, for example, requires a

group of people at BMI dedicated to its administration in order to ensure that the local

television stations that choose this license have their fees calculated properly, and that the

license fees paid pursuant to this license are distributed properly to BMI's affiliates.

(Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin;

Anticipated Testimony of Alison Smith.)

### The Parties' Experience in Implementing this Court's Interim Fee Order

102.    The parties' experience with this Court's interim fee order also

demonstrates that the implementation of the AFBL license will cause BMI (and DMX) to

incur additional costs above those that they would incur with respect to a blanket license.

(Anticipated Testimony of Milt Laughlin; Anticipated Testimony of Bruce Owen.)  For

example, it has taken MRI many months to provide BMI with usable data to accurately

audit DMX's claimed interim fee credits for 2008.  (Anticipated Testimony of Milt

Laughlin.)  The data initially provided to BMI were inaccurate in many respects.

(Anticipated Testimony of Milt Laughlin.)

103.    DMX (through Music Reports, Inc. ("MRI"), the company that DMX has

retained to assist it with various aspects of its direct licensing program) also sent BMI

interim fee data that included for the first and second quarters of 2008 more than 190,000

performances on test channels – that is, performances on channels that DMX had used

internally and had not actually transmitted to *any* actual customer locations.  (Anticipated

Testimony of Milt Laughlin; JX-1270, Email from Todd Larson to Jason Benton, dated

8/28/09, Subject Test Channels, and attached spreadsheets.)  DMX initially reported these

test performances as valid public performances for interim crediting purposes, even

though it is undisputed that they were never actual public performances. (Anticipated Testimony of Milt Laughlin.) After BMI brought the test channel issue to DMX's attention, MRI eventually removed the test channels from the DMX interim fee data (for the first two quarters of 2008) in October 2009. (Anticipated Testimony of Milt Laughlin.)

104. There were numerous other problems with the interim data sent by MRI. (Anticipated Testimony of Milt Laughlin.) For example, in the initial interim fee data it provided to BMI in March 2009, MRI miscounted performances, contributing, for the second quarter of 2008, to a discrepancy of more than 1 million performances between MRI's reported interim fee data for certain works (~2.55 million performances) and the customary data provided by DMX in the past to BMI for that same quarter with respect to those same works (~1.4 million performances). (Anticipated Testimony of Milt Laughlin; PX-178, April 15, 2009 Letter from James Fitzpatrick to Todd Larson.)

### DMX's Own Costs Support the Fact That BMI Will Also Incur Incremental Costs

105. DMX itself currently pays MRI approximately $300,000 per year to administer its direct license royalty system, and has paid other amounts in the past. (Second Gertz Dep. at 97:16-101:2, 104:5-104:18, 106:19-108:20, 113:1-113:25; PX-105, PX-106, PX-111, Second Gertz Dep. Exhibits 2-9 (DMX900399-900405 (RESTRICTED)), 2-10 (DMX900406-900407 (RESTRICTED)) and 2-11 (DMX900416-900417 (RESTRICTED)); PX-050, DMX900501 -900509 (RESTRICTED).) This amount is in addition to the hundreds of thousands of dollars that DMX has paid, and is paying, MRI to negotiate direct licenses with publishers. (*See, e.g.,* Hanson Dep. at

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

103:7-104:11, 108:22-109:20, 224:6-225:19; Second Gertz Dep. at 86:18-87:9; 89:23-

90:5, 97:19-109:23, 113:1-25; PX-104, PX-105, PX-106, PX-111, Second Gertz Dep.

Exhibits 2-7 (DMX900408-900415 (RESTRICTED)), 2-9 (DMX900399-900405

(RESTRICTED)), 2-10 (DMX900406-900407 (RESTRICTED)) and  2-11

(DMX900416-900417 (RESTRICTED)); PX-050, DMX900501 -900509

(RESTRICTED).)

106.    Further, and as described more fully at Paragraphs 131-132, *infra*, DMX

paid one of its directly licensed publishers – Sony ATV Music Publishing, Inc. – an

additional $300,000 fee that is expressly to compensate Sony for its "additional

administrative and overhead costs [Sony] will incur" in connection with the DMX/Sony

direct license.  (JX-1150, Hanson Dep. Exhibit 13 (DMX001026-27 (RESTRICTED)).)

**The Crediting Mechanism Proposed by BMI**

*The Direct License Ratio*

107.    The crediting mechanism is the manner by which deductions to the

starting fee are calculated based on (a) the direct licenses that DMX has obtained, and (b)

the performances of directly licensed works from the BMI repertoire on DMX's

commercial music services.  (Anticipated Testimony of Michael O'Neill; Anticipated

Testimony of Bruce Owen.)

108.    DMX's credits should be proportional to the ratio of DMX's directly

licensed BMI performances to the total performances of works in the BMI repertoire, on

a share-weighted basis (the "Direct License Ratio").  (Anticipated Testimony of Michael

O'Neill; Anticipated Testimony of Bruce Owen.)

**RESTRICTED – SUBJECT**
**TO PROTECTIVE ORDER**
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

109. To calculate DMX's credits, the Direct License ratio is applied against the difference between the Full Fee and the Base Fee. (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Bruce Owen.) This crediting mechanism is reasonable. (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Bruce Owen.)

110. BMI also proposes that the parties share the burden of identifying unknown rights holders to works. (Anticipated Testimony of Bruce Owen.) As a result, BMI proposes that 50% of such unidentified works should be counted in the denominator of the Direct License Ratio. This is reasonable. (Anticipated Testimony of Bruce Owen.)

### Counting On-Premises and Off-Premises Performances

111. It is reasonable when calculating the Direct License Ratio to include both DMX's on and off-premises performances. (Anticipated Testimony of Bruce Owen.) Counting both on and off-premise performances is the most accurate and fair way to determine the appropriate license fee credits due to DMX. (Anticipated Testimony of Bruce Owen.) It is also reasonable to apply a factor that adjusts the ratio of the number of off-premises performances to the number of on-premises performances to match the ratio of off-premises locations to on-premises locations. (Anticipated Testimony of Bruce Owen.)

112. The majority of DMX's customers are on-premises, not off-premises, and DMX derives more revenue from its on-premises customer locations than its off-premises customer locations. (Hanson Dep. at 25:6-23; DMX' Responses and Objections to the

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

First Set of Interrogatories by Broadcast Music, Inc. to DMX, Inc., Response to

Interrogatory No. 6; *see* Seaton Dep. at 74:6-18.)

113.    The performances on DMX's on and off-premises services are not the

same, and there is no reason to believe that performances on one service are an accurate

proxy for performances on the other.  (*See, e.g.*, Hanson Dep. at 143:23-144:9, 144:10-

13, 227:4-22, 228:9-22; Knittel Dep. at 22:11-21, 100:24-101:4; Furst Dep. at 65:12-

66:15, 66:16-68:11, 116:8-118:24, 126:13-24; *see also* September 22, 2008 Deposition of

Ronald Gertz ("First Gertz Dep.") at 91:18-25; 94:1-4; Seaton Dep. at 169:20-170:13;

Hilburn Dep. at 73:17-74:25, 84:12-85:14, 107:1-108:11, 118:12-119:23, 122:24-123:9.)

Many titles appear exclusively on the off-premises service (and not on the on-premises

service), and vice versa.  (Anticipated Testimony of Milt Laughlin; JX-1267 - 1269, MRI

Interim Data Supplied to BMI; Initial Set of Performance Data sent to BMI by MRI in

March 2009; Second Set of Interim Performance Data sent to BMI by MRI in October

2009.)

114.    DMX does not provide BMI with the number of customers that receive

each off-premises channel, but it does provide BMI with the number of customers

receiving its on-premises programs.   (Anticipated Testimony of Milt Laughlin;

Anticipated Testimony of Michael O'Neill.)  This allows weighting of on-premises

performances by program, but not off-premises performances by channel.  (Anticipated

Testimony of Bruce Owen.)

115.    DMX's provision of custom "Signature" programming almost exclusively

to on-premises (not off-premises) customers also means that off-premises music use is

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

unlikely to be representative of on-premises music use.  (Furst Dep. at 71:17-72:8; *see also* Seaton Dep. at 94:17-20; Hilburn Dep. at 114:20-116:9.)  These custom programming customers have greater control over what is played on their services, which makes it more difficult for DMX to control the amount of directly licensed programming for them.  (*See* Furst Dep. at 123:17-21, 158:22-160:14; Hilburn Dep. at 109:21-110:14, 161:4-161:16.)

116.    Counting both on and off-premises performances is also cost-effective because DMX already reports both on- and off-premises performances to BMI.  (Anticipated Testimony of Bruce Owen; Anticipated Testimony of Milt Laughlin.)

117.    Counting only off-premises performances also allows for potentially inequitable results, and for manipulation of the AFBL crediting mechanism.  (Anticipated Testimony of Bruce Owen.)

118.    DMX's head of "Select" Music Design testified that she has been instructed to try to program directly licensed music on certain off-premises channels more heavily in the overnight time period (2 a.m. to 5 a.m.) than during the daytime hours and that this same strategy was not similarly available for DMX's on-premises customers.  (Hilburn Dep. at 59:5-60:21, 99:16-108:11.)

119.    *A reasonable crediting ratio should be subject to the following two rules on which the Parties agree: (1) BMI will credit DMX with both the writer's share and the publisher's share of a performance on the basis of a direct license between DMX and that publisher, unless notified by either the writer or publisher that the writer's share is*

**RESTRICTED – SUBJECT
TO PROTECTIVE ORDER**
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

*not covered by the direct license; and (2) In the case of a direct license between DMX
and a third-party agent for a BMI affiliate, such as a law firm, BMI will credit the
affiliate's shares unless notified by either the agent or affiliate that the affiliate is not
covered by the direct license.* (Stipulated Fact.)

120.    In addition to the two rules set forth in Agreed Fact 59 (Paragraph 119), a
reasonable crediting ratio should be subject to the following rules:  (1) credits are
available only for direct licenses with BMI affiliates, and are not available based on
direct licenses with non-BMI entities who may have an ownership interest in the song, or
with ASCAP, SESAC or a foreign performing rights society, (2) For direct-license credits
claimed by DMX for performances of foreign works licensed by BMI through an
agreement with a foreign performing rights society, BMI will credit both the relevant
writer's and publisher's share to DMX only if the foreign society authorizes the writer's
share to be credited, and (3) BMI will credit DMX only for performances made after the
date that the relevant direct license was supplied to BMI pursuant to the terms of the
AFBL.  (Anticipated Testimony of Michael O'Neill.)

**I.    DMX's Direct Licenses**

121.    *Beginning in 2006, DMX commenced an initiative to acquire public
performance rights directly from music publishers.  Since that time and through the
present, DMX has entered into direct licenses covering a subset of the publishers,
musical works, and music performances that it uses on its commercial music services.*
(Stipulated Fact.)

122.    *The music industry consists of four major publishers and a large number
of independent publishers.  The four major publishers are Sony/ATV Music Publishing,*

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

*Inc. ("Sony"), Universal Music Publishing Group, EMI Music Publishing, and Warner-Chappell Music. They represent the majority of performances by most music users, including CMS providers such as DMX, when including the works of the hundreds of smaller publishers whose works they administer. Independent publishers range in size from famous or obscure songwriters – who publish their own works – to substantial enterprises with many employees and catalogues of thousands of works by various composers and songwriters.* (Stipulated Fact.)

123.   *BMI has tens of thousands of publisher affiliates.* (Stipulated Fact.)

124.   Of the licenses that DMX has obtained, there is one major publisher and many other much smaller publishers. (Anticipated Testimony of Alison Smith; Hanson Dep. at 134:20-22; *see* Knittel Dep. at 146:16-21; *see also* Jaffe Dep. at 74:14-19.) One DMX direct licensor -- Sony – accounts for approximately half of the directly licensed off-premises performances claimed by DMX as of the last statements provided by DMX to BMI in discovery. (*E.g.*, Candell Final Phase Decl. at 14-15; JX-0931, DMX 9002002-2005 (RESTRICTED).) Most of the other directly licensing publishers account for tiny percentages of DMX's off-premises performances, or none at all. (JX-0930, DMX9001999-2001 (RESTRICTED); JX-0931, DMX9002002-2005 (RESTRICTED).) For example, for the second quarter of 2009, the median royalty figure for DMX's directly licensing publishers (whose music was played at all) was $38.79 (approximately .0001% of DMX's total off-premises performances), with the lowest royalty owed being $0.48 (approximately .00001%). (JX-0931, DMX9002002-2005 (RESTRICTED); JX-0925, DMX9001802-1992 (RESTRICTED).) Many of DMX's directly licensing

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

publishers received no off-premises plays at all for that quarter. (JX-0931,

DMX9002002-2005 (RESTRICTED); DMX9001802 (RESTRICTED).)

