Page 65

[1] that you just mentioned?
[2] A. Yes. Yes. And there is certain -- the radio industry, for
[3] instance, every radio station, the 8,000 radio stations on a
[4] blanket pay as a rate. The music use is not taken into account
[5] for radio. Local television for the blanket is allocated not
[6] on music use but rather on audiences.
[7] So, there is a number of industries like that.
[8] Q. If you could look at tab 3 in your binder, and this is
[9] actually a joint exhibit, it is joint Exhibit 1291, could you
[10] identify this, please?
[11] A. This is the commercial music service license agreement that
[12] I have been talking about, the standard agreement.
[13] Q. When does this -- what is the actual term of this license?
[14] A. The standard term was from July of '04 through June 30th of
[15] 2009 or whenever a service, if a service started in '08 we
[16] would have offered this license to them with a very short-term.
[17] Q. And so, now that we are in 2010, what is the licensing
[18] status of the industry now?
[19] A. The licensing status is that everybody is on an interim
[20] license right now and they're all paying at a rate of $25 per
[21] location, per year, which was the rate set by this Court back
[22] about a year ago.
[23] Q. And why did you offer the rest of the industry the $25 rate
[24] that was set for this Court for DMX?
[25] A. Again, we believed that they're similarly situated to DMX

Page 66

[1] so we felt it would be inappropriate to offer them any other
[2] rate other than what the Court set for DMX.
[3] Q. If you could turn to page 2 of the agreement we are looking
[4] at, in paragraph 5A it describes the base license fee. Could
[5] you just describe what that is for the Court?
[6] A. Yes.
[7] The base license fee under this is the initial fee
[8] estimate, it takes the $36.36 rate per location per year times
[9] the number of locations that an establishment has times five
[10] years. So, using again a simple example, if you took 100
[11] locations times the $36.36 rate, you would pay us $3,636 per
[12] year or just about $18,000 over the five years. That would be
[13] your base fee. That pretty much never changes.
[14] Q. And could you explain what happens to that fee if the
[15] number of customer locations change over the term of the
[16] license?
[17] A. Sure.
[18] Q. And include if it goes down and if it goes up?
[19] A. Let's go with down first.
[20] If it drops -- if the number of locations drop --
[21] there is no adjustment to the $18,000 under the example I used
[22] or under any example. It is the base license fee that the
[23] establishment pays. So in the example I gave a second ago, if
[24] you had 100 locations at the start paying us $3,636 per year or
[25] $18,000 over the term and you lost 50 locations, you would

Page 67

[1] still pay us that $3,636 per year or $18,000 for 50 locations.
[2] Q. And so, what happens to the per location rate in that
[3] circumstance?
[4] A. In that situation it goes up, it doubled in that situation.
[5] Q. Okay. So, could you describe what happens under the
[6] license if the number of customer locations goes up during the
[7] course of the agreement?
[8] A. Sure. We have an organic growth concept built into this
[9] license that allows the fee to be adjusted upward -- the base
[10] fee to be adjusted upward if growth exceeds 8 percent per year.
[11] So, that $18,000 I talked about over five years would go higher
[12] if the growth increased over 8 percent per year.
[13] Q. What effect does organic growth have on the per location
[14] rate under the license?
[15] A. That, it would have the -- it would drop the per location
[16] rate.
[17] Q. Could you also take a look at subparagraph K which is on
[18] the next page, page 3 of 9, and explain what the acquired
[19] service fee is?
[20] A. The acquired service fee is, there is two different ways to
[21] look at it. If the acquiring -- if the person acquiring a
[22] service, and that service had a license already with BMI, you
[23] would just basically take that service's effective rate on top
[24] of your base fee. If the service didn't have a license with
[25] BMI, you would take the lowest effective rate that the contract

Page 68

[1] allowed and add that to your base fee. You would consider,
[2] basically, organic growth.
[3] Q. So, how does the growth by an acquisition compare to --
[4] well, first, why don't we define, what is organic growth under
[5] the agreement? What kind of growth is that?
[6] A. Organic growth is standard growth, normal business growth.
[7] They go out seeking to increase their customer base or their
[8] licensing of the industries. Drives customers numbers up.
[9] Q. And what is acquired growth?
[10] A. Buying somebody that's already in the marketplace.
[11] Q. How does the way that organic growth is treated compare to
[12] the way that acquired growth is treated under the license?
[13] A. Organic growth you are allowed an 8 percent -- basically an
[14] 8 percent cushion, if you will, before you start adding to your
[15] base fee. So, if you are at $18,000, you are allowed a little
[16] bit of growth and then you pay BMI a little bit more money.
[17] Effectively, your effective rate drops.
[18] Acquired growth, again if they had a license, you
[19] would take that company's existing effective rate and add it to
[20] your base fee. If they didn't have a license, it would be
[21] treated as basically as if you had gone out and increased your
[22] business by that amount of subscribers.
[23] Q. If you could turn to the next tab in the binder which is
[24] joint exhibit 0132 -- and we are at tab 4, just to be clear --
[25] could you identify this document, please?

Page 69

[1] **A.** This is the agreement which was reached between BMI and
[2] Muzak.
[3] **Q.** And were they the first commercial music service to enter
[4] into the agreement that we've just been looking at?
[5] **A.** Yes, they were.
[6] **Q.** Were there negotiations between BMI and Muzak prior to
[7] entering into this agreement?
[8] **A.** Yes, there were.
[9] **Q.** Were you involved in those occasions?
[10] **A.** No, I was not.
[11] **Q.** And who was?
[12] **A.** My predecessor who is the senior vice president of
[13] licensing at the time John Shaker, Marvin Berenson our general
[14] counsel, Tom Annastas who is our vice president of general
[15] licensing, and I believe Joseph DiMona, who is a vice president
[16] of legal.
[17] **Q.** And, do you know who is involved on the Muzak side?
[18] **A.** I know of Mike Zendan who is their general counsel but I
[19] don't know of anybody else.
[20] **Q.** Are you familiar with the agreement that is joint exhibit
[21] 0132?
[22] **A.** Yes, I am.
[23] **Q.** Could you turn to paragraph 4A of the agreement which
[24] starts on page 4 and describe how the base fee works under this
[25] agreement?

Page 70

[1] **A.** Yes. Muzak agreed to pay BMI $30 million from July of 2004
[2] through June 30th of 2009.
[3] **Q.** And if you could turn to paragraph 4B, what representation
[4] does Muzak make with respect to its number of customer
[5] locations?
[6] **A.** That they had 165,000 locations licensed.
[7] **Q.** As of what date?
[8] **A.** As of December 31st of 2003.
[9] **Q.** And so, what does this work out to as a starting point at a
[10] per location rate under this agreement?
[11] **A.** If you took the $30 million, divided it by the five years,
[12] you get $6 million a year divided by 165,000 locations comes
[13] out to $36.36.
[14] **Q.** And, how does this Muzak agreement compare to the agreement
[15] that we were just looking at at tab 3?
[16] **A.** It was the basis for that agreement.
[17] **Q.** Now, if you can take a look at tab 5, which is also a joint
[18] exhibit, Joint Exhibit 1293, and could you identify this
[19] document, please?
[20] **A.** Sure. This is entitled the Commercial Music Services
[21] Annual Fee and it is a lot of columns. It lays out for each
[22] year of the contract -- well, I can take you through the
[23] columns.
[24] **Q.** Sure. Why don't you go through the columns.
[25] **A.** For each year of the contract, if we look at the first page

Page 71

[1] of the top left-hand corner it tells you the year, 2005, and it
[2] will give you the span of the contract term for that particular
[3] service. The next column is current affiliation, independent
[4] or Muzak affiliate or Music Choice affiliate or so on. The
[5] account number, the contract I.D. number which is the actual
[6] contract they signed, the base license fees which were
[7] calculated using a $36.36 rate times the number of locations
[8] which is the next column. Then the organic surplus fee, that
[9] would be the fee in addition to the base fee that if they grew
[10] over the 8 percent they would owe to BMI. The acquired
[11] locations, the acquired locations fees. Force majeure
[12] locations, that is if something happened, God forbid, like
[13] Katrina that forced a lot of businesses off the air, we would
[14] give them relief under the contract for that. Total license
[15] fees. And then the very last column is the effective rate of
[16] those license fees.
[17] **Q.** And so, what years are covered on Joint Exhibit 1293?
[18] **A.** They would be all years through all five years of the term
[19] of the agreement.
[20] **Q.** And which licensees are actually included?
[21] **A.** Every licensee but DMX, their eight affiliates and the one
[22] Music Choice affiliate.
[23] **Q.** And if a licensee had the agreement over the five years,
[24] would it appear once for each year on this chart?
[25] **A.** Yes, it would. So you can track -- you can actually track

Page 72

[1] the effective rates of customers over the period of five years.
[2] **Q.** Now, I think that we have highlighted just a couple
[3] examples to take you through and we will start with Muzak. Is
[4] Muzak actually highlighted on your copy?
[5] **A.** Yes, it is, on page 2.
[6] **Q.** And so, could you take us through using the columns as you
[7] just described, take us through how this chart actually works
[8] for Muzak?
[9] **A.** Okay.
[10]     If you look, again the contract year is '05, the span
[11] is from June 30th of '05 through -- I'm sorry, July 1st of '04
[12] through the end date of June 30th of '05. Muzak had base
[13] locations at the very beginning of the contract as we just saw,
[14] the 165,000 locations. The annual license fee or base fee is
[15] $6 million per year. The actual locations reported to us at
[16] the end of the first contract was 165,136 locations so they
[17] actually grew by 136 locations, but there was no change in that
[18] because it was below the 8 percent so they didn't owe us any
[19] more money, they were allowed that growth.
[20] **Q.** Is that why there is a zero in the organic surplus fee
[21] column?
[22] **A.** Yes, it is. They didn't acquire anybody, that's why there
[23] are zeros there.
[24]     And if you come up to the very end, the total fees due
[25] were $6 million but we divide it now by the $165,136 locations

Page 73

[1] to get an effective rate of $36.33 which was different from the
[2] starting $36.36.
[3] **Q.** Now, could you go to the next year, 2006, and just take us
[4] through the same exercise for Muzak?
[5] **A.** That is found on page 6 of 15, and just if you look at the
[6] base locations, again, that hasn't changed, it was 165.
[7] **Q.** We are in the third row down on page 6 of 15?
[8] **A.** Yes, third row down. The year is 2006, the contract year
[9] again goes from July of '05 through June of '06. Muzak LLC is
[10] the name. And if you scroll over to the column I which is the
[11] base locations, it is still listed as the original base
[12] locations. That hasn't changed. The base license fees haven't
[13] changed, that's $6 million per year. The actual location has
[14] dropped. I believe at the end of 2005 they had 165,136, now
[15] they're recording 165,039 locations so they lost some
[16] locations. So, their effective rate went back up, effectively,
[17] to $36.36.
[18] **Q.** And then we can skip the exercise for 2007 and 2008?
[19] **THE COURT:** Mr. O'Neill, I'm simply not following.
[20] The base locations were 165 and the actual is 39 more,
[21] isn't it?
[22] **THE WITNESS:** Yes. I was talking --
[23] **THE COURT:** So you say it went down. It seems to me
[24] it went up.
[25] **THE WITNESS:** It did go up, your Honor, but from the

