Page 137

[1] **A.** The settlement agreement in the very first two pages, is
[2] that what you were discussing?
[3] **Q.** Yes. I may be mistaken here. Let me just check with my --
[4] no. Pardon me, if you look at the third -- the second whereas
[5] clause on page 1 of the settlement agreement.
[6] **A.** Second -- okay.
[7] **Q.** If you'd read it you see it covers a time period commencing
[8] January 1, 1994 through and including June 30, 2004?
[9] **A.** Yes, I do.
[10] **Q.** Does that refresh you that that retroactive period was
[11] identical to the period resolved with Muzak?
[12] **A.** Yes, it was.
[13] **Q.** And am I correct that that period was resolved in the same
[14] fashion as the Muzak retroactive period was resolved, by
[15] finalizing what had been the pre-existing interim fee payment
[16] levels, correct?
[17] **A.** Yes, sir.
[18]     **THE COURT:** Whenever you get to a good point to stop,
[19] Mr. Rich.
[20]     **MR. RICH:** Fine. Your Honor, let me -- this is as
[21] good as any.
[22]     **THE COURT:** Okay. Let's resume at 10:00 tomorrow
[23] morning.
[24]     **MR. RICH:** Your Honor, may we have the standard
[25] instruction to witnesses who are on cross not to discuss their

Page 138

[1] testimony overnight?
[2]     **THE COURT:** Mr. Fitzpatrick nods his agreement.
[3]     **MR. FITZPATRICK:** I agree your Honor, thank you.
[4]     **THE COURT:** For those of you who were at the pretrial
[5] conference Friday, the word that Napoleon was using is reform.
[6] So reform, reform. Don't speak to me of reform. Aren't things
[7] bad enough as they are?
[8]     **MR. FITZPATRICK:** Thank you, your Honor.
[9]     **THE COURT:** See you tomorrow morning.
[10]     (Adjourned to January 20, 2010 at 10:00 a.m.)

Page 139

INDEX OF EXAMINATION

Examination of:                               Page
MICHAEL O'NEILL
Direct By Mr. Fitzpatrick . . . . . . . . . . .48
Cross By Mr. Rich . . . . . . . . . . . . . .110

# In The Matter Of:

*BROADCAST MUSIC INC.,, v.*
*DMX, INC.,,*

---

*January 20, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 01K5BMIF.txt, Pages 140-328 (189)

**Word Index included with this Min-U-Script®**

```
01KFBMI1                    Trial
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
BROADCAST MUSIC INC.,,
                    Petitioner,
          v.                          08 Civ. 216 (LLS)
DMX, INC.,,
                    Respondent.
------------------------------x
                                      January 20, 2010
                                      10:10 p.m.
Before:
               HON. LOUIS L. STANTON,
                                      District Judge
                    APPEARANCES

HUGHES, HUBBARD & REED, LLP
     Attorneys for Petitioner
BY:  JAMES C. FITZPATRICK
     MICHAEL E. SALZMAN
     JASON C. BENTON
     MARGARET J. HOAG
     - AND -
     JOSEPH DiMONA, In-house counsel, BMI, Inc.,
WEIL, GOTSHAL & MANGES, LLP
     Attorneys for Respondent
BY:  R. BRUCE RICH
     BENJAMIN E. MARKS
     TODD D. LARSON
```

Page 141

(Case called)
(Trial resumed)
MICHAEL O'NEILL,
    called as a witness by the Plaintiff,
    having been previously duly sworn, testified as follows:
        THE COURT: Good morning. Good morning, Mr. O'Neill, you are reminded you are still under oath.
        THE WITNESS: Yes, your Honor.
        THE COURT: Mr. Rich?
CROSS-EXAMINATION
BY MR. RICH:
Q. Good morning, Mr. O'Neill.
A. Good morning.
Q. When we left off yesterday afternoon we were discussing the BMI Music Choice agreement. Do you remember that?
A. Yes.
Q. I put in front of you and I think you will find in your manila folder a document in evidence Joint Exhibit 1310 commemorating that agreement, correct?
A. Yes, sir.
Q. That agreement, just to reiterate, was entered in the middle of June or towards the end of June 2006, is that correct?
A. Yes.
Q. And I believe it was established just at the close

Page 142

yesterday that it not dissimilar to the Muzak agreement covered a retroactive period which was identical to the retroactive period of the Muzak agreement, is that correct?
A. That's correct.
Q. And a forward-operating period identical to that of the Muzak agreement as well, yes?
A. Yes, sir.
Q. Okay, now, at the time in or about the time that this license was entered into, am I correct that Music Choice and BMI had been engaged for some period of years in rate court litigation?
A. Yes, sir.
Q. That wasn't about the commercial services, it was about the residential services offered by Music Choice, is that correct?
A. Yes.
Q. And something like eight years of litigation?
A. I guess it started in '98, roughly, so --
Q. Long period of time?
A. Yes.
Q. And I take it you would agree was costly litigation, yes?
A. Yes.
Q. I take it it's also the case that for that period of time at least, the residential side of Music Choice's business was a more important component of its overall business than its commercial side, is that true?

Page 143

A. I think Music Choice generated more revenues from the residential side than they did from the commercial side.
Q. Around about the same time as this set of agreements was entered into or this agreement was entered into that you have in front of you, I take it, the parties also, that is, Music Choice and BMI, were able to resolve the residential side license issues, is that also correct?
A. I believe so, yes.
Q. Now, coming back to this agreement, the 2006 agreement on the commercial music service side, the retroactive period left the interim fees that Music Choice had been paying for its commercial music service unchanged; there was no -- there were no additional monies paid, correct?
A. Correct.
Q. And no interest payments were made, correct?
A. Correct.
Q. No additional consideration of any kind for that portion of the resolution, is that right?
A. Either way, correct.
Q. And those interim fees were at the same level that Muzak had been paying and later finalized with BMI, is that correct?
A. Yes, they operated under, again, it was under the same contract. Their fees may have been a little different because of the way it was calculated, but we finalized what they operated with under the contract.

Page 144

[1] **Q.** Right. And it was pursuant to the old rate schedule,
[2] pre-existing rate schedule that had been in place for many
[3] years, correct?
[4] **A.** Correct.
[5] **Q.** Now, with respect to the license agreement, that is, the
[6] portion of the resolution with Music Choice beginning for the
[7] period July of 2004, that agreement also was patterned after
[8] the Muzak agreement, yes?
[9] **A.** Yes.
[10] **Q.** Okay, and so like the Muzak agreement, the Music Choice
[11] license allows for a certain amount of organic growth in
[12] customer locations without there being any upward adjustment to
[13] the Music Choice fees, correct?
[14] **A.** Correct.
[15] **Q.** And that amount was 8 percent per annum?
[16] **A.** Yes, it was.
[17] **Q.** And I take it that growth above 8 percent in any year would
[18] result in Music Choice being required to make additional
[19] payments to BMI with respect to those excess locations, but
[20] that the effective rate that would be paid would result from
[21] dividing the base fee of the license by the maximum allowable
[22] locations for that year, is that correct?
[23] **A.** Yes. That is correct.
[24] **THE COURT:** What does maximum allowable locations for
[25] that year mean?

Page 145

[1] **MR. RICH:** Can we put back what was the first
[2] demonstrative from my opening, please, so I can respond to the
[3] Court?
[4] Your Honor, in each contract you will find stipulated
[5] from a, starting -- for example, let's come back to the Muzak
[6] agreement for a moment. You'll remember the number 165,000
[7] locations, your Honor, was the starting number?
[8] **THE COURT:** I do.
[9] **MR. RICH:** Each year there was set forth in these
[10] agreements a number of locations which represents 8 percent
[11] growth, assumed growth from the 165, so that -- I'm making this
[12] up for the purpose of illustration -- if Muzak were allowed by
[13] the end of the first year to grow to something like 172,000
[14] locations, that is the maximum allowable locations for that
[15] year. And so the $33 --
[16] **THE COURT:** You mean the maximum allowable without
[17] payment of an additional fee.
[18] **MR. RICH:** That's correct.
[19] **THE COURT:** This would be the 8 percent cushion. It's
[20] the upper dimension of the 8 percent cushion.
[21] **MR. RICH:** That's correct. So let's assume that Muzak
[22] grew by an additional, or Music Choice grew 1000 locations
[23] beyond the maximum locations allowable. The point of my last
[24] question was to elicit the mathematical proposition that those
[25] thousand additional locations would pay a fee not of $36.36,

Page 146

[1] but $33.67 after that first year, having reached the maximum
[2] allowance. That's how the math works out.
[3] **THE COURT:** Yes. Just what you'd think, actually,
[4] from the function of the 8 percent cushion.
[5] **MR. RICH:** Precisely. And each year, your Honor, the
[6] incremental fees, if there were, because the maximum allowance
[7] would be exceeded, would be payable at each of those reported
[8] levels of per location fee. So, for example, in the TruSonic,
[9] in the Play Network --
[10] **THE COURT:** That 33.67 would never be altered, even if
[11] the number of locations doubled in a year.
[12] **MR. RICH:** In that year.
[13] **THE COURT:** All of those over 8 percent would still
[14] pay 33.67.
[15] **MR. RICH:** And if you grew by more than 8 percent in
[16] each year of the license, as did Play Network and TruSonic, it
[17] would also follow that in year five all of the excess would be
[18] payable at the level of $24.75. We have to spend as much time
[19] on this as necessary, because this is critical.
[20] **THE COURT:** What is the base figure for the second
[21] year?
[22] **MR. RICH:** The base figure will vary in each contract
[23] depending on the starting stipulated location count. For
[24] Muzak --
[25] **THE COURT:** But it will always be at the rate of

Page 147

[1] the -- let's say they double in year one.
[2] **MR. RICH:** Yes.
[3] **THE COURT:** So everything over 8 percent had to be
[4] paid for at 33.67.
[5] **MR. RICH:** That is correct.
[6] **THE COURT:** Then the base figure for year two would be
[7] 33.67 and there would be an 8 percent cushion as in year one
[8] before it moved to 31.18, is that correct?
[9] **MR. RICH:** Mathematically the effect would be --
[10] **THE COURT:** No, I'm trying to figure out the operation
[11] of the base figure. Would that apply to the whole doubled
[12] figure?
[13] **MR. RICH:** No, your Honor --
[14] **THE COURT:** Population.
[15] **MR. RICH:** No. The way each year the fee would be
[16] determined would be to take the original base fee, in the case
[17] of Muzak, $6 million --
[18] **THE COURT:** That's 36.36.
[19] **MR. RICH:** That's correct. Look at for the given year
[20] the maximum allowable locations, so that in year two, your
[21] Honor -- we ought to pull the Muzak agreement, so we don't need
[22] to be hypothetical about this. In year two, your Honor, the
[23] maximum allowable locations for Muzak -- we'll look at that in
[24] a minute -- were something greater than in year one, was
[25] 180,000 locations, let's say. We'll get you the year numbers.

