Page 204

[1] percent. And he explained that it was due to the on-premise
[2] music use data which we have from DMX. He related the direct
[3] licenses that were in-house and how that would have impacted
[4] the on-premise reporting and he said when you weighted the two
[5] together it dropped the overall savings rates down to 20, 22
[6] percent.
[7] Q. And did you and he discuss in any greater detail the nature
[8] of the on-premise reporting data that is provided to BMI by
[9] DMX?
[10] A. I don't think we went into great length about what was
[11] supplied by DMX to BMI.
[12] Q. Why don't we explore the rest of that topic with
[13] Mr. Laughlin when he gets on the stand.
[14]     I would like to conclude my examination with some
[15] questions about DMX' direct licensing program. BMI's
[16] affiliated composers and music publishers are entitled, under
[17] this arrangement with BMI, to license the public performance
[18] rights in their musical compositions directly to users such as
[19] DMX in lieu of BMI if they choose to do that; is that correct?
[20] A. Yes, we have non-exclusive rights.
[21]     (Continued on next page)

Page 205

[1] BY MR. RICH:
[2] Q. BMI understands that this is a decision that's to be made
[3] by its affiliates without interference from BMI, is that
[4] correct?
[5] A. Absolutely.
[6] Q. Prior to the direct licensing initiative engaged in by DMX
[7] beginning in 2006, what was the prevalence, to your knowledge,
[8] of such direct licensing of BMI repertoire works by members of
[9] the commercial music service industry?
[10] A. By the commercial music service industry? I think it was
[11] nil.
[12] Q. Now, there came a time, I take it, when --
[13] A. Mr. Rich, I remember reading something about in the '94 to
[14] the 2004 period that there was talk about direct licensing, but
[15] I'm not sure if it ever came to fruition.
[16] Q. Thank you. Now, putting aside this litigation and what's
[17] come through the discovery record, there came a time when BMI
[18] became aware that DMX was contacting music publishers about
[19] entering into direct license arrangements covering, among other
[20] rights, the grants of music performing rights, is that correct?
[21] A. Yes.
[22] Q. And is it your recollection that BMI came to learn of this
[23] sometime during 2006?
[24] A. I believe that's the time frame, yes, sir.
[25] Q. Is it correct that the manner in which BMI came to learn of

Page 206

[1] this was information and contacts BMI began to receive from
[2] music publishers who had been approached by DMX?
[3] A. Yes. The music publishers called us on that.
[4] Q. And that included some contacts from the so-called major
[5] music publishers?
[6] A. Yes, sir.
[7] Q. Could you for the record identify who you understand to be
[8] the major music publishers?
[9] A. Sure. There would be four majors within the industry of
[10] publishing. Sony, Universal, Warner Chappel and EMI.
[11] Q. And am I correct that the distributions which they reflect,
[12] at least within the monies received and disbursed by BMI
[13] attributable to the commercial music services industry, that
[14] they, the four collectively, represent about 70 percent of all
[15] publisher distributions?
[16] A. I think that's correct, yes.
[17] Q. Is that about right?
[18] A. Yes.
[19] Q. Now, you and others in senior management -- are you a
[20] member of senior management, by the way?
[21] A. That's a good question. I'm senior vice president of
[22] licensing. I like to consider myself a member of senior
[23] management, but others may not.
[24] Q. I will gladly treat you as such.
[25] A. I appreciate that.

Page 207

[1] Q. Now you and others in senior management at BMI came to
[2] learn that DMX was offering these music publishers one and a
[3] half times the combined writer and publisher distributions they
[4] reported to DMX that BMI and ASCAP had been making on account
[5] of DMX performances of their music, is that correct?
[6] A. Again, I learned about it from BMI, Mr. Rich, that it was
[7] one and a half times what BMI was paying, the publishers was
[8] being offered one and a half times what BMI was paying.
[9] Q. And in addition in 2006 you and others at BMI were provided
[10] with the basic terms of the agreement that DMX was offering to
[11] potential direct licensing publishers, is that correct?
[12] A. Forgive me. There was two parts to the direct licensing
[13] campaign, and I'm not quite sure of when one happened versus
[14] the other, sitting here today, but I remember getting a term
[15] sheet for one deal and then it subsequently changed somewhat a
[16] couple of steps later in the process.
[17] Q. Let me show you a document that's been premarked as RX 22,
[18] please? Do you recognize this series of e-mails?
[19] A. Yes, I do.
[20] Q. Who is Ann Sweeney?
[21] A. Ann Sweeney is the executive vice president of Warner
[22] Chappel music now. She was I believe the head of business
[23] affairs for Sony Music at this time.
[24] Q. And it was in this capacity that you and she were
[25] communicating?

Page 208

[1] A. Yes.
[2] Q. That prior capacity?
[3] A. Correct.
[4] Q. Her e-mail was to you and Alison Smith. Could you for the
[5] record identify who Ms. Smith is?
[6] A. Alison Smith is senior vice president of distribution and
[7] performing rights for BMI.
[8] Q. So am I correct that in or about August of 2006,
[9] Ms. Sweeney forwarded to you and to Ms. Smith what the re: line
[10] indicates is DMX's direct license proposal?
[11] A. Yes.
[12]     MR. RICH: I'd like to offer this if there's no
[13] objection, your Honor?
[14]     MR. FITZPATRICK: No objection.
[15]     THE COURT: Received.
[16]     (Respondent's Exhibit RX 22 received in evidence)
[17] Q. Now, you came to understand, I take it, that the basic form
[18] of agreement that DMX was offering offered publishers their pro
[19] rata share of a pool of $25 per location, correct?
[20] A. Yes, sir. I believe at the time I thought it was $25 for
[21] BMI.
[22] Q. You later came to understand otherwise?
[23] A. Very -- through discovery process for this trial, yes, but
[24] at the time we believed it was $25 for the BMI portion.
[25] Q. And what did you subsequently come to understand?

Page 209

[1] A. That the 25 represented both ASCAP and BMI's portion.
[2] Q. Is it accurate that by the summer of 2006 BMI was contacted
[3] by all four of the major publishers concerning DMX's
[4] marketplace initiative?
[5] A. By the summer of 2006?
[6] Q. Yes.
[7] A. I'm not sure if all four had contacted BMI by that time.
[8] Q. I can show you this excerpt from your deposition, but let
[9] me read it to you first and see if it refreshes you. This is
[10] from line 23 at page 155. You were asked:
[11] "Q. You had been advised in the summer of 2006 by each of the
[12] major publishers that they had been approached by DMX
[13] concerning direct licensing?
[14] "A. I believe so, yes.
[15] "Q. And when I say major publishers, you understand that I am
[16] referring to Sony, Universal, Warner Chappel and BMI."
[17]     Your answer is "Yes."
[18] A. Was that corrected later to say I wasn't sure if EMI
[19] contacted us?
[20] Q. If so -- I don't know the answer and if so, I accept that.
[21] A. I believe, I know Universal, I know Sony and Warner Chappel
[22] were interested.
[23] Q. Is it accurate that the majors who had contacted you, one
[24] or more, were interested in knowing what the others were
[25] planning to do?

Page 210

[1] A. They did ask what the others were planning to do, yes, they
[2] did.
[3] Q. I take it you declined to indicate?
[4] A. Absolutely.
[5] Q. Now, as we'll get to in a bit greater detail, at least two
[6] of these majors specifically over time asked BMI to match the
[7] economic terms that had been offered to them by DMX, correct?
[8] A. Yes, sir.
[9] Q. The first of those was Sony, correct?
[10] A. Yes.
[11] Q. And the next was Universal?
[12] A. Yes.
[13] Q. Okay. In which case, these publishers advised BMI, didn't
[14] they, that should BMI match DMX's proposal, those publishers
[15] would forego entering into direct licenses with DMX, correct?
[16] A. Yes.
[17] Q. That was the purpose of the exercise?
[18] A. They said if you could match this, they'd rather stay with
[19] us. They also wanted to understand the dynamics of where we
[20] were with DMX in terms of the licensing of DMX.
[21] Q. Now, BMI was interested to meet these requests from its
[22] major affiliates if at all possible, true?
[23] A. True.
[24] Q. BMI had concerns over DMX's direct initiative, didn't it?
[25] A. No. Again, we felt that if a publisher came to us and

Page 211

[1] asked us for, to match an offer they were getting on the
[2] outside to remain with BMI, we'd explore that. We were not
[3] trying to hamper DMX from direct licensing.
[4] Q. Do you feel there was a need to somehow level the
[5] information playing field?
[6] A. Yes, I did. I felt that DMX was offering, again, at this
[7] time I believe $25 per location for BMI's music use. They were
[8] paying us $12 per location. We were seeking $36 per location,
[9] so we felt they were trading in the middle for this direct
[10] license. We just wanted to make sure the license -- our
[11] affiliates, our writers and publishers understood that our
[12] license was interim, that they were paying at a rate that was
[13] established back in 1987, and that we felt they should have
[14] been at a higher rate and that we were pursuing that in court.
[15] We didn't tell them, we made it absolutely clear on every phone
[16] call that it was their absolute right to directly license. In
[17] no way were we trying to influence them. We were just
[18] providing them information in order to make a sound business
[19] decision.
[20] Q. You felt that entities the likes of Sony/ATV Music
[21] Publishing Company, Universal Publishing Company, some of the
[22] largest corporations in the world, were at the risk of being
[23] disadvantaged in their negotiations with DMX unless they were
[24] provided with certain additional information by BMI?
[25] A. They called us seeking that information, Mr. Rich.

Page 212

[1] Q. In fact, BMI viewed the DMX initiative as competitive with
[2] BMI's own license offerings to the CMS industry, isn't that
[3] true?
[4] A. I actually felt the direct licensing they were paying at
[5] the time, the $25 per location was higher than what BMI was
[6] getting on an interim basis and we were at a disadvantage by
[7] not being able to match those.
[8] Q. If successful, DMX's licensing initiative stood to reduce
[9] BMI's own collections from DMX and potentially from other CMS
[10] industry participants, isn't that true?
[11] A. I would agree with you that it stood to lessen DMX's
[12] license fees to BMI, as the adjustable fee blanket license
[13] would allow.
[14] Q. It was of no concern to you, however?
[15] A. I'm not sure how it would have played across the rest of
[16] the industry. I would imagine that either, and we've seen this
[17] today, that Play Networks and, I forget, there's one other,
[18] have requested an adjustable fee blanket license on a
[19] going-forward basis. I forget the other service which has. So
[20] ultimately, I do think that it will reduce BMI's fees as they
[21] go out and directly license, as the license should.
[22] Q. And you were also concerned, were you not, that a
[23] successful DMX licensing initiative threatened to reduce the
[24] prevailing fee level for the CMS industry licenses as reflected
[25] in BMI's own license agreements with the industry, correct?

