Page 276

[1] music services.

[2] **Q.** I want to ask you a couple of questions about your specific
[3] role in these negotiations. Did you actually participate in
[4] in-person meetings?

[5] **A.** Yes, I did.

[6] **Q.** How about internal strategy sessions at BMI; did you
[7] participate?

[8] **A.** Absolutely.

[9] **Q.** Did you actually speak at any of the meetings?

[10] **A.** Yes, I did.

[11] **Q.** Were there times when you actually spoke directly to
[12] someone at Muzak without anyone being present at well?

[13] **A.** Yes.

[14] **Q.** Did your personal involvement in negotiations change over
[15] time?

[16] **A.** Yes. In the beginning I was, you know, early part I was
[17] probably more of an observer, and as time went on, and closer
[18] towards the last two years of dealing with this on and off, and
[19] depending on where the negotiations were and how they took
[20] place, but Marvin could be a lead, John Shaker might have been
[21] and then there were times that I was.

[22] **Q.** When agreement was finally reached, had BMI gotten
[23] everything that it wanted from these negotiations?

[24] **A.** I think it was a give and take on both parts, so I think it
[25] was a negotiation that was finalized and I think we got what we

Page 277

[1] could.

[2] **Q.** Was the rate, you mentioned a rate court case before. Was
[3] the rate court case actually pending at the time that final
[4] agreement was reached?

[5] **A.** Yes, it was.

[6] **Q.** And did BMI want to litigate this rate in rate court?

[7] **A.** Absolutely not.

[8] **Q.** Why not?

[9] **A.** The cost of litigation, you know, in considering how long
[10] the last one had taken, we thought if we could come up with a
[11] good blanket rate going forward it would be in everybody's best
[12] interest.

[13] **Q.** If you could take a look at the -- we'll come back to this
[14] in a minute. If you could take a look at the next document
[15] which is at tab five of your binder, and it's Joint Exhibit
[16] 1234. Could you look at that and identify it, please?

[17] **A.** It's the agreement in principle between BMI and Muzak.

[18] **Q.** And what's the date of this agreement in principle?

[19] **A.** It's August 2, 2004.

[20] **Q.** So what's the difference between this document and the
[21] agreement that we were just looking at?

[22] **A.** We had finalized discussions in July of 2004 and this was
[23] just to document where we thought the agreement was going, but
[24] the final document was the one that was in tab 4.

[25] **Q.** And did any of the terms change materially between the

Page 278

[1] agreement in principal in August '04 and the final document in
[2] December of '04?

[3] **A.** No.

[4] **Q.** If you could look specifically at page 3 of the agreement,
[5] and the first full bullet point there is titled possible
[6] initial added adjustment of 30 million base blanket license
[7] fee. Do you see that?

[8] **A.** Yes, I do.

[9] **Q.** Could you read the first sentence under that bullet point
[10] please?

[11] **A.** "The base license agreement for Muzak LLC is based on
[12] Muzak's representation that as of December 31, 2003, Muzak LLC
[13] had a total of not more than 165,000 locations receiving its
[14] background music service."

[15] **Q.** And was this representation an important part of the
[16] agreement for you?

[17] **A.** Absolutely.

[18] **Q.** Why?

[19] **A.** Well, we were going to take this agreement and create a
[20] form agreement for the rest of the industry, and we needed a
[21] representation as to how to come up with a per location rate.

[22] **Q.** Did BMI have an audit right on that representation of
[23] 165,000?

[24] **A.** Yes, we did. It's mentioned in the next sentence.

[25] **Q.** Did BMI actually conduct an audit?

Page 279

[1] **A.** Yes.

[2] **Q.** Do you recall the results of that audit?

[3] **A.** It was equal to the 165,000 locations.

[4] **Q.** Now, you mentioned before the date of this document is
[5] August 2004. Why did BMI accept the representation of number
[6] of locations as of December 2003 as it states in this document?

[7] **A.** I think the biggest reason was the fact that that was the
[8] last full year that Muzak had as the formal number that they
[9] had.

[10] **Q.** And the title of this bullet point that we just looked at
[11] is possible initial adjustment of $30 million base blanket
[12] license fee. Could you explain what that initial adjustment
[13] was or would have been?

[14] **A.** Well, if you continue reading down to the portion of that
[15] paragraph, it talks about the fact if there was a
[16] representation, if the representation of 165,000 wasn't correct
[17] and it were higher, we were then able to go back and adjust the
[18] $30 million based on the number that we found. It would
[19] increase the amount they pay us.

[20] **Q.** And if it had been more than 165,000, how much would Muzak
[21] have paid for any locations above that?

[22] **A.** $36.36.

[23] **Q.** If you could take a look at the next tab.

[24] **A.** Six?

[25] **Q.** Tab six, thank you, yes. Which is Respondent's Exhibit

| Page 280 | Page 282 |
|---|---|
| [1] 0050. If you could identify that, please? | [1] **A.** Confirm the number of locations approximately 165,000. |
| [2] **A.** It's an e-mail to me from Theresa Stafford Scherer. | [2] **Q.** And where did that 165,000 come from? |
| [3] **Q.** Who is Ms. Stafford Scherer? | [3] **A.** Muzak. |
| [4] **A.** She's the senior director who handles this marketplace. | [4] **Q.** And did you in fact confirm it? |
| [5] **MR. FITZPATRICK:** I would move this document's | [5] **A.** Absolutely. |
| [6] admission, your Honor? | [6] **Q.** And so to be clear, when BMI entered into its agreement |
| [7] **MR. MARKS:** No objection. | [7] with Muzak, what was your view of the starting per location |
| [8] **THE COURT:** Received. | [8] rate that BMI was getting for Muzak? |
| [9] (Respondent's Exhibit RX 0050 received in evidence) | [9] **A.** $36.36. |
| [10] **Q.** And can you explain what Ms. Stafford Scherer is doing for | [10] **Q.** Does Muzak have affiliates? |
| [11] you in this e-mail? | [11] **A.** Yes, they do. |
| [12] **A.** She was actually taking numbers that she had pulled from | [12] **Q.** And could you explain what an affiliate of Muzak is? |
| [13] the system, from the BMI computer system, trying to calculate | [13] **A.** To my best ability. They're franchisees of Muzak and they |
| [14] based on the old agreement we only were getting reports that | [14] distribute the Muzak product. They're just not owned and |
| [15] showed the on-premise locations. We were getting the gross | [15] operated by Muzak LLC. |
| [16] billing figures for the off-premise locations. So what she was | [16] **Q.** And was a license for those affiliates being negotiated at |
| [17] attempting to do, based on some numbers that she had found out | [17] the same time as the negotiation, as the agreement for Muzak |
| [18] how much they would be selling the service per month, she | [18] corporate was being negotiated? |
| [19] averaged it out to be about $600 per year for the off-premise | [19] **A.** Yes, it was. |
| [20] and she divided that into the gross billings and came up with | [20] **Q.** If you could take a look at tab 8, which is Joint Exhibit |
| [21] these estimated numbers. | [21] 0733, and identify that, please? |
| [22] **Q.** What was your view of the accuracy of these numbers? | [22] **A.** This is the Muzak affiliate license agreement that we |
| [23] **A.** Well, again, these were just her estimate. They weren't | [23] developed from the Muzak LLC agreement. This is the actual |
| [24] based on anything lower than what she could calculate. We in | [24] form. |
| [25] the meantime were still talking about Muzak and they had | [25] **Q.** And if you could go to page 2, paragraph 4A of that |

| Page 281 | Page 283 |
|---|---|
| [1] already given us the representation of 165,000. | [1] agreement where it says base license fee. Could you explain |
| [2] **Q.** So did you rely on the numbers contained in respondent's | [2] how their base license fee is calculated? |
| [3] 0050 when you reached agreement with Muzak? | [3] **A.** It says base license fee shall mean the fee resulting from |
| [4] **A.** No. | [4] multiplying the total number of locations serviced by Muzak |
| [5] **Q.** What did you rely on for the number of locations that Muzak | [5] affiliate as of December 31, 2003 times $36.36. |
| [6] had? | [6] **MR. FITZPATRICK:** Your Honor, I'm about to switch |
| [7] **A.** The actual numbers from Muzak. | [7] topics. Would this be an okay time for an afternoon break? |
| [8] **Q.** If you could take a look at tab 7? And that is Joint | [8] **THE COURT:** Yes, sure. Take a ten-minute recess. |
| [9] Exhibit 0745. If you could take a look at that and identify | [9] (Recess) |
| [10] it, please? | [10] **MR. FITZPATRICK:** May I proceed? |
| [11] **A.** It's an analysis done comparing a proposal from Muzak in | [11] **BY MR. FITZPATRICK:** |
| [12] June of 2004 and July 2004. | [12] **Q.** Mr. Annastas, if you're not already there, if we could go |
| [13] **Q.** So does this come before or after in time the document we | [13] to tab 4 of your binder to JX 0132, and specifically on the |
| [14] just saw from Ms. Stafford Scherer? | [14] third page under subparagraph B, about eight lines down there's |
| [15] **A.** After. | [15] a sentence that starts, "Commercial subscriber locations shall |
| [16] **Q.** And I'm sorry, did you mention who created this document? | [16] not." Do you see that sentence? |
| [17] **A.** No. It was created by Jose Gonzalez. | [17] **A.** Yes, I do. |
| [18] **Q.** Who is he? | [18] **Q.** And could you read the first part of that sentence, please? |
| [19] **A.** He's the vice president of operations and analysis in the | [19] **A.** "Commercial subscriber locations shall not under any |
| [20] licensing department. | [20] circumstances extend to ballrooms, discotheque, dance studios |
| [21] **Q.** Do you see up at the top of the document there's a heading | [21] or bowling centers." |
| [22] understandings, and then below that there's a heading called | [22] **THE COURT:** Where is this again? I missed your |
| [23] issues. Do you see that? | [23] reference. |
| [24] **A.** Yes. | [24] **MR. FITZPATRICK:** I apologize, your Honor. It's page |
| [25] **Q.** Could you read issue number two, please? | [25] 3 of tab 4, which is Joint Exhibit 0132. So page 3 of the |

Page 284

[1] Muzak agreement.

[2] **THE COURT:** Oh, back to -- yes.

[3] **Q.** And we're on --

[4] **THE COURT:** The letter agreement or the license

[5] agreement?

[6] **MR. FITZPATRICK:** The final license agreement, your

[7] Honor.

[8] **THE COURT:** Okay.

[9] **MR. FITZPATRICK:** And we're on page 3 of that in

[10] subparagraph B, about halfway through the paragraph, the

[11] sentence that starts, "Commercial subscriber locations shall

[12] not." Do you need it repeated, your Honor, or do you have it?

[13] I had asked the witness to read it. Do you need it repeated or

[14] do you have it?

[15] **THE WITNESS:** Do you want me to repeat it?

[16] **THE COURT:** Yes, if you want to.

[17] **Q.** Thank you.

[18] **A.** "Commercial subscriber locations shall not under any

[19] circumstances extend to ballrooms, discotheques, dance studios

[20] or bowling centers, any theme parks, skating rink or nightclub

[21] or other location where an admission fee or cover charge is

[22] assessed, limited to such portion of the premises from which

[23] the event or the entertainment for which admission is charged

[24] is intended to be observed or heard, and provided that any

[25] other portion of such premise shall be covered by this

Page 285

[1] agreement."

[2] **Q.** And was this exclusion something that was negotiated

[3] between BMI and Muzak?

[4] **A.** Yes.

[5] **Q.** What was BMI's position in that negotiation?

[6] **A.** We have licenses with all of these, direct licenses with

[7] all of these industries, and in our opinion it was not

[8] considered background music, and so for that purpose it wouldn't be

[9] included in this agreement.

[10] **Q.** And specifically with respect to the portion of the clause

[11] related to bowling, why did BMI want to exclude bowling centers

[12] from this agreement?

[13] **A.** We had a negotiated agreement with the Bowling Proprietors

[14] Association that was for all of the individual bowling centers

[15] and they were paying us at $16.60 per lane, I think, for each

[16] of the bowling centers.

[17] **Q.** Now, just to be clear, are there some bowling centers that

[18] are grandfathered and included under this agreement?

[19] **A.** Yes.

[20] **Q.** Could you explain that, please?

[21] **A.** As part of the settlement to move the agreement forward,

[22] any of the bowling centers that were using Muzak music as

[23] background unobtrusive music were allowed to pay, Muzak was

[24] allowed to pay under the old, under the license agreement. But

[25] if they wound up progressing into anything other than

Page 286

[1] background music, rock and bowl, laser bowl, any of that, it

[2] was not included in the agreement.

[3] **Q.** Could you describe what you mean by progressing from

[4] background music to things like rock and bowl that you

[5] mentioned?

[6] **A.** Bowling centers of today are no longer the bowling centers

[7] that I grew up with, and they use music as a form of

[8] entertainment. Now, it's a very big thing with them that music

[9] is used in bowling centers to draw crowds, to bowl with the

[10] music and some other forms that they use it for. Okay?

[11] **Q.** Now, with the exception of the grandfathered bowling

[12] centers using background music, does any commercial music

[13] service have under a final agreement bowling centers licensed

[14] at the $36.36 rate?

[15] **A.** No.

[16] **Q.** Okay, staying on this agreement, and you can refer to the

[17] first page, but what's the actual term of this license?

[18] **A.** July 1, 2004 through June 30, 2009.

[19] **Q.** Now, the Court has already heard that the decade, the ten

[20] years prior to this agreement Muzak had been paying interim

[21] fees at a lower level, is that correct?

[22] **A.** Yes.

[23] **Q.** And do you recall about what that level was?

[24] **A.** It was between 12 and $14.

[25] **Q.** And was there a negotiation over the rates for that period

Page 287

[1] that was occurring simultaneously with the negotiation for the

[2] final agreement?

[3] **A.** Yes.

[4] **Q.** What was BMI's position in the negotiations with respect to

[5] the period, the retroactive period?

[6] **A.** We had been seeking retroactive monies for that period, and

[7] we had a rate that we were looking for going forward and we had

[8] a retroactive settlement that we were looking for.

[9] **Q.** And what was Muzak's position with respect to the

[10] retroactive period?

[11] **A.** They felt that they wouldn't pay anything retroactively.

[12] **Q.** And in the end, what happened?

[13] **A.** We finalized a fee on the interim basis, the rate they paid

[14] us on the interim basis.

[15] **Q.** And why did you agree to that?

[16] **A.** For a whole lot of reasons. It had taken ten years to get

[17] to this point. Also at the same time we were looking at a

[18] pending rate court action, and I think everybody knows that

[19] rate court actions here today are going to cost us a lot of

[20] money, so the amount we were looking retroactively would have

[21] been spent probably coming to rate court.

[22] **Q.** If you could, I apologize to jump around, but if you could

[23] go to tab 5?

[24] **A.** Tab 5.

[25] **Q.** Tab 5, JX 1234 which is the August 2004 agreement in

Page 288

[1] principle. And specifically, if you could take a look at page
[2] 2 where it talks about the base license fees. Do you see that?
[3] **A.** Yes.
[4] **Q.** And in the -- if you could take a look at the first
[5] indented bullet point there under base license fee, for the
[6] period July 4 through June 2005. What was the license fee
[7] under this agreement?
[8] **A.** The sum of $6 million will be payable in advance per
[9] quarter on or before the following dates. So it was $6 million
[10] per year.
[11] **Q.** In your mind was any of that $6 million actually for a
[12] period prior to July 1, 2004 to June 30, 2005?
[13] **A.** No.
[14] **Q.** Does it say anywhere in the agreement that it was really
[15] for a prior period?
[16] **A.** No, it doesn't.
[17] **Q.** And we don't have to go one by one, but for the next four
[18] bullet points, what does it say in the agreement that the
[19] license fee is for each of the contract years '05 to '06, '06
[20] to '07, '07 to '08 and '08 to '09?
[21] **A.** It's all $6 million for those periods.
[22] **Q.** In your mind were any of those $6 million amounts actually
[23] for past periods?
[24] **A.** No.
[25] **Q.** Does it say anywhere in the agreement that any of those

Page 289

[1] dollar amounts actually were for past periods?
[2] **A.** No.
[3] **Q.** If you could turn to page 6 of the agreement, letter
[4] agreement, to be clear. And if you could look at the last
[5] bullet point, what does the letter agreement actually say about
[6] the past period?
[7] **A.** The license fees and terms for periods prior to July 1,
[8] 2004 are deemed final and not subject to adjustment. Want me
[9] to continue reading to the next page?
[10] **Q.** No, that's not necessary. Thank you.
[11] **THE COURT:** Where was that?
[12] **THE WITNESS:** Page 6. The very last bullet point.
[13] **Q.** As part of the negotiations with Muzak, did Muzak ever say
[14] that any of those $6 million amounts were actually for past
[15] periods to you?
[16] **A.** No.
[17] **Q.** Could you turn to page 9 of the letter agreement? And if
[18] you, on page 9, if you could read the first, that non-indented
[19] bullet point, please.
[20] **A.** "Muzak LLC, Muzak affiliates and BMI agree that the license
[21] fees for the term are reasonable."
[22] **Q.** And if you could just quickly go to page 1.
[23] **A.** Back to page 1?
[24] **Q.** It uses the word "term." What is the term as defined in
[25] this agreement?

Page 290

[1] **A.** The license term will be July 1, 2004 through June 30,
[2] 2009.
[3] **Q.** So does, using that definition, does the bullet point you
[4] just read on page 9 square with your understanding of the
[5] agreement?
[6] **A.** Yes.
[7] **Q.** Could you explain that?
[8] **A.** We had negotiated an agreement going forward, and again,
[9] any retroactivity had been paid to us was finalized at those
[10] existing fees so. July 1, 2004 through June 30 of 2009, they
[11] were paying those $6 million annually.
[12] **Q.** If you could go to the, back to tab 4 to the final
[13] agreement, I just want to ask you whether a similar term was
[14] incorporated into the final agreement as well between BMI and
[15] Muzak.
[16] **A.** Tab 4, what page?
[17] **Q.** Page 1.
[18] **A.** Okay.
[19] **Q.** Could you read the fifth whereas clause, the last whereas
[20] clause on the first page?
[21] **A.** "Whereas Muzak and BMI agree that the license fees to be
[22] paid by Muzak to BMI under this license agreement for the term
[23] are reasonable for the rights granted."
[24] **Q.** And again, what's the term in the final agreement?
[25] **A.** The term is July 1, 2004 through June 30, 2009.

Page 291

[1] **MR. MARKS:** Your Honor, excuse me. I wish to object
[2] to the last question on the grounds that he's reading from the
[3] whereas clauses which are not part of the --
[4] **THE COURT:** I can't hear you. On the grounds that
[5] what?
[6] **MR. MARKS:** That the question asked if it was a part
[7] of the agreement and the portion Mr. Annastas read was from a
[8] whereas clause, which is not actually part of the agreement
[9] itself.
[10] **THE COURT:** Your point is noted. It's merely a
[11] recital.
[12] **BY MR. FITZPATRICK:**
[13] **Q.** Mr. Annastas, when BMI received the license fees for Muzak,
[14] do you have an understanding of how they were distributed to
[15] BMI affiliates?
[16] **A.** All the payments that came in on an annual basis were paid
[17] prospectively.
[18] **Q.** Were any of the fees that BMI received under this Muzak
[19] agreement distributed for performances in the past prior to the
[20] beginning of the agreement?
[21] **A.** No. No retroactivity was sent back to the distribution
[22] system.
[23] (Continued next page)
[24]
[25]

**BY MR. FITZPATRICK:**

[2] Q. Mr. Annastas, could please turn now to tab 9 in the binder
[3] which is Joint Exhibit 1257? Would you identify that, please?
[4] A. It is a chart of all the commercial music service licensees
[5] that we had and there is approximately 7 columns: The first
[6] column talks about status; the second, affiliation; third,
[7] licensing; fourth, state; fifth, account number; the next one
[8] is settled periods; the next one is start date prior to January
[9] '94. And then the last column says start date not prior to
[10] January of 1994.
[11] Q. Now, when BMI offered license terms to the rest of the
[12] industry after it reached agreement with Muzak, how did BMI
[13] treat past periods?
[14] A. All the interim payments were finalized as is.
[15] Q. Were there some commercial music service licensees that
[16] didn't have 10 years of retroactivity with BMI?
[17] A. Absolutely.
[18] Q. And did BMI treat them any differently?
[19] A. No. Whatever the period that they started the license with
[20] us, that was, if it was prior to 2004, even if it was two years
[21] it was considered settled and paid in full.
[22] Q. And were there any adjustments to the $36.36 rate for
[23] licensees that had less than 10 years of retroactivity?
[24] A. No.
[25] Q. Why not?

[1] A. Because the fees were set at $36.36 prospectively July 1,
[2] 2004.
[3] Q. Back to Joint Exhibit 1257 on tab 9, could you explain what
[4] it means -- what the settled periods column means? First, if
[5] you have a "no" in that column what does that mean?
[6] A. The first category of noes are all those that started their
[7] license with us after 1994 so there was no reason to settle.
[8] The first example is right on top, the license agreement
[9] started January 1, 2006, and you can continue all the way down
[10] to one of the last ones it started May 1, 2008.
[11] Q. So, for all of those that have "no" in the settled column,
[12] did they have any retroactive period to settle at all?
[13] A. No.
[14] Q. Now, if you have a row that has "yes" in the settled period
[15] and "yes" in the start date prior to January 1994, what does
[16] that mean?
[17] A. It meant that they had been with, licensed with us prior to
[18] that period of time.
[19] Q. And if you have got two yeses and no date, how long a
[20] retroactive period did they have?
[21] A. It would have been from 1994.
[22] Q. The full 10 years?
[23] A. The full 10 years.
[24] Q. And if you have got a yes and then a blank and then a date,
[25] what does that mean?

[1] A. Well, any one of those examples would show that one started
[2] in January 1st, 2000, so they only started licensing us from
[3] January 1st, 2000, so the retroactivity that they would have
[4] owed us was also settled from that period.
[5] Q. And for those people is that the full 10 years or is that
[6] less than 10 years?
[7] A. Less than 10 years.
[8] Q. And, again, for any of those people was there any
[9] adjustment made to the $36.36 rate?
[10] A. No.
[11] Q. Now, again, the Court has heard about this so I won't ask
[12] you to describe it in detail, but are you familiar with the 8
[13] percent organic growth provision that's in BMI's commercial
[14] music services agreement?
[15] A. Yes.
[16] Q. When you, Mr. Annastas, negotiated or participated in the
[17] negotiations with Muzak over the agreement, did you have any
[18] expectations about whether Muzak's number of locations would
[19] change over the course of the agreement?
[20] A. Part of the representations they had made to us was that
[21] they had some growth.
[22]     **MR. MARKS:** Your Honor, I would object on hearsay
[23] grounds.
[24]     **THE COURT:** Frankly, I couldn't hear the answer.
[25] Q. My question, Mr. Annastas, is whether you had any

[1] expectations at the time that you negotiated the deal with
[2] Muzak, did you have any expectation as to whether Muzak's
[3] number of locations would change over time?
[4] A. Yes, I did.
[5] Q. And could you tell me what those expectations were?
[6] A. They would have been minimal.
[7] Q. Minimal what?
[8] A. Minimal growth.
[9] Q. If you can take a look at tab 7 in your binder which,
[10] again, is joint Exhibit 0745 and, again, back up to the Section
[11] issues where we were before?
[12] A. Yes.
[13] Q. Could you take a look at issue 6 and read that, please?
[14] A. When Muzak quoted the 2.5 percent to 3.0 percent average
[15] annual growth, did that include both organic and affiliated
[16] locations.
[17] Q. And what is that 2.5 to 3 percent average annual growth
[18] that's referred to in issue 6?
[19] A. It was a quote that Muzak had made to us stating that
[20] that's what their average growth had been.
[21] Q. Is that a number that you considered --
[22]     **MR. MARKS:** Objection, your Honor. I object to this
[23] witness offering -- it is rank hearsay testimony for him to
[24] testify about what Muzak said to him.
[25]     **MR. FITZPATRICK:** First of all, your Honor, this is a

Page 296

[1] Joint -- he is reading from a Joint Exhibit; but second of all
[2] he clearly, these are things he could take into account in his
[3] negotiation. So, regardless of whether in fact that was the
[4] growth. If this was what he was considering, it is relevant.
[5]     THE COURT: Overruled.
[6]     MR. LARSON: I apologize. Could I hear the last
[7] answer before the objection? I want to make sure I have the
[8] question.
[9]     (Record read)
[10] BY MR. FITZPATRICK:
[11]     Q. Was that something, was the quote that's referenced in
[12] there 6 there something that you considered when you were
[13] reaching final agreement with Muzak?
[14]     A. Yes.
[15]     MR. FITZPATRICK: Pardon me, your Honor. May I take a
[16] moment?
[17]     Your Honor, we have an issue with a missing page. I
[18] thought that my exhibit was two pages and it is only one. So,
[19] I will move on and we will try to -- we will try to remedy
[20] that. If I could, I will try to remedy it in the meantime and
[21] we can address it on redirect if that's acceptable so as not to
[22] hold up the examination.
[23]     So, back to tab 7, issue number 6. After that 2.5 to
[24] 3 percent figure the question asks when Muzak quoted that
[25] figure, annual growth, did that include both organic and

Page 297

[1] affiliated locations?
[2]     Could you explain what the reference to organic and
[3] affiliated locations is?
[4]     A. Organic was considered new business and their referral to
[5] us. And affiliated was they were buying franchisees in the
[6] past few years.
[7]     Q. And, did organic and affiliated growth end up being treated
[8] differently under the final Muzak agreement?
[9]     A. Yes, it does.
[10]     Q. Would you just briefly explain that?
[11]     A. The organic growth has the 8 percent growth rate and the
[12] acquired fee is the, if they purchased a location, a business,
[13] it was paid to us at the same rate as that business was paying
[14] us.
[15]     Q. Now, we've been talking about Muzak. Did the commercial
[16] music services agreement that BMI offered to the rest of the
[17] industry also have an 8 percent organic growth provision?
[18]     A. Yes.
[19]     Q. And, did you have any expectations as to whether the number
[20] of locations served by the entire industry rather than Muzak in
[21] particular would change during the 2004 to 2009 period?
[22]     A. I think from my perspective, you know, looking at where the
[23] industry had been at the time, there were a lot of new
[24] technologies and new services being offered. They had the
[25] introduction of XM, Sirius, and the iPod that was introduced.

Page 298

[1] And being a very competitive marketplace I didn't see much
[2] growth happening. I think Mike had paraphrased before when he
[3] said that it was cannibalized so we were buying each other's
[4] locations.
[5]     Q. What effect -- you mentioned XM, Sirius and iPod; how did
[6] they factor into your expectations about number of locations
[7] served by the commercial music services industry?
[8]     A. Well, as more businesses were telling us that they were
[9] using iPods that meant that they weren't going to be using a
[10] background music service to provide their music, they provide
[11] their own. XM and Sirius has been introduced to the
[12] marketplace and they were offered a license separate from the
[13] background music service industry.
[14]     Q. And what are XM and Sirius?
[15]     A. They're the satellite radio.
[16]     Q. So, given the expectations you just described, did you have
[17] any expectations as to what would happen to the effect of per
[18] location commercial music services rate across the industry
[19] over the course of the agreement?
[20]     A. Well, I didn't see it changing much because of the fact
[21] that as an industry I didn't see the overall locations growing.
[22]     Q. And so now that we are in 2010 have you looked back at what
[23] actually did happen?
[24]     A. Yes.
[25]     Q. And what happened?

