Page 465

[1] channels included, correct?
[2] **A.** Yes, they did.
[3] **Q.** So that's not an issue anymore going forward?
[4] **A.** That is correct.
[5] **Q.** And you have no reason to believe that even when those test
[6] channels were included in the data that those test channels had
[7] either more or less directly licensed music in them, do you?
[8] **THE COURT:** Mr. Larson?
[9] **MR. LARSON:** Yes.
[10] **THE COURT:** In the nature of things, I have to hear
[11] the question as well as the answer and you drop your voice or
[12] you leave the mic or something in the last few words of the
[13] question and I lose it.
[14] **MR. LARSON:** My apologies, your Honor. I will speak
[15] up.
[16] **BY MR. LARSON:**
[17] **Q.** Mr. Laughlin, do you have any reason to believe that when
[18] the test channel data was included in the MRI DMX reports that
[19] those test channels had either more or less directly licensed
[20] music in them?
[21] **A.** I don't know.
[22] **Q.** Do you have any reason to believe that including those
[23] channels impacted the direct license ratio in any way?
[24] **A.** I don't know.
[25] **Q.** You have no reason to believe that DMX, by including those

Page 466

[1] test channels, was trying to alter its payment in any way, do
[2] you?
[3] **A.** No, I don't.
[4] **Q.** So, in the end the issue that you raised with DMX was
[5] corrected, correct?
[6] **A.** That is correct.
[7] **Q.** And you have had the reports fixing all those issues since
[8] the beginning of October, is that right?
[9] **A.** That is true.
[10] **Q.** Let's talk about the costs of implementation that you laid
[11] out, if we could, and that's the costs that were in your
[12] demonstrative, tab 2, correct?
[13] Now, the total cost that you have slated for these
[14] tasks are estimates, is that right?
[15] **A.** That is correct.
[16] **Q.** They reflect work that still has to be completed, correct?
[17] **A.** Yes.
[18] **Q.** And, in addition to being estimates, the hourly rates that
[19] are listed on this chart aren't actual salaries for the people
[20] listed, isn't that right?
[21] **A.** Would you repeat that?
[22] **Q.** Yes.
[23] For the BMI personnel listed on this chart, the hourly
[24] rates that are listed in the chart in the third column aren't
[25] the actual salaries of the persons listed, correct?

Page 467

[1] **A.** That is correct.
[2] **Q.** They're averages that are computed?
[3] **A.** It is a blended number.
[4] **Q.** And that blended rate includes an allowance for year-end
[5] bonuses paid to employees, is that right?
[6] **A.** Not in all of these instances.
[7] **Q.** Which instances is that not the case?
[8] **A.** In the $78 per hour for the internal programmer, that's
[9] based upon our blended rate of $60 per hour which is what we
[10] use to estimate for every project that gets submitted for us to
[11] do where we have to cost it, and then the $18 additional onto
[12] that $60 represents 32 percent in benefits.
[13] **Q.** So, let's take the BMI project manager line, senior vice
[14] president; that refers to you, correct?
[15] **A.** That is correct.
[16] **Q.** And there is a rate listed there of $290?
[17] **A.** That is correct.
[18] **Q.** And, again, that's not an actual salary, that's an average,
[19] correct?
[20] **A.** That's right.
[21] **Q.** And the figure used to create that average includes an
[22] allowance for a bonus as well, doesn't it?
[23] **A.** Yes, as far as I know.
[24] **Q.** And, as you said, it includes a 30 percent premium for
[25] employee benefits as well, correct?

Page 468

[1] **A.** That is correct.
[2] **Q.** Now, with respect to the outside programmers who are
[3] included in the first line here, your evidence for the costs
[4] for those programmers is the invoices that you discussed at tab
[5] 3, correct?
[6] **A.** That is correct.
[7] **Q.** And those invoices apply specifically to programming work
[8] that's been done, correct?
[9] **A.** That's correct.
[10] **Q.** And so, those apply to just the first line on the chart,
[11] right?
[12] **A.** Yes. Those invoices equate back to the $90,000 line on
[13] this chart too.
[14] **Q.** And with respect to those with the programming that's been
[15] completed, that reflects only a portion of the work that's been
[16] done, right?
[17] **A.** That's correct.
[18] **Q.** And the remainder of the work is just an estimate, right?
[19] **A.** That is correct.
[20] **Q.** Now, for the BMI programmer that's listed here in the
[21] second line, Ms. Winters I think you said?
[22] **A.** Yes, that's who the programmer was that performed the 297
[23] hours.
[24] **Q.** Right; she's completed only 297 of the 1,400 hours that you
[25] have estimated for her, right?



Page 469

[1] **A.** That I had estimated from the original estimate that we
[2] submitted for internal programming.
[3] **Q.** You can't say for certain sitting here that you will need
[4] 1,400 hours of work exactly from that senior BMI programmer,
[5] can you?
[6] **A.** Well, in the first place, just because Anita Winter has
[7] worked on part of the project that she was familiar with with
[8] the direct license doesn't mean that the other 1,100 hours
[9] necessary to finish the rest of it wouldn't constitute multiple
[10] BMI employees and may not even include Anita Winter.
[11] **Q.** Understood. Putting aside whether it is Mrs. or Ms. Winter
[12] or some other programmer, can you say for sure that with only
[13] 297 hours out of the 1,400 completed that, necessarily, there
[14] will be another 1,100 hours of work to do?
[15] **A.** That is our estimate.
[16] **Q.** That's your estimate but you can't say for certain, right?
[17] **A.** That is correct.
[18] **Q.** Could be a thousand, could be 1,500?
[19] **A.** Yes. It could be higher or lower, depending upon when the
[20] work gets finished.
[21] **Q.** If it turns out to be a thousand, do you know whether BMI
[22] intends to provide DMX with a refund if these charges were
[23] charged to DMX?
[24] **A.** Say that again? Could you repeat the question?
[25] **Q.** Yes, I will ask again.

Page 470

[1]     If it turns out that the programmer from BMI ends up
[2] only needing a thousand hours rather than 1,400, do you know
[3] whether BMI intends to provide DMX with a refund of the money
[4] that they seek to charge to DMX in this proceeding?
[5] **A.** I would imagine that in, like any project that we work on,
[6] when you finally finish a project it is really based upon the
[7] actual hours and dollars you spend has nothing to do with the
[8] estimate that you created.
[9] **Q.** Now, I notice that your hours are not similarly split out
[10] between estimated and completed. You haven't completed those
[11] 250 hours yet, have you?
[12] **A.** I have worked on some.
[13] **Q.** About 150 hours?
[14] **A.** No, about 75.
[15] **Q.** Okay. So, again, sitting here you can't say for certain
[16] that it will end up being exactly 250 hours, correct?
[17] **A.** That is correct.
[18] **Q.** Now, apart from the invoices that you gave us as backup for
[19] the completed outside programmer work, have you provided the
[20] Court with any documentary evidence supporting your claim for
[21] the rest of the cost outlined in the testimony here?
[22] **A.** You mean the completed costs?
[23] **Q.** Having produced any evidence for the costs that haven't
[24] been completed.
[25] **A.** No, I have not.

Page 471

[1] **Q.** Now, this isn't the first estimate of cost that's been
[2] provided to DMX, correct?
[3] **A.** That is correct.
[4] **Q.** BMI's lawyers provided DMX with an interrogatory response
[5] that estimated the cost that would be involved in this project,
[6] rate, right?
[7] **A.** That is correct.
[8] **Q.** And it is true, is it not, that four different new hires
[9] and part-time consultants that were included in that first
[10] estimate were later removed?
[11] **A.** That is correct.
[12] **Q.** And the director position that we see here on the
[13] demonstrative at the bottom of the top chart was substituted,
[14] correct?
[15] **A.** That is correct.
[16] **Q.** And that's because a month or two after that first document
[17] was written you and your staff decided on a change in approach
[18] from what was envisioned in the initial document, correct?
[19] **A.** That is correct.
[20] **Q.** You decided you could use some of your normal processes
[21] rather than having to create new ones, right?
[22] **A.** Yes.
[23] **Q.** Now, there was also a later correction made to the numbers
[24] initially provided to DMX because of the salaries listed on
[25] that initial projection were incorrect, right?

Page 472

[1] **A.** I'm not aware of that.
[2] **Q.** Let me ask you this. Do you recall, in the initial
[3] interrogatory response that you were just talking about, that
[4] your salary, for example, was listed as $300?
[5] **A.** I didn't recall.
[6] **Q.** You don't recall that?
[7] **A.** I don't recall what it was listed as.
[8] **Q.** Do you recall that you provided some time sheets or a
[9] summary of time spent to DMX?
[10] **A.** Yes.
[11] **Q.** If we could mark a document, PX 153 and PX 171?
[12]     Mr. Laughlin, do you recognize the document marked as
[13] Exhibit PX 153?
[14] **A.** Yes, I do.
[15] **Q.** Can I direct your attention to the last page of that
[16] document, please? Now, this is a spreadsheet listing some time
[17] that various personnel that BMI have entered under a time code
[18] that is related to some initial work on the blanket carve-out
[19] license, correct?
[20] **A.** That is correct.
[21] **Q.** Can you take a look at PX 171 for me? And can you turn to
[22] the last page of that document? Do you recognize this as an
[23] updated version of the spreadsheet listed in PX 153?
[24] **A.** Yes.
[25] **Q.** Now, one difference between the two spreadsheets is that

Page 473

[1] the hourly fees have been updated in the second document,
[2] correct? I will point you, just to give an example, to the
[3] line for Mr. Greer and you will see, for example, that
[4] Mr. Greer's hourly rate listed falls from 150 to $70, correct?
[5] A. Yes, that is correct.
[6] Q. And, you will see the line listed for you changes from 300
[7] to 290, correct?
[8] A. Yes, that is correct.
[9] Q. Now, another change between the two spreadsheets is that
[10] although the first one is for hours through mid-June and the
[11] second one is for hours through the end of July, there is
[12] actually a reduction in the number of hours for some people on
[13] the list, correct? And, again, if you want an example I will
[14] point you to your line. Your hours actually fall from 148 to
[15] 141, correct?
[16] A. Yes. Appears to be.
[17] Q. And Mr. Blose's time, Russ Blose who is listed, his hours
[18] were changed from 132 to 50, correct?
[19] A. May I say something?
[20] Q. Yes.
[21] A. This report here through June is representative for the
[22] fiscal year that ended in that June of 2009. The sheet here
[23] that represents July is the start of a new fiscal year so,
[24] therefore, these were not the hours -- or these are not the
[25] same hours, I don't think, as what was reported on the one

Page 474

[1] sheet.
[2] Q. So, the hours in PX 153 are for hours for the fiscal year
[3] ending --
[4] A. I think it is.
[5] Q. June 30th?
[6] A. I would have to do some evaluating to find out exactly if
[7] that's a true statement, but.
[8] Q. Let me ask you this: It is the case, is it not, certain
[9] hours were removed from the time sheets because there was time
[10] included that had been spent on the litigation as opposed to
[11] time spent developing the blanket license?
[12] A. I wasn't aware of that.
[13] Q. You weren't aware of that.
[14]   Now, in your first deposition you testified, for
[15] example, that you had included the hours that you had spent
[16] preparing this for interrogatory responses, right?
[17]   **THE COURT:** Mr. Larson, the letter 0171 makes a rather
[18] concise explanation of the removal of some hours because it was
[19] decided they should be allocated to assisting in the litigation
[20] rather than administering or implementing the AFBL. Is there
[21] something in that that requires detailed cross-examination for
[22] the purpose of this case?
[23]   **MR. LARSON:** That was my question, your Honor. No, I
[24] will move on. That was the point I was trying to make.
[25] Q. Does that refresh your recollection that certain hours were

Page 475

[1] reduced because they were hours --
[2] A. I mean, I didn't read this so I --
[3]   **THE COURT:** It was a statement made by counsel rather
[4] than you. Maybe they didn't inform you.
[5]   Why am I being dragged into this kind of thing?
[6]   **MR. LARSON:** My only point here, your Honor, is to
[7] show that previous estimates that have been provided to us by
[8] BMI have been changed numerous times and, to my mind, calls in
[9] the credibility of the estimates that were now being presented
[10] on the demonstrative and whether you can trust those, frankly.
[11]   **MR. BENTON:** Your Honor, if I may? I want to clarify.
[12]   **THE COURT:** Well, I'm an old man and I know what an
[13] estimate is as compared to a fact. My vast years of experience
[14] have given me occasions to observe that estimates are sometimes
[15] improved and brought up to date and sometimes they're changed
[16] by the person who made them, and sometimes they turn out to be
[17] true and sometimes they turn out not to be. That's happened so
[18] often I regard it as part of life. My question is why are we
[19] going through it now as though it proved something in this
[20] case?
[21]   **MR. LARSON:** Fair enough, your Honor. I will move on.
[22] **BY MR. LARSON:**
[23] Q. Mr. Laughlin, I would like to discuss the programming work
[24] that's been completed, if we could, and we will move quickly
[25] here.

Page 476

[1]   Could we mark 159, please?
[2]   Mr. Laughlin, do you recognize this document?
[3] A. Yes, I do.
[4] Q. Can you tell me what it is, please?
[5] A. It is our sur-document that we use whenever we want to
[6] estimate or do a project. We create one of these documents
[7] that briefly explains at the time what the business
[8] specifications are to be and it is the form that we use to
[9] conduct our initial estimates.
[10] Q. And Mr. Blose wrote this?
[11] A. That is correct.
[12] Q. And he works for you?
[13] A. That's correct.
[14] Q. And you reviewed this and signed off on it?
[15] A. Yes, I did.
[16] Q. And so the AFBL -- this is a document that's put in in
[17] seeking the permission of management to develop the systems
[18] necessary for the AFBL, correct?
[19] A. That is correct.
[20] Q. And it is presented to the management as an investment in a
[21] capital asset, correct?
[22] A. That is correct.
[23] Q. And if you turn to the last page of your document it is the
[24] case, is it not, that capital asset is amortized out over
[25] five years?

**A-355**

Page 477

[1] **A.** That is correct.

[2] **Q.** That's because the value of the asset will continue to have

[3] value in later years?

[4] **A.** That is correct.

[5] **Q.** Now, the document notes on page 2 that you deem the

[6] development of the carve-out functionality to be necessary to

[7] remain competitive in the market, correct? That's the last

[8] line on page 2?

[9] **MR. BENTON:** Judge, just an objection, your Honor. I

[10] believe Mr. Larson said "you." I don't think Mr. Laughlin

[11] wrote this document.

[12] **THE WITNESS:** No, I did not write this.

[13] **BY MR. LARSON:**

[14] **Q.** But you reviewed it?

[15] **A.** I read it.

[16] **Q.** And the document presents or states -- I won't say it is

[17] your words -- but the document states that the development of

[18] the blanket carve-out license is necessary to remain

[19] competitive in the market; correct?

[20] **A.** That's what it says.

[21] **Q.** And, up above in the first line on page 2 it notes that

[22] providing such a license is a mandatory obligation, correct?

[23] **A.** That is correct.

[24] **Q.** Turn back to page 1, please, under the headline Value Added

[25] Goals and Objectives. This document describes Music Choice and

Page 478

[1] ABC in the past had requested carve-out licenses; isn't that

[2] right?

[3] **A.** That is correct.

[4] **Q.** It doesn't mention DMX in this document at all, does it?

[5] **A.** No, it does not.

[6] **Q.** And that's because you're developing systems that will

[7] apply not just to DMX but to other potential blanket carve-out

[8] licensees, correct?

[9] **A.** Potentially.

[10] **Q.** You are not in the business of creating systems that will

[11] only be applicable to one licensee, correct?

[12] **A.** You would hope not.

[13] **Q.** You build them to apply widely across licensees?

[14] **A.** That is correct.

[15] **Q.** That's consistent with the fact that the programming work

[16] that you have done already that you talked about during your

[17] direct testimony has created applications in databases that can

[18] be used by other licensees who may take the blanket carve-out

[19] license, correct?

[20] **A.** Potentially.

[21] **Q.** So, for example, if we turn back to your demonstrative at

[22] page 1 and you look in box A, the source and direct license

[23] database, as you explained in your deposition that's been

[24] developed and it has pieces that could be incorporated --

[25] incorporated into other AFBL type licenses, correct?

Page 479

[1] **A.** That is correct.

[2] **Q.** You also noted that the group account structure that we see

[3] in box A that is being developed could be used with other

[4] carve-out licensees if their direct licenses cover --

[5] **THE COURT:** Mr. Larson?

[6] **MR. LARSON:** Yes.

[7] **THE COURT:** Let's be frank. The form of your

[8] questions really only elicit a laconic "yes" from the witness

[9] and that's the style of examination that you are using. It is

[10] a perfectly well-established style but I can't hear your

[11] testimony if you don't state it slowly and clearly. I can hear

[12] the witness' answer yes or I don't know, whatever the answer is

[13] but, essentially, you're the one who is testifying and the use

[14] of it is if I can hear him.

[15] **MR. LARSON:** I apologize, your Honor. I apologize.

[16] Is it not loud enough.

[17] **OFFICIAL REPORTER:** No.

[18] **MR. FITZPATRICK:** It is not loud enough or slow

[19] enough.

[20] **BY MR. LARSON:**

[21] **Q.** Let me back up two questions if I could, Mr. Laughlin.

[22] You've testified, I want you to turn to look at box A

[23] on Exhibit 1 and direct your attention to the source and direct

[24] license database. Now, it is the case, is it not, as you

[25] testified at your deposition, that that particular application

Page 480

[1] has pieces that could be incorporated into other AFBL type

[2] licenses?

[3] **A.** Potentially.

[4] **Q.** And if you turn to the group account structure that's

[5] listed in that section of the document, you also noted in your

[6] deposition and it is the case, is it not, that that particular

[7] piece of programming could be used with other carve-out

[8] licensees if their direct licenses, like DMX', also covered all

[9] the owned and administered catalogs of the direct license

[10] order, correct?

[11] **A.** Potentially, yes.

[12] **Q.** You also noted in your deposition, and it is the case, is

[13] it not, that the AFBL database that's identified in Section B

[14] could also be used with other carve-out licensees if the

[15] reporting protocol were similar to that that's being used by

[16] DMX as part of this case, correct?

[17] **A.** Potentially.

[18] **Q.** And, finally, you explain that the programming work that

[19] has been done to the BMI distribution application which I take

[20] it is down in box D here, that could also be used with other

[21] carve-out licensees, correct?

[22] **A.** Potentially.

[23] **Q.** Now, at a more general level, if another licensee, say Play

[24] Network or some other CMS service, took the exact same form of

[25] blanket carve-out license as is ultimately awarded to DMX in

[1] this proceeding, there is probably not a lot that would
[2] probably have to be changed related to the upfront costs that
[3] were established here.
[4]     You testified to that in your deposition, did you not?
[5] **A.** Yes, I did.
[6] **Q.** I take it the estimates that you provided under tab 2,
[7] those don't distinguish between work that's solely applicable
[8] to DMX and work that could be applied to other AFBL licensees,
[9] correct?
[10] **A.** That's correct.
[11] **Q.** Let's talk about the on-premise versus off-premise study
[12] that you told us about and that's at tabs 10 and 11 of your
[13] binder. I would ask you to look at tab 11 first, actually.
[14] Now, if we were to add the last two lines together on that tab
[15] we would get the total percentage of songs that are played on
[16] the off-premise service, correct?
[17] **A.** The 19,242 and the 9,475.
[18] **Q.** That would reflect the songs played only on the off-premise
[19] service and would reflect the songs played on both services,
[20] correct?
[21] **A.** That's correct.
[22] **Q.** So, under DMX' proposal which proposed to use the
[23] off-premise performances as a proxy, the direct license ratio
[24] would be calculated using a proxy that, from your chart, shows
[25] or comprises 86 percent of the universe of songs played on DMX;

[1] correct?
[2] **A.** Yes, that would be correct.
[3] **Q.** Now, if I added the first and third lines of your chart,
[4] that would provide me with a total number of songs that are
[5] played on the on-premise service, correct?
[6] **A.** That is correct.
[7] **Q.** Those that are performed only on the on-premise service and
[8] those that are performed on the on-premise service as well as
[9] the off-premise.
[10] **A.** Keep in mind that this is at the title level and not at the
[11] performance level.
[12] **Q.** Understood.
[13]     Now, 9,475 of those songs are played on the satellite
[14] service as well, correct? That's what line 3 shows --
[15] **THE COURT:** I think I'm looking at a different chart.
[16] What chart are you using?
[17] **MR. LARSON:** I'm under tab 11, your Honor.
[18] **THE COURT:** I see.
[19] **BY MR. LARSON:**
[20] **Q.** So, Mr. Laughlin, it is the case, isn't it, that two thirds
[21] of the songs that are played on-premise are in fact also played
[22] on the off-premise service that DMX proposes as its proxy?
[23] **A.** How do you get that?
[24] **Q.** That's 9,475 divided by 14,178.
[25] **A.** Yes, okay.

[1] **Q.** That's correct?
[2] **A.** That's correct.
[3] **Q.** Now, even for those on-premise songs that are not played on
[4] the off-premise service, that doesn't mean those writers and
[5] publishers aren't going to get paid by DMX, right?
[6] **A.** Say that again? Repeat that, please?
[7] **Q.** Yes.
[8]     Even for the on-premise songs that are not played on
[9] the off-premise service, it doesn't mean that the writers and
[10] publishers of those songs played solely on-premise aren't going
[11] to get paid, correct?
[12] **A.** Get paid for DMX performances, you are saying?
[13] **Q.** So long as you get the DMX on the on-premise
[14] performances --
[15] **A.** Yes, I -- at this point I don't know the answer to that
[16] question.
[17] **Q.** Are you familiar with the underlying off-premise
[18] performance data that DMX provides to BMI?
[19] **A.** I know we just get the playlists and the songs that are
[20] incorporated in that that we process.
[21] **Q.** Have you personally, yourself, looked at the data that
[22] comes in for the off-premise performances?
[23] **A.** Not personally myself, no.
[24] **Q.** Is it your understanding that the off-premise data shows
[25] that each time a song is performed on the off-premise service?

[1] **A.** Yes. I would say that's true.
[2] **Q.** So, if a song is performed five times on a channel over the
[3] course of the month that would be listed in the report, is that
[4] your understanding?
[5] **A.** If it was listed in there five times.
[6] **Q.** Well, would it be listed five times, do you know, or -- it
[7] would somehow indicate that it had been played five times,
[8] correct?
[9] **A.** It would have to be listed five times in order for that to
[10] occur because there are no distribution lists that accompany
[11] the off. So, therefore, the performance counts within each one
[12] of the a hundred or so channels.
[13]     Every record is given a value of one. So, if that
[14] same song was listed in there five times, you would have five
[15] records at one each or five. But that would be the only way
[16] you would get that.
[17] **Q.** My question is, do you know whether the DMX data underlying
[18] the top chart on tab 10 --
[19] **A.** Are you at tab 10 now?
[20] **Q.** I am at tab 10.
[21]     The top chart was created from the DMX off-premise
[22] data for the second quarter of 2009, correct?
[23] **A.** That is correct.
[24] **Q.** My question to you is, Do you know whether that data shows
[25] when a song is performed multiple times over the course of a

[1] month or quarter or whatever the reporting period is?

[2] **A.** Yes. it would at this point.

[3] This was the extract out of our production environment

[4] where if the same song would have been listed on multiple

[5] channels from the input data at the point of consolidation or

[6] distribution time, you would have had the total sum of those

[7] performance counts that would have existed for that work.

[8] **Q.** Let me try one more time because I just want to make sure

[9] we understand.

[10] My question isn't whether the song was performed a

[11] single time on different DMX channels but whether the song was

[12] performed multiple times on the same DMX channel.

[13] Do you understand the distinction I'm making?

[14] **A.** How would I know that?

[15] **Q.** That's my question. Do you know whether the data shows

[16] that the song was performed multiple times on a single channel?

[17] **A.** No, I don't know.

[18] **Q.** And, do you know whether the data for the on-premise

[19] programs in the bottom chart, do you know whether that shows if

[20] a particular song was played once or multiple times on a given

[21] on-premise program?

[22] **A.** No, I don't.

[23] **Q.** Now, if it were the case, assume for me that it were the

[24] case that there was a difference between the two types of

[25] reports in terms of the question I just asked you. Do you

[1] think that would have an impact on the ability to compare the

[2] top chart to the bottom chart?

[3] **A.** No. I mean, each one of them stands alone based upon the

[4] information from each one of the files. There is not any

[5] correlation between the two of being anything that -- it is

[6] really the analysis that we did against our production

[7] distribution by looking at each one of these independently and

[8] being able to calculate the credit rate ratio that we would

[9] normally expect to do.

[10] If MRI sent us a file, for example, of second quarter

[11] of 2009 where they got the input data from DMX and sent me a

[12] file, you know, it would be interesting to see how close to

[13] 21.47 that file would contain.

[14] **Q.** Let me try one more time.

[15] With the bottom chart which lists the direct license

[16] percentage of .2147 for the on-premise, sitting here you don't

[17] know whether the data on which that was based would reflect the

[18] fact that a particular song might have been programmed to play

[19] more frequently than some other song, correct?

[20] **A.** That is correct.

[21] **MR. LARSON:** I have no more questions, your Honor.

[22] **THE COURT:** Thank you, Mr. Larson.

[23] **MR. BENTON:** No redirect, your Honor.

[24] **THE COURT:** Thank you, Mr. Laughlin. You are excused.

[25] **THE WITNESS:** Thank you, sir.

[1] (Witness steps down).

[2] **MR. FITZPATRICK:** Your Honor, our next witness will be

[3] by deposition testimony. Shall we call the -- shall we do that

[4] now or is it mid-afternoon break?

[5] **THE COURT:** Excuse me?

[6] **MR. FITZPATRICK:** Should we call the witness now? I

[7] didn't know if it was time for a break.

[8] **THE COURT:** Let's take a 10-minute break.

[9] **MR. FITZPATRICK:** Yes, your Honor.

[10] **THE COURT:** Sure.

[11] (Recess)



[1] **THE COURT:** You're going to read the deposition.

[2] **MR. BENTON:** Yes, your Honor. BMI calls Mr. Alan

[3] Furst to the stand by deposition.

[4] May I approach with the binders, your Honor?

[5] **THE COURT:** Yes.

[6] **MR. BENTON:** The witness has been sworn.

[7] "Q. Okay, Mr. Furst, we met off the record. My name is Jason

[8] Benton. Can you give me your full name, your current home

[9] address?

[10] "A. I'm Alan Gerald Furst, F-u-r-s-t, 17929 Niagara Falls

[11] Terrace, Round Rock, Texas.

[12] "Q. And when did you start working for DMX?

[13] "A. June, 2005.

[14] "Q. And when you began work in 2005 with DMX,what was your

[15] position?

[16] "A. Senior vice president content.

[17] "Q. What are your responsibilities currently as senior vice

[18] president of content?

[19] "A. I oversee the music design video and messaging department.

[20] "Q. And do you have any responsibilities or duties with respect

[21] to DMX's direct license program?

[22] "A. Implementing the program in the music area.

[23] "Q. When you say implementing the program in the music area,

[24] can you break that down further for me?

[25] "A. That would be taking the direct licensed music and applying

Page 489

[1] it to our programs where it fits.

[2] "Q. As we talk today, I'm going to sometimes use the term CMS
[3] to mean commercial music services like DMX and Muzak. If I do
[4] that, will you understand what I'm talking about?

[5] "A. Yes.

[6]      **THE COURT:** You're reading this Mr. Furst and you have
[7] the words in front of you and you can zip through them very
[8] fast. I, on the other hand, do not, and I need it a lot more
[9] slowly and clear.

[10]      **MR. BENTON:** I'll do so, your Honor.

[11]      **THE COURT:** Thank you.

[12] "Q. Does DMX as part of its overall programming play more
[13] instrumental versions of songs or does it play actual songs
[14] that you might hear on the radio?

[15] "A. Actual songs. However, they may not be songs that are
[16] always played on the radio. We play a lot of things that never
[17] make it to radio.

[18] "Q. Okay. You said before that you didn't have any involvement
[19] in DMX's marketing, correct?

[20] "A. Yes.

[21] "Q. But you do have knowledge as to how generally DMX markets
[22] itself to customers?

[23] "A. Yes.

[24] "Q. And you'd agree that it markets the importance of music to
[25] its customers?

Page 490

[1] "A. Music is what we do, so it's a big part of what our
[2] marketing does, yes.

[3] "Q. Does DMX market itself to customers based on the variety of
[4] songs that it's able to program?

[5] "A. Variety in what way?

[6] "Q. In what ways do you consider variety with respect to
[7] programming?

[8] "A. I think variety is style change. It's temp change, it's
[9] texture change. It's not necessarily different songs. It's
[10] how the music is used so that there is sometimes a perception
[11] that people use. The more songs that you play adds to more
[12] variety. Many research projects that I've done on radio
[13] actually show the opposite, that if you play the right songs
[14] played the right way you'll get higher scores for variety than
[15] you will by playing more songs that are kind of just thrown
[16] together.

[17] "Q. So is what you're saying that variety can be the same songs
[18] or, excuse me, that variety can be a lesser number of songs
[19] played in a certain manner?

[20] "A. Yes.

[21] "Q. Okay. Do you know if DMX has ever received customer
[22] complaints with regard to a lack of variety in DMX's
[23] programming?

[24] "A. Early on we did. When we first took over the company in
[25] 2005 there was a problem. We did have variety issues.

Page 491

[1] "Q. And is that no longer the case?

[2] "A. We get very, very few.

[3] "Q. Has a customer ever dropped DMX's service because of a
[4] claimed lack of variety, to your knowledge?

[5] "A. I can't point to one specifically.

[6] "Q. Who are DMX's main competitors in the CMS industry?

[7] "A. Muzak would be one, Play Network would be another.
[8] TruSonic, perhaps XM Sirius, and there are some smaller ones.

[9] "Q. And does DMX provide similar services to Muzak, for
[10] example?

[11] "A. Yes.

[12] "Q. And does DMX try to differentiate itself from its
[13] competitors in its communications with customers or potential
[14] customers?

[15] "A. Yes.

[16] "Q. And how does it do so?

[17] "A. Well, I think a big part of what we do when we do our
[18] custom work is talking about how we put our music together, how
[19] the programs go together. We work more on a consultative basis
[20] with each client to devise a branded sound for their brand.

[21] "Q. When you say a branded sound, what does that mean?

[22] "A. Well, it can mean a variety of things, but it means
[23] essentially that a retailer may want something in the store
[24] that is, that ties to the feel of the store that they want,
[25] ties to the attitude of the brand they're trying. So we try to

Page 492

[1] find music and put a program together that matches to that.

[2] "Q. So that part of the music design process is to go out, find
[3] music that will fit a particular business's or change a
[4] business's brand?

[5] "A. Yes.

[6] "Q. And in order to do that, is it necessary for you, and by
[7] you I mean the DMX programming department, to have access to a
[8] wide variety of songs from different genres?

[9] "A. Yes.

[10] "Q. And is it necessary to have access to perhaps obscure
[11] songs?

[12] "A. Yes.

[13] "Q. Okay. And is it also necessary in some instances to have
[14] access to the newest hottest songs?

[15] "A. Yes.

[16] "Q. Okay. So it's important to DMX, I'm gathering from your
[17] testimony, and correct me if I'm wrong, that it knows what is
[18] popular or desired by its customers on the off-premises
[19] services, is that right?

[20] "A. Well, certainly we want to put a product on the satellite
[21] that's going to get the most usage, yes.

