# 10-3429-cv

## In The United States Court of Appeals for the Second Circuit

BROADCAST MUSIC, INC.,

*Petitioner-Appellant*,

*v.*

DMX INC.,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York (Stanton, J.)

### JOINT APPENDIX
### VOLUME III OF V, PAGES A408-A629

R. BRUCE RICH
BENJAMIN E. MARKS
TODD D. LARSON
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Counsel for Respondent-Appellee*

SETH P. WAXMAN
JONATHAN E. NUECHTERLEIN
CATHERINE M.A. CARROLL
ERIC F. CITRON
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

MARVIN L. BERENSON
JOSEPH J. DIMONA
BROADCAST MUSIC, INC.
7 World Trade Center
250 Greenwich Street
New York, NY 10007

*Counsel for Petitioner-Appellant*

December 20, 2010

# TABLE OF CONTENTS

## VOLUME I

### RELEVANT DOCKET ENTRIES, PLEADINGS, AND ORDERS

Page

Docket sheet, No. 08 Civ. 216 (LLS) (S.D.N.Y) .................................................. A-1

Notice of Appeal, Dkt. No. 38, August 24, 2010 ................................................ A-6

Consent Decree entered in *United States v. Broadcast Music, Inc.*,
    1966 Trade Cas. (CCH) ¶71,941 (S.D.N.Y. 1966), *as amended
    by* 1966-1 Trade Cas. (CCH) ¶71,378 (S.D.N.Y. 1994) ......................... A-11

Petition for Determination of Reasonable License Fees, Dkt. No. 1,
    Jan. 10, 2008 ......................................................................................... A-19

Memorandum and Order re Interim Fee, Dkt. No. 30, Aug. 19, 2010 .............. A-24

Consent Pre-Trial Order, Part I: Agreed Findings of Fact, Dkt. No. 31,
    unsealed Aug. 19, 2010 [Excerpt—pp. 1-15].......................................... A-31

Consent Pre-Trial Order, Part II, Sections H and I: BMI Fee Proposal,
    Dkt. No. 31, unsealed Aug. 19, 2010 [Excerpt—pp. 36-68].................... A-46

Consent Pre-Trial Order, Part III, Section M: DMX Fee Proposal,
    Dkt. No. 31, unsealed Aug. 19, 2010 [Excerpt—pp. 118-132]................ A-79

### EXHIBITS SUBMITTED AT INTERIM-FEE STAGE

Deposition of Benjamin M. Hanson, Sept. 25, 2008
    [Excerpt— pp. 118, 152-153, 173-174] .................................................. A-94

Deposition of Ronald Gertz, Sept. 22, 2008
    [Excerpt—pp. 21-23, 126-127] .............................................................. A-101

Email chain between Ulman and Torrence, May 16-22, 2006,
    unsealed Aug. 26, 2010 ......................................................................... A-108

## EXPERT REPORTS

Interim Phase Declaration of Bruce M. Owen, Aug. 27, 2008......................... A-116

Interim Phase Declaration of Amy Bertin Candell, Aug. 27, 2008.................. A-131

Interim Phase Declaration of Adam B. Jaffe, Aug. 26, 2008 ........................... A-150

Interim Phase Reply Declaration of Bruce M. Owen,
    Oct. 23, 2008, Dkt. No. 42...................................................................... A-166

Interim Phase Reply Declaration of Amy Bertin Candell,
    Oct. 24, 2008, Dkt. No. 44...................................................................... A-187

Interim Phase Reply Declaration of Adam B. Jaffe,
    Oct. 24, 2008, Dkt. No. 46...................................................................... A-218

## <u>VOLUME II</u>

## TRIAL TRANSCRIPTS

Trial Transcript, Jan. 19, 2010 ......................................................................... A-233

Trial Transcript, Jan. 20, 2010 ......................................................................... A-269

Trial Transcript, Jan. 21, 2010 ......................................................................... A-318

Trial Transcript, Jan. 22, 2010 ......................................................................... A-366

## <u>VOLUME III</u>

Trial Transcript, Jan. 25, 2010 ......................................................................... A-408

Trial Transcript, Jan. 26, 2010 ......................................................................... A-455

Trial Transcript, Jan. 27, 2010 ......................................................................... A-505

Trial Transcript, Jan. 28, 2010 ......................................................................... A-549

Trial Transcript, Jan. 29, 2010 ......................................................................... A-574

Trial Transcript, Feb. 1, 2010 ......................................................................... A-612

# VOLUME IV

## JOINT TRIAL EXHIBITS

License Agreement between Broadcast Music, Inc. and PlayNetwork, Inc., June 16, 2005 (JX-95) ................................................. A-630

License Agreement between Broadcast Music, Inc. and TruSonic, Inc., June 28, 2007 (JX-127) ................................................. A-639

License Agreement between Broadcast Music, Inc. and Muzak, Inc., Dec. 31, 2004 (JX-132) .......................................................... A-649

License Agreement between DMX, Inc. and AMRA, Nov. 15, 2007 (JX-171) ................................................................................. A-674

License Agreement between THP Capstar Acquisition Corp. and Cherry Lane Music Publishing Company, Inc., Oct. 1, 2006 (JX-219) ................................................................................. A-679

License Agreement between DMX, Inc. and Sony/ATV Music Publishing, Inc., Nov. 14, 1007 (JX-449) .............................. A-704

License Agreement between DMX, Inc. and Williamson Music Co., July 1, 2009 (JX-513) .......................................................... A-721

Letter Agreement between BMI and Muzak LLC (and Muzak Affiliates), Dec. 31, 2004 (JX-723) ........................................ A-727

Muzak Affiliate License Agreement form (undated) (JX-733) ........................ A-733

Letter from Annastas to Zendan, Aug. 20, 2003 (JX-739) .............................. A-742

Chart re "Muzak Proposal" history with handwritten notes, Apr. 7, 2004 (JX-743) ........................................................................ A-744

Chart re "Muzak June 2004 & July 2004 Proposal," July 9, 2004 (JX-745) ...................................................................................... A-745

Letter from Zendan to Berenson, Apr. 4, 2003 (JX-759) ................................ A-747

Email chain between Eudeikis and Stafford-Scherer et al., Jan. 23-31, 2005 (JX-774) ........................................................................ A-750

BMI's Hotel/Motel Music Performance Agreement Form (undated) (JX-780) ................................................................................... A-756

BMI's Music License for Eating & Drinking Establishments Form (undated) (JX-781).................................................................... A-760

BMI's Retail Establishments Music Performance Agreement Form (undated) (JX-782)................................................................... A-764

Letter from Hoag to Larson with spreadsheet (Response to DMX Interrogatory No. 9), Feb. 24, 2009 (JX-0789) ....................... A-768

Email from Hanson to Lowenberg with attached draft Term Sheet, Mar. 11, 2008 (JX-827) ......................................................... A-773

Term sheet to Primary Wave Musical Composition Catalog License Term Sheet (undated) (JX-828) ................................................ A-774

Letter from Hayward to Dahl enclosing Background/Foreground Music Service License Agreement between ASCAP and AEI Music Network, Inc., Mar. 14, 1995 (JX-840)........................ A-775

Email from Knittel to Ulman re Abkco & Mother Bertha:  License Proposal for the DMX background music service, Aug. 1, 2006 (JX-874) .................................................................................. A-780

DMX, Inc.'s 2nd Quarter 2009 Royalty Statement—Sony/ATV Music Publishing LLC, Aug. 14, 2009 (JX-925) [Excerpt] .............. A-782

DMX, Inc.'s 2nd Quarter 2008 Royalty Statement—Sony/ATV Songs LLC, Aug. 19, 2008 (JX-927) [Excerpt] ................................. A-783

DMX, Inc.'s Summary of Royalties, All Payees—1st Quarter 2008, Aug. 14, 2009 (JX-929)......................................................... A-785

DMX, Inc.'s Summary of Royalties, All Payees—2nd Quarter 2008, Aug. 19, 2008 (JX-930)......................................................... A-787

DMX, Inc.'s Summary of Royalties, All Payees—2nd Quarter 2009,
Aug. 14, 2009 (JX-931) ......................................................... A-790

DMX's Responses and Objections to BMI's Second Set of
Interrogatories, Mar. 17, 2009 (JX-934) [Excerpt] ................. A-794

DMX, Inc.'s 4th Quarter 2008 Royalty Statement—Sony/ATV Music
Publishing LLC, Feb. 10, 2009 (JX-935) [Excerpt].............. A-795

DMX, Inc.'s 1st Quarter 2009 Royalty Statement—Sony/ATV Music
Publishing LLC, May 12, 2009 (JX-936) [Excerpt] .............. A-796

DMX, Inc.'s 3rd Quarter 2008 Royalty Statement—Sony/ATV Music
Publishing, Nov. 14, 2008 (JX-937) [Excerpt]....................... A-797

DMX, Inc.'s Summary of Royalties, All Payees—3rd Quarter 2008,
Nov. 14, 2008 (JX-938)........................................................ A-798

DMX, Inc.'s Summary of Royalties, All Payees—4th Quarter 2008,
Feb. 10, 2009 (JX-939)........................................................ A-801

DMX, Inc.'s Summary of Royalties, All Payees—1st Quarter 2009,
May 12, 2009 (JX-940) ........................................................ A-804

Email from Smith to Levin re DMX-AMRA—License Proposal for
Background Music Service, Aug. 8, 2007 (JX-947) [Excerpt].............. A-808

Email from Hunsaker to Knittel re Cherry Lane—DMX Proposal
(JX-968) ............................................................................... A-809

Email from Ulman to Hunsaker re Cherry Lane License Proposal for
DMX Background Music Service—Quote # 14424, June 16,
2006 (JX-0969) .................................................................... A-810

DMX, Inc.'s 1st Quarter 2008 Royalty Statement—Sony/ATV Music
Publishing, May 13, 2008 (JX-1050) .................................... A-813

Email chain between Ulman and Knittel re Manatt—DMX License
Proposal, July 5, 2006 (JX-1061) ......................................... A-814

Settlement Agreement between ASCAP and Muzak LLC re pre-2005
        claims and 2005-2009 blanket license, Jan. 14, 2005 (JX-1110)........... A-818

Email from Knittel to Taylor re ASCAP reports, January 2007,
        attaching ASCAP Monthly Statement of Account for January
        2008 through June 2008, Mar. 1, 2007 (Hanson Dep. Exhibit 8)
        (JX-1145) .................................................................................. A-821

License Agreement between DMX, Inc. and Sony/ATV Music
        Publishing, Inc., Nov. 14, 2007 (JX-1148)............................................ A-828

Email from Knittel to Engel re Royalty Advances to Sony/ATV,
        attaching Royalty Advance Payments, Nov. 30, 2007 (JX-1149) ......... A-849

Letter Agreement between DMX, Inc. and Sony/ATV Music
        Publishing, Nov. 14, 2007 (JX-1150)...................................................... A-851

Email from Knittel to Gertz re DMX-w-Sony ATV/Catalog License,
        June 19, 2006 (JX-1154) ....................................................................... A-853

Charts re BMI Proposals (undated) (JX-1164)................................................ A-854

Email chain between Knittel and Ulman et al., Aug, 2, 2006
        (JX-1167) ............................................................................................... A-859

Letters enclosing Amendment to Musical Composition Catalog
        License (Background/Foreground Music Service), Apr. 2009
        (JX-1170)................................................................................................ A-861

Email from Gertz to Arrow re direct license proposal, May 4, 2006
        (JX-1184) ............................................................................................... A-868

Email from Knittel to Arrow re Direct License Agreement between
        Universal Publishing Group and DMX Music, attaching
        proposed license agreement, Oct. 3, 2006 (JX-1185) ........................... A-870

Email from Arrow to Knittel re ASCAP DMX, Jan. 4, 2007 (JX-1186) ......... A-876

Email from Arrow to Knittel re ASCAP DMX, Jan. 4, 2007 (JX-1187) ......... A-878

Email from Knittel to Arrow re DMX proposal to Universal Music
    Publishing Group, Feb. 2, 2007 (JX-1188) ............................................ A-881

Email from Arrow to Renzer re DMX proposal to Universal Music
    Publishing Group, Feb. 28, 2007 (JX-1189) ......................................... A-888

Email from Arrow to Knittel re Publishers Licensing Proposal, July
    26, 2007 (JX-1190) ................................................................................. A-890

BMI/CMS Music Performance Agreement form 1987-1993 (JX-1215) ......... A-893

Letter Agreement between BMI, Muzak LLC, and Muzak Affiliates,
    Aug. 2, 2004 (JX-1234) ......................................................................... A-897

## **VOLUME V**

Email from Hunsaker to Burns re License Proposal, June 14, 2006
    (JX-1240) ............................................................................................... A-911

BMI Local Television Station Music Performance Per Program
    License form (undated) (JX-1242) ....................................................... A-913

ASCAP Local Station Per-Program License (undated) (JX-1249) ................. A-937

ASCAP Local Station Per-Program License (undated) (JX-1254) ................. A-958

Chart re Commercial Music Service Licensees (undated) (JX-1257) ............. A-982

Table re Muzak Off-Premise Channels Q1 2008 (JX-1265) ........................... A-985

BMI Royalty Information Booklet (Oct. 15, 2009) (JX-1266) ........................ A-990

DMX's Suppl. Response to Request No. 26 of BMI's First Request
    for Production of Documents, Sept. 19, 2008 (JX-1276) .................... A-1011

DMX Responses and Objections to BMI's First Set of Interrogatories
    (JX-1277) ............................................................................................. A-1014

BMI Commercial Music Service License Agreement (undated) (JX-
    1291) ................................................................................................... A-1032

Chart re Commercial Music Service Annual Fees (Revised) (JX-1293) ....... A-1041

DMX, Inc.'s 3rd Quarter 2009 Royalty Statement—Sony/ATV Music
    Publishing, Nov. 11, 2009 (JX-1296) [Excerpt] ................................... A-1056

DMX, Inc.'s Summary of Royalties, All Payees—3rd Quarter 2009,
    Nov. 11, 2009 (JX-1299) ...................................................................... A-1057

Redacted Confidential Memorandum from DiMona & Howland-
    Kruse to Bryant et al., June 28, 2006 (JX-1310) .................................. A-1062

Chart re Per BMI License Fee Definition & Calculation, June 27,
    2006 (JX-1311) ...................................................................................... A-1080

Amendment to Commercial Music Service License Agreement
    between BMI and TruSonic, Inc. (JX-1312) ......................................... A-1081

Redacted email chain between Salzman and O'Neill re DMX line
    item, 2007 (JX-1313) ............................................................................ A-1082

Email chain between Annastas, Shaker, and Berenson, July 9, 2004
    (JX-1318) ............................................................................................... A-1084

Analysis re Muzak Proposal, Apr. 9, 2003 (JX-1321) ................................... A-1086

Email from Annastas to Stafford-Scherer et al., July 9, 2004 (JX-
    1324) ...................................................................................................... A-1087

Letter Agreement between PlayNetwork, Inc. and BMI, Apr. 29, 2005
    (JX-1328) ............................................................................................... A-1088

Email from Arrow to Renzer forwarding email from Smith to Arrow,
    Aug. 2, 2007 (JX-1331) ......................................................................... A-1091

DMX, Inc.'s 1st Quarter 2008 Royalty Statement—Bug Music, Inc.,
    May 13, 2008 (JX-1347) [Excerpt] ....................................................... A-1092

# PETITIONER TRIAL EXHIBITS

BMI/Muzak Meeting Notes, July 9, 2002 (PX-11) ........................................ A-1093

Letter from DiMona to Marks re BMI/DMX Commercial Music
 Service, Carve-Out License Quote, Oct. 4, 2007 (PX-101) ................ A-1095

Letter Agreement between Music Reports, Inc. and THP Capstar
 Acquisition Corp., Jan. 31, 2006 (PX-104) .......................................... A-1099

Letter Ageement between Music Reports, Inc. and THP Capstar
 Acquisition Corp., Oct. 4, 2007 (PX-105) ............................................ A-1107

Letter Ageement between Music Reports, Inc. and THP Capstar
 Acquisition Corp., Apr. 4, 2008 (PX-106) ............................................ A-1114

Letter Ageement between Music Reports, Inc. and THP Capstar
 Acquisition Corp., July 4, 2008 (PX-107) ............................................ A-1116

Muzak Holdings LLC and Muzak Holdings Finance Corp. 2007
 Annual Report (undated) (PX-112) [Excerpt—pp. 5-6] ..................... A-1118

Charts re Percent of Identified Show Hours Containing BMI Music,
 Jan. 21, 2009 (PX-126) ........................................................................ A-1121

Updated Response of BMI to DMX's First Set of Interrogatories No.
 6, June 22, 2009 (PX-153) ................................................................... A-1123

Letter from Hoag to Larson attaching spreadsheet re AFBL-DMX
 Support Reporting, Sept. 3, 2009 (PX-171) ......................................... A-1133

Reply Affidavit of L. Barry Knittel on Behalf of ASCAP (PX-173) ............. A-1137

DMX Title-Usage Summary: On- Versus Off-Premises: 2008 Third
 Quarter (PX-200) .................................................................................. A-1146

Charts re 2nd Quarter 2009 Summary—Off Premises Only and 2nd
 Quarter 2009 Summary—On Premises Only (PX-201) ....................... A-1147

Email chain between McKinley, Hill, et al. re 2007 Price Increase,
 July 14, 2008 (PX-205) ......................................................................... A-1148

# RESPONDENT TRIAL EXHIBITS

Email from D. O'Neill to Stafford-Scherer re Trusonic, Mar. 13, 2007
(RX-19) ..................................................................................... A-1151

Letter from Unger to Stafford-Scherer re executed contract, July 19,
2005 (RX-20) ........................................................................... A-1152

Email exchange between O'Neill and Sweeney re DMX Proposal,
Aug. 15, 2006 (RX-22) ............................................................ A-1153

Email from O'Neill to Bryant et al. attaching DMX Payments to
Major Pubs, Oct. 26, 2007 (RX-24) ........................................ A-1154

Email from O'Neill to Cody re DMX payments, Oct. 29, 2007 (RX-27) ....... A-1157

Request to PRRC for Approval of Guarantee, Dec. 3, 2007 (RX-31) ........... A-1161

Letter Agreement between BMI and Songs of Universal Inc., Dec. 7,
2007 (RX-32) ........................................................................... A-1163

Emails between Sweeney, Smith, O'Neill, and Roberts, Apr. 16, 2008
(RX-43) ..................................................................................... A-1165

Email from Stafford-Scherer to Annastas and Stevens re Muzak, LLC
location review, June 22, 2004 (RX-50) ................................... A-1167

Email from Stafford-Scherer to Annastas, July 9, 2004 (RX-51) ................. A-1168

Redacted email from Annastas to Stafford-Scherer and Stevens,
forwarding email from Calhoun to Berenson re Music
Choice/BMI Commercial Proposal, Oct. 24, 2005 (RX-53) ............... A-1170

Redacted email from Annastas to Stafford-Scherer and Stevens,
forwarding email from Calhoun to Berenson re Music
Choice/BMI Commercial Proposal, Nov. 1, 2005 (RX-54) ............... A-1172

Chart re Per BMI License Fee Definition & Calculation Summaries,
Proposal A (Original) (undated) (RX-57) ................................ A-1175

Email from D. O'Neill to Stafford-Scherer, Nov. 16, 2006 (RX-59) ............. A-1179

Redacted email from D. O'Neill to Stafford-Scherer re Trusonic, Mar. 12, 2007 (RX-62) .................................................................. A-1180

Emails between Pattillo and Stafford-Scherer re contract agreement, Sept. 27, 2006 (RX-67) ............................................................. A-1181

Email from Arrow to Smith re DMX, Aug. 9, 2006 (RX-74) ....................... A-1187

Email from Smith to Blue re DMX-Helene Blue Musique license proposal, Mar. 26, 2009 (RX-82) [Excerpt] .......................................... A-1189

Emails between Knittel and Levin re AMRA Clients, August 2-6, 2007 (RX-86) .................................................................. A-1190

Emails between Smith, Levin, and Knittel re AMRA Clients, Aug. 24, 2007 (RX-088) ................................................................. A-1191

Letter from Stafford-Scherer to Johnson re BMI New Form Agreements, July 26, 2006 (RX-157) ................................................. A-1193

# In The Matter Of:

## *BROADCAST MUSIC INC., V.*
## *DMX, INC.,*

---

## *VOLUME 5*
## *January 25, 2010*

---

## *TRIAL*
## *SOUTHERN DISTRICT REPORTERS*
## *500 PEARL STREET*
## *NEW YORK., NY 10007*
## *212-805-0300*

Original File 01p5bmiF.txt, Pages 679-860 (182)

**Word Index included with this Min-U-Script®**

[1]          Original          trial
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
[2] ------------------------------x
[3] BROADCAST MUSIC INC.,
[4]                  Petitioner,
[5]      v.                    78 Civ. 116 (LLS)
[6] DMX, INC.,,
[7]                  Respondent.
[8] ------------------------------x
[9]                            January 25, 2010
                               10:10 a.m.
[10] Before:
[11]              HON. LOUIS L. STANTON,
[12]                            District Judge
[13]              APPEARANCES
[14] HUGHES, HUBBARD & REED, LLP
         Attorneys for Petitioner
[15]   BY: JAMES J. FITZPATRICK
         MICHAEL E. SALZMAN
[16]     JASON C. BENTON
         MARGARET J. BLAG
[17]     - AND -
         JOSEPH DiMONA, In-house counsel, BMI, Inc.,
[18]
[19] WEIL, GOTSHAL & MANGES, LLP
         Attorneys for Respondent
[20]   BY: R. BRUCE RICH
         BENJAMIN E. MARKS
         TODD D. LARSON
[21]
[22]
[23]
[24]
[25]

[1]          (Trial resumed)
[2]          MR. FITZPATRICK: Your Honor, before we call our first
[3] witness, with your permission we would like to hand up a few
[4] things that we worked on over the weekend.
[5]          Your Honor, just to describe --
[6]          THE COURT: Ah, thank you.
[7]          MR. FITZPATRICK: You're welcome, your Honor.
[8]          Taking what your Honor has in your hand first, that
[9] was our effort to add the data to the demonstrative that your
[10] Honor requested.
[11]          THE COURT: I can see that. Thank you.
[12]          MR. FITZPATRICK: You're welcome, your Honor.
[13]          The large spreadsheet, your Honor, is a correction of
[14] what had been Joint Exhibit 1.47 which your Honor had seen
[15] before. I believe it was Mr. Rich that identified correctly
[16] that there was an anomaly in the Music Choice data because
[17] since Music Choice was growing, one would have expected a
[18] steady decrease in the per-location rate. And Mr. Rich is
[19] correct, it was unless there was -- a year ago -- I went on.
[20]          THE COURT: The year before the last.
[21]          MR. FITZPATRICK: Exactly, your Honor. That is in
[22] fact -- it was a recurring issue which I won't bore your Honor
[23] with but Mr. Rich was correct.
[24]          THE COURT: And with the other correction, the is no
[25] ignored?

[1]          MR. FITZPATRICK: We would ask that, your Honor; yes.
[2]          The binder, your Honor, is -- we made an effort to
[3] locate the document related to the Muzak negotiations that your
[4] Honor had referenced and I'm not sure whether we honestly are
[5] not certain that we did it but, so what we did was there is not
[6] a lot of -- there weren't really that many documents and so we
[7] put them in chronological order, everyone that has been
[8] referenced at the trial we put them in chronological order, we
[9] put them in a binder and have given that to your Honor. So, to
[10] the extent there is such a document, we believe it would have
[11] to be that binder.
[12]          THE COURT: Did you find anything that sounded right,
[13] looked right?
[14]          MR. FITZPATRICK: Your Honor, no. No, your Honor.
[15] The closest thing was something we had already shown and your
[16] Honor had said was not it, so. But, we are --
[17]          THE COURT: The brain does funny things as you get
[18] older but usually it doesn't create documents with a front and
[19] a back in a particular format. We haven't found it either.
[20]          MR. FITZPATRICK: That's every document that was
[21] referenced, so.
[22]          THE COURT: Anyway. Thanks very much.
[23]          MR. FITZPATRICK: And then the last -- my last issue,
[24] your Honor, is with respect to Petitioner's Exhibit 200 and
[25] 201, those were the documents whose admission was moved when

[1] Mr. Laughlin was on the stand.
[2]          THE COURT: Ah, yes; subject to verification.
[3]          MR. FITZPATRICK: Yes, and we have provided the data
[4] to the respondents and we now again move their admission.
[5]          THE COURT: Mr. Rich?
[6]          MR. RICH: Good morning, your Honor.
[7]          THE COURT: Good morning.
[8]          MR. RICH: No objection to the revised JX 1293, that's
[9] fine.
[10]          With respect to PX 200 and 201, however, we received
[11] late on Friday a couple of data files, each containing more
[12] than 100,000 records. We have not had a minute, candidly to
[13] review those. We've had on this trial schedule a very full
[14] weekend of witness preparation and so forth.
[15]          We would urge your Honor to not allow these documents
[16] in evidence. They were produced to us the night of the
[17] pretrial order being filed without explanation for the delay
[18] and without providing this kind of information to us.
[19]          As your Honor saw on their face, they're summary
[20] documents, they're rank hearsay. We don't really feel it
[21] appropriate to be diverted at this moment in the trial from
[22] preparation. Your Honor heard testimony from Mr. Laughlin
[23] concerning what they purport to be. We, obviously, were not in
[24] a position to cross-examine him. And while I can't tell you
[25] that we couldn't conceivably undertake the effort at this late

Page 683

[1] date to examine 200,000 data entries for their potential
[2] relevance, it seems to us an untimely proffer from the other
[3] side.

[4] **MR. FITZPATRICK:** Your Honor, we of course provided
[5] that data because that was what we were requested to do. If
[6] there is an issue of time, I certainly don't object to waiting
[7] an extra day or two to address this but it is -- it is an
[8] extremely important piece of data, your Honor, because it goes
[9] directly to the fact that the -- using the off-premise data
[10] only for the credit is both inaccurate and inappropriate.

[11] There are hundreds of thousands of records, it is
[12] true. Those are the songs that DMX provided to us as part of
[13] their normal music use recording and what we have done is match
[14] them up with the direct license database and what it would be.
[15] If DMX needs more time to check that or authenticate it or has
[16] any other questions about it, I don't object to more time or to
[17] more answers but I don't think it goes to their admissibility,
[18] your Honor.

[19] **THE COURT:** Mr. Rich says there are thousands of
[20] underlying documents. Is that rhetorical or do you think it is
[21] a fair appraisal?

[22] **MR. FITZPATRICK:** Individual pieces of data I would
[23] agree there are thousands because it is literally every song
[24] that DMX performed and reported to us. I don't think it would
[25] be -- I don't know that I would call them documents but I

Page 684

[1] certainly don't disagree that there are thousands and thousands
[2] of pieces of data.

[3] **THE COURT:** How long was that exhibit in preparation?

[4] **MR. FITZPATRICK:** I'm sorry, your Honor?

[5] **THE COURT:** How long was that exhibit in preparation?
[6] How long did it take for you to put it together?

[7] **MR. FITZPATRICK:** I'm not sure I know the answer to
[8] that, your Honor.

[9] **THE COURT:** Well, you are asking him to check it in a
[10] rather finite amount of time; I'm just wondering how long it
[11] took you to create it.

[12] **MR. FITZPATRICK:** I would have to find the answer.

[13] **THE COURT:** In round terms.

[14] **MR. FITZPATRICK:** I think it is data that can be run
[15] in a day, your Honor. It is literally checking one database
[16] against -- it is literally taking -- because it can be done
[17] electronically it can be done very quickly. I don't mean to
[18] diminish the complexity of it, but it is an electronic process
[19] so I believe it can be done in a day.

[20] **THE COURT:** Do you have a tape of it you can furnish
[21] to them so that they can check it? That's what you did.

[22] **MR. FITZPATRICK:** My understanding is that's what
[23] we've again given and if I am incorrect and anything else is
[24] required, I am more than happy to furnish it but that's my
[25] understanding of the electronic data that we're given.

Page 685

[1] **THE COURT:** Are you checking it electronically,
[2] Mr. Rich, or manually?

[3] **MR. RICH:** That would be the process, your Honor, but
[4] literally physically, over the weekend, we simply didn't have
[5] the ability with so many moving parts of what is occurring at
[6] trial this entire week.

[7] **THE COURT:** Well, I understand that point but I'm
[8] trying to find out what remains to be done. Is it something
[9] you have to do with a horde of people manually or is it a
[10] question of an electronic comparison of data?

[11] **MR. RICH:** I think I confess to not being an expert in
[12] the processing. I think it is data manipulation but people who
[13] are trained to do that sort of thing and to understand the --

[14] **THE COURT:** Manipulation.

[15] **MR. RICH:** -- to understand the mathematics and
[16] database and understand the summary chart and whatever goes
[17] into that. It is a lot of data records. Of course it is
[18] doable, it is just a question at this point, to us, of the
[19] timeliness of that.

[20] **THE COURT:** I'm looking for the evidence rule on
[21] summaries.

[22] **MR. FITZPATRICK:** I think 1006, your Honor.

[23] **THE COURT:** 1006. Yes.

[24] Well, let's simply hold it subject to a motion to
[25] trying until the end of trial. See if you can check the stuff

Page 686

[1] electronically. It sounds manageable if you have a chance to
[2] get to it and, of course, you will be putting in your own
[3] things but see if you can do it before the end of the trial.

[4] **MR. RICH:** We will do our best, your Honor. Thank
[5] you.

[6] **THE COURT:** All right.

[7] **MR. FITZPATRICK:** Thank you, your Honor.

[8] I now turn it over to Mr. Salzman who I believe is
[9] going to provide your Honor with a cite with respect to a
[10] question that your Honor asked him last week and then we will
[11] call our next witness.

[12] **THE COURT:** Mr. Salzman.

[13] **MR. SALZMAN:** Good morning, your Honor.

[14] Before the end of the day on Friday the question arose
[15] as to what the consent decree -- BMI consent decree had to say
[16] on the subject of paying guarantees to affiliates, and at that
[17] time I referenced a provision that contemplated them as and
[18] regulated them in a certain particular respect and that
[19] provision -- I say that off the top of my head -- and that
[20] provision is Section 7B of the decree. I thought I would hand
[21] up, with your Honor's permission, a copy of the decree.

[22] **THE COURT:** Oh, thank you. I thought you did pretty
[23] well off the top of your head.

[24] **MR. SALZMAN:** Better to be lucky than smart.

[25] **THE COURT:** It is better to look at the document than



Page 687

[1] rely on memory.
[2] Thank you.
[3] What was the provision? 7B?
[4] **MR. SALZMAN:** 7B.
[5] **THE COURT:** Ah yes. Thank you.
[6] **MR. SALZMAN:** With your Honor's permission, I call
[7] BMI's next witness, Bruce Owen.
[8] BRUCE M. OWEN,
[9] called as a witness by the Petitioner,
[10] having been duly sworn, testified as follows:
[11] **THE WITNESS:** Bruce M. Owen.
[12] **THE COURT:** Mr. Salzman.
[13] **MR. SALZMAN:** Thank you, your Honor. May we approach
[14] to distribute the exhibit book?
[15] **THE COURT:** Sure.
[16] **DIRECT EXAMINATION**
[17] **BY MR. SALZMAN:**
[18] **Q.** Good morning, Mr. Owen.
[19] **A.** Good morning, Mr. Salzman.
[20] **Q.** How are you currently employed?
[21] **A.** I'm employed by Stanford University.
[22] **Q.** And what is your position there?
[23] **A.** I teach economics and public policy in the school of
[24] humanities and sciences.
[25] **Q.** What are your areas of academic interest?

Page 688

[1] **A.** Antitrust, communications regulation, industrial
[2] organization.
[3] **Q.** Have you published any books in that area?
[4] **A.** Yes. I have published several books, chiefly in connection
[5] with communications policy.
[6] **Q.** Did you ever work for the government?
[7] **A.** Yes. I worked for the government on two occasions.
[8] **Q.** Can you describe those occasions?
[9] **A.** On the first occasion I was the chief economist of the
[10] White House office of telecommunications policy. On the second
[11] occasion I was the chief economist of the Antitrust Division of
[12] the Department of Justice.
[13] **Q.** Just briefly give us your educational background?
[14] **A.** I have a bachelors degree from Williams College and a Ph.D
[15] in economics from Stanford University.
[16] **Q.** Do you belong to any academic organizations?
[17] **A.** Yes, I do. The American Economic Association, the
[18] Econometric Society and the American Law and Economics
[19] Association.
[20] **Q.** Turn, if you would, to tab 1 in your book?
[21] **A.** Yes.
[22] **Q.** What is tab 1?
[23] **A.** Tab 1 appears to be a copy of my resume.
[24] **Q.** This is an updated version of the material that was in your
[25] expert report that's P 119?

Page 689

[1] **A.** Yes, it is.
[2] **MR. SALZMAN:** I offer it in evidence.
[3] **MR. MARKS:** Assuming that the reference was of what is
[4] being offered into evidence is a copy of the curriculum vitae
[5] rather than the expert report, no objection.
[6] **MR. SALZMAN:** That is so.
[7] **THE COURT:** Received.
[8] **MR. SALZMAN:** P 119.
[9] (Petitioner's Exhibit 119 received in evidence)
[10] **BY MR. SALZMAN:**
[11] **Q.** Professor Owen, what did you do to familiarize yourself
[12] with the facts of this case?
[13] **A.** I was provided and looked through the discovery materials
[14] including both documents and the deposition testimony, and I
[15] read the trial testimony.
[16] **Q.** First, let's start with a summary of the conclusions you've
[17] reached as a result of your work. What did you understand your
[18] assignment to be in this matter?
[19] **A.** I was asked to assess whether the BMI rate proposal for the
[20] adjustable fee blanket license was reasonable, and I was also
[21] asked to assess the reasonableness of the DMX proposal for an
[22] adjustable fee blanket license.
[23] **Q.** To your understanding, has the adjustable fee blanket
[24] license ever been issued before?
[25] **A.** No, it has not.

Page 690

[1] **Q.** And, have you given any thought in your assignment to what
[2] the economic characteristics of that license are as compared to
[3] the traditional blanket license?
[4] **A.** Yes.
[5] **Q.** Now, just in summary form, what conclusions have you
[6] reached, first with respect to the BMI proposal?
[7] **A.** With respect to the BMI proposal, it seems to me that BMI's
[8] proposal is reasonable, in certain respects more than
[9] reasonable as an economic pricing for the adjustable blanket
[10] license.
[11] **Q.** And if you can summarize in a sentence what your conclusion
[12] is about the main difference between the adjustable fee blanket
[13] license and the traditional blanket license in terms of its
[14] economic consequences?
[15] **A.** Well, the principal difference is that the adjustable fee
[16] blanket license is more favorable or valuable to the user
[17] because it gives them the option to license some music directly
[18] and save money on the blanket license fee.
[19] **Q.** And from that, as an economic matter, what inference do you
[20] draw -- what conclusion do you draw from the fact that it is
[21] more valuable in terms of fee setting?
[22] **A.** Well, it is more valuable and it also costs more to produce
[23] and therefore ought to be priced at a higher rate than the
[24] blanket license.
[25] **Q.** Now, talking about blanket licenses generically, what do

Page 691

[1] you understand the main benefits of the blanket license itself
[2] to DMX to be as compared to direct licensing?
[3] **A.** Well, the principal benefit of a blanket license as opposed
[4] to direct licensing is a savings of transactions costs. I
[5] think the central issue from an economic point of view here is
[6] the transactions cost issue, whether or not the user has to
[7] deal with many thousands of affiliates, publishers and
[8] composers and songwriters, or whether they can acquire a large
[9] number of rights in a single transaction with BMI.
[10] **Q.** And, did you use the benchmark method for finding a
[11] reasonable fee or considering the BMI proposal for how much DMX
[12] should pay?
[13] **A.** Yes, that seems to be the usual way of going about these
[14] questions.
[15] **Q.** And, did it make sense to you in the context of this
[16] particular case?
[17] **A.** It did because they were benchmarks available.
[18] **Q.** What benchmark did you think was the appropriate one or
[19] ones?
[20] **A.** Well, there was a very close benchmark that requires no
[21] adjustment factors and that's the blanket license that BMI and
[22] the CMS industry entered into starting with Muzak in 2004.
[23] **Q.** And you are aware, are you not, that DMX has tendered
[24] certain direct licenses and suggested that they might be usable
[25] as a benchmark?

Page 692

[1] **A.** Yes, I am.
[2] **Q.** And, have you reached a conclusion as to whether they help
[3] determine what the fair market value is of the blanket license
[4] being discussed in this case?
[5] **A.** Yes, I have.
[6] **Q.** What is that conclusion?
[7] **A.** They are not an appropriate benchmark because they are not
[8] comparable to the blanket license.
[9] **Q.** Let's turn now to the BMI proposal. Please take a look at
[10] tab 2. Who prepared tab 2?
[11] **A.** My staff did.
[12] **Q.** And what is your understanding of what it is?
[13] **A.** It is an attempt to represent, graphically, the BMI
[14] proposal with respect to pricing of the adjustable fee blanket
[15] license.
[16] **Q.** Can you walk through the elements of the proposal, as you
[17] understand it?
[18] **A.** Yes, I can.
[19]     There is, first of all, a minimum fee which on this
[20] graphic is called a base fee. BMI's proposal is that it be
[21] $712,000 and that's based on BMI's cost of providing the
[22] adjustable fee blanket license as well as a pro rata share of
[23] BMI's overall overhead costs.
[24]     In addition --
[25] **Q.** I'm sorry. You referred to that as a minimum fee or base

Page 693

[1] fee?
[2] **A.** Yes.
[3] **Q.** What does that mean?
[4] **A.** That means that if DMX were to license all of its music
[5] directly they would nevertheless pay the base fee of $712,000.
[6] **Q.** Continue, please.
[7] **A.** The remaining part of the orange colored part of the graph
[8] shows the adjustable amounts of the license fee and that's the
[9] part that would vary according to what percentage of its BMI
[10] music use DMX licenses directly as opposed to licensing through
[11] the BMI blanket license.
[12]     On the right-hand side there are a couple of arrows,
[13] one points to the per-location rate as opposed to the one
[14] summary for the blanket -- for the full-fee adjustable fee
[15] blanket license, that's $41.81 per customer location. Then
[16] there is an arrow at the bottom pointing to the place where
[17] $36.36 would be, that's the benchmark blanket license fee based
[18] on the Muzak-BMI blanket license negotiated back in 2004, and
[19] also the Muzak-ASCAP blanket license, and then there is a 15
[20] percent premium for the option of being able to adjust the
[21] amount of the fee according to the amount of music that's
[22] directly licensed.
[23] **Q.** And, am I correct that under this proposal the credit
[24] mechanism treats all performances alike so that it is a simple
[25] ratio of directly licensed to total BMI performances?

Page 694

[1] **A.** Yes; based on performances.
[2] **Q.** Is it inherent in an adjustable fee blanket license that
[3] all performances be treated equally?
[4] **A.** No, it is not inherent in it. You could do it in any
[5] number of ways.
[6] **Q.** But, as you understand it, the BMI proposal in this case is
[7] simply to treat every performance equally?
[8] **A.** And to have a single number, some number of cents per
[9] performance depending how many total performances DMX uses of
[10] BMI music to multiply by the number that are licensed through
[11] the blanket license.
[12] **Q.** And total number on the top, $3,126,510, is derived how?
[13] **A.** It is $41.81 times the number of locations. I believe this
[14] is illustrative for 2008 so it is the number of DMX locations
[15] for that year.
[16] **Q.** To your understanding, what is the BMI proposal with
[17] respect to how to deal with works that neither DMX nor BMI can
[18] identify as to whether or not they are BMI repertoire
[19] performances?
[20] **A.** Yes; about a fifth of all the performances are not
[21] identified by DMX or by BMI as being BMI music or not BMI music
[22] and the BMI proposal that those should be split 50/50 between
[23] BMI and others.
[24] **Q.** And, under BMI's proposal, how do works that have split
[25] ownership between on the one hand one arm were BMI writers and



[1] one or more non-BMI writers such as ASCAP writers, what is the
[2] proposal there?

[3] **A.** The proposal is to split the credit according to how much
[4] owners there are and to give credit for the BMI ownership
[5] percentage as in relationship to the total percentage
[6] ownership.

[7] **Q.** And, in counting performances, what's your understanding as
[8] to which DMX performances will be used for that purpose?

[9] **A.** DMX performances that appear on their satellite channels
[10] and DMX performances that appear on their on-premise services
[11] weighted by the respective number of locations.

[12] **Q.** And satellite ones are also referred to, sometimes, as
[13] off-premise?

[14] **A.** Sometimes they're referred to as off-premise.

[15] **Q.** BMI's proposal is to weight and then count the on-premise
[16] and the off-premise performances?

[17] **A.** Exactly.

[18] **Q.** As reported by whom?

[19] **A.** DMX.

[20] **Q.** And why is weighting required?

[21] **A.** Well, because the number of locations is different.
[22] Ultimately, the objective is to get as close to the actual
[23] number of performances in the copyright sense as possible given
[24] what DMX can report.

[25] **Q.** Take a look, please, at tab 4. What is this?

[1] **A.** Tab 4 is a graphical representation of the proposal that
[2] BMI is making for the bowling center rate.

[3] **Q.** And can you just walk through that? It looks, in certain
[4] ways, like the graph we just saw, I think.

[5] **A.** Yes. It is the same sort of graph and works in much the
[6] same way.

[7] The base fee or the minimum fee corresponds to the
[8] same percentage in relationship to the full fee as the previous
[9] graph does. The amount that is adjustable based on use of BMI
[10] music is, works exactly the same way. And, on the right-hand
[11] side the only thing that's really different is the benchmark.
[12] For the benchmark here it seems most appropriate to use the
[13] blanket license that BMI has negotiated with the Bowling
[14] Proprietors of America blanket license rate which is $13.60 per
[15] line with a CPI adjustment. So, for 2008 that works out to a
[16] full fee of $15.60 and the per lane rate is $13.60 plus 15
[17] percent premium.

[18] **Q.** And, how is the base fee computed here?

[19] **A.** The base fee is simply the same percentage of BMI's
[20] overhead cost as the previous exhibit, 22.78 percent.

[21] I may have misspoke, I meant to say 22.78 percent of
[22] the full fee.

[23] **Q.** Let's go back to basic principles for a second about the
[24] word --

[25] **THE COURT:** Has that dropped a dollar? Or am I

[1] comparing two different things?

[2] **THE WITNESS:** I don't know that it has dropped at all,
[3] your Honor.

[4] **THE COURT:** Is the total $15.60 or $16.60?

[5] **THE WITNESS:** I believe it was $16.60.

[6] **THE COURT:** On page 10 of your, the summary of your
[7] testimony it is $16.60.

[8] **THE WITNESS:** I didn't prepare the summary, your
[9] Honor.

[10] **THE COURT:** I'm not charging you with either a mistake
[11] or the difference. I'm simply curious.

[12] **MR. SALZMAN:** We will clarify the discrepancy, your
[13] Honor. I don't have -- I don't know right now which one is
[14] correct.

[15] **THE COURT:** You don't know right now which one it is.

[16] **MR. SALZMAN:** Correct. We will clarify that at a
[17] break.

[18] **THE COURT:** Okay.

[19] **MR. SALZMAN:** Thank you.

[20] **BY MR. SALZMAN:**

[21] **Q.** Let's talk about the word reasonable which you've used
[22] several times here and which appears, of course, in the BMI
[23] consent decree in the rate setting provision. What is your
[24] understanding of how to go finding the reasonable fee?

[25] **A.** My understanding of how it has been done in the past, and I

[1] think it is consistent with economic principles, is that one
[2] looks at what a willing buyer would pay and a willing seller
[3] would take for the product or property in question, and then
[4] somewhere in between those two numbers is reasonable provided
[5] that the policy issues or policy factors that are intended by
[6] the underlying law are taken into account.

[7] **Q.** Is it important with respect to finding a reasonable fee to
[8] look at the characteristics of the license debts being debts in
[9] question?

[10] **A.** Yes. A reasonable fee will vary depending on the value to
[11] the buyer and the cost to the seller of producing the product.

[12] **Q.** And in this case what license is that, the product?

[13] **A.** The product is either the blanket license for one portion
[14] of the adjustable fee blanket license or the value of the
[15] option to license some music directly and to save money on the
[16] BMI blanket license fee on the other side.

[17] **MR. SALZMAN:** Your Honor, I am informed with respect
[18] to that discrepancy in the number for bowling that the summary
[19] of testimony uses the 2009 rate which is updated for consumer
[20] price index variation and that Mr. Owen's graph and his --
[21] which referred back to his report in this case reflected the
[22] 2008 rate.

[23] So, the proposal for 2009 is as stated in the summary
[24] but it is a multi-year license and it relates back to the year,
[25] year by year.

Page 699

[1] THE COURT: Okay. It says 2008 rates in the caption.
[2] All right, Exhibit 4.
[3] MR. SALZMAN: Right. Thank you.
[4] BY MR. SALZMAN:
[5] Q. You referred before to using benchmarks. How do you
[6] understand, as an economist, how benchmarks inform the question
[7] of willing buyer and willing seller or reasonable rate?
[8] A. Well, the way it is used in assessing market value or fair
[9] market value is you look at similar transactions to see what
[10] price they sell at making adjustments, if necessary, to compare
[11] the similar transactions to the transaction in question.
[12] For example, in real estate markets one normally looks
[13] at what they call comps, comparable property to get a fair
[14] market value for a house or another piece of real estate.
[15] Q. You referred before to a policy reason, considerations that
[16] also have to be looked at. What are you referring to?
[17] A. Well, this whole process is taking place in the, what we
[18] might call the shadow of the rate court and the consent decree
[19] so there is an implication that there is a need for
[20] intervention in what would otherwise be open market
[21] transactions to correct for possible antitrust issues.
[22] And so, it would be reasonable for the rate court to
[23] take that fact into account in assessing whether a particular
[24] rate was reasonable or whether it reflects market power on
[25] either side of the transaction.

Page 700

[1] THE COURT: In evaluating the effect of the
[2] availability of the rate court, don't you have to apply a
[3] discount for the transaction costs involved in litigation?
[4] THE WITNESS: Yes. Yes, you do.
[5] THE COURT: Can that be quantified and applied to the
[6] negotiation?
[7] THE WITNESS: I think that people involved in the
[8] negotiation are in a position to quantify it because they know,
[9] with some degree of certainty, what the litigation costs are
[10] likely to be and lawyers are supposed to be equipped to be able
[11] to predict the outcome of judicial proceedings with some degree
[12] of accuracy.
[13] So, the very skills that lawyers are trained to have
[14] permits an estimate of how the Court is likely to rule and that
[15] can be compared to the gain or loss from the resulting rate and
[16] the cost of going through the litigation process.
[17] THE COURT: Did you perform any such operation?
[18] THE WITNESS: No, your Honor. I'm not in a position
[19] to do that. I think the business people and the lawyers
[20] working for the parties are in a position to do that.
[21] BY MR. SALZMAN:
[22] Q. Is that consideration of cost of litigation, is that a
[23] one-way factor or does that animate both the buyer and the
[24] seller in reaching a benchmark rate?
[25] A. Well, a rational buyer or seller would both take that into

Page 701

[1] account in deciding to whether or not to litigate a particular
[2] transaction.
[3] THE COURT: I think like any cost, Mr. Salzman, its
[4] impact is the greater the fewer your resources are.
[5] Q. In the case of the BMI rate court in dealing with BMI on
[6] the one side and music users on the other side, is there, in
[7] your mind, Dr. Owen, a particular direction in which that
[8] factor of litigation cost tilts?
[9] A. Well, I don't think so.
[10] By and large, speaking broadly about the way that the
[11] rate courts have worked, the entire industry or at least very
[12] large users are on one side and BMI on the other. And even
[13] if particular controversy involved smaller users, there is
[14] nothing to prevent what amount to class actions from being used
[15] so that the ability of many users are taken into account in
[16] terms of paying for the cost of litigation.
[17] So, it really isn't clear that it is correct to think
[18] about it in terms of one large party on one side and lots of
[19] little individual parties on the other side. It doesn't seem
[20] to work out that way in practice either in the negotiations or
[21] in the litigation.
[22] Q. I think we have already heard you say this but just so that
[23] we are clear, does the rate court itself act as a check on
[24] BMI's pricing ability?
[25] A. Well, yes. That's the purpose of the rate court -- one of



Page 702

[1] the purposes of the rate court.
[2] Q. And, does the automatic license or compulsory license
[3] feature of the consent decree work together with that rate
[4] setting mechanism?
[5] A. Yes. The fact that users have a right, what amounts to a
[6] compulsory license to use BMI music while a rate is being
[7] determined by the rate court means that BMI has less bargaining
[8] power -- substantially less bargaining power than it would in a
[9] normal market situation where there was no consent decree and
[10] BMI would be in a position to withhold the music until an
[11] agreement had been reached.
[12] Q. Is the goal of rate setting for a BMI blanket license to
[13] your understanding to try to find what BMI would charge under
[14] conditions of perfect competition?
[15] A. No. I don't think that's practical. Whether or not one
[16] wanted to try it as a theoretical matter it doesn't make much
[17] sense.
[18] Q. Why is that?
[19] A. Well, by definition, the blanket license is a unique
[20] product. There is only one BMI blanket license. And as
[21] virtually everyone including the judicial system has
[22] recognized, it has very substantial advantages and, in
[23] particular, transaction cost advantages over the various
[24] alternatives. In the extreme the alternatives include direct
[25] deals, direct licenses between individual rights holders and



[1] individual users. BMI, through the blanket license like ASCAP,
[2] greatly reduces those transactions costs and the result is
[3] enormous economic efficiencies, cost savings. The result is
[4] more music is produced than would otherwise be produced because
[5] it costs less to deliver it to users.

[6]    So, it is paradoxical to think about competing blanket
[7] licenses. There couldn't be a competitor provision in which
[8] several people or a large number of people each produced a BMI
[9] blanket license. What one would have, at best, is a series of
[10] competing blanket licenses each covering less music than the
[11] BMI license covers and, therefore, there would be higher
[12] transactions costs than you see with the BMI blanket license.

[13]    So, even imagining what a competitive market -- a
[14] perfectly competitive market would be like is kind of futile.

[15] **Q.** Is there an economic property of performing rights as
[16] distinguished from other property rights that is relevant to
[17] this question of the value of the blanket license?

[18] **A.** Yes, there is.

[19]    Music performing rights cost nothing to supply on the
[20] margin. One extra performance of a song doesn't cost the
[21] composer any more, it doesn't cost BMI any more, it doesn't
[22] cost anybody on the supply side any more and, therefore, from
[23] an economic point of view doesn't cost the economy any more.
[24] And when you have goods like that, you want to encourage as
[25] much use as possible. You don't want to use prices to hold

[1] back usage and therefore, from a strictly theoretical point of
[2] view, the ideal price for a good of that sort is zero. The
[3] marginal cost for using something that it doesn't cost anything
[4] to use once more should be zero.

[5]    The nature of the traditional blanket license and the
[6] way it is priced is that additional performances don't cost
[7] anything. And so, music use is encouraged.

[8] **Q.** This is with respect to songs that have already been
[9] created?

[10] **A.** Yes, this is entirely with respect to songs that have once
[11] been created.

[12] **Q.** Does that characteristic of performing rights have an
[13] economic name?

[14] **A.** Yes. They're sometimes called public goods, they're
[15] sometimes called non-rivalrous goods, they're sometimes called
[16] collective goods but it is a well-known phenomenon in
[17] economics. The more well known general categorization is all
[18] things equal, you should price goods at their marginal costs,
[19] if possible, and that's what the traditional blanket license
[20] does -- not because that's its purpose but because that's what
[21] happens with the way it is used.

[22]    The adjustable fee blanket license, in contrast, has
[23] the effect of making an extra performance cost something.
[24] That's the credit amount under the proposal. And so, the price
[25] is greater than the cost of supplying the performance --

[1]    **THE COURT:** Professor Owen, I missed something. You
[2] said the adjustable rate marginal performance is cost --

[3]    **THE WITNESS:** It is costly. It costs something.

[4]    **THE COURT:** Costly. That's what I missed. Okay.

[5] **BY MR. SALZMAN:**

[6] **Q.** Why is that?

[7] **A.** Because you are giving up a credit under the -- when you
[8] are using the BMI adjustable fee blanket license to clear the
[9] performing right for a song it is going to cost you something
[10] in a credit that you give up that you could have gotten a
[11] different way.

[12] **Q.** From a public policy point of view should the Court be
[13] encouraging --

[14]    **THE COURT:** You mean costly to BMI?

[15]    **THE WITNESS:** It is costly to DMX because if it uses
[16] another BMI song instead of a directly licensed song, it has
[17] to --

[18]    **THE COURT:** I see.

[19]    **THE WITNESS:** -- what would otherwise be a credit.

[20]    **THE COURT:** As compared to it.

[21]    **THE WITNESS:** Exactly.

[22]    **THE COURT:** Yes.

[23] **BY MR. SALZMAN:**

[24] **Q.** From an anti-trust policy point of view, should the Court
[25] be encouraging direct licensing as compared to reliance on

[1] blanket licensing?

[2] **A.** I don't think so if by encouraging you mean pricing at
[3] other than a reasonable level that makes economic sense. The
[4] purpose of the antitrust laws is not to artificially promote
[5] any particular competitor a kind of competition; it is to have
[6] a maximum amount of competitors pricing efficiently and at a
[7] reasonable level.

[8]    The antitrust division, for many years now, since the
[9] 1980s, has been encouraging federal regulatory agencies not to
[10] use their rate regulation authority to discourage competition
[11] by artificially protecting particular means of supplying the
[12] regulated product or service but, instead, to let costs and
[13] demand work in the marketplace to do that.

[14] **Q.** And, similarly, as between the traditional blanket license
[15] and the adjustable fee blanket license, as you understand
[16] antitrust policy, should the Court be pricing the adjustable
[17] fee blanket license in such a way as to encourage its use
[18] rather than the traditional blanket license, or the other way
[19] around, or something else?

[20] **A.** No. I think the antitrust policy would suggest that the
[21] Court should be neutral about that. The two separate licenses
[22] should be priced to reflect their cost and benefits to users
[23] and their costs to -- the benefits to users and the cost to
[24] BMI.

[25]    For example, it would be an improper inference of

Page 707

[1] antitrust policy to suggest that the adjustable fee blanket
[2] license should be priced at the same level as the blanket
[3] license -- the traditional blanket license because it is worth
[4] more and therefore if they were priced at the same level,
[5] obviously all users would opt for the more flexible adjustable
[6] blanket license. The result would be that some music would be
[7] directly licensed at higher transactions costs and the system,
[8] as a whole, would be less efficient more possibly.
[9] **Q.** Let's talk a little bit about the characteristics of the
[10] traditional blanket license. What do you see as its primary
[11] components?
[12] **A.** Well, for present purposes, certainly the most important
[13] feature is the savings of transactions costs. Other advantages
[14] of the blanket license include the fact that it provides
[15] insurance against inadvertent infringement. It provides an
[16] indemnity against litigation involving a user when there is a
[17] dispute about who owns the underlying right. It provides
[18] immediate access to music that may not be yet registered with
[19] any performing rights society either because it is new or
[20] especially because it is foreign. Of course, that also
[21] requires that you have an ASCAP blanket license as well.
[22]     I guess those are the principal advantages.
[23] **Q.** About how many different songs, to your understanding, does
[24] DMX use in a year?
[25] **A.** I think there is two numbers in the record, one is 100,000

Page 708

[1] a year and the other is 150,000.
[2] **Q.** And, how many different publishers' works are used by DMX
[3] in a year, to your understanding?
[4] **A.** Well, the record seems to reflect something like 14,000
[5] publishers.
[6] **Q.** Take a look at tab 5. Does this say -- is this prepared
[7] under your supervision?
[8] **A.** Yes.
[9] **Q.** What does it portray?
[10] **A.** Well, this simply illustrates the point that I have made
[11] earlier regarding the transactions cost savings of having BMI,
[12] along with the other PROs as intermediaries in the transactions
[13] that are involved in music users, obtaining the rights to
[14] perform the music in question.
[15]     So, every black line represents a transaction and,
[16] clearly, if you substitute BMI with a blanket license from all
[17] the individual licenses on the left-hand side, you greatly
[18] reduce the number of transactions that have to take place with
[19] respect to deals between rights holders and music users. Now,
[20] of course, this only has a dozen or so boxes to represent
[21] rights holders and users. In the real world there are
[22] thousands of rights holders and thousands of users. In the CMS
[23] industry there is something like 150 CMS operators and, of
[24] course, the rights involve through-to-the-ultimate-user and
[25] there are thousands of those.

Page 709

[1] **Q.** To your understanding, are certain works more expensive to
[2] directly license than others? Would you expect that in the
[3] market?
[4] **A.** Sure. In any market you expect some rights to be worth
[5] more than others or to cost more to make available than others
[6] so there would naturally be great variation.
[7] **Q.** Let's talk about the transaction cost variables. What are
[8] the variables that would make one work or one set of works more
[9] expensive to get a license for than others in terms of
[10] transaction cost?
[11] **A.** Well, I think the right unit to think about here is the
[12] performance and that's because it is performances that are used
[13] as the metric in deciding how much credit the licensee gets --
[14] DMX gets in this case from directly licensing BMI music.
[15]     So, if you think about the kinds of transactions that
[16] have been discussed in this case, large publishers like Sony or
[17] Universal or EMI are in a position to transfer very large
[18] numbers of rights covering a very large number of, or fraction,
[19] of DMX' performances in a single transaction, whereas other
[20] publishers are much smaller and, presumably, while they may
[21] cost less from DMX' point of view to deal with, they don't cost
[22] nothing to deal with but the number of performances that one
[23] can acquire from them is far fewer. And so, the rate per
[24] performance, the cost per performance would be much higher.
[25]     So, while there are certainly going to be variations

Page 710

[1]    in the value of particular songs, the transactions costs are
[2]    systematically different across publishers according to how
[3]    large the publisher is, that is, how much rights the publisher
[4]    owns. So, very large publishers will have lower costs per
[5]    performance from DMX' point of view, whereas relatively small
[6]    publishers will have higher cost per performance acquired from
[7]    DMX' point of view.
[8]        (Continued on next page)



Page 711

[1]  BY MR. SALZMAN:
[2]  **Q.** Meaning, when you say "cost," you mean transaction cost?
[3]  **A.** And I'm only talking about transactions cost now.
[4]  **Q.** Now, let's talk a little bit about the credit feature, the
[5]  adjustable fee feature of the adjustable plan to license. Why
[6]  is that valuable?
[7]  **A.** It's valuable because the licensee can get a credit for
[8]  licensing directly songs which it otherwise would license
[9]  through the BMI blanket license, and if DMX or another user can
[10]  do that, can acquire directly these rights at a price per
[11]  performance that's less than the credit it gets from BMI, then
[12]  obviously it can make money by licensing directly rather than
[13]  licensing through DMX. The opportunity to do that is worth
[14]  something in itself.
[15]  **Q.** And that opportunity, how would you assess the value of
[16]  that in willing buyer/willing seller terms?
[17]  **A.** Well, again, it seems to me you have to look at a benchmark
[18]  in order to do that. Unfortunately, because this is unique,
[19]  this is the first time this issue has been litigated. There's
[20]  a scarcity of directly relevant benchmarks. So we cast about
[21]  for the best available benchmark for the value of the right to
[22]  save money by licensing directly, look at not only blanket
[23]  licenses in the U.S., but blanket licenses overseas and
[24]  compulsory licenses that exist in the federal regulatory
[25]  structure, like the one, for example, that gives satellite

Page 712

[1]  broadcasters the right to carry local television station
[2]  programming, and we were not able to find anything that was
[3]  directly comparable.
[4]      So in the end, we settled on the best we could do,
[5]  which is a license that exists in the local television
[6]  industry, it involves music as opposed to other kinds of rights
[7]  and it's the per-program license. Both BMI and ASCAP have
[8]  licenses with the television industry committee represented by
[9]  Weil, Gotshal that negotiates with BMI and ASCAP for blanket
[10]  licenses. So there's both a blanket license and a per-program
[11]  license available to local TV stations.
[12]  **Q.** We'll discuss that benchmark a little bit later. But just
[13]  talking about the option value, the increased value of the
[14]  adjustable fee blanket license, can you give us one or two
[15]  examples of other places in the economy where having this sort
[16]  of a contractual option entails a greater price?
[17]  **A.** Well, it's exceedingly common. Any contract, any
[18]  commercial contract that includes an option for one party to
[19]  get out of the contract or change the terms is going to be more
[20]  valuable to that party than the corresponding contract without
[21]  that option. If you buy an option to buy some real estate at
[22]  some future time at a fixed price, you pay something for it
[23]  because it's a valuable thing to have that option.
[24]      Perhaps more down-to-earth example is the New York
[25]  subway system which I discovered prices transit rides in that

Page 713

[1]  same way. If you buy a month's worth or a bulk amount you pay
[2]  less per ride, depending on how many rides you take, than if
[3]  you take an a la carte option. The same thing is common in
[4]  restaurant menus. Some restaurants offer a fixed price menu
[5]  and some restaurants, sometimes the same restaurants, offer an
[6]  a la carte menu. If you look at the fixed price and the a la
[7]  carte options, they're going to add up to more than the fixed
[8]  price menu. Why? Because exercising the option to select your
[9]  own menu costs the restaurant more and is more valuable to the
[10]  diner than the fixed price menu, so depending on what you want,
[11]  how much flexibility you want in ordering dinner, you will opt
[12]  for the a la carte dinner at a possible higher price than the
[13]  fixed price menu.
[14]  **Q.** Under the adjustable fee license, what are the
[15]  incentives --
[16]      **THE COURT:** But isn't the great value of the a la
[17]  carte menu that you can reduce the amount that you pay for the
[18]  food by selecting less than --
[19]      **THE WITNESS:** Yes.
[20]      **THE COURT:** The contents of the --
[21]      **THE WITNESS:** That's why it's valuable.
[22]      **THE COURT:** -- the fixed price.
[23]      **THE WITNESS:** That's why it's valuable, your Honor.
[24]  But if you want all the items on the fixed price menu, that's
[25]  cheaper.

Page 714

[1]  **Q.** So is that analogous --
[2]      **THE COURT:** And here the question is slightly
[3]  different. Because you don't want to eat all the value, all
[4]  the items on the fixed menu, and here the value of the full
[5]  blanket license is the access to them all, whether you want
[6]  them on the particular occasion or not.
[7]      **THE WITNESS:** Yes, your Honor, that's correct. But I
[8]  think the way to think about this is, if you did end up
[9]  choosing all the items on the a la carte menu to correspond to
[10]  the fixed price menu, then you should be paying more than the
[11]  fixed price menu.
[12]  **Q.** Am I right --
[13]      **THE COURT:** I think the moral, as usual, is that
[14]  analogies are slippery and dangerous.
[15]      **THE WITNESS:** Yes, your Honor.
[16]      **THE COURT:** And sometimes indigestible.
[17]      **THE WITNESS:** Sometimes indigestible. I think this
[18]  analogy works, though.
[19]  **Q.** Just to pursue it one round more, under the BMI proposal,
[20]  the full fee for the adjustable fee blanket license is greater
[21]  than the traditional blanket license benchmark?
[22]  **A.** Exactly.
[23]  **Q.** But then, if the licensee DMX chooses not to use the BMI
[24]  license for all its performances, but rather to directly
[25]  license some and only use the BMI license for some, the full

Page 715

[1] fee is where you start, but the credits do allow you to save
[2] money as compared to the traditional blanket license, correct?
[3] **A.** Yes. It's exactly the same as the menu example. If you
[4] only want some of the items, it may save money to use the a la
[5] carte menu and in the case of the adjustable fee blanket
[6] license, if you intend to directly license a large amount of
[7] music, you can save money compared to getting the blanket
[8] license. But it has to be true to make economic sense that if
[9] you did license, hypothetically, if you did license everything
[10] through BMI, you should be paying more if you have an
[11] adjustable option than if you take the package.
[12] **Q.** Am I correct that under the BMI proposal as you understand
[13] it that's the so-called full fee from which credits are --
[14] **A.** That's the full fee you would pay if you didn't do any
[15] direct licensing, not the amount you would pay if you did do
[16] some direct licensing.
[17] **Q.** Under the adjustable fee blanket license, what are the
[18] incentives to license directly?
[19] **A.** Well, the economic incentive is to license music that you
[20] can acquire at a relatively low per performance cost. I'm
[21] thinking now about transactions costs, and to directly -- and
[22] to license through BMI, those performances that it would cost a
[23] lot more to license directly. So in general, and not to
[24] overgeneralize, but in general you would want to directly
[25] license the music that you can acquire in very large batches,

Page 716

[1] for example, by dealing with one of the large publishers, and
[2] in general, you would rather license through BMI songs that it
[3] would be difficult and costly to find the publisher, to
[4] negotiate with the publisher and so on after taking account of
[5] how many times you're going to use those songs.
[6] **Q.** Take a look at tab 6.
[7] **THE COURT:** Conceptually, you put these benefits in
[8] the minimum way with the floor fee, right?
[9] **THE WITNESS:** No, I don't think that's right, your
[10] Honor. The benefits to DMX of having this flexibility would be
[11] measured by the savings that they can make by having the option
[12] to license some of their songs directly and being able to
[13] acquire the high cost songs, high cost per performance songs
[14] through the blanket license. So they get to save money by
[15] being able to separate all the performances into two
[16] categories, and this will depend on what the amount of
[17] credit is.
[18]     There's a category of performances that it would cost
[19] DMX a large amount to license, typically small publishers,
[20] songs or performances whose publishers aren't known because
[21] they're new and so on, and on the side of the direct licensing
[22] side to license directly those songs that could be acquired on
[23] a low cost per performance basis, and that's going to be a deal
[24] with the big publishers, the Universals and Sonys and so forth.
[25] Somewhere in there, there's going to be a point where the cost

Page 717

[1] per performance just equals the direct license cost per
[2] performance, just equals the BMI credit and that's the point
[3] where you would turn from direct licensing to using the BMI
[4] license.
[5]     **THE COURT:** But it's precisely those rights which
[6] would remain in DMX if it decided in a given year not to
[7] directly license or perform anything from BMI?
[8]     **THE WITNESS:** I'm not sure I understand the question.
[9]     **THE COURT:** It would still have that package of
[10] options available to it.
[11]     **THE WITNESS:** Yes.
[12]     **THE COURT:** And therefore the value of that package
[13] seems to me to fall properly in the floor fee rather than in
[14] the variable.
[15]     **THE WITNESS:** I see your point, your Honor, yes. I
[16] entirely agree. I think it would be even more reasonable for
[17] BMI to have proposed that the 15 percent premium be a fixed
[18] amount, not varying.
[19]     **THE COURT:** Let's take one question at a time.
[20] Because I thought that a few moments ago you disagreed with my
[21] proposition. But anyway, I'm happy that you agree with it for
[22] the reason I state. It seems to me straightforward.
[23]     **THE WITNESS:** It is straightforward that the option
[24] value shouldn't vary. The option value --
[25]     **THE COURT:** The floor fee.

Page 718

[1]     **THE WITNESS:** Should be fixed.
[2]     **THE COURT:** It's the residual value.
[3]     **THE WITNESS:** I'm sorry, your Honor, I was thinking
[4] you thought the proposed floor fee would cover that, and I
[5] don't agree with that.
[6]     **THE COURT:** Simply locating it on the chart, that's
[7] all.
[8]     **THE WITNESS:** I agree.
[9] **Q.** I'm sorry, take a look again at tab 2. And you'll see that
[10] the 15 percent option premium comes at the top of the stack,
[11] not at the bottom of the stack.
[12] **A.** Yes. That was the source of my confusion.
[13] **Q.** Okay. Can you explain your prior answer in light of this?
[14] **A.** Yes. I understand your Honor to have been suggesting that
[15] the 15 percent should be treated as a fixed amount, the minimum
[16] amount, and therefore be associated with the base fee, the minimum amount,
[17] and I agree with that. That's not, however, BMI's proposal.
[18] **Q.** But is that 15 percent already in this base fee in the
[19] proposal?
[20] **A.** No, it's not.
[21] **Q.** So it's an amount that would be in addition to the base fee
[22] as set forth here?
[23] **A.** Exactly. It would be in addition, and I think that would
[24] be, I think BMI has been more reasonable than it could have
[25] been here by not adding that 15 percent amount to what is shown



Page 719

[1] here as the base fee, which is based on something entirely
[2] different, namely, BMI's costs.
[3] **Q.** And the way you are explaining that BMI could have been
[4] tougher on DMX than what this proposal actually is, is the fact
[5] that that 15 percent, because it's in the orange part, is
[6] itself subject to proportional reduction rather than being a
[7] fixed amount?
[8] **A.** Exactly.
[9] **Q.** And why is it that that 15 percent premium that you think
[10] is reasonable is not double counting in addition to the base
[11] fee as set forth here?
[12] **A.** Because the base fee doesn't contain -- the base fee as
[13] proposed by BMI doesn't include an allowance for the value of
[14] the option. It only includes compensation to BMI for the costs
[15] of providing the adjustable fee blanket license.
[16] **Q.** Including primarily the traditional blanket license?
[17] **A.** Including primarily the traditional blanket license costs.
[18] **Q.** Now take a look at tab 6, and what is this?
[19] **A.** This is an illustration of the discussion we've actually
[20] just been having, intended to show that there's a point at
[21] which --
[22] **THE COURT:** Excuse me, but if the base fee does now
[23] contain provision for traditional blanket license costs, then
[24] isn't there double counting repeated in the 15 percent premium?
[25] **THE WITNESS:** No, your Honor, it does not. Because

Page 720

[1] the proposed minimum fee or base fee is fully justified by cost
[2] specific items, and not by the value of the option. The value
[3] of the option --
[4] **THE COURT:** Well then you're simply changing the
[5] proposition. You say it's not included.
[6] **THE WITNESS:** I'm talking about when the numbers --
[7] **THE COURT:** Mr. Salzman in his question said the
[8] transaction costs were included, as I understood his question.
[9] **THE WITNESS:** Those are different transactions costs,
[10] your Honor. The transactions costs in the base fee are BMI
[11] transactions costs, not DMX transactions costs.
[12] **THE COURT:** Oh-ho.
[13] **THE WITNESS:** If you wanted to make the adjustable fee
[14] comparable to the blanket license, you would have to add DMX's
[15] transactions costs for getting rights from 14,000 publishers,
[16] and I suspect that's a lot more than 15 percent.
[17] **THE COURT:** I'm not sure I know exactly how to
[18] articulate this, but is it enough that the willing seller
[19] recover his own costs, or to make the transaction economically
[20] acceptable must the willing seller also recover a portion of
[21] the benefit to the purchaser?
[22] **THE WITNESS:** That's the way it happens in open
[23] markets, your Honor. One way to think about it --
[24] **THE COURT:** As a rule or as a matter of negotiation?
[25] **THE WITNESS:** As a matter of negotiation.

Page 721

[1] **THE COURT:** As a matter of negotiation it's left to
[2] the negotiation in the market.
[3] **THE WITNESS:** Yes.
[4] **THE COURT:** The economist has no doctrinal interest in
[5] it one way or the other.
[6] **THE WITNESS:** That's correct.
[7] **THE COURT:** Okay. That's fine.
[8] **BY MR. SALZMAN:**
[9] **Q.** The negotiation in the market is a reflection of the
[10] relative perceptions of the buyer and the seller as to the
[11] value of the, value and cost of the feature?
[12] **A.** It's the value to the buyer, it's the cost to the seller,
[13] and between those two numbers there's a bargaining range, and
[14] where the transaction will end up is dependent on factors such
[15] as bargaining power.
[16] **THE COURT:** Yes?
[17] **MR. MARKS:** I just want to object to the question as
[18] leading, your Honor.
[19] **THE COURT:** On what grounds?
[20] **MR. MARKS:** I believe that the question from
[21] Mr. Salzman was a statement of position and just asking the
[22] economist to --
[23] **THE COURT:** Was a what?
[24] **MR. MARKS:** I believe Mr. Salzman was just stating the
[25] proposition of the question and asking the doctor to confirm.

Page 722

[1] **THE COURT:** I'm sorry, I didn't get the rest of your
[2] objection. You say he was stating what?
[3] **MR. MARKS:** I'll speak up your Honor. I was objecting
[4] to the question from Mr. Salzman as a leading question, an
[5] objection to form.
[6] **THE COURT:** Leading? Leading form of the question?
[7] **MR. MARKS:** Yes, your Honor.
[8] **THE COURT:** Oh, for heaven's sakes. Overruled.
[9] **Q.** Would you agree that in considering the costs to the seller
[10] in that sort of negotiation, that the seller would from an
[11] economics point of view have to have a reasonable return on
[12] investment as well as its actual expenditure cost?
[13] **A.** Yes, of course. Capital costs money. You have to get a
[14] rate of return on investment in order to attract the necessary
[15] funds to do business.
[16] **Q.** So it would not be accounting costs by itself?
[17] **A.** It would not be accounting costs. When I talk about costs,
[18] I'm talking about economic costs and not accounting costs.
[19] **Q.** Let's turn again to tab 6, which I think you were about to
[20] explain.
[21] **A.** Yes. There's a curved line here, which is both blue and
[22] red, which is intended to represent in an abstract way the cost
[23] to DMX of licensing directly an increasing number of
[24] performances from -- starting with the lowest cost on the
[25] left-hand side and then increasing directly licensed

Page 723

[1] performances as you move off to the right at increasing costs
[2] because of the need to deal with smaller publishers and
[3] publishers that are more difficult to find. So that represents
[4] a -- that's a representation of what for logical reasons is
[5] likely to be an increasing cost per performance of acquiring
[6] performances.
[7]     The dotted line shows the hypothetical credit rate, so
[8] many cents or parts of a cent, whatever it works out to be, per
[9] performance. The blue line simply traces what would be an
[10] economically efficient path for DMX to take given the first two
[11] curves, namely, it would make sense for DMX to license directly
[12] those songs that it can license on a per performance basis and
[13] at less than the BMI credit, and then once the curve reaches
[14] the dotted line, to begin to license the remaining songs, which
[15] it could only directly license at a higher cost from BMI.
[16]     So the vertical dotted line is simply the point at
[17] which DMX would reasonably, rationally turn from direct
[18] licensing to the use of the BMI license. We don't know where
[19] that crossing point is. There's no numbers to associate with
[20] these, this illustration, but there is presumably going to be
[21] some point if DMX is going to license directly, it could be
[22] anywhere on the graph.
[23]     This is actually a well-known phenomenon. It's
[24] created by the fact that a price is set in a way that doesn't
[25] change with the underlying costs. You see it with respect, for

Page 724

[1] example, to the 36.36 rate for the CMS blanket license, which
[2] in some cases led to lower prices and in some cases led to
[3] higher prices, depending on the experience of particular CMS
[4] providers.
[5]     The term that's used for this in a regulatory context,
[6] which I guess this is, is cream skimming. That's not intended
[7] to be pejorative, there's nothing wrong with it, it's simply
[8] users responding to the economic incentive created by the use
[9] of an average rather than an individually negotiated price for
[10] every transaction.
[11]     THE COURT: Isn't it merely a general, an application
[12] of the general principle that people pay less for poor products
[13] than they do for good product?
[14]     THE WITNESS: When there is some, when there is some
[15] single price for both kinds of products.
[16]     THE COURT: Yes.
[17]     THE WITNESS: That's what gives rise to this problem.
[18]     THE COURT: Demand will drop.
[19]     THE WITNESS: Yes.
[20]     THE COURT: Well, that's all that's demonstrated.
[21] It's a special application of that principle.
[22]     THE WITNESS: But the application here matters because
[23] this rate is set by a court rather than by the market, and in
[24] some markets there would be different rates for different
[25] users.

Page 725

[1]     THE COURT: Yes. And that in turn is a demonstration
[2] of the principle that the repetitive setting of rates by courts
[3] instead of by the market is undesirable, not desirable.
[4]     THE WITNESS: In general, that's right.
[5]     THE COURT: Yes. Because you don't build up a history
[6] of experience, but of rationalization.
[7]     THE WITNESS: You don't have a good empirical basis
[8] for evaluating what prices would be in a competitive market.
[9]     THE COURT: And decreasing to the extent that it's
[10] taken over by the courts.
[11]     THE WITNESS: Yes, or a regulatory commission.
[12]     THE COURT: Probably so.
[13] BY MR. SALZMAN:
[14] Q. We talked about DMX's perspective on what it would do with
[15] the adjustable fee blanket license. How from BMI's point of
[16] view, what are the benefits, if any, of the adjustable fee
[17] blanket license?
[18] A. Well, there aren't any. BMI doesn't get any advantage from
[19] it, except the negative advantage of higher costs.
[20]     THE COURT: And the moral satisfaction of complying
[21] with the terms of a decree.
[22]     THE WITNESS: I'm sure that's important, your Honor,
[23] as long as the price is right.
[24] Q. Now, under the cream skimming scenario incentives discussed
[25] in tab 6, what are the implications if systematically music



Page 726

[1] users relied on BMI for the hard to find publishers and relied
[2] on direct licensing for the easy to transact with publishers?
[3] A. Well, it means that more music would be licensed directly
[4] and there would be more music subject to an incremental price
[5] greater than zero.
[6]     THE COURT: Greater than?
[7]     THE WITNESS: Greater than zero, I'm sorry.
[8] Q. And what's the effect of that?
[9] A. It reduces the use of music. It reduces the amount of
[10] music that will be used in the marketplace.
[11] Q. And from BMI's operational point of view, what would the
[12] implication be?
[13] A. That there will be higher costs and depending on how the
[14] adjustable fee blanket license is priced, some of those costs
[15] will have to be borne by the publishers and composers than are
[16] being licensed through BMI rather than through direct licenses.
[17] Q. Now, let's turn back to the question of finding the right
[18] benchmark. What do you look for in general to find comparables
[19] or a benchmark?
[20] A. Well, you want to find comparables that already are as
[21] close as possible to the thing that you're trying to price, so
[22] there's no need to make the adjustments that are always
[23] problematical in terms of how to make them. The more
[24] comparable the better. So if you have a blanket license that
[25] you're trying to price and you want to find a comp for it, the



A-420

Page 727

[1] very best benchmark is going to be one that covers the same
[2] music for the same or very similar period, and on the same
[3] terms.
[4] Q. All else the same -- I'm sorry, you said the same music,
[5] did you already say that?
[6] A. The same music, the same repertoire of music, the same
[7] package of music.
[8] Q. If the music user is in the same industry, is that a plus
[9] factor when looking for a benchmark?
[10] A. Yes. The usage of the music, how it's used, in what
[11] context and with what presumed value for the user.
[12] Q. And if I understood your prior answer to the Court's
[13] question correctly, all else the same, a negotiated rate even
[14] under the shadow of the rate court is superior for this purpose
[15] than simply a Court-set rate?
[16] A. That's correct. The negotiated rate that's set in the
[17] shadow of the rate court is likely to reflect the parties'
[18] expectation about what the rate court will do and presumably
[19] therefore tends to exclude whatever market power
[20] considerations, for example, the Court takes into account.
[21] Q. What did you do to find the appropriate benchmark for the
[22] blanket license component of the adjustable fee license here?
[23] A. Well, it's not necessary to look very far. If I understand
[24] properly what BMI is offering for the blanket license component
[25] of the adjustable fee license, they're offering the same terms

Page 728

[1] that they negotiated with the rest of the industry, starting
[2] with Muzak in 2004. It's exactly the same license with the
[3] same terms.
[4] Q. Are there things about Muzak's business that make it
[5] appropriate to compare Muzak to DMX as you understand it?
[6] A. Yes. I understand they're in the same business. They're
[7] providing background and foreground music to the same kinds of
[8] customers. They compete in the marketplace, and at least on
[9] the dimension of music they use music in the same way.
[10] Q. And is the time frame of the Muzak agreement relevant here?
[11] A. Yes. The Muzak agreement is exactly the same as the DMX
[12] proposal -- BMI's proposal for the DMX license.
[13] Q. And did you take into account whether Muzak had access to
[14] the BMI rate court?
[15] A. Yes. Obviously, Muzak does have access, did have access to
[16] the BMI rate court. In fact, I think there was an ongoing rate
[17] court case already.
[18] Q. And why does that matter?
[19] A. Just to show that there's a constraint on BMI's, there was
[20] a constraint on BMI's ability to exercise whatever market power
[21] derives from its position as the only supplier of BMI blanket
[22] license.
[23] MR. SALZMAN: Your Honor, I'm changing subjects now.
[24] Is this an appropriate time for a break?
[25] THE COURT: Yes, sure. We'll take the morning recess.

Page 729

[1] I would like to receive from BMI before the end of the case
[2] what I hope is not too hard to calculate, and as usual my
[3] general question will probably provoke subsidiary questions.
[4] But what I'm looking for is what percentage of BMI's total
[5] domestic fee revenues is represented by the totals of the four
[6] firms; Muzak, Play Network, Music Choice and TruSonic. In
[7] other words, the ones represented on the revised chart.
[8] MR. SALZMAN: And just to make it a little sharper,
[9] Music Choice, for example, is in two different businesses,
[10] residential and commercial. Do you want both of those things
[11] or the commercial only?
[12] THE COURT: Whatever is represented in these charts.
[13] MR. SALZMAN: Thank you, your Honor.
[14] THE COURT: Okay. The concept I'm after is what
[15] percentage of BMI's business is represented by these four
[16] pages.
[17] MR. SALZMAN: Firms.
[18] THE COURT: In quasi-approximate terms.
[19] MR. SALZMAN: Without really knowing, I'm confident we
[20] can do it.
[21] THE COURT: Let's take a recess.
[22] (Recess)
[23] THE COURT: Mr. Salzman?
[24] MR. SALZMAN: Thank you, your Honor.
[25] BY MR. SALZMAN:

Page 730

[1] Q. Mr. Owen, in addition to Muzak's agreement to the $36.36
[2] rate, did other firms in the industry also accept that rate?
[3] A. Yes. My understanding is that virtually everybody in the
[4] industry did so.
[5] Q. And does that affect your view as to the propriety of that
[6] number as the benchmark?
[7] A. It certainly makes it a better benchmark.
[8] Q. And have you looked at the question of whether any
[9] adjustments need to be made in order to compare the Muzak
[10] agreement to DMX, leaving aside the adjustable fee component?
[11] A. Yes. I don't believe that adjustments are necessary.
[12] Q. Now, there's a contention in the case concerning the,
[13] what's been referred to as the 8 percent organic growth factor
[14] or the 8 percent cushion. Are you aware of that contention?
[15] A. Yes, I am.
[16] Q. First, just briefly tell us your understanding of how that
[17] provision works.
[18] A. Well, that provision works in the following way: The
[19] agreement with Muzak was a lump sum agreement based on the
[20] number of locations, I think it's 175,000 or 165,000 as of the
[21] end of the previous year. The way the provision worked is that
[22] if the number of locations other than through acquisition rose
[23] by more than 8 percent compound year by year over the term of
[24] the license, then there would be an increase in the fee,
[25] increase in the dollar amount paid. But if the increase was

Page 731

[1] less than that, or if there was a decrease, there would be no
[2] adjustment of the total amount paid.
[3] **Q.** Tell us why you don't believe that that requires an
[4] adjustment for DMX.
[5] **A.** Because, well, there's more than one reason, but the basic
[6] reason is DMX is being offered the same deal. It has to be, in
[7] retrospect and we know what actually happened to DMX, but the
[8] offer is as if DMX had taken that deal in 2004. The terms of
[9] the deal would have changed DMX's average rate, if you want to
[10] think of it in terms of averages, instead of the lump sum
[11] amount over the term, but DMX's rate would in fact have
[12] actually increased. So the effects of applying the location
[13] adjustment clause to DMX as it turned out would have been that
[14] their average rate would have gone up, because the number of
[15] locations actually went down.
[16]      So everybody else agreed to this on an ex-ante basis
[17] going forward. DMX waited, for whatever reasons, we're after
[18] that period now we can look back and know what happened, but if
[19] DMX had been given this same exact contract with the same
[20] 8 percent provision, it would not have benefited from it. And
[21] so if we think, the way to think about the benchmark it's
[22] the same deal and how would DMX have done under the same deal,
[23] then the 8 percent doesn't call for any adjustment just because
[24] we happen to know how DMX worked out.
[25]      **THE COURT:** Why do we start as of 2004? There was an

Page 732

[1] agreement made in 2004 which had prospective provisions in it.
[2] Why isn't the concrete thing to do to look at how it turned out
[3] in 2008 and 9 and say, well, we're setting the fee as of the
[4] year which in effect follows that, and so we will be in the sixth
[5] year of that agreement and look at it from that standpoint?
[6]      **THE WITNESS:** I think the answer, your Honor, is that
[7] the original deal involved an allocation of risk, like most
[8] contracts. There was an allocation of risk between BMI and the
[9] users and the risk was whether or not locations were going to
[10] grow or shrink and if grow, by how much. And it is not
[11] comparable to compare to that allocation of risk a later
[12] ex-post calculation based on what actually happened. Because
[13] it doesn't -- that would require an adjustment somehow to take
[14] account of the fact that the risk has been eliminated from
[15] DMX's side.
[16]      **THE COURT:** But that argument for going back and
[17] allocating the risk the same way when you know that in real
[18] life with three out of four of the major counter parties life
[19] turned out to give them a largely increased number of dollars
[20] and Muzak's declining population of locations became immaterial
[21] because of the guarantee which held its figure level. Isn't
[22] that highly artificial?
[23]      **THE WITNESS:** I don't think so, your Honor. I'm
[24] not --
[25]      **THE COURT:** Isn't the reality that turned out under

Page 733



[1] the agreement just as important as what people thought at the
[2] time they were negotiating the agreement?
[3]      **THE WITNESS:** No, I don't think that's right. I think
[4] that the -- if DMX had signed the agreement at the same time
[5] everybody else would, they would have taken on --
[6]      **THE COURT:** Started at the 36.36.
[7]      **THE WITNESS:** Yes. And to compare the ex-post events
[8] with the ex-ante events is just to erase that assumption of
[9] risk in a way that would require an adjustment. So if we want
[10] to have apples and apples in the adjustment for the going back
[11] period 2004 to 2009, then it seems to me we have to look at the
[12] ex-ante conditions, and that's what essentially BMI is
[13] offering. I don't think Muzak had a guarantee, your Honor. It
[14] was a lump sum payment.
[15]      **THE COURT:** Yes.
[16] **BY MR. SALZMAN:**
[17] **Q.** And under the Muzak agreement, if Muzak lost subscribers,
[18] what happened to its fee per location?
[19] **A.** Muzak did lose subscribers, unlike the three examples that
[20] DMX is emphasizing here, and its average rate expressed in
[21] terms of the fixed amount --
[22]      **THE COURT:** Remained at 6 million?
[23]      **THE WITNESS:** Yes. So they went up and they are
[24] far -- I don't know what the actual numbers are about, but
[25] Muzak is far larger than these other companies, these other

Page 734

[1] providers.
[2]      **THE COURT:** In number of locations.
[3]      **THE WITNESS:** In locations and in total payments to
[4] BMI.
[5] **Q.** Let's take a look briefly at tab 7, which is the revised
[6] version of JX 1293 in evidence.
[7] **A.** Yes.
[8] **Q.** Just without going line by line, I just wanted to turn your
[9] attention to the last page. And in the lower right-hand corner
[10] I think there was previous testimony concerning a prior version
[11] of this where the industry net figure as it actually turned out
[12] taking into account the 8 percent cushion was $34 I believe and
[13] 52 cents, and what does the corrected version say?
[14] **A.** Over the whole period it was $34.32.
[15] **Q.** So that's 20 cents lower than the prior exhibit.
[16]      **MR. SALZMAN:** That's the purpose of these questions,
[17] your Honor.
[18] **Q.** You talked about reasons why it's ex-ante rather than
[19] ex-post analysis that you think is appropriate, correct?
[20] **A.** Yes.
[21] **Q.** What did you consider in terms of what the expectations of
[22] the parties was back at the time?
[23] **A.** Well, there's some evidence on that in the record, and I'm
[24] not going to talk about that, because it's in the record. But
[25] just from the point of view of an observer of the industry, who



[1] was outside the firms, it was clear I think at the time that
[2] this was a declining industry under a lot of competitive
[3] pressure from new technologies, iPods and so on, and that both
[4] in the early parts of the decade and then continuing up until
[5] the present, there's tremendous amount of competitive pressures
[6] suggesting that it was going to be hard to grow locations by
[7] any significant amount, and perhaps more likely that locations
[8] would decrease because of the ease with which individual
[9] customers could just put their iPods into an amplifier system
[10] and play their background music that way, particularly for the
[11] smaller ones. So it would have been reasonable, at least for
[12] an outside observer, to have predicted that the industry would
[13] have little, if any, growth back in the early to mid-2000's.
[14] In support of that, there is this document that DMX
[15] and Muzak jointly submitted that Weil, Gotshal submitted to the
[16] Department of Justice making the case in the context of their
[17] proposed merger, that the relevant market from an antitrust
[18] point of view included far more than just background music
[19] service, that is, the industry was far more competitive than,
[20] as a structural matter, than you would conclude if you just
[21] looked at the commercial music services alone. And that
[22] submission and the evidence in it tends to confirm the view
[23] that I just gave in terms of what the future of the industry
[24] looked like as of 2004.
[25] (Continued next page)

[1] **THE COURT:** The document is dated 2007, is it not?
[2] **THE WITNESS:** Yes, but it includes historical data
[3] going back to the early part of the decade and refers
[4] specifically to a submission of a DOJ action in 2001 where the
[5] same arguments were being made.
[6] **BY MR. SALZMAN:**
[7] **Q.** Turn, if you would, to tab 9. What is this?
[8] **A.** This is a chart that was prepared under my supervision that
[9] simply shows what I think Mr. O'Neill characterized as the
[10] bell-shaped curve. I think that's what he was talking about.
[11] I don't know how much like a bell it is but what it shows is
[12] the number of companies who have ex post average fees in the
[13] amounts given on the bottom axis, $27 per location and so on,
[14] after the dust had settled on the contract period.
[15] So, I guess the point is some went down and some went
[16] up and a lot stayed at $36.36 and this is, of course, after
[17] including whatever adjustments they got as a result of the 8
[18] percent clause. In fact, these numbers are simply taken or
[19] derived from the big spreadsheet we looked at a few minutes
[20] ago.
[21] **Q.** You're aware, are you not, that at the same time that Muzak
[22] entered into its deal with BMI on a prospective basis it
[23] resolved its situation with respect to prior years that where
[24] it had been paying BMI millions of dollars on interim basis,
[25] correct?

[1] **A.** Yes, I understand that's another issue in contention.
[2] **Q.** And you're aware that no additional payment was formally
[3] made on the, with respect to that past period, correct?
[4] **A.** The final agreement called for no addition or subtraction
[5] from the previous payments on an interim basis.
[6] **Q.** And, is the fact that the prior period was wrapped up at
[7] the same time as the prospective deal was finalized, is that
[8] relevant?
[9] **A.** Well, not necessarily. It depends.
[10] **Q.** What does it depend upon?
[11] **A.** If there was evidence to show that there was what in some
[12] circumstances might be called not an arm's-length deal where
[13] there was some reason why one party would benefit from an
[14] allocation, an accounting allocation essentially from one
[15] category to another and the other party accommodated that
[16] without any compensation.
[17] So, whether or not there was such a component in the
[18] deal depends not only on simultaneity but also on how many
[19] other factors were in play and on the actual magnitudes
[20] involved.
[21] **THE COURT:** Going back to your chart -- not yours but
[22] the chart at tab 9 and, just by inspection, doesn't it indicate
[23] that more companies were paying less than $36.36 per location
[24] than were paying that amount?
[25] **THE WITNESS:** I haven't added all the numbers to the

[1] left up to see but certainly --
[2] **THE COURT:** No, you can't but sort of clumping the
[3] lengths.
[4] **THE WITNESS:** It is certainly more on the left side
[5] than on the right side.
[6] **THE COURT:** A great many, and I think taking the great
[7] length of the of 36.
[8] **THE WITNESS:** I don't know what the answer is, your
[9] Honor, arithmetically, but there is no doubt there are more
[10] vertical lines to the left than to the right. Of course, this
[11] doesn't take into account the number of locations so it is not
[12] dollar weighted.
[13] **MR. MARKS:** No, just average fees.
[14] **THE WITNESS:** Right.
[15] **BY MR. SALZMAN:**
[16] **Q.** Just raw number of firms count each firm as one?
[17] **A.** Every firm gets one unit on these lines so Muzak has the
[18] same weight, if you like, as a firm with only 50 locations.
[19] **Q.** And we know the weighted number --
[20] **THE COURT:** I see.
[21] **THE WITNESS:** The weighted number is just barely below
[22] $36.36. The weighted average is $34.32.
[23] **BY MR. SALZMAN:**
[24] **Q.** Further on the subject of the retroactive settlement --
[25] **A.** Yes.

Page 739

[1] **Q.** -- did you see any evidence, as you looked at the
[2] documents that the parties, first I will ask deliberately and
[3] consciously, traded money from one period to the other?
[4] **A.** I'm not aware of any document to that effect.
[5] **Q.** And did you, yourself, see any evidence that even if they
[6] didn't do it consciously, that in fact value that would
[7] otherwise have been paid for the future -- for the past was
[8] paid for the future?
[9] **A.** I don't -- I don't see any direct evidence and I think what
[10] the statisticians call noise level, the number of moving parts
[11] going on in the negotiations seems pretty large compared to
[12] trying to ferret that out. So, I don't think one could be
[13] confident in using the current documents that are available in
[14] reaching the conclusion that there was a one-to-one tradeoff.
[15]     In addition, I have to say it doesn't really matter
[16] because DMX got the same deal. DMX settled its previous -- its
[17] previous royalties to BMI at the interim rate which was the
[18] same as the rate Muzak was paying. That was occasioned at
[19] least in part because of a bankruptcy proceeding but that's
[20] what it got.
[21]     So, even if you thought there was a transfer from the
[22] settlement of the retroactive period to the going forward
[23] period, DMX got the benefit of the same transfer.
[24] **Q.** You referred a couple minutes ago to noise factor or moving
[25] parts; what were you referring to there?

Page 740

[1] **A.** Well, there were lots of rounds of negotiation and lots of
[2] issues even at the end in dispute or still in negotiation. The
[3] term of the license, the specific years was still in dispute,
[4] eventually got moved, I think, six months further forward. The
[5] famous 8 percent clause was still being negotiated. At least
[6] those two items and perhaps others were in dispute and moved
[7] in -- each moving in alternative directions from the settlement
[8] of the prior period.
[9]     So, I just don't see how you can reliably make an
[10] inference about settlement of the prior period.
[11] **Q.** Did you take a look at what the other CMS providers' deals
[12] with BMI were vis-a-vis this retroactive period?
[13] **A.** Yes. Just as a check on my tentative conclusion that there
[14] was no need to make an adjustment on that account, we looked at
[15] all the other CMS providers to see what they did with respect
[16] to the settlement of prior interim periods. About half of all
[17] the CMS providers did have the same interim period at issue as
[18] Muzak and about half didn't. About half of them had even a
[19] shorter period or no period because they were new entrants at
[20] stake. And, in spite of that difference, they all settled on
[21] $36.36. They all accepted the $36.36. That seems to me pretty
[22] good evidence that there is no need to make an adjustment for
[23] the settlement of the prior interim period.
[24] **Q.** Take a look at tab 10, please. What is that?
[25] **A.** That just has the numbers that I just described. It shows

Page 741

[1] the number of licensees who agreed to $36.36, the total is 160
[2] which is approximately the number that people use for the total
[3] industry; 78 of them, these are other than Muzak,
[4] settled the interim period exactly the way Muzak did, that is,
[5] the entire interim period, and then 43 had some interim period
[6] beginning after January of 1994 and 39 had no settled period.
[7] And they all had the same going forward rate:  $36.36.
[8] **Q.** There is another proposed adjustment that DMX has mentioned
[9] in its papers, namely that Muzak plays more BMI music compared
[10] to ASCAP than DMX does.  Have you looked at that contention?
[11] **A.** Yes.
[12] **Q.** And what is your conclusion?
[13] **A.** I don't know of any a priori reason to think that there
[14] would be a difference.  They're competing services that compete
[15] for the same kinds of customers.  As far as I can tell based on
[16] the DMX they don't choose music on the basis of who the PRO is,
[17] they choose music on the basis of the music, and there is no
[18] reliable way to actually measure any difference.  The DMX
[19] contention is that there is, I think, a 5 percent point
[20] difference roughly which is relatively small but the data upon
[21] which that estimate is based are completely unreliable for that
[22] purpose because Muzak and DMX measure performances in a very
[23] different way that makes it impossible to compare them.
[24] **Q.** What is the difference between the ways they measure or
[25] report performances?

Page 742

[1] **A.** Well, ultimately what we would want to see is the
[2] performance of one song in one location as a performance but we
[3] don't have anything on either side that's very close to that.
[4] What we do have from DMX is performances for off-premise
[5] purposes, satellite purposes, that are counted on the basis of
[6] one broadcast equals one performance regardless of how many
[7] locations are actually listening to it.
[8]     In the case of Muzak we know, because Muzak operates
[9] differently, how many locations received each channel.  And so,
[10] Muzak's reporting of performances off-premise takes account,
[11] weights, the performances by number of locations.  As a result,
[12] Muzak reports performances off-premise in the billions whereas
[13] DMX reports them in the millions.  Now, that's not particularly
[14] material but it illustrates what happens.  Some channels, some
[15] kind of music are more popular than others and if BMI's share
[16] varies across these channels, the weighting can easily affect
[17] the overall share that BMI and ASCAP and CSAC have of the
[18] overall CMS performances.
[19] **Q.** Can you take a look at tabs 12 and 13?  What do they
[20] illustrate?
[21] **A.** They illustrate the point I was just making.
[22]     At tab 12 we have the Muzak way of counting and if you
[23] turn to the last page of that, second page of that exhibit you
[24] see that Muzak is reporting 7.9 billion performances.  That's
[25] just the total of the first column of performances and, again,



Page 743

[1] that's because when a song is broadcast from the satellite
[2] terminal that Muzak uses to reach the satellite and then down
[3] again, it doesn't count that as one performance. Instead, it
[4] actually knows how many locations receive that song and so it
[5] weights a receipt of a song by given location or the
[6] availability of a song at a given location as one performance.
[7] And, if you look at the second column, it shows BMI's share of
[8] music over the various channels. That number varies
[9] substantially and, therefore, how you weight these individual
[10] channels does matter to the computation of the overall share.
[11]     So, BMI's overall share will depend on how many
[12] locations received each of the channels.
[13]     If you turn to tab 13, which is a depiction of how DMX
[14] measures the same factors, you see the total performances --
[15] and again this is off-premise -- are far fewer and that's
[16] simply because DMX doesn't have information on how many
[17] locations actually use each song. All the songs are available
[18] at each location for the most part so there is a total of 3
[19] million performances instead of 8 billion performances.
[20]     And, again, the shares that BMI has in each channel,
[21] each type of music varies really substantially from close to
[22] zero to close to relatively close to a hundred percent, in some
[23] cases. So, how you weight the individual channels would make a
[24] difference. Muzak weights them by locations, DMX doesn't. It
[25] is not that one is wrong and the other is right, it is that the

Page 744

[1] numbers aren't comparable and therefore an overall share --
[2] calculation of the overall share based on the averages is a
[3] comparison of apples and oranges.
[4] **Q.** Just to illustrate that last point, take a look at tab 13,
[5] the line items for about 10 items down the channel format it is
[6] called, there are two, one next to the other, one is called Rat
[7] Pack and the next one is Traditional Country.
[8]     Do you see those?
[9] **A.** Yes.
[10] **Q.** What does that illustrate?
[11] **A.** Well, these are two channels that have about the same
[12] number of performances which means the songs are about the same
[13] length. One of them BMI has -- Traditional Country BMI has a
[14] 72.5 percent share whereas the Rat Pack channel, which I assume
[15] is Sinatra and Friends, BMI has only a 9.8 percent share. So,
[16] a huge difference. And that difference in Muzak's case would
[17] be weighted by the number of locations which would not be the
[18] same. And so, the average would be different from Muzak even
[19] if the corresponding way of measuring had the same shares.
[20] **Q.** Did you take a look at the agreement between ASCAP and
[21] Muzak in connection with this proceeding?
[22] **A.** Yes.
[23] **Q.** And that's Joint Exhibit 1110 in evidence or -- I withdraw
[24] that.
[25]     That's Joint Exhibit 1110. What did you find in that

Page 745

[1] exhibit?
[2] **A.** Well, ASCAP is kind -- the ASCAP music blanket license is
[3] kind of a next best benchmark compared to the BMI Muzak
[4] benchmark. What is different about it is that it is ASCAP
[5] music instead of BMI music, although for this purpose I'm not
[6] sure it makes much difference aside from shares. But, the
[7] customers are the same, it is basically the same system, and
[8] the blanket license that Muzak negotiated with ASCAP has the
[9] same structure and apparently was modeled on the BMI Muzak
[10] blanket license. ASCAP got paid more, that's the principal
[11] difference. It is otherwise very similar.
[12] **Q.** Did it have the same 8 percent cushion in it?
[13] **A.** It had the same 8 percent cushion. There was a settlement
[14] of past interim fees that was not zero.
[15]     **THE COURT:** Mr. Salzman, I think you were there and
[16] every time this comes up I am concerned about it and I think in
[17] another case you explained it and I have forgotten the
[18] explanation, and that is the purpose of the second paragraph in
[19] Article 13 of the decree: To best preserve the independent
[20] conduct of defendant's music licensing activities the
[21] separation between the judges shall be honored.
[22] **BY MR. SALZMAN:**
[23] **Q.** I think the core purpose of that provision, as I understand
[24] it, is so that BMI and ASCAP would have independent decision
[25] makers as to what their rates were and that so that, for

Page 746

[1] example, as appropriate in a rate court case it would be
[2] confidential, secrets of BMI that ASCAP might not have access
[3] to, and vice versa, and so that in negotiations under the
[4] penumbra of the rate court each one would make its own -- be
[5] able to make its own deals and avoid rate court, if it could,
[6] by knowing that it was rowing its own boat. However, this
[7] provision was not intended to go so far as to say that ASCAP,
[8] as another player in the market, was irrelevant or could not be
[9] looked to as a market fact. I think that's the distinction
[10] that is appropriately drawn, that what happened, what ASCAP can
[11] charge whether by agreement or by Court decision from the point
[12] of view of this Court would be a piece of information that
[13] could very well be relevant.
[14]     **THE COURT:** Do you have any reason to differ with
[15] that, Mr. Rich?
[16]     **MR. RICH:** No fundamental disagreement with the
[17] principle that to the extent the Court determines it relevant
[18] we don't have a problem with allusion to what the competitor
[19] has or hasn't done.
[20]     **THE COURT:** That provision in the decree was not
[21] intended to remove the results of the procedures from the
[22] relevant Universe?
[23]     **MR. RICH:** That's always been my understanding, your
[24] Honor, as opposed to jurisdictionally who would handle these
[25] disputes.

Page 747

[1] **THE COURT:** Okay.

[2] **BY MR. SALZMAN:**

[3] **Q.** You mentioned before, Mr. Owen, that the ASCAP rate was

[4] higher. Do you remember what that number was?

[5] **A.** I think it was $6.8 million.

[6] **Q.** Do you remember how that worked out on a per location basis

[7] for --

[8] **A.** 4120. I think that's the right number.

[9] **Q.** And is $41.20?

[10] **THE COURT:** What was the rate?

[11] **A.** $41.20. It was a fixed dollar amount, $6.8 million a year

[12] and I think that works out to 41 dollars and 20 or 21 cents,

[13] per location.

[14] **Q.** And you mentioned that you took a look at it or you wanted

[15] to take a look at it from the point of view of share

[16] performances, right?

[17] **A.** Yes. There is a need to adjust that for differences in

[18] share. Traditionally ASCAP has had a slightly larger share

[19] than BMI because of its relative age and, to the extent it is

[20] possible, I tried to adjust the actual ASCAP rate to account

[21] for that.

[22] **Q.** And what did you find upon doing that?

[23] **A.** When you adjust, as best I could for the difference in the

[24] shares, you come out with the ASCAP rate being almost exactly

[25] the same as the BMI rate, $36.36.

Page 748

[1] **Q.** What did that tell you about the BMI Muzak rate as a

[2] benchmark?

[3] **A.** Well, it kind of confirmed the reasonableness of that rate

[4] as a benchmark for this matter.

[5] **Q.** You're aware, are you not, that certain music publishers

[6] entered into direct licenses with DMX, correct?

[7] **A.** Yes.

[8] **Q.** Are they an appropriate benchmark for the fees to be paid

[9] to BMI?

[10] **A.** Certainly not.

[11] **Q.** Take a look at tab 16. What is that?

[12] **A.** That's a list of some of the reasons why it is

[13] inappropriate or, as this exhibit says, erroneous to use the

[14] direct licenses as a benchmark in this case without any

[15] adjustment as a benchmark.

[16] **Q.** Who prepared this?

[17] **A.** I did.

[18] **Q.** Let's take it from the top. Number 1, direct licenses used

[19] for works/performances not licensed under AFBL.

[20] What does that mean?

[21] **A.** Well, as I indicated before in the context of identifying

[22] the features that a good benchmark has, it is important to see

[23] that they cover the same works, the same music. The direct

[24] licenses, by definition, aren't to license performances that

[25] will not be supplied by rights to which will not be supplied by

Page 749

[1] BMI under the adjustable fee blanket license. So, the music is

[2] not comparable. There is in fact, for the reasons I have

[3] explained earlier, every reason to expect substantial

[4] differences in the performances because of the transactions

[5] cost issue.

[6] **Q.** And take a look at number 2: Direct licenses are not

[7] random, cream.skimming. bias.

[8] What does that mean?

[9] **A.** You can imagine the direct licenses were simply a random

[10] sample of the BMI repertoire and, if so, then there might be

[11] nothing wrong with this point of view from comparing the

[12] blanket license with the direct licenses -- but they aren't.

[13] It doesn't make any sense to think of DMX pursuing a policy of

[14] licensing at random the various performances that it directly

[15] licenses. It would be rational for them to license the least

[16] expensive performance songs and, as I explained before, that's

[17] likely to be licenses from large -- the very largest

[18] publishers. And, indeed, whatever DMX' intent was, that's what

[19] actually happened. About half of the directly licensed

[20] performances are from a single publisher, Sony.

[21] So, this is -- because of the cream-skimming bias and

[22] by bias I mean statistical bias, this is not a random sample

[23] and therefore the music that is licensed by the, through the

[24] direct licenses is not comparable to the music that's licensed

[25] under the adjustable fee blanket license offered by BMI.



Page 750

[1] **Q.** So, what does that have to do with the Court's task of

[2] setting a reasonable fee for the BMI license?

[3] **A.** Well, it means that if you wanted to use the direct

[4] licenses as a benchmark, it would be necessary to make an

[5] adjustment to account for the transactions cost that DMX would

[6] occur in acquiring all 14,000 rights or dealing with all 14,000

[7] rights holders to acquire all the music that it would have

[8] available under the blanket license among other things, among

[9] other adjustments.

[10] So, we are not comparing apples and apples when we

[11] compare the directly licensed music and the price for it for

[12] direct licenses as opposed to access to the BMI repertoire of

[13] songs or subset of the repertoire that's actually used by

[14] DMX in getting performing licenses for high transactions cost

[15] performances.

[16] **Q.** Item 3; can you read that out and tell us what you meant by

[17] that?

[18] **A.** The price for the direct license, which is leaving aside

[19] the issue of what it is, clearly doesn't reflect anything about

[20] the willingness to pay publishers who didn't sign the license.

[21] And we don't know exactly how many publishers didn't sign the

[22] license because DMX doesn't have that information or hasn't

[23] supplied it. But, we do know that a substantial number of

[24] publishers did not sign the license when offered it.

[25] So, the information that a number of publishers didn't





Page 751

[1] value the license at the price that DMX was willing to pay is
[2] information that's relevant to the rate court in assessing
[3] whether that license is representative of the value of the
[4] blanket license.
[5] Q. Is there any reason that the publishers who refused to sign
[6] are less relevant to figure out the market price than the
[7] publishers who did sign?
[8] A. No. They're actually more relevant because they're the
[9] ones that DMX will be getting licenses from, getting rights
[10] from through the blanket license which is -- or the adjustable
[11] fee blanket license which is what the Court is faced with
[12] pricing.
[13] Q. What's the economic inference from the, a rejection by a
[14] publisher of the price tendered by DMX?
[15] A. That it is insufficient, that it is too low.
[16] Q. Item 4 on your list says: Direct licenses provide no
[17] insurance feature.
[18] What does that mean?
[19] A. The direct licenses don't include the insurance against
[20] inadvertent infringement that the blanket license provides, and
[21] by that I mean both the blanket license from BMI and the other
[22] societies.
[23] Q. And item 5: Direct licenses provide no indemnity feature.
[24] What does that mean?
[25] A. In the event that there is a dispute among composers or

Page 752

[1] publishers and to who owns the right on a given piece of music
[2] there is no indemnity that is provided by the direct licenses
[3] for costs to DMX from litigation over its alleged infringement
[4] of somebody else's music.
[5] Q. Reason 6: Direct licenses do not provide immediate access
[6] for unregistered new works.
[7] What does that mean?
[8] A. Yes, I think the evidence in the record already here is
[9] that DMX does use, at least in some of its channels, music that
[10] is hot just off the charts or on the charts already in the
[11] radio world, popular current music. And there is also evidence
[12] that that music is sometimes not registered at BMI because the
[13] publisher has not yet submitted the paperwork or the composer
[14] has not yet submitted the paperwork. So, the blanket license
[15] provides access to that music. The direct license doesn't
[16] because we don't know who it belongs to and therefore DMX
[17] doesn't know whether or not it is covered under one of the
[18] direct licenses that it has negotiated.
[19] A similar factor applies to foreign music. If DMX had
[20] blanket licenses from all of the societies, all three, then it
[21] would be covered for what would otherwise be infringement of
[22] foreign music rights that are administered in the United States
[23] by BMI and ASCAP.
[24] Q. Let's take a look at reason 7: Direct licenses rates are
[25] circular, simply reflect prior license.



Page 753

[1] What is that a reference to?
[2] A. The promise that DMX was making to the publishers that it
[3] was negotiating with was that it would pay more than BMI was
[4] paying.
[5] So, what was BMI paying? BMI was paying out to the
[6] publishers royalties based on the income from the commercial
[7] music industry including DMX and, in the case of DMX, that was
[8] royalties based on the old interim fee which was still in
[9] effect dating back to -- well, it was set as of 1987 and it was
[10] effective as of 1993, I think.
[11] So, there was an old rate, that's the 2.2 percent for
[12] off-premise and $20 and something for on-premise, much lower
[13] than rates we are talking about now, or $36.36. That
[14] determined the DMX revenue that was passed through BMI to the
[15] publishers.
[16] So, the publishers, thinking about whether DMX' offer
[17] was better than what they were now getting from BMI would be
[18] comparing DMX' offer to an old interim fee. And to the extent
[19] that DMX now wants to use its offer as a benchmark and argue
[20] that publishers signed up under that price is sort of a free
[21] market event that's independent evidence of what a marketplace
[22] would look like if it was competitive. What is really
[23] happening is the publishers are comparing DMX' offer not with
[24] some pre-market alternative but with an old rate setting that's
[25] decades old.

Page 754

[1] So, the setting of the rate by some rate court in the
[2] past, which presumably influenced the interim fee after 1993,
[3] was determining what the publishers would have to give up if
[4] they wanted to accept DMX' offer and their decision about
[5] whether to take DMX' offer.
[6] So, if that were replaced, if what they were getting
[7] from BMI were replaced by the $25 or $12.50 that DMX was
[8] nominally offering, if the rate Court would choose that as the
[9] benchmark, once again the publishers would be choosing based on
[10] the Court's setting of a previous license -- setting of a fee
[11] for a previous license and the new competitive market fee would
[12] be simply a reflection of the pre-existing license.
[13] So, the whole process is entirely circular. The point
[14] of which is it is not some competitive free-market observation
[15] that you could use as independent evidence of what a market
[16] would look like in a state of competition.
[17] Q. Is that true whether or not the prior rate was in fact
[18] Court set as opposed to negotiated as in a blanket license?
[19] A. No. I think all of these rates are at least influenced by
[20] what a Court would do, as Holmes put it.
[21] Q. That is illustrated -- your point is illustrated in tab 17?
[22] A. Yes. There is an illustration at tab 17 that just works
[23] through what I just said.
[24] On the left-hand side BMI makes current payments to
[25] publishers based in DMX' case on rates negotiated in 1987 and

[1] that affects the publishers' willingness to pay for the direct
[2] license because that's the amount they would give up if they no
[3] longer relied on BMI's pass-through of all but the
[4] administrative cost portion of the rates that DMX was paying,
[5] and that affects the rate that DMX will be able to pay, lowers
[6] it, in effect, for the direct license. And then DMX proposed
[7] to use that, the nominal $25 rate as a proposed benchmark for
[8] this case.
[9]      So, the result would be that BMI payments, in the
[10] future would be, in part, determined by what was set in 1987
[11] for the appropriate rate in 1993.
[12] **Q.** Are you familiar with the evidence that in some cases DMX
[13] expressly offered to pay 150 percent of what the publisher had
[14] been receiving from BMI or ASCAP?
[15] **A.** Yes, I think that brings us to a different issue which is
[16] not the form and coverage and comparability of the direct
[17] license but the rate, were they really offering $25 to include
[18] both BMI and ASCAP rights or were they offering something else?
[19] And at least in the case of the major publishers I think the
[20] evidence is that they offered more than that amount, they
[21] offered 150 percent or even more of what they were currently
[22] getting from what the publishers were currently getting from
[23] BMI.
[24] **Q.** Are you familiar with the evidence to the effect that
[25] publishers were encouraged to direct license by the prospect

[1] that they might have their music played more often if they
[2] direct license?
[3] **A.** Yes. I think the point really is that it wasn't so much
[4] that DMX was offering $25 or $12.50 or whatever the BMI share
[5] was, that DMX was offering the publishers more than they were
[6] currently getting or would get and the mechanism for that was
[7] not just some larger percentage of their current payments but
[8] rather that DMX would, for the directly licensed music, make
[9] greater use of it. And if they made greater use of it, then
[10] the publishers would get larger payments from DMX.
[11]      So --
[12] **Q.** Let's take a look at reason 8 back in the tab 16; reason 8:
[13] Direct license rates do not adjust for DMX transaction costs.
[14] **A.** Yes.
[15] **Q.** What does that mean?
[16] **A.** I think I have covered this point earlier, your Honor.
[17]      If we are going to compare apples and apples and we
[18] are trying to use the direct licenses as a benchmark, there has
[19] to be an adjustment for the transactions cost, DMX'
[20] transactions cost in acquiring the same music that it would
[21] acquire through the BMI adjustable fee blanket license.
[22] **Q.** Why is that?
[23] **A.** Because otherwise we are putting transactions costs on one
[24] side and not on the other side.
[25]      Which is the whole point about the cream-skimming

[1] argument or transactions costs economies here. DMX, in direct
[2] licensing, will be taking advantage of the fact that there are
[3] many, many thousands of publishers, most publishers in all
[4] likelihood, who are so small or so difficult to identify that
[5] acquiring performance rights from them would be very highly
[6] costly per performance and so it will use BMI as the mechanism
[7] to do that.
[8]      DMX' cost savings from doing that should be in the
[9] ballot, should be some kind of adjustment if we are going to
[10] use the direct licenses as a benchmark. But, of course, they
[11] aren't.
[12] **Q.** Does this point relate to the willing buyer/willing seller
[13] test for the reasonable fee?
[14] **A.** Well, yes, because if you look at DMX' willingness to pay
[15] for the transactions that it avoids having to make by relying
[16] on BMI for the high-cost performances, then that willingness to
[17] pay is, in turn, based on what DMX would have to pay in
[18] transaction cost leaving the value of the song aside for
[19] high cost performances.
[20]      So, that factor has to be included if you are going to
[21] value the willing buyer side of this correctly.
[22] **Q.** And that would include, for example, the cost DMX had in
[23] retaining MRI to negotiate and process the direct licenses?
[24] **A.** At least those costs, yes. We have to extrapolate that to
[25] what it would pay PRI to acquire and monitor all the

[1] performances that would otherwise -- will otherwise be acquired
[2] through BMI, not just the direct licenses that were actually
[3] negotiated.
[4] **Q.** Reason 9: Direct license rates reflect bargaining power
[5] imbalance.
[6]      What does that mean?
[7] **A.** Well, we want willing buyers and willing sellers in this
[8] paradigm of the law for, and economics for deciding what a
[9] reasonable market price is. It is not the case in these direct
[10] license negotiations that the two sides have the same
[11] bargaining power and that's because the bargain or the
[12] negotiation is undertaken in the shadow of the consent decree
[13] which gives DMX, like other users, a compulsory license to use
[14] all BMI music and to appeal to the Court -- this Court -- to
[15] set a fee for that use.
[16]      So, it cannot be compared to a competitive market in
[17] any sense because in a competitive market for these rights the
[18] seller would have the right to withhold the product until there
[19] is an agreement with the buyer on the price. And BMI, the
[20] publisher in the case of a direct license, doesn't have the
[21] right to withhold the product from the buyer.
[22]      So, there is a huge imbalance in bargaining power
[23] based on that fact, that fact created by the consent decree.
[24] **Q.** If there were a free market negotiation where the publisher
[25] can tell DMX, no, would that -- how would that mark work?

[1]   **A.** Well, a market like that would presumably work like other
[2]   transactions in intellectual property rights. There would be,
[3]   most likely, at least some exclusive licensing, that is to say
[4]   it would pay some user to pay some publishers enough to get the
[5]   exclusive right to use some music, something they can't do
[6]   given the consent decree. And the result would be substantial
[7]   changes in the nature of the industry in the direction of
[8]   having higher prices or lower quantities of music. And the
[9]   implications of that aren't completely clear but it sounds like
[10]  a world in which there is less music produced or less music
[11]  consumed.
[12]  **Q.** And reason 10: Direct license rates are not in fact $10
[13]  but based on a promise of more.
[14]  **A.** Yes, assuming the $10 is the part of the nominal $25 direct
[15]  license form that DMX was sending out, the publishers who were
[16]  induced to sign that, at least the ones who were -- who knew
[17]  what they were doing, were under the impression that they would
[18]  do better this way and doing better meant that DMX would
[19]  increase their share of performances.
[20]      In the case of the big companies, DMX was offering
[21]  actual numbers in terms of how much more and guarantees. But
[22]  for the smaller publishers which was the hope of getting more
[23]  than what they were currently getting from DMX through the BMI
[24]  distribution system, that induced them to sign the license --
[25]  if they knew they were signing a license for performing rights

[1]   at all.
[2]   **Q.** What do you make of the fact that DMX' offer to the small
[3]   publishers was not expressed as a set dollar amount or a set
[4]   dollar amount per performance but rather a percentage share of
[5]   a pool?
[6]   **A.** Well, I think it is pretty clear that a small publisher
[7]   would be in no position to know what its share, currently, was
[8]   of DMX performances or BMI music, or in a position to assess
[9]   what would happen to that share or could happen to that share
[10]  over time. So, there wasn't any concrete number that, in the
[11]  absence of a guarantee that they could look at, it was simply a
[12]  promise of more that induced them or -- actually have induced
[13]  them to agree to the license.
[14]  **Q.** Have you taken a look at the question of whether the Sony
[15]  transaction does or does not equal the $25 nominal pool rate?
[16]  **A.** Oh, it clearly does not.
[17]      The Sony transaction, for starters, includes this
[18]  guarantee which, by itself, makes it more valuable than the
[19]  license that was offered to other non-major publishers. In
[20]  addition, in order to have the Sony contract work out to the
[21]  equivalent of the $25 nominal fee, there would have to be an
[22]  enormous increase over what DMX has already done to increase
[23]  the use of Sony music with DMX channels.
[24]  **Q.** Take a look, if you would, at tab 18, Joint Exhibit 1296.
[25]  **A.** Yes.

[1]   **Q.** What is your understanding of this exhibit?
[2]   **A.** This is a royalty statement for the third quarter of 2009
[3]   issued by DMX to Sony.
[4]       So, it shows, for example, that DMX had 48,000
[5]   locations and that the DMX royalty pool, based on the $25
[6]   number, was $425,000 in that quarter. And it shows total
[7]   DMX -- we are calling performances, they call them
[8]   transmissions -- this is just for off-premise, and it shows the
[9]   count and the share that Sony had that quarter, 14 percent,
[10]  which was up from the initial 6 percent where Sony started.
[11]  And it shows, towards the bottom, the accounting for the
[12]  recoupment of the advance.
[13]      So, the advance was $2.7 million including $300,000
[14]  designated as compensation for Sony's increased administrative
[15]  expense. The remaining $2,400 was amortizable over the period
[16]  of the license and how, I think, 57 months, this shows that
[17]  coming into the third quarter of 2009 there was an unrecouped
[18]  balance of $2.2 million, in round numbers, and that $69,000 had
[19]  been recouped in the third quarter of 2009.
[20]  **Q.** Have you looked at the question of how much more Sony music
[21]  would have to be played during the balance of the term for the
[22]  Sony guarantee to be earned out at the nominal $25 pool rate?
[23]  **A.** Yes.
[24]  **Q.** Turn to tab 19, please? What does that show?
[25]  **A.** That shows what will have to happen over the remainder of

[1]   the Sony license term in order to recoup the advance or the
[2]   guarantee at the $25 nominal rate. So, you see to the left in
[3]   blue, this is the past including the third quarter of 2009.
[4]   DMX's music Sony music has increased as they've tried to
[5]   increase it from an initial level of about 6 percent and to a
[6]   current level as of the third quarter of about 14 percent.
[7]   But, on average over the remaining quarters of the Sony
[8]   agreement, in order to make the Sony price come down to the
[9]   equivalent of $25 they're going to have to increase that to
[10]  41.3 percent, and it seems pretty clear that that's unlikely to
[11]  happen if they've had difficulties going from around 9 percent
[12]  in the first quarter of 2009 when they put in their new system
[13]  for trying to increase usage of directly licensed music to only
[14]  14 percent in the third quarter.
[15]  **Q.** And what is the significance of the footnote here?
[16]  **A.** The $300,000 is not included here, it is not part of the
[17]  amortized amount that's being analyzed.
[18]  **Q.** So that if that were?
[19]  **A.** It would be even higher if that were included.
[20]  **Q.** Is the fact that the Sony deal was, had a guarantee in it,
[21]  does that make it different from the other deals?
[22]  **A.** My understanding is that the other majors generally were
[23]  offered a guarantee but the smaller publishers were not,
[24]  although there is a most favored nation clause in these
[25]  licenses which suggests, at least to an economist, that DMX

Page 763

[1] would have to do the same or the equivalent for the small
[2] publishers as well. And if the Sony price actually turned out
[3] to be higher than $25 per location, then the most favored
[4] nation clause would suggest that the price would have to be
[5] increased for all the licensees, not just Sony.

[6] So, this is not just one publisher, it is all the
[7] direct licensed publishers who, in fact, would get higher
[8] prices than $25.

[9] **THE COURT:** Mr. Marks.

[10] **MR. MARKS:** Your Honor, I object to the last answer
[11] stating a meaning that it states as legal opinion about the
[12] contract.

[13] **THE COURT:** I will try to keep the distinction in
[14] mind. Thank you.

[15] **BY MR. SALZMAN:**

[16] **Q.** Have you considered the possibility that the Sony agreement
[17] is not representative because DMX was trying something new here
[18] and needed to break the ice or pay extra to change existing
[19] business practices?

[20] **A.** Yes. I recollect that that wasn't an issue or a contention
[21] in the interim fee proceeding. It seems now, with the
[22] evidence -- with the advantage of hindsight, that it wasn't
[23] sufficient to break the ice because the other major publishers
[24] have not been prepared to accept DMX' offers equivalent to
[25] Sony's guarantee.

Page 764

[1] So, it didn't have that effect. I have some doubt as
[2] an economist that it could have had that effect or needed to be
[3] there, but in any event there have been no further licenses
[4] from the major publishers.

[5] **Q.** Does the fact that DMX offered other majors comparable
[6] amounts to Sony say anything about whether the Sony one was
[7] intended to break the ice?

[8] **A.** Well, you would expect that DMX hoped at least to offer the
[9] others or to negotiate with the others lower prices than Sony
[10] if that was the intent of the Sony offer but it hasn't worked.
[11] And so, there is nothing wrong with that, it is just that it
[12] makes the Sony price more representative of what DMX is going
[13] to have to pay, indeed lower than what DMX apparently is going
[14] to have to pay in order to sign the other major publishers.

[15] **Q.** I think you have already -- withdrawn.

[16] Take a look at tab 21, please, it is Joint Exhibit
[17] 1299.

[18] **A.** Yes.

[19] **Q.** What is this?

[20] **A.** It is a summary of royalties for all the DMX payees, so it
[21] shows what royalties accrued and what royalties were paid.

[22] **Q.** What time period is this?

[23] **A.** Third quarter of 2009, the same as the previous Sony
[24] invoice or statement. So, this shows administrator by
[25] administrator and payee by payee what the royalties were, and

Page 765

[1] under DMX' practice royalties don't get paid unless they exceed
[2] $25.

[3] **Q.** Per quarter?

[4] **A.** Per quarter; and therefore a number of these are zero.

[5] **Q.** Take a look at the first line item.

[6] **A.** The first line item is 24 Hour Sounds. They were entitled,
[7] according to this, in the third quarter, to royalties of $20.36
[8] but received nothing.

[9] **Q.** Now, DMX has told the Court that it has approximately, or
[10] in excess of 500 direct licenses as of now. Have you looked at
[11] how many payees are actually on Joint Exhibit 1299?

[12] **A.** Yes. My staff actually counted them. It is roughly half
[13] of 500 -- 240 or some number in that vicinity.

[14] **Q.** What is the significance of that?

[15] **A.** Well, presumably the inference is that DMX didn't use any
[16] of the music of half of the 500 licensees, therefore owed no
[17] royalties.

[18] **Q.** And how does that figure into your weighing of those direct
[19] licenses as benchmarks?

[20] **A.** Well, it certainly lends the usefulness of them as evidence
[21] of what a willing buyer would pay a willing seller or as
[22] indications of what a fair market price is.

[23] The other point I think here is that a lot of these
[24] royalties are very small numbers, presumably the smaller
[25] publishers are involved, and the transactions costs that the

Page 766

[1] publishers would have to expend to be knowledgeable about the
[2] issues in a negotiation about these royalties would be likely
[3] at least as big, probably much larger, than the royalties that
[4] were at stake. For 24 Hour Sounds gets, if this is
[5] representative of DMX' use of their music, something like $80 a
[6] year in unpaid royalties.

[7] And so, it would be unreasonable to expect 24 Hour
[8] Sounds to be highly knowledgeable about the economics of
[9] whether it made sense for them to enter into this license or
[10] not. And, presumably, that reflects on the willingness of them
[11] that they have as a seller to the extent that they know what
[12] they're doing.

[13] **Q.** And just to tie this to some prior testimony, take a look
[14] at page 2 of this exhibit under the line item or across the
[15] line item: Helene Blue Music Limited.

[16] **A.** Yes.

[17] **Q.** What does that show?

[18] **A.** That shows that Helene Blue was slated to receive in the
[19] third quarter from DMX $214.32. And, again, the point is
[20] simply that that's a very small number and, unlike the Sonys
[21] of the world or the Universals of the world, it is
[22] understandable that such a publisher would have relatively
[23] little understanding of what was at stake in signing this
[24] license even assuming, unlike Helene Blue, even assuming they
[25] knew they were signing a performing rights license.



[1] **MR. SALZMAN:** Is now, your Honor, an appropriate time

[2] to break for lunch?

[3] **THE COURT:** Yes. Sure. Let's resume at 2:15.

[4] (Luncheon recess)

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

[1]       AFTERNOON SESSION

[2]       (2:25 p.m.)

[3] **BY MR. SALZMAN:**

[4] **Q.** Good afternoon, Mr. Owen.

[5] **A.** Good afternoon, Mr. Salzman.

[6] **Q.** Could you turn briefly to tab 3 in the ring book?

[7] **A.** To tab 3?

[8] **A.** Yes. That's a written-out form of the BMI proposal that

[9] was appendixed to your report, right?

[10] **A.** Yes.

[11] **Q.** I just wanted to bring to your attention or ask you, the

[12] second bullet is about the years 2004 through 2007, right?

[13] **A.** Yes.

[14] **Q.** And so just so we're clear, the BMI proposal that you

[15] referred to this morning with the adjustable fee blanket

[16] license pertains primarily to the years July 2007 and following

[17] when DMX had started on its direct licensing campaign.

[18] **A.** Right.

[19] **Q.** Prior to that, what's your understanding of this proposal?

[20] **A.** The proposal is the traditional packet license because

[21] during those years DMX was not trying to do direct licensing,

[22] according to my understanding. So it's the same period covered

[23] by the Muzak and CMS blanket license.

[24] **Q.** Now, are you aware of evidence -- turning to another topic,

[25] are you aware of evidence in this case that Universal Music

[1] Publishing asked BMI to match the guarantee that had been

[2] offered to it by DMX and BMI agreed to do that?

[3] **A.** Yes, that's my understanding.

[4] **Q.** And are you also aware of evidence that Sony asked BMI to

[5] match the guarantee offered by DMX and BMI refused to do that?

[6] **A.** Yes, that's my understanding.

[7] **Q.** And are you also aware of evidence that Warner made at

[8] least a tentative request as to the amenability of BMI to

[9] providing it with an advance?

[10] **A.** Yes.

[11] **Q.** What do you understand was going on in these cases?

[12] **A.** Well, what's going on is a negotiation or the beginnings of

[13] a negotiation chiefly on price. There's a -- one way to

[14] characterize it is from an economic point of view there's a

[15] competing offer for a certain amount of music rights and DMX

[16] has made an offer and the seller seeks competitive bids, and in

[17] the case of Sony, the competitive bid was not forthcoming

[18] because presumably BMI didn't find the price attractive, and in

[19] the case of Universal it was forthcoming, presumably because

[20] BMI thought the price offered by its competitor was attractive.

[21] **Q.** As an antitrust economist, do you see anything

[22] anticompetitive in BMI's guarantee to Universal?

[23] **A.** No, no, I don't. The argument from an economic point of

[24] view here is that direct licensing introduces a form of

[25] competition and it's hardly competition if BMI can't compete,

[1] so from an antitrust policy or economic perspective, anyway,

[2] the general policy approach would be that the firm that is

[3] thought to have market power or may have market power can

[4] respond and should respond competitively, but not

[5] anticompetitively, and the matching of an offer from a

[6] competitor is obviously a pro-competitive thing to do.

[7] **Q.** Is there something about the adjustable fee blanket license

[8] that leads to this requesting by those publishers of guarantees

[9] from BMI?

[10] **A.** Well, sure. The adjustable fee blanket license is not

[11] without risk, because in the absence of a guarantee the issue

[12] revolves around how much of the music in question DMX will

[13] actually use. Especially once we're past the first major,

[14] subsequent majors have to worry about whether DMX can actually

[15] increase its usage of everybody's music or everybody that's

[16] directly licensed, and with Sony plus Universal plus perhaps

[17] others, we're getting into a pretty high share of all of DMX's

[18] performances. So it's reasonable from the seller's point of

[19] view to have some doubt that the ultimate fee will actually be

[20] larger than what it's getting from BMI. The guarantee solves

[21] that problem from the point of view of the seller, and it's a

[22] reasonable thing for BMI to match it because it has to

[23] compensate for that risk.

[24] **Q.** Over the long term, if BMI did not react to requests from

[25] publishers who are considering direct licensing, what would the

Page 771

[1] effect be?

[2] **A.** Well, the effect will be what I described in discussing the

[3] cream skimming point. Over time, given the uniformity of the

[4] credit, there will be substantially fewer performances licensed

[5] through BMI, and that means less BMI revenue to cover its

[6] overhead expenses and other expenses, and that means that many

[7] of the efficiencies of the blanket license will be lost to the

[8] economy as a whole and to the music industry because total

[9] transactions costs will go up and the result will be less music

[10] produced and higher costs imposed on the remaining rights

[11] holders that license through BMI.

[12] **Q.** DMX is contending in this case that to find the proper

[13] value for the adjustable fee blanket license you can simply add

[14] the prices for the direct licenses to BMI's costs and that

[15] would represent the fair market value of the adjustable fee

[16] blanket license.

[17] **A.** Yes, that's my understanding.

[18] **Q.** Do you agree with that?

[19] **A.** No, I don't. BMI's costs are hardly a useful proxy for

[20] DMX's willingness to pay for the advantages of the adjustable

[21] fee blanket license. BMI's costs do not measure, there's no

[22] reason why they should have anything to do with the value to

[23] DMX viewed as a willing buyer of the ability to license music

[24] directly or the other advantages of the blanket license, such

[25] as immediate access to rights that may not be registered or the

Page 772

[1] indemnity or the assurance feature of the blanket license.

[2] **Q.** You told us before about BMI's proposal to add 15 percent

[3] as a premium on top of the $36.36 benchmark to compensate for

[4] the additional value, the credit value, the option value, I

[5] should say, of the adjustable fee blanket license, and you told

[6] us before, I believe, that you thought that was reasonable.

[7] How did you come to that conclusion? How did you compute that?

[8] **A.** As I think I mentioned earlier, we looked for a benchmark

[9] that would give some indication of what the value is to a music

[10] user of having the option to license directly and to reduce the

[11] payment for the BMI blanket license fee accordingly. The best

[12] benchmark I was able to find was the per-program licenses that

[13] both ASCAP and BMI had negotiated with something called the

[14] television industry licensing committee. It's an affiliate of

[15] the National Association of Broadcasters, again, represented by

[16] Weil, Gotshal.

[17] **Q.** As an antitrust economist do you see any antitrust policy

[18] reason why BMI should not get an extra fee for the premium

[19] value of the adjustable fee blanket licensing?

[20] **A.** No, there's no reason in an antitrust policy from an

[21] economic point of view why DMX shouldn't pay extra if there's

[22] extra value. Obviously, there might be a question about how

[23] much extra, but there's no question it would be reasonable from

[24] an antitrust point of view to pay extra if they have extra

[25] value.

Page 773

[1] **Q.** If the adjustable fee blanket license were priced the same,

[2] the same full fee as the blanket license, the traditional

[3] blanket license, what effect would that have?

[4] **A.** Well, it would have the effect that every single CMS

[5] provider that had that license available would simply opt for

[6] the adjustable fee license because they would have the option

[7] to have exactly the same thing they have with a blanket

[8] license, plus the option to license some of their music

[9] directly and to save money. So why wouldn't you take that if

[10] it's the same price as the blanket license by itself?

[11] **Q.** Would that be a good or bad thing?

[12] **A.** It would be a bad thing, because it would mean that the per

[13] program license was undervalued --

[14] **Q.** I'm sorry, did you say the per-program license?

[15] **A.** Per program license.

[16] **Q.** Per program license?

[17] **A.** Adjustable fee blanket license was being undervalued

[18] relative to the blanket license, therefore it would be

[19] overused.

[20] **Q.** Overused in what sense?

[21] **A.** Too many CMS operators would take the adjustable fee

[22] blanket license instead of the blanket license, resulting in

[23] higher aggregate transactions costs, and probably a reduction

[24] in the output of music.

[25] **Q.** So from your point of view as an antitrust economist, how

Page 774

[1] should the two licenses be priced relative to each other?

[2] **A.** They should be priced relative to each other to reflect the

[3] increased value to the user, to the licensee, of the option to

[4] license music directly.

[5] **Q.** And from the point of view of CMS providers, what would

[6] they then be deciding in deciding which license to take?

[7] **A.** They'd be deciding between the a la carte option and the

[8] fixed price option. They'd be deciding whether it made more

[9] sense to license all their music at a relatively low price per

[10] performance through the traditional blanket license or whether

[11] to license their music through the adjustable fee blanket

[12] license and take advantage of the option, which, the advantages

[13] of this may vary from one CMS provider to another of directly

[14] licensing the music.

[15] **Q.** Take a look at tab 22. What is it?

[16] **A.** This illustrates some of the components of the computation

[17] of the benchmark for the amount of the option value for the

[18] adjustable fee blanket license, that is, the amount in excess

[19] of the traditional blanket fee component of the adjustable fee

[20] license that's attributable to the increased value to the user

[21] of the option.

[22] **Q.** And this is based on your looking at the per-program

[23] licenses in television?

[24] **A.** Yes. This is based on looking at basically three

[25] per-program licenses in television. The reason there are four

[1] columns there is because the price changed towards the end of
[2] the BMI license period because of a most favored nation clause
[3] kicking in.

[4] **THE COURT:** I'd like to interrupt you, but I don't
[5] want to do it at a time when I'm breaking your train.

[6] **MR. SALZMAN:** Now is fine. Thank you, your Honor.

[7] **THE COURT:** On thinking back to your discussion this
[8] morning about the prixe fixe and the a la carte menus, in the
[9] light of what you were saying, it seems, I want to see whether
[10] you think that a more accurate parallel could be drawn this
[11] way: When the diner comes into the restaurant and is presented
[12] with the menu, the menu does not come with a charge for having
[13] the ability to choose between the a la carte menu or the fixed
[14] price one.

[15] **THE WITNESS:** Not a separately stated charge.

[16] **THE COURT:** Please, bear with me.

[17] **THE WITNESS:** I'm sorry.

[18] **THE COURT:** I'm slow, but these are the terms in which
[19] I think of them for the purposes of this question.

[20] That choice is one he can easily make, freely make.
[21] If he chooses the a la carte menu, he pays a higher price item
[22] by item, but that's paid on the individual items he buys, not
[23] on the privilege of making the choice. The two may be linked,
[24] but that's the pricing mechanism. Okay so far?

[25] **THE WITNESS:** Yes.

[1] **THE COURT:** Therefore, the parallel with the AFBL
[2] license would be to increase the charge item by item rather
[3] than by imposing a charge for the privilege of the choice.

[4] **THE WITNESS:** Yes.

[5] **THE COURT:** That could be done by tinkering with the
[6] ratio. If the ratio were something less than the actual
[7] arithmetic ratio of performance to performance but were
[8] adjusted to be less than or more than equal parity, you would
[9] achieve the closer relationship with the restaurant menu.

[10] **THE WITNESS:** I think that's absolutely right, your
[11] Honor. And that's what BMI's proposal does. Because the
[12] credits --

[13] **THE COURT:** Oh, but it imposes a charge for the
[14] price -- for the choice.

[15] **THE WITNESS:** Well, that's the rationale for it.

[16] **THE COURT:** The other mechanism would be to adjust the
[17] discount ratio, which could be done by simply saying, taking
[18] the actual arithmetic ratio and adding or subtracting 2 percent
[19] or something.

[20] **THE WITNESS:** Or some percentage.

[21] **THE COURT:** Yes.

[22] **THE WITNESS:** I really do think that BMI's proposal
[23] does do that. Not the rationale, but the mechanical way it
[24] works.

[25] **THE COURT:** Oh, but mechanically you think it does?

[1] **THE WITNESS:** Yes, because remember DMX credits a
[2] credit, a dollar a credit or some number of cents for every
[3] work that it directly licenses. The amount of that credit in
[4] BMI's proposal is increased by 15 percent. So it is likely
[5] adding a percentage to the a la carte, item by item.

[6] **THE COURT:** But if it's done through the crediting
[7] mechanism, then you wouldn't want to repeat it as a separate
[8] item in the 15 percent?

[9] **THE WITNESS:** No, you wouldn't want to double count
[10] it, I agree.

[11] **THE COURT:** Okay. Thank you.

[12] **BY MR. SALZMAN:**

[13] **Q.** Turning back to the per-program license as the analogue or
[14] the benchmark --

[15] **A.** Yes.

[16] **Q.** What were you doing there?

[17] **A.** Well, the per-program license is like the adjustable fee
[18] blanket license in the following sense: It permits local
[19] television stations to remove BMI music from some of its
[20] programming or programming periods and to pay a lower fee than
[21] it otherwise would to BMI. And the same thing is true under
[22] the ASCAP per-program license. So as in this case, what we're
[23] looking at is the value of the option to directly license or
[24] not use BMI music, and it is possible to look at the
[25] per-program license, whatever its rationale, whatever the

[1] rationale for the structure of the license in terms of fee
[2] calculation and to ask the question what would a local station
[3] pay if it licensed all its music under the terms of the
[4] per-program license, and compare that with what it would pay if
[5] it took a blanket license, and that's the calculation that this
[6] chart reflects for three or three and a half different
[7] licenses.

[8] **Q.** To make a comparison to the per-program license, did you
[9] have to make an assumption about how much BMI or ASCAP music
[10] was in the television programs?

[11] **A.** Yes.

[12] **Q.** And what assumption did you use?

[13] **A.** The underlying structure of the per-program license is
[14] based on a calculation done by Magistrate Dolinger a number of
[15] years ago, and includes as one factor an assumption about how
[16] much, in that case ASCAP music was contained in local
[17] television programs. His objective was to achieve something, I
[18] forgot the word, but parity or something like that for the
[19] typical licensee, and he concluded that this formula was needed
[20] to reach reasonable parity between the blanket license and the
[21] per-program license for the average TV station.

[22] Whatever may have been in his mind, the number that he
[23] assumed for local stations' typical use of ASCAP music was
[24] 75 percent. 75 percent of the typical local stations'
[25] programming contained ASCAP music, and because that was ASCAP,

[1] in order to do the computation here for BMI, you needed to make
[2] an assumption which Magistrate Dolinger did not make for what
[3] percentage of programming local television stations uses BMI
[4] music.
[5] So there are several ways to do that. One is, there's
[6] hardly any information available, and Magistrate Dolinger
[7] didn't compute anything of this nature for BMI, so you could
[8] just take Magistrate Dolinger's number for ASCAP and assume it
[9] was the roughly the same for BMI, which was 75 percent. I was
[10] a little uncomfortable with using that because it was after all
[11] a number of years ago, even though the same assumption
[12] continues to be reflected in the ASCAP licenses, per-program
[13] licenses in the subsequent non-rate court negotiations over
[14] these licenses.
[15] But I thought it would be useful to try to measure to
[16] the extent possible how much music there was known to be in
[17] those programs that BMI does have data for, which is not all
[18] local programs. So I asked, through my staff I asked BMI to
[19] tell me based on all the information they had available what
[20] percentage of local television station music -- sorry,
[21] programming, had BMI music, and they produced those numbers and
[22] I think your Honor has already seen them, although they haven't
[23] been admitted. That number is roughly 83 percent.
[24] **Q.** Is that reflected in tab 24?
[25] **A.** It's in -- the numbers are actually here in tab 24.

[1] **Q.** That's Petitioner's Exhibit 126.
[2] **A.** Exhibit 126.
[3] **Q.** Am I correct that this check that you did really relates on
[4] tab 22 to the BMI bars on the graph?
[5] **A.** That's correct.
[6] **Q.** And what did you conclude as to what the premium was for
[7] the per-program license option value in these per-program
[8] licenses?
[9] **A.** Using the 75 percent number leads me to conclude that based
[10] on these benchmarks, there's a range between about 20 percent
[11] and about 38 percent that identifies the amount local stations
[12] have agreed to pay in addition to the per-program license for
[13] the option to directly license or not use their BMI music.
[14] **Q.** And how does that relate to the option value or the premium
[15] value BMI is requesting here?
[16] **A.** BMI is proposing a 15 percent premium and since that's less
[17] than any of these individual benchmarks, that is presumptively
[18] reasonable.
[19] **Q.** Now, let's talk a little bit more about the base fee in the
[20] BMI proposal. It's your understanding, is it not, that both
[21] BMI and DMX agree that there should be a base fee that does not
[22] vary based on direct licensing?
[23] **A.** That's my understanding. There's agreement on having a
[24] base fee, but not on the amount.
[25] **Q.** There is, as you said, disagreement about the computation.

[1] So how do you arrive at the computation of a reasonable base
[2] fee?
[3] **A.** I accepted BMI's representations on the amounts both of
[4] their allocated overhead costs and of the incremental costs of
[5] offering this license.
[6] **Q.** There's an issue in the case whether BMI's domestic costs
[7] only or all its costs should be used or the ratio of all its
[8] expenses -- all of its expenses to all of its costs or domestic
[9] to domestic should be used, right?
[10] **A.** Yes. I understand that there is.
[11] **Q.** What do you conclude is the appropriate way to do that?
[12] **A.** The appropriate way to do it is to look at domestic costs
[13] and domestic overhead expenses, because that's the license that
[14] DMX is asking for.
[15] **Q.** Is it relevant to you as to what the other CMS providers'
[16] royalties add up to when they're distributed to BMI affiliates?
[17] **A.** My understanding is the other royalties provided are
[18] allocated in the same way, that is subject to a 17 percent
[19] overhead charge.
[20] **Q.** Is there any reason why the money coming in from DMX should
[21] be treated in any different way from that?
[22] **A.** Not as far as I can tell.
[23] **Q.** Taking a look at -- take a look at tab 25, please.
[24] **A.** Yes.
[25] **Q.** Okay, what is that?

[1] **A.** That is simply a graphical representation of the components
[2] of the base fee that's proposed by BMI. I think I -- BMI is
[3] proposing a base fee of $712,000, which is less than the costs
[4] that have been computed by BMI for offering this license, the
[5] components of which are indicated in the graph.
[6] **Q.** Can you walk through the four bands of costs?
[7] **A.** Yes. The biggest item, $472,000, is the pro rata share --
[8] **Q.** I'm sorry, 462.
[9] **A.** 462. I didn't say that? I'm sorry. $462,000 is the DMX
[10] share of, pro rata share of domestic overhead at the 17 percent
[11] rate. Then there's up front adjustable fee blanket license
[12] costs which are in this chart amortized over the new period of
[13] the term of the license, which now extends, as I understand it,
[14] to 2012. So we took the total up-front costs and allocated
[15] them over the whole period, and then there are ongoing year to
[16] year incremental adjustable fee blanket license costs
[17] associated with the IT department, that's $37,000, and then
[18] there are ongoing incremental costs associated with licensing
[19] and performing rights departments or functions and that's
[20] $151,000, totaling 718, which exceeds BMI's proposed base fee
[21] of 712.
[22] **Q.** The incremental cost of the adjustable fee blanket license
[23] were provided to you by BMI, is that correct?
[24] **A.** Yes.
[25] **Q.** Are you expressing an opinion one way or the other about





Page 783

[1] the reasonableness of those?

[2] **A.** No, I'm not.

[3] **Q.** There was a suggestion in the record a number of days ago
[4] that it might be appropriate for BMI directly to, and not as
[5] otherwise, to simply bill DMX and get paid by DMX outside the
[6] fee structure for the incremental up-front costs of developing
[7] a license or DMX's share of that. Did you see that in the
[8] record?

[9] **A.** Yes, I remember reading something about that.

[10] **Q.** Do you see any impediment in doing that or advantage in
[11] doing that, one way or the other?

[12] **A.** From an economic point of view it ought to be equivalent.
[13] There may be legal issues, but I don't see an economic issue.
[14] A real economic issue goes to whether it should be shared with
[15] other adjustable fee licensees. And that's a significant
[16] economic question.

[17] **Q.** Let's turn quickly, please, to tab 26 concerning -- and
[18] tell us what that's about. I'm sorry, tab 26.

[19] **A.** I have it.

[20] **Q.** Can you tell us what that is about?

[21] **A.** Yes, that simply expands on the proposal with respect to
[22] the bowling rates which vary from year to year because the
[23] bowling rates have an inflation adjustment built in. You'll
[24] recall that the bowling rates are based on the Bowling
[25] Association agreement with BMI and that agreement had a



Page 784

[1] built-in inflation adjustment tied to the consumer price index
[2] and therefore increased from year to year if prices increased,
[3] and so does BMI's proposal for DMX.

[4] **Q.** Is there an economic principle at work concerning where
[5] intensity of music usage would lead to greater fees, that if a
[6] given user used music or a category of user employed music in a
[7] way that was more central to its business it ought to pay more?

[8] **A.** Well, the more important music is to the production of
[9] revenue for business, the more willingness to pay there would
[10] be for that input. So you would expect that a user that used
[11] music more intensively and therefore thought music contributed
[12] to the value of its output, substantially more than other
[13] users, would have a willingness to pay at a higher rate for
[14] that input.

[15] **Q.** One of the issues between the parties is that DMX wants to
[16] only calculate its credits, the ratio of credits based on its
[17] information concerning -- if I get this right -- on-premise and
[18] not off-premise. The other way around?

[19] **A.** The other way around.

[20] **Q.** Off-premise and not on-premise music, is that correct?

[21] **A.** Yes, I believe that's correct.

[22] **Q.** And BMI's contention is that all the music reported should
[23] be used.

[24] **A.** Yes.

[25] **Q.** What's your view?

Page 785

[1] **A.** Well, it's quite important to BMI and also to ASCAP,
[2] apparently, to do what's called follow the dollar with respect
[3] to distributions. That is, they want to pay rights holders as
[4] much as possible in proportion to the use of, value and use of
[5] their music rather than paying the same amount to everybody
[6] without regard to that value. So it's quite important if
[7] you're following that policy, which is economically sensible,
[8] to have as much information as possible and to base both rates
[9] and distributions on the actual number of performances in the
[10] legal sense, that is, actual performances by DMX and other CMS
[11] customers at customers' locations.

[12] There are two kinds of customers, roughly speaking.
[13] There are on-premise customers and off-premise customers. One
[14] involves some kind of device that's on premise, either a CD
[15] player or some kind of computerized system that plays music
[16] that's purchased by that particular establishment because of
[17] its particular characteristics. The other kind is the kind
[18] that comes over the satellite. I've already explained, I
[19] think, that in Muzak's case they already know how many
[20] customers have available each of the channels. DMX only
[21] reports how many songs were broadcast up to and down from the
[22] satellite.

[23] So if there is information, detailed information about
[24] the usage of music on premise and it's different from off
[25] premise and if on premise is from a dollar point of view more

Page 786

[1] important than off premise, which I understand it is in the
[2] case of DMX, then it is really very important to have both
[3] sources of information and to use it for distributions. And it
[4] is therefore sensible to use both sets of data in the
[5] calculation of the price or the total amount paid by DMX.

[6] This is not additional information, as I understand
[7] it. It's information that is already supplied by DMX to BMI
[8] and the issue, if I understand it correctly, is only about
[9] whether it should be used or not in the calculation of the
[10] overall fee.

[11] **Q.** If the evidence were that the amount of direct licensed
[12] music used off-premise were greater than the proportion of
[13] direct licensed music on-premise, would that be a concern of
[14] yours if both sets of data were not used?

[15] **A.** Yes.

[16] **Q.** Why?

[17] **A.** It doesn't accurately reflect the use of directly licensed
[18] music. It's important to get that right whichever way it goes.

[19] MR. SALZMAN: I have no further questions.

[20] THE COURT: Thank you, Mr. Salzman. Mr. Marks?

[21] **CROSS-EXAMINATION**

[22] **BY MR. MARKS:**

[23] **Q.** Good afternoon, Dr. Owen.

[24] **A.** Good afternoon, Mr. Marks.

[25] **Q.** Your assignment from BMI was to assess whether the rate

**A-435**

Page 787

[1] proposed by BMI was reasonable, correct?
[2] **A.** That was part of it yes.
[3] **Q.** You chose to take a willing buyer/willing seller approach
[4] to that problem?
[5] **A.** Yes.
[6] **Q.** Willing buyer/willing seller transactions can occur in
[7] markets that are not structurally competitive, correct?
[8] **A.** Yes.
[9] **Q.** This is an example of a market that's not structurally
[10] competitive, correct?
[11] **A.** That's correct.
[12] **Q.** And monopolists are willing sellers, correct?
[13] **A.** Yes, in general, if the price is acceptable. I mean,
[14] willing seller is defined with respect to a particular price.
[15] **Q.** Correct, and when a monopolist sells its goods to buyers,
[16] the monopolist is a willing seller, correct?
[17] **A.** In general that's the assumption, yes.
[18] **Q.** And in general, companies that transact with monopolists
[19] and pay monopoly prices are willing buyers for those goods,
[20] right?
[21] **A.** In terms of the paradigm, yes. It may not feel that way
[22] psychologically.
[23] **Q.** But in terms of your framework, willing buyer/willing
[24] seller, the buyer side of a monopoly-priced transaction, the
[25] buyers are still willing buyers as you used that term, correct?

Page 788

[1] **A.** Yes.
[2] **Q.** And a buyer can have an arm's length transaction with a
[3] monopolist, correct?
[4] **A.** Yes.
[5] **Q.** You referred earlier today to the term fair market value,
[6] do you recall that?
[7] **A.** Yes.
[8] **Q.** Fair market value is not a term of art in your field of
[9] economics, is that correct?
[10] **A.** Not usually, no.
[11] **Q.** An arm's length transaction between a willing buyer and a
[12] willing seller by itself doesn't tell you whether or not the
[13] price terms reflect monopoly power?
[14] **A.** No, it doesn't.
[15] **Q.** And if the parties have a broader commercial relationship
[16] and at the time that they enter into an agreement for one
[17] aspect of their commercial relationship, they're simultaneously
[18] entering into an agreement for another part of their commercial
[19] relationship, then neither agreement by itself is an arm's
[20] length transaction, correct?
[21] **A.** I don't think -- that's not the way I use arm's length. I
[22] use arm's length to reflect some kind of underlying ownership
[23] or equity interest of the buyer and the seller or vice versa.
[24] **Q.** So, well -- let me try the question again. If the buyer
[25] and the seller have two commercial relationships, and they

Page 789

[1] enter into relationships, they enter into agreements related to
[2] both of those relationships at the same time, can you look at
[3] one agreement in isolation as an arm's length transaction
[4] without looking at the other?
[5] **A.** Not without considering whether there's a relationship.
[6] **Q.** Earlier this morning you referred to the concept of
[7] reservation prices, and I'd like to turn to that for a little
[8] bit. Where there is an overlap between the reservation prices
[9] of the buyer and the seller, a mutually beneficial transaction
[10] is possible, right?
[11] **A.** Yes.
[12] **Q.** If there's an overlap, where within the range of
[13] reservation price overlap the contract price falls would be a
[14] function of the negotiating skills of the parties and the
[15] strength of the parties, among other things, correct?
[16] **A.** Yes.
[17] **Q.** And if DMX is a more effective negotiator than another
[18] commercial music service, you would expect that holding all
[19] other factors the same, DMX would pay a lower fee to BMI,
[20] correct?
[21] **A.** If everything else was the same, yes.
[22] **Q.** And if DMX is in a stronger negotiating position than
[23] another commercial music service, then holding all other
[24] factors the same, you would expect that DMX would pay a lower
[25] fee to BMI, correct?

Page 790

[1] **A.** I'm not sure that I understand the distinction between
[2] better bargaining position and in a stronger position. This is
[3] a different question.
[4] **Q.** I'm not sure that the case hinges on the distinction. I
[5] think the first one was if they're in the same position and one
[6] is a more skillful negotiator and the second question gets to
[7] let's assume that they have equivalent negotiating skills but
[8] one has a better bargaining position.
[9] **A.** Whatever that means, yes.
[10] **Q.** I should be so lucky to have your answers all come out that
[11] way.
[12]      Factors that decrease the buyer's or the seller's
[13] reservation prices, holding everything else equal, would be
[14] expected to result in a lower negotiated price, correct?
[15] **A.** Yes. And the reverse is also true.
[16] **Q.** Correct. You testified about one example of where the
[17] reverse you believe is true in connection with the option value
[18] this morning, correct?
[19] **A.** Yes.
[20] **Q.** But factors that would depress the reservation prices would
[21] lead to a lower price, correct?
[22] **A.** In general, yes.
[23] **Q.** And all other things equal, a decrease in revenues earned
[24] per location would lead to a lower reservation price for DMX,
[25] correct?

Page 791

[1] **A.** Are we talking about the period that's already past or the
[2] future?
[3] **Q.** Either one.
[4] **A.** Well, we don't know whether revenues are going to decline
[5] in the future. That's an assignment of risk problem. And
[6] DMX's willingness to pay with respect to the past, if the
[7] reservation price is already in the context of the litigation
[8] zero, I mean, I don't know what we're taking as the reservation
[9] price. Would DMX -- you're asking me, I think, would DMX ask
[10] for or settle for a different price if its previous revenues
[11] during the period that's already gone by that this case is
[12] about were lower than otherwise, and I don't know why there
[13] would be a connection there. I see why going forward there
[14] would be.
[15] **Q.** Well, why don't we focus on the piece going forward. All
[16] other things being equal, a decline in revenues per location
[17] would be expected to lead to a lower reservation price for DMX,
[18] correct?
[19] **A.** Yes, that's correct.
[20] **Q.** And if DMX is earning lower revenues per location today
[21] than it has in the past, the value of music performance rights
[22] to DMX, again, all other things held equal, has probably
[23] declined, correct?
[24] **A.** If everything else were equal, yes.
[25] **Q.** BMI's reservation price for blanket license -- excuse me.

Page 792

[1] BMI's reservation price for blanket licenses is affected by its
[2] administrative costs, correct?
[3] **A.** Yes.
[4] **Q.** And if BMI has become more efficient and its administrative
[5] costs are declining over time, you would expect that all other
[6] things equal, that decline in administrative costs would lead
[7] to a decrease in BMI's reservation price, correct?
[8] **A.** As far as the cost side is concerned, yes.
[9] **Q.** Assume with me for a moment that there are two licensees,
[10] and licensee A creates more administrative efficiency for BMI
[11] than licensee B. All other things equal, you would expect that
[12] BMI's reservation price for a license to licensee A would be
[13] lower than its reservation price to licensee B, correct?
[14] **A.** Are these licensees in the same business?
[15] **Q.** Yes.
[16] **A.** So the assumption is that different licensees have
[17] different rates?
[18] **Q.** The assumption is that of the two licensees in the same
[19] business, the administrative costs for BMI are higher for one
[20] than for the other.
[21] **A.** Right, but the practical context is, if they're in the same
[22] business they're going to have the same license, because in
[23] general, industry wide licensing is done by both BMI and ASCAP.
[24] **Q.** You're referring to the similarly situated provision of the
[25] consent decree?

Page 793

[1] **A.** For whatever reason, that's the general practice.
[2] **Q.** If that wasn't the practice, if this weren't a market in
[3] which the two largest PRO's had similarly situated provisions
[4] in their consent decrees, would you expected that two
[5] licensees, one of whom creates greater administrative
[6] efficiency than the other, the reservation price would be the
[7] same or different?
[8] **A.** It would be lower if that really were the only difference.
[9] **Q.** You believe it is appropriate for a rate court to look for
[10] competitive distortions in benchmarks, correct?
[11] **A.** It's important for the rate court to take account of market
[12] power in the context of rate setting for blanket licenses.
[13] **Q.** The best benchmarks in your view are those that are similar
[14] in as many ways as possible to the DMX license, best benchmarks
[15] for use here, correct?
[16] **A.** Yes.
[17] **Q.** And all other things equal, a more recent agreement is
[18] preferable as a benchmark to an older agreement to the extent
[19] that the more recent one reflects information that's more
[20] accurate about the period covered, correct?
[21] **A.** Yes, that's probably true.
[22] **Q.** And it is your view as an expert economist and holding all
[23] other factors constant, agreements that cover different
[24] performances are less comparable for purposes of fee setting
[25] than agreements that cover the same performances, correct?

Page 794

[1] **A.** Yes.
[2] **Q.** And the BMI Muzak agreement covers a completely different
[3] set of performances than the performances covered by the BMI
[4] DMX license, correct?
[5] **A.** Yes.
[6] **Q.** You explained this morning that you used two different
[7] benchmarks in combination to value the adjustable fee blanket
[8] license from BMI to DMX, correct?
[9] **A.** Yes.
[10] **Q.** And there's nothing wrong in your view with valuing the
[11] adjustable fee blanket license in pieces and then coming up
[12] with an aggregate value, correct?
[13] **A.** On the face of it nothing wrong, no.
[14] **Q.** And Dr. Jaffe's framework also values the adjustable fee
[15] blanket license on two pieces, although he uses different
[16] pieces than the ones you used, correct?
[17] **A.** And values them in very different ways, yes.
[18] **Q.** While you may disagree with Dr. Jaffe with regard to how he
[19] analyzes those pieces, you don't have a problem with the
[20] concept that he values the adjustable fee blanket license in
[21] two pieces, correct?
[22] **A.** No.
[23] **Q.** One of the reasons that you criticized Dr. Candell's
[24] adjustment for the organic growth allowance in the 2004-2009
[25] BMI Muzak license is that you believe it's difficult to observe

Page 795

[1] a meeting of the minds about the parties' expectations
[2] concerning changes in Muzak's number of locations during the
[3] license term, correct?
[4] **A.** That's one reason, yes.
[5] **Q.** But you would agree with me that if you were certain about
[6] the expectations of both parties, if they both expected that
[7] there would be growth of the appropriate kind as defined in the
[8] provision, then they didn't really agree on $36.36 per
[9] location, they agreed on something else, correct?
[10] **A.** Other things equal, that is a possible inference.
[11] **Q.** That is the inference you would draw, holding everything
[12] else equal, correct?
[13] **A.** In the absence of any other information, yes.
[14] **Q.** And you would make an adjustment for that shared
[15] expectation if you were certain that the parties shared that
[16] expectation, correct?
[17] **A.** Not if there were other indications that suggested that
[18] that was an inappropriate adjustment.
[19] **Q.** Prior to the time that you were deposed in connection with
[20] the reports submitted during the final phase of this
[21] proceeding, you had not analyzed the BMI TruSonic license in
[22] any depth, correct?
[23] **A.** That's correct.
[24] **Q.** You referred earlier to all other, earlier today to all
[25] other CMS services signing their deals at the same time as

Page 796

[1] Muzak. Do you recall that?
[2] **A.** No, I don't. I said they all signed the same license
[3] agreement, not they all signed at the same time. Or at least I
[4] didn't mean to say they signed all at the same time.
[5] **Q.** I have in my notes that it came all at the same time. I'll
[6] move on. I think this was in the concept of whether or not you
[7] should be looking at to what would have happened in 2004 if DMX
[8] had signed the license versus looking today what price would
[9] they pay for the license. That's fine.
[10] **A.** I certainly didn't mean to say, if I did, that they all
[11] signed at the same time.
[12] **Q.** So you are aware that TruSonic and BMI did not actually
[13] reach agreement until June of 2007 on the terms of their
[14] 2004-2009 license, correct?
[15] **A.** I'm not familiar with the details. I know that various CMS
[16] providers signed licenses throughout the period.
[17] **Q.** I will represent to you that the license has an execution
[18] date of June 2007. That license is, as far as you know,
[19] covered the same time period as the 2004-2009 license between
[20] Muzak and BMI, correct?
[21] **A.** Yes.
[22]         (Continued next page)
[23]
[24]
[25]

Page 797

**BY MR. MARKS:**
[1] **BY MR. MARKS:**
[2] **Q.** And, you would agree that in June 2007 BMI and TruSonic
[3] both had more accurate information about TruSonic's growth and
[4] locations during the license period than Muzak and BMI had in
[5] August of 2004 with respect to Muzak's future growth during the
[6] license period, correct?
[7] **A.** That seems logical.
[8] **Q.** And, in June 2007 TruSonic had more accurate information
[9] about what revenues it would earn during the license period
[10] than Muzak had in August of 2004 about what revenues Muzak
[11] would earn during the license period, correct?
[12] **A.** With respect to the preceding period, yes, the period since
[13] 2004 that had passed before these negotiations with TruSonic.
[14] **Q.** And since one, since TruSonic knew with certainty what its
[15] revenues were for the first half and Muzak didn't know with
[16] certainty what its revenues would be for any period, wouldn't
[17] you also agree that TruSonic had a better understanding of what
[18] its revenues would be over the entire period both going back
[19] and going forward since they had a lot more information?
[20] **A.** Well, just as a format matter, that doesn't really follow.
[21] It depends upon their assumptions about the volatility of
[22] revenues over the future period that was then left at the term
[23] of the license.
[24] **Q.** Assuming the volatility expectations were equal.
[25] **A.** Okay. We'll add on that assumption.

Page 798

[1] **Q.** And you are aware that TruSonic negotiated an interest-free
[2] payment plan with BMI so that the excess fees owed above the
[3] old interim rate for the 2004 to 2007 period could be spread
[4] out over the remaining two years of the license, correct?
[5] **A.** I don't actually recall that. I will accept your
[6] representation but I don't know that.
[7] **Q.** Have you read the testimony that has taken place, to date,
[8] in the trial?
[9] **A.** Yes.
[10] **Q.** And such an interest free payment plan that allowed
[11] TruSonic to pay for the 2004 to 2007 period and payments going
[12] forward and spread out over the remainder, remaining two years
[13] of the license, that interest free payment plan would have
[14] value to TruSonic, correct?
[15] **A.** Yes.
[16] **Q.** And, TruSonic did not have to pay a higher per-location
[17] rate to BMI even though BMI made a concession that afforded
[18] value to TruSonic by agreeing to a payment plan, correct?
[19] **A.** That's my understanding.
[20] **Q.** Play Network also received an interest rate payment plan
[21] from BMI, correct?
[22] **A.** Again, I don't know the details of this.
[23] **Q.** You don't know the details of how many commercial music
[24] services were able to negotiate variations off of the Muzak
[25] deal?



[1] **A.** I know that DMX is emphasizing three sort of medium-sized
[2] CMS providers that, when you take averages, show rates per
[3] location that are down on the left-hand side of my so-called
[4] bell curve chart. And it is understandable that DMX would do
[5] that but I don't think those particular observations shed much
[6] light on the validity of the CMS blanket license as a
[7] benchmark. It was inevitable that --
[8] **Q.** Sorry to interrupt.
[9] **A.** It would inevitable that some would be higher and some
[10] would be lower.
[11] **Q.** That wasn't my question. My question was directed to
[12] whether or not you were personally familiar with the extent to
[13] which commercial music services were able to negotiate
[14] variations favorable to them off of the Muzak benchmark
[15] proffered by BMI as sponsored in your report.
[16] **A.** Other than the three that you have emphasized, no, I don't
[17] know.
[18] **Q.** You are aware that TruSonic negotiated an amendment to the
[19] BMI form license that allowed TruSonic to exclude locations
[20] that played only directly licensed music, correct?
[21] **A.** Yes.
[22] **Q.** And that amendment wasn't BMI's idea, was it?
[23] **A.** I don't know whose idea it was.
[24] **Q.** Do you know whether that amendment was something that
[25] TruSonic perceived as having value to it?

[1] **A.** Presumably it did, yes.
[2] **Q.** But, again, they didn't have to pay a higher per location
[3] music rate than benchmark, did they?
[4] **A.** No, they didn't. My understanding, however, was that was
[5] available to any CMS provider.
[6] **Q.** Do you think that other CMS providers share your
[7] understanding that that amendment was available to them?
[8] **A.** I don't know.
[9] **Q.** The availability of that isn't something you have seen BMI
[10] advertise, is it?
[11] **A.** I don't follow BMI's advertisements. I just don't know.
[12] **Q.** The BMI Muzak deal fell somewhere in the range of overlap
[13] between BMI's and Muzak prices, correct?
[14] **A.** I'm sorry. Would you repeat that?
[15] **Q.** Yes. I'm transitioning now to the BMI Muzak music
[16] agreement and I believe this is a non-controversial proposition
[17] that the BMI Muzak deal fell somewhere within the range of the
[18] overlap of their respective reservation prices.
[19] **A.** Yes, that's true.
[20] **Q.** You don't know where within that range the contract price
[21] fell, correct?
[22] **A.** That's correct.
[23] **Q.** And, from the point of view of economics, there is nothing
[24] unreasonable about DMX getting a lower rate because it is in a
[25] stronger negotiating position than Muzak, is there?

[1] **A.** The benchmark, in my analysis, is the CMS license, the one
[2] originally negotiated with Muzak. And from the point of view
[3] of the consent decree and the similarly situated provision and
[4] so on, that's the license that was the prevailing benchmark for
[5] the industry as a whole and for, as far as I know, all the
[6] firms within it. And so, the issue of DMX' ability to
[7] negotiate isn't really affecting what the appropriate benchmark
[8] is. These are not individual company by company negotiations.
[9] **Q.** That's not my question. My question relates to from the
[10] point of view of economics, and again without regard to
[11] whatever consent decree constraints BMI is under, from the
[12] point of view of economics and evaluating what the overlap and
[13] reservation prices would be in a license negotiation between
[14] BMI and DMX, there is nothing unreasonable about DMX
[15] negotiating a lower rate for itself because it is in a stronger
[16] negotiating position than Muzak?
[17] **A.** We are taking this completely out of the consent decree
[18] context and everything? Yes, sure. There is nothing
[19] unreasonable about that.
[20] **Q.** Is it your understanding that once BMI negotiated a deal
[21] with Muzak it was not able to negotiate a different deal with
[22] any subsequent user?
[23] **A.** My understanding is that it was under substantial
[24] constraints in doing that.
[25] **Q.** And what is your understanding what those constraints are?

[1] **A.** The similarly situated clause or whatever it is in the
[2] consent decree.
[3] **Q.** Those didn't constrain BMI from offering variations to the
[4] form agreement that were favorable to TruSonic, did they?
[5] **A.** My understanding, as an economist of this legal question,
[6] is that those were within the scope of the similarly situated
[7] clause.
[8] **Q.** Let's take two parallel negotiations, the first between BMI
[9] and Muzak for a five-year license, 2004 to 2009, and the
[10] second, a five-year license for DMX beginning in 2005 when it
[11] emerged from bankruptcy.
[12]     Are you with me so far?
[13] **A.** Yes.
[14] **Q.** In the first negotiation, Muzak has an open retroactive
[15] period of 10 years. In the second negotiation there is no open
[16] retroactive period because the company has been acquired out of
[17] bankruptcy.
[18] **A.** Yes.
[19] **Q.** Holding everything else equal, would you agree with me that
[20] DMX is in a stronger negotiation -- excuse me, stronger
[21] negotiating position than Muzak because it doesn't have to
[22] worry about a 10-year retroactive period of potential
[23] liability?
[24] **A.** No, because BMI is constrained by the similarly situated
[25] clause to whatever extent is legally applicable. And, with

Page 803

[1] respect to all the other new CMS services, non -- CMS services
[2] with no prior overhang of interim fees, they were all, as my
[3] chart indicated, negotiated at $36.36 with no variation.
[4]     So, DMX was in the same position, according to your
[5] hypothetical, that all those other 30 or 40 CMS providers were
[6] in getting a license for the first time sometime during the
[7] period 2005 to 2009 and not having a overhanging issue about
[8] interim fees for the preceding period.
[9] **Q.** We will turn to those other services later in my
[10] cross-examination but I'm just trying to understand the
[11] framework that you've laid out here about reservation prices
[12] and what factors would affect reservation prices in a
[13] competitive market and if you had two license negotiations, and
[14] assume with me for a moment that DMX and Muzak are the only
[15] people in the industry, one has a 10-year period of open
[16] liability, one doesn't; would you agree with me that DMX is in
[17] a stronger negotiating position going forward than Muzak is?
[18] **A.** The hypothetical includes no consent decree? You said
[19] competitive market. Obviously it is not competitive with a
[20] consent decree.
[21] **Q.** Fine. We will take it with that and work from there.
[22] **A.** Then the question turns on the force of constraints that
[23] that decree imposes on BMI.
[24] **Q.** And if BMI has the ability to go to rate court and get
[25] higher fees for the past, then Muzak is in a less strong

Page 804

[1] negotiating position than DMX with no potential exposure for
[2] the past, correct?
[3] **A.** No, it seems to me it is in exactly the same position as
[4] the TV station was in the Weigel case. It had circumstances
[5] that made it different from what the industry had agreed with
[6] BMI on and it asked for a rate that was special to it
[7] reflecting those differences and the Court, if I understand it
[8] correctly, decided that the industry benchmark was the
[9] appropriate benchmark and was therefore a reasonable rate for
[10] this unusual, if you like, subsequent application of that rule.
[11] **Q.** Let's turn, for a moment, to the 1994 portion of the BMI
[12] Muzak agreement.
[13]     The final fee agreement for the 1994 to 2004 period
[14] was a willing buyer/willing seller transaction, correct?
[15] **A.** This is the earlier period that was negotiated -- the rate
[16] for which was negotiated in '87? Are we talking about the same
[17] period?
[18] **Q.** Correct.
[19] **A.** Okay.
[20] **Q.** And that rate was renegotiated as part of the overall
[21] transaction that set final fees for the 1993 to 2009 period and
[22] Muzak and BMI agreed to leave the old interim rates in place,
[23] correct?
[24] **A.** I'm sorry. The details here are not at my fingertips. Can
[25] you say that again?

Page 805

[1] **Q.** Sure. I will try to take it in smaller pieces to make sure
[2] that you and I are on the same page.
[3]     Muzak had been paying interim fees for the period 1993
[4] to 2004, correct?
[5] **A.** Yes.
[6] **Q.** And the fees -- annual fees they were paying were at the
[7] 1993 rate that was originally negotiated as part of a license
[8] beginning in 1987, correct?
[9] **A.** That's my understanding.
[10] **Q.** And, as part of the transaction that set final fees for
[11] Muzak for the 1993 period through 2009, BMI and Muzak
[12] negotiated over a period of years, correct?
[13] **A.** Yes.
[14] **Q.** And they agreed on the rates that would be paid as final
[15] fees for the 1993 to 2004 period, correct?
[16] **A.** My recollection is they were two separate agreements, one
[17] for the interim period and one for the period going forward.
[18] But, I could be wrong about that.
[19] **Q.** Do you have an understanding about whether or not they were
[20] negotiated at the same time?
[21] **A.** I believe they were negotiated at about the same time, yes.
[22] **Q.** And as part of the same economic package?
[23] **A.** I don't know what that means.
[24] **Q.** It was negotiated as a single transaction with two separate
[25] licenses but as part of one deal, correct?

Page 806

[1] **A.** I think that's a question you have to ask the parties, not
[2] me. I don't know how they thought about it.
[3] **Q.** Both parties had recourse to the rate court to set fees for
[4] the 1994 to 2004 period, correct?
[5] **A.** Yes.
[6] **Q.** And just so we are clear, that final fee agreement for '94
[7] to 2004 was an arm's-length willing buyer/willing seller
[8] transaction, correct?
[9] **A.** As far as I know, yes.
[10] **Q.** And in your view, based on the evidence that you've read
[11] and seen in this proceeding, the fees that Muzak paid for that
[12] period were reasonable, correct?
[13] **A.** I suppose that would be the inference, because they were
[14] negotiated in the shadow of the rate court.
[15] **Q.** And BMI received approximately $12 to $14 per location per
[16] year for Muzak from 1994 to 2004, correct?
[17] **A.** I'm not sure I know that number. That must be a blend of
[18] the two separate rates for on-premise and off-premise but I
[19] will accept your representation.
[20] **Q.** That was the testimony from Mr. O'Neill and Mr. Annastas --
[21] **A.** Okay.
[22] **Q.** -- of what BMI's estimates were of the effective rate of
[23] that license.
[24] **A.** Then I will accept that.
[25] **Q.** So, as recently as the first half of 2004, BMI's range of

Page 807

[1] reservation prices of what it was willing to accept for the
[2] Muzak commercial music service license was approximately $13
[3] per year, correct?
[4] **A.** As of when?
[5] **Q.** The first half of 2004.
[6] **A.** I don't know that. I mean, that depends on BMI's
[7] expectations about how it would do in the then ongoing rate
[8] court case.
[9] **Q.** Well, I'm just trying to find out if they ultimately agreed
[10] to that as the contract price, right?
[11] **A.** Yes.
[12] **Q.** And so, if it is a reasonable willing buyer/willing seller
[13] arm's-length agreement, the contract price is somewhere within
[14] the overlap of the low end of the seller's reservation price
[15] and the high end of the buyer's reservation price, right?
[16] **A.** Yes. That's the assumption.
[17] **Q.** And so, can we draw from that the conclusion that at least
[18] as recently as 2004 the low end of BMI's reservation price for
[19] a license to Muzak was as low as $12 to $14 per location per
[20] year?
[21] **A.** For the interim period, yes.
[22] **Q.** For that period, correct?
[23] **A.** For the 1993 to 2004 period.
[24] **Q.** Holding all other things equal, would you expect that BMI's
[25] willingness to settle the litigation over the retroactive

Page 808

[1] period at the interim rates that had been paid to date likely
[2] increased Muzak's reservation price that it was willing to pay
[3] for the period going forward?
[4] **A.** It could, depending on how Muzak viewed a potential rate
[5] court determination of the going forward rate in light of the
[6] prior period. And so, it depends on expectations by Muzak
[7] about what the rate court would have done if that case had
[8] proceeded in light of the interim settlement, if that
[9] settlement were part of the rate case and that's a whole series
[10] of ifs and speculations that I can't deal with.
[11] **Q.** If Muzak thought that it had -- if Muzak thought that there
[12] was a likelihood that its fees would be increased above the
[13] interim levels as a result of a rate court proceeding, then you
[14] would agree with me that BMI's willingness to settling the past
[15] at interim rates would increase Muzak's willingness to pay a
[16] higher price for the period going forward, correct?
[17] **A.** I don't follow the question. I'm sorry.
[18] **Q.** Let me try it again.
[19]      Assume with me that Muzak believed that it was likely
[20] it would have to pay some amount higher than the interim
[21] fees --
[22] **A.** Yes.
[23] **Q.** -- for the 1994 to 2004 period.
[24]      If you made that assumption then would you agree with
[25] me that BMI's willingness to settle the past at the interim

Page 809

[1] rates and end the rate court proceeding would increase Muzak's
[2] reservation price for a license fee going forward if it was
[3] negotiated as part of one package?
[4] **A.** I don't see why that would be so.
[5] **Q.** Confronted with the choice of we will continue to litigate
[6] over the 1994 to 2004 period versus we will not charge you
[7] anything more for the 1994 to 2004 period if you agree to this
[8] higher price for the 2004 to 2009 period, you don't think that
[9] that willingness to forgive the past would have any impact on
[10] Muzak's reservation price going forward?
[11] **A.** I'm simply lost in the concatenated expectations of the
[12] parties here and you've left out whatever expectations BMI had
[13] about what the rate court would do about the interim rates as
[14] well as the going forward rates.
[15] **Q.** Assume both parties thought that there would be some
[16] increase over the past, some increase for the past above the
[17] interim rates but neither party had firm expectations by
[18] exactly how much.
[19] **A.** Okay.
[20] **Q.** And they were negotiating what additional monies would be
[21] paid by Muzak over the 15-year period from 1994 through 2009.
[22] What effect does BMI's willingness to accept no additional
[23] payments for the '94 to 2004 period have on Muzak's reservation
[24] price for the forward-looking period?
[25] **A.** It depends on what else was implied.

Page 810

[1] **Q.** Everything else equal.
[2] **A.** Nothing else were open in the negotiations?
[3] **Q.** I'm asking you to hold everything else equal.
[4] **A.** In that case it is probably true that it goes in the
[5] direction that you want me to say that it goes, whatever that
[6] is.
[7] **Q.** And BMI's reservation price, likewise, went up if it was
[8] willing to forego the past and hold all other factors equal in
[9] exchange for -- in order to be willing to forgive the past for
[10] which it was asking for additional monies its reservation price
[11] of what it would accept -- minimum reservation price as to what
[12] it would accept going forward would likely be higher going
[13] forward as well, correct?
[14] **A.** If there was other issues open in the negotiation, yes.
[15] **Q.** Most of the other commercial music services that entered
[16] into license agreements with BMI for all or part of the 2004 to
[17] 2009 period also settled prior periods at the old interim rate,
[18] correct?
[19] **A.** If there were any.
[20] **Q.** In fact, if there was a period everyone settled that
[21] period, correct?
[22] **A.** That's right.
[23] **Q.** The only people that didn't settle the period were the
[24] people who were new market entrants or new companies, correct?
[25] **A.** Right. Or people emerging from bankruptcy.

Page 811

[1] **Q.** Let's look at list of commercial music services that did
[2] not have a settlement period. It is small print, we have also
[3] put it on your screen. I don't know if that will help you, but
[4] whichever is easier.
[5]    This is a chart that we took using the information
[6] that you provided to us and as well as the Joint Exhibit 1293
[7] that's already been discussed last week, this is resorted by
[8] the number of locations the commercial music services that had
[9] no retroactive settlement period had as of July 2008.
[10]    Are you with me?
[11] **A.** Yes.
[12] **Q.** So, of the services that you looked at and determined they
[13] had no settlement period, some of these are already out of
[14] business, right? They didn't even make it to 2009?
[15] **A.** You will have to tell me what these terms mean in the
[16] status column.
[17] **Q.** Well, I'm really focused on the number of locations and
[18] drawing -- I hope it is note too big a leap on my part that if
[19] they had no locations as of 2008 that they were already out of
[20] business.
[21] **A.** Maybe. Yes.
[22] **Q.** And so, some of these companies were new market entrants?
[23] **A.** Presumably, yes.
[24] **Q.** And there are some Muzak affiliates on this list, do you
[25] see that? Towards the bottom there the Muzak of Alabama, Muzak

Page 812

[1] of Palm Beach and a few other sprinkled about.
[2]    Do you see that?
[3] **A.** Yes.
[4] **Q.** Do you know whether for the Muzak affiliates on this list
[5] they were new affiliates or just change of ownership of an
[6] existing affiliate franchise?
[7] **A.** I don't know.
[8] **Q.** Whether there were no Muzak franchises granted in this
[9] period, in other words if all of the Muzak franchises on this
[10] list had already been in existence, that would suggest to you
[11] this was just a change in ownership rather than a new company,
[12] correct?
[13] **A.** I don't know.
[14] **Q.** And you don't know whether or not in fact each of those
[15] Muzak affiliates on this list did have a settlement period but
[16] it is not reflected in BMI's records because, as having a
[17] settlement period simply because there was a change of
[18] ownership of the Muzak affiliate rather than it being a new
[19] company.
[20] **A.** If there is a change in ownership doesn't there have to be
[21] a new license?
[22] **Q.** Not necessarily.
[23] **A.** Not necessarily. Okay.
[24]    Well, I will have to accept your representation on
[25] that. I don't know.

Page 813

[1] **Q.** My point is, you don't know whether or not for these Muzak
[2] affiliates there actually was a settlement period for that
[3] business that got resolved in connection with the acquisition
[4] of the Muzak affiliate by somebody else.
[5] **A.** That's correct.
[6] **Q.** There was still past liability for those franchises that
[7] got resolved at the interim rate.
[8] **A.** Which ones are we talking about now?
[9] **Q.** Muzak franchises that pre-existed 2004, there was still a
[10] past interim liability for those franchises that would have
[11] been resolved at the interim rate?
[12] **A.** If any of these were such affiliates, yes.
[13] **Q.** And you haven't done any analysis of the commercial music
[14] services on this list to determine if they in fact had
[15] settlements of past periods but were companies that were
[16] acquired rather than were actually new market entrants, right?
[17] **A.** I don't know that information.
[18] **Q.** Earlier today you talked about how much a small music
[19] publisher would have to spend to become knowledgeable enough to
[20] evaluate the reasonableness of DMX' offer for a direct license.
[21]    Do you recall that?
[22] **A.** Yes.
[23] **Q.** How much would a small new commercial music service on this
[24] list have to spend to figure out whether or not BMI's offer for
[25] a commercial music service license was reasonable?

Page 814

[1] **A.** I don't know, but it seems likely that they would all be
[2] relatively small enough so that unless there was an
[3] industry-wide law firm capable of supplying them with that
[4] information, they would be not inclined to generate it for
[5] themselves.
[6] **Q.** 11 Giraffes for instance, for example in North Carolina,
[7] you don't know whether or not they have access to information
[8] about what a BMI reasonable fee would be, right?
[9] **A.** That's right.
[10] **Q.** And you don't know how much they would have to spend to
[11] learn whether or not the offer from BMI was reasonable?
[12] **A.** I don't know how much they would have to spend. The issue
[13] turns partly on how much industry-wide information there is in
[14] things like industry trade press information and the like.
[15] **Q.** What is your understanding of the information that was
[16] available in industry-wide trade press to 11 Giraffes at the
[17] time it entered into it its --
[18] **A.** I don't have an understanding.
[19] **Q.** So you don't know whether or not any of these services on
[20] this list in fact had sufficient information to evaluate
[21] whether or not BMI's offer of $36.36 was reasonable even though
[22] they had no settlement period to contend with?
[23] **A.** That's correct. And if they had consulted counsel and been
[24] willing to pay for it, my expectation as a non-lawyer would be
[25] that they would be told that if they challenged $36.36 they



Page 815

[1] would be unlikely to prevail.

[2] **Q.** What is DJ Scratch Academy?

[3] **A.** I don't know.

[4] **Q.** It is possible that's a misclassification, that it is

[5] actually a school where people can go to learn to become

[6] scratch disk jockeys rather than commercial music services?

[7] **A.** I don't know.

[8] **Q.** You didn't do any investigation of the services on your

[9] chart that were identified by you as having no retroactive

[10] settlement period to determine whether they all were in fact

[11] commercial music services rather than some other type of

[12] business that was misclassified?

[13] **A.** Well, the source of the information here is BMI data on who

[14] was an actual licensee under the CMS license and I'm assuming

[15] those data were accurate.

[16] **Q.** It is possible that a company like DJ Scratch Academy may

[17] have been sufficiently unknowledgeable about BMI license

[18] practice that it signed the wrong license form, correct?

[19] **A.** I suppose anything is possible.

[20] **Q.** From an economic perspective, what matters is what parties'

[21] expectations were at the time an agreement is signed with

[22] respect to the growth factor adjustment, correct?

[23] **A.** What matters? For what purpose?

[24] **Q.** If you are trying to evaluate how the organic growth

[25] allowance -- if you are trying to evaluate whether or not the

Page 816

[1] organic growth allowance in the form CMS license requires an

[2] adjustment for application of that form license to DMX, you

[3] would look to what the parties that entered into that, the

[4] expectations of the parties that entered into that license were

[5] at the time they signed the license, right?

[6] **A.** If you were trying to value that clause or that part of the

[7] contract and you had evidence about expectations that was

[8] credible and reliable, then that might be a way to go about it.

[9] That's a difficult thing to do. I think that the

[10] other reasons that I have for, regarding the 8 percent part of

[11] the license as not requiring an adjustment are more powerful

[12] than the issue of how it was valued by the parties at the time

[13] based on their expectations, in particular the fact that DMX is

[14] being offered the same exact provision as if it had signed up

[15] when it came out of bankruptcy in 2005.

[16] **Q.** What is your understanding about how BMI's proposal would

[17] set fees if DMX grows in 2010, 2011 or 2012?

[18] **A.** The fees would be adjusted on the basis of the change in

[19] the number of locations. That is to say there is no special --

[20] there is no fixed fee and there is no adjustment mechanism in

[21] the proposal, it is simply locations times $41.81.

[22] **Q.** So, for fee setting purposes for this proceeding which

[23] covers June 2005 out through the end of 2012 and your benchmark

[24] is mid-2004 to mid-2009, the organic growth adjustment would

[25] only apply for the first four years of DMX' license period and

Page 817

[1] there would be no organic growth adjustment in the remainder of

[2] the period, correct?

[3] **A.** I believe that's so. I don't know what BMI's position is

[4] going forward, whether such an adjustment is part of the offer

[5] or not.

[6] **Q.** So, if DMX had gained 25,000 locations in February of 2009

[7] it would be entitled to a growth allowance of up to 8 percent

[8] carrying that through the calculation the way it is set

[9] forward, right?

[10] **A.** Yes.

[11] **Q.** But if they got 25,000 new locations in February 2010, then

[12] they don't get any economic benefit in terms of the

[13] per-location rate that they pay, right?

[14] **A.** Assuming that the 8 percent clause or part of the contract

[15] doesn't apply going forward, yes.

[16] **Q.** If Muzak and BMI both believed that Muzak was going to

[17] increase the number of locations during the license period, it

[18] would be reasonable to make an adjustment to the $36.36 per

[19] location rate to account for that expected growth; all else

[20] held equal, right?

[21] **A.** I'm sorry, Mr. Marks. You read that too fast for me.

[22] **Q.** I apologize.

[23] What I'm trying to understand is whether your

[24] objection to the adjustment made by DMX' economists that

[25] accounts for organic growth is based on uncertainty about

Page 818

[1] expectations of BMI and Muzak at the time they entered into

[2] their agreement or whether even if you were convinced that both

[3] parties thought that Muzak would grow over the term of that

[4] agreement, you still shouldn't make an adjustment.

[5] **A.** You still shouldn't make that adjustment because the

[6] important part of this comparison is the allocation of risk.

[7] Even if they both agreed on what the expected growth rate was,

[8] they might very well have different ideas about what the

[9] variance of the growth rate would be and how much downside and

[10] upside risk, respectively, they each faced.

[11] So, the contract includes not only a price but an

[12] allocation of the risks associated with various departures from

[13] a hypothetically agreed expectation about growth.

[14] **Q.** As a general proposition, the amount of BMI music that a

[15] user performs is a relevant consideration in fee setting for a

[16] BMI license, correct?

[17] **A.** Yes.

[18] **Q.** You criticize Dr. Candell's adjustment to the Muzak BMI

[19] benchmark that adjusts for differences in the intensity of BMI

[20] music use between DMX and Muzak, correct?

[21] You testified about that this morning, right?

[22] **A.** I didn't object to Dr. Candell's concern with what that

[23] might be. My concern is with the ability that we have to

[24] compute it.

[25] **Q.** You are not aware of any analysis that would disprove the

Page 819

[1] possibility that there is in fact a significant difference in
[2] the use of BMI music between Muzak and DMX, correct?
[3] A. I know of no reason to believe there would be such
[4] evidence. There is no a priori reason to expect there is a
[5] difference and therefore no a priori reason to expect there is
[6] evidence of a difference.
[7] Q. The answer to my question is you are not aware of any
[8] analysis that disproved the possibility, correct?
[9] A. That's correct.
[10] Q. The basis of your criticism of Dr. Candell's adjustment is
[11] what you perceive as a failure to properly account for
[12] differences in the way music use data is reported by the two
[13] services, right?
[14] A. Yes; and the difficulty of making that adjustment or
[15] snowing how to make an adjustment for that.
[16] Q. Both Muzak and -- both Muzak and DMX report some form of
[17] music use data for both on-premises locations and off-premises
[18] locations, correct?
[19] A. That's correct.
[20] Q. There are no differences in the way that Muzak and DMX
[21] report music use data for on-premises locations, correct?
[22] A. That's correct.
[23] Q. So, your criticism of Dr. Candell's music use adjustment is
[24] limited to how she uses data reported from the off-premises
[25] locations, correct?

Page 820

[1] A. Yes.
[2] Q. You understand that BMI cannot identify the relevant rights
[3] holder for a greater share of DMX performances on average than
[4] Muzak performances, correct?
[5] A. I thought they were both about 22 percent.
[6] Do I have that wrong? I understand your question. It
[7] is unidentified music on DMX as opposed to Muzak.
[8] Q. Correct.
[9] A. And for BMI in each case.
[10] Q. My understanding of your view is that -- of the evidence is
[11] that BMI cannot identify the relevant rights holder for a
[12] greater share of DMX performances on average than it can do for
[13] Muzak music performance.
[14] It is something we discussed at your deposition.
[15] A. It doesn't sound familiar to me.
[16] Q. Maybe at the break I will point you to that part of your
[17] report and we can come back to this.
[18] Neither the Muzak data nor the DMX data reflects
[19] actual performances heard by customers, right?
[20] A. That's correct.
[21] Q. And on the off-premises data reported by both Muzak and DMX
[22] what gets reported is the actual playlists of songs, the order
[23] in which they were performed and how many times they were
[24] performed over the course of the playlist, correct?
[25] A. Plus in the case of Muzak, the number of locations.

Page 821

[1] Q. And that's the difference because DMX doesn't report it out
[2] by location, right?
[3] A. That's correct.
[4] Q. DMX provides all 100 channels or so to the overwhelming
[5] majority of its locations, right?
[6] A. Apparently there are some exceptions but, generally, that's
[7] my understanding.
[8] Q. The data provided by both Muzak and DMX for the on-premises
[9] data is not actually a playlist of what songs get played, is
[10] it?
[11] A. It is just the music that's on the disk or the hard drive.
[12] Q. And it doesn't tell you in what order the songs were
[13] played, right?
[14] A. Not as far as I know.
[15] Q. And it doesn't tell you whether some songs were played more
[16] often than other songs, correct?
[17] A. As far as I know, that's correct.
[18] Q. Do you have an understanding as to whether or not the songs
[19] are programmed in such a way that some songs on the disk get
[20] played more often than other songs?
[21] A. I don't have an understanding about that.
[22] Q. You didn't do any investigation into that aspect of it?
[23] A. I probably read about it but I haven't retained it.
[24] Q. And it wouldn't influence your -- doesn't influence the
[25] views you have expressed here today?

Page 822

[1] A. If it were known, then it would be useful information for
[2] the purpose of measuring performances. So, if it were known,
[3] it would be good to base both license fees and distributions on
[4] that information.
[5] MR. MARKS: Your Honor, we have reached a convenient
[6] point for a break if this is a convenient time for the
[7] afternoon break.
[8] THE COURT: Okay. 10 minutes.
[9] (Recess)

Page 823

[1]  **THE COURT:** Mr. Marks?

[2]  **MR. MARKS:** Thank you, your Honor.

[3]  **BY MR. MARKS:**

[4]  **Q.** Dr. Owen, I'd like to turn to the Muzak ASCAP agreement for

[5]  2005 to 2009 that you discussed in your direct testimony. You

[6]  compared the BMI Muzak license for 2004 to 2009 and the ASCAP

[7]  Muzak license for 2004 to 2009 and concluded that the rates

[8]  were roughly equivalent after making an adjustment for the fact

[9]  that ASCAP has a greater share of Muzak performances than BMI

[10]  does, correct?

[11]  **A.** Yes.

[12]  **Q.** And to make that comparison you used BMI's distribution

[13]  data?

[14]  **A.** Yes.

[15]  **Q.** You did not make any adjustment for the relative size of

[16]  the BMI and ASCAP repertoire, correct?

[17]  **A.** That's correct.

[18]  **Q.** Did you give any consideration to whether or not the

[19]  ASCAP -- excuse me, the BMI license contains exclusions as to

[20]  the type of locations that can be served by Muzak that the

[21]  ASCAP license does not contain?

[22]  **A.** You're referring to the bowling issue?

[23]  **Q.** Among others.

[24]  **A.** No. In any event, I did not make an adjustment for that.

[25]  **Q.** You used the January 2005 agreement between ASCAP and Muzak

Page 825

[1]  BMI music to ASCAP music?

[2]  **A.** Yes.

[3]  **Q.** But the adjustable fee blanket license doesn't allow DMX to

[4]  reduce its music fees by substituting ASCAP music for BMI

[5]  music, correct?

[6]  **A.** If the result is to change the proportion of directly

[7]  licensed BMI music over all BMI music, then that would be

[8]  reflected in the license rate, yes.

[9]  **Q.** But --

[10]  **A.** You're suggesting that the overall number of performances

[11]  stays the same?

[12]  **Q.** I'm saying substituting, substituting an ASCAP song for a

[13]  BMI song would not be a means by which DMX could save money

[14]  under the adjustable fee blanket license.

[15]  **A.** It depends on whether the song that's replaced is directly

[16]  licensed or not directly licensed.

[17]  **Q.** Assume it's licensed through ASCAP.

[18]  **A.** No, the song that was replaced. Your question was about

[19]  replacing BMI music with ASCAP music.

[20]  **Q.** It's a song that's not directly licensed.

[21]  **A.** In that case, I think it does not affect the amount paid.

[22]  **Q.** So it's a way that the music user can save money under the

[23]  per-program, but can't save money under the adjustable fee

[24]  blanket license, correct?

[25]  **A.** In principle, yes.

Page 824

[1]  to make the comparison?

[2]  **A.** Yes.

[3]  **Q.** And at the time you prepared your expert report, were you

[4]  aware that ASCAP and Muzak had amended that agreement to lower

[5]  the amount payable thereunder?

[6]  **A.** No.

[7]  **Q.** If they did amend that agreement, you don't actually know

[8]  what Muzak agreed to pay and ASCAP agreed to accept for that

[9]  period?

[10]  **A.** That's correct.

[11]  **Q.** I'd like to turn now to your discussion of the option

[12]  value, as you call it, for the adjustable fee blanket license?

[13]  **A.** Yes.

[14]  **Q.** You concluded that the premiums associated with per-program

[15]  licenses represent the best available benchmarks for the

[16]  premium associated with the adjustable fee option, correct?

[17]  **A.** Yes.

[18]  **Q.** And like the adjustable fee blanket license the per-program

[19]  license offered by BMI to TV broadcasters permits the music

[20]  user to reduce the fees it pays to BMI by acquiring some of the

[21]  performance rights in direct license transactions with BMI

[22]  affiliates, right?

[23]  **A.** Or by changing the use of music in the programs, yes.

[24]  **Q.** Well, let's turn to that. The per-program license allows

[25]  the music user to reduce the fees by changing the music from

Page 826

[1]  **Q.** When a music user uses a per-program license when it comes

[2]  to split works, the music user can license a split work through

[3]  the other PRO and save money, correct?

[4]  **A.** I don't know the answer to that question.

[5]  **Q.** But you don't understand BMI's proposal to be that DMX

[6]  could license split works through ASCAP and save money under

[7]  the adjustable fee blanket license?

[8]  **A.** That's correct, I do not understand that to be the case.

[9]  **Q.** So if a television station could save money under the

[10]  per-program blanket license by licensing a split work through

[11]  ASCAP, that would be another difference between the per-program

[12]  license and the adjustable fee blanket license, correct?

[13]  **A.** Yes, it would.

[14]  **Q.** One of the ways a music user could save money under the

[15]  per-program license is by eliminating music from a programming

[16]  period entirely, correct?

[17]  **A.** Yes.

[18]  **Q.** But if DMX were to take one of its music channels and turn

[19]  it into a talk format channeling or a comedy channel, that

[20]  wouldn't result in any savings to DMX under the adjustable fee

[21]  blanket license, would it?

[22]  **A.** Not the way the formula works, no. Well, again, I guess

[23]  technically it would depend on what's used on that channel and

[24]  the proportions that were directly licensed as opposed to

[25]  licensed through the BMI license.

Page 827

[1] **Q.** Assume it was all licensed through BMI. Those are all
[2] options for fee reduction that had value to the music user,
[3] right?
[4] **A.** Perhaps.
[5] **Q.** Any reason you can think of that they had no value to the
[6] user?
[7] **A.** Well, there's an issue about magnitude. Substituting ASCAP
[8] music for BMI music is not a trivial undertaking and
[9] eliminating music entirely from a program is not a trivial
[10] undertaking, so there's some issue, an empirical issue about
[11] how important those things are. But there are differences
[12] between the two licenses that are difficult to account for.
[13] **Q.** And you haven't undertaken any kind of empirical analysis
[14] that would account for any of those differences, right?
[15] **A.** That's correct.
[16] **Q.** Another difference is that the ratio of directly licensed
[17] BMI performances to all performances affects the fee under the
[18] adjustable fee blanket license, correct?
[19] **A.** Yes.
[20] **Q.** The ratio doesn't have any effect by itself on the
[21] per-program license, correct?
[22] **A.** That's correct.
[23] **Q.** You don't know anything about the negotiations between the
[24] television music license committee and ASCAP for the 2004-2009
[25] per-program license, correct?

Page 828

[1] **A.** That's correct.
[2] **Q.** And other than the per-program license itself, you did not
[3] review any materials related to the 2004-2009 television music
[4] license committee ASCAP per-program license, correct?
[5] **A.** That's correct. As I explained on direct, I'm just taking
[6] the licenses at face value and doing the comparative
[7] computation that I described, not looking at what lies behind
[8] the formulas.
[9] **Q.** What is the factual basis for your assertion earlier today
[10] that Magistrate Judge Dolinger's assumption that 75 percent of
[11] the programs on local television contain ASCAP music continues
[12] to be reflected in the ASCAP license?
[13] **A.** My understanding is that the 140 factor is based on that
[14] assumption and the 140 factor has been constant over time and
[15] that therefore the underlying 75 percent assumption must still
[16] be in effect. But, you know, it's whatever the licenses call
[17] for that matters from an economic point of view to me, and not
[18] what the components are or where they come from or why they're
[19] there.
[20] **Q.** Under the 2004-2009 ASCAP per-program license the starting
[21] point for the per-program license is the same as the station's
[22] ASCAP blanket fee before you apply the multiplier, correct?
[23] **A.** That's my understanding. That's what they call the base
[24] fee, which is a different base fee than we're talking about in
[25] this case.

Page 829

[1] **Q.** It's a different terminology. So if I use the word
[2] starting point, will that be clear to you?
[3] **A.** Yes.
[4] **Q.** So we don't have overlapping terminology.
[5] And under the 2002-2004 BMI per-program license, the
[6] starting point fee for the per-program license is the same as
[7] the station's ASCAP blanket license fee before you apply the
[8] multiplier, is that correct?
[9] **A.** That's my understanding.
[10] **Q.** If we could put table 7 from Dr. Owen's expert report up on
[11] the screen, please? The extent of what you call the option
[12] value associated with those licenses would vary depending on
[13] the assumption you make regarding the percentage of the
[14] programs that contain the PRO's music, correct?
[15] **A.** Yes.
[16] **Q.** So if you assume that 85 percent of the programs in local
[17] television contain a PRO's music, the option value that you
[18] derive will be greater, correct?
[19] **A.** I believe that's the way it works.
[20] **Q.** And for at least the bottom three, if you assume that only
[21] 65 percent of the programs on local television contain the
[22] PRO's music, the option value that you perceive disappears,
[23] correct?
[24] **A.** I believe that's correct.
[25] **Q.** You testified before that the 140 percentage stays

Page 830

[1] constant?
[2] **A.** The 140 percentage, the number, the multiplier number stays
[3] the same and in Magistrate Dolinger's determination, that was
[4] based in part on the 75 percent number. I'm at the edge of my
[5] understanding of how this was done here.
[6] **Q.** Let me see if can clarify and make sure you and I are on
[7] the same page. Magistrate Dolinger took the inverse of
[8] 75 percent and got four-thirds or 133 percent?
[9] **A.** Yes. There was a fudge factor for something else.
[10] **Q.** Then he added a 7 percent administrative fee?
[11] **A.** Yes.
[12] **Q.** And that's how we get to the 140 percent?
[13] **A.** Yes.
[14] **Q.** And if you look at the last line of table 7 from your
[15] report, you'll notice that there's no longer a 140 percent,
[16] it's now 162 percent.
[17] **A.** Yes.
[18] **Q.** Do you see that? And do you know what accounts for the
[19] increase in the multiplier?
[20] **A.** No, I don't.
[21] **Q.** Judge Dolinger's 75 percent estimates were based on data
[22] that was more than 10 years old by the time that BMI and the
[23] TMLC reached an agreement in 2002, correct?
[24] **A.** Well, I know it was quite old. I don't know the exact age.
[25] **Q.** At least a decade old, right?

[1] **A.** Quite old. That's as far as I can go.

[2] **Q.** I believe you testified this morning that there was no

[3] information available to you about what percentage of programs

[4] covered by the ASCAP per-program license contained ASCAP music

[5] when ASCAP and the TMLC entered into the 2004-2009 license,

[6] correct?

[7] **A.** Yes.

[8] **Q.** Do you have an understanding of whether or not ASCAP and

[9] the TMLC were on the verge of a trial in a rate court

[10] proceeding at the time they entered into that licensing

[11] agreement?

[12] **A.** I think I knew that once, but I'm no longer confident of

[13] it.

[14] **Q.** Do you have any reason to doubt that discovery was

[15] exchanged and expert reports were exchanged in that rate court

[16] proceeding?

[17] **A.** I'll accept your word.

[18] **Q.** If you were to learn there was credible evidence that

[19] reflected that less than 65 percent of the programs broadcast

[20] on local TV contained ASCAP music when ASCAP and the TMLC

[21] reached agreement on the December '04-'09 per-program license,

[22] that would affect your conclusion that the TMLC agreed to pay a

[23] premium for that form of license relative to the blanket

[24] license, correct?

[25] **A.** Yes, the blanket license always has to be priced less than

[1] the per-program license or else everybody would take the

[2] per-program license. It's the same analogy as here. There has

[3] to be agreement.

[4] **Q.** I'm sorry, you're assuming there was a premium, but your

[5] assumption that there was a premium is dependent on your

[6] assumption that ASCAP music appeared in 75 percent of the

[7] programs on local television rather than 65 percent of the

[8] programs, right?

[9] **A.** Yes.

[10] **Q.** And if the parties believed that 65 percent of the programs

[11] on local television contained ASCAP music at the time they

[12] entered into that license agreement, you would agree that your

[13] perceived option value disappears.

[14] **A.** It depends on what they thought would be found in the rate

[15] court case that was going on. I mean, you want me to assume

[16] that it was a fact that 65 percent was the number, the correct

[17] number?

[18] **Q.** If 65 percent is the correct number, then there was no

[19] premium value, correct?

[20] **A.** That may follow arithmetically. I haven't done the

[21] calculation.

[22] **Q.** And you don't know whether or not ASCAP in fact claimed

[23] that less than 65 percent of the programs on local television

[24] contained ASCAP music in connection with that rate court

[25] proceeding?

[1] **A.** That's correct, I do not.

[2] **Q.** You don't know whether or not they had an expert who was

[3] prepared to so testify?

[4] **A.** I have no way of knowing that.

[5] **Q.** Let's turn to your analysis of BMI's internal study in 2005

[6] of the percentage of programs on local television that contain

[7] BMI music. It's in your binder at tab 24.

[8] **A.** Yes.

[9] **Q.** The column titled "total identified show hours" only

[10] includes those programs for which BMI had a music cue sheet in

[11] its database, correct?

[12] **A.** Yes.

[13] **Q.** And that was only about 60 percent of the programs

[14] identified by Tribune?

[15] **A.** Well, to be precise, it was 66 percent of syndicated

[16] programs and about 50 percent of local programs.

[17] **Q.** What percentage of Fox Network programs?

[18] **A.** Fox Network programs are not excluded like the other three

[19] networks. I don't know what the percentage is of Fox programs.

[20] **Q.** You don't know what percentage in the database included Fox

[21] programs?

[22] **A.** That's right.

[23] **Q.** Do you have an understanding of whether or not Fox Network

[24] programming is covered by the local television agreement?

[25] **A.** Yes. My understanding is that it is.

[1] **Q.** But those programs --

[2] **A.** It's not excluded like the big three networks at the time.

[3] It's included as if it were syndicated programming.

[4] **Q.** And the last agreement between BMI and the Television Music

[5] License Committee was reached in 2002, correct?

[6] **A.** I believe that's right.

[7] **Q.** And so you don't know how this, this data -- this data

[8] obviously could not have informed the parties' expectations at

[9] the time, correct?

[10] **A.** That's right.

[11] **Q.** And you haven't seen any analysis as to either what BMI or

[12] the TMLC thought as to the percentage of programs on local

[13] television in 2002 that contained BMI music, correct?

[14] **A.** That's right. I don't know what they thought.

[15] **Q.** Judge Dolinger determined in the Buffalo Broadcasting

[16] proceeding that ASCAP was entitled to an allowance for the

[17] administrative expense of the per-program license, correct?

[18] **A.** Yes.

[19] **Q.** There's no separate administrative fee in any of the

[20] per-program licenses referred to in your testimony other than

[21] to the extent that an administrative fee component is baked

[22] into the multiplier, correct?

[23] **A.** The 7 percent difference, yes. It's a minimum fee that was

[24] characterized at the time, I believe, as an incidental music

[25] fee.

[1] **Q.** Well, let's turn back to, because I think we're mixing
[2] concepts and let me see if I can use one of the demonstratives
[3] that was provided to you by BMI's counsel earlier today and
[4] make sure we have our terminology correct. Could you turn to
[5] tab 22 in your binder?
[6] **A.** Yes.
[7] **Q.** The minimum fee in purple at the bottom of these columns,
[8] that's what you're referring to as the fee for incidental and
[9] ambient uses in these licenses?
[10] **A.** That's how it was characterized. From my point of view
[11] it's a minimum fee, whatever it's for.
[12] **Q.** What is your understanding of what Judge Dolinger was
[13] awarding an incidental fee to ASCAP for in the Buffalo
[14] broadcasting decision?
[15] **A.** For coverage of incidental music.
[16] **Q.** In television commercials and public service announcements
[17] and the like?
[18] **A.** Yes.
[19] **Q.** So those were fees awarded for actual performances of
[20] copyrighted music, correct?
[21] **A.** As I've tried to explain, what they were intended to do
[22] isn't really relevant to the economic analysis of the effect of
[23] the overall formula in calibrating a value for the option to
[24] license programs rather than the entire schedule.
[25] **Q.** I think I'm asking a different question, which is simply

[1] what that fee represents in the formula.
[2] **A.** It represents the number that's here. It's just from my
[3] point of view it's just a number.
[4] **Q.** Does BMI have among its affiliates composers of commercial
[5] jingles that are played on local television?
[6] **A.** As far as I know.
[7] **Q.** Does BMI provide compensation to its affiliates who compose
[8] commercial jingles that are used on local television?
[9] **A.** I would assume they do.
[10] **Q.** And if a local television station took the per-program
[11] license and direct licensed all of the music in its programming
[12] so that its fee was driven down to the incidental use and
[13] ambient, incidental and ambient use fee, it's that portion that
[14] would be used to compensate the television commercial jingle
[15] writers, correct?
[16] **A.** I don't know.
[17] **Q.** If they directly licensed and drove all their other fees
[18] down for the performances that were directly licensed, where
[19] else would BMI get money to pay the commercial jingle writers
[20] whose performances have not been directly licensed?
[21] **A.** I don't know. I don't know that they do compensate.
[22] **Q.** In addition to the incidental and ambient use fee discussed
[23] in the Buffalo Broadcasting decision as relating to commercials
[24] and at least the incidental component as relating to
[25] commercials and the like, there's also an administrative fee

[1] component of the per-program multiplier set by Judge Dolinger's
[2] decision correct?
[3] **A.** Yes.
[4] **Q.** That's the 7 percent?
[5] **A.** That you explained a few minutes ago.
[6] **Q.** But that's different than the minimum fee that's set forth
[7] in this chart right?
[8] **A.** Yes, it is.
[9] **Q.** So the 7 percent for administrative costs costs is built
[10] into the multiplier and brings it to a higher starting point,
[11] correct?
[12] **A.** Anything built into the multiplier brings it to a higher
[13] starting point.
[14] **Q.** But if you license all the music in your programming you
[15] can work off that additional administrative fee component all
[16] the way down to zero, correct?
[17] **A.** It's part of the variable part of the per-program license,
[18] yes.
[19] **Q.** And that's different how the parties had conceived of an
[20] adminstrative fee component to the adjustable fee blanket
[21] license, correct?
[22] **A.** Yes, that formula works differently.
[23] **Q.** Neither part is suggesting that you could work off the
[24] administrative fee component the floor fee, you can't get all
[25] the way down to zero under the adjustable fee blanket license,



[1] correct?
[2] **A.** Under the proposals that are now agreed, to the extent
[3] there's an agreement between the parties in this case that's
[4] true.
[5] **Q.** So that's another difference between the per-program
[6] license and the adjustable fee blanket license that reflects a
[7] slightly higher starting point for the per-program license
[8] relative to the blanket fee, correct?
[9] **A.** Well, no. Not from my point of view. From an accounting
[10] point of view or from the point of view of the people
[11] negotiating, it may have been of great significance. But from
[12] my point of view the only comparison that matters is how much
[13] of a premium we pay for the right to license at a saving some
[14] music directly or to use less music. That's all that matters
[15] and now how you characterize the parts or pieces.
[16] **Q.** And again, that's contingent, whether or not there's an
[17] option premium depends on the assumptions that you've made in
[18] your report about what percentage of programs on local
[19] television contain the licensor's music?
[20] **A.** Yes. It does depend on that and it depends on the
[21] reasonableness of my assumption that for this purpose the
[22] per-program license in television is a reasonable benchmark for
[23] the CMS license.
[24] **Q.** And the data underlying your assumption are at least 20
[25] years old, correct?

[1] **A.** Well, giving aside the 83 percent number that was computed
[2] based on much more recent data, 2005, I believe.
[3] **Q.** They're either 20 years old or after the time the parties
[4] negotiated the deal, correct?
[5] **A.** What matters is the actual number, not what was negotiated.
[6] It's the formula that matters and the actual amount of music
[7] used that matters, in terms of computing the premium.
[8] **Q.** And what I'm trying to make sure that we are on the same
[9] page about is that whether or not there's any option premium at
[10] all depends on whether or not your assumption that 75 percent
[11] of the programs is a good assumption.
[12] **A.** Yes.
[13] **Q.** You mentioned this morning that savings of transactions
[14] costs is one of the principal advantages of the traditional
[15] blanket license form relative to direct licensing, correct?
[16] **A.** Yes.
[17] **Q.** I'd like to turn to the demonstrative that you used this
[18] morning. Your charge is focused on BMI, but in terms of the
[19] way the marketplace operates, in order to get all of the
[20] benefits that you discussed of the blanket license you also
[21] need to account for ASCAP and SESAC, right?
[22] **A.** I agree.
[23] **Q.** So when we add in ASCAP and SESAC, then we get lines from
[24] all the music users to ASCAP and SESAC in addition to BMI,
[25] right?

[1] **A.** Yes. Well, rights holders would only deal with one of the
[2] societies.
[3] **Q.** Many of the music publishers have publishing companies
[4] affiliated with both ASCAP and BMI, correct?
[5] **A.** The affiliates, however, include composers and songwriters.
[6] **Q.** Right, so there would be some overlap. There would be a
[7] lot of overlap on the publishing side and on the songwriter
[8] side you would have individual lines?
[9] **A.** Yes.
[10] **Q.** Just to one PRO.
[11] **A.** Yes.
[12] **Q.** I'm going to make your chart more complicated, but even I
[13] didn't get into that level of detail. But you would agree with
[14] me there would be lines from SESAC to rights holders and lines
[15] from ASCAP to rights holders as well?
[16] **A.** Yes.
[17] **Q.** Mr. O'Neill testified last week about BMI's agreements with
[18] about 80 foreign PRO's. Did you read that testimony?
[19] **A.** Yes.
[20] **Q.** In fact, one of the benefits you described of taking a BMI
[21] license, for example, is that you get the rights to use foreign
[22] music that BMI can offer to the user through its reciprocal
[23] arrangements with foreign PRO's, correct?
[24] **A.** Yes.
[25] **Q.** And ASCAP has agreements with foreign PRO's as well.

[1] correct?
[2] **A.** I believe so.
[3] **Q.** And SESAC has agreements with foreign PRO's as well, right?
[4] **A.** I assume so. I don't know.
[5] **Q.** And Mr. O'Neill also mentioned an international standard
[6] setting organization. I believe that there are -- well, do you
[7] have an understanding of whether or not there are various
[8] international standard setting organizations of PRO's whereby
[9] they harmonize the data exchanges that they have and set
[10] standards for song titles and music cues and things of that
[11] nature?
[12] **A.** I don't remember that part of Mr. O'Neill's testimony. I'm
[13] not aware of that.
[14] **Q.** You don't have an independent understanding --
[15] **A.** That's correct.
[16] **Q.** -- of whether or not there are such international standard
[17] setting organizations?
[18] **A.** Correct.
[19] **Q.** So now if we add in the lines from ASCAP, BMI and SESAC up
[20] to the foreign PRO's, there's another part of the model that
[21] was missing on your chart and that is that in order to resolve
[22] the antitrust issues that are created by this concentration of
[23] market power, you also have a Department of Justice component
[24] and an ASCAP rate court component and a separate BMI component,
[25] right?

[1] **A.** I'm not quite sure I understand what that has to do with
[2] transactions costs. It's certainly true that those consent
[3] decrees and rate courts exist.
[4] **Q.** And part of the transactions costs for music users and
[5] rights holders operating in the blanket license environment is
[6] that music users and the PRO's have the ability to go to rate
[7] court and litigate when they can't reach agreement, correct?
[8] **A.** It is true that part of the transactions costs involve
[9] acquiring legal advice related both to the usual business
[10] issues in a contract or license and to the issues that are
[11] raised by the existence of a rate court. So in a given line
[12] involving licensees and the principal rights holders involves a
[13] legal services component. It doesn't increase the number of
[14] lines, it increases the transactions costs on each line.
[15] **Q.** And the transactions costs relate to whether or not you're
[16] going to rate court or not, correct?
[17] **A.** Well, no. I think typically you don't go to rate court.
[18] There are a very large number of these transactions and most of
[19] them don't end up in rate court because they're conducted in
[20] the shadow of rate court. And what lawyers do, according to
[21] scholars, is predict what rate courts will do.
[22] **Q.** You will agree with me that part of the transactions costs
[23] incurred by DMX in acquiring reasonable BMI and ASCAP licenses
[24] involve a trip to the BMI rate court at least, correct?
[25] **A.** Sure.

Page 843

[1] **Q.** And there are transactions costs involved when the
[2] Department of Justice weighs in on rate court proceedings,
[3] correct? You're talking about transactions costs to the
[4] society?

[5] **A.** Sure.

[6] **Q.** So the way the blanket license system operates in our
[7] current environment, there's a Department of Justice component
[8] as well, correct?

[9] **A.** Sometimes. This is not a common thing.

[10] **Q.** So the right side of the chart looks a little bit more
[11] complicated now when we add in the various components for
[12] ASCAP, SESAC, the rate court, the relationship with foreign
[13] PRO's and the Department of Justice, right?

[14] **A.** Are you serious?

[15] **Q.** Yes.

[16] **A.** These are not transactions that you're describing, as I
[17] explained in answer to previous questions. Some of these
[18] issues may affect transactions costs, but not the number of
[19] transactions.

[20] **Q.** Right --

[21] **THE COURT:** Mr. Marks, how are these charts going to
[22] help me decide this case?

[23] **MR. MARKS:** What I am demonstrating, your Honor, is
[24] that the premise that blanket licenses lead to some enormous
[25] transaction cost savings relative to a world that has direct

Page 844

[1] licensing I don't think has been empirically established by the
[2] witness and I think that the demonstratives that were prepared
[3] for him to talk through don't tell the whole picture. What I'd
[4] like to do is make sure that the Court and the record have it
[5] fairly reflected that the system on the right that he depicts
[6] as low transactions costs simple scenario is in fact far more
[7] complicated in the real world.

[8] I'll move through it quickly, your Honor.

[9] **Q.** The other -- and so while I'm not suggesting that these are
[10] all individual license transactions, but these are aspects of
[11] providing a blanket license in the current regulated
[12] environment that affect the transaction costs to society of the
[13] blanket license system, correct?

[14] **A.** I suppose they are. But in spite of that, lots of courts,
[15] including the Supreme Court, has pointed to what I call the
[16] transactions costs savings as the unreproducible advantage of a
[17] blanket license over individual transactions. I didn't think
[18] that this was a controversial claim.

[19] **Q.** Well, I think the extent of it may be an amount in -- the
[20] extent of the savings may be an issue.

[21] Let me just to clarify the chart, sometimes in
[22] order -- for some music users to exploit the performance rights
[23] that they get through ASCAP, BMI or SESAC, they may also need a
[24] separate type of copyright license from copyright holders?

[25] **A.** As the blanket license and the adjustable fee blanket

Page 845

[1] license are both about the performing rights and you've raised
[2] the fact that there are other kinds of rights that are also
[3] involved in music use, depending on the particular technology
[4] involved.

[5] **Q.** Correct, and so, for example, a television station, the
[6] performing right by itself isn't that helpful unless you also
[7] have the synchronization right that allows you to synchronize
[8] the music to the visual element of the program, right?

[9] **A.** If the law calls for a synchronization right, then you need
[10] it.

[11] **Q.** That's what the lines illustrate, that even under the
[12] blanket license system there are plenty of transactions, direct
[13] transactions going on between music users on the left and
[14] rights holders on the right in order to extract the value of
[15] the performance, right?

[16] **A.** And in that context, there have been various agencies, like
[17] Harry Fox, that collectively act as a clearing house for these
[18] rights. It isn't as efficient as the blanket licensing system
[19] for performing rights, but the need for such a transaction cost
[20] saving mechanism is illustrated by its presence in that area as
[21] well.

[22] **Q.** You're referring to Harry Fox who handles mechanical
[23] licenses?

[24] **A.** Yes. And other agencies that deal in synchronization
[25] rights.

Page 846

[1] **Q.** Which agency are you referring to synchronization rights?

[2] **A.** At least one of the witnesses here talked about dealing in
[3] mechanical rights. I'm not making a distinction between
[4] synchronization and other mechanical rights.

[5] **Q.** I believe her testimony was that she does direct license
[6] deals for synchronization rights as opposed to licensing
[7] through an agency, but the record will reflect that.

[8] Now, I'd like to turn your attention to the left side
[9] of the slide, and the system of direct licenses that you've
[10] depicted where there are lots of lines going from each music
[11] user to each rights holder, that would accurately depict in
[12] your view the way that grand performing rights are currently
[13] licensed in the marketplace, correct?

[14] **A.** I don't know what you mean by grand performing rights.

[15] **Q.** Are you aware that BMI licenses some performing rights but
[16] does not include, does not grant the license to grand
[17] performing rights?

[18] **A.** I understand that it does not grant the performing right
[19] to, for example, operas. Is that what you're referring to?

[20] **Q.** It is.

[21] **A.** Okay.

[22] **Q.** And the way that that branch of the performing rights
[23] granted under the Copyright Act are handled is precisely in the
[24] way that you've indicated on the left side of your slide,
[25] right? In direct license transactions?



**A-450**

Page 847

[1] A. I don't know how operas are licensed.

[2] Q. And do you know how movie theaters acquire the right to

[3] perform music in movies?

[4] A. Yes. They are licensed at the source, under an old court

[5] decision, Alden Rochelle, is that the --

[6] A. That's correct. That's what I put on the slide, the Alden

[7] Rochelle decision. So movie theaters, the music users acquire

[8] the rights directly in transactions with the people who supply

[9] them with the movies rather than going through BMI or ASCAP or

[10] SESAC, correct?

[11] A. Apparently, yes.

[12] Q. And in fact, many forms of copyrights are licensed

[13] precisely in the direct license model rather than through the

[14] blanket license model, right?

[15] A. That I believe is true. I don't know how many, but some

[16] are, yes.

[17] Q. You would agree that the ability for users to resort to

[18] rate court is at least part of what contrains the ability of

[19] ASCAP and BMI to charge unreasonable prices?

[20] A. Of course.

[21] Q. Have you attempted to evaluate what transactions costs

[22] Muzak incurred in connection with rate court proceedings and

[23] license negotiations that led to its most recent final fee

[24] agreements with ASCAP and BMI?

[25] A. No.

Page 849

[1] Q. But that beneficial aspect of the BMI blanket license

[2] obviously only applies to the works that ultimately end up in

[3] the BMI repertoire, correct?

[4] A. Or ASCAP or SESAC.

[5] Q. How does it help the music user that has a BMI blanket

[6] license use a work that ultimately ends up in the ASCAP

[7] license?

[8] A. I think I explained this morning, you need to have

[9] coverage from all three of the major -- at least BMI and ASCAP,

[10] in order to have that assurance.

[11] Q. And so for the use on short notice, the insurance benefit,

[12] the indemnity benefit that you ascribed to the BMI blanket

[13] license, all those require in order for those benefits to have

[14] their intended impact, they require the music user to not only

[15] take a BMI blanket license but also blanket licenses from other

[16] organizations, correct?

[17] A. They don't require as a necessary condition for it to have

[18] any value. There is some value in having a license with just

[19] one, one blanket license with just one of the PRO's. The only

[20] complete insurance on indemnity and insurance on spontaneous

[21] use or immediate access is to have all three.

[22] Q. And the degree of benefit depends on how big the scope of

[23] coverage offered by the license is, correct?

[24] A. It depends on how much of the respective repertoires the

[25] user intends to make use of.

Page 848

[1] Q. Might be millions of dollars?

[2] A. I just don't know.

[3] Q. And you don't know anything about the transactions costs

[4] incurred by DMX to date on reaching final fee agreements with

[5] BMI, ASCAP and SESAC for the period since 2005, correct?

[6] A. I'm not aware of what the record holds about that.

[7] Q. It doesn't hold anything about that. I'm asking, you don't

[8] have any independent understanding of whether or not it's in

[9] fact, whether in fact it's been cheaper for DMX to acquire 500

[10] and some direct licenses rather than blanket licenses from

[11] ASCAP and BMI?

[12] A. I don't know what DMX's transactions costs have been, aside

[13] from what's in the record about MRI.

[14] Q. You identify spontaneous music use as another major benefit

[15] of the blanket license, correct?

[16] A. Immediate access to music that may not be registered yet

[17] was the way I think I put it.

[18] Q. I think in your report you used the term "spontaneous music

[19] use." Is there a difference between the term "spontaneous

[20] music" and the way you described it this morning?

[21] A. I don't recall using it in my report. My testimony is

[22] whatever my testimony was this morning.

[23] Q. And the benefit to the music user is that on short notice

[24] they can perform a work, correct?

[25] A. Without fear of being sued for copyright infringement.

Page 850

[1] MR. MARKS: Your Honor, I'm about to change topics. I

[2] can keep going for the last couple of minutes or stop.

[3] THE COURT: I don't doubt that you could, but how long

[4] are you planning to do?

[5] MR. MARKS: I have less than an hour to go, but I

[6] won't finish in ten minutes.

[7] THE COURT: Well, let's use the time available.

[8] BY MR. MARKS:

[9] Q. You believe that the Court should entirely disregard the

[10] evidence of the direct licenses for purposes of considering a

[11] reasonable fee for the DMX adjustable fee blanket license,

[12] correct?

[13] A. I'm not going to go quite that far. I think they are as

[14] presented as a benchmark completely useless for that purpose.

[15] But in principle, one might undertake a set of adjustments to

[16] compensate for their deficiencies, and perhaps provide some

[17] estimates. But as far as I know, nothing like that is in the

[18] record so far.

[19] Q. One of the reasons that you criticize the direct license

[20] benchmark is because the direct licenses are complements to the

[21] BMI licensees, right; they're not used as perfect substitutes?

[22] A. The way DMX is using them, they act as if they were

[23] something like complements, and I'm not using complements in a

[24] technical economic sense here, but just in a common language

[25] sense.

Page 851

[1] **Q.** And music users use the ASCAP and BMI licenses as
[2] complements to each other, correct?
[3] **A.** Just understand, just in that lay sense of complements,
[4] yes.
[5] **Q.** They use the BMI and ASCAP licenses as complements to each
[6] other in the same way as DMX would propose to use the direct
[7] license as a complement to the BMI blanket license, correct?
[8] **A.** Yes.
[9] **Q.** So to the extent that's a reason to discount the probative
[10] value of the direct licenses, that would also be a reason to
[11] discount the probative value of any agreement that the music
[12] user has with ASCAP, correct?
[13] **A.** It's true the ASCAP repertoire is different by definition
[14] from the BMI repertoire, because it's different musicl. On the
[15] other hand, it doesn't have the systematic difference that the
[16] cream skimming analysis I described has with respect to the
[17] direct licenses, so they are, I would say that the BMI
[18] repertoire and the ASCAP repertoire and the respective blanket
[19] licenses are more easily compared than the direct licenses are
[20] to either blanket license.
[21] **Q.** You understand that the direct licenses do not exclude
[22] bowling centers or health clubs from the types of locations
[23] that DMX can serve under the licenses, correct?
[24] **A.** I didn't know about health clubs, but I certainly did know
[25] about bowling centers.

Page 852

[1] **Q.** In terms of locations that can be served, the rights
[2] granted in the direct licenses are more favorable than the
[3] rights granted in the BMI blanket license, correct?
[4] **A.** To the extent those are important users, yes.
[5] **Q.** Let me turn for a moment to your demonstrative on
[6] circularity. Let me see if I can make that brighter so it's a
[7] little easier to see. Try to read that out, let me know if you
[8] have trouble. Your box in the middle on the left says BMI
[9] current payments to publishers negotiated in 1987, correct?
[10] **A.** Yes.
[11] **Q.** Do you see that? And in fact, the rate at least for 1993
[12] through the end of 1993 through 2004, that rate was
[13] renegotiated by BMI effectively, the rate first negotiated in
[14] 1987 was ratified as part of BMI's agreement with Muzak,
[15] correct?
[16] **A.** Yes, but I was talking about DMX. That was still operating
[17] under an interim license during this period.
[18] **Q.** At the rate that BMI renegotiated for the industry in 2004,
[19] five, six and seven, right?
[20] **A.** They didn't renegotiate that license for the period
[21] starting in 2004. They negotiated it for the period ending in
[22] 2004.
[23] **Q.** Well, I'm just focused on when the negotiation over what
[24] that rate occurred and it was first negotiated in 1987.
[25] **A.** That's correct.

Page 853

[1] **Q.** And subsequent negotiations in 2004 --
[2] **A.** Looking backwards.
[3] **Q.** Resulted in the same fee, right?
[4] **A.** Looking backwards, yes.
[5] **Q.** Looking backwards, correct? Okay. So that renegotiation
[6] in 2004 that results in the same rate then affects the
[7] publisher's reservation prices going forward, right? It wasn't
[8] just the 1987, they also agreed on the same price in 2004 for
[9] the backward-looking period, right?
[10] **A.** Let's be precise, because this really matters. What they
[11] agreed was that the interim rates that were paid by Muzak
[12] during the period that ended in 2004 would be settled at the
[13] rate established in '87 and effective in 1993. They did not
[14] agree that that interim rate would be applied starting in 2004
[15] and running through 2009.
[16] **Q.** I agree. I don't think there's any dispute about that.
[17] Let me show you another version of this slide in terms
[18] of publishers' reservation prices and see if we continue to
[19] agree. So publishers' reservation prices for direct licenses
[20] would also be affected by the amounts they were receiving from
[21] ASCAP and SESAC, correct?
[22] **A.** Yes. They would be, but I think you've missed the point
[23] that I made in answer to a previous question here, which is
[24] that these are BMI current payments to publishers for DMX
[25] music. They're all publishers. I mean, not all licensees.

Page 854

[1] DMX during this 2004 to 2005 to 2009 period was not paying the
[2] same rate that Muzak was paying. It was paying an interim fee
[3] at the same rate first established in 1987.
[4] **Q.** And under your chart, if I understand what it's intended to
[5] illustrate, is that when publishers were presented with direct
[6] licenses, publishers in the marketplace were presented with
[7] direct licenses, what they had in mind and what conditioned
[8] their response was the interim payments from DMX to BMI?
[9] **A.** Yes.
[10] **Q.** And what I'm asking, what I'm suggesting to you is that in
[11] the marketplace since ASCAP-affiliated publishers and
[12] SESAC-affiliated publishers also entered into direct licenses,
[13] that there was an influence of ASCAP payments and SESAC
[14] payments on the large big box of publisher reservation prices?
[15] **A.** Yes. I'm only talking about the BMI license. Obviously,
[16] there were other issues including possible direct licenses for
[17] ASCAP and SESAC rates as well. And that was all part of the
[18] nominal $25 offer.
[19] **Q.** And in terms of what the mass of publishers that entered
[20] into direct licenses were considering or potentially evaluating
[21] in forming their reservation prices would be not only the
[22] payments from BMI on account of DMX, but also what they were
[23] getting from ASCAP or SESAC, right?
[24] **A.** Yes, if we're talking about the $25. But there is an awful
[25] lot of testimony about how important it was to Sony to know





Page 855

[1] what its BMI royalties were from DMX on account of DMX's
[2] license fees. That was a huge issue and a lot of focus on it,
[3] because they were comparing that with the DMX offer to pay
[4] some -- at first to match it and subsequently some multiple of
[5] it with a guarantee. That's what I'm talking about.
[6] **Q.** Putting the major publishers to one side, are you aware of
[7] any other publishers that made a similar comparison to that
[8] nature?
[9] **A.** I don't know for a fact. I assume that the other major
[10] publishers would do it, and I don't know whether smaller but
[11] not small publishers would be in a position to do it or not.
[12] **Q.** And is this box of publishers reservation prices for direct
[13] licenses, is that intended to be limited to the four major
[14] publishers or does it include all the publishers that have
[15] entered into direct licenses with DMX?
[16] **A.** Different publishers depending on their size have different
[17] bases for understanding what their current receipts from BMI
[18] are attributable to DMX. The larger ones have much better
[19] information, although obviously in Sony's case not great
[20] information about what that number was. The smaller the
[21] publisher is the less likely they are to understand that, but I
[22] do understand that publishers called BMI to ask what they were
[23] getting from DMX or indirectly from DMX.
[24] **Q.** What is your understanding of what sources of information
[25] publishers would have about the amount of money that they were

Page 857

[1] **Q.** Which publishers are you referring to? Because the only
[2] two publishers who were deposed in this case, or the only two
[3] publishers who appeared at trial in this case have testified
[4] that apparently they weren't even aware they were getting
[5] performance rights at all.
[6] **A.** Yes, I understand that. I guess my understanding is from
[7] somebody else's testimony.
[8] **Q.** But sitting here today you're not sure what testimony that
[9] is?
[10] **A.** I don't read about this except in this record.
[11] **Q.** And if a publisher had consulted their royalty statements
[12] to get a sense of how DMX's offer compared to what they had
[13] been receiving as a result of DMX staying on the interim rate
[14] up to 2007 and 2008, what they would have learned, I apologize
[15] that the clarity isn't great, but I'll read the box. What it
[16] says is that BMI included other royalties on the DMX line of
[17] their royalty statements, such that the, if a publisher took
[18] out his or her BMI royalty statement and wanted to know how
[19] much they would be receiving on account of DMX, the number next
[20] to DMX was actually four times the old interim rate, correct?
[21] **A.** I don't understand, or I don't recall any details, but it
[22] was -- I do understand that it was true, that that line was
[23] incorrect when read as DMX as opposed to some larger collection
[24] of licensees.
[25] **Q.** So if a publisher received DMX's offer and wanted to know

Page 856

[1] receiving on account of performances by DMX?
[2] **A.** By calling or asking BMI and once the data had been
[3] clarified on the BMI royalty statements, by looking at their
[4] statements.
[5] **Q.** In fact, for people who didn't call BMI to get
[6] clarification of the data on their statements, it would just be
[7] the statements themselves, correct?
[8] **A.** They would be relying I think chiefly on the promise that
[9] they would get more.
[10] **Q.** What is the basis for that assertion?
[11] **A.** Because, as you're making the point that small publishers
[12] with less at stake and less, fewer resources would not
[13] necessarily know what they were getting from DMX and might not
[14] call BMI to ask. So from their point of view, since they
[15] wouldn't know the share of DMX performances that they could
[16] expect to get or were getting, the best they could do would be
[17] to accept DMX's promise that they would get more from DMX than
[18] they would from BMI on account of more intensive use of their
[19] works.
[20] **Q.** What's the basis for your statement that DMX promised that
[21] small publishers would get more?
[22] **A.** My understanding is that a variety of publishers testified
[23] in depositions and otherwise that they would get, they thought
[24] they would get more money and that was based on their
[25] understanding of the representations made by DMX.

Page 858

[1] how it compared to what they had been receiving from BMI on
[2] account of DMX, and opened their royalty statement but didn't
[3] call BMI for clarification to find out whether DMX meant DMX or
[4] something else, they would have seen a number that was four
[5] times the old rate, correct?
[6] **A.** Yes. As long as that reporting confusion continued.
[7] **Q.** And so they would have thought that they were being paid
[8] $48 a location from BMI on account of DMX instead of 12 or 14,
[9] is that right?
[10] **A.** And for the smaller publishers the result would still have
[11] been a tiny number.
[12] **Q.** You talked about the promise of more. One of the other
[13] other reasons that it would affect a publisher's reservation
[14] price for direct license isn't necessarily the promise of more,
[15] but the possibility of decreased use if they didn't grant the
[16] license, correct?
[17] **A.** If they thought about it that way, yes.
[18] **Q.** You depicted it this morning in your direct testimony as
[19] people were -- weren't agreeing to 25, they were agreeing to
[20] something more, correct?
[21] **A.** They thought that they would get more from DMX because of
[22] DMX's promise to use their music more. It's true that the
[23] implication is that DMX would use their music less if they
[24] didn't grant the license and it's also true that under the
[25] consent decree they all faced a compulsory requirement that

Page 859

[1] they make their music available to DMX.

[2] **Q.** But it wasn't necessarily that they thought that they would

[3] make more by entering into the direct license relative to what

[4] they had been receiving, it's that they thought they might earn

[5] less if they didn't grant the direct license because they knew

[6] DMX wanted to use directly-licensed music, correct?

[7] **A.** They may have taken that into consideration. I'm not aware

[8] of any testimony or other evidence about that issue.

[9] **Q.** And that also would have affected their reservation prices,

[10] correct?

[11] **A.** It might have.

[12] **Q.** And so when we add all of these factors in, it adds to the

[13] list of things that would affect the proposal for the BMI rate.

[14] It's not just the rate that was paid in 1987, but what

[15] publishers were receiving from ASCAP or from SESAC or what they

[16] learned from reviewing BMI royalty statements that inflated the

[17] amount attributed to DMX, right?

[18] **A.** Mr. Marks, there's a reason I used the word "affects"

[19] rather than "determinants" on that chart. There's no claim

[20] implied or explicit in that chart that that's the only factor.

[21]      **MR. MARKS:** Your Honor, I've reached a convenient

[22] break point.

[23]      **THE COURT:** Yes. Let's resume at 10:00 tomorrow

[24] morning.

[25]      (Adjourned to Tuesday, January 26, 2010 at 10:00 a.m.)

Page 860

[1]         INDEX OF EXAMINATION

[2] Examination of:            Page

[3] BRUCE M. OWEN

[4] Direct By Mr. Salzman . . . . . . . . . . . . 687

[5] Cross By Mr. Marks . . . . . . . . . . . . . . 786

[6]       PETITIONER EXHIBITS

[7] Exhibit No.           Received

[8]   119   . . . . . . . . . . . . . . . . . . . 689

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

A-454

# In The Matter Of:

*BROADCAST MUSIC INC.,  V.*
*DMX, INC*

*VOLUME 6*
*January  26, 2010*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 01qfbmif.txt, Pages 861-1054 (194)

**Word Index included with this Min-U-Script®**

Page 861



```
                       [STAMP]              U.S.
[1]  UNITED STATES DISTRICT OF YORK
[2]  SOUTHERN DISTRICT OF NEW YORK
     ------------------------------x
[3]
[4]  BROADCAST MUSIC INC.,,
[5]              Petitioner,
[6]                                 10 Civ. 116  CLB)
     FMX, INC.,,
[7]              Respondent.
[8]
     ------------------------------x
[9]
[10]                            January 26, 2010
                                10:17 a.m.
[11]  Before:
[12]              HON. LOUIS L. STANTON,
[13]                            District Judge
[14]                 APPEARANCES
     HUGHES, HUBBARD & REED, LLP
[15]      Attorneys for Petitioner
     BY:  JAMES J. FITZPATRICK
[16]      MICHAEL E. SALZMAN
          JASON D. BENTON
[17]      MARGARET J. HOAG
              AND -
[18]      JOSEPH DiMONA, In-house counsel, BMI, Inc.,
[19]  WEIL, GOTSHAL & MANGES, LLP
          Attorneys for Respondent
[20]  BY:  R. BRUCE RICH
          BENJAMIN E. MARKS
[21]      TODD D. LARSON
[22]
[23]
[24]
[25]
```

Page 862

[1]       (Trial resumed)

[2]  BRUCE OWEN,

[3]       called as a witness by the Petitioner,

[4]       having been previously duly sworn, testified as follows:

[5]       THE COURT:  Good morning, Doctor Owen.  You're

[6]  reminded that you're still under oath.

[7]       THE WITNESS:  Yes, your Honor.

[8]       THE COURT:  Mr. Marks.

[9]       MR. MARKS:  Good morning, your Honor.  One quick

[10] scheduling note before we begin, if I may.  Your Honor will

[11] recall from the final pretrial conference that Dr. Adam Jaffe,

[12] one of DMX's economic experts, will be appearing to testify on

[13] Friday morning, and we're not quite sure exactly, because we

[14] previously don't know the length of the cross-examination of

[15] the various witnesses, we're not quite sure where, if there

[16] will be any gap in the presentation of witnesses and we'll have

[17] a short day or not, and what we'd like to propose if it's

[18] acceptable to the Court and to your Honor is to confirm that as

[19] of at least for DMX, all of the hard-, and it's also the -- so

[20] that it's all, with respect to Thursday ground as it

[21] is in the presentation's case, and if we order to have a

[22] very high possibility, with respect to have a short day rather

[23] go forward to Monday, if it would be Wednesday, to have a

[24] short day, we'll go out so if we can, for various

[25] convenience, if it's acceptable to the Court.

---

Page 863

[1]       THE COURT:  It's too tricky, hard and far away for me

[2]  to even venture a guess of how that would go.  Sounds fine.

[3]       MR. MARKS:  Thank you, your Honor.

[4]       THE COURT:  You remember I have two conferences which

[5]  will shorten Friday anyway.  One starts at 12:30 in the early

[6]  afternoon and the other at four.  Those cases are still on and

[7]  I have to attend to them.

[8]       MR. MARKS:  We understand that, your Honor.  But I

[9]  don't think that would affect what we do, whether we have a

[10] short day on Thursday or on Wednesday.  I think that's the only

[11] difference.

[12] **CROSS-EXAMINATION**

[13] **BY MR. MARKS:**

[14] **Q.** Good morning, Dr. Owen.

[15] **A.** Good morning, Mr. Marks.

[16] **Q.** You believe that using information about music use at both

[17] on-premise and off-premise DMX locations is preferable to using

[18] the off-premises play list as a proxy for all performances,

[19] correct?

[20] **A.** Yes.  Based partly on the fact that the information is

[21] already generated.

[22] **Q.** You think that the Court should set the most accurate proxy

[23] for actual performances based on available data, correct?

[24] **A.** Yes, after taking account of costs.

[25] **Q.** Neither the on-premise data nor the off-premises data

---

Page 864

[1]  reflects actual performances at DMX customer locations,

[2]  correct?

[3]  **A.** That's correct.

[4]  **Q.** And the data reported by DMX for on-premise locations is

[5]  just a list of the song titles on the CD's or hard drives

[6]  provided to on-premise customers, correct?

[7]  **A.** Yes.  As with the off-premises.

[8]  **Q.** The off-premises lists are actually a play list of the

[9]  songs?

[10] **A.** Yes.

[11] **Q.** That's your understanding.  Is it your understanding that

[12] the song lists provided to on-premise customers are also a play

[13] list rather than just a list of songs?

[14] **A.** Yes.  There's a difference.  I think the point you're

[15] asking me to confirm is that the off-premise data would include

[16] how many times a song is made available to the location,

[17] whereas the on-premise data just has the list of songs.

[18] **Q.** Correct.

[19] **A.** Is that your question?  Yes.

[20] **Q.** And do you know whether some of the songs on the list

[21] provided to on-premise locations are programmed by DMX to be

[22] played more frequently than some of the other songs on the

[23] list?

[24] **A.** I'm not sure of this, but I believe they are.

[25] **Q.** And if some of the songs on the list are programmed to play

---

Page 865

[1] more frequently than other songs, the list of unique song
[2] titles doesn't reflect that, right?
[3] **A.** Isn't that the same question? I'm sorry, I don't
[4] understand the difference between this question and the
[5] previous one.
[6] **Q.** I just want to make sure that we understand each other that
[7] the data about what songs are on the media provided to
[8] on-premise locations doesn't show that, doesn't reflect whether
[9] some of the songs are played much more frequently than some of
[10] the other songs.
[11] **THE COURT:** Mr. Marks, you prefaced that question by
[12] saying that it was important to be sure we understand each
[13] other, as between you and the witness, and of course that is
[14] important. But as between the three of us, I can assure you
[15] that we don't understand each other, and I think it is
[16] important that we do.
[17] What I would like is a clear stipulated or at least to
[18] the degree not in dispute statement of what is shown by the
[19] off-premises reports and what is shown by the on-premise
[20] reports and what the difference is. Now, that must be common
[21] ground between the parties, and a clear, concise statement will
[22] focus the testimony and educate me, and I'd be very grateful
[23] for it. I hear a lot of talk about it, but I'm never quite
[24] clear what is being talked about.
[25] **MR. MARKS:** Let me try to do that right now, your

Page 866

[1] Honor.
[2] **THE COURT:** Good.
[3] **Q.** The play lists provided by DMX --
[4] **THE COURT:** By the way, does play list mean something
[5] else than a list of songs?
[6] **MR. MARKS:** It does, your Honor.
[7] **THE COURT:** It seems to have a connotation that
[8] they're actually played. Is that the difference?
[9] **MR. MARKS:** The difference is -- that is one of the
[10] differences. It's actually transmitted -- the play list
[11] provided to off-premises locations reflect the songs that are
[12] actually transmitted in the order in which they are transmitted
[13] to the satellite, and so if a song appears in a program two,
[14] three, four, five times over the course of a 24-hour period it
[15] will appear on the play list two, three, four or five different
[16] times.
[17] **THE COURT:** And when it goes to the satellite, it
[18] doesn't rest there as a repository, it goes directly down to a
[19] user, is that the fact?
[20] **MR. MARKS:** That is correct, although users don't
[21] listen to all 100 channels at a time, so even though DMX
[22] transmits 100 channels or more up to the satellite, what the
[23] customer hears is whichever of the various channels they're
[24] tuning to in their store on their receiver.
[25] **THE COURT:** Well, I assume that our interest stops at

Page 867

[1] the point where the song is played on whatever machine receives
[2] it. We don't require that it reach the consumer's ear, isn't
[3] that correct?
[4] **MR. MARKS:** Correct.
[5] **THE COURT:** If he's asleep or away, that's beyond our
[6] interest.
[7] **MR. MARKS:** And, your Honor, there's not in fact
[8] accurate data available about what channel customers actually
[9] tune to, which you'll hear as part of our direct case. The
[10] best available data is what gets put up on the satellite.
[11] Nobody knows exactly what people tune to in the stores.
[12] **THE COURT:** You mean what's played from the satellite
[13] counts? It goes down to the receiver and it's counted even if
[14] the receiver is turned off?
[15] **MR. MARKS:** Or if you think of it this way, if DMX --
[16] **THE COURT:** Well that's the way I think of it. Tell
[17] me that first.
[18] **MR. MARKS:** Excuse me?
[19] **THE COURT:** Answer the question the way it is first
[20] and then tell me the rest.
[21] **MR. MARKS:** I want to make sure I get the question
[22] right, could you let me know what it was again?
[23] **THE COURT:** Would you read it back?
[24] (Record read)
[25] **MR. MARKS:** That's correct, your Honor. What is on

Page 868

[1] the play lists is all of the programs and songs in order that
[2] are available for a customer to listen to if they turn on their
[3] receiver and tune the receiver to that particular channel.
[4] They don't listen to all 100 channels.
[5] **THE COURT:** Because that broadcaster is broadcasting
[6] and hence performing, is that the concept?
[7] **MR. MARKS:** I think so, your Honor.
[8] **THE COURT:** Do you think so, Dr. Owen?
[9] **THE WITNESS:** Yes, that's one of the performances.
[10] **THE COURT:** Okay, that's all I need.
[11] **MR. MARKS:** And so --
[12] **THE COURT:** Now, you were going to state the facts and
[13] the differences.
[14] **MR. MARKS:** So that's the facts as to the off-premises
[15] data, is that it reflects how many times an individual song
[16] appears in a channel or a program, so that if there are -- if a
[17] song is programmed to -- if a particularly desirable song for
[18] that channel is programmed to appear five times in the course
[19] of a day rather than once, the off-premises play list will
[20] reflect that increased usage.
[21] **THE COURT:** Because that is in fact what was broadcast
[22] to the satellite.
[23] **MR. MARKS:** Correct. Exactly right, your Honor.
[24] **THE COURT:** Whereas the on-premise --
[25] **MR. MARKS:** Is just a list of the songs that are

A-457

Page 869

[1] placed on the machines in the customer locations, but it does
[2] not reflect the variation in how frequently those songs are
[3] performed when the customer turns on the machine.
[4]     THE COURT: Is it a daily list?
[5]     MR. MARKS: Excuse me?
[6]     THE COURT: Is it a daily list?
[7]     MR. MARKS: It's -- I'd want to check to be sure. I
[8] believe it's more than a daily list. And it may vary by
[9] customer location, but we'll clear that up at a break.
[10]     THE COURT: Well, if it were a list hour by hour, it
[11] would over the course of the day give you equivalent
[12] information or roughly equivalent information to the play list
[13] going to the off-premises. So the amount of time covered by
[14] the list has a bearing on the frequency of play of the
[15] individual items, right?
[16]     MR. MARKS: It would, but I don't believe it's that
[17] granular, your Honor, and I don't believe it would reflect the
[18] variety of performances among individual songs.
[19]     THE COURT: Well, I was brought up to respect people's
[20] faith, but I'd like the fact.
[21]     MR. MARKS: We'll make sure that that is part of the
[22] presentation on direct.
[23]     THE COURT: All right.
[24] BY MR. MARKS:
[25]     Q. If DMX has been programming directly licensed songs at its

Page 870

[1] on-premise locations to play them more frequently than songs
[2] that are not directly licensed, the increased performances of
[3] directly licensed songs would not be captured in the on-premise
[4] lists of song titles that BMI proposes to use as part of the
[5] proxy for actual performances, correct?
[6]     A. Yes. Like the locations, it would be missing information.
[7]     Q. And the use of on-premise data then could significantly
[8] undercount DMX's actual use of directly licensed music,
[9] correct?
[10]     A. It could, to that extent.
[11]     Q. You haven't done any empirical analysis of that issue,
[12] correct?
[13]     A. I'm not aware of anybody who has.
[14]     Q. I'm saying you haven't done any.
[15]     A. That's correct.
[16]     Q. And while using on-premise data will involve processing
[17] more data than just using the off-premises play lists, you
[18] don't know where the potential bias we have just discussed will
[19] lead to a more accurate or less accurate proxy for actual
[20] performances?
[21]     A. In terms of the distinction between directly licensed and
[22] non-directly licensed, I don't know in what direction, if any,
[23] there will be a bias from that source. It's clear that
[24] including information about number of locations where the songs
[25] were played would be helpful in making the overall count of

Page 871

[1] performances used more accurate. So the fact that there is an
[2] imperfection, the one you've been emphasizing in this line of
[3] questioning in the on-premise data is not a reason not to take
[4] account of the greater precision of the data regarding the
[5] number of locations in which the songs are played.
[6]     Q. Whether it makes it more accurate to include the on-premise
[7] data depends on how the number of location adjustment that
[8] you're referring to balances out against the fact that the data
[9] about music at on-premise locations wouldn't reflect increased
[10] use of directly licensed music, correct?
[11]     A. We don't know. I agree that we don't know the direction of
[12] the bias, but more information seems to me more useful than
[13] less information.
[14]     Q. Is there any difference for BMI in terms of administrative
[15] costs in administrating, in the adjustable fee blanket license
[16] to DMX for a bowling center?
[17]     THE COURT: Mr. Marks, wouldn't the number of
[18] locations be in the current word a proxy for the intensity of
[19] use of a particular piece, all other things being equal?
[20]     MR. MARKS: If all other things were equal, that might
[21] be true, your Honor, but I believe the testimony on our direct
[22] case will reflect that all things are decidedly not equal.
[23]     Q. Dr. Owen, is there any difference for BMI in terms of the
[24] administrative costs of administering the adjustable fee
[25] blanket license to DMX for a bowling center location rather

Page 872

[1] than for a hotel?
[2]     A. I don't know the answer to that question.
[3]     Q. You're not aware of any difference?
[4]     A. I don't know the answer to the question.
[5]     Q. If you could turn to tab 5 in your binder from yesterday?
[6] I apologize, tab 4 in your binder. This demonstrative sets
[7] forth the proposed fee for a single lane as of 2008, correct?
[8]     A. Yes.
[9]     Q. And so, just some basic math. If a bowling center had ten
[10] bowling lanes, the base fee for DMX to serve that bowling
[11] center location would be $36 as of 2008?
[12]     A. Yes. The minimum fee.
[13]     Q. But for a hotel, the annual floor fee under BMI's proposal
[14] would be a small fraction of 36?
[15]     A. You're talking about a directly licensed hotel or a CMS
[16] service to a hotel?
[17]     Q. A CMS service to a hotel.
[18]     A. Yes. That's correct.
[19]     Q. Are you aware of any reason that a through to a bowling
[20] center license from BMI to a commercial music service is many
[21] times more valuable than a through to a bowling center license
[22] from ASCAP to a commercial music service?
[23]     A. I believe the BMI concept is that if music contributes more
[24] to the economic value of the experience that's being sold, in
[25] this case, bowling in a context where music is intensively,

Page 873

[1] used intensively as part of the experience, that the music is
[2] contributing more to value and therefore ought to be priced
[3] higher than if music is a relatively insignificant contributor
[4] to the value of the good that's being sold by the customer.
[5] **Q.** That wasn't my question. My question related to whether
[6] for a user like DMX a through to a bowling center license from
[7] BMI is considerably more valuable than a through to a bowling
[8] center license from ASCAP.
[9] **A.** Oh, I'm sorry. That depends on music use by DMX. So the
[10] usual assumption is that it's related to the relative shares of
[11] the music used for those two locations on the spot and of
[12] course we don't know that.
[13] **Q.** And other than adjusting for music use, is there any reason
[14] that you can think of that a through to a bowling center
[15] license to a commercial music service from BMI would be many
[16] times more valuable than a through to a bowling center license
[17] from ASCAP?
[18] **A.** There might be. There might be differences in usage
[19] on-site reflecting the actual experience, just as there are
[20] variations across channels in terms of relative music use and
[21] if bowling centers pick particular channels in which BMI or
[22] ASCAP happen to have a high share, there might be a reason for
[23] that, but I don't know what bowling centers actually play.
[24] **Q.** That's again related to music use, right?
[25] **A.** Well, not just measured by share, but measured by the

Page 874

[1] particular selection -- overall share, but measured by the
[2] particular selection of channels.
[3] **Q.** Any other reason that it would be many times more valuable
[4] for a music user to have a BMI license through to a bowling
[5] center than an ASCAP license through to a bowling center?
[6] **A.** I'm not aware of any, besides the ones I've given.
[7] **Q.** If I could direct your attention to tab 20 of your binder
[8] from yesterday? This analysis of the recoupment of the Sony
[9] guarantee is driven by two variable factors; Sony's share of
[10] all DMX performances as measured by the off-premise proxy and
[11] the number of DMX customer locations, correct?
[12] **A.** Yes.
[13] **Q.** And this analysis and the chart at the preceding tab 19 in
[14] your binder assume that DMX locations will be 68.078 for the
[15] remainder of the term of the Sony direct license, correct?
[16] **A.** Yes.
[17] **Q.** And if DMX were to significantly increase the number of
[18] locations it serves beginning next month, that would drive down
[19] the share that Sony needs to have in order for DMX to fully
[20] recoup the guarantee, correct?
[21] **A.** That's correct.
[22] **Q.** You acknowledge that the method used by BMI to set fees for
[23] other commercial music services can yield and has in fact
[24] yielded a variety of actual per location fee outcomes, correct?
[25] **A.** Are we talking about the benchmark license?

Page 875



[1] **Q.** Yes.
[2] **A.** Yes. The result necessarily will be variation across
[3] different CMS providers based on their actual ex-post
[4] experience.
[5] **Q.** In your estimation is each of these outcomes a reasonable
[6] one?
[7] **A.** Their actual ex-post experience. I would like to finish
[8] the answer, please.
[9] **Q.** I apologize for interrupting.
[10] **A.** The actual ex-post experience of each provider with respect
[11] to the number of locations that they're able to serve.
[12] **Q.** And just to be clear, in your estimation that actual
[13] experience is a reasonable one, the outcomes?
[14] **A.** If the original license was reasonable, yes.
[15] **Q.** I'd like to show you joint Exhibits 1242, 1249 and 1254.
[16] These are the per-program licenses.
[17] Dr. Owen, are these the usual per-program television
[18] licenses to which you were referring to in your testimony
[19] yesterday with respect to the discussion of the benchmark to
[20] measure the value of the adjustable fee blanket license?
[21] **A.** Yes, they appear to be.
[22] **Q.** Did you speak to any music publishers with respect to any
[23] of your work in connection with this proceeding?
[24] **A.** No.
[25]    **MR. MARKS:** No further questions, your Honor. I pass

Page 876

[1] the witness.
[2] **THE COURT:** Thank you, Mr. Marks. Mr. Salzman?
[3] **MR. SALZMAN:** Thank you, your Honor.
[4] REDIRECT EXAMINATION
[5] BY MR. SALZMAN:
[6] **Q.** Mr. Owen, yesterday there was discussion of whether the
[7] additional value of an adjustable fee blanket license as
[8] compared to a traditional blanket license could be captured
[9] rather than in a premium in making a differential in the credit
[10] mechanism so that it wasn't a dollar for dollar credit or a
[11] proportional credit, but a somewhat disproportionate credit.
[12] Do you remember that discussion?
[13] **A.** Yes, I do.
[14] **Q.** Take a look at tab 2, the graphic discussion of the BMI
[15] proposal?
[16] **A.** Yes.
[17] **Q.** Just as a reminder, the way this graph works is that the
[18] premium is the top 15 percent of the column?
[19] **A.** Yes.
[20] **Q.** And under this other hypothesized method for capturing the
[21] value of the credit option, the full fee would start at the
[22] bottom of that bracket on the right, correct?
[23] **A.** Yes.
[24] **Q.** And so there would be a base fee, there would be a full
[25] fee, but less than what's proposed here, and then the credit



**A-459**

[1] mechanism would instead of being directly proportionate would
[2] be at some other different proportion, right? That's the
[3] concept that we've been talking about a little bit.
[4] A. I don't -- I don't recall it that way. I understood the
[5] discussion to be whether the premium would be a fixed amount or
[6] whether it would be added to the per performance rate under the
[7] benchmark blanket license, if you were to divide the full fee
[8] for the benchmark blanket license into a per performance rate,
[9] that would be some number of cents per performance. It's not
[10] the way it's actually priced, but you could imagine that
[11] division, and then pricing the, the alternative for pricing the
[12] per-program license would be to add some percentage to that per
[13] performance rate.
[14] THE COURT: I think Mr. Salzman's statement of it was
[15] closer to my concept.
[16] THE WITNESS: Okay. So let's put it like that.
[17] THE COURT: To the extent there was variation between
[18] the two, that if you offset the rate of the adjustment which is
[19] something less than the statistical rate to compensate for the
[20] increased value of the option.
[21] Q. So that, for example, if DMX had directly licensed half the
[22] music and relied on the BMI license for half the music, instead
[23] of starting here at $3,126,000 working halfway down the orange
[24] part of the column and drawing a line there and saying that's
[25] the fee, hypothetically we could have a situation where, again,

[1] 50 percent is directly licensed, 50 percent relies on BMI, and
[2] instead of drawing the line halfway into the orange column you
[3] would say we'll draw it at one-third of the way into the column
[4] down, so that instead of dollar for dollar there is, or
[5] percentage for percentage, let's say there was a two-thirds
[6] credit. Do you understand that idea?
[7] A. Yes. That's an alternative way to price the license.
[8] Q. And assume that we work that way, but assume there was only
[9] a limited amount of direct licensing actually done.
[10] A. Yes.
[11] Q. Under that methodology, would BMI recover the extra value
[12] and cost of the adjustable fee feature?
[13] A. They certainly wouldn't recover the extra cost of the extra
[14] fee feature, and only a portion of the value would be
[15] recovered -- of the extra value would be recovered.
[16] Q. Am I right that to the extent it wasn't recovered, from DMX
[17] under that scenario then it would be the BMI composers and
[18] publishers whose works were in fact being used under the
[19] license who would be paying part of that cost?
[20] A. Those costs have to be recovered, and so the only other
[21] source of revenue would be administrative discounts on the
[22] distributions to the composers and publishers, so we're
[23] actually -- whose music was actually being used.
[24] Q. I think you testified yesterday that to recover BMI's cost
[25] under this license, or I think you were also talking about

[1] under the per-program license, there has to be a starting full
[2] fee number higher than the blanket fee number.
[3] A. Yes, exactly as with the fixed price menu or the subway
[4] tokens.
[5] Q. Under a scenario in which only on-premise music use data
[6] were used to compute the credit under the adjustable fee
[7] blanket license, if there were different songs played
[8] on-premise than off-premise --
[9] THE COURT: Mr. Salzman, I'm trying to be sure I
[10] understand your last few questions. Supposing BMI generated
[11] and offered a variable, a carveout license and there were no
[12] takers. Then under the assumption in your questions it would
[13] be victimized because it never recovered its costs of the
[14] carveout license, correct?
[15] MR. SALZMAN: Correct.
[16] THE COURT: Well, number one, I think that situation
[17] was presented at least theoretically once and I turned down
[18] making any reaction to it because I said it would be an
[19] advisory opinion. But now it's here, and you have an actual
[20] applicant.
[21] MR. SALZMAN: We have an applicant, we have evidence
[22] that to date it has used, it has done some direct licensing.
[23] We don't know whether those direct licenses will be renewed, we
[24] don't know whether there will be more use in the future, we
[25] don't know if there's less use. We know they've applied for a

[1] license and that it continues for a time to the future, and we
[2] know that BMI has experienced some costs so far and will have
[3] some more and I think that's the state of the record.
[4] THE COURT: And you know that you're under a legal
[5] duty to offer the license.
[6] MR. SALZMAN: If applicants request it.
[7] THE COURT: And the fewer demands for carveouts, the
[8] less the deductions from the existing fees. I'm not sure
[9] exactly into which niche your question falls. Where does the
[10] grievance arise from too little use of the carveout license?
[11] MR. SALZMAN: Basically, we've been asked to kind of
[12] build this house or add this addition to the house and if
[13] nobody uses it or it's used only to a limited extent, let's
[14] say, then the costs have been created and there's no one to pay
[15] for them except for the other composers. But it's not just --
[16] I would say asking hypothetically at the extreme case. If DMX
[17] were to use it moderately or down the line, it's still, no
[18] matter what you do under a formula where the starting point,
[19] the full fee is not more than the blanket license, everyone
[20] will apply for it because it doesn't cost more, but at the same
[21] time the costs are not fully borne by the applicants unless you
[22] start at a higher number.
[23] THE COURT: Why isn't it fair to think of the costs as
[24] falling into two categories: Costs that had to be incurred in
[25] preparing and creating the license, and annual costs of

Page 881

[1] administering it as it takes place in an actual business, and
[2] put into the fee structure the latter, and then there remains
[3] to be addressed the difficult question of what to do with the
[4] costs of creating it, how much of that should be charged to the
[5] first applicant, even though there will be others who might be
[6] free riders, that problem, and the other problem, is that an
[7] expense that has to be borne by BMI anyhow because it's
[8] required to offer such a license? And that I think raises some
[9] other problems that are genuine problems. But why isn't that
[10] the way to approach the cost question rather than the way BMI
[11] is?
[12]     MR. SALZMAN: Because dividing the --
[13]     THE COURT: DMX should be billed for something and how
[14] much? It may be very little. Those are real questions.
[15]     MR. SALZMAN: We could try to --
[16]     THE COURT: But why are they rate questions?
[17]     MR. SALZMAN: Both sides, I believe, have seen them as
[18] rate questions. We talked about the concept of just, quote,
[19] sending DMX a bill, unquote, and I think we agreed that it
[20] could be done that way as well. In our graphic presentation,
[21] I'll try to find which tab it is, there is a breakdown of the
[22] costs into bands. There's the DMX share of just because it's
[23] applied for a blanket license, 17 percent, and then above that
[24] I think we had three different bands on top of that, and so
[25] that was an expression of it. But here the question I was

Page 882

[1] trying to get at was regardless of which costs, the starting
[2] place under the crediting mechanism, since both sides agree
[3] there should be a proportionate crediting mechanism, that
[4] logically economically it can't be the blanket fee, it has to
[5] be higher than that, otherwise you have won an incentive for
[6] everyone to just buy it whether they want it or not, since it's
[7] a freebie, it doesn't cost you any extra, okay, I'll take the
[8] option, and then you're doing something that is not efficient.
[9]     And then, second, people who are buying are getting
[10] more value, so they should pay for it and if there are more
[11] costs then people buying should start there. They're not going
[12] to pay more. If they have the option of a traditional blanket
[13] license and a carveout license, they're only going to take the
[14] carveout blanket license if you really intend to directly
[15] license if they're priced correctly and you're only going to do
[16] it if you expect to directly license enough music that you're
[17] going to start saving money, so that it's not as though you
[18] will always pay more if you buy the carveout license, it's just
[19] that you start at that point and you start working down from
[20] that number. I think that's the concept. Okay?
[21]     I'm told tab 25 in the book is our effort to divide
[22] the cost up. And I think those top three bands are not in any
[23] particular order, but up front does come first working from the
[24] bottom up.
[25]     THE COURT: Yes.

Page 883

[1]     MR. SALZMAN: Just a couple more questions, Mr. Owen.
[2] BY MR. SALZMAN:
[3]     Q. There was some testimony on cross-examination about using
[4] only the on-premise music information in determining the credit
[5] rather than also using the on-premise -- maybe I misspoke.
[6]     The proposition from DMX was that in computing the
[7] credit, only the off-premise play list would be used, not the
[8] on-premise lists of music being delivered.
[9]     A. Correct.
[10]     Q. And if only one, only the off-premise were used and
[11] different songs or songs in different proportions were used in
[12] the on-premise, what effect could that have on the crediting
[13] mechanism?
[14]     A. Yes.
[15]     Q. What effect would that have?
[16]     A. It would make the overall crediting mechanism more accurate
[17] because --
[18]     Q. If you used one or if you used both?
[19]     A. Both. Because the crediting mechanism that takes account
[20] of on-premise songs, even though it does not include more data
[21] on how often on a given CD or hard disk drive a particular song
[22] appears, it does have the information about how many locations
[23] the song appears in, and that's relevant and useful
[24] information.
[25]     MR. SALZMAN: No further questions.

Page 884

[1]     MR. MARKS: Nothing further, your Honor.
[2]     THE COURT: Thank you, Dr. Owen.
[3]     THE WITNESS: Thank you, your Honor.
[4]     THE COURT: You're excused.
[5]     (Witness excused)
[6]     MR. FITZPATRICK: Your Honor, I just had one
[7] logistical question. The parties have been -- I think there's
[8] an agreement between the parties, but where we've been
[9] referring to joint exhibits in the record, I haven't been
[10] moving them in specifically, but just assuming that if they are
[11] joint and referred to, they'll be part of the record, but lest
[12] there be any doubt, I would move the admission of the joint
[13] exhibits that have been submitted thus far, your Honor.
[14]     THE COURT: When a joint exhibit is mentioned in the
[15] record, it is automatically received in evidence.
[16]     MR. FITZPATRICK: Thank you, your Honor.
[17]     THE COURT: Without further order. I think that's the
[18] way to set it up.
[19]     MR. FITZPATRICK: I just wanted to be sure, your
[20] Honor.
[21]     THE COURT: Yes.
[22]     MR. FITZPATRICK: Then subject to I believe the one
[23] outstanding dispute about exhibits, BMI rests its affirmative
[24] case, your Honor.
[25]     MR. RICH: If the Court is ready, we're prepared to

Page 885

[1] proceed with our case, your Honor, calling Mr. Tim Seaton as
[2] our witness who will be examined by Mr. Marks.
[3]   TIM SEATON,
[4]   called as a witness by the Respondent,
[5]   having been duly sworn, testified as follows:
[6]   **THE DEPUTY CLERK:** Please say your name spell your
[7] last name slowly for the record?
[8]   **THE WITNESS:** Timothy John Seaton, Seaton-e-a-t-o-n.
[9]   **THE COURT:** Mr. Marks.
[10] **DIRECT EXAMINATION**
[11] **BY MR. MARKS:**
[12] **Q.** Good morning, Mr. Seaton.
[13] **A.** Good morning.
[14] **Q.** By whom are you employed?
[15] **A.** DMX.
[16] **Q.** What is your current job title?
[17] **A.** I'm the chief operating officer.
[18] **Q.** How long have you held that position?
[19] **A.** A little more than two years.
[20] **Q.** And at a general level, what are your responsibilities as
[21] the chief operating officer?
[22] **A.** I have many responsibilities, but generally sales,
[23] marketing, operations, music design and customer service.
[24] **Q.** Who owns DMX?
[25] **A.** DMX is owned by Capstar Partners.

Page 886

[1] **Q.** When did Capstar Partners acquire DMX?
[2] **A.** They acquired DMX in June of 2005.
[3] **Q.** And how did Capstar Partners acquire DMX?
[4] **A.** The company was acquired out of bankruptcy proceedings.
[5] **Q.** And was there any relationship between Capstar Partners and
[6] DMX prior to the bankruptcy proceeding?
[7] **A.** No, there was not.
[8] **Q.** Were you employed by the previous owner of the DMX music
[9] service prior to their bankruptcy?
[10] **A.** Yes, I was.
[11] **Q.** Could you please describe for the Court at again a very
[12] general level your prior experience in the commercial music
[13] service industry?
[14] **A.** I've been in the commercial music business for a number of
[15] years working for AEI and then the old DMX as well.
[16] **Q.** Approximately how many years have you been in the
[17] commercial music service business?
[18] **A.** I believe it's fourteen now.
[19] **Q.** What kind of a company is DMX?
[20] **A.** I think it's termed here as a commercial music provider, a
[21] commercial music service.
[22] **Q.** Does DMX have lines of business other than its commercial
[23] background foreground music service?
[24] **A.** Yes. We provide various branding services around video,
[25] messaging, sent services, digital services and then we're also

Page 887

[1] a very large sound contractor.
[2] **Q.** Does operating DMX's commercial music service involve
[3] aspects other than just supplying programmed music content to
[4] customers?
[5] **A.** Yes, it does. With all of those services we have many
[6] parts of the organization, customer Service of course being one
[7] of the most important. Project management, engineering, our
[8] field technician network and of course all the other
[9] departments around video and messaging.
[10] **Q.** Does DMX provide equipment to its customers?
[11] **A.** Yes. We provide sound contracting services which include
[12] speakers and TV's, things like that.
[13] **Q.** What to your mind are the benefits to a customer of using
[14] music programming supplied by DMX rather than using music that
[15] they select themselves?
[16] **A.** When we think of ourselves as a marketing company, so
[17] our expertise in audio branding is a big part of the value that
[18] we bring, as well as licensing.
[19] **Q.** We've had a lot of discussion over the past week or so
[20] about the difference between on-premise delivery and
[21] off-premises delivery. Could you please explain for the Court
[22] what DMX on-premise delivery is versus its off-premises
[23] delivery?
[24] **A.** Yes, off-premise, I think the term here is also known as
[25] direct broadcast satellite, so it's delivered via satellite

Page 888

[1] services. On-premise is media on-site to the customer, and we
[2] have several products that deliver on-premise services.
[3] **Q.** Currently, approximately what percentage of DMX customer
[4] locations receive on-premise delivery as opposed to
[5] off-premises delivery?
[6] **A.** About 65 percent receive on-premise services.
[7] **Q.** Who creates the music programs that DMX delivers to its
[8] customers?
[9] **A.** Our music design team.
[10] **Q.** How does that process work?
[11] **A.** They create a number of different programs. We have a
[12] library of music that they create that can be genre specific or
[13] era specific. Typically that's attached to a marketplace or a
[14] marketing plant and then they also have customized or signature
[15] solutions for individual customers.
[16] **Q.** For its commercial music service, does DMX offer different
[17] options of music programming to its customers?
[18] **A.** Really, really two options.
[19] **Q.** Is one of them referred to as Select programming?
[20] **A.** It is.
[21] **Q.** Could you please describe for the Court what Select
[22] programming is?
[23] **A.** Select programming is a library of music where the company
[24] or the customer has a right to choose or the option to choose
[25] which programs they receive on a monthly basis.

[1]  **Q.** Can customers receive Select programming by either the
[2]  satellite delivery or by one of the on-premise delivery
[3]  options?
[4]  **A.** Yes, they can.
[5]  **Q.** For Select customers that receive delivery by direct
[6]  broadcast satellite, does DMX offer different packages of which
[7]  satellite channels the customer can receive?
[8]  **A.** There is primarily just one package available to the
[9]  customer, although I think there may be an older legacy package
[10] that a few customers still receive.
[11] **Q.** And is the package that is used -- is the current package
[12] that's offered, does that include the full slate of all of the
[13] channels available on the satellite?
[14] **A.** Yes, it does.
[15] **Q.** Approximately what percentage of current customers that
[16] receive delivery by direct broadcast satellite receive all of
[17] the satellite channels?
[18] **A.** Well over 95 percent.
[19] **Q.** For Select customers that receive on-premise delivery, how
[20] many different programs do they typically receive in a given
[21] month or quarter?
[22] **A.** There's a vast library that they can choose from, but most
[23] of our customers receive ten programs or less.
[24] **Q.** Do Select customers control what music is included in the
[25] programming they receive other than to the extent they're

[1]  choosing which ten programs they want?
[2]  **A.** No, they do not.
[3]  **Q.** Can Select customers pick specific songs to add to the
[4]  programming that DMX provides?
[5]  **A.** No, they cannot.
[6]  **Q.** Do you have an understanding of how frequently customers
[7]  request that a specific song be included in their programming?
[8]  **A.** I think it's rare. It may come into our customer call
[9]  center that somebody would make a request, but it's very rare.
[10] **Q.** Could you please describe for the Court DMX's Signature
[11] programming option?
[12] **A.** Signature programming is a program that's created in
[13] collaboration with our customer's marketing department. It's
[14] unique to that customer and delivered via on-premise services.
[15] **Q.** And how does the process for a custom programming work?
[16] **A.** The process is really a marketing discussion. Our music
[17] design team, our sales organization, the customer's marketing
[18] team really creates a calendar of what their store should sound
[19] like throughout the year and programs are created from that.
[20] **Q.** What percentage of DMX customer locations, current customer
[21] locations receive Signature programming?
[22] **A.** About 30 percent.
[23] **Q.** Has that percentage changed over the past few years?
[24] **A.** Yes, it has.
[25] **Q.** How so?

[1]  **A.** It has gone down.
[2]  **Q.** Does DMX ever get complaints about the content --
[3]      **THE COURT:** Signature is the name of a custom program?
[4]      **THE WITNESS:** Yes, your Honor.
[5]  **Q.** Does DMX ever get complaints about the content of its music
[6]  programs?
[7]  **A.** Rarely.
[8]  **Q.** When DMX does get complaints about content, what is the
[9]  typical nature of the complaints?
[10] **A.** It's subject-matter related or lyrically related.
[11] **Q.** When you say subject-matter related, what do you mean?
[12] **A.** Sex and drugs, things like that, that might be
[13] inappropriate in a commercial establishment.
[14] **Q.** To your knowledge, has DMX received any customer complaints
[15] relating to increasing use of music that has been licensed
[16] directly?
[17] **A.** No.
[18] **Q.** Who are DMX's typical customers?
[19] **A.** We have a broad array of customers, but our primary
[20] customers are retail establishments, hotels, restaurants.
[21] **Q.** Does DMX serve other types of businesses as well?
[22] **A.** We do. We serve the health and fitness industry, doctors
[23] office, clinics, hospitals, a broad array.
[24] **Q.** Does DMX distinguish between local and national accounts?
[25] **A.** Yes, we do.

[1]  **Q.** Could you describe what the distinction that DMX draws
[2]  between those two categories is?
[3]  **A.** A national account typically is a company that has
[4]  locations dispersed geographically and usually greater than 100
[5]  locations.
[6]  **Q.** Approximately what percentage of businesses served by DMX
[7]  are local accounts?
[8]  **A.** A number of locations would be about 50 percent.
[9]  **Q.** And does DMX have customers with just one single location?
[10] **A.** Sure. Yes, we do.
[11] **Q.** How does DMX charge for the various aspects of its
[12] commercial music service?
[13] **A.** Our fee structure is really made up of four primary things:
[14] Installation charge and equipment charge, warranty for that
[15] equipment if the customer chooses that and then the music
[16] service portion of the monthly fee.
[17] **Q.** Is there typically an extra charge if the customer wants to
[18] select custom programming?
[19] **A.** Yes, there can be.
[20] **Q.** Do customers that receive custom programming actually pay
[21] more for their music service than the customers that pick the
[22] Select music programming?
[23] **A.** On per location, they actually pay less.
[24] **Q.** Why is that?
[25] **A.** Typically, they're large customers that have the ability to



Page 893

[1] drive a volume discount.

[2] **Q.** Does DMX have a standard rate card?

[3] **A.** Yes, we do.

[4] **Q.** Are the rates on the card negotiable?

[5] **A.** Yes, they are.

[6] **Q.** Is that for all accounts or just larger accounts?

[7] **A.** For all accounts.

[8] **Q.** What percentage of customers actually pay the standard

[9] rates on the card?

[10] **A.** Very few.

[11] **Q.** How many competitors does DMX have?

[12] **A.** There are a number of competitors, certainly dozens.

[13] **Q.** Who are some of the commercial music services with which

[14] DMX competes?

[15] **A.** I think the most common names are Muzak, Play Network,

[16] TruSonic.

[17] **Q.** Has DMX lost customers to any other commercial music

[18] services in recent years?

[19] **A.** Unfortunately, we have.

[20] **Q.** To whom has DMX lost the most customer locations?

[21] **A.** Play Networks.

[22] **Q.** Has DMX also taken customers away from Play Network?

[23] **A.** We have not.

[24] **Q.** Has DMX lost customer locations to TruSonic?

[25] **A.** Yes, we have.

Page 894

[1] **Q.** Has DMX also taken customer locations away from TruSonic in

[2] recent years?

[3] **A.** We have not.

[4] **Q.** How would you describe the nature of the competition that

[5] DMX faces in the marketplace from other commercial music

[6] services?

[7] **A.** I would consider it to be highly competitive and

[8] price-driven.

[9] **Q.** Does DMX face other forms of competitive pressures in the

[10] marketplace beyond commercial music services?

[11] **A.** Certainly there are other options for customers, especially

[12] in this day and age with iPods and other providers.

[13] **Q.** Have the competitive pressures on DMX and its pricing

[14] increased since 2005?

[15] **A.** They have increased.

[16] **Q.** How so?

[17] **A.** It's become more and more competitive and more and more

[18] price-driven.

[19] **Q.** Have the fees that DMX charges for its commercial music

[20] services changed since 2005?

[21] **A.** Yes, they have.

[22] **Q.** How so?

[23] **A.** They have gone down.

[24] **Q.** Why is that?

[25] **A.** A competitive marketplace, difficult economy. About that.

Page 895

[1] **Q.** What has the trend been just over the past year?

[2] **A.** They have continued to go down.

[3] **Q.** Do you expect that downward trend to continue in the

[4] future?

[5] **A.** Yes, we do.

[6] **Q.** Has the number of customer locations that DMX serves

[7] changed since 2005?

[8] **A.** Yes, it has.

[9] **Q.** How so?

[10] **A.** It has gone down.

[11] **Q.** Why do you believe that the number of customer locations

[12] that DMX serves has gone down since 2005?

[13] **A.** A highly competitive marketplace and a difficult economy.

[14] **Q.** How does a bad economy affect the number of locations that

[15] DMX serves?

[16] **A.** Our customers at times will close store locations. Our

[17] customer count goes down when that happens.

[18] **Q.** Has DMX lost customer locations over just the past year,

[19] for example?

[20] **A.** Yes, we have.

[21] **Q.** Do you expect the number of locations in 2010 to be smaller

[22] than the number of locations in 2009?

[23] **A.** Actually, we believe that the business has stabilized and

[24] we look to have some increase in 2010.

[25] **Q.** Why are you projecting an increase in the number of

Page 896

[1] locations for 2010?

[2] **A.** We've made significant rate adjustments over the last year.

[3] That has yielded some success, some wins. Those will begin to

[4] roll out in 2010, large national customers. In addition to

[5] that, we've received a large sale from DirectTV.

[6]     (Continued next page)

Page 897

[1] **BY MR. MARKS:**
[2] **Q.** When will DMX begin providing commercial -- its commercial
[3] music service to business locations through the DirectTV
[4] account?
[5] **A.** Next month.
[6] **Q.** Mr. O'Neill testified last week that DirectTV serves about
[7] 25,000 business locations. Is that consistent with your
[8] understanding about approximately how many new locations DMX
[9] will begin serving through DirectTV next month?
[10] **A.** Yes, it is.
[11] **Q.** Will the DirectTV locations receive their delivery via
[12] on-premise delivery or off-premise delivery?
[13] **A.** Off-premise.
[14] **Q.** So, do you have an understanding of what the approximate
[15] ratio of off-premises delivery customer locations to
[16] on-premises delivery customer locations will be for DMX
[17] starting next month?
[18] **A.** Beginning of next month there will be a greater number of
[19] off-premise locations.
[20] **Q.** Have the revenues that DMX earns from its commercial music
[21] services changed since 2005?
[22] **A.** Yes, they have.
[23] **Q.** How so?
[24] **A.** They have gone down.
[25] **Q.** And why is that?

Page 898

[1] **A.** For the reasons we talked about; highly competitive
[2] marketplace, price pressure on rates.
[3] **Q.** And, have revenues declined over just the past year?
[4] **A.** Yes, they have.
[5] **Q.** On a per location basis, do you expect the decline in
[6] revenues to continue into the future?
[7] **A.** On a per location -- yes, we do on a per location basis.
[8] **Q.** Could you give the Court a sense of the order of magnitude
[9] of revenue decline over the past five years?
[10] **A.** 20 percent.
[11] **Q.** And what about over, say, the past year?
[12] **A.** About half of that occurred in the last year.
[13] **Q.** Has DMX taken steps to cut its costs since 2005?
[14] **A.** Yes, we have.
[15] **Q.** What steps has DMX taken?
[16] **A.** We've taken many steps. Certainly we've consolidated our
[17] business into two locations from a five region structure.
[18] We've had a significant reduction in our labor force overall.
[19] And, we continue to ask our vendors to be more cost efficient.
[20] **Q.** Could you give the Court -- excuse me. Could you give the
[21] Court a sense of what the magnitude of what the reduction in
[22] the size of your labor force has been?
[23] **A.** When we acquired the company in June 2005 we had over 550
[24] U.S. domestic employees; now we have 330.
[25] **Q.** Have these cost cutting measures resulted in savings to

Page 899

[1] DMX?
[2] **A.** Yes, they have.
[3] **Q.** Do you have any personal involvement in DMX' direct
[4] licensing effort?
[5] **A.** I do not.
[6] **Q.** Who has primary responsibility within DMX for the direct
[7] licensing effort?
[8] **A.** Our business affairs team.
[9] **Q.** And what is your involvement in music programming at DMX?
[10] **A.** It is a part of my organizational responsibilities.
[11] **Q.** Are you personally involved in any actual music
[12] programming?
[13] **A.** I am not.
[14] **Q.** Who, at DMX, is most knowledgeable about the use of
[15] directly licensed music in DMX programming?
[16] **A.** Shalonn Hilburn.
[17] **MR. MARKS:** Pass the witness, your Honor.
[18] **THE COURT:** Thank you, Mr. Marks.
[19] Mr. Fitzpatrick.
[20] **CROSS EXAMINATION**
[21] **BY MR. FITZPATRICK:**
[22] **Q.** Good morning, Mr. Seaton.
[23] **A.** Mr. Fitzpatrick, how are you.
[24] **Q.** One of the areas of responsibility that you mentioned that
[25] you have at DMX is the sales and marketing groups, correct?

Page 900

[1] **A.** That is correct.
[2] **Q.** And sales and marketing is basically how DMX communicates
[3] with its customers and its would-be customers that DMX hopes
[4] will purchase DMX' commercial music services, right?
[5] **A.** Sure.
[6] **Q.** And when you -- when DMX markets its commercial music
[7] services to its customers, one of the attributes it markets is
[8] that it has access to a wide variety of music, correct?
[9] **A.** Certainly we talk about that, yes.
[10] **Q.** And, in fact, you talk about that as an advantage you have
[11] over some of your competitors, correct?
[12] **A.** I have heard it stated that way, yes.
[13] **Q.** If I could ask you to just take a look at an example of
[14] your marketing materials, and specifically a printout from your
[15] website which is Joint Exhibit 1172. Have you seen this
[16] document before, Mr. Seaton?
[17] **A.** I believe I have.
[18] **Q.** And I will represent to you that we printed it out from the
[19] DMX website just to give you some context.
[20] **A.** Sure.
[21] **Q.** If you see at the top it is referring to DR 501 digital
[22] satellite. Do you see that?
[23] **A.** I do.
[24] **Q.** Is that part of DMX' off-premises service that you were
[25] discussing with Mr. Marks?



Page 901

[1] **A.** Yes, it is.

[2] **Q.** And if you look at the -- well, if you look at the bottom,

[3] one of the things that DMX says is that DMX knows music better

[4] than anyone.

[5] Correct?

[6] **A.** It says that, yes.

[7] **Q.** And the third paragraph down on the left has a heading

[8] titled Unparalleled Choice. Do you see that?

[9] **A.** I do.

[10] **Q.** And under that heading it says: DMX utilizes one of the

[11] world's largest music libraries to bring you incomparable

[12] variety.

[13] Do you see that?

[14] **A.** I do.

[15] **Q.** And it also says that more than 100 channels represent a

[16] wide variety of music styles to enable you to accurately target

[17] your customers and support special promotions, themes and

[18] holidays.

[19] Correct?

[20] **A.** It does say that.

[21] **Q.** And if you would look at the third page of the document,

[22] we've been talking about the approximate 100 channels

[23] that DMX offers on its off-premise service. Is this a list of

[24] those approximately 100 channels, at least as of the time this

[25] document was printed off the website?

Page 902

[1] **A.** It looks to be, yes.

[2] **Q.** And so, here you have listed the various genres of music

[3] that DMX offers on its off-premises service, correct?

[4] **A.** Various styles, yes. And genres.

[5] **Q.** This was an example of marketing on DMX' website, correct,

[6] but DMX also markets individually to various of its customers,

[7] correct?

[8] **A.** By individually you mean through our sales force?

[9] **Q.** Correct.

[10] **A.** Yes, we do.

[11] **Q.** If I could ask you to take a look at an example of that, it

[12] is JX 1192. Have you seen this document before, Mr. Seaton?

[13] **A.** I saw it during my deposition.

[14] **Q.** And it is, the first page of this is a letter from Geoff,

[15] is it Leyon?

[16] **A.** Leyon.

[17] **Q.** Geoff Leyon; he is a national account executive at DMX,

[18] correct?

[19] **A.** He is, yes.

[20] **Q.** And he is sending this package to Don Cummins at Peet's

[21] Coffee & Tea, correct?

[22] **A.** It appears so.

[23] **Q.** And that's a customer of DMX' commercial music service?

[24] **A.** They are.

[25] **Q.** And he is, if you look at the second paragraph, the last

Page 903

[1] sentence, he is attaching what he calls: The following summary

[2] documents describe, in greater detail, the benefits of our

[3] brand-specific focus, service offerings and global

[4] infrastructure; correct?

[5] **A.** It says that.

[6] **Q.** And if you turn to the actual package, it is the third page

[7] of the document I handed you up at the top, you see

[8] Unparalleled Creativity, correct?

[9] **A.** I do.

[10] **Q.** And the language included there states that: DMX' creative

[11] focus is to leverage the power of music to effectively connect

[12] with your target audience and elicit positive shopping behavior

[13] when it matters most -- at the point of purchase.

[14] Correct?

[15] **A.** It says that, yes.

[16] **Q.** And then it goes on. Brand-centric music programming

[17] requires extraordinary access to the worldwide recording

[18] community.

[19] Correct?

[20] **A.** Yes.

[21] **Q.** And finally it goes on to say: With an industry-best

[22] database of over 2 million songs, shared in real-time with

[23] programming facilities in nine countries, no one matches the

[24] programming scope and capabilities of DMX music.

[25] Did I read that correctly?

Page 904

[1] **A.** I believe you did.

[2] **Q.** And that's an example of what we were talking about before

[3] where DMX markets to its customers the fact that it has access

[4] to greater variety of music than its competitors; is that

[5] correct?

[6] **A.** It is, yes.

[7] **Q.** If you could go down just a couple paragraphs to the main

[8] heading, it is Unmatched Services.

[9] Do you see that?

[10] **A.** I do.

[11] **Q.** And there is sort of an indented paragraph under there that

[12] says ProFusion X or ProFusion D. Are those examples of

[13] hardware or equipment that DMX offers to its customers to play

[14] the music on, essentially?

[15] **A.** Yes, it is.

[16] **Q.** And three lines down there is a sentence that starts: Time

[17] to market.

[18] Do you see that?

[19] **A.** I do.

[20] **Q.** It says: Time to market with the latest songs is now a day

[21] instead of 30 to 45 days with traditional media.

[22] Do you see that?

[23] **A.** I do.

[24] **Q.** Is that referring to the fact that with this new type of

[25] equipment DMX can get a song out to its customers in just a day

Page 905

[1] whereas in the old days when you had to ship a CD it might take
[2] a month to 45 days?
[3] **A.** It does.
[4] **Q.** Is that a benefit that DMX markets to its customers?
[5] **A.** Flexibility is. Yes, it is.
[6] **Q.** Now, if I could ask you to turn to a few more pages in, if
[7] you look at the Bates numbers down in the bottom right-hand
[8] corner, this would be the page that is Bates Numbered DMX
[9] 005624. Do you have that, Mr. Seaton?
[10] **A.** I believe I do.
[11] **Q.** And just to give it some context, do you see on that page
[12] numbers 9, 10 and 11, but if you turn to the previous page this
[13] is a list of 11 items that are included in this particular
[14] package, correct?
[15] **A.** It appears to be.
[16] **Q.** And item no. 10 is that all ASCAP and BMI licensing fees
[17] paid for by DMX music; correct?
[18] **A.** That's what it says, yes.
[19] **Q.** Is that an example, I think you mentioned this to
[20] Mr. Marks, is this an example of DMX providing the licensing as
[21] one of the things it provides to its customers?
[22] **A.** Its an example of saying that, yes, we do provide
[23] licensing; yes.
[24] **Q.** And, the concept here is that if a restaurant or a hotel or
[25] a store doesn't use a commercial music service and it plays

Page 906

[1] music, it has to license that music from BMI or ASCAP or CSAC,
[2] correct?
[3] **A.** They would, yes.
[4] **Q.** And the Court has already heard evidence about some of
[5] those license fees but is it your understanding that those
[6] license fees for the store can be several hundred dollars per
[7] year to, at least to BMI and ASCAP?
[8] **A.** I don't have a specific dollar reference. I'm sorry.
[9] **Q.** But the idea here is that whatever those fees are, one of
[10] the benefits that a store or restaurant gets when it gets DMX
[11] is that it doesn't have to pay those license fees, DMX pays the
[12] license fees for it, correct?
[13] **A.** We pay it on their behalf, yes.
[14] **Q.** You talked a little bit about some of your competitors and
[15] I think you mentioned Muzak, Play Network and TruSonic,
[16] correct?
[17] **A.** I did.
[18] **Q.** And you mentioned that you have lost customers to Play
[19] Network and TruSonic, correct?
[20] **A.** We have.
[21] **Q.** Have you also lost some customers to Muzak?
[22] **A.** Yes, we have.
[23] **Q.** You also talked about the fact that revenues have declined
[24] and I believe, correct me if I am wrong, I believe the
[25] timeframe we were talking about was 2005 to the present. Is

Page 907

[1] that correct?
[2] **A.** That was correct, yes.
[3] **Q.** Now, revenues can decline in a number of ways for DMX. One
[4] way is that DMX can lose customer locations, correct?
[5] **A.** Yes.
[6] **Q.** And, do you have an understanding that the license fee that
[7] is being discussed in this case is a per location license fee
[8] so that the BMI license fee would also decrease as DMX loses
[9] customer locations, if it does?
[10] **A.** I have a general understanding, yes.
[11] **Q.** Now, another way that DMX could lose revenue is that the
[12] number of customers could stay the same but the average revenue
[13] that it gets from each of these customers could decline,
[14] correct?
[15] **A.** Correct.
[16] **Q.** And is one measure that DMX uses to look at the average
[17] revenue that it gets from each customer something called
[18] recurring monthly revenue or RMR?
[19] **A.** That's not on a per-location basis generally. Overall RMR
[20] is the recurring revenue for the company.
[21] **Q.** And then you could, if you wanted to, you could divide by
[22] the number of locations that that company had?
[23] **A.** Sure.
[24] **Q.** And you could get a monthly RMR?
[25] **A.** Yes.

Page 908

[1] **Q.** If I could ask you to take a look at Joint Exhibit 1159.
[2]    Mr. Seaton, when you take a look at this document,
[3] there is information in the document both from DMX and Muzak.
[4] I'm not going to ask you about any of the Muzak information so
[5] I'm going to direct you directly to the page about DMX. If I
[6] could I will take you to, it is table 6 which is a few pages in
[7] from the back of the document.
[8]    **MR. MARKS:** Your Honor, if I may just state for the
[9] record, this is a document that was prepared in connection with
[10] a proposed merger between DMX and Muzak. It includes
[11] information that by contractual agreement nobody from DMX can
[12] see the Muzak portion of it and nobody from Muzak can see the
[13] DMX portion of it. I just ask that that contractual
[14] restriction be honored in terms of how it is treated in the
[15] public record and that this particular document not be made
[16] part of the public record for that purpose.
[17]    I don't have any objection to him being shown the
[18] pages that relate to DMX but I just want to note the sensitive
[19] nature of the document otherwise.
[20]    **THE COURT:** Well, he seems to be proceeding in
[21] accordance with that.
[22]    **MR. MARKS:** Yes, and as I was saying, I don't have any
[23] objection to --
[24]    **THE COURT:** Mr. Marks, you don't have any objection
[25] now. If he does something which you think violates that, then



[1] you can object.

[2] **MR. MARKS:** That's fine, your Honor.

[3] **BY MR. FITZPATRICK:**

[4] **Q.** Mr. Seaton, the page I'm asking you to look at is page 68,
[5] and actually if I could approach I will direct you exactly to
[6] the page.

[7] And just to be clear, Mr. Seaton, the three pages I
[8] will be asking you about are the page that you are looking at
[9] right now and the two subsequent pages which complete table 6.
[10] Okay?

[11] **A.** Okay.

[12] **Q.** And, am I correct that your only connection with this
[13] document is that you worked with other team members to generate
[14] some data and reports that were used in the creation of this
[15] document that you did not otherwise review it or draft it, is
[16] that correct?

[17] **A.** I have never seen this document.

[18] **Q.** I am correct that you did work with team members to provide
[19] data for this document, correct?

[20] **A.** I'm unsure of that.

[21] **Q.** Well, if I could ask you to take a look at table 6, you
[22] will see it says: DMX recurring monthly revenue pricing trends
[23] for customers among the top 50 ranked by 2005 RMR. And I just
[24] want to make sure I'm looking at this document correctly.
[25] First, if you would look at the list of customers, do you

[1] recognize these as among DMX' top customers for the years 2005
[2] and 2006?

[3] **A.** They appear to be.

[4] **Q.** And the next column, I believe, refers to the total annual
[5] recurring monthly revenue from each of those customers and that
[6] goes to your point before, that's not a per-location number,
[7] that's a total dollar amount, correct?

[8] **A.** That is correct.

[9] **Q.** And then we can do what you also talked about which is look
[10] at the next column which is the number of locations each of
[11] those customers provide and then, in the column to the right of
[12] that, calculate an average monthly RMR per location, correct?

[13] **A.** It appears this chart does that, yes.

[14] **Q.** And so, for example, what this chart reflects is that for
[15] the year 2005 Hampton Inns, one of DMX' hotel customers, paid a
[16] total of $879,978. There were a total of 1,086 Hampton Inns
[17] serviced by DMX and therefore the average monthly RMR per
[18] location was $67.52, correct?

[19] **A.** That appears what it says, yes.

[20] **Q.** And, just to be clear, I was talking about the year 2005.
[21] If you go over to the next three columns for Hampton Inns in
[22] particular, it shows that the per location RMR increased to
[23] $70.02, correct?

[24] **A.** That's what it says, yes.

[25] **Q.** So, if we focus just on the third column of the chart, one

[1] of the things that you can see from this is that average
[2] monthly RMR can vary quite widely from customer to customer for
[3] DMX, correct?

[4] **A.** It varies depending on the services they receive, yes.

[5] **Q.** So, as an example just looking at the first page, it looks
[6] like the average monthly RMR for 2005 ranges from $67.52 for
[7] Hampton Inns to $17.71 for Dollar Tree; correct?

[8] **A.** That appears to be accurate, yes.

[9] **Q.** And if we go to page 70, two pages ahead, it has some notes
[10] below the chart and the first two of them say: The average
[11] monthly RMR per location increased from 2005 to 2006 for 22
[12] customers and the average monthly RMR per location decreased
[13] from 2005 to 2006 for 20 customers.

[14] Correct?

[15] **A.** That's what it says, yes.

[16] **Q.** Now, one consequence of the way that RMR is calculated is
[17] that hypothetically you could, for example, in this chart if
[18] you lost Dollar Tree, the average monthly RMR would go up
[19] because Dollar Tree is all the way down at $17.71. By losing
[20] them your average RMR would go up, correct?

[21] **A.** That sounds right.

[22] **Q.** But that wouldn't -- it wouldn't be a good thing for DMX'
[23] business to lose Dollar Tree, that's just a function of the way
[24] the math works, correct?

[25] **A.** Yes. We never want to lose a customer.

[1] **Q.** And it would work the other way, too. You could get --
[2] tomorrow you could get a large chain account, they could have a
[3] monthly average RMR of $40 because they brought you a big
[4] volume discount, for example, and your monthly RMR would go
[5] down but that would still be a very good thing for DMX'
[6] business, correct?

[7] **A.** I would think so.

[8] **Q.** Now, another thing that affects the recurring monthly
[9] revenue is, of course, the prices that DMX charges, right?

[10] **A.** Yes.

[11] **Q.** And I believe you discussed with Mr. Marks that the price
[12] that DMX has been charging over time has been decreasing
[13] somewhat, correct?

[14] **A.** Yes, it has.

[15] **Q.** What was the -- did you give a percentage? I don't recall
[16] if you did. I apologize.

[17] **A.** I don't recall either.

[18] **Q.** So, DMX' pricing has been declining but DMX is still priced
[19] as one of the highest if not the highest in the commercial
[20] music services industry, correct?

[21] **A.** I don't have the rate structure of our competitors.

[22] **Q.** Well, you do know that as a general matter DMX is in the
[23] top tier of pricing in the commercial music services industry,
[24] correct?

[25] **A.** Intuitively I believe that's correct, yes.

Page 913

[1] **Q.** If I could ask you to take a look at what's been marked as
[2] Petitioner's 205. Am I correct that this starts as an e-mail
[3] chain starting from the bottom, as these things do, from Steve
[4] Hill, going to a large group of people?
[5] **A.** I see Steve Hill at the bottom. Yes.
[6] **Q.** And one of the cc's on Mr. Hill's e-mail is Tim Seaton,
[7] that's the second cc, correct?
[8] **A.** It is.
[9] **Q.** And Steve Hill, is he in the marketing group at DMX?
[10] **A.** He was at one time.
[11] **Q.** And in his e-mail he says: Hello. Most of you are
[12] probably aware of the price adjustment that will take effect
[13] for DMX local customers beginning August 1st and for DMX
[14] premiere customers beginning September 1.
[15] Do you see that?
[16] **A.** I do.
[17] **Q.** Now, his e-mail was dated June 28th so that's obviously
[18] talking about something in the future. Do you know if that
[19] price adjustment actually occurred?
[20] **A.** I believe it did in 2007, yes.
[21] **Q.** And it was a price increase, correct?
[22] **A.** It was, yes.
[23] **Q.** Now, if you could look at the, what I understand to be the
[24] attachment to this e-mail, it says 2007 price increase
[25] frequently asked questions.

Page 914

[1] Do you see that?
[2] **A.** I do.
[3] **Q.** And, the second of these frequently asked questions reads:
[4] Why does DMX cost more than your competitors and now you are
[5] raising prices.
[6] Do you see that?
[7] **A.** Yes, I do.
[8] **Q.** Is that a question that DMX' sales and marketing group is
[9] called upon to answer occasionally as why does DMX cost more
[10] than its competitors and now it is raising prices?
[11] **A.** They would be responsible to put together this document.
[12] **Q.** And, to your knowledge, is that a question that DMX is
[13] asked, on occasion, by its customers?
[14] **A.** Yes.
[15] **Q.** The document speaks for itself, I won't read the whole
[16] answer to the question but I would ask you to take a look at it
[17] and confirm that the answer doesn't dispute the premise, that
[18] is, that DMX costs more than its competitors; correct?
[19] **A.** I would have to read it carefully.
[20] **Q.** Please do. I will read it to you, to be fair.
[21] With reliable proven technology and with
[22] professionally designed audio/video scent systems, DMX
[23] continues to be a leading provider of the sensory experience to
[24] enhance your brand and connect with your customers. DMX
[25] remains committed to delivering premiere sensory branding

Page 915

[1] services and we look forward to even more ongoing product and
[2] service enhancements in the coming months. This minimal
[3] monthly increase will enable us to continue to provide the same
[4] superior level of service and high quality products that you
[5] have come to expect.
[6] So, DMX does not dispute the premise that it costs
[7] more than its competitors in its proposed answer to this
[8] frequently asked question, correct?
[9] **A.** I think that sounds like the position that we took in 2007,
[10] yes.
[11] **MR. FITZPATRICK:** Your Honor, I would move the
[12] admission of this document, this is Petitioner's 205.
[13] **MR. MARKS:** No objection, your Honor.
[14] **THE COURT:** Received.
[15] (Petitioner's Exhibit 205 received in evidence)
[16] **BY MR. FITZPATRICK:**
[17] **Q.** If I could show you another document, Mr. Seaton, this one
[18] has been marked Joint Exhibit 1197.
[19] **THE COURT:** Mr. Marks, in light of your earlier
[20] remarks, should Joint Exhibit 1159 be excluded from the ruling
[21] of the convention of the Joint Exhibit automatically receives
[22] it in evidence?
[23] **MR. MARKS:** Correct, your Honor. I wasn't standing up
[24] to object to the line of questioning, I was just asking that
[25] that document be kept out of the public record. We don't have

Page 916

[1] a problem to it coming into evidence.
[2] **THE COURT:** Yes.
[3] **MR. MARKS:** I would ask that that one be kept out of
[4] the public record, or kept under seal if it is admitted at all.
[5] I don't know if it is necessary to move that document in.
[6] **THE COURT:** Well, it wasn't moved in. Your adversary
[7] didn't offer it in evidence specifically but I had earlier,
[8] this morning, said that the mention of "Joint Exhibit" placed
[9] it in evidence. I take it maybe this should be an exception to
[10] that.
[11] **MR. FITZPATRICK:** Well actually, your Honor, I would
[12] ask that it be considered in evidence. With respect to the
[13] confidentiality it is not my issue and I'm happy to do whatever
[14] the Court prefers. I have no objection if it is permissible.
[15] **THE COURT:** Does the part of the materials on pages 68
[16] and 69 and, I guess, 70, require special protection?
[17] **MR. MARKS:** Those pages do not, your Honor.
[18] **THE COURT:** All right. It is received to that extent.
[19] **MR. MARKS:** Thank you, your Honor.
[20] **BY MR. FITZPATRICK:**
[21] **Q.** Have I given you Joint Exhibit 1197, Mr. Seaton?
[22] **A.** You have, yes.
[23] **Q.** Starting from the bottom, this is an e-mail from you to
[24] Mr. Cullen on October 24th, 2005; correct?
[25] **A.** Yes, it is.



Page 917

[1] **Q.** And who is Mr. Cullen?

[2] **A.** He is the chief executive officer of DMX.

[3] **Q.** And the subject line of this is Thoughts on PN.

[4] Do you see that?

[5] **A.** I do.

[6] **Q.** PN, in this e-mail, refers to Play Network; is that

[7] correct?

[8] **A.** Yes, it does.

[9] **Q.** And you are providing Mr. Cullen some of your thoughts with

[10] respect to Play Network, is that correct?

[11] **A.** That is correct.

[12] **Q.** If we could go down, if we see some thoughts on Play

[13] Network, Play Network sales strategy is four-fold, and then you

[14] give four components of their sales strategy. No. 4 says

[15] price: While not nearly as low as Muzak, Play Network does

[16] sell well below DMX price points.

[17] Is that correct?

[18] **A.** That's what it says.

[19] **Q.** Was that accurate as of the date of this e-mail?

[20] **A.** I believe it was.

[21] **Q.** And so, at least as of this time, if you were looking at

[22] how these three members of the commercial music services were

[23] priced DMX would be at the top, Play Network would be below

[24] DMX, and Muzak is below even Play Network; correct?

[25] **A.** That was my view at that time, yes.

Page 918

[1] **Q.** So, to some extent the price reduction that you discussed

[2] with Mr. Marks has actually been an effort to address the fact

[3] that your prices are higher than your competitors, correct?

[4] **A.** They have been, yes.

[5] **Q.** Now, you discussed several aspects of DMX' business with

[6] Mr. Marks and I believe you mentioned installation, equipment,

[7] warranty and music service, correct?

[8] **A.** I don't understand the question. Sorry.

[9] **Q.** There were four aspects of what DMX provides to its

[10] customers that you believe you discussed with Mr. Marks but,

[11] please, correct me if I am wrong, you mentioned installation,

[12] equipment, warranty and the music service; correct?

[13] **A.** I did, yes.

[14] **Q.** So, another element that can affect DMX' revenue is how

[15] much it can charge for selling, leasing, installing and

[16] providing the warranty on its equipment, correct?

[17] **A.** Certainly.

[18] **Q.** So, if I could ask you to take a look at another document,

[19] this one has been labeled Respondent's Exhibit 5. And am I

[20] correct that this is three-page document consolidated balance

[21] sheets and consolidated statements of operations for DMX

[22] Holdings, Inc., and the years covered here are 2007 and 2008?

[23] **A.** That's what it appears, yes.

[24] **Q.** If I could ask you to focus on the third page, the

[25] consolidated statement of operations. If you look at the first

Page 919

[1] set of entries, those are labeled revenues, correct?

[2] **A.** Again, you are on page 3?

[3] **Q.** Page 3, yes.

[4] **A.** Sorry.

[5] **Q.** Oh. It is page 4.

[6] **A.** Right.

[7] **Q.** The page number at the bottom is page 4, the third page of

[8] the document.

[9] **A.** Very good.

[10] **Q.** Thank you very much.

[11] So, if you look at the top it says Revenues. And if

[12] you look at the line entry that says Total Revenues you can see

[13] that total revenues declined from 2007 $110,560; correct?

[14] **A.** You are asking me if that was the revenue number for 2007?

[15] **Q.** Yes.

[16] **A.** It appears that's correct, yes.

[17] **Q.** And, from 2007 to 2008 that number declined to

[18] $106,643,000; correct?

[19] **A.** That is correct.

[20] **Q.** And, if you can look above that to see what the various

[21] components of that revenue was, correct?

[22] **A.** Yes.

[23] **Q.** And so, if you look at the first line, that's the actual

[24] subscriber fees and that revenue actually increased from

[25] $57,136,000 to $57,215,000, correct?

Page 920

[1] **A.** Keeping in mind this is a consolidated revenue statement,

[2] my comments earlier were about our core business in the United

[3] States.

[4] **Q.** And, could you explain the difference, just so there is no

[5] confusion?

[6] **A.** We have other businesses including a residential business,

[7] a Latin American joint venture, South American business. All

[8] of those are included within this revenue number.

[9] **Q.** Understood.

[10] So, with that caveat, what we see here is that

[11] subscriber fees, as you have just defined them, increase in the

[12] amount that I just described, correct?

[13] **A.** On a consolidated basis, yes.

[14] **Q.** And, equipment sales on the other hand have decreased on

[15] the order of $2.1 million, correct?

[16] **A.** On a consolidated basis that looks accurate, yes.

[17] **Q.** And, again, on a consolidated basis equipment leases have

[18] decreased on the order of $1.6 million?

[19] **A.** That looks accurate, yes.

[20] **Q.** And so, again, on a consolidated basis, as you have just

[21] described it, the decrease in revenues from 2007 to 2008 is

[22] accounted for largely by decreases in equipment sales and

[23] equipment leases, correct?

[24] **A.** For the consolidated business, yes.

[25] **Q.** I think, and correct me if I am wrong, you mentioned to

A-470

Page 921

[1] Mr. Marks that the current on versus off-premise location split
[2] for DMX is about 65 percent on-premise, 35 percent off-premise;
[3] correct?
[4] **A.** As of today, yes.
[5] **Q.** And you did describe how the addition of DirectTV will
[6] change that, correct?
[7] **A.** Yes, I did.
[8] **Q.** If I could ask you to look at Joint Exhibit 1277, these are
[9] DMX' responses and objections to the first set of
[10] interrogatories by Broadcast Music, Inc. I just ask you to
[11] turn to the fourth to the last page and confirm that you
[12] verified the answers to interrogatory numbers 1 through 15.
[13] **A.** Fourth to the last page, yes, that's my signature.
[14] **Q.** And I will ask you to focus on interrogatory number 6 and
[15] its response which is on page 7 of the document, and just to be
[16] clear, when you were giving the 65 to 35 percent numbers, those
[17] were the current on versus off split looking at location
[18] numbers, correct?
[19] **A.** I'm sorry, I haven't read this but my answer was based on
[20] locations, yes.
[21] **Q.** Right.
[22]     And what this does, and please take your time to read
[23] it, is look at it another way, this looks at it by DMX revenue,
[24] on versus off-premise; correct? And, please, take your time.
[25] **A.** Very good. Yes.

Page 922

[1] **Q.** And so, just to take a couple of examples, we are on page 8
[2] now, the top paragraph is dealing with on-premise revenue and
[3] the first full paragraph is dealing with off-premise revenue,
[4] correct?
[5] **A.** Correct.
[6] **Q.** And so, if we take the partial year, January through
[7] October 2008 for on-premise, that was approximately 17.4
[8] million, correct?
[9] **A.** I'm sorry, I'm not -- oh. October 1 -- sorry, January 1st
[10] through October 31st, yes. Correct.
[11] **Q.** And for the corresponding period, off-premise in the next
[12] paragraph, you see that was 11.1 million, correct?
[13] **A.** Yes, I do.
[14] **Q.** And if you wanted to do a full year, for example for 2007
[15] it was 20.4 million on-premise and 15.1 million off-premise,
[16] correct?
[17] **A.** That is -- 20.4 million -- yes, that's correct.
[18] **Q.** We have talked some about the on and off-premise services
[19] of DMX. For DMX' on-premise service, do you have an
[20] understanding of whether DMX' equipment, the equipment that DMX
[21] uses can actually track what songs are played at various
[22] locations?
[23] **A.** Can you ask that one more time?
[24] **Q.** Sure.
[25]     Focusing on the on-premise service -- well, first, in

Page 923

[1] order for the customer to play DMX' on-premise service DMX has
[2] to provide it with some type of equipment, correct?
[3] **A.** Correct.
[4] **Q.** And I think ProFusion X and D were two examples of that we
[5] looked at before, correct?
[6] **A.** They are, yes.
[7] **Q.** And, can the equipment that DMX provides to its customers
[8] keep track of what songs are actually played at that customer
[9] location?
[10] **A.** It does not.
[11] **Q.** That's not -- DMX does not have that capability right now?
[12] **A.** We do not.
[13] **Q.** Do the machines have the capability to do it?
[14] **A.** A disk player plays a song, it doesn't track or record what
[15] has been played, right.
[16]     **MR. FITZPATRICK:** No further questions. Thank you,
[17] Mr. Seaton.
[18]     **THE WITNESS:** You're welcome.
[19] REDIRECT EXAMINATION
[20] **BY MR. MARKS:**
[21] **Q.** Mr. Seaton, if you could turn back to page 68 of Joint
[22] Exhibit 1159, that's the DMX Muzak document only part of which
[23] is in evidence. I'm going to direct you to the same page that
[24] you answered some questions on already.
[25] **A.** Page 68?

Page 924

[1] **Q.** Correct.
[2] **A.** Very good.
[3] **Q.** Did all of these customers receive the same suite of
[4] services from DMX?
[5] **A.** Most likely they did not.
[6] **Q.** So, to your understanding, the average monthly RMR would
[7] reflect that there was variation in what goods and services
[8] they were receiving from DMX?
[9] **A.** Yes. An example would be the first two customers.
[10] **Q.** Could you elaborate on that?
[11] **A.** Sure.
[12]     Hampton Inns receives customized music, on-hold
[13] messaging, in lobby messaging as the suite of services they
[14] receive in addition to warranty. Claire's Accessories was a
[15] select music customer.
[16] **Q.** So, does the RMR per location figure include revenues from
[17] services other than music?
[18] **A.** Yes, it does.
[19] **Q.** And, with respect to services for music, does it include
[20] just the music programming charge or are equipment or other
[21] features built into that as well?
[22] **A.** There could be equipment, and certainly warranty is part of
[23] it.
[24] **Q.** When would there be equipment charges and when wouldn't
[25] there be equipment charges?

Page 925

[1] **A.** At times our customers choose to purchase the equipment
[2] outright and other times we lease it to them or rent that to
[3] them over the term of the agreement.
[4] **Q.** Has DMX lost Bath & Body Works as a customer to a
[5] competitor?
[6] **A.** Unfortunately, we have.
[7] **Q.** Do you know to whom? Do you know which company currently
[8] provides music services to them?
[9] **A.** I do. It is Play Network.
[10] **Q.** Does DMX currently provide music service to American Eagle?
[11] **A.** We do not.
[12] **Q.** Does DMX currently provide music service to Victoria's
[13] Secret?
[14] **A.** We do not.
[15] **Q.** Do you know which company won that account from DMX?
[16] **A.** Victoria's Secret was also Play Network.
[17] **Q.** How about Nordstrom --
[18] **THE COURT:** Mr. Marks, he testified to this in general
[19] on direct. Is it useful to give particular examples?
[20] **MR. MARKS:** I will move on, your Honor. These were
[21] just some of the biggest accounts at the time.
[22] **Q.** If I could turn your attention to the document that was
[23] marked as Petitioner's Exhibit 205, this related to the price
[24] increase FAQ.
[25] **A.** Yes.

Page 926

[1] **Q.** Was DMX able to sustain its attempt in 2007 to increase
[2] prices?
[3] **A.** Prices were increased in 2007. We haven't had that
[4] practice since.
[5] **Q.** Have they dropped since 2007?
[6] **A.** Yes. We have lowered rates.
[7] **Q.** And, is one of the reasons that prices charged by DMX have
[8] declined is to meet competition from lower price competitors?
[9] **A.** It is the reason.
[10] **MR. MARKS:** No further questions.
[11] **THE COURT:** Thank you, Mr. Seaton.
[12] **THE WITNESS:** Thank you, your Honor.
[13] **THE COURT:** You are excused.
[14] **MR. RICH:** Your Honor, would it be convenient to take
[15] a mid-morning break?
[16] **THE COURT:** Yes. We will take a mid-morning break
[17] now.
[18] (Recess)
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 927

[1] **MR. RICH:** Your Honor, DMX calls Barry Knittel as its
[2] next witness.
[3] LINUS BARRY KNITTEL,
[4] called as a witness by the Respondent,
[5] having been duly sworn, testified as follows:
[6] **THE DEPUTY CLERK:** Please stay your name and spell
[7] your last name slowly for the record?
[8] **THE WITNESS:** My name is Linus, L-i-n-u-s, middle name
[9] is Barry, B-a-r-r-y, and the surname is Knittel, K-n-i-t-t-e-l.
[10] **MR. RICH:** With the Court's permission, we've prepared
[11] an exhibit binder with two demonstratives which we'd like to
[12] distribute at this point.
[13] **DIRECT EXAMINATION**
[14] **BY MR. RICH:**
[15] **Q.** Good afternoon, Mr. Knittel.
[16] **A.** Good afternoon.
[17] **Q.** By whom are you currently employed?
[18] **A.** DMX Inc.
[19] **Q.** What is your position there?
[20] **A.** Senior VP of business affairs worldwide.
[21] **Q.** How many years have you been at DMX?
[22] **A.** Since June of 2005.
[23] **Q.** Is that the moment of formation of DMX?
[24] **A.** That's when THB Capstar purchased DMX Music Inc. out of
[25] bankruptcy.

Page 928

[1] **Q.** And prior to your employment currently at DMX Inc., where
[2] were you employed?
[3] **A.** By DMX Music Inc.
[4] **Q.** And what was the business of DMX Music Inc.?
[5] **A.** What's been referred to as commercial music service,
[6] background music service.
[7] **Q.** And what was your last position at DMX Music Inc.?
[8] **A.** Senior vice president of business affairs worldwide.
[9] **Q.** Prior to DMX Music, where were you employed?
[10] **A.** By AEI Music Network, Inc.
[11] **Q.** What was their business?
[12] **A.** Commercial music, background music service.
[13] **Q.** Approximately from when to when were you employed at AEI?
[14] **A.** From 1995 to 2001 when AEI Music Network merged with DMX
[15] Music Inc.
[16] **Q.** And then I take it you were with DMX Music Inc. from that
[17] point in 2001 until the new DMX was acquired out of bankruptcy,
[18] is that correct?
[19] **A.** That's correct.
[20] **Q.** And prior to your position at AEI, where were you employed?
[21] **A.** For the -- I was employed by the American Society of
[22] Composers, Authors and Publishers, ASCAP.
[23] **Q.** And for how many years were you at ASCAP?
[24] **A.** About 23 years.
[25] **Q.** What was your last position at ASCAP?

Page 929

[1] **A.** Senior VP of licensing and I was a chief negotiator.

[2] **Q.** What industries were within your purview as senior VP of

[3] licensing?

[4] **A.** At that time in ASCAP they broke them off into two

[5] divisions. One was broadcast, which was radio, TV and cable,

[6] and the other was general licensing, which represented the

[7] balance of their licensees, such as hotels, bars, restaurants,

[8] colleges, universities and commercial music background

[9] services.

[10] **Q.** Which of those two did you have oversight of?

[11] **A.** All of them.

[12] **Q.** And so I take it that those responsibilities included

[13] oversight and involvement with the commercial music services

[14] industry?

[15] **A.** Yes.

[16] **Q.** So I take it that from your tenure at ASCAP in the early

[17] '70s through now, you've had some 40 years of involvement and

[18] experience in the music industry?

[19] **A.** Yes, I have.

[20] **Q.** Now, what are your duties and responsibilities as senior VP

[21] for business affairs at DMX?

[22] **A.** I oversee their licensing relationships with the record

[23] labels, publishers and rights organizations in the United

[24] States, and when we had international territories the rights

[25] organizations and licensing organizations in those territories.

Page 930

[1] **Q.** In your various positions from your tenure at ASCAP on

[2] through to the present, have you had personal contacts and

[3] business contacts with individual music publishing companies?

[4] **A.** Oh, a great many of them, yes.

[5] **Q.** Can you describe the nature of those contacts, perhaps

[6] beginning with your experience at ASCAP?

[7] **A.** When I was at ASCAP, I also was a part of the board. The

[8] board was made up of twelve writer members and twelve publisher

[9] members of music, and I also attended not only the board

[10] meetings but all the conferences, the various committees that

[11] made up the board, and they met once a month for twelve months

[12] through the year, and I attended those for probably ten years.

[13] **Q.** Did you have any other contacts in a business or other

[14] setting with music publishers during your ASCAP tenure?

[15] **A.** When you're around that long you get to know people both

[16] a professional as well as a personal basis and continued those

[17] relationships even after I left ASCAP.

[18] **Q.** And have you continued those relationships since you've

[19] left ASCAP?

[20] **A.** Oh, yes.

[21] **Q.** We'll get into some greater detail as to the nature of

[22] those as we proceed with your direct examination. Are you a

[23] lawyer, by the way?

[24] **A.** No, I'm not.

[25] **Q.** Now, did there come a time, sir, when DMX began to consider

Page 931

[1] seeking securing music performing rights licenses directly from

[2] music publishers instead of simply securing those licenses

[3] through blanket license arrangements with the various

[4] performing rights organizations?

[5] **A.** Yes, they did.

[6] **Q.** Approximately when was that decision made?

[7] **A.** Very soon after Capstar purchased DMX.

[8] **Q.** So sometime during mid to late --

[9] **A.** About mid-2005, towards the end of 2005.

[10] **Q.** What role did you play in the consideration of whether to

[11] pursue such a licensing initiative?

[12] **A.** I met on a number of occasions with the executive officers

[13] of Capstar, as well as then general counsel, Ben Hanson, and

[14] discussed and laid out a strategy as far as direct licensing

[15] was concerned.

[16] **Q.** What were DMX's principal motivations as of 2005 in

[17] considering whether to pursue direct license negotiations with

[18] individual music publishing companies?

[19] **A.** Capstar, again, had purchased DMX Music Inc. out of

[20] bankruptcy, and so they wanted to address the items that they

[21] could cost control as soon as possible, and certainly one of

[22] them was the performing rights rates. Their negotiations that

[23] had taken place with ASCAP and BMI had not shown there would be

[24] much movement or much addressed by the performing rights

[25] organizations to the economic times, and above all, the



Page 932

[1] pressures that were being put on by the competitiveness of the

[2] industry.

[3] **Q.** Is there anything about the nature of DMX's use of music

[4] and how it deploys that music in its programming that either

[5] favored or disfavored pursuing a direct licensing initiative?

[6] **A.** It was actually a very big favor to DMX, because DMX

[7] controlled the programming of its music. It was not one that

[8] was locked into -- sometimes we used to refer to ourselves as

[9] the antradio, so we weren't locked into the top 40 charts, the

[10] pop charts. We could use music that addressed the brands that

[11] we were programming.

[12] **Q.** Now, had you prior to this period of consideration during

[13] 2005 while at DMX, had you ever previously had occasion to give

[14] consideration to any kind of similar direct licensing efforts?

[15] **A.** Yes.

[16] **Q.** Could you describe those for the Court, please?

[17] **A.** Sure. When I was at AEI Music, we looked into directly

[18] licensing the performing rights from -- and other rights that

[19] the publishers and authors and composers had from the

[20] publishers directly.

[21] **Q.** Did that initiative ever get off the ground?

[22] **A.** I had actually traveled to New York and Los Angeles. I was

[23] based in Seattle at that time. Met with a number of major and

[24] independent publishers, had preliminary discussions with them,

[25] and came back and we started to make some steps in that



**A-473**

[1] direction. A number of things got in the way that we didn't
[2] move forward.
[3] **Q.** When you say a number of things got in the way, were they
[4] related to the conversations you had with the publishers or
[5] other aspects of AEI's business?
[6] **A.** Quite the opposite. The conversations were very positive.
[7] We just at that time were starting to branch out into Europe.
[8] We were looking at initiatives to branch out into Latin
[9] America. Then we looked at a purchase of other background
[10] music companies and subsequently the merger. So other
[11] priorities just got in our way.
[12] **Q.** Now, back to DMX and its consideration of direct licensing,
[13] can you describe, please, the preliminary steps that were taken
[14] to explore the viability of this initiative?
[15] **A.** As I mentioned before, after we had had internal
[16] discussions with management, we then went out and spoke with a
[17] gentleman named Ron Gertz.
[18] **Q.** Who is Mr. Gertz?
[19] **A.** Mr. Gertz is president, chairman, founder of Music Reports
[20] Inc.
[21] **Q.** Why did you solicit Mr. Gertz' input?
[22] **A.** Well, at my days at ASCAP, I had dealt with Mr. Gertz on
[23] some per-program licensing with regards to local television. I
[24] had found that the database that MRI had was an extremely
[25] powerful database. The protocol that they had put in place had

[1] made the direct licensing initiative much easier for both sides
[2] over time. There was certainly pain and heavy lifting in the
[3] beginning and I just thought this would be, considering that
[4] database, a good way to start and we would need outside help to
[5] initially begin this process.
[6] **Q.** Was there anything else about Mr. Gertz' background that in
[7] your estimation commended him to DMX to assist in this project?
[8] **A.** As I said, too, he had worked already with local television
[9] so therefore he had a relationship with the publishing
[10] community which would be very helpful in this licensing
[11] initiative.
[12] **Q.** And was Mr. Gertz' company, which we'll refer to as MRI,
[13] Music Reports Inc. as MRI, was it retained formally by DMX at
[14] some point in the process to work with DMX in pursuing direct
[15] licenses?
[16] **A.** Yes, it was.
[17] **Q.** Now, in your binder, sir, and your Honor, is our first
[18] demonstrative, which I'll ask you to take out. It's labeled
[19] DMX direct licenses key terms. It's up on the screen as well,
[20] for convenience.
[21] **A.** Thank you.
[22] **Q.** What did DMX see as the key issues in developing a viable
[23] direct license offer to the marketplace? And if you could
[24] start at sort of high level of generality, we could then circle
[25] back and discuss each of those in greater detail.

[1] **A.** The royalty rate certainly was most important. We wanted
[2] something that was being driven by the marketplace and being
[3] driven by something that would economically work within our
[4] services. The grant of rights that the publishers receive from
[5] the writers and can in turn license directly to. The scope of
[6] coverage, the royalty formula and most importantly, also I
[7] guess each one of these is most importantly, I've said that now
[8] twice, the royalty distribution mechanism so that the
[9] publishers would know exactly what was being played and the
[10] royalties that they were receiving from it.
[11] **Q.** Let's take these perhaps in turn, perhaps a little bit out
[12] of order. Let's start with the royalty rate. What
[13] consideration was given to arriving at a royalty rate which DMX
[14] believed would find broad acceptance in the marketplace?
[15] **A.** We took a look at, actually, it was done in two ways. MRI
[16] and Mr. Gertz looked at it in one way, I looked at it in
[17] another. And through both analyses we came up with what we
[18] believed a fair and reasonable rate to offer.
[19] **Q.** Could you tell the Court about how in your own process of
[20] thinking this through what you thought, I take it no surprise
[21] in the record was where you ended up at on the demonstrative
[22] was a royalty rate of $25 per year per location, is that
[23] correct?
[24] **A.** That's correct.
[25] **Q.** Would you tell the Court how in your own process of

[1] thinking it through you arrived at that number?
[2] **A.** I had taken a look at the percentage rate that BMI was
[3] offering, which was 2.25 percent.
[4] **Q.** What is that a reference to?
[5] **A.** That's a reference to the rate for broadcast music in the
[6] license agreement that dated back I believe to 1987. And then
[7] had been accepted by everyone within the industry at that time.
[8] I took that rate and then took into consideration the
[9] same rate for ASCAP, so that took me to about 4-1/2 percent. I
[10] then figured you needed to have some sort of rounding point for
[11] the other rights that you were giving; the right to edit, to
[12] distribute, reproduce, as well as SESAC, that got to about
[13] 5 percent. I used an income at that time which probably dated
[14] back to our earlier analysis in 2005 of about $500 per year per
[15] location, and that worked out to be about $25.
[16] **Q.** So mathematically you took the $5, you constructed it as
[17] you described --
[18] **A.** 5 percent.
[19] **Q.** Excuse me 5 percent as you described, times a putative $500
[20] to arrive at $25 per year?
[21] **A.** Yes.
[22] **Q.** Was that a scientific process to get to that?
[23] **A.** I wouldn't say scientific. I would say it was a way of
[24] looking at what had been accepted within the industry prior to
[25] then as a way of getting to a number to start the process.

Page 937

[1] **Q.** Let's jump, just because it really fits with this, let's
[2] jump to the fourth item on the demonstrative, which is what we
[3] term the royalty formula, and also with reference to the second
[4] and last demonstrative in your book, sir, could you explain how
[5] that $25 fee was anticipated to work in practice on a
[6] publisher-by-publisher basis and on a cumulative basis?
[7] **A.** Sure. If you wouldn't mind, I would rather read right to
[8] left.
[9] **Q.** Whatever works.
[10] **A.** I don't usually do that. The idea was that you would take
[11] a royalty pool of $25 per year and that royalty pool would be
[12] then multiplied by the number of locations that received DMX's
[13] music service.
[14] **Q.** Okay. So if in a given year, perhaps optimistically at
[15] this moment, there were just for simplicity of math there were
[16] 100,000 locations?
[17] **A.** That's correct.
[18] **Q.** For that process, you'd take the $25 times the hundred
[19] thousand locations, which my math says would yield
[20] $2.5 million?
[21] **A.** Absolutely right.
[22] **Q.** What would that $2.5 million represent?
[23] **A.** That would represent a royalty pool for all direct licensed
[24] music, whether it be ASCAP, BMI or SESAC.
[25] **Q.** So that's the right side of this?

Page 938

[1] **A.** That's right.
[2] **Q.** Please proceed.
[3] **A.** Okay. Then what we would do is take the total number of
[4] DMX performances and we used as a proxy the what has been
[5] referred here as off-premise, I call it broadcast, and then use
[6] as the numerator the DMX performances of the published works
[7] that they had directly licensed.
[8] **Q.** So perhaps again to illustrate by example, if cumulatively
[9] at a point in time the works of all of the participating direct
[10] licensing publishers represented 50 percent of all
[11] performances, by that the cumulative numbers of those works as
[12] measured by DMX in the numerator represented one-half of all
[13] DMX performed works, the denominator --
[14] **A.** That's correct.
[15] **Q.** How much in the way of annual royalties would be payable to
[16] that group?
[17] **A.** $1.25 million.
[18] **Q.** Namely, one-half --
[19] **A.** One-half of 2.5.
[20] **Q.** Of the $2-1/2 million pool?
[21] **A.** That's correct.
[22] **Q.** And the math would adjust per the actual number?
[23] **A.** Actually, when we laid out, if I could, the license
[24] agreement to the publishers, we used an example on a quarterly
[25] basis.

Page 939

[1] **Q.** And so is the only difference between the quarterly
[2] computation and the annual computation to take the $25 per
[3] location, divide it by four and use $6.25 to do the math?
[4] **A.** That's absolutely right.
[5] **Q.** Now, if I'm an individual publisher, I've now signed a
[6] license with DMX for direct licensing, and on the measuring
[7] techniques used by DMX I represent 1 percent of all measured
[8] performances, how would I be paid? How much would I be paid
[9] under this hypothetical example where there's a pool of $2-1/2
[10] million available?
[11] **A.** You would get 1 percent of that.
[12] **Q.** Okay, or $25,000?
[13] **A.** 25,000, that's right.
[14] **Q.** Annually.
[15] **A.** That's right.
[16] **Q.** Or the quarterly --
[17] **A.** Quarterly would be the 6,250.
[18] **Q.** Now, staying with the concept of royalties here, where in
[19] fact do the resulting royalty checks adding up to whatever
[20] totals are distributed, where conceptually and then now in
[21] reality, where do those checks get sent? Who receives them?
[22] **A.** They get sent on a quarterly basis 45 days after the end of
[23] the quarter to the publishers with a list showing the songs
[24] that were used, a calculation showing the number of DMX
[25] locations, a calculation showing the total number of DMX

Page 940

[1] performances and a calculation showing their performances of
[2] their works within that publisher's repertoire.
[3] **Q.** Was part of the concept and the economics built in that
[4] this payment level and this payment mechanism was designed to
[5] pay both the publisher and writer shares of the directly
[6] licensed works?
[7] **A.** Yes. Because as a standard practice, most publishers
[8] receive the royalties on the licensing of works that they
[9] license on behalf of their publisher's share and they keep
[10] their publisher's share and send usually the other half to the
[11] author composer.
[12] **Q.** So just implicit in your answer, I'd like the record to be
[13] clear, DMX's responsibility under this program is to send a
[14] check directly to the participating publishers, is that
[15] correct?
[16] **A.** That's correct.
[17] **Q.** How do the writers get paid?
[18] **A.** They in turn get paid from the publishers.
[19] **Q.** Is the amount that they get paid a function of anything DMX
[20] has to say or solely the relationship they have with their
[21] publishers?
[22] **A.** It's the relationship that they have with their publisher
[23] that is guided by the report form that's given to the publisher
[24] showing the works that were used and the royalties that were
[25] paid.



A-475

Page 941

[1] **Q.** And a couple of answers ago, did I understand you to say
[2] that your understanding is that the most common practice as you
[3] understand industry practice is that 50 cents or 50 percent of
[4] the amount remitted to the publisher would in the ordinary
[5] course be remitted by that publisher to the participating
[6] writers?
[7] **A.** That's correct.
[8] **Q.** I take it you understand this, that when these writers --
[9] pardon me, when these publishers who receive checks under this
[10] program from DMX do so, that they would not in the ordinary
[11] course also look to BMI or ASCAP or SESAC, that is, whichever
[12] organization they're associated with, for a second payment
[13] associated with those same performances?
[14] **A.** That's absolutely correct.
[15] **Q.** And that's a matter, I take it, as between the performing
[16] rights organization and the individual music publisher,
[17] correct?
[18] **A.** That is right.
[19] **Q.** That's not DMX's concern per se?
[20] **A.** No, it is not.
[21] **Q.** And just so the record is clear again, the $25, the pool of
[22] money in which the music publishers participate, covers the
[23] direct license performances of works no matter whose licensing
[24] organization they may be affiliated with, is that correct?
[25] **A.** It's all direct license. ASCAP, BMI, SESAC, that's it.

Page 942

[1] **Q.** So that today, if I'm music publishing company X and I have
[2] a catalog of ASCAP compositions and one or more of those
[3] compositions is transmitted, broadcast or otherwise used by DMX
[4] and captured in the distribution methodology, I take it I get
[5] as much credit for that as if it were a BMI composition,
[6] correct?
[7] **A.** That's absolutely right.
[8] **Q.** There's no distinction?
[9] **A.** There's no distinction whatsoever.
[10] **Q.** Now, let's come back to the first demonstrative, please.
[11] On grant of rights, I'll represent that I've pulled out of what
[12] we'll get to in a while, which was a standard form of license,
[13] the key language. Do you see the language there?
[14] **A.** Yes, I do.
[15] **Q.** To your knowledge, does that accurately depict the scope of
[16] the rights that DMX determined to secure from music publishers?
[17] **A.** Absolutely right.
[18] **Q.** Including, but not limited to, public performing rights?
[19] **A.** Public performing rights are certainly important, but you
[20] need the right to edit. As Mr. Seaton had said earlier, there
[21] are some songs that have certain connotations or may use
[22] language that is not acceptable to some of the stores that we
[23] program for, so you need the ability to edit, and certainly
[24] reproduce, distribute and the public performances are
[25] important, that's right.

Page 943

[1] **Q.** Next on the demonstrative is scope of coverage. Could you
[2] please tell the Court what DMX's thinking was and what its
[3] perceived needs were as to the scope of coverage of a direct
[4] license?
[5] **A.** One of the things that we had found at DMX and certainly
[6] anyone looking at it in the commercial background music service
[7] was that the scope of license being offered by BMI had started
[8] to shrink. So you were asked to pay a higher royalty fee for
[9] less markets that in many cases had been developed over time by
[10] the background music community.
[11] **Q.** Could I just interrupt for clarification? The scope of
[12] what license had shrunk?
[13] **A.** The scope of the background music license that was offered
[14] by BMI.
[15] **Q.** Thank you.
[16] **A.** You're welcome. It initially started with movie theaters
[17] and then had become more aggressive with regard to health clubs
[18] and bowling. And so when we put the license agreement to go
[19] out to the publishers directly, we wanted to broaden that scope
[20] of license agreement so that we could go into markets that we
[21] had developed and had been taken away from us by the rights
[22] organizations.
[23] **Q.** What was your understanding of why the rights
[24] organization -- let's focus on BMI particularly. Did you have
[25] an understanding why BMI was taking away certain customer

Page 944

[1] categories from within the scope of the CMS license?
[2] **A.** My opinion is, it's my personal opinion, that they saw an
[3] opportunity to go out and license things that were fairly hard
[4] to miss and certainly when they started going after the
[5] membership organizations, it made it, a term I use, low-hanging
[6] fruit.
[7] **Q.** So going back to what DMX sought to accomplish with the
[8] direct licenses, what was the bottom line determination as to
[9] the scope of customer locations that would be worked into the
[10] direct license?
[11] **A.** We wanted to expand the markets that we had developed over
[12] time so that we could go out and have licenses that addressed
[13] those markets and we could go back to programming within those
[14] markets.
[15] **Q.** And was there to be any discrimination in terms of the fee
[16] or prices charged or the royalties disbursed to participating
[17] publishers depending on the nature of the location where the
[18] music was being performed?
[19] **A.** No.
[20] **Q.** And in your subsequent conversations and those of which
[21] you're aware others may have had with music publishers, was
[22] there any reaction, was there any pushback to the scope of
[23] coverage as broad as DMX sought?
[24] **A.** No.
[25] **Q.** Now, last on the chart, royalty distribution mechanism.

Page 945

[1] **A.** Yes.

[2] **Q.** How was it envisioned that performance data would be
[3] measured for purposes of calculating the royalties that would
[4] be payable to direct licensing publishers?

[5] **A.** DMX had tasked MRI to develop a royalty distribution
[6] mechanism that would address the uses of music on our
[7] off-premise or broadcast services. The reason for that is
[8] that's where we know those songs are broadcast and performed
[9] within our subscribers who have that service.

[10]   **MR. RICH:** Your Honor, Mr. Gertz will be the next
[11] witness and will discuss this topic in a bit greater depth with
[12] him.

[13] **Q.** Now, did there come a time when a proposed license
[14] embodying these key provisions was drafted by DMX?

[15] **A.** Well, it was actually the initial draft was done by MRI and
[16] lawyers at MRI, because there again, they're used to drafting
[17] language that deals with publishers.

[18] **Q.** If you would turn in your binder, please, to the first
[19] exhibit, which is in evidence as JX 513.

[20] **A.** Yes.

[21] **Q.** Do you have that in front of you, sir?

[22] **A.** I do.

[23] **Q.** Can you identify what this document is, please?

[24] **A.** It's a musical composition catalog license agreement for
[25] background and foreground music services.

Page 946

[1] **Q.** And with whom is this agreement in place?

[2] **A.** With this license agreement it's in place with Williamson
[3] Music.

[4] **Q.** And who is Williamson Music?

[5] **A.** Williamson Music is a tremendous older publisher that
[6] represents Rogers and Hammerstein, Irving Berlin. Rogers and
[7] Hammerstein would be Oklahoma, South Pacific. Irving Berlin,
[8] you can't have a holiday without him. Easter Parade, White
[9] Christmas, God Bless America. Just a very strong smaller
[10] publisher with a great repertoire of music that fits into the
[11] programming expectations of our customers.

[12] **Q.** And is this document which Williamson Music Company signed
[13] in July of '09 representative of the direct licenses that in
[14] terms of the form of the licenses that DMX has been entering
[15] into and signing with other publishing companies?

[16] **A.** Yes, it does.

[17] **Q.** And to your knowledge, sir, when we talked about the key
[18] terms, since the inception of the licensing program through to
[19] now, have any of the key terms that we reviewed been modified
[20] or changed in any of the license agreements which the music
[21] publishing companies that have signed such agreements have
[22] entered?

[23] **A.** Not in material terms, no.

[24] **Q.** Have there been any changes of any kind in any of these
[25] agreements?

Page 947

[1] **A.** There have been some changes, yes.

[2] **Q.** And how have they been handled, considered and handled in
[3] the ordinary course?

[4] **A.** As questions are brought up with regard to certain parts of
[5] the agreement, there are discussions between the publishers,
[6] MRI and myself, and we work out back and forth dialogue and
[7] come up with whatever those changes should be.

[8] **Q.** Now, let's talk a little about the process by which the
[9] direct licenses were rolled out to the publishing industry, if
[10] we can. Once the basics of the license offer were developed
[11] through the process you've testified concerning, how did DMX
[12] roll out the offers to the publishing industry?

[13] **A.** One of the initial things that we did back in 2006 when we
[14] started to work with MRI was to get the MRI database to match
[15] up with DMX's database, which we call Studio and see what songs
[16] that we were performing so that we would have an idea of what
[17] publishers we needed to license so that we could move forward
[18] with this direct licensing process.

[19] **Q.** Let's unpack that a bit. What is in the MRI database that
[20] you just referred to? What sorts of information?

[21] **A.** The MRI database has publisher, address, name, etc. but
[22] most importantly, it has the catalogs of music that they own or
[23] represent, and it has the shares of those songs that they own
[24] and represent, and the performing rights organization that
[25] represents them.

Page 948

[1] **Q.** And you said that was somehow matched up against what you
[2] called a studio database?

[3] **A.** Correct. DMX's database Studio. We needed to get a match
[4] there to see who you would go out to license first by the
[5] repertoire that you were using.

[6] **Q.** What is in the Studio database?

[7] **A.** Studio database is song logs, artist, record label, song
[8] title. There is some performing rights information and it's
[9] used by the music designers when they develop the programs for
[10] off-premise and on-premise.

[11] **Q.** So once that matching of those databases has transpired,
[12] what did DMX do next?

[13] **A.** DMX then had a clear path as to who they would go out and
[14] license. And so working with MRI, we sent licenses out to
[15] those publishers whose musical compositions we used.

[16] **Q.** And what form did those communications take?

[17] **A.** They took a number of forms. They were letters, e-mails
[18] and subsequently phone calls and/or personal contacts.

[19] **Q.** What was your own role in that process over time?

[20] **A.** I worked very closely with Mr. Gertz and his team in
[21] rolling out the initial correspondence. and then after a while
[22] I went on the road and met with the publishers personally.

[23] **Q.** Now, BMI's economist who testified here recently speculated
[24] that it would be logical for DMX to have limited its outreach
[25] and its negotiations to those publishers as to which DMX felt




Page 949

[1] securing licenses would be easiest either transactionally or
[2] cost wise. Is that an accurate snapshot of in fact what
[3] happened?
[4] A. No, that's completely wrong.
[5] Q. How so?
[6] A. If you went about it in that fashion, you would be sending
[7] letters and generating expense for something that you wouldn't
[8] necessarily need. You needed to go out and license those
[9] people whose musical compositions you knew that were being
[10] performed and whose licenses you needed to support that
[11] programming.
[12] Q. And was that in fact the group of publishers DMX targeted?
[13] A. That in fact was the bulls eye to the people that we
[14] targeted.
[15] Q. Who was the first publisher to sign?
[16] A. Lieber & Stoller.
[17] Q. Could you tell the Court a little bit about the nature of
[18] Lieber & Stoller?
[19] A. Lieber & Stoller two New York guys out of the Brill
[20] building, which was the writing mecca of the '40's and '50's
[21] and '60s. Wrote a lot of stuff, Jailhouse Rock, Hound Dog for
[22] Elvis Presley. You can't get away from a lot of the other
[23] works that they did. Stand By Me. Just to name a few.
[24] They're tremendous entrepreneurs and tremendous songwriters.
[25] Q. How sophisticated a music publishing company do you find

Page 950

[1] them to be?
[2] A. Very sophisticated.
[3] Q. Now, and to your knowledge are they at all active in music
[4] publishing industry copyright enforcement efforts?
[5] A. Oh, Mike and Jerry are very much involved in that.
[6] Q. Now, as a general matter as DMX rolled out this program,
[7] was the fact that a music publisher may be small in terms of
[8] scale or the sizes of its catalog a factor mitigating either
[9] for or against approaching that publisher?
[10] A. No. What we were looking for, as you have with many
[11] publishers, is their jewels. Size really in this case didn't
[12] matter. We wanted the repertoire that came with that publisher
[13] whose works would support our customers.
[14] Q. In your experience, is the sophistication of the music
[15] publishing community in terms of legal acumen, in terms of
[16] business acumen, in terms of desire to maximally exploit their
[17] copyright interest, is it a direct function of the size or
[18] scale of operation of the music publisher?
[19] A. Actually, I think you would probably find that the
[20] independent or the smaller has a more of a desire or pushes
[21] harder. Realsongs is an example. Diane Warren is a
[22] consummate tremendous songwriter. At the same time she is a
[23] tremendous sales representative for her product. She's one of
[24] the few people that have had, I believe, five or six songs in
[25] the top ten at one time, and she's been written up a number of

Page 951

[1] times in the Wall Street Journal and The New York Times on the
[2] way she pushes the product that she produces, the way that she
[3] pushes her songs.
[4] Q. Is Realsongs one of DMX's direct licenses?
[5] A. Yes, they are.
[6] Q. How many approximately direct licenses as of now has DMX
[7] secured?
[8] A. About 550.
[9] Q. And can you tell the Court what the concept of a music
[10] publishing catalog is, please?
[11] A. A music publishing catalog is one that is usually owned in
[12] part by the publisher, but they minister on behalf of a number
[13] of other smaller publishers, handle the back office, handle the
[14] sale of and the distribution of royalties to other what they
[15] call catalogs.
[16] Q. And is there a typical size of a catalog or does it vary?
[17] A. Oh, a catalog could be a few dozen songs, or it could be
[18] thousands of songs. Irving Berlin would be an enormous
[19] catalog. You may have Steinberg and Kelly, a smaller catalog.
[20] Q. Does size of catalog equate with quality?
[21] A. No.
[22] Q. You could have, I take it, some small catalogs that are
[23] absolutely of stellar quality?
[24] A. You have -- I mentioned Steinberg and Kelly who wrote Like
[25] a Virgin. That's a very big hit for Madonna and tremendous

Page 952

[1] plays.
[2] Q. Does the typical license of the 550, if you were to look at
[3] those, do those licenses typically comprise the single
[4] publisher catalog or multiple catalogs?
[5] A. Multiple catalogs.
[6] Q. So if you added up all the catalogs among these 550
[7] some-odd licenses, do you have an estimation of how many
[8] catalogs are part of the direct license program?
[9] A. I think over 5,500.
[10] Q. Could you provide us with a sense, please, of the range of
[11] the works that are represented by the totality of the
[12] publishers who have signed direct licenses? I'm not looking
[13] for quantitative, I'm speaking more qualitatively.
[14] A. I mean, let me -- take Bug Music. Bug Music is a small,
[15] independent publishers, maybe a little larger in the
[16] independent field, but they deliver to us, they're directly
[17] licensed with us. They deliver to us a number of songs in the
[18] blues field, willie Dixon; songs in the country field. Johnny
[19] Cash. I'm not sure how many people here watch American Idol,
[20] but Kara -- who is one -- DioGuardi, who is one of the people
[21] who are looking at the new top models, new top artists in that
[22] show. Her art house, which is her publishing company is
[23] represented by Bug, and she's written songs that have won a
[24] number of Grammies for Christina Aguilera, Gwen Stefani and a
[25] number of other people.

Page 953

[1] **Q.** How broadly representative of the range of DMX program
[2] offers are the 5,500 or so catalogs and the music contained
[3] therein?
[4] **A.** They cover the length and breadth of our programming that
[5] we do, from country to soul to rap to classical to jazz,
[6] various versions of jazz, instrumental, show tunes, children's
[7] programming, etc. As a matter of fact, the Kara that I just
[8] mentioned just did a children's album that's going to be
[9] released fairly soon or has been released.
[10] **Q.** Have you seen a list of award winning songwriters that I
[11] asked Alison Smith during her testimony about?
[12] **A.** Yes, I did.
[13] **Q.** Can you tell us whose works among that group of songwriters
[14] have been directly licensed by DMX?
[15] **A.** Everyone.
[16] **Q.** Is the direct license project an ongoing project in the
[17] sense, that is, is DMX still out there attempting to procure
[18] new licenses?
[19] **A.** Yes, we are.
[20] **Q.** Let's turn now to how DMX has been integrating direct
[21] license programming into its programming mix. Can we do that?
[22] **A.** Sure.
[23] **Q.** What instructions has DMX been providing to its programmers
[24] in terms of programming directly licensed music?
[25] **A.** We ask that they program as much as possible of the direct

Page 955

[1] programming now currently is directly licensed, approximately?
[2] **A.** Over 30 percent.
[3] **Q.** And to your knowledge what percentage of all of the BMI
[4] works utilized by DMX is directly licensed?
[5] **A.** Over 40 percent.
[6] **Q.** And if you were to track these percentages from the
[7] beginning of the implementation of the program through today,
[8] has there been any trend?
[9] **A.** Oh, it's trended up immensely very, very quickly. I think
[10] they use the term hockey stick.
[11] **Q.** Now, there's been a lot of testimony so far about the
[12] so-called major music publishers. That's a phrase you're
[13] familiar with, yes?
[14] **A.** Yes, I am.
[15] **Q.** Are you acquainted with any of the major music publishers?
[16] **A.** All of them.
[17] **Q.** Does DMX have a direct license with any of these majors?
[18] **A.** Yes, we do.
[19] **Q.** Who?
[20] **A.** Sony/ATV.
[21] **Q.** Tell the Court about how DMX thought about the issue of
[22] securing licenses from one or more major publishers.
[23] **A.** Well, when we looked at our programming, and again, going
[24] back and running that computer run, we felt that we needed to
[25] license one or two of the majors to be successful in our

Page 954

[1] licensed works that we have.
[2] **Q.** Is that just a mandate to simply maximize the use of it?
[3] Are there any other variables?
[4] **A.** We ask that they do this, because the most important thing,
[5] and again, Tim touched on this when he was up here. The most
[6] important thing is the customer. I can program 24 hours of
[7] directly licensed music. If it doesn't match what the customer
[8] is looking for, I'm going to lose that customer. So the most
[9] important thing for us is to program the music that fits the
[10] customer and if the direct license works fit the customer
[11] perfectly, great. And if they don't, then we have to take a
[12] look at going out and getting those people directly licensed
[13] that we need.
[14] **Q.** And in fact, is that going on on a daily basis?
[15] **A.** Constantly.
[16] **Q.** Can you give an example? Does anybody come to mind,
[17] somebody come to you or any of your colleagues saying we would
[18] really dearly like to get X?
[19] **A.** It happens virtually every day. I'm sure Shalonn will
[20] speak about it when she's here that the music design people
[21] will e-mail my department and say we're looking at this song,
[22] we'd like to get this song licensed if we could. That means we
[23] have to go out to the record labels and license the master and
[24] at the same time we go out and license the publisher too.
[25] **Q.** Overall, to your knowledge, what percentage of DMX's

Page 956

[1] programming and our direct licensing effort.
[2] **Q.** And only one or two?
[3] **A.** I think that's right, yes.
[4] **Q.** What would DMX do with respect to the gaps, if there were
[5] gaps, of failing to have the largish repertoires of numbers 3
[6] and 4?
[7] **A.** Again, there's a lot of repertoire held by independents
[8] that fit our needs also, the independent libraries. You could
[9] fill it in in that fashion.
[10] **Q.** Now, in approaching the majors with the object of securing
[11] one or two, did you simply do part of this large mailing and
[12] other rollout, were they treated the same as everybody else?
[13] **A.** Yes, they were.
[14] **Q.** Did that change over time?
[15] **A.** It did.
[16] **Q.** Why?
[17] **A.** After we had sent out the agreements, I actually went and
[18] met with all of the major publishers, and I saw that there were
[19] going to be obstacles in moving forward with them, and so we
[20] sort of reevaluated what we had done.
[21] **Q.** What did you perceive the obstacles to be?
[22] **A.** To start with, most of the major publishers are on the
[23] ASCAP board. So I thought that would be, that certainly seemed
[24] to be a concern. The second part was that you're asking an
[25] industry that is not usually quick to adapt to change to change

Page 957

[1] the way they handled the licensing of their works in a
[2] different industry, the background music industry, and with
[3] everyone it's always an economic thing.
[4] **Q.** Based on your analysis, what percentage of its
[5] distributions received from ASCAP, BMI and SESAC would a major
[6] music publishing company expect to receive from a company like
[7] DMX?
[8] **A.** Less than 1 percent.
[9] **Q.** And did that factor into your thinking in any way?
[10] **A.** Yes, it did.
[11] **Q.** How so?
[12] **A.** Because it was to me a perfect opportunity in an
[13] ever-changing environment with regards to the music industry.
[14] Again, we take a look at the spot, take a spot look at time
[15] that the record industry was starting to have its own problems
[16] with regards to sale. That was going to play back with regards
[17] to the publishers because they're used to receiving royalties
[18] for the sale of records, and that it would have been far easier
[19] to have a discussion about something that to these big
[20] companies, Universal, Sony, EMI, is probably a mathematical
[21] rounding error, 1 percent, than it would be to, for others, for
[22] others who were much more of their royalty base to go and try
[23] the same thing.
[24] Also as I mentioned before, we had that the ability to
[25] control the way we were programming, and so therefore we could

Page 958

[1] program their works in a stronger rotation. So that caused me
[2] to start to step back --
[3] **Q.** Let me ask you a question, so we don't just get a
[4] narrative.
[5] **A.** I'm sorry.
[6] **Q.** What given these various inputs and feedback, what did DMX
[7] determine to do to maximize the opportunity of licensing one or
[8] more of the majors?
[9] **A.** I actually went back to management and said here's where I
[10] think we are, and I think for us to make this work on a major
[11] basis, we're going to have to look at it slightly differently.
[12] **Q.** And did you in fact over time look at it slightly
[13] differently?
[14] **A.** Yes, we did.
[15] **Q.** How did you come to look at it?
[16] **A.** I came to look at it that the publishers were receiving an
[17] X amount from ASCAP, BMI and SESAC for their performances, that
[18] if everyone is living by the rules of the road, then the writer
[19] members should be getting the same amount, so the thought
[20] process was let's take a look at what you receive from ASCAP,
[21] BMI and SESAC.
[22] **Q.** Who is the "you" in that?
[23] **A.** You being the major publisher, I'm sorry. Let's take a
[24] look at what you receive from ASCAP and BMI, let's take that
[25] amount and take again the laws of the land that the writers are

Page 959

[1] getting the same amount, so we would double that and then let's
[2] say that we would pay a premium above that for you to try this
[3] new system to see if it works for you.
[4] **Q.** Why did you determine it was appropriate to offer a
[5] premium?
[6] **A.** Because you needed to entice someone to change.
[7] **Q.** And did you in fact secure from one or more majors the data
[8] you requested to enable you to do this mathematics?
[9] **A.** Yes, I did.
[10] **Q.** Did that include Sony?
[11] **A.** Yes, it did.
[12] **Q.** After, did you in fact float this offer to one or more of
[13] the majors?
[14] **A.** Yes, I did.
[15] **Q.** And did you get any favorable responses?
[16] **A.** I did.
[17] **Q.** From?
[18] **A.** Sony/ATV.
[19] **Q.** And specifically how in dollars and cents terms how did
[20] this translate into -- let me back up and ask a predicate
[21] question. What form did this, did the dollars generated by
[22] this formula, what was the form in which those dollars took in
[23] terms of the offers being made?
[24] **A.** In real dollars?
[25] **Q.** As opposed to -- were these in the nature of royalty

Page 960

[1] payments, guarantees, advances, something else?
[2] **A.** They were, again, using the same formula I just outlined,
[3] it turned out to be $2.7 million in advances that were
[4] recoupable by the use of DMX use of their music.
[5] **Q.** So the record is clear, what does the concept of recoupable
[6] entail?
[7] **A.** It means that you would not pay any additional royalties,
[8] but actually deduct it from the advances that you paid to the
[9] publisher.
[10] **Q.** And also so the record is clear, if in the case of the Sony
[11] advance it was not fully recouped over the term of the years in
[12] which that was allowable, was Sony going to be allowed to
[13] retain any excess dollars?
[14] **A.** If it was not recoupable, the additional, the 36 months,
[15] they would keep the money, that's absolutely right.
[16] **Q.** And the term with Sony was 36 months?
[17] **A.** 36 months, that's right.
[18] **Q.** Did it change over time?
[19] **A.** Yes, it did.
[20] **Q.** What happened?
[21] **A.** In further research, we had seen that BMI had overstated
[22] the royalties that they were collecting from DMX by about some
[23] 72 percent, I think it was, we were about 27 percent of the
[24] hundred percent that they claimed that we were, so when I found
[25] that out --

Page 961

[1] **Q.** This was subsequent to executing the agreement with Sony?

[2] **A.** This was after the agreement was executed for the 36

[3] months. So I had a number of conversations with Sony, and then

[4] eventually had a conversation with Marty --

[5] **Q.** Who is Marty?

[6] **A.** Marty Vandier is the CEO at Sony.

[7] **Q.** Thank you.

[8] **A.** Said that it seems it may have been an accident or they may

[9] have been misled by BMI, but in fact these were the royalties

[10] that were truly attributable to DMX and that we would expect

[11] some concession and to Marty's honor, he made a concession for

[12] that.

[13] **Q.** And what resulted?

[14] **A.** 21 additional months on the agreement.

[15] **Q.** Extending the terms from 36 months to 57?

[16] **A.** To 57, that's correct.

[17] **Q.** And was that subsequently memorialized?

[18] **A.** It was, in a letter, yes.

[19] **Q.** Okay, let's just turn now to the two remaining documents in

[20] your binder, the first JX 449 and the second JX 1170, and I

[21] would ask you if you could identify what those documents are,

[22] please.

[23] **A.** The -- I'm sorry, Mr. Rich.

[24] **Q.** Take your time.

[25] **A.** The JX 449, I just wanted to get that right, is the musical

Page 962

[1] composition catalog license and background/foreground musical

[2] services agreement with Sony/ATV publishing.

[3] **Q.** And JX 1170?

[4] **A.** That is the extension letter from -- no. That's the letter

[5] from Jonas Kant with the executed license agreements.

[6] **Q.** Attached to it?

[7] **A.** That's correct.

[8] **Q.** And did DMX pay any additional consideration in relation to

[9] the reaching of the what is styled the, in relation to the

[10] amendment to the musical composition catalog license with Sony?

[11] **A.** Yes, we did. We paid --

[12] **Q.** You paid additional monies?

[13] **A.** For the extension? I'm sorry, I'm sorry. We did not, no.

[14] **Q.** Let me just state it clearly for the record. With respect

[15] to JX 1170, which is the amendment?

[16] **A.** Right.

[17] **Q.** Did DMX pay any further consideration?

[18] **A.** No, we did not.

[19] **Q.** Now, is it DMX's belief that in fact over this 57-month

[20] term it will be able to earn out the Sony advance?

[21] **A.** Yes, we do.

[22] **Q.** How confident are you about that?

[23] **A.** Well, I'm much more confident after Mr. Seaton this

[24] morning, since the idea is that the way of recouping against

[25] these is having more accounts that generate more revenue, more

Page 963

[1] uses of the works, and certainly when we entered into this, it

[2] was a slightly better financial time, and we had lost some

[3] accounts, but with the additional 25,000 accounts from

[4] DirectTV, it certainly gives us a far better chance of being

[5] successful and recouping.

[6] **Q.** With reference to the second of these exhibits in the

[7] binder, JX 449, apart from the advance term that you've

[8] testified to, are the other terms and conditions of the Sony

[9] license similar to all of the other direct licenses that you've

[10] entered into?

[11] **A.** Yes, it is.

[12] **Q.** Now, were you able to reach, was DMX able to reach an

[13] agreement with Universal Music Publishing?

[14] **A.** Sadly, we were not.

[15] **Q.** What happened?

[16] **A.** I thought that we were very, very close. As a matter of

[17] fact, was told by Mr. Arrow that we were very close, and

[18] subsequently it just didn't happen.

[19] **Q.** Were you ever advised by Universal that they were

[20] simultaneously in negotiations with BMI at the same time they

[21] were discussing a direct license with you?

[22] **A.** No, I was not.

[23]     **MR. RICH:** Your Honor, I have about probably five to

[24] ten minutes, so we could conclude if you'd like or break now.

[25]     **THE COURT:** If you can stick to five or ten minutes,

Page 964

[1] we'll do it now.

[2]     **MR. RICH:** I believe I can.

[3] **Q.** Are you familiar with how DMX reports performances to BMI?

[4] **A.** Yes, I am.

[5] **Q.** What reports are sent?

[6] **A.** The music use reports, we give for, what again is referred

[7] to off-premise or broadcast, the actual music that is used on

[8] each channel.

[9] **Q.** Let's just describe at a general level, then I'm going to

[10] walk you through each of those, because I know this is subject

[11] matter that the Court has asked for clarification on.

[12] **A.** Fine. Each month we furnish our list of music that is used

[13] within our programs to an FTP site, which is a site that is

[14] exclusively used by BMI and they can pull that information down

[15] electronically.

[16] **Q.** I'm sorry, you said monthly, yes?

[17] **A.** Yes, that's correct.

[18] **Q.** Am I correct that data is furnished with respect both to

[19] music use on the off-premise service and the on-premise

[20] service?

[21] **A.** That's correct.

[22] **Q.** Now, focusing on the data supplied with respect to the

[23] off-premise service, can you describe with as much

[24] particularity as you can the data that is captured and provided

[25] to BMI?

Page 965

[1] **A.** The data that is captured for the broadcast or off-premise
[2] is the actual music that has been performed during that month
[3] on all of the channels offered by DMX to its subscribers.
[4] **Q.** Let me see if I understand what you mean by performed,
[5] because that word has been used perhaps a little loosely here.
[6] Is that the same thing as saying every musical composition that
[7] is broadcast, that is broadcast on one of the channels and so
[8] channels and made available for listening, that every one of
[9] those musical works is captured on these monthly reports?
[10] **A.** That's correct.
[11] **Q.** So whether or not people actually listen to it, so long as
[12] it is physically being transmitted on one of the broadcast
[13] channels, that data is captured, correct?
[14] **A.** That's correct.
[15] **Q.** Now, if a given musical composition is found in a 24-hour
[16] period once, it is used once in the country hits channel in
[17] that broadcast, how many times will it be logged or noted in
[18] that monthly report with respect to that?
[19] **A.** If it was used once through the month, it will be noted
[20] once.
[21] **Q.** And if, say, even in a 24-hour period a work is put into a
[22] higher use cycle, so that it appears multiple times in the
[23] broadcast stream, do each and every one of those uses, are
[24] those captured and reported in the off-premise report?
[25] **A.** Yes, they are.

Page 966

[1] **Q.** Okay. Now, please tell the Court the nature of the
[2] reporting with respect to the on-premise reports?
[3] **A.** The on-premise is simply a list of music that is sent to
[4] the on-premise equipment to be possibly played.
[5] **Q.** For any given program, is there an average number of such
[6] musical compositions that are available for listening?
[7] **A.** I think Shalonn will address that better. Usually you
[8] could say in four hours there would be 60 to 65 songs, but it
[9] may be far fewer or it may be a lot more.
[10] **THE COURT:** I want to be sure I got Mr. Rich's
[11] question. For off-premises the reports include the number of
[12] performances of each piece of music, is that correct?
[13] **THE WITNESS:** Yes, your Honor.
[14] **THE COURT:** Okay.
[15] **Q.** Now, staying with this, let's use as an example 65
[16] compositions for a particular program that's made available via
[17] your on-premise service.
[18] **A.** Yes.
[19] **Q.** Is the sum total of what is reported to BMI with respect to
[20] that program for a given reporting period the identity of those
[21] 65 musical works?
[22] **A.** Yes, it is.
[23] **Q.** In fact, are those works used uniformly in terms of
[24] frequency of play?
[25] **A.** No. Some of those songs may never even be played.

Page 967

[1] **Q.** Could you explain to the Court what determines which works
[2] from those 65 are played and with what frequency?
[3] **A.** It's a software program that we have within the equipment,
[4] and again, I think Shalonn will give you chapter and verse on
[5] that.
[6] **Q.** So whatever the resulting numbers it plays from within the
[7] 65, is that data which is captured by DMX and in turn reported
[8] to BMI? That is, the actual frequency it plays?
[9] **A.** For --
[10] **Q.** For on-premise?
[11] **A.** No.
[12] **Q.** It is not.
[13] **A.** It is not.
[14] **THE COURT:** So it reports the identities of the pieces
[15] played, but not the number of times they were played.
[16] **THE WITNESS:** It identifies the pieces that have been
[17] sent to the equipment and there's cases in which they never --
[18] any of those songs may have never been played. Then it doesn't
[19] tell us how many times it didn't play for those.
[20] **MR. RICH:** Thank you, your Honor. That concludes my
[21] examination.
[22] **THE COURT:** All right, we'll recess for lunch and
[23] resume at 2:20. Thank you.
[24] (Luncheon recess)
[25]

Page 968

[1] **A F T E R N O O N   S E S S I O N**
[2] 2:30 p.m.
[3] (Trial resumed)
[4] **MR. FITZPATRICK:** Your Honor, during the examination I
[5] might, with your permission, use the flip chart. Is that
[6] positioned okay for your Honor and for the court reporter right
[7] there?
[8] **THE COURT:** Yes.
[9] LINUS BARRY KNITTEL, resumed.
[10] **CROSS EXAMINATION**
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

VOLUME 6
January 26, 2010    Case: 10-3429    Document: 64-1    Page: 88    01/05/2011    BROADCAST MUSIC INC., V.
180349    132 DMX, INC

[1] **Q.** Thank you.

[2] And then if you go to the next e-mail, Mr. Harrison

[3] replies but also copies Brian McKinley and yourself, correct?

[4] **A.** That's correct.

[5] **Q.** And what Ms. Barrymore was originally asking is what is the

[6] difference in our licensing offerings versus Play Network. Is

[7] it pretty much the same?

[8] Is that the question that she asked?

[9] **A.** Yes.

[10] **Q.** And Mr. Harrison responded: Our position has been that we

[11] have more labor relations than any other CMS provider.

[12] And on that response he copied you, correct?

[13] **A.** That's correct.

[14] **Q.** And you then added to the e-mail chain: Stephanie, the

[15] enormous difference between DMX and Play -- and that refers to

[16] Play Network, correct?

[17] **A.** That's correct.

[18] **Q.** And Play is the access to repertoire that our programmers

[19] have versus the programmers at Play. DMX has direct license

[20] agreement with all of the major record labels and their

[21] sub-labels as well as over 2,100 independent record labels

[22] throughout the world. With all of the sub-labels added to the

[23] direct licenses it probably totals over 2,500 labels. The last

[24] time the record label discussion came up with someone at Play

[25] was about two years ago, they were sitting at about 400 record

[1] labels licensed including the majors.

[2] Correct?

[3] **A.** That's correct.

[4] **Q.** Would the greater access to license music that DMX has here

[5] in comparison to Play Network, would that apply with respect to

[6] TruSonic as well?

[7] **A.** Yes.

[8] **Q.** And Muzak as well?

[9] **A.** Again, are you talking about 2007 or are you talking about

[10] today?

[11] **Q.** I will ask both.

[12] **A.** In 2007 the answer would still be yes.

[13] **Q.** And today is it true as well?

[14] **A.** Today I think that Play probably has more licenses than

[15] they did at that time and I know TruSonic does.

[16] **Q.** And how about Muzak?

[17] **A.** I don't know.

[18] **Q.** Now, if I could, I would like to explore a little bit

[19] further your development of the $25 royalty rate that you

[20] discussed with Mr. Rich earlier today, okay?

[21] **A.** Sure.

[22] **Q.** And, just to put it in the proper time frame, are we in the

[23] 2005-2006 time period when you are developing the $25 rate?

[24] **A.** Late 2005, that's right.

[25] **Q.** And, I believe you testified that in developing that rate

[1] you actually looked at a BMI rate that was in the marketplace,

[2] correct?

[3] **A.** That's correct.

[4] **Q.** And the BMI rate that you used was from the license

[5] agreement, I believe you testified, the 1987 to 1993 BMI

[6] license agreement with the commercial music services industry,

[7] correct?

[8] **A.** That's correct.

[9] **Q.** So, if I could ask you to take a look at that so you will

[10] have it for a reference, it is Joint Exhibit 1215. And now I

[11] will use the flip chart.

[12] And so, again, you said that we were in late 2005,

[13] correct, Mr. Knittel?

[14] **A.** That's correct.

[15] **Q.** And the rate that you used you said was from the 1987 to

[16] 1993 BMI commercial music agreement, correct?

[17] **A.** It came from that agreement, that's correct.

[18] **Q.** And now, if you could turn to page 2 of the agreement,

[19] there is a license fee schedule and one of the boxes in that

[20] schedule is actually where you got the rate that you were

[21] talking about this morning, correct?

[22] **A.** The 1993, that's correct.

[23] **Q.** And if you look in the 1993 row on page 2, there are

[24] actually three rates listed, one for on-premise delivery, one

[25] for off-premise delivery, and one for storecast music, correct?

[1] **A.** That's correct.

[2] **Q.** And if we look at what the rates are for on it was $25.50,

[3] correct?

[4] **A.** Correct.

[5] **Q.** And for off it was two and a quarter percent of the gross

[6] billings, correct?

[7] **A.** Correct.

[8] **Q.** And that, to be clear, is the number that you selected,

[9] correct?

[10] **A.** That's correct.

[11] **Q.** And also, just so we are clear, this is the on and

[12] off-premise that the Court has heard about in the case so far

[13] up to this point, this is on-premise delivery and this is what

[14] you prefer to call satellite delivery, is that correct? Or

[15] broadcast?

[16] **A.** Broadcast, that's correct.

[17] **Q.** And then there is a third rate called storecast, and am I

[18] correct that that's $2.15 per month, in 1993?

[19] **A.** That's correct. That's what it says.

[20] **Q.** Now, at the time in late 2005 that you were deciding on the

[21] rate to offer in your direct licenses, DMX did have all three

[22] types of these businesses, correct; it had on, off, and the

[23] storecast business, correct?

[24] **A.** That's correct.

[25] **Q.** And I'm not sure if we have talked about this before, but



Page 973

[1] could you just explain what storecasting is, as it is used in
[2] this agreement?
[3] **A.** Wouldn't it just be easier to read the definition that they
[4] use?
[5] **Q.** Whatever you prefer, Mr. Knittel.
[6]    Do you have an understanding of storecasting?
[7] **A.** I have an understanding but I actually don't remember the
[8] definition that they used back in 1993.
[9] **Q.** Okay.
[10]    So, if we could look at page 1, I believe the
[11] definition is under subparagraph 2F; is that correct?
[12] **A.** That's correct.
[13] **Q.** And that says that storecast music, as used herein, shall
[14] mean only the non-dramatic performances of recorded music
[15] interspersed with advertising announcements for which
[16] consideration is received from the advertisers for the placing
[17] of the advertisement and serving as an accompaniment to
[18] shopping in a retail store where merchandise is sold or
[19] services rendered to the public and audible solely to persons
[20] physically on the serviced premises; and by means of
[21] loudspeakers in the immediate vicinity of such serviced
[22] premises.
[23]    Is that sufficient or do you want me to continue?
[24] **A.** No, that's fine. Yes, I understand.
[25] **Q.** That's a definition of storecasting?

Page 975

[1] **Q.** So then you took that 5 percent and you applied it to an
[2] average annual revenue -- an estimate of the average annual
[3] revenue that DMX received from each customer location, correct?
[4] **A.** For, I think, the period 2004.
[5] **Q.** Okay, and that was approximately $500 per year?
[6] **A.** That's correct.
[7] **Q.** And so you took 5 percent of 500, that got you to the $25
[8] rate?
[9] **A.** That's correct.
[10] **Q.** Now, to be clear, you selected one of the three rates that
[11] was in the agreement that BMI had from the '87 to the '93
[12] period?
[13] **A.** That's correct.
[14] **Q.** And you didn't use the other two at all, correct?
[15] **A.** That's correct.
[16] **Q.** And just to follow the methodology, if you had used the
[17] on-premise rate, you still -- had you used that, you still
[18] would have had to double it because that's just a BMI rate and
[19] you were licensing BMI and ASCAP music, correct?
[20] **A.** Slightly different.
[21]    The reason that I didn't use the on-premise rate is
[22] that there was a perception at AEI, and subsequently at DMX,
[23] that BMI had conspired with Muzak in coming up with that rate
[24] and that rate was substantially greater than 2.25 would have
[25] given, and at that time Muzak was predominantly an off-premise

Page 974

[1] **A.** Yes.
[2] **Q.** And, using that definition, DMX did have a storecasting
[3] business in 2005?
[4] **A.** I'm not sure we had much of one but we may have had one.
[5] **Q.** And then I just want to make sure we are clear on how we
[6] got from the rate, the 2.25 percent to the $25 rate that you
[7] explained earlier today.
[8]    The first thing you did, if I am correct, is you
[9] doubled the 2.25 percent because you weren't just directly
[10] licensing BMI music, you were going to directly license BMI and
[11] ASCAP music and to account for that you doubled the 2.25
[12] percent rate, correct?
[13] **A.** That's correct.
[14] **Q.** So that got you to 4.5 percent.
[15]    And then you got to 5 percent because you were also
[16] going to be licensing SESAC music and you were also going to be
[17] obtaining the mechanical license that's usually licensed by
[18] Harry Fox, so I don't know if you called it a clear factor or
[19] not, but just to get from -- to estimate the value of that you
[20] got from 4.5 to 5 percent to account for SESAC and Harry Fox,
[21] correct?
[22] **A.** I never used "fudge" but we did round it up for those two
[23] uses; that's right.
[24] **Q.** So, that is for SESAC and Harry Fox?
[25] **A.** Correct.

Page 976

[1] or broadcast system. And if you look at the numbers they
[2] certainly, in 1987, start at 1250 and 1150, so it runs fairly
[3] close, but by the time you get to 2050 it really is more like
[4] $12 to $14 that should be paid. And AEI was -- the chairman
[5] used the word duped by BMI in that negotiation.
[6]    So, I figured why would you use a number that duped
[7] someone.
[8] **Q.** That's why you selected one of the three numbers?
[9] **A.** That's why I selected 2.25. It wasn't selecting one of the
[10] three, it was selecting the one that best articulated the
[11] business that people was in and the going rate for a majority
[12] of the business.
[13] **Q.** And that's based on your perception of a conspiracy and the
[14] duping that occurred at AEI?
[15] **A.** Again, I did not use the word conspiracy. It was my
[16] perception of the value of music that was being offered by DMX
[17] in comparison to the value of music that was being offered by
[18] Muzak at that time.
[19] **Q.** Okay, but had you applied the same methodology, regardless
[20] of the reason that you selected one of the three rates, had you
[21] applied the same methodology this number still would have had
[22] to have been doubled?
[23] **A.** I don't agree with you. I didn't use that methodology so
[24] why would it have had to have been doubled.
[25] **Q.** You agree with me that had you gotten that number you would

Page 977

[1] have gotten $41, correct?

[2] **A.** If you want me to work a mathematical equation?

[3] **Q.** Please, yes.

[4] **A.** Then I believe if you took $25.50 and you added another

[5] $25.50 you would get the $41 but that's simply a mathematical

[6] equation.

[7] **Q.** Absolutely.

[8] So this represents the math of doubling $20.50?

[9] **A.** That represents your math and other people's math of $20.50

[10] and doubling it.

[11]

[12] **Q.** And, similarly, the storecast rate was $2.15 per month so

[13] you are talking about roughly $25 a year there, correct?

[14] **A.** If you multiply that by 12 you are getting close to that,

[15] that's right.

[16] **Q.** So, if you double that, recognizing that you did not do

[17] this, had you applied the same methodology doubling that would

[18] have resulted in a direct license of about $50, a rate of a

[19] direct license of about $50 per year, correct?

[20] **A.** Again, it is a mathematical equation that you are using.

[21] It is nothing more than that.

[22] **Q.** Right.

[23] And you selected to do the mathematical equation that

[24] got you to a $25 royalty pool, correct?

[25] **A.** No, that's incorrect. I selected an amount, 2.25 percent,

Page 978

[1] which I believed was the amount predominantly used by Muzak and

[2] off-premise broadcast distribution which was prominent at that

[3] period of time and used that amount for that reason. And, if

[4] you took 2.25 you got yourself to the 5 percent.

[5] **Q.** Did you believe there was any duping or conspiracy in

[6] connection with the $2.15 per month storecasting rate?

[7] **A.** Storecasting is a minimal, minimal, minimal use by most

[8] background music services.

[9] **Q.** Did you think there was any duping or conspiracy?

[10] **A.** I really didn't give it a second thought.

[11] **Q.** Now, the doubling that we did here, that you did here

[12] because you actually did do this, this is the doubling you did,

[13] correct, in the middle?

[14] **A.** That's right.

[15] **Q.** You did that to account for the fact that this was a BMI

[16] rate. You also wanted to account for the fact that you were

[17] going to be direct licensing ASCAP music, correct?

[18] **A.** That's correct.

[19] **Q.** Now, you elected to double a BMI rate. There was also an

[20] ASCAP rate in the marketplace at that time, correct?

[21] **A.** There was.

[22] **Q.** And the ASCAP rate in the marketplace in the time was in

[23] the mid-$40s, mid-$40 per location, am I correct?

[24] **A.** Are you talking about broadcast?

[25] **Q.** I'm talking about the ASCAP agreement that was in the

Page 979

[1] marketplace at that time.

[2] **A.** I would have to take a look at that agreement to see that.

[3] **Q.** Sure. One second.

[4] If I could ask you, and we will hand it up, to take a

[5] look at what's been marked as Joint Exhibit 0840. Am I

[6] correct, Mr. Knittel, that this is a copy of the final ASCAP

[7] agreement covering the period from 1994 to 1999 for AEI music?

[8] **A.** According to the letter from Ken Hayward, that is correct.

[9] **Q.** And I apologize, I forget, I don't recall the chronology;

[10] were you at ASCAP in 1995?

[11] **A.** No, I was not.

[12] **Q.** Were you at AEI in '95?

[13] **A.** As of April 1st, two weeks later from this letter.

[14] **Q.** Am I correct, if we turn to page, the third page of the

[15] exhibit, we have a list licensees, correct?

[16] **A.** Yes, you do.

[17] **Q.** And if you look under tab A it lists license fees for the

[18] period 1994 through 1999 and the annual license fees range from

[19] $46.25 to $49.50; correct?

[20] **A.** That's correct.

[21] **Q.** And that's not a distinction between on or off-premise,

[22] that's just a type of establishment that's licensed, correct?

[23] **A.** Establishments open to the public, that's correct.

[24] **Q.** And so, these would be the rates regardless of whether it

[25] was broadcast or on-premise?

Page 980

[1] **A.** That's correct.

[2] **Q.** And so, if we take the lowest -- let's take the lowest of

[3] those rates at $46.25, that was an ASCAP rate that was in the

[4] marketplace in 1994, that would be 11 years before you were

[5] setting the direct license rate in 2005, correct?

[6] **A.** That's correct.

[7] **Q.** And you did not use that rate at all, once again, in your

[8] calculation, the $25 royalty pool, correct?

[9] **A.** I did not. No.

[10] **Q.** Instead, you double the lowest of the three rates that was

[11] in the BMI 1987 to 1993 agreement?

[12] **A.** I did not -- I doubled what you could see as the lowest

[13] rate but it was not chosen because it was the lowest rate, it

[14] was chosen because it addressed the predominant uses at that

[15] time in the marketplace as far as distribution.

[16] **Q.** Now, another thing that you could have done if you were

[17] trying to approximate the pool for BMI and ASCAP music is you

[18] could have used the rate that you preferred to use, the 2.25

[19] percent for BMI, but then you could have added that to the

[20] $46.25 rate that was in the ASCAP agreement at the time,

[21] correct?

[22] **A.** I don't agree with that.

[23] **Q.** You don't think that would have been another way to account

[24] for the ASCAP value instead of doubling the BMI rate to

[25] actually add what people were paying for ASCAP music at the

Page 981

[1] time?

[2] **A.** I think there is probably a great deal of hypothesis. I

[3] didn't choose to go in that direction.

[4] **Q.** Let me just make sure I'm done with this.

[5]     Mr. Knittel, when you developed the $25 royalty pool

[6] you didn't have any discussions with publishers as part of

[7] developing that rate, correct?

[8] **A.** I, personally, did not have any discussion with publishers

[9] but I believe from discussions I had and I don't want to get

[10] into hearsay with Mr. Gertz, that he had some discussions with

[11] publishers.

[12] **Q.** But, leaving aside Mr. Gertz, you yourself did not, right?

[13] **A.** No, I did not.

[14] **Q.** Now, the ASCAP rate in the mid-$40, you, when you were at

[15] ASCAP, had previously negotiated a rate between ASCAP and the

[16] commercial music services industry, correct?

[17] **A.** Yes, I had.

[18] **Q.** And, am I correct that the last final rate under the

[19] agreement that you negotiated was $41 per location, per year?

[20] **A.** I will take your word for it.

[21] **Q.** And whatever that rate was at the time you believed that to

[22] be a reasonable rate that you had negotiated, correct?

[23] **A.** I think, you know, when you look at snapshots of economic

[24] times, that that would have been back in 1990 to 1995,

[25] probably. 1989 to 1995, a very different economic time for the

Page 982

[1] broadcast background music industry and the growth in retail

[2] store was probably a fair and equitable rate at that time.

[3] **Q.** So it was reasonable at that time that things might have

[4] changed since the early 1990s?

[5] **A.** Certainly. Things have changed.

[6] **Q.** Fair enough.

[7]     If I can ask you to take a look at Petitioner's

[8] Exhibit 0173, please?

[9] **A.** Mr. Fitzpatrick, may I put these away so I don't get them

[10] confused?

[11] **Q.** Yes.

[12]     Mr. Knittel, am I correct that Petitioner's Exhibit

[13] 0173 is a reply affidavit that you submitted to the rate court

[14] at a time when you were director of licensing for ASCAP?

[15] **A.** Yes. That's what it says.

[16] **Q.** And, am I correct, referring to paragraph 1, that you

[17] submitted that reply affidavit in support of ASCAP's motion

[18] pursuant to Section 9B of the amended final judgment for an

[19] order fixing interim fees for applicant at the voluntarily

[20] negotiated and agreed upon rates paid by applicants in 1991?

[21] **A.** That's what it says. Yes.

[22] **Q.** And, just for reference, the voluntary negotiated and

[23] agreed upon rates in 1991 are the rates that we've just been

[24] talking about, that was the last final rate that you negotiated

[25] when you were at ASCAP?

Page 983

[1] **A.** I negotiated on behalf of ASCAP with the background and

[2] foreground music industry, yes.

[3] **Q.** And, I think I may have given you an incorrect rate before

[4] so I want to correct myself. If you could turn to paragraph 4,

[5] am I correct that it says the music services paid ASCAP an

[6] annual fee of only $44.50 for each restaurant, bar, retail

[7] store or similar establishment which was a music service

[8] subscriber in 1991?

[9]     So, does this reflect that the last final rate under

[10] the agreement that you negotiated on behalf of ASCAP was $44.50

[11] per location?

[12] **A.** That's what it says, yes.

[13] **Q.** In paragraph 4 it then goes on to say: If these

[14] establishments were licensed by ASCAP directly, they would have

[15] paid fees from two and a half to 25 times more than the ASCAP

[16] fee paid by the music services for each such 5A subscriber.

[17]     Do you see that?

[18] **A.** Yes, I do.

[19] **Q.** 5a refers to establishments open to the public, is that

[20] what you referring to before?

[21] **A.** Yes, that's correct.

[22] **Q.** So, the concept that in addition to licensing the

[23] commercial music services industry or background music services

[24] industry, ASCAP also licensed restaurants, bars, hotels

[25] directly?

Page 984

[1] **A.** Sure, under the general licensing program; yes.

[2] **Q.** When they did so, according to your paragraph 4, ASCAP

[3] obtained fees that were from two and a half to 25 times more

[4] per location than ASCAP was receiving from the commercial music

[5] services industry?

[6] **A.** That's right.

[7] **Q.** If I could ask you to turn to page 3, paragraph 7 of your

[8] affidavit, and in that you state: The other basic difference

[9] between the music services and the users they allege are

[10] analogous is the relative intensity of their music use. The

[11] music services make a far greater use of music than any other

[12] user group licensed by ASCAP. They provide uninterrupted music

[13] 24 hours a day.

[14]     Do you see that?

[15] **A.** I do.

[16] **Q.** And then, just to be clear, in that paragraph you are

[17] comparing the commercial music services to the other, all the

[18] other entities that ASCAP licensed at this time, correct?

[19] **A.** Mostly against to AM and FM radio stations.

[20] **Q.** So, that was the primary comparison but you do specifically

[21] refer to any other user group licensed by ASCAP?

[22] **A.** That's correct.

[23] **Q.** That's correct?

[24] **A.** Uh-huh.

[25] **Q.** And then if I could ask you to turn to paragraph 15 on page

A-486

Page 985

[1] 7 of your affidavit, you actually discuss the BMI agreement
[2] that you ultimately used the broadcast rate from in your
[3] development of the $25 royalty pool, correct?
[4] **A.** That's correct.
[5] **Q..** And they say: The music services also suggest that the BMI
[6] license fee is an appropriate benchmark from which this Court
[7] should set ASCAP's interim fee. In their view, the current BMI
[8] license fee is a more accurate reflection of the economic value
[9] to their industry of the right to use a large music repertoire
[10] than is the industry's history of agreements with ASCAP.
[11]      And then in paragraph 16 you say: Of course, we
[12] expect the music services to use the lowest possible fee as the
[13] benchmark for ASCAP's fees. BMI's fees have always been low
[14] when compared to ASCAP's. To be sure, BMI has, for many years,
[15] been seeking license fees closer to ASCAP's -- in some cases,
[16] successfully, in some cases unsuccessfully.
[17]      Then in paragraph 17 you cite to Mr. Cramer, BMI's
[18] former president and state that: However, Edward Cramer, BMI's
[19] former president, testified in 1980, in proceedings before the
[20] Copyright Royalty Tribunal, that BMI cannot achieve this result
[21] in a single bound. And you give the citation.
[22]      Thus, according to Mr. Cramer's testimony for purely
[23] historical reasons, BMI has been unable to achieve a fee which
[24] properly reflects the value of its repertoire in radio and
[25] television.

Page 986

[1]      In 18 you say: The same would presumably be true
[2] here. If it is, that would mean that the 1987 BMI fees were
[3] part of a BMI program to increase fees gradually. Then the
[4] current BMI fee would not reflect BMI's judgment as to the full
[5] value of its repertoire for this industry, correct?
[6] **A.** That's what it says, correct.
[7] **Q.** And so, in this particular affidavit you are urging the
[8] recipient of the affidavit not to rely on the BMI license fees
[9] because they're too low that you ultimately relied on in
[10] developing the $25 rate, correct?
[11] **A.** I don't think that's correct.
[12] **Q.** So, if we could then, I would like to turn to the actual
[13] rollout of the direct licenses that contained the $25 royalty
[14] pool.
[15]      I believe you have already described, so I won't make
[16] you repeat, that in order to roll this out you asked MRI to
[17] look at who are the publishers that DMX is actually playing and
[18] then you selected some of them and sent direct licenses out to
[19] that group for their review, correct?
[20] **A.** That's correct.
[21] **Q.** And, by the way, the $25 royalty pool, with the exception
[22] of the majors, the royalty amounts haven't been negotiated
[23] between DMX and any publisher, correct?
[24] **A.** No. There was not a negotiation.
[25] **Q.** If I could ask you to take a look at Joint Exhibit 0874.

Page 987

[1] If we could start at the bottom there is an e-mail from Karyn
[2] Ulman to Seth Adkins.
[3]      Do you see that?
[4] **A.** Yes, I do.
[5] **Q.** Karyn Ulman, at the time of this e-mail, was at MRI,
[6] correct?
[7] **A.** I believe she is still at MRI.
[8] **Q.** And Seth Adkins, she was sending this to Seth Adkins in his
[9] role as a manager at Abkco?
[10] **A.** Mother Bertha is also a publisher that is part of Abkco.
[11] Abkco is also a record label.
[12] **Q.** And Ms. Ulman, after sending the e-mail to Seth Adkins,
[13] Ms. Ulman then forwarded the e-mail to you with the line, "Per
[14] your request," correct?
[15] **A.** Yes. That's right.
[16] **Q.** And am I correct that Ms. Ulman's e-mail to Mr. Adkins
[17] represented one of the e-mails that you described when you were
[18] talking to Mr. Rich where DMX was making its initial rollout of
[19] the direct licenses with the $25 royalty pool?
[20] **A.** That's correct.
[21] **Q.** And she has an introductory paragraph and then she gets
[22] down to the line that says: The basic terms are as follows:
[23] Correct?
[24] **A.** That's correct.
[25] **Q.** And there is a grant of rights provision and I believe you

Page 988

[1] discussed that with Mr. Rich earlier today, correct?
[2] **A.** That's correct.
[3] **Q.** And then you get to number 2, royalty. The "royalty" is
[4] over to the left, the 2 shifted up to the right-hand side of
[5] the page. Do you see that?
[6] **A.** I do, yes.
[7] **Q.** It says: 2. Royalty: Publishers pro rata share based on
[8] plays of a royalty pool of $25 per location per year multiplied
[9] by the number of locations, paid quarterly (all in including
[10] both the publishers and writers share).
[11]      Correct?
[12] **A.** That's correct.
[13] **Q.** It doesn't tell Mr. Adkins anywhere in there that the
[14] royalty pools would be calculated using only the off-premise
[15] service, does it?
[16] **A.** It doesn't say it there.
[17] **Q.** And you've never -- you never had any discussions with
[18] Mr. Adkins or any other publisher about the concept that DMX
[19] was using only its off-premise service as a proxy for
[20] distributions, did you?
[21] **A.** That's not true. I have had a great deal of conversations.
[22] **Q.** Not with Mr. Adkins, did you?
[23] **A.** No. I believe I had conversations with Alissa Coleman --
[24] Alissa Coleman-Ritz at that time, she has since divorced -- and
[25] is at Abkco.



**A-487**

Page 989

[1] As part of our discussions with the publishers we made
[2] it a point to lay all 52 cards face up so that they knew
[3] exactly where the royalty was coming from, exactly how the
[4] royalty would be paid and what it represented.
[5] **Q.** Do you recall giving your deposition in this case earlier
[6] last year?
[7] **A.** I do.
[8] **Q.** And on page 165 of your deposition, and I'm happy to show
[9] this to you if you would like, but do you recall being asked
[10] the question: Have you ever had any discussions with a
[11] potential or actual direct licensee about the fact that DMX
[12] uses the broadcast performances to distribute the money?
[13] **A.** I don't remember that. I would have to see it.
[14] **Q.** Let me provide it to you.
[15] Your Honor, may I approach to show it to the witness?
[16] Mr. Knittel, I'm going to start on page 164, line 21
[17] and go to 165, line 4.
[18] Mr. Knittel, am I correct that in the part of the
[19] deposition that I just noted I asked you the question: Have
[20] you ever had any discussion with a potential or actual direct
[21] licensee about the fact that DMX uses the broadcast
[22] performances to distribute the money?
[23] And you gave the answer: It's not been brought up.
[24] And I asked you the question: Do you know if anyone
[25] else has had any discussion with publishers?

Page 990

[1] And you gave the answer: Not to my knowledge.
[2] **A.** That's what I see here.
[3] **Q.** If I could ask you to go back to Joint Exhibit 0874, and I
[4] think we just looked at the number 2, the royalties section,
[5] number 3 says the territories in the U.S., number 4 says the
[6] term is three years, and then Ms. Ulman makes a calculation
[7] for Mr. Adkins where she states: Based on our recent analysis
[8] of current programming data, Abkco's market share of plays is
[9] approximately .42 percent.
[10] Do you see that?
[11] **A.** I do.
[12] **Q.** And she says: Based on our license proposal and Abkco's
[13] current pro rata share, Abkco would receive approximately
[14] $10,500 (.42 percent times $25 times approximately 100,000
[15] locations). This is exclusive of Mother Bertha's shares.
[16] Do you see that?
[17] **A.** That's right.
[18] **Q.** So, in order to get to the number $10,500, Ms. Ulman uses
[19] the number of DMX locations which she states is approximately
[20] 100,000.
[21] Do you see that?
[22] **A.** That's correct.
[23] **Q.** And that's not right, is it?
[24] **A.** It is not right today.
[25] **Q.** And it wasn't right at the time, was it?

Page 991

[1] **A.** You know, I don't know. I would have to see how many
[2] accounts we had at that time.
[3] **Q.** If I could ask you to take a look at what's been marked
[4] Joint Exhibit 0934. This is a document titled DMX Responses
[5] and Objections to the Second Set of Interrogatories by
[6] Broadcast Music Inc. to DMX Inc. If I could just direct your
[7] attention to the last page, you see there is a document titled
[8] DMX Response to Interrogatory No. 3 of BMI's Second
[9] Interrogatories.
[10] Do you see that?
[11] **A.** I do see response to No. 3, yes.
[12] **Q.** And, do you see that it lists location -- subscriber
[13] locations for each of the years and each quarter in each of the
[14] years for 2005, 2006, 2007 and 2008 except for the first
[15] quarter of 2005.
[16] Do you see that?
[17] **A.** On the very last page?
[18] **Q.** Correct.
[19] **A.** I do, yes.
[20] **Q.** And so, just to go back to Ms. Ulman's e-mail, we are in
[21] May of 2006 so that would be second quarter 2006, correct?
[22] **A.** That's correct.
[23] **Q.** And if we go to the last page of interrogatory No. 3, it
[24] states that there were a total U.S. commercial subscriber
[25] locations for DMX of 81,066, correct?

Page 992

[1] **A.** That's correct.
[2] **Q.** Now, if Ms. Ulman had used the number of locations that's
[3] been provided in interrogatory No. 3 when she e-mailed
[4] Mr. Adkins, she would have estimated a lower return to Abkco on
[5] this direct license, correct?
[6] **A.** Certainly.
[7] **Q.** And just to do the math, the way you would do it is you
[8] would take .42 percent, multiply that times the $25 per
[9] location rate, and instead of multiplying that by 100,000
[10] locations you would multiply it by the 81,066 locations,
[11] correct?
[12] **A.** 81,286, isn't it?
[13] **Q.** I think second quarter '06 --
[14] **A.** 81,066. That's right.
[15] **Q.** Let me do the math: 81,066 times the $25 royalty pool
[16] times .0042 equals $8,511.93, and that's what Ms. Ulman would
[17] have used -- that's the number Ms. Ulman would have come up
[18] with had she used the number of locations reported in response
[19] to interrogatory no. 3, correct?
[20] **A.** That's correct.
[21] **Q.** Now, two lines down Ms. Ulman also says to Mr. Adkins: DMX
[22] is increasing its reliance on direct license works. A direct
[23] license would not only ensure continued use of the Abkco and
[24] Mother Bertha catalogs but incentivize DMX to increase its use
[25] which would directly translate into higher pro rata shares and

A-488

VOLUME 6
January 26, 2010

Case: 10-3429    Document: 64-1    Page: 94    01/05/2011    180349    132

BROADCAST MUSIC INC., V.
DMX, INC

Page 993

Page 995

[1] higher royalties.

[2]    Do you see that?

[3] **A.** I do.

[4] **Q.** And that was an important component of the offer that DMX

[5] was making to publishers to enter into the direct license,

[6] correct?

[7] **A.** It was a component that we would program more of their

[8] musical compositions, yes.

[9] **Q.** And, is the idea there that regardless of the size of the

[10] royalty pool, DMX is going to play more of your performances

[11] and that's going to translate, hopefully, into higher dollar

[12] amount royalties for you?

[13] **A.** I think there is two components, one, the more accounts

[14] that we have the pool increases; and the number of spins that

[15] you receive, your royalties increase.

[16] **Q.** Right.

[17]    So, two ways your royalties could go up: DMX gets

[18] more locations or you get more plays?

[19] **A.** That's right.

[20] **Q.** The sentence we were just looking at refers to DMX is going

[21] to be incentivized to give you more plays?

[22] **A.** That's correct.

[23] **Q.** And that means hopefully you are going to get more money

[24] regardless of the size of the pool because your share of the

[25] pool is going to be bigger, is that correct?

Page 994

[1] **A.** That's correct.

[2]    Abkco and Mother Bertha are very strong repertories,

[3] Abkco: Rolling Stones, Sam Cooke to mention a few.

[4] **Q.** When you sent out this initial wave of direct licenses I

[5] believe you discussed with Mr. Rich this morning but, please,

[6] correct me if I am wrong, that none of the four majors, Sony,

[7] Universal, EMI, Warner/Chappel if I'm correct, were interested

[8] in the direct license with the terms that you sent out,

[9] correct?

[10] **A.** I think you said were interested in the terms. They didn't

[11] sign the license agreements.

[12] **Q.** They didn't want the license if the only monetary term was

[13] a $25 royalty pool, correct?

[14] **A.** No. Incorrect.

[15] **Q.** They wanted more money, didn't they?

[16] **A.** They wanted advances. They didn't want more money, they

[17] wanted advances and opportunity to recoup those advances.

[18] **Q.** They didn't want the license if the only payment term was

[19] the $25 royalty pool. It had to have an advance in it as well,

[20] correct?

[21] **A.** Most publishers that you deal with today of the page

[22] publishers are going to want an advance on everything they do.

[23] **Q.** And that was the response, that was the reaction that you

[24] got when you first sent out your $25 royalty pool license to

[25] the major publishers, correct?

[1] **A.** After meeting with them, that was the feeling.

[2]    Again, you are taking part of what I said earlier

[3] today. The bigger part was all of them were on the board of

[4] ASCAP, that gave them heartburn. The other side was that they

[5] were used to doing something that's been a standard practice

[6] for, in some cases, 50, 60, a hundred years, and you needed to

[7] have an incentive for them to try to something different. And,

[8] again, most of them being used to advances, that seemed to be

[9] the way to look at it.

[10] **Q.** The incentive that you are talking about is a nonrefundable

[11] advance, correct, so, in a sense or in essence it is a

[12] guarantee?

[13] **A.** No. That's not true.

[14] **Q.** Well, you did tell Mr. Rich this morning that at least with

[15] respect to the Sony deal, even if DMX doesn't earn it out,

[16] doesn't recoup the royalties, Sony gets to keep the money,

[17] right?

[18] **A.** I did say that but I said that we are certainly expecting

[19] to earn it out.

[20] **Q.** Right, but that's the idea of a guarantee. In case you are

[21] wrong Sony gets to keep the money, right?

[22] **A.** Well, the idea of a guarantee -- first of all, it is an

[23] advance. The idea of an advance is to front-load royalties so

[24] that people have initiative to enter into a license agreement.

[25] We front-loaded those royalties off what we believed was being

Page 996

[1] paid by ASCAP and BMI to Sony/ATV. When it subsequently came

[2] out that BMI had overstated it, an adjustment was made in time.

[3] That in-time adjustment may certainly give us a better

[4] opportunity to recoup this advance. And I think, you know, you

[5] have to sort of wait for the 57 months to run its course to see

[6] if, in fact, we do recoup it. It certainly is our intention to

[7] do everything possible to recoup it, but time will tell.

[8] **Q.** Right.

[9]    And the point of the guarantee is that you and I might

[10] have to wait. Sony doesn't have to wait. Sony has the money.

[11] Sony keeps the money no matter what happens, right?

[12] **A.** The idea of an -- you know, you keep saying guarantee.

[13] That's what your client gave to Universal not to do something.

[14] I'm saying an advance.

[15]    We gave an advance to Sony/ATV for Sony/ATV publishing

[16] and for their writer members to get a distribution off the

[17] music that we use with the intentions of recouping over 57

[18] months.

[19] **Q.** And I just want to make sure there is no disagreement.

[20] Let's say you're wrong and you don't recoup -- not saying you

[21] think that's what's going to happen but let's say it happens --

[22] Sony keeps the money, right?

[23] **A.** Yeah. They would. Yeah.

[24]    If we don't recoup they keep the money. If we recoup

[25] they we have to pay them more money than we gave them as an



**A-489**

[1] advance because we used their music beyond that point.

[2] **Q.** And, the type of offering that we are talking about to the
[3] other majors was similar in that respect, correct? That is,
[4] you were offering them upfront advances which you hope to
[5] recoup and if it turned out that you didn't, they would get to
[6] keep the money, right?

[7] **A.** Which we expected to recoup by programming their music in a
[8] fashion in which we had a great opportunity -- an opportunity
[9] to recoup.

[10] **Q.** Now, another thing that you saw from the initial wave of
[11] direct licenses is that there were some publishers, some
[12] non-major publishers that were very interested in whether or
[13] not a major publisher had taken the direct license, correct?

[14] **A.** That's correct.

[15] **Q.** And if I could ask you to take a look at Joint Exhibit
[16] 1167?

[17] Before you look at that, Mr. Knittel, we talked about
[18] the arrangement with Sony. Are there other publishers with
[19] whom DMX has entered into agreements where there are advances?

[20] **A.** Yes.

[21] **Q.** Could you give me some examples of those?

[22] **A.** There are a number of smaller publishers that we've given
[23] advances to. I would have to take a look. I don't have them
[24] all off the top of my head. There may be, I don't know, a
[25] dozen.

[1] **Q.** And these are non-majors that you are referring to?

[2] **A.** Yes.

[3] **Q.** And can you give an order of magnitude of the advances that
[4] you have given to these non-major publishers?

[5] **A.** $125 to $700 to $1,000 to $500; something that reflects an
[6] opportunity for them to have an advance in royalties, again a
[7] common practice in this business, and for us to have an
[8] opportunity to recoup it over time.

[9] **Q.** Thank you.

[10] If you could take a look at Joint Exhibit 1167, again
[11] it is a chain of e-mails so we will start at the bottom. The
[12] bottom is an e-mail from Theresa Torrance whose e-mail suggests
[13] that she's at Stage 3 music.

[14] Do you see that?

[15] **A.** I do, yes.

[16] **Q.** And that's sent to Karyn Ulman?

[17] **A.** Yes.

[18] **Q.** And the date is August 2nd, 2006.

[19] And then on that same day Karyn Ulman forwards the
[20] e-mail to you copying Ron Gertz and others, correct?

[21] **A.** Yes.

[22] **Q.** And then is the top e-mail of you replying all to the
[23] second.

[24] What Theresa has written to Karyn after some
[25] introductory pleasantries is: I have spoken to the owners

[1] about this deal and they okay with it but they want to wait
[2] until DMX has deals in place with the major publishers before
[3] signing.

[4] Do you see that?

[5] **A.** I do.

[6] **Q.** And when Karyn Ulman forwards that to you she says: It
[7] looks like Stage 3 (ZZ Top, Aerosmith (early) Macy Gray, Clint
[8] Black, Terry Clark, John Doe) will sign on to the DMX deal once
[9] we close a major.

[10] Do you see that?

[11] **A.** I do.

[12] **Q.** And the idea of the parenthetical is those are
[13] representative of some of the works in the Stage 3 repertoire,
[14] correct?

[15] **A.** That's correct.

[16] **Q.** And you replied to Karen: Thank you very much. It seems
[17] that's the call of many of the next tier publishers. Now let's
[18] get a major under our belt so that we can bring the rest of
[19] them into the fold. Take care. Barry.

[20] Correct?

[21] **A.** That's correct.

[22] **Q.** Now, the publishers that were interested in whether or not
[23] a major had taken the direct license, their interest was not
[24] just in whether or not the major had taken the direct licenses,
[25] but their interest is that they also want to be treated in the

[1] same way about the money and the reports and the $25 royalty
[2] pool, correct?

[3] **A.** No one stated that to me but I would imagine that was
[4] probably in someone's minds.

[5] **Q.** And, in fact, when I asked you a similar question at your
[6] deposition you agreed with that concept, correct?

[7] **A.** Again, I trust that you said that and I agree.

[8] **Q.** Now, you discussed this morning with Mr. Rich how you
[9] actually went about obtaining a direct license with at least
[10] Sony -- one major -- correct? And you talked about, I believe,
[11] the fact that there was an advance made that totaled $2.7
[12] million, correct?

[13] **A.** The advance was $2.4 million, I believe.

[14] **Q.** And there was a $2.4 million advance and a second agreement
[15] that covered Sony's administrative expenses for $300,000 and
[16] that's how you get to the $2.7 million total, correct?

[17] **A.** That's correct.

[18] **Q.** So, if I could ask you to take a look at Joint Exhibit
[19] 1150? Is this the $300,000 agreement that we were just
[20] discussing?

[21] **A.** That's correct.

[22] **Q.** And if you look at the second paragraph, well, just to be
[23] clear, this is a letter signed by you and sent to Mr. Bandier
[24] at Sony and it was also counter-signed by someone at Sony/ATV
[25] Music, correct?

Page 1001

[1] **A.** That's correct.

[2] **Q.** If you looked at the second paragraph of the letter on the

[3] first page it says: In consideration of the additional

[4] administrative and overhead costs, publisher will incur --

[5] publisher refers to Sony/ATV, correct?

[6] **A.** That's correct.

[7] **Q.** Publisher will incur, in connection with the agreement, DMX

[8] will pay Sony an additional fee of $300,000 (the fee).

[9]     Do you see that?

[10] **A.** I do.

[11] **Q.** And the rest of the paragraph deals with an option that

[12] could occur if there was a merger or acquisition between DMX

[13] and Muzak, correct?

[14] **A.** That's correct.

[15] **Q.** But, focusing on the first sentence, the concept here is

[16] that because it was entering into a direct license, Sony was

[17] going to incur additional administrative and overhead costs and

[18] DMX was making an upfront advance payment of $300,000 to help

[19] cover or defray those costs for Sony, correct?

[20] **A.** That's correct.

[21] **Q.** And if I could ask you to take a look in connection with

[22] this also at Joint Exhibit 1149, and the first page of this

[23] document is an e-mail from you to Mr. Brad Engel copying Ben

[24] Hanson dated November 30th, 2007, correct?

[25] **A.** That's correct.

Page 1002

[1] **Q.** Who is Mr. Engel?

[2] **A.** Brad Engel works in our finance area.

[3] **Q.** And the second page which is, if I'm correct, an attachment

[4] to the e-mail, lays out the schedule of payments, advance

[5] payments under the DMX Sony direct license, correct?

[6] **A.** That's correct.

[7] **Q.** And just so we are clear how that works, if you go to that

[8] page, the first bullet point, that's the $300,000 payment for

[9] the administrative expenses we were looking at, correct?

[10] **A.** That's right.

[11] **Q.** And then there would be a $450,000 advance due in December

[12] 2007, although that could be altered depending on when DMX

[13] receives some data, correct?

[14] **A.** That's correct.

[15] **Q.** The date could be altered, not the amount?

[16] **A.** No, that's right.

[17] **Q.** And then another $450,000 advance would be due February

[18] 2008?

[19] **A.** Right.

[20] **Q.** And then for the years 2009, 2010, total payments of

[21] $750,000, in installments, for each of those two years,

[22] correct?

[23] **A.** That's correct.

[24] **Q.** And, just so we are clear, you discussed this with Mr. Rich

[25] this morning, but subsequent -- subsequent -- to this the deal

Page 1003

[1] was extended from a three-year period to a 57-month period, the

[2] payment schedule would stay the same, there was no additional

[3] payments made under the agreement, correct?

[4] **A.** That's correct.

[5] **Q.** Now, you also referred to some discussions that you had

[6] with Mr. Arrow at Universal Publishing, correct?

[7] **A.** That's correct.

[8] **Q.** And if I could ask you to take a look, I will show you four

[9] exhibits at once so Ms. Hoag doesn't have to keep getting 1184,

[10] 1185, 1188 and 1190.

[11]     Mr. Gertz, if I could ask you to start --

[12] **A.** I'm Barry Knittel.

[13] **Q.** Oh, you're right. I was look being at Mr. Gertz' name.

[14] **A.** No problem. I didn't know if I was to leave. I wasn't

[15] sure.

[16] **Q.** Mr. Knittel, if you could take a look at Joint Exhibit 1184

[17] and, again, since it is an e-mail chain we will start at the

[18] bottom on the second page; the first e-mail is a May 2nd, 2006

[19] e-mail from Mr. Gertz to Mr. Arrow copying Karyn Ulman,

[20] correct?

[21] **A.** Are we talking about Exhibit 1184?

[22] **Q.** Yes. I'm at page 2?

[23] **A.** Okay. That's correct. You're right.

[24] **Q.** And I'm doing this just because since it is an e-mail chain

[25] it starts at the bottom.

Page 1004

[1] **A.** That's fine. I'm with you now.

[2] **Q.** So, this is an e-mail from Mr. Gertz to Mr. Arrow copying

[3] Ms. Ulman, and I haven't compared it word for word, but this

[4] looks similar to the e-mail that was the initial rollout of

[5] DMX' direct licenses that we looked at before, correct?

[6] **A.** It looks similar, yes.

[7] **Q.** And it also contains the 100,000 location language?

[8] **A.** That's correct.

[9] **Q.** Correct?

[10]     And there is a response from Mr. Arrow and Mr. Gertz

[11] then replies to Mr. Arrow and copies you, correct?

[12] **A.** That's right.

[13] **Q.** And Universal did not accept this offer that contained over

[14] the $25 royalty pool, correct?

[15] **A.** No, they did not.

[16] **Q.** If you could take a look at Joint Exhibit 1185, we have now

[17] moved ahead approximately five months to October 2006, correct?

[18] **A.** That's correct.

[19] **Q.** And this is an e-mail from you to Mr. Arrow enclosing a

[20] direct license agreement, correct?

[21] **A.** That's correct.

[22] **Q.** And if you look at the third paragraph of your e-mail, you

[23] have now made an offer of a $100,000 advance in connection with

[24] the direct license to Mr. Arrow, correct?

[25] **A.** That's correct.



Page 1005

[1] **Q.** And moving down further through that paragraph, another
[2] component of your offer is that DMX will use Universal's
[3] repertoire, no less than 17.5 percent of the publisher plays
[4] during any quarter commencing October 2007.
[5]     Correct?
[6] **A.** That's correct.
[7] **Q.** And there are two bullet points at the bottom there that
[8] you are offering as additional incentives to Mr. Arrow,
[9] correct?
[10] **A.** That's correct.
[11] **Q.** The first one of those states: As part of the agreement
[12] between UMPG -- which is Universal -- and DMX, DMX will also
[13] try and incorporate as much as possible the Universal library
[14] into our messaging service.
[15]     Correct? And if you did so, would that result in
[16] additional compensation for Universal?
[17] **A.** It would, yes.
[18] **Q.** And the second bullet point is: With regards to the DMX
[19] consumer products business (sale of CDs through alternative
[20] distribution), DMX will use its commercially reasonable efforts
[21] to incorporate the Universal Music publishing Group repertoire
[22] into the final playlists for these CDs.
[23]     And if you did so, that would result in additional
[24] compensation for Universal, correct?
[25] **A.** Yes, it would.

Page 1006

[1] **Q.** And Mr. Arrow did not accept that offer either, correct?
[2] **A.** He did not.
[3]     (Continued on next page)

Page 1007

[1] **BY MR. FITZPATRICK:**
[2] **Q.** If would could go to Joint Exhibit 1188, we move ahead to
[3] February 2007, and it's another e-mail from you to Mr. Arrow,
[4] correct?
[5] **A.** That's correct.
[6] **Q.** And in this particular offer, you have now moved to
[7] advances as laid out in the four bullet points in the middle of
[8] the e-mail, starting at $750,000 for the period February '07
[9] through May of '08, and then $800,000 for the subsequent two
[10] years, $800,000 each for the subsequent two years, correct?
[11] **A.** That's correct.
[12] **Q.** And Mr. Arrow didn't accept that offer either, right?
[13] **A.** They did not enter into a license agreement with us.
[14] **Q.** And then finally we move ahead to July 2007 in Joint
[15] Exhibit 1190, and in this e-mail, this is another e-mail from
[16] you to Mr. Arrow and Mr. Arrow's response to you, correct?
[17] **A.** Well, a couple of things had happened. In that time
[18] Universal had bought BMG Songs, which was considered a major
[19] product of that, so other than that, I made an offer back to
[20] them including Universal's repertoire plus all of BMG's songs
[21] repertoire and he made a counter offer back.
[22] **Q.** So it is an e-mail exchange between you and Mr. Knittel --
[23] **A.** I am Mr. Knittel.
[24] **Q.** Yes, I keep doing that. Between you and Mr. Arrow. I
[25] apologize.

Page 1008

[1] **A.** No, no offense.
[2] **Q.** Between you and Mr. Arrow. It reflects the fact that in
[3] the interim Universal has acquired BMG's catalog?
[4] **A.** That's right.
[5] **Q.** And in the offer that you make here, it's laid out in the
[6] bullet points on the second page, it starts at a $2 million
[7] advance for the period August '07 through October '08 and then
[8] has escalating amounts by $100,000 each year for the years '08,
[9] '09, 2010, etc., is that correct?
[10] **A.** That's correct.
[11] **Q.** Now -- and regardless of whether we use the word advance or
[12] guarantee, the offer that you were making to Universal was
[13] recoupable to the extent you played Universal's music, but to
[14] the extent that you did not, that DMX did not play enough of
[15] the music to recoup all of it, Universal would still keep the
[16] money, correct?
[17] **A.** You know, it's -- no offense, but it's not so easy when you
[18] use terms such as advance versus guarantee, because in the
[19] publishing community, as a matter of fact in the record
[20] industry community, those are very different terms. An advance
[21] has a recoupable element to it. A guarantee is here's the
[22] money and that's all there is to it. These were set as
[23] advances and under the entire terms, and under the entire term
[24] of the agreement, DMX would recoup those advances by
[25] programming their music.

**A-492**

Page 1009

[1] **Q.** Understood. And my only question is, it was conceivable
[2] that DMX might not play enough Universal music to recoup all of
[3] these royalties, correct?
[4] **A.** I don't mean to be argumentative. But again, you're
[5] looking at Universal, which is U2, Elton John, Eminem. There's
[6] a lot of repertoire there that can be used across all our
[7] channels of music. Our best intentions as we looked at these
[8] deals and made these offers was to be fiscally sound and at the
[9] same time have the opportunity to recoup these advances. That
[10] was our thought process from the get-go.
[11] **Q.** Well, let's talk about that for a second. Let's look at
[12] the year 2008 to 2009, where you're offering Universal an
[13] advance of $2.15 million. Do you see that?
[14] **A.** Mm-hmm. Yes.
[15] **Q.** Now, your whole royalty pool, as you've described it today,
[16] if you had 100,000 locations, which you don't, would have been
[17] $2.5 million. Do I have that correct?
[18] **A.** That's correct.
[19] **Q.** And you're offering Universal one publisher, $2.15 million
[20] in advance, is that correct?
[21] **A.** That's correct.
[22] **Q.** And is your testimony that you can't even conceive of the
[23] possibility that DMX might not recoup that advance?
[24] **A.** Again, it goes back to if the expectation was, and I think
[25] that we had back in those times expectations of having more

Page 1010

[1] than 100,000 accounts, not expecting the economy to shift the
[2] way it did so quickly, not expecting as Mr. Seaton laid out
[3] earlier, a loss of accounts through others undercutting our
[4] costs. The expectation when this letter was written on
[5] July 25th of 2007 was that we would have more accounts, more
[6] revenue and be able to recoup this advance.
[7] **Q.** And in what you would consider the extremely unlikely event
[8] that that didn't happen, I just want to make sure we're on the
[9] same page, if somehow that didn't happen, Universal keeps the
[10] money?
[11] **A.** They would have the money, that's right. Over the whole
[12] term of the agreement.
[13] **Q.** The money that's laid out in these bullet points?
[14] **A.** They don't get the 2.15 million as of the end of
[15] October 2009. We would have until October of 2010 to recoup
[16] that, the whole term of the agreement. Our advances covered
[17] the entire three-year term.
[18] **Q.** Just so we're clear, they would get the money, but you
[19] would have the whole year to recoup?
[20] **A.** That's right. As you mentioned earlier, with regards to
[21] Sony, it was initially 36 months, became 57 months, and the
[22] money did not increase.
[23] **THE COURT:** And what in your mind is the key
[24] difference between that agreement and a guarantee?
[25] **THE WITNESS:** A guarantee is usually for a finite

Page 1011

[1] period of time in which you give a certain amount of money and
[2] they get it whether you use their music or not. An advance is
[3] you give a certain amount of money for usually a longer period
[4] of time in which you have an opportunity to recoup that
[5] advance, and their intentions are that they want you to recoup
[6] it and pay you even more by using even more music after the
[7] recoup has been made.
[8] **THE COURT:** Well, are you implying that in one they
[9] could terminate the relationship before the term came to an
[10] end, and in the other they couldn't?
[11] **THE WITNESS:** No. Once they entered into that
[12] agreement, unless someone breaches the agreement, they can't
[13] terminate the agreement.
[14] **THE COURT:** Under either?
[15] **THE WITNESS:** That's right. In the case of Sony, the
[16] initial payments were made and we would have recouped in 36
[17] months. When we found the mathematical error at BMI, it was
[18] extended to 57 months. So we had 57 months to recoup the
[19] entire amount that's been paid to Sony.
[20] **THE COURT:** So you think that with an advance, both
[21] sides expect that the money will be recouped, and in a
[22] guarantee, they're not so sure.
[23] **THE WITNESS:** In a guarantee, I think they're less apt
[24] to care. In an advance, they'd like to see it recoup because
[25] then they know they're going to make more on the back side as



Page 1012

[1] you go beyond that base.
[2] **THE COURT:** But what happens to the money is the same
[3] either way?
[4] **THE WITNESS:** That's absolutely right.
[5] **BY MR. FITZPATRICK:**
[6] **Q.** We were just looking at the Universal guarantee and the
[7] amounts changed year to year, but roughly speaking, your
[8] last -- I'm sorry if I used the word guarantee. I'll use the
[9] word advance. The Universal advance, which had, the amount
[10] that you were offering in that last offer was somewhat a little
[11] bit in excess of about 12 million per year, correct?
[12] **A.** That's actually right.
[13] **Q.** And the Sony deal prior to its amendment to make it a
[14] 57-month deal had been a $2.7 million deal over three years,
[15] correct?
[16] **A.** That's correct.
[17] **Q.** And so that's $900,000.
[18] **A.** Actually, 2.4, because you remember 300,000 went towards
[19] the administration fee.
[20] **Q.** Okay, call it a $2.4 million deal with 300,000 for
[21] administrative fees, fair?
[22] **A.** That's correct.
[23] **Q.** So the Sony agreement, then, would work out to 800,000 a
[24] year if you exclude the 300,000 in administrative expenses.
[25] **A.** That's right.



**A-493**

Page 1013

[1] Q. So had you, had Universal taken your last offer, which we
[2] know they didn't, had Universal taken your last offer, am I
[3] correct that you would have a direct license with Universal
[4] where you were advancing a little bit in excess of 2 million a
[5] year and a direct license with Sony where you would, which you
[6] do have, which you are advancing approximately or exactly
[7] $800,000 a year, is that correct?
[8] A. They didn't take the deal.
[9] Q. No, I understand. But if they had, would that have been
[10] the situation?
[11] A. They didn't take the deal.
[12] Q. But you understand my question, don't you, Mr. Knittel?
[13] A. No, it makes no sense. They didn't take the deal. If they
[14] took the deal, then you say hey, you got to look at this thing
[15] differently. But they didn't take the deal.
[16] Q. Understood. But if they had -- you don't disagree with my
[17] math do you? You have about 2 million out each year to
[18] Universal and about 800,000 out each year to Sony?
[19] A. Yes.
[20] Q. And if that was the case, you would have more out in direct
[21] licenses, that is, in advances $2.8 million than the entire
[22] royalty pool that you had contemplated under your agreement,
[23] correct?
[24] A. If you had no growth in those accounts, yes.
[25] Q. Yes. So if you had the hundred thousand, if you had

Page 1014

[1] 100,000 locations, which again, you were 19,000 locations
[2] below, at least in second quarter of '06, if you had 100,000,
[3] your royalty pool is $2.5 million?
[4] A. That's correct.
[5] Q. And if Universal had taken your deal, understanding they
[6] didn't, you'd have $2.8 million out just to Universal and Sony,
[7] correct?
[8] A. That's correct.
[9] Q. Did you tell any of the other publishers that you entered
[10] into direct licenses with that you had offers out in excess of
[11] your entire royalty pool to just two major publishers?
[12] A. No.
[13] Q. And that's despite the fact that you understood that the
[14] publishers that you were negotiating with cared not just that a
[15] major had entered the deal, but that they were being treated
[16] the same in terms of money as those majors?
[17] A. Again, you have a pool that was $25 times a number of
[18] accounts, right? So those accounts would have received the
[19] royalties from that pool by the pro rata share of the music of
[20] theirs that was used.
[21] Q. So that was why you didn't tell anybody about it?
[22] A. We didn't have a deal with Universal.
[23] Q. Did you tell anybody about the deal with Sony?
[24] A. I imagine most people knew about the deal with Sony. That
[25] stuff travels through the industry. A number of people were

Page 1015

[1] saying, your earlier exhibit said once you get a major come
[2] back to us. There were a number of people that made that
[3] statement. When we got majors, we went back to them.
[4] Q. Did you tell anybody that you negotiated with that you had
[5] a deal with Sony and it involved an advance which Sony would
[6] keep no matter what, of $800,000 a year plus a $300,000
[7] administrative payment?
[8] A. Usually we don't tell, for the people that we gave an
[9] advance of $500, we didn't tell somebody else we gave them an
[10] advance of $500. You keep that stuff confidential.
[11] Q. And so that was the reason, to be clear, you didn't tell
[12] anybody, right?
[13] A. No.
[14] Q. If you could take a look at Joint Exhibit 1240, please?
[15] Now, we've been talking about the advance to Sony and the
[16] offered advance to Universal, and in both of those cases the
[17] concept is obviously that DMX has a huge incentive to increase
[18] plays of, in Sony's case, Sony's music in order to recoup the
[19] advance, correct?
[20] A. That's correct.
[21] Q. But DMX made that point to other publishers as well, that
[22] DMX would have great incentive to use their music more, even if
[23] there wasn't an advance outstanding, correct?
[24] A. That's correct.
[25] Q. And this top e-mail here from Anita Hunsaker to Brett Burns

Page 1016

[1] is an example of that type of statement, correct? You know,
[2] Mr. Knittel, that's actually not fair. I don't think that's
[3] what that is. Let's take a --
[4] A. I was reading it for the second time and didn't see quite
[5] the same thing either.
[6] Q. I agree. I think this is a different type of statement, so
[7] let's look at it. What Ms. Huntsacker says to Mr. Burns is,
[8] "Hi, Brett. Just following up on this DMX proposal." The
[9] proposal, again, she's referring to is at the bottom of the
[10] page and that's similar to the other proposals we've been
[11] looking at today, correct?
[12] A. That's correct.
[13] Q. And she says, "Please keep in mind that direct licensing
[14] removes the middle man, insuring that the publishers
[15] controlling the works actually receive payment consistent with
[16] their songs uses (at a higher per song rate, since there would
[17] be no ASCAP cost, expenses or admin fees deducted from
[18] royalties paid to you.) This also permits DMX to pay a lower
[19] rate overall because it is not paying for ASCAP's
[20] administrative expenses."
[21] So contrary to what I said before, what Ms. Huntsacker
[22] is saying to Mr. Burns here is his particular publisher could
[23] actually get a higher per song rate from DMX than it would have
[24] gotten from ASCAP because there were no administrative costs,
[25] correct?

A-494

Page 1017

[1] A. I really don't know. I've not seen this before. I'm not
[2] quite sure what she's saying. I'm not quite sure of the
[3] accuracy of it.
[4] Q. Now, one of the terms that's in every direct license that
[5] DMX has entered is a most favored nations clause, correct?
[6] A. That's correct.
[7] Q. And I think you discussed this morning with Mr. Rich, and I
[8] think your testimony was that none of the material terms of the
[9] direct license has changed from form to form over your 550
[10] direct licenses, correct?
[11] A. That's correct.
[12] Q. But there have been some changes in some cases to the most
[13] favored nations clause discussed with publishers, correct?
[14] A. I think there's been one or two changes. Not many.
[15] Q. Well, if I could ask you to take a look, and again, we can
[16] look at three at the same time, joint Exhibits 969, 968 and
[17] 219.
[18]         MR. RICH: Your Honor, I notice the witness has been
[19] on cross-examination for a considerable period of time. Might
[20] we consider a mid-afternoon break?
[21]         THE COURT: Oh, sure. Is this a good time?
[22]         MR. FITZPATRICK: This is fine, your Honor, sure.
[23]         THE COURT: Let's take an afternoon break now.
[24]         (Recess)
[25]                 o0o

Page 1018

[1]         MR. FITZPATRICK: May I continue, your Honor?
[2]         THE COURT: Yes, please.
[3] BY MR. FITZPATRICK:
[4] Q. Mr. Knittel, I apologize, I forgot one document. If you
[5] could take a look at Joint Exhibit 1061, and then we'll come
[6] back to the three that I asked you before the break. And if we
[7] start at the end at the last page, we have an e-mail from Anita
[8] Hunsaker at MRI to Judy Castano, and it contains the language
[9] that we've seen before in the initial rollout of the DMX direct
[10] license program, correct?
[11] A. Of May 6, 2006?
[12] Q. Correct.
[13] A. That's correct.
[14] Q. And above that on the second page, Ms. Castano responds,
[15] and her e-mail suggests that she is Manatt, correct?
[16] A. Yes.
[17] Q. And Ms. Castano responds to Ms. Hunsaker's e-mail by
[18] saying, "I am sorry for the long delay in getting back to you
[19] on this, but I wanted to discuss with my colleagues. Since the
[20] license is on MFN basis"-- and that's a reference to most
[21] favored nations as you understand it?
[22] A. Yes.
[23] Q. "Since the license is on most favored nations basis, we
[24] don't have a problem in signing for our clients, but I'd like
[25] to ask you if you could do a term of any shorter than three

Page 1019

[1] years." Do you see that?
[2] A. I do.
[3] Q. And Ms. Hunsaker then forwards the e-mail to you above that
[4] and the chain continues, correct?
[5] A. That's correct.
[6] Q. And am I correct that neither you nor to your knowledge
[7] anyone else ever discussed with Manatt the terms of the advance
[8] that DMX had agreed to with Sony?
[9] A. Well, this is July of 2006. The license agreement with
[10] Sony wasn't until --
[11] Q. I think it was the end of 2007, is that correct?
[12] A. 2007. I don't want to encumber ourselves with facts, since
[13] it is here. It's 2007. Effective -- 2007 or eight.
[14] Q. I think I can represent to you accurately that its
[15] effective date was the beginning of 2008.
[16] A. January 1, 2008, right?
[17] Q. I think I can do that, yes. So my question is, once you
[18] entered into the guarantee with Sony, did you ever have any
[19] discussion -- I'm sorry, advance. Once you entered into the
[20] advance with Sony, did you ever discuss that fact with anyone
[21] at Manatt?
[22] A. No, I did not.
[23] Q. And to your knowledge, did anyone else?
[24] A. Not to my knowledge, no.
[25] Q. Now, if you could go back to --

Page 1020

[1] A. That actually, if I may, brings up a point that when you
[2] asked about Universal's advance, we had not signed with
[3] Sony/ATV yet, so my perception would be had we signed with
[4] Universal, the deal with Sony may not have gone forward. Just,
[5] you know, as you brought it up here, it's the thought process.
[6] Universal when we made that offer, no one else had signed,
[7] right?
[8] Q. I don't know it to be the case that no one else signed, but
[9] certainly Sony had not signed. I agree with that.
[10] A. No major had signed.
[11] Q. That's correct.
[12] A. So therefore, if we had signed with Universal, we would
[13] have probably stopped negotiating with Sony or withdrawn the
[14] offer. So we would not have been over the 2.5 million pot.
[15] Q. Okay. So your testimony is that if you had signed
[16] Universal, you would not have pursued another major?
[17] A. Probably would not have pursued and moved ahead. Probably.
[18] Q. So if you could take a look at Joint Exhibit 969. And
[19] again, starting at the end which goes from the second to the
[20] third page, we see another e-mail from Ms. Hunsaker and it
[21] contains the sort of standard language we've been looking at
[22] earlier today, correct?
[23] A. That's correct.
[24] Q. And then there's a response above that from Sego Takashima,
[25] whose e-mail suggests -- I don't know if that's a he or a she.



A-495

[1] Do you know, Mr. Knittel?

[2] **A.** I believe it's a he.

[3] **Q.** Assuming that's right, Mr. Takashima's address suggests

[4] he's at Cherry Lane?

[5] **A.** Cherry Lane Music Publishing, yes.

[6] **Q.** The first line of his response to Ms. Hunsaker is, "Hi,

[7] Anita. We can agree to the following terms on MFN with all

[8] songs." Do you see that?

[9] **A.** I do.

[10] **Q.** And then continuing up the chain, Ms. Hunsaker forwards the

[11] e-mail to Ms. Ulman asking for her review and comment. Do you

[12] see that?

[13] **A.** I do.

[14] **Q.** And then Ms. Ulman sends it to you and Mr. Gertz with a

[15] copy to Mr. Watkins and she says, "Hi, guys. Cherry Lane is

[16] willing to say yes to DMX," and then the first paragraph

[17] continues. But then the second paragraph starts, "The catch,

[18] MFN on all terms with all songs. While we have not yet entered

[19] into any agreements with advances it may be necessary to do so

[20] to land a major publisher."

[21] Just to be clear, we're again, pre-Sony deal at this

[22] point, which is why she's saying that, correct?

[23] **A.** Mm-hmm.

[24] **Q.** "Do either of you think you can convince CL" -- I take it

[25] that's Cherry Lane -- "to accept MFN on the royalty rate and

Page 1022

[1] methodology for calculating the royalty rate only? We could

[2] also living with MFN as to the quarterly payment schedule for

[3] accounting." Do you see that?

[4] **A.** I do.

[5] **Q.** And then if I could ask you to turn to Joint Exhibit 968,

[6] there's an e-mail from a few days later from Ms. Hunsaker to

[7] you and copy to Ms. Ulman. Do you see that?

[8] **A.** I do.

[9] **Q.** Ms. Hunsaker says, "Barry, according to my Cherry Lane

[10] contact their in-house attorney, Keith Hotrich," if I'm saying

[11] that correctly, "has agreed to license with DMX and will be

[12] preparing the license for our review. The MFN will be with

[13] respect to the royalty rates (as opposed to all terms)."

[14] Do you see that?

[15] **A.** I do.

[16] **Q.** And then if you could look at Joint Exhibit 219, am I

[17] correct that this, among other things, is the direct license

[18] that DMX entered into with Cherry Lane?

[19] **A.** Yes, it is.

[20] **Q.** And if you could look at page 3, there's a subparagraph D

[21] there that says "most favored nations." Do you see that?

[22] **A.** I do.

[23] **Q.** And this is a most favored nations provision that's not

[24] identical to the most favored nations clauses contained in

[25] other contracts, is that correct?

Page 1023

[1] **A.** That's correct.

[2] **Q.** And this most favored nations provision reads: "Licensee,"

[3] and that's DMX in this case, correct?

[4] **A.** Correct.

[5] **Q.** "Licensee represents and warrants that the methodology and

[6] royalty rate for calculating royalties payable to publisher, as

[7] well as the schedule for accounting of such royalties will be

[8] the same as the methodology and royalty rate for calculating

[9] and accounting of such royalties payable to any third party

[10] music publisher or administrator, a third party, under any

[11] catalog license between licensee and any such third party which

[12] is entered into during the term for the same rights, territory

[13] and term as provided herein."

[14] And then it says, "For the avoidance of doubt a third

[15] party does not include a music collection society." Do you see

[16] that?

[17] **A.** I do.

[18] **Q.** And again, to be clear, this is before the Sony agreement,

[19] correct?

[20] **A.** That's correct.

[21] **Q.** And did at any time after you entered into the Sony

[22] agreement you discuss with anyone at Cherry Lane the fact that

[23] Sony, that DMX had offered and granted Sony an $800,000 a year

[24] advance?

[25] **A.** Not to my knowledge.

Page 1024

[1] **Q.** And that's despite the fact that this most favored nations

[2] clause promises that the schedule for accounting of such

[3] royalties will be the same for Cherry Lane as it is with all

[4] other publishers?

[5] **MR. RICH:** Objection.

[6] **THE COURT:** I'll hear you on it.

[7] **MR. RICH:** Number one, the document speaks for itself.

[8] Number two, this witness is not an attorney, it's not been

[9] established that he drafted or understands as legal counsel

[10] would the meaning and interpretation of the most favored

[11] nations clause. I could certainly examine him on redirect

[12] about his understanding, your Honor, but I don't think that

[13] would govern, in any event.

[14] **THE COURT:** Well, you're free to -- I'll let the

[15] answer stand and you're free to cross-examine on redirect if

[16] you wish.

[17] Was there a substantial difference in the schedule for

[18] accounting of such royalties? Is that the point that you're

[19] making, Mr. Fitzpatrick?

[20] **MR. FITZPATRICK:** Well, am I correct -- just to be --

[21] I think so, your Honor, but I should be clear with the witness.

[22] **Q.** Am I correct, Mr. Knittel, that Sony received its payments

[23] according to the schedule that we looked at earlier where, for

[24] example, for the year 2009 Sony would get its $800,000 in a

[25] $450,000 payment at the beginning of the year and a $350,000

Page 1025

[1] payment mid-year?

[2] **A.** Sony --

[3]      **THE COURT:** But those are for, not for royalties.

[4]      **MR. FITZPATRICK:** Well, those are for the --

[5]      **THE COURT:** It's a method of carrying out the

[6] guarantee -- the advance, so-called.

[7]      **MR. FITZPATRICK:** It is an advance, which I believe --

[8]      **THE COURT:** It's the reciprocal of the royalty.

[9]      **MR. FITZPATRICK:** I think it's an advance which

[10] Mr. Knittel has testified is recoupable against royalties.

[11]      **THE COURT:** How do you reconcile the provision here

[12] for uniform schedules for accounting of royalties and the

[13] arrangement you made with Sony?

[14]      **THE WITNESS:** This was drafted by, this language was

[15] drafted in conjunction with MRI's lawyers and the lawyer for

[16] Cherry Lane, and I was under the, and still am under the

[17] assumption that this was not a material change to the license

[18] agreement, and not triggered by anything that we did with Sony.

[19]      **THE COURT:** So your answer is you take it on faith

[20] that the lawyers wouldn't have put in anything inconsistent.

[21]      **THE WITNESS:** Inconsistent to the way we were treating

[22] all licenses.

[23]      **THE COURT:** But you wouldn't know anything about that.

[24]      **THE WITNESS:** I'm not a lawyer.

[25]      **THE COURT:** I think Mr. Rich has made his point.

Page 1026

[1] **Q.** If I could ask Mr. Knittel to take a look at Joint Exhibit

[2] 0827. Thank you. Yes, it's Joint Exhibit 0827 and 0828,

[3] please. And if you could look at the first page, Mr. Knittel.

[4] This is an e-mail from Ben Hanson to Adam Lowenberg at Primary

[5] Wave Music, correct?

[6] **A.** That's, it's from Ben to Mr. Lowenberg, yes. I don't know

[7] who he is.

[8] **Q.** And do you recognize Primary Wave Music as a music

[9] publisher?

[10] **A.** I recognize part of it as being a music publisher, yes.

[11] **Q.** Am I correct Mr. Hanson at the time was general counsel at

[12] DMX?

[13] **A.** I believe at that time he was, yes.

[14] **Q.** And he attaches to his e-mail a document called Primary

[15] Wave musical composition catalog license term sheet, correct?

[16] **A.** That's correct.

[17] **Q.** And the paragraph on that term sheet dealing with payment

[18] is paragraph number 6, correct?

[19] **A.** It is stated payment and it is the 625, which would be the

[20] quarterly.

[21] **Q.** Okay, so just so we're clear, the payment paragraph, the

[22] paragraph labeled payment says DMX shall pay royalties which

[23] shall include the so-called publishers share and so-called

[24] songwriter's share equal to PW's, I assume that's Primary

[25] Wave's, pro rata share of a pool of royalties calculated by

Page 1027

[1] multiplying a fee of $6.25 by the number of service locations

[2] royalty pool calculated on a quarterly basis regarding the

[3] number of locations existing for the duration of the quarter.

[4] The pro rata share is determined each quarter by multiplying

[5] the royalty pool by a fraction where the numerator is the total

[6] number of identified musical works from publisher's catalog

[7] that are digitally transmitted by DMX to location as part of

[8] service programming in that quarter, and the denominator is the

[9] total number of musical works from all publisher catalogs that

[10] are digitally transmitted by DMX to locations as a part of

[11] service programming in that quarter. Do you see that?

[12] **A.** I do.

[13] **Q.** And that's basically a description of the fraction that you

[14] and Mr. Rich discussed when the demonstrative was up on the

[15] screen, correct?

[16] **A.** Basically it is. It's not quite the way I would have

[17] worded it, but basically.

[18] **Q.** And you see going back to the first page in Mr. Hanson's

[19] e-mail to Adam, the third sentence is, "These are the terms

[20] that 150 other publishers, including one of the majors, have

[21] agreed to." Correct?

[22] **A.** If you're asking me to verify what's stated, that is what

[23] is stated in the e-mail.

[24] **Q.** And the one major as of March '08 that DMX had a direct

[25] license with was Sony, correct?

Page 1028

[1] **A.** That would be correct.

[2] **Q.** Mr. Knittel, we've heard and I think you testified to the

[3] fact that DMX has approximately 550 direct licenses, is that

[4] correct?

[5] **A.** Slightly over, yes.

[6] **Q.** And am I correct that at least as of 2008 DMX used musical

[7] works that were in the catalog of, the catalogs of over 14,000

[8] different publishers?

[9] **A.** I don't know that to be true.

[10] **Q.** If I could ask you to take a look at Joint Exhibit 1277,

[11] please? Joint Exhibit 1277 is a document called DMX response

[12] and objections to the first set of interrogatories by Broadcast

[13] Music Inc. to DMX Inc. and if I could ask you to take a look at

[14] page 12, the response to interrogatory number 12. And in

[15] particular, if I could direct your attention to the final,

[16] final clause of the second to last sentence where it says "and

[17] approximately 14,381." Do you see that?

[18] **A.** I see that. Approximately 14,381.

[19] **Q.** And the response to this interrogatory reads, or the last

[20] part of the response to this interrogatory reads:

[21] "Approximately 14,381 publishers owned or controlled rights to

[22] musical works performed on DMX's commercial music service in

[23] 2008." Correct?

[24] **A.** Again, that's what it says.

[25] **Q.** And you don't have any reason to doubt the accuracy, do



**A-497**

[1] you?

[2] **A.** I don't know.

[3] **Q.** If you could take a look at a demonstrative, which we'll
[4] hand out, that has been made based on data contained in Joint
[5] Exhibit 1299. And, Mr. Knittel, I know you haven't seen this
[6] before. I will represent to you that what we have done is
[7] taken the summary of -- the DMX summary of royalties all payees
[8] for the third quarter of 2009 and we have put those in
[9] descending order in terms of royalties in the royalty column.
[10] So if I could confirm this with you, we've also put a number to
[11] make it easier to count in the far left-hand corner. If you
[12] could go to the last page, there are 250 administrators listed
[13] on this chart. Do you see that?

[14] **A.** I do.

[15] **Q.** And so, assuming that we accurately transcribed the data,
[16] this would suggest that of the 550 direct licenses, there are
[17] 250 administrators who actually had works performed on DMX
[18] during the third quarter of 2009, is that correct?

[19] **A.** That's what it would show, yes.

[20] **Q.** And just to be clear on the administrator concept, there
[21] are times when there will be multiple rows here that result
[22] from a single direct license, correct? And I'm happy to give
[23] you an example. If you look at lines 43 on page 2, 63 on page
[24] 2, 152 on page 5, 176 on page 5, and 226 on page 7, those are
[25] all Sindee Levin, correct?

[1] **A.** It says that she's the administrator, that's correct.

[2] **Q.** And that reflects in part a concept that you were
[3] discussing with Mr. Rich earlier, which is that one
[4] administrator can have multiple catalogs, correct?

[5] **A.** That's absolutely right.

[6] **Q.** So the fact that there are 250 entries on here reflects
[7] something less than 250 of the direct licenses, just using
[8] Sindee Levin as an example, correct?

[9] **A.** I'm not sure I would say it that way, but --

[10] **Q.** Well, the five lines that were Sindee Levin were all the
[11] result of one direct license that Sindee Levin signed, correct?

[12] **A.** For five different catalogs.

[13] **Q.** Right, but just logistically she put her name on that one
[14] piece of paper, and I do recognize she also signed a license on
[15] behalf of AMRA, but these are all the licenses she signed in
[16] her own name?

[17] **A.** As I said we had 550 signed licenses that represented over
[18] 5500 various publisher's catalogs. This is what's going to
[19] happen.

[20] **Q.** Right. So these 250 administrators that had works
[21] performed represents something less than 250 signed direct
[22] licenses, correct?

[23] **A.** That's correct.

[24] **Q.** And if we look at the chart number 158 on page 5 is the
[25] last publisher that actually received a distribution in this

[1] particular quarter, correct? Everything below that received
[2] zero distribution because it was less than the $25 rate,
[3] correct? Twenty-five dollars threshold for DMX to send out --

[4] **A.** Threshold to cut a check, that's correct.

[5] **Q.** And it's in descending order, so this is easy to do. You
[6] could use any threshold you want, but for example, if you
[7] wanted to look at any publisher that received $100 or more in
[8] that particular quarter, there would be 71 of those, correct?

[9] **A.** That's correct.

[10] **Q.** And also, if you go to the end, we've totaled up the
[11] columns. You could see that there are $142,431 paid in total,
[12] or, sorry, they're not actually paid because of the $25
[13] threshold, but $142,000 -- $142,431 in royalties accrued during
[14] that quarter, correct?

[15] **A.** That's correct.

[16] **Q.** And of that, almost $69,000 are from DMX's license with
[17] Sony/ATV Music Publishing, which is the number one license
[18] listed there, is that correct?

[19] **A.** That's correct.

[20] **Q.** Am I also correct that there are some direct licenses that
[21] DMX has where it's still figuring out what's in the catalog of
[22] the license that was signed?

[23] **A.** There's catalog updates that we get virtually every day, so
[24] I would imagine there's something in the pipeline coming from
[25] DMX to MRI that's constantly being looked at, yes.

[1] **Q.** If I could ask you to take a look at Joint Exhibit 1271.
[2] And if I could ask you -- first of all, I'll identify it.
[3] This, as you can see, is a letter from Mr. Larson at Weil,
[4] Gotshal to Mr. DiMona at BMI. Do you see that?

[5] **A.** I see that in this.

[6] **Q.** And on the second page, first full paragraph, the letter
[7] states: "For those licenses identified as TBD on the attached
[8] spreadsheet, DMX is in the process of obtaining further details
[9] regarding their associated publishing catalogs." Do you see
[10] that?

[11] **A.** I do.

[12] **Q.** And then if you look at the attachment to the letter, there
[13] are a variety of spreadsheets, or several spreadsheets that
[14] list licensors and some of those have TBD in the far right hand
[15] column. Do you see that?

[16] **A.** I do.

[17] **MR. FITZPATRICK:** Could I just have one minute, your
[18] Honor?

[19] (Pause)

[20] **MR. FITZPATRICK:** Thank you, Mr. Knittel. I have no
[21] further questions.

[22] **MR. RICH:** No redirect, your Honor.

[23] **THE COURT:** Thank you, Mr. Knittel. You're excused.

[24] **THE WITNESS:** Thank you very much.

[25] (Witness excused)

Page 1033

[1] **MR. MARKS:** Your Honor, for our next witness, we're
[2] going to read in the testimony of Ms. Teresa Stafford-Scherer,
[3] of BMI by deposition.
[4]     **MR. LARSON:** May I proceed?
[5]     **THE COURT:** Yes, please.
[6]     **MR. LARSON:** DMX calls as its next witness by
[7] deposition Teresa Stafford-Scherer. I'll spell that for the
[8] record. Teresa, middle initial A, last name S-t-a-f-f-o-r-d
[9] dash S-c-h-e-r-e-r.
[10] "Q. Ms. Stafford-Scherer, can you state your current address
[11] for the record, please?
[12] "A. Yes. 116 Oriel Avenue, O-r-i-e-l. Nashville, Tennessee,
[13] 37210.
[14] "Q. Do you report to Mr. Annastas today?
[15] "A. I do.
[16] "Q. Have you reported to Mr. Annastas throughout your tenure
[17] at BMI?
[18] "A. I have.
[19] "Q. What is your current title at BMI?
[20] "A. Senior director of general licensing.
[21] "Q. When did you become a senior director?
[22] "A. It's been a long time. At least seven years ago.
[23] "Q. So just to make sure I understand, the final decision for,
[24] final decision-making authority with respect to the terms of
[25] any license in the general licensing area is a combination of

Page 1034

[1] Tom Annastas, Mike O'Neill and the BMI legal department?
[2] "A. Correct.
[3] "Q. When you use the term general licensing, could you explain
[4] what you mean?
[5] "A. General licensing is everything other than broadcast or
[6] cable or new media. General licensing is commercial venues
[7] such as restaurant, retail, hotel, airlines, cruise lines.
[8] That which is not broadcast media.
[9] "Q. What role if any did you play in the negotiations between
[10] BMI and Muzak that led to the 2004 to 2009 license between
[11] Muzak and BMI?
[12] "A. Only as a support internally. I was not involved in the
[13] actual negotiations itself.
[14] "Q. And what did you do to support BMI internally in
[15] connection with the Muzak negotiations?
[16] "A. I would run spreadsheets as to number of locations on the
[17] industry that we had, known locations that we had trying to
[18] figure out a per-location basis.
[19] "Q. And why was it, why were you asked to identify the number
[20] of locations that Muzak had?
[21] "A. I had all the day-to-day operations with the commercial
[22] music services, so I had access to all the different report
[23] forms and things such as that. There were some assumptions
[24] that had to be made as far as trying to figure out the
[25] locations based on the reporting, because part of the provision

Page 1035

[1] in the old license was gross receipts, so you had to try to
[2] determine what that would be as a location count.
[3] "Q. So your estimate of the number of locations, total number
[4] of locations that Muzak corporate was servicing was based on
[5] information that Muzak provided to you?
[6] "A. Yes.
[7] "Q. Did you have any reason to doubt the accuracy of that
[8] information?
[9] "A. No. We had done audits previously and we've done audits
[10] after the new license just to get a number of count, making
[11] sure they're in the right, you know, spots or whatever on their
[12] original licenses.
[13] "Q. And have those audits revealed that your estimates of the
[14] number of locations were generally accurate?
[15] "A. Yes.
[16] "Q. Can you recall any instances where the audit of a
[17] commercial music service revealed that your estimate of the
[18] number of locations was inaccurate?
[19] "A. No. The only audit that we had, any audits that we had
[20] done that had adjustments in the fees were based on the
[21] storecasting, whether or not they put those appropriately.
[22] Whether it be Muzak or DMX or anyone else, whether or not they
[23] put storecasts in there appropriately, because storecasts was a
[24] different fee structure and they may have put it in on-premise
[25] or the off-premise figures.

Page 1036

[1] "Q. Storecasting was more expensive under the prior license?
[2] "A. Correct.
[3] "Q. Why did BMI charge more for a location storecasting than
[4] it charged for a location that received music via on-premise
[5] delivery?
[6] "A. The fee structure on storecasting, it's a more valuable
[7] service to us. It is a more feature performance. Advertising
[8] draws the attention to the customers as opposed to the
[9] commercial music being just in the background where you're not
[10] really necessarily paying attention to it. The advertising
[11] brings it more to the forefront and therefore we've considered
[12] it a higher value.
[13] "Q. Does BMI still consider it a higher value of performance
[14] today?
[15] "A. We do. I do.
[16] "Q. Are you aware, has anyone within BMI expressed to you a
[17] different view that storecasting is not more valuable than
[18] background and the foreground music performance?
[19] "A. No.
[20] "Q. I'm sorry, performances?
[21] "A. No.
[22] "Q. Do commercial music services that have signed in agreement
[23] with BMI for the 2004 to 2009 period pay a higher rate for
[24] storecasting locations than they do for locations that receive
[25] on-premise or off-premise delivery of the commercial music



**A-499**

Page 1037

[1] service?

[2] "A. We no longer have the separation that we used have in our

[3] license. It's such a flat fee per location.

[4] "Q. Would it be fair to describe the fee per location as a

[5] blended rate that allows licensees to either storecast or not?

[6] "A. Yes.

[7] "Q. Muzak was on interim, paid interim fees to BMI between

[8] 1994 and July 1, 2004?

[9] "A. Yes.

[10] "Q. From the outset of the negotiations on the new final

[11] license, BMI was seeking an increase in annual fee payments for

[12] Muzak, correct?

[13] "A. Correct.

[14] "Q. Muzak was paying less to BMI than it was paying to ASCAP

[15] during that period?

[16] "A. Correct.

[17] "Q. And BMI wanted to help bridge the gap?

[18] "A. Correct.

[19] "Q. I'll restate the question. Is it fair to say that the

[20] negotiations were on-again off-again over that ten-year period

[21] that Muzak was paying interim fees?

[22] "A. Yes.

[23] "Q. Sometimes the negotiations were more intense, sometimes

[24] they were a little less active?

[25] "A. Yes.

Page 1038

[1] "Q. And for some period of that time BMI was engaged in a rate

[2] court proceeding with Muzak and other members of the commercial

[3] music service industry to set final fees?

[4] "A. Correct.

[5] "Q. But from your perspective as an employee of BMI, it's not

[6] more valuable to make a performance via off-premise than

[7] on-premise delivery?

[8] "A. No.

[9] "Q. One of the issues in the Muzak BMI negotiations was

[10] whether Muzak would make a retroactive payment for the interim

[11] period prior to executing a new license, correct?

[12] "A. Correct.

[13] "Q. I'd like to show you an exhibit that has been previously

[14] marked as O'Neill Exhibit 6.

[15] MR. LARSON: Your Honor, this is under the first tab

[16] of the binder JX 759.

[17] "Q. Take all the time you need to review the document, but my

[18] first question is going to be if you've ever seen it before.

[19] "A. Yes.

[20] "Q. Did you see this document in or about April 4, 2003?

[21] "A. No, it would have been well after that probably.

[22] "Q. Do you recall when you first saw this document?

[23] "A. No. Generally, when things come in like that, I would get

[24] copied on it, so it would be after the fact. So it may be a

[25] week, two weeks after it was actually sent.

Page 1039

[1] "Q. And just so the record is clear, you mentioned Muzak

[2] corporate earlier.

[3] "A. Yes.

[4] "Q. And you are distinguishing Muzak corporate from Muzak

[5] affiliates?

[6] "A. Correct.

[7] "Q. Could you explain to me how you're using those terms and

[8] what the distinction in your mind is between Muzak corporate

[9] and Muzak affiliates?

[10] "A. Muzak corporate is separately licensed and their

[11] affiliates are individually licensed. So when you use Muzak,

[12] I'm assuming you're talking Muzak corporate in this, but Muzak

[13] also refers to Muzak affiliates to us, so it's a collective

[14] group of Muzak and its affiliates.

[15] "Q. For purposes of today's deposition, I'll use the term

[16] Muzak to refer to Muzak corporate that -- to Muzak corporate

[17] and when I want to refer to Muzak affiliates, I'll call them

[18] Muzak affiliates. Will that be clear to you?

[19] "A. That will be clear.

[20] "Q. You understood that Muzak wanted a license fee that

[21] wouldn't go up or down based on the change in the number of

[22] locations?

[23] "A. They had a fixed fee that they wanted to pay, yes.

[24] "Q. And at this point in the negotiations BMI wanted Muzak to

[25] pay on an annual per location basis, correct?

Page 1040

[1] "A. Correct. What I do want to qualify on the other is they

[2] had a flat fee, but it would go up if they exceeded the

[3] allowance, the 8 percent allowance.

[4] "Q. That's the deal they have today, correct?

[5] "A. Correct.

[6] "Q. In fact, one of the points of negotiation between BMI and

[7] Muzak was whether or not there should be an additional charge

[8] if Muzak's growth exceeded a certain percentage, correct?

[9] "A. Yes.

[10] "Q. Stafford-Scherer Exhibit 3 is an analysis that -- is that

[11] an analysis that Mr. Annastas had asked to you prepare?

[12] "A. Yes."

[13] MR. LARSON: Let me note that Stafford-Scherer Exhibit

[14] 3 is tab JX 221, the next exhibit in the binder. Go ahead.

[15] "A. Yes.

[16] "Q. At the bottom where it says prepared 4903 TSS, is that an

[17] indication that you prepared it on April 9, 2003?

[18] "A. Yes.

[19] "Q. Did you have any discussions with Mr. Annastas about the

[20] preparation of this analysis other than him asking you to

[21] prepare it?

[22] "A. He asked me to prepare it, and we were looking on a

[23] per-location basis what the fee would be.

[24] "Q. It assigns in the first license the number of locations

[25] for, a number of Muzak locations for 4903. Do you see that?

A-500

## Page 1041

[1]   "A.  I do.

[2]   "Q.  And that's the number of locations for Muzak as opposed to

[3]   Muzak affiliates?

[4]   "A.  This would be Muzak corporate.

[5]   "Q.  What was -- was this location count accurate to your

[6]   knowledge?

[7]   "A.  It was accurate.  One of the things I want to point out

[8]   here, just so that you are aware too, is Muzak would bring in

[9]   affiliates, so the rates, their locations counts were changing.

[10]  For example, Muzak corporate had an owned affiliate, Muzak

[11]  Orlando, and they would bring that into their agreement.  They

[12]  were doing that along the way.  They had about 19 of them.  And

[13]  so each year they were bringing groups in, so it wasn't

[14]  additional growth.  They were just bringing their own

[15]  affiliates into the master agreement.

[16]  "Q.  They were expanding the scope of their license to cover

[17]  locations serviced by Muzak, Muzak affiliates?

[18]  "A.  Those were owned affiliates.  It was just regionally

[19]  placed.  For example, the corporate offices in Fort Mill, South

[20]  Carolina, their Orlando, Muzak Orlando had an office there.

[21]  That was their affiliate that had handled everything for that

[22]  region.  They started to bring those regions into the

[23]  corporate.

[24]  "Q.  And so the number of locations covered by the agreement

[25]  between Muzak and BMI was increasing over time?

## Page 1042

[1]   "A.  Correct.

[2]   "Q.  About one-third of the way down the page you have a note

[3]   at the bottom of the chart that says, 'Between December 2001

[4]   and March 2002 increase in number of locations from 26 percent

[5]   from 114,309 locations to 143,348 locations.' Do you see that?

[6]   "A.  Yes.

[7]   "Q.  And that reflects that the number of locations covered by

[8]   Muzak's license interim license from BMI increased by

[9]   26 percent in between December 2001 and March 2002?

[10]  "A.  Yes.  With the qualification that they brought in their

[11]  regional-owned affiliate.  The Muzak Orlando, Muzak Dallas,

[12]  they would bring those in during that time.

[13]  "Q.  Was that the only source of the increase in the number of

[14]  locations serviced by Muzak?

[15]  "A.  No.  I'm sure that was not the only share, but that is the

[16]  lion's share of the major adjustments.

[17]  "Q.  Under the second chart it says, there's a note for the

[18]  column of the number of locations that reads, 'Assures no

[19]  increase in number of locations.  This assumption would have no

[20]  true basis in fact as Muzak's own goal is for 10 to 15 percent

[21]  increase in number of locations within a 12 to 18-month period.

[22]  In addition, with DMX having trouble in the marketplace and

[23]  technology allowing many new DMX dealers with interpret-based

[24]  delivery, Muzak stands to capture those locations.' Do you see

[25]  that?

## Page 1043

[1]   "A.  Yes.

[2]   "Q.  How did you know that Muzak's own goal was for a 20 to

[3]   25 percent increase in its number of locations over the balance

[4]   of 2003 and beginning of 2004?

[5]   "A.  In my day-to-day working with Chuck Walker, who used to be

[6]   their operations director, we would talk about things, their

[7]   goals what they were looking for, chain accounts that they may

[8]   wish to or try to get into.  Staying flat would not have been a

[9]   business model that they were looking for, that they could not

[10]  have survived staying flat.

[11]  "Q.  And you expected that in fact they would grow the number

[12]  of locations over the next several years at the time you

[13]  prepared this analysis, correct?

[14]  "A.  At the time I prepared it, I expected it would grow

[15]  locations.  To those levels I did not expect that, no.

[16]  "Q.  What level did you expect they would grow?

[17]  "A.  At that point in time they were doing about a 5 percent

[18]  increase in locations.  I expected to stay within a 5 percent

[19]  range you know, 5 to 6 percent, not greater than that.

[20]  "Q.  Why did you assume a 10 percent increase in the number of

[21]  locations for the first chart that you did?

[22]  "A.  It's a number out of the air.  I mean, it's one of those

[23]  things where we were looking at a normal 5 percent increase.

[24]  What is a possibility of a 10 percent was on the outside.

[25]  "Q.  When you say a normal 5 to 6 percent increase, what do you



## Page 1044

[1]   mean?

[2]   "A.  That's location counts.  Over a year period, they had a

[3]   normal growth of 5 to 6 percent on a fairly regular basis.

[4]   Given such, 10 percent is an outside figure.

[5]   "Q.  And in 2003, you believe that DMX was having trouble in

[6]   the marketplace, correct?

[7]   "A.  Absolutely.

[8]   "Q.  What is the nature of the trouble that in the marketplace

[9]   that DMX was having in the marketplace during that period?

[10]  "A.  There was technological issues at the time of whether or

[11]  not the delivery was the best delivery.  There was new

[12]  technologies where new players were entering into the

[13]  marketplace.  You know, Muzak had satellite at that time.  That

[14]  was a different technology than what was being utilized by DMX.

[15]  "Q.  And the troubles that DMX was having in the market, at the

[16]  time was DMX Muzak's largest competitor?

[17]  "A.  Yes.

[18]  "Q.  Is it fair to say that you thought that Muzak had an

[19]  opportunity for increased growth over potential rates because

[20]  of the trouble that its largest competitor was having at the

[21]  time?

[22]  "A.  That's correct.

[23]  "Q.  Does Muzak report the current locations under the 2004 or

[24]  2009 license agreement?

[25]  "A.  They do.



**A-501**

[1] "Q. How frequently?

[2] "A. That's once a year. It's due after June 30th of each

[3] year.

[4] "Q. And all of the commercial Muzak services that have signed

[5] a final license agreement with DMX report the number of

[6] locations serviced under the agreement on an annual basis?

[7] Excuse me, with BMI?

[8] "A. They are supposed to. I chase them quite often to make

[9] sure they do. Not everyone has complied, but most have through

[10] most current periods, but still chasing a few for this year.

[11] "Q. There's been a decrease in the number of locations

[12] serviced by Muzak?

[13] "A. Yes.

[14] "Q. Since 2004?

[15] "A. Correct.

[16] **Q.** What is your understanding of the approximate number of

[17] locations serviced by Muzak?

[18] **A.** 150 to 154,000 locations, in that range. I don't know

[19] exactly the figure.

[20] "Q. And do you recall what Muzak's number of locations was at

[21] the time the 2004 license started?

[22] "A. When we started the license, 165,000 locations.

[23] "Q. That's the number of locations Muzak had in December of

[24] 2003?

[25] "A. Correct.

[1] "Q. Let me show you a document that was previously marked as

[2] O'Neill Exhibit 8."

[3] **MR. LARSON:** Your Honor, that's JX 1164 under the next

[4] tab.

[5] "Q. If you could take a look at O'Neill Exhibit 8 and tell me

[6] if you've seen that document before.

[7] "A. I have.

[8] "Q. Is the first page of O'Neill Exhibit 8 the A1 proposal

[9] referred to in your May 21, 2004 e-mail to Mr. Annastas?

[10] "A. It is.

[11] "Q. In preparing what was BMI's latest proposal to proposal

[12] A1, you thought the only real difference between those two

[13] proposals would be whether or not Muzak would pay additional

[14] monies for the retroactive period of the interim license and if

[15] so how much?

[16] "A. That was my opinion on that yes.

[17] "Q. And at this point, May 21, 2004, the, in your view the

[18] difference between BMI's A1 proposal and Muzak's proposal was

[19] $4.5 million worth of retroactive payments?

[20] "A. I don't know if that's a retroactive period. I don't know

[21] if the 4.5 specifically refers to retro.

[22] "Q. Well, looking at the BMI proposal A1 on O'Neill Exhibit 8

[23] on the column that says 'retro dollars,' it adds up to

[24] 5.5 million. Do you see that?

[25] "A. Yes.

[1] "Q. In your e-mail, you know that Muzak was offering a million

[2] dollars up front in retroactive payment with their proposal.

[3] Do you see that?

[4] "A. Yes.

[5] "Q. It says that figure is a difference of 4.5 million. Does

[6] that refresh your recollection that the difference was

[7] 4.5 million worth of retroactive payments?

[8] "A. It helps put the numbers together. As far as

[9] recollecting, no. I mean, I see it here, but --

[10] "Q. You don't have an independent recollection that that's

[11] what you're talking about?

[12] "A. No.

[13] "Q. Can you think of anything else you might have been

[14] referring to at this time?

[15] "A. No.

[16] "Q. Okay, then you write to Mr. Annastas, 'What figure are we

[17] willing to give in this area? If they would split the

[18] difference on the retro, I would think we would have a deal on

[19] Tuesday. What do you think?' Do you see that?

[20] "A. I do.

[21] "Q. Did Mr. Annastas respond to these questions?

[22] "A. I don't think I have anything in writing on that. It was

[23] a discussion. It wasn't something that was a definitive. It

[24] didn't go from me to him and we decided it.

[25] "Q. But did you discuss your analysis with Mr. Annastas after

[1] you sent him this e-mail?

[2] "A. Yes.

[3] "Q. What did you say to him and what did he say to you?

[4] "A. I do not recall that conversation. I mean, as far as what

[5] was actually stated at the time.

[6] "Q. Do you recall the substance of the conversation?

[7] "A. It was dealing with retro figures and what was our area of

[8] give. That wasn't my determination to make at that time. That

[9] was just my opinion as to what I thought.

[10] "Q. Ultimately Muzak agreed to pay higher annual fees than it

[11] previously offered and BMI agreed to settle the past period at

[12] the interim rates with no separate retroactive payment,

[13] correct?

[14] "A. Correct.

[15] "Q. And part of the give and take was that Muzak agreed to pay

[16] higher fees than it had previously offered and BMI agreed it

[17] would not charge a separate fee for the retroactive period of

[18] the interim license?

[19] "A. Correct.

[20] "Q. The annual fees that Muzak agreed to pay for the July 1,

[21] 2004 to June 30, 2009 period were $6 million a year, correct?

[22] "A. Correct.

[23] "Q. Apart from any adjustments for organic growth?

[24] "A. Correct.

[25] "Q. And BMI proposal A1 -- strike that. $6 million a year for

Page 1049

[1] a five-year period was $30 million for over the life of the
[2] license, correct?
[3] "A. Correct.
[4] "Q. And that's even higher than the annual fees being, that
[5] BMI would have sought under BMI proposal A1, correct?
[6] "A. It ended up being higher than this particular proposal.
[7] "Q. And if you turn to BMI proposal A on the third page of
[8] this document, it was higher than the proposal, the annual fees
[9] in proposal A as well, correct?
[10] "A. Correct.
[11] "Q. If you look at proposal B, it was higher than the annual
[12] fees in proposal B as well, correct?
[13] "A. Correct.
[14] "Q. If you look at proposal C, it was higher than the annual
[15] fees in proposal C, correct?
[16] "A. Correct.
[17] "Q. Turning to the third page of O'Neill Exhibit 8, BMI
[18] proposal 1, there's a column that says 'Number LOC.S'. that's a
[19] reference to the number of locations correct?
[20] "A. Correct.
[21] "Q. What does the .164 EST refer to?
[22] "A. 164,000 locations is my understanding of that. They used
[23] to do that like in the thousands when they did those numbers.
[24] "Q. So that's an indication that BMI's estimate as of May 2004
[25] was that Muzak had approximately 164,000 locations?

Page 1050

[1] "A. That would be correct.
[2] "Q. Do you see the final column that says 'per 100 location
[3] ADJ,' and then there's an asterisk?
[4] "A. Yes.
[5] "Q. What does that column refer to?
[6] "A. I don't know. I don't -- well, this is showing organic
[7] growth adjustment according to the asterisks down here at the
[8] bottom. A 2.5 percent increase.
[9] "Q. Does that reflect that the proposals BMI was considering
[10] would include a growth adjustment up to 2.5 percent with no
[11] additional payment of fees, but that if the number of locations
[12] grew by more than 2.5 percent they would have to make an
[13] additional license fee payment?
[14] "A. That's what it appears to be.
[15] "Q. You would agree with me that it's more valuable for a
[16] licensee to have an allowed growth in locations of 8 percent
[17] than to have an allowed growth percentage of only 2.5 percent,
[18] correct?
[19] "A. Yes.
[20] "Q. I'd like to mark as Stafford-Scherer Exhibit 7 --"
[21]    MR. LARSON: Which is RX50 in the binder.
[22] "Q. -- a document bearing the Bates number of 10746. Have
[23] you seen this document before?
[24] "A. I have.
[25] "Q. This is an e-mail that you sent to Mr. Annastas on or

Page 1051

[1] about June 22, 2004?
[2] "A. Correct."
[3]    MR. LARSON: Your Honor, I'd enter RX50 into evidence.
[4]    MR. FITZPATRICK: I believe it's in, your Honor, but
[5] no objection if it's not.
[6]    (Respondent's Exhibit RX50 received in evidence)
[7] "Q. And this is an updated analysis as of June 22, 2004 of
[8] Muzak's number of locations during 2002, 2003 and 2004?
[9] "A. Correct.
[10] "Q. And the row of on-premise locations that comes from, that
[11] number of locations was reported directly by Muzak?
[12] "A. Yes. That would be on that report form.
[13] "Q. And the storecasting locations comes directly from Muzak's
[14] reports also?
[15] "A. Yes.
[16] "Q. And the off-premise locations, does that come from Muzak
[17] or did you have to estimate based on --
[18] "A. We do the estimates based, and usually it's $55 what we
[19] use.
[20] "Q. Did anyone ever tell you that the estimates reflected on
[21] Stafford-Scherer Exhibit 7 were inaccurate?
[22] "A. No.
[23] "Q. And as of June 22, you were projecting that Muzak had
[24] increased its number of locations 13 percent since 2002 and
[25] 18 percent since 2003, correct?

Page 1052

[1] "A. Within those periods. 2003 to 2004 it increased 18
[2] percent. 2002 to 2004, over that entire period it was
[3] 13 percent.
[4] "Q. And did anyone ever tell you that analysis was incorrect?
[5] "A. No.
[6] "Q. And you explained at the bottom of this e-mail that you
[7] were utilizing the monthly fee per location for off-premise
[8] billings of $55 per location per month to derive the number of
[9] locations that receive off-premise delivery?
[10] "A. Correct.
[11] "Q. And you note that that was an averaging figure that Chuck
[12] Walker and Mark Williams at Muzak corporate told BMI they used
[13] for their own averaging purposes?
[14] "A. Correct.
[15] "Q. You then go on to note that the numbers would be for 2004
[16] if BMI were to use $60 per location per month for averaging
[17] purposes?
[18] "A. Yes.
[19] "Q. Why did you conduct a separate analysis at $60 per
[20] location per month?
[21] "A. Only reason for that, to seek adjustments what they would
[22] be charging the retail locations or the restaurant locations,
[23] you know, would have gone up. It would not necessarily have
[24] stayed stagnant at the $55 level.
[25] "Q. When did Mr. Walker and Mr. Williams tell you that they

A-503

Page 1053

[1] were using $55 per location for their own averaging?
[2] "A. I don't exactly know the date.
[3] "Q. Which estimates were used by BMI, if you know, for its
[4] analysis of the Muzak negotiations; the $55 per location or the
[5] $60 per location?
[6] "A. I generally use the $55, from my recollection."
[7] **MR. LARSON:** Your Honor, I see that it's 5:00 and
[8] we're at the end of the discussion of that exhibit. If we
[9] could continue in the morning.
[10] **THE COURT:** Yes.
[11] **MR. LARSON:** Okay, thank you.
[12] **THE COURT:** We'll resume at 10:00.
[13] (Adjourned to January 27, 2010 at 10:00 a.m.)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 1054

[1] INDEX OF EXAMINATION
[2] Examination of:                    Page
[3] BRUCE OWEN
[4] Cross By Mr. Marks . . . . . . . . . . . . . 863
[5] Redirect By Mr. Salzman . . . . . . . . . . 876
[6] TIM SEATON
[7] Direct By Mr. Marks . . . . . . . . . . . . 885
[8] Cross By Mr. Fitzpatrick . . . . . . . . . . 899
[9] Redirect By Mr. Marks . . . . . . . . . . . 923
[10] LINUS BARRY KNITTEL
[11] Direct By Mr. Rich . . . . . . . . . . . . . 927
[12] Cross by Mr. Fitzpatrick. . . . . . . . . . 968
[13]        PETITIONER'S EXHIBITS
[14] Exhibit No.                    Received
[15]  205  . . . . . . . . . . . . . . . . . . . 915
[16]        RESPONDENT'S EXHIBITS
[17] Exhibit No.                    Received
[18]  RX50  . . . . . . . . . . . . . . . . . 1051
[19]
[20]
[21]
[22]
[23]
[24]
[25]

A-504

# In The Matter Of:

*BROADCAST MUSIC INC., v.*
*DMX, INC*

---

*VOLUME 7*
*January 27, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 01r5bmiF.txt, Pages 1056-1226 (171)

**Word Index included with this Min-U-Script®**

Page 1056

[1]                    01r5bmil              trial
[1]   UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
[2]   -------------------------------x
[3]   BROADCAST MUSIC INC.,
[4]                    ,  Petitioner,
[5]           v.                          08 Civ. 216 (LLS)
[6]   DMX, INC.,,
[7]                    Respondent.
[8]   -------------------------------x
[9]                                  January 27, 2010
                                     10:07 a.m.
[10]  Before:
[11]                    HON. LOUIS L. STANTON,
[12]                                     District Judge
[13]                    APPEARANCES
[14]  HUGHES, HUBBARD & REED, LLP
           Attorneys for Petitioner
[15]  BY:   JAMES C. FITZPATRICK
           MICHAEL E. SALZMAN
[16]        JASON C. BENTON
           MARGARET J. HOAG
[17]        - AND -
           JOSEPH DiMONA, In-house counsel, BMI, Inc.,
[18]
      WEIL, GOTSHAL & MANGES, LLP
[19]       Attorneys for Respondent
      BY:   R. BRUCE RICH
[20]        BENJAMIN E. MARKS
           TODD D. LARSON
[21]
[22]
[23]
[24]
[25]  .

Page 1057

[1]                    (Trial resumed)
[2]        MR. LARSON:  Your Honor, DMX continues the examination
[3]   of Teresa Stafford-Scherer by deposition.  And before we start,
[4]   if I do, I just wanted to note one correction from yesterday
[5]   near the end of the day, at page 614 of the transcript, line 17
[6]   to 20, there was an error in the recitation, if I could just
[7]   correct that for the record.  The question was:
[8]   "Q And the off-premise locations, does that come from Muzak or
[9]   did you have to estimate based on --"
[10]            And the proper answer should be:
[11]  "A We do the estimates based on adjusted gross revenues and
[12]  usually it is $55 is what we use."
[13]       THE COURT:  Let me ask counsel, did you make the
[14]  correction that you brought to my attention last week,
[15]  something that I had said?
[16]       MR. RICH:  Yes, your Honor.
[17]       THE COURT:  You nod.  Thank you.
[18]  "TERESA STAFFORD-SCHERER", (by deposition)
[19]       MR. LARSON:
[20]  "Q Have you seen Stafford-Scherer Exhibit 9 before?
[21]            And this is Joint Exhibit 1324 in the binder.
[22]  "A I have.
[23]  "Q This is a printout of an e-mail that you received from
[24]  Mr. Annastas on or about July 9, 2004?
[25]  "A That's correct.

Page 1058

[1]   "Q And are these your handwritten notes on the document?
[2]   "A Yes.
[3]   "Q And in the handwritten note on the top of the left-hand
[4]   side of the page where it says, '$6 million for 182,000
[5]   locations is $32.92 or $33 per location.'
[6]            "Do you see that?
[7]   "A Yes.
[8]   "Q That was your analysis of Muzak's proposal to pay $6
[9]   million a year and a determination of what the per location
[10]  rate would be based on your understanding that Muzak had
[11]  182,000 locations as of July of 2004?
[12]  "A That's a number if they had that location count, the
[13]  182,000.  We didn't have a known 182,000 that I'm aware of.
[14]  "Q So, using your best estimate of the number of locations
[15]  serviced by Muzak under its interim license with BMI as of July
[16]  9, 2004, you calculated the $6 million per year license would
[17]  translate to a per location fee of $32.97?
[18]  "A Correct.
[19]  "Q Did you understand at the time that Muzak was growing at
[20]  approximately 12 percent per year in terms of the number of
[21]  locations?
[22]  "A Based on the previous Exhibit 7, that's what we were
[23]  looking at, was 12 to 13 percent.
[24]  "Q In terms of BMI's internal analysis, you were looking at a
[25]  Muzak growth rate of 12 to 13 percent?

Page 1059

[1]   "A Correct.
[2]   "Q You just explained to me that in July, in early July of
[3]   2004 the growth rate assumption that BMI was using internally
[4]   with respect to the number of locations that would be covered
[5]   under its license with Muzak was 12 percent to 13 percent a
[6]   year, correct?
[7]   "A Correct.
[8]   "Q Did BMI use a, change its assumption about Muzak's growth
[9]   rate at any time between July 9, 2004 and the time that the
[10]  final deal was reached with Muzak later in 2004?
[11]  "A I'm not aware of, you know, I didn't do another analysis
[12]  that I'm aware that would have changed those figures.
[13]  "Q Nobody asked you to prepare a different analysis showing a
[14]  lower growth rate, correct?
[15]  "A Not that I recall.
[16]  "Q I would like to mark as Stafford-Scherer Exhibit 11 "--
[17]  which is RX 51 in the binder -- "a document that bears Bates
[18]  Number BMI 10702 to 10703.  Have you seen this chain of e-mails
[19]  before?
[20]  "A I have.
[21]  "Q The top one is an e-mail from you to Mr. Annastas sent on
[22]  or about July 9, 2004, responding to an e-mail from him to you
[23]  earlier in the day, correct?
[24]  "A Correct.
[25]  "Q And, does this memo reflect some of the handwritten notes

---

Page 1060

[1] that we just talked about in the last document?

[2] "A Yes. Yes. This is where my handwritten notes actually got

[3] written out properly."

[4]      MR. LARSON: Your Honor, we would enter RX 51 into

[5] evidence.

[6]      MR. FITZPATRICK: No objection, your Honor.

[7]      THE COURT: Received.

[8]      (Respondent's Exhibit 51 received in evidence)

[9]      MR. LARSON:

[10] "Q You also received earlier that the most recent analysis

[11] that the number of Muzak locations that you had done prior to

[12] BMI and Muzak reaching an agreement on the terms of the 2004

[13] license is that Muzak had 182,000 locations, approximately, as

[14] of early July of 2004?

[15] "A Correct. Correct.

[16] "Q Did BMI reach any deals with Muzak affiliates that had

[17] different terms than the ones that were agreed to with Muzak

[18] corporate?

[19] "A Different terms in what sense?

[20] "Q A different fee structure?

[21] "A No. The fee structure is exactly the same. It was the

[22] $36.36 figure on a per location basis. It also had the organic

[23] growth provisions in it as well.

[24] "Q I would like to mark as Stafford-Scherer Exhibit 13" --

[25] which is JX 774 in the binder -- "a document bearing BMI

---

Page 1061

[1] 11/6/03 to 1/16/08. Have you seen this chain of e-mails

[2] before?

[3] "A Yes.

[4] "Q At the time, Time Comet was an independent affiliate of

[5] Muzak?

[6] "A Correct.

[7] "Q And he was offered the same BMI license as the other Muzak

[8] affiliates?

[9] "A Correct.

[10] "Q And Mr. Eudeikis had several concerns about that license,

[11] correct?

[12] "A Correct.

[13] "Q He was concerned about a major increase in his BMI fees?

[14] "A Correct.

[15] "Q He was concerned that his client base was declining but

[16] there was no provision in the form license to reduce fees in

[17] the event his number of locations decreased?

[18] "A Correct.

[19] "Q He was concerned about locking himself into a five-year

[20] agreement given the declines in his business?

[21] "A That's correct.

[22] "Q Did anyone at BMI ever respond to Time Comet's concerns

[23] other than by your referring him to Mr. Carroll?

[24] "A I referred him to Jack Carroll. I also talked to him on

[25] occasions after that trying to explain to him he did not have

---

Page 1062

[1] 10 years' worth of retroactivity going forward and we were

[2] looking at those things as well. It was to his benefit to do,

[3] you know, do it that way because he didn't have the retro

[4] adjustment.

[5] "Q And he had been in existence and on an interim license from

[6] 1994 to 2004?

[7] "A Correct. Well, I mean, yeah, through that period. That's

[8] correct.

[9] "Q Did Time Comet ever execute a final license agreement with

[10] BMI?

[11] "A I don't know if they went out of business or if they

[12] actually did. I would have to look at that and see if they're

[13] on that list. They would be on a list of licensees under CMS

[14] agreements.

[15] "Q But certainly they didn't sign a license that had an

[16] adjustment, a downward adjustment to reflect their downward

[17] decline in client base, correct?

[18] "A Oh, no. They had two options, they would sign that

[19] agreement or remain a party to the rate court case that was

[20] currently in effect.

[21] "Q I would like to mark as Stafford-Scherer Exhibit 14" --

[22] which is JX 789 in the binder -- "a document bearing Bates

[23] numbers 2870 to 2871.

[24]      What is the difference between 05 MA and 05 MA-N?

[25] "A The 05 MA-N is regarding negotiated, and that's Muzak

---

Page 1063

corporate, and I think that's the only one we have under the N.
Yeah, it's Muzak LLC. The others are master agreement, you
know, regular form agreements.

"Q Does that reflect that Muzak is the only one that
negotiated the license and the others took a form based on that
Muzak license?

"A Yes. Because Muzak's license wasn't a form agreement and
we took that agreement and made form agreements for everyone
else."

     THE COURT: Excuse me.

     You know, you're reading those things into the record
and the use for me is if I can hear them and understand them as
you do.

     THE WITNESS: Okay.

     THE COURT: So, if you could, instead of just reading
the words into the page, if you could sort of speak them to the
courtroom and to me, I'll be able to follow what the purpose of
this is.

     THE WITNESS: Sure.

     MR. LARSON: Should we take the last question and
answer again:

"Q Does that reflect that Muzak is the only one that
negotiated the license and the others took a form based on that
Muzak license?

"A Yes. Because Muzak's license wasn't a form agreement and

---

Page 1064

[1] we took that agreement and made form agreements for everyone
[2] else."
[3]     THE COURT: That's much better. Thank you. That's
[4] what I needed.
[5]     MR. LARSON:
[6] "Q And people were given the option of either signing the form
[7] agreement or continuing the rate court litigation?
[8] "A That's correct.
[9] "Q So, is it fair to say that since BMI took the negotiated
[10] Muzak agreement and turned that into a form agreement for other
[11] services, that BMI didn't give any consideration to differences
[12] between the business operations of other commercial music
[13] services and Muzak other than the number of locations?
[14] "A The marketplace, the licensees were considered similar type
[15] and nature so, therefore, the same license was presented to all
[16] of those licensees. They were currently under the broadcast
[17] music service agreement or the interim at that period.
[18] "Q So the answer is, does that mean the answer to my question
[19] is, no, there wasn't any consideration given to differences in
[20] the way one commercial music service might operate as a
[21] business than another?
[22] "A No consideration. We considered them the same type of
[23] business.
[24] "Q Did BMI, to your knowledge, give any consideration to
[25] differences in the amount of BMI music that the other

Page 1065

[1] commercial music services used relative to their use of ASCAP
[2] music?
[3] "A None whatsoever. It was blanket licensing for a catalog.
[4] "Q Did BMI, to your knowledge, consider the rates that Muzak
[5] was paying to ASCAP in connection with the negotiation of the
[6] Muzak agreement?
[7] "A We absolutely were aware of those rates and, yes, we would
[8] have liked to have had the parody with ASCAP.
[9] "Q Was there any difference in the terms offered other than
[10] the initial per location, the initial count of the number of
[11] locations?
[12] "A No. It was a form agreement, it was based on location
[13] count.
[14] "Q Historical growth rates had no impact?
[15] "A None whatsoever.
[16] "Q Music Choice is another large member of the commercial
[17] music service industry, correct?
[18] "A Correct.
[19] "Q Music Choice and DMX are competitors?
[20] "A Correct.
[21] "Q I would like to mark as Stafford-Scherer Exhibit 15" --
[22] which is RX 53 in the binder -- "a document bearing the Bates
[23] numbers BMI 11497 to 11498.
[24]     "Have you seen this chain of e-mails before?
[25] "A I have.

Page 1066

[1] "Q Did you receive it from Mr. Annastas on or after October
[2] 24th, 2005?
[3] "A I did.
[4] "Q Is that your handwriting on the second page of the
[5] document?
[6] "A It is."
[7]     MR. LARSON: Your Honor, I move RX 53 into evidence.
[8]     MR. FITZPATRICK: No objection, your Honor.
[9]     THE COURT: Received.
[10]     (Respondent's Exhibit 53 received in evidence)
[11]     MR. LARSON:
[12] "Q And at the time that Music Choice and BMI were negotiating
[13] a final license agreement in, as of October 2005, Music Choice
[14] had already lost a major commercial account for its commercial
[15] music service, correct?
[16] "A Correct.
[17] "Q And so, their effective per location rate would be higher
[18] than 2000, it would be higher going forward than $36.36 because
[19] their overall number of locations had declined from the
[20] starting period of the proposed license?
[21] "A If using the base rate with removing the DirectTV locations
[22] going forward, the per location rate would have been
[23] considerably higher.
[24] "Q So, BMI agreed to treat the DirectTV locations differently
[25] than the other Music Choice locations for purposes of the

Page 1067

[1] license for the 2004 to 2009 period?
[2] "A We would license them separately; direct TV on one license
[3] and Music Choice on one license, still at the same rate.
[4] "Q But, for purposes of the organic growth adjustment and the
[5] minimum fee that Music Choice had to pay, it was a significant
[6] benefit to Music Choice to have the DirectTV account fee
[7] separately, correct?
[8] "A Correct.
[9] "Q I would like to mark as Stafford-Scherer Exhibit 16" --
[10] which is RX 54 in the binder -- "a document bearing Bates
[11] numbers BMI 3893 to BMI 3895.
[12]     "Have you seen this document before?
[13] "A I have.
[14] "Q This is a chain of e-mails that you received from
[15] Mr. Annastas on or about November 1st, 2005?
[16] "A It is.
[17] "Q This is your handwriting in the margins on first page?
[18] "A It is."
[19]     MR. LARSON: Your Honor, I would move RX 54 into
[20] evidence.
[21]     MR. FITZPATRICK: No objection, your Honor.
[22]     THE COURT: Received.
[23]     (Respondent's Exhibit 54 received in evidence)
[24]     MR. LARSON:
[25] "Q And if the number of subscribers that they actually had as



Page 1068

[1] of July 1, 2004 was lower than 29,907, then it is to Music
[2] Choice's benefit to use the later date as to the starting point
[3] for the license than the 12/31/03 date that was used for the
[4] Muzak license. correct?
[5] "A Correct. I don't know which one they used. I don't know
[6] if they used 12/31 or 7/1.
[7] "Q I'm just trying to understand how the math works because it
[8] is a benefit to Music Choice if their numbers went down in the
[9] first half of 2004, it is to their benefit to use the later
[10] date rather than the same date that was used for purposes of
[11] the Muzak agreement, correct?
[12] "A Not necessarily, and I will tell you why.
[13] "If you true up at the end of the year, which they all
[14] true up at the end of the year, if you had a higher starting
[15] point your 8 percent allowable would be higher, a higher fee,
[16] so it would not necessarily be to their benefit to use 12/31 as
[17] opposed to 7/1 if 7/1 was lower. You would have more allowance
[18] of 8 percent growth factor if you have a higher number to start
[19] with.
[20] "Q Let me mark as Stafford-Scherer Exhibit 19" -- which is RX
[21] 57 in the binder -- "a document bearing Bates numbers BMI 12870
[22] to 12873.
[23] "Have you seen this document before?
[24] "A I have.
[25] "Q Is it your understanding of what Stafford-Scherer 19 is is

Page 1069

[1] two different proposals that were prepared by Music Choice?
[2] "A Yes.
[3] "Q Prepared by Music Choice and sent to BMI?
[4] "A Yes. Sorry.
[5] "Q I direct your attention to the date in the upper right-hand
[6] corner. Is that your handwriting?
[7] "A That is.
[8] "Q Does that reflect the date that you received this document?
[9] "A That would be the day I received it, yes."
[10] **MR. LARSON:** Your Honor, we move RX 75 into evidence.
[11] **MR. FITZPATRICK:** No objection.
[12] **THE COURT:** Received.
[13] (Respondent's Exhibit 75 received in evidence)
[14] **MR. LARSON:**
[15] "Q I would like to show you a document that was previously
[16] marked as O'Neill Exhibit 13."
[17] -- which is JX 1311 in the binder.
[18] "Have you seen the document that was marked as O'Neill
[19] Exhibit 13 before?
[20] "A I have.
[21] "Q I would like to show you a document that was previously
[22] marked as O'Neill Exhibit 12" -- which is JX 1310 in the
[23] binder-- "which is the agreement between BMI and Music Choice
[24] settling the rate court proceeding between and with respect to
[25] commercial music services and the pending license for July 1,

Page 1070

[1] 2004 through June 30, 2009 license period. Have you seen this
[2] document before?
[3] "A I have. It's been quite some time.
[4] "Q Could you just -- this page reflects how the fees for the
[5] DirectTV locations that were lost XM at the end of 2005 were
[6] treated under this license agreement, correct?
[7] "A Correct.
[8] "Q I'm sorry. Does this reflect that on June 30, 2005, Music
[9] Choice had more locations through its DirectTV relationship
[10] than it had on June 30th, 2004?
[11] "A Yes. This is what it appears. 12,279 was their actual
[12] locations so there was a calculation here. 615 locations were
[13] those that were in surplus of the organic growth surplus so
[14] their adjustment fee was the 22,000 of which was added to their
[15] previous annual fee of $424.
[16] "Q And then for 2005 they paid a prorated portion of the
[17] annual fee to reflect that they lost all of those accounts by
[18] November 15th, correct?
[19] "A Correct.
[20] "Q Are you aware of any commercial music service that has
[21] provided BMI with information about what was actually listened
[22] to as opposed to what was programmed?
[23] "A I'm not aware of that, no.
[24] "Q Who would that -- who does the music performance reporting
[25] information provided pursuant to paragraph 8 go to?

Page 1071

[1] "A It goes to our operation folks. They check it against our
[2] system to see if it is a BMI work or not.
[3] "Q And they do that for purposes of making distributions?
[4] "A Absolutely.
[5] "Q Are you familiar with a company called TruSonic?
[6] "A I am.
[7] "Q TruSonic is another member of the commercial music service
[8] industry?
[9] "A They are.
[10] "Q Another competitor with DMX for CMS customers?
[11] "A Yes.
[12] "Q I would like to mark as Stafford-Scherer Exhibit 20" --
[13] which is JX 1326 in the binder -- "a document bearing the Bates
[14] Number BMI 7207. This is a letter that you sent to Steve
[15] Wasson of TruSonic on or about July 21, 2006?
[16] "A That's correct.
[17] "Q Was TruSonic paying interim license fees to BMI when you
[18] sent this letter?
[19] "A They were.
[20] "Q And TruSonic and BMI ultimately negotiated an agreement
[21] that covered a full settlement of the past periods and carry
[22] forth through June 30th, 2009, correct?
[23] "A Correct.
[24] "Q I would like to mark as Stafford-Scherer 21" -- which is RX
[25] 58 in the binder -- "a document bearing Bates Number BMI 12691.

Page 1072

[1] Have you seen this document before?
[2] "A I have.
[3] "Q This is an e-mail that you received from Dan O'Neill on or
[4] about October 30th, 2006 that you then forwarded on to
[5] Mr. Annastas, Mr. Berenson, Mr. DiMona and Mr. O'Neill?
[6] "A That's correct.
[7] "Q And TruSonic requested a modification of the form of
[8] agreement used by BMI with Muzak and Music Choice to contain a
[9] fee adjustment for locations which played songs from a direct
[10] licensed catalog, correct?
[11] "A The request was that locations that were 100 percent
[12] directly licensed at that particular location would not be
[13] added into the number of locations serviced.
[14] "Q And how was that request expressed?
[15] "A I'm sorry?
[16] "Q Well, in Mr. O'Neill's October 30th e-mail to you he notes
[17] that, 'The current BMI offer to TruSonic has no provision for
[18] locations which play songs from such a catalog.' Were the
[19] discussions limited to locations which play only songs that are
[20] directly licensed? Or were there also discussions, to your
[21] knowledge, between BMI and TruSonic about locations that played
[22] some directly licensed music but some music that wasn't
[23] directly licensed?
[24] "A No. It was solely 100 percent directly licensed, that was
[25] the issue at hand, was it had to be a location that was 100

Page 1073

[1] percent directly licensed therefore BMI would not be able to
[2] license that venue in and of itself so it had to be 100 percent
[3] directly licensed.
[4] "Q What I'm trying to understand is was that BMI's position in
[5] the negotiations or was TruSonic not requesting anything other
[6] than a provision for locations where 100 percent directly
[7] licensed?
[8] "A TruSonic was not requesting anything other than that. They
[9] confirmed that it was solely 100 percent directly licensed.
[10]     **MR. LARSON:** Your Honor, we enter RX 58 into evidence.
[11]     **MR. FITZPATRICK:** No objection, your Honor.
[12]     **THE COURT:** Received.
[13]     (Respondent's Exhibit 58 received in evidence)
[14]     **MR. LARSON:**
[15] "Q I would like to mark as Stafford-Scherer 2" -- which is RX
[16] 59 in the binder -- "the document bearing Bates Number BMI
[17] 7164. Have you seen this document before?
[18] "A I have. It's my scribbles.
[19] "Q These are your handwritten notes on the document?
[20] "A Yes."
[21]     **MR. LARSON:** We move RX 59 into evidence.
[22]     **MR. FITZPATRICK:** No objection, your Honor.
[23]     **THE COURT:** Received.
[24]     (Respondent's Exhibit 59 received in evidence)
[25]     **MR. LARSON:**

Page 1074

[1] "Q Do you have an understanding of what the content was of the
[2] directly licensed catalogs that TruSonic had?
[3] "A Content? Genre?
[4] "Q What songs have they been able to directly license?
[5] "A The only thing I knew is the Universal catalog. I did not
[6] know genre or songs in particular.
[7] "Q That's the Universal Music publishings catalog?
[8] "A That's correct.
[9] "Q Universal is one of the four major music publishers?
[10] "A They are now.
[11] "Q Were they at the time in 2006?
[12] "A Yes.
[13] "Q I suppose there might have been more than four at the time?
[14] "A There was more than four at the time. They've since
[15] consolidated becoming larger, the major four.
[16] "Q But they were one of the majors; however many majors there
[17] were in 2006 they were one of that group?
[18] "A That's correct.
[19] "Q Did Mr. O'Neill provide you with a list of locations that
[20] were solely directly licensed?
[21] "A We have not gotten that as of yet, nor have we asked for
[22] it. We know we can go and audit it at any time to get that
[23] list of locations.
[24] "Q To your knowledge, is TruSonic providing music service to
[25] directly licensed locations for which it is not paying a BMI

Page 1075

[1] fee today?
[2] "A I'm sure they're still doing that. I do not know to the
[3] extent of location counts.
[4] "Q You don't have an understanding of how many locations they
[5] serve with directly licensed material?
[6] "A No, I do not.
[7] "Q Does TruSonic have authorized dealers that it services in
[8] addition to what it sells directly?
[9] "A Yes.
[10] "Q And do those, are those dealers licensed through TruSonic
[11] or do they have separate license agreements with BMI?
[12] "A They're licensed through TruSonic.
[13] "Q And, do you know whether those dealers have the ability to
[14] provide directly licensed music to locations without incurring
[15] a fee for TruSonic to BMI?
[16] "A TruSonic has the master agreement so all the location
[17] counts go through them, but those locations that they would be
[18] providing on the dealer levels would have to be the 100 percent
[19] directly licensed locations.
[20] "Q Do you know today whether or not the type of music that
[21] TruSonic provides on a directly licensed basis is limited to
[22] particular genres of music?
[23] "A I do not know that.
[24] "Q What was the relevance to you of knowing whether the
[25] directly licensed works were on any particular channels or any

A-510

Page 1076

[1] venue receiving special programming?

[2] "A Curiosity, meaning is it a Mexican restaurant, is it a

[3] Japanese restaurant. You know, is it a certain, particular

[4] type of location receiving that.

[5] "Q Apparently the answer was you don't know one way or the

[6] other?

[7] "A I don't know.

[8] "Q I would like to mark as Stafford-Scherer 23" -- which is RX

[9] 60 in the binder -- "a document bearing Bates Number 12622.

[10] Have you seen this document before?

[11] "A I have.

[12] "Q This is a chain of e-mails, the first one is an e-mail from

[13] Dan O'Neill to you on December 12, 2006, and the top one is an

[14] e-mail from you to Mr. Annastas, Mr. DiMona, Mr. Berenson and

[15] Mr. O'Neill providing Mr. O'Neill's e-mail to you along with a

[16] cover note to them?

[17] "A That's correct.

[18] "Q When you write: We were only briefly able to touch on the

[19] directly licensed locations issues. What are the directly

[20] licensed locations issues that you are referring to there?

[21] "A It's the location list, what was direct and what was not

[22] directly licensed locations.

[23] "Q Those were the only issues about directly licensed

[24] locations that you recall?

[25] "A About the locations, yes.

Page 1077

[1] "Q And Mr. O'Neill told you that TruSonic no longer had direct

[2] licensing from Vivendi Universal at that point?

[3] "A That's correct.

[4] "Q Does that refresh your recollection that they had directly

[5] licensed material other than that provided by Universal music

[6] publishing?

[7] "A Yes.

[8] "Q Does it refresh your recollection as to what catalogs they

[9] had that were directly licensed in addition to Universal music?

[10] "A In here it says MP3. I mean, I don't know of any others.

[11] They actually purchased MP3.com.

[12] "Q MP3.com isn't a music publisher, is it?

[13] "A I don't know what books they had in, whether they're a

[14] publisher or not."

[15]     MR. LARSON: Can you read that one again? I think we

[16] missed a word.

[17] "A I don't know what books they had in the industry at that

[18] time, whether they're a publisher or not.

[19] "Q Did Mr. O'Neill ever give you a sense of how many songs

[20] were in their directly licensed library?

[21] "A No.

[22] "Q Did you ever ask him for that information?

[23] "A I did. I asked him for what the breakdown was in the

[24] catalog as to what was direct and what wasn't.

[25] "Q Did he know the answer and was the issue that he knew the

Page 1078

[1] answer but didn't want to tell you? Or did he not know the

[2] answer himself? Or some other possibility?

[3] "A I don't know. I don't know.

[4] "Q He didn't explain that to you?

[5] "A No.

[6]     MR. LARSON: Your Honor, we would move Exhibit RX 60

[7] into evidence.

[8]     MR. FITZPATRICK: No objection, your Honor.

[9]     THE COURT: Received.

[10]     (Respondent's Exhibit 60 received in evidence)

[11]     MR. LARSON:

[12] "Q I would like to mark as Stafford-Scherer Exhibit 24" --

[13] which is RX 61 in the binder -- "a document bearing Bates

[14] numbers BMI 12612 to BMI 12613. Have you seen this document

[15] before?

[16] "A I have.

[17] "Q This is an e-mail from Mr. O'Neill to you dated February

[18] 13th, 2007 attaching a spreadsheet that has license fee

[19] calculations on it?

[20] "A Yes.

[21] "Q Mr. O'Neill writes that, 'The attached spreadsheet is one

[22] that we worked on together.' Is that a reference to you and he

[23] working on the spreadsheet together?

[24] "A Yes. He asked how organic growth works, can we work this

[25] out, put it on a spreadsheet as to how it would work.

Page 1079

[1] "Q And so this is something that you helped him put together

[2] so that he can explain to his colleagues at TruSonic how the

[3] organic growth adjustment would work for TruSonic?

[4] "A Correct."

[5]     MR. LARSON: Your Honor, we enter RX 61 into evidence.

[6]     MR. FITZPATRICK: No objection, your Honor.

[7]     THE COURT: Received.

[8]     (Respondent's Exhibit 61 received in evidence)

[9]     MR. LARSON:

[10] "Q And?

[11] "A I don't know if these are actual figures or if these are

[12] estimates that we had at the time.

[13] "Q That was my next question, whether these are actual figures

[14] or whether these were estimates at the time, but is it fair to

[15] say that if TruSonic grew with the number of locations

[16] projected on the spreadsheet, that their monthly license fee

[17] would decline from 281 in the first year of the license to 206

[18] in the final year of the license?

[19] "A Based on this spreadsheet it would show that, yes. Because

[20] of the organic growth allowance the per location rate goes down

[21] because they're allowed 8 percent.

[22] "Q Right.

[23] "A This was done in February 2007 so it would have been an

[24] estimated just to kind of show what if.

[25] "Q It would have been estimated for 2008 and 2009?

A-511

"A Correct.

"Q Do you know whether the actual number of locations used for 2004 to 2005 and 2005 to 2006 were actual numbers or estimates?

"A I don't know. I would assume they would be estimates because we were just doing an exercise in what if.

"Q This reflects that if a service grows at the maximum allowed rate under the BMI form license for the commercial music service industry, the monthly fee by the last year of the license is $2.06?

"A In this example, yes.

"Q Well, in any -- that would be true in any example where someone is growing at the maximum 8 percent rate, correct?

"A If they're growing at 8 percent -- if they're growing solely at 8 percent the fee would not change at all.

"Q And the effective per location rate would get down to $2.06 per month or $24.72 per year, correct?

"A That's correct. This is not a practical experience, as you know.

"Q That people grow neatly at 8 percent you mean?

"A Yes. People don't neatly grow at 8 percent and traditionally they actually lose locations. In the grand scale some have increases but some do not.

"Q I would like to mark as Stafford-Scherer Exhibit 26" -- which is RX 62 in the binder -- "a document bearing Bates Number BMI 7166. Have you seen this document before?

"A I have.

"Q This is an e-mail from Mr. O'Neill to you dated March 12th, 2007?

"A Yes, it is.

**MR. LARSON:** Your Honor, we would move Exhibit RX 62 into evidence.

**MR. FITZPATRICK:** No objection, your Honor.

**THE COURT:** Received.

(Respondent's Exhibit 62 received in evidence)

**MR. LARSON:**

"Q The last paragraph of his e-mail to you he said, 'There is one more question that I didn't ask related to the size of the venue. We are moving to market to a lot of,' and then there is a word redacted, 'franchises with stores of 1,000 square feet or less. Is there any adjustment possible in the rate for small versus large locations?'

"Did you respond to that question?

"A Yes.

"Q How did you respond?

"A There is no rate adjustment for small or large locations.

"Q So the per location rate is the same for an 800 square foot store as a 400 square foot store, right?

"A Yes.

"Q This was a document that was marked previously as O'Neill 13 and this is RX 19 in the binder. Have you seen this

document before?

"A I have.

"Q This is an e-mail from Mr. O'Neill to you dated March 13th, 2007?

"A That's correct.

"Q Those are your handwritten notes on the document?

"A Yes."

**MR. LARSON:** Your Honor, we would move RX 19 into evidence.

**MR. FITZPATRICK:** No objection, your Honor.

**THE COURT:** Received.

(Respondent's Exhibit 19 received in evidence)

**MR. LARSON:**

"Q Mr. O'Neill is representing to you the number of TruSonic locations -- the number of locations that TruSonic had as of 7/1/2004, 6/30/2005, and 6/30/2006, correct?

"A I think this was what we used to do the estimated calculations.

"Q Prior to executing the license agreement with TruSonic, did BMI do an independent calculation of the number of TruSonic locations as of July 1, 2004, June 30, 2005, and June 30, 2006?

"A They would have given us the locations on the report forms under the interim agreement.

"Q And that was the only way you could figure out -- you didn't have another way to calculate the number of locations

they had other than by going back and looking at their reports, right?

"A That's correct.

"Q Did you go back and review TruSonic's interim reports prior to BMI's execution of the license agreement with TruSonic?

"A I would have looked at the 7/1/2004 reporting to get the figure for the initial license.

"Q I would like to mark as Stafford-Scherer 27" -- which is RX 63 in the binder -- "a document bearing Bates Number BMI 13509. Have you seen this chain of e-mails before?

"A I have.

"Q Had you seen them on or about June 21st, 2007?

"A Yes.

"Q This was an exchange of correspondence between you and Mr. O'Neill, and then forwarding it to Mr. Annastas about an adjusted payment plan for TruSonic to pay the new fees required under the 2004 to 2009 license?

"A Correct.

"Q What do you recall about those discussions with TruSonic about a payment plan?

"A When you have -- when anyone had the retroactive adjustment, that was fairly substantial. You sign and license. Two years later rather than saying, okay, you owe the whole thing all at this one time we would allow a payment plan. You pay a portion every month. You pay your regular monthly fee,

---

Page 1084

[1] and then you pay portion each month to take care of the arrears
[2] in the retro adjustment.
[3] "Q And that's an accommodation to the licensee?
[4] "A Yes.
[5] "Q It is a benefit to the licensee to be able to pay the
[6] retroactive fees on a deferred basis rather than having to pay
[7] them at the time that the license is assigned, right?
[8] "A That's correct.
[9] We do this with anyone that has a hardship. We have
[10] done it with a lot of Muzak affiliates. The smaller dealers
[11] are unable to come up with the two years' worth of license fee
[12] adjustments so we will do payment plans generally anywhere from
[13] 18 months to two years just to give them the ability to pay it.
[14] "Q But TruSonic, which reached an agreement with BMI -- strike
[15] that. Let me ask the question a different way.
[16] "Is there an interest component built into the payment
[17] plan?
[18] "A No.
[19] "Q So, TruSonic, by signing the agreement in 2007 and
[20] establishing a deferred payment plan with BMI, got an interest
[21] and time value of money benefit relative to what Muzak got for
[22] the same 2004 to 2009 time period?
[23] "A Muzak signed the agreement earlier and they did not have
[24] the retro period that TruSonic had. In addition to that,
[25] TruSonic also had a substantial growth during that same period

Page 1085

[1] so their organic growth adjustments were substantially higher
[2] for them as far as on per location. They had a lot more growth
[3] so that their hardship was more of a hardship at that point,
[4] general period of time. And for us, rather than send something
[5] to outside collection at a 38 percent charge, we do a deferred
[6] payment plan without the interest.
[7] "Q As an accommodation to the licensee?
[8] "A Yes.
[9] "Q Was the payment plan agreed to by TruSonic the first
[10] payment plan BMI proposed? Or were there a series of
[11] negotiations on what the payment plan would be for the
[12] retroactive payments?
[13] "A I think there were a couple of adjustments.
[14] When I put together a payment plan for someone I
[15] usually make them equal. I take whatever period that we are
[16] going to agree to to extend the payment plan. Whatever
[17] fee is for the prior period, I put that across that entire
[18] period equally for each of those months. If it is going to be
[19] more of a hardship for that licensee, we make it less on the
[20] front end and heavier on the back end.
[21] "Q Did Mr. Annastas approve the proposed payment schedule that
[22] you sent to him here?
[23] "A I would think so. I know we had a payment plan in place.
[24] It would have had to come through Tom to okay it.
[25] "Q And you don't recall him rejecting the payment plan that he

Page 1086

[1] worked out with TruSonic?
[2] "A No.
[3] "Q I would like to show you a TruSonic agreement that was
[4] previously marked as O'Neill Exhibit 14" -- JX 127 in the
[5] binder.
[6] "The last page of this agreement, schedule B, this
[7] just reflects using hypothetical numbers of the locations how
[8] the 8 percent growth adjustment works in terms of the allowed
[9] locations without incurring the additional fee, correct?
[10] "A That's correct. This schedule B is attached to all the
[11] form agreements, the same schedule.
[12] "Q You knew at the time that BMI entered into this agreement
[13] that TruSonic had grown substantially between June -- sorry,
[14] July 1, 2004, and June 28, 2007?
[15] "A Yes.
[16] "Q I show you a document that was previously marked as O'Neill
[17] Exhibit 16, JX 1312 in the binder. This is an amendment to the
[18] form commercial music service license agreement that was signed
[19] by TruSonic and BMI?
[20] "A That's correct.
[21] "Q And this is what addresses the carve-out for locations that
[22] play solely directly licensed music?
[23] "A It is regarding the 100 percent directly licensed
[24] locations.
[25] "Q And it addresses that TruSonic would haven't to pay license

Page 1087

[1] fees on those locations, correct?
[2] "A That's correct.
[3] "Q And this was negotiated at the same time as the form
[4] agreement?
[5] "A This was with the form agreement. It was signed with the
[6] form agreement at the same time, yes.
[7] "Q Another way of saying it, this was all worked out and
[8] agreed to before TruSonic signed the form agreement?
[9] "A They signed them together, yes.
[10] "Q And TruSonic can decide, on a quarterly basis, which
[11] locations it wants to include in the BMI CMS agreement and
[12] which locations it wants to exclude, correct?
[13] "A Which paragraph are you referring to?
[14] "Q The third paragraph.
[15] "A They would give us a list of those that were being
[16] excluded. They would give us a list of those that were
[17] actually directly licensed locations.
[18] "Q And if I understood your testimony from earlier, you said
[19] that in practice they haven't actually given you a list?
[20] "A Right. We haven't said we want the list.
[21] "Q And they haven't, in the ordinary course, provided the
[22] list?
[23] "A No.
[24] "Q But your understanding is they are, that they do have
[25] locations that are 100 percent directly licensed and are not



A-513

Page 1088

[1] paying BMI fees for those locations, correct?
[2] "A Yes.
[3] "Q In your view, does this amendment make TruSonic -- excuse
[4] me.
[5] In your view, does this amendment to the form license
[6] make the -- make BMI's license to TruSonic more valuable than
[7] it would be if it didn't have this amendment? Do you
[8] understand the question?
[9] "A More value to TruSonic? I don't think it makes it more
[10] valuable, only for the fact that BMI cannot license that
[11] location anyway because it is all directly licensed. There is
[12] a provision here that even if one song gets into a location,
[13] they have to report for that. So, administratively they're
[14] going to have to track that on their end as to which location.
[15] So, is it more valuable? I would think not.
[16] "Q But they have no risk of infringement if they play a song
[17] at a -- that isn't directly licensed at a location they thought
[18] was going to be 100 percent directly licensed, correct?
[19] "A Not correct. Not correct.
[20] "If it is directly licensed and it can be shown as
[21] such, then it would be -- then it would not be infringable. If
[22] it is not directly licensed and it is an establishment that we
[23] check or we would monitor that establishment, it would be an
[24] infringable performance.
[25] "Q My question is if they, for whatever reason, played a BMI

Page 1089

[1] song at a location that they had intended to be 100 percent
[2] directly licensed, they would have the option of simply paying
[3] BMI the license fee for that performance rather than being
[4] exposed to the risk of a copyright infringement lawsuit,
[5] correct?
[6] "A My understanding is we would allow them to pay the license
[7] fee instead of a copyright infringement case.
[8] "Q And TruSonic can exclude from the scope of its BMI license
[9] as many locations as it wants as long as it is providing them
[10] with 100 percent directly license material, correct?
[11] "A That is correct.
[12] "Q And TruSonic didn't have to pay blanket license fees on a
[13] different formula than Muzak or Music Choice as a condition of
[14] getting the right to exclude locations for directly licensed
[15] material, right?
[16] "A They signed the form agreement. The only difference is
[17] those locations that are 100 percent solely, directly licensed
[18] would not be part of that formula.
[19] "Q Right. Now I just want to make sure I understand.
[20] "They didn't have to pay any kind of supplemental fee
[21] or give BMI any additional consideration for the amendment that
[22] was provided by BMI to the form license agreement, right?
[23] "A No.
[24] "Q Are you familiar with the company called Play Network?
[25] "A I am.

Page 1090

[1] "Q Play Network is another member of the commercial music
[2] service industry?
[3] "A Yes.
[4] "Q They compete with DMX for commercial music service
[5] customers?
[6] "A They do.
[7] "Q I would like to mark as Stafford-Scherer 29" -- which is JX
[8] 1328 in the binder -- "a document bearing Bates Number BMI 5046
[9] to 5048.
[10] "Have you seen this document before?
[11] "A I have.
[12] "Q This is a payment plan that you sent to Mr. Brotman along
[13] with a cover letter deferring some of the retroactive payments
[14] for Play Network?
[15] "A That's correct.
[16] "Q And unlike the other payment plan we discussed for
[17] TruSonic, this was done as an accommodation to Play Network?
[18] "A Correct.
[19] "Q Turn your attention to the second page of the document.
[20] There is a line on the spreadsheet that says: Estimated
[21] organic growth adjustment due August 31, 2005.
[22] "Do you see that?
[23] "A I do.
[24] "Q Does that reflect that as of April 29, 2005, when you sent
[25] this to Mr. Brotman, BMI was projecting that Play Network would

Page 1091

[1] exceed the allowed 8 percent growth in the first year of the
[2] license?
[3] "A That's correct. We had an estimated growth adjustment.
[4] "Q And that was -- that assumption about Play Network's growth
[5] during the first term of the license was based on February 2005
[6] reports submitted by Play Network to BMI showing that type of
[7] growth?
[8] "A That's correct. They were still reporting under the
[9] interim agreement so we would have those report forms.
[10] "Q I would like to show you a document bearing Bates numbers
[11] BMI 5017 to 5025, Exhibit Stafford-Scherer 30" -- and this is
[12] JX 95 in the binder.
[13] "Have you seen this document before?
[14] "A I have.
[15] "Q This is the agreement for the period July 1, 2004, through
[16] July 30, 2009 between Play Network and BMI?
[17] "A That's correct.
[18] "Q That's all I wanted to know. I would like to mark as
[19] Stafford-Scherer Exhibit 31' -- which is RX 65 in the binder --
[20] "a document bearing the Bates Number BMI 5044 to BMI 5045.
[21] "Have you seen this document before?
[22] "A I have.
[23] "Q What is it?
[24] "A It is an adjustment given their retroactive -- not
[25] retroactive, their organic growth adjustment. There was a

A-514

Page 1092

[1] substantial increase in fees based on that so I was asking if
[2] they needed a 12-month plan or if they were still going to
[3] continue with the regular monthly payment, the $44,000 with the
[4] $57,000 adjustment.
[5]      **MR. LARSON:** Your Honor, we move RX 65 into evidence.
[6]      **MR. FITZPATRICK:** No objection, your Honor.
[7]      **THE COURT:** Received.
[8]      (Respondent's Exhibit 65 received in evidence)
[9]      **MR. LARSON:**
[10] "Q And so, this is a second payment plan for them? This is a
[11] different payment plan than the one that was agreed to when
[12] they first signed the license, correct?
[13] "A Right. The payment plans are sort of moving targets. We
[14] set up what we consider to be an estimate but we put these
[15] little stars on them that will say based on actual number of
[16] locations. There is a little asterisk that is on Exhibit 29 so
[17] payment plans get adjusted as they go along. Sometimes they're
[18] firm but sometimes with substantial growth we may make an
[19] adjustment to it.
[20] "Q And this was an adjustment that was made in September of
[21] 2006 because Play Network had grown substantially and now had
[22] higher fees than it had the year before?
[23] "A Correct. So, we were attaching it to that payment plan.
[24] You make an adjustment there.
[25] "Q Does BMI have internal or final license agreements in place

Page 1093

[1] with any commercial music service provider for the period
[2] beginning July 1, 2009?
[3] "A No.
[4] "Q I would like to mark as -- I'm sorry, this is a document
[5] that was already marked as O'Neill Exhibit 17."
[6]      This is RX 20 in the binder.
[7]      "Have you seen this document before?"
[8] "A I have.
[9] "Q Is this a letter that you received from Mr. Unger, of
[10] Networx Corporation, on or before July 19th, 2005?
[11] "A It is.
[12] "Q Did you state to Mr. Unger before he wrote you this letter
[13] that there could be no changes to the form license that you had
[14] sent him and that this was the only type of license available
[15] for his type of service?
[16] "A Yes.
[17] "Q Did you tell Mr. Unger that any large decrease in locations
[18] would be addressed under number 18 of the force majeure event
[19] paragraph whether or not it technically met the definition of a
[20] force majeure event?
[21] "A Yes. It would be the same situation as discussed before.
[22] If it is substantial decrease in locations, the 50 percent or
[23] better, that we would consider it a force majeure event.
[24] "Q Did you tell him that if a sizeable decrease in the number
[25] of locations did occur, the agreement would be redone?

Page 1094

[1] "A It wouldn't be redone. We would make the adjustment in the
[2] force majeure provision that allows for deduction in the
[3] license fee based on the catastrophic event."
[4]      **MR. LARSON:** We would move RX 20 into evidence.
[5]      **MR. FITZPATRICK:** No objection, your Honor.
[6]      **THE COURT:** Received.
[7]      (Respondent's Exhibit 20 received in evidence)
[8]      **MR. LARSON:**
[9] "Q I could like to mark as Stafford-Scherer Exhibit 33" --
[10] which is RX 67, last document in the binder -- "a chain of
[11] e-mails bearing the Bates Number BMI 8893 to 8898. This is a
[12] chain of e-mails between you and Brent Patillo of GPL
[13] Communications?
[14] "A That's correct."
[15]      **MR. LARSON:** We move RX 67 into evidence.
[16]      **MR. FITZPATRICK:** No objection your Honor.
[17]      **THE COURT:** Received.
[18]      (Respondent's Exhibit 67 received in evidence)
[19]      **MR. LARSON:**
[20] "Q Later in that first paragraph you say, 'As we first
[21] approach the market with a more beneficial license than the
[22] rate court proceeding in April 2005, it is now time to conclude
[23] this matter.'
[24]      "Do you see that?
[25] "A Yes.

Page 1095

[1] "Q What is the reference to approaching the market with a more
[2] beneficial license in April 2005?
[3] "A This was when we sent everything out. It's the Muzak, the
[4] form agreement that we send out to the entire industry to allow
[5] them to not have retroactive back to the 1994, to have the
[6] start date of 7/1/2004.
[7] "Q So, the Muzak deal was finished and was signed at the end
[8] of 2004 and then several months later BMI sent out a form
[9] license based on the Muzak deal?
[10] "A That's correct.
[11] "Q To the entire industry?
[12] "A That's correct.
[13] "Q And when you say, 'A more beneficial license than the rate
[14] court proceeding.' What did you mean?
[15] "A In the rate court proceeding we were asking to go back to
[16] the very start date of January 1st, 1994 with a higher rate.
[17] Again, we were asking for the parody with ASCAP of the $49.50.
[18] "Q More beneficial is a reference to the fact the license was
[19] more beneficial, was a better offer than what the position BMI
[20] was taking in the rate court proceeding?
[21] "A Yes.
[22] "Q And you advised Mr. Patillo that he had only two choices on
[23] this issue, he could remain a litigant in the rate court
[24] proceeding or he could sign the new license as is?
[25] "A Correct.

Page 1096

[1] "Q In Mr. Patillo's next e-mail to you of August 10, 2006, he
[2] expresses a concern that his number of accounts is decreasing
[3] rather than increasing, correct?
[4] "A Correct.
[5] "Q And that would mean that he would be paying a higher per
[6] location rate over time than his competitors who would be
[7] adding locations, correct?
[8] "A Correct. And, again, this is not a definitive. This is, I
[9] think, I'm going to be doing worse.
[10] "Q So he didn't want to lock himself into a framework that
[11] didn't have any downward adjustment given that he thought his
[12] number of locations was going to be decreasing, right?
[13] "A Correct.
[14] "Q In fact, anybody who thought their number of locations was
[15] going to be decreasing wouldn't be happy with the structure of
[16] the Muzak deal, correct?
[17] "A I would assume so.
[18] "Q On the page bearing the number 8895 which is your response
[19] to Mr. Patillo, in the middle of your response you state, 'I
[20] have no ability to allow for reduction in location counts
[21] unless the satellite goes dark for service locations.'
[22]     "Do you see that?
[23] "A Um, yes.
[24] "Q Does that mean that you personally didn't have authority to
[25] alter the terms of the license?

Page 1097

[1] "A A form agreement, we have to treat everyone the same so we
[2] couldn't alter it and say, okay, we are going to allow for
[3] these reductions of locations because you're losing locations.
[4] I had to treat him the same as everyone else. So, in licensing
[5] in BMI, we couldn't treat him differently, we have to give him
[6] the same form agreement.
[7] "Q And in his next response to you he says that his problem is
[8] that, 'You are setting my account base at a level that we both
[9] know was at a peak. I already have less than the 375 you list.
[10] We both know this trend will continue.'
[11]     "Do you see that?
[12] "A I do.
[13] "Q And, am I correct that BMI did not compromise on this issue
[14] with GPL Communications?
[15] "A We did not adjust it, no.
[16] "Q Mr. Patillo then asked if you could adjust the end date of
[17] the contract because he didn't want to be locked into a
[18] five-year term, correct?
[19] "A Correct.
[20] "Q And BMI couldn't accommodate that request either, correct?
[21] "A That would, again, be offering different terms to him than
[22] everyone else.
[23] "Q Well, I will point your attention to the e-mail on the
[24] first page of this chain, your September 27 e-mail to him where
[25] you say: With BMI's give on the retro period from 1/1/94 to

Page 1098

[1] June 30, 2004, BMI negotiated a fixed end date for the
[2] agreement.
[3] "A Correct.
[4] "Q Did you mean, is it correct that part of the bargaining was
[5] that BMI wouldn't charge a separate fee for retroactivity but
[6] the end date of the agreement would be June 30, 2009? That was
[7] part of the give and take?
[8] "A That was a fixed date, yes."
[9]     MR. LARSON: That's all we have, your Honor.
[10]     MR. RICH: Your Honor, we call as our next witness
[11] Mr. Ronald Gertz.
[12]     THE COURT: This might be a good time for the
[13] mid-morning recess.
[14]     MR. RICH: Fine.
[15]     THE COURT: Somebody from each side come up, I have
[16] got just two questions I want to ask.
[17]     (Sidebar discussion off the record)
[18]     (Recess)

Page 1099

[1] RONALD H. GERTZ,
[2]     called as a witness by the Respondent,
[3]     having been duly sworn, testified as follows:
[4]     THE DEPUTY CLERK: Please say your name and spell your
[5] last name slowly for the record.
[6]     THE WITNESS: Ronald H Gertz, G-e-r-t-z.
[7]     MR. RICH: Your Honor, we have the usual witness
[8] binders if we may distribute and approach the witness. May I
[9] proceed, your Honor?
[10]     THE COURT: Yes, please, Mr. Rich.
[11] DIRECT EXAMINATION
[12] BY MR. RICH:
[13] Q. Good morning, Mr. Gertz.
[14] A. Good morning.
[15] Q. Where are you currently employed?
[16] A. I'm employed at Music Reports Inc. as the chairman.
[17] Q. Before discussing your work at, and the work generally
[18] performed by MRI, I'd like to have you review your professional
[19] background working from your post-college years forward, if you
[20] don't mind. What did you do out of college?
[21] A. I was a touring musician, songwriter, composer, performer.
[22] Q. Were you affiliated with one or more of ASCAP or BMI?
[23] A. Yes, I was an ASCAP songwriter, an ASCAP publisher member
[24] and ultimately a BMI publishing member as well.
[25] Q. And I take it that there came a time when you stopped this

Page 1100

[1] touring existence?

[2] **A.** Yes.

[3] **Q.** And what did you decide to pursue at that point?

[4] **A.** I decided it would be nice to be able to make a living, so

[5] I went to law school.

[6] **Q.** And did you procure a law degree?

[7] **A.** Yes.

[8] **Q.** And did you practice law for a time?

[9] **A.** Yes.

[10] **Q.** And in fact, do you still practice law?

[11] **A.** Yes.

[12] **Q.** And what was the nature of your early law practice?

[13] **A.** Representing artists and songwriters in recording and

[14] publishing agreements.

[15] **Q.** And did there come a time when you supplemented that

[16] activity with other business activity?

[17] **A.** Yes. I worked at a company that handled music licensing

[18] transactions for television and film producers. Actually, I

[19] did that while I was going to law school as well, and then

[20] eventually I started my own company, a company called the

[21] Clearing House Ltd. representing television and film producers

[22] and acquiring various types of licenses.

[23] **Q.** Could you describe for the Court's benefit what types of

[24] licenses you're referring to?

[25] **A.** Principally, they're called synchronization licenses in

Page 1101

[1] television programming, because producers need the right to

[2] reproduce music in synchronization or timed relation to the

[3] images in their television and film programming and we

[4] concentrated on those kinds of rights.

[5] **Q.** That's a distinct copyright right from the music

[6] performance right that's centrally at issue here, is that

[7] correct?

[8] **A.** Yes.

[9] **Q.** And how did those transactions occur, between which parties

[10] and which parties?

[11] **A.** We were negotiating on behalf of various independent

[12] producers and motion picture studios directly with the music

[13] publishers.

[14] **Q.** And this began approximately when in your career?

[15] **A.** In the mid-'70s.

[16] **Q.** Now, when did MRI enter the picture?

[17] **A.** MRI entered the picture in the late '90s. It was a joint

[18] venture between the Clearing House Ltd. and the Television

[19] Music License Committee. It was designed to assist the

[20] television industry in their efforts at administering the

[21] per-program form of blanket license.

[22] **Q.** When you say assist in administering, what was the

[23] envisioned role and what became the eventual role of MRI in

[24] relation to that?

[25] **A.** Well, to analyze the amount of ASCAP, BMI and other music

Page 1102

[1] contained in television programs, to assist in the ASCAP rate

[2] proceeding and ultimately to administer the data processing and

[3] reporting requirements of whatever per-program license form was

[4] ordered by the courts.

[5] **Q.** What sorts of database, information databases were required

[6] on the part of MRI to fulfill those responsibilities?

[7] **A.** Databases first of song ownership, title, artist, composer,

[8] affiliation information and databases of documents called music

[9] cue sheets. A music cue sheet is a document that lists all of

[10] the music contained in the program along with the composers,

[11] publishers, society affiliations. It's essentially a blueprint

[12] for how the royalties get distributed in a television program.

[13] **Q.** And did you over time build a music database?

[14] **A.** Yes.

[15] **Q.** Could you describe for the Court what that database

[16] comprises?

[17] **A.** Well, it comprises a database of music cue sheets and it's

[18] a very comprehensive database of copyright ownership

[19] information, of songs and recordings, and on the song side,

[20] it's about 12 million individual song title records that

[21] include the titles, alternative titles, composers, publishers,

[22] shares, society affiliation and the contact information for who

[23] you would go to in order to get permission.

[24] **Q.** And I take it that that database is accessed on a regular

[25] basis, among other functions, to administer and prepare proper

Page 1103

[1] reports for per-program reporting to local television stations?

[2] **A.** Yes, it's accessed across all of our clients and we have 20

[3] researchers who are maintaining it on a daily basis.

[4] **Q.** Now, how, with what frequency -- of the total number of

[5] per-program reporting stations who operate under that form of

[6] license, as opposed to blanket licenses, do you know the

[7] percentage of those who are represented by BMI in preparing and

[8] submitting monthly reports?

[9] **A.** Probably about 97 percent.

[10]     **THE COURT:** Those 20 researchers, are they putting in

[11] performances? Or they would have nothing to do with

[12] performances?

[13]     **THE WITNESS:** No. The actual number of performances,

[14] no. They maintain the copyright information in the database,

[15] who are the composers, who are the publishers.

[16]     **THE COURT:** And that requires that many people?

[17]     **THE WITNESS:** Yes.

[18] **Q.** And how frequently are per-program reports submitted to BMI

[19] and ASCAP by these local television station clients of MRI?

[20] **A.** On a monthly basis.

[21] **Q.** Could you describe at a general level what sorts of

[22] information are culled and presented and disseminated to these

[23] performing rights organizations in these reports?

[24] **A.** Yes. Generally, the reports are very detailed. They

[25] require a listing of all programs broadcast by a television

Page 1104

[1] station. Each of the specific episodes of those programs, all
[2] the revenue related to those programs. In other words, we have
[3] to keep track of every commercial broadcast within a program
[4] and how much money the station made from that commercial. We
[5] also have to keep the music cue sheets for the locally produced
[6] programs that are broadcast, and we're the ones who actually
[7] compile the information in the cue sheets and we have to keep
[8] track of and report to the societies any source or direct
[9] licenses directly with the publishers that convey performance
[10] rights.
[11] **Q.** I think the Court is by now familiar with the concept of
[12] direct licensing. You make a reference to source licensing.
[13] What is that?
[14] **A.** Just a term of art. It's a direct license with the owner
[15] of the rights. It's called a source license in the television
[16] industry, because the rights are obtained from the program
[17] producer or distributor, which from the station's perspective
[18] is the source of the programming. So you're getting the
[19] license from the party who supplies the programming.
[20] **Q.** So let's just take one concrete example. Let's assume that
[21] there is theme music --
[22] **THE COURT:** In the music industry, would it
[23] distinguish between the author and the publisher?
[24] **THE WITNESS:** The cue sheets.
[25] **THE COURT:** No, what's termed source?

Page 1105

[1] **THE WITNESS:** No, it has nothing to do with that. It
[2] has to do with the source of the program.
[3] **THE COURT:** I see.
[4] **THE WITNESS:** For instance, Harpo Productions --
[5] **THE COURT:** All right.
[6] **Q.** Let's take one example of how a source license would be
[7] negotiated. Let's assume that there's a theme writer for the
[8] music in the Oprah Winfrey show, and you were asked by a
[9] television client to procure what you called a source license.
[10] Who would that negotiation take place with?
[11] **A.** That negotiation would take place with Harpo Productions,
[12] which is the producer of the program.
[13] **Q.** And does Harpo Productions have any association with the
[14] music publisher who is affiliated with that music?
[15] **A.** In most cases the composer is an employee for hire with
[16] Harpo Productions.
[17] **Q.** Is there a music publisher associated with that work?
[18] **A.** Yes. Harpo Productions has set up several publishing
[19] companies to administer those rights they've acquired.
[20] **Q.** And have you, and has MRI from time to time negotiated
[21] source licenses on behalf of individual television
[22] broadcasters?
[23] **A.** Yes.
[24] **Q.** So functionally speaking, is it correct that similarly to
[25] the impact of direct licenses, which is a different method for

Page 1106

[1] securing performing rights other than under a blanket license
[2] or even a per-program license. a source license accomplishes
[3] the same result but through a license where the license is
[4] procured at the point of program creation?
[5] **A.** Correct.
[6] **Q.** Now, how --
[7] **THE COURT:** Just as a matter of curiosity, is a
[8] non-trivial proportion of the published music and performed
[9] music at large written on a work-for-hire basis for the
[10] publishing companies?
[11] **THE WITNESS:** In the television area. it's usually on
[12] a for-hire basis. The producers, the studios hire composers.
[13] There are times when --
[14] **THE COURT:** I'm thinking about background music
[15] particularly.
[16] **THE WITNESS:** Background music, those are often under
[17] for-hire arrangements with libraries that are established for
[18] the purpose of creating background music. Sometimes they're on
[19] a for-hire basis. Sometimes those libraries just license in
[20] copyrights that have already been created by composers.
[21] **THE COURT:** But by analogy to a book publishing
[22] company, not much of the material comes in over the transom?
[23] **THE WITNESS:** For popular songs, a lot of it can come
[24] in over the transom.
[25] **THE COURT:** I see. Okay.

Page 1107

[1] **THE WITNESS:** Yes.
[2] **Q.** Is MRI, in connection with this per-program reporting
[3] activity, is MRI in touch with the performing rights
[4] organizations?
[5] **A.** Yes.
[6] **Q.** How frequently?
[7] **A.** We have staff that interfaces with all the societies on a
[8] daily basis.
[9] **Q.** And how smoothly does this interface between MRI and the
[10] performing rights organization, including, of course, BMI,
[11] operate in your experience?
[12] **A.** It runs at this point very smoothly.
[13] **Q.** Was it always that way?
[14] **A.** No. In the beginning it took time for the parties to work
[15] out the data exchange protocols, what information BMI and ASCAP
[16] wanted in the report, how they would respond to us if they
[17] thought that their information was a little bit different than
[18] ours, how we would set up a dispute resolution methodology.
[19] But all of that has been worked out for years.
[20] **Q.** Now, am I correct that you provided testimony in the local
[21] television industries' own ASCAP rate proceeding involving
[22] establishing rates and terms for a per-program license?
[23] **A.** Yes.
[24] **Q.** And from that experience and your continuing experience
[25] with implementing the terms of that license, do you have an

A-518

Page 1108

[1] understanding as to what the basis is for the per-program
[2] multiplier?
[3] **A.** Yes.
[4] **Q.** What is that understanding?
[5] **A.** It was determined during, we're using an analysis of the
[6] cue sheets, that many -- a certain number of programs broadcast
[7] by the local television stations did not have music, did not
[8] contain music of a particular society to which they were
[9] reporting.
[10] **Q.** Could I interrupt you to ask you if in your knowledge of
[11] cue sheets and matching those programs, that in fact reflects
[12] reality?
[13] **A.** Yes.
[14] **Q.** Go ahead, please.
[15] **A.** Yes. So the requirement of the per-program license was
[16] that it be on the same basis as the blanket license. So
[17] because some programs did not contain a musical performance
[18] from a society it was necessary to increase the starting point
[19] for the per-program license, so that stations would not receive
[20] a windfall on day one if they switched to another form of
[21] license. In other words, the licenses had to be at the same
[22] point before the stations started saving money.
[23] **Q.** So from your perspective the license multiplier was not
[24] intended to day one place broadcasters as a price disadvantage
[25] for having elected a per-program license?

Page 1109

[1] **A.** That's correct.
[2] **Q.** Now, back to the basic business of MRI, you've described
[3] its per-program activities. Does MRI do work for other clients
[4] as well?
[5] **A.** Yes.
[6] **Q.** Could you briefly describe the range of those activities?
[7] **A.** In two basic areas; the licensing area and royalty
[8] processing and accounting. In the licensing area, we represent
[9] a whole host of music users for all kinds of licensing
[10] transactions. As from anywhere from Sandisk, which is one of
[11] the world's largest manufacturers of computer memory devices,
[12] we represent them in a product they make available called Slot
[13] Radio, which is a small device player for those people who
[14] can't afford an iPod, to companies like American Greetings,
[15] where we clear the music contained in the chips in greeting
[16] cards, so if you send "Happy Birthday," you know, to a friend
[17] and you open up the card it plays "Happy Birthday." We do
[18] that.
[19] **Q.** And staying with this licensing area, does that -- about
[20] how many employees are devoted to the licensing function at
[21] MRI?
[22] **A.** About ten.
[23] **Q.** And does that ever, has that ever entailed -- you described
[24] occasional activities, clearing rights, clearing music
[25] performing rights for local television broadcasters in the

Page 1110

[1] Oprah-type setting. Have you engaged in similar direct or
[2] source licensing of music performing rights on behalf of other
[3] clients?
[4] **A.** Yes.
[5] **Q.** Could you describe that, please?
[6] **A.** Often, for instance, for telephone carriers. When they
[7] were making ring tones available or performance -- previews of
[8] ring tones or ringback tones, sometimes they did not have
[9] licenses from the performing rights societies, so in those
[10] cases we would negotiate performing rights licenses. Another
[11] one of our clients, QVC and Home Shopping Network, I'm not sure
[12] about Home Shopping Network, QVC has never had licenses with
[13] ASCAP or BMI and for at least fifteen years for all the music
[14] they use, we have been negotiating direct performance licenses
[15] with all the publishers.
[16] **Q.** With?
[17] **A.** All of the publishers.
[18] **Q.** All of the music publishers?
[19] **A.** Yes.
[20] **Q.** And you mentioned, so there's the licensing end and then
[21] you said the digital sort of related platform. Could you just
[22] say a few sentences about what that work entails?
[23] **A.** They kind of overlap. We also administer the royalty
[24] payments under many of the licenses we enter into, so we have a
[25] very detailed royalty accounting platform that uses our Songdex

Page 1111

[1] database to pay royalties out to music publishers. Another
[2] example is the digital on-demand streaming service. We
[3] represent about 20 of those, including Microsoft, Apple, MySpace
[4] Music and others, and for them, we invoke the statutory license
[5] for doing those activities and sometimes negotiate voluntary
[6] agreements with publishers and handle all the accounting
[7] on a monthly basis back to estimate about 17,000 publishing
[8] administrators which represent about more than 60,000
[9] publishers, all on a monthly basis.
[10] **Q.** Yesterday the names of several MRI employees came up in
[11] connection with several e-mail exchanges relating to the DMX
[12] license initiatives. I want to ask you about the background of
[13] one or two of those, please. Do you have an employee named
[14] Anita Huntsacker?
[15] **A.** I do.
[16] **Q.** How long has she been employed by MRI?
[17] **A.** She's been employed by MRI for I'm sure it's over 20 years.
[18] **Q.** What is her background?
[19] **A.** She, and before she came to work for us, she was the
[20] administrator of the United Artists music catalog, which became
[21] part of EMI Music Publishing Company, so she has a very strong
[22] publishing background.
[23] **Q.** EMI is one of the majors, correct?
[24] **A.** Yes.
[25] **Q.** Do you also have an employee by the name of Karyn Ulman?



Page 1112

[1] **A.** Yes.

[2] **Q.** How long has she been employed by MRI?

[3] **A.** In two stints, about ten years total.

[4] **Q.** What is her background?

[5] **A.** Karyn also comes from the publishing industry. At one
[6] point she has been the executive in charge of Hanna-Barbera
[7] Publications, which at the time was one of ASCAP's largest
[8] payers in television music licensing.

[9] **Q.** Is that the famous cartoon production company?

[10] **A.** Yes, it is.

[11] **Q.** Let's turn a bit to MRI's involvement in the DMX direct
[12] licensing activities, please. Has MRI been involved in DMX's
[13] direct license efforts?

[14] **A.** Yes.

[15] **Q.** What's the nature of that involvement been?

[16] **A.** We've been involved in the beginning in helping them
[17] strategize what the direct licensing campaign should look like,
[18] what the rates and principal terms of the license should be,
[19] designing a license and trying to figure out how to approach
[20] the publishing community, in what order, and the ultimate
[21] administration of the direct licenses and the carveout
[22] reporting to ASCAP and BMI.

[23] **Q.** And so have you and your colleagues worked in coordination,
[24] among others, with Mr. Knittel?

[25] **A.** Yes.

Page 1113

[1] **Q.** Now, turning first to some of the strategic thinking, did
[2] MRI participate in DMX's early feasibilities analysis?

[3] **A.** Yes.

[4] **Q.** How did you interface with DMX on that?

[5] **A.** They gave us a one-month's data of music performances on
[6] their satellite, and we used that to run it against Songdex to
[7] determine --

[8] **Q.** That's your music use database?

[9] **A.** Sorry, that's our database. To determine the relative
[10] ranking by plays of the various publishers of music they were
[11] using.

[12] **Q.** And do you know whether DMX made use of that analysis?

[13] **A.** Yes.

[14] **Q.** How so?

[15] **A.** Well, we identified the ranking of publishers in importance
[16] for who we should try to go out and secure licenses from.

[17] **Q.** And did you personally and did others of your colleagues at
[18] MRI also participate in developing a license strategy from this
[19] early feasibility analysis?

[20] **A.** Yes.

[21] **Q.** What was, as you perceived it, what was the overall
[22] objective of developing the key license terms?

[23] **A.** Well, we have so many publishers, the objective is to
[24] develop a form that publishers will receive as being
[25] reasonable, rational, with terms they're used to seeing in

Page 1114

[1] other contexts so that they can be signed with a minimum of
[2] back and forth negotiation.

[3] **Q.** In your binder, sir, is a demonstrative which was used
[4] yesterday as part of Mr. Knittel's examination. I would ask
[5] you to put it in front of you, please. It's also up on the
[6] screen.

[7] **A.** Yes.

[8] **Q.** Focusing on the first of the key terms, the royalty rate.

[9] **A.** Yes.

[10] **Q.** Did you provide input on the issue of what would be an
[11] appropriate royalty rate?

[12] **A.** Yes.

[13] **Q.** Would you please tell the Court what your analytic process
[14] was?

[15] **A.** Well, I guess it's about seven or eight years ago, I was
[16] retained by Muzak to do exactly the same thing, determine a
[17] fair royalty rate and negotiate direct licenses, and I had
[18] obtained statements from some of the publishers. Some of the
[19] publishers told us how much they were making. And in
[20] negotiations with the major publishers, we came to an agreement
[21] on a royalty rate of $28 per location per year.

[22] **Q.** 28?

[23] **A.** 28. Ultimately, although two major deals were entered into
[24] and signed by the parties, ultimately those licenses did not go
[25] into effect because Muzak settled with the PRO's.

Page 1115

[1] **Q.** Can you identify the two parties with whom licenses were
[2] executed at a $28 royalty rate?

[3] **A.** Sony Music and EMI Music.

[4] **Q.** Both majors?

[5] **A.** Both majors.

[6] **Q.** Okay. Please go ahead.

[7] **A.** Then my understanding was that the royalty settlement ended
[8] up really representing a 10 percent discount for Muzak off what
[9] they were previously paying. So when it came time to establish
[10] a royalty rate for DMX's direct licensing effort, it seemed to
[11] make sense simply to reduce the $28 that we had previously
[12] agreed to with the major publishers down 10 percent to around
[13] $25 and start that way.

[14] **Q.** So you ended up arriving at the same proposed royalty as
[15] Mr. Knittel, it appears, did?

[16] **A.** Yes.

[17] **Q.** Was this devised in coordination or independently?

[18] **A.** Completely independently.

[19] **Q.** Now, were you also involved down to the fourth bullet, in
[20] consideration of an appropriate royalty formula?

[21] **A.** Yes.

[22] **Q.** Could you please share with the Court what your thinking
[23] was on what would be appropriate as to that issue?

[24] **A.** Well, again, the idea was to find ways to divide royalties
[25] and create royalties that publishers were used to and

Page 1116

[1] publishers are very, very used to taking their pro rata share
[2] of a pool of royalties, so we adopted the same common
[3] methodology.
[4] **Q.** And with respect to the last bullet on this demonstrative,
[5] the royalty distribution mechanism, were you involved in
[6] consideration of that issue as well?
[7] **A.** Yes.
[8] **Q.** Would you please tell us what that consideration entailed?
[9] **A.** When I was negotiating on behalf of Muzak, we had the same
[10] issue that DMX has. A certain number of locations that are
[11] on-premise which just include a, where Muzak reported simply a
[12] list of programs without -- a list of songs without frequency
[13] of play, and satellite locations where they could report the
[14] actual frequency of songs used. So when I began negotiating
[15] with the major publishers of Muzak, I laid this problem out for
[16] them, explained the two different methodologies, and --
[17] **Q.** Just so we're clear, off-premise methodology and --
[18] **A.** And the on-premise -- say off-premise frequency data with
[19] the on-premise play list data, and discussed this with all the
[20] major publishers, and they wanted the royalty calculation to be
[21] based on the off-premise data because it was a much better
[22] proxy because it included the frequency information.
[23]      At the time, you know, our discussions were with Sony,
[24] with a woman named Joanne Boris at EMI who made that decision.
[25] She at the time was on the ASCAP board of directors, and I also

Page 1117

[1] had that similar, reached that similar understanding with a man
[2] named James Morganstern, who ran Warner Chappel, who I believe
[3] at the time was the co-chairman of the ASCAP board of
[4] directors.
[5] **Q.** A little inside baseball. Warner Chappel, just for the
[6] record, is a music publisher?
[7] **A.** Yes.
[8] **Q.** Now, when all these pieces came together into what in
[9] became the offer package that DMX was prepared to make, did you
[10] form a judgment as to how attractive and feasible this
[11] licensing initiative likely would be to the music publishing
[12] industry?
[13] **A.** Yes.
[14] **Q.** What was that judgment?
[15] **A.** Well, again, the goal was to do something that the
[16] publishers, if they thought about it, would find reasonable,
[17] and it made sense, first of all, because I believe the royalty
[18] rate was a fair one. Secondly, by getting paid directly from
[19] DMX, they were able to avoid any society administrative fees.
[20] They were able to go around the distribution systems of the
[21] societies, which seemed to be rather opaque, which are rather
[22] opaque, and they were able to get the money on a faster basis
[23] and have direct audit rights against DMX.
[24] **Q.** What do you mean by opaque reporting systems of the
[25] performing rights organizations?

Page 1118

[1] **A.** Well, it's almost impossible to look at a royalty statement
[2] from any society and really figure out how the royalty is being
[3] computed, and as a matter of fact, I understand that in fact
[4] BMI had been distributing based on only six DMX channels. One
[5] of the interesting, one of the things the publishers wanted was
[6] all the satellite data because it was much more representative,
[7] they believed, of the actual use of their material.
[8]      So the license is designed to be completely
[9] transparent so that the publisher could see the number of
[10] locations, their songs, their share of the pool, and have the
[11] ability to audit DMX if they believe that there's something
[12] incorrect.
[13] **Q.** Are you familiar with the testimony which has been adduced
[14] during this trial about BMI's practice prior to late 2007 with
[15] respect to reporting on the DMX reporting line?
[16] **A.** Yes.
[17] **Q.** Is that an example of the opacity you have in mind?
[18] **A.** It's a good example. That line on the royalty statement
[19] made it look like more money was being received from DMX than
[20] actually was.
[21] **Q.** What is it about the proposed DMX distribution and
[22] reporting system that was designed to make it more transparent
[23] to the music publishers?
[24] **A.** If you look at the royalty statement, it's clear, every
[25] step of the calculation is clear on the top sheet. On

Page 1119

[1] secondary sheets we list every publisher, how much every
[2] publisher makes down to the song level detail and their share
[3] of the song. Couldn't be more open and transparent.
[4] **Q.** Why don't we, even though it's out of the sequence I
[5] intended, why don't you turn in your book, please, to the, what
[6] is in evidence as Joint Exhibit 1347, please. Do you see that?
[7] **A.** Yes.
[8] **Q.** Is this an example of what you were just referring to?
[9] **A.** It is.
[10] **Q.** This is a -- can you describe what the document we're
[11] looking at is?
[12] **A.** This is a royalty statement prepared by MRI on behalf of
[13] DMX to a company called Bug Music Inc.
[14] **Q.** Do you know anything about Bug Music Inc.?
[15] **A.** Yes, I do. Bug Music is an owner of copyrights and an
[16] administrator of copyrights, so they not only negotiate
[17] licenses on their own behalf, but on behalf of many, many
[18] publishing interests, publishing companies that they
[19] administer.
[20] **Q.** And are we looking at the first page of this document, are
[21] we looking at the summary form that accompanies the periodic
[22] royalty statements that have been implemented and made pursuant
[23] to the DMX direct license?
[24] **A.** Yes.
[25] **Q.** Could you walk -- you'll see in the left hand most column



[1] there are letter entries A through G.

[2] **A.** Yes.

[3] **Q.** Could you walk the Court through what each of those letter

[4] entries represent?

[5] **A.** Yes.

[6] **MR. RICH:** Your Honor, do you have that in front of

[7] you?

[8] **THE COURT:** I'm not sure.

[9] **THE WITNESS:** It's this one. 1347.

[10] **THE COURT:** Yes, I do have it.

[11] **MR. RICH:** Great.

[12] **Q.** Please walk us through how this form works.

[13] **A.** Okay. Row A is number of locations reported by DMX for the

[14] period. Row B --

[15] **Q.** That's straightforwardly the number of locations that have

[16] been reported to MRJ as to which DMX is providing commercial

[17] music service, is that correct?

[18] **A.** Yes, in that quarter. Row B is how the royalty pool is

[19] calculated. The royalty pool is, for the year is $25 times the

[20] number of locations. Since this is a quarterly statement, the

[21] number is $6.25 times the number of locations. So you get a

[22] royalty pool of $472,000.

[23] **Q.** So that's multiplying $6.25 by the 75,000 some-odd

[24] locations, is that correct?

[25] **A.** Yes.

[1] **Q.** And am I correct that that represents the maximum amount

[2] available for distribution for that quarter?

[3] **A.** Yes.

[4] **Q.** Okay, go ahead.

[5] **A.** Okay. Line C is the total number of transmissions of

[6] songs, in other words, the frequency of all the songs played on

[7] the satellite service. So you have 3.6 million performances

[8] that occurred in the off-premise service during that quarter.

[9] **Q.** By all publishers, whether directly licensing or not?

[10] **A.** Yes. All publishers.

[11] **Q.** Okay.

[12] **A.** Item D is the number of songs controlled by that publisher,

[13] performances of songs controlled by that publisher.

[14] **Q.** In this case, Bug Music?

[15] **A.** Yes, occurring during that quarter, in this case 83,000.

[16] Item E is that same number weighted by the shares

[17] controlled by each publisher. For instance, it's possible that

[18] a publisher could own less than 100 percent of a song, and,

[19] frankly, it's common.

[20] **Q.** Who would own the rest?

[21] **A.** A different publisher. So it could be, you know, that in

[22] many of these -- or it is, that in many of these works Bug

[23] Music does not control the rights for 100 percent of the song.

[24] So when you weight those performances by the 83,000 shares, you

[25] end up with essentially 51,000 performances.

[1] **Q.** Now, how do you -- where does the data as to shares, how do

[2] you have that? Is that part of this big database?

[3] **A.** It's part of Songdex and it's supplied to us by publishers

[4] on a regular basis.

[5] **Q.** Okay, go ahead.

[6] **A.** Item F is their share of the total number of transmissions.

[7] In other words, their share of the 3.6 million transmissions,

[8] which is 1.425 percent.

[9] **Q.** So it says, the mathematics in the next to the right most

[10] column says the number appearing in the last column under row E

[11] divided by the number appearing in row C, is that correct?

[12] **A.** Correct. And the last row, row G is the royalty

[13] calculation, which is multiplying F times the royalty pool B.

[14] **Q.** All right. Now, there's a lot of paperwork behind this.

[15] Could you tell the Court what that represents?

[16] **A.** If the Court will look at maybe the third page, because the

[17] second page is blank. There are two royalty schedules here.

[18] The first one is a listing of all of the publishers

[19] administered by Bug Music, their share count and their

[20] royalties. So that goes through all of the Bug's administered

[21] catalog.

[22] **Q.** These are conceivably, do you know for a fact are these all

[23] companies which are probably wrapped under one license

[24] agreement with Bug Music?

[25] **A.** Yes.

[1] **THE COURT:** And the asterisk is a symbol for

[2] multiplication?

[3] **THE WITNESS:** Yes. On the top sheet?

[4] **THE COURT:** Yes.

[5] **THE WITNESS:** Yes, your Honor.

[6] **MR. RICH:** Would you like us to wait a moment, your

[7] Honor, before going on to the next pages?

[8] **THE COURT:** No.

[9] **Q.** All right, go ahead.

[10] **A.** The simplest thing to do is go to the last page of the

[11] report. This is the last page of the track detail report.

[12] **Q.** What's the Bates number at the bottom, the MR number?

[13] **A.** One of our internal --

[14] **Q.** So the Court, so everybody is focused on the right page.

[15] **A.** It says page 4949.

[16] **Q.** Okay. So the very last document in the binder?

[17] **A.** Yes.

[18] **Q.** Okay.

[19] **A.** This is called a track detail report. So what it shows is

[20] the publisher that you saw before, the name of the song, who

[21] the composers are, what their claimed share of the song is. If

[22] you look at the top one, "Words Fail," they control 50 percent

[23] of that song. The count is the number of times it was

[24] performed and share count is that number share weighted and

[25] then the last column is their royalties. Underneath you can

Page 1124

[1] see that all those columns are totaled.

[2] **Q.** Is what accounts for a substantial amount of the volume of
[3] this backup data the fact that for each song performed during
[4] the reporting period, which is quarterly, the participating
[5] publisher knows exactly which of its songs were performed --
[6] this is on the off-premise now -- and the frequency of
[7] performance?

[8] **A.** Yes.

[9] **Q.** And all of that is toted up into those summary sheets at
[10] the end?

[11] **A.** Yes.

[12] **Q.** Let's come back to the discussion before we moved over to
[13] this. You also indicated that what you felt would be
[14] attractive about the DMX direct license package was the
[15] timeliness of the royalty distributions that would be made,
[16] correct?

[17] **A.** Correct.

[18] **Q.** Can you discuss the relative timeliness of what DMX's
[19] direct license program provides in relation to the timeliness
[20] of royalty reports for those publishers who instead rely on
[21] receiving royalty distributions from, say, BMI?

[22] **A.** The DMX payments are master. They are 45 days after the
[23] end of any quarter.

[24] **Q.** Now, I take it that you personally and others at MRI have
[25] ongoing relationships with a wide array of music publishing

Page 1125

[1] companies?

[2] **A.** Yes.

[3] **Q.** Having nothing to do with DMX, correct?

[4] **A.** Yes.

[5] **Q.** Did this reality affect your own thinking in any way as to
[6] the nature of the terms and conditions to be offered out in a
[7] project with which MRI was associated?

[8] **A.** Absolutely.

[9] **Q.** How?

[10] **A.** Well, we run essentially a licensing machine, so our people
[11] could be talking to a publisher about DMX in the morning and
[12] then Microsoft in the afternoon. So our ability to negotiate
[13] on behalf of our clients is entirely based on our credibility
[14] in the marketplace and offering reasonable license terms. If
[15] we were to offer unreasonable license terms, we would lose our
[16] credibility and we would lose our business.

[17] **Q.** Now, in your experience, how sophisticated are music
[18] publishers when it comes to evaluating license proposals of the
[19] type that DMX was contemplating and eventually offered out?

[20] **A.** Well, there is a range but for the most part, they're very,
[21] very sophisticated. And if they aren't, they are represented
[22] by a lawyer or accounting firm or a business manager that is.

[23] **Q.** Did DMX focus its licensing efforts on those publishers
[24] least likely to bargain hard?

[25] **A.** No. Quite to the contrary. We went -- we started our

Page 1126

[1] negotiating process by trying to go to the publishers that were
[2] sophisticated. As a matter of fact, I think we talked about
[3] the Lieber Stoller license. Lieber Stoller is a sophisticated
[4] though small publisher. The guy who ran that company is a guy
[5] named Randy Poe, is a guy who wrote several books on proper
[6] music administration. And the reason we wanted to go to the
[7] knowledgeable publishers first is because there were
[8] potentially thousands of licenses that we had to enter into.
[9] It was a new form, so we wanted to get the publisher's
[10] comments, so we could hopefully get reasonable comments back
[11] from sophisticated publishers so we could modify the form and
[12] improve it so that as we went out generally to the marketplace
[13] there would be a form the publisher would be more likely to
[14] sign.

[15] **Q.** Did DMX, to your knowledge, focus its licensing efforts on
[16] those music publishers who DMX believed valued their music the
[17] least?

[18] **A.** No.

[19] **Q.** Was there any element of compulsion somehow requiring music
[20] publishers to sign the DMX license in lieu of staying with one
[21] or more of the performing rights organizations for payment?

[22] **A.** Absolutely not.

[23] **Q.** I ask you to open your binder again, please, to the first
[24] tabbed document, which is JX 513.

[25] **A.** Yes.

Page 1127

[1] **Q.** Do you recognize this agreement?

[2] **A.** Yes.

[3] **Q.** Who is it entered into with?

[4] **A.** With Maxine Lang. Actually with Williamson Music. Maxine
[5] Lang runs Williamson Music.

[6] **Q.** Is that who signed the agreement on page 6?

[7] **A.** Yes.

[8] **Q.** Do you know her?

[9] **A.** Very well.

[10] **Q.** Tell the Court about her.

[11] **A.** Maxine is probably one of the most sophisticated publishers
[12] on the planet. She at one point ran Chappel Music, then when
[13] that merged with Warner Chappel, she was a senior executive
[14] there. She was on the National Music Publishers board of
[15] directors and I believe she was also a member of the ASCAP
[16] board of directors.

[17] **Q.** Does this license embody the basic form of license into
[18] which DMX entered with now some 500 or more music publishers?

[19] **A.** Yes.

[20] **Q.** I'd like very quickly for you to identify the key
[21] provisions that track the key terms that you and Mr. Knittel
[22] identified. Just point them out in the contract as to where
[23] they are embodied, if you will, starting, if you would, with
[24] where the grant of rights provision is contained?

[25] **A.** The grant of rights provision is 1A.



Page 1128

[1] **Q.** Is that grant limited in any way in terms of the locations
[2] that can be served by a commercial music service like in this
[3] case DMX?
[4] **A.** No.
[5] **Q.** Are there any restrictions with respect to scope of
[6] exploration?
[7] **A.** The -- no. The only restrictions in the contract deal with
[8] reservation of rights for things that DMX would not be doing
[9] anyway.
[10] **Q.** Is that a reference to paragraph 1C?
[11] **A.** Yes.
[12] **Q.** Can you point to where the royalty rate is set forth in
[13] this agreement, please?
[14] **A.** The royalty rate is set forth in paragraph 2A, which is
[15] called the royalty pool.
[16] **Q.** And is it accurate that within that royalty rate that it
[17] encompasses both the publisher and the writer share?
[18] **A.** Yes. It's what we call in the business an all-in deal.
[19] **Q.** And can you point, please, to the provision that addresses
[20] the royalty distribution formula, how the money would be
[21] distributed between and among participating publishers?
[22] **A.** Yes. That allocation methodology is handled in 2B, labeled
[23] publisher's pro rata share.
[24] **Q.** Does 2B also set forth the use of the off-premise proxy as
[25] the basis for distributions?

Page 1130

[1] same in the manner in which the royalty pool is allocated among
[2] publishers, strictly on a pro rata basis.
[3] **Q.** Does it purport to do anything broader than that?
[4] **A.** No.
[5] **Q.** Does it require DMX to notify a publisher as to any
[6] advances that may have been provided to a publisher such as
[7] Sony/ATV?
[8] **A.** No.
[9] **Q.** Now, did DMX ever agree to any other form of most favored
[10] nation clause as part of this program?
[11] **A.** Yes.
[12] **Q.** On how many occasions, to your knowledge?
[13] **A.** Other than minor, minor variations, I believe only two.
[14] **Q.** And with whom? Do you recall?
[15] **A.** Well, one was with Sony/ATV, and the other was with Cherry
[16] Lane.
[17] **Q.** Turn to the next tab in the binder, which is JX 219. Does
[18] that appear to you to be the executed Cherry Lane Music
[19] Publishing company direct license?
[20] **A.** Yes.
[21] **Q.** And if you would turn to paragraph 2D of that document on
[22] the third page, you'll see a clause styled most favored
[23] nations, yes?
[24] **A.** Yes.
[25] **Q.** Do you recognize that to be the somewhat different most

Page 1129

[1] **A.** Yes, it does.
[2] **Q.** Has any publisher, to your knowledge, raised any issue or
[3] any question concerning the fairness of this, of the
[4] formulation set forth in 2B of this license form?
[5] **A.** No.
[6] **Q.** In his testimony, Mr. Owen, the economist, suggested that
[7] the direct licenses of DMX lacked insurance or indemnity
[8] features, unlike the practices and protections of the
[9] performing rights organizations. Is that correct?
[10] **A.** No.
[11] **Q.** Where are such features contained in this form of license?
[12] **A.** Well, first of all, in the grant of rights it's a license
[13] just like the society licenses, for any, some or all of the
[14] songs of the publisher catalog, and there are representations
[15] and warranties contained in paragraph 5, along with an
[16] indemnity.
[17] **Q.** And if you turn back to paragraph 2E of this document,
[18] please, labeled most favored nations.
[19] **A.** Yes.
[20] **Q.** Is this the standard most favored nations provision that
[21] was afforded to publishers who signed on to the direct
[22] licenses?
[23] **A.** Yes.
[24] **Q.** What does it provide?
[25] **A.** It provides that the publishers will be treated exactly the

Page 1131

[1] favored nations clause appearing in that contract?
[2] **A.** Yes.
[3] **Q.** How is this most favored nations clause different from the
[4] more standard clause that you just testified concerning?
[5] **A.** Well, it's also a favored nations clause on the royalty
[6] rate itself, along with the distribution methodology.
[7] **Q.** And are there -- in terms of what would trigger this
[8] clause, what comparability, if any, does the clause require?
[9] What elements of comparability are required?
[10] **A.** Well, the comparison in rates would have to be with regard
[11] to a license with a third party that was entered into during
[12] the term for exactly the same rights, exactly the same
[13] territory and exactly the same license term.
[14] **Q.** As you understand this clause, does it require and would it
[15] require DMX to match advances provided to a publisher like --
[16] well, let me strike that. Do you understand and interpret this
[17] clause, does it obligate DMX to match any and all of the
[18] economic terms that may at the end of the 57-month term of that
[19] license be afforded to Sony/ATV?
[20] **A.** No.
[21] **Q.** And the reason?
[22] **A.** Different license. I mean, different terms.
[23] **Q.** Could you turn to the next document in the binder, JX 1061.
[24] Mr. Fitzpatrick showed Mr. Knittel this e-mail chain yesterday,
[25] which includes on the second page towards the bottom a

Page 1132

[1] reference to discussions with Manatt Phelps on a variety of
[2] issues and makes reference to an MFN clause. You'll see the
[3] carry-over paragraph, on the second page it says, Ms. Castano
[4] writes to your Ms. Huntsacker: "I am sorry for the long delay
[5] in getting back to you on this, but I wanted to discuss with my
[6] colleagues. Since the license is on MFN basis, we don't have a
[7] problem in signing for our clients, but I'd like to ask you if
[8] we could do a term any shorter than three years."
[9]    Do you see that?
[10] **A.** Yes.
[11] **Q.** Now this was not itself a license, was it?
[12] **A.** No.
[13] **Q.** Turn to the next tab, JX 612?
[14] **A.** Yes.
[15] **Q.** Do you recognize this to be the actual executed license
[16] agreement with --
[17] **A.** Yes.
[18] **Q.** Manatt Phelps?
[19] **A.** Yes.
[20] **Q.** And if you turn to paragraph 2D of this document, please?
[21] **A.** Yes.
[22] **Q.** Labeled most favored nations?
[23] **A.** Yes.
[24] **Q.** How does the substance of this clause compare to the
[25] standard most favored nation clause in its scope of protection?

Page 1133

[1] **A.** The language is somewhat different, but it has exactly the
[2] same effect. It's a most favored nations clause regarding the
[3] allocation methodology. It has nothing to do with the rate.
[4] **Q.** Turn to the next document in your binder, please, which is
[5] JX 874.
[6] **A.** Yes.
[7] **Q.** Also a document discussed yesterday as part of
[8] Mr. Knittel's cross-examination, and I take it this also
[9] involves a communication between a representative of MRI and a
[10] prospective direct license publisher. Do you recognize it or
[11] does it appear to you to be such?
[12] **A.** Yes, it does.
[13] **Q.** Do you recognize the language appearing from the salutation
[14] "Hi Seth" on down?
[15] **A.** Yes.
[16] **Q.** As a form of communication that was used early on in the
[17] license solicitation process?
[18] **A.** Yes. This is among the first licenses we sent out. I see
[19] it was the middle of 2006.
[20] **Q.** And in your experience, what significance, if any, should
[21] be ascribed to the fact that on the face of this e-mail
[22] communication, not every provision that eventually found itself
[23] into the final agreement was set forth or discussed?
[24] **A.** Insignificant.
[25] **Q.** Now, down towards the bottom of this, there's a reference

Page 1134

[1] to some mathematics. This is the "based on our recent
[2] analysis" paragraph. Can you see that?
[3] **A.** Yes.
[4] **Q.** I take it, by the way, you were not the author of this?
[5] **A.** No.
[6] **Q.** But Ms. Ulman who works for you was?
[7] **A.** Yes.
[8] **Q.** And there's a reference to the math, including a reference
[9] to approximately 100,000 locations. Do you see that?
[10] **A.** Yes.
[11] **Q.** Which I take it you understand to be a reference to 100,000
[12] DMX locations?
[13] **A.** Yes.
[14] **Q.** Do you know the basis for the use of that number?
[15] **A.** No. Actually, I admit I don't know, but I do know that at
[16] the time DMX was expecting to see some significant subscriber
[17] growth.
[18] **Q.** Now, overall, comparing the work performed by MRI that you
[19] described earlier in administering the per-program television
[20] industry licenses, with the administration process you had been
[21] undertaking on behalf of DMX, including as illustrated by the
[22] reports appearing at JX 1347, how do they compare in terms of
[23] complexity?
[24] **A.** Well, the per-program reporting is very complicated, but
[25] ultimately became trivial as we spent a lot of time, man hours,

Page 1135

[1] writing the software. The DMX reporting is very, very simple.
[2]    **MR. RICH:** Thank you. I have no further questions.
[3]    **THE COURT:** Thank you, Mr. Rich.
[4]    Mr. Fitzpatrick?
[5] **CROSS-EXAMINATION**
[6] **BY MR. FITZPATRICK:**
[7] **Q.** Good afternoon, Mr. Gertz.
[8] **A.** Good afternoon.
[9] **Q.** If you could look again at JX 219 in your binder.
[10] **A.** Yes.
[11] **Q.** Actually, I apologize, JX 513 is the first tab in your
[12] binder. I did just want to look at one other clause in the
[13] direct license, and this is the direct license with Williamson
[14] Music, correct?
[15] **A.** Correct.
[16] **Q.** If you could look at, on the third page under royalties,
[17] number 2C, the no double payment provision.
[18] **A.** Yes.
[19] **Q.** Am I correct that this reads: Publisher -- and in that
[20] case that would be Williamson, correct? Publisher refers to
[21] Williamson, correct?
[22] **A.** Mm-hmm.
[23] **Q.** "Publisher acknowledges that during the term licensee" --
[24] and here that would be DMX, correct?
[25] **A.** Yes.

Page 1136

[1] **Q.** "Publisher acknowledges that during the term licensee may
[2] be a licensee of ASCAP, BMI and/or SESAC, each a music
[3] collection society." Do you see that?
[4] **A.** Yes.
[5] **Q.** And in fact, DMX was a licensee of each of those performing
[6] rights organizations during the term of this agreement,
[7] correct?
[8] **A.** I believe so.
[9] **Q.** And then it goes on: "From time to time, a music
[10] collection society may make a claim against licensee for
[11] payment of royalties for the public performance of compositions
[12] otherwise licensed hereunder." Do you see that?
[13] **A.** Yes.
[14] **Q.** Then it goes on. "Notwithstanding anything to the contrary
[15] in this agreement, licensee," and, again, that's DMX, "will
[16] have no obligation to pay publisher," here Williamson, "with
[17] respect to the public performance rights for any composition
[18] for any period of the term where licensee has paid a music
[19] collection society for such rights to such composition in such
[20] period." Did I read that correctly?
[21] **A.** Correct.
[22] **Q.** If I could ask you also briefly about the formulation of
[23] the $25 rate in the royalty pool. I believe your testimony
[24] was, and please correct me if I'm wrong, that you sort of
[25] independently from Mr. Knittel arrived at a $25 royalty pool,

Page 1137

[1] correct?
[2] **A.** Yes.
[3] **Q.** And the way that you did that, if I'm correct, is that you
[4] had previously come to a $28 rate when working for Muzak, and
[5] then to reflect the fact that Muzak entered into an agreement
[6] or a settlement at a 10 percent lower rate than they had been
[7] getting, you moved it from 28 to 25, correct?
[8] **A.** Yes.
[9] **Q.** And am I correct that that 10 percent discount you're
[10] talking about that Muzak agreed to was an agreement with ASCAP
[11] where their rate went down from something in the mid to high
[12] 40's to something in the low 40's?
[13] **A.** You know, I don't really remember. All I know is that
[14] Muzak told me they got a 10 percent discount.
[15] **Q.** Okay. Did Muzak also tell you that they had entered into
[16] an agreement with BMI where rather than a 10 percent reduction,
[17] they had agreed to a rate that, where it had previously been 12
[18] to $14 and now it had gone up to $36.36?
[19] **A.** I don't recall.
[20] **Q.** So I take it you don't recall taking into account that
[21] increase that Muzak agreed to with BMI in formulating the $25
[22] royalty pool, correct?
[23] **A.** I did not, because it was off of an already negotiated
[24] reasonable license fee.
[25] **Q.** Okay. If I could ask you to take a look at some MRI

Page 1138

[1] contracts with DMX, and I'll ask them to be brought to you at
[2] once, just so we don't have to make a whole bunch of trips.
[3] For the record, I'll ask you to look at Petitioner's
[4] Exhibit 104, Petitioner's Exhibit 105, 106 Petitioner's
[5] Exhibit, Petitioner's Exhibit 107, Petitioner's Exhibit 0054,
[6] Petitioner's Exhibit 0051 and Petitioner's Exhibit 0050.
[7] **A.** Excuse me. Could I stand up for a second?
[8] **THE COURT:** Sure.
[9] **THE WITNESS:** I reached for an expresso yesterday and
[10] threw my back out.
[11] **THE COURT:** Sure. Any time you feel like.
[12] **THE WITNESS:** Thank you.
[13] (Pause)
[14] **MR. FITZPATRICK:** And for the record I apologize, I
[15] neglected to include Petitioner's Exhibit 0054.
[16] (Continued next page)

Page 1139

[1] **BY MR. FITZPATRICK:**
[2] **Q.** Now, Mr. Gertz, we have handed you what I believe are a
[3] series of MRI agreements with DMX, or its previous name THP
[4] Capstar Acquisition Corp, and I'm just going to go through them
[5] briefly with you. I would like to make sure I'm clear on the
[6] fee terms in each one, but obviously to the extent you need to
[7] look at any other portions, please feel free to do so.
[8] Starting with Petitioner's Exhibit 0104, am I correct
[9] that this is a January 31st, 2006 agreement between MRI and
[10] then THP Capstar, now DMX?
[11] **A.** Yes.
[12] **Q.** And, this is the agreement that covers, among other things,
[13] what's been called the feasibility study that MRI performed on
[14] DMX' behalf to examine direct licensing, correct?
[15] **A.** Yes.
[16] **Q.** And if we look on the first page, the fees under this
[17] agreement will be billed hourly in an amount not to exceed
[18] $100,000 in the aggregate, is that correct?
[19] **A.** Correct.
[20] **Q.** And, am I correct that MRI did in fact receive at or close
[21] to $100,000 under this agreement for those services?
[22] **A.** I don't recall. Could be close.
[23] **Q.** And if we look at page 2 under fees and expenses, 2(A)(3),
[24] there is a feasibility study data processing fee of $50,000,
[25] correct?

Page 1140

[1] **A.** Correct.

[2] **Q.** And MRI did receive that fee, correct?

[3] **A.** Yes.

[4] **Q.** Now, if we could look at Petitioner's Exhibit 105, that's

[5] an October 4th, 2007 agreement between DMX and MRI, correct?

[6] **A.** Correct.

[7] **Q.** And the scope of services relate to direct licensing

[8] services and royalty administration services, and I won't read

[9] them all but they appear on pages -- they're described on pages

[10] 1 and 2 of the contract under those headings, correct?

[11] **A.** Correct.

[12] **Q.** And the fees under this agreement are described starting on

[13] page 2 going on to page 3, in paragraph B, MRI will receive the

[14] greater of $200,000 or an amount equal to 20 percent of the

[15] savings achieved by DMX in connection with the services

[16] provided by MRI hereunder, correct?

[17] **A.** Correct.

[18] **Q.** And DMX did in fact receive the $200,000 under this

[19] agreement -- I'm sorry, MRI did in fact receive the $200,000

[20] under this agreement, correct?

[21] **A.** Correct.

[22] **Q.** And, there is also on page 4 of the document, under number

[23] 3, an additional base fee of $6,000 that MRI would receive if a

[24] dynamic crediting mechanism was put in place under what we are

[25] calling in this proceeding an adjustable fee blanket license,

Page 1141

[1] correct?

[2] **A.** Correct, but let me explain what that was for.

[3] **Q.** Please.

[4] **A.** Our original deal was for, I think, $260,000, and DMX

[5] wanted to defer some part of the payment so we decided to defer

[6] it until the reporting started. That's all.

[7] **Q.** And the net result was that when this Court did order, as

[8] part of the interim fee proceeding that there would be dynamic

[9] crediting put in place, ultimately MRI received this $60,000,

[10] correct?

[11] **A.** Correct.

[12] **Q.** Then if we go to the April 4th, 2008 agreement, this is

[13] basically a continuation of prior agreements, MRI will continue

[14] to provide services to DMX, and if you look in paragraph 2 that

[15] will be for a $50,000 fee and paid in installments, correct?

[16] **A.** Correct.

[17] **Q.** And then, just so that we can move a little more -- and I

[18] apologize, did I not identify that, that was Petitioner's

[19] Exhibit 106. Petitioner's Exhibit 107 is July 4th, 2008, and

[20] basically it is the same as the prior one, a $50,000 agreement

[21] for additional services by MRI, correct?

[22] **A.** Yes. These were all service contracts for the ongoing

[23] royalty processing and we just continued them on in a quarterly

[24] basis.

[25] **THE COURT:** Mr. Fitzpatrick, I take it your point here

Page 1142

[1] is that these amounts should be added to the total development

[2] amounts suffered by BMI and then one should see that they are

[3] divided equally.

[4] **MR. FITZPATRICK:** Not exactly, your Honor. I don't

[5] think they should be added because DMX has already -- DMX has

[6] already paid MRI for these services. I think what they -- my

[7] point is that they do reflect that however complicated or

[8] simple this system is, it is sufficient to warrant $50,000

[9] quarterly payments to MRI and I think it corroborates the

[10] numbers that Mr. Laughlin testified about that BMI will have to

[11] do on the other end of this process.

[12] But, no, I'm not suggesting that DMX should add what

[13] it paid to MRI to BMI.

[14] **THE COURT:** But, if the total expense of developing

[15] the form of lease was in fact evenly shared or approximately

[16] evenly shared by both parties, doesn't that argue that they

[17] should be left where they fell?

[18] **MR. FITZPATRICK:** I don't think it does, your Honor,

[19] because --

[20] **THE COURT:** Oh. I thought that was the purpose.

[21] **MR. FITZPATRICK:** Our point on this, your Honor, is

[22] that BMI is going to have to incur expenses -- and I hope I'm

[23] not repeating.

[24] **THE COURT:** But so did DMX.

[25] **MR. FITZPATRICK:** They did. They absolutely did, your

Page 1143

[1] Honor, but so did BMI, and if those are not recouped then for

[2] offering the same kind of license, BMI's affiliates are going

[3] to get less money just because BMI has to incur additional

[4] expenses. And that, we believe, would be an unfair result and

[5] not one contemplated by the Second Circuit when it ordered us

[6] to --

[7] **THE COURT:** Why should BMI recoup its expenses and DMX

[8] not recoup its?

[9] **MR. FITZPATRICK:** Because DMX is buying the product,

[10] your Honor. DMX wants the license.

[11] The way I think of it, your Honor, is that BMI --

[12] **THE COURT:** No. Under a duty to furnish a form of

[13] license there is no presumption, I wouldn't think, that the

[14] total cost of that license should be, of preparing that license

[15] should be borne by the first person who asks for it. You would

[16] think a reasonable approach would be to say, well, how much did

[17] it cost? And if that was evenly shared by the parties, why

[18] that's a rough justice.

[19] **MR. FITZPATRICK:** I think there is two issues there,

[20] your Honor. There is first whether it should be divided

[21] between DMX and someone else who accidentally might want the

[22] license.

[23] **THE COURT:** Correct.

[24] **MR. FITZPATRICK:** And then there is the issue of

[25] whether it should be borne by DMX and/or BMI.

A-527