125.     *The DMX direct licenses each contain a "Royalty Pool" provision*

*providing that, per quarter, DMX will pay the publisher for its ASCAP and BMI works*

*"royalties equal to Publisher's pro rata share of a pool of royalties calculated by*

*multiplying a fee of Six Dollars and Twenty Five Cents ($6.25) by the number of Service*

*Locations." The $6.25 per-location pool is per quarter year, so it translates to $25 per*

*location annually. The quarterly "Royalty Formula" by which each DMX direct*

*licensor's royalties are supposed to be calculated is as follows:*

> *Publisher's Pro Rata Share: For each quarter of the Term,*
> *Publisher's pro rata share of royalties will be determined by*
> *multiplying the Royalty Pool for that quarter by a fraction, the*
> *numerator of which is the total number of identified musical*
> *compositions from Publisher's Catalog which are digitally transmitted*
> *by [DMX] to Locations as part of Service programming in that*
> *quarter, and the denominator of which is the total number of musical*
> *compositions from all publisher catalogs which are digitally*
> *transmitted by [DMX] to Locations as part of Service Programming in*
> *that quarter (the "Royalty Formula").*

(Stipulated Fact.)

126.     The $25 nominal pool was not developed in collaboration or through

negotiation with any of DMX's directly licensing publishers. (Knittel Dep. at 135:20-23;

First Gertz Dep. at 15:22-16:18, 100:16-18; *see also* Hanson Dep. at 105:6-107:15,

118:25-120:8, 123:3-124:17.) Indeed, the $25 pool was developed prior to DMX even

approaching its first direct licensor, Lieber and Stoller. (First Gertz Dep. at 33:4-13,

36:6-8.) DMX has not negotiated its royalty pool with any non-major publisher. (First

Gertz Dep. at 100:16-18.)

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

127.    *DMX's direct licenses also all contain "most favored nations" clauses*

*(with some variance in language between licenses) representing that the Royalty*

*Formula will be the same for each publisher.  For example:*

> *Most Favored Nations:  [DMX] represents and warrants that the*
> *Royalty Formula will be the same as the Royalty Formula for*
> *calculating royalties payable to any third party publisher or*
> *administrator (a "Third Party"), under any catalog license between*
> *[DMX] and any such Third Party which is entered into during the*
> *Term, for the same rights, Territory, and Term as provided herein. . . .*

(Stipulated Fact.)

128.    *In some cases the most favored nations clause also requires that the*

*"schedule for accounting for . . . royalties" will be the same as any other directly*

*licensing publisher.  In at least one case this was specifically negotiated by the publisher.*

(Stipulated Fact.)

129.    The direct licenses obtained by DMX vary from each other, and from

BMI's blanket license, in several ways.  Many of the direct licenses signed to date

convey to DMX the public performing rights to the given publisher's repertory of

compositions, as well as compositions from publishing catalogs that are administered by

that publisher.  However, there are also some direct licenses that do not include the

entirety of the directly licensing publisher's catalog.  As one example, one publisher,

Dangerbird Publishing LLC, has a direct license provision that allows it to remove any

work from the scope of the direct license for any reason.  (JX-0230, DMX000295-298

(RESTRICTED), at ¶ 1(d).)  As another example, DMX's agreement with Stage Three

allows that publisher to remove the popular rock band Aerosmith from the scope of the

direct license.  (JX-0457, DMX001063-1074 (RESTRICTED), at ¶1(d).)  As a further

example, the Sony direct license contains a provision that excludes any purchased

catalogs with a value of greater than $75 million dollars; by contrast, BMI's blanket

licenses contain no such exclusions – all of BMI's affiliates' works, including subsequent

additions during the term of the license, would be immediately available to DMX.  (JX-

1148, Hanson Dep. Exhibit 11 (DMX013055-13075 (RESTRICTED)) at ¶ 1(d); *see*

Hanson Dep. at 192:20-193:14; First Gertz Dep. at 72:3-73:25; Anticipated Testimony of

Michael O'Neill.)  The Sony license also carves out the works of Neil Diamond.  (JX-

1148, Hanson Dep. Exhibit 11 (DMX013055-13075 (RESTRICTED) at ¶ 1(a) and

Schedule A "Excluded Compositions".)

130.    DMX has a license from one major publisher – Sony.  The Sony

agreement includes a large guarantee that is not present in any other direct license.

(Anticipated Testimony of Bruce Owen; *see also* Sony License, JX-1148, Hanson Dep.

Exhibit 11 (DMX013055-13075 (RESTRICTED)), at ¶ 2(e); JX-1150, Hanson Dep.

Exhibit 13 (DMX 001026-1027 (RESTRICTED)).)

131.    The Sony/DMX license that DMX obtained from Sony guarantees Sony

$2.4 million in license fees over the term of the license agreement (plus a $300,000

additional payment ostensibly to cover Sony's administrative costs associated with the

license over the term of the agreement).  (JX-1148, Sony License, Hanson Dep. Exhibit

11 (DMX013055-071 (RESTRICTED)) at ¶ 2(e); JX-1150, Hanson Dep. Exhibit 13

(DMX 001026-1027 (RESTRICTED)).)  Most of this guaranteed amount has already

been paid to Sony.  (JX-1149, Hanson Dep. Exhibit 12 (DMX013095-96

(RESTRICTED)).)

132.    In addition to the specific guarantees in the Sony agreement itself, there is a contemporaneous side letter agreement between DMX and Sony that provides for DMX to pay Sony an additional $300,000 in the first year of the Sony license "[i]n consideration of the additional administrative and overhead costs [Sony] will incur" in connection with the DMX/Sony direct license.  (JX-1150, Hanson Dep. Exhibit 13 (DMX001026-27 (RESTRICTED)) (the "Sony $300,000 Side Letter"); *see also* Hanson Dep. at 157:4-161:21; First Gertz Dep. at 68:3-70:3.)

133.    Sony is guaranteed these royalty payments regardless of how many or how few times Sony's music is played.  (Knittel Dep. at 139:4-13; Hanson Dep. at 153:18-155:6, 167:17-168:16; First Gertz Dep. at 55:14-57:13.)  These guaranteed royalty payments are also not paid on a quarterly basis, unlike royalty payments to all other direct licensors.  (*See* Hanson Dep. at 162:11-165:7; JX-1149, Hanson Dep. Exhibit 12 (DMX013095-96 (RESTRICTED)).)

134.    *The formula for Sony's guaranteed payments was calculated by taking Sony's representations regarding its 2006 royalty distributions from ASCAP and BMI, doubling that number to account for Sony's songwriters' share of performing rights organization royalties, and then adding a 50% premium to that amount.*  (Stipulated Fact.)

135.    This same 150% formula was offered by DMX to all three of the other major publishers, but not to any other publishers.  (Knittel Dep. at 144:8-146:14; *see also* Hanson Dep. at 173:9-10, 174:5-25; First Gertz Dep. at 21:11-22:17.)

136.    *The existence of a direct license agreement with a major like Sony was an important inducement for some other publishers to sign direct licenses with DMX.* (Stipulated Fact.)

137.    Some independent publishers want to know whether a major publisher has signed a direct license because it makes them more comfortable signing their own direct licenses. (*See* First Gertz Dep. at 122:4-123:6.)

138.    No one at DMX (or at MRI) has ever told any present or potential direct licensor about the Sony guaranteed advances. (See Knittel Dep. at 146:22-124:9; First Gertz Dep. at 118:7-16, 119:10-120:16.) Nor has DMX provided guarantees to any other publisher. (See First Gertz Dep. at 120:4-8; Second Gertz Dep. at 12:10-13.)

139.    DMX has incurred significant transaction costs to negotiate and administrate its direct licenses. (Anticipated Testimony of Bruce Owen; *see also e.g.,* Hanson Dep. at 203:24-205:10; Agreed Fact 56 (Paragraph 140) and Paragraph 105, *supra*.)

140.    *As of June 2009, DMX has paid approximately $816,000 to MRI in connection with its direct license program.* (Stipulated Fact.)

**DMX's Direct Licenses Are Not Valid Benchmarks for the AFBL at Issue**

141.    *DMX proposes its direct licenses with publishers as benchmarks in support of its per-location rate for the BMI blanket rate of between $11.32 and $19.57.* (Stipulated Fact.)

**RESTRICTED – SUBJECT
TO PROTECTIVE ORDER**
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

142.    This argument is incorrect for many reasons that can be summarized into three main points: (1) there is no evidence that any publisher understood and agreed to a $25 royalty pool as opposed to agreeing to a dollar amount that they hoped would be greater than what they would otherwise get from BMI; (2) the DMX direct licenses are not "willing buyer/willing seller" transactions as that term is used in determining fair market value; and (3) the direct licenses are by definition licenses only for a small fraction of the works in the BMI repertoire, and as such they cannot be used to value the BMI blanket license. (Anticipated Testimony of Bruce Owen; *see also* Paragraphs 95-106, *infra*.) Accordingly, DMX's claimed per-location rate based on its direct licenses is unreasonable as a benchmark for a BMI Adjustable Fee Blanket License rate. (Anticipated Testimony of Bruce Owen; *see also* Paragraphs 143-153, *infra*.)

*Directly Licensing Publishers Agree to More Dollars, Not a $25 Royalty Pool*

143.    There is no evidence that any publisher agreed to a $25 annual per-location rate from DMX. In its negotiations with publishers, DMX promised increased performances on its commercial music services as inducement for those publishers to enter into their direct licenses. (*See, e.g.*, First Gertz Dep. at 77:19-79:20; First Gertz Dep. Exhibit 9 (MRI004975 (RESTRICTED)); JX-0970, MRI000531-532 (RESTRICTED); *see also, e.g.*, JX-0958, MRI000358 (RESTRICTED); JX-0962, MRI 000395-398 (RESTRICTED).)

144.    Thus, the evidence is that those publishers that understood they were entering into direct licenses with DMX for the public performing right, did so based on an expectation of greater royalty payments than they were receiving from BMI (which

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

themselves were artificially low because DMX was paying at low, interim fees rather than under the BMI/CMS License) or from another performing rights organization. (Anticipated Testimony of Bruce Owen.)  A publisher that enters into a direct license based on a promise of increased performances is agreeing to the possibility of an increase in the amount of money that it will receive from DMX, *not* to any ostensible $25 per-location royalty pool.  (Anticipated Testimony of Bruce Owen; August 21, 2009 Deposition of Ed Arrow, Universal Music Publishing Group's Vice President of Copyright ("Arrow Dep.") at 71:15-72:8; *see also* Jaffe Dep. at 180:3-181:1; Deposition of Amy Bertin Candell ("Candell Dep") at 159:9-24, 179:10-181:2.)

145.    Furthermore, Sony agreed only to a multi-million dollar guarantee, not to any $25 per-location rate.  The major publishers, including Sony, were not offered the $25 per-location direct license pool; they were offered significant guaranteed payments. (*See* Paragraphs 88-91, *supra; see also* Candell Dep. at 199:6-200:10, 246:2-21.)  DMX had to guarantee Sony $2,700,000 to obtain a direct license with Sony.  (*See* Paragraphs 87-89, *supra.*)  The Sony license is different both in kind and royalty amount from the other direct licenses.  (Anticipated Testimony of Bruce Owen; *see also* Candell Dep. at 223:25-224:15.)