Page 74

[1] prior year they had 165,136 locations so I'm saying they lost
[2] about a hundred locations year to year.
[3] **THE COURT:** Between those two years?
[4] **THE WITNESS:** Yes, sir.
[5] **THE COURT:** I see.
[6] **BY MR. FITZPATRICK:**
[7] **Q.** And if you could go to the, Mr. O'Neill, the final year
[8] represented on this exhibit which is 2009 and again take us
[9] through that exercise for Muzak, please?
[10] **A.** Sure. That's the very last page of the document, page 15
[11] of 15, and it is highlighted about a quarter of the way down
[12] the page. Muzak, again the base license fees were $6 million.
[13] There are actual locations at the end of the term dropped to
[14] 156,733 so they've lost almost 10,000 locations. And if you go
[15] all the way to the right which is the effective rate of their
[16] license now, they're paying us respectively $38.28 per
[17] location.
[18] **Q.** Now, are there also examples of music services whose per
[19] location rate, effective rate, declined over the course of the
[20] agreement?
[21] **A.** Yes, there are.
[22] **Q.** And I think we have highlighted an example of that on the
[23] chart which is Play Network. So, if you could just do the same
[24] thing to show how it works for a service that is gaining
[25] locations and start with Play Network in the year 2005 and do

Page 75

[1] the same explanation?
[2] **A.** Okay.
[3] If we jump backward to page 3 of 15, Play Network is
[4] listed right at the bottom in yellow for 2005. They started
[5] the year with 11,017 locations, were paying fees of $400,578.
[6] That was the base license fees. At the end of the year they
[7] actually reported 13,190 locations so they actually increased
[8] over 8 percent. And if you look at the organic growth surplus
[9] fee under column L, they paid BMI an additional $43,000 --
[10] $43,500 for that year. For a total fee you would add the
[11] $43,498 to the original base fee of $400,578 and you would come
[12] up with a new total fees of $444,076 and their effective rate
[13] dropped to $33.67 per location.
[14] **Q.** And then if we could, we can cut out the middle years but
[15] if you could go to 2009 and just explain, do the same
[16] explanation but for Play Network at the end of the contract?
[17] **A.** Sure.
[18] Again, they started the original contract -- that's on
[19] page 15 of 15 at the very bottom in yellow. They started the
[20] original contract year in '05 with 11,017 locations. At the
[21] end of this contract they actually had 32,595 locations, almost
[22] triple their number of establishments, so their effective rate
[23] has dropped to $24.75 per location.
[24] **Q.** And what is the column L, the organic surplus fee for 2009?
[25] **A.** It has actually grown to almost -- actually has grown

Page 76

[1] larger than their base fee originally. Their base fee was
[2] $400,000 which is column J at the very beginning of the
[3] contract, never changed per year, but now they're paying in
[4] addition to that $400,000 an additional $406,000 on top of
[5] that.
[6] **Q.** Now, using again using this document, could you give the
[7] yearly -- the yearly averages and the overall average rates
[8] that the industry has been paying using this document?
[9] **A.** Sure. If you look on page 3 of 15, the end of the first
[10] year, the average rate per location came up to $35.59.
[11] **Q.** And is that for the entire industry?
[12] **A.** That's for the entire industry.
[13] **Q.** And if you could go to 2006?
[14] **A.** That's on page 6 of 15. The total effective rate for the
[15] entire industry was $34.77.
[16] **Q.** Is that highlighted on your copy?
[17] **A.** It is highlighted in green on our copy so it dropped --
[18] again, it dropped from the first year it was $35.59, it went
[19] down to $34.77 in the second year.
[20] **Q.** And if you could do the same for 2007, please?
[21] **A.** On page 9 the average was $33.87 for the entire industry.
[22] **Q.** And the same for 2008?
[23] **A.** 2008 is page 12 of 15 and the average fee is $34.06, per
[24] location, per year.
[25] **Q.** And then, finally, if you could give the numbers for the

Page 77

[1] 2009 year as well as the overall average for the five?
[2] **A.** That's on page 15, the last page. The 2009 average was
[3] $34.43 and the overall average for the full five-year term for
[4] everybody in the, operating under this license, I guess it was
[5] the 164 businesses, came to $34.52.
[6] **Q.** Did these data factor into your evaluation of your proposal
[7] to DMX?
[8] **A.** Yes, it did.
[9] **Q.** Could you explain that?
[10] **A.** Well, we wanted to offer DMX the same exact license that
[11] everybody here signed. Unfortunately DMX had lost locations
[12] from 2005 to 2009 so their effective rate would have been north
[13] of the $36.36. They probably would have been higher, around
[14] where Muzak was, you know, $38, $39 per location. We didn't
[15] offer that to them, we offered them the straight $36.36 rate as
[16] a starting point. We didn't look back and say this could have
[17] happened or that could have happened. We knew what happened
[18] and we didn't want to basically hamstring them with the higher
[19] rate.
[20] **Q.** Did you consider the 8 percent organic growth provision of
[21] the contract that we've been talking about in evaluating your
[22] proposal to DMX?
[23] **A.** Yes.
[24] **Q.** And what effect did that have on your thinking?
[25] **A.** Again, we -- I would offer it to DMX. I don't think

Page 78

[1] they'll take it. I don't think they -- it's only going to hurt
[2] them versus the $36.36 straight rate because they lost
[3] locations. They would have effectively paid us higher than
[4] that. They didn't have the 8 percent growth that some of these
[5] others had.
[6] **Q.** Are you familiar with an issue that arose with respect to
[7] Music Choice and Direct TV during the term of Music Choice's
[8] contract?
[9] **A.** Yes. Yes, I am.
[10] **Q.** Could you explain what occurred there?
[11] **A.** Sure.
[12] Music Choice was negotiating the execution of the
[13] commercial music agreement with BMI. At the time of the
[14] negotiation they were losing about 25,000 locations that they
[15] had licensed via Direct TV and they felt that they didn't want
[16] to be hampered by that going forward because their effective
[17] rate would have been so much higher for the locations they had
[18] left. They knew they were losing them, they knew going into
[19] this license they were losing them so they wanted to treat them
[20] separately from their core business.
[21] **Q.** And did BMI accommodate that request?
[22] **A.** Yes, we did.
[23] **Q.** How did that work?
[24] **A.** We actually did two license agreements with them. For the
[25] period of time that they actually had the Direct TV licenses we

Page 79

[1] charged them the $36.36 rate and they paid that. And then, on
[2] a going forward basis or actually from 2004 to 2009, they paid
[3] us based on their number of locations excluding Direct TV.
[4] **Q.** Mr. O'Neill, what is ASCAP?
[5] **A.** I ask myself that a lot.
[6] ASCAP is a performing rights organization, they're a
[7] competitor, our main competitor for writers and publishers.
[8] **Q.** And do you know what ASCAP was getting from Muzak during
[9] the license term 2005 to 2009?
[10] **A.** I believe it was $41.50 or thereabouts.
[11] **Q.** If you could turn to the next tab in your binder, could you
[12] identify this document?
[13] **A.** Tab 6?
[14] **Q.** Tab 6, yes.
[15] **A.** This is the 2007 annual report for Muzak.
[16] **Q.** Did you consider this document in evaluating your proposal
[17] to DMX?
[18] **A.** Yes, we did.
[19] **MR. FITZPATRICK:** And, your Honor, this is
[20] Petitioner's Exhibit 0112 and I would move its admission.
[21] **MR. RICH:** We would object, your Honor, to the extent
[22] that the purpose of its offer is to validate whatever fees that
[23] Muzak may or may not have paid ASCAP. And, from the witness'
[24] testimony, it sounds as if he relied on this document in
[25] forming his knowledge. This is rank hearsay. This is a

Page 80

[1] statement of fact by a third-party not sitting in the witness
[2] chair.
[3] **MR. FITZPATRICK:** Your Honor, it is true that this
[4] doesn't come in for truth of it but it does go into how
[5] Mr. O'Neill evaluated his, the proposal that he was making to
[6] DMX.
[7] **THE COURT:** Well, Mr. Rich, if a witness is testifying
[8] to his understanding during a negotiation and some of his
[9] understanding consists of false information, I don't think that
[10] disqualifies it as still having been an ingredient in his
[11] acting the way he did during the negotiations.
[12] **MR. RICH:** I understand that.
[13] Your Honor, I wouldn't quarrel with that. Two
[14] questions ago, though, the foundational question was do you --
[15] to the effect do you have an understanding of what ASCAP
[16] received from Muzak. And the witness said words to the effect:
[17] Yes, I do; then he testified to a number. It turns out now the
[18] only connection and foundation for that is a document which is
[19] clearly hearsay.
[20] **THE COURT:** You think the question should have been do
[21] you have either a misunderstanding or an understanding,
[22] gentleman, and what is that based on? And it is based on a
[23] document we know is not reliable.
[24] **MR. RICH:** Within that context I accept your Honor's
[25] characterization.

Page 81

[1] **THE COURT:** I will accept it with that caution to
[2] myself and counsel, that it is not for the truth. It is not
[3] independent, valid evidence of the Muzak figures.
[4] **MR. RICH:** Thank you.
[5] **BY MR. FITZPATRICK:**
[6] **Q.** Mr. O'Neill, could you turn to page 6 of the document?
[7] **A.** Okay.
[8] **Q.** And at the bottom of the page there does it list a license
[9] fee that ASCAP is reported to be paying to Muzak?
[10] **A.** The last paragraph of that page about midway through the
[11] fixed license fee of $6.8 million per annum. That's what it
[12] listed for the ASCAP license.
[13] **Q.** Did you consider that number in evaluating BMI's proposal
[14] to DMX?
[15] **A.** Yes, we did.
[16] **Q.** What would the $6.8 million number work out to as a per
[17] location rate?
[18] **A.** I think it comes out to $41.20 but for some reason I had
[19] $41.50 sitting on my brain.
[20] **Q.** How did that number factor into your thinking when you
[21] evaluated BMI's proposal to DMX?
[22] **A.** When we looked at the starting blanket rate of $36.36 it
[23] was well below the $41.20 that ASCAP was asking from Muzak.
[24] **MR. RICH:** Objection.
[25] **THE COURT:** What is the objection?