Page 148

[1] Taking your example, if Muzak in year one mushroomed to 300,000
[2] locations, your math is exactly right for year one, they would
[3] have paid for the difference between the allowable for the
[4] first year -- I'm looking at JX132, which is the Muzak
[5] agreement, which I think is in the binder as well.
[6]     THE COURT: Just tell me how it works.
[7]     MR. RICH: Okay. Your Honor, for the first, I'm just
[8] getting the actual numbers. Give me one moment, please.
[9]     THE COURT: In the year two you start with an actual
[10] number of locations under your example.
[11]     MR. RICH: You do.
[12]     THE COURT: 300,000.
[13]     MR. RICH: And you subtract from that the maximum
[14] allowable locations for that year, whether it's year one, two,
[15] three or five, four or five. That number of locations grows
[16] each year under the contract, so you would subtract from our
[17] hypothetical 300,000 the maximum allowable locations, say, in
[18] year two, and that would yield X number of locations. Let's
[19] say it yielded 100,000 locations over and above the allowable
[20] for that year, your Honor, and in that situation, here on the
[21] screen is an excerpt from the Muzak agreement. What paragraph
[22] is that, please? The end of paragraph 4H, your Honor, you will
[23] see for --
[24]     THE COURT: Do each of these figures in this clause
[25] that you're displaying represent successive 8 percent additions

Page 149

[1] to the original starting base figure?
[2]     MR. RICH: Yes. If you were to -- if you see the
[3] number $192,000 and change, your Honor?
[4]     THE COURT: I do.
[5]     MR. RICH: That is the mathematical -- locations,
[6] thank you.
[7]     THE COURT: 165 plus 8.
[8]     MR. RICH: Now if you go to 207,000 for the next year?
[9]     THE COURT: That's 192,000 plus 8 percent.
[10]     MR. RICH: Exactly. So in your example --
[11]     THE COURT: I understand the process.
[12]     MR. RICH: So just in year two, so I think the record
[13] will be clear and I'd like to make sure our witness agrees with
[14] our interpretation. If there were 300,000 Muzak locations with
[15] respect to the year 2006-2007 --
[16]     THE COURT: Yes.
[17]     MR. RICH: They would pay $6 million to cover the
[18] first 207,852 of those, and then if we could flip back to the
[19] demonstrative, please, for the remaining approximately 92 or
[20] 93,000, they would pay at the second year rate, your Honor, of
[21] $31.18 for the balance.
[22]     THE COURT: And the growth of the next 8 percent would
[23] be paid for at 31.18, and after that would be paid for at
[24] 33.67?
[25]     MR. RICH: No. That 33.67 would be history at that

Page 150

[1] point. In other words, the bottom line each year is that if
[2] you are growing at or above the 8 percent, your maximum, your
[3] effective rate will be exactly per every location, exactly what
[4] this chart depicts from location one. So that in year five,
[5] your Honor, Play Networks for every single location because it
[6] had grown by more than 8 percent each year, under the contract
[7] paid exactly $24.75 to BMI for every single one of its
[8] locations from the first. 36.36 was a shadow of history.
[9]     THE COURT: Okay.
[10]     MR. RICH: Just how it works.
[11]     THE COURT: Is that accurate, Mr. O'Neill?
[12]     THE WITNESS: It's acc -- the way I look at it, if you
[13] took $6 million the first year divided by 165,000 locations,
[14] you would get the 36.36. They have 8 percent to grow as the
[15] cushion the next year or actually that year. You would get
[16] 192,000 locations. If you simply divided 6 million by 192, you
[17] would end up at the 33.67. That's effectively what they would
[18] pay for those locations. If they grew over that 8 percent,
[19] they would pay each additional location that 33.67. The next
[20] year, you take the $6 million and they have the ability to grow
[21] another 8 percent.
[22]     THE COURT: The disciplining figure is the 6 million.
[23]     THE WITNESS: Correct. That's why it gets added to
[24] that 6 million. So, yes, I agree with the math.
[25]     MR. RICH: Thank you.

Page 151

[1]     THE COURT: The business purpose was to get the
[2] $6 million and the calculation we're performing is really a
[3] secondary and collateral one to determine a rate as part of
[4] this argument?
[5]     THE WITNESS: Yes. The $6 million was guaranteed each
[6] year and that was a floor, if you will, or hence a base fee
[7] that we couldn't fall below.
[8]     THE COURT: With additions compensated at a
[9] diminishing rate because of the increasing number.
[10]     THE WITNESS: Correct.
[11]     THE COURT: Yes.
[12]     MR. RICH: May I proceed, your Honor?
[13]     THE COURT: Yes, please.
[14]     MR. RICH: Thank you.
[15] BY MR. RICH:
[16] Q. Now, the Music Choice agreement we were discussing was
[17] entered mid-2006, yes?
[18] A. Yes, sir.
[19] Q. And, however, it had applicability back as early as
[20] mid-2004, is that correct?
[21] A. Yes, July 1.
[22] Q. So it had, that agreement itself had a slight retroactive
[23] feature in terms of its date of first coverage, correct?
[24] A. Yes.
[25] Q. Prior to the date of execution?

Page 152

[1] **A.** Yes.
[2] **Q.** Now, in fact, Music Choice's growth in that first year of
[3] the license, namely, from July of 2004 to June of 2005, okay,
[4] that actually exceeded 8 percent to your recollection, yes?
[5] **A.** Yes, it did.
[6] **Q.** Okay, and that, therefore, resulted in the very first year
[7] of the license which was executed in 2006 in a first year per
[8] location effective rate of not 36.36 but 33.67, is that
[9] correct?
[10] **A.** Yes, sir.
[11] **Q.** And indeed, given that timing, namely, that this was a
[12] determination as to growth which had occurred prior to the
[13] execution of the license, at the time the license was entered
[14] into, BMI knew and understood, did it not, that even the first
[15] year of the license would be payable by Music Choice at a rate
[16] less than $36.36, correct?
[17] **A.** Yes. What governed our belief was the fact they were
[18] similarly situated. We had to offer them the same contract
[19] that Muzak had or anybody else had signed. Even if the rate
[20] fell, that was what the contract called for.
[21] **Q.** But the narrow answer to my question is, yes, BMI knew that
[22] as of the date it entered into the license it would be
[23] receiving from the first year from Music Choice a fee on a per
[24] location basis less than $36.36, correct?
[25] **A.** On a per location basis, yes.

Page 153

[1] **Q.** Now, it's also the case, isn't it, that Music Choice's
[2] locations continued to grow over the term of the license?
[3] **A.** Yes, they did.
[4]   **THE COURT:** But your point is it wasn't a free choice
[5] because you were bound to offer them the same as you had
[6] already offered to Muzak?
[7]   **THE WITNESS:** Absolutely.
[8] **Q.** And the reason you were bound is what?
[9] **A.** The similarly situated.
[10]   **MR. RICH:** Could I explore that a moment, your Honor?
[11]   **THE COURT:** Sure.
[12] **Q.** What would prevent you from offering more preferable to the
[13] user economic terms as opposed to more discriminatory against
[14] the user economic terms to a subsequent licensee in an
[15] industry?
[16]   **MR. FITZPATRICK:** Your Honor, I object to the extent
[17] it calls for a legal conclusion. Although Mr. O'Neill can give
[18] his own opinion.
[19]   **THE COURT:** It does call for a legal conclusion, but
[20] it is one very well within Mr. O'Neill's province.
[21] **A.** Could you repeat the question?
[22] **Q.** Yes. My question is, is it your understanding that BMI is
[23] legally constrained from offering any better license terms to a
[24] user in an industry where it has licensed any prior users at a
[25] given rate?