Page 213

[1] A. I think it was going to have an impact on our licensing.
[2] Again, if the rate was the standard contract, I'm not sure
[3] where that ultimately would have ended up, Mr. Rich.
[4] Q. If successful, it threatened, did it not, in BMI's
[5] estimation, to lower the royalty levels received by BMI's
[6] affiliates for the performances of their music by DMX, true?
[7] A. I think direct licensing would reduce royalty levels
[8] payable to other affiliates.
[9] Q. Payable to --
[10] A. Other affiliates.
[11] Q. If successful, it might have set a precedent for other
[12] users to attempt to replicate that process, true?
[13] A. I think other users had the right to replicate that
[14] process, yes.
[15] Q. That was viewed as a risk to BMI, correct?
[16] A. I don't think it would be viewed as a risk. I think it was
[17] viewed as this is going to happen.
[18] Q. In fact, BMI is aware of other large users and industries
[19] of users that have indicated a desire to operate under blanket
[20] carveout licenses, isn't that true?
[21] A. Yes, it is true.
[22] Q. And in BMI's senior management's estimation, it was
[23] worthwhile to make an investment to forestall this initiative
[24] from gaining a head of steam, isn't that true?
[25] A. That's false.

Page 214

[1] Q. Even to bend BMI's distribution rules a bit to accomplish
[2] it, isn't that true?
[3] A. That's false.
[4] Q. Now, you personally had discussions with the major
[5] publishers concerning DMX's direct license initiative, right?
[6] A. Yes, I did.
[7] Q. In which you advised them that DMX was paying BMI some
[8] three times less than the what you termed new established rate
[9] in the marketplace, is that right?
[10] A. I believe I phrased it DMX was paying us at a rate of 12 to
[11] $14, which was three times less than the established rate of
[12] 36.36.
[13] Q. And that BMI was hoping to triple the license fees it was
[14] currently receiving from DMX through negotiation or potential
[15] rate litigation, correct?
[16] A. I said we were seeking to get DMX on the same licensing
[17] agreement as every other CMS provider signed on to.
[18] Q. At the time you represented that the going rate was 36.36,
[19] had BMI done any research as to the actual effective rates of
[20] CMS licenses of the type that PX 1293, pardon me, JX 1293
[21] undertakes here?
[22] A. Is that that big document, Mr. Rich?
[23] Q. Mm-hmm?
[24] A. No. But we did estimate that DMX's rate would have been
[25] north of the 36.36.

Page 215

[1] Q. Did you do any estimation of the effective rates then being
[2] paid by any of DMX's major competitors?
[3] A. Not at that time.
[4] Q. Now, BMI enlisted its most senior management, did it not,
[5] to weigh its options in responding first to Sony and then to
[6] Universal?
[7] A. Sony again approached us to see if we could match an offer
[8] that DMX made for direct license, and we brought it to the very
[9] senior management group to say here is what Sony has been
[10] offered by DMX, here is what we think we can do, we don't think
[11] we can do that.
[12] Q. The effort involved Mr. Bryant, Del Bryant?
[13] A. Yes it did.
[14] Q. What is his position at BMI?
[15] A. He's president and CEO of BMI.
[16] Q. Did it involve John Cody, did it not?
[17] A. Yes.
[18] Q. Who is Mr. Cody?
[19] A. Executive vice president and COO of BMI.
[20] Q. Did it involve Mr. Marvin Berenson, did it not?
[21] A. Yes.
[22] Q. Who is he?
[23] A. Senior vice president and general counsel of BMI.
[24] Q. Did it involve Ms. Smith who we identified, correct?
[25] A. Yes.

Page 216

[1] **Q.** And you, right?
[2] **A.** Yes.
[3] **Q.** Senior team?
[4] **A.** Yes.
[5] **Q.** Now, Sony/ATV, which was the first requester of the majors,
[6] controls the rights to songs written by a fair number of
[7] luminaries correct?
[8] **A.** Yes, sir.
[9] **Q.** Their catalog includes the Beatles' music?
[10] **A.** I believe it does. I am, quite candidly, not familiar with
[11] all of their catalog.
[12] **Q.** Now, am I correct that, we'll do this in more detail with
[13] Ms. Smith, but just as a predicate for understanding this, am I
[14] correct that typically when BMI distributes royalty it
[15] distributes a portion of those royalties to the composer
[16] associated with a musical composition and the remaining portion
[17] to the music publishing company associated with it?
[18] **A.** Correct.
[19] **Q.** And if there's a default, it tends to be 50 percent to one
[20] and 50 percent to the other, right? Although there are
[21] variations?
[22] **A.** I believe that's the case. For every dollar we distribute,
[23] 50 cents is allotted to the publisher, 50 cents is allotted to
[24] the writer.
[25] **Q.** Now, I take it that Sony's request to BMI was that BMI

Page 217

[1] match the publisher's share of what DMX was offering to it,
[2] correct?
[3] **A.** I believe that's the case, yes.
[4] **Q.** And in furtherance of this interest, Sony furnished BMI
[5] with the specifics of the offer that had been made to it by
[6] DMX, is that correct?
[7] **A.** Yes, it is.
[8] **MR. RICH:** May I have one second?
[9] (Pause)
[10] **Q.** Now, BMI evaluated that offer, that is, the DMX offer, to
[11] see if it could match it, is that correct?
[12] **A.** Yes, sir.
[13] **Q.** Let me show you a document that's been premarked as RX 34.
[14] You'll see this is an e-mail chain starting with you at the
[15] bottom, addressed to Ms. Smith and then a series of other
[16] e-mails. Can you identify Vinolla Chenault please?
[17] **A.** Yes Vinolla Chenault was assistant vice president working
[18] for Alison Smith.
[19] **Q.** In June of 2007, Ms. Smith per this e-mail writes to
[20] Ms. Chenault, "Well, without going into much detail, see below.
[21] I will explain on Monday. So without hesitation I need you to
[22] do the same workup for DMX on Sony as you did for XM. I'm so
[23] sorry, but we got to get it done. We can do the others later.
[24] Hope you have a good weekend." Do you see that?
[25] **A.** Yes, I do.

Page 218

[1] **Q.** Do you have an understanding what task Ms. Smith was
[2] assigning to Ms. Chenault?
[3] **A.** I believe she was being asked to pull Sony's royalties.
[4] I'm not quite sure of the date span or things like that. But
[5] how much did BMI pay to Sony for the DMX distribution.
[6] **Q.** And that was for purposes of assisting BMI senior
[7] management in evaluating whether it could match the DMX offer?
[8] **A.** I believe so.
[9] **Q.** Is it your recollection that the attached information to
[10] this e-mail constitutes the workup she did?
[11] **A.** I'm not sure if this is the final product of it all, but it
[12] was the initial phases of it.
[13] **Q.** Iteration of it?
[14] **A.** Yes, sir.
[15] **Q.** Okay.
[16] **MR. RICH:** I'd offer this in evidence at this point,
[17] your Honor?
[18] **MR. FITZPATRICK:** No objection.
[19] **THE COURT:** Received.
[20] (Respondent's Exhibit RX 34 received in evidence)
[21] **Q.** Now, Sony put considerable pressure on BMI in the period
[22] the summer '07 into the fall '07 to get them a response, is
[23] that accurate?
[24] **A.** I would say that's accurate.
[25] **Q.** Let me show you a document that's been premarked as RX 24.

Page 219

[1] October 26, 2007 e-mail from you to Mr. Bryant, Mr. Cody and
[2] Alison Smith?
[3] **A.** Yes.
[4] **Q.** Do you recall preparing this e-mail in or around this time?
[5] **A.** Yes, I do.
[6] **MR. RICH:** Offer this in evidence, your Honor?
[7] **MR. FITZPATRICK:** No objection.
[8] **THE COURT:** Received.
[9] (Respondent's Exhibit RX 24 received in evidence)
[10] **Q.** Notice in the second paragraph of this e-mail it states,
[11] "Sony called me this morning," meaning you, "and said that
[12] Marty is pushing for an answer." Who is Marty?
[13] **A.** Marty Vandier is the CEO of Sony Music Publishing.
[14] **Q.** And you continue to say, "I told them that we were spread
[15] out around the country but that Del," meaning Mr. Bryant?
[16] **A.** Yes.
[17] **Q.** BMI CEO?
[18] **A.** Yes.
[19] **Q.** "Would be calling Marty at his house." Correct?
[20] **A.** Yes.
[21] **Q.** We'll come back to this memo in a few minutes as to the
[22] denouement, but I want to show you a document that's premarked
[23] as RX 27. This is an October 29, 2007 e-mail from you to
[24] Mr. Cody, and you recall preparing this e-mail?
[25] **A.** Yes, I do.