Page 299

[1]     A. For once I may have been right but it wound up being that
[2] the average number of locations hasn't changed, overall, within
[3] the industry.
[4]     MR. FITZPATRICK: I pass the witness, your Honor.
[5] CROSS EXAMINATION
[6] BY MR. MARKS:
[7]     Q. Good afternoon, Mr. Annastas.
[8]     BMI has approximately 70,000 different licensees that
[9] fall under general licensing, is that correct?
[10]     A. Yes.
[11]     Q. And I think you testified earlier today that that covers
[12] about 100,000 customer locations?
[13]     A. Yes.
[14]     Q. And DMX provides 70,000 customer locations, approximately,
[15] by itself; is that correct?
[16]     A. Yes, they do.
[17]     Q. The licensing and commercial music services such as DMX,
[18] Play Network and TruSonic are covered by general licensing at
[19] BMI?
[20]     A. Yes, they are.
[21]     Q. And the license that BMI offers to commercial music service
[22] is a through to the audience license, correct?
[23]     A. Yes.
[24]     Q. That means that customers of a commercial music service do
[25] not need to take a separate performance rights license to

Page 300

[1] perform BMI music when they play the music provided by the
[2] music service at their locations; correct?
[3] **A.** If that's the only music they're playing, no, they don't.
[4] **Q.** Are you familiar with the terms background music and
[5] foreground music?
[6] **A.** Yes.
[7] **Q.** The license that a commercial music service obtains from
[8] BMI does not distinguish between background music uses and
[9] foreground music uses, correct?
[10] **A.** No, it doesn't.
[11] **Q.** BMI makes no distinction in any of its licenses as to
[12] whether the music used has lyrics versus an instrumental
[13] version of the song, correct?
[14] **A.** You are talking about the background, commercial music
[15] services.
[16] **Q.** Talking about any license offered in the general department
[17] of BMI.
[18] **A.** Yes, it does. It does distinguish.
[19]      As I pointed out in the restaurant license, it talks
[20] about whether or not there is multiple instrumentalists under
[21] the live music category so, yes, there is distinction between
[22] live music and recorded music.
[23] **Q.** I will try to sharpen my question because I think there is
[24] some confusion. I'm not distinguishing between live music and
[25] recorded music.

Page 301

[1] **A.** Okay.
[2] **Q.** But, within recorded music is there any distinction drawn
[3] between recorded music that has the vocals or the lyrics to the
[4] song as opposed to just an instrumental version of the song?
[5] **A.** No. But if you have karaoke it is distinguished. And I'm
[6] just trying to understand where you are coming from, Ben, so.
[7] **Q.** I understand. Let's just stick within the recorded music
[8] category, not karaoke, just recorded music whether it is played
[9] by a restaurant, a hotel, or a commercial music service.
[10] **A.** Okay.
[11] **Q.** There is no distinction in any of those licenses as to
[12] whether or not it is an instrumental version of the song or a
[13] version of the song with a singer singing lyrics, correct?
[14] **A.** No, it is not.
[15] **Q.** BMI employs business development personnel to identify
[16] potential licensees that may be using BMI music without a
[17] license, correct?
[18] **A.** Yes.
[19] **Q.** There are approximately 30 people within the general
[20] licensing department employed primarily for that purpose,
[21] correct?
[22] **A.** Just that area, yes.
[23] **Q.** And, overall, the general licensing department has
[24] approximately a hundred employees, correct?
[25] **A.** Yes.

Page 302

[1] **Q.** And once the business development groups identifies a
[2] potential licensee, information about that business is
[3] transferred over to the sales group, correct?
[4] **A.** Absolutely.
[5] **Q.** And the sales group contacts potential licensees and
[6] attempts to have them sign the appropriate form license,
[7] correct?
[8] **A.** Yes.
[9] **Q.** There are approximately 40 people within the sales function
[10] in the general licensing department, correct?
[11] **A.** Yes, there are.
[12] **Q.** And if a sales group is unable to secure agreement to the
[13] form license from the potential licensee, the matter will be
[14] referred to another group that will start talking with the
[15] potential licensee about legal matters and copyright
[16] infringement, correct?
[17] **A.** Yes.
[18] **Q.** At some point in the absence of a license agreement BMI
[19] will send a cease and desist letter, correct?
[20] **A.** Yes.
[21] **Q.** And if the potential licensee still doesn't take a license
[22] BMI will sue them, correct?
[23] **A.** Yes.
[24] **Q.** Enforcement actions, as I think you mentioned earlier, can
[25] be costly and time consuming, correct?

Page 303

[1] **A.** Yes.
[2] **Q.** BMI would prefer to avoid bringing copyright enforcement
[3] actions if it can?
[4] **A.** Absolutely.
[5] **Q.** Even with the ongoing efforts that BMI devotes to music
[6] licensing businesses that fall within the general licensing
[7] category, there are likely many businesses that are using music
[8] that do not currently have a BMI license, correct?
[9] **A.** Yes.
[10] **Q.** I would like to show the witness Joint Exhibit 1215.
[11]      Mr. Annastas, this is the form license that BMI
[12] offered to the background music industry for the time period
[13] from 1987 to 1993, correct?
[14] **A.** Yes.
[15] **Q.** This is the license that you were referring to earlier that
[16] generated rates of approximately $12 to $14 per location to
[17] BMI?
[18] **A.** On average, yes.
[19] **Q.** And this form license was the result of negotiations
[20] between BMI and members of the commercial music service
[21] industry, correct?
[22] **A.** Yes.
[23] **Q.** Including negotiations as to fees?
[24] **A.** Yes.
[25] **Q.** Marvin Berenson was the primary negotiator of this form,

Page 304

[1] correct?
[2] **A.** Yes.
[3] **Q.** You are generally familiar with this license from your role
[4] as vice president of general licensing during the period --
[5] during in which it was in effect, correct?
[6] **A.** Yes.
[7] **Q.** During the term of this agreement a hotel that took the
[8] then operative hotel form license from BMI would pay
[9] substantially more than $12 to $14 per hotel location, correct?
[10] **A.** Yes.
[11] **Q.** And a restaurant operating under the then operative
[12] restaurant form license agreement at that time paid
[13] substantially more than $12 to $14 per restaurant location,
[14] correct?
[15] **A.** Yes.
[16] **Q.** That's true of each of the industries that might have been
[17] covered under the form license, correct?
[18] **A.** Absolutely.
[19] **Q.** Certain types of premises were expressly included from the
[20] scope of the through to the audience license, correct?
[21] **A.** Yes.
[22] **Q.** And the exclusions are set forth in paragraph 2B on the
[23] first page of this agreement, correct?
[24] **A.** Yes, they are.
[25] **Q.** And discotheques and dance studios, for example, were

Page 305

[1] excluded?
[2] **A.** Yes, they were.
[3] **Q.** The license did not contain an exclusion for bowling
[4] centers?
[5] **A.** Not specifically.
[6] **Q.** Is there any other way in which it contained an exclusion
[7] for bowling centers?
[8] **A.** Well, there are other things that we considered and this is
[9] where we took the new agreement and made more specific
[10] exclusions. But, if you go above that it talks about it is
[11] understood that such subscription music services are intended
[12] to be used as accompanying routine activities, including but
[13] not limited to working, shopping, conversation, dining and
[14] relaxation, as long as such music is not offered to subscribers
[15] as an accompany to dancing or to serve as an adjunct to any
[16] other physical activity or form of entertainment.
[17] **Q.** Between 1987 and 1993 BMI treated bowling centers as within
[18] the scope of this license agreement, correct?
[19] **A.** I really couldn't tell you specifically that we did or
[20] didn't. When I came into the department we didn't.
[21] **Q.** When did you join the department?
[22] **A.** When I took over general licensing in '87.
[23] **Q.** Do you recall being deposed in this case?
[24] **A.** Yes.
[25] **Q.** You told the truth that day?

Page 306

[1] **A.** Yes.
[2] **Q.** I asked you in reference to this agreement: It did not
[3] contain an exclusion for bowling centers, correct? And you
[4] responded no.
[5]    Do you recall that?
[6] **A.** I guess so, yes.
[7] **Q.** It is your understanding that today ASCAP does not exclude
[8] bowling center from the scope of its licenses to commercial
[9] music services, correct?
[10] **A.** Yes.
[11] **Q.** I would like to show the witness a document that's been
[12] marked as Petitioner's Exhibit 11. This document contains
[13] Marvin Berenson's notes of a meeting that you and he had with
[14] representatives of Muzak on July 9th, 2002, correct?
[15] **A.** Yes.
[16] **Q.** You received a copy of these notes shortly after
[17] Mr. Berenson prepared them, correct?
[18] **A.** Yes.
[19] **Q.** At the time of this meeting the most recent proposal
[20] exchanged between the parties was BMI's proposal that Muzak pay
[21] $32.50 per location going forward; correct?
[22] **A.** I'm assuming. I don't remember all the dates and so forth
[23] but I'm assuming you're right.
[24] **Q.** I can direct your attention to the second page of the
[25] document and see if it refreshes your recollection.

Page 307

[1] **A.** It is on the back? Okay. I didn't see it was on the other
[2] side.
[3]    Yes.
[4] **Q.** Does that refresh your recollection that at the time of
[5] this meeting BMI's last proposal had been $32.50 per location?
[6] **A.** Yes.
[7] **Q.** And during this meeting Muzak expressed its preference for
[8] a flat license fee rather than a per location fee, correct?
[9] **A.** Yes.
[10] **Q.** And BMI, in turn, expressed its preference for a per
[11] location fee rather than a flat fee, correct?
[12] **A.** Yes.
[13] **Q.** And one of the reasons that BMI wanted Muzak to pay a
[14] per-location rate was that if Muzak increased its number of
[15] locations BMI would be able to earn additional license fees
[16] under a per-location structure but would not receive additional
[17] fees under a flat fee structure, correct?
[18] **A.** If that's what this says. I haven't read it line by line.
[19] **Q.** I'm asking you what your recollection was.
[20] **A.** My -- again, going back to the time of that negotiation, it
[21] was possible.
[22] **Q.** Let me read to you some of your deposition testimony and
[23] see if that refreshes your recollection.
[24] **A.** Perfect.
[25] **Q.** I asked you the questions, this is at page 139 of your

Page 308

[1] deposition, if we can call it up if that would be helpful, I
[2] asked you the question: Was one of the reasons that if Muzak
[3] increased its number of locations, BMI would be able to earn
[4] additional license fees under a per-location rate structure and
[5] would not under a flat rate structure?
[6]         And your answer was: Well, obviously yes.
[7]         And I asked you: That was one of the things that you
[8] talked about within BMI?
[9]         And your answer was: Yes.
[10]         Does that refresh your recollection?
[11] **A.** Yes.
[12] **Q.** That that was in fact one of the reasons and that not only
[13] that, that was one of the reasons that you discussed internally
[14] at BMI?
[15] **A.** Yes.
[16] **Q.** The parties also discussed the issue of retroactive
[17] payments for the 1994 to 2002 period during this meeting,
[18] correct?
[19] **A.** This one, yes.
[20] **Q.** BMI wanted Muzak to make a retroactive payment above the
[21] interim fees already paid, correct?
[22] **A.** Correct.
[23] **Q.** And Muzak's position in this face to face negotiation was
[24] that they did not want to make a retroactive payment, correct?
[25] **A.** Yes.

Page 309

[1] **Q.** Muzak didn't ask BMI in this meeting to return some of the
[2] interim fees as part of a final fee agreement, did it?
[3] **A.** Say that again?
[4] **Q.** BMI wasn't asking for money -- excuse me.
[5]         Muzak wasn't asking for money back on the interim fees
[6] as part of these negotiations, were they?
[7] **A.** No.
[8] **Q.** In this time frame Muzak had already offered to pay an
[9] amount higher than their interim fee rates, correct?
[10] **A.** Yes.
[11] **Q.** And the $32.50 per location rate that BMI offered to accept
[12] here provided that Muzak paid retroactive fees for the period
[13] back to 1994 is less than the rate that Muzak ultimately agreed
[14] to pay at the start of the 2004 license which did not have a
[15] retroactive fee component, correct?
[16] **A.** Say that again?
[17] **Q.** Sure.
[18] **A.** Sorry.
[19] **Q.** The $32.50 per location that BMI was offering to accept
[20] from Muzak --
[21] **A.** Right.
[22] **Q.** -- as long as Muzak paid a retroactive fee component --
[23] **A.** Right.
[24] **Q.** -- is less than the per-location rate ascribed to the
[25] license Muzak signed and agreed to pay in 2004 without a

Page 310

[1] retroactive fee component, correct?
[2] **A.** The per-location rate was higher than the $32.50.  $36.36
[3] is higher than $32.50.
[4] **Q.** I would like to show the witness Joint Exhibit 759.
[5]         **MR. FITZPATRICK:** Can I move in this document?
[6]         **MR. MARKS:** Sure. We jointly --
[7]         **MR. FITZPATRICK:** Either way.
[8]         **MR. MARKS:** We jointly move the admission of this
[9] document into evidence.
[10]         **THE COURT:** Received.  PX.
[11]         (Petitioner's Exhibit PX 11 received in evidence)
[12] **BY MR. MARKS:**
[13] **Q.** Mr. Annastas, Joint Exhibit 759 is a license proposal that
[14] Muzak sent to BMI on or about April 4th, 2003, correct?
[15] **A.** Yes.
[16] **Q.** In this proposal Muzak was still proposing annual
[17] enterprise-wide fees rather than per-location fees for each
[18] year of the license going forward, correct?
[19] **A.** Yes.
[20] **Q.** And Muzak was proposing that fees paid at the interim rate
[21] from 1994 to 2002 be made final at that interim rate, correct?
[22] **A.** That's what it says.
[23] **Q.** And the amount that Muzak offered in April 2003 to pay for
[24] the calendar year 2003 was more than the interim fee rate,
[25] correct?

Page 311

[1] **A.** Yes.
[2] **Q.** And Muzak offered more to pay -- excuse me -- Muzak offered
[3] to pay more for the calendar year 2003 than BMI ultimately
[4] agreed to accept as final fees for 2003, correct?
[5] **A.** Yes.
[6] **Q.** I would like to show the witness Joint Exhibit 739.
[7]         Mr. Annastas, Joint Exhibit 739 is a letter that you
[8] sent to Muzak's general counsel on August 20th, 2003, correct?
[9] **A.** Yes.
[10] **Q.** This was a counter-proposal by BMI to an offer made by
[11] Muzak earlier that year?
[12] **A.** Yes.
[13] **Q.** BMI was proposing annual license fees for the 2003 to 2007
[14] period as well as retroactive payments for the 1994 to 2002
[15] period, correct?
[16] **A.** Yes.
[17] **Q.** And if the number of locations serviced by Muzak increased
[18] Muzak would pay an additional fee, correct?
[19] **A.** Yes.
[20] **Q.** BMI was proposing annual payments at the bottom of the
[21] first page as a minimum fee payment with some upside to BMI if
[22] Muzak's number of locations increased, correct?
[23] **Q.** And if you look at the total annual license fees that BMI
[24] was seeking for the five-year period from 2003 to 2007, it was
[25]

A-312

Page 312

[1] $27 million over that five-year period if you are looking at
[2] the first column on the left?
[3] **A.** Okay.
[4] **Q.** Do you agree with that? You can accept my representation
[5] it is the math.
[6] **A.** Absolutely. Absolutely.
[7] **Q.** And that was based on an estimate of 157,000 locations,
[8] correct?
[9] **A.** At that time, yes.
[10] **Q.** And, for those 157,000 locations BMI was offering to accept
[11] a lower per-location amount at the beginning of the license
[12] period than the $32.50 per the offer we discussed
[13] a moment ago in exchange for a higher per location amount at
[14] the end of the license, correct?
[15] **A.** Yes. This given proposal, yes.
[16] **Q.** And, in addition to the $27 million in prospective license
[17] fees, BMI was seeking $6 million as settlement for the past
[18] interim period, correct?
[19] **A.** Well, it is five years, it is $5 million, isn't it?
[20] **Q.** Let me point your attention --
[21] **A.** Okay, Muzak paid $6 million, yes.
[22] **Q.** Let's just make sure the record is clear. There is going
[23] to be a $1 million up front payment as part of a $6 million
[24] package for the past and the rest of the retroactive fee would
[25] be paid out in $1 million increments during the term of the

Page 313

[1] license?
[2] **A.** Yes.
[3] **Q.** I would just like to show the witness a demonstrative and
[4] see if I have captured this offer correctly.
[5] So, Mr. Annastas, if you add up the $27 million in
[6] annual license fees that BMI was seeking and the $6 million
[7] retroactive fees that BMI was seeking, it was a total package
[8] of $33 million in total additional payments beyond what Muzak
[9] had already paid on interim basis to settle the 1994 through
[10] 2007 period, correct?
[11] **A.** At this proposal, yes.
[12] **Q.** And there was no organic growth component contemplated as
[13] part of this package?
[14] **A.** No.
[15] **Q.** I would like to show the witness Joint Exhibit 1164.
[16] Before we turn to that document, if we can go back to
[17] the demonstrative I have one more question on that. You will
[18] see that indicated in the parentheses in the second line and
[19] the third line there is a percentage figure. Do you see that?
[20] **A.** Yes.
[21] **Q.** I will represent to you that $27 million is 82 percent of
[22] $33 million and $6 million is 18 percent of $33 million. So,
[23] of the $33 million in total additional payments that BMI was
[24] seeking for the 1994 to 2007 period, 18 percent of it was
[25] attributable to the retroactive component, correct?

Page 314

[1] **A.** I will -- assuming your numbers are right, yes.
[2] **Q.** If we can turn to Joint Exhibit 1164? This is an analysis
[3] of proposals that was prepared for John Shaker in May 2004,
[4] correct?
[5] **A.** Yes.
[6] **Q.** And, to this point in the negotiations Muzak's position
[7] remained that it wanted to pay a flat fee, correct?
[8] **A.** Yes.
[9] **Q.** And BMI's position was that it wanted Muzak either to pay a
[10] per-location rate or a minimum fee with a per-location
[11] adjustment over the number of locations at the time the
[12] contract was signed, correct?
[13] **A.** Yes.
[14] **Q.** In the BMI proposals on the first third, fourth and fifth
[15] pages of this joint exhibit the proposals --
[16] **A.** Third, fourth and fifth pages you are saying?
[17] **Q.** Yes.
[18] **A.** Okay. Sorry.
[19] **Q.** The proposal is labeled BMI proposal A1, BMI proposal A,
[20] BMI proposal B, and BMI proposal C.
[21] **A.** Okay.
[22] **Q.** And my question is, each of these proposals under
[23] consideration includes a growth allowance of 2.5 percent,
[24] correct?
[25] **A.** Yes.

Page 315

[1] **Q.** And that wouldn't distinguish between organic growth or
[2] existing affiliate growth, correct?
[3] **A.** Yes.
[4] **Q.** And the inclusion of a 2.5 percent growth allowance in
[5] these proposals was an attempt to bridge the parties'
[6] respective positions on the license structure, correct?
[7] **A.** Yes.
[8] **Q.** And if you could turn to the proposal labeled BMI proposal
[9] A1, we have also got it up on the screen if that's more
[10] convenient for you.
[11] **A.** No, that's okay.
[12] **Q.** This proposal had a five year total for annual fees of
[13] $27.5 million, correct?
[14] **A.** Yes.
[15] **Q.** And that's less than Muzak -- that's less than the $30
[16] million that Muzak agreed to pay to BMI two months later for a
[17] five-year license, correct?
[18] **A.** Yes.
[19] **Q.** And in this proposal the fees were weighted toward the end
[20] of the license so that the annual fees were lower at the start
[21] of the license and higher at the end, correct?
[22] **A.** Yes.
[23] **Q.** This proposal also included $5.5 million in retroactive
[24] fees, right?
[25] **A.** Yes.

Page 316

[1]   Q. And comparing this proposal to the August 20th, 2003 offer
[2]   that we looked at a moment ago, the total payments for a
[3]   five-year license for both are $33 million in addition to what
[4]   had already been paid for entering, correct?
[5]   A. Yes.
[6]   Q. But in the May 2004 proposal labeled A1 the annual fee
[7]   would be a little higher and the retroactive fee would be a
[8]   little lower, correct?
[9]   A. Yes.
[10]  Q. The reference in the bubble to interest on the retroactive
[11]  component was a reference to the fact that Muzak could owe
[12]  interest payments on retroactive fees, correct?
[13]  A. Yes.
[14]  Q. And the interest fees would compensate BMI for the lost
[15]  time value of money?
[16]  A. Yes.
[17]  Q. If you could turn to BMI proposal A, this proposal also had
[18]  a five-year total for annual fees of $27.5 million, correct?
[19]  A. Yes.
[20]  Q. Still less than the $30 million Muzak agreed to pay in
[21]  annual fees for a five-year license two months later, correct?
[22]  A. Yes.
[23]  Q. This proposal had a smaller retroactive fee component of
[24]  $4.5 million, correct?
[25]  A. Yes, it did.

Page 317

[1]   Q. So, the overall package was slightly less than BMI proposal
[2]   A1 at $32 million in additional license fees over the period
[3]   from 1994 through 2008, correct?
[4]   A. Yes.
[5]   Q. If you could turn to BMI proposal B? This proposal had a
[6]   five-year total for annual fees of $29.5 million, correct?
[7]   A. Yes.
[8]   Q. Still less than Muzak agreed to pay in annual fees for a
[9]   five-year license about two months later, correct?
[10]  A. Yes.
[11]  Q. This proposal had a retroactive fee component of $5
[12]  million, right?
[13]  A. Yes.
[14]  Q. But a smaller upfront payment of retroactive fees compared
[15]  to proposals A or A1?
[16]  A. Yes.
[17]  Q. So the fees would be smaller at the start of the new
[18]  license period under this proposal but the overall fees for the
[19]  license period would be higher, correct?
[20]  A. Yes.
[21]  Q. And, finally, if you could turn to BMI proposal C? This
[22]  proposal is similar to BMI proposal B on the preceding page
[23]  except that there would be no upfront payment for retroactive
[24]  fees, correct?
[25]  A. Right.

Page 318

[1]   Q. Their $5 million for retroactive fees would be spread out
[2]   in payments of $1 million per year during each year of the
[3]   prospective period in the license, correct?
[4]   A. Correct.
[5]   Q. I would like to show the witness another demonstrative.
[6]        I just want to make sure that we have the proposals
[7]   that BMI was considering in May of 2004 accurately depicted.
[8]   They contemplated a range of $32 million on the low end and
[9]   $34.5 million on the high end of total additional license
[10]  payments to BMI to cover the period 1994 through the end of
[11]  2008, correct?
[12]  A. Yes.
[13]  Q. And of those additional payments between $32 million and
[14]  $34.5 million, BMI was attributing $27.5 million to $29.5
[15]  million of those fees to the five years going forward, correct?
[16]  A. Correct.
[17]  Q. And BMI was attributing $4.5 to $5.5 million above the
[18]  interim fees paid for the 1994 to 2004 period to settle the
[19]  past, correct?
[20]  A. Correct.
[21]  Q. And so the retroactive component was in between 14 and 17
[22]  percent when you take the 4.5 to 5.5 and match it up against
[23]  32, the 34.5?
[24]  A. Correct.
[25]  Q. And these proposals included a growth allowance that was

Page 319

[1]   different than the one that was ultimately agreed to, correct?
[2]   A. Correct.
[3]   Q. It had a lower growth rate but it included adding existing
[4]   affiliates?
[5]   A. Yes.
[6]   Q. Did BMI consider the 2.5 growth allowance that allowed not
[7]   only organic growth but also existing affiliate growth to be
[8]   more favorable to BMI or less favorable to BMI than the 8
[9]   percent organic growth allowance that was ultimately agreed to?
[10]  A. I have to go back to the chart then. There is another
[11]  component on this proposal that they would have to pay
[12]  additional amounts so with the two and a half percent growth
[13]  rate and inclusive they would still be paying us more money.
[14]  Q. And in these proposals, in May 2004, the retroactive fees
[15]  of between $4.5 million to $5.5 million, those were designed to
[16]  compensate BMI for what it felt were underpayments for the 1994
[17]  to 2004 period, correct?
[18]  A. Correct.
[19]  Q. Ms. Stafford-Scherer is a senior director of general
[20]  licensing at BMI, correct?
[21]  A. Yes, she is.
[22]  Q. She held that position in 2004?
[23]  A. Yes, she did.
[24]  Q. And she reported to you in 2004?
[25]  A. Yes, she did.

A-314

[1] **Q.** During the first half of 2004 Ms. Stafford-Scherer was
[2] providing analyses of the number of locations that Muzak had,
[3] correct?

[4] **A.** Yes.

[5] **Q.** She was the only employee at BMI who was providing you with
[6] analyses of the number of locations that Muzak had, correct?

[7] **A.** Yes.

[8] **Q.** I would like to show the witness a document that's
[9] premarked as respondent -- it is actually respondent's Exhibit
[10] 50 and it is already in evidence. This was tab 6 in the binder
[11] that you were shown on your direct examination.

[12] **A.** Okay.

[13] **Q.** This is an e-mail that you received from
[14] Ms. Stafford-Scherer on June 22nd, 2004?

[15] **A.** Yes.

[16] **Q.** And Ms. Stafford-Scherer testified at her deposition -- we
[17] will be hearing it read in -- that as of June 22nd, 2004, her
[18] best estimate was that Muzak, at that time, had 182,686
[19] locations. You never did a separate analysis that showed a
[20] lower number of Muzak locations, correct?

[21] **A.** No.

[22] **Q.** Ms. Stafford-Scherer's June 22nd, 2004 estimate of the
[23] number of Muzak locations was the best information that you had
[24] at the time, correct?

[25] **A.** Internally, yes, but Muzak had already introduced number of

[1] locations and into the discussions that we were having by then
[2] by 2004.

[3] **Q.** Correct, the number of locations as of the end of 2003,
[4] correct?

[5] **A.** Yes.

[6] **Q.** And Ms. Stafford-Scherer's e-mail to you reflects her
[7] estimate of how many locations they had by June of 2004,
[8] correct?

[9] **A.** It just says most recent 2004 period, 2004 reported period,
[10] so I don't know that it is saying June that I read.

[11] **Q.** I'm pointing you to the date that she sent the e-mail to
[12] you.

[13] **A.** Yes, the e-mail came in June but that doesn't mean that it
[14] was all the way through June. And again, it was her
[15] guesstimate.

[16] **Q.** And her guesstimate reflected that there had been growth in
[17] locations from the average of 2003 to what they were showing in
[18] 2004, correct?

[19] **A.** But, again, if you look at the off-premise and guesstimate
[20] she was making, the estimate she was making was based on taking
[21] the amount she assumed each location was paying to Muzak and
[22] divided it into their gross billings that they reported to us
[23] because they didn't report to us the actual locations on
[24] off-premise. They only reported to us the on-premise
[25] locations.

[1] **Q.** And she reported to you that that's the same methodology
[2] that Muzak itself used for their internal analogies of how many
[3] locations they had, correct?

[4] **A.** That's what she says here.

[5] **Q.** You never told her that her estimates were inaccurate, did
[6] you?

[7] **A.** No. I had no reason to.

[8] **Q.** I would like to show the witness Joint Exhibit 1318.

[9] This is a chain of e-mails between you and John
[10] Schaffer who was then BMI's senior vice president of licensing,
[11] correct?

[12] **A.** Yes.

[13] **Q.** This chain includes an e-mail to Mr. Zendan that you had
[14] drafted and forwarded to Mr. Schaeffer for his comments?

[15] **A.** Yes.