[22] "Q. And how does DMX go about determining what channels to
[23] offer its customers?

[24] "A. Well, we look at national trends and we listen to what
[25] kinds of requests are coming in from the field as far as

[1] particularly we see things, trends that are starting to take
[2] place in our, with our custom work, where we get a lot of
[3] requests from maybe more of a hip-hop sound or maybe more of a
[4] jazz sound or something. Sometimes these programs become
[5] created in such a way that we can put them in general release,
[6] programs like City Scapes, Metro Blend. They're not really
[7] radio formats. They're things that came out of retail world.
[8] "Q. Now, you mentioned earlier that one of the ways that DMX
[9] chooses its off-premise programming or chooses the genres of
[10] its off-premise programming was to look at national trends, is
[11] that correct?
[12] "A. Yes.
[13] "Q. What did you mean by national trends?
[14] "A. Well, we'll look at things that are new sounds that are
[15] emerging, perhaps coming through radio, things that, we'll even
[16] watch things like iTunes and that sort of thing to see what
[17] kinds of new artists are breaking through, if there's a new
[18] style of music that seems to be getting popular. We'll listen
[19] to our sales team as to what kind of requests they get.
[20] "Q. So when you said, so you look to the radio, is that
[21] correct?
[22] "A. That's one place.
[23] "Q. And you look to services on the internet, such as iTunes,
[24] to see what's popular?
[25] "A. Yes.

[1] "Q. Is it important to DMX in programming its off-premises
[2] service to try to find new artists before the other CMS
[3] providers and put them on its programming?
[4] "A. I can't say before. We do look for new artists, yes, but
[5] we don't necessarily have to be the first ones on it. And
[6] there is a huge number of new artists that are releasing
[7] material every day. So it really comes down to what the fit of
[8] the material is for the kind of project we're working on.
[9] "Q. So when one of your programmers hears of or hears a new
[10] song by a new artist, is it important as a general matter for
[11] the programming department to be able to put that song if it
[12] fits with the brand that it's trying to create on DMX's
[13] off-premise services quickly?
[14] "A. Speed is really of no essence there that I can think of as
[15] far as released today and on tomorrow.
[16] "Q. Well, how about six months? Would that matter on a top-40
[17] format station, for example?
[18] "A. Well, it varies from format to format. On the top-40,
[19] music tends to have a shorter shelf life. But on other
[20] formats, and that's really the only one that's like that. Most
[21] other ones don't have a short shelf life. Top-40 if it's hot
[22] today, you generally need to be pretty close to what's going on
[23] out there in the real world.
[24] "Q. Meaning you have to get the song on to the service quickly?
[25] "A. Yeah, right.

[1] "Q. How many of the channels that are listed on the
[2] off-premises services would you consider to be a top-40 format?
[3] "A. We only have a couple. Hottest Hits, Power Hits would
[4] probably fall into that, and I think there's more, but I don't
[5] see any. Those are really the only two that I see.
[6]     **MR. BENTON:** Can I have one second, your Honor?
[7]     (Pause)
[8]     **MR. BENTON:** I apologize, your Honor.
[9] "Q. How about Hot Tracks?
[10] "A. Oh, Hot Tracks, yes.
[11] "Q. And Hit Sweep?
[12] "A. No, Hit Sweep is really not as hit-driven as or
[13] current-music driven as it sounds.
[14] "Q. When you say program, what does that mean?
[15] "A. As you look back on the DBS channel lineup where I was
[16] talking about folk rock, those I would call programs. So as an
[17] example, they might have ten programs that might be smooth
[18] jazz, jazz, big band, swing, classic rock, etc.
[19] "Q. So, it's analogous to the channels on off-premise services,
[20] is that correct?
[21] "A. Yes.
[22] "Q. Furst Exhibit 3 Profusion DS printout marked for
[23] identification."
[24]     **MR. BENTON:** And that, your Honor, is at tab 1 and has
[25] been marked for identification as Joint Exhibit 1173. Also

[1] Furst Exhibit 4 Profusion SX printout marked for identification
[2] and that's at tab 2 of the binder and has been premarked as JX
[3] or Joint Exhibit 1174.
[4] "Q. Just let me know when you have had a chance to look them
[5] over. So Exhibit 3 is the Profusion DS lineup, is that
[6] correct, the second page?
[7] "A. Yes."
[8]     **MR. BENTON:** We should be on tab 1 now.
[9] "Q. And over just to the right in green, there is a genre pop
[10] adult contemporary, correct?
[11] "A. Yes.
[12] "Q. And there are 14 programs. Was there any basis for
[13] deciding to include 14 programs under pop adult contemporary as
[14] opposed to three international programs?
[15] "A. Yes. Those pop adult contemporary programs are much higher
[16] usage programs than what you see on the international
[17] selection.
[18] "Q. Meaning more customers take those?
[19] "A. Absolutely.
[20] "Q. And is that because they're popular channels?
[21] "A. Yeah, probably. I mean, you know, the kind of customer
[22] that uses that service would be looking for more of a
[23] mainstream pop kind of program."
[24]     **THE COURT:** Excuse me a minute. Could you reread the
[25] question and answer about why were those 14 selected?



**A-360**

Page 497

MR. BENTON: Should I reread it, your Honor?

THE COURT: Whoever is reading the question and answer. That's the one I want.

"Q. And there are 14 programs. Was there any basis for deciding to include 14 programs under pop adult contemporary as opposed to three international programs?

"A. Yes. Those pop adult contemporary programs are much higher usage programs than what you see on the international selection."

THE COURT: Okay. Yes. Thank you.

"Q. Meaning more customers take those?

"A. Absolutely.

"Q. And is that because they're popular channels?

"A. Yeah, probably. I mean, you know, the kind of customer that uses that service would be looking for more of a mainstream pop kind of program.

"Q. Right. Is that type of usage pattern by DMX's customers consistent with off-premise as well? In other words, do most DMX off-premise customers listen to pop or popular formats than international?

"A. We have no way of knowing.

"Q. Do you have an opinion on it?

"A. The only way I would have an opinion is by looking at what's being used with on-premise, and so when we do look at programs to add or delete, we look at what's been ordered and

Page 498

what's actually being used on the Pro X boxes. That's our lead indicator, and we know that there are certain programs like Familiar Favorites and Country, those sorts of things are very, are highly used programs on the Pro X boxes, whereas if you look at the bottom, things like Chinese and so forth really don't get a lot of usage.

"Q. Okay. So in determining or in making decisions about DMX's off-premises programming in terms of genres, you look to the usage patterns on the on-premise?

"A. Yes, we do.

"Q. So aside from those cases that you've just described, in general the databases are the same across the platforms?

"A. Very close, yes.

"Q. Now, if I were to listen today at a DMX customer location to Hottest Hits on an off-premises service and then I was also to listen on the same day at a customer location that received Hottest Hits at an on-premises program, would I hear the same music on that day at both locations?

"A. Unlikely that you would hear them at exactly the same time. The satellite is going to run according to time, but if the Pro X is turned off at the store location, say at 9:00 at night when they go home, it will pick up exactly where it left off. So that program may not be in synch with what you're hearing on the satellite.

"Q. But are you saying that it would be the same playlist for

Page 499

that day?

"A. Essentially it would, yes. The same playlist will play, but if it gets turned off, one is running 24 hours a day. The other one might only run 9:00 a.m. to 9:00 p.m., so it might be getting turned off. So it's possible that on an on-premise location, you could be playing a log that is set up for, say, Monday, and would have played Monday on the satellite. It might not play until Wednesday on the on-premise because of the on-off feature.

"Q. And that sort of leads to my next question, because I had a little bit of misunderstanding. When the disks for the Profusion D are sent to the on-premise customer, they have the same playlist as the off-premise channel for any given genre?

"A. Yes.

"Q. So the same mix of songs will play?

"A. Exactly, the same mix of songs will play.

"Q. So if we didn't turn off the Profusion D at one location that's playing the Hottest Hits, we play it 24 hours and we started it immediately as the day's satellite broadcast was made, you would hear the exact same songs on the satellite off-premise locations as you would hear on the Profusion D?

"A. Yes, that should happen.

"Q. And that should also happen with the Profusion X?

**A.** Right."

MR. BENTON: Furst Exhibit 5 supplemental response to

Page 500

request 26 marked for identification. This should be tab 3 in the binder and for the record it is Joint Exhibit JX 1276. JX 1276.

"Q. If you look at the second paragraph on the first page, six lines down, it says, 'In the case of the approximately 7500 DMX customer locations that receive delivery of DMX programming via Profusion X device through a two-way ethernet connection, the device is able to transmit logs of certain data to DMX at the time when new programming is delivered.' Do you know what that's referring to?

"A. Yes. That's one delivery method of the music and new music, meaning additional titles that are going into the program. And the music logs themselves are delivered to the Profusion X device that way rather than on a disk update.

"Q. Okay. And is it your understanding that on the Profusion X device, DMX can track exactly what the customer is playing or has played during a period of time?

"A. That they can track it exactly when, no.

"Q. Not exactly when. Exactly what was played.

"A. Well, we know what was played, what was sent to the box, so we can look at the Selector and see.

"Q. Okay. Do you know in the same sentence that I read to you, it says the device is able to transmit logs of certain data to DMX. Do you know what the certain data refers to?

"A. Those logs would be the Selector logs I'm talking about.

Page 501

[1] That would be the text file from Selector.

[2] "Q. And what would the Selector text contain in it? What
[3] information?

[4] "A. That would be the daily music logs, the list of songs
[5] starting at midnight going all the way through to 11:59 p.m.
[6] with song, then next song; song, song, song. So it would have
[7] the songs in order of play for that day.

[8] "Q. Earlier I referred to custom programming, and you called it
[9] signature programming. Can you tell me what signature
[10] programming is?

[11] "A. Well, it is custom programming. Signature program is what
[12] we call it, but it's essentially our custom programs which are
[13] designed to be created for specific brands. We've worked with
[14] a lot of fashion retailers. We work with a lot of casinos and
[15] restaurants and so forth that want a specific sound just for
[16] that something that is unlike anything that you would ever hear
[17] on radio generally.

[18] "Q. So again, for this type of programming, you need access to
[19] obscure songs?

[20] "A. Oh, yeah. We use a wide range of things and, you know, new
[21] artist obscure songs, older songs, new songs, sure.

[22] "Q. And is custom programming only available on an on-premise
[23] basis?

[24] "A. Yes, on-premise.

[25] "Q. So there are no custom or signature off-premise channels?

Page 502

[1] "A. I think there might be one or two that are up there, but
[2] they're long time, and I'm not even sure they're system there.
[3] There had been a couple there, a channel that was a split
[4] channel that was used for a couple of clients. I'm not even
[5] certain they're still on the satellite.

[6] "Q. So, to your knowledge, the overwhelming majority of
[7] signature programming is on-premise?

[8] "A. Exactly, yes.

[9] "Q. So, given one on-premise location and one off-premise
[10] location, both of which are using messaging on the same
[11] schedule, for example, every eight minutes, the on-premise
[12] service will actually have performed fewer songs than the
[13] off-premise service?

[14] "A. No. They --

[15] "Q. In a 24-hour period?

[16] "A. No. I think they play the same number of songs. I don't
[17] think anything would be dropped.

[18] "Q. Well, but if you're able to play a given amount of songs in
[19] 24 hours and on one service, the off-premise, the message is
[20] played at the same time as the songs, and on the other service
[21] the songs, the playlist takes a break at various points, isn't
[22] it true that there has to be less songs played on the
[23] on-premise?

[24] "A. Well, it may throw it by 30 seconds, because there are only
[25] 15 and 30-second announcements.

Page 503

[1] "Q. How many are played in a day?

[2] "A. Well, typically an hour, and it would be maybe two an hour
[3] or something like that. So 30 seconds, one minute out of an
[4] hour is what you will get, so you really wouldn't lose any
[5] music.

[6] "Q. So, again, part of the function of Selector is to make sure
[7] that songs aren't being repeated too often?

[8] "A. Right. And what we do is we look at the play histories of
[9] songs, and we can actually model the rotations before we even
[10] do scheduling if we want to see where the songs, how many songs
[11] we need in a category, how, you know, do we want a song to play
[12] today at 10:00, we don't want it to play tomorrow at 10:00. So
[13] we try to move it to, say, 3 or 4 in the afternoon the next
[14] time it plays and move it throughout the day. So what Selector
[15] does is it will move it into day parts, so that we will have a
[16] program from, say, set up from day part being 6:00 a.m. to
[17] 10:00 a.m.; 10:00 a.m. to 2:00 p.m.; 2:00 p.m. to 6 and so
[18] forth. And it would say that next time if it plays in day part
[19] one between 6 and 10, it has to play in another day part or two
[20] more day parts before it comes back to 6 to 10. And we also
[21] force it into different hours, so that if it plays at 9 today
[22] it can't come back to play at 9 tomorrow until it's played in
[23] 10, 11 and 12 each time it comes through that day part. So
[24] what that makes it able to do is take a smaller library and use
[25] it more effectively, so we're playing really right songs and

Page 504



[1] using them in a way that gives us a really well-balanced log
[2] and gives us that consistency that we're looking for in the
[3] program. So you go into that store, you get the sense of that
[4] store brand all the time.

[5] "Q. Do you know if the number of unique works used by DMX on
[6] its commercial music services is greater or lesser than a
[7] typical radio station uses during a given time period?

[8] "A. Would you ask that again?

[9] "Q. Does DMX in a year use a greater number of songs or a
[10] lesser number of songs than a typical radio station?

[11] "A. Oh, much greater.

[12] "Q. Do you know by how many? Ten times as many?

[13] "A. Well, I don't know. A radio station you have one radio
[14] station. We have essentially 100 radio stations plus. So
[15] that's why we use more music. But as far as the number of
[16] titles within a program, many radio stations only play 300
[17] tracks, if that. We often play more than that. But in some
[18] cases we play less than that. We don't look at the sheer
[19] numbers as being an issue.

[20] "Q. Okay. Does DMX ever use songs on its CMS services as to
[21] which it does not know all of the relevant publishers with an
[22] interest in the song?

[23] "A. I don't think so. I would think that everything has to be
[24] licensed. We would have to have full licensing, yeah, we
[25] wouldn't use it if it's not licensed.

[1] "Q. So it's your testimony that on DMX's premises -- excuse
[2] me -- so it's your testimony that on DMX's on-premise services
[3] every song that DMX uses it has identified to its knowledge all
[4] of the relevant publishers?
[5] "A. It's my understanding that everything that we have that is
[6] usable has been cleared.
[7] "Q. Meaning that DMX has identified all the publishers for any
[8] work that it uses on its off-premises services?
[9] "A. My understanding is for everything that we can use and it
[10] does not flag us and stop us that we have the appropriate
[11] licenses.
[12] "Q. Do music designers ever have trouble programming music on
[13] DMX's off-premise channels because a performing rights license
[14] is lacking?
[15] "A. There is almost always an alternative for a song. So if
[16] they have, if they're looking for some particular song and they
[17] don't have licensing for it, it's not going to make that much
[18] difference in their individual program, so they'll move on to
[19] something else.
[20] "Q. So the songs are basically interchangeable?
[21] "A. In some cases they can be, or you have plenty of music to
[22] work with. You don't need to necessarily focus on one song.
[23] One song isn't going to make your program.
[24] "Q. So, then, the music designer would go out and find a song
[25] that was licensed?

[1] "A. Right.
[2] "Q. If you could go out to the sheet that you printed out or I
[3] printed out from that or somebody printed out from the DBS
[4] channel lineup, can you go to that?
[5] "A. Yes.
[6] "Q. This is titled DBS channel lineup. Would you agree that
[7] some of these channels are listened to more often by DMX
[8] customers than others?
[9] "A. My assumption would be some of it would be more popular
[10] than others, yes.
[11] "Q. And would those are the top-40-type stations, for example?
[12] "A. No, not necessarily. You would have to remember, we're
[13] working in the retail world and they still like to be playing
[14] things that are not necessarily what everybody is going to hear
[15] on the radio. So it's quite possible that some of the most
[16] popular ones are things that contain music that ever never gets
[17] played on the radio.
[18] "Q. Okay. You would agree that Hottest Hits is listened to by
[19] more customers than Hawaiian?
[20] "A. Yeah, I would assume that that's true, yes. I don't have
[21] any hard evidence of that, but --
[22] "Q. Is DMX interested in finding out which channels on its
[23] off-premise services are listened to by the most customers?
[24] "A. We have not done any research on to that.
[25] "Q. Never used any consultants?

[1] "A. No.
[2] "Q. Never done any studies?
[3] "A. No.
[4] "Q. Never had any customer questionnaires?
[5] "A. No.
[6] "Q. Ever send anyone out into the field to ascertain what
[7] customers are listening to?
[8] "A. No.
[9] "Q. Yes, since you started there in 2005?
[10] "A. No.
[11] "Q. Do you know if prior to your tenure in 2005 DMX has done
[12] any such studies?
[13] "A. I don't know.
[14] "Q. Do customers ever send in requests for songs to be put on
[15] their service?
[16] "A. On the Signature projects, yes, sometimes they do.
[17] "Q. Aside from the Signature projects, do you ever have letters
[18] or communications of any kind from customers saying play X song
[19] or Y song?
[20] "A. On a rare, rare occasion.
[21] "Q. Okay. Do you have any knowledge as to whether the same
[22] number of titles are used on off-premises as opposed to
[23] non-Signature on-premises?
[24] "A. Off-premise databases will vary from the on-premise, yes.
[25] That will happen.

[1] "Q. And they will typically vary having less songs available or
[2] having more?
[3] "A. On the DBS or the satellite, will probably have more songs,
[4] but it's hard to say. I don't really look at the number of
[5] songs on each program.
[6] "Q. With regard to the off-premises programming for a given
[7] day, is the playlist repeated at all during the course of a had
[8] hour day? In other words, is there an eight-hour playlist that
[9] gets repeated three times or is one playlist for the 24-hour
[10] period?
[11] "A. No, it's one 24-hour period.
[12] "Q. And for on-premise, is that the same?
[13] "A. Yes.
[14] "Q. Can you walk me through the process generally as to how
[15] Signature programming is done?
[16] "A. From what point?
[17] "Q. So, well, from, you said you weren't involved in selling
[18] Signature programming, is that correct?
[19] "A. Right. Generally that's true. I mean, I don't sell it,
[20] but I do occasionally have conversations, as I stated earlier,
[21] with a client prior.
[22] "Q. So let's assume that a client has asked DMX, we want you to
[23] create Signature programming for our stores. Okay, from that
[24] point in general, what are the steps in the process of
[25] programming?

Page 509

[1] "A. Well, we usually do a consultation with a client, get to
[2] know them. That's often done by Lianne where we will have a
[3] music designer, sometimes also Lianne in this case would have
[4] been on the call with them, so they sit down and they really go
[5] through what the brand is and they try to understand what the
[6] goals are for the company that they're working with, and from
[7] there they will go and a couple of things will happen. One, if
[8] they are in a place where they can go and do an on-site visit,
[9] they will go to a mall store and do an on-site visit, spend
[10] time in the store. They spend a lot of time looking at detail
[11] in these stores. They look at the materials that are used to
[12] build the set or the store set. They look at the merchandise.
[13] They look at the online websites and things like that. And so
[14] they try and get a real sense of what the brand is about. Then
[15] they come back and create what we call our brand DNA report, a
[16] written report much like you get from a consultant outlining
[17] what the brand is and how we see music fitting into that brand
[18] and what music we then see fitting into the brand. So then
[19] they would go through and look at in that report they would
[20] give them samples of the type of music they recommend, why they
[21] recommend that music, how it fits their brand, and then
[22] eventually they would break it down into a snippet or a
[23] snapshot, as we call it, of what they would sound like, so they
[24] would give them a montage of an hour or two sample so they can
[25] hear the flow of the program. We don't give them individual

Page 510

[1] songs. We give them about ten seconds of the hooks, montaged
[2] together so they can hear what it sounds like, and after that,
[3] they decide whether it's on track or not or what adjustments
[4] need to be made and if they like it we move forward and build
[5] out a complete database and program for them.
[6] "Q. And so, a given customer account that has Signature
[7] programming would have its own database?
[8] "A. Yes.
[9] "Q. And is Selector applicable to that database as well?
[10] "A. Yes, it is.
[11] "Q. And it's programmed differently than for other channels,
[12] Selector, that is?
[13] "A. Yes. This would be its own database. It's created
[14] specifically for this client's needs, and it's going to be
[15] programmed around whatever sound they're trying to create.
[16] Usually around that four-song set we described earlier to give
[17] it that consistency.
[18] "Q. Okay. And you mentioned that you give them a sampler or a
[19] demo, and that's snippets of songs?
[20] "A. Yes. We just give it to them so they can listen to it, get
[21] an idea of what the flow would be like. There's a sample hour
[22] and one of the reasons we do that is we don't want them
[23] focusing on individual songs, because typically people start
[24] going yes, no, yes, no, I like this song, I don't like that
[25] song. We really focus, our whole focus is looking at the

Page 511

[1] product as a whole, as opposed to the individual pieces that go
[2] into the program.
[3] "Q. Well, that was going to be my next question, actually. Do
[4] they veto songs ever?
[5] "A. There are situations where, yes, that will happen, but we
[6] really try to get them -- the best working relationships we
[7] have had have been ones where they don't get caught up on the
[8] individual songs.
[9] "Q. Right. Have you had less successful working relationships
[10] where they do get caught up on individual songs?
[11] "A. Yeah. Typically it's a tougher relationship.
[12] "Q. So typically it's a tougher relationship because they want
[13] to, and by they I mean the customers receiving Signature
[14] programming, want to have more control over each song that's
[15] played?
[16] "A. Yeah. You get into the back and forth, and, you know, you
[17] typically run into people's personal tastes as opposed to
[18] really looking at it as a fully branded program.
[19] "Q. And then once that initial mix of songs has been
[20] determined, do customers, Signature customers, continue to ask
[21] DMX to remove songs or add songs?
[22] "A. Well, they continue a dialogue. Generally what happens is
[23] they have a monthly call with each client to talk about
[24] potential songs or things that they want to make adjustments in
[25] a program, but it's really again back to just a consultative

Page 512

[1] type of call.
[2] "Q. I'm going to turn now to DMX's direct licensing program.
[3] What if any was your role beginning in 2005 and at any time to
[4] the present in DMX's direct licensing initiative?
[5] "A. Implementation.
[6] "Q. And by implementation, what does that mean?
[7] "A. Well, once we have the -- once the direct licensing
[8] decision was made and the program got underway, it was my job
[9] to work with music design to figure out a way to get it into
[10] the system and to get the music designers to understand it and
[11] use it.
[12] "Q. Okay. So aside from any discussion you have had with
[13] counsel, do you know for the second quarter of 2009 what
[14] percentage of DMX's off-premises programming consists of
[15] directly licensed performances?
[16] "A. No.
[17] "Q. And you were in charge of implement of the direct license
[18] programming?
[19] "A. Right.
[20] "Q. And you don't know for the second quarter of 2009?
[21] "A. That's right.
[22] "Q. Do you know for the first quarter of 2009?
[23] "A. No, I don't.
[24] "Q. Do you know for any period prior to that?
[25] "A. No, I don't.



[1] "Q. You discussed earlier that your involvement with the direct
[2] licensing programming was in implementing it, correct?
[3] "A. Yes.
[4] "Q. Was part of that implementation trying to increase the
[5] percentage of directly licensed music played on DMX's services?
[6] "A. Yes.
[7] "Q. On DMX's off-premise services?
[8] "A. Yes.
[9] "Q. On-premises services?
[10] "A. Yes.
[11] "Q. And what about Signature programming?
[12] "A. Yes.
[13] "Q. Okay, and was there any specific target that you received
[14] from anyone that you needed to reach with respect to directly
[15] licensed performances on DMX's services as a whole?
[16] "A. No. The goal would be 100 percent.
[17] "Q. In terms of your implementation of DMX's direct licensing
[18] program, what changes, if any, were necessary to the
[19] programming of DMX's services?
[20] "A. Well, what we needed to do was have the visibility to see
[21] what was directly licensed, and that was added to Studio, so we
[22] could actually see in Studio what songs are directly licensed.
[23] Once that was done, it made things very much easier to identify
[24] songs. Prior to that, we didn't have that, and we were working
[25] off a spreadsheet, so it was a very, very slow process.

[1] "Q. When did this information that you're describing get on to
[2] Studio?
[3] "A. Sometime at the end of last year or early this year. I
[4] don't remember the exact time frame.
[5] "Q. Who put it on?
[6] "A. The technology department.
[7] "Q. Who in the technology department?
[8] "A. I'm not sure who wrote the software for it. Somebody wrote
[9] a piece of software.
[10] "Q. Okay. Do you know why this wasn't implemented earlier?
[11] "A. It just took time for development, from what I understand.
[12] "Q. Do you know how DMX --"
[13] **THE COURT:** I think whenever you reach a good stopping
[14] point.
[15] **MR. BENTON:** This would be fine, your Honor.
[16] **THE COURT:** How much more do you have to do of this?
[17] **MR. BENTON:** There is about four pages out of, what, a
[18] total of 23.
[19] **THE COURT:** We'll resume at 10:00 tomorrow morning.
[20] (Adjourned to January 22, 2010 at 10:00 a.m.)
[21]
[22]
[23]
[24]
[25]

[1]           INDEX OF EXAMINATION
[2] Examination of:               Page
[3] THOMAS ANNASTAS
[4] Cross By Mr. Marks . . . . . . . . . . . . . . 330
[5] Redirect By Mr. Fitzpatrick . . . . . . . . . 356
[6] SINDEE LEVIN
[7] Direct By Mr. Fitzpatrick . . . . . . . . . . 374
[8] Cross By Mr. Marks . . . . . . . . . . . . . . 382
[9] HELENE BLUE
[10] Direct By Mr. Fitzpatrick . . . . . . . . . . 397
[11] Cross By Mr. Marks . . . . . . . . . . . . . . 407
[12] MILTON LAUGHLIN
[13] Direct By Mr. Benton . . . . . . . . . . . . . 410
[14] Cross By Mr. Larson . . . . . . . . . . . . . 463
[15]         PETITIONER EXHIBITS
[16] Exhibit No.              Received
[17] 82 . . . . . . . . . . . . . . . . . . . . 403
[18]         RESPONDENT EXHIBITS
[19] Exhibit No.              Received
[20] 31 . . . . . . . . . . . . . . . . . . . . 330
[21] 63 . . . . . . . . . . . . . . . . . . . . 333
[22] RX 0086 . . . . . . . . . . . . . . . . . 376
[23] RX 88 . . . . . . . . . . . . . . . . . . 386
[24]
[25]

# In The Matter Of:

*BROADCAST MUSIC, INC., V.*
*DMX, INC.,*

---

*VOLUME 4*
*January 22, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 01mfbmif.txt, Pages 516-678 (163)

**Word Index included with this Min-U-Script®**

Page 516

01MFBMI1 Trial

```
[1]    UNITED STATES DISTRICT COURT
[2]    SOUTHERN DISTRICT OF NEW YORK
       ------------------------------x
[3]
[4]    BROADCAST MUSIC INC.,,
                       Petitioner,
[5]
[6]            v.                      08 Civ. 216 (LLS)
[7]    DMX, INC.,,
[8]                    Respondent.
[9]    ------------------------------x
[10]                                   January 22, 2010
                                       10:15 a.m.
[11]   Before:
[12]                  HON. LOUIS L. STANTON,
                                       District Judge
[13]
                     APPEARANCES
[14]
       HUGHES, HUBBARD & REED, LLP
[15]        Attorneys for Petitioner
       BY:  JAMES C. FITZPATRICK
[16]        MICHAEL E. SALZMAN
            JASON C. BENTON
[17]        MARGARET J. HOAG
            - AND -
[18]        JOSEPH DiMONA, In-house counsel, BMI, Inc.,
[19]   WEIL, GOTSHAL & MANGES, LLP
            Attorneys for Respondent
[20]   BY:  R. BRUCE RICH
            BENJAMIN E. MARKS
[21]        TODD D. LARSON
[22]
[23]
[24]
[25]
```

Page 517

```
[1]                (Trial resumed)
[2]            THE COURT:  Mr. Benton.
[3]    BY MR. BENTON:
[4]    "Q.  Do you know how DMX obtains information on the catalogs in
[5]    its directly licensed publishers?
[6]    "A.  I believe we get that from Ron Gertz.
[7]    Q.  Do you know how Mr. Gertz gets that?
[8]    "A.  I don't know.
[9]    "Q.  Do you know if the publishers send any information
[10]   electronically to Mr. Gertz?
[11]   "A.  I don't know.
[12]   "Q.  Do you know if they send it to DMX?
[13]   "A.  The publishers themselves?
[14]   "Q.  Yes.
[15]   "A.  I don't know.
[16]   "Q.  And once this information is up on, am I correct to say
[17]   the Studio database?
[18]   "A.  Yes.
[19]   "Q.  And it's flagged as directly licensed, is that the correct
[20]   way to put it?
[21]   "A.  Yes.
[22]   "Q.  How does that factor into a music designer's programming
[23]   decisions?
[24]   "A.  Well, if they see something in there that is directly
[25]   licensed that would work in a program, we encourage them to use
```

Page 518

```
[1]    that over something else.  It doesn't mean they have to, but we
[2]    encourage, they try to do it and try to bring percentages up,
[3]    but again, the big thing is not to play things that are going
[4]    to ruin your program or be wrong for your program.
[5]    "Q.  Okay.  Which channels did you start with first in terms of
[6]    trying to increase the percentage of directly licensed music?
[7]    "A.  Well, we took a look at what we had available to us, and
[8]    we started working on things like country, familiar favorites,
[9]    some of those, knowing that we didn't have as much music
[10]   available to us in some of the more specialized things,
[11]   Chinese, Japanese, etc.
[12]   "Q.  Right.  So when you say -- I just want to make sure I
[13]   understand.  When you say 'available to us,' you mean, and
[14]   correct me if I'm wrong, or do you mean that in Chinese,
[15]   Japanese, etc. you did not have as much directly licensed music
[16]   available to you to program?
[17]   "A.  That's right.
[18]   "Q.  So, is it correct to say that you have chosen to increase
[19]   the percentage of directly licensed music on those channels
[20]   first in which you believed you have the most directly licensed
[21]   music?
[22]   "A.  That plus -- that is true, plus one other thing that plays
[23]   into it when you're doing this, and this is, it's much easier
[24]   when you're looking at some of those sort of radio formats, if
[25]   you will, like country and familiar favorites, which is really
```

Page 519

```
[1]    adult contemporary.  I can look down that list of songs very
[2]    quickly and spot songs that should be in a program or shouldn't
[3]    be in a program.  It's a lot more difficult on some of the
[4]    other programs and certainly when you get into foreign
[5]    language, it's really slow.  But some of the other programs
[6]    such as City Scapes are really built around a sound, so it
[7]    takes time to listen to music and find music and so that's why
[8]    we did it the other way.
[9]    "Q.  So on certain of the channels, it's just easier for you to
[10]   utilize directly licensed music than it is on other channels?
[11]   "A.  Yes.
[12]   "Q.  And you were talking off-premise, is that correct?
[13]   "A.  Right.
[14]   "Q.  And would you say that it's been easiest to program
[15]   directly licensed music on the more popular off-premise
[16]   channels than on the less popular?
[17]   "A.  Well, what we would probably consider to be the bigger,
[18]   broader format such as AC and country, yes, we have actually
[19]   had a pretty easy time.
[20]   "Q.  When you say broader formats, what do you mean?
[21]   "A.  Broader in appeal.  You know, the more mass appeal type of
[22]   formats.
[23]   "Q.  With respect to your Signature program, has it been more
[24]   difficult to increase the directly licensed percentage of music
[25]   on that type of programming vis-a-vis off premise programming?
```

Page 520

[1] "A.  It can be, depending on the client, easier or more
[2] difficult, depending on what we're doing with a particular
[3] signature project.  In some cases the client doesn't get
[4] involved in the music as much as other clients do, and in
[5] those cases we're fine with it.  In some cases they're very
[6] particular.  They actually will ask for certain songs and so we
[7] keep, you know, it's really, it really comes down to individual
[8] clients.
[9] "Q.  Yes, the record will speak for itself, that's fine.  But
[10] typically it's difficult with Signature programming to avoid
[11] having them, the customers, request songs be deleted on a
[12] song-by-song basis, correct?
[13] "A.  Sometimes it is.  Not all the time.
[14] "Q.  But I think you said before typically, isn't that right.
[15] "A.  I don't know if I did or not.
[16] "Q.  Okay, but if a customer is particular about the particular
[17] songs that that customer wants on its signature programming,
[18] you would agree that would make it more difficult to increase
[19] the percentage of directly licensed music, wouldn't you?
[20] "A.  Yes, sir, that's true.
[21] "Q.  Were you ever told to try to increase the plays of Sony's
[22] music to any specific level?
[23] "A.  No.
[24] "Q.  Do you have any idea what level Sony's percentages are
[25] today?