146.    In fact, based on the percentage of Sony music that DMX has performed on its services, Sony has been paid guaranteed advances that equate to per-location rates that are much higher than DMX's purported $25 per-location rate (and are higher than the per-location rate that BMI has proposed).  (Anticipated Testimony of Bruce Owen.)  For example, using reasonable estimates of DMX's past and potential future use of Sony's

music (*i.e.*, taking an average of 10%) and location numbers, and taking into account

DMX and Sony's settlement agreement to extend the Sony license until September 2012,

DMX's effective payment to Sony reflects a licensing pool of $76.80 per customer

location. (Anticipated Testimony of Bruce Owen; JX-1170, Knittel Dep. Exhibit 9

(DMX016082-16087 (RESTRICTED).) DMX also offered Universal, another major

publisher, guaranteed advances that also equate to per-location rates that are significantly

higher than its $25 pool. (Arrow Dep. at 60:4-12, 68:15-69:20, 71:15-73:7, 78:15-79:9.)

147.    DMX also used the fact that it obtained a major publisher (Sony) to try to

entice smaller publishers to sign direct licenses with it. (*See* Agreed Fact 55 (Paragraph

136) and Paragraph 137, *supra*.) Yet, despite the "most favored nations" clauses in every

direct license, DMX did not tell any publisher that it was actually paying Sony millions

of dollars in guaranteed royalties. (*See* Agreed Facts 50 and 51 (Paragraphs 127 and 128)

and Paragraph 138, *supra*.) Nor did DMX pay any other publisher guaranteed royalties.

(*See* Paragraphs 135 and 138, *supra*.)

*DMX Direct Licenses Are Not "Willing Buyer/Willing Seller" Transactions*

148.    The very existence of the BMI blanket license provides DMX with a great

deal of negotiating power vis-à-vis publishers. (Anticipated Testimony of Bruce Owen.)

Under the Consent Decree, BMI's affiliated publishers cannot refuse to allow DMX to

play their music on its commercial music services. (Anticipated Testimony of Bruce

Owen; BMI Consent Decree.) If DMX is unable to convince a publisher to grant it a

direct license it can still play that publisher's works by relying on the compulsory license

from BMI. (Anticipated Testimony of Bruce Owen.) Given the mandatory availability

of a BMI license, publishers lack the leverage to truly negotiate with DMX. (Anticipated Testimony of Bruce Owen.) Indeed, DMX did not negotiate the $25 pool with any independent publisher; instead offering it on essentially a take-it-or-I'll-use-your-music-anyway basis. (*See, e.g.*, First Gertz Dep. at 100:16-18.)

149. There is evidence that at least some publishers did not even understand that they were entering into direct licenses for the public performing right, but rather thought DMX's direct licenses were only for other rights, such as for digital distribution. (Anticipated Testimony of Helene Blue; Deposition of Helene Blue ("Blue Dep.") at 12:4-21, 65:15-19; Anticipated Testimony of Sindee Levin; Deposition of Sindee Levin ("Levin Dep.) at 9:4-22, 11:8-18, 14:7-21, 60:14-61:16, 82:15-23.) Some of DMX's direct license agreements also appear incomplete and not legally enforceable as they lack signatures, have blank durations and/or have other problems, such as being executed by unauthorized agents. (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Milt Laughlin; Second Gertz Dep. at 45:3-47:22.) This marketplace confusion further undermines the direct licenses as benchmarks.

*Direct Licenses Cover Only a Subset of the Works in the BMI Repertoire*

150. The DMX direct licenses – which include one major publisher and many smaller publishers – cover a different and lesser set of rights than a BMI blanket license (including the number of publishers covered by the licenses, the number of works available for use by DMX, and the percentage of works actually used by DMX on its services). (*See* Paragraphs 68, 124 and 129, *supra*; Anticipated Testimony of Bruce Owen.) The direct licenses also have different provisions than the AFBL blanket license

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

at issue, such as "take-down" provisions that make them inferior as compared to a license from BMI. (*See* Paragraph 129, *supra*.) DMX's direct licenses cannot serve as a benchmark for the much greater set of benefits offered by the BMI license. (Anticipated Testimony of Bruce Owen.)

151.    The fact that DMX relies on its direct licenses for only a subset of the works that it uses on its CMS service also provides it with the opportunity to engage in a form of cream-skimming. (Anticipated Testimony of Bruce Owen.) Using direct licensees DMX can rely on BMI for the more difficult-to-obtain (and more expensive-to-license) works and publishers instead of expending the effort and money to enter into direct licenses for those works. (Anticipated Testimony of Bruce Owen.) This means that it is not possible to equate the "value" to DMX of the works for which it chooses to seek direct licenses to that of those it chooses to obtain from BMI. (Anticipated Testimony of Bruce Owen.)

152.    DMX has entered into multiple direct license transactions, each covering a subset of the works it might use. DMX must incur transaction costs to obtain these licenses. The $25 royalty pool that DMX proposes does not include the costs to DMX of implementing its direct license program. (*See* Agreed Fact 56 (Paragraph 140 and Paragraph 139, *supra*.) This makes these transactions dissimilar from the BMI license that is the subject of this rate case, and is another reason that DMX's direct licenses are an unreasonable benchmark for an AFBL license from BMI.

153.    DMX's direct license transaction costs are also impacted by its need to identify relevant publishers of the works it performs in order to negotiate with them in the

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

first place.  (Anticipated Testimony of Bruce Owen.)  MRI, which administers DMX's direct license program, does not even know the identity of the publisher for works accounting for at least 20 percent of DMX's performances, much less how to contact them.  (Anticipated Testimony of Bruce Owen; Second Gertz Dep. at 55:9-12, 66:15-67:4; First Gertz Dep. at 39:3-23; Candell Dep. at 122:10-14.)  Identifying the relevant rights holder is a general problem for music users like DMX.  (*See* Second Gertz Dep. at 64:20-66:21.)  This problem is solved for DMX by a BMI blanket license, but not by a direct license.  (Anticipated Testimony of Bruce Owen.)

J.    **Bowling Center License**

154.    The parties are also asking this Court to set fees for a reasonable license for DMX to provide music to bowling centers.  This is a category of business that is not included in the BMI/CMS license.  (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Thomas Annastas; *see also* discussion at Paragraph 54, *supra*.)

155.    Bowling centers use music as part of the primary form of entertainment. (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Cleve Murphy.) This includes activities such as playing music at elevated levels and/or in synchronization with light shows.  (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Cleve Murphy.)  Such activities are marketed by bowling centers under names such as "Rock N Bowl" or "Cosmic Bowling."  (Anticipated Testimony of Michael O'Neill; Anticipated Testimony of Cleve Murphy.)

156.    When the current form of CMS license was signed with Muzak and the rest of the CMS industry, the license addressed the bowling center issue by expressly

same structure as the DMX carve-out license, the up-front programming and system changes completed by BMI for DMX could be used to administer that other licensee's carve-out license as well.  BMI's cost estimates charge the entire amount to DMX rather than spreading it across other licensees who may take a carve-out license; BMI also seeks to recoup the entire amount from DMX alone in just three years, even though it will be used for as long as DMX operates under a carve-out license.  (See Laughlin Dep. at 152-154, 159, 162-165, 243-246; Final Phase Deposition of Bruce Owen ("Owen Final Dep.") at 387-390.)

112.    DMX (through Music Reports, Inc. ("MRI"), the company that DMX has retained to assist it with various aspects of its direct licensing program) sent BMI interim fee data for the first and second quarters of 2008 that inadvertently included performances on several test channels – that is, channels that DMX had used internally and but not made available to customer locations.  After a series of discussions between the parties on this and other reporting issues, MRI submitted revised reports that removed the test channel performances. (Anticipated Testimony of Ron Gertz.)

## M.    DMX's Blanket Carve-Out License Proposal

113.    DMX's blanket carve-out license proposal, which is stated in terms of an annual per-location fee that would be paid for each DMX subscriber location with a credit for directly licensed performances, includes three components: (a) a Blanket Fee, (b) a Floor Fee, and (c) the Direct License Ratio.  (See Anticipated Testimony of Adam Jaffe.)

      i.    The *Blanket Fee* represents the total per-location license fee before any credits are calculated and applied for performances covered by

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

direct licenses.  It is equivalent to the fee that DMX would pay for each subscriber location if it used no directly-licensed music and completely relied on the BMI license.  (See Anticipated Testimony of Adam Jaffe.)

ii.    The *Floor Fee* is that part of the Blanket Fee that reflects the per-location amount that DMX would pay for its license even if it directly licensed all of its BMI music.  The Floor Fee ensures that BMI is paid for the costs of aggregating its repertory and for insuring that DMX will not be subject to an infringement suit – even if all of the music played in a given period is already directly cleared with publishers.  A reasonable Floor Fee should be calculated on the basis of an economically appropriate allocation of BMI's costs in providing such a license to DMX.  (See Anticipated Testimony of Adam Jaffe.)

iii.    *(Blanket Fee – Floor Fee)*:  The Per-Location Blanket-Carve-Out Fee will range from the full Blanket Fee (at the high end) to the Floor Fee (at the low end).  The difference between the Blanket Fee and the Floor Fee thus represents the total possible amount of the carve-out that will be subtracted from the Blanket Fee to calculate the Per-Location Fee.  For example, if every performance of music on DMX were directly licensed, the full difference – *i.e.*, all but the Floor Fee – would be carved out.  (See Anticipated Testimony of Adam Jaffe.)

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

iv.    The *Direct License Ratio* represents the percentage of performances of BMI-affiliated music on the DMX service in a given time period that are directly licensed by DMX. It is used to determine the amount of the carve out. The more directly licensed music, the larger the carve out. (See Anticipated Testimony of Adam Jaffe.)

114.    The annual fee to be paid to BMI for each DMX location can be expressed by the following formula:

**Per-Location Fee    =    Blanket Fee – [(Blanket Fee – Floor Fee) x Direct License Ratio]**

(See Anticipated Testimony of Adam Jaffe.)

115.    The basic carve-out mechanism is not disputed by the parties. At issue is the rate that should be set for the Blanket Fee, and the rate that should be set for the Floor Fee. (See Anticipated Testimony of Adam Jaffe.)

***The Blanket License Fee Proposed by DMX***

116.    For the Blanket Carve-Out license at issue, DMX proposes that it pay an annual Blanket Fee (pre-carve out) of between $11.32 and $19.57 per customer location. This fee is based on the hundreds of direct licenses that DMX has negotiated with publishers in the competitive marketplace. (See Anticipated Testimony of Adam Jaffe.)

117.    The Blanket Fee can be understood conceptually as having two discrete components: The first component can be seen to represent the reasonable value of having a BMI license independent of how much music is actually licensed from BMI or licensed directly. In DMX's fee proposal, this is represented by the *Floor Fee.* The second component is the fee for the BMI music that is actually used and licensed via BMI (rather

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

than directly from publishers). This second component is equal to an appropriate *Unbundled Music Fee* – the amount of money that DMX should pay (per location) for performance rights for all of the BMI-affiliated music it plays (however licensed) – times the share or fraction of BMI-affiliated music played on the service that DMX licenses from BMI rather than directly. This formulation explicitly recognizes that DMX is paying separately for (1) the general protection and any other benefits of the license not tied to the music performances actually made (via the *Floor Fee*); and (2) its BMI music performance rights. (See Anticipated Testimony of Adam Jaffe.)

118. If all of the BMI-affiliated music that DMX plays is direct-licensed, DMX pays only the *Floor Fee*. If no music is direct-licensed, then the *Share Licensed via BMI* is one, and DMX pays the *Floor Fee* plus the entire *Unbundled Music Fee*, that is, the full *Blanket Fee*. (See Anticipated Testimony of Adam Jaffe.)

**The Unbundled Music Fee should be Based on DMX's Direct Licenses**

119. The best available benchmark for the *Unbundled Music Fee* element of the *Blanket Fee* is the direct license experience of DMX. These direct licenses are market transactions for comparable unbundled music performance rights. (See Anticipated Testimony of Adam Jaffe.)

120. These transactions occur in the marketplace with the rightsholders themselves deciding whether or not the compensation offered by DMX for performing their music is reasonable. Publishers have the option of signing a direct license with DMX and being paid directly by DMX or continuing to be paid by the PROs. In deciding between the two options, rational publishers will consider their expected future payments from both DMX and PROs. They thereby provide the clearest and most direct market

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

evidence of a reasonable level for the *Unbundled Music Fee*. (See Anticipated Testimony of Adam Jaffe.)