Page 82

[1] **MR. RICH:** Well below the amount that ASCAP was
[2] asking.
[3] **THE COURT:** Excuse me?
[4] **MR. RICH:** He doesn't know what ASCAP was asking, your
[5] Honor.
[6] **THE COURT:** What was ASCAP asking?
[7] **THE WITNESS:** I don't know what they were asking. I
[8] know what this document says they were getting. They were
[9] getting $6.8 million a year or $41.20 per location from Muzak.
[10] **BY MR. LARSON:**
[11] **Q.** And so, how did the report in this -- how did the reported
[12] number in this document factor into your thinking?
[13] **A.** Our blanket fee, starting point, was below that number.
[14] Our adjustable fee blanket quote, the full fee quote, the
[15] $41.81 was just a hair above that number and I felt that was
[16] reasonable.
[17] **Q.** Why is that?
[18] **A.** I believe the industry uses a little bit more ASCAP music
[19] than BMI music in general, it is just some of the historical
[20] catalog that ASCAP has versus BMI has used more in the
[21] background music business.
[22] So, while BMI was describing to get a higher blanket
[23] rate from the background music, we felt we were comfortable for
[24] our affiliates to go with the $36.36 rate versus where our
[25] competitor was feeing these same establishments. That's where

Page 83

[1] we felt it was reasonable.
[2] **MR. FITZPATRICK:** Your Honor, the next document is not
[3] in Mr. O'Neill's binder, it is a document that's been produced
[4] by ASCAP.
[5] **THE COURT:** Mr. Fitzpatrick, would it be a fair
[6] paraphrase and sufficient for my notes and reliance on this
[7] little piece of testimony about ASCAP to take it as amounting
[8] to that he thought the $36.36 was a little under what he
[9] thought ASCAP was getting?
[10] **MR. FITZPATRICK:** It would be a fair summary of where
[11] we are right now, your Honor.
[12] **THE COURT:** Maybe we are going somewhere else later?
[13] **MR. FITZPATRICK:** We are going somewhere else right
[14] now which is that the next tab in your Honor's binder is not in
[15] Mr. O'Neill's binder because it is the actual ASCAP agreement,
[16] it is a document that was produced by ASCAP and marked
[17] restricted and so it is not something Mr. O'Neill saw then and
[18] it is not something Mr. O'Neill can see now. It is, however, a
[19] joint exhibit so I would refer the Court to it. And I won't go
[20] through the numbers in open Court, but the numbers are on the
[21] face of the document and it is a joint exhibit and I think that
[22] would impact --
[23] **THE COURT:** What are you going to do with that,
[24] Mr. Rich?
[25] **MR. RICH:** Your Honor, I have don't have a problem and

Page 84

[1] there is no inconsistency. We don't object to this. I was
[2] simply talking about the witness' state of mind and his
[3] knowledge.
[4] **THE COURT:** But now that we know from a joint exhibit
[5] it becomes academic --
[6] **MR. RICH:** No objection. Here, again, he was
[7] testifying as to how he formulated a view based on data.
[8] **THE COURT:** Yes.
[9] **BY MR. FITZPATRICK:**
[10] **Q.** Mr. O'Neill, are you familiar with the term "through the
[11] listener" or "through the customer" license?
[12] **A.** Yes, I am.
[13] **Q.** Could you explain what that term means?
[14] **A.** Yes.
[15] What it means to me is it is a downstream looking
[16] license where one party will request a license to cover all
[17] performances along a stream, if you will, ultimately to the end
[18] user. In this case DMX is requesting a license that covers not
[19] only the performances of music by DMX but also performances of
[20] the music which is performed by DMX' customers, the stores or
[21] bars or establishments, if you will.
[22] **Q.** And did you consider that fact in evaluating BMI's proposal
[23] to DMX?
[24] **A.** Yes.
[25] Again, I came into this with some fresh eyes that I

[1] thought when you look at a $36.36 per location rate that's
[2] about 10 cents a day for a very large music user, if you will,
[3] of a background music provider, and then you look at the
[4] revenues of not only what DMX is making but what are the end
[5] users making. I think the effective rates of that are
[6] extremely low vis-a-vis the full stream of through to the
[7] listener or through to the viewer. And, again, I came back to
[8] the fact that the $36.36 was established and I felt it was
[9] reasonable.
[10] Q. Does BMI license directly restaurants, hotels, bar, stores,
[11] etc.?
[12] A. Yes, we do. I think we have, last look, about 45,000
[13] eating and drinking establishments licensed directly.
[14] Q. And, how did the rates of those licenses compare to the
[15] rates paid by commercial music services per location?
[16] A. On an eating and drinking establishment license I think the
[17] minimum fee is $300 a year, roughly. And we have them up to
[18] $9,000 a year paying us and that is compared to $36.36 per year
[19] from a commercial music service.
[20] Q. And, did that factor into your thinking in evaluating your
[21] proposal to DMX?
[22] A. Yes, it did. But, again, we had historical licenses where
[23] the commercial music services industry at rates actually lower
[24] than this that had been built up to the 2004 license. And it
[25] has always been brought to my attention that the background

Page 86

[1] music said they were able to bring us massive customers,
[2] 400,000 customers, and that that's what the discount was for.
[3] Q. Okay, so let's move on to the second part of BMI's
[4] proposal, the base fee. Can you describe how BMI arrived at
[5] its proposed number which, if we go back to -- when we go back
[6] to tab 1 in the binder, is $712,218.95?
[7] A. The 95 cents was important.
[8]     The $712,000, the way we came to that number was we
[9] basically wanted to cover our expenses in this license. We
[10] felt that if a writer should not be disadvantaged if they were
[11] performed on DMX versus another background music service and if
[12] we didn't cover our expenses in the license, then it wasn't
[13] economical to us. I mean, in theory, if we didn't cover any
[14] expenses and DMX was able to direct license everything from BMI
[15] they would pay zero and it would still cost us $700,000 to do
[16] this license and they would still get the indemnity and full
[17] access to it. So, we felt when we came up to the 712 we looked
[18] at what is our standard domestic overhead rate and that rate
[19] was 17 percent. And then we added to that the incremental cost
[20] that we believed we would incur administering this license.
[21] Q. Okay, so let's start with the 17 percent domestic rate.
[22] Can you explain how that rate is arrived at?
[23] A. Yeah. It's -- we've had published documents that say BMI's
[24] overhead rate is anywhere from 11.8 to 12 percent but that's
[25] overall revenues. And when I look at domestic revenues, the 17

Page 87

[1] percent, the reason it is 17 percent is we have some licenses
[2] that carry a very low overhead rate and some licenses that
[3] carry a high overhead rate. For instance, the ones with the
[4] low overhead rate we have reciprocal agreements with 70 foreign
[5] societies, sister societies across the world. These societies
[6] basically go out, find establishments that are using music,
[7] negotiate license fees with these establishments, figure out
[8] what music is being played in these establishments, distribute
[9] those funds back to BMI, and they take out administrative fees
[10] from that. But, the information coming to us is already
[11] pre-identified. So we take out only 3.6 overhead rate on our
[12] foreign incoming.
[13] Q. And let me just slow you down a little bit. Why don't you
[14] take us through a hypothetical of what would happen if a BMI
[15] affiliate's work was performed at a concert or on the radio in
[16] a foreign country, say in Japan, for example. Track how that
[17] revenue would get to the BMI affiliate for me.
[18] A. The Japanese society, Jazz Rack I believe the name is,
[19] would actually license the venue where the concert took place.
[20] They would go in and fee the promoter of the concert. The
[21] entertainers would provide Jazz Rack with a setlist of actually
[22] what was played during that concert. Jazz Rack would take the
[23] money in-house, take off their administration, pay what was
[24] left over back to those performances and ship that money back
[25] to the states to BMI.

Page 88

[1] Q. And then what is left for BMI to do at that point?
[2] A. Well, BMI has some administration on that. I mean, it is
[3] not just a rubber stamp, if you will, we still have to match it
[4] up to our database. We have to mail the checks out to our
[5] affiliates. We still have to have systems in place with Jazz
[6] Rack to talk back and forth.
[7] Q. And what overhead rate does BMI apply to that tape of
[8] revenue?
[9] A. We take out a minimum of -- I mean a very minimal overhead
[10] rate of 3.6 percent on any foreign revenues coming into this
[11] country.
[12] Q. And then if you could, compare that to what would track the
[13] revenue for me on a U.S. performance? How would BMI distribute
[14] that? What steps does BMI have to go through to get that to
[15] its affiliate?
[16] A. First, if you want to take an easy case or a hard case, we
[17] would have to find the establishment using the music, we would
[18] have to license that establishment, we would have to collect
[19] the license fees, collect the music use information, run it
[20] through our database to see who is payable, who is not payable,
[21] and then make those distributions.
[22] Q. And what overhead rate does BMI apply to that tape of
[23] revenue?
[24] A. Well, there is two overheads that we apply to that type of
[25] revenue. For a little bit more intensive distribution like a

Page 89

[1] follow-the-dollar distribution we would take off 20 percent
[2] overhead rate and then what is left over, basically, is the
[3] available expenses that haven't been accounted for divided by
[4] total remaining revenue and that comes up to 17 percent.
[5] Q. And why did BMI use the 17 percent number as the starting
[6] point for its cost for the DMX license that it is proposing
[7] here?
[8] A. Again, we thought it was reasonable to use the standard
[9] overhead. That's right, currently what we are taking out from
[10] Music Choice, from Muzak, from Play Networks or TrueSonic,
[11] that's the rate we apply against those services. So, we wanted
[12] to treat again, similarly, DMX. We didn't want to treat them
[13] any differently.
[14] Q. And, conversely, why didn't you use the published rates
[15] that you mentioned before, the 11 to 12 percent overhead rates?
[16] A. Because, again, that would entail us counting the foreign
[17] and having a much lower overhead rate for DMX than we would for
[18] Music Choice or Muzak or any of the others.
[19] Q. You also mentioned that you added the incremental costs on
[20] top of the 17 percent, correct?
[21] A. Yes, we can.
[22] Q. Can you explain what that means?
[23] A. Sure.
[24]      We anticipate that the 17 percent covers our basic
[25] operations but this is going to be a little bit more intensive

Page 90

[1] than our basic operations. So, we tried to determine at this
[2] point in time what an incremental fees we were going to incur
[3] and I had some experience with the television for program
[4] license when that first started for BMI back in '94 trying to
[5] estimate what those fees would be.
[6] Q. If you could turn to tab 8? If you could take a look at
[7] that document and identify it, please?
[8] A. Sure. This is a document entitled Additional Cost of the
[9] AFBL Licensing and Performing Rights Departments.
[10] Q. Why are the licensing and performing rights groups together
[11] on this document?
[12] A. Because I think they're going to have an impact on each
[13] other, unlike many of the other licenses we are going to have
[14] to work in concert with performing rights to make sure that
[15] we're, one, not charging DMX for music that they may have
[16] directly licensed; and two, not paying affiliates that may have
[17] directly licensed via BMI's distribution system.
[18] Q. Will departments other than licensing and performing rights
[19] at BMI have additional incremental expenses under the AFBL?
[20] A. Yes. I believe probably the biggest focal point will be IT
[21] and operations.
[22] Q. And are those expenses included on this chart?
[23] A. No. This is just licensing and performing rights.
[24] Q. If you could take us through the chart and explain what the
[25] various tasks are in the left-hand column and why you believe

Page 91

[1] they would be necessary to administer the AFBL?
[2] A. Sure.
[3]      The first is review and input renew and direct
[4] licenses. And we have had some experience with that under the
[5] interim license. I believe we had over 300 direct licenses
[6] come in and that is simply going through the direct licenses,
[7] making sure, one, they're signed because we realize there were
[8] a lot that were unsigned, what are the date stands, what are
[9] the terms, did the person executing the direct lines actually
[10] have the authority to do so.
[11]      It will be those types of review and analysis.
[12] Q. And what is the contemplated personnel for that task?
[13] A. We assumed hiring a new person, a sort of paralegal-type
[14] person to be able to review those and to communicate internally
[15] with us on that. We assumed about 250 hours over a full year
[16] at a rate of $40 an hour for a total of $10,000.
[17] Q. And where does the hourly rate come from?
[18] A. That's an internal rate we use. We have a subsidiary
[19] company at BMI and this is the rate we use internally to charge
[20] various levels time across interdepartmental work.
[21] Q. If you could go down to the second task and, again, please
[22] explain the task and the personnel and the estimates?
[23] A. The task is resolve direct license issues with affiliates
[24] and with DMX. The people we have doing it, there is a business
[25] affairs attorney, Fiona Kwasnik. F-I-O-N-A, K-W-A-S-N-I-K.