Page 154

[1] **A.** No, I think it's incumbent upon BMI to determine if that
[2] user is similarly situated to others that are already operating
[3] under a final license. If we believe they are similarly
[4] situated, meaning their operations are similar, their music use
[5] which they make available is similar, their mode of operation,
[6] delivery of their product is similar, if they're competing
[7] against these people that have signed the final license
[8] agreement on a daily basis for the same customers, then we
[9] would determine at that point in time that they should be
[10] treated similarly as everybody else in the industry.
[11] **Q.** My question is a little more narrow than that. Let's take
[12] two separate situations, just to explore your understanding of
[13] the scope of your leeway as head of licensing, okay? Let's
[14] assume that you licensed radio station X, commercial radio
[15] station X at a percentage of its revenues equaling 1.7 percent
[16] of its advertising revenues, okay? Let's say you licensed 100
[17] radio stations, each of them at a rate of 1.7 percent of their
[18] advertising revenues, okay? Are you with me so far?
[19] **A.** Yes.
[20] **Q.** Now, a new radio station comes on the air and needs a
[21] license from BMI. And BMI says, well, we don't really like the
[22] 1.7 percent, it's not enough. I think we should license the
[23] new station at 2 percent, okay? I take it you understand your
[24] requirement not to discriminate between similarly situated
[25] users as preventing BMI from issuing a license that is

Page 155

[1] detrimental or discriminatory against that later station,
[2] correct?
[3] **A.** Yes, assuming again --
[4] **Q.** Assuming they're comparably situated?
[5] **A.** Assuming they're comparably situated, as I answered a
[6] minute ago, I would treat them at the 1.7 rate.
[7] **Q.** Indeed, you believe you could not do otherwise, correct?
[8] **A.** I don't think it would be right to do otherwise.
[9] **Q.** But now let's take a situation where you got those hundred
[10] stations licensed at 1.7 percent, okay?
[11] **A.** Mm-hmm.
[12] **Q.** And a new station comes along and you say I think it's time
[13] to make a gesture in favor of the radio industry. As we've
[14] thought about it, 1.7 is too high, in fairness. We're prepared
[15] to license this new fella at 1.5 percent, okay, that's
[16] otherwise similarly situated, in terms of music use, right?
[17] **A.** Yes.
[18] **Q.** You could do that, couldn't you?
[19] **A.** Only if I lowered everybody else that was on the 1.7 to the
[20] 1.5.
[21] **Q.** You could do that, right?
[22] **A.** I could do that.
[23] **Q.** That's a business decision not to, correct?
[24] **A.** Again, if I felt the one-five was the proper rate for that
[25] station and that station was similarly situated to the stations

Page 156

[1] that were paying one-seven, I could not allow those stations to
[2] continue to pay one-seven when I just issued a license for
[3] one-five.
[4] Q. You're saying that as a matter of business practice or as a
[5] matter of your understanding of the decree or a matter of your
[6] understanding of the contracts?
[7] A. As a matter of my understanding as the head of licensing
[8] what my responsibilities are regarding the concept of similarly
[9] situated.
[10] Q. So you're saying as a matter of fairness?
[11] A. As a true example, when the contract that we're talking
[12] about for Muzak and 164 other licensees expired on June 30 of
[13] 2009, they were paying effectively, as we saw earlier, $34
[14] across the spectrum of licenses per location. Each of those
[15] stations requested the $25 interim rate that the Court set for
[16] DMX, and BMI felt they were similarly situated, so we lost
[17] three and a half million dollars on that decision, but we had
[18] to lower their fees on an interim base to match the $25.
[19] Q. That was my first example; you had to, correct?
[20] A. We believed it. Nobody forced us to do so, but we believed
[21] they were similarly situated.
[22] Q. Well, we won't debate the law because as your counsel
[23] indicated and his Honor appreciates, you're not a lawyer. But
[24] I would submit to you that in the second example, the only
[25] constraint that BMI has against lowering its fee to a given

Page 157

[1] year is whatever business judgment BMI decides to make as to
[2] what its impact might be on its future licensing with all of
[3] the other members of that industry, isn't that correct?
[4] A. I think that's fair, that's one of the assessments we would
[5] look at.
[6] THE COURT: What is your answer?
[7] THE WITNESS: Yes. I'd consider the impact across the
[8] whole industry on whether I go up or go down.
[9] THE COURT: Well, he says, his question I think is
[10] asking you whether you could lower the rate to the new entrant
[11] who is similarly situated to the existing population without
[12] lowering it also to the existing population.
[13] THE WITNESS: Again, in this hypothetical I would have
[14] a difficult time doing this and passing the straight-faced test
[15] with the other licensees.
[16] THE COURT: What is the position of BMI about the law
[17] applicable to that question?
[18] MR. SALZMAN: One thing I would point out that hasn't
[19] been discussed about this is there's a proviso in that
[20] similarly situated paragraph which says provided that due to
[21] changes in market conditions from time to time BMI may make
[22] changes in rates and terms so that proviso would have to be
[23] taken into account along with the similarly situated stricture.
[24] If the new rate were as a result of changes in business
[25] conditions, while other people had signed two years earlier for

Page 158

[1] a five-year term, that proviso may very well give BMI the
[2] leeway, or I think probably does give BMI the leeway if there
[3] were changes in market conditions to say, well, that would
[4] explain a new person coming along for a new period, not for a
[5] retroactive period, but for a new period, forward looking,
[6] getting a different rate.
[7] THE COURT: Without changing the rate earlier entered
[8] into by others under different business conditions.
[9] MR. SALZMAN: Correct.
[10] MR. RICH: Your Honor, I would submit BMI has far more
[11] discretion than that. If you were to conclude otherwise, you
[12] would literally have a situation where BMI, having entered into
[13] a license with a commercial music service of the type I'll put
[14] up on the screen in a few minutes, where the effective rate is
[15] $600 a location, a little guy, literally adopting the view that
[16] that would bind BMI, using it as a sword, as it were, or as a
[17] shield by BMI here rather than a protective measure for users,
[18] if you were construe Article 8A of the decree as an offensive
[19] tool for use by BMI, then BMI would take that $600 a location
[20] licensee and profess to be unable to vary downward with any
[21] other licensee, lest it violated its consent decree. That's
[22] plainly not the purpose of that provision, which is to avoid
[23] BMI from deviating upwards from pre-existing rates to
[24] discriminate against future licensees. But there surely is no
[25] injunction against BMI on a forward-looking basis adjusting its

Page 159

[1] rates downward.
[2] It would also make a mockery of a rate court case. We
[3] have numerous rate court proceedings with BMI and with ASCAP
[4] where adjustments are made industry wide. There is no issue
[5] that that's smacking up against non-discrimination provisions.
[6] BMI is entitled to make a business judgment that it doesn't
[7] want to offer a DMX or somebody a lower rate because inevitably
[8] when those next licenses come forward for renewal, they would
[9] need to offer the rest of the industry that rate, which is what
[10] happened effectively once your interim fee was put in.
[11] Prospectively, what Mr. O'Neill says is surely true, they can't
[12] hold out two levels of license fees that discriminate, but
[13] going forward, they have infinite flexibility as a business
[14] organization to decide to lower their rates, simply recognizing
[15] that the future effect will be to bring down that rate
[16] structure for the industry.
[17] There is nothing that you would find, there's no most
[18] favored nation clause that I'm aware of in the license
[19] agreements we're examining. I'm not aware that for the term of
[20] the licenses that expired in June of 2009 Muzak or anybody else
[21] could say if you gave a better rate to TruSonic, which in fact
[22] they did, we get the benefit of it for this license period.
[23] But going forward, if Muzak, for example, were to come into
[24] this Court and demonstrate and your Honor were to determine
[25] that the effective rate for TruSonic was in fact more favorable

January 20, 2010

Case: 10-3429  Document: 63-3  Page: 8  01/05/2011  180348  18

BROADCAST MUSIC INC., v.
DMX, INC.,

Page 160

Page 162

[1] than that which Muzak had entered into, the proper remedy would
[2] be to say going forward, Muzak, you get the benefit of that
[3] rate because BMI is not allowed under Article 8A of its decree
[4] to discriminate in fees. And that's in fact how the licensing
[5] societies have operated forever.
[6]     THE COURT: And does going forward mean from that
[7] moment on or from the expiration of the pending lease?
[8]     MR. RICH: Expiration of the pending licenses.
[9]     THE COURT: In your view.
[10]    MR. RICH: In my view.
[11] BY MR. RICH:
[12] Q. I want to just clean up what appears to us to be a data
[13] anomaly in one of the joint exhibits that was prepared by BMI,
[14] Mr. O'Neill. Can we put up the Music Choice lines coming from
[15] JX1293, your Honor? That's that big chart, the blowup that
[16] appeared in the direct examination booklet at tab 5. To save
[17] everybody the eye -- is that the best we can do it?
[18]    Mr. O'Neill, if you'll look at the actual locations
[19] column highlighted in the second or third column, am I correct
[20] that it shows year over year growth for each of the five years?
[21] If it's easier, you can look at the screen.
[22] A. I'm not quite sure if this is -- is this the same licensee,
[23] Mr. Rich?
[24] Q. This is Music Choice.
[25] A. You consolidated --

[1] now for some time are structured, how the effective rate could
[2] jump back up in that middle year.
[3] A. The organic surplus grows in that year versus -- so those
[4] organic surplus, maybe it was growing at that higher rate,
[5] Mr. Rich, from the previous year?
[6] Q. It would take more math than you would try to solve here?
[7] A. Now. But that's what I assume happened.
[8] Q. I just wanted to observe. It struck me as an anomaly.
[9] Obviously, it's not an enormous matter in the case, but I
[10] wanted to see if you had an explanation about why that would
[11] be?
[12] A. Again, the base fee doesn't change from the 953. The only
[13] thing that changes is the organic growth number. Then we were
[14] dividing that by the total license fees. That's the only thing
[15] I could assume.
[16]    MR. RICH: Could we put this demonstrative back up
[17] from yesterday?
[18] Q. Now, yesterday, when we discussed Play Network, we talked
[19] about the economics of that deal reflected in the first row of
[20] this demonstrative, correct?
[21] A. Yes, sir.
[22] Q. That proved to be the per location count for Play Network
[23] over the five years.
[24] A. Yes, it was.
[25] Q. Now we just talked about Music Choice and pulling from

Page 161

Page 163

[1] Q. We pulled the year-by-year lines for Music Choice for the
[2] purposes of demonstrating and just condensed them here. Can
[3] you push it over so we can see the start years? Jacob?
[4] There's the beginning, okay, five through nine, and now let's
[5] scroll back, please? All right. And do you see that it
[6] reports location growth each year?
[7] A. Yes, sir.
[8] Q. Okay. Now, if you look at the farthest most column, R, it
[9] translates it into effective per location rates. Do you see
[10] that?
[11] A. Yes, I do.
[12] Q. And it goes from 33 and change to 31 and change to 28 and
[13] change and then jumps up to 29 and change and back down to 27.
[14] Does that strike you as an error? Shouldn't there be
[15] progressively lower per location fees given the steady increase
[16] in location?
[17] A. Can you slide the screen back a little bit?
[18] Q. Sure.
[19] A. Right there is good. Thank you. It looks like the actual
[20] locations grew by only a couple of hundred locations, so I
[21] don't have my calculator on me to do the division, but I'm sure
[22] you have.
[23] Q. No, actually, we haven't. It just struck us we couldn't
[24] understand a scenario where there was persistent growth but
[25] where the effective, as these licenses we've been discussing