Page 220

[1] **MR. RICH:** Offer this document in evidence?
[2] **MR. FITZPATRICK:** No objection, your Honor.
[3] **THE COURT:** Received.
[4] (Respondent's Exhibit RX 27 received in evidence)
[5] **Q.** This e-mail you write, "Hey, John, I've updated the work
[6] sheet with some better numbers. Alison," which I take it as a
[7] reference to Alison Smith?
[8] **A.** Yes.
[9] **Q.** "And I are talking with Del about it this afternoon and
[10] then he is scheduled to call Marty at 5:00 p.m., not that
[11] close..." Do you see that?
[12] **A.** Yes, I do.
[13] **Q.** So this back and forth with Sony, I take it, culminated in
[14] or about late October of 2007, is that correct?
[15] **A.** That is correct.
[16] **Q.** And I take it that at the end of the day BMI determined
[17] that it would not match DMX's offer to Sony, correct?
[18] **A.** That is correct.
[19] **Q.** And the reason resulted at least in significant part from
[20] BMI's determination that Sony had misinterpreted a line
[21] appearing on its periodic BMI royalty distribution statement,
[22] is that correct?
[23] **A.** I don't know if Sony misinterpreted it or not in that
[24] negotiation, in their negotiation with DMX. I know I explained
[25] what was in BMI's line item to Sony. I'm not sure how they

Page 221

[1] then transferred that communication in their negotiation to
[2] DMX.
[3] **Q.** The line item we're talking about is denominated, at that
[4] time was denominated on the distribution statement as DMX, is
[5] that correct?
[6] **A.** That is correct.
[7] **Q.** Let's come back to RX 24, please.
[8] **A.** Yes, sir.
[9] **Q.** The third paragraph you write: "In looking at the attached
[10] schedule, it's very hard to come up with what they are seeking.
[11] Perhaps Sony shared their statement with DMX and DMX used it to
[12] come up with their offer, not knowing or understanding that
[13] other background music providers were included in this line
[14] item. I replicated this approach and just about tied out to
[15] the offer. If this is the case, DMX will be overpaying Sony
[16] and only receiving a fraction of the savings via a carveout
[17] license." You wrote that, correct?
[18] **A.** Yes, I did.
[19] **Q.** And that was accurate, right?
[20] **A.** Yes, it is.
[21] **Q.** All right, now, let's go through, if we can, using the
[22] attachment to RX 27, and understanding, help the Court
[23] understand exactly what it is that your e-mail of three days
[24] earlier was describing.
[25] If you look at the attached analysis, attached

Page 222

[1] beginning at the second page of RX 27, I take it this reflects
[2] an analysis that BMI had been making of the royalties paid by
[3] BMI to major publishers on account of DMX performances?
[4] **A.** Yes, sir.
[5] **Q.** For a certain period of quarters, correct?
[6] **A.** Yes, sir.
[7] **Q.** And this was prepared specifically to assist BMI in its
[8] consideration of Sony's request that BMI match DMX's offer,
[9] yes?
[10] **A.** Yes.
[11] **Q.** Okay. Now, if we start at the top of the page, the chart
[12] at the top half of this second page, I take it this sets forth
[13] the actual amounts distributed to the four major publishers
[14] attributable to the DMX reporting line on the realized royalty
[15] statements over the reporting periods identified. Is that what
[16] that represents?
[17] **A.** Yes, it does.
[18] **Q.** Then appearing as a footnote to that chart, your Honor,
[19] it's at the bottom left of the top half there starting with DMX
[20] numbers with an asterisk, it states: "DMX numbers above
[21] include royalties from over 200 background music customers and
[22] not just DMX." Did I read that correctly?
[23] **A.** Yes, you did.
[24] **Q.** And then directly below that is a box denominated DMX only?
[25] **A.** Yes.

Page 223

[1] **Q.** And there it's reported, quote, "DMX only accounts for
[2] approximately 27 percent of DMX line on our affiliate
[3] statements," correct?
[4] **A.** Correct.
[5] **Q.** And directly below that, some math is done to demonstrate
[6] that the actual 2006 royalties attributable to DMX
[7] performances, rather than 192,000, according to my notes is
[8] 27 percent of $192,274, I believe it is, gets you to $51,914,
[9] is that correct?
[10] **A.** Yes. If you take that full year for 2006 --
[11] **Q.** Yes?
[12] **A.** Which is the bottom half of the top spreadsheet?
[13] **Q.** Right.
[14] **A.** Sony is $192,274. You would take 27 percent of that for
[15] DMX and that would translate into approximately $51,914 was
[16] attributable out of that money from DMX.
[17] **Q.** So just to step back and make sure the record is totally
[18] clear, Sony had been receiving statements, as had other music
[19] publishers which among other reporting lines had a line labeled
[20] DMX, yes?
[21] **A.** Anybody whose performance was on a commercial background
[22] service or commercial music service would have received a
[23] statement that said DMX.
[24] **Q.** Right. And so in this case for 2006 that line for Sony
[25] cumulated to some $192,000, correct?

Page 224

[1] A. Yes.
[2] Q. Notwithstanding the label, what this document identifies
[3] and your prior e-mail elucidates is that while it's labeled
[4] DMX, in fact the source of income to BMI was not solely DMX,
[5] but some 200 other reporting background music licensees,
[6] correct?
[7] A. Correct.
[8] Q. And on deeper analysis, if you isolated out the royalties
[9] being paid to the majors on account solely of DMX, that's where
[10] the 27 percent came from, correct?
[11] A. Correct.
[12] Q. Okay. And so when you backed out the real numbers
[13] attributable to DMX and put it against the offer that had been
[14] made by DMX, the conclusion was you could not match, match that
[15] offer to Sony, correct?
[16] A. Yes, it --
[17] Q. Please state it in your own way.
[18] A. Thank you. The concept was since the line item on the
[19] royalty statement summed numerous background music providers
[20] into one number, 192,000 in this case labeled DMX, we felt that
[21] 27 percent represented DMX, the balance represented final fees.
[22] So if we were going to compare apples to apples comparison with
[23] what we believed Sony was asking, we had to first try to
[24] determine what BMI believed would be final fees for DMX, and
[25] that's where we take the 51,914 and we multiply it by three,

Page 225

[1] because the rate would increase from 12 to 36 in our minds and
[2] then over a three-year period. Then we would compare that to
[3] the DMX number in and of itself.
[4]     Secondly, we would add everything together to see if
[5] we came up with it closer.
[6] Q. Coming back to RX 24 for a minute, the prior document we
[7] looked at and the cover memo.
[8] A. Mm-hmm.
[9] Q. In the paragraph I had read, the third paragraph I read to
[10] you previously, you reached the -- you inferred, did you not,
[11] that DMX had misconstrued the royalty dollars communicated to
[12] it by Sony as part of their negotiations in coming up with its
[13] own proposal, correct?
[14] A. I assume that could have happened. Again, I didn't know if
[15] Sony was trying to negotiate with BMI. I didn't know if they
[16] were using it, but at this point in time I had to assume
[17] something and I assume that's what happened.
[18] Q. And that to the degree that DMX taking that royalty line at
[19] its face value itself would have inferred that 100 percent of
[20] that sum rather than 27 percent of that sum reflected actual
[21] BMI distributions to Sony. In formulating its own proposal to
[22] Sony, you report, in that situation DMX will be overpaying Sony
[23] and only receiving a fraction of the savings via carveout
[24] license, correct?
[25] A. That is correct.

Page 226

[1] Q. That is what you meant by that, correct?
[2] A. Yes.
[3] Q. Now, on this -- back to the data work on RX 27, on the
[4] right side of the page appears a box headed 2006 big four
[5] publisher dollars. Do you see that?
[6] A. Yes. The 1 million 332?
[7] Q. Yes. And I take it this cumulates the earnings of all four
[8] majors as reported on that DMX reporting line and comes up with
[9] a total of 1,332,635 and then sets forth the actual amount
[10] attributable to DMX performances, namely, 27 percent of that
[11] number or 360,000, is that correct?
[12] A. That is correct.
[13] Q. Okay. And then down a bit further on the right side is
[14] reported the fact that the big four represents 70 percent of
[15] total distributions. Do you see that?
[16] A. Yes, I do.
[17] Q. And I take it as we established that was meant at least
[18] relating to DMX?
[19] A. That is true.
[20] Q. And below that --
[21] A. Just to clarify the way I got there.
[22] Q. Yes.
[23] A. If I, in this box labeled directly under the big four
[24] publisher dollars it says 2006 DMX license fees of $1,286,000.
[25] Q. Yes.

Page 227

[1] A. I took 20 percent off. Again, assuming a 20 percent
[2] overhead rate to get to the million 29, divided it evenly
[3] between writer and publisher, and then just simply divided the
[4] 360 by the 514 and that got me to 70 percent.
[5] Q. Thank you. And if we keep going down that right hand
[6] column, we see that reported are the respective shares of the
[7] big four in relation to the distribution showing Sony at
[8] 14 percent, correct?
[9] A. Yes.
[10] Q. And Universal at 29 percent?
[11] A. Yes.
[12] Q. Those totals add up to 100 percent of the 70 percent, is
[13] that correct?
[14] A. That is correct.
[15] Q. Now, in October of 2007, I take it, BMI advised Sony that
[16] it was not going to match BMI's proposal, is that correct?
[17] A. That is correct.
[18] Q. And specifically, you told Sony, did you not, you
[19] personally did, about this data issue underlying the
[20] determination, correct, the 27 percent issue?
[21] A. Yes, I did.
[22] Q. You did that both in a phone call to the Sony inside lawyer
[23] who was involved, correct?
[24] A. Correct.
[25] Q. And in a subsequent e-mail confirmation, is that correct?

Page 228

[1] A. Yes, it is.
[2] Q. Let me show you what's in evidence as JX 1313. This is two
[3] redacted e-mails. At the bottom there's one from you to Jonas
[4] Kant at Sony/ATV?
[5] A. Yes.
[6] Q. Who is he, please?
[7] A. He's the head of business affairs for Sony/ATV. I'm not
[8] quite sure of his exact title.
[9] Q. Do you recall writing this note to Mr. Kant?
[10] A. I do.
[11] Q. This is already in evidence. We don't need to offer it.
[12] Let me read into the record this one paragraph. "Jonas, I just
[13] wanted to follow up on the voice mail I just left to you. It
[14] was really good speaking with you on Monday. While we were
[15] disappointed that we could not meet the number you asked us to
[16] match via your DMX offer, I'm pleased that it worked out for
[17] you." What is that a reference to?
[18] A. That they decided that this was their business decision,
[19] they decided to go with DMX and I was just letting them know
[20] that while BMI was disappointed you wouldn't be keeping the
[21] catalog here, we're happy you made your decision.
[22] Q. You go on to say, "I was glad to have the opportunity to
[23] explain the composition of the line item on your royalty
[24] statement titled DMX. As we discussed, this line also includes
[25] other royalties from other background music providers and in

Page 229

[1] fact DMX only accounts for approximately 25 percent," is that
[2] right?
[3] A. That's right.
[4] Q. That was the conclusion we were discussing although we
[5] talked about 27 percent a few minutes ago, correct?
[6] A. Yes.
[7] Q. Now, I take it BMI did not advise DMX of the reality of
[8] this reporting line, did it?
[9] A. No, we did not.
[10] Q. As to what it represented or didn't?
[11] A. No, we did not.
[12]    MR. RICH: Your Honor, this is a good time to break
[13] for lunch, and I hope to conclude within 30 minutes after
[14] lunch.
[15]    THE COURT: Okay. Thank you very much. We will
[16] recess until, I think probably 2:10 is probably safe.
[17]    (Luncheon recess)

Page 230

[1]    AFTERNOON SESSION
[2]    2:20 p.m.
[3] BY MR. RICH:
[4] Q. Good afternoon, Mr. O'Neill.
[5] A. Good afternoon, Mr. Rich.
[6] Q. You will be happy to know we are nearing the end of this.
[7]    Before lunch we discussed BMI's consideration of a
[8] request from Sony, ATV publishing in relation to a proposal it
[9] had received from DMX, yes?
[10] A. Yes.
[11] Q. I would like to conclude by discussing the Universal
[12] counterpart to that.
[13]    I take it that at the same time that BMI was deciding
[14] whether to match DMX' offer to Sony it received a similar
[15] request from Universal music publishing, correct?
[16] A. Correct.
[17] Q. And the final decision as to how to respond to Universal
[18] was not made until following BMI's determination not to
[19] accommodate Sony's request, correct?
[20] A. Yes, sir.
[21] Q. It happened after that?
[22] A. Yes, sir.
[23] Q. And, in fact, the decision on BMI's part how to respond to
[24] Universal wasn't made until after Sony entered into its direct
[25] license agreement with DMX, yes?