[16] **Q.** At this point in time, in July 2004, Muzak was still
[17] pressing for a flat dollar fee amount without any adjustment
[18] for changing the number of locations, correct?

[19] **A.** Yes.

[20] **Q.** At the time, July of 2004, you were concerned that a flat
[21] fee structure for the industry would provide an unfair
[22] advantage to services with significant growth at the expense of
[23] services that were not growing at the same pace, correct?

[24] **A.** Yes.

[25] **Q.** You thought that such a structure that benefited services

[1] with a high growth rate would be unfair to the other members of
[2] the industry, correct?

[3] **A.** Yes.

[4] **Q.** If I could turn your attention to Joint Exhibit 745 which
[5] is the top tab of the binder that you had on direct
[6] examination. And just so the record is clear, the June 21,
[7] 2004 proposal; was that a proposal from Muzak to BMI or a
[8] proposal from BMI to Muzak?

[9] **A.** Muzak to BMI.

[10] **Q.** And, that was for $30 million over five years, correct?

[11] **A.** Yes.

[12] **Q.** And that was with no -- that would be a flat fee with no
[13] additional fees if they added locations, correct?

[14] **A.** Yes.

[15] **Q.** And, is the proposal labeled Muzak 7/2/04 proposal, what
[16] is the difference between the June 21, 2004 proposal and the
[17] July 2nd, 2004 proposal by Muzak?

[18] **A.** It was another flat fee proposal but it increased from $6
[19] million to $6.2 million per year.

[20] **Q.** Is it your testimony that neither of these proposals had
[21] any kind of growth allowance or is it that the July 2nd, 2004
[22] proposal had no adjustment for additional locations, whereas
[23] the June 21, 2004 proposal did have a cap on growth?

[24] **A.** The -- well according to what this schedule says Muzak,
[25] July 2nd -- of '04 proposal, no adjustment for organic growth

[1] versus prior Muzak proposal. So, the extra $200,000 wouldn't
[2] be inclusive of any growth.
[3] **Q.** And under the June 21, 2004 proposal description there is a
[4] reference to incremental dollars at various allowable growth
[5] scenarios versus 10 percent, (June '04).
[6] Do you see that?
[7] **A.** Yes.
[8] **Q.** Does that refresh your recollection that Muzak's June 21,
[9] 2004 proposal was $6 million a year for five years with 10
[10] percent growth allowance?
[11] **A.** Yes.
[12] **Q.** And they provided as an alternate proposal that they pay
[13] you more money if there were no cap on their growth, correct?
[14] **A.** Yes.
[15] **Q.** And BMI preferred not to accept more money that where Muzak
[16] could grow without limitation, correct?
[17] **A.** Absolutely.
[18] **Q.** You didn't turn down the extra million dollars because you
[19] thought they were declining locations, did you?
[20] **A.** No.
[21] **Q.** After the Muzak deal was finalized BMI offered a form
[22] license based on the Muzak deal to other commercial music
[23] services, correct?
[24] **A.** Yes.
[25] **Q.** Ms. Stafford-Scherer sent out a form letter to other

[1] commercial music services advising them that they could take
[2] the form license based on the Muzak deal or they could continue
[3] in the rate court, correct?
[4] **A.** Yes.
[5] **Q.** I would like to show the witness Respondent's Exhibit 157.
[6] If you could take a moment to review the letter and
[7] let me know if this is an example of the form letter that
[8] Ms. Stafford-Scherer was sending out to the rest of the
[9] commercial music services industry?
[10] **A.** Yes, it was.
[11] **Q.** If the service took the form license for 2004 to 2009 BMI
[12] would settle the period from 1994 to 2004 at the interim rates
[13] paid, correct?
[14] **A.** Yes.
[15] **Q.** That's the approximately $12 to $14 per location?
[16] **A.** Correct.
[17] **Q.** If the service did not take the form license for the 2004
[18] to 2009 period BMI would not settle the past at that rate,
[19] correct?
[20] **A.** Correct.
[21] **Q.** BMI wanted services to know that it would continue to seek
[22] higher fees for that 1994 to 2004 period unless they took the
[23] prospective deal for 2004 to 2009, correct?
[24] **A.** Say that again, Ben?
[25] **Q.** BMI wanted commercial music services to know that it would

[1] continue to seek higher fees than had been paid on an interim
[2] basis for the 1994 to 2004 period?
[3] **A.** I think we were also advising them they still had the rate
[4] court if they wanted to go back to the rate court and if they
[5] wanted to, you know, take that on it would be probably for
[6] higher fees.
[7] **Q.** Correct. You were telling services if they didn't want to
[8] take the deal you were offering going forward?
[9] **A.** Right.
[10] **Q.** They could go back to rate court and you would not only
[11] seeks those fees going forward but you would also seek
[12] additional payments for 1994 to 2004, correct?
[13] **A.** Yes.
[14] **Q.** The past license fee exposure was used as leverage by BMI
[15] to get commercial music services to sign on to the new deal
[16] going forward, right?
[17] **A.** Yes.
[18] **MR. MARKS:** Your Honor, I move the admission of this
[19] exhibit.
[20] **MR. FITZPATRICK:** No objection, your Honor.
[21] **THE COURT:** Received.
[22] **MR. MARKS:** 157.
[23] (Respondent's Exhibit 157 received in evidence)
[24] **MR. MARKS:** Your Honor, I'm happy to keep going. I
[25] know we are a minute away from 5:00 and I have reached a

[1] natural break point.
[2] **THE COURT:** Let's break for the day. We will resume
[3] at 10:00 tomorrow morning.
[4] **MR. MARKS:** Thank you, your Honor.
[5] May we have the standard instruction with regard to
[6] him not speaking?
[7] **THE COURT:** No. I'm not going to issue it every day.
[8] **MR. MARKS:** That's fine. I just wanted to be clear.
[9] (Adjourned to 10:00 a.m., Thursday, January 21, 2010.)

Page 328

[1]                    INDEX OF EXAMINATION
[2]   Examination of:                    Page
[3]   MICHAEL O'NEILL
[4]   Cross By Mr. Rich . . . . . . . . . . . . . 141
[5]   Redirect By Mr. Fitzpatrick . . . . . . . . 252
[6]   THOMAS ANNASTAS
[7]   Direct By Mr. Fitzpatrick . . . . . . . . . 262
[8]   Cross By Mr. Marks . . . . . . . . . . . . . 299
[9]              PETITIONER EXHIBITS
[10]  Exhibit No.                     Received
[11]   PX 11  . . . . . . . . . . . . . . . . . . 310
[12]             RESPONDENT EXHIBITS
[13]  Exhibit No.                     Received
[14]   RX 22  . . . . . . . . . . . . . . . . . . 208
[15]   RX 34  . . . . . . . . . . . . . . . . . . 218
[16]   RX 24  . . . . . . . . . . . . . . . . . . 219
[17]   RX 27  . . . . . . . . . . . . . . . . . . 220
[18]   32  . . . . . . . . . . . . . . . . . . . 232
[19]   RX 0050  . . . . . . . . . . . . . . . . . 280
[20]   157  . . . . . . . . . . . . . . . . . . . 326
[21]
[22]
[23]
[24]
[25]

A-317

# In The Matter Of:

*BROADCAST MUSIC INC.,, v.*
*DMX, INC.,,*

*CORRECTED*
*January 21, 2010*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 01L5BMIF.txt, Pages 329-515 (187)

**Word Index included with this Min-U-Script®**

---

**Page 329**

```
01L5bmil
[1]  UNITED STATES DISTRICT COURT
[2]  SOUTHERN DISTRICT OF NEW YORK
     ----------------------------x
[3]  BROADCAST MUSIC INC.,
[4]            Petitioner,
[5]      v.                    08 Civ. 216 (LLS)
[6]  DMX, INC.,,
[7]            Respondent.
[8]  ----------------------------x
[9]                            January 21, 2010
                               10:15 a.m.
[10] Before:
[11]           HON. LOUIS L. STANTON,
[12]                        District Judge
[13]           APPEARANCES
[14] HUGHES, HUBBARD & REED, LLP
         Attorneys for Petitioner
[15] BY: JAMES C. FITZPATRICK
     MICHAEL E. SALZMAN
[16] JASON C. BENTON
     MARGARET J. HOAG
[17]     AND -
[18] JOSEPH DiMONA, In-house counsel, BMI, Inc.,
[19] WEIL, GOTSHAL & MANGES, LLP
         Attorneys for Respondent
[20] BY: R. BRUCE RICH
     BENJAMIN E. MARKS
     TODD D. LARSON
[21]
[22]
[23]
[24]
[25]
```

**Page 330**

```
[1]       (Trial resumed)
[2]       THE COURT: Mr. Annastas, you are still under oath.
[3]       THE WITNESS: Yes, sir.
[4]       THE COURT: Mr. Marks.
[5]  THOMAS ANNASTAS,
[6]     called as a witness by the Petitioner,
[7]     having been duly sworn, testified as follows:
[8]       MR. MARKS: Your Honor, before I continue with the
[9]  cross-examination of Mr. Annastas, one housekeeping matter from
[10] yesterday.
[11]      Mr. Rich examined Mr. O'Neill on respondent's Exhibit
[12] 31 but I don't believe it's been formally received into
[13] evidence, and at this point I would like to move its admission.
[14]      MR. FITZPATRICK: No objection, your Honor.
[15]      THE COURT: Received.
[16]      (Respondent's Exhibit 31 received in evidence)
[17] CROSS EXAMINATION  (Cont'd)
[18] BY MR. MARKS:
[19] Q. Mr. Annastas, I would like to turn to the BMI agreement
[20] with TruSonic. Ms. Stafford-Scherer negotiated the agreement
[21] on behalf of BMI, correct?
[22] A. No, she didn't negotiate it. She actually -- she was the
[23] point person to talk to them. When the final agreement was
[24] done there were a few of us that were involved in it.
[25] Q. But she was the one who had the direct contact with TruSonic,
```

**Page 331**

```
[1]  correct?
[2]  A. Yes.
[3]  Q. She was the one who communicated BMI's position to
[4]  TruSonic?
[5]  A. Yes.
[6]  Q. And she was the one who communicated TruSonic's position
[7]  internally back to her colleagues at BMI, correct?
[8]  A. Yes.
[9]  Q. So, in terms of the face to face negotiations or direct
[10] contact in the negotiations, she was the person who --
[11] A. It was all via phone.
[12] Q. It was all via her?
[13] A. Via phone.
[14] Q. Via phone; but she was the only person involved in the
[15] phone conversations?
[16] A. As far as I remember.
[17] Q. You weren't personally involved?
[18] A. No.
[19] Q. And as Mr. O'Neill explained yesterday, TruSonic had
[20] already grown by more than 8 percent each year between 2004 and
[21] the time they signed the license on June 28, 2007, correct?
[22] A. Yes.
[23] Q. So, at the time it signed the license agreement with BMI in
[24] 2007, TruSonic already owed additional fees for the period from
[25] the start of the new license in July of 2004 through the middle
```

**Page 332**

[1] of 2007, correct?

[2] **A.** Yes.

[3] **Q.** TruSonic didn't agree to pay those additional fees for the

[4] prior three years right away upon the execution of the license

[5] agreement, correct?

[6] **A.** Correct.

[7] **Q.** With your approval, Ms. Stafford-Scherer negotiated a

[8] payment plan with TruSonic that allowed TruSonic to pay BMI the

[9] additional fees it owed for the prior three years in increments

[10] over the remaining term of the license, correct?

[11] **A.** Correct.

[12] **Q.** In negotiations Ms. Stafford-Scherer made that payment plan

[13] a little softer on the front end and a little more aggressive

[14] on the back end?

[15] **A.** If I remember correctly, yes.

[16] **Q.** Let me show the witness respondent's Exhibit 63. This is

[17] an e-mail that you received from Ms. Stafford-Scherer on June

[18] 21st, 2007, shortly before TruSonic executed the agreement with

[19] BMI?

[20] **A.** Yes.

[21] **Q.** Does this refresh your recollection that

[22] Ms. Stafford-Scherer agreed to make the payment schedule softer

[23] on the front end and more aggressive on the back end?

[24] **A.** Yes.

[25]     **MR. MARKS:** I would like to move its admission into

Page 333

[1] evidence.
[2] **MR. FITZPATRICK:** No objection, your Honor.
[3] **THE COURT:** Received.
[4] **MR. MARKS:** Respondent's Exhibit 63.
[5] (Respondent's Exhibit 63 received in evidence)
[6] **BY MR. MARKS:**
[7] **Q.** TruSonic didn't have to pay interest on the prior three
[8] years' fees that were turned into a payment plan going forward?
[9] **A.** No. Not that I'm aware.
[10] **Q.** If ms. Stafford-Scherer testified that there was no payment
[11] associated you would have no reason to disagree, correct?
[12] **A.** No.
[13] **Q.** And allowing TruSonic to pay for the past in incremental
[14] interest free installments going forward was done as an
[15] accommodation to TruSonic, correct?
[16] **A.** Yes.
[17] **Q.** If you could turn to tab 3 in your binder which is joint
[18] Exhibit 782.
[19] **A.** Tab 3 you said?
[20] **Q.** Yes. This is the current form license that BMI offers to
[21] retail establishments?
[22] **A.** Yes.
[23] **Q.** And this license was developed internally at BMI?
[24] **A.** Yes.
[25] **Q.** It was not negotiated with representative --

Page 334

[1] **THE COURT:** I think we already have that in the
[2] record.
[3] **MR. MARKS:** Excuse me?
[4] **THE COURT:** I think it is already clear in the record
[5] that it was not.
[6] **MR. MARKS:** Fine. I will move more quickly, your
[7] Honor.
[8] **THE COURT:** Good.
[9] **BY MR. MARKS:**
[10] **Q.** To your knowledge, BMI has not agreed to bury the terms of
[11] this license for any retail establishment license?
[12] **A.** Not that I'm aware.
[13] **Q.** BMI resists efforts to negotiate different terms by retail
[14] licensees, correct?
[15] **A.** Again, anybody within the same class and category, this
[16] would be an agreement that they would be offered.
[17] **Q.** And you would resist efforts to negotiate different terms,
[18] correct?
[19] **A.** Yes.
[20] **Q.** This retail establishment form license agreement contains a
[21] volume discount, correct?
[22] **A.** Yes.
[23] **Q.** And that's because when a retailer with many locations
[24] takes a license, BMI's administrative costs per location
[25] compared to a retailer with a lower number of locations, BMI's

Page 335

[1] administrative costs are lower; correct?
[2] **A.** Yes.
[3] **Q.** And you believe it is reasonable for BMI to provide a
[4] volume discount?
[5] **A.** Yes.
[6] **Q.** When a commercial music service takes a blanket license
[7] from BMI, BMI's administrative costs are lower than if it went
[8] out and the licensee took the locations serviced by the
[9] commercial music service individually, correct?
[10] **A.** Yes.
[11] **Q.** And, in fact, that's one of the reasons the volume of
[12] locations that commercial music services pay a lower
[13] per-location rate than their customers would pay if they
[14] licensed individually with BMI, correct?
[15] **A.** Yes. That's what I said yesterday.
[16] **Q.** And the volume of locations covered by a commercial music
[17] service leads to administrative efficiencies for BMI, correct?
[18] **A.** To a degree.
[19] **Q.** And, at all times since June 3rd, 2005, DMX has had at
[20] least twice as many locations as Play Network, correct?
[21] **A.** If you are saying so. I don't doubt that.
[22] **Q.** If that's what's reflected on the chart of location counts
[23] by, provided to DMX by BMI you would have no reason to
[24] disagree?
[25] **A.** No.

Page 336

[1] **Q.** And, at all times since June 3rd DMX has had at least six
[2] times as many locations as TruSonic, correct?
[3] **A.** Yes.
[4] **Q.** TruSonic is a much smaller service --
[5] **A.** Yes.
[6] **Q.** -- than DMX.
[7] BMI is proposing that DMX should pay 50 percent more
[8] than TruSonic than DMX paid in the last year of their license
[9] even before any surcharge for the option of direct licensing,
[10] correct?
[11] **MR. FITZPATRICK:** I object as vague to the extent it
[12] is not clear what metric. Are we talking about per location,
[13] total dollars or something else, your Honor?
[14] **BY MR. MARKS:**
[15] **Q.** I will amend the question.
[16] The per location rate that BMI is proposing that DMX
[17] pay is approximately 50 percent higher than the $24.75 paid by
[18] TruSonic and Play Network in the final year of their license?
[19] **A.** Yes.
[20] **Q.** I would like to show the witness a demonstrative.
[21] Mr. Annastas, are you familiar with a commercial music
[22] service called GrayV?
[23] **A.** Not really.
[24] **Q.** Are you aware that it is a commercial music service?
[25] **A.** If it is on the list, yes.



[1] **Q.** The source of your knowledge would be that if it is on
[2] BMI's list it is --
[3] **A.** Yes.
[4] **Q.** -- probably a commercial music service?
[5] **A.** Yes.
[6] **Q.** I will represent to you that these numbers were of -- these
[7] location counts on this chart are taken from the much larger
[8] chart that is Joint Exhibit 1293 that has already been the
[9] subject of discussion today. Am I correct that the way that
[10] the license works, even though GrayV serves a much smaller
[11] number of locations than Muzak, Muzak pays a considerably
[12] higher rate?
[13] **A.** Yes.
[14] **Q.** And that's notwithstanding the fact that Muzak brings much
[15] greater administrative efficiency to BMI by licensing 156,733
[16] locations in 2008-2009 versus 671 locations serviced by GrayV?
[17] **A.** Again, they had the benefit of the growth rate, they just
[18] didn't grow where the small GrayV grew and they got the benefit
[19] of the growth rate.
[20] **Q.** There is no additional benefit to BMI that GrayV brings
[21] relative to Muzak, correct?
[22] **A.** No.
[23] **Q.** They don't bring any administrative efficiencies to BMI?
[24] **A.** No.
[25] **Q.** They don't bring any lower costs to BMI than Muzak?

[1] **A.** No.
[2] **Q.** The license fees paid by retail establishments to BMI do
[3] not depend on the volume at which they play music, correct?
[4] **A.** When you say volume.
[5] **Q.** Quietly or loudly?
[6] **A.** No. No.
[7] **Q.** And the license fees paid by retail establishments to BMI
[8] do not depend on the lighting in the store, do they?
[9] **A.** No.
[10] **Q.** Retail establishments do not have to report any of their
[11] music use to BMI, do they?
[12] **A.** Specific music use? No.
[13] **Q.** Right. They don't report which songs they play and which
[14] songs they don't play?
[15] **A.** No.
[16] **Q.** And BMI uses a proxy to make distributions to its members
[17] on account of performances by retail establishments?
[18] **A.** Yes, they do.
[19] **Q.** Do you know what the proxy is?
[20] **A.** It goes into the radio distribution.
[21] **Q.** So whatever songs are made on the radio, that's how BMI
[22] decides to distribute royalties paid by retail stores to its
[23] publisher and writer affiliates?
[24] **A.** Yes.
[25] **Q.** If you could turn to tab 2 in your binder which is Joint

[1] Exhibit 781?
[2] **THE COURT:** Mr. Marks, what conclusion do you want me
[3] to draw from that last chart and your proposition that the
[4] decrease in rate is a consequence only of growth?
[5] **MR. MARKS:** That it is a completely arbitrary factor
[6] that isn't reasonable to apply to other services. In other
[7] words, that if a --
[8] **THE COURT:** To other services?
[9] **MR. MARKS:** To DMX in particular.
[10] If Muzak believed it was growing or if a service
[11] believes it's growing and thereby negotiates a favorable -- a
[12] rate that favors its growth at the expense of competitors who
[13] are losing locations, that's not something that a competitor
[14] that's in a declining phase would negotiate in a competitive
[15] market. And so, there is no reason to saddle those services
[16] that don't believe it is reasonable to have their fees
[17] determined by the fact that their competitor may have been
[18] growing. It is not reasonable to saddle them with the adverse
[19] consequences of that negotiation.
[20] I will give an extreme example. If Muzak had
[21] negotiated a license that said we'll agree that as long as our
[22] name starts with the letter M through Z we will pay $25 a
[23] location, but if our name ever starts with A, with the first
[24] half of the alphabet, we will pay $36; well, that would be
[25] unfair to DMX. And we are just pointing out that there is no

[1] logic, no economic rationale to applying the 8 percent growth
[2] factor to DMX. It is not justified by any meaningful change in
[3] the number of locations that are served because you have a
[4] growth factor applied to a tiny service like GrayV that gets
[5] paid a much lower rate than a very large service like DMX.
[6] **THE COURT:** Well, couldn't one say that as long as
[7] DMX' volume of locations remains the same the growth factor
[8] doesn't apply to it?
[9] **MR. MARKS:** But my point is only that the economic
[10] consequence of the deal, if you look at what the actual
[11] economic negotiation was at, let's say TruSonic for example,
[12] which had already grown to the point where when they negotiated
[13] their deal the effective rate was $28. They agreed to a very
[14] different deal than would have been -- than that form would
[15] have applied to DMX which, even though it was much larger than
[16] TruSonic, had lost a certain number of locations or even if
[17] they had stayed the same or even if they had grown by less than
[18] 8 percent.
[19] The point of the examination and the point of the
[20] chart is just to show that it is arbitrary. The difference in
[21] rates isn't grounded in any economic principle of consequence
[22] that either drives -- that alters BMI's costs of delivering the
[23] license, that alters the value of the music or the value of the
[24] performances. It is just an arbitrary factor.
[25] **THE COURT:** Well, with the 8 percent clause in effect,

Page 341

[1] every competitor who's market share is falling would prefer not
[2] to have that clause in a standard lease because it benefits
[3] those of its competitors whose rates are already increasing.
[4] Is that correct?
[5]     MR. MARKS: That's correct. And in fact as --
[6]     THE COURT: And so, I would prefer to see what change
[7] is made and how is this to be taken into effect in determining
[8] a reasonable fee.
[9]     MR. MARKS: Well, we -- we will get to the direct
[10] license evidence as part of our affirmative case, but even
[11] taking other commercial music service license agreements as a
[12] benchmark, if your Honor were to take that as the benchmark
[13] rather than the direct license evidence, the evidence at the
[14] end of the case will show that the economic deal that TruSonic
[15] for example agreed to is a much lower fee than the one that
[16] Muzak agreed to or the one that some of the smaller services
[17] that lost locations agreed to. And DMX shouldn't be taxed with
[18] the rate that is paid at the high end of the scale or even the
[19] middle of the scale.
[20]     If BMI offered better deals to the TruSonics and the
[21] Play Networks of the commercial music services industry, DMX is
[22] likewise entitled to the economic benefit of those and not just
[23] by rigorous, rigid application of the growth factor but by
[24] looking at what the actual economics of the deal were.
[25]     THE COURT: But this is a matter of argument which can

Page 342

[1] be based on facts which are essentially not contested. Isn't
[2] that true?
[3]     MR. MARKS: That's true. I was just asking -- the
[4] point of the examination of the chart was to make sure that BMI
[5] agreed that the difference in the rates between GrayV and Muzak
[6] isn't justified by volume discount, any other benefit to BMI.
[7]     THE COURT: Well, that would take one question.
[8]     MR. MARKS: I apologize if I burdened the Court with
[9] more questions, your Honor.
[10]     THE COURT: You are making this point about no
[11] economic value to the -- the distinction isn't based on
[12] economic value and you are doing it because you want me to take
[13] account of it in setting a fee and I'm still left a little bit
[14] at a loss to understand mechanically how it bears on the
[15] setting of the fee except for the obvious one that we discussed
[16] yesterday.
[17]     It seems to me in a sense that it is most useful as an
[18] attack on the use of locations as a method for arriving at a
[19] fee. Now, I thought that that was common ground between the
[20] parties as being the best available way. It obviously has
[21] defects with which you are spending some time.
[22]     MR. MARKS: We don't --
[23]     THE COURT: Is there a better way? Has your
[24] fundamental position changed? Because if there is to be a
[25] uniform form of lease and it is to be based -- and the fee is

Page 343

[1] to be based on locations, there are bound to be discrepancies
[2] in the application.
[3]     MR. MARKS: Your Honor, we don't --
[4]     THE COURT: And if things bother you this much are we
[5] going down the right path?
[6]     MR. MARKS: Your Honor, I don't think we quibble with
[7] the notion of setting a per location fee. I think where the
[8] parties disagree is whether or not DMX should be saddled with a
[9] fee with the high end or even the middle end of a deal that was
[10] negotiated by a company in a different phase of growth, or at
[11] least that thought it was in a different phase of growth than
[12] DMX was in, or by other services that were in active growth
[13] phases and then not giving the benefit of the true economic
[14] bargain of those deals to a company like DMX that was not in an
[15] active phase of growth.
[16]     THE COURT: What is the true economic value of those
[17] deals?
[18]     MR. MARKS: Well, let's take TruSonic for example. At
[19] the time they entered into the agreement they were not agreeing
[20] to pay $36.36 per location.
[21]     THE COURT: But that point has been driven to death.
[22] If you want to arrive at the true economic value of a deal
[23] don't you have to do so over its life and how it applies in a
[24] great variety of situations?
[25]     MR. MARKS: Well, I would make two points. One is



Page 344

[1] that if the economic consequences of the deal are different for
[2] members of the commercial music service industry that have
[3] signed the license with BMI DMX, we believe we are entitled to
[4] the most favorable deal that's been offered to anybody else.
[5] We can't be discriminated against if they've entered into deals
[6] that end up with fees at 25. We shouldn't have to pay more
[7] than 25 just simply because somebody grew and somebody didn't.
[8] We are entitled to the most favorable deal they've offered to
[9] anybody else.
[10]     THE COURT: Well, they say the expression of the deal
[11] it may have offered to everybody else is contained within the
[12] license agreement that they tender to everybody else. You
[13] don't like that.
[14]     MR. MARKS: You're absolutely right we don't like
[15] that.
[16]     THE COURT: Because of a peculiarity in your economic
[17] situation.
[18]     MR. MARKS: Well, and because the factor that drives
[19] our fees up and the fees for our primary competitors down is an
[20] arbitrary one --
[21]     THE COURT: Loss of business.
[22]     MR. MARKS: -- loss of business. Even though we've
[23] lost business and some other services have gained business, we
[24] are still much larger, we still provide much greater
[25] administrative efficiency to BMI, we are still in a much

Page 345

[1] stronger negotiating position, we are still able to afford
[2] experienced music licensing counsel capable of litigating the
[3] rate court proceeding which the GrayVs of the world with 600
[4] locations likely are not. And the purpose of the examination
[5] is to show that this is an arbitrary factor that shouldn't
[6] drive your Honor's determination of the fees applicable to us.
[7]     **THE COURT:** I think I'm beginning to grasp the notion
[8] that there are arbitrary effects of the lease the way it is
[9] going.
[10]     **MR. MARKS:** I have moved on from that portion of the
[11] examination, your Honor, so I won't belabor the Court any more
[12] on that point.
[13]     **THE COURT:** Go ahead.
[14] **BY MR. MARKS:**
[15] **Q.** Mr. Annastas, I will continue to turn to some of the
[16] industry license agreements that you talked about yesterday --
[17]     **THE COURT:** While we are on this point let me ask
[18] counsel, I think probably for DMX but subject to check by DMX,
[19] I was thinking overnight, yes, I think it's expressed probably
[20] most directly in JX 1293, the Play Network, Music Choice and
[21] TruSonic per location fees paid across the five-year period and
[22] I was trying to clarify for myself the significance of
[23] evidence. It seems to me that the primary significance of the
[24] terms which underlie these figures is the production of license
[25] payments. The one thing which this chart does not make clear

Page 346

[1] is how much money did BMI receive under the structures which
[2] developed these per location figures each year. If these
[3] figures do no more than to keep the million dollar figure
[4] level, that's one thing. If it increased over the years
[5] despite the drop in per location fees, that's perhaps of
[6] interest. If it decreased, that's perhaps of interest. But in
[7] any -- and the whole thing may, in the end, turn out to be
[8] immaterial. I suspect from the fact that nobody made that
[9] point clear that they think it is immaterial and may be, but in
[10] the same tone a neophyte can't help being curious about it.
[11]     **MR. MARKS:** Your Honor, the --
[12]     **THE COURT:** And I can perform the arithmetic but I
[13] have doubts in my ability and I would rather get it from the
[14] people who know the facts. It is just arithmetic.
[15]     **MR. FITZPATRICK:** If I could, your Honor, and I
[16] attempted to do it, I apologize for not making it clear, the
[17] sort of oversized chart that I went over with Mr. O'Neill that
[18] had all those rows and columns on it --
[19]     **THE COURT:** Oh.
[20]     **MR. FITZPATRICK:** The far right-hand column would
[21] yield the numbers that were on the demonstrative that your
[22] Honor was looking at, the effective per location rate but also
[23] each of the individual columns on that chart for every licensee
[24] and for every year gives what they actually paid as well as
[25] what their actual locations were so that you could do the math

Page 347

[1] and get to the final column.
[2]     **THE COURT:** Ah, yes. Your next to the last column is
[3] total fees.
[4]     **MR. FITZPATRICK:** Exactly, your Honor. And it
[5] actually, it is actually broken out in more detail as well.
[6] You can see what the base fee is on the left which is basically
[7] the base fee is the amount the contract started at and then
[8] each year, as your Honor knows, if the service grew within the
[9] 8 percent there would be no adjustment. But, if the service
[10] grew exceeding 8 percent there would be what is called an
[11] organic surplus fee which is a column on that chart and that
[12] reflects the dollars that get added for growth above 8 percent.
[13] And I think the example that Mr. O'Neill -- that I used with
[14] Mr. O'Neill was Play Network, which I believe is the very last
[15] entry on page 15 of the chart and I think it is highlighted in
[16] yellow.
[17]     So, assuming my memory is correct about that --
[18]     **THE COURT:** Yes. Play Network is there.
[19]     **MR. FITZPATRICK:** Yes, and you will see in the far
[20] right column it does get to the effective $24.75 rate that
[21] we've been talking about but there are also individual columns
[22] that show Play Network grew, if I remember correctly, from at
[23] the start of the deal it was about 11,000 locations and by the
[24] end of the deal it had exceeded 30,000 locations. And so,
[25] again, if memory serves we are talking about a license fee that

Page 348

[1] started at around $400,000 but by the end of the deal they were
[2] paying a surplus fee of something on the order of $800,000.
[3] And so, that reflects --
[4]     **THE COURT:** Well, the organic surplus fee was $406,000
[5] and the total fees are $806,000. But, the word "total" might
[6] mean the total number paid over the whole four-year period.
[7]     If you could simply put on the what 1293 chart a
[8] figure for each of the years of the total fees provided in that
[9] year in that year's regime, that would tell me all that I want
[10] to know.
[11]     **MR. FITZPATRICK:** Sure. We will be happy to add that.
[12] And just to clarify --
[13]     **THE COURT:** Because it will show the play of the
[14] actual money paid each year responsive to the application of
[15] the 8 percent cushion and whatever increase over the cushion
[16] there was.
[17]     **MR. FITZPATRICK:** We will do so, your Honor. And to
[18] give you a preview of what that will look like, for Play
[19] Network --
[20]     **THE COURT:** Yes.
[21]     **MR. FITZPATRICK:** -- what this chart is meant to
[22] reflect is that at the beginning of the deal there were 11,000
[23] locations.
[24]     **THE COURT:** Right.
[25]     **MR. FITZPATRICK:** That meant there was a base fee of

## Page 349

[1] the 400,000.