Page 521

[1] "A.  No.
[2] "Q.  Do you know what percentage of music performed on DMX's
[3] off-premise services is from the Sony catalog from any period
[4] of time?
[5] "A.  No.
[6] "Q.  So you were never given a direction increase Sony to
[7] 50 percent of our total plays?
[8] "A.  No, I was not.
[9] "Q.  Do you have any idea whether it would be possible to raise
[10] the total amount of Sony's percentage of spins on DMX's
[11] off-premise services to 40 percent?
[12] "A.  No.
[13] "Q.  To 30 percent?
[14] "A.  I have no idea.
[15] "Q.  To any specific percentage?
[16] "A.  Don't know.
[17] "Q.  Okay.  Can you tell me what went on with that?
[18] "A.  We created a program that is a program of pop, country,
[19] rock, a variety of styles, sort of a family reunion program, if
[20] you will, of direct licensed music.
[21] "Q.  Okay.  So the Dollar Tree receives an on-premise service
[22] of 100 percent correctly licensed music or an off-premise?
[23] "A.  It would be on-premise.
[24] "Q.  On-premise?  And to your knowledge, has the Dollar Tree
[25] been satisfied with that?

Page 522

[1] "A.  Yes, as far as I know.
[2] "Q.  Is there any reason that all of these channels have the
[3] worked 'eclectic'?
[4] "A.  Yes.  Because what we found is that one of the things with
[5] these channels is, they're allowed to be a little bit broader
[6] musically.  What we find with retail is that they tend to like
[7] that, and the word 'eclectic' seems to work pretty well in the
[8] retail world, believe it or not.  Eclectic Town and Country,
[9] town and country is really a mix of town or pop music and
[10] country music.  It's like an old format that was done in the
[11] 1970's.  It's one we actually had requests for from mostly out
[12] of the southeast from people who wanted to hear a mix of pop
[13] and country.  So that's what that one is.
[14]       Country Hits is a blend of today's country and
[15] yesterday's country.  Oldies is a broader based oldies than is
[16] typically heard on channels, on your '60s channel, like our
[17] Malt Shop channel.  So they're all just a little bit broader
[18] musically.  They're really designed more for the retail world
[19] than what you would hear in radio.
[20] "Q.  Do you think that if DMX programmed all directly licensed
[21] music it might generate negative calls in a customer,
[22] potentially?
[23] "A.  No, I don't think so.
[24] "Q.  Why not?
[25] "A.  Because I don't think we would program bad music.

Page 523

[1] "Q.  With respect to the five eclectic stations that we
[2] discussed, who decided to create those stations?
[3] "A.  I did.
[4] "Q.  And has there been any formal analysis at all about
[5] whether those stations are popular or not?
[6] "A.  It's early to tell, but we have had some positive
[7] feedback.
[8] "Q.  From who?
[9] "A.  From customers.
[10] "Q.  How many?
[11] "A.  I don't know.
[12] "Q.  Who received the feedback?
[13] "A.  I've got it back from sales, salespeople who said they've
[14] got customers using it and from customer service upstairs.
[15]       **MR. BENTON:**  That concludes for Mr. Furst, your Honor.
[16]       **THE COURT:**  Thank you.
[17]       **MR. FITZPATRICK:**  Your Honor, BMI calls to the stand
[18] Mr. Cleve Murphy.
[19] CLEVE MURPHY,
[20]       called as a witness by the Petitioner,
[21]       having been duly sworn, testified as follows:
[22]       **THE DEPUTY CLERK:**  Please say your name and spell your
[23] last name slowly for the record?
[24]       **THE WITNESS:**  My name is Cleve Bryant Murphy,
[25] M-u-r-p-h-y.

Page 524

[1]     **MR. FITZPATRICK:** May I approach, your Honor?
[2]     **THE COURT:** Yes.
[3]   **DIRECT EXAMINATION**
[4]   **BY MR. FITZPATRICK:**
[5]     **Q.** Good morning, Mr. Murphy.
[6]     **A.** Good morning.
[7]     **Q.** Are you currently employed by BMI?
[8]     **A.** I am.
[9]     **Q.** And what's your position at BMI?
[10]    **A.** I'm the assistant vice president of general licensing.
[11]    **Q.** And how long have you had that position?
[12]    **A.** Since 1996.
[13]    **Q.** And how long in total have you been at BMI?
[14]    **A.** Since 1972.
[15]    **Q.** And where are you currently located, Mr. Murphy?
[16]    **A.** In Nashville, Tennessee.
[17]    **Q.** What are your current responsibilities at BMI?
[18]    **A.** I'm responsible for managing the base of general licensing
[19]  accounts to include all industries that we currently license in
[20]  that field. The customer service area is my responsibility.
[21]  Also the key accounts area, which would be group agreements,
[22]  chain agreements, the like. I also manage association
[23]  relationships for BMI in the industries that we license.
[24]    **Q.** Now, you mentioned groups, chains and associations. Could
[25]  you go through them one by one and explain what they are?

Page 525

[1]   We'll start with group. What are BMI's group agreements?
[2]     **A.** Group agreements are license agreements whereby an
[3]  association or an entity collects for BMI and remits to us
[4]  under one payment and one in administered under one contract.
[5]     **Q.** And collects from who in that instance?
[6]     **A.** Their members or their locations.
[7]     **Q.** You also mentioned chains. Does BMI have chain agreements?
[8]     **A.** Yes, sir.
[9]     **Q.** And what are those?
[10]    **A.** For example, Hyatt Hotels has one agreement with BMI which
[11]  covers all their corporately and managed properties. They
[12]  administer that agreement through one contact at BMI and we
[13]  administer it through one contact at their headquarters and it
[14]  covers all locations that require licensing.
[15]    **Q.** Are you in the group that BMI calls general licensing?
[16]    **A.** I am.
[17]    **Q.** And who do you report to?
[18]    **A.** Tom Annastas.
[19]    **Q.** Has the licensing of bowling centers been within your area
[20]  of responsibility?
[21]    **A.** Yes, it has.
[22]    **Q.** Now, the Court has already heard about an agreement between
[23]  BMI and the Bowling Proprietors Association of America and BPAA.
[24]  Did you negotiate that agreement?
[25]    **A.** I did.

Page 526

[1]     **Q.** And could you explain to the Court what the Bowling
[2]  Proprietors Association of America or BPAA is?
[3]     **A.** It's an association that represents the majority of bowling
[4]  centers nationwide. They offer discount programs through their
[5]  association for various vendors and providers for their
[6]  industry. BMI sought to work with them for a group agreement
[7]  so they could in turn collect from their membership and remit
[8]  to BMI under one centrally administered contract.
[9]     **Q.** Mr. Murphy, if you could take the binder that I've handed
[10]  to you and turn to tab 1 of that binder.
[11]    **A.** Okay.
[12]    **Q.** There's a document there marked Joint Exhibit 0728. If you
[13]  so take a look at that and identify it, please.
[14]    **A.** It's the current agreement for the Bowling Proprietors
[15]  Association of America and BMI.
[16]    **Q.** And what does this agreement cover, what type of music use
[17]  does it cover?
[18]    **A.** It covers all uses of music within a bowling center, with a
[19]  couple of exceptions. One of those exceptions is any
[20]  entertainment or music event that requires an additional charge
[21]  or admission, and primarily it covers any live entertainment,
[22]  recorded music uses, dancing, etc.
[23]    **Q.** And what types of businesses does BMI make this agreement
[24]  available to?
[25]    **A.** Under the Bowling Proprietors Association of America

Page 527

[1]   agreement only members in good standing with Bowling
[2]  Proprietors Association.
[3]     **Q.** Does BMI have an agreement for bowling centers that are not
[4]  BPAA members?
[5]     **A.** Yes. We have an individual bowling center agreement.
[6]     **Q.** How does the license fee under the BPAA agreement compare
[7]  to the license fee for individual bowling centers who are not
[8]  members?
[9]     **A.** The BPAA agreement is a discounted rate because they are
[10]  actually collecting the fees on BMI's behalf. They're also
[11]  educating their membership as to the requirements of the
[12]  copyright law, and help us in the sales effort. So they have a
[13]  reduced rate.
[14]        The individual bowling center rate is substantially
[15]  higher because that requires us to go out and negotiate
[16]  individual agreements with businesses across the country, and
[17]  then administer those agreements on an individual basis going
[18]  forward.
[19]    **Q.** Now, one of the things that you just mentioned in that
[20]  answer was education about the copyright laws. Could you
[21]  explain what the BPAA does on BMI's behalf in that area and why
[22]  that's important to BMI?
[23]    **A.** Well, it multiplies our voices. We operate as a
[24]  non-profit-making corporation and we don't have a large staff
[25]  that can go out and talk to every bowling center in the United

Page 528

[1] States. So if the BPAA is able to communicate either through
[2] correspondence or through their website or through their bowl
[3] expo on an annual basis, the need for music licensing and their
[4] member centers, it helps us in making sure that we have
[5] compliance in that particular industry.
[6] **Q.** Now, if you were an individual bowling center and you
[7] weren't a member of the BPAA, what would you have to do to get
[8] the BPAA agreement from BMI?
[9] **A.** You would first have to join the state association for
[10] bowling proprietors and then you would join the national
[11] association.
[12] **Q.** If you could turn to paragraph 4 of the document we were
[13] just looking at, it says "fees," and in particular, if you
[14] could look at subparagraphs A and B and explain to the Court
[15] how the BMI license fee is calculated for an individual bowling
[16] center under the BPAA agreement.
[17] **A.** Okay. The individual -- the members of the bowling
[18] proprietors associations pay a fee based on the number of lanes
[19] within their center. This paragraph 4A indicates $11.75 per
[20] lane.
[21] **Q.** And then does that fee change from year to year?
[22] **A.** Yes, it's escalated based on a CPI.
[23] **Q.** If I could ask you to turn to tab 2 of the binder,
[24] Mr. Murphy, and first of all, just for the Court, this is a
[25] single page from the report of our expert, Professor Owen.

Page 529

[1] It's marked Petitioner's Exhibit 119. The only reason I'm
[2] showing it to you, Mr. Murphy, is to ask you to please look at
[3] the table in the middle of the page there, and there's a column
[4] headed per lane rate of BPAA's traditional blanket license.
[5] And if you could just look at that column and confirm for me
[6] whether or not those are in fact the year to year per lane
[7] rates charged under the BMI Bowling Proprietors Association of
[8] America agreement.
[9] **A.** There are two columns. One is per lane rate BPAA
[10] traditional blanket license.
[11] **Q.** That's the only one you need to focus on, Mr. Murphy.
[12] **A.** They're approximately correct. Without having those
[13] agreements year-by-year in front of me I can't attest to the
[14] actual number, but they look approximately correct.
[15] **Q.** What is the average number of lanes of a bowling center
[16] licensed by BMI?
[17] **A.** National average is around 24 lanes.
[18] **Q.** And so if you wanted to calculate an average fee that BMI
[19] currently receives from bowling centers, let's say under the
[20] BPAA agreement, how would you do that?
[21] **A.** You would take the new current rate for the BPAA agreement
[22] and multiply by the number of lanes and that would be the
[23] annual fee.
[24] **Q.** How long has BMI offered the BPAA license?
[25] **A.** Since 1997.

Page 530

[1] **Q.** If you could take a look at tab 3 of your binder,
[2] Mr. Murphy, there's a document there that has been marked as
[3] Joint Exhibit 0772.
[4] **A.** Yes.
[5] **Q.** If you could take a look at that and identify it, please?
[6] **A.** This is the initial agreement that was submitted to the
[7] BPAA for their review and approval back in 1997.
[8] **Q.** And is there a cover letter up front?
[9] **A.** There is. Addressed to Joe Schoenberg, who is the director
[10] of member services I believe at the time.
[11] **Q.** For the BPAA?
[12] **A.** Correct.
[13] **Q.** And if you look at the first sentence of the letter, it
[14] says, "Enclosed please find an original and one copy of the
[15] agreement which has been reviewed by Mr. Doyle and our
[16] counsel." Who is Mr. Doyle?
[17] **A.** Mr. Doyle was the counsel representing the BPAA.
[18] **Q.** And when it says "our counsel," who is that a reference to?
[19] **A.** I believe that was Rob Boatti.
[20] **Q.** Was he at BMI at the time?
[21] **A.** Yes.
[22] **Q.** In the second paragraph it says, "Please arrange for
[23] Mr. Harris's and Mr. Brehob's signatures on both copies of the
[24] agreement." Then it continues. Could you please explain who
[25] Mr. Harris and Mr. Brehob are?

Page 531

[1] **A.** Mr. Harris was the then executive director of the BPAA and
[2] Mr. Brehob was the president of the association at that time.
[3] **Q.** Could you identify -- is there an attachment to that
[4] letter?
[5] **A.** There is. The Bowling Proprietors Association agreement.
[6] **Q.** Now, did you discuss the terms of this agreement with
[7] anyone at BPAA before you sent this letter?
[8] **A.** Yes.
[9] **Q.** How did those discussions start?
[10] **A.** They initiated in early 1997 in Minnesota with Mr. Harris's
[11] predecessor, Mr. Jack Kelly. Mr. Kelly had reached out to us
[12] to talk about the possibility of a group agreement, since one
[13] of their major chain members had contacted them and indicated
[14] that they may be interested in talking to us about a group
[15] agreement for a reduced rate over what we were then at that
[16] time talking to AMF about.
[17] **Q.** Who is AMF?
[18] **A.** They were a major, still are a major bowling center chain
[19] in the United States.
[20] **Q.** And did you actually go out to Minnesota and speak to
[21] Mr. Kelly?
[22] **A.** I did.
[23] **Q.** And what did you discuss with Mr. Kelly in Minnesota?
[24] **A.** The concept of a group license agreement, how it would
[25] function and the prospect of reduced rates as a result of that.



Page 532

[1] **Q.** And were there further discussions after your initial
[2] conversations with Mr. Kelly?
[3] **A.** Yes, there were.
[4] **Q.** And could you describe those, please?
[5] **A.** They were basically going back and forth with regards to
[6] the rates themselves. We offered a rate initially. It wasn't
[7] accepted by them. They countered, we went back and forth a few
[8] times and ultimately settled on the rates that are indicated in
[9] this agreement.
[10] **Q.** Now, just to be clear, the agreement attached to this
[11] letter is not the executed version of the agreement, correct?
[12] **A.** No, it's not.
[13] **Q.** Was the license in fact executed?
[14] **A.** Yes, it was.
[15] **Q.** If you could turn to tab 4 of your binder, Mr. Murphy,
[16] there's another document there that has been marked as Joint
[17] Exhibit 0769. If you could take a look at that and identify
[18] it, please?
[19] **A.** This is the original agreement that was executed by the
[20] Bowling Proprietors Association which was in effect as of
[21] July 1, 1997.
[22] **Q.** Now, we've looked at two BPAA agreements. There's the
[23] agreement that's at tab 1 and the agreement at tab 4. Could
[24] you just explain the difference between those two agreements
[25] and how that difference arose?

Page 533

[1] **A.** I don't believe there are any differences between the
[2] unexecuted version in tab 3, I believe it is?
[3] **Q.** Yes. I apologize, Mr. Murphy. I'm referring to the
[4] difference in tab 1, which is the first BPAA executed agreement
[5] that we looked at.
[6] **A.** The first one was executed in 2003. This agreement was
[7] executed in 1997.
[8] **Q.** And are there any differences in terms --
[9] **A.** There are differences --
[10] **Q.** Let me finish, just so the court reporter can get us both.
[11] **A.** Sorry.
[12] **Q.** Are there differences in terms between those agreements?
[13] **A.** Yes. The rates are higher in the 2003 version, which is
[14] tab one, versus the 1997 version, which is tab four.
[15] **Q.** How did that rate increase come about?
[16] **A.** We discussed -- I discussed our intent to raise the rates
[17] on the BPAA agreement with the incoming executive director,
[18] John Berglund. Our purpose was to raise the rates to parity
[19] with our competitor in the marketplace. Our catalog warranted
[20] it, and Mr. Berglund agreed with that concept and approved the
[21] increase from the prior agreement to the one he executed in
[22] 2003.
[23] **Q.** And you said Mr. Berglund was the incoming executive
[24] director?
[25] **A.** Correct.

Page 534

[1] **Q.** Is that of the BPAA?
[2] **A.** Yes. He replaced Mr. Harris.
[3] **Q.** Now, do you understand that in this case DMX has requested
[4] a license that covers the provision of its commercial music
[5] services to bowling centers?
[6] **A.** Yes.
[7] **Q.** Does BMI's standard final commercial music service license
[8] cover the provision of commercial music services to bowling
[9] centers?
[10] **A.** No, it does not.
[11] **Q.** Are there any commercial music services that have a license
[12] that covers the transmission of their services to bowling
[13] centers?
[14] **A.** There is one commercial music service that covers their
[15] members, their locations, but not under their CMS agreement,
[16] but under our individual bowling center agreement rate
[17] structure.
[18] **Q.** And who is the -- what is the commercial music service
[19] you're referring to?
[20] **A.** Called Rock 300 in Texas.
[21] **Q.** What is Rock 300?
[22] **A.** Rock 300 started out as a music program provider for
[23] bowling centers.
[24] **Q.** If I could ask you to take a look at tab 5 of your binder.
[25] There's a document there that has been labeled petitioner's

Page 535

[1] Exhibit 0191. If you could take a look at that and identify
[2] it, please?
[3] **A.** This is the original agreement that was signed by the vice
[4] president of Rock 300 for the centers that they wished to
[5] license.
[6] **MR. FITZPATRICK:** Your Honor, I'd move the admission
[7] of this document?
[8] **MR. LARSON:** No objection, your Honor.
[9] **THE COURT:** Received.
[10] (Petitioner's Exhibit 0191 received in evidence)
[11] **Q.** If you could take a look at the second page of the
[12] agreement in paragraph 7, there's a paragraph titled "fee
[13] calculations." Do you see that?
[14] **A.** That's correct.
[15] **Q.** If you could look at subparagraph A of that paragraph.
[16] Could you explain to the Court how the license fee is
[17] calculated under Rock 300's license that covers the provision
[18] of its commercial music services to bowling centers?
[19] **A.** Under that agreement, they were paying what is commonly
[20] termed our street rate, our individual bowling center rate for
[21] each of the 790 lanes that they were providing service to.
[22] These were military centers that were not members of the BPAA
[23] association. The vast majority of Rock 300's customers were
[24] already members of the BPAA and were getting their coverage
[25] through that group agreement.

Page 536

[1] Q. Mr. Murphy, are you familiar with the way that bowling
[2] centers use music today?
[3] A. I am.
[4] Q. Could you describe that, please?
[5] A. Bowling centers are reinventing themselves. The
[6] traditional bowling alley and local pool hall is a thing of the
[7] past. League bowling has virtually disappeared. It's
[8] difficult to get people to commit to 26 weeks or more a year in
[9] a league environment. That generated most of the revenue for
[10] many of the bowling centers across the country.
[11]     As that demographic aged, they started to lose the
[12] commitment to league bowling. Their revenue started to drop,
[13] so they tried to figure out ways of attracting new customers
[14] and drive traffic to their centers. So they have developed
[15] programs such as Cosmic Bowling, Rock and Bowl, various other
[16] entertainment offerings which music is an integral part of to
[17] attract a whole new customer.
[18] Q. You mentioned Rock and Bowling, Cosmic Bowl. Could you
[19] explain to the Court what those are?
[20] A. They basically turned the bowling center lanes into a
[21] nightclub environment. They turn on various genres of music,
[22] if it's country or rock and roll. They increase the volume and
[23] in some instances they have lights accompanying the
[24] presentation or the entertainment offering. They changed their
[25] pricing schedules. They then rent the lanes, either one lane

Page 537

[1] or two lanes rather than by line bowling, which is typical for
[2] a bowling center. So they enhance the revenue stream by
[3] renting the lanes. They attract a different audience within
[4] their center and they may rent a lane for, you know, several
[5] hours or more.
[6] Q. Mr. Murphy, from your perspective, should bowling centers
[7] be covered as part of the standard commercial music services
[8] $36.36 per location license?
[9] A. No, I don't believe so.
[10] Q. Why not from your perspective, Mr. Murphy?
[11] A. Well, the CMS rates were calculated based on an unobtrusive
[12] accompaniment to dining, shopping or relaxing, and the
[13] agreement itself states it cannot be used as an adjunct to
[14] physical activity or other entertainment. Well, bowling is
[15] certainly a physical activity and it's most definitely
[16] entertainment.
[17]     In addition to that, there's a segment in the
[18] agreement that talks about additional charges such as cover or
[19] admission. When they price differently for the entertainment
[20] segments that are associated with Rock and Bowl or Cosmic
[21] Bowling that, too, would interfere with them being covered
[22] under the existing CMS agreement.
[23] Q. Can you estimate BMI's current license fees that it
[24] receives from the bowling industry in total?
[25] A. Just under 1.2 million, I believe.

Page 538

[1] Q. And what would happen to those fees, what would happen to
[2] that revenue if bowling centers instead of being covered under
[3] the agreements that they are covered under, if they were
[4] covered as part of the $36.36 CMS license?
[5] A. It could be greatly diminished.
[6]     MR. FITZPATRICK: Thank you. I pass the witness, your
[7] Honor.
[8] CROSS-EXAMINATION
[9] BY MR. LARSON:
[10] Q. Good morning, Mr. Murphy.
[11] A. Good morning.
[12] Q. How are you?
[13] A. I'm fine, thank you.
[14] Q. You testified on direct about BMI's agreement with the
[15] BPAA, correct?
[16] A. Yes.
[17] Q. And as part of this agreement, the BPAA collects fees,
[18] license fees for BMI, is that right?
[19] A. That's correct.
[20] Q. There's also a BMI bowling center license that is not done
[21] through the BPAA, but is done directly with individual bowling
[22] centers, is that right?
[23] A. Correct.
[24] Q. Let's discuss that license for just a moment. BMI
[25] developed the individual bowling center license in 1996, is

Page 539

[1] that right?
[2] A. Yes.
[3] Q. And prior to that, the bowling centers were licensed under
[4] a general agreement from BMI that applied to nightclubs and
[5] bars and things like that, right?
[6] A. That's correct.
[7] Q. And BMI decided to switch to a license specifically for
[8] bowling centers that used the number of lanes as the way to
[9] calculate the field, right?
[10] A. Correct.
[11] Q. And you chose lanes as a factor for calculating the rate
[12] because it was easily verifiable and made the fee calculation
[13] simple, correct?
[14] A. Yes.
[15] Q. And that was done without any input from bowling centers,
[16] right?
[17] A. That's correct.
[18] Q. And the per lane rates were created such that the bowling
[19] center fee under that agreement would essentially replicate
[20] what the bowling centers had previously been paying under the
[21] eating and drinking establishment license, correct?
[22] A. It was set at a rate that would approximately equal what we
[23] were getting from that industry under the previous agreement,
[24] yes.
[25] Q. Right, with a slight bump up?

Page 540

[1] A. With a slight bump for CPI increases. The rates for the
[2] existing license for restaurants and nightclubs had not been
[3] adjusted in many years.
[4] Q. And at the time when you developed these per lane rates for
[5] the bowling centers, you did no formal analysis as to the use
[6] of music in bowling centers as compared to other types of
[7] establishments correct?
[8] A. We did informal site inspections. My licensing staff in
[9] the field visited bowling centers. I had been a league bowler
[10] my entire life virtually, so I've been in bowling centers quite
[11] often and have seen how they changed.
[12] Q. As you said in your deposition, you learned nothing from
[13] those site visits with respect to the amount of music or how
[14] much music was being used at the bowling centers that
[15] ultimately impacted the per lane rate that you came up with,
[16] correct?
[17] A. Well, we were developing the bowling center agreement on a
[18] per lane basis, and at the same time events like Rock and Bowl
[19] and Cosmic Bowling were becoming more and more popular, so
[20] there was a change in the use of music in a bowling center and
[21] we noted that in our investigation of the premises.
[22] Q. But the rate you came up with was based upon, as you said
[23] before, replicating the old eating and drinking establishment
[24] fees that you were collecting, correct?
[25] A. Correct.

Page 541

[1] Q. The individual bowling center license was not negotiable,
[2] is that correct?
[3] A. It was an agreement that was developed for the industry and
[4] our class and category for bowling centers.
[5] Q. But you sent that out to bowling centers and said this is
[6] your new license, sign this as opposed to the eating and
[7] drinking establishments, is that correct?
[8] A. We did two campaigns. One to the existing licensees who
[9] were under agreement with respect to restaurants and
[10] nightclubs, advising them their current agreement would be
[11] canceled upon the expiration and they would be offered this new
[12] bowling center agreement which was predicated on lanes. And we
[13] also did a campaign on licensed bowling centers subsequent to
[14] that renewal program.
[15] Q. And that was not negotiable, correct? They had to sign
[16] that agreement if they wanted to play BMI music?
[17] A. It was offered to them. They had a choice to enter into it
[18] or not.
[19] Q. And if they didn't enter into it and played BMI music, they
[20] could have been subject to an infringement suit, correct?
[21] A. They could have been, yes.
[22] Q. Let's talk about the BPAA license. I think you know that
[23] was developed back in around 1996, correct?
[24] A. The latter part of 1996, '97, first part of '97.
[25] Q. And the per lane BPAA agreement reflected something of a

Page 542

[1] discount from the rate that was in the individual license,
[2] correct?
[3] A. That's correct.
[4] Q. Now, in April 2002, you informed the BPAA that you were
[5] seeking higher rates, is that right?
[6] A. I'm sorry, would you repeat the question?
[7] Q. Yes. In 2002, you informed the BPAA, as I think you
[8] testified on your direct, that you were seeking higher rates?
[9] A. That's correct.
[10] Q. Those rates went from the prior rate of $8 per lane to
[11] 11.75 per lane?
[12] A. That is also correct.
[13] Q. And the BPAA signed on to that nearly 50 percent increase,
[14] correct?
[15] A. They did.
[16] Q. There was no negotiation over that increase, is that right?
[17] A. There was discussion about the basis for our request for
[18] the rate increase and there was agreement on the part of the
[19] BPAA that BMI was entitled to the increase.
[20] Q. Right. You told them 11.75 and they took it, correct?
[21] A. We told them that we were looking to have parity with
[22] ASCAP, as I mentioned in my earlier testimony, based on our
[23] catalog, the strength of our catalog. The executive director
[24] of the BPAA at the time agreed and said we were entitled to
[25] that increase and approved it.

Page 543

[1] Q. And that's the fee with the addition of CPI increases that
[2] is the basis of the rate that BMI is seeking to apply to DMX in
[3] this proceeding, correct?
[4] A. The 11.75 rate has increased in accordance with the CPI
[5] adjustment since 2003, yes.
[6] Q. And that's now the basis of your rate proposal here for DMX
[7] for bowling centers?
[8] A. That's my understanding.
[9] Q. Mr. Murphy, are you aware of the agreement that BMI had in
[10] place with commercial music services prior to the current
[11] commercial music service agreement?
[12] A. Yes.
[13] Q. And that's the agreement that was in place essentially from
[14] 1987 to 2004?
[15] A. Yes.
[16] Q. We discussed that at your deposition, do you recall that?
[17] A. Yes.
[18] Q. Now, that 1987 to 2004 agreement did not specifically
[19] exclude bowling centers, is that right?
[20] A. That's correct.
[21] Q. It was BMI's position that commercial music services
[22] licensed under that agreement in fact could provide services to
[23] bowling centers so long as those bowling centers didn't have
[24] things like Rock and Bowl, correct?
[25] A. As long as they met all the provisions in the agreement and

Page 544

[1] did not exceed the exceptions.
[2] Q. Right. Let me ask, do you recall testifying at your
[3] deposition as follows:
[4] "Q. Putting aside Rock and Bowl and Cosmic Bowling,
[5] quote-unquote 'regular bowling' on a Tuesday afternoon when the
[6] lights are up and people are bowling and there's music just
[7] playing over the stereo of the bowling alley at normal levels,
[8] is it your understanding that that sort of use of music would
[9] or would not cause a bowling center to be excluded under this
[10] agreement?"
[11]     MR. FITZPATRICK: I just object. That doesn't impeach
[12] his prior answer, your Honor. That's entirely consistent with
[13] what he just said, so it's not a proper use of deposition
[14] testimony.
[15]     THE COURT: I'll allow it. The deposition of a party
[16] can be used for any purpose.
[17] Q. "A. Had a commercial music service been providing
[18] programming to a bowling center and was being broadcast across
[19] the lanes at a low level and not as an accompaniment to some
[20] sort of entertainment offering such as Rock and Bowl, Cosmic
[21] Bowling etc. or if they were not charging admission to come
[22] into the bowling center or into the nightclub or into the
[23] tavern area, then under this agreement it probably could have
[24] been covered."
[25]     Do you stand by that testimony here today?

Page 545

[1] A. Yes. I do.
[2] Q. And that's BMI's position today?
[3] A. Under our existing commercial music service agreement
[4] bowling centers have been excluded.
[5] Q. Under the current agreement, but not under the former
[6] agreement?
[7] A. The former agreement has specific language in it where uses
[8] within a bowling center are not covered by CMS, which I
[9] testified to earlier. Your remark about it being broadcast
[10] across the lanes is something that was in the old business
[11] model of bowling centers. It's not currently widely used in
[12] bowling centers nationally.
[13] Q. I understand, but under the former agreement, what you
[14] explained in your deposition is true, they would only be
[15] excluded if they had something along the lines of Rock and
[16] Bowl, correct?
[17]     THE COURT: Along the lines of what?
[18]     MR. LARSON: I'm sorry, your Honor?
[19]     THE COURT: I couldn't hear the next to the last
[20] words. Along the lines of what?
[21]     MR. LARSON: Of what was described in his deposition
[22] testimony, just music being played over the stereo in the
[23] background.
[24]     MR. FITZPATRICK: He didn't hear Rock and Bowl.
[25]     MR. LARSON: Rock and Bowl, I'm sorry.