121.    In fact, these direct license transactions are the *only* available evidence of competitive market-based transactions for public performance rights for CMS. For the first time in the CMS industry, an industry member has obtained a significant number of direct licenses for performance rights without going through a Performing Rights Organization. (See Anticipated Testimony of Adam Jaffe.)

122.    The fact that hundreds of publishers representing thousands of catalogs have chosen the direct license offered by DMX provides strong evidence that the rates offered by DMX are reasonable. Furthermore, these licenses include the rights to perform works by some of the world's most prominent artists. If the royalties offered by DMX were too low, these hundreds of publishers would have simply elected to continue to be paid through BMI and not sign the direct license with DMX. (See Anticipated Testimony of Adam Jaffe.)

123.    The refusal of some publishers to accept a DMX direct licensing proposal, by contrast, cannot be taken as a sign that the rates offered by DMX are unreasonable. Rather, they may simply reflect one or more of: BMI's willingness to manipulate its distributions to dissuade direct licensing, as described above in paragraphs 47 to 56; other BMI efforts at dissuasion, such as overconfident predictions as to likely outcomes in this litigation, publisher concerns over "breaking ranks" from a blanket license system that has served them well over many years (many of the more prominent publishers have close and deep relationships with BMI and ASCAP, including sitting on ASCAP's Board of Directors); or simple inertia. (See Anticipated Testimony of Adam Jaffe.)

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

*The Direct Licenses Suggest a Blanket Fee of $11.32 to $19.57*

124.    The DMX direct license evidence points to a reasonable Blanket Fee (before any carve-outs) of between $11.32 and $19.57 per location, depending on the assumptions one makes about the share of DMX performances over the license period attributable to directly-licensed compositions, the share attributable to Sony compositions in particular, the value ascribed to the mechanical rights conveyed along with the performance rights by the direct licenses, and the value assigned to the Floor Fee. (See Anticipated Testimony of Amy Candell.)

125.    In order to use DMX's direct licenses as a benchmark for fee setting for the BMI blanket license, the $25-per-location royalty in the direct licenses first must be adjusted to reflect BMI's share of DMX performances (or a reasonable estimate concerning that share). Once this adjustment has been made, the resulting number will be the value of performances that BMI-affiliated publishers agreed to accept in competitive marketplace transactions. (See Anticipated Testimony of Amy Candell.)

126.    Based on distribution data provided by BMI in this proceeding, BMI's share of total performances on DMX is 40%. Applying this 40% share to the $25 per-location fee in the benchmark direct licenses results in a BMI royalty rate of $10. (See Anticipated Testimony of Amy Candell.)

127.    This $10 figure corresponds to the *Unbundled Music Fee* portion of the Blanket Fee – that is, the fee for music rights alone. Adding in the 11.7% *Floor Fee* results in a total Blanket fee of $11.32. (See Anticipated Testimony of Amy Candell.)

128.    The Sony guarantee can also be factored into the direct license benchmark. Were one to assume either that DMX will recoup the Sony guarantee, or conclude that

**RESTRICTED – SUBJECT**
**TO PROTECTIVE ORDER**
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

the Sony guarantee is a unique payment that does not represent a true payment for performance rights alone, no adjustment would be necessary to the $11.32 direct-license benchmark calculated above. (See Anticipated Testimony of Amy Candell.)

129.    If DMX does not fully recoup the Sony guarantee, and it were determined that that guarantee properly should be factored into the adjustment of the $25-per-location royalty benchmark, then the benchmark could be adjusted upward to account for the amount of the Sony guarantee that remains un-recouped. If one follows this approach, the resulting benchmark fee for DMX direct-license performances of BMI-affiliated music rises to $19.57 per location after addition of the *Floor Fee*, assuming DMX's second quarter 2009 share of directly-licensed music (26% of all DMX uses of BMI music), including Sony's (13%), is maintained, on average, over the course of license term and the number of DMX subscriber locations does not increase (or decrease). (See Anticipated Testimony of Amy Candell.)

130.    As DMX is more successful in increasing its share of Sony music above these levels – *i.e.*, the closer it gets to recouping the guaranteed payment – the benchmark fee implied by the direct license evidence will fall from $19.57 towards $11.32. Likewise, the more locations DMX adds, through commencement of service to many thousands of DirecTV commercial accounts in February 2010 or otherwise, the faster it can recoup the Sony guarantee and the lower the implied benchmark. (See Anticipated Testimony of Amy Candell.)

***BMI's Agreements with Muzak and Other CMS Providers Suggest a Ceiling on a Reasonable Fee for DMX of Not More than $22***

131.    The direct-license transactions (together with a proper valuation placed on a *Floor Fee)* provide the best available benchmark for reasonable fees in this proceeding

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

because they were struck directly between the licensee and the rightsholders in a competitive market. In the alternative, and as a check on the validity of the competitive market benchmark, the very BMI/Muzak relationship on which BMI relies can be examined. When properly analyzed, as did this Court at the interim fee stage of this proceeding, this alternative benchmark thoroughly refutes the reasonableness of BMI's proffered rate and provides a somewhat higher upper bound on a reasonable rate here. (See Anticipated Testimony of Adam Jaffe.)

132.    In order to use the BMI/Muzak agreement as a benchmark, it is critical to consider the entirety of the BMI/Muzak transaction, as opposed to cherry-picking literally half of it, as BMI attempts to do. When properly adjusted, the BMI/Muzak agreement suggests a reasonable level for the *Blanket Fee* of between $21.40 and $22.08. (See Anticipated Testimony of Adam Jaffe.)

133.    To appropriately calculate the per-location rate governing the most analogous licensing period, 2004-2009, one must first reduce the amount attributable to the 2004-2009 period by the $5 million ascribed by BMI to the 1994-2004 period. With that adjustment, Muzak's annual payment for royalties for 2004-2009 approximate $5 million, rather than $6 million, per year. This adjustment alone decreases the per-location fee from BMI's proffered $36.36 to $30.30. (See Anticipated Testimony of Amy Candell.)

134.    A further adjustment to the benchmark is required to account for the fact, as described above in paragraphs 62 to 65, that the BMI/Muzak agreement contemplates 8% per year organic growth before any additional fees are owed to BMI. The impact of applying this adjustment (in addition to the adjustment for the 1994-2004 settlement

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

period) is to further reduce the per-location fee implied by BMI's benchmark to $23.91.
(See Anticipated Testimony of Amy Candell.)

135.    Finally, DMX's use of BMI music in relation to that of Muzak must also
be accounted for in any use of the Muzak transaction as a benchmark.  The difference in
BMI music use by Muzak and DMX as discussed in paragraphs 66 above calls for a
downward adjustment to the BMI-Muzak rate.  BMI's share of total music plays on
DMX is only 89% of its share on Muzak (40%/45%).  (See Anticipated Testimony of
Amy Candell.)

136.    Adjusting the BMI-Muzak agreement to account for (i) the
contemporaneous settlement of the interim period, (ii) the anticipated organic growth,
and (iii) the differences in intensity of the use of BMI music by DMX and Muzak leads to
an actual rate not of $36.36 per location (as averaged over the five year term), but $21.40
to $22.08 per location.  (See Anticipated Testimony of Amy Candell.)

137.    Even as adjusted in this fashion, this rate should at most be viewed as on
the high end of the range of reasonable rates, given BMI's monopoly power and Muzak's
indisposition to make the large investment necessary to continue to pursue a rate
proceeding against BMI – particularly at a time when it was already engaged, and had
heavily invested, in such a proceeding with ASCAP.  (See Anticipated Testimony of
Adam Jaffe.)

### BMI Agreements with Other CMS Providers Likewise Suggest Per-Location Rates Comparable to the $22 Muzak Rate

138.    As described in paragraphs 67 to 82, BMI's subsequent agreements with
other large CMS providers support the same conclusion – that the $36.36 per-location
rate that BMI attempts to derive from these agreements must be adjusted downward to

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

reach any arguably appropriate benchmark rate for DMX.  (See Anticipated Testimony of

Amy Candell.)

### DMX's Floor Fee Proposal

#### Overview

139.    The parties agree that the Blanket Carve-Out license should include a

*Floor Fee*.  They disagree only on the particular level at which the *Floor Fee* should be

set.  (See Anticipated Testimony of Adam Jaffe.)

140.    The *Floor Fee* is the mechanism by which DMX pays BMI for the costs of

aggregating its repertory and for the insuring that DMX will not be subject to an

infringement suit if it accidentally performs a work in the BMI repertoire without a direct

license.  It reflects the fact that the cost of offering a blanket license includes not only the

costs for the rights to perform the music (which is accounted for by the *Unbundled Music*

*Fee*), but also the costs of aggregating those rights.  (See Anticipated Testimony of Adam

Jaffe.)

#### BMI's Overhead Costs Suggest a Floor Fee of 11.7% of the Blanket Fee

141.    As a matter of economics, the *Floor Fee* should be set as a percentage of

the *Blanket Fee* so that each of BMI's licensees covers a share of BMI's costs that is

proportional to the royalty fees it pays.  This is the cost allocation approach that is

embedded implicitly in the traditional blanket license.  It ensures that BMI will continue

to get the same contribution toward covering its non-royalty costs regardless of the

extent to which DMX (or any other licensee) utilizes the carve-out to reduce its royalty

payments.  (See Anticipated Testimony of Adam Jaffe.)

**RESTRICTED – SUBJECT
TO PROTECTIVE ORDER**
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

142.    In a competitive market, the value of the aggregation and related services would simply be the cost of providing those services because competition among different providers for those services would drive payments to the level of cost. Because performing rights organizations (including BMI) do not operate in a competitive environment, there is no reliable estimate of these costs.  BMI does, however, reports its operating costs (*i.e.*, the costs  of aggregating its repertory and administering its licenses). In a 2008 press release, BMI published that its operating costs were at 11.7%.  While this figure likely overstates the competitive rate in BMI's favor, it is the best information available.  (See Anticipated Testimony of Adam Jaffe.)

### *Incremental Costs for the Carve-Out License*

143.    *It is appropriate to add into the Floor Fee any net additional or incremental costs created for BMI to implement and administer the blanket-carve-out license.  It is important, however, to be scrupulous in ensuring that only true incremental costs are added in this way, and to make sure that this cost is calculated appropriately.* (Stipulated Facts.)

144.    Because the *Floor Fee* must be paid regardless of how much music is direct-licensed, it represents a limit on the functioning of competition in this market. BMI, therefore, has every incentive to make the *Floor Fee* as high as possible, in order to preserve its revenue stream in the face of emerging competition.  The Court should be skeptical of any claims made by BMI regarding the increased costs associated with direct licensing.  As earlier noted in paragraph 79, BMI did not charge Trusonic any additional fee for the right to avail itself of direct license savings.  (See Anticipated Testimony of Adam Jaffe.)

**RESTRICTED – SUBJECT
TO PROTECTIVE ORDER**
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

145.    The incremental costs should be calculated on a net basis.  While BMI may incur additional costs to operate the blanket-carve-out license, it also may save costs that it no longer has to incur related to the traditional blanket license.  Any cost savings should be subtracted from any increased costs associated with managing the carve-out provisions.  (See Anticipated Testimony of Adam Jaffe.)

146.    It is also important to separate ongoing costs specific to processing transactions for DMX from one-time set-up costs associated with the initial creation of the systems necessary to manage the blanket carve-out license across all licensees.  The ongoing costs specific to DMX should be borne by DMX.  The one-time set-up costs should be spread across all users of the license – both current and future.  (See Anticipated Testimony of Adam Jaffe.)

147.    Any alleged incremental costs of the blanket carve-out license should be real costs justified by empirical data.  BMI has not yet presented any documentary evidence supporting its incremental cost evidence.  (See Anticipated Testimony of Adam Jaffe.)

148.    Any *proven* incremental costs (both those specific to DMX and DMX's share of the set-up costs) should be recovered through an increased *Floor Fee* and not be added to the overall *Blanket Fee*.  (See Anticipated Testimony of Adam Jaffe.)