Page 92

[1]      Do you need me to name the people?
[2] Q. Sure.
[3] A. Okay. Michael Tortora. T-O-R-T-O-R-A. Misha Hunke.
[4] M-I-S-H-A, H-U-N-K-E. Michael Steinberg. And Alison Smith.
[5] They're a mixture of performing rights group and licensing
[6] group, and what this would be is to actually do exactly what
[7] the task says, resolve issues on direct licenses with either
[8] publishers, with songwriters, with writers feeling that they
[9] didn't get paid from their publishers via direct license,
[10] answering questions what would you have paid if we didn't
[11] directly license.
[12]      Those are the types of resolutions.
[13] Q. Now, the task says resolve direct license issues with
[14] affiliates and DMX. What type of resolutions with DMX do you
[15] contemplate?
[16] A. Again, I think it would be once -- I think it would be term
[17] dates, I think it would be did we receive the direct license in
[18] time for it to apply against the report in question, did it
[19] convey the full rights that would be needed, what was the
[20] catalog of works that it represented, do we have the full
[21] catalog or not, was BMI missing a piece, was DMX missing a
[22] piece?
[23]      It was kind of a two-way communication going back and
[24] forth.
[25] Q. And, how many hours do you have listed for that test?

Page 93

[1] A. For the lower level people, 125 hours; and for Michael
[2] Steinberg and Alison Smith about 50 hours a year.
[3] Q. Are all of the rates in the hourly rate column as you
[4] described earlier the internal rates used for the subsidiary?
[5] A. Yes, they are.
[6] Q. If you could go down to the third task and explain what's
[7] involved with that?
[8] A. Yes, it is resolving disputes regarding credits with DMX
[9] and MRI and, again, part of this comes from my experience with
[10] television for program working with MRI. There are --
[11] Q. How did that experience play into coming up with these
[12] estimates?
[13] A. I think it allowed me to sit back and say in per-program we
[14] have five people internally dealing with television per-program
[15] with MRI for the most part. Here we are asking for one new
[16] hire and we are absorbing the work amongst our colleagues at
[17] BMI. It is not -- in practice, it is not easy to initially
[18] work these licenses. I think with time you become some of
[19] these things become repetitive, like direct licensing, we may
[20] do a direct license and that may save some time, but with MRI
[21] that is constant back and forth data transfers that need to go
[22] on, there is constant explanations of why you were taking a
[23] credit versus not giving a credit or why they were taking a
[24] credit on something that may not -- maybe they shouldn't have
[25] taken a credit on. And that could be as simple as we believed

Page 94

[1] it was a BMI work but it is actually an ASCAP work.
[2]     Those are the types of issues that would need to be
[3] resolved.
[4] Q. How many hours do you have listed for this particular test?
[5] A. For program supervisor we assumed 375. That person deals
[6] now directly with DMX -- I'm sorry, deals directly with MRI on
[7] a daily basis. The new hire would also be involved in this for
[8] 750 hours a year. And we assumed Mike Steinberg, who is our
[9] vice president of business affairs, would be called on to
[10] interpret contract language as has happened many, many times on
[11] the per-program side.
[12] Q. And I'm not sure if we've covered this, but you said deals
[13] with MRI. Could you explain who MRI is and where they fit into
[14] this process?
[15] A. Yes.
[16]     MRI prepares the reports for DMX and they send those
[17] reports to BMI. They tell us, you know, basically what music
[18] was used on DMX, of that music how much have they directly
[19] licensed and how much they haven't.
[20] Q. And, have you dealt with MRI in connection with other
[21] licenses as well?
[22] A. Yes, I have.
[23] Q. And, which licenses have you dealt with MRI on for BMI?
[24] A. From an administration standpoint, the per-program license.
[25] Q. And is that experience reflected in your estimates in this

Page 95

[1] chart?
[2] A. Yes, it is. I think it is a large learning curve which we
[3] didn't build in here and it evens out to standard operating
[4] procedure after a while.
[5] Q. Does it become less expensive over time?
[6] A. I think it becomes less expensive. I think -- I think
[7] there is operational efficiencies that get built into the
[8] license.
[9]     Again, we will take a license that might be mandated
[10] by the Court or negotiated between the parties but then we
[11] actually have to implement that license and there is a lot of
[12] gray when you are doing something like that operationally.
[13] Q. Could you explain what the next task you have listed there
[14] is and what it involves?
[15] A. These are, it would be the adjustable fee blanket license
[16] project meeting team and this is just an update on the progress
[17] of the development of the system, the specs of the license, are
[18] we receiving reports on time, are we crediting correctly, what
[19] are the results of that crediting, are there major disputes
[20] that need to be resolved, did a report come in on time but BMI
[21] for some reason didn't process it and we had to give on issues;
[22] are there disputes over direct licenses which will have an
[23] impact on not only this report or subsequent reports or past
[24] reports.
[25]     All of these things, again, based on experience of

Page 96

[1] per-program will come into the adjustable fee blanket.
[2] Q. Are any of the hours or costs listed on this chart, are
[3] they costs that BMI already incurs in administering blanket
[4] licenses?
[5] A. No. These are all incremental costs.
[6] Q. Have you given any consideration to whether it could be
[7] possible to save any of these costs in administering the AFBL?
[8] A. Yes. Yes, I have. And I think there are certain ways -- I
[9] mean if DMX provided BMI the direct licenses and if we had a
[10] template built and BMI put those against our database and
[11] processed it, it would be much more efficient versus having to
[12] compare a report versus our information, reconcile those two
[13] reports, argue over the reconciliation and get it out. I think
[14] it would save numerous steps but that's not what's been asked.
[15] Q. Now, you said provide BMI with the direct licenses. Do you
[16] mean with the actual credit report or do you mean the actual
[17] direct licenses themselves?
[18] A. The actual document from the publisher or the songwriter or
[19] composer that they've dealt with. If they provided BMI with
[20] the term sheets or the deals themselves it would allow us to
[21] put them against our affiliate database to know if we were
[22] going to pay Mike O'Neill for a song, now we don't have to pay
[23] him.
[24] Q. But DMX has provided BMI with copies of the direct
[25] licenses, correct?

Page 97

[1] A. Yes, but they're also doing their own reports internally
[2] which will tell us what they believe is in the BMI repertoire
[3] and what they believe isn't. And that's how there is going to
[4] be a lot of reconciliation in that.
[5] Q. So, if you could explain again what would have to happen in
[6] order to save some of the money under here? What is it that
[7] DMX would have to give you and do to save some of the money
[8] that you have listed on this chart?
[9] A. I believe it would simply be a matter of DMX providing BMI
[10] with the direct licenses they have with publishers, BMI taking
[11] that information, running it against our distribution and
[12] providing back to DMX a credit report to say these direct
[13] licenses relate to these affiliates, here is your credit, here
[14] is ones that we didn't have, here is ones that you didn't have
[15] and we would have to resolve it. It would save, probably, two
[16] steps along the way.
[17] Q. Have you done any estimates as to hours or dollar amounts
[18] that could be saved using that approach?
[19] A. We can probably save the new hire. Besides that, I think
[20] it would maybe be -- I haven't done an in-depth analysis on
[21] that yet.
[22]   (Continued on next page)

Page 98

[1] BY MR. FITZPATRICK:
[2] Q. Good okay, going to the next step under the BMI proposal,
[3] let's talk about the crediting mechanism. We talked about this
[4] briefly before, but could you explain again how that works
[5] under BMI's proposal?
[6] A. Yes. We would take the, it's basically a fraction, the
[7] numerator works, BMI works which DMX has directly licensed.
[8] The denominator is total BMI works, and, again, it's what DMX
[9] makes available for broadcast. They cannot tell us from what
[10] we understand, actually who listens to each channel, but they
[11] tell us what they make available for people to listen.
[12] Q. I think you mentioned this before, but how does DMX
[13] distribute music to its customers?
[14] A. They do it via satellite, which is off-premise and they do
[15] it via CD or hard drive delivery, which is on-premise.
[16] Q. And how are these two businesses handled under BMI's
[17] proposal in terms of the crediting mechanism?
[18] A. They're handled the same. We would weight them equally.
[19] Q. Do you understand what DMX's proposal is with respect to
[20] the crediting mechanism?
[21] A. I believe they only want to use off proxy or the satellite
[22] delivered as -- I'm sorry, off-premise as a proxy for
[23] on-premise delivery.
[24] Q. Why does BMI propose using both on and off rather than off
[25] alone?