[1] those same lines, from JX1293 we depict in the second row what
[2] these numbers are, including what we think may be that small
[3] anomaly, okay? That's what I'm showing you there, correct?
[4] A. That is.
[5] Q. So those were the effective year-by-year per location fees
[6] paid by Music Choice according to BMI's business records,
[7] correct?
[8] A. Yes, it is.
[9] Q. And BMI regards the Music Choice deal as a reasonable one,
[10] right?
[11] A. Yes, we do.
[12] Q. And recognizes that DMX is entitled to a license on
[13] comparable economic terms to Music Choice, correct?
[14] A. Yes, we do.
[15] Q. Okay, let's turn to TruSonic now if we can. TruSonic
[16] entered a license with BMI in or about June of 2007, is that
[17] correct?
[18] A. I believe that is correct.
[19] Q. And I believe that's in the book which Mr. Fitzpatrick had
[20] a series of exhibits on, although he may have skipped over
[21] discussion of this, and if I'm correct it appears at tab 10 to
[22] the direct exhibits binder. Do you see that?
[23] A. Yes, I do.
[24] Q. And that is in fact as you recognize it, that's in evidence
[25] as JX0127. Do you recognize that as the June 2007 TruSonic

Page 164

[1] agreement?
[2] A. Yes, I do.
[3] Q. And this agreement was structured the same way as the Muzak
[4] and Music Choice agreements, correct?
[5] A. Yes, it is.
[6] Q. And it has that 8 percent organic growth provision, right?
[7] A. Yes, it does.
[8] Q. In fact, TruSonic also experienced growth exceeding
[9] 8 percent during all of the years of the contract, correct?
[10] A. That is correct.
[11] Q. And in fact, our third row here, pulling from JX1293,
[12] again, the TruSonic lines sets forth the year-by-year per
[13] location rates, which I'll represent to you accurately reflect
[14] what's on JX1293.
[15] A. That is correct.
[16] Q. Does that look about right to you?
[17] A. Yes it does.
[18] Q. Is 24.74 a rounding error or did they get an extra penny?
[19] A. That's a good question. I don't know. My guess would be
[20] it's a rounding error.
[21] Q. And because of this growth, it's also the case that
[22] TruSonic never paid 36.36 a location, correct?
[23] A. Ultimately, no, not per location.
[24] Q. And BMI knew as of June 2007 when this agreement was
[25] executed that TruSonic would never pay 36.36, isn't that

Page 165

[1] correct?
[2] A. Yes. We knew those effective rates.
[3] Q. You testified yesterday just over one more tab in the
[4] direct binder about the amendment entered into with TruSonic?
[5] A. Yes.
[6] Q. That had to do with the circumstance in which
[7] establishments might offer solely directly licensed music?
[8] A. Correct.
[9] Q. And I understood the import of that amendment to be to
[10] permit TruSonic to exclude from the location counts, which goes
[11] into driving these location fees, such establishments as might
[12] have all of their music directly licensed, correct?
[13] A. That is correct.
[14] Q. Now, BMI secured no additional consideration from TruSonic
[15] in return for this agreement, did it?
[16] A. No, we did not.
[17] Q. And the amendment appearing at JX 1312 calls for no
[18] additional fees to cover any costs that might be incurred by
[19] BMI due to this allowance, is that correct?
[20] A. We didn't believe there would be any additional costs
[21] incurred. Basically, they're requesting not to license
[22] establishments.
[23] Q. Conceivably you could have needed to monitor to see if they
[24] were accurate, yes?
[25] A. Conceivably we could have. If they weren't licensed, they

Page 166

[1] weren't licensed. If we found somebody infringing, we had the
[2] ability to sue for copyright infringement, but in our mind, it
[3] was as if they were playing news talk that used no music at all
[4] in that establishment, we wouldn't have to license that
[5] establishment.
[6] Q. But you're not in the habit of necessarily taking a
[7] licensee's word for it that it's not using any BMI music, are
[8] you?
[9] A. I would say we verify when needed.
[10] Q. That has a cost associated with it, correct?
[11] A. Yes, it did.
[12] Q. But you didn't attempt to monetize or create any estimate
[13] of what those costs might be if in fact TruSonic exercised the
[14] rates granted it under this amendment, is that correct?
[15] A. No, we didn't.
[16] THE COURT: Let me just as a matter of curiosity ask
[17] you about the TruSonic figures. Are they rounding errors?
[18] Fairly consistently the TruSonic fee is a penny or so less. In
[19] 2004 to five it's 66 cents instead of 67. In 2005 into '06
[20] it's, curiously enough, two pennies more. In 2007 and 2008
[21] it's a penny less. There's some sort of fluctuation affecting
[22] TruSonic?
[23] THE WITNESS: Yes. I don't know if it's an actual
[24] rounding error, but I believe that would be the case. Could be
[25] just the odd number of locations when you're dividing it into

Page 167

[1] the actual.
[2] THE COURT: It jumps the number up or down. Okay.
[3] THE WITNESS: But I believe it operated exactly the
[4] same as the Play Network agreement. It was just a rounding
[5] issue.
[6] BY MR. RICH:
[7] Q. I have just a few more general questions, Mr. O'Neill,
[8] about this.
[9] THE COURT: I could tell you that I have a fairly firm
[10] suspicion that if the rate set by the Court in this proceeding
[11] is correct to the penny, it's going to be because of a false
[12] accuracy, not because of a meritorious reason.
[13] BY MR. RICH:
[14] Q. A few general questions on JX 1293, this big chart of all,
[15] reporting by all CMS services which is in your binder. You
[16] have it I think right in front of you.
[17] A. Yes, I do.
[18] Q. This depicts the average per location rates across all
[19] commercial services licensed by BMI, is that correct?
[20] A. That is correct.
[21] Q. Large and small?
[22] A. Yes.
[23] Q. Including the likes of Carolina Georgia Sound?
[24] A. I'm sure they're on here.
[25] Q. Here it is. We're just blowing up that piece of it. Do

Page 168

[1] you see Carolina Georgia Sound, that piece there?
[2] A. Yes, I do.
[3] Q. Can you swing over to see what the per location rate for
[4] the contract year, this is July 1, '08. Is that the year
[5] that's up there? Is that a correct depiction of their per
[6] location rate is $416.28?
[7] A. Again, Mr. Rich, can you tell me what page that's on? I
[8] just want to be able to go through.
[9] Q. The second to the last page.
[10] A. Thank you.
[11] Q. Do you see it?
[12] A. Yes, I do.
[13] Q. Is that correct, 416.28?
[14] A. Yes. They started the year with 2,015 locations. They
[15] ended the year with 176 locations. So they lost close to 1800
[16] locations, and their base fee was 73,000 and that would be the
[17] effective rate, 416 per location.
[18] Q. And they were remitted to having to pay that rate?
[19] A. Yes, they were.
[20] Q. That includes something called Great Plains Sound and
[21] Technologies on the same page down a bit?
[22] A. Yes, I see that.
[23] Q. Could you read into the record their effective rate
[24] beginning July 1, 2008?
[25] A. Great Plains' effective rate was $594.64.

Page 169

[1] Q. And they were remitted to paying that too, correct?
[2] A. Yes, they were.
[3] Q. Now, the data from which this chart was constructed apply
[4] to licenses whose termination dates are pretty uniformly the
[5] end of June of 2009, correct?
[6] A. That is correct.
[7] Q. And whose start dates are as early as but no earlier than
[8] July 1, 2004, is that correct?
[9] A. Yes.
[10] Q. So this chart doesn't reflect whether there were
[11] simultaneous settlements of prior open periods with any of this
[12] group of licensees, correct?
[13] A. If the licensees were in existence prior to July 1 of 2004,
[14] it doesn't reflect. They were all treated equally. We settled
[15] that period of time anything prior to 2004 at what interim fees
[16] they paid became final.
[17] Q. I'm simply asking whether this chart and the column R
[18] analysis in any way reflects the resolution of any prior
[19] periods with any of the listed entities which were
[20] simultaneously entered into, the resolution of those prior
[21] periods, at the time the licenses for which you depict the
[22] economics appears here.
[23] A. No, this chart only explores the five years of the current
[24] license.
[25] Q. Right. Now, even with that, I take it BMI's take-away from

Page 170

[1] this chart when you tote it all up and you do the big average
[2] at the bottom, you come up with a number of $34.50 a location
[3] on average across large and small, Great Plains and Muzak and
[4] the whole group, yes?
[5] A. $34.52.
[6] Q. $34.52?
[7] A. I don't want to be off on that.
[8] Q. With respect to his Honor we'll stay to the penny here for
[9] the moment.
[10] THE COURT: When a customer loses a location, as
[11] demonstrated here, is that location characteristically picked
[12] up by another customer or does it vanish from sight?
[13] THE WITNESS: Our understanding, your Honor, is that
[14] it's a lot of cannibalism internally within that industry. So
[15] if one loses another one gains. That's what we've seen.
[16] THE COURT: The location doesn't go out of existence,
[17] it simply comes under different ownership characteristically.
[18] THE WITNESS: If another service in the industry
[19] purchased it or acquired it, it comes under the organic growth
[20] calculation, but the old business still pays us at the higher
[21] effective rate.
[22] Q. So in that situation, if Great Plains Sound and
[23] Technologies lost an account for which it was paying nearly
[24] $600, and that account was acquired by TruSonic, BMI would then
[25] receive $24.75 on the last year if that happened during the