Page 231

[1] A. Yes. It post-dated Sony.
[2] Q. And this time BMI did put together an economic package
[3] designed to satisfy Universal, correct?
[4] A. Correct.
[5] Q. And thereby to avert Universal also from entering into a
[6] direct license with DMX, right?
[7] A. Yes. We matched what DMX was offering.
[8] Q. And this offer to Universal took the form of a three-year
[9] guarantee; is that right?
[10] A. That is correct.
[11] Q. Okay.
[12]    Which guarantee was against future monies that might
[13] become payable to Universal in the form of BMI royalty
[14] distributions on account of DMX commercial performances, right?
[15] A. Yes.
[16] Q. Commercial music performances?
[17] A. Yes, sir.
[18] Q. And which guaranteed sums were assured to Universal
[19] irrespective of whether such future royalties earned out the
[20] guarantees; is that right?
[21] A. That is right.
[22] Q. Okay. And, having accepted this arrangement in December of
[23] 2007 it is your understanding, is it not, that Universal in
[24] fact declined to enter into a direct license arrangement with
[25] DMX?

Page 232

[1] **A.** Yes, they did.
[2] **Q.** Now let me show you what's been premarked as RX 31. Beg
[3] your pardon. You can leave that with the witness, let's also
[4] show him 32. Hold on to 31 for a few minutes.
[5]     I have put in front of you as RX 32, a document which
[6] is a December 7, 2007 letter agreement on BMI letterhead
[7] addressed to Songs of Universal Inc. signed by Del Bryant as
[8] president and counter-signed by Officers of Universal.
[9]     Do you see that?
[10] **A.** Yes, I do.
[11] **Q.** Do you recognize this to be the commemoration of the
[12] guarantee arrangement that was executed, entered into with
[13] Universal?
[14] **A.** Yes, I am. Yes, I do.
[15]     **MR. RICH:** I offer that into evidence at this point,
[16] your Honor.
[17]     **MR. FITZPATRICK:** No objection.
[18]     **THE COURT:** Received.
[19]     (Respondent's Exhibit 32 received in evidence)
[20] **Q.** Looking at paragraph 1 -- and your Honor, I'm going to
[21] because of the commercial sensitivity for BMI because of the
[22] actual terms, I'm going to make reference to these including a
[23] demonstrative but not read numbers into the record for the next
[24] few minutes to accommodate confidentiality concerns without
[25] needing to worry about the public in the courtroom. If that's

Page 233

[1] acceptable.
[2]     If you would look at paragraph 1 of this document and
[3] see the numbers set forth in A, B and C?
[4] **A.** Yes.
[5] **Q.** I take it those are the annual sums for the years 2008,
[6] 2009 and 2010 that were guaranteed to Universal, is that
[7] correct?
[8] **A.** That is correct.
[9] **Q.** And do you still have from before lunch RX 27?
[10] **A.** Yes, I do.
[11] **Q.** If you would turn to the second page of RX 27, please?
[12] **A.** Yes, sir.
[13] **Q.** And looking at the top half of that page remember we talked
[14] about the $192,000 sum that Sony had received?
[15] **A.** Yes.
[16] **Q.** As a comparable number to Universal for 2006 the number
[17] next to it 392994?
[18] **A.** Yes, it is.
[19] **Q.** Just to be clear, those were performances reported on the
[20] DMX line but which in fact represented more than simply the DMX
[21] performances as we discussed, correct?
[22] **A.** Correct.
[23] **Q.** Now, if one does the math off of the 392994 and applies the
[24] same 27 percent factor, I will represent to you that the
[25] amounts of the 2006 distributions attributable to DMX

Page 234

[1] performances of Universal music comes out to around $106,000.
[2] Does that sound about right?
[3] **A.** That sounds about right.
[4] **Q.** Okay.
[5]     And so, if one wanted to compare the level of the
[6] guarantees set forth in the December 7, 2007 letter agreement
[7] against $106,000 you would simply, obviously, compare the
[8] $106,000 to the numbers depicted in paragraph 1. Is that
[9] correct?
[10] **A.** Yes.
[11] **Q.** And you get the order of magnitude difference which, again,
[12] I won't speak into the record because it will give away the big
[13] number. Okay?
[14] **A.** Okay.
[15] **Q.** Now, I want to show you a demonstrative which does a little
[16] bit of math and I will hand that out to counsel and the Court,
[17] please. The first of these starts at the caption: Universal
[18] guarantee is blank times royalties actually earned.
[19]     Do you have that one in front of you?
[20] **A.** Yes, I do.
[21] **Q.** This, I think, accurately captures the math we just went
[22] through first identifying the 2006 royalties on the DMX line,
[23] yes?
[24] **A.** Yes.
[25] **Q.** Attributing the DMX portion to them?

Page 235

[1] **A.** Yes.
[2] **Q.** The product of that, the $600,000 set forth there?
[3] **A.** Yes.
[4] **Q.** And then setting forth comparatively the amount of the
[5] Universal guarantee for 2008 as against that, correct?
[6] **A.** Yes.
[7] **Q.** Okay.
[8]     Now, can one counsel from each side come up, please?

Page 236

[1] (At side bar)
[2] THE COURT: What is BMI's interest in the
[3] confidentiality of these numbers?
[4] MR. FITZPATRICK: The only number is the actual --
[5] THE COURT: Excuse me.
[6] MR. FITZPATRICK: The only number that we are
[7] concerned about is the actual dollar amount of the guarantee.
[8] THE COURT: Yes.
[9] MR. FITZPATRICK: And we -- I mean, it is a number we
[10] prefer to keep confidential because it is not known among all
[11] the affiliates exactly how every affiliate is treated so it
[12] would be -- the sensitivity would be with respect --
[13] THE COURT: The term affiliate meaning?
[14] MR. FITZPATRICK: Other song writers and publishers,
[15] like Sony for example, would then know how much we guaranteed
[16] to Universal. Or EMI would know or whatever.
[17] THE COURT: And your reasons for preferring that they
[18] not know are what?
[19] MR. FITZPATRICK: We just prefer to keep our dealings
[20] with individual affiliates confidential, your Honor, so that
[21] they don't all know each other's business.
[22] THE COURT: No more than that.
[23] MR. FITZPATRICK: No more than that, your Honor.
[24] THE COURT: Hmm?
[25] MR. FITZPATRICK: No, no more than that, your Honor.

Page 237

[1] THE COURT: Well, this is a public proceeding
[2] affecting various aspects of public business and you're
[3] offering this so that I will rely on it in reaching a decision.
[4] MR. RICH: Indeed.
[5] THE COURT: And I'm expect to be candid about --
[6] MR. SALZMAN: Excuse me. May I join the conference,
[7] your Honor?
[8] THE COURT: Sure.
[9] And I'm expected to be candid about my reasons and the
[10] facts underlying them and --
[11] MR. FITZPATRICK: Your Honor, I have been given
[12] permission to waive it, if that makes life easier. I just got
[13] it, so.
[14] THE COURT: You waive the confidentiality?
[15] MR. FITZPATRICK: I do. Yes, your Honor.
[16] THE COURT: Good. You can use the numbers.
[17] MR. RICH: Thank you very much.
[18] THE COURT: I think it is preferable that you do in a
[19] public court.
[20] MR. RICH: Thank you.

Page 238

[1] (In open court)
[2] BY MR. RICH:
[3] Q. Mr. O'Neill, come back to RX 32 for a moment, please?
[4] A. Yes.
[5] Q. Am I correct that the amounts of the annual guarantees
[6] provided to Universal by BMI for 2008 was the sum of $600,000?
[7] A. Correct.
[8] Q. 2009 a sum of $625,000? And for 2010 the sum of $650,000?
[9] A. That's correct.
[10] Q. And so that the relative ratio between the pre-existing
[11] levels of royalties attributable to DMX which had been earned
[12] by Universal of $106,000 represented roughly one sixth of the
[13] level of the annual guarantee made pursuant to this document?
[14] A. Yes, that is correct.
[15] Q. Thank you.
[16] Now, let's do some more math, please, and we can use
[17] as an aid this second demonstrative which is titled: Expected
[18] Universal Royalties Under BMI Best Case Scenario.
[19] Do you have that?
[20] A. Yes, I do.
[21] Q. And if you need a calculator at any point, let me know,
[22] otherwise I have done the math. But, you are free to check.
[23] Assuming that all of DMX' approximately 77,000
[24] locations as of the fourth quarter of 2007 were to be licensed
[25] by BMI or had been licensed by BMI at the fee level which BMI

Page 239

[1] seeks, $36, approximately, a location, by my math that would
[2] generate in royalty income to BMI approximately $2.8 million
[3] for the year.
[4] Do you accept that?
[5] A. That premise, yes.
[6] Q. Yes.
[7] A. I believe at the time, though, they had about a hundred
[8] thousand locations based on the e-mail we had from Ann Sweeney.
[9] The deal offer that DMX made to Sony listed their locations at
[10] a hundred thousand.
[11] Q. Okay. We can redo the math simultaneously if you would
[12] like?
[13] A. No.
[14] Q. Let's stay with the 77 and we can up it by whatever amount,
[15] okay?
[16] On the premise that that was the actual accounting
[17] time that would generate about $2.8 million to BMI, second line
[18] of the demonstrative, yes?
[19] A. Yes. The math works, yes.
[20] Q. Now, you testified earlier that BMI takes anywhere from 17
[21] to 20 percent off for expenses so I took the more conservative
[22] 17 percent figure off the top from the $2.8 million best case?
[23] A. Okay.
[24] Q. Which would leave about $2.3 million available for
[25] distribution on account of DMX performances?