[2] **THE COURT:** The 400,000, yes.

[3] **MR. FITZPATRICK:** The actual locations increased over
[4] the term to 32,000 so there was an additional organic surplus
[5] fee of the $406,000. So, the $806,000 would be the total fees
[6] that Play Network paid in the year 2009.

[7] **THE COURT:** Yes.

[8] **MR. FITZPATRICK:** And you would divide that by the
[9] actual locations and that gets to the $24.75. So, we will add
[10] that data to the demonstrative for your Honor.

[11] **THE COURT:** Yes; and year by year as you have done on
[12] Exhibit 1293?

[13] **MR. FITZPATRICK:** Certainly, your Honor. Yes.

[14] **THE COURT:** It is just arithmetic, I recognize that,
[15] but I feel uncertain with arithmetic.

[16] **MR. FITZPATRICK:** We will do that, your Honor.

[17] **THE COURT:** Okay. Thank you.

[18] All right, Mr. Marks. I apologize for the
[19] interruption.

[20] **MR. MARKS:** Not at all, your Honor. And I have a few
[21] clean up questions on some of the industry form agreements that
[22] Mr. Annastas discussed yesterday.

[23] **BY MR. MARKS:**

[24] **Q.** Are you at tab 2 in your binder of Joint Exhibit 781?

[25] **A.** Yes.

## Page 350

[1] **Q.** And that's the -- that's the current form license for
[2] eating and drinking establishments?

[3] **A.** Yes, it is.

[4] **Q.** And the majority of BMI licensees that fall within general
[5] licensing are actually fall within this category of
[6] restaurants, night clubs and bars, correct?

[7] **A.** There is approximately half of -- yeah, little more than
[8] half.

[9] **Q.** And there are many eating and drinking establishments that
[10] do not take a BMI license, correct?

[11] **A.** Correct.

[12] **Q.** At last count BMI's internal estimate of its coverage of
[13] the restaurant and bar industry was about 60 percent?

[14] **A.** Yes.

[15] **Q.** And there was -- you explained yesterday this was the form
[16] license that was developed with some input from state
[17] restaurant associations?

[18] **A.** From state restaurant association executives, yes.

[19] **Q.** Their input was limited to the criteria that you were using
[20] for fees as opposed to negotiating the actual fees themselves,
[21] correct?

[22] **A.** As I explained, we went to the national restaurant
[23] association and the state restaurant association to negotiate
[24] an agreement and they weren't ready to negotiate the actual
[25] fees. So, they did give us the input that we needed for the

## Page 351

[1] fee criteria.

[2] **Q.** And the fee levels were determined by BMI itself, correct?

[3] **A.** Yes.

[4] **Q.** As with retail stores, the license fees that restaurants
[5] and bars paid don't depend on how loud the music -- how loudly
[6] they're playing the music, correct?

[7] **A.** No.

[8] **Q.** And the fees that restaurants and night clubs and bars pay
[9] don't depend on the lighting in the venue, do they?

[10] **A.** No.

[11] **THE COURT:** No, they don't any more than they did the
[12] first time you asked the question.

[13] **MR. MARKS:** Well, this is for a different category of
[14] licensee, your Honor.

[15] **THE COURT:** Oh, I see.

[16] **MR. MARKS:** I'm just establishing that for various
[17] industries these aren't factors that determine fees.

[18] **THE COURT:** Can we take it as a general proposition
[19] that they don't, in any event, depend on the degree of
[20] lighting?

[21] **MR. MARKS:** With one exception, your Honor, and I
[22] believe that's the bowling industry.

[23] **THE COURT:** Okay.

[24] **BY MR. MARKS:**

[25] **Q.** I will ask the question.

## Page 352

[1] Is there any industry other than -- putting bowling to
[2] one side for a minute -- are any industries licensed by BMI
[3] where the fees are affected by whether -- by the volume of the
[4] music, the volume at which the music is played or the lighting
[5] in the venue?

[6] **A.** No.

[7] **Q.** And restaurants and bars don't report their music use to
[8] BMI, correct?

[9] **A.** Not currently.

[10] **Q.** Is that also the same distribution you used, the radio
[11] distribution to pay royalties?

[12] **A.** Currently, yes.

[13] **Q.** And yesterday Mr. Fitzpatrick asked you some questions
[14] about the form license that BMI offers to hotels, correct?

[15] **A.** Yes.

[16] **Q.** And that's -- you want to see it, I believe it is tab 1 in
[17] your binder.

[18] **A.** Yes.

[19] **Q.** And you mentioned that this license is a product of
[20] negotiations with the hotel association, correct?

[21] **A.** Yes, it is.

[22] **Q.** The hotel association is not represented by outside counsel
[23] with experience in music licensing matters in those
[24] negotiations, is it?

[25] **A.** I don't -- Weil Gotshal, not that I'm aware of, but they

---

Page 353

[1] have had attorneys present.
[2]   **Q.** They haven't had outside counsel present in those
[3] negotiations, have they?
[4]      **THE WITNESS:** I don't know.
[5]      **THE COURT:** Mr. Marks, this isn't going to help me
[6] much.
[7] **BY MR. MARKS:**
[8]   **Q.** BMI refers to bowling alleys as bowling centers, correct?
[9]   **A.** Yes.
[10]      **THE COURT:** Unless you can tie it to a particular
[11] result in the terms of the fee arrangement.
[12]      **MR. MARKS:** The purpose of this line of examination,
[13] your Honor, is again to show the arbitrary distinction of
[14] singling out bowling from any of these other industries. I
[15] will move directly to the bowling agreement.
[16]      **THE COURT:** Do whatever you please.
[17]      **MR. MARKS:** Excuse me?
[18]      **THE COURT:** Do whatever you please.
[19]      **MR. MARKS:** Thank you, your Honor. I will try to be
[20] brief.
[21] **BY MR. MARKS:**
[22]   **Q.** Was the -- you discussed yesterday the agreement that's
[23] been negotiated with the bowling proprietors association?
[24]   **A.** Yes.
[25]   **Q.** And they were not represented by outside counsel in those

Page 354

[1] negotiations, were they?
[2]   **A.** No, but I think the -- they have an attorney that was on
[3] board that we negotiated with.
[4]   **Q.** And at the time that BMI developed its form license for
[5] BPAA members, a lot of bowling alleys were licensed either
[6] under a commercial music service license or the form license
[7] for restaurants, correct?
[8]   **A.** I couldn't tell you the number because we don't get the
[9] numbers from bowling centers for their services.
[10]   **Q.** But your general understanding was that before you had the
[11] separate form license for bowling centers, bowling alleys were
[12] licensed either through a CMS or through the restaurant
[13] license, correct?
[14]   **A.** Yes.
[15]   **Q.** And the form license for -- there is a separate form
[16] license for individual bowling centers you mentioned yesterday?
[17]   **A.** Yes, there is.
[18]   **Q.** And that form license was negotiated without input from
[19] representatives of individual bowling centers, correct?
[20]   **A.** It was outside of the bowling proprietors' agreement.
[21]   **Q.** And there was no other input, correct?
[22]   **A.** No.
[23]      **THE COURT:** Mr. Marks, what distinction are you
[24] drawing? The individual bowling -- a separate license for
[25] individual bowling centers as distinct from what?

Page 355

[1]      **MR. MARKS:** From a bowling alley that is a member of a
[2] bowling trade association. So, if you are a bowling alley --
[3]      **THE COURT:** I see.
[4]      **MR. MARKS:** -- and you join the trade association, you
[5] get a lower rate. If you are outside the trade association,
[6] you pay a higher rate.
[7]   **Q.** Is that correct, Mr. Annastas?
[8]   **A.** Yes.
[9]   **Q.** And, the fees offered under the bowling center license --
[10]      **THE COURT:** Why is that so?
[11]      **THE WITNESS:** The Bowling Proprietors' Association
[12] actually collects the money for us. It is savings in the
[13] administration costs. And there are a lot of bowling centers
[14] that don't want to belong to an association so we had to
[15] develop a license for those that didn't want to belong to the
[16] association.
[17]      That's the basic reason.
[18] **BY MR. MARKS:**
[19]   **Q.** And the fees offered under the bowing center licenses don't
[20] depend on whether or not the bowling center offers rock & bowl,
[21] do they?
[22]   **A.** Say that again.
[23]   **Q.** I'm saying that the fees that the bowling center pays --
[24]   **A.** Right.
[25]   **Q.** -- don't depend on whether or not it offers a service

Page 356

[1] called rock & bowl?
[2]   **A.** No.
[3]   **Q.** And it doesn't depend on whether or not the bowling center
[4] actually offers a service called cosmic bowling?
[5]   **A.** No, but I know there are definitions within the license as
[6] to what cosmic bowling is and so forth. There is a definition
[7] on how the music is used.
[8]   **Q.** The bowling centers are permitted to offer those services
[9] under the license but the fees don't depend on whether or not
[10] they do offer that service, correct?
[11]   **A.** Right.
[12]   **Q.** And it doesn't matter how much, you know, how much rock and
[13] bowl or how much cosmic bowling they offer, correct?
[14]   **A.** Not that I'm aware of.
[15]      **MR. MARKS:** No further questions, your Honor.
[16]      **THE COURT:** Thank you, Mr. Marks.
[17]      Anything further for Mr. Annastas?
[18]      **MR. FITZPATRICK:** Yes, your Honor.
[19] REDIRECT EXAMINATION
[20] **BY MR. FITZPATRICK:**
[21]   **Q.** Hello, Mr. Annastas.
[22]      Just to follow up on one question you were asked
[23] before. You were asked about administrative efficiencies
[24] provided to BMI by the commercial music services industry and I
[25] think that you answered to a degree they do that. I just

---

Page 357

[1] wanted to ask you to expand on that, why the answer wasn't just
[2] yes, that it was to a degree?
[3] **A.** As much as we offer the volume discount we have no idea of
[4] what locations they're servicing. They don't give us a list of
[5] anyone they're servicing. So, from the 165,000 Muzak is
[6] servicing we still have to find out when we make contact with
[7] all these establishments that they're with Muzak or with DMX
[8] because they've refused to give us a list over the years. So,
[9] we've actually only gotten the number of locations.
[10] **Q.** And how does that affect BMI's administrative costs or the
[11] administrative efficiencies that they offer to BMI?
[12] **A.** As we are talking about costs and sales reps and the BDS,
[13] the business development group most of what they do, if the
[14] total industry has 400,000 locations that they're servicing, we
[15] are still calling them to find out, whoops, they've got Muzak.
[16] So, the cost of doing that is burdensome on BMI.
[17] **Q.** If I could please show the witness, it was the document we
[18] were looking for the other day, it is Joint Exhibit 0743.
[19]     Mr. Annastas, could you take a look at this and
[20] identify it, please?
[21] **A.** It is a chart that was prepared of all the various Muzak
[22] proposals.
[23] **Q.** And just focusing on the handwriting portion of the
[24] document, whose handwriting is that?
[25] **A.** That's mine.

Page 358

[1] **Q.** And why were you writing this?
[2] **A.** I think we had it in a meeting with Muzak and I was getting
[3] this information from Muzak.
[4] **Q.** And if you could look over on the far left there is a note
[5] that starts with 2 to 3 percent. Do you see that?
[6] **A.** Yes.
[7] **Q.** Could you read that?
[8] **A.** It says 2 to 3 percent growth factor.
[9] **Q.** And what does that note mean?
[10] **A.** At the time that was when they introduced the -- Muzak
[11] introduced the idea that they would be growing approximately 2
[12] to 3 percent per year.
[13] **Q.** Mr. Annastas, if you could take a look --
[14]     **MR. MARKS:** Your Honor, I would just object. It is
[15] hearsay of any indication of what Muzak said.
[16]     **THE COURT:** Overruled.
[17]     **MR. MARKS:** To the extent it is being offered for the
[18] truth of what Muzak said I believe it would be hearsay for
[19] Mr. Annastas to testify about what they said.
[20]     **THE COURT:** Thank you. I will receive it.
[21] **BY MR. FITZPATRICK:**
[22] **Q.** Can you take a look at -- sorry -- at Respondent's 157 if
[23] you still have that? It was a document you were shown
[24] yesterday and we have another copy if you don't have it.
[25] **A.** Is it in the book or --

Page 359

[1] **Q.** No, one of the documents that Mr. Marks reviewed with you.
[2] **A.** Okay. It is a letter that went out?
[3] **Q.** Yes.
[4] **A.** Okay.
[5] **Q.** And you testified about this yesterday and I just wanted to
[6] ask you about the last paragraph. The last paragraph actually
[7] says if you choose to continue as a litigant in the rate
[8] court -- let me just start.
[9]     This is a letter that Teresa Stafford-Scherer sent to
[10] a company called Sound Solutions, correct?
[11] **A.** Yes.
[12] **Q.** And that was a member of the commercial music services
[13] industry?
[14] **A.** Yes.
[15] **Q.** And they had not, as of yet, accepted the industry-wide
[16] license that BMI was offering after it concluded its
[17] negotiations with Muzak, correct?
[18] **A.** Yes.
[19] **Q.** And so one of the things that Ms. Stafford-Scherer is
[20] telling Sound Solutions is that if you choose to continue as a
[21] litigant in the rate court proceeding, please so indicate below
[22] by the signature of an authorized individual in your company.
[23]     Correct?
[24] **A.** Yes.
[25] **Q.** And she's informing them if you continue as a litigant, BMI

Page 360

[1] reserves the right to take all appropriate steps to protect the
[2] interests of its affiliated songwriters, composers and
[3] publishers including seeking additional retroactive final fees
[4] for the entire open period back to 1994. Correct?
[5] **A.** Yes.
[6]     **MR. MARKS:** Your Honor, I would object to this line of
[7] question as leading.
[8]     **THE COURT:** What is the objection?
[9]     **MR. MARKS:** I believe he is leading the witness, your
[10] Honor.
[11]     **THE COURT:** The form of the question?
[12]     **MR. MARKS:** Correct.
[13]     **THE COURT:** You believe it is leading.
[14]     **MR. MARKS:** I believe he is leading the witness, yes.
[15]     **THE COURT:** Overruled.
[16] **BY MR. FITZPATRICK:**
[17] **Q.** Mr. Annastas, this was an -- the position that is described
[18] here, is that the position that BMI was taking with Muzak
[19] whether it was in the rate court that it was seeking
[20] retroactive fees back to 1994?
[21] **A.** The original rate court? Yes.
[22] **Q.** And, if the -- if Sound Solutions had elected to -- was
[23] Muzak taking the position that they wanted a retroactive
[24] decrease in the fees in rate court?
[25] **A.** Yes.



[1] Q. And if Sound Solutions had elected to remain in the rate
[2] court, could they have taken the position that they wanted a
[3] retroactive decrease in fees so that BMI would actually have to
[4] pay them money for the decade starting in 1994?
[5] A. Yes.
[6] Q. Now, if BMI had proceeded in rate court with Sound
[7] Solutions -- first of all, as it says here they would have
[8] sought retroactive fees for the period beginning in 1994,
[9] correct?
[10] A. Correct.
[11] Q. And would BMI have also sought the $36.36 blanket license
[12] fee rate?
[13] A. Yes.
[14] Q. I just want to look at some of the --
[15] THE COURT: Mr. Fitzpatrick, I take it that the
[16] respondent's inquiry directed to that sentence that you just
[17] read into the record is if BMI was content to write off all of
[18] any increase based on the interim payments and live entirely
[19] with the fee with the new fee agreement, why was it putting
[20] this sentence into the letter directed simply to the choice not
[21] to accept the new fee agreement?
[22] (Continued on next page)

[1] MR. FITZPATRICK: As part of the agreement with Muzak,
[2] BMI was -- if the parties were willing to reach an agreement,
[3] that was the agreement BMI was willing to reach. In part, I
[4] think as Mr. Annastas testified yesterday because the benefit
[5] you get from getting the retroactive fees would be eaten up by
[6] the expenses in rate court to actually go back and get it. But
[7] if a party was not, if the agreement was not acceptable to a
[8] party and they wanted to exercise their right to go to rate
[9] court, which they still had, there was in fact a rate court
[10] case pending, then BMI is being clear its position in rate
[11] court is and always would have been with Muzak or anyone else
[12] that it was entitled to both retroactive fees and a $36.36 rate
[13] going forward.
[14] THE COURT: Yes, I see. This sentence would still be
[15] not inconsistent with a calculation which carried forward some
[16] of the money owed, as viewed by BMI for the interim period into
[17] the new rate.
[18] MR. FITZPATRICK: I think it would, your Honor. It
[19] certainly is not inconsistent with the idea that BMI believed
[20] it should get some money for the past. I think that's
[21] consistent. BMI has always believed --
[22] THE COURT: But that isn't the issue. The issue is
[23] whether, whether some of the money it wanted for the past was
[24] carried over into and satisfied by to some extent the new fee.
[25] MR. FITZPATRICK: Exactly, your Honor. And that was

[1] the purpose of my last question, which is if BMI had gone to
[2] rate court, its position would have been that it wanted the
[3] past and it wanted 36.36, not oh, we're going to ask for
[4] something from the past so that means our rate going forward is
[5] $32 or $33. Its position would remain consistent, which is for
[6] '04 to '09 it's $36.36. For the past, if we can do this with
[7] an agreement, we'll finalize. If we have to go to rate court
[8] even to get the 36.36, then part of the cost of that is we are
[9] going to litigate our belief that we were entitled to money for
[10] the past as well.
[11] BY MR. FITZPATRICK:
[12] Q. If we could take a look at Petitioner's Exhibit 11, which
[13] is a document, it's in evidence and it was used with you
[14] yesterday, Mr. Annastas.
[15] A. Could you tell me what it looks like?
[16] Q. It's the notes from the negotiation, the July 9, '02
[17] negotiation.
[18] A. Okay, I've got it.
[19] Q. Do you have that, Mr. Annastas?
[20] A. Yes, I do.
[21] Q. And I just want to make sure we have the terms of all of
[22] these offers clear. So if we turn to the second page of this
[23] document, second full paragraph, am I correct that it's
[24] describing a BMI offer, correct?
[25] A. Where it says BMI indicated?

[1] Q. Yes.
[2] A. Yes.
[3] Q. And the proposal as you discussed yesterday was that there
[4] was a $32.50 per location rate.
[5] A. Yes.
[6] Q. Now, I want to talk about the differences between this
[7] offer and the final agreement that BMI reached with Muzak.
[8] First of all, as I think was discussed yesterday, this per
[9] location rate is $32.50. The rate, the per location rate in
[10] the Muzak deal started at $36.36, correct?
[11] A. Yes.
[12] Q. Now, the term of the Muzak agreement was July 2004 to
[13] June 2009, correct?
[14] A. Yes.
[15] Q. Does it say in this document what the term of BMI's $32.50
[16] per location offer was?
[17] A. Not that I see.
[18] Q. And given that this was occurring in July 2002, it's
[19] unlikely that it would have been an '04 to '09 offer, correct?
[20] A. Yes.
[21] MR. MARKS: Objection, your Honor. Leading the
[22] witness.
[23] THE COURT: Overruled.
[24] Q. And this paragraph says $32.50 per location, so am I
[25] correct that this was a straight per location offer from BMI?



Page 365

[1] **A.** Yes.

[2] **Q.** And was the ultimate agreement with Muzak a per location

[3] deal?

[4] **A.** Yes.

[5] **Q.** Could you explain how that worked, the Muzak deal?

[6] **A.** Well, again, the Muzak, when Muzak reported to us and we

[7] finally came to a deal, they had 165,000 locations. They were

[8] going to pay us $6 million per year, 165,000 into the 6 million

[9] came out to be $36.36.

[10] **Q.** But would -- changes in the number of Muzak locations would

[11] not result in corresponding changes in the Muzak fees, correct?

[12] **A.** Only if they got past the growth factor rate.

[13] **Q.** And this $32.50 per location rate doesn't have any growth

[14] provision in it, correct?

[15] **A.** No.

[16] **Q.** Now, if we drop down two paragraphs. It says BMI brought

[17] up the issue of retroactivity back to 1994, correct?

[18] **A.** Yes.

[19] **Q.** Does it say anything in here about how much money BMI was

[20] seeking for retroactivity at this point?

[21] **A.** No, there's no money mentioned.

[22] **Q.** If I could just go on to the next BMI offer that we looked

[23] at yesterday, which was used with you. It's Joint Exhibit 73.

[24] It's an August 20, 2003 letter from you to Mr. Zendan?

[25] **A.** It's in the book?

Page 366

[1] **Q.** I'm sorry?

[2] **A.** In the book or --

[3] **Q.** It was a document Mr. Marks used with you, so it should be

[4] a loose document.

[5] **A.** The August 20, 2003?

[6] **Q.** Yes.

[7] **A.** Yes.

[8] **Q.** Again, I just want to look at the offer that's here and

[9] compare it to the final agreement reached with Muzak. First of

[10] all, in the annual license fee column, I believe Mr. Marks

[11] added those numbers up with you yesterday and reached

[12] $27 million, correct?

[13] **A.** Yes.

[14] **Q.** And the final deal with Muzak as we know was $30 million?

[15] **A.** Yes.

[16] **Q.** And again, we mentioned before the deal with Muzak was from

[17] mid-'04 to mid-'09, correct?

[18] **A.** Correct.

[19] **Q.** The years of this deal are 2003 to 2007, is that correct?

[20] **A.** Correct.

[21] **Q.** Now, the terms of the Muzak deal are $6 million a year,

[22] correct? The total dollar amount doesn't change from year to

[23] year?

[24] **A.** Correct.

[25] **Q.** And this is -- how does that compare to the way the dollars

Page 367

[1] work in this deal?

[2] **A.** In this deal, there's an annual license fee specified on

[3] each year, and then any new locations had a per location rate.

[4] **Q.** In this particular offer the annual license fees increase

[5] each year going from 4.4 million to 6.4 million, correct?

[6] **A.** Yes, they do.

[7] **Q.** I believe, as Mr. Marks pointed out yesterday, there was a

[8] $6 million retroactive component in this offer as well,

[9] correct?

[10] **A.** Yes.

[11] **Q.** I just want to talk briefly about number of locations. If

[12] you could turn the page, how many locations was this offer

[13] premised on?

[14] **A.** 157,000.

[15] **Q.** And how many locations was the final agreement with Muzak

[16] premised on?

[17] **A.** 165,000.

[18] **Q.** And if you look back to page 1, the column on the far right

[19] has a heading called dollars per new location. Can you explain

[20] what that is?

[21] **A.** That's what we would be charging them for any new locations

[22] above and beyond the 4 point million and 157,000 locations.

[23] **Q.** If you wanted to calculate how this would work out with

[24] 165,000 locations, you would have to, am I correct, for each

[25] year take the difference between 157 and 165, which is 8,000,

Page 368

[1] and then for each year multiply it by the dollars per new

[2] location rate on the far right?

[3] **A.** Yes.

[4] **Q.** And the way the dollars per new location works is that for

[5] in 2003 dollars per new location was $27.85, correct?

[6] **A.** Correct.

[7] **Q.** But over the course of the deal, by 2007, dollars per new

[8] location would be $40.50?

[9] **A.** Yes.

[10] **Q.** And 2007 was the end of this deal, but was only in the

[11] middle of the term of the final agreement reached with Muzak,

[12] correct?

[13] **A.** Correct.

[14] **Q.** Okay. Last one. If we could look at Joint Exhibit 1164,

[15] which was also used with you yesterday. This is the one with

[16] BMI proposals A1, A, B and C. Mr. Marks used it with you.

[17] **A.** Okay.

[18] **Q.** And again, just want to make sure I have the comparison.

[19] We'll use BMI proposal A1. I want to make sure we have the

[20] comparison of this with the final agreement reached with Muzak.

[21] **A.** Okay.