Page 546

[1] A. BMI was not seeking to license the bowling centers. If CMS
[2] was in the bowling center, it was being used as an unobtrusive
[3] accompaniment, as I mentioned earlier.
[4] Q. Let's take a look at tab 5, if you would, please. This is
[5] the agreement that you testified to with Rock 300.
[6] A. Mm-hmm.
[7] Q. Was Rock 300 represented by counsel in the negotiation of
[8] this agreement?
[9] A. No, just the president of their organization.
[10] Q. And could you tell me, if you turn to the second page of
[11] that agreement and turn to paragraph 8.
[12] A. Mm-hmm. Yes.
[13] Q. It lists there there are 790 lanes covered under the
[14] agreement?
[15] A. That's correct.
[16] Q. What percentage is that of the total number of lanes
[17] covered under the BPAA agreement nationally, do you know?
[18] A. I think the national number is somewhere around 58,000
[19] lanes.
[20]     MR. LARSON: Thank you. No further questions, your
[21] Honor.
[22]     MR. FITZPATRICK: No questions, your Honor.
[23]     THE COURT: Thank you, Mr. Murphy. You're excused.
[24]     MR. SALZMAN: BMI calls as its next witness Alison
[25] Smith.

Page 547

[1] ALISON SMITH,
[2]     called as a witness by the Petitioner,
[3]     having been duly sworn, testified as follows:
[4]     THE DEPUTY CLERK: Please state your name and spell
[5] your last name slowly for the record.
[6]     THE WITNESS: Alison Smith, S-m-i-t-h.
[7]     THE COURT: Mr. Salzman.
[8]     MR. SALZMAN: Good morning, your Honor. May we
[9] approach with the exhibit book, please?
[10]     THE COURT: Yes.
[11]     MR. SALZMAN: May I proceed?
[12]     THE COURT: Yes, please.
[13] DIRECT EXAMINATION
[14] BY MR. SALZMAN:
[15] Q. Good morning, Ms. Smith.
[16] A. Good morning.
[17] Q. How are you employed?
[18] A. At BMI. Senior vice president of performing rights.
[19] Q. What is your responsibility as senior vice president of
[20] performing rights?
[21] A. I oversee royalty administration as well as the processing
[22] of writer applications, publisher applications, publisher
[23] administration agreements. Basically, anything having to do
[24] with administration of affiliates joining BMI and remaining at
[25] BMI, hopefully.



[1] **Q.** Does that include renewing agreements as well?

[2] **A.** Yes, it does.

[3] **Q.** How long have you been at BMI?

[4] **A.** Almost 25 years.

[5] **Q.** You told us your department is called performing rights, is

[6] that correct?

[7] **A.** That's correct.

[8] **Q.** And is there another department there that is writer and

[9] publisher relations?

[10] **A.** Yes, there is.

[11] **Q.** And does your department interact with that department?

[12] **A.** Very closely.

[13] **Q.** And can you describe the functions of the writer and

[14] publisher relations department?

[15] **A.** Yes, the writer publisher relations department is primarily

[16] a creative department, and that means that their responsibility

[17] is to go out and sign up songwriters and music publishers to

[18] BMI. They go out to clubs to see new bands. They will work

[19] with composers who write for film and television and the goal

[20] of that department is to sign up the best of the best to BMI.

[21] **Q.** And does that include in addition to new talent attempting

[22] to persuade established writers to come over to BMI from ASCAP

[23] or SESAC?

[24] **A.** It certainly does.

[25] **Q.** And how is that done?

[1] **A.** Well, they establish a relationship, and they would go out

[2] and if they have a particular interest in a songwriter or

[3] composer that's a member of another society, they would talk to

[4] them about the positive aspects of BMI and try to get them to

[5] come to BMI.

[6] **Q.** Now, in your work in the performing rights department, do

[7] you deal with publishers from day-to-day?

[8] **A.** Every day.

[9] **Q.** How many different publishers would you talk to in the

[10] course of a week?

[11] **A.** Oh, goodness. Probably ten or twelve.

[12] **Q.** And what sort of issues might come up in the course of a

[13] week?

[14] **A.** Well, the issues that typically get to me have to do with

[15] royalty payments, questions about their royalty statements,

[16] questions about administration agreements. If there are

[17] perceived errors or omissions in their statements that's my

[18] area of oversight.

[19] **Q.** How many people are in your department?

[20] **A.** About 45.

[21] **Q.** Are they all located in New York?

[22] **A.** No, they're not.

[23] **Q.** Where are they located?

[24] **A.** They're located in New York, Nashville and Los Angeles.

[25] **Q.** Now, I'd like to just ask you some basic questions about

[1] performing rights background, really, for what BMI does.

[2] First, we've talked maybe a thousand times already at this

[3] trial about BMI affiliates. What is a BMI affiliate?

[4] **A.** A BMI affiliate is going to be either a songwriter, a

[5] composer or a music publisher.

[6] **Q.** Can you tell us the difference between a songwriter on the

[7] one hand and a singer or a recording artist or sometimes

[8] referred to as an artist?

[9] **A.** Sure. A songwriter is someone who does just that, writes

[10] songs. That songwriter may not be an artist, he may not be

[11] able to even sing, but can write songs. Then you have a

[12] recording artist that may write songs also and then again may

[13] not write songs.

[14] **Q.** So can you give us an example of a song where the composer,

[15] the songwriter is different from the singer?

[16] **A.** Sure. How about "New York, New York" written by Kander and

[17] Ebb and sung, as we know, by Frank Sinatra, Liza Minelli.

[18] **Q.** You talked about songwriters and composers being affiliates

[19] of BMI, is that correct?

[20] **A.** That's correct.

[21] **Q.** How do you distinguish between those two?

[22] **A.** A songwriter, again, typically writes lyrics and music and

[23] a composer for the most part would write mostly just music. A

[24] film composer would write an underscore to a film or television

[25] program. You might have a jazz composer that writes jazz music

[1] and plays the horn.

[2] **Q.** BMI affiliate composers and songwriters, are they all

[3] famous in their field?

[4] **A.** No, they're not.

[5] **Q.** Some are?

[6] **A.** Some are.

[7] **Q.** Give us two or three examples of some people who are.

[8] **A.** Who are?

[9] **Q.** Yes.

[10] **A.** Dolly Parton, Beyonce, Keith Urban. I'm from Nashville, so

[11] I'm conjuring up country singers, singer songwriters.

[12] **Q.** Are there other songwriters who are not famous and

[13] prominent in their field?

[14] **A.** Yes, a good example of that is Julie Gold, who wrote a song

[15] called "From a Distance" that was a very popular and still

[16] today is, especially in wartime, but she's not widely known.

[17] **Q.** How many different songwriters get at least some royalties

[18] from BMI in one year?

[19] **A.** BMI issues approximately 35,000 royalty statements every

[20] quarter. Of those, about 30,000 are for writers.

[21] **Q.** There's been some discussion in this trial so far about

[22] split works. Can you explain how that comes about?

[23] **A.** Yes, a split work would come about when a songwriter would

[24] co-write with one or more other writers.

[25] **Q.** Is the Kander and Ebb example such a thing?

---

Page 552

[1] **A.** That's a very good example. Oftentimes you might have a
[2] songwriter and a composer who will join together. I'm going to
[3] use an ASCAP example, but Bacharach and David, for example.
[4] **Q.** Are the shares always divided 50-50 among different
[5] co-writers of a work?
[6] **A.** No, they're not.
[7] **Q.** Now let's talk a little bit about the music publishing
[8] world. How many different music publishers are affiliated with
[9] BMI? Do you have any sense of that?
[10] **A.** About 100,000.
[11] **Q.** Where are they located?
[12] **A.** All over the world.
[13] **Q.** Among those hundred thousand publishers, are there several
[14] that are popularly known as the majors or can be called that
[15] way?
[16] **A.** Yes, there are.
[17] **Q.** Can you just list those?
[18] **A.** Universal, Warner, EMI and Sony Music.
[19] **Q.** As to those four majors, are they all exclusively BMI
[20] affiliates?
[21] **A.** No, they're not. They are all members of BMI, ASCAP and
[22] SESAC.
[23] **Q.** How does that work?
[24] **A.** The music publisher, unlike the songwriter, needs to be
[25] affiliated or a member of multiple performing rights

---

Page 554

[1] **A.** There is. We call that tier the major independents.
[2] **Q.** About how many of those are they?
[3] **A.** There are four or five of those. Those include peermusic,
[4] Bug Music, Cherry Lane Music.
[5] **Q.** Are there strata of the industry below that?
[6] **A.** Yes.
[7] **Q.** How would you describe the rest?
[8] **A.** The rest are much smaller independents. Quite often a
[9] songwriter would own his own publishing and there are literally
[10] tens of thousands of writer-owned companies.
[11] **Q.** Are you familiar with a music publisher named Helene Blue?
[12] **A.** Yes, I am.
[13] **Q.** She testified here yesterday. Is she an example of a small
[14] independent publisher?
[15] **A.** Yes, she is.
[16] **Q.** Are there publishers both foreign and domestic whose works
[17] were licensed through BMI in the United States?
[18] **A.** BMI represents domestic copyrights as well as represents
[19] songs that originates from songwriters overseas.
[20] **Q.** Is foreign music played in the United States?
[21] **A.** Sure.
[22] **Q.** Now, there's also been reference at the trial to
[23] administration agreements or publishers having the right to
[24] administer other catalogs. What is that about?
[25] **A.** Typically an administration agreement would be between a

---

Page 553

[1] organizations because a songwriter can only be a member of one.
[2] The music publisher who publishes a BMI writer's works needs to
[3] be a member of BMI to do that. If it's an ASCAP songwriter,
[4] they would put the share into their ASCAP company and likewise
[5] for SESAC.
[6] **Q.** So am I correct that a big publishing company will have an
[7] ASCAP member subsidiary, a BMI member subsidiary and perhaps a
[8] SESAC subsidiary?
[9] **A.** That's absolutely correct.
[10] **Q.** Now, over time, do the major publishers have the ability to
[11] move parts of their repertoire between BMI and ASCAP?
[12] **A.** Yes, they do.
[13] **Q.** How does that work?
[14] **A.** They have a clause in their contract referencing a
[15] termination date, and upon proper notice in the contract they
[16] can notify BMI at a particular time that they wish to remove
[17] certain works from the BMI repertoire.
[18] **Q.** Is that a competitive concern of BMI's?
[19] **A.** Yes, it is.
[20] **Q.** Why is that?
[21] **A.** Because BMI negotiates licenses day in and day out, and
[22] having the strength of repertoire is very, very important to
[23] those licensing negotiations.
[24] **Q.** Beyond the majors, is there a next tier of music
[25] publishers?

---

Page 555

[1] small music publisher or an individually-owned music publisher
[2] and a major or a major independent. Those companies are set up
[3] to administer mechanical licensing, synchronization licensing,
[4] doing the business of a music publisher and they would for a
[5] small fee do that work and take it off the hands of a small
[6] publisher that may not have either the operational setup or the
[7] ability to do that on their own.
[8] **Q.** Do the majors have administration set up to do a performing
[9] rights licensing?
[10] **A.** Not to my knowledge.
[11] **Q.** When a small publishing company signs an administration
[12] agreement with a large one to handle administration of its
[13] catalog, does the administrator company have the right to
[14] license on whatever terms it deems appropriate?
[15] **A.** Yes.
[16] **Q.** Does the administrating publisher have to confer with the
[17] owner publisher before granting particular licenses?
[18] **A.** Sometimes that does happen. It would just depend on the
[19] contract that the administrator has with the people that
[20] they're doing the work on behalf of.
[21] **Q.** So, for example, if an administrator company wanted to
[22] enter into a direct performing rights license with a music
[23] user, would the administrator invariably have the right to do
[24] that without first checking with the publisher whose rights it
[25] is administering?

---

Page 556

[1] **A.** No. They maybe could do it sometimes, but certain
[2] contracts are subject to consent.
[3] **Q.** Let me ask you just at a very high level of generality
[4] about the BMI distribution process. What are the main
[5] constituent parts?
[6] **A.** The main constituent parts are starting with the license
[7] fees, that becomes the royalty pool in effect. Then BMI
[8] collects performance data on many, many, many media, from radio
[9] to local television, network television, cable television,
[10] across the internet, websites, mobile phone companies and then
[11] we collect performance information on all the works that are
[12] performed. I neglected to say general licensing also,
[13] remembering Cleve being up here a moment ago, from bars,
[14] restaurants, everybody else. Then we make royalty
[15] distributions on a quarterly basis for the performance of the
[16] works during that quarter.
[17]     (Continued next page)
[18] **BY MR. SALZMAN:**
[19] **Q.** And now let's talk very briefly about commercial music
[20] service royalties, the distribution process specific to that
[21] industry.
[22] **A.** The license fees get to us in the distribution process less
[23] an administrative fee that BMI takes, then BMI gets reports
[24] from the background music services indicating what performances
[25] occurred, and then we tabulate those performances; we match,

Page 557

[1] for example, a song that's on that performance log to our
[2] database that indicates, you were mentioning earlier the shares
[3] attributable to the writers and the publishers on those
[4] individual works, and then a royalty distribution is sent out.
[5] **Q.** Am I correct that not every commercial music service
[6] provides music use data?
[7] **A.** That's correct.
[8] **Q.** Is DMX an example of one that does?
[9] **A.** Yes.
[10] **Q.** Let me ask you some basic questions about BMI as it
[11] competes in the marketplace. Just at a very basic level, why
[12] is it that BMI competes to sign up writers and publishers?
[13] **A.** BMI competes because the strength of you're repertoire is
[14] the key component in our licensing negotiations.
[15] **Q.** Are some songwriters more valuable to the BMI repertoire
[16] than others?
[17] **A.** Yes, they are.
[18] **Q.** And are some publishers more important to BMI than others?
[19] **A.** Yes, they are.
[20] **Q.** And just, again, why is that?
[21] **A.** That's because certain songwriters bring a cache -- song
[22] writers and composers to BMI that the masses, if you will,
[23] don't have. Top songwriters attract other songwriters to come
[24] to BMI and then, when you move over into music publishing, the
[25] majors are our most important clients, they bring not only a

Page 558

[1] vast number of works to our catalog but they also bring many,
[2] many genres of music that allow our licensing department to go
[3] out and license across many media.
[4] **Q.** Would it be of concern to your department if a major
[5] started to move parts of its repertoire over to ASCAP?
[6] **A.** Yes.
[7] **Q.** Why is that?
[8] **A.** Because, again, BMI's strength of repertoire for licensing
[9] is very, very important and if a major publisher was to
[10] indicate or notice us of removal of works from the BMI
[11] repertoire, that would put us in a lesser position.
[12] **Q.** And how would that affect the other song writers and
[13] publishers in the BMI community?
[14] **A.** It could have multiple effects.
[15]     **MR. RICH:** Your Honor, objection. Calls for
[16] speculation.
[17]     **THE COURT:** Overruled.
[18] **Q.** You may answer.
[19] **A.** It could have multiple effects. If some of the other
[20] publishers saw that a major publisher was beginning to remove
[21] repertoire from BMI, it might have the effect of having other
[22] publishers do the same thing. It could be that the licensing
[23] negotiations would not go as well as had originally been
[24] intended if you don't have the same repertoire that you had
[25] going into a negotiation.

Page 559

[1] **Q.** Does BMI's incidence of music use on a particular media
[2] play into license negotiations, as you understand it?
[3] **A.** As I understand it, all the time --
[4] **Q.** Could you explain how?
[5] **A.** -- or most of the time.
[6] **Q.** Could you explain how?
[7] **A.** Sure.
[8]     When the licensing team is going out to license,
[9] whether it is television or radio, they do calculations on the
[10] strength of BMI's repertoire in that particular media and
[11] utilize that in their negotiations.
[12] **Q.** Are you familiar with the concept of direct licensing? I
[13] think we mentioned it before but I take it you are familiar
[14] with that?
[15] **A.** Yes, I am.
[16] **Q.** And is that a common phenomenon in the music industry
[17] today?
[18] **A.** It is not very common but it does happen.
[19] **Q.** Does BMI have a policy with respect to how to handle direct
[20] licensing by its affiliated publishers?
[21] **A.** Yes. Any publisher or songwriter can issue a direct
[22] license to a user of music and they're required, contractually,
[23] to notify us of that particular issuance of a license.
[24] **Q.** And why is there a requirement of --
[25]     **THE COURT:** Mr. Salzman, if you are going into direct

Page 560

[1] licensing now maybe this is a good time to take the mid-morning
[2] recess.
[3]     MR. SALZMAN: Sure. Thank you.
[4]     THE COURT: Before you get too deeply into the subject
[5] of the trial.
[6]     MR. SALZMAN: Fine.
[7]     THE COURT: Okay. 10 minutes.
[8]     Mr. Marks, before we recess I have a question for you.
[9] Because of your cross-examination -- you were conducting the
[10] cross-examination on the -- really on the question of the
[11] retroactive interim payment situation, do any of your exhibits,
[12] I think, or including the oral testimony make plain that a
[13] particular body of money was moved from the interim payments
[14] into the $36.36 fee? Can you trace from any of the materials
[15] you were using or from the testimony -- anybody can sit down
[16] who wants to.
[17]     MR. MARKS: Your Honor --
[18]     THE COURT: Excuse me -- a finite number with more or
[19] less coherence between its presence and the interim obligation
[20] and its transfer or its disappearance from that and
[21] reappearance in the rate side of the card?
[22]     Now, I say "may have in mind" and for some mysterious
[23] reason I can't put my hand on an exhibit which I think was a
[24] report of perhaps Mr. Annastas to his committee, and on the
[25] reverse side of a one-page document there was a history of

Page 561

[1] offers made by Muzak, I guess it was, and it may be that in
[2] that document there is such a chart and you think you can
[3] derive from that the answer to my question. It is the piece of
[4] evidence that seems to me closest allied possibly to my
[5] question but, as I say, I can't find it this morning.
[6]     MR. MARKS: Your Honor, we will take a look and see if
[7] we can look at the specific exhibit that you are referring to.
[8] But, just to answer your question generally, I think what the
[9] evidence has not shown absolutely explicitly is any
[10] conversation where Muzak said, in words or substance, we agree
[11] that we will pay you $5 million for retroactive fees but let's
[12] spread it out going forward.
[13]     THE COURT: But I'm not asking specifically for a
[14] concession from Muzak; just any evidence that would show that
[15] that process occurred.
[16]     MR. MARKS: Well, and if I could answer it more
[17] generally and I think this will be the subject of expert
[18] testimony next week as well --
[19]     THE COURT: Well, before we get to experts --
[20]     MR. MARKS: -- but before we get to that, what was
[21] demonstrated and what I believe the cross-examination of
[22] Mr. Annastas will show in terms of the bid and the ask is that
[23] if you were just looking at the annual license fee portion of
[24] what BMI was requesting in the negotiations, the amount that
[25] they were asking was less than Muzak agreed to pay and so the

Page 562

[1] question -- it seems fairly self-evident, at least to us, that
[2] the quid pro quo was Muzak would pay more going forward even
[3] than BMI was requesting if BMI won't specifically attribute it
[4] to the past.
[5]     So, what we've done is trace through the various
[6] offers and show that up until the final negotiations -- up
[7] until the final deal, the amounts attributed in the
[8] negotiations by BMI to the annual license fee portion are in
[9] fact millions of dollars less than what Muzak agreed to pay
[10] and, in exchange, they dropped out the portion of it.
[11]     So, fairly consistently you see that the retroactive
[12] component of the deal is somewhere between 14 and 18 percent of
[13] the total package presented by BMI and then all they do -- we
[14] think the final deal just simply doesn't have those separate
[15] labels, they just spread it out over the five years; not
[16] dissimilarly to what happened in the TruSonic negotiation where
[17] there was a retroactive payment owed and they made an explicit
[18] payment plan that got incorporated into the payments going
[19] forward, there is not a comparable document in the record
[20] showing that the retroactive payments were made into a formal
[21] payment plan but we think the economic effect of the
[22] negotiations was similar.
[23]     THE COURT: Okay. Thank you.
[24]     We will take the recess.
[25]     (Recess)

Page 563

[1]     MR. SALZMAN: May I proceed?
[2]     THE COURT: Mr. Salzman.
[3]     MR. MARKS: Your Honor, before we get going may I
[4] point you to the document I had in mind?
[5]     THE COURT: Good. I looked again and haven't been
[6] able to find it. You are my savior. You wouldn't think in
[7] this small space I could lose something, but it seems to be.
[8]     MR. MARKS: Joint Exhibit 1164 is a document that we
[9] examined Mr. Annastas on yesterday and some of the
[10] demonstratives were extracted from that document and we think
[11] it illustrates the principle. There are obviously other
[12] documents that complete the story but it certainly illustrates
[13] the principle that the amount that BMI --
[14]     THE COURT: I don't remember it by document number.
[15] Do you have a copy you can show me?
[16]     MR. MARKS: I do. If you allow me to approach I can
[17] show you.
[18]     THE COURT: Sure. I assume it is in evidence.
[19] (tendering document)
[20]     THE COURT: Oh no. No, no, we have this.
[21]     MR. MARKS: Your Honor, the second page of this
[22] document --
[23]     THE COURT: No.
[24]     MR. MARKS: That's not the document.
[25]     THE COURT: Not the document I was thinking of but

[1] thanks for trying. Okay.

[2]     **MR. MARKS:** At any rate, this document we believe

[3] illustrates the notion that all of BMI's --

[4]     **THE COURT:** I understand.

[5]     **MR. MARKS:** You understand. Okay.

[6]     **THE COURT:** Go ahead, Mr. Salzman.

[7]     **MR. SALZMAN:** Thank you.

[8] **BY MR. SALZMAN:**

[9]     **Q.** Ms. Smith, before the break I think I was about to ask you,

[10] maybe I got part of the question out but I will try again, why

[11] are BMI affiliates required to notify BMI if and when they

[12] enter into direct licenses?

[13]     **A.** First and foremost, if a work or a series of works has been

[14] directly licensed, BMI cannot license those same works.

[15] Secondly, if the writer or publisher does not notify us of a

[16] direct license, there is a potential for direct -- or excuse

[17] me -- for double payment.

[18]     **Q.** Now, did there come a time when you learned that --

[19]     **THE COURT:** Does that assume that both licenses are

[20] exclusive licenses?

[21]     **THE WITNESS:** Typically on a direct license the

[22] licensee would get an exclusive right from, I believe, the

[23] composer or publisher and we would not license that same

[24] performance, not be able to.

[25]     **THE COURT:** So, you are saying that it does presume

[1] that the direct license is an exclusive license?

[2]     **THE WITNESS:** I believe so for that use, sir.

[3]     **THE COURT:** Okay.

[4] **BY MR. SALZMAN:**

[5]     **Q.** Just to clarify that, you mean as to that particular user,

[6] not --

[7]     **A.** To that particular use or user.

[8]     **Q.** So that BMI would still be able to license that even if a

[9] direct license had been given, let's say, to station ABC, BMI

[10] could still license that work to station NBC or radio station

[11] XYZ?

[12]     **A.** Absolutely.

[13]     When someone notifies us of a direct license they are

[14] specific to the name of the work, the user or licensee that

[15] they have directly licensed to. A very good example is ESPN

[16] directly licenses quite a bit of music but we do have the rest

[17] of the repertoire that they've directly licensed for usage on

[18] ESPN, we license it on ABC network and we pay royalties for the

[19] ABC network performances of the same titles, but we don't pay

[20] for them on ESPN, but ESPN has acquired direct licenses and

[21] paid the royalties through their source.

[22]     **Q.** Did there come a time when you learned that Universal was

[23] considering an offer to directly license the DMX commercial

[24] music service?

[25]     **A.** Yes. I was advised by Universal that they had been offered

[1] a direct license.

[2]     **Q.** How did you learn that?

[3]     **A.** Mr. Ed Arrow from Universal Music Publishing contacted me.

[4]     **Q.** And, what did he say?

[5]     **A.** He said that he had been approached by DMX and had been

[6] talking to them about the possibility of receiving payment in

[7] exchange for direct license for DMX and, potentially, Muzak.

[8]     **Q.** And in that conversation did Mr. Arrow express a view as to

[9] what he thought of that proposal?

[10]     **A.** He said that Universal didn't really want to get into

[11] direct licensing of its music.

[12]     **MR. RICH:** Your Honor, objection. Hearsay as to

[13] Mr. Arrow's purported statements.

[14]     **THE COURT:** Well, there may be an interest in whether

[15] she believed that or not.

[16]     To take an ugly example, any blackmailer might say I

[17] don't want to do what I'm threatening to do. But, it

[18] certainly, at the present level, deals only with the fact of

[19] utterance and it is received for that purpose.

[20]     **MR. RICH:** Thank you very much.

[21] **BY MR. SALZMAN:**

[22]     **Q.** Did Mr. Arrow tell you the level of the offer he had

[23] received from DMX?

[24]     **A.** I don't remember if it was in the first conversation but I

[25] subsequently did come to know that.

[1]     **Q.** And how did you come to learn that?

[2]     **A.** I spoke with Ed and he told me that DMX had offered him an

[3] amount equal to one and a half times the royalty payments that

[4] Universal had received on their BMI statements. We were also

[5] talking about ASCAP at the same time but I wasn't interested in

[6] talking about ASCAP.

[7]     **Q.** Did he give you a figure that he had received from DMX?

[8] Did he tell you the amount?

[9]     **A.** I believe he did tell me the amount. It was in the range

[10] of $600,000.

[11]     **Q.** And, how did BMI react -- I'm sorry. Withdrawn.

[12]     Did Mr. Arrow ask anything of BMI in connection with

[13] that proposal from DMX?

[14]     **A.** Yes. He asked us to match that proposal because he would

[15] prefer to have BMI license his music -- or Universal's music.

[16] Excuse me.

[17]     **Q.** And how did BMI react to that request from Universal?

[18]     **A.** BMI considered that request, as we would consider any

[19] request from one of our biggest clients, and we discussed it

[20] internally. Then we proceeded to talk to Universal about what

[21] they wanted. Then we went to -- or I went to the president of

[22] the company, Del Bryant, discussed it with him, and

[23] subsequently we decided that we would proceed with Universal's

[24] request; and we had to secure BMI board approval to do so. So,

[25] we proceeded to the board of directors for approval, we got

Page 568

[1] that approval, and we entered into the agreement.
[2] **Q.** How did the $600,000 figure compare to the amounts that
[3] Universal receives from BMI each year?
[4] **A.** Overall?
[5] **Q.** Overall.
[6] **A.** That's a very small amount compared to what Universal
[7] receives overall from BMI.
[8] **Q.** What's the order of magnitude of Universal's payments from
[9] BMI?
[10] **A.** I'm not sure if that's breaching any confidentiality,
[11] Mr. Salzman.
[12] **Q.** Okay, let me withdraw that and ask you maybe a more general
[13] question and see if there is an issue with this.
[14] Is it fair to say that Universal gets tens of millions
[15] of dollars from BMI every year?
[16] **A.** Yes.
[17] **Q.** Let me show you that's in evidence as RX 31. Take a look
[18] at that, it is in your binder at tab 1.
[19] **A.** Okay.
[20] **Q.** Do you recognize this document?
[21] **A.** Yes, I do.
[22] **Q.** Who wrote it?
[23] **A.** I did.
[24] **Q.** Did you make an effort to be accurate in it?
[25] **A.** I most certainly did. It was a request to our board of

Page 569

[1] directors.
[2] **Q.** Have you recently reviewed it?
[3] **A.** Yes.
[4] **Q.** Do you know of anything in it that is incorrect?
[5] **A.** No, I do not.
[6] **Q.** Taking a look at the first page, those figures below the
[7] center, the three figures in the amount column, do you see
[8] that?
[9] **A.** I do.
[10] **Q.** What is that?
[11] **A.** Those were earnings that were presented on the BMI
[12] statements for the Universal owned and administered catalogs
[13] for the quarters indicated to the left under the period
[14] section.
[15] **Q.** And, do those figures relate specifically to the actual
[16] payments from DMX or do they relate to something more general?
[17] **A.** They are inclusive of license fees from other background
[18] music services in addition to DMX but it was reflected on the
[19] BMI statement as DMX.
[20] **Q.** And, did you do anything with those figures in deciding
[21] whether or not to match the request of Mr. Arrow?
[22] **A.** Yes, I did. I took these figures and approximated that
[23] about 27 percent of these numbers were attributable to DMX on
[24] its own apart from the other background music service fees, and
[25] then I spoke with Mike O'Neill with respect to what we were

Page 570

[1] asking at the time during this rate court proceeding which was
[2] I believe in the $48-$49 range at the time and I --
[3] **Q.** Let me just explore that with you.
[4] It was your understanding that BMI was already in the
[5] rate court or that there could be a rate court proceeding?
[6] **A.** I'm not as clear in terms of how it works. I mean, I knew
[7] we were in a dispute with DMX, that there had been a rate court
[8] filing, that there was always a chance that it might be settled
[9] or that we would go to trial.
[10] That, really, is the extent of my knowledge of how
[11] that all works.
[12] **Q.** And, as of that time your understanding was that BMI was
[13] seeking -- was either seeking or going to seek a license fee in
[14] what range?
[15] **A.** In the $48 range. And it was my understanding that that
[16] was a higher rate because of the AFBL or the -- the blanket,
[17] the carve-out as we called it, license. And it was discussed
[18] as high as that and then the $36 was also discussed.
[19] **Q.** $36?
[20] **A.** A range, uh-huh.
[21] **Q.** So, can you just do for us the math of how you got from the
[22] number on page 2 to what you ultimately decided to do with
[23] Universal?
[24] **THE WITNESS:** May I borrow a pencil, Judge?
[25] **THE COURT:** A pencil.

Page 571

[1] **THE WITNESS:** Thank you.
[2] May I write on this?
[3] **MR. SALZMAN:** We will give you another piece of paper.
[4] May I approach the witness?
[5] **A.** I simply want to make sure my math is correct as I go
[6] through this.
[7] I started with the 359 as the highest because that was
[8] the most recent year's worth of earnings, took approximately 27
[9] percent of that number which gets you right in the $97,000 to
[10] $100,000 range. I quadrupled that to get to $400,000 and then
[11] I built in a growth factor year over year growth for Universal
[12] because they do grow and gain more performances quarter over
[13] quarter, year over year because of acquisitions of new
[14] catalogs, because of signing of new writers that become very
[15] successful.
[16] So, I arrived at my numbers through that process.
[17] **Q.** Take a look at page 1, again, of RX 31, maybe that's right
[18] in front of you. Do you see that figures for 2007 were
[19] 359,000, the prior years are at 270,000, and the year before
[20] that is 194,000.
[21] Did that trend from 194,000 to 359,000 figure in your
[22] thinking?
[23] **A.** Yes.
[24] **Q.** How?
[25] **A.** In terms of growth of the Universal catalog and their

Page 572

[1] earnings overall in this category.
[2] **Q.** Is Universal continuing to grow in terms of catalog?
[3] **A.** Yes, they are. It is a trend in the industry.
[4] I think all of us in here have probably noticed that
[5] the major publishers are buying up or acquiring smaller
[6] publishing companies or, frankly, each other. There are now
[7] four majors, there used to be maybe six or seven and they
[8] combined, they join and they all compete to buy more successful
[9] smaller catalogs.
[10] **Q.** And take a look at page 2 of RX 31 and did you -- I think
[11] you told us you wrote this page?
[12] **A.** Yes, I did.
[13] **Q.** Take a look at the second paragraph and the last half of
[14] it, it says: We are hopeful that BMI will prevail in the rate
[15] proceeding and that we will be awarded license fees on a per
[16] location basis the same license fee basis that the other
[17] players, that is, Muzak, Music Choice, Play Network, etc., are
[18] paying which is three times the rate that DMX is currently
[19] paying on an interim basis.
[20] Do you see that?
[21] **A.** I do.
[22] **Q.** And is that what -- that's a reference to what you just
[23] told us before as to your thinking as to justifying the
[24] proposal you made to Universal, right?
[25] **A.** That's correct.