***The Direct License Ratio Proposed by DMX***

149.    The direct license ratio is the mechanism designed to credit DMX for its use of directly licensed works.  DMX and BMI agree on the basic structure of the ratio. (See Anticipated Testimony of Adam Jaffe.)

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

150.    DMX's credits should be proportional to the ratio of DMX's directly licensed performances of works in the BMI repertoire to the total performances of BMI works.  (See Anticipated Testimony of Adam Jaffe.)

151.    To calculate DMX's credits, the *Direct License Ratio* is applied against the difference between the *Blanket Fee* and the *Floor Fee* (what has also been referred to as the *Unbundled Music Fee*) – i.e., that portion of the *Blanket Fee* available for carve-out.  All parties agree that this crediting mechanism is reasonable.  (See Anticipated Testimony of Adam Jaffe.)

152.    For certain tracks played on DMX, DMX may not be able to identify the publisher or PRO affiliation.  The question is whether these are "BMI Works" (and thus included in the denominator of the *Direct License Ratio*).  DMX proposes that the parties share the burden of identifying unknown rights holders to such works.  As a result, DMX proposes that 40% of such unidentified works should be counted in the denominator of the *Direct License Ratio*.  This is based on the overall share of performances on DMX that are BMI-affiliated.  This is reasonable, and is in fact conservative as the fact that these works are unidentified makes it even less likely that they are BMI-affiliated.  (See Anticipated Testimony of Adam Jaffe.)

### *Use of Off-Premise Performances for Reporting and Calculation of the Direct-License Ratio*

153.    DMX proposes using its off-premise performance data to calculate the Direct License Ratio for DMX overall, including as a proxy for the distribution of royalties associated with DMX's on-premise locations.  This is reasonable and supported by the marketplace.  (See Anticipated Testimony of Adam Jaffe.)

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

154.    All of the publishers with whom DMX has direct licenses have agreed to use the off-premise performances as a proxy for all performances.  The fact that Sony/ATV and all of the other direct licensees agreed to have their payments based solely on off-premise performances is persuasive evidence that there is no significant and systematic error in doing so.  BMI, as described above, regularly uses proxies for distribution purposes, with little if any dispute from the marketplace.  (See Anticipated Testimony of Adam Jaffe.)

155.    Furthermore, given that all of the publishers with whom DMX has direct licenses have already agreed to the off-premise formulation in arms-length competitive market transactions, calculating the share for the blanket carve-out license on a basis different from that used in the direct-license agreements would add nothing other than an unnecessary burden on the direct-licensing process.  (See Anticipated Testimony of Adam Jaffe.)

***Other Issues Related to the Direct License Ratio***

156.    *A reasonable crediting ratio should be subject to the following two rules on which the Parties agree: (1) BMI will credit DMX with both the writer's share and the publisher's share of a performance on the basis of a direct license between DMX and that publisher, unless notified by either the writer or publisher that the writer's share is not covered by the direct license; and (2) In the case of a direct license between DMX and a third-party agent for a BMI affiliate, such as a law firm, BMI will credit the affiliate's shares unless notified by either the agent or affiliate that the affiliate is not covered by the direct license.*  (Stipulated Finding.)

RESTRICTED – SUBJECT
TO PROTECTIVE ORDER
In BMI v. DMX, S.D.N.Y. 08 Civ. 216 (LLS)

157.    A reasonable crediting ratio also should be subject to the following additional rules: (1) credits should be available for DMX direct licenses with affiliates of a foreign performing rights society that has a reciprocal representation agreement with BMI; (2) for direct-license credits claimed by DMX for performances of foreign works licensed by BMI through an agreement with a foreign performing rights society, BMI will credit both the relevant writer's and publisher's share to DMX unless notified by the foreign society that the writer's share is not covered by the direct license; and (3) BMI will credit DMX for performances made after the effective date of the direct license. (See Anticipated Testimony of Adam Jaffe.)

**N.    An Increase in the Blanket Fee to Reflect Option Value is Unreasonable**

158.    BMI argues that the blanket fee should be increased above the BMI/Muzak rate in order to reflect the "option value" associated with the blanket-carve out license.  This increase is neither economically appropriate nor in furtherance of the root purposes of the BMI Consent decree.. (See Anticipated Testimony of Adam Jaffe.)

159.    As a matter of economics, in competitive markets, prices do not increase simply because the value of the good to the buyer increases.  Competition forces producers to offer superior products without raising the price to reflect those improvements.  The simple fact that a user of a blanket carve-out license may find that license more valuable than a traditional blanket license does not imply that the price for the license should necessarily increase.  (See Anticipated Testimony of Adam Jaffe.)

160.    In any event, we are not here dealing with a competitive market but, rather, with rate-setting under the auspices of BMI's Consent Decree.  That decree, as affirmed by the courts, requires BMI to offer users such as DMX a blanket carve-out

RESTRICTED - SUBJECT TO PROTECTIVE ORDER
in BMI v. DMX, S.D.N.Y., 08 Civ. 216 (LLS)