Page 99

[1] A. We get it now. DMX supplies us with the on-premise data so
[2] we know what music is actually being used there. So I just
[3] don't understand why we couldn't use it in a crediting
[4] mechanism. It's available, it's actually a little bit better,
[5] more detailed information, because we know what locations are
[6] actually using what CD's. From what I understand the
[7] difference by using the off-premise only would save DMX a
[8] substantial amount of money via the crediting mechanism.
[9] Q. Could you explain why that is?
[10] A. Because when you look at the on-premise performances, they
[11] are not the same music that they make available for the
[12] off-premise performances. It's, from what I understand it's
[13] different, it's not analogous. It's not a good proxy is the
[14] way to say it.
[15] Q. And have you looked at what the credit would be using
[16] off-premise alone as compared to looking at on-premise?
[17] A. Yes. I believe -- I don't have the exact percentages from
[18] the interim license that was run, but I believe the most recent
[19] report DMX had like a 35 percent credit via their direct
[20] licenses for off-premise only.
[21] Q. And what would it have been if they had used on-premise?
[22] A. I think it drops to like 21, 22 percent.
[23] Q. Does using both on and off-premise add to BMI's incremental
[24] costs as compared to if BMI just used the off-premise proxy?
[25] A. No, it doesn't. We use on and off now for distribution to

Page 100

[1] our affiliates of royalties and we would use that for the
[2] crediting mechanism also.
[3] Q. If you could turn to tab 9 in your binder and identify that
[4] document, please? It's Joint Exhibit 0723.
[5] A. Yes. This is a letter between, from Marvin Berenson, who
[6] is our general counsel at BMI, to Mike Zendan, vice president
[7] and general counsel of Muzak and John Carroll, who is a lawyer
[8] for Wolfson & Carroll.
[9] Q. Do you have an understanding of who Mr. Carroll was
[10] representing in 2004?
[11] A. Yes. Mr. Carroll was representing the Muzak affiliates.
[12] While Muzak had about 165,000 locations, the Muzak affiliates
[13] had about 85,000 affiliates that they represented.
[14] Q. And what license did the Muzak affiliates take?
[15] A. They took the CMS, the standard CMS license or the standard
[16] music license, if you will.
[17] Q. At what rate?
[18] A. The same rate, $36.36 with the organic growth and
[19] everything else built in.
[20] Q. If you could direct your attention to in the first
[21] paragraph, about five lines up from the bottom, there's a
[22] sentence that starts "in order to resolve." Do you see that?
[23] In order to resolve between them?
[24] A. Yes, I do.
[25] Q. Could you read that sentence and explain the context of it

Page 101

[1] for the Court, please?
[2] A. In order to resolve between them the pending rate
[3] proceeding in the BMI rate court known as United States v.
[4] Broadcast Music Inc., in the matter of the application of AEI
[5] Music Network Inc., et al, BMI, Muzak and the Muzak affiliates
[6] also desire to finalize the BMI license fees and terms for each
[7] of these entities for the interim period -- I'm sorry, for the
[8] interim license fee period from January 1, 1994 through
[9] June 30, 2004.
[10] Q. Could you explain the context for that sentence? What does
[11] it mean?
[12] A. It basically means we finalized the interim period from '94
[13] to 2004 at what was paid.
[14] Q. What had Muzak been paying for the '94 to '04 period?
[15] A. I believe they were paying between 12 and $14 per location
[16] on average.
[17] Q. Now, after BMI and Muzak reached this agreement, how was
[18] the rest of the commercial music services treated for that '94
[19] to '04 period?
[20] A. They were treated similarly. Everybody got the same exact
[21] treatment.
[22] Q. Meaning what?
[23] A. Meaning we finalized with the entire industry from 1994 to
[24] 2004 at the interim fees that were paid, they became final.
[25] Q. Now, the DMX entity that's a part of this proceeding, does

Page 102

[1] BMI have any dispute with them about the 1994 to 2004 period?
[2] A. No.
[3] Q. Why not?
[4] A. That was settled with the predecessor. I believe the DMX
[5] that currently exists came through bankruptcy. Their
[6] predecessor, we settled out the period of 1994 through 2004
[7] also at the same rates.
[8] Q. And how was that predecessor company treated for the '94 to
[9] '04 period?
[10] A. They were treated the exact same way as Muzak or anybody
[11] else in the industry. We finalized the interim fees at what
[12] was paid.
[13] Q. Did you consider whether to adjust your proposal to DMX in
[14] this proceeding in light of the finalization of the '94 to '04
[15] period that we've been discussing?
[16] A. No, we didn't.
[17] Q. Why not?
[18] A. I didn't think it was an issue. I thought the $36.36
[19] contract was the main contract that I was concerned with.
[20] There were a lot of different leverage points that I recall in
[21] the Muzak agreement, and I believe they were asking for a
[22] refund at a certain point in time. They were asking for an
[23] adjustable fee blanket. It was, by settling out that period,
[24] it was no different to me, it had no bearing on what my
[25] going-forward rate was.

Page 103

[1] Q. If you could take a look at tab -- we can skip tab 10,
[2] actually. If you could go ahead to tab 11. If you could take
[3] a look at that and identify it for me, please.
[4] A. This would be an amendment to the commercial music services
[5] agreement for TruSonic, which is a commercial music provider in
[6] the industry.
[7] Q. And could you explain the terms of the amendment?
[8] A. Basically, it allows TruSonic to exempt locations from
[9] their fee if the location is playing completely directly
[10] licensed music. So they wouldn't have to count that location
[11] in their 36.36 location count to BMI.
[12] Q. And what happens if the location plays any non-directly
[13] licensed BMI music?
[14] A. It would be basically infringing copyright. They would
[15] have no license for that establishment. It would be a
[16] copyright infringement.
[17] Q. Did BMI charge TruSonic any extra for this amendment?
[18] A. No, we didn't.
[19] Q. Why not?
[20] A. What they were saying is here's an establishment that is
[21] playing directly licensed music only, potentially. We don't
[22] need a license for that, we don't want a license for that, so I
[23] wasn't going to try to force them to take a license for those
[24] establishments.
[25] Q. Did anyone else in the commercial music services industry

Page 104

[1] ask for an amendment similar to this?
[2] A. Not that I recall, no.
[3] Q. Would you have made it available if asked?
[4] A. Yes. Yes.
[5] Q. Has DMX asked you for it?
[6] A. No. They've asked for a blanket coverage with a way to
[7] reduce their fees if they directly license certain --
[8] Q. And would you make this available to DMX if asked?
[9] A. If DMX came to us and said we've directly licensed these
[10] establishments, they're playing all directly licensed music,
[11] yes, I would exempt those establishments from the license.
[12] Q. In your view how does this TruSonic amendment compare to
[13] the adjustable fee blanket license that DMX has requested in
[14] this case?
[15] A. It's not even -- this is not coverage. This is basically
[16] saying we're not covering that establishment. They can't play
[17] any music that's licensable. If they do, we can sue you for
[18] infringement. There's no indemnity, there's no access, there's
[19] no anything.
[20] Q. How does that compare to the AFBL in this case?
[21] A. The AFBL is blanket coverage with the option to reduce so
[22] they would be indemnified if they played music. They would get
[23] full access to the catalog and they would have every right to
[24] play whatever they wanted.
[25] Q. Has DMX requested license coverage for the provision of its

## Page 105

[1] service to bowling centers?
[2] A. Yes, they have.
[3] Q. And has BMI made a proposal to cover that?
[4] A. Yes, we have.
[5] Q. If you could turn to tab 12 in your binder and identify
[6] that document, please?
[7] A. This is the BMI adjustable fee blanket license proposal to
[8] DMX for bowling centers. And again, we believe they wanted an
[9] adjustable fee blanket for bowling centers. Again, if they're
[10] providing directly licensed music on some scale to bowling
[11] centers, they would want to be able to reduce their BMI fees,
[12] so we tried to follow the same exact form of our commercial
[13] music adjustable fee blanket.
[14] Q. So if you could, just using that demonstrative explain how
[15] BMI's proposal for DMX service being provided to bowling
[16] centers works?
[17] A. We currently license bowling centers and the bowling
[18] industry under its own license agreement. There are about
[19] 70,000 lanes licensed currently, and we have two different
[20] rates in the industry. We have the Bowling Proprietors
[21] Association of America rate, which is the majority of lanes
[22] covered under it. I think it's $14.40 per lane. We have a
[23] higher rate of around $25, I believe, for the non-affiliated
[24] bowling centers.
[25] Q. And which of the rates did you use to set the full fee in

## Page 106

[1] your proposal here?
[2] A. We gave DMX the advantage of the lower rate, the $14.40
[3] rate.
[4] Q. And how do you get to the full fee of $16.60 that's listed
[5] on that document?
[6] A. We took the same premium, the 15 percent premium that we
[7] had, which I talked about earlier, and applied it to the 14.40
[8] and that's how we got to the 16.670 per lane. We would
[9] multiply that simply by the number of lanes DMX wanted licensed
[10] and that would be your full fee starting point.
[11] Q. If you could turn to tab 13 in the binder, and this is
[12] Joint Exhibit 0728. If you could identify that document,
[13] please?
[14] A. Yes, this is the Bowling Proprietors Association of America
[15] license, BPAA license, as we like to call it.
[16] Q. And if you could just take a look at paragraph 4A under
[17] fees, it mentions a rate of $11.75 per lane. Can you just
[18] explain how that gets to the rate that you proposed for DMX?
[19] A. Yes. If you go to paragraph 4B, directly under that, it
[20] allows for us to increase that rate each year based on the
[21] consumer price index and that's how it's grown to the $14.40.
[22] Q. Were you involved in negotiating the BPAA license?
[23] A. No, I was not.
[24] Q. Who from BMI was?
[25] A. Cleve Murphy, who is assistant vice president of general

## Page 107

[1] licensing.
[2] Q. What happens with bowling centers who are not members of
[3] the BPAA?
[4] A. They can sign their own, we have a standard bowling center
[5] license which they can sign. It carries a higher rate, I think
[6] I said $25, in that location, in that neighborhood.
[7] Q. And if you could take a look at tab 14 of your binder. If
[8] you could just identify this document, please.
[9] A. Yes, this is TV local, January 2005 percent of identified
[10] show hours containing any BMI music.
[11] Q. And who prepared this document?
[12] A. Frank Krupit.
[13] Q. Who is Mr. Krupit?
[14] A. Frank Krupit is assistant vice president at BMI.
[15] Q. Do you have an understanding of what source of data he used
[16] to prepare this document?
[17] A. Yes, I do.
[18] Q. What source is that?
[19] A. He used two sources; BMI's internal cue sheet database
[20] along with an outside source called Tribune Data, which lists
[21] every station across the country and the programming that is
[22] aired on those stations.
[23]     MR. FITZPATRICK: Your Honor, I'd move the admission
[24] of this document.
[25]     MR. RICH: May I have one moment, your Honor?

## Page 108

[1]     (Pause)
[2]     MR. RICH: No objection.
[3]     THE COURT: Received.
[4] Q. So Mr. O'Neill, if you could explain the data in the table
[5] on the first page of this document and what it means?
[6] A. Yes. If you look at the center column, total identified
[7] show hours, those are the show hours provided to BMI from this
[8] company Tribune across the television stations. The identified
[9] show hours, the first column, identified show hours, which any
[10] BMI music would actually say do we have a cue sheet or music
[11] within that program that this company has identified. We've
[12] broken that out into overall, syndicated and local. Overall is
[13] the combination of syndicated and local. Syndicated is shows
[14] like Oprah, Wheel of Fortune or Jeopardy. Local would be local
[15] news, sports, public affairs programming.
[16]     The very last column to the right, percentage of show
[17] hours with any BMI music is simply a division of the first
[18] column divided by the second column. I'm sorry, the identified
[19] show with BMI music divided by total identified show hours.
[20] Q. And so the numbers in the far right hand column, what do
[21] they actually represent?
[22] A. About 83 percent of overall identified shows contain BMI
[23] music.
[24] Q. And again, this is in what industry?
[25] A. Local TV.