Page 171

[1] last year of the TruSonic agreement for that account?
[2] A. Yes, we would. Again, Mr. Rich, if it exceeded the
[3] 8 percent. If it was under the 8 percent, it would be
[4] considered under the cushion, so we wouldn't receive anything.
[5] Q. Right, right. Now, notwithstanding that the bottom line of
[6] this opum magnus here, this 1293 is $34.50, I take it BMI's
[7] position in this Court, putting aside option values and
[8] premiums, is that our client, DMX, should pay $36.36 per
[9] location, is that correct?
[10] A. That is correct.
[11] Q. Now, if DMX acquired TruSonic, or if it acquired Play
[12] Network, if it had, I should put in the word had, as of July 1
[13] of 2008 -- with me so far?
[14] A. If DMX --
[15] Q. DMX had acquired TruSonic as of July 1, 2008, for the year
[16] ended June 30, 2009, meaning for that succeeding twelve months,
[17] am I correct that DMX would have paid $24.75 for each of the
[18] TruSonic locations it would have acquired?
[19] A. I am not quite sure how that would work, since DMX wasn't
[20] under this agreement. I'm not sure if DMX could say that those
[21] locations now fall under the auspices of the rate court action
[22] so we're going to pay $25 per location.
[23] Q. Very fair question. I should have been more precise. Had
[24] DMX been operating under the standard CMS industry form
[25] license, which you seek here to place DMX under, would my

Page 172

[1] hypothetical be correct in that circumstance, its acquisition
[2] of TruSonic in the period July 1, 2008 through June 30, 2009
[3] would have required DMX pursuant to that form of license to pay
[4] BMI $24.75 with respect to each of the acquired TruSonic
[5] locations?
[6] A. Yes, that is correct.
[7] Q. But under BMI's proposal for DMX here, DMX would pay $36.36
[8] for its own locations over that period, correct?
[9] A. Again, we thought that was a -- we offered DMX the same
[10] concept of this license as everybody else, but we knew that at
[11] this point in time DMX's effective rate would have been north
[12] of the 36.36, so we offered them the 36.36 as what we believed
[13] a reasonable rate, so that would be correct, they would be
[14] paying at the 36.36.
[15] Q. And what distinction does BMI see and do you see as BMI's
[16] head of licensing in the value of the BMI music used in that
[17] circumstance between a DMX location paying 36.36 and an
[18] acquired TruSonic location paying $24.75 or a nearly 50 percent
[19] premium for the DMX locations? What's the economic rationale
[20] for that, if any?
[21] A. I'm not sure if there is an economic rationale for that.
[22] There's a contractual rationale for that, that the contract
[23] called for that to happen and that's what we agreed to.
[24] Q. If GE had come along and acquired TruSonic, covering the
[25] same period, so the deal closes July 1, 2008, okay? For that

Page 173

[1] year, is it not accurate that GE would have paid $24.75 per
[2] location for the TruSonic locations it would have acquired?
[3] A. Is GE operating in the space under a current license
[4] agreement?
[5] Q. Assume GE signs your standard form.
[6] A. Again, anybody signing our standard form would operate
[7] under that way, that they would acquire that service at $24.74,
[8] which was the effective rate.
[9] Q. And if DMX were operating under the standard form and GE
[10] came along and acquired DMX effective the same date, I take it
[11] they would be required to pay $36.36 for the same locations,
[12] for the DMX locations?
[13] A. Per the contract, yes.
[14] Q. Now, did I understand your direct testimony to indicate
[15] that TruSonic and maybe your testimony a few minutes ago, and
[16] Play Network at the present moment are licensed on an interim
[17] basis at $25 a location?
[18] A. Yes, they are.
[19] Q. That's a function of BMI's observance of the interim fee
[20] ruling in place here?
[21] A. Correct.
[22] Q. In your estimation and knowing this business as well as you
[23] do, are those entities apt to voluntarily agree to paying
[24] $36.36 a location as a final fee matter for the period from
[25] July 1 of this year -- of '09 forward, the unlicensed or the

Page 174

[1] not finally licensed period?
[2] A. I think it would be part of the negotiation that we would
[3] be seeking with them.
[4] Q. I'm asking you knowing the business people, knowing the
[5] business, knowing the business experience, knowing the license
[6] fee experience, do you think it's likely that in a voluntary
[7] face-to-face negotiation, TruSonic or Play Network would say
[8] sure, we'll give you a 50 percent increment over the per
[9] location rates we have been paying in order to close a deal
[10] beginning July of '09?
[11] MR. FITZPATRICK: Could I just object, your Honor?
[12] Just the hypothetical is incomplete because it doesn't include
[13] whether the court would have ruled or we're assuming there's no
[14] ruling in this case in the hypothetical?
[15] MR. RICH: I'm assuming in the free marketplace, no
[16] Court ruling.
[17] Q. Do you think it's likely?
[18] A. I think we would be seeking 36.36.
[19] Q. Do you think it's likely they'd agree? You know this
[20] business. You know them.
[21] A. I'm sure if you were their counsel, they wouldn't agree
[22] with me.
[23] Q. Assume I wasn't. Even assuming I wasn't.
[24] A. We would be seeking it. I'm not sure if they would,
[25] Mr. Rich, or not. They agreed to the original increase off the

Page 175

[1] 12 or $14 per location rate. We would be seeking potentially
[2] higher than the 36.36 rate. I'm not really sure of that
[3] dynamic because we haven't even gotten to that point yet.
[4] Knowing the parties, we would be starting higher, they'd be
[5] starting lower and hopefully we'd end up somewhere in the
[6] middle.
[7] Q. Are you aware of any material changes in TruSonic or Play
[8] Network's use of the BMI repertoire that would warrant a
[9] 50 percent rate increase?
[10] A. No, I'm not.
[11] Q. Any other business elements affecting TruSonic and Play
[12] Network as you understand them that would warrant a 50 percent
[13] rate increase?
[14] A. On those two, no, I'm not.
[15] Q. Let's turn to some cost issues from your direct testimony,
[16] if we can. Am I correct, sir, that --
[17] THE COURT: Mr. Rich, I hope that in your closing
[18] argument or somewhere along the way you will give attention to
[19] the concept that is increasingly bothering me, and that is
[20] whether these anomalies and disproportions in the per location
[21] payments that you've been parading are really significant to a
[22] process of rate setting across the board, or whether they
[23] demonstrate no more than the fact that if when you're setting
[24] rates that yield finite amounts, steady amounts of money on a
[25] varying base in the population of the amount of locations held,

Page 176

[1] there is always going to be anomalies and disproportions
[2] because the money remains equal and the number of locations
[3] fluctuates, and perhaps that's an argument for setting the rate
[4] in a different way than by reference to locations, because of
[5] these fluctuations and discrepancies.
[6] But if that is the best way to set the rate, then
[7] those fluctuations and anomalies have to be accepted as part of
[8] life. You see what I'm getting at?
[9] **MR. RICH:** I do, your Honor. The limitations here --
[10] **THE COURT:** It's the consequences of what you've been
[11] playing with this morning. I say that with great respect, but
[12] it is a series of manipulations and demonstrations, each of
[13] which is local and finite in nature. What is the conclusion to
[14] be drawn from that display?
[15] (Continued next page)

Page 177

[1] **MR. RICH:** We will be happy to have a dialogue about
[2] it and argue about it and to ultimately brief it, your Honor.
[3] The limitation -- I understand your point.
[4] First of all, though, these are three of the most
[5] major competitors, more so than Muzak for our client, and so it
[6] is critically important that the Court understand the real term
[7] real world economics of contemporaneous arrangements with three
[8] competitors at least two of whom are considered much more
[9] significant competitors for DMX than even Muzak is, as you will
[10] hear on the direct testimony of our own witnesses. Point one.
[11] Point two. Your Honor, these are not simply fixed
[12] flat fee deals which commonly occur. Let's say that the
[13] broadcast television networks have historically entered into
[14] fixed fee deals and everybody is taking a gamble which I think
[15] is your implicit point that revenues may go up in the term of
[16] the license, they may go down. By analogy, locations might go
[17] up, locations might go down. If it were solely a fixed fee,
[18] say the Muzak license at $6 million, or the TruSonic or Play
[19] Networks licenses reflecting their smaller scale at lesser
[20] levels, there would be considerable force to your Honor's view.
[21] However, that's not how these licenses in fact operate because
[22] once those 8 percent growth allowances have been exceeded as
[23] was the case for these three key competitors, they pay
[24] significantly more dollars to BMI than the starting dollars.
[25] And the key question I have been trying to get at maybe not

Page 178

[1] very well is at what rate --
[2] **THE COURT:** At what?
[3] **MR. RICH:** At what rate do they pay more? And what
[4] these contracts contemplate is the rate at which they pay more
[5] continues to ratchet downward until you reach $24.75. It
[6] wasn't as if they keep paying at or about $36.36. Built into
[7] the contracts was the right, expectation, and assumption on
[8] BMI's part that it would be reasonable that if these people
[9] continue to grow they get a freebie of 8 percent in a given
[10] year but that's it. As soon as you go to 8.1 percent, 8.01
[11] percent, you pay more. But the key is you don't pay more at
[12] the $36.36 bogey, you pay considerably less, as much as $12,
[13] almost, less by the last year, as is demonstrated, so that by
[14] the last year TruSonic and Play Network, which grew
[15] considerably. If you look at 1293 you see their base location
[16] counts, your Honor, grew considerably, but so did their license
[17] fees to BMI.
[18] So, it is not as if it was a fixed contract saying
[19] we'll both take our chances. BMI knowingly built the license
[20] structure that allowed BMI to grow in income with these
[21] licensees but grow at a diminishing rate of recompense provided
[22] they had success. And that's what I've been trying to elicit,
[23] which is that those who actually did grow at that larger level
[24] were being incrementally taxed as if it was a progressive tax
[25] system, your Honor, at lower and lower annual per location