Page 240

[1] A. Okay.
[2] Q. Now, that would be both to writers and to publishers,
[3] correct?
[4] A. That is correct.
[5] Q. And so BMI will not, as a matter of practice, ever --
[6] ever -- distribute less than 50 percent of such a sum to its
[7] writers; is that correct?
[8] A. Out of every dollar, yes, 50 cents gets allocated to.
[9] Q. So, out of every $2.3 million it will never distribute less
[10] than $1.15 million or half that sum to writers, correct?
[11] A. Yes, that's our practice.
[12] Q. So, I have deducted that and that would leave you a
[13] publisher share available for distribution to all participating
[14] publishers of $1.15 million, is that correct?
[15] A. Yes.
[16] Q. Now, we earlier established that Universal's share of the
[17] 70 percent share held by the four majors was about 29 percent.
[18] Do you recall that?
[19] A. Yes.
[20] Q. And therefore of the total universe of dollars if you took
[21] 29 percent of 70 percent you would be at 20 percent of total
[22] publisher distributions, correct?
[23] A. Again, with -- yes, wasted on your representation.
[24] Q. Sounds right, yes?
[25] So, if you took 20 percent which would be Universal's

Page 241

[1] rightful share of the maximum anticipated income if you earned
[2] the full $36 against an available $1.15 million, by our math
[3] you come down to a grand total of $230,000, correct?
[4] A. Under your example, yes.
[5] Q. Yes.
[6] And the 2008 guarantee to Universal which was the
[7] lowest of the three years was $600,000, correct?
[8] A. That is correct.
[9] Q. And so, that's not yet even half of the guaranteed sum
[10] under your best case, is that correct?
[11] A. This isn't our best case. This wasn't how we figured it
[12] out.
[13] Q. Okay.
[14] But, this would be the math, would it not, if you
[15] achieved $36.36 from Universal? $36?
[16] What is incorrect about how this?
[17] A. I think this mathematically works correctly.
[18] Q. Now, BMI needed to get its board approval for this
[19] transaction, is that correct?
[20] A. Yes, it is.
[21] Q. This wasn't an everyday transaction, was it?
[22] A. A guarantee, I think, always needs board approval.
[23] Q. And in connection with that board approval --
[24] THE COURT: Mr. Rich, I'm not sure whether you are
[25] through with this point but I have already lost track of what

Page 242

[1] you are going to ask me to conclude from it. Is it that BMI
[2] contemplated if it attained the $36 per location figure that it
[3] would recover a great deal more than it was guaranteeing?
[4] Under this arrangement?
[5] MR. RICH: No. As the next --
[6] THE COURT: What comparison are you going to draw to
[7] what point?
[8] MR. RICH: As the next five minutes I think will
[9] demonstrate, your Honor, there was a presentation and a series
[10] of representations made to the BMI board that were inaccurate
[11] in terms of BMI's expectation as to recoupment and I will leave
[12] it to your Honor to conclude as to the relevance of it. It
[13] seemed to us and it seems to us to be strong evidence that BMI
[14] was going to throw as much money at stopping a second major
[15] publisher from entering into a direct license as it needed to
[16] irrespective of any realistic probability of recovery to the
[17] point of, etc.
[18] Let me just finish the examination.
[19] THE COURT: As long as I understand the overarching
[20] point. You may proceed.
[21] BY MR. RICH:
[22] Q. If you would turn back to what's already in evidence as RX
[23] 31, please?
[24] A. Yes, sir.
[25] Q. I take it that a memorandum was prepared for a committee of

Page 243

[1] the board to approve the guarantee arrangement?
[2] A. Yes, it was.
[3] Q. Do you recognize RX 31 as that documentation?
[4] A. I do.
[5] Q. And it went to a committee of the board whose initials are
[6] the PRRC, is that correct?
[7] A. That is correct.
[8] Q. For the record, what is the PRRC?
[9] A. I don't quite know what the initials stand for. Performing
[10] rights royalty committee potentially?
[11] Q. Okay. And I take it this is the board committee to which a
[12] guarantee of a request of this sort is directed?
[13] A. Correct.
[14] Q. In the middle of the first page of this document under
[15] history of prior guarantees and earnings, do you see that?
[16] A. Yes, I do.
[17] Q. In fact, there was no history of prior guarantees for
[18] Universal, was there?
[19] A. It listed last guarantee amount zero.
[20] Q. Yes.
[21] A. Yes.
[22] Q. The history was that they were like any other publisher,
[23] they lined up and got their share of distributions in the
[24] ordinary course, correct?
[25] A. That is correct.

Page 244

[1] Q. Such that in the second quarter '06 to the first quarter
[2] '07 that amount as reported here was $359,613, correct?
[3] A. That is correct.
[4] Q. And, am I correct that that number in fact representing
[5] earnings is not simply from DMX but from roughly 200 music
[6] publishing -- pardon me commercial music services?
[7] A. Correct.
[8] Q. As we discussed earlier. Okay.
[9] Indeed, if you turn to the second page of this which
[10] is the board memorandum of justification, it is pointed out in
[11] the third paragraph, is it not, "it is important to note that
[12] the earnings listed above are comprised of DMX and some smaller
[13] background music services."
[14] Do you see that?
[15] A. Yes, I do.
[16] Q. And then it goes on: But on a going forward basis BMI will
[17] be breaking out DMX as its own line item on our royalty
[18] statements.
[19] Correct?
[20] A. That is correct.
[21] Q. Now, this memorandum doesn't anywhere say, however, to the
[22] board, does it, that solely 27 percent of three hundred 59
[23] thousand some odd dollars is represented by DMX. It didn't
[24] quantify it, did it?
[25] A. No, it did not.

Page 245

[1] Q. To your knowledge, was the board otherwise notified about
[2] that, about that percentage, the $359,000, what it represents?
[3] A. I don't have that knowledge.
[4] Q. Now, the memo goes on in the same paragraph that I was just
[5] quoting from to advise the board that if BMI prevails in what
[6] is now this litigation and receives a rate at its requested
[7] $36.36, then, quote: It is likely that the Universal earnings
[8] will more than triple and the expected return on the guarantee
[9] when all retroactive periods are applied would be in the 75 to
[10] 100 percent range.
[11] Do you see that?
[12] A. Yes, I do.
[13] Q. But, if you look back at the last demonstrative here, under
[14] BMI's $36.36 scenario, based on the assumptions underlying this
[15] at least, the most that Universal could have hoped to achieve
[16] was some $230,000, correct?
[17] A. Under your demonstrative?
[18] Q. Yes?
[19] A. That's correct.
[20] Q. And if we did the math for a hundred thousand locations
[21] instead I will indicate that the number would be instead of
[22] $230,000, $300,000 or barely 50 percent of the first year
[23] guarantee, correct?
[24] A. Yes. Under your demonstrative, that's correct.
[25] Q. Under our demonstrative, okay.

Page 246

[1] So, when you advised the board that on the assumption
[2] that BMI would achieve, if BMI prevails in your words here,
[3] prevails in the rate court proceeding and in the appeal, the
[4] result you say is that it is likely that Universal's earnings
[5] will more than triple, meaning from $12 to $14 to $36?
[6] A. More than triple. It could go to $49 at this point in
[7] time. We were debating whether to use the ASCAP high end.
[8] Q. You don't say more than four or five or six times, you say
[9] more than triple; right?
[10] A. Which means more than three times.
[11] Q. Okay. I'm not going to quibble about that. But, the fact
[12] of the matter is you testified for the last two days here,
[13] didn't you, and the record is replete with evidence saying that
[14] when asked by publishers you said compare $12 to $14 to $36
[15] which is the prevailing established rate in the industry, that
[16] is a more than tripling we are looking to get from DMX.
[17] You didn't say to those publishers we are looking for
[18] $49, did you?
[19] A. No. I said that we are looking at the established blanket
[20] rate which is in the market and which is more than three times
[21] what DMX is currently paying.
[22] Q. Can you cite to single commercial music services entity
[23] ever that BMI was getting more than $49 from per location?
[24] Music Choice? Any of those?
[25] A. No, I can't.

Page 247

[1] What I said was that we were modeling numbers for the
[2] direct -- for the adjustable fee blanket license that exceeded
[3] $36.36.
[4] Q. You didn't say that to the board?
[5] A. No, we didn't. We just said more than three times.
[6] Q. Yes, $12 to $36; correct?
[7] A. More than three times.
[8] Q. You didn't say more than four or five or six times, did
[9] you?
[10] A. No, I did not.
[11] Q. No.
[12] So you think your math was good to the board, yes?
[13] A. Yes, I do.
[14] Q. And you believe at the time this memo went to the board,
[15] based on everything you knew about the levels of historic
[16] distributions that Universal had achieved, based on your best
[17] case outcome in a rate court case, based on how BMI distributes
[18] monies, based on its knowledge that DMX represented only 27
[19] percent of all publisher line distributions and that if you did
[20] that math, even assuming a hundred thousand DMX locations the
[21] most that Universal would ever see, best case, is $300,000,
[22] that your representation to the board that it was likely that
[23] Universal's guarantee would be recouped to the 75 to 100
[24] percent range was fair and accurate, yes?
[25] MR. FITZPATRICK: Object. That misstates his

Page 248

[1] testimony. Each of the premises that he just gave was not
[2] consistent with the witness' testimony, your Honor.
[3]     THE COURT: Was not?
[4]     MR. FITZPATRICK: It was not. That was not the
[5] witness' testimony, your Honor. All of the numbers that
[6] Mr. Rich just gave were not -- the hypothetical is not
[7] consistent with the witness' testimony.
[8]     The witness' testimony was that they were not looking
[9] at $36.36 per location; and that's the premise of the question.
[10]    THE COURT: Yes. The question asks you to accept the
[11] premises not in your own view but in the view that he takes of
[12] the matter.
[13]    THE WITNESS: In the view that Mr. Rich lays out here
[14] I don't know if I would say that it -- again, he doesn't have
[15] any retroactive periods which this note has also in it. The
[16] note to the board has that when all retroactive periods are
[17] applied the recoupment would be in 75 to 100 percent range. I
[18] don't see that in Mr. Rich's demonstrative so I don't think it
[19] is comparing apples and apples.
[20] BY MR. RICH:
[21] Q. How would any retroactive year, pick any one you want, how
[22] would the math come out dramatically different than what is on
[23] the demonstrative?
[24] A. If you look at 6,000 the 27 percent from this analysis
[25] would translate to Universal. And if you increased that by

Page 249

[1] three times, that's at least $300,000 a year. There is two and
[2] a half years open where DMX would pay a blanket rate under
[3] their scenario from 2005 to the end of 2007 which would add to
[4] your numbers, an additional three, six, almost $850,000 on top
[5] of that. So, that's why we would still have to get fees for
[6] that period of time as we testified yesterday in the AFBL
[7] quote. We suggested that they just take the $36.36 rate for
[8] those two and a half years.
[9] Q. You also testified that it is possible that you had gotten
[10] $49 or something like that, yes?
[11] A. I said it was something BMI was exploring and modeling
[12] internally as a potential rate quote.
[13] Q. That was not communicated to the board, was it?
[14] A. No, it was not.
[15] Q. Now, BMI hadn't offered the composers whose BMI works are
[16] represented by Universal, the same terms that were offered to
[17] Universal, has it?
[18] A. No, we have not.
[19] Q. So that if the Universal advance were not to earn out the
[20] effect would be, would it not, that per performance by DMX of
[21] BMI works Universal would have received a greater sum than the
[22] maximum 50 percent which BMI's operating rules call for,
[23] correct?
[24] A. Under that scenario, yes, that would happen.
[25] Q. Was that discussed with the board?