[22] **Q.** First, I believe you did this yesterday, total annual fee,

[23] if you add the five years up, is $27.5 million, correct?

[24] **A.** Correct.

[25] **Q.** And the agreement you reached with Muzak was $30 million,



[1]  correct?

[2]  **A.** Correct.

[3]  **Q.** This also had a $5.5 million in the retro column?

[4]  **A.** Correct.

[5]  **Q.** And there was no retro component in the final deal with
[6]  Muzak, correct?

[7]  **A.** Correct.

[8]  **Q.** Now, the term of this agreement, is, am I correct that it's
[9]  full year 2004 to full year 2008?

[10]  **A.** Yes.

[11]  **Q.** And the, again, the time term with Muzak was mid-year '04
[12]  to mid-year '09, correct?

[13]  **A.** Correct.

[14]  **Q.** In the location column, what was the estimated number of
[15]  locations at this point for Muzak?

[16]  **A.** 164,000.

[17]  **Q.** And you mentioned before it was 165,000 at the final deal,
[18]  correct?

[19]  **A.** Yes.

[20]  **Q.** Now, if you could, the organic, well, actually it's not
[21]  organic, the growth provision, I'm sorry, in this offer, I
[22]  think you testified yesterday was 2.5 percent, correct?

[23]  **A.** Correct.

[24]  **Q.** And it says in the parenthesis organic or existing
[25]  affiliate, correct?

[1]  **A.** Correct.

[2]  **Q.** And could you explain what that means?

[3]  **A.** This was going to include whether or not they acquired
[4]  another service. So if they acquired the service, it would be
[5]  part of the growth factor of 2.5 percent.

[6]  **Q.** Now, final deal with Muzak, as we've said many times, the
[7]  growth provision was 8 percent, correct?

[8]  **A.** Yes.

[9]  **Q.** And we've been calling it an organic growth provision. Is
[10]  that different than the growth provision that was here?

[11]  **A.** Yes.

[12]  **Q.** Could you explain that?

[13]  **A.** The organic was total new accounts that they would be
[14]  servicing that they never had before. Again going back to the
[15]  existing affiliate or existing service, if they bought another
[16]  service they would be paying us for those additional locations
[17]  without the growth factor.

[18]  **Q.** And then just so we understand the final column, the per
[19]  100 location adjustment, are those additional amounts that
[20]  Muzak would be paying if they exceeded this growth factor we've
[21]  been talking about?

[22]  **A.** Yes.

[23]  **Q.** And they go, if I have the math right, it's actually done
[24]  as a per hundred location adjustment and then it's in thousands
[25]  of dollars, but the way it works out is it would be $27 a

[1]  location in '04 going up to $42 a location in 2008, is that
[2]  correct?

[3]  **A.** Yes, that's correct.

[4]  **Q.** I think you mentioned during your direct testimony that you
[5]  described the Muzak affiliates, correct?

[6]  **A.** Yes.

[7]  **Q.** And we talked about the fact that their agreement was
[8]  included in the negotiation that BMI had with Muzak?

[9]  **A.** Yes.

[10]  **Q.** Were the Muzak affiliates represented by counsel?

[11]  **A.** Yes.

[12]  **Q.** And who is that?

[13]  **A.** Jack Carroll.

[14]       **MR. FITZPATRICK:** Thank you. I have no further
[15]  questions.

[16]       **MR. MARKS:** No recross, your Honor.

[17]       **THE COURT:** Thank you, Mr. Annastas. You're excused.

[18]       **THE WITNESS:** Appreciate it.

[19]  (Witness excused)

[20]       **MR. FITZPATRICK:** Your Honor, could I do a quick
[21]  housekeeping issue before you call the next witness?

[22]       **THE COURT:** Yes.

[23]       **MR. FITZPATRICK:** On, and the court reporter has
[24]  notified me that I've again failed to identify two exhibits.
[25]  On January 19, page 83 of the transcript, there was a reference

[1]  to an exhibit that I didn't identify. It was Joint Exhibit
[2]  1110.

[3]       **THE COURT:** Is there a transcript?

[4]       **MR. FITZPATRICK:** Yes, your Honor.

[5]       **THE COURT:** I don't seem to have it.

[6]  (Pause)

[7]       **THE COURT:** Forgive me. Go ahead.

[8]  **Q.** And on the same day, at page 103 of the transcript there
[9]  was a reference to an exhibit which I should have called Joint
[10]  Exhibit 1312.

[11]       One other matter, your Honor. I made an error
[12]  yesterday in a question that I asked to Mr. O'Neill. I had
[13]  asked Mr. O'Neill when we were talking about the domestic
[14]  overhead rate that BMI applies, I had asked him whether that
[15]  domestic overhead rate was applied to every dollar in the
[16]  United States that BMI brings in, and I had forgotten an
[17]  exception. There is an exception which I completely forgot.

[18]       **THE COURT:** I think his answer was yes.

[19]       **MR. FITZPATRICK:** It was, your Honor, but I had made a
[20]  mistake in asking the question, because there is an exception
[21]  for public broadcasting educational television like Channel 13
[22]  in New York. Those are domestic dollars and BMI historically
[23]  has taken a zero percent overhead rate on that. I don't think
[24]  it affects our position, but I didn't want there to be an
[25]  inaccuracy in the record, your Honor.

Page 373

[1]    THE COURT: Is there --
[2]    MR. MARKS: No objection to that clarification.
[3]    THE COURT: Thank you. So accepted. Mr. O'Neill's
[4] testimony has been modified accordingly.
[5]    MR. FITZPATRICK: Should we call our next witness or
[6] is it time for a break, your Honor?
[7]    THE COURT: We're about the time for a mid-morning
[8] break, so do it now. Come back at 11:25.
[9]    MR. FITZPATRICK: Thank you, your Honor.
[10]    (Recess)
[11]    MR. FITZPATRICK: May we call our next witness, your
[12] Honor?
[13]    THE COURT: Yes.
[14]    MR. FITZPATRICK: Your Honor, BMI calls Ms. Sindee
[15] Levin.
[16]    SINDEE LEVIN,
[17]    called as a witness by the Petitioner,
[18]    having been duly sworn, testified as follows:
[19]    THE DEPUTY CLERK: Please state your name and spell
[20] your last name slowly for the record.
[21]    THE WITNESS: My name is Sindee, and it's S as in Sam,
[22] i-n-d-e-e. My last name is Levin, L-e-v as in Victor, i-n.
[23]    MR. FITZPATRICK: Your Honor, may I approach with a
[24] binder of exhibits?
[25]    THE COURT: Yes.

Page 374

[1]    DIRECT EXAMINATION
[2]    BY MR. FITZPATRICK:
[3]    Q. Good morning, Ms. Levin.
[4]    A. Good morning, sir.
[5]    Q. Could you please tell the Court what it is you do for a
[6] living?
[7]    A. I am a lawyer in the State of California by profession. I
[8] run a music publishing company and in addition I run a society
[9] called AMRA, which is an acronym for American Mechanical Rights
[10] Agency, Inc., which is a mechanical rights society in the
[11] United States.
[12]    Q. And how many people work for AMRA?
[13]    A. There's approximately eight people. Some in my office in
[14] Los Angeles. One in, actually in Israel right now or
[15] continental Europe, and a couple off site who do data
[16] processing.
[17]    Q. And you mentioned that it's, I believe you said the acronym
[18] was the American Mechanical Rights Agency. What is a
[19] mechanical rights agency?
[20]    A. AMRA is, what the acronym for that, it's a society that
[21] collects mechanical royalties.
[22]    Q. And could you explain what mechanical royalties are?
[23]    A. Traditionally, mechanical royalties would have been for
[24] albums, CD's, mechanical reproduction of music. It has grown
[25] into the new technologies, which may be digital downloading or

Page 375

[1] streaming or sort of euphemistically called the internet, which
[2] encompasses increasing technologies.
[3]    Q. Are they different than the performing rights that BMI
[4] licenses?
[5]    A. Yes.
[6]    Q. Does AMRA license any other kind of rights besides the
[7] mechanical rights that you've just described?
[8]    A. In certain situations AMRA does do what's called
[9] synchronization licensing, which is music and film or
[10] television, commercials, possibly.
[11]    Q. And what is the synch right actually for music and film and
[12] television?
[13]    A. It's the synchronization of music to a picture and it can
[14] be in any medium.
[15]    Q. And again, is that different from the performing right that
[16] BMI licenses?
[17]    A. Yes, it is.
[18]    Q. Does AMRA ever license performing rights?
[19]    A. No. It's not authorized under our mandate.
[20]    Q. Could you estimate roughly how many mechanical and
[21] synchronization licenses AMRA will do in a given year?
[22]    A. For the United States and Canada, which is the only parts
[23] of the world that issue a mechanical license, I would say
[24] approximately 250 to maybe 300 a year.
[25]    Q. Ms. Levin, if I could ask you to take the binder in front

Page 376

[1] of you and turn to tab 1 of the binder.
[2]    A. Sure.
[3]    Q. There is an exhibit at tab one which was been marked
[4] Respondent's Exhibit 0086.
[5]    A. I have it, sir.
[6]    Q. If you could take a look at that and identify it, please.
[7]    A. Looks like e-mail correspondence between me and Barry
[8] Knittel.
[9]    MR. FITZPATRICK: I would move this document's
[10] admission, your Honor?
[11]    MR. MARKS: No objection.
[12]    THE COURT: Proceed.
[13]    (Respondent's Exhibit RX 0086 received in evidence)
[14]    Q. Ms. Levin, who is Mr. Knittel?
[15]    A. To my understanding, he runs DMX.
[16]    Q. And is bottom half of this, is the LALaw9049, is that one
[17] of your e-mail addresses?
[18]    A. Yes, it is.
[19]    Q. So in your e-mail to Mr. Knittel, you say: "Hi, Barry. I
[20] really appreciate you taking the time to meet with me the other
[21] day." Do you see that?
[22]    A. Yes.
[23]    Q. Do you recall what was discussed at the meeting between
[24] yourself and Mr. Knittel?
[25]    A. I think we discussed our respective backgrounds, I'm sure



[1] some industry gossip. Other than that, what DMX was and we
[2] also had a discussion about certain clients that I had that had
[3] their music used at airlines, on the flights, and he told me he
[4] could assist me with getting collection for that.
[5] **Q.** With respect to DMX, had you known what DMX was prior to
[6] your meeting with Mr. Knittel?
[7] **A.** No.
[8] **Q.** Now, is the top half of this document, is that Mr. Knittel
[9] responding to you?
[10] **A.** It appears so.
[11] **Q.** And the last sentence of Mr. Knittel's e-mail to you is a
[12] question that says -- sorry, the whole last paragraph says:
[13] "After review of the attached catalog, DMX would be interested
[14] in entering into a direct license agreement for AMRA publishing
[15] rights." Do you see that?
[16] **A.** Yes.
[17] **Q.** And what did you understand Mr. Knittel to mean by
[18] publishing rights in that context?
[19] **A.** Publishing rights is used sort of in a casual way. I took
[20] it as mechanicals, because all AMRA collects are mechanical
[21] rights.
[22] **Q.** And did you believe Mr. Knittel was referring to
[23] performing -- to publishing rights to be including performing
[24] rights on the e-mail?
[25] **A.** No, I did not.

[1] **Q.** It concludes, "With would you like me to have MRI forward
[2] to you the appropriate DMX publishing license agreement." Do
[3] you see that?
[4] **A.** Yes.
[5] **Q.** Did MRI in fact forward you an agreement?
[6] **A.** Yes, it did.
[7] **Q.** If you could take a look at tab 2 of your binder, which is
[8] Joint Exhibit 0947, and if you could identify that for me,
[9] please?
[10] **A.** Looks like e-mail correspondence between Trent Smith and
[11] myself, and to my understanding, this Trent is a licensing
[12] manager for Music Reports Inc. or MRI.
[13] **Q.** And what's MRI?
[14] **A.** MRI historically, I think they're music clearance and now
[15] works with many of the digital providers and assists with
[16] clearances, with getting licenses and with royalty payment.
[17] **Q.** Is there an attachment to this e-mail as well?
[18] **A.** Well, it refers to a direct license, and I assume what's on
[19] the next page is a copy of the license.
[20] **Q.** Now, if you look at Mr. Trent's e-mail to you, he's got
[21] four numbered paragraphs; 1, 2, 3 and 4. Do you see that?
[22] **A.** Yes.
[23] **Q.** In paragraph number 1, it says, "Grant of rights, entire
[24] catalog of owned or administered compositions, including all
[25] performance reproduction and distribution rights necessary to

[1] deliver the service to business locations." Do you see that?
[2] **A.** Yes, sir.
[3] **Q.** And so just so there's no question, the word "performance"
[4] is included in Mr. Trent's e-mail to you, correct?
[5] **A.** It is.
[6] **Q.** Now, did you, when you received this e-mail, did you
[7] understand Mr. Smith to be requesting a performance rights
[8] license from you?
[9] **A.** No, I did not.
[10] **Q.** And could you explain why not?
[11] **A.** Again, for purposes of AMRA, AMRA doesn't create that, and
[12] my understanding from previous situations with Mr. Smith is
[13] he's somewhat, I want to say a low-level employee, at the risk
[14] of sounding somewhat arrogant. Again, it's common that people
[15] are somewhat loose, not very precise in correspondence about
[16] rights.
[17] I also don't professionally believe in the concept of
[18] direct licensing, and I've been public about that over the
[19] years.
[20] **Q.** Did you have any comments when Mr. Smith -- did you have
[21] any comments to the direct license that Mr. Smith sent to you?
[22] **A.** I think I had a few comments that I had sent to him.
[23] **Q.** And if you could turn to tab 3 of the binder. There's a
[24] document there that's been marked as Joint Exhibit 1106. Do
[25] you see that?

[1] **A.** Yes.
[2] **Q.** Could you identify that document, please?
[3] **A.** It's an e-mail from Mr. Smith responding to comments that I
[4] had given him.
[5] **Q.** Now, did any of your comments relate to which rights were
[6] actually being provided under the license?
[7] **A.** No.
[8] **Q.** Did any of your comments relate to the royalty clause in
[9] the contract?
[10] **A.** No. And typically, these royalty provisions, they're not
[11] negotiable.
[12] **Q.** If you could take a look at tab 4 of your binder, please.
[13] And there's a document there marked as Joint Exhibit 0437. Do
[14] you see that?
[15] **A.** Yes.
[16] **Q.** And can you identify that, please?
[17] **A.** This looks like an additional, another agreement between
[18] DMX and me personally in regards to what I refer to as my
[19] publishing clients, which is separate and apart from AMRA.
[20] **Q.** Okay. Actually, if we could bypass that for just a moment
[21] and go to tab 5. There's a document there marked as Joint
[22] Exhibit 0171. Do you see that?
[23] **A.** Yes.
[24] **Q.** Could you identify that document, please?
[25] **A.** This looks like, this is the agreement between DMX and

Page 381

[1] AMRA.
[2] **Q.** And if you could go to the last page of the document, is
[3] that your signature there under the AMRA block?
[4] **A.** Yes, it is.
[5] **Q.** And when you signed this license on behalf of AMRA, what
[6] rights did you believe you were providing to DMX?
[7] **A.** Mechanical rights.
[8] **Q.** And did you think you were providing performance rights to
[9] DMX?
[10] **A.** No, I did not.
[11] **Q.** Have you subsequently learned whether or not the agreement
[12] does include performance rights?
[13] **A.** Well, I've learned that it did include performance rights.
[14] **Q.** And after you learned that, did you cancel the license?
[15] **A.** Yes, I have terminated it.
[16] **Q.** When you signed this agreement, did you have any
[17] understanding of what DMX's on and off-premises businesses
[18] were?
[19] **A.** I assumed it was similar, you know, to what once was called
[20] elevator music, or Muzak is the company that I'm familiar with,
[21] but there are countless internet providers that have these
[22] types of agreements that I am approached by or have licenses
[23] sent to me, so it's just not humanly possible to read line by
[24] line all these things that it's been made very clear AMRA is a
[25] mechanical rights society.

Page 382

[1] **Q.** Did you have an understanding of whether DMX's on-premise
[2] or off-premise service or both would be used to calculate your
[3] royalties under this agreement at the time you signed it?
[4] **A.** I assumed there would be a mechanical royalty paid.
[5] **Q.** If you could take a look now back at tab 4, and I believe
[6] you identified this as another direct license that you entered
[7] into with DMX, correct?
[8] **A.** Well, I didn't take it as a direct license, but yes, this
[9] is an agreement between DMX and myself as a lawyer, and this
[10] has to do with my music publishing company.
[11] **Q.** When you signed this agreement, what rights did you believe
[12] you were providing to DMX?
[13] **A.** Mechanical rights, sir.
[14] **Q.** Did you subsequently learn it included performance rights?
[15] **A.** Yes, I have.
[16] **Q.** What did you do when you learned that?
[17] **A.** I terminated this agreement around the same time I
[18] terminated the other. There was some question as to the proper
[19] address and when the termination -- there's a rather onerous
[20] termination agreement in here, but, yes, they were done within
[21] a few days of each other.
[22]     **MR. FITZPATRICK:** Thank you, Ms. Levin. I pass the
[23] witness.
[24] **CROSS-EXAMINATION**
[25] **BY MR. MARKS:**

Page 383

[1] **Q.** Good afternoon, Ms. Levin.
[2] **A.** Hi.
[3] **Q.** You are a veteran entertainment attorney, correct?
[4] **A.** Yes, sir.
[5] **Q.** And you're an active member of the State Bar of California?
[6] **A.** Yes, I am.
[7] **Q.** And you're also a music publisher, you said?
[8] **A.** Yes. I make my living primarily as a music publisher. I'm
[9] not -- I don't consider myself a practicing lawyer.
[10] **Q.** And in your capacity as a music publisher, you administer
[11] copyrights that are owned by other people, correct? That's
[12] part of what you do?
[13] **A.** Yes, sir.
[14] **Q.** And another part of what you do as a music publisher is
[15] license the compositions for which you own the copyright?
[16] **A.** Well, there are certain copyrights that I personally own.
[17] A majority of the publishing I do, though, I am an
[18] administrator for other people's own copyright.
[19] **Q.** Before you were a music publisher, you were in private
[20] practice as an entertainment attorney?
[21] **A.** I was in-house counsel and prior to that, I was in private
[22] practice at a law firm.
[23] **Q.** An entertainment law firm?
[24] **A.** Yes.
[25] **Q.** You hold yourself out to the marketplace as a



Page 384

[1] well-respected authority that insures your clients will be
[2] fairly compensated for their creative efforts, is that correct?
[3] **A.** Yes.
[4] **Q.** You own a music publishing called Sindee Levin Music?
[5] **A.** It's an S Corp. in California that's a holding company for
[6] the copyrights I personally own.
[7] **Q.** You're affiliated with six or seven other publishing
[8] company names?
[9] **A.** That's probably right.
[10] **Q.** And on behalf of these various music publishing entities,
[11] you negotiate copyright licenses, correct?
[12] **A.** You'd have to define what you mean by copyright licenses.
[13] Generally, that is correct, though.
[14] **Q.** For various different types of copyrights you negotiate
[15] licenses, correct?
[16] **A.** Yes, sir.
[17] **Q.** And Sindee Levin Music has a website, correct?
[18] **A.** Yes, it does.
[19] **Q.** And on the website you advertise that Sindee Levin Music
[20] offers high quality music fare at budget friendly rates,
[21] correct?
[22] **A.** Yes, but that's for synchronization licensing.
[23] **Q.** And one of the ways that you compete in the marketplace for
[24] synchronization rights is by offering those rights at a lower
[25] price than some other people, correct?

[1] **A.** Yes.

[2] **Q.** If I could turn your attention back to tab 2 of your

[3] binder, which is Joint Exhibit 947.

[4] **A.** Yes, sir.

[5] **Q.** This is the e-mail that you received from Mr. Smith at MRI

[6] on August 8, 2007, correct?

[7] **A.** Yes, that's correct, sir.

[8] **Q.** And you were previously acquainted with Ron Gertz and Doug

[9] Brainin of MRI from other business activities at the time you

[10] received this e-mail?

[11] **A.** Yes.

[12] **Q.** I'd like to turn your attention -- excuse me one second.

[13] I'd like to show the witness Respondent's Exhibit 88. This is

[14] an e-mail that you received from Mr. Smith on August 24, 2007?

[15] **A.** Based on the information on here, yes.

[16] **Q.** And Mr. Smith at MRI said that in connection with your

[17] negotiation of the AMRA license, DMX would be willing to do

[18] deals for as many of your music publishing clients as you like.

[19] That's what you understood from this e-mail, correct?

[20] **A.** Let me review it, please? At the top of it, it's talking

[21] about the proper information for payees and proper tax

[22] information. Okay. Yes, sir.

[23] **Q.** You discussed over time not only the AMRA license, but a

[24] license that would cover the other music publishing companies

[25] for which you do own performance rights, correct?

[1] **A.** Yes. Barry and I had discussed that.

[2] **Q.** If I could turn your attention to tab 4 of your binder and

[3] Joint Exhibit 437. On page 5 of that agreement, you'll see

[4] paragraph 6C, there's a provision that says, "Merger/No oral

[5] amendments." Do you see that?

[6] **A.** Yes, sir.

[7] **Q.** And it states: "This agreement sets forth the entire

[8] understanding between the parties with respect to the subject

[9] matter hereof, and all prior and contemporaneous agreements are

[10] merged herein," and then it continues. Do you see that?

[11] **A.** Yes, sir.

[12] **Q.** As an attorney, you understand that provision to mean that

[13] whatever conversations you had prior to the execution of the

[14] agreement, it's this agreement that controls the terms of the

[15] contract between the parties, correct?

[16] **A.** Yes.

[17] **MR. MARKS:** Mr. Fitzpatrick points out to me that I

[18] have not yet moved Respondent's Exhibit 88 into evidence, and I

[19] do so now.

[20] **MR. FITZPATRICK:** No objection, your Honor.

[21] **THE COURT:** Received.

[22] (Respondent's Exhibit RX 88 received in evidence)

[23] **Q.** And if I could turn your attention to tab 5 of your binder,

[24] Joint Exhibit 171.

[25] **A.** Yes, sir.

[1] **Q.** That's the agreement that you executed on behalf of AMRA?

[2] **A.** Yes.

[3] **Q.** And then the whereas, in the third whereas clause, it

[4] refers to licensee desiring to obtain from publisher a blanket

[5] license for all necessary performance reproduction and

[6] distribution rights implicated by the delivery of the service.

[7] Do you see that?

[8] **A.** Yes, sir.

[9] **Q.** And the grant of rights in the service programming, it

[10] states that the publisher is, among other things, seeking

[11] performance rights?

[12] **A.** That's what it says, sir.

[13] **Q.** There's no confusion to you now reading the document about

[14] what scope of rights was covered by this agreement, right?

[15] **A.** I don't think it's very clear. These agreements are often,

[16] again, drafted with broad terms and not very precise terms.

[17] **Q.** As a veteran entertainment attorney, were you capable of

[18] drafting language that would sharpen that -- that would

[19] eliminate that confusion, weren't you?

[20] **A.** Perhaps. I think, if there's no provision that this was a

[21] direct performance license --

[22] **Q.** If I could draw your attention to page 4 of the license?

[23] In paragraph 5A, it's entitled mutual ability. Do you see

[24] that?

[25] **A.** Yes, sir.

[1] **Q.** It states, "Each party represents and warrants to the other

[2] that it has full right, power and authority to enter into this

[3] agreement and to perform its obligations hereunder." Do you

[4] see that?

[5] **A.** Yes, sir.

[6] **Q.** Do you understand that to mean that you as the signatory on

[7] behalf of AMRA were representing and warranting to DMX that you

[8] had the rights provided in the scope of grant of rights in this

[9] license?

[10] **A.** This is boilerplate language, but yes.

[11] **Q.** You understand as an attorney that that's what it meant,

[12] correct?

[13] **A.** Yes.

[14] **Q.** The AMRA agreement that we're looking at, that was entered

[15] into as of November 15, 2007, correct?

[16] **A.** That's what it's dated.

[17] **Q.** Is that approximately the time it was entered?

[18] **A.** I would have no idea. These things are dated and it could

[19] take months. It would not be unusual.

[20] **Q.** Let me see if I could short circuit the need to wade

[21] through lots of correspondence.

[22] **A.** Okay.

[23] **Q.** Am I correct that the agreement at tab 4 of your binder, JX

[24] 437, was entered into some months after you had entered into

[25] the AMRA agreement?

Page 389

[1]  **A.** Based on the dates, yes.

[2]  **Q.** Based on your recollection as well?

[3]  **A.** I really don't recall.

[4]  **Q.** If I could turn your attention to Schedule A of tab 4.

[5]  **A.** Okay.

[6]  **Q.** This is a list of various publishing entities.

[7]  **A.** Yes, it is.

[8]  **Q.** Some of which you either own or administer the rights for

[9]  the catalogs, and some of which you do not, correct?

[10] **A.** That's correct.

[11] **Q.** And the ones for which you do not own the rights are

[12] crossed out of Schedule A?

[13] **A.** Yes.

[14] **Q.** And that's because you were excluding those from the scope

[15] of the grant of rights that you were making in this agreement,

[16] correct?

[17] **A.** Most of these are former clients and companies I no longer

[18] have any agreement with. Whether I ever had an agreement, I'm

[19] not sure exactly where this entire list came from.

[20] **Q.** Correct. But you reviewed the list and for people for whom

[21] you didn't have authority to enter into the license, you

[22] crossed them out, correct?

[23] **A.** Yes.

[24] **Q.** But you didn't cross out anything from the grant of rights

[25] provision, did you?

Page 390

[1]  **A.** No. I did not make any changes there.

[2]  **Q.** And let's turn to the grant of rights provision 1A on the

[3]  first page of the agreement.

[4]  **A.** Yes.

[5]  **Q.** And it says, "Publisher hereby grants to licensee the right

[6]  to edit, reproduce, distribute and publicly perform any, some

[7]  or all of the musical compositions in publisher's catalog

[8]  solely in connection with the delivery of the service to

[9]  locations." Do you see that?

[10] **A.** Yes.

[11] **Q.** What is your understanding of the reference to the right to

[12] publicly perform? That's the public performance right that you

[13] otherwise license to BMI, correct?

[14] **A.** My read of this is that they have the right to publicly

[15] perform, but it doesn't mean necessarily without a license from

[16] either ASCAP, BMI or SESAC. Just they can perform it.

[17] **Q.** It's under the heading grant of rights, correct?

[18] **A.** Yes, it is.

[19] **Q.** They didn't need a separate right from anybody else to edit

[20] the compositions, did they?

[21] **A.** I'm not sure, sir, what you're asking.

[22] **Q.** Well, I think it's clear from the document that the right

[23] to publicly perform is included within the grant of rights, and

[24] you I think are suggesting that they may need some other right

[25] from somebody else to do that?

Page 391

[1]  **A.** Traditionally this type of language is used with the

[2]  understanding that there would be, one of the performing rights

[3]  organizations in the United States would be collecting

[4]  royalties from it. This is not unusual language or specific

[5]  language to what's referred to as direct licensing.

[6]  **Q.** You owned the public performance rights in the compositions

[7]  referred to --

[8]  **A.** I do not own the majority of them. I administer them.

[9]  Again, just the fact of you using language, language,

[10] unfortunately, in this area of business and the law is used

[11] very imprecisely, and people use, for instance, collection

[12] rights, administrative rights, publishing right, ownership

[13] right interchangeably, even though they are not, it's not

[14] accurate. The same thing with they have the right to publicly

[15] perform does not mean they have the right to collect for public

[16] performances. There is a difference, a distinction.