Page 573

[1] **Q.** And then in the next paragraph you write in the last
[2] sentence of the next paragraph, quote: If BMI prevails in the
[3] rate court proceeding and any appeal, it is likely that the
[4] Universal earnings will be more than triple and the expected
[5] return on the guarantee, when all retroactive periods are
[6] applied, would be in the 75 to 100 percent range.
[7] Do you see that?
[8] **A.** I do see that.
[9] **Q.** Can you explain why you wrote that?
[10] **A.** I wrote that because that's what I believe to be the
[11] recoupment at the end of the term of the guarantee. When we
[12] enter into guarantees for board approval we are required to
[13] indicate the expected recoupment rate and that was what I
[14] believed to be the case in this particular agreement. Provided
[15] everything --
[16] **THE COURT:** Does that mean you contemplated that you
[17] would only get 75 percent of the guarantee back?
[18] **THE WITNESS:** It would be in that range.
[19] **THE COURT:** I understand that would be the bottom of
[20] the range.
[21] **THE WITNESS:** Yes, sir.
[22] **THE COURT:** That you would get back.
[23] And what would the payment be between whatever you got
[24] back and 100 percent represent as an investment?
[25] **THE WITNESS:** That would be an additional payment.

Page 574

[1] BMI would not recover that amount if there was a shortfall.
[2] **THE COURT:** I understand that. And that would be made
[3] for what business purpose?
[4] **THE WITNESS:** That would be made because Universal is
[5] our number one single biggest client and it was specific to
[6] this particular category. And, we also got an extension on
[7] this, on the Universal agreement overall.
[8] There were multiple business reasons for doing this
[9] agreement and these agreements are done not frequently but
[10] occasionally with very significant affiliates, both writers --
[11] writers, composers and publishers. One could call it a
[12] premium, if you will.
[13] **THE COURT:** All right.
[14] **BY MR. SALZMAN:**
[15] **Q.** Ms. Smith, can you explain, in greater depth, what you
[16] meant by getting an extension on the Universal agreement?
[17] **A.** Certainly.
[18] If you will look back to the first page where at the
[19] very top what we have to provide to the board is what we call
[20] the basic agreement expiration date. In this case the
[21] Universal expiration date -- now, clarify that as the point in
[22] time that Universal can remove repertoire from BMI we, in
[23] exchange or one of the things for this particular arrangement
[24] we got, or BMI got an additional 18 months on the Universal
[25] contract for licensing purposes, ergo they could not remove

Page 575

[1] repertoire as of 6/30/09 but they had to wait until 12/31/10 as
[2] a part of this agreement, if they so chose.
[3] **Q.** How did it come about that you got that extension? Was
[4] that something BMI demanded?
[5] **A.** That was negotiated between myself and Mr. Arrow but, yes,
[6] that is what we asked for.
[7] **Q.** And why was that valuable to you?
[8] **A.** That's probably the most valuable part of this agreement
[9] because we were entering into radio negotiations. Our radio
[10] agreement expired the end of 2009, there are multiple other
[11] radio -- excuse me -- multiple other license agreements in play
[12] right now and we did not want to have Universal remove any
[13] repertoire.
[14] **Q.** Did BMI come back to Universal and agree to a guarantee,
[15] initially?
[16] **A.** Initially the discussions were regarding an advance of
[17] royalties and that's how it started. We thought we had agreed
[18] to an advance but then somewhat at the last minute Mr. Arrow
[19] came back and indicated that he had re-reviewed some things on
[20] his end and that he wanted a guaranteed payment as opposed to
[21] an advance.
[22] **Q.** Looking back at it, was this an agreement that made
[23] business sense to BMI from today?
[24] **A.** Absolutely.
[25] **Q.** Take a look, if you would, at --

VOLUME 4
January 22, 2010

BROADCAST MUSIC, INC., V.
DMX,INC.,

---

Page 576

[1]      THE COURT: Let me just ask. You say the extension of
[2] the term was really the most important part of this
[3] transaction?
[4]      THE WITNESS: Yes, sir; one of the most important
[5] parts.
[6]      THE COURT: Do you mention that extension in the
[7] textual part of page 2?
[8]      THE WITNESS: I don't see it in the text here. It is
[9] and was on the first page of the agreement --
[10]      THE COURT: Please -- please adhere to my question.
[11]      THE WITNESS: I'm sorry, sir.
[12]      THE COURT: The answer to my question is?
[13]      THE WITNESS: No, it is not on the second page.
[14]      THE COURT: Thank you.
[15]      THE WITNESS: You're welcome.
[16]      (continued on next page)
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 577

[1] BY MR. SALZMAN:
[2]      Q. You told us before that you had a conversation with the
[3] board people, the board committee about this proposed
[4] guarantee, correct?
[5]      A. Correct.
[6]      Q. Did the subject come up in that conversation of how much of
[7] the $359,000 on page one, how much of that was the DMX money?
[8]      A. Yes, it did, that a portion of that money was DMX. I don't
[9] recall if we said the exact percentage or not.
[10]      Q. Now, the committee that we're referring to here is called
[11] what? The board committee.
[12]      A. The performing rights review committee.
[13]      Q. And it wasn't set up for this one transaction, was it?
[14]      A. No, it wasn't.
[15]      Q. What is its function?
[16]      A. Its function is to review any deal of a particular size.
[17] There are several different guidelines that we operate under
[18] for board approval, and this committee then reviews any
[19] agreement of a great magnitude and then represents to the full
[20] board of directors either to approve or not approve those
[21] agreements.
[22]      Q. When you refer to a deal, what are you referring to?
[23]      A. Advances or guarantees.
[24]      Q. This was not the first guarantee BMI ever made?
[25]      A. No, sir.

---

Page 578

[1]      Q. Is that a regular feature of the performing rights
[2] business?
[3]      A. I wouldn't say that it's regular, but it does happen often.
[4]      Q. Take a look, please, at tab 2 in the book. It's RX32. Can
[5] you identify it?
[6]      A. Yes. It's the contract that Songs of Universal signed with
[7] BMI.
[8]      Q. Let me turn your attention to paragraph 2, and the first
[9] unlettered subparagraph under paragraph 2. Do you see that?
[10]      A. I'm sorry, say that again, please?
[11]      Q. Sure. Do you see paragraph 2?
[12]      A. Yes.
[13]      Q. After that paragraph, there's another paragraph that starts
[14] "in the event that"?
[15]      A. Yes.
[16]      Q. First, can you read that aloud?
[17]      A. "In the event that you or your own and/or administrated
[18] companies license directly to DMX any performances of the works
[19] or if by reason of any action or inaction on your part any
[20] licensing of such performances takes place other than by BMI--"
[21]      Q. And then there's an A and a B?
[22]      A. Yes.
[23]      Q. Do those provisions as you understand it prevent --
[24] withdrawn.
[25]      Does anything in this agreement prevent Universal from

---

Page 579

[1] direct licensing to DMX?
[2]      A. No, nothing in this agreement prevents them at all from
[3] licensing anything directly to DMX.
[4]      Q. And paragraph 2 provides what would happen in that event?
[5]      A. Correct.
[6]      Q. And what is your understanding of that?
[7]      A. My understanding is that at any point in time Universal
[8] could decide to issue a direct license to DMX on behalf its
[9] companies provided they notify BMI, and then there's a
[10] qualifier paragraph that suggests either the return of money
[11] already received or non-payment of any future installments on
[12] the guarantee.
[13]      Q. Take a look at tab 3 in your book. This is a demonstrative
[14] that has already been seen by the Court, I think in perhaps
[15] Mr. O'Neill's testimony. It's entitled, "Additional Costs of
[16] AFBL Licensing and Performing Rights Departments." Do you see
[17] that?
[18]      A. Yes.
[19]      Q. And you are in charge of the performing rights department,
[20] right?
[21]      A. Correct.
[22]      Q. I'd like to just take you through the portions of this that
[23] relate to your department. First, let's go the second
[24] horizontal band; resolve direct license issues with affiliates
[25] and DMX, and then the name Smith is there along with others and

---



Page 580

[1] other people in your department, right?
[2] **A.** That's right.
[3] **Q.** Which of the people in your department are listed here?
[4] **A.** Totora and Hunky, in addition to myself.
[5] **Q.** What did you understand this task to be?
[6] **A.** This task involved reviewing direct licenses where they are
[7] either missing information, we cannot determine by the name of
[8] the company on the direct license if it's a BMI affiliate or
[9] not. If there's no signature or an unauthorized signature,
[10] there are multiple reasons why we would have to review if that
[11] agreement did not have every single component to move in
[12] quickly to our system.
[13] **Q.** And so far, under the interim license and the direct
[14] license tendered so far by DMX, have you had occasion to get
[15] involved in ascertaining a piece of information in order to
[16] resolve a direct license issue with an affiliate?
[17] **A.** Yes, I have.
[18] **Q.** Okay. Could you tell us what that was?
[19] **A.** Disney would be one of them, for example. The direct
[20] license said Disney. Disney has multiple catalogs. I had to
[21] contact Julie Enzer at Disney to ask her which catalogs those
[22] covered; was it Disney ABC, just Disney cable or was it all of
[23] her companies and what were they that she intended the direct
[24] license to be.
[25]     Ms. Blue also, I had to contact her because the name

Page 581

[1] on the direct license was Helene Blue Musique, Ltd. and that
[2] name is an ASCAP company name and her BMI company name is Blue
[3] Parasol Music. The contract was not drawn in the name of Blue
[4] Parasol who BMI has a contract with, so I had to contact
[5] Ms. Blue in that example and ask her if her intention was to
[6] direct license both her BMI and her ASCAP catalogs.
[7] **Q.** Now, let's take a look at the third horizontal band.
[8] Resolve disputes regarding credits with DMX and MRI. Do you
[9] see that?
[10] **A.** Yes, I see that.
[11] **Q.** And you and your colleagues in your department, Totora and
[12] Hunky, those people are listed without hours, hourly rate or
[13] total. What's your understanding of that?
[14] **A.** We are there basically on call to discuss any disputes, the
[15] disputes being if shares come in from MRI that differ or claims
[16] of carveouts that are different from what we have in our
[17] database. If you have three songwriters on a song and the MRI
[18] report says a third a third a third, a presumption of equal
[19] shares, then it might not match our database.
[20] **Q.** Do you have an example of that?
[21] **A.** I have not personally seen an example, but I've been told
[22] there are.
[23] **Q.** So if I understand your testimony, you're saying that it
[24] may arise that MRI on behalf of DMX supplies data assuming or
[25] asserting that there are three writers, each of whom owns

Page 582

[1] one-third of the song, whereas the BMI database might show one
[2] writer has 50 percent and the others have one quarter each?
[3] **A.** Yes.
[4] **Q.** That's an example.
[5] **A.** That's an example.
[6] **Q.** BMI is not seeking reimbursement for that on this page,
[7] right?
[8] **A.** No, we're not.
[9] **Q.** You're also listed along with Totora and Hunky in the next
[10] horizontal band, AFBL project team meeting, right?
[11] **A.** Yes, we are.
[12] **Q.** And then there's another band here called royalty inquiries
[13] with affiliates and foreign societies. What is that about?
[14] **A.** That's part of what our department does is handle any
[15] inquiries that come in from songwriters, publishers, about
[16] their royalties, and if someone called and asked about their
[17] royalties they'd be calling our department.
[18] **Q.** Changing subjects --
[19]     **THE COURT:** Before you change the subject, these are
[20] not annual costs, correct? They're substantially the fixed
[21] costs of setting up the system.
[22]     **THE WITNESS:** I didn't -- I'm sorry, I didn't prepare
[23] this document as to all the other --I'm not sure, your Honor,
[24] I'm sorry. I believe they are.
[25]     **THE COURT:** I could see that some costs might continue

Page 583

[1] to be incurred. Disputes might continue to arise, but for the
[2] most part are these annual costs or one-time costs?
[3]     **THE WITNESS:** That's my understanding that these
[4] are --
[5]     **THE COURT:** You don't know.
[6]     **THE WITNESS:** I don't know, sir. Sorry.
[7]     **THE COURT:** All right.
[8] **Q.** Now, let's just speak briefly about foreign works. How do
[9] foreign works come into the BMI repertoire?
[10] **A.** A member of a foreign society would write a song, then
[11] typically that songwriter would assign it to a foreign
[12] publisher, and then the foreign publisher would get what's
[13] called a U.S. subpublisher and bring that work into the BMI
[14] repertoire through the U.S. subpublisher.
[15] **Q.** BMI is asking for a ruling in this case under the carveout
[16] license or AFBL license that as to a foreign direct license the
[17] presumption would be that only the publisher's share, not the
[18] writer's share, was conveyed, unless the license, the licensee,
[19] DMX, came forward with some evidence that the writer's share
[20] was also intended to be directly licensed. What's your
[21] understanding of the difference between foreign and domestic
[22] works that would warrant that rule?
[23] **A.** In every territory the foreign societies have different
[24] rules with their members and different rights are conveyed.
[25] It's my understanding that the U.S. subpublisher most likely

Page 584

[1] does not have the rights to grant on behalf of the foreign
[2] writer, but then again, he might.
[3] **Q.** Just before ending, take a look again at the tab 3, the
[4] spreadsheet. Is it your understanding that under the carveout
[5] license DMX would be free to enter into new direct licenses all
[6] during the course of the agreement?
[7] **A.** Yes.
[8] **Q.** And if tomorrow or next week or next year you were
[9] presented, you and BMI were presented with a new direct
[10] license, would you have to do the work of making sure, like
[11] with Helene Blue, that the name was intended and other
[12] verification of a license as it came in?
[13] **A.** Yes. As this license has taken effect, all of this is
[14] ongoing activity with new licenses that come in.
[15] **Q.** And it's your understanding that under the carveout
[16] license, old licenses, direct licenses could expire, new
[17] licenses could be entered into all during the course of the
[18] agreement?
[19] **A.** Certainly.
[20]         **MR. SALZMAN:** I have no further questions.
[21]         **THE COURT:** Thank you, Mr. Salzman. Mr. Rich?
[22] **CROSS-EXAMINATION**
[23] **BY MR. RICH:**
[24] **Q.** Good afternoon.
[25] **A.** Hi.

Page 585

[1] **Q.** You earlier in your direct examination you cited some of
[2] the more prominent BMI writers, is that correct?
[3] **A.** Yes, sir.
[4] **Q.** Am I correct that one of the signal events in the industry
[5] for awarding achievement and prominent achievement by
[6] songwriters and composers is the Grammy Awards?
[7] **A.** That's correct, yes.
[8] **Q.** Big event, right?
[9] **A.** Big event. Next week, actually.
[10] **Q.** Am I correct that of the five 2010 Grammy songs of the
[11] year's nominees, three are BMI affiliates?
[12] **A.** I'm sorry, Mr. Rich. I haven't looked at that list in
[13] detail. I wouldn't recall the number of them.
[14] **Q.** If I would to identify Taylor Swift, Kings of Leon and Lady
[15] GaGa, would that ring some bells with you?
[16] **A.** Yes, it does, and they are.
[17] **Q.** Is it also correct that the following BMI writers are
[18] Songwriter Hall of Fame inductees? Is that a big deal, too?
[19] **A.** Yes, it is.
[20] **Q.** Mack Davis?
[21] **A.** Yes.
[22] **Q.** John Lennon?
[23] **A.** Yes.
[24] **Q.** Paul McCartney?
[25] **A.** Paul McCartney has some catalog with ASCAP and some with

Page 586

[1] BMI.
[2] **Q.** I was only asking if they're in the Songwriters Hall of
[3] Fame, to your knowledge.
[4] **A.** I believe he is, yes.
[5] **Q.** And Roy Orbison?
[6] **A.** Yes.
[7] **Q.** John Lennon and Paul McCartney are associated with a group
[8] known as the Beatles?
[9] **A.** The Beatles, yes.
[10] **Q.** Now, BMI honors its most celebrated and successful writers,
[11] doesn't it?
[12] **A.** Yes.
[13] **Q.** Certain awards each year?
[14] **A.** Yes.
[15] **Q.** Those include something called the BMI Country Awards?
[16] **A.** Yes.
[17] **Q.** Am I correct that the same Taylor Swift won BMI's 2009
[18] country song of the year award for a song called "Love Story"?
[19] **A.** Yes, that's correct.
[20] **Q.** And that that same song topped Billboard's not only country
[21] but pop and so-called adult contemporary charts?
[22] **A.** That was a crossover song.
[23] **Q.** Huge, correct?
[24] **A.** Huge.
[25] **Q.** Am I also correct that Sony/ATV Publishing Nashville won

Page 587

[1] country music's publisher title for the last eight consecutive
[2] years?
[3] **A.** I believe they have. Sony has won it many years. Eight
[4] consecutive I can't tell you for sure, but I believe yes.
[5] **Q.** Is it also right that a songwriter named Jeffrey Steele,
[6] S-t-e-e-l-e, was winner of BMI's 2007 Country Songwriter of the
[7] Year? Sound right?
[8] **A.** Sounds right.
[9] **Q.** And that Kenny so-called BabyFace Edmonds -- sounds more
[10] like a movie figure -- is a seven time BMI winner?
[11] **A.** That's true.
[12] **Q.** Sheryl Crow, popular 1996 BMI songwriter of the year?
[13] **A.** Sounds right.
[14] **Q.** Is it correct that works of all of these foregoing
[15] songwriters are directly licensed by DMX, to your knowledge?
[16] **A.** I'm sorry, could you repeat that?
[17] **Q.** Is it correct that works of all of the foregoing
[18] songwriters and publishers and performers I've identified are
[19] among the works directly licensed by DMX?
[20] **A.** I would suspect Taylor is a Sony writer and some of the
[21] names you mentioned, Jeff Steele I've seen on the direct
[22] license list, but really off the top of my head you mentioned a
[23] lot of writers. I just can't say one by one if they're
[24] all directly licensed.
[25] **Q.** Okay. And of course the Sony/ATV catalog to your knowledge



[1] is directly licensed?

[2] **A.** Yes, sir.

[3] **Q.** Now, you also testified in response to some questions

[4] Mr. Salzman put to you about how BMI distributes royalties,

[5] yes?

[6] **A.** Yes.

[7] **Q.** I want to explore a few of those areas further with you,

[8] please?

[9] **A.** Okay.

[10] **Q.** With respect to the royalties BMI distributes on account of

[11] the performance of any given musical work, BMI's rules provide

[12] for at least, at least equal treatment to be given to the

[13] composers of that work in relation to the music publishers

[14] associated with that work, is that correct?

[15] **A.** Under the regular royalty distribution methodology, that is

[16] correct.

[17] **Q.** Yes, and let's mark, please, I'm going to show the witness,

[18] pardon me, a document that's already in evidence as JX 1266.

[19] Now, the document I put in front of you is titled BMI royalty

[20] information and in smaller print towards the bottom it says,

[21] "Important: The information in this brochure current as of

[22] October 15, 2009 is revised and updated frequently."

[23]     Do you see that?

[24] **A.** Yes, I do.

[25] **Q.** Now, this was produced to us as the most recent version of

[1] such a document. To your knowledge, is that correct?

[2] **A.** There may have been some language changes or edits, but to

[3] any change in royalty structures, this is the most current, to

[4] my knowledge.

[5] **Q.** Would you turn to page 4 of this document, please? And

[6] before we do that, let me just ask you, to whom is this booklet

[7] distributed in the normal course?

[8] **A.** This booklet is made available to people who want to join

[9] BMI either in hard copy, if they ask for a paper application,

[10] it's part of the packet. It's made available also on line.

[11] **Q.** And on line, I believe, am I correct, that its purpose is

[12] stated as to provide prospective BMI affiliates with, quote,

[13] "the information they want to know about the method by which

[14] their BMI royalties are calculated and distributed"? Sound

[15] right?

[16] **A.** That sounds right.

[17] **Q.** Now, let's come back to page 4, please. I take it that

[18] with respect to making a decision as to distributing money on

[19] any particular work, each work is given a unit value, is that

[20] correct, according to page 4?

[21] **A.** That's correct.

[22] **Q.** And that unit value for purposes of computation is given a

[23] value of 200 percent, according to this?

[24] **A.** That's right. 100 percent writer share and 100 percent

[25] publisher share.

[1] **Q.** Okay. So that in the usual situation, is it correct,

[2] Ms. Smith, that where the composer and publisher have not

[3] otherwise agreed to any different arrangement, BMI will

[4] distribute one-half or 100 percent of the 200 percent unit

[5] value to the composer and the remaining 100 percent to the

[6] music publisher?

[7] **A.** Yes, sir.

[8] **Q.** Okay. Now, there are circumstances where the composer will

[9] be entitled to receive more than one-half of that total unit

[10] value, correct?

[11] **A.** Correct.

[12] **Q.** So that if, for example, the composer and the music

[13] publisher between themselves say, hey, I'm going to make this a

[14] 60/40 arrangement, then BMI will honor that, is that correct

[15] with appropriate documentation?

[16] **A.** Yes, sir, that's correct.

[17] **Q.** But the reverse is not true, is it?

[18] **A.** Not in typical situations.

[19] **Q.** Well, let me just see what this says. This says on the

[20] first little bullet on page 4, it says the total publisher's

[21] shares may not exceed 100 percent. Is that accurate?

[22] **A.** Yes, sir, that's accurate.

[23] **Q.** And so if by contract a composer and music publisher were

[24] to say, well, I the music publisher am going to take 75 percent

[25] of the BMI performing royalties, and you the composer will keep

[1] 25 percent, and they were to hand you that document, you,

[2] meaning BMI, BMI would say you can do what you want privately,

[3] but we are going to distribute not less than 100 percent of the

[4] 200 percent unit value to that composer. Is that essentially

[5] correct?

[6] **A.** That's essentially correct in the regular royalty

[7] calculations.

[8] **Q.** Okay. Do you have a lot of irregular royalty calculations?

[9] **A.** There are not irregular royalty calculations. There are

[10] agreements that BMI has that fall outside of this with certain

[11] composers and publishers.

[12] **Q.** And do you have such a uniform set of understandings with

[13] Universal Music Publishing?

[14] **A.** I'm sorry, I don't know what you mean by --

[15] **Q.** Do you have a Universal set of irregular understandings in

[16] addition to your regular rules with respect to distributions of

[17] works represented by composers who are affiliated with

[18] Universal?

[19] **A.** Some composers, yes, who are affiliated with Universal.

[20] **Q.** Do you have a uniform set of understandings with respect to

[21] all Universal publishing works represented by BMI to deviate

[22] from this practice?

[23] **A.** I'm sorry, Mr. Rich, I'm still not understanding what you

[24] mean by uniform set of --

[25] **Q.** With respect to any given Universal Music Publishing work

[1] which is performed, let's say by a commercial music service,
[2] all right? Is there a standing understanding that this set of
[3] rules on page 4 is to be deviated from?
[4]  A. There's an agreement that BMI has with Universal for
[5] prepayment of royalties under what we looked at earlier, and
[6] then royalty calculations are done under these rules towards
[7] the recoupment of that money.
[8]  Q. When you say what you looked at earlier, you're talking
[9] about that guarantee arrangement?
[10]  A. Yes, sir.
[11]  Q. And pre-existing that guarantee arrangement, what set of
[12] understandings were there, if any, that were designed to
[13] deviate from the standing rules, the regular rules as you term
[14] them on page 4, with Universal?
[15]  A. There were not any, to my knowledge.
[16]  Q. We'll come back to that guarantee in some length. Why is
[17] it, by the way, that the standing and regular rule is that
[18] composers won't receive less than 50 percent of a total
[19] distribution as to the given work?
[20]  A. That's just the way that it has been historically. A lot
[21] of times, well, not a lot, but sometimes there have been
[22] publishers under work for hire arrangements who have asked to
[23] have the writer's share, and this was pretty much designed to
[24] have the writer's share stay the writer's share and the
[25] publisher's share stay the publisher's share.

[1]  Q. A little bit of extra protection for the writers?
[2]  A. Yes.
[3]  THE COURT: Excuse me, Mr. Rich, for a minute. I'm
[4] trying to be clear about some of your prior answers about
[5] Universal and I'm afraid I may have it wrong. Were you saying
[6] that with respect to Universal occasionally Universal gets a
[7] little piece of the proceeds first and then the balance is
[8] distributed in accordance with these rules 100 percent to each
[9] of the publisher and the author of the 200 percent remaining?
[10]  THE WITNESS: They may get -- in this case they've
[11] gotten an advance payment.
[12]  THE COURT: They, Universal?
[13]  THE WITNESS: Yes, sir, Universal in advance of the
[14] actual computation of the calculation of the royalty.
[15]  THE COURT: And what they do with that, you don't care
[16] whether they divide it and give it to the author or whether
[17] they keep it?
[18]  THE WITNESS: No, sir.
[19]  THE COURT: No, you don't care?
[20]  THE WITNESS: I don't know what they -- if they divide
[21] any of that with the authors.
[22]  THE COURT: Okay. And then the balance you distribute
[23] according to these rules.
[24]  THE WITNESS: Well, it's all distributed --
[25]  THE COURT: What is not distributed by the advance?

[1]  THE WITNESS: We distribute the advance and then all
[2] the royalties are calculated after the performances are
[3] tabulated. Those royalties then go against the recovery of the
[4] advance money. It's not paid out to Universal. They've
[5] already received their money, and then that's when we get into
[6] the projected recoupment rate. And, let's say, we paid the
[7] 600,000 to Universal in advance of these royalty distributions
[8] being tabulated and through the normal course they earned
[9] 500,000, then the gap would be what they would keep. Or if
[10] they earned 650,000 through the regular processing, they would
[11] get the additional 50,000 in publisher share in cash. The
[12] writers are continuously getting their own royalties in that
[13] 500,000, they would have gotten 500,000 as well, or 650.
[14]  THE COURT: I see.
[15]  BY MR. RICH:
[16]  Q. Let me just explore that slightly to complete the record.
[17] Let's take the first year of the Universal guarantee, that's
[18] $600,000, correct?
[19]  A. Correct.
[20]  Q. Just so there's no ambiguity in the record, that $600,000
[21] is recoupable solely with respect to earnings otherwise
[22] attributable to Universal Music on account of DMX's commercial
[23] music performances during that calendar year, correct?
[24]  A. Yes, that is correct.
[25]  Q. So that if there is a performance by Muzak or by TruSonic

[1] or by any of the other 164 by last count commercial music
[2] services, that doesn't credit against that guarantee, correct?
[3]  A. No, sir, it doesn't.
[4]  Q. Only DMX performances, right?
[5]  A. That's right.
[6]  Q. And that's money going only to Universal as its publisher
[7] share, is that correct?
[8]  A. That's correct.
[9]  Q. So that if, hypothetically, in 2008, the total dollars
[10] attributable to DMX in terms of payments made by DMX less your
[11] overhead expense allocation, whether it's 17 percent or 20
[12] percent or whatever it might be, whatever is left, let's say
[13] that for 2008 that total sum of money was $750,000 -- I'm just
[14] hypothesizing that sum.
[15]  A. I hope it is.
[16]  Q. Am I correct that under your rules, one-half of that amount
[17] would be allocable to Universal of the 750,000 and the other
[18] half of the total royalty stream that you will have received,
[19] my hypothetical 750, would be attributable and payable to the
[20] composers, correct?
[21]  A. Are you suggesting that 750,000 would be the full year fee?
[22]  Q. In my example. If that were the case, the full year
[23] payment for DMX --
[24]  A. From DMX --
[25]  Q. From DMX to BMI.



Page 596

[1] **A.** Less the admin fee.

[2] **Q.** That's right.

[3] **A.** That would go against the performances, the 750 would be
[4] applied against all the performances and divided amongst all
[5] the writers and publishers.

[6] **Q.** And am I correct it would be divided according to the rules
[7] on page 4 of this booklet?

[8] **A.** That's correct.

[9] **Q.** So you have no separate understanding with Universal that,
[10] for example, as long as its guarantee is outstanding they'll
[11] get three out of four of every distributable dollar or anything
[12] like that, correct?

[13] **A.** Correct.

[14] **Q.** The normal distribution rules apply to Universal like
[15] everybody else when it comes to dividing up royalties, correct?

[16] **A.** Correct.

[17] **Q.** So in my hypothetical, if there were $375,000 available to
[18] offset the $600,000 guarantee -- are you with me?

[19] **A.** I'm with you.

[20] **Q.** Then Universal gets to keep the difference, does it not?

[21] **A.** Yes, sir.

[22] **Q.** But do Universal's composers see that difference in that
[23] year from BMI?

[24] **A.** Not from BMI.

[25] **Q.** And you have no idea if they'll see any or all of it from

Page 597

[1] Universal, correct?

[2] **A.** No, sir, I do not.

[3] **Q.** And that's a matter of no consequence to BMI, is it not?

[4] **A.** No, sir. Advances and guarantees are part of the business
[5] as we operate on a daily basis.

[6] **Q.** And does BMI have a practice of advising its affiliates
[7] that in that kind of circumstance, notwithstanding the what you
[8] term regular rules on page 4, in practice there could be quite
[9] a disparity in any given year between the dollars payable on
[10] account of distribution, say, of performances by a client such
[11] as ours on the one hand to a music publishing company which has
[12] a nice guarantee and on the other hand to a composer member of
[13] BMI which doesn't?

[14] **MR. SALZMAN:** Objection. I couldn't follow the
[15] question.

[16] **THE COURT:** I think as to form it's a little beyond
[17] the rules of complexity normally.

[18] **MR. RICH:** I apologize, your Honor. I'll rephrase it.

[19] **Q.** Does BMI advise composers that consistent with its regular
[20] rules -- strike that.

[21] Does BMI -- where in this booklet, if anywhere, does
[22] BMI have a section saying these rules may not apply in
[23] circumstances in which we decide to guarantee significant
[24] dollars to a major publishing affiliate? Is there anything in
[25] this booklet where we would find a discussion of that?

Page 598

[1] **A.** I would have to read back through here, but advances and
[2] guarantees for writers, composers and publishers are
[3] commonplace and common knowledge in the business, Mr. Rich.
[4] Whether it's printed here or not.

[5] **Q.** If I searched the website as a prospective BMI affiliate,
[6] would I find it?

[7] **A.** I don't believe so, no.

[8] **Q.** If I searched this booklet, you know it pretty well, I
[9] assume, would I find it?

[10] **MR. SALZMAN:** Objection.

[11] **A.** No, sir, I don't believe you would, but I would have to
[12] reread it. It says things like from time to time BMI can make
[13] decisions. I just would have to read it, I'm sorry. I don't
[14] know it verbatim.

[15] **Q.** In fact, in fact, as matters now stand do you know whether
[16] the 2008 guarantee to Universal was earned out by royalties
[17] distributed on account of DMX performances for 2008?

[18] **A.** I do not believe that it was because we are still in this
[19] proceeding and that guarantee will not close out until this
[20] closes out and all retroactive payments are applied.

[21] **THE COURT:** Ms. Smith, excuse me. For whose benefit
[22] was the guarantee arrangement with Universal entered into;
[23] BMI's or the authors and publishers?

[24] **THE WITNESS:** I believe it was both.

[25] **THE COURT:** I think I understand how it, at least in

Page 599

[1] part how it benefited BMI. How did it benefit the authors and
[2] publishers?