Page 1

```
1               UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
2

    BROADCAST MUSIC, INC.,        )
3               Petitioner,       )  08 Civ. 216 (LLS)
                                  )
4         -against-              )  Related to United States v.
                                  )  Broadcast Music, Inc.,
5    DMX, INC.,                   )  64 Civ. 3787 (LLS)
                Respondent.       )      FILED UNDER SEAL
6                                    SUBJECT TO PROTECTIVE ORDER
7                                    Contents hereof are subject to a court-ordered
                                     protective order governing its use and dissemination.
8    ****************************************************
9                    ORAL DEPOSITION OF
                     BENJAMIN M. HANSON
10                   September 25, 2008
                        Volume 1
11
     ****************************************************
12
13
14            ORAL DEPOSITION OF BENJAMIN M. HANSON,
15   produced as a witness at the instance of the Petitioner,
16   and duly sworn, was taken in the above-styled and
17   numbered cause on the 25th of September, 2008, from
18   9:14 a.m. to 3:13 p.m., before Leigh Anne Williams, CSR
19   in and for the State of Texas, reported by machine
20   shorthand, at the law offices of Fulbright & Jaworski,
21   L.L.P., 600 Congress, Suite 2400, Austin, Texas, pursuant
22   to the Federal Rules of Civil Procedure.
23
24
25
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-94

RESTRICTED - SUBJECT TO PROTECTIVE ORDER
in BMI v. DMX, S.D.N.Y., 08 Civ. 216 (LLS)

Page 114

1   A.   Not to my knowledge.
2   Q.   Do you know at that early -- I guess you've
3   been calling it the first wave. Is that right?
4   A.   The initial wave.
5   Q.   Okay. The initial wave.
6        And the initial wave, in your mind, is what
7   period of time?
8   A.   Spring through summer '06.
9   Q.   And then would there have been a second wave?
10  A.   Not to my knowledge. I just say -- I call it
11  an initial wave.
12  Q.   You just mean that's the initial wave --
13  A.   That was the first opportunity that the form
14  license was put out on the street, so to speak, in a
15  broad manner.
16  Q.   And do you know, during this initial wave
17  period, how many publishers signed on?
18  A.   I don't know.
19  Q.   Do you know approximately?
20  A.   I don't know.
21  Q.   So, is it accurate to say that MRI did not use
22  as a criteria for identifying potential direct licensors
23  whether or not DMX already had to negotiate with those
24  direct licensors for mechanical rights?
25       MR. RICH:  Object to the form to the extent

Page 115

1   it purports to tie the prior testimony.
2        You can answer.
3   A.   What I can tell you is that Jean-Paul
4   Jumonville did not go back to relationships that he had
5   with artists for the purposes of going and getting a
6   direct license for the reproduction and performance
7   rights until the latter part of 2007 probably, maybe a
8   little bit earlier, maybe the early part of 2007. So,
9   this was -- He was not engaged for that purpose early on
10  in the initial wave, as we're calling it.
11  Q.   (By Mr. Benton)  Okay. So -- and I just want
12  to be clear then. So, in the initial wave, there was no
13  effort to tie who MRI went to to obtain direct licenses
14  for the performing right to who DMX had to independently
15  go to to get the mechanical rights. Is that correct?
16       MR. RICH:  No effort on whose part? DMX's
17  part or MRI's part? He's testified he doesn't know what
18  MRI -- how MRI --
19       MR. BENTON:  No effort on DMX's part.
20  A.   I don't know. Actually, I don't understand the
21  question.
22  Q.   (By Mr. Benton)  Okay. Is it your testimony in
23  your declaration that, one of the -- and I'll use the word
24  synergies, that DMX can exploit is that it has to, in
25  certain circumstances, go to publishers to obtain

Page 116

1   mechanical rights. Is that correct?
2   A.   In connection with the direct licensing
3   initiative?
4   Q.   Yes.
5        One of the reasons -- Is it your testimony
6   that one of the reasons that -- or efficiencies involved
7   in DMX's direct licensing program is that it has to go to
8   certain publishers for mechanical rights, and, so, it
9   might as well, at the same time, negotiate for performing
10  rights?
11  A.   Yes.
12  Q.   Okay. And what I'm asking is, was that -- from
13  your knowledge, was that not a criteria that MRI used --
14  or strike that.
15       Was it a criteria that MRI used in
16  approaching direct licensors as part of the initial wave
17  whether or not DMX had to approach the publisher anyway
18  for the mechanical rights?
19  A.   I want to go back and clear something up.
20  Q.   Sure.
21  A.   If you're working under the assumption that
22  Jean-Paul Jumonville approached publishers directly for
23  mechanical rights and that was what his job was, that's
24  not correct.
25  Q.   Okay.

Page 117

1   A.   He approached -- His original job description
2   prior to our telling him to go to publishers directly was
3   to focus on the sound recording side.
4        Okay. I just want to make sure that
5   that --
6   Q.   Yeah, I'm not referring to Jean-Paul Jumonville
7   right now.
8   A.   Okay. So --
9   Q.   I'm thinking the primary wave, I thought, was
10  from the spring to the summer of 2006?
11  A.   Correct.
12  Q.   And MRI was choosing which publishers to go to.
13  Is that correct?
14  A.   Correct.
15  Q.   And they weren't choosing them based on whether
16  DMX independently obtained mechanical rights from those
17  publishers. Right?
18  A.   There was no --
19       MR. RICH:  Can I hear the question, please?
20       (The requested portion was read back.)
21       MR. RICH:  I believe he testified he
22  doesn't know the basis on which he selected them.
23  A.   There was no criteria, to my knowledge.
24  Q.   (By Mr. Benton)  Fine.
25       So, they weren't given that criteria by

30 (Pages 114 to 117)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-95

RESTRICTED - SUBJECT TO PROTECTIVE ORDER
in BMI v. DMX, S.D.N.Y., 08 Civ. 216 (LLS)

Page 118

1  you?
2     A.  No.
3     Q.  By DMX, to your knowledge?
4     A.  No.
5     Q.  Okay.  From the beginning of the direct
6  licensing initiative in the spring of 2006 until you left
7  DMX in the summer of 2008, how many potential direct
8  licensors have been approached by DMX and/or MRI?
9     A.  I don't know that number.
10    Q.  Okay.  Do you have any idea of the order of
11 magnitude?
12    A.  I do not know the number of publishers that
13 were approached.
14    Q.  Is it more than 196?
15    A.  I don't know that number.
16    Q.  Has every direct licensor -- or potential
17 direct licensor that you've approached signed a license?
18    A.  I don't know.  My recollection is there are
19 folks that have passed for the time being.
20    Q.  Okay.  So, there are people that have said no?
21    A.  196 is a subset of a larger number.
22    Q.  And you -- but you don't know what the larger
23 number is?
24    A.  I don't know what the larger number is.
25    Q.  Were you involved in -- personally in

Page 119

1  negotiating with direct licensors?
2     A.  I was.
3     Q.  Do you -- How many times?
4     A.  The only license that I recall directly getting
5  involved in was the Sony/ATV license and, let me say,
6  concerning the strategy associated with other major
7  publishers and whether or not we could get a direct
8  license from those other major publishers.
9     Q.  Okay.  I think I understand.
10       So, you were involved behind the scenes, so
11 to speak, with some group of publishers --
12    A.  Correct.
13    Q.  -- but your direct communications were limited
14 to negotiations with Sony?
15    A.  Correct.
16    Q.  Do you have any knowledge as to whether -- with
17 respect to the 196 direct licenses that DMX has in place,
18 as to whether there was commonly back-and-forth in the
19 negotiations, give and take?
20    A.  I certainly know from the Sony -- from my
21 personal experience with the Sony perspective, yes, that
22 is the case.  From other perspectives, I don't really
23 know.
24    Q.  So, you know that that was the case with Sony;
25 you don't know with respect to the other 195?

Page 120

1     A.  Correct.
2     Q.  Okay.  From DMX's perspective was the $25
3  royalty pool negotiable?
4     A.  Was it negotiable?  I was never asked the
5  question.
6     Q.  Okay.  Did you ever offer anything other than
7  the $25 to --
8     A.  I don't believe so.
9     Q.  Are you aware of any instances in which a
10 potential direct licensor asked DMX if it had signed any
11 major publishers?
12    A.  I think my recollection is that some of those
13 status reports that I saw from -- containing responses
14 from certain publishers that had been approached were
15 that -- was something to the effect of call me when you
16 get a major signed.
17    Q.  Okay.  And, so, you received status reports?
18    A.  Correct.
19    Q.  And how often did you receive those reports?
20    A.  As often as I requested them, but typically it
21 was once a month.
22    Q.  Okay.  And who provided those reports to you?
23    A.  Trent Smith, I believe.
24    Q.  From MRI?
25    A.  MRI.

Page 121

1     Q.  Okay.  And when did these reports start coming
2  to you?
3     A.  It would have been at or around the time that
4  we signed the first deal, and my recollection is May of
5  '06.
6     Q.  Okay.  So -- and did you read those reports
7  generally when you received them?
8     A.  Correct.
9     Q.  Okay.  And those reports gave you details about
10 the back-and-forth in various negotiations, if any?
11    A.  Correct.
12    Q.  Do you have an understanding as to why
13 potential direct licensors asked if DMX had signed a
14 major?
15    A.  Do I have an understanding of that?  I don't
16 understand why they would say that, no.
17    Q.  Did anyone ever tell you why they asked that?
18    A.  No.
19    Q.  So, it's your testimony you have no idea why a
20 potential direct licensor would ask if DMX had signed a
21 major to a direct licensor?
22       MR. RICH:  Based on communications from
23 such entities, is the question?
24       MR. BENTON:  No, that's not the question.
25    Q.  (By Mr. Benton)  The question is, is it your

31 (Pages 118 to 121)

**A-96**

RESTRICTED - SUBJECT TO PROTECTIVE ORDER
in BMI v. DMX, S.D.N.Y., 08 Civ. 216 (LLS)

Page 150

1  Paragraph 4, and it says the term of this agreement will
2  commence on -- this one is blank, and will continue for a
3  period of three years thereafter. Are the licenses that
4  DMX has obtained from publishers typically three years?
5      A.  The form of the license was certainly, I
6  believe, for three years, and I don't think there was a
7  great degree of negotiation on the term. There may have
8  been differences, but I'm not certain.
9      Q.  Okay. There may have been some different
10  terms, but this is the standard form term?
11     A.  This is the standard form term.
12     Q.  In situations such as this where the
13  commencement date is blank, does DMX have a position as
14  to when the agreement is effective?
15     A.  We don't have a position at this point.  I
16  mean, I would -- I guess I would look to the front of the
17  agreement as one thing to look at.
18     Q.  As the effective date?
19     A.  As the effective date.
20     Q.  Okay. And then Paragraph 5 , Indemnity --
21  Now, this indemnity, you'd agree, is limited to breaches
22  of the warranties and representations of the parties
23  under the agreement?
24     A.  This particular indemnity is relate -- is --
25  Yes.

Page 151

1      Q.  And this is part -- This indemnity is part of
2  the form agreement -- the form direct licensing
3  agreements. Isn't that right?
4      A.  Correct.
5      Q.  Okay. Again, I understand -- You know, all
6  these questions, when I'm talking about the standard
7  form, I understand that in any given instance, there
8  might have been a negotiation with a directly licensing
9  publisher to change the language, but the standard
10  form -- this is the standard indemnity. Is that right?
11     A.  Yes.
12     Q.  Okay. And does this indemnity include a
13  defense obligation?
14     A.  It's not specifically -- No, not specifically
15  outlined.
16     Q.  Okay. And then finally on this license,
17  Paragraph 5(d), Availability -- and this says, "Publisher
18  represents and warrants that other than is provided in
19  Section 1(d) above" -- which is a specific section for
20  exclusions from publisher's catalog -- "the entirety of
21  publisher's catalog will be available for use by licensee
22  as provided herein during the term."
23          In the standard form license, do directly
24  licensing publishers grant DMX the entirety of their
25  catalogs?

Page 152

1      A.  I don't know. I would assume, if this is
2  similar to the form documents that (d) is a provision,
3  that that regularly occurred in the form documents that
4  were not specifically negotiated by any other independent
5  publishers.
6      Q.  Right.
7          And again, I want to -- Like I said, that's
8  kind of a given that there might be individualized
9  changes, but I just want to make clear that you are
10  familiar with the standard form direct license.
11     A.  I'm familiar with it. I don't recall if this
12  provision is in the form or not.
13     Q.  But this is a form direct license, isn't it, or
14  no?
15     A.  Well, I mean, I think so. I mean, if I saw the
16  form, that would be one thing. This is not a form. This
17  is actually an executed license.
18     Q.  Right.
19          Do you know if DMX -- and if you don't
20  know, that's fine -- if DMX provided BMI, as part of the
21  discovery process, with a form license?
22     A.  I don't know if we did or not.
23     Q.  Okay. Do you have any idea or knowledge as to
24  how many publishers, if any, have categorically said no
25  to this direct license?

Page 153

1      A.  Categorically said no?
2      Q.  Uh-huh.
3      A.  I don't think anybody categorically said no.
4      Q.  Do you know how many have just said no?
5          MR. RICH:  Object to the form.
6          Go ahead.
7      A.  My recollection of the status reports that I
8  saw is that nobody has categorically said no.
9      Q.  (By Mr. Benton) According to the status
10  reports that you've seen, are there direct licensors that
11  have been approached by DMX, but that have not, to date,
12  signed licenses?
13     A.  I think that's an accurate statement.
14     Q.  Do you have any idea of the number?
15     A.  I don't.
16          MR. BENTON:  Mark this as Hanson 11.
17          (Exhibit 11 marked.)
18     Q.  (By Mr. Benton) Do you recognize this
19  document?
20     A.  I do.
21     Q.  And what is it?
22     A.  This is the Sony/ATV Musical Composition
23  Catalog License agreement.
24     Q.  Okay. And you testified earlier that you were
25  involved with the negotiations for this license?

39 (Pages 150 to 153)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-97

RESTRICTED - SUBJECT TO PROTECTIVE ORDER
in BMI v. DMX, S.D.N.Y., 08 Civ. 216 (LLS)

Page 154

1    A.   I was involved in these negotiations.
2    Q.   Were you involved from the start?
3    A.   Involved in what respect?
4    Q.   Communicating with Sony.
5    A.   Not directly communicating with Sony, no.
6    Q.   Were you involved in formulating a strategy for
7    obtaining a license from Sony?
8    A.   Correct.
9    Q.   The Sony license provides for nonreturnable,
10   nonrefundable advances. Is that correct?