[1] Q. Do you have an understanding of why this document was
[2] prepared?
[3] A. Yes, I do.
[4] Q. Could you just explain the context for that?
[5] A. I think it's to -- I know the economists when they tried to
[6] verify the premium of what the AFBL would be both looked to the
[7] local television marketplace and the program licenses, and part
[8] of that license when it was adopted or created had a percentage
[9] of music that the typical television station played -- typical,
[10] it had a percentage of music that the typical television played
[11] of ASCAP music and that's how they originally got to this
[12] multiplier.
[13] Q. Do you have an understanding of whether the economists,
[14] whether our economists in this case used these data in
[15] calculating the premium under the television per program?
[16] A. Yes, I believe they did.
[17] Q. And if you could just explain briefly, what's the
[18] difference between the first page of this document and the
[19] second page of the document? And I direct your attention to
[20] the heading if that helps.
[21] A. The first is percent of identified show hours containing
[22] any BMI music. The second thing is TV local -- oh, one is
[23] January and the other one is the whole year.
[24] Q. Mr. O'Neill, have you ever had conversations with
[25] BMI-affiliated publishers about direct licensing?

[1] A. Yes.
[2] Q. The other entities listed on JX1293, that big tabulation?
[3] A. Was that that long spreadsheet?
[4] Q. I believe it is.
[5] A. Yes, sir.
[6] Q. Prior to that time, you had no role in licensing what we're
[7] referring to here as the commercial music service industry, is
[8] that correct?
[9] A. That is correct.
[10] Q. And so I take it you also testified that you had no
[11] involvement in the negotiations underlying the 2004 license
[12] agreement between Muzak and BMI, is that right?
[13] A. That is right.
[14] Q. And your knowledge as to those negotiations is confined to
[15] what you've learned from briefings that occurred sometime
[16] either in late 2007 or early 2008, is that right?
[17] A. That is correct.
[18] Q. So three or four years after the fact, right?
[19] A. Pretty close, yes.
[20] Q. Mr. Berenson, BMI's general counsel, was the lead
[21] negotiator in the Muzak deal, is that right?
[22] A. Mr. Berenson and Mr. Annastas, I think. Oh, Mr. Shaker
[23] also from BMI. But I believe Mr. Berenson was the lead,
[24] Mr. Rich.
[25] Q. You do believe?

Page 110

Page 112

[1] A. Yes, I have.
[2] Q. Have you ever told any of them to sit tight because we're
[3] going to rate court, so don't enter into a direct license?
[4] A. No, I would never do that.
[5] Q. Have you ever discouraged any BMI affiliate from entering
[6] into a direct license?
[7] A. No, I have not.
[8]     MR. FITZPATRICK: Thank you. I pass the witness, your
[9] Honor.
[10]    THE COURT: Thank you, Mr. Fitzpatrick. Mr. Rich?
[11]    MR. RICH: Thank you.
[12] **CROSS-EXAMINATION**
[13] **BY MR. RICH:**
[14] Q. Good afternoon, Mr. O'Neill.
[15] A. Good afternoon, Mr. Rich.
[16] Q. I believe you testified that you took on responsibility for
[17] general licensing at BMI as of April of 2006, is that correct?
[18] A. That is correct.
[19] Q. And I believe you testified that that's the licensing area
[20] that covers the licensing of entities such as DMX and Muzak,
[21] yes?
[22] A. Yes, sir.
[23] Q. TruSonic?
[24] A. Yes.
[25] Q. Play Network?

[1] A. I do believe so.
[2] Q. I think you so testified in your deposition.
[3] A. I believe -- yes.
[4] Q. He's not appearing as a witness for BMI here, is he, to
[5] your knowledge, Mr. Berenson?
[6] A. I haven't seen the witness list, but I don't think he's
[7] here today.
[8] Q. And also involved was the predecessor in your current
[9] position, Mr. Shaker, is that right?
[10] A. That's right.
[11] Q. He's no longer with BMI?
[12] A. No, he's not.
[13] Q. I believe you've mentioned both before and now Mr. Annastas
[14] was involved, is that right?
[15] A. Yes, sir.
[16] Q. He played a subordinate role in the negotiations, isn't
[17] that true?
[18] A. I think I said Mr. Berenson was the lead, so he would have
[19] been the support in that.
[20] Q. In fact, at some meetings Mr. Annastas was just an observer
[21] who wasn't doing a lot, isn't that true?
[22] A. I don't know if that's true or not.
[23] Q. If I represent to you he so testified at his deposition,
[24] you would accept that?
[25] A. I would.

Page 113

[1] Q. Okay. Now, am I correct that Muzak's principal negotiator
[2] was its general counsel, Mr. Zendan, as far as you're aware?
[3] A. Yes.
[4] Q. And were you involved in the negotiation of any of the
[5] other principal CMS licenses, Music Choice, Play Network,
[6] TruSonic on which BMI relies here for its benchmarking?
[7] A. I was involved in the decision to allow Music Choice to
[8] exempt the DirectTV subscribers. That would be it.
[9] Q. What about the amendment to the TruSonic agreement about
[10] which you testified a few minutes ago which appears as tab 11
[11] in the binder on your direct?
[12] A. I would have been involved, in 2007, I would have had say
[13] over this, yes.
[14] Q. My question was, were you involved in the negotiation of
[15] what appears as JX1312?
[16] A. No.
[17] Q. Who was that?
[18] A. Tom Annastas.
[19] Q. You're sure? It wasn't Ms. Stafford Scherer?
[20] A. I know Ms. Stafford Scherer worked with Daniel O'Neill at
[21] TruSonic on some of these issues, and I also know I was
[22] involved in some discussions with Ms. Stafford Scherer and
[23] Mr. Annastas around this amendment, but I believe Mr. Annastas
[24] ultimately was the one responsible for it.
[25] Q. In other words, you didn't negotiate it, is that correct?

Page 114

[1] A. No, I did not.
[2] Q. In other words you believe that all commercial music
[3] providers should be treated comparably for purposes of
[4] licensing by BMI, is that right? That's the gist of your
[5] testimony?
[6] A. I live by that similarly situated concept.
[7] Q. I take it from BMI's proposal here that the proper metric
[8] you believe for measuring comparability is on a per customer
[9] location basis?
[10] A. For this license, yes.
[11] Q. 36.36?
[12] A. Per license, yes. I mean, per location yes.
[13] Q. Is there any reason in your judgment in light of that
[14] comparability that Muzak should do better in its license
[15] dealings with BMI than DMX?
[16] A. I would offer DMX the same license that we offered Muzak
[17] and how they operated under that license over the five years,
[18] everybody was treated equally under that license. So I would
[19] say some might benefit, some might not.
[20] Q. When you say some might benefit, you believe that all CMS
[21] industry licensees are entitled to comparable economic
[22] treatment by BMI, correct?
[23] A. Yes.
[24] Q. Do you believe that Music Choice should do better in its
[25] music license dealings than DMX?

Page 115

[1] A. No.
[2] Q. What about Play Network?
[3] A. No.
[4] Q. What about TruSonic?
[5] A. No.
[6] Q. I'd like to explore a bit further your understanding of the
[7] 2004 Muzak negotiations as you've come to understand those and
[8] as you've reviewed the license agreements, okay?
[9] A. Yes.
[10] Q. Now, I take it the Muzak deal was the template for all
[11] succeeding commercial music service license agreements,
[12] correct?
[13] A. That's my understanding, yes.
[14] Q. And BMI, I take it, was unwilling to vary the essential
[15] terms of that agreement as it rolled this license out to other
[16] industry players, correct?
[17] A. I believe that was correct. I think the one major change
[18] was the way the base fee was talked about in subsequent
[19] license, the CMS standard license versus the Muzak license.
[20] Q. What do you have in mind by that?
[21] A. The Muzak license was stated at $30 million over the five
[22] years whereas the base rate on the CMS agreement was $36.36
[23] times the number of locations times five years.
[24] Q. But if customer X came to you saying I don't like the Muzak
[25] deal, I'd like to start over and negotiate with you, I take it

Page 116

[1] BMI's position is this is the license we're prepared to offer
[2] for the period of time involved, correct?
[3] A. That would be it, yes.
[4] Q. Whether you were large or whether you were small, correct?
[5] A. Correct.
[6] Q. So everybody on that long list of JX1293 entities was
[7] essentially presented with a fait accompli as far as the form,
[8] structure, fee structure of that license was concerned,
[9] correct?
[10] A. I don't know that for a fact. Again, as I testified just a
[11] second ago, I wasn't involved in that negotiation. I'm not
[12] sure if there were discussions or whether it was presented as
[13] fait accompli. I know there were adjustments made, like to
[14] Music Choice, I know there were adjustments made to TruSonic in
[15] those situations. We didn't try to just jam down that license
[16] down their throats. So there was some negotiations brought
[17] into it.
[18] Q. If a customer came to you and said I want to do a deal that
[19] gives me $30.30 per year for the period June 2004 through, or
[20] July 2004 through June 2009, starting at $30.30 rather than
[21] $36.36, am I right that BMI was open to that discussion?
[22] A. I don't know at that time, Mr. Rich. I know in my time I'd
[23] like to see if there was a way, if they were differently, set
[24] up differently than the people taking the $36.36 license, if
[25] they were operating differently, if there was something that

Page 117

[1] necessitated a rate differential. Anything to avoid ending up
[2] here litigating over it. I think we would be short sighted to
[3] do so.
[4]     In answering it, though, I don't know if that happened
[5] or not. I don't know if somebody came to them other than DMX
[6] who wanted the adjustable fee blanket saying they wanted a
[7] different form of license, and I think that was the main, the
[8] main person who was arguing.
[9] **Q.** Sitting here today putting DMX to one side, you are
[10] unaware, at least from the learning you have acquired in your
[11] current position, right, of any situation in which BMI
[12] following conclusion of the Muzak negotiation expressed a
[13] willingness to renegotiate its basic economic terms, is that
[14] correct?
[15] **A.** That's correct.
[16] **Q.** Now, Muzak and BMI executed two documents simultaneously on
[17] or about December 31 of 2004, is that correct?
[18] **A.** Yes.
[19] **Q.** And just looking back at your binder, we have them in your
[20] binder, I believe, don't we?
[21] **A.** I believe so. Muzak was tab 4?
[22] **Q.** Yes.
[23] **A.** I believe the side letter was tab 9.
[24] **Q.** And they bear the same effective date, is that correct?
[25] **A.** Yes.