Page 179

[1] rates. We will argue to you that that's highly probative of
[2] when a reasonable fee is, even putting aside the direct license
[3] data we haven't gotten to yet, even if you were to principally
[4] examine the experience under the CMS industry licenses.
[5] **THE COURT:** But in my interim fee decision I
[6] recognized that there was evidence tending to show that BMI
[7] contemplated and accepted the notion that something on the
[8] order of $24.75 would be a reasonable fee, rate.
[9] **MR. RICH:** Yes.
[10] **THE COURT:** And it seems to me that that comprehended
[11] a great deal of what you are trying to spend so much time in
[12] the intricacies of.
[13] Now, I understand that you are adding to that the fact
[14] that it actually happened in fact with two big participants.
[15] Of course that has probative force. But, does it require the
[16] kind of intricacy that you are going through?
[17] **MR. RICH:** No. And had BMI stipulated to the
[18] correctness of your interim fee, being a little facetious, I
[19] wouldn't be going through this. It is because they are pushing
[20] back as they are entitled to, your Honor, so very hard on that
[21] interpretation they're denying, in a sense --
[22] **THE COURT:** I'm trying to find out whether what I've
[23] been listening to adds anything to the understanding that I had
[24] a few years ago when I was addressing the interim fee.
[25] **MR. RICH:** It is designed solely to reinforce exactly

Page 180

[1] your understanding, your Honor. And if I overburdened it, I
[2] apologize.
[3]     THE COURT: Well, I'm sure I should be very grateful
[4] but, frankly, it leaves me confused about the purpose of this
[5] because the point still remains.
[6]     MR. RICH: The point does remain.
[7]     THE COURT: Okay. All right.
[8]     MR. RICH: And it is a little belt and suspenders.
[9]     THE COURT: Let's tip-toe towards --
[10]    MR. RICH: As I said to the parties, reasonable
[11] anticipation of BMI suffices since they have agreed. I have
[12] spent more than an hour, I fear.
[13]    THE COURT: Almost a day.
[14]    MR. RICH: I apologize -- that establishing in reality
[15] not only in expectation those levels were reached.
[16]    THE COURT: This chart I understand.
[17]    MR. RICH: Thank you. We are moving on.
[18] Q. Costs. I take it that in fiscal year 2008, Mr. O'Neill,
[19] BMI topped some $900 million in revenues, is that correct?
[20] A. That is correct.
[21] Q. I would like to show you what has been premarked as Joint
[22] Exhibit 1263, please.
[23]    You recognize this as a BMI press release?
[24] A. Yes, I do.
[25] Q. Dated August 25, 2008?

Page 181

[1] A. Yes, I do.
[2] Q. And it reports, both in its headline and in the text in the
[3] first paragraph, that BMI had topped the $900 million mark for
[4] that fiscal year; yes?
[5] A. Yes.
[6] Q. Okay.
[7]    And the same release indicates that BMI distributed
[8] royalties of some $786 million to its songwriters, composers
[9] and music publishers; is that correct?
[10] A. That is correct.
[11] Q. And the same press release makes reference to the sums
[12] collected on account of domestic licensing income. Do you see
[13] that in the third paragraph toward the bottom?
[14] A. Yes, I do.
[15] Q. And the same press release, I believe it is on the second
[16] page in the third to the last paragraph, claims to have lowered
[17] its overhead, BMI, to 11.7 percent, what it terms the lowest in
[18] the company's history --
[19] A. I see that, yes.
[20] Q. -- do you see that?
[21]    Now, even though the press release makes reference to
[22] what it terms an impressive $664 million in domestic licensing
[23] income, it doesn't anywhere indicate, does it, that BMI applies
[24] a 47 percent higher overhead rate than 11.7 percent, namely
[25] 17.2 percent to these domestic license receipts. Is that

Page 182

[1] correct?
[2] A. The 47 percent, Mr. Rich, that's the delta between the --
[3] Q. 11.2 -- 11.7 and 17.2, if my math is right.
[4] A. No, it doesn't.
[5] Q. Is this higher overhead figure the domestic figure publicly
[6] announced by BMI anywhere?
[7] A. No, it is not.
[8] Q. Isn't it a matter that would be of great interest to, among
[9] others, BMI's own affiliates who are recipients of license
[10] income?
[11] A. I don't know the answer to that.
[12] Q. Isn't it a matter of some competitive significance to BMI
[13] to identify what its -- how efficiently it is operating and
[14] what its overhead therefore is?
[15] A. I think for most writers and publishers they look at the
[16] overall number that's published. They don't get into details.
[17] In certain cases I know that publishers and composers and
[18] songwriters do know there is a higher administrative fee built
[19] in such as local television per program, they know there is a
[20] higher cost for that license and they know there is a higher
[21] administrative fee tacked on. I know that just from dealing
[22] with certain people but, in general, no, it is not well known.
[23] Q. No, but I take it it was not gratuitous that BMI put the
[24] 11.7 percent in the press release. They saw a benefit in doing
[25] that, right?

Page 183

[1] A. Well I guess, again, the benefit would be our major
[2] competitor ASCAP.
[3] Q. And it would be less beneficial, would it not, to say,
[4] well, by the way, asterisk, when we distribute the bulk of our
[5] revenue, $664 million out of seven hundred and some, we
[6] actually take out 17 percent.
[7]    That wouldn't play as well, would it, in the public?
[8] A. Again, I'm not quite sure if they know that or not,
[9] Mr. Rich. I'm not sure how that would play in the public.
[10] Q. Now, BMI contends in this case that it is entitled to apply
[11] this unannounced domestic overhead rate to DMX in lieu of its
[12] announced 11 percent overhead rate in calculating what we have
[13] called the floor fee. Is that right?
[14] A. That is correct.
[15] Q. And that's because, as I understand it, the overall
[16] overhead rate is calculated against all BMI revenues including
[17] revenues associated with foreign performances?
[18] A. That is correct.
[19] Q. And therefore it is BMI's view that that figure understates
[20] the true cost to BMI of administering domestic performances by
[21] commercial music services?
[22] A. That is correct.
[23] Q. And so, consistent with that view, if I understand your
[24] testimony, when BMI administers its commercial music service
[25] licenses it keeps 17 percent, roughly, of the revenues it earns

**Page 184**

[1] and distributes the remaining 83 percent; is that correct?
[2] **A.** That is correct.
[3] **Q.** And so, you take that domestic overhead as a proxy for how
[4] to withhold attributable expenses for this industry; correct?
[5] **A.** Correct.
[6] **Q.** Do you keep any separate books or records as to the actual
[7] expenses incurred in running this part of BMI's business?
[8] **A.** No, we don't.
[9] **Q.** Now, how is that 17 percent figure calculated, to your
[10] knowledge?
[11] **A.** To my knowledge it's -- you have a sum certain of costs,
[12] expenses for the company, and you look at what the 3.6 of
[13] foreign income relates to how much that -- how much of those
[14] costs relate to that 3.6 percent. You also have higher
[15] administrative costs on certain licenses up to 20 percent. You
[16] look at what that 20 percent covers of those costs. Whatever
[17] is remaining is divided by the license fees that remain to come
[18] up with the 17 percent.
[19] **Q.** Which costs are treated by BMI as associated with
[20] administering and collecting foreign license fees and therefore
[21] are pulled out of that equation?
[22] **A.** 3.6 percent of the foreign revenues would be those costs.
[23] **Q.** What do they consist of?
[24] **A.** They consist of -- you mean in general?
[25] **Q.** No, my question is to your knowledge -- I take it this is

**Page 185**

[1] not something that you personally sit down and calculate as
[2] part of your responsibilities as BMI overhead, correct?
[3] **A.** That is correct.
[4] **Q.** And how familiar are you, in fact, with the derivation of
[5] that 17 percent as a matter of actual record showing, well, we
[6] will take X percent of this or Y percent of that operation.
[7] Have you ever studied that? Has anybody ever made a
[8] presentation to you about it?
[9] **A.** No, they haven't.
[10] **Q.** Sitting here today, do you have any basis to know what cost
[11] components are allocated to domestic versus foreign activities
[12] of BMI?
[13] **A.** I believe it is just simply a subtraction. If you start
[14] with a hundred million dollars of expenses, X percent of those
[15] expenses are attributed to foreign in terms of the 3.6 percent
[16] covers X percent, the 20 percent covers Y percent whatever is
[17] remaining. It is sum. All the expenses remaining are sum.
[18] That's my understanding of how we get to the 17 percent.
[19] **Q.** Does BMI have something called an international
[20] administration department?
[21] **A.** Yes, we do.
[22] **Q.** What is it?
[23] **A.** It deals with our 70 sister societies. I think there is
[24] 70, plus or minus.
[25] **Q.** I think your website says 80, if I am not mistaken.

**Page 186**

[1] **A.** It could be 80. There have been new ones.
[2] **Q.** Could you explain to His Honor what that means?
[3] **A.** Yes.
[4] Throughout the world there are organizations like BMI
[5] in particular countries which are responsible for collecting
[6] license fees and distributing to their members. When a BMI
[7] work is performed in that country those societies pay that,
[8] those licensing fees back to BMI and we, in turn, distribute it
[9] to our affiliate.
[10] **Q.** Where is that? Is there a physical locale for the
[11] employees associated with that international administration
[12] department?
[13] **A.** They're spread out through BMI's organizations, some in
[14] Nashville, some in London, some in New York.
[15] **Q.** Do you know for a fact whether the cost of that operation
[16] are backed out of the numerator that would go into the
[17] determination of the 17 percent -- let me ask a better
[18] question.
[19] I take it that to get to the denominator to get to 17
[20] percent you take all of your revenues and you back out the
[21] foreign revenues; right?
[22] **A.** Correct.
[23] **Q.** Now, you said several times they also back out the costs
[24] for the numerator associated with the foreign stuff, right?
[25] Sitting here today -- correct?