Page 250

[1] A. No, it was not.
[2] Q. I take it that BMI has told Warner/Chappel that it stands
[3] ready to consider a similar accommodation to that accorded to
[4] Universal if and when requested by Warner/Chappel, is that
[5] correct?
[6] A. That is incorrect.
[7] Q. We will discuss that with Ms. Smith who had something to
[8] say on that subject.
[9]     All of this activity, I take it, the payment of what
[10] Mr. Arrow from Universal called an extraordinary guarantee at
[11] his deposition in this case, all of this occurred, I take it,
[12] on account of the direct line activities of a single BMI
[13] licensee, DMX, that represents less than three tenths of one
[14] percent of BMI's annual revenues, is that correct?
[15] A. DMX requested it from Universal. Universal contacted BMI
[16] to see if we could match it and that's how it started. In
[17] terms of DMX' overall fees compared to total revenues, I will
[18] take your representation that it is about 3 percent, if that.
[19] Q. Notwithstanding their small scale, this was a very
[20] important plugging of the dike, wasn't it, for BMI?
[21] A. I don't consider it a plugging of the dike, I consider it
[22] responding to a publisher that has requested something from
[23] BMI -- a major publisher and one of our biggest customers.
[24] Q. Pay an extraordinary guarantee, yes?
[25] A. Matching what they've been offered by an outside entity.

Page 251

[1] They say this is what they believe my catalog is worth, why
[2] won't you --
[3] Q. Which two months earlier you declined to do as another
[4] major, Sony?
[5] A. And I believe we declined Sony conveyed that $2.71 million
[6] guarantee or the $1.3 million publisher was both -- I mean was
[7] BMI only. We couldn't come close to that. We subsequently
[8] found out that that was for BMI and ASCAP. I think if it was
[9] BMI only we may have come close to it, Mr. Rich.
[10] Q. So, the fact as you write in the fourth paragraph of the
[11] board memo that, quote: More and more publishers are being
[12] asked by DMX to directly license. We have been notified that
[13] at least one major publisher has entered into a direct license
[14] with DMX and has accepted the guaranteed payment from DMX
[15] wasn't what made the decision to extend this extraordinary
[16] guarantee, right?
[17] A. It was the fact that we felt we could compete in this level
[18] and get a return on the investment.
[19] Q. And so, as you further write, quote: Assuring that BMI
[20] licenses in this market is important was not a factor or
[21] significant factor in extending this extraordinary guarantee,
[22] right?
[23] A. No. Again, I believe we should have a license in this
[24] genre.
[25] Q. And having the ability to license Universal's music to help

Page 252

[1] solidify BMI's position not only for this negotiation but for
[2] the background music industry as a whole also wasn't a major
[3] consideration, huh?
[4]  A. It was a consideration, yes.
[5]   MR. RICH: I have nothing else, your Honor. Thank you
[6] very much.
[7]   THE COURT: Thank you, Mr. Rich.
[8] REDIRECT EXAMINATION
[9] BY MR. FITZPATRICK:
[10]  Q. Hello again, Mr. O'Neill.
[11]  A. Good afternoon.
[12]  Q. If we could start where we left off with the Sony and
[13] Universal guarantees?
[14]   I just want to be clear. in both cases what BMI was
[15] being asked was to match a proposal that DMX had made to those
[16] two entities; correct?
[17]  A. That is correct.
[18]  Q. And during your cross-examination we looked at some of the
[19] spreadsheets that you had put together, particularly in
[20] connection with the Sony guarantee request, correct?
[21]  A. That is correct.
[22]  Q. Now, the proposals that you were being asked to match, were
[23] those $25 royalty pool proposals or were those proposals by DMX
[24] to those publisher of guaranteed money?
[25]  A. They were guaranteed money.

Page 253

[1]  Q. And do you recall the amount of the guarantee? How was
[2] that guarantee calculated by DMX?
[3]  A. I believe it was calculated at one and a half times what
[4] BMI was paying the entity.
[5]  Q. So, when you were thinking about whether or not to match
[6] those offers to Sony and -- to Sony and Universal that DMX had
[7] made, were you thinking of those offers as $25 royalty pool
[8] offers? Or were you thinking of those offers as offers of 150
[9] percent of what BMI had been paying in the past?
[10]   MR. RICH: Objection. Leading, your Honor.
[11]   THE COURT: Overruled.
[12]  A. I was initially thinking of what the actual number was, how
[13] did they arrive at the number which was one and a half times.
[14] I didn't even know the Sony license had a $25 concept in it
[15] until I got it about, very recently under the interim
[16] agreement.
[17]  Q. Okay. Let's talk briefly. You were asked a few questions
[18] on cross-examination about a TruSonic amendment. Do you recall
[19] that?
[20]  A. Yes, I do.
[21]  Q. And you specifically discussed whether or not there have
[22] been any incremental cost to BMI as a result of that amendment?
[23]  A. Yes.
[24]  Q. Now, has TruSonic actually sought to exclude any locations
[25] under that agreement, to your knowledge?

Page 254

[1]  A. No, they haven't.
[2]  Q. And, has BMI done any monitoring in connection with that
[3] amendment other than the usual monitoring that it does as part
[4] of its business?
[5]  A. No, we haven't.
[6]  Q. So, have there been any incremental costs whatsoever to BMI
[7] as a result of the TruSonic amendment?
[8]  A. No, there hasn't.
[9]  Q. You were asked a few questions about the 17 percent
[10] domestic overhead rate. Do you recall that?
[11]  A. Yes, I do.
[12]  Q. And I just want to be clear, is the 17 percent overhead
[13] rate applied to the entire commercial music service industry?
[14]  A. Yes, it is.
[15]  Q. And, in fact, with respect to every domestic dollar that
[16] BMI receives, does it apply a 17 percent or higher overhead
[17] rate to those dollars?
[18]  A. Yes, it does.
[19]  Q. If you could take a quick look at tab 8 which was the
[20] demonstrative incremental costs.
[21]  A. Yes.
[22]  Q. And you were just asked a few questions about there being
[23] multiple departments represented on here so I just want to be
[24] clear about that. What are the two departments that are
[25] represented on here?

Page 255

[1]  A. Licensing and performing rights.
[2]  Q. And the performing rights people, as Mr. Rich pointed out,
[3] do not report to you, correct?
[4]  A. They do not.
[5]  Q. Who they report to?
[6]  A. Alison Smith.
[7]  Q. Do the licensing people report to you?
[8]  A. Yes, they do.
[9]  Q. And if we can be clear about the chart, the new hire on the
[10] first row, will that be a licensing -- will that person report
[11] to you?
[12]  A. Yes, they will.
[13]  Q. And in the second row, Kwasnik and Steinberg report to you,
[14] correct?
[15]  A. Correct.
[16]  Q. And Tortora and Hunke report to Smith and the Smith is a
[17] reference to Alison Smith?
[18]  A. That is correct.
[19]  Q. Under the next row, the per-program supervisor and new hire
[20] and Steinberg are all licensing people?
[21]  A. They are.
[22]  Q. And then the Smith, Tortora and Hunke are performing rights
[23] but are there any dollars claimed for those people?
[24]  A. No, there aren't.
[25]  Q. And then in the following row are all of the entrants other

Page 256

[1] than Smith, Tortora and Hunke, licensing people who would
[2] report to you?
[3] **A.** They are.
[4] **Q.** And, again, is any money requested for Smith, Tortora and
[5] Hunke?
[6] **A.** No, they're not.
[7] **Q.** And the same thing with the next row, Smith, Tortora and
[8] Hunke are performing rights people and, again, no money is
[9] requested, correct?
[10] **A.** That is correct.
[11] **Q.** I think in discussing this chart before you mentioned the
[12] per-program license. Does BMI have a per-program department?
[13] **A.** Yes, we do.
[14] **Q.** Who does that department report to?
[15] **A.** Michael Steinberg.
[16] **Q.** And who does Mr. Steinberg report to?
[17] **A.** Myself.
[18] **Q.** When was that department created?
[19] **A.** That was -- actually, when I joined BMI in December of '94
[20] we had a per-program department already up and running and that
[21] was for the interim local television per program.
[22] **Q.** And how many people are currently in that department?
[23] **A.** I believe there are five people in that department.
[24] **Q.** Has your experience with that department factored in, in
[25] any way, to the creation of the estimates on this chart?

Page 257

[1] **A.** Yes, it has.
[2] **Q.** Could you explain that?
[3] **A.** I was there when in '94 I took over responsibility for the
[4] television per-program department right when we went to a new
[5] form of per program. We also went from three people to five
[6] people at that point in time to handle the workload involved.
[7]     I just know from -- I think I may have said this
[8] yesterday -- in dealing with a license agreement while it might
[9] appear black and white in reality of administering that license
[10] it is never as clear cut as it seems. There are disputes all
[11] the way through, especially with the new license. I will say
[12] that the man-hours spent on the early days of per program were
[13] tremendous. And today it is not nearly as intensive as when it
[14] first started but it is still requires five people to
[15] administer.
[16] **Q.** Okay, last topic.
[17]     I think Mr. Rich spent some time with you establishing
[18] the fact that Play Network paid license fees in the final year
[19] of the contract that worked out to $24.77 per location,
[20] correct?
[21] **A.** I think it was $24.75.
[22]
[23] **Q.** $24.75. If that's not what I said, I apologize.
[24] **A.** It is burned in there now.
[25] **Q.** As Mr. Rich established, that was because Play Network grew

Page 258

[1] by more than 8 percent in each year of the correct, correct?
[2] **A.** That is correct.
[3] **Q.** In fact, if you take a look at tab 5 quickly, just to put a
[4] number on it, if you can look at the very last row on page 15,
[5] could you give the actual numerical growth that Play Network
[6] had over the term of the agreement?
[7] **A.** Yes. They started the agreement with 11,017 locations and
[8] they've ended the agreement with 32,595 locations.
[9] **Q.** And you have testified in fact that it was reasonable for
[10] Play Network to pay a fee that worked out to $24.75 in the last
[11] year of the agreement, yes?
[12] **A.** Yes. In year five of the agreement that's what it called
[13] for.
[14] **Q.** Now, did DMX grow during the course of the 2004 to 2009
[15] time period?
[16] **A.** My understanding is they actually lost locations.
[17] **Q.** I think you also testified that it would be reasonable to
[18] give DMX a license on the same -- with the same economic
[19] parameters as the license given to Play Network, correct?
[20] **A.** That is correct.
[21] **Q.** And could you explain what you mean by that?
[22] **A.** Yes. I would offer him the same form agreement --
[23] **Q.** I'm sorry?
[24] **A.** -- as I offered to Play Network or Music Choice or
[25] TruSonic.