[17] **Q.** Your suggestion is there's a distinction when you grant

[18] somebody the right to publicly perform a composition, what you

[19] mean is they don't actually have the right to publicly perform

[20] the composition, but they have to go get a license from

[21] somebody else? Is that your testimony?

[22] **A.** Yes. The inference is there. This is standard language in

[23] agreements, and it doesn't mean that they are going to direct

[24] license it.

[25] **Q.** You're referring to an inference and that's based on

Page 392

[1]  something outside the language of the agreement?

[2]  **A.** It's industry standard and how these things are standardly

[3]  drafted. This in no place says that they will be circumventing

[4]  the PRO's.

[5]  **Q.** It in no place says it needs a separate license from a PRO,

[6]  does it?

[7]  **A.** Well, again, when you get to paragraph 2C about double

[8]  payment, they talk about the performing rights societies.

[9]  **Q.** Correct, and that's if they license it through a society,

[10] they won't also pay you?

[11] **A.** That's an industry standard. It gives a license to a

[12] performing rights organization. Industry standard is not to be

[13] doing direct licensing.

[14] **Q.** I understand that's the industry standard, but you're not

[15] suggesting that you are not allowed by BMI to enter into direct

[16] licenses, are you?

[17] **A.** I don't believe there's any restriction to do direct

[18] licensing. My point is that this license is not clear that

[19] they are doing direct licensing.

[20] **Q.** And turning back to the grant of rights, is there some

[21] other third party from whom DMX would need to go out and

[22] separately obtain an additional right to edit your

[23] compositions?

[24] **A.** In terms of editing? No.

[25] **Q.** Is there some other organization that DMX needed to secure



[1] separate permission to reproduce the compositions in your
[2] catalogs that you either own or administer?
[3] **A.** I'm assuming they're getting the rights for the master
[4] recordings.
[5] **Q.** But that's for the sound recording as opposed to the
[6] musical composition?
[7] **A.** Yes.
[8] **Q.** I'm talking about the musical composition itself, the
[9] rights that you own and administer. There's no reason to go
[10] get a reproduction right after you've given them the
[11] reproduction right, correct?
[12] **A.** Not to my knowledge.
[13] **Q.** And same question as to distribution. Once you grant them
[14] the rights to distribute the musical compositions in the
[15] catalogs you own or administer, they don't separately need to
[16] go to anybody else to get the distribution right, do they?
[17] **A.** I'll be honest with you. The way the internet is evolving,
[18] it's unclear in terms of other rights that people need to have
[19] or not. Again, this is standard language for most of these
[20] mechanical licenses. I get countless licenses like this every
[21] week.
[22] **Q.** Sitting here today with regard to what you know about the
[23] DMX service, you're not aware of anyone else they would need to
[24] go to to get a separate distribution right in addition to what
[25] you grant to them?

[1] **A.** Not off the top of my head.
[2] **Q.** You learned subsequent to signing these agreements that
[3] they did in fact include public performance rights? I believe
[4] you testified to that a moment ago, is that correct?
[5] **A.** Yes, sir.
[6] **Q.** You learned they included public performance rights in a
[7] conversation with Alison Smith of BMI, correct?
[8] **A.** Yes, she had advised me of that.
[9] (Continued next page)

[1] **BY MR. MARKS:**
[2] **Q.** And in that conversation, you told her that you had not
[3] been previously aware that you granted public performance
[4] rights to DMX?
[5] **A.** That is correct.
[6] **Q.** And at the time of that first conversation you weren't
[7] aware that DMX and BMI were engaged in a rate court proceeding,
[8] correct?
[9] **A.** Correct.
[10] **Q.** Ms. Smith asked you if you would speak to one of BMI's
[11] lawyers, correct?
[12] **A.** I don't know if it was in that conversation but at some
[13] point in time she did ask me.
[14] **Q.** Let's turn back to that initial conversation.
[15] When you learned from Ms. Smith that the rights you
[16] had granted to DMX included public performance rights, it is
[17] after that conversation that you terminated the contracts,
[18] correct?
[19] **A.** It wasn't after that conversation. It was several months
[20] afterwards they were terminated.
[21] **Q.** So you learned that they included performance rights and
[22] decided not to terminate the contracts, correct?
[23] **A.** No, that's not true. It is just a matter of priority and
[24] how many hours there are in the day and their termination
[25] language is rather cumbersome.

[1] **Q.** It wasn't a sufficiently high priority that as soon as you
[2] learned you immediately terminated?
[3] **A.** I am trying to get an answer from Mr. Knittel where in
[4] this agreement it stated that they were doing direct licensing
[5] which I never really received a proper response.
[6] **Q.** Is it your testimony that DMX was hiding the fact that it
[7] was engaged in a direct license campaign?
[8] **A.** Yes, I think they were somewhat hiding it. I don't think
[9] they were forthright with it.
[10] **Q.** Let's turn to tab 2 of your binder, Joint Exhibit 947.
[11] **A.** Okay.
[12] **Q.** Turning your attention to the first sentence of the second
[13] paragraph it says: DMX, one of the largest suppliers of
[14] background music services to business locations in the United
[15] States, is seeking a catalog direct license with publishers
[16] including all necessary performance and pre-production rights
[17] in order to distribute the DMX service to business
[18] establishments in the U.S., regardless of the delivery
[19] methodology.
[20] Do you see that?
[21] **A.** Yes, sir.
[22] **Q.** This is in fact an e-mail you received?
[23] **A.** Yes.
[24] **Q.** Is it still your testimony that DMX was hiding the fact
[25] that it was seeking to engage in direct licensing and to

Page 397

[1] acquire performance rights?

[2] **A.** I think they obscured it. It just said -- I mean, you are
[3] asking me to look at the provision in the agreement that says
[4] all the terms of the agreement are within the agreement and not
[5] any external documentation. This is irrelevant. The reality
[6] is I received most every day a minimum of 100 to 150 e-mails so
[7] these get skimmed. And Mr. Smith is also, to my understanding,
[8] an office, you know, a low level office clerk.

[9]     **MR. MARKS:** No further questions.

[10]    **MR. FITZPATRICK:** I have no questions, your Honor.

[11]    **THE COURT:** Thank you, Ms. Levin. You are excused.

[12]    **THE WITNESS:** Thank you very much, sir.

[13]    (Witness steps down)

[14]    **MR. FITZPATRICK:** Shall we call our next witness, your
[15] Honor? BMI calls Ms. Helene Blue.

[16]    HELENE BLUE,

[17]    called as a witness by the Petitioner,

[18]    having been duly sworn, testified as follows:

[19]    **THE WITNESS:** Helene Blue. B-L-U-E.

[20] **DIRECT EXAMINATION**

[21] **BY MR. FITZPATRICK:**

[22] **Q.** Good afternoon, Ms. Blue.

[23] **A.** Good afternoon.

[24] **Q.** Would you please explain to the Court what you do for a
[25] living?

Page 398

[1] **A.** I'm a music publisher.

[2] **Q.** And what is Helene Blue Music?

[3] **A.** It's a firm that both publishes and administers copyrights.

[4] **Q.** How long has Helene Blue Music been around?

[5] **A.** Just about 15, maybe 16 years.

[6] **Q.** Did you start it?

[7] **A.** I did, indeed.

[8] **Q.** Where is it located?

[9] **A.** It is located on 33rd Street and Seventh Avenue.

[10] **Q.** How many people work for Helene Blue Music?

[11] **A.** Full-time, one.

[12] **Q.** Who is that?

[13] **A.** That's me.

[14] **Q.** How about part-time?

[15] **A.** And two part-time people. I have one who works
[16] administration and royalties and one who does promotion.

[17] **Q.** And other than sole full-time employee, what is your
[18] position at Helene Blue Music?

[19] **A.** Oh, I'm the president of the company.

[20] **Q.** Were you in the music publishing business before starting
[21] Helene Blue Music?

[22] **A.** Indeed, I have been in the music publishing business for 41
[23] years.

[24] **Q.** And, what did you do generally before starting Helene Blue
[25] Music?

Page 399

[1] **A.** Well, the job right before was worldwide general manager of
[2] a company called MPL Publications and that's Paul McCartney's
[3] publishing company, and before that there was a company called
[4] Ark Music Group which represented wonderful jazz and rock and
[5] roll songwriters, and before that was a company called Bellwin
[6] Mills Publishing that was also a wonderful catalog of superb
[7] writers, and on and on.

[8] **Q.** You can stop there.

[9] **A.** Thank you.

[10] **Q.** When you left the Paul McCartney Publishing Company to
[11] found Helene Blue music, why did you do that?

[12] **A.** Well, I was at the end of a contract and as I was
[13] renegotiating my rights with Paul I realized I was at an age
[14] where if I didn't start my own company I would never do it.
[15] And I just really wanted to do my own thing. And so, I
[16] explained that to Paul and Linda and they were very generous
[17] and not only said we won't do anything to stop you, we would
[18] like you to represent us for the first couple of years to help
[19] get you started.

[20] **Q.** So, what does, if you could explain it a in a little more
[21] detail, what is it that Helene Blue Music does?

[22] **A.** Well, what any music publisher does. We represent the
[23] copyrights. We are responsible for the basics of registering
[24] copyrights with the copyright office in Washington, D.C., we
[25] are responsible for promoting the songs, getting them out there

Page 400

[1] to see that they might be in the days when artists covered
[2] outside material, they might cover songs that you represent.
[3] You get them out to the film companies, the production
[4] companies that do television, the advertising agencies that do
[5] commercials so they know what you have and, hopefully, so that
[6] they will license the songs and they will earn money. And you
[7] don't only do that in the United States, you are responsible
[8] for those copyrights around the world.

[9] **Q.** Does Helene Blue Music own some copyrights and then
[10] administer some copyrights on behalf of other people?

[11] **A.** I do indeed, yes.

[12] **Q.** And, could you explain that distinction?

[13] **A.** Yes.

[14]    I have bought the rights to some copyrights and so I
[15] own them, I am the publisher entirely but I do pay out, of
[16] course, for some of them, it depends on the underlying deal,
[17] the writer's share. And then there are many catalogs that I
[18] administer.

[19] **Q.** And, can you explain the concept of the writer's share? We
[20] haven't talked about that yet.

[21] **A.** Well, a composition is written by a songwriter and
[22] songwriter's rights are in their song and, traditionally, let's
[23] say for the sake of this discussion, for every dollar that's
[24] collected 50 cents of that dollar is the songwriter's dollar,
[25] 50 cents is the publisher's dollar. Now, of course that is



[1] dependent upon the underlying contract that you have made with
[2] the songwriter. And so that number, those numbers can change
[3] depending on the writer and depending on the underlying deal
[4] that you have created.
[5] Q. So, between the catalogs that you own and the catalogs that
[6] you administer, about how many musical works are in there?
[7] A. A lot. Probably between 5,000, 7,500. Somewhere. I have
[8] not counted.
[9] Q. Could you talk a little bit about what types of rights
[10] Helene Blue Music licenses?
[11] A. Mechanical rights, synchronization rights, digital download
[12] rights, print rights. And, in some instances, grand rights.
[13] Q. So, we just heard about mechanical and synch rights so I
[14] won't make you repeat that, but could you explain digital
[15] download rights, please?
[16] A. Digital download is similar to mechanical in that we have
[17] gone from a world of vinyl to a world of digital transmission,
[18] and when people download songs either onto their computers or
[19] onto their portable cell phones or -- that's digital
[20] downloading -- and that's virtually taken over the industry.
[21] Q. You also mentioned print rights. What are those?
[22] A. Well, believe it or not there are still musicians out there
[23] who want to learn songs from reading the sheet music, and print
[24] rights are rights that I can grant to companies that specialize
[25] in creating sheet music so that the works of a variety of the

[1] writers I represent can be in print.
[2] Q. And you also mentioned grand rights. What are grand
[3] rights?
[4] A. Grand rights are very broad.
[5] They can refer to opera, concerts, Broadway shows. I
[6] don't any longer represent catalogs -- well, with one
[7] exception, Jim Juan has written some Broadway shows where I
[8] might get involved in the negotiations -- but I have licensed
[9] certain songs that have been performed in Broadway shows and
[10] musical reviews and I have licensed songs to ballet companies.
[11] And those -- that's considered grand rights licensing.
[12] Q. About, taking into account all these different kinds of
[13] licenses, about how many licenses come through the offices of
[14] Helene Blue Music in a given year?
[15] A. It is a guesstimate. I would say around 3,000.
[16] Q. Does Helene Blue Music ever license the public performance
[17] right?
[18] A. The word ever I'm underscoring. I have, especially when
[19] certain television, particularly cable stations have had no
[20] performance licenses. Then my synchronization license will
[21] also include a performance right. But, by and large, my
[22] performance rights are handled through these three societies in
[23] the United States -- BMI, ASCAP and CSAC.
[24] Q. And why do you do it that way? Why do you license the
[25] performing rights through BMI, ASCAP and CSAC?

[1] A. Well, primarily because they're there and they do it so
[2] well. They have been around for generations and they're
[3] extraordinarily competent and I don't certainly, not in my
[4] office would I have the ability to monitor all of the
[5] performing rights that I would need to do.
[6] Q. Ms. Blue, could I ask you, do you have a binder in front of
[7] you? Great.
[8] If you could turn to tab 1 of that binder and in there
[9] is a document labeled Respondent's Exhibit RX 0082.
[10] A. I see it.
[11] Q. If you could take a look at that and identify it, please?
[12] A. Yeah. It's an e-mail that was sent to me by Trent Smith.
[13] MR. FITZPATRICK: I would move the admission of RX 82,
[14] your Honor.
[15] MR. MARKS: No objection.
[16] THE COURT: Received.
[17] (Respondent's Exhibit 82 received in evidence)
[18] BY MR. FITZPATRICK:
[19] Q. Ms. Blue, do you recall receiving this e-mail?
[20] A. I do not recall receiving it but I have since been
[21] reminded.
[22] Q. Do you have any reason to doubt that you in fact did
[23] receive it?
[24] A. No, I have no reason to doubt. ·
[25] Q. Did you know who Trent Smith was when you received the

[1] e-mail?
[2] A. I did not.
[3] Q. How about Music Reports, Inc., did you know what that was?
[4] A. Yes, because I know Ron Gertz.
[5] Q. And the e-mail mentioned DMX. Did you know what DMX was
[6] when you received the e-mail?
[7] A. I did not.
[8] Q. And could you identify, is there an attachment to the
[9] e-mail?
[10] A. Yes.
[11] Q. Could you identify that?
[12] A. That's an agreement that was attached to license rights
[13] between my company and DMX.
[14] Q. And, if you could turn to tab 2 there is another document
[15] there, this one is Joint Exhibit 0283. Do you see that?
[16] A. Yes, I do.
[17] Q. And could you identify that, please?
[18] A. Again, that is the agreement and in this case it is the
[19] signed agreement between us.
[20] Q. And is that your signature on the last page of the
[21] agreement?
[22] A. Indeed, it is.
[23] Q. Did you read this agreement before you signed it?
[24] A. That's a very good question. I probably scanned the
[25] agreement and I know I gave it to my assistant and said this

Page 405

[1] looks like a digital download thing, does this look all right?
[2] She said I will get back to you tomorrow; and she did and she
[3] said, yeah, it is a basic digital download thing.
[4] Q. And so, what did you believe the agreement was at the time
[5] that you signed it?
[6] A. That's what I believed that the agreement was a digital
[7] download agreement.
[8] Q. Did you negotiate any of the terms of the agreement before
[9] signing it?
[10] A. I did not.
[11] Q. Did you have any communications at all with anyone at MRI
[12] or DMX --
[13] A. I did not.
[14] Q. -- I'm sorry -- prior to signing it?
[15] A. No.
[16] Q. Did you understand that this agreement included the public
[17] performance right?
[18] A. I clearly did not read this agreement very carefully so I
[19] did not.
[20] Q. Did you have an understanding today?
[21] A. I do, indeed.
[22] Q. What is your understanding today?
[23] A. That it does include it.
[24] Q. Have you made any efforts to cancel the license?
[25] A. I have not.

Page 406

[1] Q. Why not?
[2] A. It is a limited term agreement. I have no intention to
[3] renew the agreement and I am embarrassed by my negligence.
[4] Q. If you look at page 2 of the agreement there is, under
[5] number 2 there, there is a section called Royalties.
[6] A. Yes.
[7] Q. And on 2A there is a paragraph called royalty pool. Do you
[8] see that?
[9] A. Yes.
[10] Q. Did you review that paragraph before signing the agreement?
[11] A. No. As I said to you, I did not read this agreement
[12] carefully.
[13] Q. Looking at that today, are you able to calculate what your
[14] fees would be under this license?
[15] A. If you would allow me I will take a moment to read it.
[16] Q. Please.
[17] A. But I am going to turn back to the other agreement which is
[18] larger.
[19] Q. Yes. Sorry. It is the same.
[20] A. I am at an age where I need a little more help with the
[21] reading.
[22] Q. So, just to be clear, we are back on tab 1, the attachment
[23] to the e-mail.
[24] A. Correct.
[25] Q. Page 2, paragraph 2A which is the same language?

Page 407



[1] A. Correct.
[2]    They are indicating they will pay a pro rata share of
[3] a pool of royalties multiplying a fee of $6.25 by the number of
[4] service locations that they have licensed.
[5] Q. Do you know how many locations DMX has?
[6] A. Well, they are -- no, I have no idea. I mean in the
[7] agreement they talk about 100,000 but they -- I have no idea.
[8] Q. Do you know what your share of performances is on DMX'
[9] service?
[10] A. No, I do not.
[11] Q. When you signed the agreement do you have an understanding
[12] of what DMX' on and off-premises services were?
[13] A. I confess, I do not.
[14] Q. And, did you have an understanding of whether your
[15] royalties under this agreement would be calculated using the
[16] on-premise, the off-premise or a combination of both?
[17] A. No.
[18]    MR. FITZPATRICK: Thank you, Ms. Blue. I pass the
[19] witness, your Honor.
[20] CROSS EXAMINATION
[21] BY MR. MARKS:
[22] Q. Good day, Ms. Blue.
[23] A. Hello.
[24] Q. You referred a moment ago in your direct testimony to an
[25] assistant who reviewed the contract for you, correct?

Page 408

[1] A. Correct.
[2] Q. Is that Deborah Evans?
[3] A. That is correct.
[4] Q. And Deborah Evans has been employed by Helene Blue Music
[5] for about six years?
[6] A. Yes. I think even longer.
[7] Q. How long do you think she has been employed with you?
[8] A. I think seven.
[9] Q. And she had experience in the music publishing field before
[10] being employed by you?
[11] A. Yes, she does.
[12] Q. That was about 10 years of prior experience before she
[13] started with Helene Blue Music?
[14] A. That's correct.
[15] Q. You also testified during your direct examination about
[16] granting public performance rights to cable television
[17] networks?
[18] A. That's correct.
[19] Q. And those are the public performance rights that if you
[20] don't grant a direct license are typically acquired from a
[21] performing rights organization such as ASCAP, BMI, or CSAC?
[22] A. That's correct.
[23] Q. And you offered direct licenses to those entities that
[24] didn't want to take the license through the PRO, correct?
[25] A. That is correct.



|  | Page 409 |
|---|---|

[1] **Q.** You were not misled by anybody at DMX or MRI as to the
[2] nature of the agreement you were signing, correct?
[3] **A.** I didn't say that. I specifically said I made an error.
[4] **Q.** I just wanted to clarify that. I wasn't accusing you of
[5] saying anything or not saying anything.
[6]     You first learned that BMI was litigating a rate court
[7] proceeding against DMX last year when you received a telephone
[8] call from one of BMI's lawyers?
[9] **A.** That's correct.
[10] **Q.** And at the time of that call you didn't know anything about
[11] DMX?
[12] **A.** I did not.
[13] **Q.** And that's when you first realized that the license you
[14] signed included the performance rights?
[15] **A.** Indeed.
[16]     **MR. MARKS:** I have no further questions.
[17]     **MR. FITZPATRICK:** No questions, your Honor.
[18]     **THE COURT:** Thank you, Ms. Blue. You are excused.
[19]     **THE WITNESS:** Thank you.
[20]     **MR. FITZPATRICK:** Your Honor, we do have another
[21] witness. Would you prefer to take an earlier lunch break or
[22] would you prefer to start with the next witness?
[23]     **THE COURT:** That's perfectly okay with me.
[24]     **MR. FITZPATRICK:** I'm sorry. I didn't hear you.
[25]     **THE COURT:** The lunch break is not entirely within my

|  | Page 410 |
|---|---|

[1] control. I have got, during that we have a meeting of the
[2] grievance committee of which I happen to be a member and I
[3] really can't leave that until it is over. So, we will have to
[4] resume at about 2:00 anyway. If you want to fill in the time
[5] between now and then with something else, fine. And if you are
[6] not prepared to do that, we will stop now.
[7]     **MR. FITZPATRICK:** We will call our witness, your
[8] Honor.
[9]     **MR. BENTON:** Your Honor, BMI calls Mr. Milton Laughlin
[10] to the stand.
[11]     **THE COURT:** I have to stop again about a quarter to
[12] 1:00, in any event.
[13]     MILTON LAUGHLIN,
[14]     called as a witness by the Petitioner,
[15]     having been duly sworn, testified as follows:
[16]     **THE WITNESS:** Milton Laughlin, L A U G H L I N.
[17]     **MR. BENTON:** Your Honor, may I approach with the
[18] binders?
[19]     **THE COURT:** Yes.
[20] **DIRECT EXAMINATION**
[21] **BY MR. BENTON:**
[22] **Q.** Good morning, Mr. Laughlin.
[23] **A.** Good morning.
[24] **Q.** Are you currently employed by BMI?
[25] **A.** Yes, I am.

|  | Page 411 |
|---|---|

[1] **Q.** And, how long have you been working at BMI?
[2] **A.** 15 years.
[3] **Q.** And what is your current position?
[4] **A.** I'm senior vice president of IT and operations.
[5] **Q.** And what is IT?
[6] **A.** IT is our information technology department, it is
[7] responsible for all the computer infrastructure within the
[8] company including hardware, communications, networking, system
[9] applications, and programming.
[10] **Q.** And, how long have you been in your current position?
[11] **A.** Three years.
[12] **Q.** Prior to becoming senior vice president, what was your
[13] position?
[14] **A.** I was vice president of IT and operations.
[15] **Q.** And when did you become vice president?
[16] **A.** I don't recall the exact day.
[17] **Q.** Before working at BMI, how were you employed?
[18] **A.** I worked for MCA Universal for five years prior to coming
[19] to BMI and 23 years with Capitol Records EMI.
[20] **Q.** And what types of companies are those?
[21] **A.** Record labels.
[22] **Q.** How many employees are in BMI's IT operations department?
[23] **A.** 178.
[24] **Q.** Are you in charge of all of them?
[25] **A.** Yes, I am.

|  | Page 412 |
|---|---|

[1] **Q.** Mr. Laughlin, what are your current responsibilities as
[2] senior vice president of operations, information technology?
[3] **A.** I oversee, from an IT perspective, all their budgets, all
[4] their development, prioritization, approval of projects that we
[5] work on on behalf of the company. On the operations side also
[6] responsible for all of the budgets and the departments that
[7] process music use information, registrations, and all the
[8] documentation that we receive in that we need to process for
[9] doing distributions to our affiliates.
[10] **Q.** And you mentioned development. What did you mean by
[11] development?
[12] **A.** The writing of new computer applications or modifications
[13] to existing ones that we have based upon business requests that
[14] we get from within the company.
[15] **Q.** So, that's programming new software applications?
[16] **A.** That is correct.
[17] **Q.** Does that include databases?
[18] **A.** That is correct.
[19] **Q.** And you oversee the budget for that?
[20] **A.** Yes, I do.
[21] **Q.** Can you explain when programming is necessary for a project
[22] at BMI what that programming generally entails?
[23] **A.** Well, we get a request from either a business unit within
[24] the company or sometimes an outside request that we may get as
[25] well. We have to formulate by reviewing what those business



Page 413

[1] requirements are and whether they touch existing systems that
[2] we have or it is the development of newer systems. And then we
[3] estimate what the costs of those are so that we can go through
[4] the budget process for approvals and also scheduling for
[5] priorities into which projects have certain timelines
[6] associated with them.
[7] Q. And, with respect to this programming, as the senior vice
[8] president, what are your specific responsibilities?
[9] A. To oversee the direction of the projects, the
[10] prioritizations and the budgets, primarily.
[11] Q. And, does your department have programmers that are
[12] employees at BMI?
[13] A. Yes, they are.
[14] Q. Approximately how many?
[15] A. Approximately 25.
[16] Q. And, does your department also use any programmers that are
[17] not BMI employees?
[18] A. Yes, we do.
[19] Q. Can you explain how that works?
[20] A. We occasionally have a couple of firms that we deal with
[21] where we get outside consultant programmers. A lot of that is
[22] based upon the skill sets necessary for individual projects
[23] that we are working on and we use approximately three or four
[24] firms throughout the year that we contract programmers, as
[25] necessary.

Page 414

[1] Q. And, is there a general rate that you pay these outside
[2] consultant programmers?
[3] A. Yes; $75 an hour.
[4] Q. And, does that go to the programmers or to the firms that
[5] you have engaged in?
[6] A. No, that goes to the firms. They are employees of the
[7] firms.
[8] Q. And, is it typical to use such outside consultant
[9] programmers on new projects that require a programmer?
[10] A. That is correct.
[11] Q. And, do you also use BMI's internal programmers?
[12] A. Yes, we do.
[13] Q. Mr. Laughlin, do you know generally what the commercial
[14] music services industry is?
[15] A. Yes. It's a company that provides music to other
[16] businesses such as guest hotels and restaurants.
[17] Q. Do you know of any specific members of that industry?
[18] A. DMX and Muzak are the only two that I'm familiar with a
[19] little bit.
[20] Q. And, putting aside the license that is at issue in this
[21] proceeding, does your department have any role with respect to
[22] the processing of performance data for members of the
[23] commercial and music services industry?
[24] A. Yes, they do.
[25] Q. Can you tell me what that role is?

Page 415

[1] A. Yes.
[2] We have a department within the operations department
[3] that processes all the music use reports received from various
[4] licensees including the commercial music service licensees.
[5] They process the information through a set of systems that
[6] we've constructed in order to do what we call title
[7] identification so we can identify the songs that are being used
[8] within play lists or other forms of media that they submit to
[9] us to identify, for the end of that result being that
[10] processing those things through our royalty distribution for
[11] those works that are compensable from BMI.
[12] Q. And is that what's generally done for all members of the
[13] commercial music services industry now, from your department's
[14] perspective?
[15] A. That is correct.
[16] Q. And you mentioned music use reports. What do you mean when
[17] you say music use reports?
[18] A. Well, licensees are required -- or some licensees are
[19] required to submit music use reports. They have to report to
[20] BMI what was actually being performed within the licenses that
[21] they have with BMI.
[22] Q. And in what form do they typically report that music use?
[23] A. There is various different ways that we get them submitted.
[24] There are standard formats that some industries will follow.
[25] Q. What about the commercial music service industry?