[3] **THE WITNESS:** Well, because Universal typically is not
[4] in the business of performing rights and they had a concern
[5] about tracking all of the performances, about paying out the
[6] royalties properly to their writers and composers that they
[7] represented because they rely on the societies to do that. So
[8] I think there was some concern there, and I believe that is a
[9] benefit for the writers and the publishers -- excuse me, the
[10] writers and composers.

[11] **THE COURT:** And that's one of the reasons why they
[12] didn't want to get into direct licensing?

[13] **THE WITNESS:** Yes, sir. That's what they told me.

[14] **Q.** And did you understand that they were otherwise compelled
[15] to enter into a direct license with DMX if BMI didn't offer
[16] them what Mr. Arrow, who was the person you negotiated with,
[17] has called an extraordinary guarantee? Do you feel they were
[18] compelled to do this? Is that your understanding?

[19] **A.** Mr. Arrow asked us to enter into this agreement and if we
[20] didn't match the offer, he indicated to me that they were going
[21] to direct license.

[22] **Q.** And you felt it was your role to protect the unsuspecting
[23] songwriter affiliates of Universal from a fate worse than death
[24] by entering into such a direct license?

[25] **MR. SALZMAN:** Objection.

Page 600

[1]    THE COURT: Sustained.

[2]    Q. You felt it was an appropriate role for BMI to discourage
[3]  Universal and its affiliated songwriters and composers from
[4]  entering into that arrangement, as you appeared to testify a
[5]  minute ago in response to his Honor's question, because it
[6]  could lead to lots of uncertainties of administration, among
[7]  other things?

[8]    A. I didn't say I discouraged in any way Universal from doing
[9]  that. I said they told me they had a concern about doing
[10]  certain things. Certainly they have a concern about money
[11]  also.

[12]   Q. Let's move on.

[13]      Now, I take it you're familiar with two basic methods
[14]  by which DMX distributes its programming, is that correct?

[15]   A. Yes, sir.

[16]   Q. You heard of the concept of off-premise and on-premise?

[17]   A. I have.

[18]   Q. Now, in paying out royalties with respect to performances
[19]  of BMI musical works, does BMI value a performance occurring
[20]  via one of these distribution techniques more highly than the
[21]  other?

[22]   A. Not to my knowledge, no.

[23]   Q. So the same performance, a given performance being
[24]  transmitted by on-premise is valued for distribution purposes
[25]  by BMI in the same manner as a transmission of a given

Page 601

[1]  performance off-premise, is that correct?

[2]    A. It may not have the same rate at the end of the day if
[3]  there were fewer performances or whatever, but a performance is
[4]  a performance is a performance.

[5]    Q. And does the time of day at which a work is performed,
[6]  staying with the DMX operation now, affect the amount of the
[7]  royalty that's ascribed to that performance?

[8]    A. Not on background music services.

[9]    Q. And does the nature of the customer location, whether it's
[10]  a retail establishment or an office or a bar or a restaurant,
[11]  does the nature of that location at which the performance is
[12]  being made affect the amount of the royalty?

[13]   A. No.

[14]   Q. And to the extent a DMX customer deploys different players
[15]  in different areas of its establishment, enabling it to perform
[16]  different musical works simultaneously, what's sometimes called
[17]  zoning, does this affect the royalties payable with respect to
[18]  any of the works that are performed?

[19]   A. Not to my knowledge.

[20]   Q. Now, for the period January 1, 2005 through June of 2007, I
[21]  believe you testified at your deposition for purposes of
[22]  distribution of royalties BMI pooled the fees collected from
[23]  all commercial services, including DMX and Muzak, with the
[24]  exception of Play Network, is that right, up until June of
[25]  2007?

Page 602

[1]    A. Yes, that's correct.

[2]    Q. And up until the fourth quarter of 2006, I believe you've
[3]  previously testified, in aid of such distributions BMI
[4]  collected data with respect to DMX's off-premise services
[5]  limited to music use on six of its approximately 90 off-premise
[6]  channels, is that also correct?

[7]    A. That was my understanding from the people in our operations
[8]  department that received that information.

[9]    Q. Right, and that's consistent I think you saw with some
[10]  interrogatory answers that were submitted by your counsel in
[11]  this proceeding?

[12]   A. Yes, sir.

[13]   Q. Thank you. Now, during this period, that is, up until that
[14]  fourth quarter when that practice changed, to your knowledge,
[15]  did BMI receive any complaints from any of its affiliates
[16]  asserting the unfairness or lack of representativeness of the
[17]  survey and distribution methodology by which they were being
[18]  paid for services, on services like DMX?

[19]   A. I didn't get any complaints about our method of
[20]  distribution. I got complaints about comparisons with ASCAP
[21]  sometimes because ASCAP was paying more than we were.

[22]   Q. Different issue?

[23]   A. Right.

[24]   Q. I take it that effective July of 2007 BMI modified its
[25]  pooling arrangement with respect to most commercial music

Page 603

[1]  service providers, is that right?

[2]    A. That's correct.

[3]    Q. And am I correct that for performances reported for that
[4]  time period forward, royalties are calculated separately for
[5]  each of DMX, Muzak and certain other commercial music services
[6]  that using performance data provided BMI from each service and
[7]  also combining that with the actual license fees that are
[8]  payable by those services, is that correct?

[9]    A. Yes, that's correct.

[10]   Q. The so-called follow-the-dollar technique?

[11]   A. Yes, sir.

[12]   Q. And am I correct that that change was instituted
[13]  principally in response to DMX's direct license initiative?

[14]   A. I don't think it was in response to that. As we would get
[15]  information from more and more of the networks, Play Network
[16]  you mentioned earlier, we would move towards dividing out those
[17]  royalty pools.

[18]   Q. Do you recall testifying at your deposition to a
[19]  recollection that at least a significant driver of this change
[20]  was the confusion which had been experienced by a number of
[21]  publishers in their ability to evaluate the economics of DMX's
[22]  direct license proposal under the old reporting system?

[23]   A. Yes. I remember saying that, and there was a little bit of
[24]  confusion as to what was on those lines.

[25]   Q. And so a contributing factor to this change in distribution

Page 604

[1] practice was the confusion occasioned by these publishers'
[2] interest in really understanding the amounts of distributions
[3] that were actually attributable to DMX as opposed to a result
[4] of this pooled distribution process, true?
[5] **A.** Well, there were only a handful that asked us about that,
[6] but yes.
[7] **Q.** But it was a factor --
[8] **A.** It was a factor.
[9] **Q.** As you earlier acknowledged, in making the change?
[10] **A.** Yes.
[11] **Q.** By the way, what is the typical lag time between when BMI
[12] receives royalties, say, for use of BMI music on a commercial
[13] music service and when it pays out those royalties? How many
[14] months are we talking about typically?
[15] **A.** In a typical royalty scenario, it's approximately seven to
[16] nine months following the actual date of the performance.
[17]     **MR. RICH:** Your Honor, I'm about to move back into the
[18] direct licensing segment. I can either proceed for fifteen
[19] minutes or so or we can break for lunch.
[20]     **THE COURT:** Let's go ahead. I think I mentioned that
[21] I might have another conflict. It went away, but I still have
[22] to honor the conference at 4:00 this afternoon, so we'll stop
[23] then.
[24]     **MR. RICH:** Thank you.
[25] **Q.** Ms. Smith, you responded to a number of questions from your

Page 605

[1] counsel on direct about your awareness of the DMX direct
[2] license initiative and certain conversations you had and I'd
[3] like to explore that a little more with you if I may.
[4] **A.** Sure.
[5] **Q.** Beginning in the summer of 2006, you personally had a
[6] series of conversations with representatives of the major music
[7] publishing companies whom we've identified already concerning
[8] DMX's direct license initiative, is that correct?
[9] **A.** Yes, that's correct.
[10] **Q.** And in these conversations, representatives of the music
[11] publishers inquired as to where BMI stood in its license
[12] relationship with DMX, correct?
[13] **A.** Yes, sir.
[14] **Q.** And you advised them, I take it, that DMX was paying
[15] interim fees that BMI regarded to be inadequate, right?
[16] **A.** Yes. Too low.
[17] **Q.** And that BMI was seeking, whether by agreement or potential
[18] future rate court litigation fees at least three times higher
[19] than DMX was then paying, is that correct?
[20] **A.** At least three times higher, if not more than that, yes.
[21] **Q.** Yes. And at this time, what was your understanding of the
[22] prevailing commercial music service fee structure that BMI had
[23] attained in the industry and was operating under?
[24] **A.** It was my understanding that they were blanket fees for
[25] 36.36.

Page 606

[1] **Q.** And were you aware, at least in terms of BMI's view of the
[2] 36.36, whether BMI had then entered into agreements that it
[3] believed were intended to yield 46.46 or 56.56, or 66.66 or
[4] something of that order of magnitude?
[5] **A.** In the discussions about the higher fees as far as I was
[6] concerned and involved in had to do with the new rate and
[7] license type that we had not dealt with before, the AFBL?
[8] **Q.** And when to your knowledge did BMI engage in discussions
[9] with DMX concerning this so-called AFBL?
[10] **A.** I'm sorry, Mr. Rich, I'm not involved in the licensing side
[11] of it, so I can't really speak to that, when they met with them
[12] and discussed it. I'm sorry, I just can't.
[13] **Q.** And did you ever say in so many words to any of the
[14] publishers with whom you spoke, BMI is seeking a rate of 48 or
[15] $49 from DMX?
[16] **A.** We used the phrase "more than triple."
[17] **Q.** You didn't use the phrase "quadruple," right?
[18] **A.** Not that I can recall.
[19] **Q.** What was your understanding of the effective rate that DMX
[20] was paying at the time? What were you advised?
[21] **A.** The effective rate at the time before the interim --
[22] **Q.** That DMX was actually paying as an interim fee per
[23] location, did you have an understanding of that?
[24] **A.** Thirteen dollars. 12 or $13.
[25] **Q.** You were one of a group engaged along with Mr. Bryant,

Page 607

[1] Mr. Cody, Mr. O'Neill and Mr. Berenson, among others, in
[2] determining how to respond to several of the majors' requests
[3] of BMI to consider some form of a match to the offers they were
[4] receiving from DMX, is that correct?
[5] **A.** Yes. We had internal discussions.
[6] **Q.** And you were personally asked by the senior management team
[7] to perform some financial analyses in connection with those,
[8] correct?
[9] **A.** I was asked to have my staff perform those analysis.
[10] **Q.** You managed that end of the process, correct?
[11] **A.** Correct.
[12] **Q.** And out of that process -- I'm not going to belabor what
[13] the record has already established -- emerged, among other
[14] data, data indicating that the DMX line, in fact reflected,
[15] some 27 percent of that line in fact reflected distributions to
[16] DMX as opposed to a larger group of commercial service
[17] providers, correct?
[18] **A.** The 27 percent was determined to be the attributable DMX
[19] portion of those royalty lines, yes.
[20] **Q.** And with respect to Sony, I take it that following some
[21] back and forth, which, again, I'm not going to dwell on again,
[22] BMI declined to match what it understood to be DMX's offer, is
[23] that correct?
[24] **A.** That's correct.
[25] **Q.** And Sony thereafter in or around November of 2007 executed

Page 608

[1] a direct license with DMX, correct?

[2] A. That's correct.

[3] Q. Now, following that event and staying with Sony, you and
[4] others at BMI had certain interactions with Sony
[5] representatives to deal with various administrative and
[6] implementation issues flowing from their decision to implement
[7] the direct licensing arrangement with DMX, is that true?

[8] A. That's true.

[9] Q. I take it as part of that Sony represented to BMI that it
[10] had the right to enter into and issue the various direct
[11] licenses that were in issue, correct?

[12] A. Yes, they did.

[13] Q. Okay, and that included a representation by Sony, did it
[14] not, that it had that right, both on behalf of both its own and
[15] administered companies, right?

[16] A. Correct.

[17] Q. And they also represented to BMI, did they not, that they
[18] had that right on behalf of both their domestic and foreign
[19] writers, correct?

[20] A. They did represent that, yes.

[21] Q. And BMI accepted those representations, is that correct?

[22] A. Yes, we did, for the time being.

[23] Q. Have you ceased accepting them?

[24] A. We have not ceased accepting them, no.

[25] Q. So as we sit here today, you still accept them, correct?

Page 609

[1] A. That's correct.

[2] Q. And accordingly, am I correct, that BMI stopped making its
[3] own -- well, let me back up. You testified earlier on direct
[4] on the concept of a double payment, yes?

[5] A. Yes.

[6] Q. Just so the record is clear there, I take it what BMI wants
[7] to avoid, understandably, is a publisher receiving from someone
[8] like DMX direct royalties for a given performance, but then
[9] equally collecting for that same performance through BMI,
[10] assuming this is a BMI affiliate, correct?

[11] A. Yes. You want to avoid that.

[12] Q. And your operating understanding and your agreements with
[13] your affiliates says you can't do that, correct?

[14] A. Correct.

[15] Q. You must, A, notify us, if you enter a direct license,
[16] right?

[17] A. Correct.

[18] Q. And upon notification, we will then make sure in our
[19] records that you don't get paid from BMI with respect to any
[20] performance for which you are otherwise being paid, correct?

[21] A. We will do our best, yes, to effect that.

[22] Q. Understandably, correct?

[23] A. Correct.

[24] Q. And so just to clarify a colloquy you had with his Honor on
[25] direct, because I think there may have been some

Page 610

[1] misunderstanding, his Honor asked you whether, how exclusivity
[2] of licenses fits into this. Do you recall?

[3] A. Yes, I recall the question.

[4] Q. Is it your understanding that the licenses that DMX enters
[5] into with music publishers require those music publishers only
[6] to license those rights through DMX, that it is exclusive in
[7] that sense?

[8] A. I don't know, I haven't read the contract with DMX in a
[9] while, so I don't know if it says exclusive, but the
[10] notification to BMI is that they have licensed those works in
[11] their catalog for those performances on DMX and in fact upon
[12] validation of a direct license we would then put it through the
[13] process and effect it as such.

[14] Q. So the critical issue from your perspective and BMI's is
[15] not whether a grant from a music publisher is or isn't
[16] exclusive to a third party, but rather whether in fact that
[17] third party is compensating directly the BMI affiliate for a
[18] performance for which that affiliate would otherwise look to
[19] BMI for payment, is that correct?

[20] A. Whatever agreement they have between themselves, that's
[21] what they have. But BMI would not want to pay them that same,
[22] for the same performance if there's a direct license.

[23] Q. Okay, now, coming back to Sony, did BMI in fact stop making
[24] payments to Sony and to the Sony artists associated with works
[25] which were now the subject of direct licenses with DMX?

Page 611

[1] A. Yes, we did.

[2] Q. And when you stopped that, I take it you stopped making
[3] royalty distributions with respect both to Sony's own and
[4] administered catalogs?

[5] A. That's correct.

[6] Q. As well as with respect to both domestic and foreign
[7] writers associated with those catalogs?

[8] A. That's also correct.

[9] Q. Let me ask you this: Did BMI stop paying other music
[10] publishing companies who had entered into direct license
[11] arrangements?

[12] A. We have now, yes.

[13] Q. As of when?

[14] A. As of this past quarter.

[15] Q. Can you be a little more specific?

[16] A. The January 2010 distribution.

[17] Q. And prior to that time, you had not, correct? -

[18] A. We were building a very complicated system to move through
[19] these agreements and get everything lined up in order to be
[20] able to do that and do it properly, sir.

[21] Q. Now, as of January, 2010, you are aware, there has been
[22] ongoing direct licensing for a period of time prior to that
[23] date, correct?

[24] A. That's correct.

[25] Q. Is the change with respect to these other publishers



Page 612

[1] prospective in terms of from now forward, any subsequent
[2] directly licensed works won't be also compensated for by BMI,
[3] or has BMI also backwards come back to recollect, as it were,
[4] monies which it hadn't collected back for direct performances
[5] prior to January?
[6] **MR. SALZMAN:** Objection.
[7] **THE COURT:** Excuse me?
[8] **MR. SALZMAN:** I object. It's a garbled question, I
[9] believe.
[10] **THE COURT:** It's a what?
[11] **MR. SALZMAN:** I believe the question is garbled. I
[12] don't think it makes sense.
[13] **THE COURT:** I think it's sufficiently clear. If she
[14] can't understand it, she can ask for clarification.
[15] **Q.** Do you understand the question? If not, I'll try again.
[16] **A.** I believe you asked me or I interpret it as do we plan to
[17] retroactively institute a recoupment or recovery of royalties
[18] that we paid to directly licensed publishers, is that --
[19] **Q.** No. My question is not what you may plan to do, but
[20] whether as of today BMI or as of -- as of today whether BMI has
[21] in fact recouped or sought to recoup any of the monies from the
[22] non-Sony direct licensed publishers which it has not done so to
[23] date?
[24] **A.** We have not done it to date because there are numerous, and
[25] there are numerous reasons for that.

Page 613

[1] **Q.** The answer is as of yet no, right?
[2] **A.** Correct.
[3] **MR. RICH:** Your Honor, if it's acceptable, I'd like to
[4] do the Universal segment as a segment after lunch.
[5] **THE COURT:** All right. Recess now and resume at 2. I
[6] think I usually give an hour and a quarter, so we'll resume at
[7] 2:10.
[8] **MR. MARKS:** Your Honor, there was one transcription
[9] error with respect to what your Honor said. If I may approach
[10] with counsel, if it is left uncorrected, it has an unfortunate
[11] connotation.
[12] (Discussion off the record)
[13] (Luncheon recess)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 614

[1] A F T E R N O O N   S E S S I O N
[2] 2:20 p.m.
[3] (Trial resumed)
[4] ALISON SMITH
[5] CROSS EXAMINATION (cont'd)
[6] **BY MR. RICH:**
[7] **Q.** Good afternoon.
[8] **A.** Good afternoon.
[9] **Q.** The commercial music services industry is an important one
[10] to BMI, is that correct?
[11] **A.** All our licensees are important ones, yes.
[12] **Q.** So, too, the commercial music services industry?
[13] **A.** Yes.
[14] **Q.** And if you would put back in front of you the document in
[15] evidence appearing at tab 1 of your direct examination binder
[16] and turn to the second page of that, please, which is the board
[17] memorandum? This is a document you were principally
[18] responsible for, correct?
[19] **A.** Correct.
[20] **Q.** And that you testified on direct you believed to be
[21] accurate in all respects, correct?
[22] **A.** Correct.
[23] **Q.** And if you look at the fourth paragraph of this memorandum,
[24] as stated there, quote: Assuring that BMI licenses in this
[25] market, referring to the commercial music services market, is

Page 615

[1] important.
[2] You believed that then, is that true?
[3] **A.** Yes.
[4] **Q.** And I take it that BMI management was asking its board to
[5] favorably act on the proposed guarantee to Universal at a time
[6] when, per the same memo, quote: More and more publishers are
[7] being asked by DMX to directly license.
[8] That is also correct, yes?
[9] **A.** Yes.
[10] **Q.** And at a time when, quote: At least one major publisher
[11] has entered into a direct license with DMX.
[12] Correct?
[13] **A.** Correct.
[14] **Q.** Now, Universal, in your view, is a leader in the industry,
[15] correct?
[16] **A.** Correct.
[17] **Q.** And other people look to Universal to see what they do and
[18] don't do; isn't that correct?
[19] **A.** Correct.
[20] **Q.** And, accordingly, as this memo further indicates, quote:
[21] Having the ability to license Universal's music will help
[22] solidify BMI's position not only for this negotiation but for
[23] the background music industry as a whole; is that correct?
[24] **A.** Correct.
[25] **Q.** Now, on the basis of that line of reasoning it justified,

Page 616

[1] in BMI's estimation, did it not, paying what you termed to His
[2] Honor, the premium, before lunch, that it determined to, in
[3] terms of the offer to Universal; correct?
[4] **A.** I'm not certain that there is going to be a premium,
[5] Mr. Rich, because we have not had the ability to place all the
[6] royalties against the guarantee itself. But, to give Universal
[7] a guarantee was something that we did ask the board to consider
[8] and they did approve.
[9] **Q.** I was only using a word which you yourself used to
[10] characterize in a colloquy with the Court but I will accept
[11] your characterization for the moment.
[12]   I would like to explore a little bit more some of the
[13] thinking you indicated animated and supported the economics of
[14] this proposed transaction as you reviewed with Mr. Salzman,
[15] okay?
[16] **A.** Okay.
[17] **Q.** Before lunch you testified on direct that having done the
[18] math, looking at the historic payments made by BMI to Universal
[19] and having made the adjustment for 27 percent, that you then
[20] spoke to Mr. O'Neill to understand what BMI would be asking
[21] during this rate proceeding and you said, quote: Which was, I
[22] believe, in the $48 to $49.
[23]   I'm quoting you from just brunch lunch, okay?
[24] **A.** Okay.
[25] **Q.** That was your testimony?

Page 617

[1] **A.** Yes.
[2] **Q.** In fact, you don't know if there was a rate proceeding at
[3] that time, do you?
[4] **A.** I know that there was a dispute that we were involved in
[5] and the negotiation was ongoing. At whatever particular time
[6] the rate court case was actually filed I don't know that day.
[7] **Q.** Were you shown any projections of what BMI was hoping to
[8] achieve in such a rate proceeding without revealing any
[9] attorney-client privilege communications?
[10] **A.** Not that I can recall.
[11] **Q.** Now, I would like to show you a document that's in evidence
[12] already which is RX 27.
[13]   You will see that this document is dated October 27th
[14] of 2007.
[15] **A.** Yes.
[16] **Q.** So, about barely a month before the proposal that appears
[17] at tab 2 the board memo was created, is that right? That was
[18] dated December 3rd, 2007? Am I right?
[19] **A.** That's correct.
[20] **Q.** And you have seen this before, yes?
[21] **A.** Yes, I believe I have.
[22] **Q.** And, on page 2 of this document there are some tabulations
[23] and calculations and am I correct that these relate to the work
[24] which you supervised at Mr. Bryant's request and Mr. O'Neill's
[25] request to try to determine, first with respect to Sony and

Page 618

[1] later with respect to potential other majors, whether you could
[2] match DMX' direct license offer?
[3] **A.** That's correct.
[4] **Q.** Okay.
[5]   Now, if you look down into the box on the left-hand
[6] side midway down the page below the quarterly tabulations do
[7] you see the box headed: DMX Only?
[8] **A.** The one that indicates the number 1 off to the side?
[9] **Q.** Yes, that's correct.
[10] **A.** Yes, I see that.
[11] **Q.** And it is also up on the screen if it is any easier for you
[12] to look at, okay?
[13] **A.** Oh, okay. Thank you.
[14] **Q.** And I take it what that is doing in the first part is
[15] backing out or accounting for the -- accounting for the portion
[16] of the total reporting -- I take it that what the top part of
[17] this box is doing is accounting for the fact that the full
[18] reported amounts of distributions appearing in the top half of
[19] this document, adjusting that for the fact that DMX represented
[20] only 27 percent, correct, that's doing that math there?
[21] **A.** Correct.
[22] **Q.** And that's where you get the $51,000?
[23] **A.** Yes.
[24] **Q.** And then if you would look down do you see where it says
[25] adjusted for potential rate increase?

Page 619

[1] **A.** Yes, I see that.
[2] **Q.** And, do you see the math there which says $12 per --
[3] meaning I assume per location, yes?
[4] **A.** Yes.
[5] **Q.** Adjusted to $36, correct?
[6] **A.** Correct.
[7] **Q.** Or three times, correct?
[8] **A.** Correct.
[9] **Q.** I don't see on this document, unless you can find it, a
[10] multiplication that gets you to $48 or $49. Is there one on
[11] here?
[12] **A.** No, sir. I don't see that.
[13] **Q.** So, isn't it the case, and perhaps it will refresh your
[14] recollection, that at least as of the end of October 2007 the
[15] mathematics that were being performed, the estimates that were
[16] being calculated by BMI were based on a best case assumption in
[17] a rate court case as set forth here of $36.36?
[18] **A.** I can't say that to be true. We had multiple discussions
[19] on this and Mike prepared this document. We talked about 36,
[20] we talked about 48 and somewhere in between.
[21]   That's my recollection, Mr. Rich.
[22] **Q.** Let me review, to see if it refreshes your recollection,
[23] what Mr. O'Neill had to say about this entry in this courtroom
[24] two days ago.
[25] **A.** Okay.



Page 620

[1] **Q.** Okay? I'm reading, your Honor, from page 224 of the trial
[2] transcript beginning at line 17; Mr. O'Neill says: The concept
[3] was since the line item on the royalty statement summed
[4] numerous background music providers into one number, 192,000 in
[5] this case labeled DMX, we felt that 27 percent represented DMX,
[6] the balance represented final fees. So, if we were going to
[7] compare apples to apples comparison with what we believed Sony
[8] was asking, we had to first try to determine what BMI believed
[9] would be final fees for DMX, and that's where we take the
[10] 51,914 -- back to the other document -- and we multiply it by 3
[11] because the rate would increase from $12 to $36 in our minds
[12] and then over a three-year period.
[13]      Now, that was Mr. O'Neill's testimony as to why that
[14] computation was done and you have no reason to believe that was
[15] an inaccurate recounting of the purpose of that, do you?
[16] **A.** Well, he's discussing the fees. I wasn't here to hear his
[17] testimony, you just read it, I'm sorry but that was his
[18] calculation. It appears as such, yes.
[19] **Q.** And, as between you and Mr. O'Neill, whose responsibility
[20] is it to oversee rate setting judgments by BMI?
[21] **A.** Mr. O'Neill.
[22] **Q.** Now, you also testified that another rationale for
[23] justifying the guarantee at the level proposed was the
[24] importance of a term extension with Universal, is that correct?
[25] **A.** That's correct.

Page 621

[1] **Q.** Which was secured in the document which appears at tab 3 of
[2] the binder, is that correct -- pardon me, tab 2 of the binder,
[3] which is the guarantee arrangement?
[4] **A.** Correct.
[5] **Q.** We've established, I believe this morning, that that wasn't
[6] flagged anywhere in the memo itself to the board, is that
[7] correct?
[8] **A.** It's not in the memo but both of these documents are part
[9] of the board package.
[10] **Q.** It is not in the memo, the justificatory memo itself,
[11] correct?
[12] **A.** Correct.
[13] **Q.** Are you aware that in a deposition given in this case
[14] Mr. Arrow, of Universal, testified that even in the absence of
[15] the guarantee, Universal would have renewed in the normal
[16] course?
[17] **A.** I'm not aware to what Mr. Arrow testified. I'm sorry.
[18] **Q.** Now, you also testified, on direct, as to the content of a
[19] conversation, as you termed it, that occurred as this board
[20] committee deliberated the decision of whether to grant the
[21] guarantee.
[22]      Do you recall that?
[23] **A.** Yes, sir.
[24] **Q.** And you said something about how the DMX issue or the DMX
[25] percentage, although maybe not mathematically precisely

Page 622

[1] defined, came up in that conversation?
[2] **A.** That's my recollection, yes.
[3] **Q.** Now, when did you recall that?
[4]      **MR. SALZMAN:** Objection.
[5] **Q.** When did you first recall that that discussion occurred at
[6] that -- was that a meeting of the board -- of the committee?
[7]      **MR. SALZMAN:** I'm sorry. Objection.
[8]      **THE COURT:** Excuse me?
[9]      **MR. SALZMAN:** I object. I don't understand -- he
[10] asked when she first recalled it. Presumably she would have
[11] recalled it when it occurred.
[12]      **MR. RICH:** Well, we will find out about that.
[13]      **MR. SALZMAN:** Okay, but the question itself doesn't
[14] make sense.
[15]      **THE COURT:** Well, I don't really understand the
[16] objection either so I will let it pass.
[17] BY MR. RICH:
[18] **Q.** Ms. Smith, was this a meeting or phone call?
[19] **A.** This is a phone conference with the members of the PRRC
[20] committee, myself and another manager at BMI, Phil Graham.
[21] **Q.** And, when did you first recall that subject of DMX
[22] representing only a portion of the $359,000 came up during
[23] that --
[24]      **THE COURT:** Mr. Rich, I think part of what is
[25] bothering Mr. Salzman, maybe it's the whole, is that your

Page 623

[1] question assumes that she forgot it for a while in between.
[2]      **MR. RICH:** Fair enough, your Honor.
[3]      **THE COURT:** That's the way it sounds to me.
[4]      **MR. RICH:** Fair point.
[5]      **THE COURT:** And I always assume that cross-examining
[6] counsel know exactly what they're doing. So far you have got
[7] us all mystified.
[8]      **MR. RICH:** Okay. I will try to de-mystify your Honor.
[9] BY MR. RICH:
[10] **Q.** At your deposition which occurred in July of this year --
[11] pardon me, July of last year, and if you would like a copy in
[12] front of you we can supply it, tell me if at any point you
[13] would like it, I'm going to read you an excerpt of questions
[14] that my colleague Mr. Larson asked you and answers you gave
[15] beginning on line 18, Page 106:
[16] "Q  Do you recall participating in an actual phone call with
[17] the PRRC members?
[18] "A  I think so, yes.
[19] "Q  And when was that call?
[20] "A  It would have been somewhere very shortly after the date
[21] of this, meaning the December 3rd memo. This is a reference
[22] point. I could probably find it on my calendar, if you want to
[23] know the exact day.
[24] "Q  After December 3rd?
[25] "A  Oh yeah, it definitely would have been after December 3rd.