11   A.   Nonreturnable, nonrefundable, yes, or
12   recoupable.
13   Q.   Okay. But the advances themselves are
14   nonreturnable and nonrefundable regardless of how many
15   times DMX during any particular year actually performs
16   Sony's works. Is that correct?
17   A.   The advance portions, yes, sir, are
18   nonreturnable and nonrefundable.
19   Q.   Okay. And they're recoupable against any
20   royalties based on Sony's performances. Is that right?
21   A.   Correct.
22   Q.   Okay. And the advance listed on Page 4 of the
23   license under Section 2(e) for the period January 1st,
24   2008, through December 31st, 2008, is $900,000. Is that
25   correct?

Page 155

1    A.   Correct.
2    Q.   And again, that 900,000 is not returnable from
3    Sony to DMX. Correct?
4    A.   Correct.
5    Q.   And it's not refundable?
6    A.   Correct.
7         MR. RICH:  Why are we repeating what he's
8    already conceded three times. This is not closing
9    argument or, you know, getting into rhetorical speeches.
10        MR. BENTON: I'll make the record I want.
11        MR. RICH: Well, make the record
12   efficiently, please.
13        MR. BENTON: No. I'll ask the questions I
14   like.
15        MR. RICH: Every time he answers, you have
16   to summarize in your own words what he says.
17   Q.   (By Mr. Benton) Now, this 900,000 is paid in
18   two tranches?
19   A.   Correct.
20   Q.   And then for subsequent years, the amount is
21   seven hundred and fifty for 2009 through -- for the year
22   2009. Is that correct?
23   A.   I agree, yes.
24   Q.   And seven hundred and fifty for the following
25   year?

Page 156

1    A.   Yeah, I agree to that, yes.
2    Q.   And is there any reason that it's higher in the
3    first year than in the second two years?
4    A.   Is there any reason?
5         MR. RICH: Other than what's stated here,
6    are you saying what's the ration -- is there a rationale
7    for it?
8    Q.   (By Mr. Benton) What's the rationale? Is
9    there any?
10        MR. BENTON: Reason and rationale are
11   basically the same thing, Bruce.
12   A.   Part of the negotiations.
13   Q.   (By Mr. Benton) Okay. And do you remember why
14   that was negotiated that way?
15   A.   I don't recall.
16   Q.   Do you remember who asked for it to be that
17   way?
18   A.   I'm sure Sony did.
19   Q.   Okay. Why are you sure that Sony did?
20   A.   It's -- If you take the average of the
21   2.4 million over the three years, that's $800,000. It
22   appears that as a result of that, there's an advance in
23   year one of something that's more than what the pro rata
24   portion should be. That is favorable to Sony. I would,
25   therefore, conclude that Sony probably asked for it and

Page 157

1    we conceded the point.
2    Q.   Okay.
3         (Exhibits 12 and 13 marked.)
4    Q.   (By Mr. Benton) So, if you could look at
5    Hanson Exhibit 13. Do you recognize this document?
6    A.   Yes.
7    Q.   And what is it?
8    A.   This is the so-called side letter between
9    Sony/ATV Music Publishing, Inc., and DMX.
10   Q.   Okay. And this provides for an extra $300,000
11   payment to Sony in the first year of the term?
12   A.   It provides for a $300,000 payment to Sony in
13   the first year of the term.
14   Q.   And it's addressed to the attention of
15   Mr. Martin Bandier. Do you know who that is?
16   A.   I do know who --
17   Q.   Who --
18   A.   -- Marty Bandier is.
19   Q.   And who is he?
20   A.   I don't know his title, but he's either the
21   chairman or the CEO of Sony/ATV Music Publishing.
22   Q.   And, so, is it correct to say that in the first
23   year of the term, that is January 1st, 2008, through
24   December 31st, 2008, that Sony would actually receive
25   royalties of 1.2 million?

40 (Pages 154 to 157)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-98

RESTRICTED - SUBJECT TO PROTECTIVE ORDER
in BMI v. DMX, S.D.N.Y., 08 Civ. 216 (LLS)

Page 170

1   A.   That was a portion of what we were obligated to
2   do under the terms of the license agreement.
3   Q.   Right.
4        Recoupable -- Some of it -- At least a
5   portion of which is recoupable?
6   A.   Correct. Or all. Right.
7   Q.   Or all. Okay.
8        Okay. So, we'll go back. So, Sony's
9   advances under the Sony agreement were calculated by
10  taking Sony's BMI and ASCAP distributions and increasing
11  this amount by 50 percent. Is that correct?
12       MR. RICH: I'll object to the form.
13       You can answer.
14  A.   I think what this -- You're trying to summarize
15  what's said in the second paragraph. I think what Barry
16  is saying in that particular e-mail to Jonas is we will
17  take whatever your distributions were on the publisher's
18  share from ASCAP and BMI, we will double it then for the
19  writer's share and then we'll pay a 50 percent premium on
20  top of that.
21  Q.   Yes. I missed that in my question. Thank you.
22  That's correct.
23       So, the monies paid to Sony under the
24  Sony/ATV agreement, Paragraph 2(e), were calculated by
25  taking BMI and ASCAP's distribution to Sony as a

Page 171

1   publisher, doubling it to account for songwriters
2   portion, and then multiplying that amount by 50 percent.
3   Is that correct?
4        MR. RICH: You're assuming a critical fact
5   not in evidence and that's now been proven to be
6   fraudulent representation. So, I can't accept a line of
7   question that incorporates the premise of what Sony --
8   that what Sony/ATV presented to DMX purporting to be its
9   distributions on account of DMX form the basis for the
10  deal. If you want to say purporting to be what Sony
11  represented to be, I'll allow the line of questioning.
12       MR. BENTON: Well, that's fine. I'm not
13  taking a position one way or the other with respect to
14  that.
15       MR. RICH: But the record otherwise will be
16  unclear.
17       MR. BENTON: No, no. I hear you. So, I'll
18  ask it again.
19  Q.   (By Mr. Benton) At this time, Sony's
20  royalties -- One more time --
21  A.   Sony's advances.
22  Q.   I just want to make sure because your -- Well,
23  not that I agree with him.
24       Sony's -- At this time --
25       MR. RICH: Wait. Agree with who on what?

Page 172

1        MR. BENTON: Don't worry about it. That's
2   okay.
3        Well, it's gratuitous to say you agree.
4   You can argue whatever you want.
5        MR. BENTON: Okay.
6   Q.   (By Mr. Benton) At this time, Sony's advances
7   were calculated by what Sony told DMX about their BMI and
8   ASCAP distributions, that number was doubled to account
9   for the songwriters portion, and then multiplied by
10  50 percent. Is that correct?
11  A.   That would be correct.
12  Q.   And that's the formula for the advances?
13  A.   That is the formula for the advances as
14  outlined in this e-mail.
15  Q.   Okay. And then because this e-mail is prior to
16  the actual signing of the license, is it accurate to say
17  that the final license amounts were calculated according
18  to that same formula?
19  A.   That's my understanding.
20  Q.   Okay. Your understanding based on your
21  participation in the negotiations?
22  A.   Participation in the negotiation.
23  Q.   Okay. Do you know how much Sony has been paid
24  to date?
25  A.   I don't know that number off the top of my

Page 173

1   head.
2   Q.   Why was it necessary to give Sony an advance as
3   part of the negotiations?
4   A.   Because they requested it.
5   Q.   Did any other publisher request an advance, to
6   your knowledge?
7   A.   To my knowledge, no other non-major publisher
8   requested an advance.
9   Q.   So, did major publishers request advances?
10  A.   Other major publishers requested advances.
11  Q.   Okay. Did DMX believe at the time of the Sony
12  negotiations that it was important to get a major signed
13  in order to sign on other directly licensing publishers?
14  A.   Crucial.
15  Q.   Okay. Why was it crucial?
16  A.   Because, from our understanding, the past
17  efforts to implement a direct licensing initiative, I
18  think early 2000s -- from our understanding, those
19  efforts failed as a result of the fact that it was really
20  a hypothetical exercise when you were talking to
21  Judge Connor and/or Judge Stanton. No direct licenses
22  had been signed. It was simply a, hey, Judge, what-if
23  question.
24       From our perspective, in order to validate
25  and position our case as best -- putting its best foot

44 (Pages 170 to 173)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-99

RESTRICTED - SUBJECT TO PROTECTIVE ORDER
in BMI v. DMX, S.D.N.Y., 08 Civ. 216 (LLS)

---

**Page 174**

1 forward in front of either Judge Stanton or Judge Connor
2 was to sign up as many direct licenses as possible in
3 addition to hopefully signing a major of the four major
4 publishers.
5    **Q.   And I think you said in your declaration at**
6 **Footnote 3 that it's typical to give an advance to a**
7 **major publisher in the industry?**
8    A.   It certainly was our experience in that every
9 single major publisher that we talked to about doing a
10 direct license requested an advance.
11    **Q.   Okay. And is it typical to give a guaranteed**
12 **advance?**
13    A.   Is it typical?
14    **Q.   Yes.**
15    A.   From my experience in talking to all of the
16 publishers, they were all asking for guaranteed advances.
17    **Q.   And by guaranteed, I mean nonrefundable,**
18 **nonreturnable.**
19    A.   Nonrefundable, nonreturnable.
20    **Q.   And, so, the other three major publishers have**
21 **also asked for advances?**
22    MR. RICH:  Once again, don't give the
23 details of any specific ongoing negotiation.
24    A.   Those are ongoing negotiations. My view is
25 that those are ongoing negotiations.

---

**Page 175**

1    MR. BENTON:  Okay. And, so, Bruce, just to
2 make it clear, you're going to direct him not to
3 answer --
4    MR. RICH:  Any specifics.
5    MR. BENTON:  -- on the basis --
6    MR. RICH:  I mean, I've been letting him go
7 a way about the other majors, but I don't want to get --
8 I don't want to drill down into any open conversations.
9    MR. BENTON:  Okay. Well, you have to do
10 what you think is right, and we can agree to disagree on
11 that, I guess.
12    MR. RICH:  Well, I mean, that was the
13 ground rules BMI asked for. So, we're obliging.
14    **Q.   (By Mr. Benton)  Does DMX intend to sign all**
15 **four majors?**
16    A.   Do we intend to?
17    **Q.   With direct licenses.**
18    A.   I mean, at the time that I was general counsel
19 for DMX, I don't think that we ever intended on signing
20 all four major publishers.
21    **Q.   Why was that?**
22    A.   Because I don't think that we needed all four
23 major publishers.
24    **Q.   Did you think you needed some subset of them?**
25    A.   We felt like we needed one or, perhaps on the

---

**Page 176**

1 outside, depending on who the other publishers were that
2 did, in fact, sign, might need two.
3    **Q.   Okay. Do you have any knowledge as to what**
4 **percentage of total DMX performances would have to be**
5 **performances of Sony songs in order for the advance for**
6 **2008 to be recouped in full?**
7    MR. RICH:  In any one period of time or
8 with the term of the deal?
9    MR. BENTON:  I said 2008.
10    MR. RICH:  I'm sorry.
11    A.   To be recouped in 2008?  We don't think about
12 it in terms of trying to recoup in 2008 because we've got
13 the ability to recoup over the course of the three years.
14 So, we don't think about it in terms of recouping in just
15 2008. We think about it in terms of recouping the
16 overall advance over the term of the deal.
17    **Q.   (By Mr. Benton)  So, you believe that you --**
18 **that DMX -- or at least when you were there, that DMX**
19 **could directly license enough Sony performances that the**
20 **two -- I guess you're saying 2.4 million over the**
21 **three-year --**
22    A.   We could play enough Sony performances --
23 publicly perform enough Sony performances in order to
24 recoup the advance -- the aggregate advance over the
25 entire term of the agreement.

---

**Page 177**

1    **Q.   Okay. And when you say recoup the advance, do**
2 **you mean the payments that would be due to Sony over that**
3 **three-year period would equal $2.4 million in the**
4 **aggregate?**
5    A.   Well, that the overall royalty pool that is
6 paid over the course of those three years was equal to or
7 greater than the 2.4 million, if that makes sense.
8    **Q.   I guess it doesn't. It might be my problem,**
9 **but I don't understand that. I guess.**
10    A.   Well, it wouldn't equal necessarily 2.4 million
11 because, depending on the play right, because of our
12 ability to uniquely program Sony works as high or as low
13 as we wanted to, we're obviously incentivized to recoup
14 the advance plus.  Right?
15    I mean, if you think about the total
16 advance as $2.4 million, if the royalty pool -- the funds
17 paid from the royalty pool over the course of those three
18 years allocated specifically to Sony, we would be
19 incentivized to have that -- those funds be $2.4 million
20 or more so that we had, in fact, fully recouped the
21 entire $2.4 million advance.
22    **Q.   Right.**
23    And I guess -- Currently, if you
24 **have 80,000 locations approximately -- correct?**
25    A.   Uh-huh.

---

45 (Pages 174 to 177)

**A-100**

1      UNITED STATES DISTRICT COURT
2      SOUTHERN DISTRICT OF NEW YORK
3
4    BROADCAST MUSIC, INC.,              )
                                          )
5              Petitioner,               )   No. SCV 21557
                                          )
6    vs.                                  )
                                          )
7    DMX, INC.,                           )
                                          )
8              Respondent.               )
                                          )
     _____     )
9
                              **FILED UNDER SEAL**

10                       SUBJECT TO PROTECTIVE ORDER
11                Contents hereof are subject to a court-ordered
                  protective order governing its use and dissemination.
12

13

14

           DEPOSITION OF RONALD GERTZ
15
           Redwood Shores, California
16
           Monday, September 22, 2008
17

18

19

20   Reported by:
     Linda Vaccarezza
21   RPR, CRP, CLR, CSR No. 10201
22
23
24
25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

**A-101**

Page 18

1    THE WITNESS: Oh, Kamorksy. Some of the Manatt
2    licenses, M-a-n-a-t-t, Disney license. And I was
3    involved in initial contacts with the major
4    publishers.
5    BY MR. FITZPATRICK:
6    Q    And who were the major publishers?
7    A    Universal, EMI, Sony, Warner.
8    Q    And am I correct that of those four, Sony is
9    the only one with whom DMX currently has a direct
10   license for the public performance of musical
11   compositions?
12   A    At the moment.
13   Q    What is the status of the other three?
14   A    In negotiation.
15   Q    Have any of Universal, EMI, or Warner
16   accepted the $25 rate as we have defined it?
17   A    Not yet.
18   Q    You believe they will?
19   A    Yes.
20   Q    Why?
21   A    Well, I believe at least one other will.
22   Q    Why?
23   A    Because since we -- after doing the 200 or so
24   deals we did, plus Sony, we put the negotiations on
25   the back burner because DMX had significant double

Page 19

1    payment liability, and we needed, for cash flow
2    reasons, to kind of put the negotiating on hold to
3    give us time to get closer to an interim carve-out
4    license to deal with the cash flow problems that
5    double payment presented to DMX.
6    Q    Is there one of the three in particular which