Page 118

[1] **Q.** Tab 4 is denominated license agreement, correct?
[2] **A.** Correct.
[3] **Q.** And sets forth license terms between BMI and Muzak for the
[4] period July 1, 2004 through June of 2009, right?
[5] **A.** Yes.
[6] **Q.** And then flipping to tab 9, the letter agreement, that
[7] agreement as I believe you've already testified, finalized
[8] license agreements for the period January 1, 1994 through 2004,
[9] correct?
[10] **A.** Correct.
[11] **Q.** And the opening paragraph of that agreement which you
[12] earlier read into the record a portion of, expressly links the
[13] two as part of one unitary agreement, correct? Could you read
[14] it to yourself, that opening paragraph?
[15] **A.** Thank you. I believe it says that in order to resolve
[16] between them the rate proceeding. I'm not quite sure that, and
[17] correct me --I'm not quite sure the time of the rate proceeding
[18] or what date span the rate proceeding was asking to resolve,
[19] but it says we resolved that period and we also resolved the
[20] past. So if the date period of that application of AEI music
[21] went through the '09 period, then I would agree with you.
[22] **Q.** Let me ask the question a little differently. The
[23] resolution of both time periods, that which was the subject of
[24] the license agreement, and that which was the subject of the
[25] letter agreement, was all part of the same negotiation,

Page 119

[1] correct?
[2] **A.** I guess the date span was being considered, from '94
[3] through '09, I guess that might be the way to look at it, yes.
[4] **Q.** So the answer is yes, right?
[5] **A.** Yes.
[6] **Q.** I take it we've established that the license agreement, the
[7] portion of the unitary time span that ran from July of 2004
[8] through June 30, 2009, afforded BMI higher license fees than
[9] Muzak had theretofore been paying, correct?
[10] **A.** That is correct.
[11] **Q.** Can you identify what the gap was between what Muzak had
[12] been paying and what it agreed to pay for that period?
[13] **A.** I believe I said they were paying between 12 and $14 per
[14] location on average, in that root of $36.36 per location on a
[15] final basis.
[16] **Q.** A significant increment for BMI, correct?
[17] **A.** Yes, it probably wasn't quite where we wanted to get, but
[18] it was a step in the right direction.
[19] **Q.** A large jump from where it had been, correct?
[20] **A.** Yes.
[21] **Q.** And then with respect to the earlier part of this unitary
[22] time period, the part preceding July of 2004, dating back all
[23] the way to January of 1994, I take it we all agree that prior
[24] 12 to $14 effective rate was left in place, correct?
[25] **A.** That's what happened, yes.

Page 120

[1] **Q.** So you have, if you look at a unitary time period starting
[2] in January of 1994, ending in June of 2009, and if you plotted
[3] it out, you would have a fee structure level 12 to $14 level in
[4] a general sense, if you follow me, or almost a ten-year period,
[5] yes, and then a sharp increase beginning July 1 of 2004
[6] carrying through under the current, under the license structure
[7] we've been talking about today, until June of 2009, correct?
[8] **A.** You can actually back that up to the original start date of
[9] '87 license that they were on, yes.
[10] **Q.** Now, what occurred between June 30, 2004 and July 1, 2004,
[11] that is, the last day of the finalization of the 12-to
[12] 14-dollar fees, what happened between that day and the next day
[13] when those licenses went here, that changed the fundamental
[14] value to Muzak of its license with BMI?
[15] **A.** Again, we were seeking a rate increase from DMX, and we
[16] felt we were being well underpaid vis-a-vis our competitor
[17] ASCAP and we were seeking to get a much closer rate, if you
[18] will, competitively. In Muzak's mind I guess we were
[19] successful in convincing them we deserved that rate.
[20]     **MR. RICH:** Could I get an answer to my question
[21] please, your Honor?
[22] **Q.** I'm asking what changed in terms of the value of BMI's
[23] repertoire to Muzak between June 30, 2004, and July 1, 2004.
[24] **A.** I'm not Muzak. I don't know what in their minds changed.
[25] **Q.** Not my question. In your mind what changed?

Page 121

[1] A. In our mind, we were more valuable to Muzak and we deserved
[2] a rate increase.
[3] Q. Did you become three times more valuable between June 30,
[4] 2004 and July 1, 2004?
[5] A. Did BMI become more valuable?
[6] Q. In your estimation?
[7] A. I may say I became more -- I believe, I believe BMI was
[8] seeking a rate that they felt justified, they were justified in
[9] getting, and the three times increase they felt justified in
[10] getting that rate, yes.
[11]     MR. RICH: Could I try one more time, your Honor?
[12]     THE COURT: No. I don't think it's a fair question.
[13] There may be many reasons why a rate changes as of a certain
[14] day, not necessarily only a change in value. And yet that's
[15] the presumption on which this argument that you're inquiring
[16] about rests.
[17]     MR. RICH: It's the very point I'm trying to
[18] establish, your Honor, that there was no such change in fact.
[19]     THE COURT: It doesn't matter. It wasn't done as a
[20] change in intrinsic value. It was done as what can be
[21] accomplished in a negotiation and that must inevitably take
[22] place as of some date. Now, you can ask him why that date
[23] rather than some other date, but I think the proposition on
[24] which you're resting this question is not a useful proposition,
[25] so I'm not going to allow you to try for the third time.

Page 122

[1]     MR. RICH: I'll move on.
[2] Q. Now, the Muzak negotiations leading up to the agreements
[3] transpired on and off for an extended period of years, isn't
[4] that true?
[5] A. Yes.
[6] Q. And it's your understanding, is it not, that from the
[7] outset of these negotiations BMI was seeking increased fees
[8] from Muzak beyond what it had been receiving on an interim
[9] basis for the entire period back to January of 1994?
[10] A. That's what I believed, yes. I'm sorry, that's what I
[11] understand, yes.
[12] Q. And this was because in BMI's view, the interim fees which
[13] dated back to a license covering the 1987, I think, to 1993
[14] period, if I'm correct, were inadequate on a going-forward
[15] basis from that point, correct?
[16] A. I believe that was our view heading into the negotiation.
[17] Q. Including because BMI's competitor ASCAP had collected
[18] significantly larger fees from Muzak for that prior period,
[19] correct?
[20] A. Yes.
[21] Q. And because --
[22] A. I'm sorry. And the fact that the industry was using more
[23] BMI music than they had previously, under previous license
[24] agreements. We felt that their use of BMI music had grown.
[25] Q. Well, you're going beyond my questions, but my next

Page 123

[1] question was about to elicit the very point, which is that I
[2] take it it was BMI's view that since the amount of BMI music
[3] used by Muzak in relation to ASCAP had been increasing over
[4] time, that it would be appropriate to bridge the gap in
[5] payments beginning as of January of 2004, is that right?
[6] A. Correct.
[7] Q. And in turn, I take it it's your understanding that Muzak
[8] did not want to pay higher fees than it had paid on an interim
[9] basis for the retroactive period back to 1994, true?
[10] A. True.
[11] Q. But that it was willing to negotiate terms for higher fees
[12] on a going-forward basis?
[13] A. I know there was a fairly long period of negotiation from
[14] '94 to '98, prior to the first trial that resulted in the
[15] adjustable fee blanket. I believe BMI was seeking, as you
[16] suggested, a fee increase. I believe DMX was seeking to have
[17] their fees actually lowered or potentially have them
[18] adjusted --
[19] Q. You mean Muzak?
[20] A. Yes, thank you, I mean Muzak. Ultimately, and I
[21] apologize -- can you repeat that last question?
[22] Q. My question is, as these negotiations periodically
[23] occurred, I take it you would agree with me that at the same
[24] time Muzak at the bargaining table was resisting making
[25] increased payments for what we've been calling the retroactive

Page 124

[1] period, it expressed that it was amenable to paying something
[2] more to be determined for the going-forward period?
[3]     MR. FITZPATRICK: Object on foundation grounds at this
[4] point, your Honor. I think the witness clearly wasn't at the
[5] negotiating table, so I don't think he has a foundation to
[6] answer this question.
[7]     MR. RICH: Your Honor, I believe my --
[8]     THE COURT: I think the witness can express that in
[9] his answer, if that renders him unable to express a testimonial
[10] answer.
[11] A. I was not in the negotiation. I believe there's a lot of
[12] give and take in a negotiation, so I wouldn't assume that it
[13] didn't come into play, Mr. Rich. That probably could have
[14] happened, but I wasn't there to actually witness it.
[15] Q. Now, in fact, you do know that Muzak successfully avoided
[16] making any additional retroactive payments satisfactory to BMI
[17] on a going-forward basis, is that right?
[18] A. That is correct.
[19] Q. So the deal got done?
[20] A. The deal got done, finalized for the past. We have a new
[21] license going forward.
[22] Q. Finalized for the dollars that have been paid and the
[23] additional for the remainder?
[24] A. New dollars, if you will.
[25] Q. New, additional dollars.

Page 125

[1] **A.** New dollars--
[2] **Q.** New dollars.
[3] **A.** For the going forward.
[4] **Q.** To the extent BMI wanted on a precedential basis to focus
[5] solely on the prospective portion and tout this as a 36.36 deal
[6] to Muzak's competitors, this would not necessarily have been to
[7] Muzak's disadvantage, true?
[8] **A.** From Muzak's standpoint, I don't think it would have been
[9] to their disadvantage. They would have had everybody on the
[10] same rate as they were paying.
[11] **Q.** And Muzak, as we've established, resolved satisfactorily to
[12] itself a much longer period of years, correct? Including a
[13] period that was open retroactively, correct?
[14] **A.** Again, they settled the '94 through '04 period.
[15] **Q.** Yes?
[16] **A.** At what was paid, and we set the new license going forward.
[17] And that's what the whole industry ended up doing.
[18] **Q.** Let's review some of the basic economics of the portion of
[19] the 2004 Muzak agreement that deals with the July 1, 2004 to
[20] 2009 period, okay?
[21] **A.** Okay.
[22] **Q.** You testified, I believe, that the license calls for what
[23] is termed a base license fee or base fee of $30 million over
[24] the five-year term, is that correct, that's the starting base
[25] fee?

Page 126

[1] **A.** That is correct, yes. Yes, 30 million divided by time got
[2] us to the 6 million.
[3] **Q.** And if you ever want to refer to the document as we speak.
[4] It's not a memory test.
[5] **A.** Thank you.
[6] **Q.** And that base fee was payable in equal installments of
[7] $6 million per annum, is that correct, over five years?
[8] **A.** That is correct.
[9] **Q.** And I take it that the license is predicated in part on a
[10] starting subscription location count of 165,000 locations as of
[11] December 31, 2003, is that a correct reading of it?
[12] **A.** That is. Correct.
[13] **Q.** And I take it in this proceeding, BMI seeks a license fee
[14] from DMX predicated on the assumption, tell me if I'm wrong,
[15] that the 2004 Muzak deal was one calling for payment by Muzak
[16] of $36.36 per subscriber location, correct?
[17] **A.** I'm sorry I missed the last --
[18] **Q.** Am I correct that the predicate for the fee that you seek
[19] here, before we talk about option value premiums, is based on a
[20] base rate of $36.36 a location, correct?
[21] **A.** Well, actually -- yes, that is correct, because I think the
[22] contract itself would be, would be a disadvantage to DMX.
[23] Because they lost subscribers.
[24] **Q.** I didn't ask you reasons. I asked if that's correct.
[25] **A.** Yes, that's correct.