**Page 187**

[1] **A.** I will correct that. If you took the foreign revenues of
[2] $200 million and you applied 3.6 percent on that $200 million
[3] the resulting cost, the resulting overhead would be removed
[4] from the expenses. It is not dollar for dollar for the
[5] international department.
[6] **Q.** Where did the 3.6 percent come from?
[7] **A.** We have a much lower administration charge for that 3.6
[8] percent because the foreign societies do, as I mentioned
[9] earlier, the negotiations with the licensees. They do the
[10] collection of the dollars from these establishments, they track
[11] the music use from these establishments, they have whatever
[12] discrepancies, resolutions overseas. They determine how much
[13] money is to be paid to BMI. They take out their overhead and
[14] then ship the dollars to BMI. BMI still has some
[15] administration on that but not nearly the amount we have
[16] domestically so we take a smaller overhead rate of 3.6 percent.
[17] How that came to be I don't know but that is what, as long as I
[18] have been here that's been 3.6 percent.
[19] **Q.** You don't know how closely or not it relates to the actual
[20] costs BMI incurs to receive the income it receives from its
[21] some 80 foreign affiliates, correct?
[22] **A.** That is correct.
[23] **Q.** And so sitting here today, for example, do you know what
[24] percent, if any, of the costs of running its international
[25] administration department go into that 3.6 percent?

Page 188

[1] A. No, I don't.
[2] Q. Do you know something -- have you ever heard of something
[3] called Fast Track?
[4] A. Yes, I have.
[5] Q. Tell the Court what that is.
[6] A. Its an international database which I'm not that familiar
[7] with but this is my 30,000 foot view: An international
[8] database which tries to generalize or standardize, I should
[9] say, works and title registrations across all these various
[10] societies.
[11] Q. And so, that has an international component, correct?
[12] A. Yes, it does.
[13] Q. It is relevant to what BMI takes in in revenues from
[14] foreign affiliates, correct?
[15] A. It helps, yes.
[16] Q. Are the costs associated with Fast Track baked into the 3.6
[17] percent?
[18] A. Again, not directly.
[19] Q. Indirectly?
[20] A. I believe it is indirectly.
[21] Q. What is the basis for your knowledge?
[22] A. Again, we are taking 3.6 percent overall to account for
[23] expenses. That's my understanding, it covered the expenses of
[24] BMI's licensing and reciprocal agreements with these 70 to 80
[25] for foreign countries.

Page 189

[1] Q. The last question on this topic. I take it BMI doesn't
[2] simply rely on what your foreign affiliates report to be the
[3] actual performances of BMI represented works in their
[4] respective countries, correct?
[5] A. Correct.
[6] Q. You do some of your own monitoring, correct?
[7] A. We do. I'm not quite sure how we do it, but I know there
[8] is some auditing done.
[9] Q. This is an area you don't know much about?
[10] A. No, I don't.
[11] Q. How much of that activity and the time and employee expense
[12] associated with it is baked into this 3.6 percent cost
[13] deduction?
[14] A. I don't know.
[15] Q. Last question on this subject. What portion of this 17.2
[16] percent domestic overhead rate derived in the fashion you have
[17] testified underwrites one or more contingency funds maintained
[18] by BMI such as would finance special distributions to BMI
[19] affiliates?
[20] A. I don't know, Mr. Rich.
[21] Q. If you turn to tab 8 of your direct license binder,
[22] please -- your direct testimony binder, please?
[23] A. Yes, sir.
[24] Q. Do you remember testifying briefly about this demonstrative
[25] yesterday?

Page 190

[1] A. Yes, I do.
[2] Q. I will let his Honor get ahold of it.
[3] Now, am I correct that the purpose of this
[4] demonstrative was to suggest that the administrative costs to
[5] be incurred by the licensing and performing rights departments
[6] in connection with administering a blanket carve-out license
[7] will be something over $150,000 a year?
[8] A. For the licensing and performing rights, yes, for the two
[9] departments.
[10] Q. That's basically a guesstimate at this point, right?
[11] A. That is correct.
[12] Q. Involving tasks that have not yet been undertaken, correct?
[13] A. That is correct.
[14] Q. And including estimates based on operations of a
[15] department, namely the performing rights department that you
[16] don't even supervise; is that correct?
[17] A. That is correct.
[18] Q. So, just taking a single line entry here in the third
[19] grouping: Resolve disputes regarding credits with DMX and MRI.
[20] Do you see that?
[21] A. Yes, I do.
[22] Q. There is a title called Per Program Supervisor next to it
[23] which is listed 375 hours?
[24] A. Yes, sir.
[25] Q. You can't really say sitting here today, can you, whether

Page 191

[1] such a per program supervisor will spend 375 hours per year
[2] resolving disputes with DMX or 300 hours or any other number;
[3] right?
[4] A. It is an estimate.
[5] Q. And if that person were to end up working only 200 hours a
[6] year is part of BMI's proposal in this case to send a refund to
[7] DMX?
[8] A. I believe that if the costs do not come out -- they would
[9] be the incremental costs on top of the 17 percent that we were
[10] talking about. I believe it comes to $250,000 to get to the
[11] $751,000 in the base fee. I believe that we should explore if
[12] those costs are not -- are too high that we would lower those,
[13] or if they're too low we should be able to raise those. I
[14] think there should be some type of resolution with DMX on that.
[15] Q. Other than your oral testimony and this demonstrative, are
[16] you aware of any data of any kind, single piece of paper, that
[17] was provided to DMX to support any of these figures?
[18] A. I believe there was a, again during discovery phases or
[19] there was some papers back and forth between the attorneys
[20] trying to justify some of these expenses, but.
[21] Q. What do you recall?
[22] A. I just recall having to do this estimate for them in
[23] order -- was it an interrogatory response I believe we had to
[24] send back to DMX? That's what I recall.
[25] Q. Do you recall any business records that were shared

Page 192

[1] supporting any single line item here?
[2] **A.** Not personally, no.
[3] **Q.** You have never seen any, I take it?
[4] **A.** Not -- I haven't had to share any, correct.
[5] **Q.** You did a work file with all the workups for this?
[6] **A.** Did I have a work file? Not a big work file. I think
[7] there was a file created by people who were asked to spec these
[8] things out.
[9] **Q.** Did you do any of the specking out?
[10] **A.** I did some of it. Yes, I reviewed them all.
[11] **Q.** You list a project team meeting. Is that literally a
[12] meeting?
[13] **A.** It is 25 hours throughout a year and I figured if you do a
[14] half hour, an hour a week or an hour every other week you are
[15] pretty much there in terms of catching up to speed on the
[16] issues of a brand-new license for BMI.
[17] **Q.** What travel expenses do you envision associated with making
[18] sure that a standard form of direct license whose terms are
[19] identical across all users actually was signed by the licensee?
[20] **MR. FITZPATRICK:** I just would object. The premise of
[21] that question is incorrect.
[22] **THE COURT:** Excuse me?
[23] **MR. FITZPATRICK:** The premise of the question is
[24] incorrect that terms are identical. If it is a hypothetical I
[25] don't object.

Page 193

[1] **MR. RICH:** I will rephrase, your Honor.
[2] **BY MR. RICH:**
[3] **Q.** What does the $10,000 in travel expense envision?
[4] **A.** Again, that comes from my experience in per program where
[5] the license was launched we had to attend a couple of industry
[6] conventions in order to explain the per program license. We
[7] had to -- I assume there are two major -- major commercial
[8] music services conventions that we will have to attend to
[9] explain how the adjustable fee blanket license will be working
[10] with DMX, how it all pans out. There will be publisher
[11] meetings that we will have to attend, I'm sure.
[12] That's where the $10,000 came from.
[13] **Q.** So BMI's position, at least in this court, is that by being
[14] required to offer a form of license required by its decree,
[15] BMI's travel expenses to industry conventions to explain the
[16] workings of that Court ordered license should be borne by the
[17] applicant who was successful in achieving that license?
[18] **A.** It is an incremental cost of administering this license
[19] which we didn't have under the blanket so, yes, I would say
[20] this is a cost that we didn't occur under the standard blanket
[21] license.
[22] **Q.** You made reference to the broadcast per program rate,
[23] correct?
[24] **A.** Yes, sir.
[25] **Q.** How many local televisions stations operate under the BMI

Page 194

[1] per program license?
[2] **A.** Today?
[3] **Q.** Yes.
[4] **A.** I'm going to throw a dart. I think about 450, roughly.
[5] **Q.** 450, okay.
[6] We're talking here about a single licensee for the
[7] moment taking the blanket carve-out license, correct?
[8] **A.** That is correct.
[9] **Q.** Now, each per program, each of those 450 broadcasters
[10] submits monthly reports, is that correct?
[11] **A.** Yes, they do.
[12] **Q.** And, among other things, am I correct that each of those
[13] reports contains information relating to the different
[14] television programs and program episodes they broadcast?
[15] **A.** Yes, they do.
[16] **Q.** The revenues associated with each program and episode?
[17] **A.** Yes, they do.
[18] **Q.** Music cue sheets for locally produced programming?
[19] **A.** Yes, they do.
[20] **Q.** And, last, where those stations themselves may have entered
[21] into source or direct licenses, copies of those or information
[22] relating to those, correct?
[23] **A.** Yes, they do.
[24] **Q.** Quite a bit more data to process than with respect, simply,
[25] to the DMX experience, no?

Page 195

[1] **A.** I don't know if it is because DMX has so many customers, I
[2] believe 75,000 locations. I'm not sure how the information
[3] will come into BMI.
[4] **Q.** Let's turn to tab 14 of the binder, please.
[5] Your Honor, I don't know if you want to break at some
[6] point for midmorning break?
[7] **THE COURT:** I wasn't sure how you were coming.
[8] **MR. RICH:** I'm moving along and am about to finish
[9] this segment. Well, this might be a good time for a break.
[10] **THE COURT:** The question that is raised in DMX' brief
[11] and towards which Mr. Rich is heading is why should all the
[12] expenses of developing and administering a new form of lease be
[13] inflicted on the first person to apply for it.
[14] **THE WITNESS:** Again, we are looking at just the -- the
[15] 17 percent is the standard administration charge. That would
[16] say that regardless of what license you take you should at
[17] least cover the 17 percent as Muzak or Play Networks or
[18] TruSonic do now. The incremental value of that, I believe
[19] their fees are much higher than what we've stated here. We've
[20] had developmental costs, we've had computer cost. This is just
[21] the incremental value we deemed that we are going to have to
[22] focus on DMX for this license. The concept should be --
[23] **THE COURT:** The additional costs are institutional in
[24] the sense of being spent to get the form of lease operated, the
[25] new lease.