Page 259

[1] **Q.** And what would the result of that agreement have been for
[2] DMX?
[3] **A.** They effectively, using rough math, they would have been
[4] well north of the $36.36.
[5] **Q.** And what is your actual offer to DMX in this proceeding?
[6] **A.** Just to cut it off at $36.36.
[7]     **MR. FITZPATRICK:** Thank you. I have no other
[8] questions.
[9]     I did have one administrative matter, your Honor. On
[10] direct I was notified by the court reporter I identified an
[11] exhibit as tab 14. I failed to point out that it was
[12] Petitioner Exhibit 0126. It had been received but I didn't
[13] properly identify it.
[14]     **THE COURT:** If a given location of one customer is
[15] fairly priced at $25 a year, why isn't a given location of
[16] another customer also fairly priced at $25 a year even though
[17] the other business arrangements, the history of how the $25 was
[18] reached at is different between the two customers?
[19]     **THE WITNESS:** I think this form agreement, you kind of
[20] have a bell curve, if you will. At the low end of the bell
[21] curve you have the $24.75. At the high end I think Mr. Rich
[22] showed us some numbers around $500 or $600 per location. The
[23] average fee over that term ended about $34.52. I think if --
[24] when we originally did this agreement we were going to have
[25] customers on all different ends of it being that the base was

Page 260

[1] laid and we wouldn't ever receive less money that we've
[2] negotiated in that first contract here. It was only what was
[3] the value of that incremental dollars to that license.
[4] So, when I looked at it and when I reviewed this, your
[5] Honor, I looked at it as a bell curve saying, yes, we have some
[6] customers down here but we have some here, where is the
[7] majority of them.
[8] THE COURT: Thank you.
[9] MR. FITZPATRICK: May Mr. O'Neill be excused, your
[10] Honor?
[11] MR. RICH: I have no recross, your Honor.
[12] THE COURT: Thank you, Mr. O'Neill. You are excused.
[13] THE WITNESS: Thank you very much, your Honor.
[14] MR. FITZPATRICK: Should we move directly to our next
[15] witness, your Honor, or would you like to take a break, first?
[16] THE COURT: I take it that the short summary of that
[17] answer, Mr. O'Neill, is that the fact that one given location
[18] might be priced at $25 does not mean that all locations should
[19] be priced at $25.
[20] THE WITNESS: That is correct.
[21] THE COURT: Because of the other provisions of release
[22] that result in quite different prices under other circumstances
[23] covered by the lease?
[24] THE WITNESS: That is absolutely correct.
[25] THE COURT: Thank you.

Page 261

[1] THE WITNESS: Thank you, your Honor.
[2] THE COURT: Were you suggesting, do you want a recess
[3] now?
[4] MR. FITZPATRICK: I could call the next witness or if
[5] we are going to take a short break we can take it right now.
[6] Whatever is convenient.
[7] THE COURT: Normally I take it about half an hour
[8] later are but if for some reason you want to do it now, you
[9] can.
[10] MR. FITZPATRICK: No, we can get started now.
[11] THE COURT: Okay.
[12] (Continued on next page)

Page 262

[1] MR. FITZPATRICK: Your Honor, for our next witness BMI
[2] calls Mr. Thomas Annastas.
[3] THOMAS ANNASTAS,
[4] called as a witness by the Plaintiff,
[5] having been duly sworn, testified as follows:
[6] THE DEPUTY CLERK: Please state your name and spell
[7] your last name slowly for the record.
[8] THE WITNESS: My name is Thomas Annastas,
[9] A-n-n-a-s-t-a-s.
[10] MR. FITZPATRICK: Your Honor, may I approach with a
[11] binder of exhibits?
[12] THE COURT: Sure.
[13] DIRECT EXAMINATION
[14] BY MR. FITZPATRICK:
[15] Q. Good afternoon, Mr. Annastas.
[16] A. Good afternoon.
[17] Q. Are you currently employed by BMI?
[18] A. Yes.
[19] Q. Where are you located at BMI?
[20] A. In Nashville, Tennessee.
[21] Q. How long have you been with BMI?
[22] A. 37 years.
[23] Q. And currently, what's your position at BMI?
[24] A. Vice president of licensing.
[25] Q. What do you do as vice president of licensing?

Page 263

[1] A. I oversee the sales and marketing area for licensing in
[2] both the media and the general licensing areas.
[3] Q. And what is the general licensing area at BMI?
[4] A. General licensing area handles approximately 30 industries.
[5] It's everything from hotels, symphonies, colleges, restaurants,
[6] bars, nightclubs, retail I could go on from there.
[7] Q. Could you give a rough estimate of how many general
[8] licensees BMI has?
[9] A. Approximately 70,000 licensees, which actually includes
[10] about 100,000 locations.
[11] Q. And what's BMI's approximate annual revenue in total from
[12] these general licensees?
[13] A. About $104 million.
[14] Q. Does BMI offer general kinds of -- is there just one kind
[15] of general license or does BMI offer different kinds of general
[16] license?
[17] A. There's basically a form license agreement for each
[18] industry. There's one for hotels, there's one for restaurants,
[19] bars and nightclubs, retail and so forth.
[20] Q. If you could take the binder that I've given you and turn
[21] to tab 1, please. And there is a document at tab 1 which is
[22] Joint Exhibit 0780. If you could take a look at that and
[23] identify it, please.
[24] A. It's the license agreement that we negotiated with the
[25] American Hotel Association that we offer to hotels and motels.

Page 264

[1] Q. And what is the American Hotel Association?
[2] A. The American Hotel & Lodging Association represents most of
[3] the hotels in the country, and they, as representation they
[4] negotiate this license and other things for their members.
[5] Q. Now, what types of music use does this license at tab 1
[6] cover?
[7] A. It covers live and recorded music.
[8] Q. And how many, about how many hotels have signed this
[9] license?
[10] A. About 4500 hotels.
[11] Q. Now, you mentioned that this was negotiated with the AHLA.
[12] Who negotiated it on BMI's behalf?
[13] A. On BMI's behalf it was Mike Steinberg and myself.
[14] Q. And when did those negotiations occur?
[15] A. This last agreement was 1999 and it self renews every year.
[16] Q. Could you just generally describe those negotiations? What
[17] were they like?
[18] A. The Hotel Association had a negotiating committee, and they
[19] had representations from everything from the casinos all the
[20] way down to the smaller hotels, and they probably lasted
[21] approximately two and a half to three years.
[22] Q. Was the fee one of the terms that was negotiated?
[23] A. Absolutely. The fee was probably the biggest part of the
[24] negotiation at the time that we started negotiations. At the
[25] time we started negotiations we wound up being paid less than

Page 265

[1] ASCAP and our commitment to them was to get parity with ASCAP.
[2] Q. Are there other situations where BMI negotiates direct
[3] licenses with industry associations analogous to the AHLA?
[4] A. Yes.
[5] Q. Could you give some examples of those?
[6] A. The symphony area. The American Symphony Orchestra League
[7] negotiated a license with us. Colleges represented by NACUBO
[8] and ACE, that's a negotiated licensing. The Bowling
[9] Proprietors Association, North American Concert Promoters
[10] Association, and there's probably at least a dozen more.
[11] Q. Does BMI have a preference between negotiating with a
[12] industry-wide group like that versus developing a license on
[13] its own without negotiation?
[14] A. We reach out to every association that we possibly can and
[15] when we reach out to them, the first thing we ask for them is
[16] to negotiate a license, and we've been doing that for quite a
[17] few years.
[18] Q. Why does BMI do that?
[19] A. It's more favorable for both sides that if we have a
[20] negotiated rate all of their members would understand the
[21] agreement, they'd help us educate and it's a win-win for both
[22] sides.
[23] Q. If you could turn to page 3 of tab 1, and you see there's a
[24] Schedule A, a Schedule B and Schedule C there.
[25] A. Okay. Yes.

Page 266

[1] Q. And if you could just using those schedules briefly
[2] describe for his Honor how the fee would be calculated under
[3] this license for a hotel.
[4] A. Schedule A basically deals with the live music and
[5] entertainment of the hotel. So if a hotel had live music for
[6] the year 2009, they would tell us how much entertainment cost
[7] they had spent, and, for example, if it was $100,000, you'd go
[8] down the bracket of annual live music and entertainment cost,
[9] you see it says 100,000 to 119,999.99, and their annual fee for
[10] music alone would be $3,582.
[11] Q. How about an example where a hotel had no live music at all
[12] but just played let's say recorded music in the lobby, for
[13] example? How would their fee be calculated?
[14] A. Their fee would be calculated on Schedule B. It says
[15] recorded music only fee, no live music performed. So, for
[16] example if the hotel had 115 rooms, it's based on the number of
[17] rooms. You would go and the second bracket is 101 to 300
[18] rooms, and you'd go across, it says 2009 without AV and their
[19] fee would be $401.
[20] Q. What's the without AV refer to?
[21] A. Audio visual, if they didn't have TV's in their lobby or
[22] whatever.
[23] Q. Now, just to be clear, if a hotel gets the only music that
[24] it uses from a commercial music service like DMX, do they need
[25] this license?