Page 416

[1] A. The commercial music service industry, they send us files
[2] with play list information and distribution lists which tells
[3] us who purchases the services that they offer.
[4] Q. These are electronic files?
[5] A. Yes, they are.
[6] Q. Are these basically electronic files that contain thousands
[7] and thousands of performances?
[8] A. Yes. I mean, they can be pretty big files depending on
[9] what the time period from the reporting period is and how many
[10] playlists or programs that they have. So, it can be tens of
[11] thousands of records that you receive that we have to process
[12] through our system.
[13] Q. Okay, you mentioned DMX earlier. Do you know, again,
[14] putting aside the license that is at issue in this case for a
[15] moment, how DMX has customarily provided BMI with performance
[16] data for its commercial music services?
[17] A. Yes, I do.
[18] Q. And, could you tell me how they've done so for their
[19] off-premises services?
[20] A. Yes.
[21] their off-premise services is their satellite
[22] delivery, and they provide us with a hundred or so channels.
[23] Each channel contains the individual musical compositions that
[24] make up each of those channels. And that's the only
[25] information that they provide to us.

Page 417

[1]  Q. And, does DMX provide for you for the off-premise satellite
[2]  channels the number of locations that receive each channel?
[3]  A. No, they do not.
[4]  Q. And, now, does DMX also have on-premises services?
[5]  A. That is correct.
[6]  Q. And what are on-premises services?
[7]  A. That is the physical delivery of product either from CDs or
[8]  hard drives that are used by the retail establishment. They
[9]  give us playlist programs similar to the channels that are
[10] created on the off-premise side but unlike the off-premise side
[11] we do get a distribution count list of customers that equates
[12] to who does -- who subscribes to which service of those
[13] individual programs.
[14] Q. Does that allow BMI to have information about the
[15] popularity of the different programs in the on-premises
[16] services?
[17] A. Yes, that is correct. We utilize -- we utilize that in
[18] order to calculate the performance counts for each of the
[19] individual works that are associated within each playlist, and
[20] naturally if one playlist has a larger customer count of
[21] subscribing to then another it would have a higher performance
[22] count per each of the individual songs within that -- within
[23] that play list.
[24] Q. And, for DMX' satellite or off-premises, are you able to do
[25] the same?

Page 418

[1]  A. No, we are not.
[2]  Q. You also mentioned Muzak. Do you know how Muzak reports
[3]  performance data to BMI?
[4]  A. Yes, I do.
[5]  Q. Can you tell me how it does for its on-premises services?
[6]  A. It is the same thing we get from DMX. We get the programs,
[7]  the playlist, as well as the distribution list that tells us
[8]  how to equate the performances when processing through
[9]  distribution.
[10] Q. So, for Muzak they also give you a list of the locations
[11] for on-premises --
[12] A. That's correct.
[13] Q. -- services, what business locations those particular
[14] programs went to?
[15] A. That's correct.
[16] Q. And how does Muzak report performances for its off-premises
[17] services?
[18] A. They follow the same routine as they do for the on where
[19] they actually give us the channels or playlist information for
[20] the stuff that's delivered via satellite but they do, unlike
[21] what DMX does, give us the customer count information so that
[22] we can actually calculate the performance counts for the
[23] on-premise just as accurate -- for the off-premise just as
[24] accurately as we do for the on.
[25] Q. And, Mr. Laughlin, are you familiar with the adjustable fee

Page 419

[1]  blanket license or AFBL that is at issue in this proceeding?
[2]  A. Yes, I am.
[3]  Q. And, do you have any role with respect to the AFBL for DMX?
[4]  A. Yes, I do.
[5]  Q. As a general matter, what is your role?
[6]  A. My role is to evaluate what the license will contain for
[7]  the purposes of any software development or operational needs
[8]  that will be necessary in order to comply with what the license
[9]  dictates.
[10] Q. Will you also -- and by you I mean you and your
[11] department -- have any responsibilities for the ongoing
[12] implementation of the AFBL for DMX?
[13] A. Yes. Depending upon -- depending upon what would be
[14] required from a continuing processing criteria different from
[15] what you would do initially to get the new license implemented
[16] there will be -- there will be requirements necessary to
[17] support it on an ongoing basis.
[18] Q. Now, you mentioned first that your department will develop
[19] the AFBL or will develop software for the AFBL; let's turn to
[20] that topic.
[21]     Will DMX' AFBL require any additional systems to be
[22] developed by BMI beyond what BMI currently uses for the
[23] traditional blanket license?
[24] A. Yes, it will.
[25] Q. And if you could turn to tab 1 in your binder? Are you

Page 420

[1]  with me?
[2]  A. Yes.
[3]  Q. Can you identify this document?
[4]  A. Yes. What this document is, it's a processing flow diagram
[5]  of a portion of our distribution process as well as the there
[6]  are elements that will need to be incorporated in order to
[7]  support the AFBL license.
[8]  Q. Does this show the existing systems at BMI and the new
[9]  systems at BMI that are being put in place for DMX' AFBL?
[10] A. That is correct.
[11] Q. And, has BMI begun to put this process into place?
[12] A. Yes, we have.
[13] Q. So programming has been started?
[14] A. That is correct.
[15] Q. Using this document, can you tell us where the AFBL process
[16] for DMX begins?
[17]     THE COURT: I'm not sure I have the right document,
[18] Mr. Benton.
[19]     MR. BENTON: I'm sorry, your Honor.
[20]     THE COURT: Just point me to it again.
[21]     MR. BENTON: It is at tab 1 and it is a very colorful
[22] flowchart and I can get you another binder if you don't have
[23] the correct one.
[24]     THE COURT: Tab 1 I have the pictures and the data
[25] about Mr. Laughlin.

Page 421

[1]       **MR. BENTON:** Yes, your Honor. I'm not --
[2]       **THE COURT:** Ah, it is a different tab 1. Does it
[3] start "Invoice"? No.
[4]       **MR. BENTON:** May I approach, your Honor?
[5]       **THE COURT:** Yes.
[6]       **MR. BENTON:** Your Honor, I think that what you might
[7] have is a binder from the deposition of Mr. Laughlin, if I
[8] could get it back?
[9]       **THE COURT:** Yes.
[10]      **MR. BENTON:** I do apologize, your Honor.
[11]      **THE COURT:** Okay. I have got you.
[12] **BY MR. BENTON:**
[13]   **Q.** So, at tab 1, Mr. Laughlin, can you please tell us where
[14] the AFBL process starts for the DMX AFBL license?
[15]   **A.** There is primarily two starting points. There is a
[16] starting point in the tan box A by the red arrow that says
[17] start, and in the blue box B under the red arrow start of
[18] submission of the AFBL reports.
[19]   **Q.** Okay, so there is two starting places. Why are there two
[20] starting places?
[21]   **A.** There are two starting places because box A, which is the
[22] tan colored box, is the process that we utilize in order to
[23] process the direct license agreement that we have received from
[24] DMX MRI that equate to the direct license. The submitted AFBL
[25] reports are the reports that were established that gives us the

Page 422

[1] credit reports plus the musical composition reports that we get
[2] for further processing within distribution according to the
[3] agreed upon standards worked out in the interim agreement.
[4]       **THE COURT:** Excuse me a moment.
[5]       Would you read back that answer, slowly?
[6]       (Record read)
[7]       **MR. BENTON:** We will work through it, your Honor.
[8]       **THE COURT:** I think we will have to.
[9]       **MR. BENTON:** Yes, I think so, but it will work out.
[10] **BY MR. BENTON:**
[11]   **Q.** So, Mr. Laughlin, before I get to my next question, you
[12] mentioned MRI?
[13]   **A.** Yes.
[14]   **Q.** And who is MRI?
[15]   **A.** I don't know what the acronym stands for but they're a
[16] customer of DMX as well as we have experienced with them in the
[17] TV per-program industry.
[18]   **Q.** When you said they're a customer of DMX, do you mean that
[19] they're working with DMX?
[20]   **A.** That's correct.
[21]   **Q.** And with respect to His Honor's interim fee decision, has
[22] it been MRI that's been sending interim fee data to BMI on
[23] behalf of DMX?
[24]   **A.** That is correct.
[25]       **THE COURT:** So that what is represented in box A on

Page 423

[1] this chart is the current management of the direct licenses
[2] under the interim fee regime? Is that correct?
[3]       **THE WITNESS:** That is correct.
[4]       **THE COURT:** I see.
[5] **BY MR. BENTON:**
[6]   **Q.** So, let's turn to the first starting place that you
[7] mentioned, Mr. Laughlin, which is the box labeled A which is
[8] tan. What does this box generally contain?
[9]   **A.** It's the process that we used to take in the direct license
[10] agreements, go through a validation process and enter them into
[11] a database that can be used further by other systems that need
[12] to interrogate the validity of the direct licenses.
[13]   **Q.** And what is the first step in this process?
[14]   **A.** We receive the submitted direct license reports from MRI or
[15] DMX. They're customarily paper forms that have numbers on them
[16] so that it will be easily be tracked once we put them into our
[17] system.
[18]       That's the first step.
[19]   **Q.** And do those direct licenses typically contain one direct
[20] licensing publisher name or multiple?
[21]   **A.** In the validation process what we need to do is there are
[22] certain elements within the direct license that we need to
[23] validate, one of them being to make sure that it is
[24] representative of the performing right and not just mechanical
[25] or sync rights. We need to know what the start and end date of

Page 424

[1] the agreement is so that it is in the time frame that we need
[2] for processing. It has got to be signed by a legal
[3] representative of the publisher that issued it. And, in every
[4] one of the ones that we process, most of them only reference
[5] one publisher name that this agreement has been executed with.
[6]   **Q.** Okay, Mr. Laughlin, so now you are referring --
[7]       **THE COURT:** Excuse me, Mr. Benton.
[8]       **MR. BENTON:** Yes.
[9]       **THE COURT:** But box A represents a series of
[10] procedures that only has to be gone through once for each
[11] direct license, is that correct?
[12]       **THE WITNESS:** That's correct.
[13]       **THE COURT:** It is not an ongoing activity at all?
[14]       **THE WITNESS:** The only way it would be an ongoing --
[15]       **THE COURT:** With respect to the individual license.
[16]       **THE WITNESS:** There may be times where corrections
[17] need to be made if a license expires and you get an extension.
[18]       **THE COURT:** But, otherwise, this process is gone
[19] through once with respect to every direct license and then it
[20] is complete?
[21]       **THE WITNESS:** That is correct.
[22]       **THE COURT:** Okay.
[23] **BY MR. BENTON:**
[24]   **Q.** And so, the process you are talking about now, the
[25] validation process --

Page 425

[1]    **THE COURT:** Mr. Benton, whenever you get to a point.
[2]    **MR. BENTON:** It would be okay now.
[3]    **MR. MARKS:** We will suspend until as near 2:00 as I
[4] can make.
[5]    **MR. BENTON:** Very good, your Honor.
[6]    (Luncheon recess)
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 426

[1]    AFTERNOON SESSION
[2]        (2:30 p.m.)
[3]    **THE COURT:** I apologize to all of you, it took a great
[4] deal longer than usual, and there was nothing I could do about
[5] it.
[6]    **MR. BENTON:** May I proceed, your Honor?
[7]    **THE COURT:** Yes.
[8] **BY MR. BENTON:**
[9]    Q. Mr. Laughlin, right before we broke, I think we were
[10] talking about the document at tab 1 at the validation process
[11] stage, is that correct?
[12]    A. That's correct.
[13]    Q. And you had described a manual review of the paper direct
[14] licenses that came into BMI. Has BMI completed its manual
[15] review of the direct licenses that DMX has submitted to it to
[16] date?
[17]    A. Yes, we have.
[18]    Q. And what were the results of that review?
[19]    A. In the first batch we had approximately 100 of them that
[20] contained errors, either with start and end dates that weren't
[21] legible. We had some titled parties or publishers, the names
[22] that were referenced on the direct licenses, we had no idea who
[23] they were, and there were some signature issues.
[24]        Out of that batch we submitted, we received a response
[25] back correcting most of those, with the exception of

Page 427

[1] approximately 28 of them which are still outstanding, and
[2] there's a second batch where we had 44 that were rejected where
[3] we've gotten no response back to date.
[4]    Q. Okay. So you said you got a response to a first batch.
[5] Does that mean, did BMI inform DMX of its perceived errors in
[6] the direct licenses?
[7]    A. That's correct.
[8]    Q. At some point did DMX respond back to BMI?
[9]    A. We did receive a response back, yes.
[10]    Q. Do you know when that was?
[11]    A. I believe it was the beginning of August.
[12]    Q. And I think you said in that first batch there were still
[13] 28 agreements where there was some issue. What was the issue
[14] with those 28 remaining agreements?
[15]    A. I think the majority of the issue with them was that we
[16] received an explanation to the name that was referenced in the
[17] agreement as to TBD, which somebody apparently didn't know who
[18] this was either that was on the agreement, as well as what we
[19] could have.
[20]    Q. Do you mean that DMX didn't know who was in the agreement?
[21]    A. Right.
[22]    Q. At this validation step of the process, beyond the manual
[23] review you've described, is there any automated review that's
[24] necessary?
[25]    A. Yes. I mean, one of the things that's challenging about

Page 428

[1] putting this together is the fact that you do have only one
[2] account number listed on the agreements, and as we know, a
[3] single account has many either subaccounts or administrative
[4] accounts that basically link to this parent or primary account.
[5] I mean, for an example, Bug Music has a direct license. We got
[6] the SDL in and it referenced Bug Music. Well, we've got
[7] several hundreds of accounts of Bug Music that were set up with
[8] individual catalogs at the request of Bug Music. Also, there
[9] are at least over 800 accounts that they actually administer,
[10] so all of the accounts, since the direct licenses cover
[11] anything that's owned or administered, we had to insure that we
[12] could take all of these accounts and put them within that
[13] direct license so that later on when we're validating royalties
[14] to be removed, we knew which accounts had earnings.
[15]    Q. Okay. Now, you mentioned account numbers. What is an
[16] account number?
[17]    A. Every affiliate that's on the BMI database has an account
[18] number.
[19]    Q. So do you mean in this instance, account number means
[20] publisher?
[21]    A. That's correct.
[22]    Q. And you also used the term SDL. What do you mean by that
[23] term?
[24]    A. Source or direct license.
[25]    Q. Are there source license?

Page 429

[1]  **A.** No, it's just direct licenses.
[2]  **Q.** Sorry. Are there source licenses that are at issue in this
[3]  proceeding?
[4]  **A.** No.
[5]  **Q.** So when you referred to DMX in the context of DMX's AFBL,
[6]  you're just referring to direct licenses?
[7]  **A.** Yes.
[8]  **Q.** Am I correct that account numbers are publishers, meaning
[9]  the account has a single publisher name on it when it's
[10] submitted from DMX to BMI?
[11] **A.** Yes.
[12] **Q.** And then BMI has to link that publisher name to all the
[13] owned and administered accounts, is that correct?
[14] **A.** That is correct.
[15] **Q.** And is this a process that required programming from BMI to
[16] accomplish for the DMX AFBL?
[17] **A.** Yes, it did.
[18] **Q.** Has this programming been done?
[19] **A.** Yes, it has.
[20] **Q.** And when was it done?
[21] **A.** It was done, started in August of '09.
[22] **Q.** Okay. And this is the programming that was done for the
[23] linking of the publishers that you've described?
[24] **A.** That's correct.
[25] **Q.** And where is this on tab 1, this document?

Page 430

[1]  **A.** It's in the A section under group account structure, the
[2]  yellow box.
[3]  **Q.** This box is shaded yellow as you've indicated. Why is
[4]  that?
[5]  **A.** All the boxes that are yellow on here means there was
[6]  development done in support of the AFBL.
[7]  **Q.** So across the chart in the boxes that are shaded in yellow,
[8]  that means that programming has been done to date?
[9]  **A.** That's correct.
[10] **Q.** And BMI has incurred costs in doing that programming?
[11] **A.** Yes.
[12] **Q.** While we're at it, some of these boxes don't have any
[13] shading. They're just in white. What does that mean?
[14] **A.** Those are either processes or applications where we didn't
[15] have to make any modifications in order to incorporate part of
[16] the AFBL.
[17] **Q.** So does that mean that's an existing process at BMI that
[18] doesn't require any additional costs to BMI specific to DMX's
[19] AFBL?
[20] **A.** That's correct.
[21] **Q.** And just to round it out, the last shading is in orange.
[22] What does that mean?
[23] **A.** Those are activities that we need to complete in the future
[24] that we haven't started.
[25] **Q.** So you anticipate for the orange boxes that some

Page 431

[1]  programming will be necessary, is that correct?
[2]  **A.** That is correct.
[3]  **Q.** But that program hasn't been started yet?
[4]  **A.** No, it has not.
[5]  **Q.** After the creation of this group account structure and in
[6]  the process, the linking of --
[7]      **THE COURT:** Excuse me a moment, Mr. Benton.
[8]      **MR. BENTON:** Yes.
[9]      **THE COURT:** The orange box that leads to the I's, the
[10] ones in the tan section that says reject directly resolution
[11] protocol, does that mean that you're simply holding that place
[12] for the establishment of a procedure about leases that you
[13] reject when and if that problem arises?
[14]     **THE WITNESS:** Yes, that is correct.
[15]     **THE COURT:** Thank you.
[16] **Q.** And so once this validation process that you've described
[17] has been completed, what's the next step in the process?
[18] **A.** We enter them into the direct license database that's been
[19] created, which will, some of that information would be manually
[20] created into the database. Some of it is a direct feed from
[21] the group account structure, depending on if somebody linked
[22] that direct license to one of those huge groups and needs to
[23] carry it over into the database.
[24] **Q.** And was programming necessary for this step of the process?
[25] **A.** Yes, it was.

Page 432

[1]  **Q.** Has that programming been completed?
[2]  **A.** Yes, it was.
[3]  **Q.** Has the direct licenses that DMX has submitted to BMI to
[4]  date, have they been entered into this direct license database?
[5]  **A.** Yes, they have.
[6]  **Q.** And who did that?
[7]  **A.** Peg Farthing.
[8]  **Q.** Who is Ms. Farthing?
[9]  **A.** She's a director that works with strategic operations.
[10] **Q.** Do you know how long Ms. Farthing spent on this?
[11] **A.** About 126 hours at a cost of $8,800.
[12] **Q.** Now, is this entry into the direct license database, is
[13] this something that your operations IT department will be
[14] responsible for on a going-forward basis?
[15] **A.** No, it will not.
[16] **Q.** Do you know what department will be responsible for that
[17] entry?
[18] **A.** The licensing department.
[19] **Q.** And so from your department's perspective, have all the
[20] costs been incurred to date, are they basically completed for
[21] this step?
[22] **A.** That is correct.
[23] **Q.** And was programming necessary to make the database itself
[24] for the direct licenses?
[25] **A.** No, it was not.

[1] Q. And was this an existing database at BMI?
[2] A. Yes, it was.
[3] Q. Could you explain that?
[4] A. We already had a direct license database set up in order to
[5] house the TV program direct licenses and other direct licenses
[6] that we've received.
[7] Q. Were enhancements to this database, programming
[8] enhancements necessary specific to DMX's AFBL?
[9] A. Yes.
[10] Q. And have those been completed?
[11] A. Yes, they have.
[12] Q. And under that it says accepted or rejected. If a license
[13] is rejected, his Honor asked a question about this, what's the
[14] next step in that process?
[15] A. It gets communicated, back to MRI with a resolution
[16] saying that it's been rejected, the reasons why it's been
[17] rejected and then wait for some response to come back so that
[18] we can update the database, potentially change the status of
[19] that direct license from rejected to accepted if the issue's
[20] been resolved.
[21] Q. Do you anticipate that programming will be necessary for
[22] this step?
[23] A. We would like to set up an automated process to do this,
[24] rather than manually passing papers back and forth. And that
[25] would require some programming to develop an interface between

[1] files we would create. We would probably put them out there
[2] into some site that MRI or DMX would pick up, you know, that
[3] file from us.
[4] Q. So this is a program you anticipate in the future?
[5] A. Yes.
[6] Q. Do you anticipate that you would work with MRI and DMX in
[7] creating this resolution process and the software necessary?
[8] A. Yes. Yes, we would.
[9] Q. Now, you said there were two starting places. Can you tell
[10] me where the other starting place is on this chart?
[11] A. It's up in box B, under, where submitted AFBL reports.
[12] Q. I apologize. I forgot to ask if a direct license is
[13] accepted, in other words, if BMI enters it into its database
[14] and there's not a problem with it, what's the next step in the
[15] process?
[16] A. The direct license is just keyed into the database. It's
[17] got a flag on it saying it's accepted, and then later on in the
[18] process when we're validating performance information against
[19] the direct license database, those would be the ones that would
[20] be interrogated.
[21] Q. And I'm sorry, going back to the other starting point,
[22] could you tell me what that is again?
[23] A. That's where we get the submitted AFBL reports in from MRI.
[24] Q. And are these reports music performance information?
[25] A. Yes.

[1] Q. And will they contain the claimed credits?
[2] A. That's correct.
[3] Q. And have you been receiving music use reports on an interim
[4] basis from MRI?
[5] A. Yes, we have.
[6] Q. And so the first step in that process is submitted AFBL
[7] reports. Does that just mean okay, the reports come in?
[8] A. That's correct.
[9] Q. And what's the next step in the process?
[10] A. We load it into a brand new database that we've created
[11] where we're going to store and house all the information that
[12] comes in from the submitted file, along with an extensive array
[13] of other data elements that we will use during the process when
[14] we're validating the information that is within that file that
[15] was submitted.
[16] Q. Okay. And is this database that you need to create, have
[17] you in fact created it?
[18] A. Yes, we have.
[19] Q. And has programming been done?
[20] A. Yes.
[21]     THE COURT: Come up counsel, please.
[22]     (Discussion off the record at the sidebar)
[23] BY MR. BENTON:
[24] Q. Mr. Laughlin, once the reports come in, can you tell me
[25] just very generally for the next step in the process what needs

[1] to be done?
[2]     THE COURT: Tell us about the next three steps that
[3] need to be done.
[4] Q. Or the next three.
[5] A. Well, once we just validate that the files are submitted
[6] correctly, they're just formatted and loaded into our
[7] distribution identification process, which is box C, which then
[8] gets title identifications done to all the work submitted.
[9] From there, they're then extracted into what we call payable
[10] affiliate records with all of the publishers and the writers
[11] that have earned money against performances that came in from
[12] DMX. They're then consolidated at the publisher or writer
[13] level that would then include every one of their songs that
[14] they're being paid for regardless of source.
[15]     We then have to validate the SDL's against those
[16] publishers. So, for an example if there's a publisher
[17] statement sitting in the consolidated piece of this, and it's
[18] got a performance from DMX, we have to see if that publisher
[19] account number was loaded into the direct or source license
[20] database in order to remove the royalties from that record.
[21]     The other challenging part we have to this that we had
[22] to create was the ownership resolution. If you have two
[23] publishers and two writers and one of the publishers you linked
[24] to the direct license database and said that his earnings
[25] should be removed, you need to also remove the corresponding

[1] writer's earnings that is connected to that publisher. In some
[2] cases this link between the writers and publishers don't exist,
[3] therefore, we had to create a process, you know, to do that for
[4] the ones that wouldn't automatically link. Then from there it
[5] just goes into the final royalty calculation disposition where
[6] anything we've removed for direct or source licenses the
[7] dollars get zeroed out, the performance accounts get zeroed
[8] out, royalty statements get created and they're sent out to the
[9] affiliates.
[10] And then after that process in the purple box is where
[11] we take an extract from the distribution information that we've
[12] done after removing all the direct or source license agreements
[13] as well as the unidentified and non-payable records that came
[14] out of distribution, go back up to the AFBL database and do
[15] reconciliation, problem resolution, eventually dispute
[16] processing.
[17] **Q.** Thank you. And, Mr. Laughlin, have you estimated the total
[18] cost to BMI of developing the programs and systems that you've
[19] described?
[20] **A.** Yes, we have.
[21] **Q.** Could you turn to tab 2 in your binder? Mr. Laughlin, in
[22] total, what have you estimated that the AFBL processes that you
[23] described will cost BMI to develop?
[24] **A.** $339,875.
[25] **Q.** And the top chart is listed up-front system development.

[1] **A.** Yes, that's correct.
[2] **Q.** And is this all the components of that 339,875?
[3] **A.** Yes, it is.
[4] **Q.** And the first line reads BMI operations senior programmer.
[5] Do you see that?
[6] **A.** Yes, I do.
[7] **Q.** Can you explain what that line refers to?
[8] **A.** That is a BMI programming staff member. The estimate,
[9] which is the remaining, is 1103 hours at $86,034, at a rate of
[10] $78 an hour.
[11] **Q.** So you're estimating for BMI's internal programming needs
[12] for the AFBL, a further $86,000?
[13] **A.** That is correct.
[14] **Q.** Under that it says completed to date, 297 hours. Can you
[15] explain that?
[16] **A.** Yes. That is the amount of money that we spent in the
[17] yellow boxes on the graph of BMI internal hours which were 297
[18] at a cost of 23166.
[19] **Q.** And is there a particular programmer that did this work?
[20] **A.** Yes, Anita Winters.
[21] **Q.** The next entry under employee consultant is BMI's
[22] operations outside consultant programmer. Under the estimated
[23] line, can you explain that entry?
[24] **A.** Yes. That is the estimated hours and dollars that are
[25] remaining for the task that we need to do to complete the AFBL

[1] process. That's 785 hours at 58,875.
[2] **Q.** And where did the $75 rate come from?
[3] **A.** That is our blended rate that we use for consulting
[4] support.
[5] **Q.** And the next line down under outside consultant programmer
[6] says completed to date 1,215 hours. Can you explain this line?
[7] **A.** Yes. That's the amount of hours and dollars that we
[8] expensed in developing the yellow boxes that were on the chart
[9] that we've already completed, and the rate was $74 an hour,
[10] because the four consultants that were working on it were
[11] slightly less than what our blended rate really came to be.
[12] **Q.** And to date for outside consultant programming, how much
[13] has BMI incurred?
[14] **THE COURT:** 1215 hours at a cost of $90,405.
[15] **MR. BENTON:** Yes, your Honor.
[16] **THE COURT:** 445 dollars.
[17] **Q.** Could you turn to tab 3, Mr. Laughlin? Can you identify
[18] these documents?
[19] **A.** Yes. They're billing invoices for the outside consultants
[20] who worked on this project.
[21] **Q.** Okay, and do these invoices relate to the chart that we
[22] just looked at?
[23] **A.** They are for the yellow boxes that we've done the
[24] programming completed.
[25] **Q.** They're for the $90,445?

[1] **A.** That is correct.
[2] **MR. BENTON:** Your Honor, I would move the admission of
[3] Plaintiff's Exhibit 0203 into evidence?
[4] **MR. LARSON:** No objection, your Honor.
[5] **THE COURT:** If there's a total expressed as a total in
[6] another exhibit, they're here available for inspection by the
[7] other side. Why do they need to be introduced into evidence?
[8] **MR. BENTON:** Why do the invoices need to be
[9] introduced?
[10] **THE COURT:** That's the question.
[11] **MR. BENTON:** Well, your Honor, I mean --
[12] **THE COURT:** Who needs them?
[13] **MR. BENTON:** I assume the Court needs them to prove
[14] that --
[15] **THE COURT:** Do you think I'm going to audit them?
[16] **MR. BENTON:** I'm sorry.
[17] **THE COURT:** Do you wish them in for purposes of cross?
[18] **MR. LARSON:** No, your Honor.
[19] **MR. BENTON:** Your Honor, if you accept Mr. --
[20] **THE COURT:** The summary is in evidence.
[21] **MR. BENTON:** That's fine, your Honor.
[22] **THE COURT:** The rules of evidence provide for this
[23] sort of situation.
[24] **MR. BENTON:** Well, your Honor, actually, the tab, tab
[25] 2 was not in evidence, as it's a demonstrative.