Page 624

[1] And if you could show me the date of the actual agreement, I
[2] could probably tell you if it was a call for sure or the board
[3] meeting.
[4] "Q  I will represent to you that the agreement was December
[5] 7th, 2007.
[6] "A  Okay.  Then it would have been a call, because we do not
[7] have a board meeting physically all together in December.
[8] "Q  Do you recall any particular questions that the PRRC
[9] members had on the call?
[10] "A  I don't remember, no, other than the approval.
[11] "Q  Did you make a presentation of any kind to them on the
[12] call?
[13] "A  They already received this, so effectively this would have
[14] been the presentation of the agreement.
[15] "Q  Is it your recollection that they received this and you
[16] got on the call and they basically voted and said, okay; or was
[17] there discussion?  Questions?
[18] "A  I just don't remember.  I'm sorry."
[19]        Was that testimony accurate?
[20] A.  I suppose at the time it was accurate, Mr. Rich, but there
[21] is discussion about all the agreements on those calls.  We do
[22] have discussions about each one of them.  This was one of them.
[23] I'm recalling conversation about it and there had been multiple
[24] internal conversations as well as on the board call.
[25] Q.  I believe this morning your testimony was that on the call

Page 625

[1] which you were describing and being asked questions about this
[2] past July you recalled, with some specificity on direct exam
[3] today, that the fact that DMX represented some percentage less
[4] than the total of the reporting line was discussed.
[5]        That was your testimony, correct?
[6] A.  That was my testimony and that's my recollection.  I don't
[7] recall it specifically as to any particular amount.  I remember
[8] there was some discussion about this agreement and maybe I
[9] didn't recall it in July.
[10] Q.  My question is when between July and your testimony this
[11] morning did you recall it?
[12] A.  Perhaps this morning.
[13] Q.  Now, I want to show you next a document premarked as RX 43,
[14] please.  Do you recognize this as a series of e-mail exchanges
[15] between you and a woman named Ann Sweeney?
[16] A.  Yes, I do.
[17] Q.  And it has been established earlier in the record of this
[18] proceeding that for a time Ms. Sweeney acted as an executive at
[19] Sony ATV; is that your recollection as well?
[20] A.  Yes.  She was originally at Sony ATV and she is now
[21] employed by Warner/Chappel.
[22] Q.  Yes, and that was going to be my next question; that she
[23] then moved over to Warner/Chappel, is that correct?
[24] A.  Yes.  That's correct.
[25] Q.  And this exchange occurred following that move to

Page 626

[1] Warner/Chappel, is that correct?
[2] A.  Yes, because she has a Warner/Chappel e-mail address.
[3]     MR. RICH:  I would like to offer this at this point,
[4] your Honor.
[5]     MR. SALZMAN:  No objection.
[6]     THE COURT:  Received.
[7] BY MR. RICH:
[8] Q.  Now, I take it that the subject matter in part of these
[9] e-mails reflected some prior conversation you and Ms. Sweeney
[10] had concerning a request which Warner/Chappel had made to their
[11] own entreaties from DMX concerning direct licensing.  Is that
[12] correct?
[13] A.  That's correct.
[14] Q.  Why don't you describe, in your own words, what it is that
[15] Ms. Sweeney sought from BMI.
[16] A.  Ms. Sweeney, in first communication when she was at Sony,
[17] spoke in very general terms about receiving inquiries from DMX,
[18] then she very shortly thereafter went to Warner/Chappel and had
[19] the same opportunity to receive from DMX a request for a direct
[20] license.  And she came to BMI and asked BMI if we would
[21] consider giving Warner/Chappel an advance against future
[22] royalties that may come in if we prevail in the rate court.
[23] Q.  Thank you.
[24]        And if you look at the body of Ms. Sweeney's April 15
[25] e-mail, the second paragraph, it states in part, we understand

Page 627

[1] that BMI is currently in a rate proceeding with DMX and that
[2] you expect, based on Muzak and other comparable services, to
[3] get something very similar to the $36.36 per location
[4] settlement with Muzak.
[5]        Do you see that?
[6] A.  Yes, sir.
[7] Q.  And where did she get that expectation or understanding
[8] from?
[9] A.  During a conversation with myself and Mike O'Neill.
[10] Q.  Which occurred sometime, by definition, prior to that date,
[11] yes?
[12] A.  Yes.
[13] Q.  And that was an accurate depiction of BMI's perspective on
[14] what its best case outcome would be in a rate court proceeding,
[15] correct?
[16] A.  I don't know that to be the best case scenario, Mr. Rich.
[17] I'm sorry.
[18] Q.  That's what this reports, though, and that's what was
[19] reported to Ms. Sweeney, correct; that that was a top-end
[20] likely -- top-end potential outcome in the rate case, correct?
[21] That was intended to be conveyed to her, true?
[22] A.  Well, it doesn't say that.  It says very similar to the
[23] $36.36 location settlement.  Very similar but there was
[24] subsequent discussions after that about different level sets on
[25] where the blanket license would start.  But, I'm not a

---

**Page 628**

[1] licensing expert so Mr. O'Neill and I had several conversations
[2] about that.
[3] **Q.** So, in October of 2007 when the Sony advance request was
[4] being considered, RX 27 that we had up on the screen a few
[5] minutes ago indicated that the basis for BMI's calculation, as
[6] of October 29th, 2007, was three times or $36, correct?
[7] **A.** That's what that document said, yes.
[8] **Q.** Yes.
[9]      And now, the following April, when Warner/Chappel
[10] comes to BMI the same calculation is made, correct? What we
[11] might expect, those are BMI's words, correct? Expect?
[12] **A.** That's correct.
[13] **Q.** Pardon me. It is Ms. Sweeney's words, characterizing what
[14] BMI might expect which is $36 per location, right?
[15] **A.** That's what that says, yes.
[16] **Q.** Now, I take it that senior BMI management you included
[17] decided to recommend favorably to the board providing this
[18] advance to Warner/Chappel, is that correct?
[19] **A.** We agreed internally that if Warner did want an advance
[20] that we would proceed with that. But it never got that far.
[21] **Q.** And it never got that far, I take it, because Ms. Sweeney
[22] never came to close the deal, so to speak, and the final call
[23] saying we're ready never happened; is that right?
[24] **A.** That's correct.
[25] **Q.** And that's where the matter stands today?

---

**Page 629**

[1] **A.** Yes, sir.
[2] **Q.** Now, you and others working at BMI have initiated a number
[3] of contacts not simply with publishers who were considering --
[4] considering -- entering into license arrangements with DMX but
[5] also those who have actually entered into such arrangements,
[6] correct?
[7] **A.** That's correct.
[8] **Q.** And, in fact, you've covered a variety of topics with these
[9] publishers encompassing general discussions about BMI payments,
[10] the rate court case and the DMX proceeding, is that right?
[11] **A.** Yes. The publishers that have contacted us or that I have
[12] talked to, those were the substances of those conversations.
[13] **Q.** And, is it your testimony that the only such communications
[14] that you have had with them were initiated by those publishers?
[15] **A.** No, that's not true. As we discussed this morning when we
[16] were looking at the chart, I have had occasion during the
[17] validation process to contact publishers about the direct
[18] licenses that they've issued.
[19] **Q.** Among those was a woman named Sindee Levin?
[20] **A.** Yes, that's correct.
[21] **Q.** Are you aware that she testified here the other day?
[22] **A.** Yes, sir.
[23] **Q.** And among those was a woman named Helene Blue?
[24] **A.** Correct.
[25] **Q.** And are you aware she testified here the other day?

---

**Page 630**

[1] **A.** Yes, sir.
[2] **Q.** Now, did you contact them before or after they determined
[3] to appear here as witnesses on BMI's behalf?
[4] **A.** Before.
[5] **Q.** You also spoke to some other publishers including
[6] representatives of Disney, correct?
[7] **A.** Correct.
[8] **Q.** And ABCO Music?
[9] **A.** Correct.
[10] **Q.** At Disney it was a woman named Ms. Enser, correct?
[11] **A.** Correct.
[12] **Q.** And who was it at ABCO music?
[13] **A.** Alissa Coleman.
[14] **Q.** And, as I think you have already indicated, among the
[15] topics you discussed with at least certain of these publishers
[16] who had already entered into direct licenses was this rate
[17] court proceeding, right?
[18] **A.** We talked about the dispute between BMI and DMX over the
[19] per location rate and the license fees, in general; yes, sir.
[20] **Q.** Why did you find that a relevant topic given that these
[21] publishers had already cashed their licensing lot with DMX?
[22] **A.** Because they would ask questions of me that would cause me
[23] to answer in that fashion.
[24]      They typically asked, Mr. Rich, what's going on? They
[25] hear about these things.

---

**Page 631**

[1] **Q.** And I take it it is accurate that in one or more of these
[2] conversations you indicated, as you did to those publishers who
[3] were considering but ultimately didn't enter into direct
[4] licenses, BMI's view that it would ultimately collect
[5] significantly more from DMX as a result of this rate proceeding
[6] than it was collecting presently, is that correct?
[7] **A.** I told them that we hoped that we would prevail in the rate
[8] court, that none of us basically has a crystal ball but that it
[9] was our goal to increase the fees, yes.
[10] **Q.** Now, we talked before the lunch break about BMI in early
[11] January of this year having instituted a practice of refraining
[12] from double paying those publishers who have entered into
[13] direct licenses, correct, with respect to performances for
[14] which they are otherwise being compensated?
[15] **A.** Yes, sir. That's correct.
[16] **Q.** You also testified that at least as of today BMI hasn't
[17] gone back retroactively to try to clean up that state of
[18] affairs, correct?
[19] **A.** Correct; not yet.
[20] **Q.** So, as of today is it accurate that there are at least some
[21] publishers that have benefited from BMI's largess, as it were,
[22] by retaining certain royalty earnings from BMI which, in BMI's
[23] estimation, they're really not entitled to?
[24] **A.** Those publishers have been notified of our intent to
[25] reclaim those royalties but at the time that everything is

---

Page 632

[1] settled.

[2] **Q.** But you have not yet physically taken steps to collect them
[3] backwards, correct, prior to January?

[4] **A.** No, sir. We have not.

[5] **Q.** Now, isn't it a fact, Ms. Levin, that you have used this
[6] reserved right as a source of leverage with certain publishers
[7] who are operating under the direct licenses?

[8] **A.** You called me Ms. Levin but --

[9] **Q.** Pardon me. I beg your pardon.

[10] **A.** That's okay.

[11] **Q.** Ms. Smith.

[12] **A.** Could you repeat that, please?

[13] **Q.** Isn't it a fact that you've used this reserve right to
[14] collect back for prior periods as a source of leverage with
[15] certain publishers who are operating under direct licenses?

[16] **A.** I'm not sure what you mean by leverage.

[17] **Q.** Let me explore it.

[18] **A.** Okay.

[19] **Q.** You are aware that these direct licenses have finite terms,
[20] correct?

[21] **A.** That's correct. The ones I've seen, yes.

[22] **Q.** And what is your understanding of what that term is?

[23] **A.** I believe it is a three-year term.

[24] **Q.** And you are aware, therefore, that a number of these are
[25] coming due for renewal or even have come due for renewal,

Page 633

[1] correct?

[2] **A.** Correct.

[3] **Q.** And you've discussed that fact with one or more of the
[4] publishers you've spoken to, haven't you?

[5] **A.** Yes.

[6] **Q.** And you've indicated to one or more of these publishers,
[7] have you not, that if you renewed their direct licenses with
[8] DMX they can assuredly look for a bill from BMI to collect for
[9] the past period; isn't that accurate?

[10] **A.** No, sir, that's not accurate.

[11] **Q.** You're sure it's not accurate now?

[12] **A.** Would you repeat the question then? What I heard you say
[13] was not accurate.

[14] **Q.** I will repeat the question just to make sure --

[15] **A.** Okay.

[16] **Q.** -- that we're both understanding one another.

[17] **A.** Sure.

[18] **Q.** Is it not a fact that in one or more conversations with
[19] publishers who presently operate under direct licenses, you
[20] advised them that if they were to renew those licenses they
[21] would be receiving a bill from BMI to collect back the monies
[22] which BMI has not so far billed for the past periods of double
[23] payment?

[24] **A.** No, sir, that is not correct. There was no discussion
[25] about if they did renew or did not renew with respect to the

Page 634

[1] potential debit on the catalog of works that had been
[2] previously directory licensed under the old agreement.

[3] **Q.** And, isn't it also a fact that in one or more of these
[4] conversations with certain of these publishers you threatened
[5] that if they renewed their contracts you, or one of your team,
[6] would be contacting some of their marquis writers to express
[7] BMI's perspective on their decision to have renewed the direct
[8] licenses?

[9] **A.** I most certainly did not.

[10] **Q.** Now, Mr. DiMona is employed by BMI, is he not?

[11] **A.** Yes. He is right there.

[12] **Q.** The gentleman right there?

[13] **A.** Yes.

[14] **Q.** What's his role?

[15] **A.** He's an attorney in our legal department.

[16] **Q.** Now, he has also had a number of contacts with folks
[17] holding direct licenses, that is, music publishers with DMX,
[18] has he not?

[19] **A.** I believe he would in the context of speaking with Ms. Blue
[20] and Ms. Levin, yes, but I don't know of others.

[21] **Q.** He was assigned, wasn't he, to shop for potential witnesses
[22] to testify on BMI's behalf at this trial, wasn't he?

[23] **MR. SALZMAN:** Objection.

[24] **THE COURT:** To the word shop?

[25] **MR. SALZMAN:** Object to the work product. Witness'

Page 635

[1] come, lawyers talk to witnesses or prospective witnesses.

[2] **THE COURT:** The objection is work product, Mr. Rich.

[3] **MR. RICH:** I think, your Honor, since this entire
[4] subject trenches on very questionable legal conduct, I don't
[5] think it's appropriate to try to put a work product privilege
[6] around efforts to talk witnesses who didn't even know they had
[7] problems with their licenses into coming here and giving the
[8] form of testimony that they were ultimately induced to do. I
[9] can't imagine that's the function of the work product doctrine.

[10] **THE COURT:** The objection is sustained as to form.

[11] **BY MR. RICH:**

[12] **Q.** Did you ask Mr. DiMona to reach out to any direct license
[13] publishers?

[14] **A.** As I was just thinking about that while you were having the
[15] conversation, there were a couple of other calls with other
[16] publishers that Mr. DiMona was on.

[17] **Q.** And what was the purpose of those calls?

[18] **A.** To talk to those publishers about their interest in
[19] testifying, potentially, about their licensing DMX.

[20] **Q.** I'm sorry. Your voice trailed off at the end. I missed
[21] it.

[22] **A.** About licensing DMX.

[23] **Q.** And we're specifically talking about people who had entered
[24] into license agreements with DMX, is that correct?

[25] **A.** That's correct.

[1] **Q.** And was it also -- was Mr. DiMona also instructed to
[2] suggest to these folks that their lot would be better served by
[3] coming here and testifying to enable BMI to elevate and be
[4] successful in elevating the fees it would achieve from DMX?
[5] **A.** That their lot would be what?
[6] **Q.** Let me rephrase.
[7]   Was part of Mr. DiMona's purpose in participating in
[8] one or more of these calls to attempt to convince these
[9] publishers that in lieu of staying with direct licensing with
[10] DMX, their economic interests would be better served by
[11] supporting BMI's court effort here?
[12] **A.** The substance of those conversations had to do with would
[13] people testify, but I think realistically and what was in
[14] Mr. DiMona's mind you would probably have to ask him.
[15] **Q.** You didn't participate, I take it, in all of the
[16] conversations Mr. DiMona had on the subject?
[17] **A.** No, sir. I didn't.
[18] **Q.** You indicated you know Ms. Blue, is that correct?
[19] **A.** That's correct.
[20] **Q.** You know her to be a truthful person, right?
[21] **A.** Yes, I do.
[22]   **THE COURT:** Mr. Rich, there is a general preference in
[23] this Court and a fairly strong preference on my part that the
[24] theory is each witness testifies to what he or she believes to
[25] be the case as accurately as they can. There is no purpose to

[1] be served and a good deal of confusion to be created by asking
[2] one witness to comment on the testimony of another witness.
[3]   **MR. RICH:** I take that point, your Honor. And I
[4] certainly don't want the record to contain any more than the
[5] direct knowledge of the witness and, in fact, I was about to
[6] say I have concluded my examination.
[7]   **THE COURT:** Whatever you wish.
[8]   Mr. Salzman.
[9]   **MR. SALZMAN:** Yes, your Honor. Thank you.
[10]   **THE COURT:** Just come up for a second, both of you,
[11] before we start the redirect. This will only take a minute.
[12]   (Bench conference held off the record)
[13] REDIRECT EXAMINATION
[14] **BY MR. SALZMAN:**
[15] **Q.** Hello again, Ms. Smith.
[16] **A.** Hello.
[17] **Q.** You remember that in your previous testimony you stated as
[18] one of the reasons why you were recommending the Universal
[19] guarantee to the board was that there was -- you were getting
[20] in return an 18-month extension of the Universal affiliation
[21] agreement with BMI, correct?
[22] **A.** Correct.
[23] **Q.** The Court asked you whether that reason was stated in the
[24] exhibit which is RX 31 or maybe more precisely the Court may
[25] have asked specifically about the second page of RX 31 and you

[1] gave the answer to that that it was not on that page, correct?
[2] **A.** Correct.
[3] **Q.** It is correct, however, that that statement is given on the
[4] first page of RX 31, is it not, in the paragraph under the
[5] heading proposed agreement?
[6] **A.** Yes. It says extend basic agreements of top two counts,
[7] songs of Universal, Universal music careers, to 12/31/10.
[8] **Q.** One of the questions that I explored on direct examination
[9] and Mr. Rich explored on cross-examination was the right of
[10] foreign publishers to directly license the writer's shares with
[11] respect to any direct licenses the foreign publisher might
[12] choose to give DMX.
[13]   Do you remember that?
[14] **A.** Yes.
[15] **Q.** Has the question arisen and been presented to you as to
[16] whether the foreign publishers do in fact have that right?
[17] **A.** Yes, it's come up in discussions.
[18] **Q.** Can you tell us about that?
[19] **A.** It came up on a visit to PRS in the UK.
[20] **Q.** Who is PRS?
[21] **A.** PRS is the society now called PRS for music that represents
[22] British songwriters and music publishers.
[23] **Q.** PRS stands for what?
[24] **A.** Performing Rights Society.
[25] **Q.** And someone from that organization raised the question?

[1] **A.** It came up in a discussion about -- and it has actually
[2] come up before, this is not the first time but it has come up
[3] in this particular instance as the direct licenses were being
[4] issued by U.S. publishers on behalf of their foreign
[5] counterparts.
[6] **Q.** Has that issue been resolved?
[7] **A.** That issue has not been resolved but it is still being
[8] talked about, to my knowledge.
[9] **Q.** On cross-examination by Mr. Rich, I think before lunch, you
[10] said that there were a number of reasons why BMI has not yet
[11] sought to get back from direct licensing publishers any money
[12] that they would have been paid by BMI and some had effectively
[13] been paid twice. Do you remember that?
[14] **A.** Yes.
[15] **Q.** What are those reasons?
[16] **A.** To go back and rerun a distribution and reclaim royalties
[17] in and of itself is an unusual process. To the extent that
[18] there is a strong possibility that ultimately because we're
[19] operating under an interim fee that may go up you or down,
[20] there has been discussion about whether or not we proceed with
[21] adjusting and debiting and doing all of that now only to
[22] potentially have to do more when everything else is settled
[23] because it is not just about debiting, it is about
[24] re-allocating those funds back to other publishers.
[25]   There are many steps in the process and it is a

Page 640

[1] difficult process to institute if you still have many
[2] open-ended things where you are going to have to do multiple
[3] steps across multiple clients.
[4] **Q.** Did it cross your mind to have that over the heads of the
[5] publishers so that you could tell them one way or the other
[6] whether to directly license in the future?
[7] **A.** No, it did not hang over their heads and I didn't put it
[8] over their heads.
[9] **Q.** There were questions on cross-examination about BMI's
[10] having given a guarantee to Universal but not to Universal
[11] writers at the same time. Remember that?
[12] **A.** Yes.
[13] **Q.** And if Universal does not in fact earn out the guarantee,
[14] Universal will get paid more than any Universal writer as a
[15] result of that guarantee, right?
[16] **A.** On a one-to-one basis, yes.
[17] **Q.** But, is it -- let me ask you this: The funds that were
[18] used to pay the guarantee, did those funds come specifically
[19] from the pool of money from DMX?
[20] **A.** I'm not sure if there is a set aside pool of money from
[21] DMX. There is revenue that BMI has and what account they wrote
[22] it out of was a BMI account so I really can't answer that from
[23] an accounting standpoint.
[24] **Q.** Let me ask it a different way.
[25] **A.** Okay.

Page 641

[1] **Q.** Assuming that Universal did not earn out the guarantee,
[2] would Universal writers earn less from DMX performances than if
[3] Universal had not been given a guarantee?
[4] **A.** I'm sorry. I'm still not following, Mr. Salzman.
[5] **Q.** Sure. The way you compute the royalties to the Universal
[6] writers now, has that changed in any way because Universal
[7] itself has gotten a guarantee?
[8] **A.** No, it has not.
[9] **Q.** And has any, the money available to distribute to the
[10] Universal writers been diminished because Universal got a
[11] guarantee?
[12] **A.** No, it hasn't.
[13] **Q.** You were asked some questions by Mr. Rich concerning
[14] whether BMI really was seeking an amount greater than $36.36 or
[15] thought that it might receive an amount greater than $36.36 per
[16] location as of the time that it was considering the Universal
[17] guarantee. Remember that?
[18] **A.** Yes.
[19] **Q.** Take a look at Plaintiff's Exhibit 101. Do you see this is
[20] a letter from Mr. DiMona to Mr. Marks of Weil, Gotshal &
[21] Manges? Do you see that?
[22] **A.** Yes, I do.
[23] **Q.** And this was dated October 4th, 2007?
[24] **A.** Yes.
[25] **Q.** And it was addressed to Mr. Marks in his capacity as a

Page 642

[1] lawyer for DMX, right?
[2] **A.** Yes.
[3] **Q.** And this was several weeks prior to and in the same month
[4] as Respondent's Exhibit 27, a spreadsheet that Mr. Rich put up
[5] would be $12 per adjusted to $36.
[6]      Do you see that?
[7] **A.** Yes.
[8] **Q.** Okay. And do you see that on, attached to Mr. DiMona's
[9] letter is a proposal for carve-out license quote. Do you see
[10] that on the third page of the exhibit?
[11] **A.** Yes, I do.
[12] **Q.** And do you see the, in paragraph 2 what the full fee quote
[13] was in the first paragraph of number two as to the full fee
[14] that BMI was seeking at that time from DMX?
[15] **A.** I see that.
[16] **Q.** And what is that number?
[17] **A.** $47.27.
[18] **Q.** Mr. Rich brought to the attention of the Court that
[19] Mr. Arrow had testified in a deposition in this case that he
[20] would have renewed on behalf of Universal whether or not he got
[21] the guarantee that you promised him.
[22]      Do you remember that testimony?
[23] **A.** Yes, I remember that.
[24] **Q.** Did Mr. Arrow, when he asked you for the guarantee, tell
[25] you that what his intention was about whether he would or

Page 643

[1] wouldn't renew?
[2] **A.** No, he didn't.
[3] **Q.** Take a look again at tab 1 in the binder which is RX 31,
[4] and Mr. Rich also asked you some questions about whether you
[5] really did tell the board that $359,000 figure or the other
[6] figures in this exhibit were included both DMX and other
[7] services.
[8]      Remember that?
[9] **A.** Yes.
[10] **Q.** And he asked you when you had first remembered this fact,
[11] right? Remember that?
[12] **A.** Yes.
[13] **Q.** Now, it is true, is it not -- turn, if you would to the
[14] second page of the exhibit -- and the memo that you wrote
[15] explicitly tells the board that the figures on the first page
[16] include services in addition to DMX, does it not?
[17] **A.** It does? Paragraph 3.
[18] **Q.** Can you read that, please?
[19] **A.** It is important to note that the earnings listed above are
[20] comprised of DMX and some smaller background music services but
[21] on a going forward basis BMI will be breaking out DMX as its
[22] own line item on our royalty statements.
[23]      Do you want me to continue?
[24] **Q.** No. That's sufficient.
[25]      Last, let me ask you about this subject that Mr. Rich



[1] brought up. Mr. Rich raised questions about the fact that you
[2] had discussions with other direct licensing publishers in
[3] addition to Ms. Levin and Ms. Blue, right?
[4] **A.** Correct.
[5] **Q.** Did you have a conversation with a person at Disney?
[6] **A.** I did.
[7] **Q.** And, what did she say to you and what did you say to her?
[8] **A.** We talked on several occasions but the most recent call --
[9] there were several calls.
[10] **Q.** And what was the sum and substance of what was said?
[11] **A.** Well, in the first call was about DMX and the direct
[12] license that they had entered into, and the second series of
[13] calls many months later this subject matter was that they were
[14] considering whether or not to re-up or renew their direct
[15] license and she had done or had her staff do a royalty
[16] comparison of her ASCAP, BMI and DMX royalties in order to try
[17] assist her in determining whether or not she wanted to renew
[18] the direct license.
[19]      **MR. RICH:** Objection, your Honor. Hearsay testimony
[20] from a third-party.
[21]      **MR. SALZMAN:** I believe Mr. Rich opened this subject
[22] wide open.
[23]      **THE COURT:** Excuse me?
[24]      **MR. SALZMAN:** I say I believe Mr. Rich opened this
[25] subject wide open.

[1]      **THE COURT:** Well, the topic may be open but that
[2] doesn't justify hearsay. It seems to me that this is hearsay
[3] offered for the truth. The answer will be stricken.
[4] **BY MR. SALZMAN:**
[5] **Q.** Did you speak to anyone from ABCO?
[6] **A.** I spoke to Alissa Coleman from ABCO, gosh, probably two
[7] years ago, a year and a half ago.
[8] **Q.** On the subject of DMX?
[9] **A.** Yes.
[10] **Q.** And what is ABCO?
[11] **A.** ABCO is a, what we would term major independent, if you
[12] will, representing the Rolling Stones and many other -- Sam
[13] Cooke. Quite a significant catalog.
[14] **Q.** And what did Ms. Coleman tell you?
[15] **A.** Ms. Coleman said to me that she would take -- well, let me
[16] back up. I asked her if she had realized that she entered into
[17] a direct license because she had not notified us of that direct
[18] license and that is a typical question that we would ask
[19] because they are supposed to notify us. So, I had a copy of
[20] the direct license, I called her to confirm that in fact this
[21] was their direct license, and she said to me after reading it
[22] that it was their direct license, that they had in fact
[23] directly licensed.
[24] **Q.** What else did she say?
[25]      **MR. RICH:** Same objection.

[1]      **THE COURT:** I'm going to change my prior ruling,
[2] Mr. Rich, because in the interim, which was short, it has
[3] occurred to me a recollection that there is a long-standing
[4] exception, at least in this district, to the hearsay rule which
[5] would otherwise apply as I applied it, for merchants giving
[6] reasons for price changes.
[7]      Under that exception I am going to allow the prior
[8] answer to stand.
[9]      **MR. SALZMAN:** Can we have back the current question?
[10]      (Record read)
[11] **A.** We had a discussion about the direct license itself. She
[12] was somewhat unaware herself that it included performance
[13] rights and she indicated to me that they may or may not have
[14] different performance rights splits from mechanical splits; a
[15] more general discussion about that. She was not aware that --
[16] she, herself, not that her company wasn't -- but that she,
[17] herself, was not aware and that she would take it to her legal
[18] department.
[19]      (Continued on next page)
[20]
[21]
[22]
[23]
[24]
[25]

[1]      **MR. RICH:** Objection, your Honor. I don't know the
[2] scope of the doctrine, but this sounds like it goes well beyond
[3] any price change discussion.
[4]      **THE COURT:** Yes, it probably does, but its truth or
[5] falsity doesn't really matter.
[6]      **MR. SALZMAN:** No further questions.
[7]      **MR. RICH:** No recross.
[8]      **THE COURT:** Thank you Mr. Rich, Mr. Salzman, and thank
[9] you Ms. Smith.
[10]      (Witness excused)
[11]      **THE COURT:** The afternoon is rather short, so let's
[12] keep the recess to five minutes.
[13]      (Recess)
[14]      **MR. FITZPATRICK:** Your Honor, BMI calls as its next
[15] witness by deposition Mr. Benjamin M. Hanson.
[16]      **THE COURT:** Before you start with that witness, I have
[17] a question for Mr. Salzman. Mr. Salzman, if or when BMI offers
[18] large and important affiliates a guarantee of earnings, if it
[19] won't -- as long as it doesn't accept a direct leasing, a
[20] direct licensing arrangement with a competitor of BMI's, and
[21] doesn't make that offer publicly available to others similarly
[22] situated, how does that square with its duty to treat similarly
[23] situated customers equally? And is the distinction between a
[24] large customer and a small customer a justifiable distinction
[25] or is this regarded as some sort of a volume discount? How is

Page 648

[1] it justified legally?

[2]     **MR. SALZMAN:** Sure. I think of BMI as kind of a pipe.
[3] Songs come in from publishers, they go through BMI and they go
[4] out to music users. That requirement decree is about not
[5] discriminating between music users, DMX versus Muzak. That
[6] provision of the decree doesn't say anything about the rates
[7] and terms that BMI pays to its affiliates, the front end of the
[8] pipe. The only requirement -- the decree makes a complete
[9] distinction between BMI's treatment of writers and publishers
[10] and its treatment of music users. That provision 8A doesn't
[11] speak to how BMI distributes money.

[12]     **THE COURT:** All right.

[13]     **MR. FITZPATRICK:** Your Honor, BMI calls by deposition
[14] Mr. Benjamin Hanson.

[15]     **THE COURT:** Has this deposition been pared down to
[16] only those portions which are germane to the rate proceeding?

[17]     **MR. FITZPATRICK:** We have certainly made that effort,
[18] your Honor.

[19]     **MR. SALZMAN:** Before Mr. Fitzpatrick starts, I was
[20] reminded also that the consent decree itself speaks about
[21] advances and guarantees, so they are contemplated, they were
[22] contemplated at the time of the decree in 1964 that they could
[23] exist.

[24]     **THE COURT:** What's it say about them?

[25]     **MR. SALZMAN:** There's a provision that says something

Page 649

[1] more or less like you can -- I don't remember, frankly. It has
[2] something to do with you can't lure writers or publishers from
[3] ASCAP to BMI with an advance or guarantee unless ASCAP is doing
[4] the same unto you.

[5]     **THE COURT:** I see. Just showed awareness of the
[6] concepts.

[7]     **MR. SALZMAN:** Right, that's all.

[8] **BY MR. FITZPATRICK:**

[9] "Q. Mr. Hanson, we met off the record, but could you please
[10] state your name and current address for the record?

[11] **A.** Benjamin Michael Hanson, 2211 Sunny Slope Drive, Austin,
[12] Texas, 78703.

[13] "Q. And when were you hired by DMX Holdings Inc.?

[14] "A. At or around the time that the acquisition was completed
[15] in --

[16] "Q. Okay.

[17] "A. June of '05.

[18] "Q. And what did you understand you were being hired to do?

[19] "A. To be the in-house counsel for the company.

[20] "Q. General counsel at that time?

[21] "A. Correct.

[22] "Q. No, not at all. And what was your role with regard to
[23] licensing during your time period at DMX?

[24] "A. Handle anything that was licensing related concerning the
[25] company's music usage and other content usage.

Page 650

[1] "Q. Okay. And that would include performing rights licensing?

[2] "A. Correct.

[3] "Q. Mechanical rights?

[4] "A. Correct.

[5] "Q. Master rights?

[6] "A. Correct.

[7] "Q. Ephemeral rights with regard to the transmission of
[8] digital music?

[9] "A. Correct.

[10] "Q. If I refer today to background music services or
[11] commercial music services, will you understand what I mean by
[12] that?

[13] "A. I will.

[14] "Q. And just to be clear, when I'm referring to that, I'll be
[15] referring to a company that provides music and perhaps other
[16] services to businesses using proprietary equipment. Is that
[17] fair? Is that what you understand a background music service
[18] to be?

[19] "A. That's a different question. I think that --

[20] "Q. That's why I asked it. The proprietary nature is
[21] something that's -- I think there are other providers that
[22] don't necessarily use a proprietary service delivery vehicle.

[23]     **MR. FITZPATRICK:** Wait a minute, I'm sorry, what did I
[24] do?

[25]     **MS. HOAG:** You read my answer.

Page 651

[1]     **MR. FITZPATRICK:** I'm sorry.

[2] "Q. That's why I asked it.

[3] "A. The proprietary nature is something that's, I think there
[4] are other providers that don't necessarily use a proprietary
[5] service delivery vehicle.

[6] "Q. Such as?

[7] "A. I'm trying to think of the different alternatives that are
[8] out there. There are folks that utilize iPods or their flash
[9] memory as a delivery vehicle. I don't know if that would be, I
[10] don't think of iPods in the similar terms that I think about
[11] the boxes, the proprietary boxes that DMX delivers its service
[12] by.

[13] "Q. So you think of those two services or products as
[14] different?

[15] "A. No. What I'm saying is I think that your definition of
[16] commercial music service provider based on the fact that you
[17] have a proprietary definition in there is, it's narrower than
[18] what we see as other competitors actually utilizing.

[19] "Q. Because there are other competitors that use
[20] non-proprietary equipment?

[21] "A. Correct.

[22] "Q. Such as companies that would provide iPods?

[23] "A. Correct.

[24] "Q. And, as I think you said in your declaration, there are
[25] self-suppliers?