7    you believe will agree to the $25 rate?
8    A    At least one.
9    Q    And which --
10   A    Actually, I think all three of them
11   ultimately will.
12   Q    Have any of them expressed a willingness to
13   do so as of yet?
14   A    They have.
15   MR. LARSON: You can answer yes or no.
16   THE WITNESS: Yes.
17   BY MR. FITZPATRICK:
18   Q    Which one or more?
19   MR. LARSON: I'm going to jump in here. This is
20   getting into the topic of our letters that have gone
21   back and forth just in the last day, last business
22   day.
23   As we indicated there, it was our
24   understanding from our meet-and-confer session that
25   open negotiations would be off limits for discovery

Page 20

1    at, I think, your suggestion.
2    And so I'm going to need to draw the line
3    into getting into the substance of particular
4    discussions between Mr. Gertz and publishers with whom
5    there's not a final deal in place, so at a categorical
6    level, I'm happy to let him discuss it, but if it gets
7    to the level of specific conversations or back and
8    forth with a publisher with whom there's not an
9    executed license, I'm going to instruct him not to
10   answer.
11   MR. FITZPATRICK: Okay. Well, we can agree to
12   disagree on that.
13   MR. LARSON: Yeah. Yeah. Understood.
14   MR. FITZPATRICK: And obviously you can do what
15   you think is appropriate.
16   MR. LARSON: Yeah. Yeah.
17   MR. FITZPATRICK: On the -- can you read back what
18   the last question was, specifically was, and we can
19   decide whether there's an instruction not to answer on
20   that one?
21   (Record was read back as requested.)
22   BY MR. FITZPATRICK:
23   Q    And I believe that refers to accept the $25
24   rate. So I'll just strike the last question and ask
25   whether any of the three majors, Universal, EMI and/or

Page 21

1    Warner, have expressed a willingness to enter into the
2    $25 rate as we have defined it?
3    A    They have not said no.
4    Q    Have they said yes?
5    A    We are talking about it.
6    Q    But as of today, none of them have agreed to
7    it; is that correct?
8    A    But, again, we put those negotiations on hold
9    pending time to get closer to the -- a carve-out, so
10   that DMX won't have to double pay.
11   Q    Have there also been discussions of
12   guarantees with Universal, EMI, and Warner? And by
13   "guarantees," I mean a certain amount of guaranteed
14   money from DMX to be paid to them regardless of the
15   royalty pool?
16   MR. LARSON: You can answer for them as a group.
17   THE WITNESS: Yes. However, we never intended to
18   offer those guarantees to all the major publishers.
19   We intended to do that maybe for one or two major
20   publishers only.
21   BY MR. FITZPATRICK:
22   Q    Okay. Well, you obviously have offered it to
23   Sony, correct?
24   A    Yes.
25   Q    And have you offered it to any of the other

6 (Pages 18 to 21)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-102

Restricted – Subject to Protective Order in BMI v. DMX, S.D.N.Y. 08 Civ. 0216 (LLS)

Page 22

1   three major publishers? Have you offered a guarantee,
2   to be clear, to any of the three major publishers?
3       MR. LARSON: Object to the form of the question.
4   By "guarantee," you mean an advance?
5   BY MR. FITZPATRICK:
6       Q   By "guarantee," I mean an advance but a
7   guaranteed advance that the payments will not go
8   below. That's what I mean by "guarantee."
9       A   Yes. We offered it. And clearly offered it
10  with the intention that it would be available to the
11  first major publishers. Mostly as an incentive for
12  DMX to play more of their music.
13      Q   So we know you offered it to Sony. And I
14  just want to be clear. You've made that offer to
15  others of the three majors as well?
16      A   Yes. Intending to actually enter into such
17  an agreement with probably one more publisher only.
18      Q   Understood. So if one more publisher takes
19  it, your current intent would be the guarantee would
20  be off the table with respect to the other two major
21  publishers?
22      A   Yes.
23      Q   And do you have any reason to believe that
24  any of the non-Sony major publishers would accept the
25  $25 rate without a guarantee?

Page 23

1       A   Yes.
2       Q   Have any of them said they would do so?
3       A   Again, we haven't gone back to them for a
4   while.
5       Q   Prior to putting the negotiations on the back
6   burner, as you've described, had any of the non-Sony
7   majors indicated a willingness to enter into the $25
8   rate without a guarantee?
9       MR. LARSON: You can specify without indicating
10  any of the particular companies in response.
11      THE WITNESS: I don't recall.
12  BY MR. FITZPATRICK:
13      Q   Is it fair to say that one of the DMX's goals
14  in developing its direct license strategy was to lower
15  its overall payments for public performing rights in
16  musical compositions?
17      MR. LARSON: Object to the form, lack of
18  foundation.
19      THE WITNESS: Its main goal was to get all the
20  rights they needed in order to deliver their service
21  to locations that included performance rights and
22  reproduction rights for the various methodology they
23  used to deliver that service.
24      They also believe that -- I also believe that
25  in a package of rights paid directly to the

Page 24

1   publishers, given the publishers desire to have their
2   music used more, that they would be able to receive
3   some discount.
4   BY MR. FITZPATRICK:
5       Q   "They" being DMX would be able to receive a
6   discount?
7       A   Yeah.
8       Q   So just so we are on the same page. Am I
9   correct that the rights that in your view DMX requires
10  include the public performance rights in the musical
11  composition, that's one?
12      A   Correct.
13      Q   And those are the rights that are available,
14  among other places, from BMI, ASCAP and SECAS,
15  correct?
16      A   Correct.
17      Q   And DMX also requires the reproduction right
18  in the musical composition; is that right?
19      A   Correct.
20      Q   And is that -- are those rights available in
21  part from the Harry Fox Agency?
22      A   In small and decreasing part.
23      Q   How many of the rights -- do you have an
24  estimate of what the percentage of DMX's performances
25  would currently be available through the Harry Fox

Page 25

1   Agency?
2       MR. LARSON: Object to the form.
3       THE WITNESS: No. Except that to say, generally,
4   it is an increasingly fragmented marketplace for
5   reproduction rights licenses because the Harry Fox
6   Agency has an intention or a policy of licensing only
7   those shares in works that they control.
8       Meaning, co-publishers who are not
9   represented by the Fox Agency now must be contacted in
10  order to negotiate licenses for their shares of Fox
11  co-administered works, which means there are thousands
12  of negotiations that need to take place directly with
13  copyright owners in order to get the rights need
14  for the reproduction of works and DMX's various
15  distribution methodologies.
16  BY MR. FITZPATRICK:
17      Q   Is the reproduction right in the musical
18  composition in your view only necessary for DMX's
19  on-premises delivery?
20      MR. LARSON: I'm going to object to the question.
21  Are you calling for a legal conclusion here?
22      MR. FITZPATRICK: No. I'm asking about what DMX's
23  practice is here. So I'll rephrase the question.
24      Q   Does DMX obtain the reproduction right and
25  musical composition only for its on-premises delivery?

7 (Pages 22 to 25)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-103

**Restricted -- Subject to Protective Order in BMI v. DMX, S.D.N.Y. 08 Civ. 0216 (LLS)**

Page 122

1   deal; is that correct?
2      A   It slowed down, and we have just begun to
3   pick them up again.
4      Q   Has any publisher ever told you why they
5   wanted to wait until DMX had a license with a major
6   before entering into a direct license?
7      A   Yes.
8      Q   Who has told you that?
9      A   I can tell you generally why publishers say
10  that.
11     Q   Okay. That's fine. Based on what they told
12  you?
13     A   Yes.
14     Q   Okay. Go ahead.
15     A   There are some publishers -- publishing is a
16  passive business. And for publishers who aren't
17  actively doing a lot of negotiating, when you approach
18  them with something that they haven't seen before,
19  they want to know they are doing what other publishers
20  are doing or what they are doing is in the ballpark.
21         And here we were having to educate the
22  publishers about the need for a reproduction rights
23  license that covered multiple types of distribution
24  technologies. And they needed the same time to get
25  performance license included.

Page 123

1          So some of those publishers felt much more
2   comfortable doing deals after the major publisher had
3   agreed to an all-in grant of performance and
4   reproduction rights that would just make them feel
5   comfortable without having to expend a lot of money
6   doing the research.
7          Could I add something?
8      Q   Go ahead.
9      A   Going back to your previous question about
10  whether we had mentioned to publishers that we had an
11  advance promised to Sony.
12     Q   Yes.
13     A   I am -- in hind-site, I'm really glad we
14  didn't, knowing that the Sony payment was vastly
15  overstated.
16     Q   Okay. Is it correct that when you're
17  negotiating with a publisher on behalf of DMX, in the
18  event that you are unable to reach an agreement with
19  that publisher, you can still play the publisher's
20  works as a result of your BMI and ASCAP license?
21     A   Can you ask that one more time?
22     Q   Is it correct that when you're negotiating
23  with a publisher for public performance rights, even
24  if you're unable to reach agreement with the
25  publisher, DMX can still perform that publisher's

Page 124

1   works as a result of DMX's license with BMI and ASCAP?
2      A   DMX can still publicly perform it, but
3   there's an issue as to whether or not it can still
4   include it in the service because DMX also requires
5   reproduction rights, which the BMI grant of rights
6   does not include.
7      Q   So if they are -- if it is a publisher from
8   whom the reproduction rights are available from Harry
9   Fox, then is it correct that even if the publisher
10  doesn't want to enter into the deal, DMX can still use
11  the publisher's works by using a Harry Fox license for
12  the reproduction rights and a BMI or ASCAP license for
13  the performance rights?
14         MR. LARSON: Object to the form. You can answer.
15         THE WITNESS: No.
16  BY MR. FITZPATRICK:
17     Q   Why not?
18     A   The Fox Agency license is not a catalog or a
19  license. If is 100 percent Fox Agency song, maybe,
20  assuming DMX wants to enter into an agreement with Fox
21  Agency, which is becoming harder and harder to do.
22         But the bulk of the work controlled by the
23  Fox Agency are not 100 percent Fox Agency controlled.
24  So there's very little value to a Fox Agency license.
25         MR. FITZPATRICK: Give me five minutes. I'll try

Page 125

1   to wrap up.
2          (Recess taken from 1:00 p.m. to 1:06 p.m.)
3          MR. FITZPATRICK: So at the moment I have no
4   further questions for you, Mr. Gertz. Thank you.
5          MR. LARSON: Just a couple follow-up questions.
6                  EXAMINATION
7   BY MR. LARSON:
8      Q   Mr. Gertz, you indicated before that there
9   were, as you used the term, some disputes in the
10  context of MRI's per-programming reporting to the
11  society.
12         MR. FITZPATRICK: Object to the form.
13  BY MR. LARSON:
14     Q   Can you indicate the nature of those
15  disputes?
16         MR. FITZPATRICK: Same objection.
17         THE WITNESS: In the electronic recording back and
18  forth, the key is to determine which programs are
19  compensable to ASCAP and BMI and which ones are not.
20  That's determined by looking at music queue sheets,
21  which are documents that identify the music contained
22  in a program. Often per program reports are delivered
23  before either MRI or the PROs have copies of these
24  queue sheets.
25         So there's an adjustment process that allows

32 (Pages 122 to 125)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

A-104

Restricted – Subject to Protective Order in BMI v. DMX, S.D.N.Y. 08 Civ. 0216 (LLS)

Page 126

1   to dispute whether or not a program is compensable
2   upon receiving these documents. When either asked --
3   when either the PROs or MRI receive these documents,
4   we make adjustments to the report to reflect the
5   actual music content of the programs and provide
6   copies of the queue sheets back to the PROs; BMI does
7   the same thing with us.
8       So these aren't really classic disputes; they
9   are just both entities trying to figure out what is
10  compensable. It's a an electronic process that goes
11  back and forth very, very seamlessly.
12  BY MR. LARSON:
13      Q   When you say back and forth, between --
14      A   Between MRI and ASCAP and BMI.
15      Q   And between their computers or between
16  people?
17      A   The bulk of the work is done by computers.
18      Q   You also mentioned at one point earlier, I
19  believe you said there was no non-major publisher who
20  said no to the $25 direct license offer. Did I hear
21  that correctly?
22      MR. FITZPATRICK:  Object to the form.
23      THE WITNESS:  What I was trying to say was that I
24  view all of these negotiations as being continuously
25  open. I'm sure there are some publishers who have

Page 127

1   said no, but there are some publishers who has said
2   no, no, no and then yes. So we continually go back to
3   the publisher that say no in hopes that they decide
4   not to pass on the deal.
5       MR. LARSON:  Okay. That's all I have.
6       MR. FITZPATRICK:  No questions for me.
7           (Time Noted:  1:08 p.m.)
8           --oOo--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 128

1   I certify (or declare) that the foregoing is
2   true and correct.
3
    Executed at_____on_____.
4       (Place)            (Date)
5
6
7
        _____
        (Signature of Deponent)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 129

1   STATE OF CALIFORNIA  )
                         ) SS.
2   COUNTY OF SONOMA     )
3
4       I, LINDA VACCAREZZA, hereby certify:
5       I am a duly qualified Certified Shorthand
6   Reporter in the State of California, holder of
7   Certificate Number CSR 10201, issued by the Court
8   Reporters Board of California and which is in full
9   force and effect. (Bus. & Prof. Code 8016.)
10      I am not financially interested in this
11  action and am not a relative or employee of any
12  attorney of the parties, or of any of the parties.
13  (Civ. Proc. 2025 (k) (1).)
14      I am authorized to administer oaths or
15  affirmations pursuant to the California Code of Civil
16  Procedure, Section 2093 (b), and prior to being
17  examined. the deponent was first duly sworn by me.
18  (Civ Proc. 2025 (r)(1).)
19      I have not and shall not offer or provide any
20  services or products to any party's attorney or third
21  party who is financing all or part of the action
22  without first offering same to all parties or their
23  attorneys attending the deposition and making same
24  available at the same time to all parties or their
25  attorneys. (Civ. Proc. 2025 (k)(2).)

33 (Pages 126 to 129)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-105