Page 127

[1] **Q.** And I take it the basis for the $36.36 is the fact that if
[2] one were to divide the annual starting base fee of the Muzak
[3] license, namely, $6 million, by 165,000, the number of starting
[4] locations, that's the number that would result, correct, the
[5] math would get you to $36.36?
[6] **A.** That is correct.
[7] **Q.** But what we've covered thus far doesn't cover the entirety
[8] of the economics of that agreement, correct? There were more
[9] moving parts, as it were, yes, that could affect the ultimate
[10] fees paid?
[11] **A.** Because the organic -- yes, correct.
[12] **Q.** It incorporates an organic growth provision and several
[13] other bells and whistles, correct?
[14] **A.** Yes. Acquired locations, organic growth. Some others.
[15] **Q.** So just to be clear we're on the same page as to how that
[16] works, the license allows Muzak to add as many as 8 percent
[17] more subscribers in each year by what is defined as organic
[18] growth, without any increase in Muzak's annual fees, is that
[19] right?
[20] **A.** Yes, the base fee would remain unchanged.
[21] **Q.** And with each added subscriber up to that 8 percent
[22] allowance, the effect of per location rate would decline, is
[23] that right?
[24] **A.** That would be the impact of that.
[25] **Q.** Because the 165,000 under that scenario would be something

Page 128

[1] larger, so a larger devisor would be -- a larger number would
[2] be divided into the $6 million, is that correct?
[3] **A.** That is correct and the effective rate would drop. But it
[4] would drop with a floor. It couldn't -- the 36.36 cannot fall
[5] lower than 8 percent per year.
[6] **Q.** Per year, okay. Could we put back up on the screen what
[7] was the first demonstrative from the opening, please? That's
[8] basically a correct depiction as you understand it, I take it,
[9] of what those maximum sort of year-to-year per location fee
[10] benefits would be, assuming 8 percent or greater growth, is
[11] that correct?
[12]      **MR. FITZPATRICK:** Just object and want to be clear
[13] we're talking about the numbers and not any other part of the
[14] slide. If we're asking Mr. O'Neill to adopt the accuracy of
[15] the whole slide, I just want that to be clear in the question.
[16]      **MR. RICH:** I welcome any aspect of that that he feels
[17] is an inaccurate depiction of the manner in which the math
[18] under the Muzak license works.
[19]      **THE COURT:** What is your objection?
[20]      **MR. FITZPATRICK:** It's unclear to me whether Mr. Rich
[21] was asking Mr. O'Neill whether he adopted that these were
[22] actually contemplated per location rates or whether he was just
[23] asking Mr. O'Neill to confirm that the math does work out that
[24] way. It wasn't clear to me in the question and to me they'd be
[25] two different questions.

**Page 129**

THE COURT: Can we operate on the basis that this exhibit is an accurate representation of what would happen if the underlying facts supported it?

MR. FITZPATRICK: If there was 8 percent growth or more, yes, that's agreed between the parties, your Honor.

BY MR. RICH:

Q. So we're in agreement on that, yes?
A. Yes.
Q. And I take it you testified on direct, as you did at your deposition, that this was viewed by BMI as a form of a built-in cushion to allow Muzak to experience a certain level of growth annually without sustaining any fee increase, correct?

THE COURT: Without sustaining -- oh, yes, any fee increase.

A. Yes, without having to add any money to the base fee they could grow up to 8 percent in customer locations.
Q. So assuming during the first year of the license Muzak had grown by a full 8 percent, I take it the mathematical result of dividing the 8 percent larger subscriber base by that unchanged annual fee would have been to reduce the effective per location fee at the end of the first year from $36.36 to what you see on the depiction, which is $33.67, correct? I'm not asking you to do the math, but you can assume I've done it.
A. That is correct, Mr. Rich.
Q. Then for each year on the same assumptions, had they come

**Page 130**

to pass, take your counsel's concern, I'm not saying they did, or they were anticipated to for purposes of this, but mathematically had that happened, the effective rates would have scaled down as per this document, correct?
A. Yes.
Q. Now, the Muzak agreement as you understand it also sets forth the fee consequences were Muzak to acquire another commercial music service that was not operating under its own final license agreement with BMI, correct?
A. That's correct.
Q. You also touched on that with Mr. Fitzpatrick during your direct, right?
A. Yes.
Q. And do you recall discussing this kind of scenario as well in your deposition with my partner, Mr. Marks?
A. Yes, Mr. Marks was very helpful in taking me through the examples.
Q. Yes, I was hoping you would say that so we could short circuit the same elaborate gymnastics here. I take it it's the case, is it not, that had Muzak acquired our client, DMX during the last year of the Muzak license -- can we keep that chart up, please -- the per location rate that Muzak would have paid in acquiring each of those DMX locations would have been $24.75?
A. On a going-forward, I mean, for the last year of the

**Page 131**

contract, yes, that would have been correct.
Q. And you believe the terms of the Muzak agreement terms are reasonable ones, correct?
A. Yes, I do.
Q. And were reasonable at the time the deal was entered into, right?
A. Yes, I do.
Q. And viewing as you do DMX to be a similarly situated licensee to Muzak, you're prepared to accord and afford DMX the same economic terms as BMI regarded to be reasonable to Muzak, correct?
A. Correct.

THE COURT: What was the predicate of that question?
MR. RICH: That BMI regards the --
THE COURT: That was the conclusion. Could you read back the question?
(Record read)

Q. Now, following entering the Muzak deal in 2004, sir, BMI entered into deals with several of the other larger commercial industry music competitors, correct?
A. Yes.
Q. These included Play Network?
A. Yes.
Q. And Music Choice?
A. Yes.

**Page 132**

Q. And TruSonic?
A. Yes.
Q. These are the among the other larger competitors?
A. Yes.
Q. Now, let's talk about the Play Network for a moment. I'm not sure the Play Network agreement is in the binder. I thought I saw TruSonic or that might have been -- why don't we show you and hand you the document that's been premarked as JX0095.?

MR. RICH: With your Honor's permission can we hand it to the Court and the witness?

Q. Have you seen this document before, sir?
A. Yes, I have.
Q. Do you recognize this to be the license agreement entered into on or about June 16, 2005 between BMI and an entity called Play Network?
A. Yes, I am.
Q. And Play Network is a participant, a business operating in the commercial music service environment.
A. Yes, they are.
Q. Am I correct that this agreement is structured the same way as the Muzak agreement is?
A. Yes, it is.
Q. Calling for or allowing an 8 percent per annum organic growth allowance without any increase in fee for Play Network?

Page 133

[1] A. Yes, sir.
[2] Q. And it's the case, is it not, that Play Network has in fact
[3] experienced growth exceeding 8 percent during all of the years
[4] of the contract?
[5] A. Yes, they have.
[6] Q. -- to your knowledge.
[7] And I want to do a bit of an extraction from JX1293,
[8] that's that very large document, your Honor, that is folded up
[9] here in the binder at tab 5 of the materials that Mr.
[10] Fitzpatrick walked the witness through, and we're just going to
[11] extract out here -- I'm sorry, we're going to do a
[12] demonstrative instead. Can we pull out from 1293 the lines for
[13] each year for Play Network? I'm advised they already appear in
[14] yellow form. Yes, they are, so anticipating my cross here,
[15] counsel was kind enough, I think, to yellow line those, but we
[16] tried to -- were we able to put them on a -- it's easier to
[17] look in one place. Why don't we instead of holding up the
[18] examination, I'll represent to you that on this demonstrative
[19] that you have been just handed we have extracted from JX1293
[20] the effective yearly per location rates generated by the growth
[21] experienced by Play Network, so that's the first row of entries
[22] on this. Do you see that?
[23] A. Yes, I do.
[24] Q. I'll represent to you those are accurate, okay? And is it
[25] also not the case, sir, to your knowledge, that even as of the

Page 134

[1] date this license, JX0095 was executed, which was in or about
[2] June of 2005, it's your understanding, is it not, that even
[3] prior to the time the license was signed, BMI recognized and
[4] understood that the effective per location rate for the first
[5] year would be less than $36.36?
[6] A. With Play Networks, yes, we did.
[7] Q. Indeed it would be at about $33.67?
[8] A. Because of their growth yes.
[9] Q. Yes, prior to the actual execution of the agreement,
[10] correct?
[11] A. Yes.
[12] Q. And so at least as to Play Network, this never was a 36.36
[13] per location agreement, was it?
[14] A. I don't know if that's the case, if they were communicated
[15] prior to 2005 of what the license was. It may have been at the
[16] time that they believed it was 36, but when they first heard of
[17] this new license that BMI was offering.
[18] Q. Let me be more precise with my question. At the time Play
[19] Network signed this license in June of 2005, it knew and
[20] understood, as did BMI that this was not a 36.36 license, even
[21] as of year one, correct?
[22] A. The effective rate for Play Networks was going to be less
[23] than 36.36.
[24] Q. Indeed would be $33.67, correct?
[25] A. That is correct.

Page 135

[1] Q. And scooting to the end here, I take it based on BMI's own
[2] data analysis that by the last year of the license, the
[3] effective per location rate that was being paid by Play Network
[4] was at $24.75, that's consistent with your knowledge and
[5] understanding, correct?
[6] A. Yes, it is.
[7] Q. And you regard the Play Network deal to be a reasonable
[8] one, correct?
[9] A. Yes, I do.
[10] Q. And you would -- BMI recognizes that DMX is entitled to a
[11] license on comparable economic terms to that afforded to Play
[12] Network, correct?
[13] A. I believe that DMX should be afforded the same exact
[14] license agreement as Play Networks.
[15] Q. Now we turn to Music Choice. Am I correct that the most
[16] recent agreement, final agreement entered into between BMI and
[17] Music Choice occurred sometime in 2006?
[18] A. I don't have the Music Choice agreement in front of me.
[19]     MR. RICH: Let's show the witness JX1310, please?
[20] A. I'm sorry, Mr. Rich, that is correct. That is correct.
[21] Q. I know there are a lot of dates flying by. We'll provide
[22] that document now to you.
[23] Now, am I correct that although featured at one
[24] document, what we have here is turning to the second page, the
[25] first numbered page, the document styled BMI Music Choice

Page 136

[1] confidential settlement and release agreement dated June 27,
[2] 2006, yes?
[3] A. Yes, sir.
[4] Q. And then if you flip in to Bates page 1010166, perhaps a
[5] little more than halfway through.
[6] A. There we are.
[7] Q. There is a document attached to it styled commercial music
[8] service license agreement.
[9] A. Correct.
[10] Q. Bearing the same date, is that correct?
[11] A. Yes, sir.
[12] Q. So I take it that the license agreement entered into
[13] between BMI and Music Choice in the middle of 2006 was part and
[14] parcel of a larger settlement agreement, is that correct?
[15] A. Yes. Yes, it was.
[16] Q. And the license agreement generated new license fees for
[17] the period July 1, 2004 through June 30 of 2009 no differently
[18] and at the same structure as the Muzak deal, correct?
[19] A. Correct.
[20] Q. And simultaneously, the settlement agreement which appears
[21] at the front of this document, settled a retroactive period
[22] covering January of 1994 to June 30, 2004?
[23] A. I'm seeing July 2004, whereas -- I'm sorry, Mr. Rich, I'm
[24] not -- let me just take a quick gander.
[25] Q. Please. Take your time.