Page 196

[1] **THE WITNESS:** Yes, that's true. But if you had a
[2] composer who has performed on DMX and BMI had to incur more
[3] costs to administer that license versus a, the same composer's
[4] performance on Muzak and he had less cost on Muzak because of
[5] the blanket license, should he make any less for that same
[6] performance? And our feeling is if you cover your cost, the
[7] composer is then held steady. He is no worse off on either
[8] service in this industry.
[9]     **THE COURT:** Okay. Let's take a 10 minute recess.
[10] (Recess)
[11] **BY MR. RICH:**
[12] Q. Mr. O'Neill, if you would turn to the exhibit located at
[13] tab 14 of your direct examination binder that's a document now
[14] in evidence as PX 126?
[15] A. Yes, sir.
[16] Q. Do you remember you gave some testimony about this
[17] yesterday?
[18] A. Yes, I did.
[19] Q. When were these charts created?
[20] A. There is a date stamp on here of -- I don't know the exact
[21] date they were created.
[22] Q. Did you have any involvement in their creation?
[23] A. No, I didn't.
[24] Q. Do you know when this data was first supplied to DMX?
[25] A. No, I don't.

Page 197

[1] Q. What backup for this data have you seen?
[2] A. No backup for this data.
[3] Q. What purpose was this created for?
[4] A. I believe it was created to help the economists verify the
[5] premium within the television per program license.
[6] Q. And what's your recollection of when the terms of that
[7] television license were entered into? When was that deal done,
[8] last final license deal?
[9] A. The last final license deal for BMI and the local
[10] television industry?
[11] Q. Yes.
[12] A. It expired in -- December 31st of 2004 was the last final
[13] deal. I don't quite know the start date of that, it just
[14] slipped my mind. It was about five years.
[15] Q. I was asking if it was negotiated and concluded in 2002.
[16] Does that sound about right?
[17] A. It does.
[18] Q. So, if I understand the purpose of this exercise, it was to
[19] provide your economist in this litigation with some data; yes?
[20] A. Yes, sir.
[21] Q. Designed to interpret the so-called premium value
[22] associated with a deal that was done back in 2002?
[23] A. That's my understanding, yes.
[24] Q. And for that purpose data was prepared reflecting
[25] television industry activity as of 2005? Is that what this is?

Page 198

[1] A. Yes, it is.
[2] Q. Was this analysis done, to your knowledge, back in 2002?
[3] A. I don't think it could have been done in 2002 for 2005.
[4] You mean an analysis like this?
[5] Q. Yes.
[6] A. No, sir.
[7] Q. Did your economist and you discuss how it could be that
[8] data created three years after the deal was done could be of
[9] use to this Court in interpreting what premium value the
[10] parties, three years earlier, put on their activities?
[11] A. I had no discussions with the economist.
[12] Q. Now, I take it that the information on here -- let me ask
[13] you a question. The middle -- the middle data entry, the
[14] heading of it is total identified show hours. Do you see that?
[15] A. Yes, I do.
[16] Q. What is that?
[17] A. Those are the identified show hours from Tribune data.
[18] That's a company which provides program information, what
[19] actually aired on local stations, and this is the total
[20] identified show hours from that.
[21] Q. Is this every program they gave you?
[22] A. I believe every program that we were able to identify that
[23] they gave us.
[24] Q. Or is this every program for which you were able to
[25] identify and locate a music cue sheet?

Page 199

[1] A. I believe it would be every program we were able to -- I
[2] don't know -- quite know the answer to that, Mr. Rich.
[3] Q. The answer could be quite important, would it not, to
[4] interpreting this data?
[5] A. Yes, it could.
[6] Q. Because, in fact, BMI retains cue sheets for -- what -- 60
[7] percent for all local television, give or take, roughly?
[8] A. I think our coverage is, again, if you look at the total
[9] universe of programs it would be about 60 percent. A lot of
[10] that is the balance. The 40 percent we don't have is due to
[11] paid programming for the most part where it is listed as the
[12] data will come to us from Tribune listing paid programming, not
[13] actually the program that was aired so we don't -- we're not
[14] able to match something up against that.
[15] Q. So, if we don't know the universe figure, namely there,
[16] under an old principal of garbage in garbage out, we don't
[17] really know the percentage of which derives from taking the
[18] first column as the numerator and the second column as the
[19] denominator because sitting here today you don't know what the
[20] denominator represents, correct?
[21] A. Again, my understanding was it was total identified show
[22] hours. I'm not sure if that meant, as you suggested, from a
[23] cue sheet or from -- that we were able to identify the program
[24] name to --
[25] Q. You don't know.

Page 200

[1] **A.** I don't know.
[2] **Q.** And the Court has been provided with no explanation that
[3] would elucidate that, correct?
[4] **A.** At this point -- no, I don't know the answer to that
[5] question, Mr. Rich.
[6] **Q.** Now, in your extensive history with the local television
[7] industry, is it conceivable to you that 85 percent or more of
[8] all local programs BMI has secured music use information
[9] concerning, as this would imply, the third row, that's not
[10] true, is it?
[11] **A.** I would say there is a good portion of local programming.
[12] Again, local is news, public affairs, religious, anything the
[13] local station produces. I would say that is probably --
[14] correct, we wouldn't have 86 percent of cue sheets representing
[15] total programs.
[16] **Q.** Which suggests that this universe in the second --
[17] represented by the data in the second column is a universe
[18] solely of those shows for which BMI maintains any music use
[19] data, correct?
[20] **A.** That would make sense.
[21] **Q.** So it is a subset of a universe which has not been sampled,
[22] correct?
[23] **A.** If that is the case it would be total identified show hours
[24] for which we had a cue sheet. It would be the center column.
[25] It wouldn't represent the total universe of programming.

Page 201

[1] **Q.** Was that qualification discussed with BMI's economist when
[2] this data was provided to him?
[3] **A.** I'm not sure.
[4] **Q.** By definition, if this data was created in 2005 it wasn't
[5] discussed or the topic of discussion when the television
[6] industry representative sat down with BMI in 2002, correct?
[7] **A.** Correct, this was not discussed at 2002.
[8] **THE COURT:** Mr. Rich, are these questions better
[9] reserved for the economist when you see what use, if any, he
[10] makes of this chart?
[11] **MR. RICH:** I think we will be in a catch-22, your
[12] Honor, because I expect Dr. Owen will say I relied on the data
[13] provided to me by Mr. O'Neill and his colleagues. It was what
[14] it was. They represented it to be this.
[15] He didn't generate it, it was handed to him by BMI, as
[16] we understand it.
[17] **THE COURT:** You haven't taken his deposition?
[18] **MR. RICH:** We have, but this was only provided to us
[19] about a week ago, your Honor.
[20] **THE COURT:** I see.
[21] **MR. RICH:** Without backup.
[22] **THE COURT:** Your colleague is gesticulating.
[23] **MR. MARKS:** Let me just correct the record on that
[24] point. This document was first provided to us as part of a
[25] package of materials relied upon by Dr. Owen. We did have the

Page 202

[1] opportunity to --
[2] **MR. RICH:** Beg your pardon --
[3] **MR. MARKS:** -- to depose him on it but he testified --
[4] and we can explore it with him during his cross-examination
[5] here at trial -- that he didn't create the chart, it was simply
[6] handed to him by BMI.
[7] **MR. RICH:** Apologies for the misstatement, your Honor.
[8] **THE COURT:** Well, he is saying that he relied on it.
[9] Of course it is so broad as to be almost useless. The question
[10] is what did he understand it to be and that he was relying on,
[11] what was its meaning and significance and how was this
[12] conclusion supported by it. And if you went into that with
[13] him, I can understand it. If you didn't, then I suppose you
[14] have to do it by some other witness who knows nothing about it.
[15] **MR. MARKS:** We have explored and will explore with
[16] Dr. Owen how he uses it. What we are exploring with
[17] Mr. O'Neill is what actually this data is, who created it and
[18] what it in fact represents because I don't think that that's
[19] within Dr. Owen's personal knowledge since he accepted this
[20] information at face value.
[21] **THE COURT:** It doesn't seem to be very clear within
[22] Mr. O'Neill's knowledge either.
[23] **MR. RICH:** I agree, your Honor. And I'm proposing to
[24] move on from here.
[25] **BY MR. RICH:**

Page 203

[1] **Q.** Mr. O'Neill, toward the end of your direct examination
[2] yesterday you described what you referred to as an internal
[3] analysis that BMI conducted comparing the percentage of
[4] directly licensed performances on the DMX off-premise or
[5] satellite channels with the percentage on the on-premise
[6] channels.
[7] Do you recall being asked some questions and giving a
[8] few answers there?
[9] **A.** Yes, I do.
[10] **Q.** What was the basis of the information you testified to
[11] there yesterday?
[12] **A.** The report was generated by a colleague of mine, Milt
[13] Laughlin who I believe is testifying at this trial, and it was
[14] supplied based on the data supplied to DMX by BMI.
[15] **Q.** Do you know when that analysis was run, when it was
[16] performed by Mr. Laughlin?
[17] **A.** I don't know the exact dates, Mr. Rich. I believe it was
[18] fairly recently.
[19] **Q.** And, have you seen any of the underlying data supporting
[20] the analysis?
[21] **A.** No, I have not.
[22] **Q.** Did you discuss any of that with Mr. Laughlin?
[23] **A.** Yes, I did. I asked questions about why a savings rate for
[24] DMX would drop from 38 percent or 35 percent. I'm not quite
[25] sure of the number. It was in that range down to 20, 22