Page 267

[1] A. No.
[2] Q. How is the hotel licensed if they get their music solely
[3] through a commercial music service?
[4] A. If it was DMX, DMX would not only supply the music, but
[5] they would supply the coverage of the license agreement with
[6] BMI and they would pay us, the average would be $36.36.
[7] Q. Not for DMX currently, but under the final commercial music
[8] services agreement?
[9] A. Yes.
[10] Q. If you could take a look at tab 2 of the binder, please.
[11] And this is Joint Exhibit 0781. If you can take a look at that
[12] and identify it, please?
[13] A. It's a license agreement for the restaurant, nightclubs and
[14] bars. It's called the music license for eating and drinking
[15] establishments.
[16] Q. And about; how many restaurants, nightclubs and bars have
[17] signed this license with BMI?
[18] A. Since its interception probably well over 70,000.
[19] Q. And again, what types of music use that restaurants
[20] nightclubs and bars might make does this license agreement
[21] cover?
[22] A. Both live and recorded.
[23] Q. Do different types of music use get different rates under
[24] this agreement?
[25] A. Yes. If you look at the calculation page on page 3, it

Page 268

[1] starts off just like the other one with live music only, and
[2] it's based on the frequency of music per week, frequency of
[3] live music per week, and it's also based on rate per year per
[4] occupant. So if the restaurant has a band playing three nights
[5] a week, you basically go down to that first schedule and the
[6] rate would be $4.35 and if they --
[7] Q. Can I just ask you, I just want to make sure we're
[8] following. You're in the live music box?
[9] A. Yes, first category.
[10] Q. Multiple singers, instrumentalists?
[11] A. Yes, I am.
[12] Q. I'm sorry, go ahead. I just wanted to make sure where you
[13] were.
[14] A. You're in the multiple singer instrumentalists because
[15] you're a band, four or five members. Because it's three
[16] nights, it would go to the category of two to four nights and
[17] the rate there is $4.35. If they had a hundred occupants in
[18] their restaurant as an established fire occupancy code you
[19] would multiply the hundred times $4.35 and they pay us $435 a
[20] year if they had no other music used.
[21] Q. Now, the hotel agreement didn't use a per occupant rate,
[22] correct?
[23] A. No, it was based on entertainment cost.
[24] Q. And what's the metric for the hotel agreement for recorded
[25] music only?

Page 269

[1] A. Recorded music, it's the number of rooms.
[2] Q. So why the difference? Why use occupants for a restaurant
[3] and rooms for a hotel?
[4] A. I think part of what a restaurant has is a fire occupancy,
[5] so based on the fire occupancy that they have, it's an
[6] established code that we know exactly how many the restaurant
[7] can have within their restaurant, and when we talk to the
[8] industry, they thought it was a good indication of how many
[9] people would be in and out of the place.
[10] Q. If you could, again, back on page 3 of the restaurant
[11] agreement at tab 2, I think you took us through a live
[12] entertainment example, but could you do an example for a
[13] restaurant, that the only music it uses is recorded music?
[14] A. If you go to number 2, the second box, it says recorded
[15] music, and recorded music here is tapes, records, free play
[16] jukebox, DJ's, VJ's, CD's, or other digital music like iPods.
[17] And the rate there is $2.55 per occupant. If they have a
[18] hundred occupants, you'd multiply that out and it would be
[19] $2.55 times 100, which is $255. But if that's the only music
[20] used, the minimum fee on this license is $320.
[21] Q. And is there a reference to that minimum fee on this page?
[22] A. Yes. If you go down to right under category six or number
[23] six, it says annual minimum fee if over $320. Enter annual fee
[24] here. If less, 320 or less, enter annual minimum fee of $320.
[25] Q. And again, if the restaurant, if the only music that a

Page 270

[1] restaurant used was recorded music and it got all of that music
[2] from a commercial music service like DMX, would the restaurant
[3] need the license we've been looking at?
[4] A. No, they wouldn't.
[5] Q. Now, was this license agreement, the restaurant agreement,
[6] negotiated?
[7] A. No, it wasn't.
[8] Q. Why not?
[9] A. We had reached out to the National Restaurant Association
[10] and they weren't interested, but what we did was develop a rate
[11] structure and contact all of the state restaurant associations
[12] and we had a focus group that came in and took a look at the
[13] agreement, rate structure and had some input as to how they
[14] thought it would work better and helped us with some of the
[15] definitions for the members.
[16] Q. Did you incorporate any of their input?
[17] A. Yes, we did.
[18] Q. Does BMI currently have any arrangements with any of the
[19] state or national restaurant associations?
[20] A. We've currently got about 60 or 62 state association
[21] programs with them and we offer the state associations a
[22] discount for their members in exchange for them marketing and
[23] educating their members about BMI and the license agreement.
[24] Q. Are there any other industries where there's been an
[25] analogous situation that is not a negotiated license but focus

Page 271

[1] groups have come in?
[2] A. Yes. We've got the fitness industry. We've worked with
[3] them, one of the associations, is IRSHA, which is the
[4] International Racquet Sports and Health Association, and it's
[5] where all fitness center members took a look at this along with
[6] the executive director of the association.
[7] Q. Do the industry groups that we've been talking about
[8] provide any education functions on BMI's behalf?
[9] A. Yes, they do.
[10] Q. Could you explain that?
[11] A. Again, going back to these discount programs that we've
[12] developed with them, everything from their website has material
[13] on their website about BMI and that they can link directly to
[14] us so they know exactly how to explain BMI to their members.
[15] We've also developed Q and A's, FAQ sheets they can distribute
[16] directly to their members. We've done press, we've been
[17] invited to some of their board meetings and we've made
[18] presentations at the conventions whereby we can educate their
[19] members, but the bulk of the education comes from the
[20] association itself.
[21] Q. Why is that important to BMI, why is that education
[22] function?
[23] A. Again, copyright is a tough thing to understand as it is,
[24] and when you get down to these industries, whether it's a hotel
[25] or a restaurant or a fitness center, they really don't

Page 272

[1] understand copyright and understand performing rights either.
[2] So it's much better to educate them through the association,
[3] because it's a party that they believe in, they understand and
[4] it's in forms of education that they help present to their
[5] members.
[6] **Q.** If you could turn to tab 3, please, in your binder. And
[7] this is Joint Exhibit 0782. If you could take a look at that
[8] and identify it, please?
[9] **A.** This is the license agreement that was developed for the
[10] retail establishments.
[11] **Q.** And what kinds of establishments does BMI include within
[12] retail establishments?
[13] **A.** It ranges from department stores like Nordstrom's to
[14] Limited to beauty salons, any type of service situation.
[15] **Q.** What kind of music use by retail establishments does this
[16] license cover?
[17] **A.** It covers both live and recorded.
[18] **Q.** Can you estimate about how many retail establishments have
[19] signed this particular license?
[20] **A.** Probably around 6,000.
[21] **Q.** Now, was this license negotiated?
[22] **A.** No.
[23] **Q.** Why not?
[24] **A.** We reached out to the retail, National Retail Federation
[25] and the NFIB, which is the National Federation of Independent

Page 273

[1] Businesses, and they really had no issue that their members
[2] felt performing rights were important to them, so they had no
[3] interest in negotiating.
[4] **Q.** Can you turn to page 3 of the agreement?
[5] **A.** Okay.
[6] **Q.** And again, we have a license fee schedule. Maybe if you
[7] could just take the recorded music only example and explain to
[8] the Court how the fee would be calculated under this agreement.
[9] **A.** If we go to Schedule 1A and it says recorded music, one to
[10] nine locations, one to nine licensed retail premises, minimum
[11] fee of not less than the lowest class fee applies to each
[12] licensed retail premise. That means the smallest fee would be
[13] $207.24, if you go into the categories, but it's broken down
[14] into class and it's class 1 through 9.
[15]     The second category is total square footage of each
[16] licensed retail premise.
[17]     Third category is the annual license fee for audio
[18] only performances and then fourth category is annual license
[19] fee for audio visual performances. If you had a square footage
[20] of your store retail establishment about 4,000, you'd go to
[21] class 3 and it's 2501 to 5000 square feet. If you had audio
[22] only it would be $402.27.
[23] **Q.** And again, if the retail establishment got all its music
[24] from a commercial music service would it need this license?
[25] **A.** No.

Page 274

[1] **Q.** And how much would the commercial music service pay for
[2] that location if it had the last final agreement with the
[3] users?
[4] **A.** 36.36.
[5] **Q.** Why the disparity in rates from your perspective,
[6] Mr. Annastas?
[7] **A.** I think over the years the background music service has
[8] given us volumes of locations, and we gave them a volume
[9] discount.
[10] **Q.** And what's your view of that discount today, Mr. Annastas?
[11] **A.** I think over the years, things have changed, especially in
[12] the last decade with technology and how we do business at BMI,
[13] and all performing rights organizations, where I think
[14] technology has made it more readily available for us to get to
[15] these individual locations. So I think the difference in what
[16] we get directly is, it's ten times more in most instances, and
[17] I think that's more of a disparity than it should be.
[18] **Q.** If I could ask you to turn to tab 4 of the binder.
[19] **A.** Okay.
[20] **Q.** And we have there Joint Exhibit JX 0132. The Court has
[21] seen it before. If you could just identify that document,
[22] please?
[23] **A.** It's the license agreement with Muzak LLC.
[24] **Q.** Were you involved with the negotiation of this agreement?
[25] **A.** Yes.

Page 275

[1] **Q.** Who else was involved on both sides of the negotiation?
[2] **A.** From BMI it was Marvin Berenson, John Shaker and myself,
[3] and from Muzak it was Mike Zendan and Rod McCinnis of Abry.
[4] **Q.** How long did those negotiations last?
[5] **A.** From the first negotiation started in 1994 when the old
[6] agreement expired, and then we had the rate court action, so in
[7] reality, that itself, that period was about eight years, and
[8] then the last negotiation that brought this agreement to
[9] fruition was started in early 2002 after the rate court hearing
[10] ended.
[11] **Q.** And when did the negotiations culminate in an agreement?
[12] **A.** 2004.
[13] **Q.** What was BMI's goal in these negotiations with Muzak?
[14] **A.** I think that the key we were trying to get to was as close
[15] to parity with ASCAP.
[16] **Q.** What was the basis for that goal?
[17] **A.** ASCAP had paid 49.50 per location, and as Mike had
[18] testified before, we were getting anywhere between 10 and $12
[19] per location. We also had a per location rate on the
[20] off-premise, on the on-premise in the old agreement that was
[21] $20.50. So we actually thought that if we could increase the
[22] market share from the previous agreement, we should get closer
[23] parity with ASCAP.
[24] **Q.** When you say market share, what are you referring to?
[25] **A.** The amount of BMI music that was being played on commercial