[1] **THE COURT:** The figure of $90,000 is in evidence,
[2] because the witness used it on direct.
[3] **MR. BENTON:** Very good, your Honor.
[4] **THE COURT:** They're excluded as needlessly cumulative.
[5] **MR. BENTON:** Yes, your Honor.
[6] **Q.** And, Mr. Laughlin, turning back to tab 2, have you also
[7] estimated what it will cost your department on an ongoing basis
[8] to administer the AFBL for DMX?
[9] **A.** Yes, we have.
[10] **Q.** And what is the amount that you've estimated?
[11] **A.** $37,073 a year.
[12] **Q.** There's two employee and consultants listed on this chart.
[13] The first one is a part-time employee manual processing of
[14] data. Can you explain that?
[15] **A.** Yes. That's a part-time person that is on staff currently
[16] at BMI. Some of their duties will include 30 hours per
[17] distribution quarter to conduct the manual resolution that we
[18] spoke of before between trying to link the writers and the
[19] publishers from the report that comes out of that new process
[20] in order that we can correct them.
[21] **Q.** And the second entry, could you explain that?
[22] **A.** Yes, the second entry is myself, for about 30 hours per
[23] quarter going through the auditing of the process, once we get
[24] it all completed, make sure everything is working fine, having
[25] meetings with performing rights and licensing on any issues

[1] that may crop up with regards to direct licenses or other
[2] related tasks.
[3] **Q.** And you mentioned earlier that MRI has provided interim fee
[4] reports to IBM, is that correct?
[5] **A.** Yes, that's correct.
[6] **Q.** And when did MRI first provide BMI with interim fee data?
[7] **A.** March of 2009.
[8] **Q.** And was BMI able to process that data?
[9] **A.** No, it was not.
[10] **Q.** And why is that?
[11] **A.** Because there were errors in it.
[12] **Q.** What kind of errors?
[13] **A.** There were errors in the performance counts being grossly
[14] overstated.
[15] **Q.** Can you explain that?
[16] **A.** There were, each individual work has a number of
[17] performances to it. For an example if a title has a thousand
[18] performances, that's exactly the performances that it had.
[19] There are publisher records that come in with the file and what
[20] had happened is that thousand was populated amongst all of the
[21] publisher records rather than as the title record. So, for
[22] example, if it had two publishers, we were being reported that
[23] that work had 2,000 performances on it when in reality it only
[24] had 1,000 performances, and that equated to about a million
[25] performances in the off-premise file.

[1] **Q.** Meaning in the first set of data it was wrong by a million
[2] performances?
[3] **A.** That's correct.
[4] **Q.** Did BMI communicate this to DMX?
[5] **A.** Yes, we did.
[6] **Q.** And were these errors rectified?
[7] **A.** Yes, they were.
[8] **Q.** And was another set of data provided to BMI from MRI?
[9] **A.** Yes.
[10] **Q.** Was BMI able to process that set of data?
[11] **A.** No, it did not.
[12] **Q.** And why is that?
[13] **A.** It contained test channels from DMX that should have been
[14] removed before they sent the file to us.
[15] **Q.** And what are test channels?
[16] **A.** Test channels are channels that DMX sets up that is not
[17] really made commercially available to anybody, so therefore we
[18] don't count them as performances. And DMX removes them from
[19] the information that they supply to us, or notifies us of them
[20] being there and then we remove them. But in this case when we
[21] had a discussion with MRI, MRI didn't even know about this test
[22] channel routine that was going on at the time, and so therefore
[23] we had to work with DMX to resolve that and remove those test
[24] channels.
[25] **Q.** And when were these test channels ultimately removed?

[1] **A.** When we got the file in October of 2009.
[2] **Q.** Okay. And do you know how long you and your department
[3] spent on resolving the issues with the interim fee data from
[4] MRI?
[5] **A.** Probably worked on it a couple of hundred hours.
[6] **Q.** Okay, and over what time period did that occur?
[7] **A.** Between March and October.
[8] **Q.** Did this have any effect, the errors in the MRI data, on
[9] BMI's ability to begin programming on the AFBL?
[10] **A.** No, it did not.
[11] **Q.** Well, did you need to get a complete set of data for any
[12] reason for the programming on the AFBL?
[13] **A.** Well, we needed -- we already knew the values of what the
[14] fields were, even though the file was not capable of usage. So
[15] creating the database and figuring out what we needed to do
[16] from some programming standpoints, we could still complete
[17] that.
[18] **Q.** And why did you begin programming only after August?
[19] **A.** Well, that was the first time that we had the direct or
[20] source licenses all figured out and what we needed to do there
[21] and we needed to get it in the database because we were under a
[22] mandate to start removing direct or source license works from
[23] our database effective with the distribution that we processed
[24] in December, and then eventually paid in January.
[25] **THE COURT:** Why do these kinds of costs that you've

[1] been describing, by and large, form a part of a rate setting
[2] case? Why aren't they more logically viewed as matters which
[3] should be or should not be included in a bill to DMX for the
[4] costs incurred in making special arrangements for DMX but
[5] regarded as a one-time expense, not something which would be
[6] incorporated in a continuing fee or rate for the performance of
[7] music?
[8]     MR. BENTON: Well, your Honor, certainly both parties'
[9] proposals include amounts, include in principle amounts for
[10] incremental costs.
[11]     THE COURT: I'm not questioning that. I'm just asking
[12] why.
[13]     MR. BENTON: I think in concept I think it could be
[14] done that way, your Honor, except for the ongoing portion. Of
[15] course, that could be also I suppose a bill that was sent to
[16] DMX every quarter or every year for the costs incurred.
[17]     THE COURT: Look. The ongoing portion is 37,000 and
[18] change. The major portion is 340,000 and change.
[19]     MR. BENTON: That's correct, your Honor.
[20]     THE COURT: Which would you rather discuss?
[21]     MR. BENTON: I'm sorry?
[22]     THE COURT: Which would you rather discuss?
[23]     MR. BENTON: Well, certainly the concept of taking the
[24] $339,000 in up-front development and sending a bill to DMX, I
[25] don't think there's anything wrong with that concept. That's

[1] discrete, finite situation?
[2]     MR. BENTON: I think it could be billed, the initial
[3] development cost could be billed separately.
[4]     THE COURT: My question is why shouldn't it?
[5]     MR. BENTON: Your Honor, I can't think of a reason why
[6] we shouldn't bill DMX for the money we spend on developing this
[7] system.
[8]     THE COURT: Any grayer heads have anything to add?
[9] Mr. Rich? You rise?
[10]     MR. RICH: Your Honor, I always fear that this part of
[11] the case overwhelms the real meat of the case.
[12]     THE COURT: Excuse me?
[13]     MR. RICH: I always fear that this part of these cases
[14] has a tendency, as I think you're suspecting, of overwhelming
[15] the meat of the case, which is what is the core rate dispute.
[16]     THE COURT: Yes.
[17]     MR. RICH: I think the only principal point that we
[18] want the Court --
[19]     THE COURT: It's actually harmful, because it
[20] eventually complicates a calculation which is plenty sensitive
[21] and difficult enough with considerations which are temporal
[22] rather than permanent, finite rather than continuing, and which
[23] raise the type of questions what should be included in the
[24] bill, what shouldn't, what should be spread over others and
[25] what shouldn't, which are much more handily dealt with in a

[1] not what the parties have --
[2]     THE COURT: But there may be something wrong with the
[3] concept that it should be incorporated in a license arrangement
[4] for the continued performance of music.
[5]     MR. BENTON: Well, I don't think so, your Honor.
[6]     THE COURT: I'm sure it can be done, but I'm asking
[7] why is that the more logical or more businesslike concept?
[8]     MR. BENTON: Well --
[9]     THE COURT: When the rate contains all these other
[10] consequences.
[11]     MR. BENTON: Well, your Honor, I think the concept
[12] that the AFBL, which requires, which is a license that requires
[13] additional processing steps and additional systems to be
[14] developed and additional people, not only from Mr. Laughlin's
[15] department but from other departments as you heard Mr. O'Neill
[16] testify to the other day, the concept that these incremental
[17] costs above what a normal blanket license should be paid is an
[18] important one. Because if those incremental costs are not
[19] picked up by the user that chooses the AFBL, then BMI's
[20] affiliates who do not directly license can experience a
[21] shortfall, even though the value of their music hasn't
[22] diminished at all.
[23]     THE COURT: That may be entirely correct, but it has
[24] nothing to do with the question I asked, which is why shouldn't
[25] it be billed separately, where it can be fought over as a

[1] dispute within the terms of a finite sort of bill, rather than
[2] in a case setting a rate for an industry composed of a great
[3] many people whose relationship to these charges is rather
[4] collateral.
[5]     MR. RICH: I have no dispute with any of that. But
[6] there's one interesting and I think not obvious question in
[7] terms of its answer, your Honor, where the parties disagree,
[8] which is as your Honor knows, DMX made a very large investment,
[9] including through this case, to develop the contours and
[10] parameters of this so-called carveout license. It's been a
[11] long road to get here because it wasn't one from the beginning
[12] that BMI said, sure, let's do it. It had to be litigated
[13] through the Second Circuit, as you know, and so forth. So
[14] they've made a big investment in real terms and as you're
[15] learning they're not the biggest company on the face of the
[16] media, and there's an interesting question to, and a
[17] significant economic question, it seems, which is now that BMI
[18] is putting together an infrastructure, and I don't doubt for a
[19] minute the sincerity of the efforts that Mr. Laughlin is --
[20]     THE COURT: You're coming to the point, aren't you?
[21]     MR. RICH: Yes. I apologize. The point is only
[22] should DMX bear the entire up-front cost of being the --
[23]     THE COURT: Of course that's a question.
[24]     MR. RICH: Naturally it's a question. It's not
[25] whether --



Page 449

[1]    **THE COURT:** But it's partially a question as between
[2]  you and the class, it's partly a question of between you and
[3]  BMI, and the reciprocal question is should BMI be charging all
[4]  these costs to you rather than in some other mechanism which
[5]  spreads the cost of the benefit over those who receives the
[6]  benefit.
[7]    **MR. RICH:** I would submit that your Honor has some
[8]  control over the second, whereas DMX has no ability on the
[9]  first to spread its cost among the rest of the industry. If
[10]  they were to send a bill to Muzak or Music Choice --
[11]    **THE COURT:** Of course it has an ability. It has an
[12]  ability to object to BMI's effort to increase the size of the
[13]  rate by the inclusion of this kind of cost.
[14]    **MR. RICH:** Yes.
[15]    **THE COURT:** On the argument that it is more fittingly
[16]  handled by the mechanism of a charge, which can be disputed on
[17]  its own merits. In what form I wouldn't have the temerity to
[18]  say. But somewhere, surely.
[19]    **MR. RICH:** As I understand you, I think that's very
[20]  close to our actual position, which is that it would be
[21]  inappropriate to build a fee that captures the full up-front
[22]  cost here. There should be some other mechanism for an
[23]  equitable portion of it. To the extent your Honor is a bit
[24]  reluctant to --
[25]    **THE COURT:** There are two aspects to it. One is the

Page 451

[1]  admittedly on the subject on a granular level, as here, as to
[2]  how many computers had to be installed and how many programs.
[3]  It's awkward, but I don't know if we have figured out a way to
[4]  avoid, if we can't between the parties reach an agreement, I
[5]  would hope making through this we could, prodding, but if we
[6]  can't, I don't know if there is a mechanism that's available
[7]  particularly to DMX where BMI is taking a position which is it
[8]  should get built into the very fee mechanism through this floor
[9]  fee so-called, they're taking this data and as you know, their
[10]  proposal is that that cost structure should be built into the
[11]  minimum fee to which BMI would be entitled no matter how much
[12]  direct licensing actually occurs and that has real dollars and
[13]  cents consequences, of course.
[14]    At DMX it's our job to provide the Court with the
[15]  views as to the degree to which and the extent to which that
[16]  charge we feel is appropriate. We're always open to some other
[17]  mechanism for a reasonable sharing of expenses that properly
[18]  ought to be allocable to our client. Our proposal says
[19]  forthrightly to the Court in our trial submissions, yes, we
[20]  recognize that if there are legitimate incremental costs
[21]  associated with operating this new form of license, our client
[22]  ought to pay for those. The question is, what are reasonable
[23]  incremental costs and, you know, as this testimony is
[24]  indicating, I think there may be different ways to think about
[25]  amount and apportionment, particularly on the front end where

Page 450



[1]  argument that it shouldn't all be charged to you because you're
[2]  acting on behalf of what we might loosely call a class, a lot
[3]  of other beneficiaries. The other argument is does this kind
[4]  of expenditure have a legitimate place in the calculation of a
[5]  rate rather than some other form of charge. That's the
[6]  question I'm raising now. I recognize the presence of the
[7]  other question.
[8]    **MR. RICH:** It could legitimately be viewed several
[9]  ways. We struggled considerably with this issue and the one
[10]  other context was which I'm most familiar, your Honor, and if
[11]  you'll indulge me to go across the street, figuratively to the
[12]  ASCAP court for a moment.
[13]    **THE COURT:** Oh, dear, there's that clause in the
[14]  decree that I've always worried about.
[15]    **MR. RICH:** I'm simply by a factual analogy, when the
[16]  per program license which you've heard a bit about here was
[17]  developed there, that very issue was the subject of even
[18]  considerably more testimony and struggle, which is does this
[19]  come into the rate as a percentage increase, is it a discreet
[20]  series of charges, and, candidly, as you'll hear here, the
[21]  economists had opposing views.
[22]    At the end of the day, I regret to say it was thrown
[23]  into Magistrate Judge Dolinger's lap and in his decision he
[24]  decided to approach it in a particular fashion that he thought
[25]  was Solomonic justice, having had way too much evidence

Page 452

[1]  that $300,000, I don't doubt it was or may be spent, subject to
[2]  my colleague's cross-examination questions, but the question
[3]  is, if the television industry or the radio industry or other
[4]  background music services may decide this is pretty good, it
[5]  strikes us as onerous that the pioneers who invested in getting
[6]  to that point ought to bear the entirety of that expense going
[7]  in. But I confess, your Honor, your question's a very fair one
[8]  and I don't know that it's an obvious topic that should
[9]  otherwise be occupying this much of the Court's time. We just
[10]  don't have an easy way around it.
[11]    **MR. SALZMAN:** Your Honor, on behalf of BMI, I would
[12]  say several things in response to Mr. Rich. First, up until
[13]  this very moment, the bona fides of BMI's charges were hotly
[14]  contested. You might remember that there was an insistence on
[15]  having Mr. Laughlin's deposition, which was taken yesterday, to
[16]  verify those invoices and the spreadsheet and so on. So it's
[17]  great if there can be agreement. I am extremely pessimistic
[18]  that there actually will be agreement without at least the
[19]  assurance that the Court would be there to decide, and we have
[20]  made great effort, I think both sides have expended a lot of
[21]  money to put it before the Court now. So whether -- that's
[22]  first. So that if you'd sent us into a room, I don't think we
[23]  would get there, and if your Honor were to issue a decision
[24]  about everything else, we would be back here.
[25]    Second, I would say that both sides' economists agree

A-349

[1] that not only BMI's ongoing costs -- one side says
[2] 11.7 percent, one side says 17 percent -- should be in this
[3] base fee, but both sides also agree that incremental costs at
[4] least on an ongoing basis, those costs, and we say an allocable
[5] share each year of the development cost should be in that base
[6] fee.
[7]   If you take out the up-front development costs and put
[8] them in a separate bill, I don't know what the economists would
[9] say, but again, I don't see why that discreet component can't
[10] come out, if it could be agreed to or decided by the Court
[11] separately and paid for.
[12]   Third, as to the concept that this is the beginning of
[13] a benefit that the radio industry or the television industry or
[14] many other classes of people might use, I would say that
[15] remains to be seen. The background music industry uses music
[16] in a particular way, uses feature songs only and it's a song by
[17] song thing. It's quite different, for example, from what the
[18] television industry does. It might be completely different
[19] sets of processes needed for television music, which is
[20] different than -- it's the cue sheet database, it's not the
[21] song database. It's quite a bit different.
[22]   So BMI's approach on this third part is to say so far
[23] we have one user, allocate cost to it and I think as
[24] Mr. O'Neill said, if other people come along and there is
[25] adjustment because the same processes are usable, then that's

[1] fair and BMI is open to it. But meanwhile, BMI has these real
[2] costs and it's proposing that not all of them but a share
[3] spread over time would be paid.
[4]   (Continued next page)

[1]   THE COURT: Well, I think I will only respond to that
[2] by making three observations which are certainly not rulings,
[3] not at this point.
[4]   First, I'm not interested in promoting an agreement or
[5] settlement. I think we are past that and it would waste time
[6] which is necessarily going to be consumed by the conduct of the
[7] trial. If you want do that, God bless you, but not because I
[8] urge you.
[9]   Second, I agree with the obvious observation that the
[10] costs fall into two categories, one being the cost of what I
[11] think what you are saying is development costs, putting
[12] yourself in a position to administer the adjustable rate
[13] license; and the second component is the costs of operating it
[14] on an ongoing basis. And I would think anybody who didn't know
[15] anything about economics would say the first is a capital cost
[16] which should be addressed separately and I suggest billed
[17] separately and the continuing one is one that has a much more
[18] natural part in a rate 7 exercise.
[19]   And third, I think we are all deferring, for the
[20] moment, at least except for glancing references so far, the
[21] question which will arise about the development costs, whether
[22] they are or are not, in toto or in very large part, an expense
[23] which BMI should expect to absorb itself under its duty to
[24] provide an adjustable rate license.
[25]   But, that's a whole argument of law, not of economics.

[1]   MR. SALZMAN: If I could just very briefly address
[2] that third point?
[3]   It is a point of law. We think it is quite clear from
[4] the Second Circuit's decision as well as from the decree that
[5] the Second Circuit was construing that when an applicant
[6] applies for a license, BMI is entitled to be charged a
[7] reasonable fee for that license. And the reasoning of the AEI
[8] court, the Second Circuit was they can have any, some, or all,
[9] they're entitled to that carve-out provision but you can go
[10] charge them for that license and here there are additional
[11] administrative costs including costs. So, we think it is
[12] settled that they should pay the costs of that license.
[13]   THE COURT: They may have thought that the license
[14] covered the playing of the music rather than the generation of
[15] the operations of the agreement but, as I say, I think we are
[16] all happy to defer that to another afternoon. There remains
[17] the question of where these costs forming really a proper part
[18] of the calculations in setting a rate --
[19]   MR. SALZMAN: In terms of where we are --
[20]   THE COURT: I raised it because I was curious but now
[21] I'm becoming quite fascinated with it.
[22]   MR. SALZMAN: In terms of where we are in the trial
[23] and why we are all here and what work has been done to this
[24] point, my observation would be that both sides agree that the
[25] base fee should have costs in it. We, both sides have tested

[1] each other as to how to measure those costs and what are
[2] appropriate costs and what aren't. I agree with Mr. Rich that
[3] there is no other forum and I would submit that we should go
[4] forward, submit the proof, make the arguments we need to make
[5] and not have a situation where there is a decision as a prelude
[6] to a dispute.
[7]     THE COURT: Well, then I think you better be prepared
[8] for the possibility that you will be directed to prepare
[9] alternate forms, one in which these costs are judicially
[10] directed to be billed outside the fee structure which will then
[11] be simplified by their exclusion and the consequences that that
[12] would have on the remaining of the fee setting problem and
[13] present them for separate recompense or treatment.
[14]     MR. SALZMAN: I understand, your Honor.
[15]     MR. RICH: Thank you, your Honor.
[16] BY MR. BENTON:
[17] Q. Mr. Laughlin, do you have an understanding of which data,
[18] on-premises or off-premises, DMX is proposing in this case to
[19] use for the AFBL?
[20] A. Yes, I do.
[21] Q. And what is that understanding?
[22] A. The understanding is that they would use off-premise as a
[23] surrogate for on.
[24] Q. And based on BMI's data, do you know if DMX' off-premises
[25] performances are representative of its on-premise performances?

[1] A. No, it is not.
[2] Q. And how do you know that?
[3] A. We ran -- just recently we ran our distribution where we
[4] had to remove all the director source licenses. Currently, we
[5] are using both the on and off-premise data that gets submitted
[6] directly from DMX to process those distributions and take out
[7] the director source licenses that we have already validated
[8] that we had. We did some analysis on the number of unique work
[9] titles that existed between both on and off and found that only
[10] 28 percent of the titles overall that constituted DMX was
[11] really located in both on and off-premise.
[12] Q. So, when you looked at the titles that DMX was performing
[13] on its on and off-premise services, only 28 percent of them
[14] were included in both services?
[15] A. That's correct.
[16] Q. And could you turn to tab 10 in your binder?
[17]     THE COURT: The positive way of stating that is that
[18] except for 28 percent, all of the off-premises titles are
[19] different from the on-premises titles?
[20]     THE WITNESS: That is correct.
[21] Q. Can you identify this document, Mr. Laughlin?
[22] A. Yes.
[23] Q. What is it?
[24] A. It is a document that contains an analysis that was
[25] performed from Aaron Parrington, P-A-R-R-I-N-G-T-O-N, using our

[1] second quarter 2009 production distribution.
[2] Q. Okay. And who is Mr. Parrington?
[3] A. He is a project manager that works in our IT applications
[4] department.
[5] Q. And looking at the top chart, does this top chart have to
[6] do with DMX' off-premise performance data?
[7] A. Yes, it does.
[8] Q. And what quarter was this analysis done on?
[9] A. The second quarter of 2009.
[10] Q. And, can you tell me the process by which this chart was
[11] created?
[12] A. Yes. It was -- we created it from the performance data
[13] that we got directly from DMX --
[14]     THE COURT: Excuse me, Mr. Benton. Where are you now?
[15]     MR. BENTON: At tab 10, your Honor.
[16]     THE COURT: 10. Thank you.
[17]     MR. BENTON: We skipped a few.
[18]     THE COURT: Yes. That's okay. All right.
[19]     THE WITNESS: The first chart's example we used the
[20] data that we got from DMX in its original format which is what
[21] we processed through our production distribution, and just a
[22] few weeks ago made payments to all of the works identified that
[23] didn't contain a director source license, and we also used the
[24] direct licenses that were validated during production in
[25] December and the performances for just related to the

[1] off-premise. Then we calculated the direct license ratio
[2] against those performances for that file by analyzing the
[3] information that we had at a detailed level for off-premise.
[4] BY MR. BENTON:
[5] Q. And when you say direct license ratio, does that mean you
[6] took a look and saw what DMX' credit would be by running DMX'
[7] performance data against BMI's AFBL process that you described
[8] earlier?
[9] A. Yes.
[10] Q. What credit did you find DMX would be entitled to use on
[11] its off-premise data for the second quarter of 2009?
[12] A. 36.64.
[13] Q. And the bottom chart --
[14]     THE COURT: Before you get there, total BMI
[15] performances means of the same music or of its entire
[16] inventory?
[17]     THE WITNESS: No. Just for the music that was
[18] identified --
[19]     THE COURT: By DMX.
[20]     THE WITNESS: -- by BMI from its database of the
[21] performances that happened in the on-premise file that was
[22] submitted. So, the total BMI performances equal the total
[23] number of performances from song titles given to BMI by DMX
[24] where we have identified it to a song number.
[25]     THE COURT: So it is all the performances of those

A-351

Page 461

[1] songs?
[2]     THE WITNESS: Right, that had a BMI participation in.
[3]     THE COURT: Yes.
[4] BY MR. BENTON:
[5] Q. I think you were just discussing the off-premises data,
[6] Mr. Laughlin?
[7] A. Yes.
[8] Q. Is that right?
[9] A. Yes.
[10] Q. And then the bottom chart, this says second quarter 2009
[11] summary on-premises performances only created by BMI from
[12] performance data received from DMX in original format and using
[13] direct licenses validated by BMI.
[14]     Here did you take DMX' on-premise data that it gave to
[15] BMI to find out what its credit would be?
[16] A. That is correct.
[17] Q. And what did you find?
[18] A. We found that the credit rate for the performances within
[19] on-premise we equated to 21.47 percent.
[20]     MR. BENTON: Your Honor, I would move this Exhibit
[21] into evidence, PX 0201.
[22]     MR. LARSON: Your Honor, we object to the admission of
[23] the document.
[24]     THE COURT: Excuse me?
[25]     MR. LARSON: Object to the admission of the document.

Page 463

[1] of the information that was identified from DMX during that
[2] quarter and then it gave a breakdown. This is what I
[3] referenced before where only 28 percent of those titles were
[4] located in both the on and off-premise data.
[5]     MR. BENTON: Your Honor, I would move this exhibit
[6] into evidence, HX 0200.
[7]     MR. LARSON: Offer the same objection, your Honor.
[8]     MR. BENTON: Your Honor, we would also make the data
[9] available for this.
[10]     THE COURT: Same ruling.
[11]     MR. BENTON: Pass the witness, your Honor.
[12] CROSS EXAMINATION
[13] BY MR. LARSON:
[14] Q. Good afternoon, Mr. Laughlin.
[15] A. Good afternoon.
[16] Q. I would like to start with the discussion of the MRI
[17] interim fee data that you were provided, if we could. Now, I
[18] think you testified that DMX provided a first set of reports to
[19] BMI in march of last year, is that correct?
[20] A. That is correct.
[21] Q. And, after some analysis of the reports by BMI, BMI,
[22] through its counsel, notified DMX of some of the errors that it
[23] found in the reports, correct?
[24] A. That is correct.
[25] Q. And that was the performance count issue that you alluded



Page 462

[1]     THE COURT: Why?
[2]     MR. LARSON: It is hearsay, first of all. It was
[3] created by Mr. Parrington, not by the witness he just
[4] testified. It is clearly being offered for the truth of the
[5] matter asserted. I also think there is a best evidence issue
[6] as some sort of summary sheet of an underlying study that was
[7] done without any presentation to us of the underlying work. We
[8] got this document about a week ago. All we got was, literally,
[9] this page.
[10]     THE COURT: Can you make it available for them to
[11] inspect over the weekend?
[12]     MR. BENTON: Yes. Sorry. We can, I believe, your
[13] Honor.
[14]     MR. LARSON: Thank you.
[15]     THE COURT: Please do so and we will revisit this
[16] objection on Monday morning.
[17] BY MR. BENTON:
[18] Q. Mr. Laughlin, could you turn to tab 11? Can you identify
[19] this document?
[20] A. Yes, I can.
[21] Q. And what is it?
[22] A. It is a study that we did for the time period of the third
[23] quarter of 2008, it was conducted by Lee Greer who works in our
[24] strategic operations department. It was an exercise to take a
[25] look at the 33,420 unique song titles that existed across all

Page 464

[1] to in your testimony?
[2] A. Yes.
[3] Q. And, are you aware that that communication was made in the
[4] middle of April of 2009?
[5] A. I didn't recall.
[6] Q. But, in any case, at some point shortly after the March
[7] submission of the report, correct?
[8]     Now, revised reports were provided to BMI on May 12th,
[9] is that right?
[10] A. I don't recall what date they came in.
[11] Q. Shortly after the issues were communicated between BMI and
[12] DMX?
[13] A. Yes.
[14] Q. And so, shortly after that those reports actually took care
[15] of the problems that you notified DMX of, correct?
[16] A. In the first -- in the first submission, that's correct.
[17] Q. Save for the test channel issue that was raised?
[18] A. Would you repeat the question?
[19] Q. My question is the reports took care of the issues you
[20] raised except for the test channel issue, correct?
[21] A. That is correct.
[22] Q. Now, MRI and DMX ultimately removed those test channels
[23] too, didn't they?
[24] A. Yes, they did.
[25] Q. And they gave you new reports that didn't have those



A-352