A-400

[1] "A. Correct.

[2] "Q. Okay. And does part of DMX's supply of audio content to

[3] its subscribers, what are the types of delivery methods they

[4] use?

[5] "A. Two different types of delivery methodologies. I think

[6] one you would call on-premise and one you would call

[7] off-premise. On-premise delivery is direct to the customer.

[8] The box resides at the customer. And it's typically media that

[9] is provided to the customer that plays on the location at the

[10] location's premises. Off-premise would be something we call

[11] DBS or satellite-delivered services that pull the content from

[12] the satellite dish.

[13] "Q. Okay. And so we've discussed two types of delivery,

[14] off-premise and on-premise, correct?

[15] "A. Correct.

[16] "Q. And I think you said in your declaration, and correct me

[17] if I'm wrong, that the split is 65 percent on-premise locations

[18] and 35 percent off-premise, is that correct?

[19] "A. Correct.

[20] "Q. Okay. Has that number changed during your time at DMX

[21] from 2005 to 2008 when you left?

[22] "A. I think the proportion has stayed relatively constant.

[23] "Q. At 65?

[24] "A. At 65/35.

[25] "Q. Okay, do you think that or to your knowledge does DMX

[1] market itself to customers as providing variety in music?

[2] "A. I think we do market ourselves that way, correct.

[3] "Q. Okay. I'm going to hand you what's going to be marked as

[4] Hanson 3."

[5] **MR. FITZPATRICK:** That's at tab 1 in the binder.

[6] "Q. Do you know what this document is?

[7] "A. I do.

[8] "Q. What is it?

[9] "A. It's the DBS off-premise channel lineup.

[10] "Q. Okay, and does this indicate that at least on off-premise

[11] DMX offers at least 106 styles?

[12] "A. Yes.

[13] "Q. All music?

[14] "A. All music.

[15] "Q. And are all of the programs offered under Profusion X all

[16] music?

[17] "A. To my knowledge.

[18] "Q. Okay. And they're all commercial free?

[19] "A. To my knowledge.

[20] "Q. Does DMX offer custom programming?

[21] "A. Correct.

[22] "Q. Is that called Signature programming?

[23] "A. Correct.

[24] "Q. And is non-custom programming called Select programming?

[25] "A. Correct.

[1] "Q. Does DMX charge additional money above and beyond its

[2] normal services when a customer obtains from DMX Select

[3] programming?

[4] "A. There is a premium associated with customized music.

[5] "Q. If you could refer to your declaration on page 8, the

[6] second paragraph on this page, the first full paragraph reads:

[7] 'This increased competition and ease of self supply has lead to

[8] a reduction of DMX's average monthly revenue per client and/or

[9] a reduction in the margin associated with such revenue.'. Did

[10] I read that correctly?

[11] "A. Correct.

[12] "Q. From 2008 up until the time you left, what was the average

[13] monthly revenue per client?

[14] "A. I don't know.

[15] "Q. Okay. What's the basis for your statement that it was

[16] reduced?

[17] "A. The basis for the statement with respect both to average

[18] monthly revenue and the reduction of margin is twofold. The

[19] pricing study that was done by North Hyland, I don't know the

[20] formal name of the company, that was done for the company with

[21] respect to its national accounts, and I think to a lesser

[22] degree local accounts, performed in '06 that talked about the

[23] lowered level of revenue associated with the provision of music

[24] services in addition to a compression of margins.

[25] "Q. Okay. And that was in 2006?

[1] "A. It was in 2006, correct.

[2] "Q. Okay. Have there been any studies?

[3] "A. It was for, I believe it was conducted in '07 for the

[4] period 2006.

[5] "Q. Okay. Do you know what the reduction in average monthly

[6] revenue per client is from the 2006 study until the time you

[7] left DMX?

[8] "A. Do I know the trend or do I know the actual detail?

[9] "Q. Do you know the detail?

[10] "A. I don't know the detail.

[11] "Q. Do you know the trend?

[12] "A. I do know the trend.

[13] "Q. And what is the basis for that?

[14] "A. The basis for the trend is data that was compiled as a

[15] result of the process that we went through with the Department

[16] of Justice in the merger between DMX and Muzak concerning our

[17] lowered revenue run rates from a music service subscription

[18] perspective in addition to compression of margins associated

[19] with the same.

[20] "Q. Mr. Hanson, you stated in your declaration at page 11 that

[21] DMX has a, quote, 'unusual ability to control the music works

[22] its programs.' Can you explain that statement?

[23] "A. We classify that as an unusual or unique ability to

[24] control its programming relative to other broadcasters, other

[25] music providers that are required to play a particular, a

Page 656

[1] significant portion of their music as a result of, for
[2] instance, as I indicated, I think somewhere else in the
[3] declaration being a, quote, 'slave' to the top 40 charts or
[4] whatever.
[5] "Q. So your first involvement with DMX was in 2005, is that
[6] correct?
[7] "A. The middle part of 2005, correct.
[8] "Q. Okay. And was that after the combined entity that is DMX
[9] and AEI emerged from bankruptcy?
[10] "A. I'm not sure if it emerged from bankruptcy necessarily. I
[11] mean, we bought the asset subject to a bankruptcy court sale
[12] order dated sometime in May '05 and we closed on the
[13] acquisition June 3rd '05.
[14] "Q. Okay. And when you say we, what was the entity that
[15] purchased?
[16] "A. THP Capstar Inc. was the holding company, and THP Capstar
[17] Acquisition Corp. was the operating subsidiary.
[18] "Q. And have those companies subsequently changed their names?
[19] "A. They have.
[20] "Q. To what?
[21] "A. The former of those two companies changed it to DMX
[22] Holdings Inc. The latter to DMX Inc.
[23] "Q. Okay. And I'm marking Hanson Exhibit 8."
[24] **MR. FITZPATRICK:** That's tab 2 in the binder.
[25] "Q. And Hanson Exhibit 8 is an e-mail from Barry Knittel to

Page 657

[1] someone named Warren Taylor and you were copied on this e-mail,
[2] is that correct?
[3] "A. Uh-huh.
[4] "Q. Who is Warren Taylor?
[5] "A. Warren Taylor is a controller for DMX Inc.
[6] "Q. Do you recognize this e-mail?
[7] "A. I don't recognize it, but I am named as a copy on it.
[8] "Q. Okay, and in the column marked 13, do you see that?
[9] "A. Uh-huh.
[10] "Q. It says, 'Commercial, please pay at the reduced rate of
[11] $43 annually for type A and type C services.' Do you see that?
[12] "A. Uh-huh.
[13] "Q. Is it accurate to say that the per location rate for ASCAP
[14] was approximately $43?
[15] "A. For what period of time?
[16] "Q. At the time of this e-mail.
[17] "A. Sure.
[18] "Q. Has DMX requested a carveout license from ASCAP?
[19] "A. I believe we have made that request.
[20] "Q. Okay, and do you, does, at the time you left, did DMX
[21] anticipate that it would obtain such a license?
[22] "A. Yes. Do we anticipate obtaining a dynamic carveout
[23] license from ASCAP? Yes.
[24] "Q. So who are DMX's competitors in the background music
[25] services industry?

Page 658

[1] "A. Muzak, Play Network, XM Sirius, now combined, In-store
[2] Broadcasting, Premier Retail Networks, PCM Technologies,
[3] TruSonic, Private Label Radio, Music Technology International,
[4] Creative Retail Communications, American Music Environments,
[5] Focus Point Communications, Prescriptive Music, Pyramid Radio,
[6] Rock 300 and I would throw in an additional category of music
[7] consultants and self supply, locations that choose to self
[8] supply.
[9] "Q. Okay. Now, out of those competitors, does DMX provide
[10] similar services to Muzak?
[11] "A. Do we provide similar services?
[12] "Q. Uh-huh.
[13] "A. As compared to Muzak, yes, we do.
[14] "Q. And so, you would say that DMX is a similar company to
[15] Muzak?
[16] "A. I mean, similar company, that's broad, but conceptually I
[17] think I know where you're headed and you're talking about in
[18] terms of the services provided? Yes, correct.
[19] "Q. And what about with respect to Music Choice on its
[20] commercial side, same question, is it similar, is DMX similar?
[21] "A. In its commercial -- on Music Choice's commercial side,
[22] yes, it would be similar provision of music services to DMX and
[23] Muzak.
[24] "Q. And would DMX provide similar music services to Play
[25] Network?

Page 659

[1] "A. Yes, I think I indicated that.
[2] "Q. Okay. Out of the list of competitors that you just gave
[3] me a few minutes ago, are there any that DMX is not similar to
[4] in terms of its provision of music?
[5] "A. I don't know.
[6] "Q. Okay. Is DMX similar to XM in its provision of music?
[7] "A. DMX and XM both provide satellite, have components of
[8] satellite-delivered services that are similar.
[9] "Q. Okay, now, if I referred to DMX's present direct licensing
[10] initiative, do you understand what I mean?
[11] "A. The current direct licensing initiative, the focus of this
[12] particular proceeding?
[13] "Q. Yes.
[14] "A. Correct.
[15] "Q. And when did that initiative start?
[16] "A. It started in the summer of '05 with a conversation
[17] between Mr. Knittel and myself.
[18] "Q. And did you -- I mean DMX and MRI drafted a form license?
[19] "A. Correct.
[20] "Q. When was that, the first form license drafted?
[21] "A. I think the process, again, similar to other things that
[22] we've talked about when preparing these types of documents was
[23] rather iterative, so I think that the process began sometime
[24] the first part of 2006 and we finalized the formal license
[25] agreement sometime in the spring of 2006 when the first



Page 660

[1] approach was made to a group of independent publishers.
[2] "Q. Okay.
[3] "A. I shouldn't have said independent. To a group of
[4] publishers.
[5] "Q. Okay. And when the form license, the $25 royalty pool
[6] form license was developed, that was done between MRI and DMX
[7] only, is that correct? Well, I mean, there weren't other
[8] companies involved?
[9] "A. Not other companies, no.
[10] "Q. You said, were there other individuals involved outside of
[11] MRI and DMX?
[12] "A. I think counsel, outside counsel may have been involved.
[13] "Q. Okay. Fair enough. And again, any of these questions
[14] that don't involve privileged conversations, I mean, I want to
[15] be clear about that. But with outside counsel, MRI and DMX
[16] that's the group that came up with the $25 form license, is
[17] that right?
[18] "A. That would be the only group, correct.
[19] "Q. Okay. Publishers didn't, they didn't help in making the
[20] license?
[21] "A. Not to my knowledge.
[22] "Q. Do you remember lots of examples?
[23] "A. I remember a few examples. Lieber Stoller stand out in my
[24] mind, because they were the first to execute an agreement.
[25] "Q. Lieber Stoller was the first?

Page 661

[1] "A. Correct.
[2] "Q. Okay, from DMX's perspective was the $25 royalty pool
[3] negotiable?
[4] "A. Was it negotiable? I was never asked that question.
[5] "Q. Okay, did you ever offer anything other than the $25 to --
[6] "A. I don't believe so.
[7] "Q. Okay. I'm going to mark Hanson Exhibit 10."
[8]     MR. FITZPATRICK: That's tab 3 in the binder.
[9] "Q. Do you recognize this document?
[10] "A. Yes.
[11] "Q. And what is it?
[12] "A. I don't recognize -- I'm sorry, I should clarify. I don't
[13] recognize this particular document with a Slice of Evan Music
[14] BMI as a counter party, but I recognize the form of the
[15] document.
[16] "Q. Okay, and what is the form of the document?
[17] "A. The form of the document is the form musical composition
[18] catalog license agreement that was prepared in conjunction with
[19] MRI and counsel.
[20] "Q. Okay, and is this paragraph 2B are the performances
[21] counted with, are the performances that are counted with
[22] respect to the royalty formula only those that are performed as
[23] part of DMX off-premises services?
[24] "A. When you look at which are digitally transmitted by
[25] licensee, I think that would be an accurate statement.

Page 662

[1] "Q. And so that's the operative language which provides for
[2] the, what I'll call the off-premise proxy. Do you understand
[3] what I mean by when I say that?
[4] "A. Yes, I do.
[5] "Q. Okay, and was that ever specifically negotiated, to your
[6] knowledge, this off-premise proxy, with any particularly
[7] directly licensing publisher? Was it ever discussed?
[8] "A. Again, the only personal experience I have is in
[9] connection with the Sony/ATV license and I don't recall that
[10] that was a negotiated point.
[11] "Q. Okay. To your knowledge, you don't remember it being
[12] discussed?
[13] "A. I don't recall.
[14] "Q. Okay. And then turning to the next page, there's a
[15] provision 2 which is entitled no double payment.
[16] "A. Right.
[17] "Q. And what is the intent of this term?
[18] "A. I think that when you look at 2, I think you have to think
[19] about it in terms of we're requiring the publisher to
[20] acknowledge to us that in connection with a dispute with ASCAP,
[21] BMI or SESAC, with respect to the particular ownership of a
[22] particular work, we are asking the publisher to acknowledge
[23] that in such a dispute if we have paid somebody, whether
[24] publisher or PRO, then, you know, don't look to us to pay
[25] anybody else.

Page 663

[1] "Q. Okay, and has this provision been in the formula since
[2] 2006, to your knowledge?
[3] "A. To my knowledge, yes.
[4] "Q. Okay, and DMX is in fact paying both the PRO's and the
[5] publishers for directly licensed performances as of the time
[6] you left DMX?
[7] "A. Yes. We have been double paying.
[8] "Q. Okay. And if DMX does not obtain a so-called carveout
[9] license from ASCAP or BMI, does this provision give DMX the
[10] right to go and take back any royalties for the direct licenses
[11] from the publisher?
[12] "A. I don't think that's the intent, no.
[13] "Q. Okay, and you're not aware of plans in DMX to go out and
[14] get this money back if DMX does not obtain a carveout license
[15] from ASCAP or BMI?
[16] "A. No.
[17] "Q. Okay, that was helpful. So this provision, its intent is
[18] only to apply to where there's a dispute about whether a
[19] particular work is direct licensed or not and one of the
[20] performing rights organizations has come and said you have to
[21] pay us for that, that's not subject to a credit?
[22] "A. I think it goes to the question of whether or not who owns
[23] the particular or represents the particular work. If the PRO
[24] represents the particular work or the publisher represents the
[25] work and there is a dispute about the ownership of that

Page 664

[1] particular work and who has the ability to do the direct
[2] license with us, provided that we have paid one of those
[3] parties, we are asking the publisher to acknowledge that they
[4] have no right to come back to us provided it's not our
[5] responsibility to pay, it's not our responsibility to solve
[6] that dispute.
[7] "Q. Okay. So it's your testimony that this is not intended to
[8] absolve DMX from payment while it is -- excuse me. This is not
[9] intended to absolve DMX from payment while DMX is waiting for a
[10] crediting mechanism to be put in place by the Court?
[11] "A. Not only was it not intended to do that, in practical
[12] application it does not do that. In other words, DMX has not
[13] sought to claw back any double payments that it has made to
[14] date."
[15]    MR. FITZPATRICK: Exhibit 11 is marked and that's tab
[16] 4 in the binder.
[17] "Q. Do you recognize this document?
[18] "A. I do.
[19] "Q. And what is it?
[20] "A. This is the Sony/ATV musical composition catalog license
[21] agreement.
[22] "Q. Okay, and they're recoupable against any royalties based
[23] on Sony's performances, is that right?
[24] "A. Correct.
[25] "Q. Okay. Did DMX believe at the time of the Sony

Page 665

[1] negotiations that it was important to get a major signed in
[2] order to sign on other directly licensing publishers?
[3] "A. Crucial.
[4] "Q. Okay. Why was it crucial?
[5] "A. Because, from our understanding, the past efforts to
[6] implement a direct licensing initiative I think early 2000's,
[7] from our understanding those efforts failed as a result of the
[8] fact that it was really a hypothetical exercise when you are
[9] talking to Judge Connor and/or Judge Stanton. No direct
[10] licenses had been signed. It was simply a, hey, judge, what if
[11] question. From our perspective, in order to validate and
[12] position our case as best, putting its best foot forward in
[13] front of either Judge Stanton or Judge Connor was to sign up as
[14] many direct licenses as possible, in addition to hopefully
[15] signing a major of the four major publishers.
[16] "Q. And I think you said in your declaration at footnote 3
[17] that it's typical to give an advance to a major publisher in
[18] the industry?
[19] "A. It certainly was our experience in that every single major
[20] publisher that we talked to about doing a direct license
[21] requested an advance.
[22] "Q. Okay. And is it typical to give a guaranteed advance?
[23] "A. Is it typical?
[24] "Q. Yes.
[25] "A. From my experience in talking to all the publishers, they

Page 666

[1] were all asking for guaranteed advances.
[2] "Q. And by guaranteed, you mean non-refundable,
[3] non-returnable?
[4] "A. Non-refundable, non-returnable.
[5] "Q. Does DMX intend to sign all four majors?
[6] "A. Do we intend to?
[7] "Q. With direct licenses.
[8] "A. I mean, at the time that I was general counsel for DMX I
[9] don't think that we ever intended on signing all four major
[10] publishers.
[11] "Q. Why was that?
[12] "A. Because I don't think that we needed all four major
[13] publishers.
[14] "Q. Did you think that you needed some subset of them?
[15] "A. We felt like we needed one or perhaps on the outside
[16] depending on who the other publishers were that did in fact
[17] sign, might need two.
[18] "Q. Okay. Do you have any knowledge as to what percentage of
[19] total DMX performances would have to be performances of Sony
[20] songs in order for the advance for 2008 to be recouped in full?
[21] "A. To be in recouped in 2008? We don't think about it in
[22] terms of trying to recoup in 2008, because we've got the
[23] ability to recoup over the course of the three years, so we
[24] don't think about it in terms of recouping in just 2008. We
[25] think about it in terms of recouping the overall advance over

Page 667

[1] the term of the deal.
[2] "Q. So you believe that you, that DMX or at least when you
[3] were there, that DMX could directly license enough Sony
[4] performances that the two, I guess you're saying 2.4 million
[5] over the three-year --
[6] "A. We could play enough Sony performances, publicly perform
[7] enough Sony performances in order to recoup the advance, the
[8] aggregate advance over the entire term of the agreement.
[9] "Q. Did you ever tell any other publisher about the Sony
[10] advances?
[11] "A. That there was in fact an advance or the size of the
[12] advance or the timing of the advance?
[13] "Q. Let's go first that there was an advance.
[14] "A. I don't believe so.
[15] "Q. Okay. To your knowledge, did anyone at DMX tell any other
[16] publisher that Sony had received an advance?
[17] "A. No. I think the terms of the Sony agreement precluded us
[18] from even talking about its existence.
[19] "Q. Okay. So, if everyone complied with the terms of the Sony
[20] agreement, no other publisher was told?
[21] "A. Correct.
[22] "Q. And going back, you had said the existence, and you had a
[23] parsed it out. Obviously, that means you didn't tell anyone
[24] the amount?
[25] "A. No.

Page 668

[1] "Q. Or the schedule?

[2] "A. No.

[3] "Q. Okay, and no one, to your knowledge, at DMX did either?

[4] "A. Not to my knowledge.

[5] "Q. If you could turn to paragraph 1D, which is, I believe, on

[6] the next page. The final clause of this paragraph, starting

[7] with "notwithstanding anything to the contrary," what's the

[8] intent of this?

[9] "A. The intent was to allow DMX to participate in expanded

[10] catalog offerings that Sony may ultimately acquire, without

[11] having to go through the need of renegotiating the license

[12] agreement terms from an either royalty pool perspective or an

[13] advance perspective.

[14] "Q. Okay. And this excludes catalogs that Sony acquires that

[15] have an aggregate equity value in excess of $75 million,

[16] correct?

[17] "A. That is the exclusion. That is the exclusion threshold.

[18] "Q. Right. Meaning that if Sony obtains a catalog that

[19] qualifies under this paragraph, it will not be subject to the

[20] agreement?

[21] "A. In excess, yes, that would be a correct statement.

[22] "Q. And it would have to be separately negotiated or not?

[23] "A. Well, I think that the parties would have to ultimately,

[24] you know, have to work it out, because it would be outside the

[25] scope of the agreement.

Page 669

[1] "Q. Right, but there would -- and if that was worked out,

[2] there would be additional monies due Sony?

[3] "A. There could be. I mean, again, it would be part of the

[4] negotiation, part of a negotiation. Sony would certainly have

[5] a contractual right to exclude a catalog that's greater than

[6] 75 million in equity value from the inclusion within the

[7] current license agreement.

[8] "Q. Do you know why Neil Diamond's works were excluded from

[9] this license?

[10] "A. Something internal to Sony that I wasn't party to the

[11] discussions."

[12] **MR. FITZPATRICK:** Exhibit 17 was marked, and that's

[13] tab 5 in the binder.

[14] "Q. And I apologize. It looks like I've only got the front

[15] page of this and it's a multi e-mail chain, but if you could

[16] look at the bottom, the portion that you can see, it's an

[17] e-mail from Les Watkins, who I think you told me is an attorney

[18] at MRI, to Ann Sweeney at SonyMusic.com and you're copied.

[19] Does this refresh your recollection at all that it might have

[20] been in the summer of 2006 that --

[21] "A. Well, this, I mean, I think that we approached all of the

[22] major publishers during the first wave, and I would classify

[23] this as the first wave, the initial wave. This is the spring

[24] of '06 when we rolled out the form license to everybody,

[25] including the major publishers.

Page 670

[1] "Q. Okay.

[2] "A. My recollection is we did not, however, get any traction

[3] based on this e-mail.

[4] "Q. Yes, projections for total 2008 from January 1 till the

[5] end of 2008.

[6] "A. At December 31, 2008, I'm not sure that we had any

[7] projections. I mean, again, we're in the unique position of

[8] being able to program as much or as little Sony/ATV or any

[9] other directly licensed work as we want. So I think that was a

[10] sliding scale. I'm not sure that there was a projection.

[11] Certainly the theme was the more the better.

[12] "Q. Okay. So there had been efforts to directly license to --

[13] excuse me.

[14] "A. Program them in higher rotations, correct.

[15] "Q. Okay, let me just make that clear so I can -- there had

[16] been efforts to put directly licensed music into DMX's

[17] programming at a higher rate than in previous years?

[18] "A. Correct.

[19] "Q. Okay. Are there any types of works or publisher catalogs

[20] for which DMX at the time or as of the time that you left did

[21] not plan to obtain direct licenses?

[22] "A. Not that I recall.

[23] "Q. So there was no intent to not obtain direct licenses for

[24] niche genres? I could give you an example, if it makes it

[25] easier.

Page 671

[1] "A. Please.

[2] "Q. Or foreign language programming, for example?

[3] "A. I don't think anything was off the table from a direct

[4] licensing perspective. I mean, the more content we directly

[5] license the better.

[6] "Q. Okay, but was there an order of priority within DMX?

[7] "A. There was. The way that we thought about it was that the

[8] entire direct licensing initiative was staged. The first stage

[9] was a broad approach that we call -- that we've discussed

[10] before, the initial wave, see what traction that got. As, what

[11] we came to find out was there was a great degree of traction.

[12] The next stage was to focus on a major publisher. The stage

[13] after the major publisher was to go back to all of the other

[14] publishers that had talked to us about or noted in our history

[15] sheets that they were waiting for the cover associated with a

[16] major publisher having signed prior to them signing. The next

[17] was to go back to independent artists that had given us their

[18] sound recording rights and to go back and get their composition

[19] rights, publishing rights. I mean, it was a very, it's a very

[20] staged approach. So there was a variety of different stages.

[21] "Q. Okay, and what was --

[22] "A. But nothing was off the table.

[23] "Q. Okay. But at -- in terms of these stages, what was the

[24] last -- what types of works or catalogs were in the last stage

[25] that DMX did consider?

Page 672

[1] "A. The last stage prior to me leaving was kind of finalizing
[2] the independent artists, obtaining their publishing rights.
[3] "Q. And when you say independent artists, what exactly do you
[4] mean by that?
[5] "A. The small artists that we had reached out to. DMX has
[6] about 1700 independent sound recording licensing agreements
[7] with various artists, not major represented artists, and as
[8] best I recall, at the end of the summer when I left, that was
[9] the phase that was just finishing up.
[10] "Q. Okay. So those would be the publishers, the independent
[11] publishers with which, or as to which DMX would have lower
[12] transaction costs as opposed to publishers that DMX did not
[13] already have a pre-existing relationship with?
[14] "A. Yes. I don't understand the lower transaction costs. I
[15] mean, it's extraordinarily expensive to go back to these folks
[16] and educate them on what rights in fact they have the ability
[17] to license to us and talk to them about what the benefit is to
[18] them in terms of giving us those publishing rights, licensing
[19] us those publishing rights.
[20] "Q. You mean it's tremendously expensive to go the independent
[21] publishers that you've already gone to?
[22] "A. No, to go to the artists on the artist side that had
[23] previously given us their artist license, their sound recording
[24] license.
[25] "Q. Okay, but you targeted during this stage artists with whom

Page 674

[1] "Q. Just let me know when you've had a chance to look it over.
[2] You're okay?
[3] "A. Yes.
[4] "Q. Just before the break, Mr. Benton asked you your rationale
[5] to support as part of the DMX's interim fee a proposal using
[6] data respecting off-premise plays as a proxy for all plays and
[7] you gave an answer, and is that -- do you want to amplify that
[8] answer?
[9] "A. I do think I want to amplify the answer. The way that we
[10] think about the data that comes out as a result of our service
[11] being performed is, again, if you parse it between off-premises
[12] and on-premises, when you think about on-premises, there are
[13] more, there is less value associated with the on-premises data
[14] because it suffers from multiple deficiencies, the deficiencies
[15] really being twofold. Number one, you don't know what the end
[16] user ultimately listens to, and, number two, you don't know
[17] what the location ultimately plays in terms of the works, the
[18] sound recordings, for that matter. The off-premises data by
[19] contrast suffers from less of those problems in that the former
[20] of those two is still an issue in that you don't know what the
[21] enter user ultimately listens to, but you do know and the
[22] company has the ability to track and does report on the number
[23] of times that a particular work is in fact publicly-based.
[24] "Q. And does that answer and your, the consideration you
[25] indicated supporting it, is it affected by the nature of the

Page 673

[1] you had had a previous relationship, is that correct?
[2] "A. A previous relationship, yes, but I'm not sure that, the
[3] premise of your question that the previous relationship reduces
[4] its transaction cost. I'm not sure that's necessarily the
[5] case.
[6] "Q. Okay. As part of these stages of approaching publishers
[7] or artists, did DMX consider transaction costs in terms of who
[8] it prioritized first?
[9] "A. I don't recall if transaction costs were something that
[10] resulted in, was a factor in the prioritization, no.
[11] "Q. Okay. Why was off-premises chosen as a proxy in the
[12] direct licenses as opposed to using both off-premise and
[13] on-premise?
[14] "A. Well, first, I'm not sure that you could ever get a proxy
[15] for on-premise and number two, I think more importantly is
[16] that's how we report to BMI right now.
[17] "Q. That's how you report to BMI right now?
[18] "A. Uh-huh.
[19] "Q. You have knowledge about that?
[20] "A. I think that I, I recall being told that, at least.
[21] "Q. If that were not true, that wouldn't support your
[22] off-premise proxy?
[23] "A. Well, if it were not true, then it wouldn't support it.
[24] "Q. Okay, let me hand you Exhibit 21."
[25] **MR. FITZPATRICK:** That is tab 6 in the binder.

Page 675

[1] reporting that DMX makes to BMI in the normal course one way or
[2] the other?
[3] "A. Does -- say that again?
[4] "Q. Does the manner in which DMX reports in fact to BMI alter
[5] in any way the considerations you've just identified?
[6] "A. No."
[7] **MR. FITZPATRICK:** That concludes this witness, your
[8] Honor.
[9] Just for the record, I didn't identify the exhibit
[10] numbers in the tabs. Tab 1 was Joint Exhibit 1141; tab 2,
[11] Joint Exhibit 1145; tab 3, Joint Exhibit 1147; tab 4, Joint
[12] Exhibit 1148; tab 5, Joint Exhibit 1154; tab 6, Joint Exhibit
[13] 1158. And, your Honor, BMI has one last witness, our expert,
[14] Professor Owen, and he'll be here Monday morning, if that's
[15] acceptable.
[16] **THE COURT:** And how long do you expect he will be?
[17] **MR. SALZMAN:** Likely the whole day with
[18] cross-examination.
[19] **THE COURT:** Taking the whole day with cross?
[20] **MR. SALZMAN:** That's what I expect. Could be longer.
[21] **MR. FITZPATRICK:** Your Honor, if I could ask one
[22] logistical question. There was an exhibit that came up when
[23] Mr. Laughlin was on the stand where your Honor instructed us to
[24] provide some backup data to DMX's counsel which we are doing.
[25] I believe your Honor said you would address the objection on



BROADCAST MUSIC, INC., v.
DMX, INC.,

[1] Monday after they've had the opportunity to look at it. I just
[2] wanted to be certain, Mr. Laughlin is located in Tennessee and
[3] he's back there. I just wanted to -- obviously, if the Court
[4] requires him he'll be here whenever the Court requires, but I
[5] just wasn't sure whether in addressing the objection the Court
[6] would require Mr. Laughlin's presence at that time. We could
[7] certainly work it out with Weil, Gotshal in terms of whether or
[8] not they require him, but there's of course the separate
[9] question of whether your Honor requires him. I just wanted to
[10] find out what your Honor's intentions were.
[11]     **THE COURT:** Does the response to the -- how did I
[12] leave it? Did I take the question subject to check over the --
[13] take the answer? I don't think so.
[14]     **MR. FITZPATRICK:** I believe you took the oral
[15] testimony and with respect to the exhibit the objection is
[16] pending and your Honor said you would revisit it on Monday. Is
[17] that accurate?
[18]     **MR. LARSON:** Yes. My recollection is we had no
[19] objection to the oral testimony about the exhibit. It was just
[20] when it was moved into evidence.
[21]     **THE COURT:** Therefore, I don't see any reason if it's
[22] simply a ruling on the admissibility.
[23]     **MR. FITZPATRICK:** Thank you, your Honor.
[24]     **THE COURT:** I wouldn't bring him all the way back.
[25] And if it turns out that we do need him, we can fit him in

[1] later.
[2]     **MR. FITZPATRICK:** Thank you, your Honor.
[3]     **THE COURT:** Don't bring him back just for that.
[4]     **MR. FITZPATRICK:** Thank you, your Honor.
[5]     **THE COURT:** Well, then, I guess we're through for the
[6] week and I'll see you at 10:00 Monday morning. Have a good
[7] weekend.
[8]     (Adjourned to January 25, 2010 at 10:00 a.m.)
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

[1]             INDEX OF EXAMINATION
[2] Examination of:                 Page
[3] CLEVE MURPHY
[4] Direct By Mr. Fitzpatrick . . . . . . . . . . 524
[5] Cross By Mr. Larson . . . . . . . . . . . . . 538
[6] ALISON SMITH
[7] Direct By Mr. Salzman . . . . . . . . . . . 547
[8] Cross By Mr. Rich . . . . . . . . . . . . . . 584
[9] Redirect By Mr. Salzman . . . . . . . . . . 637
[10]         PETITIONER EXHIBITS
[11] Exhibit No.                 Received
[12] 0191    . . . . . . . . . . . . . . . . . . 535
[13]         RESPONDENT EXHIBITS
[14] Exhibit No.                 Received
[15] RX 43 . . . . . . . . . . . . . . . . . . . . . . . . . . 626
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]