[1] **THE COURT:** But if the second question is reached,
[2] what would be the rationale for imposing the whole, it's own
[3] and BMI's on DMX?
[4] **MR. FITZPATRICK:** Because to do otherwise, your Honor,
[5] would mean that we would go to a system where there was the
[6] blanket license to a system where there was a more expensive
[7] license for BMI to administer.
[8] By definition, if those costs aren't covered, by
[9] virtue of the Second Circuit's decision our affiliates start
[10] making less for the same use of their music. And I don't -- I
[11] don't think that's what the Second Circuit said. I think the
[12] Second Circuit said you have to offer this license -- and
[13] clearly we do -- but I don't think there was anything explicit
[14] or implicit in that ruling that our affiliates should have to
[15] bear the cost of that. And if all of our costs aren't covered
[16] that would be the necessary result. And I don't -- I don't
[17] think that's what they contemplated and I don't think that's
[18] what the consent decree contemplated.
[19] **THE COURT:** They said on reasonable terms. I reread
[20] the opinion the other day with this in mind. They weren't
[21] thinking of this kind of thing. They simply were tracking the
[22] concept of a decree that had to be on reasonable terms.
[23] **MR. FITZPATRICK:** I agreed. I don't think they
[24] address the point.
[25] **THE COURT:** They don't address the outcome of this

[1] proceeding at all. It never crossed their minds.
[2] **MR. FITZPATRICK:** I agree, your Honor.
[3] **THE COURT:** So we are left with what is reasonable.
[4] **MR. FITZPATRICK:** Agreed, your Honor. And the reasons
[5] I have been giving are the reasons we believe it is reasonable
[6] to have our fees covered.
[7] **THE COURT:** Is the presumption that those authors
[8] signed up with BMI are to be spared costs which are endured by
[9] those signed up with DMX? Those authors?
[10] **MR. FITZPATRICK:** I'm not sure -- I apologize. I'm
[11] not sure I understand the question.
[12] **THE COURT:** Well, if we are looking at the ultimate
[13] transferee of the royalties there are two, one is the class of
[14] transferees from BMI and the other is the class of transferees
[15] from DMX.
[16] **MR. FITZPATRICK:** Oh, those that direct license and
[17] those who don't.
[18] **THE COURT:** Why should one party be favored over the
[19] other?
[20] **MR. FITZPATRICK:** They're not.
[21] DMX, one of the things that DMX uses to entice people
[22] to enter into the direct licenses is that you don't have to pay
[23] the -- we are not deducting the administrative costs, but the
[24] royalty pool that DMX is using is far lower than the royalty
[25] pool BMI is using, so we would submit they are paying those

[1] administrative costs by virtue of agreeing to a much lower
[2] royalty pool.
[3] So, I don't think they are spared, it is just that
[4] DMX -- DMX takes it out before the pool and has a lower pool.
[5] BMI has a larger pool but takes out its administrative fees.
[6] I don't think one is being favored over the other,
[7] your Honor.
[8] **THE COURT:** Okay.
[9] **BY MR. FITZPATRICK:**
[10] **Q.** Mr. Gertz, you had described, I think these are continuing
[11] service agreements of $50,000 so just to confirm, that's the
[12] case with PX 0054, the October 4, 2008 document?
[13] **A.** I'm looking for it... what date?
[14] **Q.** Sorry, Mr. Gertz, you don't have that one.
[15] PX 0051, the January 2009 contract, but that is an
[16] example of a $50,000 continuation?
[17] **A.** Yes.
[18] **Q.** And then the last one is as of March 2009, and if we turn
[19] to page 3 of that agreement under Roman numeral II, there is --
[20] and letter B there is a description of the recurring fees and
[21] those are $25,000 per month, correct?
[22] **A.** Correct.
[23] **Q.** And that's the current amount that -- the current monthly
[24] amount that MRI receives from DMX for the services you have
[25] been describing, correct?

[1] **A.** Yes.
[2] **Q.** And there are, under this agreement, additional services
[3] that MRI will bill DMX on an hourly basis for, correct?
[4] **A.** Yes.
[5] **Q.** And if you look under pages 1 and 2, the scope of services
[6] just to distinguish, A, the direct license services, those are
[7] billed at an hourly rate, correct?
[8] **A.** Correct.
[9] **Q.** B, the direct license administration services, those are
[10] included in the $25,000 monthly charge?
[11] **A.** Correct.
[12] **Q.** Same for C, the PRO reporting services, those are within
[13] the $25,000?
[14] **A.** Yes.
[15] **Q.** And D, litigation support services, those are billed at an
[16] hourly rate, correct?
[17] **A.** Correct.
[18] **MR. FITZPATRICK:** May I have one moment, your Honor?
[19] (pause)
[20] **Q.** Turning to a different topic, Mr. Gertz, there are
[21] instances in which DMX uses music where neither MRI nor DMX can
[22] identify the publisher of that music, correct?
[23] **A.** Correct.
[24] **Q.** And, as an estimate, that occurs about -- with about 20
[25] percent of the works used?

Page 1148

[1] **A.** I haven't looked at the numbers for a while.
[2] **Q.** You have referred to, in the past, of an 80/20 rule where
[3] the 20 refers to 20 percent unidentified works, correct?
[4] **A.** Before one actually starts working at trying to cut those
[5] numbers down, yes.
[6] **Q.** And I also just wanted to discuss the way shares can
[7] sometimes be distributed on a musical work. I think you have
[8] described some of this before, but in some instances a musical
[9] work will have multiple publishers, correct?
[10] **A.** Correct.
[11] **Q.** And in some instances, for example, there could be three
[12] publishers each with a third share, correct?
[13] **A.** Correct.
[14] **Q.** But there are sometimes when it is not a third each, one
[15] publisher could have 50 percent, one 25 and one 25, correct?
[16] **A.** Correct.
[17] **Q.** And you have also talked about MRI's database and this is
[18] the type of information that's included in MRI's where this is
[19] among the types of information included in MRI's database,
[20] correct?
[21] **A.** Correct.
[22] **Q.** Now, there are certain instances where MRI will know that a
[23] song has three publishers and it will know who those three
[24] publishers are but it won't know the exact share distribution
[25] between the three of them, correct?

Page 1149

[1] **A.** That's a situation that is faced by everybody in the world
[2] in business.
[3] **Q.** And when that situation arises MRI's approach would be, in
[4] that example, to give each a one third share, correct?
[5] **A.** Yes.
[6] **Q.** Now --
[7] **THE COURT:** On the theory that they will sort it out
[8] between them?
[9] **THE WITNESS:** Yes.
[10] What we do is, if you see from the royalty standing,
[11] your Honor, we clearly label the share we have utilized and we
[12] give the publishers the ability, if that share is not correct,
[13] to tell us.
[14] Also, in the reporting we do for the -- for digital
[15] music services we have set up, as I think I he had earlier,
[16] 17,000 websites for publishers where they can get their royalty
[17] statements. There is also a tab that allows the publisher to
[18] see its full catalog and all the shares and allows them, on
[19] their own in a password protected way, to correct the shares
[20] saying they don't control the song or change the shares.
[21] So, we give the publisher every opportunity to do
[22] that.
[23] **BY MR. LARSON:**
[24] **Q.** And so, my only question is, along those lines, Mr. Gertz,
[25] if in the process of administering this AFBL license MRI

Page 1150

[1] reported a situation to BMI where it had imputed one third
[2] share to each and BMI could show MRI that, no, actually, it is
[3] 50 percent, 25 percent, 25 percent, you would not take issue
[4] with adjusting the credit to make it accurate accordingly, is
[5] that correct?
[6] **A.** Not if BMI was correct.
[7] **MR. FITZPATRICK:** I would, your Honor, move the
[8] admission of the agreements between MRI and DMX that I just
[9] went through with Mr. Gertz.
[10] **THE COURT:** I think they were joint exhibits.
[11] **MR. FITZPATRICK:** They were Petitioner's Exhibits,
[12] your Honor.
[13] **THE COURT:** I'm sorry.
[14] **MR. RICH:** No objection.
[15] **THE COURT:** They're received, the ones you referred
[16] to.
[17] **MR. FITZPATRICK:** Petitioner's Exhibits 104, 105, 106,
[18] 107, 0051, 0050.
[19] (Petitioner's Exhibits 104, 105, 106, 107, 0051, 0050
[20] received in evidence)
[21] **MR. FITZPATRICK:** No further questions. Thank you,
[22] Mr. Gertz.
[23] **THE COURT:** Anything further, Mr. Rich?
[24] **MR. RICH:** Two questions, your Honor.
[25] REDIRECT EXAMINATION

Page 1151

[1] **BY MR. RICH:**
[2] **Q.** Mr. Gertz, if you turn back to the first document in the
[3] binder at JX 513, page 3, Mr. Fitzpatrick read into the record
[4] the text of what's called the no double payment provision.
[5] **A.** Yes.
[6] **Q.** Can you explain what that provision is designed to deal
[7] with? What situation?
[8] **A.** Yes. It is a situation where we disagree with BMI about
[9] the effectivity of a, or the validity of a license agreement.
[10] It had been our experience in the past when we started
[11] the per program license that ASCAP and sometimes BMI challenged
[12] the validity of certain license agreements that we thought were
[13] valid for various reasons which, ultimately, all got worked
[14] out. But, since we hadn't gone through the process of
[15] supplying them these forms of direct licenses, I wanted to make
[16] sure that -- and since we were handling the accounting with BMI
[17] after we were accounting to the publishers, I wanted to make
[18] sure that if we had paid a publisher under a valid direct
[19] license but BMI later thought or made a claim that that license
[20] was invalid and those -- that we would have the ability to get
[21] the money back or essentially get a credit on future royalty
[22] payments from the publisher.
[23] **Q.** This is to protect DMX against the risk of making a double
[24] payment with respect to the same performance, correct?
[25] **A.** Correct.

[1] **Q.** Has this resulted in practice, under any of the more than
[2] 500 agreements in DMX with holding any payments otherwise owing
[3] to a direct licensing publisher?
[4] **A.** Not that I'm aware of.
[5] **Q.** Now, Mr. Fitzpatrick asked you to attest to the various
[6] agreements entered into and the various sums earned in your
[7] relationship with DMX, yes?
[8] **A.** Yes.
[9] **Q.** Could you briefly describe the range of services that are
[10] encompassed by the compensation which have been paid to MRI?
[11] **A.** Yes.
[12]   All the strategy, all of the license development,
[13] conversations, multiple conversations with publishers, the back
[14] and forth of negotiating specific licensing language and the
[15] development of royalty statements and ongoing payment of
[16] royalties, we actually cut the checks and handle the check
[17] reconciliations directly to the publishers administering the
[18] carve-out reporting and adjustment from BMI and the carve-out
[19] reporting and adjustment to ASCAP.
[20] **Q.** Based on your per program experience and interface with
[21] BMI, how does that range of activities and their extensiveness
[22] compare to the functions -- to the functions that BMI will be
[23] prepared -- will be required to perform in processing the
[24] reports that are sent to it by MRI?
[25] **A.** It is more extensive because we have to deal with three

[1] groups of copyright owners.
[2] **MR. RICH:** Thank you. I have no further questions.
[3] **MR. FITZPATRICK:** None, your Honor.
[4] **THE COURT:** Thank you, Mr. Gertz.
[5] **THE WITNESS:** Thank you.
[6] **THE COURT:** You are excused.
[7] (Witness excused)
[8] **MR. LARSON:** Your Honor, DMX calls as its next witness
[9] Shalonn Hilburn.
[10] SHALONN HILBURN,
[11] called as a witness by the Respondent,
[12] having been duly sworn, testified as follows:
[13] **DIRECT EXAMINATION**
[14] **BY MR. LARSON:**
[15] **Q.** Good morning, Ms. Hilburn.
[16] **A.** Good morning.
[17] **Q.** What is your position at DMX?
[18] **A.** I am the manager of select music design.
[19] **Q.** How long have you been employed by DMX?
[20] **A.** Since November 2009. I'm sorry is, November 2005.
[21] **Q.** Please tell the court, if you would, about your educational
[22] Background.
[23] **A.** I have a bachelor of science in radio television film from
[24] the University of Texas and an MBA in accounting and business
[25] management from St. Edwards University.

[1] **Q.** When did you graduate from the University of Texas?
[2] **A.** 1996.
[3] **Q.** And just tell us, generally, what did you do professionally
[4] after graduating in 1996?
[5] **A.** I spent about 10 years working for various radio companies
[6] in different capacities.
[7] **Q.** What capacities were those?
[8] **A.** I was a radio personality, a program director, a promotions
[9] assistant, a business manager.
[10] **Q.** What were your responsibilities at those stations as a
[11] radio personality?
[12] **A.** I hosted a radio program, and in some cases I was able to
[13] pick my own music because they were specialized programs.
[14] **Q.** And, did your work at those stations focus on a particular
[15] genre or style, or was it more varied?
[16] **A.** No. I worked at -- I worked in different music formats.
[17] One of the companies, Star System, I was able to be a radio
[18] personality for different formats across the country, so I was
[19] able to do classic rock, adult contemporary, top 40, classic
[20] R&B. You name it, I was able to do it.
[21] **Q.** So, at this point how would you characterize your knowledge
[22] of various music genres?
[23] **A.** It is very extensive.
[24] **Q.** Did you spend some time working for Clear Channel?
[25] **A.** Yes, I did. I was the director of music services for Star

[1] System which was at that time owned by Capstar. And then, once
[2] Capstar sold all of its radio stations to Clear Channel, I
[3] started working for Clear Channel.
[4] **Q.** And, did that involve some interface with radio stations
[5] around the country?
[6] **A.** Yes, it did. We were on a numbering system and so all of
[7] the radio stations had to -- all the songs had to have the same
[8] song I.D. number because they were using a digital music
[9] playback system, and so all the music had to come from a
[10] central source, which was my department.
[11] **Q.** And, how many stations did you work with?
[12] **A.** It was hundreds.
[13] **Q.** Did you have music programming responsibilities when you
[14] worked for Clear Channel?
[15] **A.** Yes, I did. I programmed a small country station in Yakima,
[16] Washington.
[17] **Q.** And I think you said you started at DMX in 2005, is that
[18] right?
[19] **A.** That is correct.
[20] **Q.** Let's turn to your role at DMX. What are your
[21] responsibilities as the manager of select music design?
[22] **A.** I oversee the select music design program. Those are our
[23] catalog offerings, they're also -- they're pre-programmed
[24] basically, not our customized offerings. They cross different
[25] genres, they cover different eras. Sometimes they're lifestyle

Page 1156

[1] programs.

[2] **Q.** Just so we are clear, a DMX customer could choose or has
[3] the choice among those different pre programmed stations as to
[4] which one they want to listen to?

[5] **A.** That is correct.

[6] **Q.** What are some of your other responsibilities in your job
[7] position?

[8] **A.** I also act as supervisor for our music designers. I am the
[9] direct supervisor for our part-time music designer our
[10] audio/video engineers, some of the interns. I also sometimes
[11] work with marketing to come up with our marketing materials
[12] that describe what our programs are and what DMX is about.

[13] **Q.** And, do you do programming yourself?

[14] **A.** I do.

[15] **Q.** How many music designers are there at DMX?

[16] **A.** We have 11 full-time music designers including myself and
[17] six part-time music design.

[18] **Q.** You said you supervise that staff of music designers?

[19] **A.** Yes, I do.

[20] **Q.** Just give us a general sense of their background, if you
[21] would?

[22] **A.** Some music designers come from the world of radio. We have
[23] some former musicians, former club DJs, old marketing people.
[24] The common factor is that we all have very strong music
[25] backgrounds.

Page 1157

[1] **Q.** And you mentioned marketing. Why is marketing background
[2] relevant for music designers at DMX?

[3] **A.** You have to understand brands. We are programming to a
[4] retail environment. Especially with the signature music, you
[5] have to be able to choose music that is brand appropriate for
[6] that particular customer.

[7] **Q.** And, how would you characterize the experience or expertise
[8] of the music design staff in terms of their knowledge of music
[9] genres?

[10] **A.** They're experts, otherwise they wouldn't be working for us.

[11] **Q.** Do you have client interaction in your position?

[12] **A.** Yes, I do. I provide consultations for new and existing
[13] clients to get them on the right music programs. Usually
[14] around July or August I hear from a lot of existing program --
[15] existing customers wanting to know the appropriate Christmas
[16] music because we start doing Christmas towards the end of
[17] summer.

[18] **Q.** Let's talk for a moment, shift a bit and talk about DMX
[19] services. Just to move it along, is it consistent with your
[20] understanding what we have heard here in court previously that
[21] DMX offers off-premise or satellite service and also an
[22] on-premise service?

[23] **A.** That is correct.

[24] **Q.** Let's talk about the satellite service first or the
[25] off-premise service. If we could put up demonstrative number 1

Page 1158

[1] and hand those out, too, please? We will give both the
[2] demonstratives now to save time.

[3] It is up on the screen as well, Ms. Hilburn, if it is
[4] easier to look there.

[5] **A.** It is not.

[6] **Q.** So, can you tell us what demonstrative number 1 is?

[7] **A.** This is our latest DBS channel lineup.

[8] **Q.** Okay. And is this something that's available on your, on
[9] the DMX website?

[10] **A.** It is.

[11] **Q.** And is it accurate, to the best of your knowledge?

[12] **A.** It appears to be, yes.

[13] **Q.** And just, if you would, give us at a general level, a sense
[14] of what types of programs are offered on the satellite or
[15] off-premise service?

[16] **A.** It crosses genres like, you know, we have jazz, we have
[17] classic rock, we have traditional country. It also crosses, we
[18] cover different eras like '70s hits, '80s. Sometimes it is a
[19] lifestyle program like Sheik Boutique or City Scapes. And
[20] sometimes we also -- we offer a number of international
[21] programs like Italian Bistro Blend, Quebec Pop Rock, a number
[22] of Latin programs.

[23] **Q.** Are that's what you described for your select programming?

[24] **A.** Yes, they are.

[25] **Q.** How many channels are delivered on the satellite service?

Page 1159

[1] **A.** 110, 111.

[2] **Q.** Are you responsible for the programming of every one of
[3] these channels?

[4] **A.** No. I oversee the department but I don't personally
[5] program all of them.

[6] **Q.** How many do you program personally?

[7] **A.** I do around 20.

[8] **Q.** And so, for the others that you don't program, what is your
[9] awareness of the programming on those channels?

[10] **A.** At one point there were about -- there were about 90
[11] programs that I actually personally programmed at one point in
[12] time or another, so I'm aware of what they're supposed to sound
[13] like. I also listen to the programs on a daily basis just to
[14] make sure they're in line with what our customers are
[15] expecting.

[16] **Q.** And, do you have interactions of any kind with the
[17] designers who are now programming those particular channels?

[18] **A.** I do.

[19] **Q.** Do you know when this list was last updated?

[20] **A.** We updated it last month.

[21] **Q.** And, what was the reason for the update?

[22] **A.** We added a few new additional programs, and some of our
[23] existing programs underwent name changes.

[24] **Q.** And what was the reason for adding some programs?

[25] **A.** We recently entered into an agreement with DirectTV to



---

Page 1160

[1] provide their additional music channels and they wanted a
[2] channel for channel switch with what they were currently
[3] getting. And so, we had to remove some of our programs from
[4] the satellite in order to accommodate them.
[5] **Q.** I see.
[6]      How did you decide which channels to remove?
[7] **A.** I looked at a number of factors; my perceived popularity of
[8] the programs, whether or not there was a comparable alternative
[9] to offer to our clients that were losing some of the programs
[10] that we would have to get rid of.
[11] **Q.** And, can you just give a couple of examples of programs
[12] that were removed?
[13] **A.** For example, Eclectic Country Hits, we actually brought on
[14] a couple of additional country programs that were covering that
[15] like Bluegrass, Honky Tonk Tavern, and so those customers had
[16] plenty to choose from. Also, Eclectic Modern Classics, they
[17] can listen to Eclectic Hit Mix or Classic Hits Blend. The
[18] Divas program, which kind of broke my heart to take off the
[19] lineup, it was one of those fashion-forward type programs so we
[20] had other alternatives for them like Sheik Boutique or City
[21] Scapes.
[22] **Q.** I see.
[23]      You mentioned Eclectic Country and Eclectic Modern
[24] Classics. Are those two stations that were 100 percent
[25] directly licensed music?

---

Page 1161

[1] **A.** Yes, they were.
[2] **Q.** We will talk about those a bit more in a minute. Let's,
[3] before we do that, turn to the DMX on-premise programming.
[4] **A.** Okay.
[5] **Q.** If we can put up demonstrative 2?
[6]      Can you identify demonstrative number 2?
[7] **A.** This is our listing of our ProFusion X programs.
[8] **Q.** And, to your knowledge, is this list up-to-date and
[9] accurate?
[10] **A.** I believe it is.
[11] **Q.** And these are select programs again?
[12] **A.** Yes.
[13] **Q.** And how many select on-premise programs does DMX offer?
[14] **A.** Around 140.
[15] **Q.** And how many of these do you personally program?
[16] **A.** Around 30.
[17] **Q.** Do you have familiarity with those that you don't program?
[18] **A.** Yes.
[19]      Again, there are around 90 that I personally
[20] programmed at one point in time or another, so I'm very
[21] familiar with the rest of our lineup.
[22] **Q.** And, as with the off-premise programs that we discuss for
[23] the programs on this list that you don't personally program,
[24] are you in touch with the music designers who are responsible
[25] for programming these stations?

---

Page 1162

[1] **A.** I am.
[2] **Q.** Now, comparing the two demonstratives for a second, if we
[3] could, for each of the satellite programs or off-premise
[4] programs on the first demonstrative, is there a similar
[5] on-premise program on the second demonstrative?
[6] **A.** I believe with the exception of symphonic, yes.
[7] **Q.** So, could you just give a couple examples of where we see a
[8] similar program on the off-premise and on the on-premise?
[9]      **THE COURT:** Let's take it for granted.
[10]      **MR. LARSON:** Okay.
[11] **Q.** In a situation where you have a program that is both
[12] off-premise and on-premise, are there differences between how
[13] you approach the programming of one versus the other?
[14] **A.** No. You don't want one customer to have a different
[15] experience than the other customer so we do have pretty much
[16] the same programming philosophy when we are doing these, and we
[17] are using the same music scheduling software.
[18] **Q.** And is it the same programmer who actually programs the
[19] off-premise and on-premise version?
[20] **A.** Yes.
[21] **Q.** And, again, sticking with these similar stations, will the
[22] off-premise and on-premise programs literally contain the same
[23] songs?
[24] **A.** Not in every aspect. There are a few songs that we lack, I
[25] believe the master rights to, with, or a master agreement with

---

Page 1163

[1] the label.
[2] **Q.** You are referring to the record label that controls the
[3] song?
[4] **A.** Correct.
[5] **Q.** And, in that case, if there is no license with the record
[6] label, then what's the upshot of that?
[7] **A.** Then we won't use the song on an on-premise program. And
[8] if it is something we really want, I will usually let
[9] Mr. Knittel's department know if -- or ask them to find out
[10] more about that particular label.
[11] **Q.** I see.
[12]      Recognizing that exception that you just described,
[13] are you able to estimate the overlap between a comparable
[14] on-premise and off-premise program in terms of the commonality
[15] of the songs on the program?
[16] **A.** My guess would be 90, 95 percent.
[17] **Q.** Let's discuss, if we could, how you go about programming
[18] particular DMX channels.
[19] **A.** Okay.
[20] **Q.** How do you determine which songs to include when you are
[21] creating a program?
[22] **A.** I basically go by a certain vibe. I will look in studio
[23] and I will look for these songs and I can create a pool of
[24] music for the programs.
[25] **Q.** Let me jump in, if I could. You mentioned the word studio.

---

Page 1164

[1] Can you describe what studio is?
[2] **A.** Studios are a digital music library.
[3] **Q.** And, what do you do in studio to choose the pool of songs?
[4] **A.** I can search for the songs, I can search by genre, artist
[5] if I know what I'm looking for, and I can create, like I said,
[6] a pool of music and just kind of set it aside inside the studio
[7] program until I am ready to use it.
[8] **Q.** This is a computerized process?
[9] **A.** Yes, it is.
[10] **Q.** Do you find that there are songs that you must include
[11] within a given program or style when you are sitting down to
[12] program a station?
[13] **A.** No. There is never anything you absolutely have to use.
[14]      What we have found is that customers never know what
[15] they're missing but they definitely notice if we put something
[16] in that doesn't belong.
[17] **Q.** What do you mean by "doesn't belong"?
[18] **A.** For example, Elvis Presley has a lot of great set of gospel
[19] songs that we are using in our new hallelujah program, but we
[20] couldn't get away with putting Hound Dog in there.
[21] **Q.** Do you find there are certain publishers' works that you
[22] need to include in a given program?
[23] **A.** No. We don't think about publishers. As creative people
[24] we are thinking about the artist and the songs.
[25] **Q.** How does what you have just been describing compare to your

Page 1165

[1] experience when you are working as a radio personality?
[2] **A.** Well, in radio you kind of live and die by the ratings and
[3] so we have to give our listeners what they want, otherwise they
[4] change the channel and they go elsewhere. And so, you know,
[5] they would call and, you know, they'll make requests and they
[6] want to hear the most popular songs of the day. But, with DMX
[7] we are actually creating experiences and so, you know, we have
[8] that captive audience there and so they're not going to go
[9] anywhere. And so, what we are trying to do is kind of create a
[10] certain vibe or mood. We are not necessarily programming to
[11] certain songs. And they really don't have, you know, they're
[12] not expecting for us to break music, they just want us to put
[13] together a really great soundtrack for their business.
[14] **Q.** Got it.
[15]      How important is it to you, as a programmer, to have a
[16] wide variety of songs for a channel, if at all?
[17] **A.** For us it is more about quality over quantity. I would
[18] much rather have 200 or 300 really strong songs to choose from
[19] than, you know, 5,000 mediocre songs to choose from.
[20] **Q.** Okay, so once you have gotten your pool of songs identified
[21] in the studio program that you described, how do you actually
[22] go about determining the order in which those songs are played
[23] or sequenced?
[24] **A.** Okay. Well, we don't manually program our music, we use
[25] our what is called, Selector. It is a software program that a

Page 1166

[1] lot of radio stations use which is why our programs run kind of
[2] like radio stations.
[3]      What I will do is I will take the pool of music, put
[4] it into the software and from there I can put them into
[5] different categories.
[6] **Q.** Let me is to stop you there. If you can describe what you
[7] mean by categories?
[8] **A.** For example, if I was programming a '90s -- my '90s program
[9] I might have category A as all of my R&B music, category B
[10] would be all of my rock music, and category C would be the pop
[11] music. And once I put the songs in categories, I would
[12] establish rules in Selector. I would basically tell it don't
[13] play, like, three slow songs back to back because it would kill
[14] the energy. You wouldn't want a really soft ballad coming --
[15] you wouldn't a really loud, in your face song following a
[16] really soft ballad.
[17]      We take a number of different things into
[18] consideration.
[19]      I would also tell Selector, you know, a song that's 10
[20] years old, I don't want that to play every four hours. But, a
[21] song that is brand-new, I might want to hear it every three or
[22] four hours.
[23]      So, there are just different rules to affect the
[24] program.
[25] **Q.** So, is it the case you are saying play song A, song B and

Page 1167

[1] then song C? Or by category? Can you explain how that process
[2] works?
[3] **A.** In Selector we have what are called clocks, and I'm telling
[4] the clock that in this position of the hour I want it to play a
[5] song from category A, and then the second portion of the hour I
[6] want to play something from category C. And then maybe I will
[7] go back to category A again and play category B.
[8]      So, basically I am telling Selector I want these
[9] particular elements to lay out.
[10] **Q.** And then as it works through it it will draw a song from
[11] each of those categories and insert it in the transmission?
[12] **A.** That is correct. And it will do that automatically instead
[13] of us having to manually insert each individual song.
[14] **Q.** I see.
[15]      Now, are there any differences in how this process
[16] works with respect to an off-premise program versus an
[17] on-premise program?
[18] **A.** We use the same software so it is the same process.
[19]      **MR. LARSON:** Your Honor, it is a good stopping point
[20] for lunch.
[21]      **THE COURT:** All right. Let's resume at 2:15.
[22]      (Luncheon recess)
[23]
[24]
[25]

A-533

[1]     AFTERNOON SESSION
[2]     (2:25 p.m.)
[3]     **THE COURT:** Mr. Larson.
[4]     **MR. LARSON:** Thank you.
[5]     **BY MR. LARSON:**
[6]     **Q.** Ms. Hilburn, are you aware that DMX has licensed certain
[7]     songs directly from music publishers?
[8]     **A.** Yes.
[9]     **Q.** And do you include this directly licensed music in your
[10]    programs at DMX?
[11]    **A.** We did.
[12]    **Q.** As someone whose worked in the radio business for a number
[13]    of years and at DMX, tell the Court about your view of the
[14]    quality of the directly licensed material?
[15]    **A.** It's actually been pretty good. Actually it's been very
[16]    good. We have a lot of classic artists like Hank Williams,
[17]    actually Hank Williams I, II and III. Aretha Franklin, the
[18]    Beatles are covered, Elvis, Luther Vandross, Mary J. Blige, new
[19]    artists like Taylor Swift, Lady Gaga, just to name a few.
[20]    We also have -- it's crossed genres and cultures. We
[21]    have a whole library of Chinese music, I actually went so far
[22]    as to hire a music designer because we had so much different
[23]    music we were actually able to create a number of different
[24]    offerings to service some of our customers that had been
[25]    underserved in the past. So she's, so far she's already come

[1]     **Q.** Are there any directives for DMX management for the music
[2]     designers regarding the use of directly licensed music?
[3]     **A.** We were just told to use it as much as possible. I know at
[4]     one point Alan had the idea that on a couple of our programs
[5]     where we had an extremely large amount of direct licensed music
[6]     like with our country programs, the oldies, some of my heavy
[7]     metal, the direct licensed numbered in the hundreds and so we
[8]     were able, he had the idea maybe we could use those a little
[9]     more often during the overnight hours between two and five.
[10]    But after a while it didn't really seem like it was
[11]    making that much of a difference, because we were adding maybe
[12]    two songs or three songs an hour during that time, and so it,
[13]    to us it just made more sense to just spread it out throughout
[14]    the rest of the day.
[15]    **Q.** Let's talk about that in a moment, if we could. Let me
[16]    just ask, are there any percentages that you've been given in
[17]    terms of what percentage of directly licensed music you need to
[18]    achieve on a particular program?
[19]    **A.** No. We just, as music designers, we're just looking for
[20]    the best music possible. We're not looking to necessarily
[21]    overload our programs with direct licensed music. We want the
[22]    best music that's available for us in order for us to do the
[23]    best job possible and deliver these great programs to our
[24]    clients.
[25]    **Q.** So what have you done at a general level to try to increase

[1]     up with, she's finished two programs and she has ideas for
[2]     three others.
[3]     **Q.** Thank you. Are songs -- we talked before about the Studio
[4]     database of music that's available to you at DMX, correct?
[5]     **A.** Yes.
[6]     **Q.** Are songs labeled as being directly licensed in that
[7]     system?
[8]     **A.** Yes. There's a tag that let's us know whether a song is
[9]     fully or partially directly licensed.
[10]    **Q.** And has this been the case since the beginning of the
[11]    direct license initiative?
[12]    **A.** No. When it was first started, I believe Alan, who is our
[13]    former senior vice president of music content, he was working
[14]    off of a, using an Excel spreadsheet.
[15]    **Q.** And that's Mr. Furst, Alan Furst?
[16]    **A.** Correct.
[17]    **Q.** So he was working off of music that was on the
[18]    spreadsheets?
[19]    **A.** It was a list of songs that were directly licensed.
[20]    **Q.** And that since became somehow flagged in the computer
[21]    system?
[22]    **A.** Yes, after that technology got involved and they were able
[23]    to tag the music and that way as music designers we can tell
[24]    whether or not a song is fully or directly licensed and it also
[25]    updates our Selector scheduling software at the same time.

[1]     the use of the directly licensed music?
[2]     **A.** For starters, we went through Studio, since we can actually
[3]     search Studio by direct licensed music, we can say, we tag
[4]     Studio and say spit out all the direct licensed R and B music.
[5]     So by doing that, I'm able to listen to the music and if I
[6]     determine it's a good fit, I can add it to my programs.
[7]     In a lot of ways it kind of got our creative juices
[8]     flowing, because I know when I was updating traditional country
[9]     I ended up adding maybe 200 songs to BCS, and it kind of gave a
[10]    new life to the program.
[11]    **Q.** So what you're explaining is adding songs to program play
[12]    lists, is that --
[13]    **A.** That's correct.
[14]    **Q.** Has there been an attempt to increase the frequency with
[15]    which you play the songs?
[16]    **A.** Yes. There's actually three ways that we can integrate the
[17]    direct licensed music into our programs.
[18]    **Q.** Can you explain that, please?
[19]    **A.** Sure. We can create our own direct licensed category and
[20]    in that I would actually create a position in the clock that
[21]    will tell Selector schedule a direct, something out of the
[22]    direct licensed category when this position comes up. The
[23]    second method is to create subcategories, like earlier I gave
[24]    an example of like doing the '90s program where category A
[25]    would be maybe all of my R and B songs, and I can say category

Page 1172

[1] A1 is all of the direct licensed music, category A2 is the
[2] non-direct licensed music and I can tell Selector 50 percent of
[3] the time when it's time to schedule something from category A I
[4] want you to pull it out of direct license, the other time I
[5] want you to pull it out of the non-direct licensed music.
[6]         And the third method, if you'll allow me to give you a
[7] mental image, back in the old days of radio they were on a card
[8] catalog system and they'd have a box of index cards, and there
[9] would be the title of a song, they'd play it and they would
[10] stick that card at the very back of the box. And then they'd
[11] play the next song, stick it at the back of the box and that's
[12] in effect what Selector does, except it does it as a computer
[13] and it does it instantly.
[14]         What I can do is tell Selector instead when you come
[15] across these direct licensed songs, instead of putting it at
[16] the very back of the queue, put it 50 percent of the way back
[17] or 70 percent of the way back. That way those songs rotate
[18] more often.
[19] **Q.** And are these strategies that you've just been describing,
[20] are those available to you both for off-premise programs as
[21] well as on-premise programs?
[22] **A.** That is correct.
[23] **Q.** Now, you mentioned before in the beginning of the
[24] examination something called eclectic channels?
[25] **A.** Yes.

Page 1173

[1] **Q.** Can you tell the Court what the eclectic channels are?
[2] **A.** Those are our 100 percent directly licensed music
[3] offerings. Alan created those initially. They're eclectic.
[4] Eclectic Country Hits, Eclectic Town and Country, Eclectic
[5] Modern Classics, Eclectic Hit Mix and Eclectic Oldies.
[6] **Q.** How many? There's five total?
[7] **A.** There's five eclectic programs total now, yes.
[8] **Q.** How many of those are off-premise and how many are
[9] on-premise?
[10] **A.** There are three on-premise, five off-premise. I mean, five
[11] on-premise.
[12] **Q.** Three off-premise, five on-premise, is that --
[13] **A.** Three on the satellite, five on-premise.
[14] **Q.** Thank you. And has it always been that split or has it
[15] changed?
[16] **A.** No, all five used to be on the satellite.
[17] **Q.** And you removed two?
[18] **A.** That's correct.
[19] **Q.** And that was the Eclectic Country and eclectic Modern
[20] Classics you described earlier?
[21] **A.** That's correct.
[22] **Q.** Why did you eliminate those two off of the eclectic
[23] satellite channel service?
[24] **A.** We needed to make space on the satellite because of the
[25] DirectTV offerings we were creating. So since those two

Page 1174

[1] programs had alternatives to offer our customers who listen
[2] to them, then I felt comfortable removing those from the
[3] satellite and replacing them with something else.
[4] **Q.** Were there other cuts that you considered in the station as
[5] opposed to those two eclectic channels?
[6] **A.** Yes, we made a number of cuts. I mentioned earlier my Pet
[7] Project Divas I had removed. There were a couple of others we
[8] wanted to remove like Greek. They weren't, they aren't very
[9] popular, but with the Greek program, I didn't, we didn't have
[10] anywhere else to send our customers who were using the
[11] satellite and only listened to Greek, and so we didn't want to
[12] kind of, well, we didn't want to hurt their business because,
[13] you know, they're depending on us, and so we ended up keeping
[14] Greek.
[15] **Q.** So in your decision to keep the Greek station and to get
[16] rid of a couple of these eclectic stations, did the amount of
[17] directly licensed music on these programs play at all into your
[18] decision of which one to keep or which one to get rid of?
[19] **A.** No. At that point the most important thing for me was to
[20] make sure our customers were being served and because, you
[21] know, if I was only concentrating on keeping the direct
[22] licensed programs I would have taken, you know, I would have
[23] gotten rid of Greek and some of the other programs that had
[24] very little direct licensed music. Divas, that I had mentioned
[25] earlier, that had 40 percent direct licensed music and it got

Page 1175

[1] over 50 percent of the spins.
[2] **Q.** Now, you mentioned before when we started this conversation
[3] an attempt at some point to play the direct licensed music a
[4] bit more in the overnight hours, is that right?
[5] **A.** That's correct.
[6] **Q.** And what programs was that?
[7] **A.** That was on the country programs, I believe Traditional
[8] Country, Hit Country. I also was able to add a couple of
[9] direct licensed positions during the overnights on my heavy
[10] metal program.
[11] **Q.** And why those particular programs?
[12] **A.** The number of direct licensed songs numbered in the
[13] hundreds, and so it was -- there was enough of the music to
[14] play during the overnights without it getting very repetitive
[15] during that time.
[16] **Q.** I see. And were you successful on those stations in
[17] increasing the amounts of the directly licensed music on those
[18] stations doing that?
[19] **A.** Just barely. It was during a three-hour time period, and
[20] my whole thing was I didn't want the program to sound different
[21] at 3:00 a.m. than it does at 3:00 p.m., so I was still playing
[22] a lot of our regular music and so after a while, like I said,
[23] it just didn't make sense and it yielded, you know, very
[24] minimal results.
[25] **Q.** So that's not something you're doing any more?



A-535

[1] **A.** No.

[2] **Q.** Are you aware looking at the service overall, the DMX

[3] service, of how the percentage of directly licensed material

[4] has changed over the past year?

[5] **A.** Yes.

[6] **Q.** And how so?

[7] **A.** It's increased. We get new deals with these publishers on

[8] a daily basis, and, like I said, the music's been great and so

[9] we've been able to increase the direct license material that we

[10] use on our programs.

[11] **Q.** And are there other reasons that you're aware of that have

[12] allowed you to increase the percentages besides signing new

[13] catalogs?

[14] **A.** Just finding, you know, these great gems and putting them

[15] in our programs.

[16] **Q.** Did the tagging you described before have any role in that?

[17] **A.** That definitely helped. You definitely don't want to have

[18] to work off of an Excel spreadsheet if you don't have to, so it

[19] makes it very easy for us to find direct licensed music as it

[20] becomes available.

[21] **Q.** Is there a distinction in your mind between the on-premise

[22] programs and the off-premise programs in terms of your ability

[23] to program directly licensed music on them?

[24] **A.** No, but I can effect change a lot faster on the satellite

[25] than I can on the on-premise programs.

[1] **Q.** You mentioned before that DMX offers custom or Signature

[2] programming, is that right?

[3] **A.** That is correct.

[4] **Q.** And do you have any responsibility with respect to

[5] programming custom stations?

[6] **A.** I do have some custom programs, yes.

[7] **Q.** What has your experience been with the custom stations in

[8] terms of your ability to increase the amount of directly

[9] licensed music on those stations?

[10] **A.** Actually, it's been pretty easy. The way we normally work

[11] is, you know, our clients depend on us, they, you know, we're

[12] the music experts, so they depend on us to deliver, you know,

[13] the right program for them, and so in my case, it just so

[14] happens the last program I built, it ended up being 70 percent

[15] direct licensed music and the client absolutely loved it.

[16] **Q.** And what happens if a Signature customer, custom customer,

[17] demands that a certain song be included in the program that

[18] isn't directly licensed?

[19] **A.** We'll include it.

[20] **Q.** Have you had any complaints from any customers, to your

[21] knowledge, about the amount of directly licensed music that's

[22] included in your programs?

[23] **A.** They wouldn't even know anything about directly licensed

[24] music, and we, like I said, we're pros. We know how to put it

[25] in there without anyone, you know, noticing, you know, this

[1] particular song comes up more often than this song, because

[2] it's great music, so why would you complain.

[3] **MR. LARSON:** I'll pass the witness, your Honor.

[4] **THE COURT:** Mr. Benton.

[5] **CROSS-EXAMINATION**

[6] **BY MR. BENTON:**

[7] **Q.** Good afternoon, Ms. Hilburn.

[8] **A.** Good afternoon.

[9] **Q.** Now, Ms. Hilburn, you mentioned that one of the ways that

[10] DMX tried to increase the direct licensed percentage on the

[11] off-premise channels was to increase the performance of

[12] directly licensed music from 2:00 a.m. to 5:00 a.m. on certain

[13] channels, is that right?

[14] **A.** That's correct.

[15] **Q.** Now, DMX only made this change with respect to off-premise

[16] programming, correct?

[17] **A.** That is correct.

[18] **Q.** And it didn't apply the same 2:00 a.m. to 5:00 a.m.

[19] criteria to the on-premise programming, right?

[20] **A.** That is correct.

[21] **Q.** Ms. Hilburn, during your direct examination, you described

[22] how you and the programmers at DMX use, I think it was, used

[23] scheduling software to program the off-premise and to program

[24] the on-premise, correct?

[25] **A.** That is correct.

[1] **Q.** And what is the name of that scheduling software again?

[2] **A.** Selector.

[3] **Q.** Thank you. And so you used Selector as an automated

[4] process to choose the play list for each day on the off-premise

[5] programming, is that right? For the off-premise satellite

[6] programming, you used the Selector software and it creates a

[7] play list for each day, is that right?

[8] **A.** It creates a schedule, yes.

[9] **Q.** A schedule of songs?

[10] **A.** Correct.

[11] **Q.** And then also for the on-premise programming, such as on

[12] the Profusion X that you mentioned before, you also used the

[13] Selector software, is that right?

[14] **A.** That is correct.

[15] **Q.** And that Selector software also creates a schedule of songs

[16] for the entire day, is that correct?

[17] **A.** That is correct.

[18] **Q.** And that schedule of songs is not simply a list of the

[19] songs that will be played, it's actually song by song in order

[20] of play throughout the day, correct?

[21] **A.** Yes. It generates the schedule as it's going to play, yes.

[22] **Q.** And so just as an example, if the Rolling Stones'

[23] Satisfaction was being scheduled for a classic rock Profusion X

[24] on-premise device and that song was scheduled to play every

[25] eight hours, it would show up on the Selector software three

Page 1180

[1] times, is that correct?
[2] **A.** Yes.
[3] **Q.** And then when you program either off-premise or on-premise
[4] with the Selector software, is there a log that's created
[5] showing the order of each song for the day?
[6] **A.** Yes.
[7] **Q.** And so for the off-premise there will be a Selector log
[8] that shows all of the songs that were played for a given day,
[9] is that right?
[10] **A.** That is correct.
[11] **Q.** And then also for the on-premise there will also be a
[12] Selector music log that shows the order of songs played for
[13] each day, is that right?
[14] **A.** It will show the schedule, yes.
[15] **Q.** Meaning the order of songs by hour scheduled to play for a
[16] particular day?
[17] **A.** Yes.
[18] **Q.** So in this sense, there's no difference between the
[19] off-premise and the on-premise in terms of what the play list
[20] schedules look like, is that right?
[21] **A.** Correct.
[22] **Q.** And then with respect to the Profusion X devices that you
[23] described before, those are on-premise devices, correct?
[24] **A.** That is correct.
[25] **Q.** And they operate using a hard drive?

Page 1181

[1] **A.** Yes.
[2] **Q.** And does that hard drive store the information about each
[3] day's schedule of songs?
[4] **A.** Yes. It will deliver the songs the way they're meant to be
[5] played, yes.
[6] **Q.** Meaning for each day out of, say, a month, it will contain
[7] the list of songs that if I had that machine on would play for
[8] the entire day, is that correct?
[9] **A.** Correct.
[10] **Q.** And DMX has access for these Profusion X on-premise devices
[11] to these Selector music logs, is that right?
[12] **A.** I don't understand that.
[13] **Q.** You can see them, you have them, the Selector music logs,
[14] is that right?
[15] **A.** Yes. On my end, yes.
[16] **Q.** Ms. Hilburn, it's true, isn't it, that DMX offers almost
[17] all of its customers all of its off-premise satellite channels,
[18] is that right?
[19] **A.** Some channels are masked.
[20] **Q.** I'm sorry, you said masked?
[21] **A.** Yes.
[22] **Q.** What does masked mean?
[23] **A.** That means they don't have access to it.
[24] **Q.** Okay. And is that something that's done on the customer
[25] end, correct?



Page 1182

[1] **A.** They'll call and ask us to block access to certain
[2] channels.
[3] **Q.** And is that done because of expletives or something along
[4] that nature?
[5] **A.** Yeah, like if you had a contemporary Christian bookstore
[6] you may not want your employees to have access to some of the
[7] rock stations or the rap stations.
[8] **Q.** Now, putting aside the masking of the channels that some
[9] customers might ask for, is it true that most of the DMX's
[10] customers receive all or most of DMX's offered satellite
[11] channels?
[12] **A.** The Select programs, yes.
[13] **Q.** When you say Select, what you mean is non-customized,
[14] right?
[15] **A.** That is correct.
[16] **Q.** Because Select is DMX's generic term for non-customized
[17] music, isn't that right?
[18] **A.** Yes, that's what we call our non-custom programs.
[19] **Q.** And then for its customized programming for specific
[20] customers, that's called generically Signature programming, is
[21] that right?
[22] **A.** Yes.
[23] **Q.** And Signature programming isn't one particular program,
[24] right?
[25] **A.** No.

Page 1183

[1] **Q.** It's a generic term for everybody's customized program?
[2] **A.** Yes, Signature is our custom offerings.
[3] **Q.** Now, back to the satellite channels, you don't know how
[4] many customers tune in to any given satellite channel, isn't
[5] that right?
[6] **A.** That's correct.
[7] **Q.** But you'd agree that some satellite channels are actually
[8] tuned into more than others, wouldn't you?
[9] **A.** That would be my guess, yes.
[10] **Q.** And I think you earlier in your testimony said that one of
[11] the channels that you thought about dropping with respect to
[12] DirecTV was the Greek channel, isn't that right?
[13] **A.** That is correct.
[14] **Q.** And so it's fair to say that the Greek channel is probably
[15] not as popular as, say, adult contemporary, isn't that right?
[16] **A.** Yes.
[17] **Q.** But DMX does know the popularity of its on-premise
[18] programming, isn't that right?
[19] **A.** That is correct.
[20] **Q.** And that's because DMX knows what customers order, right?
[21] **A.** That is correct.
[22] **Q.** Ms. Hilburn, I'd like to show you Joint Exhibit 1295.
[23] Ms. Hilburn, have you had a chance to look at the document?
[24] **A.** Yes.
[25] **Q.** Is this a document that shows for on-premise programs how





Page 1184

[1] many devices have been ordered by customers with the particular
[2] program?
[3] **A.** Yes.
[4] **Q.** And so just as a quick example, if you turn to page 15 --
[5] there are numbers at the bottom. Eight lines up there's a
[6] listing for Greek, and is that DMX's Greek on-premise program
[7] for the Profusion X device?
[8] **A.** That is correct.
[9] **Q.** And that's because it says PFX in the style type?
[10] **A.** Yes.
[11] **Q.** And PFD would be Profusion D?
[12] **A.** That is correct.
[13] **Q.** That's also an on-premise programming device?
[14] **A.** It is.
[15] **Q.** And that's disk-based rather than hard drive?
[16] **A.** They receive their updates via disk, but the music is also
[17] on a drive, I believe.
[18] **Q.** Oh, okay. And also with respect to the Profusion D, the
[19] Selector software is also used to schedule for the Profusion D,
[20] correct?
[21] **A.** Yeah. In most cases the Profusion D is released along with
[22] the Profusion X.
[23] **Q.** Okay. And just quickly, this shows that either 99 or 26
[24] customers have a device with this style design. Which is it?
[25] **A.** 99 have the style on their devices, but only 26 appear to

Page 1185

[1] be actually using it, or at least have it as part of their
[2] schedule where it's supposed to be used.
[3] **Q.** Okay. And then I don't think we need to go through any
[4] more of this document, but in any given case the on-premise
[5] programming, it would show how many customers had ordered that,
[6] correct?
[7] **A.** Correct.
[8] **Q.** And you discussed Signature programming earlier. Now,
[9] Signature programming is by definition different than the
[10] Select non-customized programming, correct?
[11] **A.** That is correct.
[12] **Q.** And the particular songs used will, of course, be different
[13] on Signature than it will be on a particular satellite channel,
[14] for example?
[15] **A.** That is correct.
[16] **Q.** And the vast majority of Signature programming customers
[17] receive on-premise programming, not off-premise, isn't that
[18] right?
[19] **A.** That is correct.
[20] **Q.** Now, Ms. Hilburn, you said earlier that DMX's programmers
[21] don't even think about publishers when they're programming. Do
[22] I have that correct?
[23] **A.** That's correct.
[24] **Q.** And so you haven't made any systematic attempt to reduce
[25] the amount of music programmed for any particular publisher,

Page 1186

[1] correct?
[2] **A.** No.
[3] **Q.** And so as far as you know, DMX is still playing songs at
[4] the same level for any given publisher, right?
[5] **A.** As far as I know.
[6] **Q.** Ms. Hilburn, do you have any knowledge at all about how
[7] much or what percentage of DMX's off-premise programming Sony
[8] could make up for any future period?
[9] **A.** I have no idea.
[10] **MR. BENTON:** I'll pass the witness, your Honor.
[11] **MR. LARSON:** No redirect, your Honor.
[12] **THE COURT:** Thank you, Ms. Hilburn.
[13] (Witness excused)
[14] **MR. LARSON:** Your Honor, if we could just have a
[15] moment, we're going to present another witness through
[16] deposition.
[17] (Pause)
[18] **MR. LARSON:** Your Honor, DMX calls the next witness by
[19] deposition, Mr. Ed Arrow, from Universal Music Publishing.
[20] A-r-r-o-w. And there's a binder that we've provided for you
[21] with the referenced exhibits.
[22] "Q. Mr. Arrow, would you state your name and address for the
[23] record, please?
[24] "A. My name is Edward Arrow.
[25] "Q. And what is your -- by whom are you employed?

Page 1187

[1] "A. Universal Music Publishing Group.
[2] "Q. And what is your position at Universal Music Publishing
[3] Group?
[4] "A. Vice president of copyright.
[5] "Q. We'll get into it as, obviously, the dealings with DMX, but
[6] putting the DMX dealing to one side, have there been occasions
[7] during your tenure when Universal Music Publishing Group was
[8] approached by other entities other than Touch Tunes to explore
[9] the direct licensing of the small performing rights?
[10] "A. I know it has come up before, but I don't think that I can
[11] tell you as I sit here now which companies have asked us for
[12] those rights. It is not frequent, but I know it has come up.
[13] "Q. What is the company's practice in terms of how it
[14] determines to respond to such requests? Is there a general
[15] policy? Is it case by case, that sort of thing?
[16] "A. Well, as a general policy, we steer people towards the
[17] performing rights societies, but I can't say that there would
[18] never be a circumstance where we would grant a direct
[19] performing rights license. But generally we steer people
[20] towards the PRO's.
[21] "Q. And is there a reason for that?
[22] "A. Yeah. We don't have a great deal of experience in setting
[23] rates for performing rights. The societies have a lot of
[24] experience in that area, and it is easier sometimes to license
[25] through a collective than to do it just one-on-one.

Page 1188

[1] "Q. To what degree in your experience in considering potential
[2] direct licensing requests has Universal Music Publishing taken
[3] into consideration the precedential effects, either within a
[4] given industry or across industries of Universal Music
[5] Publishing either agreeing to or declining to enter into direct
[6] licensing arrangements?
[7] "A. We would consider precedential effects, if that's your
[8] question. Is that what you're asking me if we would consider
[9] precedential effects?
[10] "Q. Yes.
[11] "A. Yes we would.
[12] "Q. Are the precedential effects which Universal Music
[13] Publishing has been concerned about from the standpoint of
[14] negative precedential effects of going forward with direct
[15] licensing?
[16] "A. Yeah. We would not be concerned with the precedential
[17] effect of doing a direct license per se. We would be more
[18] concerned with the precedential effects of the rates within a
[19] direct license.
[20] "Q. And what would the nature of those concerns be?
[21] "A. If we set a rate in a direct license that we thought was a
[22] rate that would be less favorable than might otherwise be had,
[23] had we the license, were the rates set either by negotiation
[24] between a performing rights society and the licensee or set by
[25] a rate court.

Page 1189

[1] "Q. The question should have been in your experience have you
[2] ever considered entering into a relationship where Universal
[3] knowingly or in its belief would receive lesser royalties than
[4] it would receive as a distributee through one or more of the
[5] performing rights organizations.
[6] "A. Not that I recall or not that I'm aware of.
[7] "Q. Do you have a general understanding of what Universal Music
[8] Publishing Company's market share is and as part of that I
[9] would invite you to define how you would yourself understand
[10] the concept of market share, if you have any understanding?
[11] "A. I mean, I think it is very difficult to determine exact
[12] market share for music publishing, especially in the United
[13] States. I think outside the United States it may be a little
[14] easier to do it. So I just, I don't know just from my
[15] experience exactly what our market share is. I obviously,
[16] other people have made estimates of it, but I don't know what
[17] those estimates were based on.
[18] "Q. We have marked as Arrow Exhibit 4 --"
[19]    **MR. LARSON:** Which is RX072 in the binder.
[20] "Q. "A document styled agreement dated or made as of
[21] October 21, 2002 between Broadcast Music Inc. and Songs of
[22] Universal Inc. Mr. Arrow, are you able to identify this
[23] document?
[24] "A. It is the membership agreement between Songs of Universal
[25] Inc. and BMI."

Page 1190

[1]    **MR. LARSON:** We'd enter the RX72 into evidence, your
[2] Honor.
[3]    **MR. FITZPATRICK:** No objection, your Honor.
[4]    **THE COURT:** Received.
[5]    (Respondent's Exhibit RX72 received in evidence)
[6] "Q. And what is Songs of Universal Inc.?
[7] "A. It is a music, a company that owns and administers rights
[8] in musical compositions that is a member of BMI.
[9] "Q. And I take it this is one of several entities about which
[10] you testified to earlier which has entered into comparable
[11] arrangements from time to time with BMI?
[12] "A. Yes.
[13] "Q. And to your knowledge is this the most current affiliation
[14] agreement between Songs of Universal and BMI?
[15] "A. Yes.
[16] "Q. To your knowledge, is this the same or substantially the
[17] same form of agreement that BMI enters into with all of its
[18] other music publisher affiliates?
[19] "A. I think there can be some variations in the agreement.
[20] "Q. To your knowledge, were there any specific to Universal
[21] Music Publishing modifications made to the standard agreement
[22] that are reflected in this document?
[23] "A. The one that I recall is in paragraph 1, the way we handled
[24] the term.
[25] "Q. Do you recall how this deviates from the standard BMI

Page 1191

[1] clause?
[2] "A. Yes. I think the standard agreement is a five-year term
[3] and several years ago we sought to shorten the term of our
[4] membership agreements to be three year terms and also to align
[5] them in such a way that they would all expire at the same time.
[6] So we changed -- we -- I can't remember how many agreements we
[7] worked with, maybe five, where we aligned the terms of the
[8] agreements and then made them three-year terms.
[9] "Q. Is there any particular contact person at BMI with whom you
[10] dealt with the negotiations and execution of these affiliation
[11] agreements?
[12] "A. Yeah. When we modified the term of agreements I negotiated
[13] that with Del Bryant.
[14] "Q. And specifically what is the reference you are making to
[15] the modification? What is that a reference to?
[16] "A. The one I spoke of before in paragraph 1 where we modified
[17] not the terms of the agreement, but the actual term in terms of
[18] the date of the agreement.
[19] "Q. I will ask you to turn to page 3 of the document in front
[20] of you, please. If you could read to yourself paragraph C
[21] towards the top of the third page beginning, 'Publishers, the
[22] writers and/or the co-publishers if any.'
[23] "A. I've read it.
[24] "Q. You understand that provision to entitle Universal Music
[25] Publishing to license some or all of the music performing

[1] rights which are licensed to BMI through this agreement on its
[2] own? Let me rephrase. That was awkward. Do you understand
[3] this paragraph to permit Universal Music Publishing to license
[4] music performing rights outside of its relationship with BMI?
[5] "A. Yes.
[6] "Q. Was any aspect of this paragraph 4C of the agreement viewed
[7] by Universal as any form of impediment to carrying on
[8] negotiations or, if it desired, to completing negotiations with
[9] DMX over a direct license?
[10] "A. No.
[11] "Q. What is your understanding, then, as a BMI affiliate of
[12] BMI's practices with respect to distributions of royalties on
[13] the one hand to the music publishing company associated with a
[14] given work that's been performed and on the other hand to the
[15] associated writer or writers of those works?
[16] "A. My understanding is the amount distributed to writer and
[17] publisher are equal.
[18] "Q. Did there come a time when Universal Music Publishing was
[19] approached by representatives of DMX concerning a catalog
[20] direct license to DMX?
[21] "A. Yes.
[22] "Q. What is your understanding of how that initial contact
[23] occurred and when?
[24] "A. My recollection is I was first contacted by Ron Gertz from
[25] the Music Reports and he asked if we might be interested in

[1] speaking with DMX about a direct license. I said sure, we will
[2] speak to anybody about anything. And then he had Barry Knittel
[3] call me or maybe the three of us spoke, I can't remember
[4] exactly. But at some point I wound up speaking with Barry
[5] Knittel.
[6] "Q. Did you bring one or more other individuals employed by
[7] Universal Music Publishing into the process of considering and
[8] valuing over time DMX's direct license proposal?
[9] "A. I know I spoke with or possibly e-mailed David Renzer,
[10] R-e-n-z-e-r, on the subject. I do not recall whether I
[11] involved others or not.
[12] "Q. And for the record can you identify the position held by
[13] Mr. Renzer?
[14] "A. He is chairman and CEO of Universal Music Publishing group.
[15] "Q. Wouldn't it have been Mr. Renzer's ultimate decision and
[16] did it require Mr. Renzer's ultimate approval had you made a
[17] recommendation to go forward with some form of direct license
[18] arrangement with DMX?
[19] "A. Yes.
[20] "Q. Did there come a time when you made a recommendation one
[21] way or the other to Mr. Renzer?
[22] "A. Yes.
[23] "Q. What was that ultimate recommendation?
[24] "A. Ultimate recommendation was not to do a direct license with
[25] DMX and continue to license through the performing rights

[1] organizations.
[2] "Q. And was that recommendation made only after you had secured
[3] from BMI the guarantee arrangement, which we will discuss a
[4] little bit later?
[5] "A. It was always my preference to stay with the performing
[6] rights organizations, but obviously that preference could be
[7] mitigated by an extraordinary offer from DMX.
[8] "Q. Did you feel that DMX at the end of the day failed to make
[9] an extraordinary offer?
[10] "A. Yes.
[11] "Q. Did you believe that BMI for its part did make an
[12] extraordinary offer?
[13] "A. Yes.
[14] "Q. Let's mark as the next exhibit, it should be Arrow 6."
[15]     MR. LARSON: Which is RX 073 in the binder.
[16] "Q. "It's a June 6 -- pardon me, June 17, 2003 e-mail from
[17] Mr. Renzer to I think one of the individuals identified
[18] earlier. I can't pronounce this name, so I'll spell it from
[19] the e-mail address. ADISAVERIO@BMI.com.
[20] "A. I see it.
[21] "Q. Do you recall sending this note to Ms. Disaverio?
[22] "A. I do.
[23] "Q. What is her position with BMI to your understanding?
[24] "A. I don't know her precise title.
[25] "Q. Why was it you determined to direct this e-mail to her

[1] attention Specifically?
[2] "A. She is someone who I know at BMI who is good at obtaining
[3] information.
[4] "Q. Do you know what area or department of BMI she works in?
[5] "A. I think she works in membership.
[6] "Q. So with Ms. Smith?
[7] "A. Yeah. You know, I really don't know. She is just a person
[8] that I know that I go to."
[9]     MR. LARSON: Your Honor we'd move RX073 into evidence.
[10]     MR. FITZPATRICK: No objection, your Honor.
[11]     THE COURT: Received.
[12]     (Respondent's Exhibit RX073 received in evidence)
[13] "Q. Okay. This memo states that, 'I'm trying to get an idea of
[14] how much BMI pays us for the above background music service.'
[15] And I assume the above background music is the reference to the
[16] subject line, which is DMX Music services, is that correct?
[17] "A. Yes.
[18] "Q. Why were you seeking this information?
[19] "A. We were trying to determine whether the advances being
[20] offered by DMX were good. We were trying to determine how much
[21] money we were receiving from ASCAP and BMI and then we were
[22] going to calculate the total value of DMX and then compare it
[23] to the offer being made by Barry."
[24]     MR. LARSON: Your Honor, could you just excuse me one
[25] second? I just want to check a notation with my co-counsel.

Page 1196

[1]    (Pause)
[2]    "Q. Did you over time have in mind what multiple of the amounts
[3]    that Universal came to understand it had been receiving from
[4]    ASCAP and BMI with respect to DMX performances, what multiple
[5]    would be necessary to create that extraordinary offer that
[6]    might induce Universal to accept the proposal?
[7]    "A. No.
[8]    "Q. You never got to that point?
[9]    "A. No.
[10]   "Q. Did you reach a point, however, when you were able to
[11]   obtain information that you believed accurately provided you
[12]   with the information as to what revenues Universal Music
[13]   Publishing had been receiving from ASCAP and BMI combined
[14]   attributable to performances of Universal Music Publishing
[15]   works on DMX and by DMX?
[16]   "A. Yes.
[17]   "Q. Was that a -- let's start with BMI.  Was that a
[18]   straightforward process or did you find it took a fair amount
[19]   of working with data and interpretation of data with BMI to get
[20]   to that point?
[21]   "A. I know that some of the information that I used came from
[22]   our royalty department and how much work they had to do I don't
[23]   know.  From my end, I don't recall a tremendous amount of
[24]   effort.  I received the numbers from wherever I received them
[25]   and I made a calculation.

Page 1197

[1]    "Q. Do you recall at any point in this process of your
[2]    interaction with BMI focusing on royalty streams attributable
[3]    to DMX, at any point in that did any representative of BMI say
[4]    to you in words or substance the data we have furnished you is
[5]    incorrect in whole or in part?
[6]    "A. Not that I recall.
[7]    "Q. Did anybody report to you inside of Universal that they had
[8]    received such a heads up from BMI?
[9]    "A. No.
[10]   "Q. Did you at some point transmit either to Mr. Gertz or
[11]   Mr. Knittel information relating to what the stream of
[12]   royalties that Universal believed were attributable to DMX that
[13]   it was receiving from ASCAP and BMI?
[14]   "A. Yeah.  I recall speaking with Barry about the calculations
[15]   I had made and I remember he was surprised.
[16]   "Q. What do you recall him surprised as to?
[17]   "A. I recall he thought it was more than he thought it should
[18]   have been.
[19]   "Q. Let's mark as Arrow 7 a two-page document.  The second page
[20]   is boilerplate, which is an e-mail chain, the top sequence of
[21]   which is from Mr. Arrow to Alison Smith Wednesday August 9,
[22]   2006, 5:15 p.m."
[23]      MR. LARSON:  This is RX74 in the binder.
[24]   "A. Okay.
[25]   "Q. Looking down at the e-mail from Ms. Smith to you on

Page 1198

[1]    August 9, 4:39, do you recall receiving this communication from
[2]    Ms. Smith?
[3]    "A. Yes."
[4]      MR. LARSON:  Your Honor, we'd move RX74 into evidence.
[5]      MR. FITZPATRICK:  No objection, your Honor.
[6]      THE COURT:  Received.
[7]      (Respondent's Exhibit RX74 received in evidence)
[8]    "Q. And what prompted that?
[9]    "A. I was trying to determine the value of the DMX service
[10]   because in the offer made by DMX they were offering us a
[11]   royalty based on $25 per location per month, and I was trying
[12]   to find out whether the performing rights societies had
[13]   agreements in place with DMX and what the royalty basis was for
[14]   those agreements.
[15]   "Q. And I take it from the beginning of Ms. Smith's e-mail to
[16]   you that this e-mail was preceded by a conversation.  Do you
[17]   see?
[18]   "A. I suppose it was, yes.
[19]   "Q. Do you have any specific recall of your first conversation
[20]   or conversations on this general subject with Ms. Smith?
[21]   "A. No.
[22]   "Q. Do you recall independently of the timing of those
[23]   conversations what Ms. Smith may have said to you on the
[24]   subject either present or anticipated fees from DMX?
[25]   "A. Are you asking me what she said in terms of what kind of

Page 1199

[1]    rate BMI might receive?
[2]    "Q. Let me break it down.  Did Ms. Smith ever describe to you
[3]    the terms of the then current license relationship with DMX?
[4]    "A. Well, it says right here, she says right in this e-mail,
[5]    'Also to confirm the $36.36 for BMI is per location per year
[6]    for other services we spoke with.  DMX estimated in
[7]    communication with other publishers they had approximately
[8]    100,000 locations that they have not signed a BMI agreement.' I
[9]    was thinking about this before I came in today and I recall
[10]   this $36 number and I also recalled that, and I don't know if
[11]   this came from BMI or from ASCAP, but there was some kind of a
[12]   number that was in like the $45 range that maybe ASCAP was
[13]   getting or was seeking, I don't recall exactly, but I recall
[14]   that figure.
[15]   "Q. Do you recall Ms. Smith identifying any rate other than
[16]   36.36 that was then being paid by DMX to BMI?
[17]   "A. No.  I do not recall.
[18]   "Q. Do you recall Ms. Smith indicating in a forward looking
[19]   fashion whether BMI was looking to escalate or increase the
[20]   fees it had been receiving from DMX?
[21]   "A. I think she was anticipating an escalation.
[22]   "Q. Do you remember what she said about that?
[23]   "A. They always anticipate escalation.
[24]   "Q. What recommendations did Ms. Smith give you with respect to
[25]   your consideration of DMX's direct licensing proposal?

A-541

Page 1200

[1] "A. She made no recommendations.

[2] "Q. Do you recall roughly in this time period, and I will

[3] represent to you I'm trying to move this along for everybody's

[4] benefit, a couple of internal, a couple of exchanges which

[5] appear to indicate that in late September of 2006 you had lunch

[6] with Mr. Knittel?  Does that ring a bell?

[7] "A. I recall having lunch with Barry Knittel.

[8] "Q. And what do you recall about the substance of the

[9] discussion about the then pending DMX proposal that occurred or

[10] otherwise the substance of discussions between you and

[11] Mr. Knittel around that time about the DMX proposal?

[12] "A. At the lunch or just in that general time?

[13] "Q. Well, why don't we expand it from the lunch?  What is your

[14] recollection of the feedback which you provided around this

[15] time to DMX concerning its initial license proposal to

[16] Universal?

[17] "A. My general recollection is I had run some numbers based on

[18] that information I was given regarding our ASCAP and BMI

[19] revenues, and then obviously I took those numbers and I had to

[20] factor in that, that we had already received the publisher's

[21] share and DMX's offer was based on us licensing both the

[22] publisher's and writer's share.  So I had to double those

[23] numbers and try to figure out how much revenue we would have

[24] received each year and we received both publisher's and

[25] writer's share and I did some calculations.  And I recall

Page 1201

[1] telling Barry that I thought the amount they were offering was

[2] not sufficient.  And I think also around the same time or was

[3] it shortly after, I can't remember, we were also in the process

[4] of acquiring BMG Music Publishing and he had to calculate based

[5] on that, but I think that was after the lunch.  The lunch was

[6] mostly social.  It was a very nice lunch.

[7] "Q. Let's mark as Arrow 8 a document, we're skipping a couple

[8] of documents in your pile.  So we're moving to an e-mail dated

[9] October 3, 2006, 5:32 p.m. from Barry Knittel to Ed Arrow."

[10]     MR. LARSON:  This is JX 1185 in the binder.

[11] "A. Okay.

[12] "Q. It looks like you and Mr. Knittel might have had at least

[13] one more lunch, yes?

[14] "A. I remember one lunch.  I don't remember two, but there

[15] could have been two.

[16] "Q. Do you recall in or around this time receiving a further

[17] proposal from DMX in the form that appears here?

[18] "A. You know, what I remember about this specifically was the

[19] offer of no less than 17-1/2 percent of publisher plays during

[20] a quarter.  That's what I remember about this.

[21] "Q. That was one of my questions.  What was the derivation of

[22] that that you remember?

[23] "A. No, that was something he invented as far as I recall.

[24] "Q. It wasn't something you and he previously discussed?

[25] "A. He may have mentioned it to me before, but it wasn't a

Page 1202

[1] number that I requested, I don't think.  I think it was a

[2] number that he was offering.

[3] "Q. Did you come to know the source or derivation of the 17-1/2

[4] percent?

[5] "A. Not that I recall, except to say that our market share at

[6] the time was probably, like I said, market share we don't know

[7] exactly, but I would guess it was less than 17-1/2 percent and

[8] Barry was explaining to me that they would do these direct

[9] deals with only a limited number of publishers and therefore we

[10] would have a larger slice of a smaller pie.

[11] "Q. Did that have commercial appeal to you?

[12] "A. Sure, yeah.

[13] "Q. Now, in the third paragraph of Mr. Knittel's notes to you

[14] he says, 'Please note the license includes the agreed-upon

[15] $100,000 advance.'  Do you see that?

[16] "A. I do.

[17] "Q. Had you proposed to Mr. Knittel over lunch or otherwise

[18] that Universal be offered a $100,000 advance?

[19] "A. I think that was Barry's proposal.

[20] "Q. Do you have any understanding of why he would have

[21] characterized it as agreed upon?

[22] "A. No.

[23] "Q. How would you characterize the degree of interest at this

[24] point in discussions on Universal's part in pursuing the direct

[25] license with BMI?

Page 1203

[1] "A. We were interested.  We were interested in trying to figure

[2] out what the best offer with DMX, you know, what DMX's best

[3] offer would be and then we would make a decision as to what we

[4] wanted to do.

[5] "Q. And internally during this period and as the discussions

[6] progressed, were various forms of modeling undertaken as to

[7] what the economics of this deal would look like, either in

[8] absolute terms or relative to then current and anticipated

[9] distributions from the performing rights organization?

[10] "A. I don't think we did any modeling beyond the rough

[11] calculations I did as to what the performing rights societies

[12] were paying us and what we might get out of the DMX deal.

[13] "Q. Let's mark next, and again we're going a bit out of

[14] sequence here, a document bearing an e-mail, a two page e-mail

[15] sent Thursday, January 4, 2007 from Ed Arrow to Barry Knittel."

[16]     MR. LARSON:  This is JX 1186 in the binder.

[17] "Q. Do you have that document?

[18] "A. I have it.

[19] "Q. And just to be clear, is there an attachment to it that

[20] says ASCAP earnings?

[21] "A. There is.

[22] "Q. Okay.  Is this transmittal in response to a request that

[23] you received from Mr. Knittel to provide information as to

[24] ASCAP and ultimately ASCAP and BMI distributions that had been

[25] received by Universal?

Page 1204

[1] "A. Well, as I said before, I had told Barry that I thought the
[2] basis for his offer, because I think he made an offer and I
[3] thought it was low, and he said it was based on whatever and I
[4] said I don't think it is right, and yeah, I think he said to
[5] me, 'Well, show me.' So I was showing him.
[6] "Q. Now, if you look at the attachment, is this an internal
[7] spreadsheet or an excerpt from an internal spreadsheet that was
[8] created by you and your folks?
[9] "A. It looks like an internal spreadsheet I had. Looks like an
[10] Excel spreadsheet.
[11] "Q. And do you remember the document or documents from which
[12] the data was derived?
[13] "A. This specific one, no. I don't remember.
[14] "Q. I take it it was information supplied to you by ASCAP?
[15] "A. It could have been ASCAP or it could have been from our
[16] royalty department.
[17]       **MR. LARSON:** I'll note, too, for the record that the
[18] spreadsheet is in the back of the binder in the tab JX 1186.
[19] It's two-sided.
[20] "Q. I take it it was information supplied to you by ASCAP?
[21] "A. It could have been ASCAP or it could have been from our
[22] royalty department.
[23] "Q. As you sit here today --
[24] "A. I'm sorry, I think it was from our royalty department.
[25] "Q. Let's mark next as Arrow 10 an e-mail, same day, January 4,

Page 1205

[1] 2007, 11:40 a.m. at the top."
[2]       **MR. LARSON:** This is JX 1187 in the binder.
[3] "Q. Am I correct, Mr. Arrow, with this transmittal you supplied
[4] the counterpart data concerning what Universal understood to be
[5] its earnings from BMI?
[6] "A. That's what it said.
[7] "Q. We have placed before you as Arrow 11 what appears to be a
[8] further and later license proposal from BMI. Do you recognize
[9] it as such?
[10] "A. Yes.
[11] "Q. And it looks like it followed yet another lunch?
[12] "A. I only remember the one.
[13] "Q. What was the basis, to your recollection, Mr. Arrow, of the
[14] escalated levels of the advances from the prior proposal that
[15] we looked at a few minutes ago?
[16] "A. I suppose it was based on the numbers that I gave him.
[17] "Q. Did Mr. Knittel around this time convey to you any
[18] methodology by which those advances had been computed by BMI?
[19] "A. I don't recall."
[20]       **MR. LARSON:** Could I have just one moment, your Honor?
[21]       (Pause)
[22]       **MR. LARSON:** The document being discussed here is
[23] Arrow Exhibit 11, which we're making a copy of. My apologies.
[24] My understanding is it's not included in the binder. We'll get
[25] a copy right now to the Court. Would it be best for us to

Page 1206

[1] continue or just take a moment to get the exhibit, your Honor?
[2]       **MR. FITZPATRICK:** You can show this to the Court.
[3]       (Continued next page)



Page 1207

[1]     **BY MR. LARSON:**
[2] "Q We have placed before you as Arrow 11 what appears to be a
[3] further and later license proposal for BMI. Do you recognize
[4] it as such?
[5] "A Yes.
[6] "Q And it looks like it followed yet another lunch?
[7] "A I only remember the one.
[8] "Q What was the basis, to your recollection, Mr. Arrow, of the
[9] escalated levels of the advances from the prior proposal that
[10] we looked at a few minutes ago?
[11] "A I suppose it was based on the numbers that I gave him.
[12] "Q And did Mr. Knittel, around this time, convey to you any
[13] methodology by which those advances had been computed by BMI?
[14] "A I don't recall.
[15] "Q Let me turn now, in the third paragraph of this letter Mr. Knittel
[16] writes, 'this is the same license that we've discussed
[17] previously, except for the removal of the 17.5 percent
[18] programming restriction, since the advance would exceed the
[19] advance by said restriction.'
[20]       "Do you see that?
[21] "A I do.
[22] "Q What was your reaction to the $25 royalty provision
[23] separate and apart from the advance terms?
[24] "A The $25 per location royalty was the thing that concerned
[25] me the most about what DMX was proposing because, based on

**A-543**

Page 1208

[1] information I had obtained, it seemed that the performing
[2] rights societies either were licensing based on a higher per
[3] location fee or it seemed like they might be able to obtain a
[4] higher per location fee later on in a rate court."
[5] **MR. LARSON:** I will note for the record that Arrow 11
[6] that we spoke amount is JX 1188.
[7] "Q Did you and Mr. Knittel, over the course of your dealings,
[8] discuss DMX' interest in earning out the advance in terms of
[9] increasing its plays of Universal repertory music over the
[10] course of the license?
[11] "A Yes. Well, when I, you know, spoke with Barry about these
[12] various offers and I think it frequently came up that the $25
[13] royalty was lower than what I thought the current market was
[14] and he would explain to me, 'Well, yes, that's true but, or
[15] that may be true, but what we're offering you, you know, is a
[16] bigger slice of a smaller pie and these advances as an
[17] incentive for you to do this. So, while it may be less than
[18] what you're currently paying ASCAP and BMI ultimately you,
[19] Universal, will wind up with more.'
[20] "I think that was the entire character of the deal.
[21] "Q What was your reaction to that statement?
[22] "A To Barry? Or just to myself?
[23] "Q To yourself or to Barry.
[24] "A I mean, to myself, this was really the whole crux of the
[25] decision that we had to make because it was a question of

Page 1209

[1] whether we would make more money in the short-term by taking
[2] this offer and accepting these advances which might be more
[3] than we would otherwise receive and maybe a larger market share
[4] of DMX' market, which would be a smaller market because they
[5] would presumably only have these direct deals, and let me roll
[6] back.
[7] So, Barry was saying that, you know, they would do
[8] these direct deals and then they would no longer use any songs
[9] that were not subject to the direct deals so that would cut a
[10] lot of publishers out and that would be the smaller pie we
[11] would have a bigger piece of. So, in the short-term, that
[12] would be very good for us, probably because we would make more
[13] money than we otherwise would under the current arrangement.
[14] But, in my mind, maybe that wasn't a good deal in the long term
[15] because it might devalue this particular type of service within
[16] the industry.
[17] "Q Could you explain what your thought process was there in
[18] that valuation?
[19] "A Yes. Because if the service is worth $35 to $45, it had
[20] previously been worth $35, $45 per location and he is offering
[21] us a deal at $25, then that sets a new value for the service
[22] that's lower than the current value within the marketplace.
[23] "Q And was that --
[24] "A I was concerned.
[25] "Q Was it your concern therefore on that part that

Page 1210

[1] independently of the short-term advantage that Universal might
[2] obtain in its dealings with DMX, that written large across the
[3] industry it could have the effect of pressing down the
[4] prevailing industry fee level?
[5] "A Well put. Yes.
[6] "Q Were you also concerned about any destabilizing effect
[7] entering into this arrangement might have on the activities and
[8] relationships of ASCAP and BMI with user groups?
[9] "A No.
[10] "Q Let's mark as Arrow 12 a document that was premarked as
[11] Arrow 16."
[12] And this is JX 1189 in the binder.
[13] "For the record, this is an e-mail chain, the top most
[14] of which is a February 28, 2007 8:48 a.m. e-mail from Ed Arrow
[15] to David Renzer. I would ask you to focus initially on the
[16] e-mail from Mr. Knittel to you in the beginning of the middle
[17] of the first page.
[18] "A I've read it.
[19] "Q Mr. Knittel says, 'I'm writing further to our conversation
[20] this morning. I'm disappointed to hear that Universal wants
[21] advances greater than those offered in our previous e-mail
[22] attached.'
[23] I take it that you and Mr. Knittel had a conversation
[24] on or about the morning of February 27th, to which he is
[25] responding?

Page 1211

[1] "A It appears to be the case.
[2] "Q And, what do you recall of that conversation?
[3] "A I don't recall.
[4] "Q Is it accurate in that conversation you convey, either
[5] generally or with specifics, the view reported by Mr. Knittel
[6] that in order to promote an arrangement with DMX, Universal
[7] wanted greater advances than those set forth in the last offer
[8] that was made?
[9] "A That appears to be the case.
[10] "Q How much more did you indicate Universal wanted?
[11] "A I don't remember.
[12] "Q Did you give no sense of dimensioning to Knittel or you
[13] just don't remember?
[14] "A I just don't recall.
[15] "Q Mr. Knittel continues in his note, 'In order for DMX to
[16] consider Universal's requirements, as we discussed, the easiest
[17] way would be for Universal to send its proposal to DMX so that
[18] we can evaluate it and make a decision.'
[19] "Did, in fact, Universal provide, in written or oral
[20] form, a counter proposal to DMX?
[21] "A I don't recall.
[22] "Q The top of this e-mail chain reflects an e-mail from you to
[23] Mr. Renzer. Do you see that?
[24] "A I do.
[25] "Q It has an attachment. Did you and Mr. Renzer discuss the

Page 1212

[1] state of this negotiation around this time?

[2] "A I don't recall about the specific time but I know that

[3] David and I communicated or this, you know, as it progressed.

[4] "Q And what was Mr. Renzer's perspective on the potential

[5] desirability of entering into a direct license with DMX?

[6] "A I think David, like I, was open to it, but concerned about

[7] the $25 per location fee but wanted to see what DMX' best offer

[8] would be and then we would make a decision. And obviously, as

[9] you know, we were also interested to see what the ASCAP and BMI

[10] would do for us if, you know, would they also pass the

[11] advances.

[12] "Q Arrow Exhibit 13 is marked for identification as JX 1190.

[13]         "I take it this --

[14] "A Okay.

[15] "Q I take it this reflects further discussion with DMX over

[16] possible terms for direct license?

[17] "A Yes.

[18] "Q And I take it in the interim a material change occurred

[19] with respect to the size of the Universal music publishing

[20] catalog with the accretion of the BMG catalog?

[21] "A That's correct.

[22] "Q I take it in response to that development DMX, through

[23] Mr. Knittel, revised upwardly its calculation of the proposed

[24] advances?

[25] "A Yes.

Page 1213

[1] "Q And those are reflected, I take it, in the e-mail carrying

[2] over onto the second and third pages?

[3] "A Yes.

[4] "Q Did these get your attention?

[5] "A Sure. Yes.

[6] "Q At the top of the first page you write back to Mr. Knittel,

[7] I take it, a counter proposing what you described as periods 1

[8] and 2 you write, 'You quoted me 2.2 and 2.4.

[9]         'Can you do 2.25 for period 2 and 2.25 for period 3

[10] with no option period (i.e. no 4th period)?'

[11]         "Correct?

[12] "A That's what it says, yes.

[13] "Q And had Mr. Knittel said yes to that, was that a proposal

[14] Universal was prepared to accept?

[15] "A I don't recall. I don't recall.

[16] "Q Had you gained authorization from Mr. Renzer to make this

[17] proposal?

[18] "A I believe this was made at David Renzer's suggestion.

[19] "Q Okay. And do you recall DMX' response to this suggestion?

[20] "A I don't.

[21] "Q Do you recall any discussions with Mr. Knittel around this

[22] time about your counter-proposal?

[23] "A No.

[24] "Q If you would look at the second page of this document,

[25] please, Mr. Knittel describes how the advance part of the

Page 1214

[1] proposal has been calculated.

[2]         "Do you see that?

[3] "A You are talking about the bullet points that name the

[4] specific advance amounts?

[5] "Q No. Over on 2 there is a couple of indented paragraphs

[6] describing the methodology by which the proposal and advances

[7] had been calculated?

[8] "A Sure. Let me take a look.

[9] "Q Sure.

[10] "A Okay.

[11] "Q What was your reaction to this methodological approach and

[12] the levels of advances it generated?

[13] "A I don't recall.

[14] "Q Back to your note at the top of the first page you say,

[15] 'Barry, for periods 1 and 2 you quoted me 2.2 and 2.4.'

[16]         Was that intended to suggest that the advance set

[17] forth in the proposal was different from what you understood

[18] would be forthcoming?

[19] "A I don't recall.

[20] "Q Is that how you interpreted it reading it now?

[21] "A Yeah. My interpretation was we must have had a discussion

[22] subsequent to this where he increased the amount.

[23] "Q Okay. Let's mark next what was premarked as Arrow Exhibit

[24] 20 and becomes Arrow 14."

[25]         This is JX 1331 in the binder.

Page 1215

[1]         "This is e-mail chain, top most of which is from

[2] Mr. Arrow to Mr. Renzer dated Thursday, August 2, 2007, 4:56

[3] p.m.

[4] "A Okay.

[5] "Q Do you recall, in or about this time period, intensifying

[6] your discussions with BMI but with respect to the DMX direct

[7] license proposal?

[8] "A No, I don't.

[9] "Q Pardon me?

[10] "A You said intensifying. I don't -- obviously we were

[11] talking to BMI. I think I spoke with them several times over

[12] the course of these negotiations but I don't know if they

[13] intensified them or not. At some point we began speaking with

[14] BMI and asked them whether or not they would make an advance or

[15] guarantee to us.

[16] "Q And, what information did you supply them in or around the

[17] time of the e-mails reflected in Arrow 14 on which they were to

[18] consider making you an advance or a guarantee?

[19] "A We told them that we were in discussions with DMX over a

[20] direct license and we were considering doing that and we said

[21] to them, 'Well, we may do that or we may stay with you on it.

[22] We don't know yet. We are entertaining offers from DMX, what

[23] is your offer to us.'

[24]         "I don't recall providing any other information

[25] offhand.



[1] "Q Was your principal contact in or around, beginning in this
[2] period of August 2007, Alison Smith, in this back and forth
[3] with BMI asking them for their best proposal?
[4] "A Yes.
[5] "Q Did you initiate the concept of an advance or guarantee
[6] from BMI?
[7] "A Yes.
[8] "Q What is your recollection from the time of Arrow 14 forward
[9] of the conversations that took place between Universal and BMI
[10] leading to the eventual agreement on a guarantee?
[11] "A I don't recall the specific conversations. I just know
[12] that we ultimately, Alison ultimately made an offer and we
[13] accepted the offer but I don't remember if there are iterations
[14] along the way.
[15] "Q You don't remember if there was any give or take or offer
[16] and counter-offers made?
[17] A. No. I just don't remember.
[18] "Q Let's mark as Arrow 15 a document that was premarked as
[19] Arrow 21."
[20] MR. LARSON: And this is RX 75. I think in my binder
[21] it is a bit earlier so you may have to flip back if it is not
[22] the last one in the binder.
[23] MR. LARSON:
[24] "Q The top most e-mail is from Mr. Arrow to Mr. Renzer dated
[25] August 9th, 2007, 5:26 p.m.?

[1] "A Okay.
[2] "Q At the bottom of this chain Ms. Smith writes to you, 'Dear
[3] Ed, my sincerest apologies for the delay. Still discussing
[4] internally, and Del not back in town until next Tuesday and we
[5] need his input, as you can understand. Please bear with me.'
[6] "What was this e-mail in response to?
[7] "A I don't recall specifically but my presumption was it was
[8] about trying to get the deal done. I don't know if it was a
[9] question of whether they were going to do it or not, or whether
[10] it was a question of the amount. I just don't remember
[11] because, I think, that's what you are getting at.
[12] "Q As a matter of process, were you phoning or e-mailing
[13] Ms. Smith to find out what the status was?
[14] "A I am sure I called her, you know, and emailed. The subject
[15] here is our recent conversation so that couldn't have been an
[16] e-mail.
[17] "Q And what were you saying, in substance to her, as you were
[18] awaiting BMI's answer?
[19] "A Probably saying to her what's your answer?
[20] "Q Is it fair to say you were putting some gentle or otherwise
[21] pressure on BMI to get an answer?
[22] "A Gentle pressure.
[23] "Q And what were you doing with respect to DMX with respect
[24] during this period?
[25] "A I was telling Barry I would get back to him so we were

[1] waiting to see. we were leaning towards going. doing this deal
[2] with BMI. But, until the pen was put to paper. I was not going
[3] to tell Barry we were finished because if the BMI thing didn't
[4] happen, then maybe we should have done a DMX deal."
[5] MR. LARSON: We would enter RX 75 in evidence, your
[6] Honor.
[7] MR. FITZPATRICK: No objection, your Honor.
[8] THE COURT: Received.
[9] (Respondent's Exhibit 75 received in evidence)
[10] MR. LARSON:
[11] "Q To your knowledge, had BMI ever entered into guarantees as
[12] opposed to advances with any major music publishing company?
[13] "A I don't know.
[14] "Q How about with any publishing companies?
[15] "A I don't know.
[16] "Q How about with any BMI affiliates?
[17] "A You are asking advances versus guarantees, correct?
[18] "Q Yes.
[19] "A I don't know.
[20] "Q You testified earlier you had heard, albeit without
[21] specific reference, of advances that had been issued by BMI and
[22] other circumstances, correct?
[23] "A That's correct.
[24] "Q You have no similar recollection as to guarantees, correct?
[25] "A Correct.

[1] "Q Let's mark as Arrow 18 a document that was premarked as
[2] Arrow 25 which is a December 7, 2007 agreement between
[3] Broadcast Music, Inc. and Universal."
[4] This is RX 32.
[5] "A I have it.
[6] "Q Do you recognize this document?
[7] "A I do.
[8] "Q Can you describe it for the record?
[9] "A It was a modification to our membership agreement in which
[10] BMI makes minimum guarantees against all monies -- I'm just
[11] going to read them -- become payable pursuant to the basic
[12] agreement and affiliation agreement. And for performances of
[13] the works embraced on the DMX commercial background music
[14] service, and then it is lists specific guarantee amounts by
[15] year."
[16] MR. LARSON: Your Honor, we enter RX 32 in evidence.
[17] MR. FITZPATRICK: I believe it is in but if it is not,
[18] no objection, your Honor.
[19] MR. LARSON:
[20] "Q So the record is clear by "guarantee" is meant irrespective
[21] of actual royalties earned out over the 2008, '90 and '10
[22] periods associated with performances of DMX music, those sums
[23] were in fact, as the word states, guaranteed to Universal,
[24] correct?
[25] "A That's correct.

Page 1220

[1] "Q Did you in fact enter into any similar arrangement with
[2] ASCAP?
[3] "A No.
[4] "Q Did you attempt to?
[5] "A Yes.
[6] "Q You ultimately couldn't reach terms?
[7] "A Correct.
[8] "Q Did you ever advise ASCAP of the terms to which BMI had
[9] agreed with you?
[10] "A I don't recall.
[11] "Q Is it possible that you did?
[12] "A It is possible.
[13] "Q Did ASCAP offer some form of advance or guarantee, simply
[14] not at the level that proved to be acceptable to Universal?
[15] "A ASCAP refused to offer an advance or guarantee.
[16] "Q What extent did Universal or contractual arrangements with
[17] its writer entitle those writers to any portion of the
[18] guaranteed sums reflected in this agreement?
[19] "A Okay. To the extent that we have a co-publishing or
[20] administration agreement with a writer, assuming that the
[21] writer is the owner of the company we are contracting with,
[22] then a portion of the publisher's share of royalties that we
[23] receive is paid to those clients. Obviously if --
[24] "Q Pardon me. I didn't mean to interrupt.
[25] "A That's okay. I paused.

Page 1221

[1]     "If we had an agreement that was just a traditional
[2] songwriter agreement where the songwriter doesn't have a
[3] publishing entity and they just receive their writer's share,
[4] in that case they would receive no part of this.
[5] "Q Mr. Arrow, what is your understanding of the implications
[6] for the guarantees to Universal where Universal or any of the
[7] companies whose catalogs it administers, to enter into any form
[8] of direct license arrangement with DMX during the term of this
[9] agreement?
[10] "A It was my understanding BMI was just trying to protect
[11] themselves. Obviously if they're offering us guarantees and we
[12] enter into a direct agreement with DMX, that would reduce the
[13] amount of money that BMI would be collecting and therefore
[14] could make this deal uneconomical for BMI.
[15]     "So, this was just to protect them in the event that
[16] we suddenly said, 'oh, now we have this BMI deal and now we are
[17] going to did a direct deal with DMX, we are going to collect
[18] from both.'
[19] "Q I take it the way that language was structured and agreed
[20] to, though, that would -- that result would be triggered
[21] irrespective of the scale or size or number of works
[22] encompassed by any number of direct license or arrangement with
[23] DMX, correct?
[24] "A That's what it says but I don't think that was the intent.
[25] "Q But that's what it says?

Page 1222

[1] "A That is what it says.
[2] "Q Now, if you look at paragraph 3 on page 2 there is a
[3] reference to the term of the basic agreement between BMI and
[4] Universal Music Careers?
[5] "A I see that.
[6] "Q Pardon me. Term of the basic agreement of both songs of
[7] Universal Inc. and Universal Musical Careers being extended?
[8] "A I see that.
[9] "Q What's the relevance of that in terms of why did that end
[10] up as part of this arrangement with BMI?
[11] "A Just to preclude the possibility that we might not renew
[12] one of those membership agreements during the term of during
[13] the periods in which the guarantees were to be made.
[14]     "Do you understand?
[15] "Q In other words, absent this agreement, is there any reason,
[16] sitting here today, that you believe those normal periodic
[17] extensions would not have taken place even in the absence of
[18] this agreement?
[19] "A Absent this agreement, those extensions would have taken
[20] place.
[21] "Q Okay.
[22]     "Am I correct that under the agreement which we have
[23] marked as Arrow 18, the only basis on which the guarantees
[24] could be earned out was with respect to performances of,
[25] occurring on the DMX commercial background music service?

Page 1223

[1] "A That's what the agreement says, yes.
[2] "Q What do you recall telling DMX after you concluded this
[3] arrangement with BMI?
[4] "A I recall telling Barry we were not going to do the deal
[5] with him."
[6]     **MR. LARSON:** That concludes the examination.
[7]     **MR. RICH:** Your Honor, that leaves solely our two
[8] expert witnesses and, as expressed yesterday, we propose to
[9] bring in Ms. Candell bright and early tomorrow morning. I
[10] think both sides would expect she would be concluded and we
[11] would bring Dr. Jaffe in beginning Friday morning at whatever
[12] expanded schedule works for your Honor, on either the front end
[13] and/or the back end with the goal, hopefully, of concluding him
[14] on Friday as well.
[15]     **THE COURT:** All right. You thought Candell would take
[16] most of the day or you are not sure?
[17]     **MR. RICH:** I believe our direct will be under two
[18] hours. I can't speak for the cross.
[19]     **THE COURT:** Okay. Well then, do you want to start at
[20] 10:00 or 10:30 tomorrow? When do you want to start?
[21]     **MR. RICH:** Either is amenable to us.
[22] Jim?
[23]     **MR. FITZPATRICK:** Either. Either is acceptable, your
[24] Honor.
[25]     **THE COURT:** Let's say 10:30 then.

[1]  **MR. RICH:** That's great. We will see you then.
[2]  **THE COURT:** See you then.
[3]  (Adjourned to 10:30 a.m., Thursday, January 28, 2010.)
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

[1]  65  . . . . . . . . . . . . . . . . . . . .1092
[2]  20  . . . . . . . . . . . . . . . . . . . .1094
[3]  67  . . . . . . . . . . . . . . . . . . . .1094
[4]  RX72  . . . . . . . . . . . . . . . . . .1190
[5]  RX073  . . . . . . . . . . . . . . . . .1195
[6]  RX74  . . . . . . . . . . . . . . . . . .1198
[7]  75  . . . . . . . . . . . . . . . . . . . .1218
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

[1]          INDEX OF EXAMINATION
[2]  Examination of:                    Page
[3]  TERESA STAFFORD-SCHERER        1057
[4]  RONALD H. GERTZ
[5]  Direct By Mr. Rich . . . . . . . . . . . . .1099
[6]  Cross By Mr. Fitzpatrick . . . . . . . . . .1135
[7]  Redirect By Mr. Rich . . . . . . . . . . . .1151
[8]  SHALONN HILBURN
[9]  Direct By Mr. Larson . . . . . . . . . . . .1153
[10]  Cross By Mr. Benton  . . . . . . . . . . . .1178
[11]          PETITIONER EXHIBITS
[12]  Exhibit No.              Received
[13]  104, 105, 106, 107, 0051, 0050  . . . . . .1150
[14]          RESPONDENT EXHIBITS
[15]  Exhibit No.              Received
[16]  51  . . . . . . . . . . . . . . . . . . . .1060
[17]  53  . . . . . . . . . . . . . . . . . . . .1066
[18]  54  . . . . . . . . . . . . . . . . . . . .1067
[19]  75  . . . . . . . . . . . . . . . . . . . .1069
[20]  58  . . . . . . . . . . . . . . . . . . . .1073
[21]  59  . . . . . . . . . . . . . . . . . . . .1073
[22]  60  . . . . . . . . . . . . . . . . . . . .1078
[23]  61  . . . . . . . . . . . . . . . . . . . .1079
[24]  62  . . . . . . . . . . . . . . . . . . . .1081
[25]  19  . . . . . . . . . . . . . . . . . . . .1082

# In The Matter Of:

*BROADCAST MUSIC INC.,, v.*
*DMX, INC.,,*

---

*January  28, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 01S5BMIF.txt, Pages 1227-1319 (93)

**Word Index included with this Min-U-Script®**

Page 1227

```
              01SFBMI1                          Trial
[1]     UNITED STATES DISTRICT COURT
[2]     SOUTHERN DISTRICT OF NEW YORK
        ------------------------------x
[3]
[4]     BROADCAST MUSIC INC.,
[5]                       Petitioner,
[6]            v.                          08 Civ. 216 (LLS)
[7]     DMX, INC.,
[8]                       Respondent.
[9]     ------------------------------x
[10]                                       January 28, 2010
                                              10:30 a.m.
[11]    Before:
[12]                   HON. LOUIS L. STANTON,
[13]                                       District Judge
[14]                   APPEARANCES
[15]    HUGHES, HUBBARD & REED, LLP
                Attorneys for Petitioner
[16]    BY:  JAMES C. FITZPATRICK
             MICHAEL E. SALZMAN
[16]         JASON C. BENTON
[17]         MARGARET J. HOAG
                - AND -
[18]         JOSEPH DiMONA, In-house counsel, BMI, Inc.,
[19]    WEIL, GOTSHAL & MANGES, LLP
                Attorneys for Respondent
[20]    BY:  R. BRUCE RICH
             BENJAMIN E. MARKS
[21]         TODD D. LARSON
[22]
[23]
[24]
[25]
```

Page 1228

```
[1]                    (Trial resumed)
[2]          MR. FITZPATRICK:  Your Honor, could I just hand up
[3]     what I believe is the data about revenue that your Honor
[4]     requested?
[5]          THE COURT:  Thank you.  Should that be given
[6]     particularly confidential treatment?
[7]          MR. FITZPATRICK:  No, your Honor.
[8]          THE COURT:  Okay.  Good.
[9]          MR. FITZPATRICK:  And if we could, I just would like
[10]    to confirm that it's what your Honor wanted.  We took the four
[11]    firms, their license fees as a percentage of BMI's total
[12]    domestic revenue, is that correct?
[13]         THE COURT:  Yes, I think that's right.
[14]         MR. FITZPATRICK:  That's what that should be, your
[15]    Honor.
[16]         THE COURT:  Thank you.  This is just what I wanted.
[17]    Thanks a lot.  It's statistically insignificant, in short.
[18]         MR. FITZPATRICK:  I'm sorry, your Honor?
[19]         THE COURT:  It's statistically well below
[20]    insignificant.
[21]         MR. FITZPATRICK:  Each firm's fees is a very small
[22]    percentage of our overall license fees.  I do agree with that,
[23]    if that's what your Honor is saying.  They're very small.
[24]         THE COURT:  When you added them, they'd still be --
[25]         MR. FITZPATRICK:  Yes, agreed, your Honor.
```

Page 1229

[1] **THE COURT:** Statistically trivial.

[2] **MR. FITZPATRICK:** Agree, your Honor. It would be

[3] somewhat less than 2 percent, I think.

[4] **THE COURT:** Yes, thank you.

[5] **MR. MARKS:** Your Honor, we have one housekeeping

[6] measure as well and I hope to have solved the case of the

[7] missing document, which is I think perhaps some of the

[8] confusion may have stemmed from your Honor's first recollection

[9] of a chart as being on the back page of an exhibit. I think

[10] when we cross-examined Mr. O'Neill it was printed on both sides

[11] of the paper, and I think when we showed it to you later, we

[12] only had it printed on one side. So if I may approach. It's a

[13] document already in evidence, but this may be the document you

[14] were looking for.

[15] **THE COURT:** Yes, that's the chart, I think. But my

[16] recollection is that it had a memorandum on the front page.

[17] When was this chart prepared?

[18] **MR. MARKS:** I believe that comes from, that's part of

[19] a document that was prepared by BMI in May of 2004.

[20] **THE COURT:** Contemporaneously.

[21] **MR. MARKS:** Roughly contemporaneous. Certainly

[22] contemporaneous with the negotiations and towards the very end.

[23] **THE COURT:** Well, I suspect that it was placed on the

[24] back of a memorandum transmitting to some sort of a reviewing

[25] committee in BMI the chart and the report from Mr. Annastas.

Page 1230

[1] But if there is no such memorandum, sobeit. I will go to my

[2] grave bearing one more mistake.

[3] **MR. MARKS:** Thank you, your Honor. DMX calls as its

[4] next witness, Dr. Amy Candell.

[5] **THE COURT:** In any event, thank you for the effort

[6] that's gone into this. It's probably to no point.

[7] **AMY CANDELL,**

[8] called as a witness by the Respondent,

[9] having been duly sworn, testified as follows:

[10] **THE DEPUTY CLERK:** Please say your name and spell your

[11] last name slowly for the record.

[12] **THE WITNESS:** Amy Burton Candell, C-a-n-d-e-l-l.

[13] **MR. MARKS:** Your Honor, we have prepared some binders

[14] of documents and demonstratives that we'll be discussing with

[15] Dr. Candell. May we approach?

[16] **THE COURT:** Yes.

[17] **MR. MARKS:** Your Honor, we've passed up two binders.

[18] I'm pleased to say we'll be focusing most of our attention on

[19] the small binder rather than the second, much larger binder.

[20] **DIRECT EXAMINATION**

[21] **BY MR. MARKS:**

[22] **Q.** Good morning, Dr. Candell. What is your current

[23] professional position?

[24] **A.** I'm a senior vice president at Compass Lexicon.

[25] **Q.** What is Compass Lexicon?

[1]   **A.** Compass Lexicon is an economic consulting firm.

[2]   **Q.** How long have you been employed by Compass Lexicon?

[3]   **A.** I have been employed by Compass Lexicon and its predecessor

[4]   Lexicon since 1999.

[5]   **Q.** What did you do before joining Lexicon?

[6]   **A.** Before joining Lexicon I was also a consulting economist at

[7]   the Economics Resource Group from 1993 to 1994.

[8]   **Q.** And the Economics Resource Group was another economics

[9]   consulting firm?

[10]   **A.** Yes.

[11]   **Q.** Would you please briefly describe your educational

[12]   background?

[13]   **A.** I have a Bachelor's in economics from MIT and a Master's

[14]   and PhD in economics from Harvard.

[15]   **Q.** When did you receive your PhD?

[16]   **A.** In 1994.

[17]   **Q.** Have you served as an economic consultant prior to this

[18]   proceeding?

[19]   **A.** I have, yes.

[20]   **Q.** In what areas?

[21]   **A.** In a variety of areas. My work encompasses antitrust and

[22]   competition issues, the economics of regulation, quantitative

[23]   analysis and also intellectual property issues, particularly

[24]   around copyright issues. I have worked looking at issues

[25]   related to copyrights in a variety of industries including

[1]   local television, cable television and the internet.

[2]   **Q.** Prior to this proceeding, have you served as an expert in a

[3]   variety of adversarial proceedings?

[4]   **A.** Yes, I have.

[5]   **Q.** If I could ask you to turn to the very front of the small

[6]   binder we passed up --

[7]       **THE COURT:** Didn't you testify in Music Choice?

[8]       **THE WITNESS:** I did not testify in Music Choice. Adam

[9]   Jaffe testified in Music Choice. He'll be here tomorrow.

[10]       **THE COURT:** Did you submit a report?

[11]       **THE WITNESS:** I did not submit a report, no.

[12]       **THE COURT:** Okay. Thank you.

[13]   **Q.** If I could ask you to turn to the very front of the small

[14]   binder in front of you, is this your curriculum vitae?

[15]   **A.** Yes, it is.

[16]       **MR. MARKS:** It's been premarked as Respondent's

[17]   Exhibit 162, your Honor, and we offer it into evidence.

[18]       **MR. SALZMAN:** No objection.

[19]       **THE COURT:** Received.

[20]       (Respondent's Exhibit RX162 received in evidence)

[21]       **MR. MARKS:** Your Honor, at this time I would offer

[22]   Dr. Candell as an expert witness on antitrust and competition.

[23]       **THE COURT:** That isn't necessary in this court. That

[24]   hasn't been done in federal courts for quite a while. They may

[25]   still do it in the state court, but the measure in federal

[1]   court is is the witness qualified to answer the question that

[2]   is put to him or her. We proceed that way.

[3]       **MR. MARKS:** Thank you, your Honor.

[4]       **THE COURT:** I don't anticipate any challenge on the

[5]   credentials. We'll see.

[6]   **BY MR. MARKS:**

[7]   **Q.** Please describe the nature of the assignment you've been

[8]   given by DMX in connection with the nature of this proceeding.

[9]   **A.** My assignment was to do three things: The first thing I

[10]   did was to determine a range of reasonable blanket fees using

[11]   competitive market evidence using the framework set forth by

[12]   Professor Jaffe. The second thing I did was evaluate the

[13]   benchmark for a blanket license that was put forth by BMI in

[14]   this case, the BMI Muzak agreement, and I made appropriate

[15]   adjustments to that agreement to have it suitable to use as

[16]   a benchmark for a blanket license.

[17]       And the third thing I did was respond to criticisms

[18]   and comments made by Dr. Owen on my work.

[19]   **Q.** What information did you review in connection with this

[20]   assignment?

[21]   **A.** I have reviewed the trial transcripts, deposition

[22]   transcripts and a substantial portion of the discovery record.

[23]   **Q.** If I could ask you to turn to tab 1 in the small binder.

[24]   You mentioned that you worked within Dr. Jaffe's framework.

[25]   Dr. Jaffe is going to go into this in much greater depth during

[1]   his own testimony tomorrow, but just so the Court has an

[2]   understanding of the terms that you're going to be using today,

[3]   could you please describe the elements of Dr. Jaffe's

[4]   framework?

[5]   **A.** So these are the elements of a blanket carveout license.

[6]   The first thing on here is the blanket fee. The blanket fee is

[7]   the full fee that's paid for a blanket license. The blanket

[8]   license in the framework that I'm going to discuss has two

[9]   components: One component is the floor fee. The floor fee is

[10]   the fee that is paid for the part of the blanket license that

[11]   is not associated with performing rights, and the unbundled

[12]   music fee is the part of the blanket license that is associated

[13]   with the performing rights part of the blanket fee.

[14]       And then one component of the blanket carveout

[15]   license is the direct license ratio. That adjusts the blanket

[16]   fee to account for the percentage of music that is directly

[17]   licensed.

[18]   **Q.** Is another way to think about the floor fee and the music

[19]   fee that the music fee is designed to compensate the publishers

[20]   and composers for their contribution to the value of the

[21]   blanket license, and the floor fee is designed to compensate

[22]   BMI for its contribution to the value of the blanket license?

[23]   **A.** Yes, that's another way to think about it.

[24]   **Q.** If I could ask you to turn to the second tab in your

[25]   binder. What does this demonstrative show?

[1]  **A.** This is a --
[2]      **THE COURT:** Let me hear that last question read back.
[3]  Could I? I know the answer was yes, but I want to hear the
[4]  question.
[5]      (Record read)
[6]      **THE COURT:** Okay, thank you.
[7]  **Q.** Dr. Candell, if you could explain what this demonstrative
[8]  reflects?
[9]  **A.** So this is just a graphical representation of what we were
[10] just talking about. On the left-hand side, the shaded-in area
[11] is what the blanket fee is with no direct licensing, and it
[12] showed here that there are again these two components. The
[13] floor fee, which is the value of the blanket license associated
[14] with such things as the aggregation of the blanket license and
[15] the indemnity and insurance features of the blanket license,
[16] that's accounted for by the floor fee. The music fee component
[17] is the value of the performance rights.
[18]     **THE COURT:** You're saying that these are all elements
[19] contained within the present structure, but undifferentiated?
[20]     **THE WITNESS:** That's right.
[21]     **THE COURT:** They float, as in a liquid solution?
[22]     **THE WITNESS:** That's correct. But I'm breaking it out
[23] into these two pieces because they're going to relate to how I
[24] think about valuing it.
[25]     **THE COURT:** Well, you're keeping it in that context.

[1]      **THE WITNESS:** Yes.
[2]  **Q.** In determining a value for the BMI blanket license did you
[3]  value the floor fee and music fee component separately?
[4]  **A.** Yes, I did.
[5]  **Q.** Let's start with the music fee.
[6]  **A.** Do we want to talk about the other part of the chart?
[7]  **Q.** I'm sorry.
[8]  **A.** So the other part of the chart here is the blanket license
[9]  fee, the blanket carveout license when there is direct
[10] licensing. So the part at the top is the component that's paid
[11] for directly. The music fee part of the license is adjusted
[12] proportionally by the direct license fee, so that's the
[13] blanket fee minus the floor fee is adjusted proportionally.
[14] The part of the blanket license that's paid to BMI is the
[15] remaining music fee component plus the floor fee and the rest
[16] of it is paid directly to the publishers.
[17] **Q.** You mentioned that you valued the components, the floor fee
[18] and the music fee components of the BMI blanket license
[19] separately. Let's start with the music fee. What did you
[20] consider in determining the reasonable value of the music fee
[21] component of the BMI blanket license?
[22] **A.** I used the evidence from the competitively --the evidence
[23] from the direct licenses that were negotiated in the
[24] competitive market by DMX with music publishers.
[25] **Q.** Did you look at all 550 or so of the direct licenses?

[1]  **A.** I did not look at all of the direct licenses that DMX
[2]  signed. I looked at many of the ones with large publishers, a
[3]  subsample of the smaller publishers and my understanding is
[4]  that the economic terms of the ones that I didn't look at are
[5]  the same as the ones that I did look at.
[6]  **Q.** The grant of rights in the direct licenses, as Mr. Knittel
[7]  testified the other day, include the rights to edit, reproduce,
[8]  distribute and publicly perform the compositions in the
[9]  directly licensed catalogs. What value did you assign to the
[10] rights other than the public performance rights?
[11] **A.** I didn't -- I attributed all the value to the public
[12] performance rights so I assigned no value.
[13] **Q.** Why did you choose to assign no value to these other rights
[14] contained in the direct licenses?
[15] **A.** I didn't have sufficient information to evaluate how to
[16] divide up the value across these different rights and for the
[17] purposes of my calculation, it's a conservative assumption. If
[18] there was value that we could attribute to the other rights,
[19] that would reduce the value of the public performance rights.
[20] **Q.** How were the royalties calculated in the direct licenses?
[21] **A.** The direct licenses are calculated based on the concept of
[22] a royalty pool. The royalty pool is set as $25 times the
[23] number of locations and then a given publisher's payment, is
[24] its proportionate share of all performances on DMX.
[25] **Q.** Is this $25 per location royalty pool in the direct

[1]  licenses attributable only to performances of BMI works?
[2]  **A.** No it's not. It includes performances for BMI, ASCAP and
[3]  SESAC works.
[4]  **Q.** What adjustment did you make to the $25 per location
[5]  royalty pool in the direct licenses to account for the fact
[6]  that BMI does not represent all of the works included?
[7]  **A.** I adjusted the royalty pool by BMI's share, overall share
[8]  of music performances on DMX.
[9]  **Q.** Could I ask you to turn to tab 3 in your binder? Does this
[10] demonstrative show the analysis that you did to calculate BMI's
[11] share of DMX Music use?
[12] **A.** Yes, it does.
[13] **Q.** Please describe to the Court what you did to calculate
[14] BMI's share.
[15] **A.** I calculated BMI's share of DMX Music use based on using
[16] BMI's distribution data. That was provided as part of the
[17] discovery in this case. I think, as there's been some
[18] testimony in previous days, DMX provides information to BMI on
[19] the music that is used in its services. I mean, on its
[20] stations, and BMI as part of its distribution goes through that
[21] file, identifies whether each work is a BMI work, a work that's
[22] outside BMI's repertoire or work that they don't have that
[23] information for. And just sort of summarized here, looking at
[24] the share of music use, BMI identified 38 percent of the titles
[25] in this distribution data as being part of BMI's repertoire,

Page 1239

[1] 34 percent as being associated, that they knew it was not a BMI
[2] work and it belonged to somebody else, and 29 percent they were
[3] not able to identify who the appropriate affiliate was.
[4] Q. Do you have an understanding of why a copyrighted work
[5] would not be identified in BMI's database?
[6] A. BMI's database is for the purpose of distributing monies to
[7] its affiliates, so BMI's incentive in creating this database is
[8] to identify its own affiliates and not necessarily to create a
[9] complete list of all rights holders.
[10] Q. How does BMI treat works for purposes of royalty
[11] distributions for which it's not able to identify the work in
[12] its database?
[13] A. BMI does not make any distributions for those works. They
[14] only pay, the only row on this chart in which they pay
[15] distributions is the first one, ones that are identified as
[16] part of BMI's repertoire.
[17] Q. Would you expect any of the works that are not identified
[18] in BMI's database nonetheless to be associated with BMI
[19] affiliates?
[20] A. It's possible. There's a variety of reasons that something
[21] could not be identified. I mean, one is that it could be
[22] affiliated with a different society, but it could also be that
[23] it was a new work or that BMI didn't have enough information to
[24] identify that work. And, I mean -- go ahead.
[25] Q. Did you undertake an analysis to determine BMI's share of

Page 1240

[1] works that are not identified in its database?
[2] A. I did. I had the hypothesis that I already shared that BMI
[3] has a strong incentive to identify these titles as BMI
[4] affiliates. But nonetheless, I took a statistically
[5] significant sample of these works and I sent them to MRI and I
[6] asked MRI if they could run them against their database of
[7] rights holders and performing rights affiliations, and let me
[8] know what percentage of those were associated with BMI.
[9] Q. Why did you use MRI to analyze the sample of unidentified
[10] works?
[11] A. I used MRI because MRI has a large database as part of
[12] their ordinary course of business that they've created that has
[13] the affiliations in it, and they attempt to identify as many
[14] rights holders as possible across all societies.
[15] Q. What was the result of the analysis of performing rights
[16] organization affiliation of the works that were not identified
[17] in BMI's database?
[18] A. So the result is summarized on the last row here, that in
[19] that sample 8 percent of those works were associated with BMI
[20] and that suggests BMI actually does do a very good job of
[21] identifying its rights holders. Of the remaining 92 percent, I
[22] believe something like 80 percent were associated with ASCAP.
[23]     THE COURT: How did you arrive at 8 percent?
[24]     THE WITNESS: So I took a sample of work. It was a
[25] long, I had a very large computer file, and there were certain

Page 1241

[1] works that BMI said we don't know what this is. So I drew a
[2] sample of that and the sample was actually 500 titles and I
[3] sent that list to MRI and I asked MRI if they could essentially
[4] run that list against their database and say, please tell me
[5] for each of these works who the rights holder, who the rights
[6] holder is and who they're affiliated with. And when we went
[7] through that --and they sent me back a file. And of the ones
[8] they were able to identify, 8 percent were associated with BMI,
[9] which is what we would expect. BMI has a, BMI wants to do a
[10] good job of having a complete database of identifying its own
[11] affiliates.
[12]     So then I adjust -- if I didn't account for the
[13] unidentified ones, it's possible I could be understating BMI's
[14] share and that's why I went through this whole exercise instead
[15] of just using the number on the top.
[16]     THE COURT: Yes, I understand that.
[17] Q. Just to complete that aspect of the story, of the 500
[18] titles that you pulled for the sample and sent to MRI, was MRI
[19] able to identify a PRO affiliation for all 500?
[20] A. They were not able to identify all 500.
[21] Q. How many of the 500, approximately, were they able to
[22] identify?
[23] A. I think they identified 350, approximately 350 out of 500.
[24] Q. Is there any reason to expect that BMI's share would be
[25] higher or lower in the remaining 150?

Page 1242

[1] A. I don't have any expectation that MRI's database is biased
[2] one way or another. They -- I don't expect it to be any
[3] different than the ones that they were able to identify.
[4] Q. And so the mathematical result of this analysis is
[5] reflected on the bottom line of the demonstrative?
[6] A. That's correct.
[7] Q. I would ask you to turn to tab 4 in your binder. Does this
[8] demonstrative reflect your calculation of the music fee portion
[9] of the BMI blanket license using the share analysis you just
[10] described?
[11] A. It does. I started with the $25 per location, which is the
[12] royalty pool for the direct licenses which covers all
[13] performances, not just BMI performances, and I adjusted that by
[14] the BMI share of DMX music use of 40 percent and I came up with
[15] the music fee portion in my graph that we looked at before of
[16] $10 a location.
[17] Q. Earlier this week we heard testimony about a non-refundable
[18] advance paid by DMX to Sony. In evaluating the range of
[19] reasonable fees in this proceeding, did you give any
[20] consideration to the Sony direct license transactions?
[21] A. I did give consideration to the Sony direct license
[22] transaction.
[23] Q. Are there reasons to conclude that the non-refundable
[24] advance does not affect the direct license royalty rate of $10
[25] per location?

Page 1243

[1] **A.** Yes, there are.

[2] **Q.** What are those?

[3] **A.** One reason is, if we think of the -- if we think of the

[4] advance as not a payment for performance rights. The $10 a

[5] location reflects payment for performance rights. So if the

[6] Sony advance is a payment, essentially a cost of entry as was

[7] discussed by Mr. Knittel, then I wouldn't consider that part of

[8] a payment for performance rights. And another reason that I

[9] could think of it as not affecting the $10 per location is that

[10] that advance is a recoupable advance. The advance is

[11] non-refundable, but it can be essentially earned out against

[12] this $25 per location royalty pool. So if DMX has enough

[13] locations and a high enough share of -- a high enough share of

[14] Sony plays, then they could earn out, potentially earn out the

[15] advance.

[16] **Q.** Notwithstanding these reasons, have you undertaken an

[17] analysis that does take the non-refundable advance into

[18] consideration?

[19] **A.** Yes, I have.

[20] **Q.** If you could turn to tab 5 in your binder, and explain to

[21] the Court the concepts that are reflected in this

[22] demonstrative.

[23] **A.** So this demonstrative summarizes the analysis that I

[24] undertook where I treated the Sony advance fully as a payment

[25] for performance rights, and so -- and I calculate the music fee

Page 1244

[1] portion of the BMI blanket license here --

[2] **THE COURT:** Dr. Candell, I'm still mulling over your

[3] answer about the non-refundable advance. Let me see if I

[4] understand your position on it.

[5] If it is either a payment representing cost of entry

[6] or if it is recoupable, in either of those events it can be

[7] disregarded for fee setting purposes.

[8] **THE WITNESS:** Can I clarify that?

[9] **THE COURT:** It's extra to the --

[10] **THE WITNESS:** So the Sony agreement has the same

[11] structure of the royalty pool as all the other direct license

[12] agreements. There's a $25 --

[13] **THE COURT:** I understand that. We're talking about

[14] the guarantee advance.

[15] **THE WITNESS:** So if they -- so in the first case we

[16] can set aside the advance and just say, because we're treating

[17] that as a cost of entry, and the second case --

[18] **THE COURT:** Let me finish. I may be doing a lame and

[19] halting job of understanding, but I'd like you to hear it all.

[20] If it's a cost of entry, it is not something that you

[21] would need to take into account in fee setting, it's parallel

[22] but unrelated.

[23] **THE WITNESS:** That's correct.

[24] **THE COURT:** If it's recoupable, it can be economically

[25] immaterial because it represents things which are earned

Page 1245

[1] anyway. So in either of those two events, it can be

[2] disregarded for fee setting, license fee setting purposes.

[3] Have I summarized your position?

[4] **THE WITNESS:** I think in the second case we're not

[5] disregarding it. I mean, we're treating it parallel to all the

[6] other direct licenses. And maybe if I talk a little bit more

[7] about this slide -- so the question is will they play enough

[8] Sony music over the entire length of the contract to recoup the

[9] advance fully, and that depends on two factors.

[10] **THE COURT:** Should it turn out to be fully recouped,

[11] it becomes essentially immaterial and its function has been to

[12] give Sony comfort that it would have that amount to its credit

[13] in any event.

[14] **THE WITNESS:** Right.

[15] **THE COURT:** And if the comfort turns out to be

[16] illusory because it was recouped, nevertheless it was part of a

[17] price paid for entering into the -- its availability, ease the

[18] entry into the market.

[19] **THE WITNESS:** I mean, I think in the case in which

[20] they recoup it, I would give it the same economic significance

[21] that I give to all the other direct licenses. That's a case --

[22] **THE COURT:** Yes.

[23] **THE WITNESS:** So I wouldn't say it's immaterial.

[24] **THE COURT:** It cancels out.

[25] **THE WITNESS:** Right. In that case in this picture

Page 1246

[1] where I would be averaging these two different factors, I would

[2] be averaging $10 and $10 and getting a music fee portion of the

[3] blanket license of $10.

[4] **THE COURT:** I see.

[5] **THE WITNESS:** And I'm going to be talking about the

[6] music fee portion in terms of a range today, and so one end of

[7] the range is this $10 number that we already talked about.

[8] **THE COURT:** I think we're drifting from the point I

[9] was concerned about.

[10] **THE WITNESS:** All right.

[11] **BY MR. MARKS:**

[12] **Q.** Does this analysis depend on assumptions that you make

[13] about DMX's business and its -- the size of DMX's business and

[14] its use of Sony Music?

[15] **A.** Yes, so the BMI music fee that is derived from the Sony

[16] license depends -- that depends on how much of the advance they

[17] earn out, and in this calculation I essentially, if they don't

[18] play enough Sony music to earn out the entire advance, I treat

[19] that in this analysis as part of the value for performing

[20] rights, and that depends on -- and how much they earn out

[21] depends on two assumptions. One is what's the size of the

[22] royalty pool. And the size of the royalty pool depends on the

[23] number of locations, the number of subscriber locations that

[24] DMX has, and then the second piece of that is how much Sony

[25] music does DMX use.

[1] **Q.** If I could ask you to turn to tab 6 in your binder. You
[2] mentioned that you'd be discussing a range and that for the
[3] music fee portion of the blanket license, $10 would be the low
[4] end of the range. Does this slide reflect your calculation of
[5] the upper end of that range for the music fee portion?
[6] **A.** It does represent the upper end of the range for the music
[7] fee portion. Let me walk through the numbers that are on this
[8] slide.
[9]      So the BMI music fee portion that's derived from the
[10] non-Sony direct licenses is the $10 that we already talked
[11] about. The Sony box here takes the advance and it makes some
[12] conservative assumptions about the number of locations that DMX
[13] has and also what DMX's share of Sony Music are, and it derives
[14] what the equivalent number to the $10 would be, as I said,
[15] making these very conservative assumptions about the number of
[16] locations, the number of locations and Sony share, and I'll
[17] talk about in a second why those assumptions are conservative.
[18]      And then we get the music fee portion of the blanket
[19] license is the, sort of combining each of these boxes on the
[20] top, and in my example here, the shares of each of them is
[21] 13 percent. That was what the usage of Sony music was, Sony
[22] direct licensed music by DMX in the second quarter of 2009 and
[23] it's what the usage of other direct license was. So these
[24] numbers happen to be the same, so we're just averaging these
[25] two numbers together. If there was a disparate share across

[1] the two, the numbers on that arrow would be something
[2] different.
[3] **Q.** If I could ask you to turn to tab 7 in your binder. What
[4] aspect of the analysis you've just described does this
[5] demonstrative show?
[6] **A.** This demonstrative relates to the share of Sony music that
[7] I assumed would be used on average over the life of the
[8] contract. So in tab 6, I assumed that over the life of the
[9] contract DMX would use, that 13 percent of DMX's performances
[10] would be Sony music. I characterized that as a conservative
[11] assumption because they're, in the most recent data I have
[12] available, they were using 14 percent Sony music and in order
[13] to average 13 percent over the entire life of the contract,
[14] they just have to use Sony music at the level of 15 percent of
[15] the performances. So we can see that the Sony share has been
[16] trended upwards over time. I don't know exactly what direction
[17] it's going to go over time. That dotted line is just saying if
[18] the past trend continues, DMX certainly has the incentive to
[19] continue to use more Sony direct license music.
[20] **Q.** And that's the red line on the chart. What does the blue
[21] line on the chart reflect?
[22] **A.** The blue line on the chart reflects the total amount of
[23] direct license music that DMX uses. So the blue line is the
[24] sum, includes Sony and then it also includes the music that's
[25] used for all the other direct licenses. So in the third

[1] quarter of 2009, 19 percent of DMX's performance came from
[2] licenses other than the Sony license.
[3]      **THE COURT:** How is the dotted line derived?
[4]      **THE WITNESS:** It's not derived. That's just
[5] illustrative of the fact that this contract is continuing into
[6] Q3 2012.
[7]      **THE COURT:** But its direction has no significance
[8] whatsoever?
[9]      **THE WITNESS:** Well, I think the direction -- the
[10] direction shows the past trend. I mean, I can't predict.
[11]      **THE COURT:** How is that calculated?
[12]      **THE WITNESS:** No, it's just drawn on the picture. I
[13] mean, the solid line, that's the --
[14]      **THE COURT:** The dotted portion.
[15]      **THE WITNESS:** The dotted portion is just drawn on the
[16] graph to show that they're going to continue to use direct
[17] license music.
[18]      **THE COURT:** But it's drawn in a particular direction.
[19] What determined that direction?
[20]      **THE WITNESS:** It was just -- there's nothing --
[21] there's no conclusion to be drawn about the particular
[22] direction.
[23]      **THE COURT:** It could just as well go straight down as
[24] far as data or reasoning is concerned?
[25]      **THE WITNESS:** Well, in terms of reasoning, I don't

[1] expect it to go straight down. DMX has an incentive to use
[2] direct licensed music.
[3]      **THE COURT:** But it does not express any backward
[4] average from the actual experience in projected form?
[5]      **THE WITNESS:** No, it's not projecting it forward, no.
[6] **Q.** Dr. Candell, would another way of expressing that be that
[7] you believe it's more likely to increase over time rather than
[8] decrease, but you can't predict the future as to specifically
[9] how much it will increase and you haven't attempted to quantify
[10] the forward-looking increase?
[11]      **MR. SALZMAN:** Objection.
[12]      **THE COURT:** The objection?
[13]      **MR. SALZMAN:** Leading.
[14]      **THE COURT:** It certainly is. It's beyond leading.
[15] It's testifying. She may accept it, and if she does, I have
[16] another question for her.
[17] **A.** Yes, I haven't attempted to quantify the going-forward
[18] period. I mean, I think I can draw the conclusion just that
[19] it's continued to increase over time and as I said there are
[20] economic --
[21]      **THE COURT:** Well, that's the conclusion that Mr. Marks
[22] suggested, that you believe it will continue, it will continue
[23] in one direction or not. And then I would ask you on what does
[24] that belief rest?
[25]      **THE WITNESS:** That belief is based on talking with

Case: 10-3429    Document: 64-2    Page: 29    01/05/2011    180349    102

[1] people at DMX about their -- how they're using direct
[2] licensing, and the direct license music and I believe
[3] Ms. Hilburn talked about that a little bit yesterday. And it's
[4] also just from looking at the historical trend. In the early
[5] part of the period, the use of both direct license and Sony
[6] music in the early part or the startup period was before DMX
[7] even really could identify in their database which music was
[8] direct licensed, and in the more recent period, they've been
[9] able to identify which music is direct licensed, and my
[10] understanding from Ms. Hilburn is that they tried to put those
[11] songs in in a greater rotation, so that increases their share.
[12]     **THE COURT:** But the dotted line at the end of the blue
[13] line goes up at a slightly higher angle than the dotted line at
[14] the end of the red line, is that correct?
[15]     **THE WITNESS:** It is correct, your Honor. And I don't
[16] mean those lines --
[17]     **THE COURT:** Is that just accidental?
[18]     **THE WITNESS:** Yes. I don't mean those lines to be
[19] confusing.
[20]     **THE COURT:** Why did you put a dotted line in instead
[21] of leaving the line ending at the data?
[22]     **THE WITNESS:** Just to show that I expect the trend to
[23] continue.
[24]     **THE COURT:** Thank you.
[25]     **MR. MARKS:** Your Honor, if I would help resolve any

[1] confusion, we would be happy to substitute a revised
[2] demonstrative tomorrow morning that takes out the dotted lines.
[3] We don't mean to cause any confusion with that.
[4]     **THE COURT:** It's not causing any confusion.
[5] **BY MR. MARKS:**
[6]     **Q.** What source materials did you look at to develop the solid
[7] portions of the trend lines for the total direct license share
[8] and the Sony direct license share?
[9]     **A.** Those are reports that are prepared by MRI that summarize
[10] the total use of direct license music and summarize Sony's use
[11] of direct license music. And MRI prepares those reports to pay
[12] the direct licensees.
[13]     **Q.** If I could ask you to turn to the larger binder that we
[14] have provided to you, and ask you if the documents that have
[15] been marked as JX 929, 930, 938, 939, 940 and 931 are the
[16] reports that you used to derive the total direct license share?
[17]     **A.** Yes, they are.
[18]     **Q.** And if I could ask you to look at the exhibits in that
[19] binder that have been marked as JX 937, 935, 936, 925 and JX
[20] 1296, and ask you to confirm that those are the reports that
[21] you used to develop the trend line for Sony's share.
[22]     **A.** Yes, they are.
[23]     **Q.** Let me ask you to turn to tab 8 in your binder. What as
[24] respect of your analysis does this demonstrative reflect?
[25]     **A.** This demonstrative reflects what the effect is of

[1] increasing the number -- as DMX increases the number of
[2] subscriber locations, what is the effect on the BMI music
[3] portion, the BMI music fee portion, and the first column is the
[4] 17.28 that I had on the chart at tab 6. The second column
[5] holds all the assumptions equal about Sony's share and the
[6] average, Sony's share and the total share of music. It
[7] increases the number of locations to 85,000 and that decreases
[8] the music fee portion, basically, as the pool grows, as there's
[9] more locations, then more of the Sony advance is recouped
[10] against those larger number of locations.
[11]     **Q.** And the number 71,156 DMX locations that you used to
[12] calculate the upper end of the range for the BMI music fee
[13] portion, where does that number come from?
[14]     **A.** That is the number of DMX locations in the second quarter
[15] of 2009.
[16]     **Q.** And where does the 85,000 number that you used for the
[17] second column to illustrate this principle?
[18]     **A.** That is an average number of the 71,000 number plus
[19] approximately 96,000, which is assuming that -- not assuming --
[20] DMX is going to have 25,000 more subscriber locations
[21] relatively shortly in February as they acquire the DirectTV
[22] subscribers, and the 85,000 number is an average over the life
[23] of the contract of 71,000 locations for some portion of the,
[24] you know, for the first two years of the contract, and 96,000
[25] over the remaining portion of the contract.

[1]     **Q.** Is it a precise average or did you engage in some rounding?
[2]     **A.** I think it's rounded here. This is just for illustrative
[3] purposes to show what the effect on the music fee portion is,
[4] you know, on sort of the two ends of my range of reasonable
[5] numbers for the music fee when the number of locations
[6] increases.
[7]     **Q.** If I could ask you to turn to tab 9 in your binder? What
[8] does this figure depict?
[9]     **A.** So this figure depicts -- so I have shown -- this figure
[10] depicts essentially changing the number of locations and the
[11] Sony share together. The top line, the blue line on the chart
[12] shows what happens to the music fee portion as Sony's share
[13] increases over the life of the contract. And that ranges, and
[14] that sort of shows my range of reasonable music fee numbers
[15] ranging from $10 to $17.28. So this shows they have to use
[16] Sony music with the current number of locations of 32 percent
[17] of the total plays, and the other end shows at a 13 percent
[18] Sony share.
[19]     The green line shows how the music fee, shows the same
[20] concept with an increase in the number of locations, and it's
[21] with the increased number of locations which we know DMX is
[22] going to have, the music fee portion is lower for any given
[23] Sony share.
[24]     **Q.** If I could ask you to turn to tab 11 in your binder.
[25] Excuse me, tab 10 in your binder. I apologize. Does this

---

Page 1255

[1] demonstrative reflect your addition of the floor fee component
[2] to the music fee component to derive a BMI blanket license fee?
[3] **A.** Yes, it does.
[4] **Q.** We'll hear more about this tomorrow from Dr. Jaffe, but
[5] based on the information available to him at the time he wrote
[6] his expert report, he concluded that the 11.7 percent BMI
[7] overhead rate was a reasonable rate to use in calculating the
[8] floor fee. Is that the same rate that you used to calculate
[9] the floor fee component of the blanket fee here?
[10] **A.** Yes, it is.
[11] **Q.** Where does that 11.7 overhead rate come from?
[12] **A.** The 11.7 percent is BMI's overhead rate as reported in
[13] 2008. It's the most recent publicly available information that
[14] I'm aware of their overhead rate.
[15] **Q.** If the Court decides that BMI is entitled to reimbursement
[16] for incremental costs associated with offering the adjustable
[17] fee blanket license over -- costs that are incremental over the
[18] cost of offering a traditional blanket license, are those fees
[19] accounted for in the 11.7 percent figure on this chart?
[20] **A.** No. No, they're not. If the Court wanted to include an
[21] incremental cost component, that would increase the floor fee
[22] rate and then increase the floor fee and increase the blanket
[23] license fee.
[24] **Q.** If the Court determined that some portion of the
[25] incremental costs should be borne by DMX, could the Court also

---

Page 1257

[1] adjustment for the fact that the 2004 to 2009 license was
[2] signed at the same time as a previous -- as the prior period,
[3] so there's an adjustment for the retroactive fees.
[4]     The second adjustment is that the BMI Muzak agreement
[5] is not an agreement for a fixed fee per location, that it has
[6] an allowed growth component in it. And the third adjustment I
[7] made was to account for the fact that the amount of BMI music
[8] used by DMX was different than the amount of BMI music used by
[9] Muzak.
[10] **Q.** Let's start with the first of these adjustments. Why do
[11] you believe that adjustments must be made to account for the
[12] settlement of final license fees at a lower rate for the 1994
[13] to 2004 period?
[14] **A.** Those two -- there are two agreements that were signed at
[15] the same time. One was a going-forward agreement between BMI
[16] and Muzak that set license fees for the 2004 to 2009 time
[17] period. At the same time that that agreement was negotiated,
[18] the parties also settled the 1994 to 2009 prior period, and
[19] those agreements are a single economic transaction. We can't
[20] cherry pick looking at just one part of that agreement without
[21] looking at the effect of the economic whole.
[22]     And another reason is, one of the things that we
[23] observe is that there is fairly, that there is a disparate
[24] levels of rates. The earlier period was settled at a rate of
[25] $20 -- well, I don't know what the rate is. It was settled at

---

Page 1256

[1] just charge that separately rather than building it into the
[2] floor fee?
[3] **A.** Those are equivalent ways that the incremental costs could
[4] be treated.
[5] **Q.** And what were the results of adding the floor fee component
[6] to the music fee component you previously discussed?
[7] **A.** So this chart summarizes the reasonable range of blanket
[8] license fees based on adding together these two components; the
[9] music fee and the floor fee and that range -- based on the
[10] direct license evidence, that range is $11.32 to $19.57.
[11] **Q.** Did you also consider the BMI Muzak license from 2004 to
[12] 2009 as a potential benchmark for setting reasonable fees here?
[13] **A.** I considered it because that was the benchmark that BMI
[14] considered in its filings.
[15] **Q.** We'll be hearing more tomorrow from Dr. Jaffe about why the
[16] direct licenses are a better benchmark in his view --
[17] **THE COURT:** Mr. Marks, if you just put your questions
[18] to this witness about her testimony, you will get the same
[19] effect as if you recite what Dr. Jaffe is or isn't going to do
[20] tomorrow.
[21] **MR. MARKS:** That's fine, your Honor.
[22] **Q.** If one were to try to use the 2004 to 2009 BMI Muzak
[23] license as a benchmark, what adjustments would be needed to set
[24] fees for DMX?
[25] **A.** There are three adjustments. One adjustment is an

---

Page 1258

[1] the interim rates and then it was set at a substantially higher
[2] rate. I'm not aware of any evidence that suggests that there
[3] was this big discrete jump in the value of the license fee on
[4] that date. Instead, there's more likely -- economically, I can
[5] draw the conclusion that there's a more gradual change in the
[6] value of the license fees.
[7] **Q.** What did you learn about the parties' negotiating positions
[8] from your review of the discovery record?
[9] **A.** Muzak took the position that it did not want to pay an up
[10] front retroactive payment, but that it was willing to pay
[11] more -- it was willing to pay more in the going-forward period
[12] to settle past license obligations, and BMI's position, at
[13] least in the documents, is that it consistently asks for
[14] multimillion dollar payments for the retroactive period.
[15] **Q.** How did you quantify your adjustment for the settlement of
[16] the 1994 to 2004 period at the interim fee rate level?
[17] **A.** I looked at BMI negotiating documents -- not negotiating --
[18] I looked at BMI documents, where BMI put a value on, a relative
[19] value on the retroactive period to the total period.
[20] **Q.** If I could ask you to turn to the last tab in your binder,
[21] in the document that's been marked as JX 1164. Is this the
[22] document that you used to quantify the relative value of the
[23] retroactive period to the value of the total additional fees
[24] that Muzak agreed to pay to BMI for the 15-year period?
[25] **A.** Yes. There's a series of proposals that BMI was

---

Case: 10-3429    Document: 64-2    Page: 31    01/05/2011    180349    102

Page 1259

[1] evaluating, where they looked at the retroactive payment and a
[2] total payment. And I used this document to look at what
[3] proportion of the value of that economic transaction could be
[4] associated with the retroactive period.
[5] Q. Mathematically, how did you do that? What figures did you
[6] use to make that calculation?
[7] A. So on this chart, I would take the 5.5 million that BMI was
[8] considering as part of the retroactive period and divide that
[9] by the total license dollars of 33, and I believe that I get a
[10] ratio of 16.7 percent when I do that.
[11] Q. And you'll see there's a bubble off to the left that says
[12] interest on the 5.5 million retro equals 1.6 million. Do you
[13] see that?
[14] A. Yes, I do.
[15] Q. Did your analysis incorporate any amounts attributed on
[16] this document to interest on retroactive amounts?
[17] A. No. No, that was not included in my calculation. So
[18] there's a series of documents here, a series of proposals, and
[19] I looked across all these proposals and I came up with a range
[20] that was associated with the relative value of the prior period
[21] of 14 percent to 16.7 percent, and that's sort of the
[22] mathematical numbers that I used in my calculation.
[23] Q. If I could ask you to turn to tab 12 in your binder. Is
[24] the adjustment that you've made to reflect the settlement of
[25] the retroactive period reflected on this bar graph?

Page 1260

[1] A. Yes, it is. It's the first slice here, and let me just
[2] walk through how I made that adjustment. I removed from the
[3] 30 million-dollar settlement, I mean, the $30 million agreement
[4] that Muzak and BMI reached, I removed either 16.7 percent of
[5] that in the left hand bar or 14 percent in the right hand bar,
[6] and then I calculated what effect that had on the per location
[7] effective rate and that's what's reflected in the top slice
[8] here.
[9] Q. We heard testimony from Dr. Owen challenging the
[10] appropriateness --
[11] THE COURT: Mr. Marks, just put the question to the
[12] witness.
[13] Q. Do you believe that it's appropriate to make this
[14] adjustment even though there were some commercial music
[15] services that did not have a settlement period but nonetheless
[16] entered into agreements with BMI?
[17] A. Yes, I do. And I have a figure that looks at that issue.
[18] Q. Is that tab 11 in your binder?
[19] A. It is tab 11, yes. To draw that conclusion, Dr. Owen
[20] looked at the raw number of licensees that had entered, that
[21] had no settlement period and used that to draw a conclusion
[22] that no adjustment for retroactive periods was necessary. This
[23] chart looks at those same, looks at the same set of licensees
[24] that Dr. Owen looked at, but I instead look at that in terms of
[25] how many locations each set has. The no settlement period is a

Page 1261

[1] very small percent of total locations and the licensees that
[2] are in there are uniformly small and I don't draw any economic
[3] conclusions about the value of a retroactive settlement period
[4] from that small slice represented by the green bar.
[5] Q. Let's now move on to the second adjustment that you
[6] mentioned, the second adjustment you mentioned, accounting for
[7] the allowed growth in the 2004 to 2009 BMI Muzak license. Why
[8] do you believe this adjustment is appropriate?
[9] A. I believe that this adjustment is appropriate because the
[10] BMI Muzak agreement is not an agreement for a fixed per
[11] location amount. The contract allows the number of subscriber
[12] locations to grow in each year without a change in the fee.
[13] Q. I'm sorry to jump back, but what is the percentage of
[14] locations for which there was no settlement period? That's the
[15] 3 percent number on this chart?
[16] A. Right. The 3 percent is no settlement period and the
[17] remaining two bars were licensees, locations for licensees
[18] where there was some settlement, which is 97 percent of the
[19] locations.
[20] Q. And of the 97 percent, 75 percent had the full settlement
[21] period and 22 percent had a partial settlement period?
[22] A. That's correct.
[23] Q. Turning back now to the second adjustment, have you
[24] reviewed evidence that some of DMX's competitors paid lower
[25] rates than the $36.36 per location?

Page 1262

[1] A. Yes, I have.
[2] Q. Did the negotiations between TruSonic and BMI affect your
[3] thinking as to the appropriateness of making an adjustment for
[4] the growth allowance in the BMI license?
[5] A. Yes, it did. The TruSonic agreement signed with BMI in
[6] 2007, at which point -- and that covered the period from 2004
[7] to 2009. So at the time that the agreement was signed, both
[8] parties were aware that TruSonic had a level of growth that
[9] would have it paying a rate below the highest rate. And that
[10] affected my conclusions.
[11] Q. Did you see any evidence in the record that TruSonic was
[12] ever willing to agree to a rate for which they would be paying
[13] $36.36 per location?
[14] A. No, I didn't.
[15] Q. Did you consider the negotiations between Play Network and
[16] BMI in your analysis of the growth adjustment?
[17] A. Yes. It's similar to TruSonic. That contract was signed
[18] in 2005, and Play Network's, at the time that the contract was
[19] signed, they had already, they had already had some growth.
[20] Q. Did you consider the agreement between Music Choice and BMI
[21] in connection with this adjustment?
[22] A. Yes, I did.
[23] Q. Did the negotiations over that agreement affect your
[24] analysis?
[25] A. Yes, it did. Music Choice is a slightly different

## Page 1263

[1] situation. If the formula in the Muzak BMI agreement was
[2] mechanically applied to Music Choice, Music Choice would not
[3] have seen a decrease in its per-location fee. But instead, the
[4] agreement that was negotiated between Music Choice and BMI in
[5] 2006 for the 2004 to 2009 period included something different
[6] than the standard agreement. Music Choice had at the time it
[7] negotiated the agreement lost the DirectTV account. So it
[8] already knew that it had lost locations. So rather than BMI
[9] mechanically applying the formula, BMI pulled those locations
[10] out and Music Choice paid for them separately, and then Music
[11] Choice for the remaining locations, Music Choice was able to
[12] benefit from the formula that allowed a cushion of growth and
[13] allowed the rate to go down over time.
[14]    (Continued next page)
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

## Page 1264

[1] **BY MR. MARKS:**
[2] Q. Did you also consider the negotiations between Muzak and
[3] BMI in connection with your adjustment for the growth allowance
[4] in a license?
[5] A. Yes, I did.
[6] Q. What materials did you consider in that regard?
[7] A. I considered discovery documents and the documents in the
[8] record, and the testimony of the negotiators through
[9] depositions and trial testimony.
[10] Q. And, what did you conclude from this evidence?
[11] A. I concluded from this evidence that both parties thought
[12] that Muzak would experience some growth and also that Muzak's
[13] lead negotiator said that he was willing to pay for additional
[14] growth and that was something that Muzak valued -- I'm sorry
[15] yeah -- Muzak valued and was willing to pay for.
[16] Q. If you could flip back again to tab 12 in your binder; is
[17] the adjustment for organic growth also reflected in this
[18] demonstrative?
[19] A. Yes, it is. That's the second slice here.
[20] Q. And that's the slice that is either $6.39 or $6.59 per
[21] location depending on whether you've already allocated,
[22] depending on the size of the adjustment that you made for the
[23] settlement period?
[24] A. Yes. And let me explain how I -- yes.
[25]    Can I explain how I got that number?

## Page 1265

[1] Q. Please.
[2] A. That number looked at what the effective per location rate
[3] was over the length of the -- over the term of the contract,
[4] assuming that there was 8 percent subscriber growth and I
[5] calculated an average. I know there has been some testimony
[6] showing the pattern of how rates go down when there is
[7] subscriber growth. This number represents the average of what
[8] that number would be over the entire period. And I looked at
[9] that on a -- I adjusted that to look at it on a per location
[10] basis and that is what is reflected here.
[11] Q. Why did you use the full 8 percent per year adjustment
[12] rather than some portion of the allowed 8 percent growth?
[13] A. There were two factors that influenced me to do that. The
[14] first was that at the time that BMI and Muzak were negotiating
[15] this agreement, BMI was willing to accept this was a term of
[16] the contract. BMI was willing to separate that incorporated
[17] this 8 percent growth. And the second factor that when I look
[18] at some of DMX' and Muzak's other competitors, they were able
[19] to negotiate contracts where they were able to get the value of
[20] this -- they were able to get the value of this growth factor.
[21] Q. Did you consider whether there were commercial music
[22] services that were declining in their number of locations but
[23] still took the deal?
[24] A. Yes, I did. There were some -- I mean there were -- what
[25] is important here is what parties' expectations were at the

## Page 1266

[1] time that they signed the contract, and there were some smaller
[2] services who were declining and knew they were declining.
[3] There are some documents that I've seen in the record that
[4] where parties say they were declining and they didn't want to
[5] take this deal because they knew that they would be paying for
[6] locations that they wouldn't have. BMI said to those
[7] locations -- said to those licensees: Pretty much you have no
[8] choice, you have to take this agreement or your choice is to go
[9] to rate court.
[10] Q. And did you give any consideration to the option of the
[11] smaller services to go to rate court?
[12] A. I don't think that was a realistic option for the smaller
[13] services. These were services that had maybe a couple hundred
[14] locations and the cost of rate court would be large compared to
[15] the cost of the license. So, that didn't really provide a
[16] realistic alternative for these services.
[17] Q. You also mentioned that there is a music use adjustment
[18] that should be made. Why is it appropriate, in your view, to
[19] make an adjustment for music use?
[20] A. It is appropriate to make an adjustment for music use
[21] because music -- the amount of BMI music that is used is one of
[22] the economic drivers of the value of the license.
[23] Q. How did you determine that Muzak uses more BMI music on a
[24] relative basis than DMX?
[25] A. I used the same BMI distribution data that I discussed

[1] earlier in my testimony, but this time for Muzak instead of
[2] DMX. I did the same calculation of what is Muzak -- what is
[3] BMI's share of Muzak music use and I got 45 percent as compared
[4] to DMX' music usage of 40 percent. So, I made an adjustment to
[5] account for that relative difference in music use which is DMX
[6] uses 89 percent of the BMI music that Muzak did and that is
[7] what is reflected in the final slice on this chart.
[8] **Q.** As part of this analysis, did you make a comparable
[9] adjustment for Muzak works that were not identified in BMI's
[10] database?
[11] **A.** Yes, I did.
[12] **Q.** Are there -- are you aware of differences in the way that
[13] Muzak and DMX report their off-premises data to BMI?
[14] **A.** Yes, I'm aware of differences.
[15]         DMX reports the transmissions for all of its
[16] off-premises performances. Muzak reports the same information,
[17] the transmissions, but in addition reports the number of
[18] locations.
[19] **Q.** Do you believe that the comparison is appropriate across
[20] DMX and Muzak, not withstanding this difference in the way that
[21] music use information is reported for the off-premises
[22] locations?
[23] **A.** I do believe that the comparison is appropriate. This is
[24] the data that BMI uses to pay its affiliates, so implicitly BMI
[25] is doing a comparison. It is paying out money based on this

[1] directly licensed locations?
[2] **A.** No, I didn't.
[3]     **MR. MARKS:** Pass the witness, your Honor.
[4]     **THE COURT:** Let's take the morning recess.
[5]     (Recess)
[6]     **THE COURT:** Mr. Salzman.
[7]     **MR. SALZMAN:** Thank you, your.
[8] **CROSS EXAMINATION**
[9] **BY MR. SALZMAN:**
[10] **Q.** Good morning, Dr. Candell.
[11] **A.** Good morning, Mr. Salzman.
[12] **Q.** On direct examination you referred, in reference to tab 2
[13] of the binder, to a floor fee. Do you remember that?
[14] **A.** Yes, I do.
[15] **Q.** And you are familiar with the BMI proposal in this case,
[16] right?
[17] **A.** Yes, I am.
[18] **Q.** And I think in the BMI proposal there is a concept called a
[19] base fee?
[20] **A.** Yes.
[21] **Q.** And would you agree with me that the floor fee, in your
[22] concept, is functionally the same as the BMI base fee?
[23] **A.** Yes, I would agree with that.
[24] **Q.** And, would you agree also that the crediting mechanism in
[25] your proposal over on the right side of tab 2 is the same, a

[1] information that it has collected.
[2]         In addition, I looked at what the music use share was
[3] just on on-premise locations to see if that difference
[4] persisted, aside from this difference that might occur from
[5] differences in data collection. And I saw the same pattern in
[6] terms of differences in BMI music use when I looked at just the
[7] on-premise distribution data.
[8] **Q.** And what were the results of just looking at the
[9] on-premises location data?
[10] **A.** The results were that the music use of DMX was 92 percent
[11] Muzak's music use.
[12] **Q.** Of BMI?
[13] **A.** Yes. DMX' BMI music use was 92 percent of Muzak's BMI
[14] music use.
[15] **Q.** So, what is the overall effect of making the three
[16] adjustments to the BMI Muzak benchmark that you just described?
[17] **A.** The blue bars show what the range is of the, how I would
[18] economically interpret the BMI music contract after making
[19] these adjustments, $21.40 to $22.08.
[20] **Q.** Did you make any adjustments to account for interest free
[21] payment plans that were provided by BMI to some commercial
[22] music services?
[23] **A.** No, I didn't.
[24] **Q.** Did you make any adjustment to the benchmark to reflect the
[25] amendment to the BMI TruSonic agreement that relates to

[1] proportion of direct license to non-direct license above the
[2] floor fee?
[3] **A.** Yes. A mathematical calculation that does the crediting is
[4] the same.
[5] **Q.** Would you agree with me that as between the carve-out
[6] license and the traditional license, it is traditional,
[7] economically, for the Court to be neutral in terms of pricing
[8] one as against the other?
[9] **A.** I'm thinking about that because that really wasn't part of
[10] my assignment here, so give me a second to think about it.
[11] **Q.** Sure. If it helps you, if you have no opinion on that
[12] subject, that's fine.
[13] **A.** Okay. I have no opinion on that subject.
[14] **Q.** Would you agree that all else the same, the carve-out
[15] license is going to have higher administrative costs than a
[16] traditional blanket license?
[17] **A.** Potentially it could have higher administrative costs. I
[18] mean, part of the question is, in this case, is how those costs
[19] are going to be split between the parties. I understand there
[20] has been testimony about what those costs are, yes.
[21] **Q.** So, the answer is yes?
[22] **A.** Yes.
[23] **Q.** And you would agree that as an economic matter it's as
[24] desire -- it's as wrong to underprice the license as to
[25] overprice the license?

---

**Page 1271**

[1] **THE COURT:** This is a helping me a lot, Mr. Salzman.
[2] It is rolling down price as to price. We are trying to get a
[3] reasonable price.
[4] **MR. SALZMAN:** I will withdraw the question.
[5] **THE COURT:** The job of the Court is to be neutral as
[6] between the parties and to find a reasonable price. What we
[7] are working on is to try to find a reasonable price.
[8] **MR. SALZMAN:** Thank you, your Honor.
[9] Q. Would you agree that from an economic point of view
[10] reasonable fees has to be arranged?
[11] A. It doesn't have to be arranged, no. It could be a single
[12] value.
[13] Q. In this case you propose a range?
[14] A. I did propose a range, yes.
[15] Q. You would agree that under the current circumstances DMX
[16] needs a blanket license, right?
[17] A. DMX is requesting a blanket license, yes. A blanket
[18] license with carve-out. I don't believe that they are planning
[19] to -- well, at least currently they're not direct licensing all
[20] their performances so they need a blanket license to cover the
[21] rest of them.
[22] Q. Now, you told us on direct examination that you looked at
[23] the direct licenses that DMX had gotten with music publishers
[24] and concluded that that was an appropriate benchmark, right?
[25] A. Yes. Consistent with Professor Jaffe's framework I

**Page 1273**

[1] publishers, small publishers, big publishers -- there is a
[2] relatively large number of them at this point, and they
[3] represent a broad range of genres, different genres that DMX
[4] uses for its programming. It is not sort of focused just on
[5] one piece of the repertoire.
[6] Q. Would you agree with me that it would be rational for DMX,
[7] in rolling out its direct licensing campaign, to try to get
[8] licenses from those where it is easiest and cheapest to do so,
[9] per performance?
[10] A. It might be rational but I'm not sure that DMX would know
[11] how to identify which ones were easiest and cheapest. I mean,
[12] are you stating that in a transactions cost way?
[13] Q. Yes.
[14] A. In terms of cheapest?
[15] Q. Yes.
[16] A. I don't know how they identify which ones necessarily have
[17] the cheapest transactions cost before they start this process.
[18] Q. But it would be rational for them to pursue that course,
[19] right?
[20] A. It would be, but my understanding of the course they
[21] pursued from the testimony of Mr. Knittel was that they
[22] developed a list of -- they didn't say here are the ones that
[23] are going to be the easiest and cheapest for us to use. They
[24] developed a list of here are publishers that we use heavily in
[25] our music service and they went after those publishers.

---

**Page 1272**

[1] evaluated the economic value of the direct licenses.
[2] Q. Was it you or Dr. Jaffe who made the conclusion that those
[3] licenses were an appropriate benchmark?
[4] A. I mean, that's one of the subjects of Professor Jaffe's
[5] testimony, is sort of the definition of what a reasonable fee
[6] is. My role was more to evaluate those licenses and calculate
[7] what the reasonable range of blanket license fees was.
[8] Q. But the decision to say that those licenses provide
[9] relevant data for the Court in this case for the blanket
[10] license, is that your work or Dr. Jaffe's?
[11] A. That's Dr. Jaffe's work.
[12] Q. You would agree, would you not, that the direct licenses
[13] you looked at cover a different set of works, by definition,
[14] than those that DMX is going to use through the BMI blanket
[15] license?
[16] A. They're not exactly the same publishers, correct, but they
[17] are BMI -- they include works by BMI affiliates and it is the
[18] same rights and they're -- so it is not -- it is not identical
[19] works but it is -- it seems to me that it is a very comparable
[20] benchmark to the music part of the rights that are part of the
[21] BMI license.
[22] Q. What did you do, if anything, to consider whether the
[23] direct licensors' works were representative of the rest of the
[24] repertoire?
[25] A. I know that the direct licenses represent a range of

**Page 1274**

[1] Q. Well, aren't the ones that they used most heavily the ones
[2] that, on a per performance basis, would have the lowest
[3] transaction cost to acquire?
[4] A. On a per performance basis, I would agree with that.
[5] Q. When it rolled out the direct license campaign it simply
[6] picked a single number, $25, and offered that to everyone,
[7] right?
[8] A. My understanding of that $25 number is that was based on
[9] the market knowledge of Mr. Knittel and Mr. Gertz and that they
[10] developed that number based on their market knowledge and some
[11] conversations with publishers.
[12] Q. I don't think you answered my question which was very
[13] simple. I simply asked whether that $25 number was offered to
[14] everyone on a take it or leave it basis.
[15] A. All the licenses -- I don't know the answer to that
[16] question. I believe all the licenses -- all the licenses I
[17] have seen are at the $25 number. I don't know about sort of
[18] the initial steps of developing the $25 number.
[19] Q. And, do you know that none of the four major publishers
[20] accepted the $25 offer, right?
[21] A. Well, Sony accepted the $25 offer.
[22] Q. Well, it also required a non-refundable advance, right?
[23] A. That's correct, yes.
[24] Q. And you told -- you would agree, would you not, that the
[25] mere fact that there is an advance and that it is

---

Page 1275

[1] non-refundable are value to Sony, right?

[2] A. Yes, I would agree with that, and I have taken that into

[3] consideration in the range of fees that I have presented.

[4] Q. And you would agree that DMX continues to use music from

[5] the three other majors apart from Sony, right?

[6] A. That's my understanding, yes.

[7] Q. And it is relying on the BMI blanket license to clear those

[8] rights, right?

[9] A. Yes.

[10] Q. And you don't know which publishers, apart from the majors,

[11] have also rejected the $25 price, do you?

[12] A. I don't know specifically which publishers, no.

[13] Q. You are aware from the record that there are more than

[14] 14,000 publishers whose works DMX uses every year, right?

[15] A. Historically I believe that was the number, yes.

[16] Q. And that has not declined to your knowledge, has it?

[17] A. I don't know one way or the other if it has declined.

[18] Q. And you don't know how many of those 14,000 publishers

[19] would have accepted a direct license proposal at the $30 level

[20] rather than $25, do you?

[21] A. No.

[22] Q. Or at the $40 level?

[23] A. No.

[24] Q. Or at the $50 level?

[25] A. No, but a substantial -- I know that a substantial number

Page 1276

[1] have accepted it at the $25 level.

[2] Q. But, you don't know what proportion of those who were asked

[3] accepted at that level, do you?

[4] A. I don't know, no.

[5] Q. And it is those works, the works that were of publishers

[6] who did not have direct licensing arrangements with DMX that

[7] the Court is now called upon to value, right?

[8] A. I mean, the Court is setting a blanket license fee here so

[9] for the earlier part of the period the blanket license fee, my

[10] understanding is that DMX wants to take just a blanket license

[11] fee for part of the carve-out for part of the period so they're

[12] setting a fee -- they're setting a fee including those

[13] publishers. We don't know in any period which publishers are

[14] going to be directly performed or not directly performed. The

[15] blanket license fee, sort of the framework here is to think

[16] about the value of the BMI repertoire and to use this

[17] competitive market evidence as a proxy for the value -- a

[18] benchmark for the value of the repertoire.

[19] Q. Part of the market, competitive market evidence that you

[20] referred to also includes the people, publishers who turned

[21] down the $25 proposal, right?

[22] A. Yes.

[23] Q. And you disregard that in your analysis, don't you?

[24] A. I didn't disregard it. I mean, I know that there are -- I

[25] know the circumstances surrounding some of the publishers that

Page 1277

[1] have turned down the $25 proposal and I know that BMI has not

[2] remained a neutral party in this market, so it makes that

[3] evidence somewhat difficult to interpret in terms of whether

[4] the parties are turning down the license because they don't

[5] value the -- because they don't feel the $25 is appropriate or

[6] because of interactions that they've had with BMI.

[7] Q. But, in your analysis you don't weigh that as part of

[8] trying to determine the fair market value of the BMI license,

[9] right?

[10] A. That's correct. I have used the licenses that they've

[11] signed as a proxy.

[12] Q. And only them?

[13] A. And only them, yes.

[14] Q. Now, you would agree with me, would you not, that a

[15] publisher faced with a proposal from DMX to directly license

[16] and a proposal to pay from a $25 pool would compare that to

[17] what that publisher had gotten or would expect to get from BMI

[18] or ASCAP, right?

[19] A. I think that's one of the factors they would consider, yes.

[20] Q. And as of the time that DMX rolled out its campaign, those

[21] publishers were facing information from the market that said

[22] that ASCAP was paying at a rate of more than $40 a location and

[23] BMI was paying $12 or $14 per location, right?

[24] A. On interim fees, yes. I mean, assuming that they didn't

[25] understand that the fees were interim, yes.

Page 1278

[1] Q. So, taking those numbers together, $12 to $14 per location

[2] plus, let's say $40, that's a $52 to $54 pool from the PROs,

[3] right?

[4] A. Well, I don't think that calculation is quite right because

[5] the PROs take some administrative fees and the rights holders

[6] don't receive all of that payment. But, you know, even

[7] accepting that some portion was taken out I would accept that

[8] that would be, you know, with that correction I would accept

[9] that; yes.

[10] Q. And so, if you take off 11 percent, 15 percent, 20 percent

[11] for that factor, the publisher was still in a position where if

[12] it were acting rationally it would be seeing the direct license

[13] offer from DMX as offering much less per play than the PROs

[14] were offering, right?

[15] A. I think there is a couple different factors at work there.

[16] Q. I don't think you are answering my question.

[17] With the Court's permission, can that question be read

[18] back?

[19] THE COURT: Well, she started her answer a little off

[20] from your question but I thought that if you let her continue

[21] maybe she was going to work back into it.

[22] MR. SALZMAN: Very well.

[23] THE WITNESS: Can you reread me the question now

[24] because I've lost the thread?

[25] MR. SALZMAN: Sorry.

Page 1279

[1]     (Record read)
[2]     **THE WITNESS:** So I started to say, I mean, that's one
[3] of the factors on a per play basis they would be offering less
[4] but what the publishers care about is several different things
[5] in addition to just the per play amount. I think Mr. Gertz
[6] talked about some of those yesterday. For example, they get
[7] paid much more quickly under the direct license. There is also
[8] much more transparency about how their music is used and there
[9] is also the possibility that their music could be used more or
[10] at least not used less as DMX had the incentive to use the
[11] direct license music.
[12]     So, I'm not sure that the, while I would agree that on
[13] a per play basis they might be getting paid less there is a
[14] variety of factors that would influence their decision about
[15] which choice to take.
[16]     **Q.** And the prospect of being paid more was certainly one of
[17] them, right?
[18]     **A.** Either to be paid more or not to be paid less, yes.
[19]     **Q.** I'm sorry, and played more. I said paid more, let me ask
[20] it a different way.
[21]     The prospect of having music even about it was per
[22] performance getting less money because it was a smaller pool,
[23] the fact the chance to get played more and therefore would get
[24] a bigger part of the pool was what would motivate the publisher
[25] to accept a DMX offer, right?

Page 1280

[1]     **A.** Yes. And I said it is either to get played more or not to
[2] get played less because in, you know, this competitive market
[3] DMX is making a decision about what music to play and they may,
[4] for example, play Sony -- in fact, they have played Sony more
[5] than some of the other major publishers and that may influence
[6] people in terms of maybe they think they'll get more or maybe
[7] they just don't want to get less -- be played less because if
[8] they're played less that will influence their BMI
[9] distributions.
[10]     **Q.** Now, in the proposals that DMX made to publishers, it told
[11] them explicitly that if you take this license that will
[12] incentivize DMX to play your music more, right?
[13]     **A.** I don't recall that it specifically said that in the
[14] license but I would accept that.
[15]     **Q.** Not in the license, in the communications to the
[16] publishers. Do you remember that?
[17]     **A.** I recall reading some examples that have been in the trial
[18] transcript. I don't know how widespread that is.
[19]     **Q.** Take a look at joint Exhibit 1240. We will give you a
[20] copy.
[21]     I call your attention to the next to last paragraph on
[22] the first page, it is an e-mail from DMX to a publisher.
[23]     **A.** I'm sorry. The next to last paragraph on first page or the
[24] second page?
[25]     **Q.** Yes, and it says, quote: DMX is increasing its reliance on

Page 1281

[1] direct licensed works. A direct license would not only ensure
[2] continued work of the Sloopy II catalog but incentivize DMX to
[3] increase its use which would directly translate into higher pro
[4] rata share and higher royalties.
[5]     Right?
[6]     **A.** I see that, yes.
[7]     **Q.** And it is your understanding that that was the general
[8] pitch made to all the publishers who were approached to give
[9] direct licenses?
[10]     **A.** I don't have an understanding of the general pitch.
[11]     **Q.** And you would agree, would you not, that DMX couldn't play
[12] more of everyone's music, right?
[13]     **A.** That's correct. I'm not sure they wanted to direct license
[14] everyone's music.
[15]     **Q.** But you were proposing that those direct licenses be used
[16] as the benchmark for the people in the BMI catalog who did not
[17] directly license and whose music, presumably, is not going to
[18] be played more, right? Correct?
[19]     **A.** I think that's correct but, you know, I'm a -- they can't
[20] play everyone's more but they will be playing, you know, if
[21] they're responding to the economic incentives that they've set
[22] up they will be playing more and more directly licensed music
[23] and I think that's, you know, what this paragraph is
[24] essentially saying. I'm not sure that -- I don't read it
[25] necessarily as saying that they would be paid more than they're

Page 1282

[1] paid now. They're just saying if there is a higher -- if
[2] they're played more they'll have a higher pro rata share and
[3] get higher royalties.
[4]     **Q.** My question now is: Isn't it correct that the people who
[5] were giving direct licenses on the hope that their music would
[6] be played are being used as a benchmark, according to your
[7] proposal, for the rest of the repertoire which is not directly
[8] licensed? Correct?
[9]     **A.** I think that's correct. I mean, I think those are some of
[10] the normal forces of competition that you see in markets other
[11] than markets with PROs in them that you sign a license and you
[12] get used more and you earn more.
[13]     **Q.** I understand that.
[14]     My point now is -- my question is simply the focus on
[15] your certain set of transactions and you are saying that those
[16] provide a benchmark for different transaction, right? You are
[17] saying the direct license transactions should be used as a
[18] benchmark for the BMI blanket license, right?
[19]     **A.** That's correct.
[20]     **Q.** And I'm asking you, isn't it true that those direct
[21] licenses were made by the publishers in the hope that their
[22] music would be played more, right?
[23]     **A.** I agree with that, yes.
[24]     **Q.** And, you are saying that that is representative or
[25] benchmark or useful information for the BMI music which,

[1] according to that hypothesis, is not going to be played more,
[2] right, on a per performance basis?
[3] **A.** Yes. I mean, and I will go back to what I just said, it
[4] provides a competitive market benchmark and that's what I, what
[5] we use here. But I -- go ahead.
[6] **Q.** Okay. Thank you.
[7]     Now, you understand that BMI operates under consent
[8] decree that provides that any music user automatically gets a
[9] license simply by writing a letter to BMI requesting one,
[10] right?
[11] **A.** Yes, I understand that.
[12] **Q.** And, you would agree that that's different from the way
[13] copyright markets operate generally, right?
[14] **A.** Yes. Some copyright markets operate differently than that,
[15] yes.
[16] **Q.** In general, the way copyright markets work is that the
[17] owner of the copyright has the right to withhold permission to
[18] use its work, correct?
[19] **A.** That's correct.
[20] **Q.** And it's that ability to say no to withhold the work that
[21] creates the leverage or the value that the would-be user has to
[22] pay for, right?
[23] **A.** Yes. I mean, I think in this case the rights holders have
[24] decided to be part of BMI. I mean, if they were not part of
[25] BMI which operated under consent decree they would have the

[1] ability to withhold their work, but being part of the BMI
[2] because of the consent decree they don't have that ability.
[3] **Q.** And that makes the -- withdrawn.
[4]     The direct license transactions that you proposed as a
[5] benchmark were all done in the shadow of the fact that there
[6] was a compulsory BMI blanket license available to DMX, right?
[7] **A.** Yes.
[8] **Q.** And that changed the bargaining power of the music
[9] publishers as compared to an unregulated copyright market,
[10] right?
[11] **A.** I'm not sure I understand your question. Could you repeat
[12] it?
[13] **Q.** Sure.
[14]     But for the fact of the BMI consent decree, music
[15] publisher approached by DMX could tell DMX, no, $25 is no good,
[16] you can't use my music unless you pay me more; right?
[17] **A.** Yes, they would be able to exploit their market power to
[18] ask, you know, if they were something unique that there were no
[19] substitutes for, they would be able to exploit that market
[20] power in coming up with an agreement.
[21] **Q.** And that's different from the actual situation that you are
[22] proposing here as the benchmark -- competitive benchmark, isn't
[23] that true?
[24] **A.** I mean, you know, I think it is hard for me to know the
[25] answer to that because it depends whether the person who is

[1] coming up with the license absolutely needs to have that
[2] particular work.
[3]     In a competitive market there might be -- there might
[4] be substitution across these different products. In this
[5] market there is no substitute for BMI.
[6] **Q.** But what you call the competitive market price, the $25
[7] price, it was negotiated with those people and with those
[8] publishers who could not withhold their works, right?
[9] **A.** So, they couldn't withhold their works but in a competitive
[10] market, if they decided to withhold their work, then they
[11] wouldn't get -- they wouldn't get paid to use it. So? This
[12] market, there's sort of a symmetry here. You are saying DMX
[13] with continue to use the works but at the same time the
[14] publishers can continue to get paid when DMX uses their works.
[15] I mean, that's a lot of factors. I don't know how, taking both
[16] those factors into consideration would affect the kinds of
[17] decisions that publishers would make. I mean if -- I'm done.
[18] **Q.** And you --
[19]     **THE COURT:** Mr. Salzman, I'm trying to work my way
[20] through your proposition that the author and -- well, that the
[21] author or his publisher representative is at a negotiating
[22] disadvantage because of the blanket license of that BMI allows
[23] DMX to say, well, I will play your music now under my BMI
[24] license. And that theme runs through, of course, the briefing
[25] and I think is quite persuasive as a factor on its face but

[1] didn't the author, when he decided he or she decided to be
[2] represented by BMI, cross that bridge and substitute either the
[3] publisher or BMI as a party who could either say no if it was
[4] the publisher, or who had the panoply of advantages and
[5] disadvantages which BMI has if it was BMI?
[6]     So, isn't it a little more circular than you make it
[7] sound if you start at the point that you do?
[8]     **MR. SALZMAN:** I would say, your Honor, that the
[9] compulsory license -- let me start over.
[10]     There is nothing wrong with DMX going and seeking
[11] direct licenses and getting whatever price it can. I am not
[12] suggesting that.
[13]     **THE COURT:** Of course we know that.
[14]     **MR. SALZMAN:** What I am suggesting is that to claim
[15] that the prices achieved are superior to the benchmark we
[16] proposed, because that is the real competitive market, that is
[17] the real price. And what BMI has been doing all these years in
[18] licensing Muzak and ASCAP licensing Muzak and those benchmarks
[19] are no good, they're tainted by BMI market power, finally we
[20] can see through the -- into the sunlight of the true
[21] competitive market is illusory.
[22]     **THE COURT:** Well, those epithets don't apply to the
[23] author who is not represented by either a publisher and who has
[24] not contributed his work to BMI. He stands like Abraham
[25] Lincoln, free on the open field. And the decision that he made

Page 1287

[1] to take either of those other two marketing moves, he took for
[2] his advantage.
[3]     Now you are saying that in some way he should be
[4] regarded as hampered in his negotiation with DMX and I'm just
[5] wondering if either of those two proxies that he appoints are
[6] capable of doing it for him. He thought they were when he went
[7] into the relationship with them.
[8]     **MR. SALZMAN:** There are good reasons why a composer
[9] cannot, by himself, like Abraham Lincoln, stand on the field
[10] alone. He is faced with music users who want to use a lot of
[11] music and aren't going to search him out, I would suggest, your
[12] Honor.
[13]     Having made the deal and doing what is in his own best
[14] interest we are not quarreling with -- we are not quarreling
[15] with DMX' ability to choose between the blanket license and
[16] these direct licenses. We are only quarreling with the
[17] proposition that those transactions offer better evidence of
[18] the value of BMI blanket license than other transactions
[19] involving a BMI blanket license.
[20]     **THE COURT:** Ah yes, but the reason you say they offer
[21] better evidence is because of this -- in part because of this
[22] factor of the freedom to say no and not have DMX play their
[23] music anyway under the BMI license.
[24]     One other earlier witness said that there were good
[25] many independent authors as to whom that proposition wouldn't

Page 1288

[1] be true in any event. I have forgotten where he put the
[2] percentage, it was a little higher than I expected.
[3]     Anyway, it seems to me largely rhetorical at this
[4] point.
[5]     **MR. SALZMAN:** Let me continue then. All right. Thank
[6] you.
[7] **BY MR. SALZMAN:**
[8] **Q.** You would agree that the $25 royalty pool number that you
[9] are proposing as the benchmark here doesn't take account of
[10] DMX' transaction costs in acquiring those licenses, correct?
[11] **A.** That's correct; DMX bears its own transactions cost.
[12] **Q.** And you would agree that in terms of DMX as a willing buyer
[13] of a BMI blanket license, would take into account not only the
[14] individual transaction costs of direct licenses but also -- I'm
[15] sorry. Let me start over. I misspoke.
[16]     You would agree that in deciding whether how much to
[17] pay for a BMI blanket license and a willing buyer/willing
[18] seller transaction as opposed to relying on direct licenses of
[19] the kind you are proposing as the benchmark, DMX would also
[20] consider that under the blanket license it avoids the
[21] transaction costs of acquiring direct licenses, correct?
[22] **A.** I -- there were too many parts to that question so can you
[23] break it down?
[24]     (Continued on next page)
[25]

Page 1289

[1] **BY MR. SALZMAN:**
[2] **Q.** Okay, I'll do better.
[3]     Under the direct licensing campaign that DMX has
[4] embarked on, it had to hire MRI, right?
[5] **A.** Yes.
[6] **Q.** And it has paid substantial amounts of money to MRI,
[7] correct?
[8] **A.** Yes, it paid money to MRI.
[9] **Q.** And in figuring out whether to go in that route or to just
[10] have a traditional blanket license, DMX would consider those
[11] costs, right?
[12] **A.** Absolutely.
[13] **Q.** So in considering how much the blanket license is worth to
[14] DMX, it would consider the fact that it can avoid those
[15] transaction costs in getting a blanket license, right?
[16] **A.** It could avoid the transactions cost from MRI.
[17] **Q.** And in addition to the transactions cost it already spends
[18] to deal with the 500 some direct licenses it already has, to be
[19] fairly measured against the BMI blanket license it would also
[20] have to consider the transactions costs of getting the other
[21] 14,000 publisher licenses it would have to get in a direct
[22] license contract, isn't that true?
[23] **A.** So I'm cogitating here on, they're not just considering the
[24] cost, they're considering in some sense the looking at the
[25] revenues they can make from this compared to the cost in making

Page 1290

[1] that decision. So you were focusing just on the transactions
[2] cost.
[3] **Q.** Right, that one aspect.
[4] **A.** And they were considering those transactions costs, but
[5] they were also considering what are the costs of the rights as
[6] well.
[7] **Q.** Right, and I'm just in this question focusing on the
[8] transactions costs, to compare your benchmark to a blanket
[9] license, which you asked the Court to do, you're talking about
[10] the acquisition cost, the $25, but you're ignoring the
[11] transaction cost of getting all the rights that a BMI license
[12] encompasses, right?
[13] **A.** I'm using the direct licenses just to look at the music fee
[14] portion of the blanket license. I'm using that as a benchmark
[15] for the music fee blanket license, so I don't see how those MRI
[16] transactions costs, which is the performing rights, I don't see
[17] how the MRI transactions costs factor into coming up with a
[18] value for the music fee.
[19] **Q.** Well, the point of using one transaction as a benchmark for
[20] another is to say that this is what the other transaction is
[21] worth because it's similar to the benchmark transaction, right?
[22] That's why we're talking about benchmarks in the first place,
[23] correct?
[24] **A.** Yes.
[25] **Q.** And I'm suggesting to you that on an apples to apples

[1] basis, if you look at that $25 price, it comes with the
[2] attached transaction cost, doesn't it?
[3] **A.** Yes. Those aren't paid to the publishers, though. I mean,
[4] I'm having trouble making the leap here. Maybe you're making
[5] an argument somehow that the floor fee should be different
[6] here?
[7] **Q.** No. What I'm saying here is you're proposing that the
[8] willing buyer here, DMX, should pay BMI on the basis of $25
[9] because that's what DMX has been able to get in the marketplace
[10] for a comparable product, right? That's your proposal.
[11] **A.** Well, I think that --
[12] **Q.** That these transactions are comparable and they tell us
[13] what the fair price is of the BMI license, right?
[14] **A.** I think you're mischaracterizing what I said. I'm saying
[15] that the direct licenses are a benchmark for part of the BMI
[16] blanket license, just the music fee which represents the
[17] performance rights, and that's not the only thing I'm using to
[18] come up with a value of the BMI blanket license.
[19] **Q.** But the music rights that DMX acquired directly that you're
[20] proposing as the benchmark come phrased with transaction costs,
[21] right?
[22] **A.** I have no idea what the level of those transaction costs
[23] are precisely but --
[24] **Q.** And you leave them out of your calculus as to whether that
[25] $25 is representative of what a willing buyer in DMX's shoes

[1] ought to pay for the blanket license, right?
[2] **A.** Yes.
[3] **Q.** Now, you're aware, are you not, that the direct license
[4] that DMX acquired from the publishers all had most favored
[5] nations clauses in them, correct?
[6] **A.** Yes.
[7] **Q.** And in general, most favored nations clauses have
[8] significance in terms of what the meaning is of the price term
[9] in a contract?
[10] **A.** That's one purpose of them, yes.
[11] **Q.** And if some or all of those publishers other than Sony were
[12] looking to the price that Sony was getting or the deal that
[13] Sony was getting as a major, you didn't give that any weight,
[14] did you?
[15] **A.** To my understanding of the most favored nations clauses is
[16] that generally they relate to the royalty pool portion of the
[17] contract, and that the Sony contract doesn't implicate any of
[18] the most favored nations clauses. This is from some of the
[19] testimony that I've read in the trial.
[20] **Q.** Right. Assume hypothetically that all the other direct
[21] licensors were entitled to the Sony deal because of the most
[22] favored nations clause. Wouldn't that undermine your
[23] benchmark?
[24] **A.** Well, that's something I would want to take into
[25] consideration. I mean, hypothetically, assuming that.

[1] **Q.** And there's testimony in the record that other publishers
[2] also got advances in addition to Sony, correct?
[3] **A.** I don't recall that specifically, but I would accept that
[4] if you wanted to show it to me or talk about it more
[5] specifically.
[6] **Q.** If publishers did get advances, how would they be valued?
[7] **A.** I don't recall that there were any other non-recoupable
[8] advances. There were just advances that would be earned out
[9] against the royalty pool, and would be returned to DMX if they
[10] weren't earned out.
[11] **Q.** You would agree with me that the direct licensors who got
[12] no royalties because their music was not played by DMX are not
[13] usable as benchmarks, right?
[14] **A.** No, I don't know that I'm willing to accept that. I mean,
[15] some of these licensees are quite new. There's been a lot of
[16] growth in the number of licensees, and there's also variation
[17] quarter to quarter in terms of which licensees are being used.
[18] **Q.** And in any given quarter, a minority of the direct
[19] licensors music is used even one time, right?
[20] **A.** I haven't done that analysis.
[21] **Q.** Take a look, please, at a demonstrative we've made based on
[22] Joint Exhibit 1299. What this is is taking the third quarter
[23] royalty statement and arraying the publishers from the highest
[24] to lowest in terms of royalties. And you'll see that there are
[25] a total 250 publishers all together, right?

[1] **A.** That were used in this particular quarter, yes.
[2] **Q.** And that's less than half of all the publishers with direct
[3] licenses, right?
[4] **A.** I don't know that it's less than half of the publishers
[5] with direct licenses in the third quarter of 2009, but it's
[6] less than half than the current amount of direct licensed
[7] publishers.
[8] **Q.** And it's certainly substantially fewer than DMX had at the
[9] time, right?
[10] **A.** It is fewer than they had at the time, yes.
[11] **Q.** Substantially fewer, right?
[12] **A.** I don't know that one way or the other.
[13] **Q.** Okay. Take a look at the royalty column and the payable
[14] column in this demonstrative, and you'll see that at the back
[15] of the list there are 92 who get no royalty at all, right?
[16] **A.** You mean there was no royalty that was payable?
[17] **Q.** Paid. It says payable, so I'll agree with you on that.
[18] **A.** There are two columns, one that says royalty and one that
[19] says payable. Yes, my understanding of that is that the
[20] royalties they earned in this particular quarter were below the
[21] threshold for writing a check. So it isn't that they get no
[22] royalties. Those royalties accrue until there's large enough,
[23] they don't write a check if it's under $25.
[24] **Q.** That's a rule that DMX imposed?
[25] **A.** I don't know who imposed that rule. I mean, that's --

Page 1295

[1] Q. And you also see that the median publishers between numbers
[2] 125 and 126 down in this list of 250, the median is less than
[3] $33, right, in royalties?
[4] A. I see that, yes.
[5] Q. And it's this array of publishers that you say is
[6] representative of what the value is of the BMI blanket license,
[7] is that right?
[8] A. Not just this array, but all of the direct licenses, yes.
[9] Q. Including the ones below this level that take zeroes,
[10] right?
[11] A. Well, they were zero in this quarter, but yes.
[12] Q. Now, when DMX entered into its agreement with Sony, the
[13] original deal called for Sony to receive a non-recoupable
[14] advance of 2.4 million over three years, correct?
[15] A. When they originally entered into the agreement, yes.
[16] Q. And in addition to that, Sony was paid $300,000 as an
[17] administrative fee, correct?
[18] A. That's correct, yes.
[19] Q. That adds up to 2.7 million?
[20] A. Yes.
[21] Q. And if you, and that's over three years, correct?
[22] A. The original agreement was over three years, yes.
[23] Q. And so if I do that arithmetic right, DMX was paying Sony
[24] $900,000 a year non-recoupable in that deal, right?
[25] A. In the original deal, yes.

Page 1296

[1] Q. And as of the time of the original deal in 2007, DMX was
[2] using Sony music approximately 6.1 percent of the time?
[3] A. Before it had instituted any adjustments for increasing the
[4] spins of Sony direct music, yes.
[5] Q. And at that time, Sony had -- excuse me, DMX had something
[6] less than 77,000 locations, is that right?
[7] A. I would accept that, yes.
[8] Q. And if you do the arithmetic to derive a royalty pool from
[9] that, 900,000 divided by .061, you get an implied royalty pool
[10] of $14,754,000, right?
[11] A. Unfortunately, I can't do that math in my head.
[12] Q. Right. Would you accept my representation?
[13] A. I would accept your representation. Although I'm not sure
[14] why you are focusing on the three-year period here. The
[15] license was eventually amended to cover a longer time period.
[16] Q. Sure. The reason I am focusing on it is my suggestion to
[17] you is that was what DMX was willing to pay at that time,
[18] correct? Yes or no?
[19] A. It was what it was willing to pay based on the information
[20] it had available to it at that time, and when that information
[21] changed, the contract was amended. So I'm not sure why we're
[22] spending time looking at a contract that they subsequently
[23] changed.
[24] Q. Because I'm choosing to ask you that particular question
[25] now, so just try answer it.

Page 1297

[1] A. You get to choose the questions, Mr. Salzman.
[2] Q. If you take that royalty pool of $14 million plus and
[3] divide it by this 76,935 locations at that time, you get a
[4] per-location rate that DMX was willing to pay Sony at that
[5] time, based on the information it had at that time, of $191.77
[6] per location, right?
[7] A. I'm going to accept your arithmetic on that. But that
[8] calculation is implicitly making the assumption that the Sony
[9] share isn't going to change and that the number of locations
[10] isn't going to change.
[11] Q. Do you have any reason to believe that Sony won't ask for
[12] an advance, a non-recoupable advance next time its license
[13] comes up?
[14] A. I don't know one way or the other. My expectation would be
[15] that if Sony wasn't part of this direct license, if it didn't
[16] have a direct license with DMX there, the amount of Sony music
[17] that DMX used would decrease fairly substantially. We've seen
[18] that that 6 percent has increased to 14 percent just over the
[19] two years that have been in place so far. So I don't know if
[20] they'll ask for an advance or not. I can think of other
[21] factors that they would consider in making that decision.
[22] Q. You would agree, would you not, that if the direct licenses
[23] that you propose as the benchmark are not employed by the Court
[24] for whatever reason, the second best benchmark is the Muzak
[25] agreement with BMI that the rest of the industry took, correct?

Page 1298

[1] A. That you could use that benchmark with appropriate
[2] adjustments. I would agree with that, yes.
[3] Q. Now, let's talk about the adjustments that you propose.
[4] First let's talk about the organic growth adjustment,
[5] the fact that there was this cushion built into this agreement
[6] you say diminishes the true value of that agreement, right, to
[7] BMI?
[8] A. I think a summary is it doesn't diminish the value of the
[9] agreement. It alters the perception of what the per-location
[10] rate that can be deduced from that agreement.
[11] Q. You would agree that the Muzak BMI deal allocated the risk
[12] of growth or decline in locations between the parties, right?
[13] A. Yes.
[14] Q. And Muzak took the risk that it would lose locations,
[15] right?
[16] A. It did, yes. That wasn't their expectation at the time
[17] that they signed the contract, but they did take that risk,
[18] yes.
[19] Q. Well, they understood that that was possible, you assume?
[20] A. I assume they understood it was possible.
[21] Q. And that's what actually happened?
[22] A. It is what actually happened. It wasn't what their
[23] expectation was, which for me is the economically relevant way
[24] to understand the contract is.
[25] Q. There's no evidence that Muzak actually expected to grow at

[1] an 8 percent compound rate, is there?
[2] **A.** I have seen some evidence in the record where BMI discovery
[3] documents where BMI is considering Muzak's growth, where they
[4] do have -- I don't know if they're 8 percent, but they have
[5] some high numbers, where they are saying, for example, they
[6] have 182,000 -- that Muzak has 182,000 locations. So I have
[7] seen some evidence about what the parties' possible
[8] expectations were at various points during the contract
[9] negotiations.
[10] **Q.** Now I'm specifically asking about Muzak. There's no
[11] evidence that Muzak expected to grow at an 8 percent compound
[12] rate, isn't that true?
[13] **A.** I didn't seen any evidence about that, no. I've seen
[14] evidence that they expect to grow, but not that they
[15] necessarily expected to grow at 8 percent.
[16] **Q.** And they hadn't grown by 8 percent in any of the prior five
[17] years, had they?
[18] **A.** I'm not sure.
[19] **Q.** Now, the structure of the license as it was, the stated
[20] amount based on the subscriber count as of a certain date is
[21] inevitably going to lead to an array of outcomes as to what the
[22] actual yield is, is that right, on a per-location basis?
[23] **A.** Yes.
[24] **Q.** And the companies that you cite as ones where their
[25] per-location rates declined, TruSonic, Play Network, were

[1] relatively small companies, right?
[2] **A.** I'm not sure if Play Network was a small company. TruSonic
[3] at the time it was negotiating was smaller than Play Networks.
[4] **Q.** And you'd agree with me that the overall market has not
[5] grown -- did not grow by 8 percent from year to year until now?
[6] **A.** That's my understanding of the data, yes.
[7] **Q.** Actually, the other commercial music service firms have
[8] been all over the place. Some grew, some declined, right?
[9] **A.** If you look -- yes. There was variation in how much people
[10] grew. I will accept that.
[11] **Q.** And you have no quarrel with Joint Exhibit 1293 as revised,
[12] the chart showing who paid what, right?
[13] **A.** Not as it's revised, no.
[14] **Q.** And you have no quarrel with the bottom line figure there
[15] that the industry as a whole paid at the rate of $34.32, right?
[16] **A.** That's just as a mathematical calculation, I have no
[17] quarrel with that. I'm not sure where there's any economic
[18] implications to be drawn from that, but I don't have a quarrel
[19] with the calculation.
[20] **Q.** Take a look, if you would, at the graph we've made based on
[21] Joint Exhibit 1293 called total companies by average fees per
[22] location 2005 to 2009. Have you seen that before?
[23] **A.** I have seen this before on Dr. Owen's direct.
[24] **Q.** And you have no quarrel with the information there?
[25] **A.** I haven't checked it. I don't have any reason to believe

[1] that it doesn't represent the raw data. This is simply just a
[2] count of the companies, treating all companies equally.
[3] **Q.** Okay. And we're going to now show you another
[4] demonstrative that was provided to the Court the other day,
[5] which shows the locations, total fees and annual location rates
[6] for several different CMS providers. Have you seen this one
[7] before?
[8] **A.** I believe I was in Court the day that it was given to the
[9] Court.
[10] **Q.** Could you have any quarrel with the information in this
[11] demonstrative?
[12] **A.** I mean, I'll accept it that it represents -- I'll accept
[13] that it represents what you're saying it represents.
[14] **Q.** Okay. Let's take a look through it. The first page is
[15] about Play Network, right?
[16] **A.** Yes.
[17] **Q.** And their starting locations were 11,017?
[18] **A.** Yes.
[19] **Q.** And they wound up almost tripling their locations over the
[20] course of the contract term?
[21] **A.** Yes.
[22] **Q.** And their fees went up year over year every year from
[23] 444,000 to 806,000, right?
[24] **A.** Yes.
[25] **Q.** And the next page, Music Choice, their fees also went up,

[1] not in direct proportion, but as their locations went up their
[2] fees went up, right?
[3] **A.** Yes. I assume this is just the portion of Music Choice
[4] where you excluded the DirectTV licenses, is that correct,
[5] or --
[6] **Q.** I guess I don't -- I'm not sure of the answer to that. It
[7] does exclude the DirectTV customers.
[8] **A.** So once you exclude the DirectTV customers, it does show an
[9] increase. I'm not sure, I think there were something like
[10] 13,000 DirectTV customers. So if you included those here, you
[11] wouldn't see an increase year over year.
[12] **Q.** Well, the DirectTV customers, DMX did pay -- sorry -- BMI
[13] was paid by Music Choice for those DirectTV customers
[14] separately, right?
[15] **A.** They were, but it was a variation in the -- it was a
[16] variation from what BMI is asserting is the form license, the
[17] CMS form license, from which there's no variation.
[18] **Q.** And the total amount paid would be in addition to this, not
[19] in subtraction from this, right? Total fees paid?
[20] **A.** Right. It would be in addition to this.
[21] **Q.** And the next page is TruSonic. Do you see that?
[22] **A.** Yes.
[23] **Q.** And TruSonic started out at 2259 locations, which is much,
[24] much smaller than DMX, right?
[25] **A.** Yes.

January 28, 2010

Page 1303

[1] **Q.** And its locations almost quadrupled over five years?

[2] **A.** Yes.

[3] **Q.** And its fee went up from 130,000 to 280,000 over that

[4] period?

[5] **A.** Yes.

[6] **Q.** Now, you briefly mentioned in your direct testimony that

[7] TruSonic had the benefit of being able to exclude locations

[8] from its license if they didn't use any BMI music, right?

[9] **A.** Yes.

[10] **Q.** I guess, I think you also said that that did not figure in

[11] your analysis?

[12] **A.** It didn't figure into my calculation at all.

[13] **MR. SALZMAN:** Would now be an acceptable time for

[14] lunch, your Honor?

[15] **THE COURT:** Yes. Let's resume at 2:15.

[16] (Luncheon recess)

[17] o0o

[18] AFTERNOON SESSION

[19] (2:15 p.m.)

[20] **THE COURT:** Mr. Salzman.

[21] **MR. SALZMAN:** Thank you, your Honor.

[22] **BY MR. SALZMAN:**

[23] **Q.** Good afternoon, Dr. Candell.

[24] **A.** Good afternoon Mr. Salzman.

[25] **Q.** A second adjustment you propose for the Muzak agreement

Page 1304

[1] benchmark, if we go with that, is for a difference in music

[2] use, correct?

[3] **A.** That's correct, yes.

[4] **Q.** And you compared all the DMX Music use to Muzak music use,

[5] correct?

[6] **A.** That's correct. That's the only data I had available to

[7] me, yes.

[8] **Q.** And you would have liked if you had it available to look at

[9] music use data from the other CMS services, right?

[10] **A.** I would have looked at it, yes.

[11] **Q.** And you don't know, therefore, whether other of the CMS

[12] services who took the 36.36 deal had music use greater or less

[13] than DMX in terms of BMI music usage, right?

[14] **A.** I wouldn't characterize it as the 36.36 deal, but I do not

[15] know about -- I don't know anything about their music use. BMI

[16] didn't produce that information.

[17] **Q.** You're not alleging that BMI withheld it?

[18] **A.** No. I think the parties agreed. I think we asked for it

[19] and the parties agreed not to -- that we would settle it on a

[20] smaller subset of services.

[21] **Q.** So, for example, you don't know whether TruSonic uses more

[22] or less BMI music than DMX?

[23] **A.** I didn't have any information, so, no, I don't know.

[24] **Q.** And the same for Play Network, right?

[25] **A.** Yes.

Page 1305

[1] **Q.** And it's common, is it not, for all the members of an

[2] industry to take a music performing rights license from BMI or

[3] ASCAP on the same basis, even if there are small variations in

[4] their music use, correct?

[5] **A.** I would say in some industries it's common. There's a --

[6] it's also common to use music use as something for adjusting

[7] licenses for looking at the value of the music that's used and

[8] how it's changed over time, when it needs adjustment.

[9] **Q.** So, for example, in the radio industry all the blanket

[10] licensees across the entire country pay on the same basis even

[11] if different stations have more or less BMI or ASCAP music in

[12] them, right?

[13] **A.** That's my understanding, yes.

[14] **Q.** And that's also true in the television industry?

[15] **A.** In the television industry, the industry negotiates an

[16] industry-wide number and it's allocated across the television

[17] stations in a way that the industry agrees on.

[18] **Q.** And it doesn't vary station by station according to how

[19] much music they use?

[20] **A.** No.

[21] **Q.** Now, the data you used for your study was the data provided

[22] by BMI, correct?

[23] **A.** Yes.

[24] **Q.** And that data included as to both DMX and Muzak on-premise

[25] and off-premise data, correct?

Page 1306

[1] **A.** That's correct, yes.

[2] **Q.** And you didn't have any problem statistically with the fact

[3] that both on-premise and off-premise data were provided?

[4] **A.** No.

[5] **Q.** And that was true even though you understood that the

[6] off-premise data was station by station and the on-premise data

[7] was simply the list of songs in each program.

[8] **A.** I mean, it depends what purpose you're putting it to.

[9] **Q.** I meant for the purpose of your study.

[10] **A.** For my purpose, yes, of looking at BMI music use. I mean,

[11] that's what BMI uses to measure its music use.

[12] **Q.** And you thought it was statistically valid?

[13] **A.** Yeah, it's the best I had.

[14] **Q.** And you told us on direct examination that you're aware

[15] that Muzak and DMX report their music use to BMI differently,

[16] right?

[17] **A.** Yes.

[18] **Q.** And the difference leads to a very wide disparity in the

[19] number of performances reported, right?

[20] **A.** Yes.

[21] **Q.** Take a look at Joint Exhibit 1265, please? We'll provide

[22] it to you. Have you seen this exhibit before?

[23] **A.** Yes, I have.

[24] **Q.** And you see that in table 1, beginning of the exhibit which

[25] is labeled on page 1, Muzak off-premise channels that for Muzak

Page 1307

[1] there's one channel, the foreground music one channel, the very
[2] first one, that's 36.5 percent of all the performances on
[3] Muzak?
[4] A. Yes, I see that.
[5] Q. And the top six channels represent 66 percent of the
[6] performances as weighted by Muzak?
[7] A. I'll accept your calculation of that, yes.
[8] Q. And in contrast, if you turn to table 2 on the third page,
[9] which is DMX's off-premise channels, the top six channels only
[10] represent 11 percent of the performances, right?
[11] A. That's the nature of how the information is reported to
[12] BMI.
[13] Q. On page 2 of the exhibit, you see that Muzak has a total of
[14] almost 8 billion performances in that quarter, Q1 of 2008?
[15] A. Yes.
[16] Q. And DMX off-premise for the same time period has 3,402,000?
[17] A. Yes, and apparently this is the same data that BMI uses to
[18] pay its composers. BMI doesn't worry about this difference
[19] when it's making the payments.
[20] Q. So therefore what?
[21] A. So therefore BMI feels that it represents BMI's share. BMI
[22] can use it to figure out who to pay.
[23] Q. But it was good enough for your study too, right?
[24] A. Mm-hmm.
[25] Q. And there are -- now, in the DMX part of the exhibit, so

Page 1308

[1] the third page and following, as you understand it, the music
[2] use as reported, which DMX weights every channel equally,
[3] right?
[4] A. Yes. They just report the list of transmissions for
[5] off-premise channels for each channel, because they don't have
[6] information about, every customer receives every channel, so if
[7] we wanted to in some sense make this equivalent to the Muzak,
[8] we could multiply the total performances by the total number of
[9] DMX customers, since nearly all of DMX customers receive all of
[10] the channels.
[11] Q. Now, in terms of -- now, all these channels are 24 hours a
[12] day, seven days a week, right?
[13] A. I believe that's correct, yes.
[14] Q. So really, the difference in total performances in the DMX
[15] channel is largely a function of the length of the songs,
[16] right?
[17] A. Yes. That would be correct.
[18] Q. And the way the DMX Music is reported, for example, take a
[19] look on the third page, you have two channels, one listed after
[20] another, one's called Rat Pack and the next one is called
[21] Traditional Country, right? Do you see those?
[22] A. I do.
[23] Q. And Rat Pack has only 9.8 percent BMI and Traditional
[24] Country has 72.5 percent? Do you see that?
[25] A. I do see that, yes.

Page 1309

[1] Q. And it may be the case, as far as you know, that
[2] Traditional Country is listened to by many DMX locations and
[3] Rat Pack by very few, and that wouldn't be taken into account
[4] in your study, right?
[5] A. I have no information and I don't believe DMX does either
[6] on who listens to what channels. I don't have any reason to
[7] think that it's going to be systematically biased either,
[8] though.
[9] Q. Do you have any reason to believe on a going-forward basis,
[10] do you know of any reason why Muzak would use more BMI music
[11] than DMX?
[12] A. Do I understand why? No. I don't understand why.
[13] Q. The third proposed adjustment reason that you provide on
[14] direct examination was because Muzak and BMI retroactive --
[15] settled the retroactive period that was open between them at
[16] the same time they entered into the 2004 to 2009 license
[17] agreement, correct?
[18] A. Yes.
[19] Q. Muzak had already paid BMI millions of dollars for that
[20] prior period, right?
[21] A. Yes. I think there was testimony that they paid something
[22] like 12 to $14 a location the prior period. That was the
[23] number I read in the transcript.
[24] Q. And at the time that BMI and Muzak entered into that
[25] agreement, there was a rate court case pending between BMI and

Page 1310

[1] Muzak, correct?
[2] A. That's my understanding, yes.
[3] Q. And in that rate court, Muzak had taken the position that
[4] it wanted a decrease on a retroactive basis, correct?
[5] A. I am not aware of the record in that case. I wasn't
[6] involved in it. I don't know.
[7] Q. Now, Muzak never actually agreed with BMI that it would pay
[8] an additional retroactive sum, correct?
[9] A. Muzak agreed to make a single payment of $30 million a year
[10] and there were two agreements that were signed at the same
[11] time.
[12] Q. I'm asking a slightly different question. Did Muzak ever
[13] agree with BMI to make a payment expressly attributable to the
[14] prior period?
[15] A. You mean expressly attributable written down that said this
[16] is for the prior period?
[17] Q. Orally or in writing.
[18] A. I wouldn't know orally. They didn't do it in writing, but
[19] from an economic perspective, they can divide things up between
[20] the different contracts however they want. And what we observe
[21] is this big change in the rates that happens on the day that
[22] they signed the 2004 to 2009 agreement.
[23] Q. And that to you is an important fact, that the change
[24] occurred on a certain day specific?
[25] A. Yes. I think it provides, it provides evidence that Muzak

## Page 1311

[1] was thinking about the whole period. They cared, I mean, there
[2] is, I have seen testimony from Muzak saying they cared about
[3] the total amount that they paid.
[4] **Q.** But just so we're clear, there is nothing in writing that
[5] said some of the money we're paying you is for the past?
[6] **A.** The contracts do not reflect that. I agree with that
[7] statement.
[8] **Q.** And you didn't see any document in which Muzak in the
[9] course of the negotiation had even on a tentative basis said
[10] we'll pay you for the future -- we'll pay you some money for
[11] the past and BMI said, no, you know what, we'd rather have it
[12] for the future? You didn't see any evidence of that, did you?
[13] **A.** No. Muzak consistently maintained that it didn't want to
[14] pay any money for the past.
[15] **Q.** Take a look at tab 11 in the binder that DMX's lawyers gave
[16] you this morning.
[17] **A.** Okay, I have it.
[18] **Q.** Okay, and that's the one labeled retroactive settlements
[19] affect 97 percent of locations, correct?
[20] **A.** That's correct.
[21] **Q.** You talked in your testimony this morning primarily about
[22] the blue bar and green bar, but you -- and you also mentioned
[23] the red bar in passing, right?
[24] **A.** Yes.
[25] **Q.** And the significance of the red bar taken together with the

## Page 1312

[1] green bar, settled period, interim period begins after
[2] January 1994, and the third bar, the green bar, no settled
[3] period, that means that 25 percent of the locations taken
[4] together agreed to pay the 36.36 rate and didn't have the same
[5] retroactive period as Muzak had, right? Isn't that what that
[6] means?
[7] **A.** I would agree that some of the locations did not pay for
[8] the same period that Muzak did, yes.
[9] **Q.** 25 percent.
[10] **A.** Yes. Sure. I mean, what I can tell from looking at this
[11] chart, which I did look at for the people that were in the
[12] 3 percent is what are the size of the licensees in the 22
[13] percent bar that would help me interpret whether I could draw
[14] any conclusions from that. As I discussed this morning, the
[15] smallest licensees really didn't have an opportunity, they
[16] were -- I'll stop talking, let you ask the questions.
[17] **Q.** Thank you. Now, in your binder you also have at the very
[18] end Joint Exhibit 1164. Do you see that?
[19] **A.** Yes, I do.
[20] **Q.** And that's the document you rely on primarily to come to
[21] your conclusion that the adjustment, the retroactive adjustment
[22] should be 14 to 16.7 percent, correct?
[23] **A.** That's correct, yes.
[24] **Q.** Now, let's take a look at the first page of Joint Exhibit
[25] 1164. Do you have that in front of you?

## Page 1313

[1] **A.** Yes.
[2] **Q.** And here the math you did was 5.5 million in the retro
[3] column, as a percentage of 33.0 million in the total column,
[4] gave you 16.7 percent, right?
[5] **A.** That's correct, yes.
[6] **Q.** Now, BMI and Muzak actually reached their agreement shortly
[7] after Joint Exhibit 1164, right?
[8] **A.** That's correct, yes.
[9] **Q.** And in the final agreement, BMI got $30 million in total,
[10] correct?
[11] **A.** Yes.
[12] **Q.** And in the final agreement, BMI gave Muzak an 8 percent
[13] cushion, correct?
[14] **A.** An 8 percent organic growth cushion.
[15] **Q.** Just answer my question, please.
[16] **A.** Yes.
[17] **Q.** Okay, thank you. And in the final agreement the annual
[18] fees are level amounts, right?
[19] **A.** Yes.
[20] **Q.** And in final agreement, the first half of 2009 is included,
[21] is it not?
[22] **A.** Yes.
[23] **Q.** And the second --
[24] **A.** I mean, it starts in the middle of 2004 to 2009.
[25] **Q.** Right. So everything is pushed forward half a year in the

## Page 1314

[1] final agreement compared to this, right?
[2] **A.** That's my understanding of this document, yes.
[3] **Q.** And going back, you would agree, would you not, that
[4] pushing the agreement forward an additional half year was an
[5] advantage to Muzak, correct? As compared to proposal A1.
[6] Right? They got a longer license.
[7] **A.** They got a longer license. I mean, it would make the value
[8] of the settlement period greater because they got to, they got
[9] to have, you know, another six months at the lower rates as
[10] opposed to at the higher rates.
[11] **Q.** This was an advantage to Muzak to have the first half of
[12] 2009 covered by the license, right?
[13] **A.** Yes, it's not clear how the retroactive -- how BMI
[14] would think about the retroactive dollars with that change.
[15] **Q.** And the final agreement had flat payments rather than
[16] payments that increased every year, right?
[17] **A.** Yes.
[18] **Q.** If you look at the annual fee column here, you could see a
[19] pattern on A1 where it jumped a half million, then another half
[20] million, then a million, then another million. Do you see
[21] that?
[22] **A.** Yes.
[23] **Q.** So that projecting forward on that basis, you could
[24] anticipate that if 2009 were included, the number could have
[25] been in excess of $7 million for that year, right?

Page 1315

[1] **A.** I have no basis to conclude one way or the other.

[2] **Q.** You don't see a pattern there?

[3] **A.** I see a pattern, but I don't know if that's how they would
[4] have changed their agreement or not.

[5] **Q.** There's no way to know?

[6] **A.** I don't know. I mean, it's possible BMI knows, but I
[7] haven't seen it in the record.

[8] **Q.** Okay. And I think we already established that in the final
[9] agreement the organic growth cushion was 8 percent, whereas
[10] here there was both organic or existing affiliate growth, but
[11] it was only 2-1/2 percent, correct?

[12] **A.** That's correct, yes.

[13] **Q.** And so organic to organic, if that were the right measure,
[14] the final agreement was favorable to Muzak in that way, right?

[15] **A.** I can't tell one way or the other.

[16] **Q.** And you haven't attempted to assess whether these changes
[17] in these other variables in the agreement did or didn't affect
[18] the amount of money Muzak was prepared to pay BMI, correct?

[19] **A.** That's correct.

[20] **Q.** You just assumed, didn't you, that the movement from
[21] proposal A1 to the final agreement was in return for BMI
[22] dropping the retro demand, isn't that true?

[23] **A.** Well, I --

[24] **Q.** Isn't that true? That was just an assumption.

[25] **A.** I didn't assume that they dropped the retro demand. I

Page 1316

[1] assumed that they reached a total agreement and that BMI
[2] thought of allocating it in a certain way, and I used this to
[3] look at the relative value of the two periods. I can't tell
[4] how, you know, in the final agreement. In the final agreement
[5] all I see is a single number.

[6] **Q.** And you can't tell whether the movement from proposal A1 to
[7] the final agreement was attributable to the retro difference,
[8] the annual fee difference or the organic growth difference or
[9] any combination of them, correct?

[10] **A.** That's correct. Although I see that Muzak paid a higher
[11] amount than BMI was requesting on this document, final.

[12] **Q.** And got several different benefits in excess of what was
[13] proposed on this document, correct?

[14] **A.** There were, I mean, there were various tradeoffs between
[15] the parties.

[16] **Q.** And you haven't isolated how much, if any, was specifically
[17] traded off for the retro period, isn't that true?

[18] **A.** Between this document and the final agreement, no, I
[19] haven't.

[20] **Q.** Remind me, because I'm sorry, I have forgotten, to what
[21] extent it's your testimony that the base fee or the, under the
[22] license you are proposing for BMI, should cover BMI's costs
[23] only to the extent of 11.7 percent? Is that your testimony
[24] or --

[25] **A.** I think that's Dr. Jaffe's testimony.

Page 1317

[1] **Q.** You would agree with me, would you not, that as a factual
[2] matter -- withdrawn.

[3] You have no reason to doubt that the other CMS
[4] services' royalties have a 17 percent deduction applied to them
[5] by BMI, right?

[6] **A.** I have no reason to doubt that, no.

[7] **Q.** Okay. And you would agree as an economic matter that DMX
[8] should not be subsidized by its competitors in that respect,
[9] correct?

[10] **A.** I mean, that presupposes that the 17 percent number is an
[11] exact accounting of the cost for the CMS license that you say
[12] that there is a subsidy in, and I don't agree with that. The
[13] 17 percent number I understand to be the number that BMI uses
[14] for domestic overhead, but I haven't seen an accounting of it
[15] related to sort of costs and revenues in the same way that I've
[16] seen for the 11.7 percent.

[17] **MR. SALZMAN:** No further questions. Thank you.

[18] **MR. MARKS:** No redirect, your Honor.

[19] **THE COURT:** Thank you, Dr. Candell. You are excused.

[20] **THE WITNESS:** Thank you, your Honor.

[21] **MR. RICH:** Your Honor, I discussed that concludes our
[22] one witness today. We have our last witness, Professor Jaffe,
[23] as early as is convenient to the Court. I suggest his direct
[24] and cross, combined guesstimate, will be a little bit longer
[25] than today.

Page 1318

[1] **THE COURT:** Do you want to start at ten?

[2] **MR. RICH:** Perhaps we could start 9:30 and give us a
[3] little cushion to be sure we finish tomorrow? Would that work
[4] for your Honor?

[5] **THE COURT:** I'll give you a cushion at the end of the
[6] day.

[7] **MR. RICH:** Why don't we say ten start?

[8] **THE COURT:** We'll resume at 10:00. Thank you.

[9] (Adjourned to January 29, 2010 at 10:00 a.m.)

BROADCAST MUSIC INC.., v.
DMX, INC..,

Page 1319

[1]                    INDEX OF EXAMINATION
[2]    Examination of:                Page
[3]    AMY CANDELL
[4]    Direct By Mr. Marks . . . . . . . . . . . .1230
[5]    Cross By Mr. Salzman . . . . . . . . . . . .1269
[6]            DEFENDANT EXHIBITS
[7]    Exhibit No.                Received
[8]     RX162  . . . . . . . . . . . . . . . . . .1232
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

A-573

# In The Matter Of:

*BROADCAST MUSIC INC., v.*
*DMX, INC.,*

*VOLUME 9*
*January  29, 2010*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 01T5bmiF.txt, Pages 1320-1466 (147)

**Word Index included with this Min-U-Script®**

Page 1320

[1]    01T5bmil            trial
[1]    UNITED STATES DISTRICT COURT
[2]    SOUTHERN DISTRICT OF NEW YORK
       ------------------------------x
[3]    BROADCAST MUSIC INC.,,
[4]                    Petitioner,
[5]              v.              08 Civ. 216 (LLS)
[6]    DMX, INC.,,
[7]                    Respondent.
[8]    ------------------------------x
[9]                          January 29, 2010
                             10:05 a.m.
[10]   Before:
[11]             HON. LOUIS L. STANTON,
[12]                          District Judge
[13]                 APPEARANCES
[14]   HUGHES, HUBBARD & REED, LLP
           Attorneys for Petitioner
[15]   BY:  JAMES C. FITZPATRICK
            MICHAEL E. SALZMAN
[16]        JASON C. BENTON
            MARGARET J. HOAG
[17]          - AND -
            JOSEPH DiMONA, In-house counsel, BMI, Inc.,
[18]
       WEIL, GOTSHAL & MANGES, LLP
[19]       Attorneys for Respondent
       BY:  R. BRUCE RICH
[20]        BENJAMIN E. MARKS
            TODD D. LARSON
[21]
[22]
[23]
[24]
[25]

Page 1321

[1]              (Trial resumed)
[2]        MR. RICH:  Your Honor, DMX calls as its final witness
[3]    Adam Jaffe.
[4]      ADAM B. JAFFE,
[5]        called as a witness by the Respondent,
[6]        having been duly sworn, testified as follows:
[7]    DIRECT EXAMINATION
[8]    BY MR. RICH:
[9]    Q.  Good morning, Professor Jaffe.
[10]   A.  Good morning.
[11]       MR. RICH:  Your Honor, we are going to hand out trial
[12]   binders, if that's acceptable.
[13]   Q.  Professor Jaffe, what is your current professional
[14]   position?
[15]   A.  I'm the Fred C. Hecht Professor in Economics and the Dean
[16]   of Arts and Sciences at Brandeis University.
[17]   Q.  And for how long have you taught economics at Brandeis?
[18]   A.  Since 1994.
[19]   Q.  And since when have you been Dean of Arts and Sciences?
[20]   A.  Since 2003.
[21]   Q.  Can you please briefly describe your educational
[22]   background?
[23]   A.  I have an undergraduate degree in chemistry from MIT,
[24]   Masters degree in technology and policy in MIT and a Ph.D
[25]   degree in economics from Harvard University.

Page 1322

[1]    Q.  And the Ph.D was earned in 1985?
[2]    A.  That's correct.
[3]    Q.  Can you summarize your professional employment since
[4]    earning your Ph.D?
[5]    A.  Yes.
[6]        Upon earning the Ph.D I took a position as assistant
[7]    professor on the faculty at Harvard and was on the faculty at
[8]    Harvard until 1994 when I moved to Brandeis, except for one
[9]    year in 1990-91 when I took a leave of absence from Harvard and
[10]   served as senior staff economist at the President's Council of
[11]   Economic Advisors under the first President Bush.
[12]   Q.  Have you had other significant professional
[13]   responsibilities?
[14]   A.  Yes.
[15]       As a practicing economist I'm a research associate at
[16]   the National Bureau of Economic Research and also was for quite
[17]   a while the co-organizer at the NBER of the innovation policy
[18]   and the economy group.  I have been a referee for many
[19]   scholarly economic journals.  I was on the board of editors of
[20]   the American Economic Review which is the leading American
[21]   economics journal as well as the Rand journal of economics
[22]   which is leading journal within the field of industrial
[23]   organization and regulatory economics in which I specialize.
[24]   Q.  And have you published in your field?
[25]   A.  I have published two books and dozens of scholarly articles

Page 1323

[1]    in referee journals including the top journals in economics in
[2]    the English language.
[3]    Q.  Have any of those published works focused on areas of
[4]    intellectual property?
[5]    A.  Yes.  Both of my books are to varying degrees about
[6]    patents.  One, in particular, is about patent policy.
[7]    Q.  In what areas have you taught at Brandeis and Harvard?
[8]    A.  I have taught micro-economics, I have taught economics of
[9]    innovation.  I have taught environmental economics, regulatory
[10]   economics, antitrust economics, and economics of industrial
[11]   organization.
[12]   Q.  Please describe briefly any other areas of consulting work
[13]   that you have done prior to this proceeding.
[14]   A.  I have been a consultant and an expert witness for a
[15]   variety of firms and government agencies.  I have testified in
[16]   litigation and before regulatory agencies of both state and
[17]   federal regulatory agencies on matters relating to antitrust,
[18]   to economic regulation, to contract as well as to patents, and
[19]   also music royalties as are at issue in this case.
[20]   Q.  And, with reference to that last portion of testimony, what
[21]   prior testimony relating to music royalties have you provided?
[22]   A.  I have worked for a number of different licensees in
[23]   addition to DMX in the residential music services like Music
[24]   Choice, cable television, local television, network television.
[25]   Q.  And, have you testified in this court before?

Page 1324

[1]    A.  I have.

[2]    Q.  In what matter?

[3]    A.  In the Music Choice matter that I just referred to.

[4]    Q.  If you could turn to tab 1 in your binder, please, which is

[5]    a copy of your curriculum vitae, that's RX 163, can you

[6]    identify that, please?  Is that your current CV?

[7]    A.  Yes, it is.

[8]         MR. RICH:  We would offer that in evidence at this

[9]    point, your Honor.

[10]        MR. SALZMAN:  No objection.

[11]        THE COURT:  Received.

[12]        (Respondent's Exhibit 163 received in evidence)

[13]   BY MR. RICH:

[14]   Q.  Professor Jaffe, can you describe the nature of the

[15]   assignment you were given by DMX in connection with this rate

[16]   proceeding?

[17]   A.  Yes.

[18]        I was asked to analyze and eventually opine upon both

[19]   the structure for -- or the reasonable structure for a blanket

[20]   license with a carve-out mechanism as well as appropriate

[21]   benchmarks and their implication for the actual fee levels in

[22]   that license.

[23]   Q.  And, generally, what materials have you reviewed in

[24]   preparation for your testimony?

[25]   A.  I have reviewed a number of different depositions and other

Page 1325

[1]    testimony in the case.  I have had some conversations with DMX

[2]    people.  I have tried to review the trial transcript from the

[3]    last two weeks; I won't pretend that I have read every word

[4]    because I have another job, but I have reviewed portions of it

[5]    and tried to review the parts that seem relevant.

[6]    Q.  Does that include part or all of Dr. Owen's testimony here?

[7]    A.  I did review Dr. Owen's testimony, yes.

[8]    Q.  Now, what is your understanding, as an economist, of the

[9]    purpose of a rate proceeding such as this?

[10]   A.  Well, as an economist what I would look for would be to

[11]   think about what it means economically for fees to be

[12]   reasonable which I think means, or most sensibly means

[13]   attempting to identify fees that correspond to what would occur

[14]   in a competitive market to the extent that there might be a

[15]   competitive market for music performance royalties.

[16]   Q.  And as you think about the concept of reasonableness since

[17]   we are here defining reasonableness for a blanket license, how

[18]   did that fact that we are making that consideration in the

[19]   context of a blanket license affect the way you think about the

[20]   issue of going about the process?

[21]   A.  So, historically or traditionally the blanket license

[22]   conveys really two different kinds of value to the licensee.

[23]   It includes within it, in a sense, the specific rights to

[24]   perform specific works that the licensee then does perform.  It

[25]   also conveys value by virtue of the fact that those rights for

Page 1326

[1]    individual works are aggregated into one blanket license,

[2]    thereby providing convenience to the licensee as well as

[3]    providing a kind of what has been called an insurance function

[4]    from the perspective that if a licensee were to accidentally

[5]    perform a work that they didn't realize, for example, that they

[6]    didn't otherwise have the rights to, the blanket license would

[7]    provide them protection against thereby infringing.

[8]    Q.  If you look at tab 2, have you prepared a series of

[9]    demonstratives, does tab 2 begin to or illustrate this

[10]   principle?

[11]   A.  Yes.  It is making the point that the traditional blanket

[12]   fee contains two portions.  We have labeled those in our

[13]   presentation the music fee and the floor fee.  The music fee

[14]   corresponds to what I call the rights for the specific

[15]   performances themselves, and then the floor fee represents

[16]   compensation to -- sorry, the floor fee represents compensation

[17]   to BMI for the fact that the blanket license also conveys these

[18]   benefits of aggregation, convenience and insurance.

[19]   Q.  Now, if I refer during today's testimony to on the one hand

[20]   a so-called traditional blanket license, namely the form of

[21]   blanket license that BMI has historically offered industries

[22]   such as the commercial music services on the one hand and a

[23]   blanket carve-out license on the other, are you comfortable

[24]   working with those?

[25]   A.  Yes.

Page 1327

[1]    Q.  What are the competitive pros and cons of the traditional

[2]    blanket license as offered by BMI?

[3]    A.  So, the main competitive advantage of the traditional

[4]    license is the potential for economizing on transactions costs

[5]    on the part of both the licensee and the rights holders making

[6]    that convenient and reducing the costs of making the

[7]    arrangements necessary otherwise for the performances to occur.

[8]         The main disadvantage of the blanket fee is that

[9]    because it is a collective, collectively priced package of

[10]   music performance rights in the absence of some mechanism to

[11]   discipline that pricing, that would represent a situation in

[12]   which the sellers of the music performance rights would be able

[13]   to exploit their market power by collectively licensing their

[14]   works rather than competing with each other to sell their works

[15]   to potential users.

[16]   Q.  And, have you had occasion to consider the incentives or

[17]   disincentives, the structure of the traditional blanket license

[18]   presents for users to explore and exploit direct licensing

[19]   opportunities?

[20]   A.  Yes.

[21]   Q.  Can you describe your conclusions there?

[22]   A.  Under the traditional blanket license, since it is a

[23]   package deal and the pricing is not in any way affected by any

[24]   alternative means that users may have utilized to get the

[25]   rights for the performances, there is no economic incentive to

[1] think about, to consider, to try to effectuate trying to get
[2] those rights directly from the rights holders because you would
[3] have to pay something to get those rights and there would be no
[4] corresponding economic benefit.
[5] **Q.** What are the attributes and functions of the blanket
[6] license with a carve-out feature as you understand them in
[7] relation to the traditional blanket license?
[8] **A.** From an economic perspective, the blanket license with
[9] carve-out provides an superior overall compromise between these
[10] competing considerations of wanting to economize transactions
[11] costs on the one hand but also not wanting market power and
[12] collective price setting to determine fee levels because it
[13] creates a structure in which users can rely on the aggregation
[14] function and pay for it, but also to the extent that they find
[15] it appropriate and desirable to contract directly with the
[16] owners of the rights to, for the rights to make those
[17] performances they can do so and receive an economically
[18] appropriate benefit.
[19] **Q.** To what extent does the existence of the BMI consent decree
[20] mitigate BMI's ability to exploit its market power?
[21]     **THE COURT:** What was the question?
[22]     **MR. RICH:** Your Honor, I'm sorry.
[23] **Q.** To what extent the presence and the existence of the
[24] consent degree mitigate BMI's ability to use its market power?
[25]     **THE COURT:** Maybe you could ask a narrower question.

[1]     **MR. RICH:** Okay, sure.
[2] **Q.** Have you given consideration to the extent to which the
[3] presence of the consent decree and the rate making mechanisms
[4] of the decree have influenced the outcomes of marketplace
[5] transactions between BMI and licensees of BMI?
[6] **A.** Yes. The combination of the consent decree requirement
[7] that BMI must provide licenses to people who ask for it and the
[8] existence of the rate court to determine a reasonable fee level
[9] for those licenses if the parties can't agree to it provides
[10] some amount of discipline or restraint on the extent to which
[11] otherwise BMI could exploit the market power represented by its
[12] collective price making.
[13] **Q.** Is the correct conclusion economically from that that any
[14] and all agreements reached between BMI and users in a given
[15] industry should be presumed to be reasonable because of the
[16] very presence of that consent decree constraint?
[17] **A.** No, because the rate court --
[18]     **THE COURT:** Oh, come on.
[19]     **THE WITNESS:** I'm sorry?
[20]     **THE COURT:** Nobody would make such an assumption.
[21]     **MR. RICH:** Your Honor, the reason I ask it is because,
[22] at least as I understood Professor Owen's testimony, he said
[23] that by its very nature, agreements reached in a shadow of the
[24] rate court mechanism and so long as they are willing
[25] buyer/willing seller, are presumed to be reasonable.

[1]     At least that was my understanding of the purport of
[2] his testimony.
[3]     **THE COURT:** He certainly used that phrase quite often,
[4] but I think we should get to the -- the structure part of it is
[5] really in little dispute, around the edges perhaps, but let's
[6] get to the reasonable determinations that we have to make.
[7]     **MR. RICH:** Fine, fine. Happy to do that, your Honor.
[8]     **THE COURT:** The interplay between the consent decree
[9] and the actions of the parties and its effect on their thinking
[10] is too broad and infected with legal concepts.
[11]     **MR. RICH:** Very well, your Honor.
[12] **BY MR. RICH:**
[13] **Q.** Why don't we move on then directly, Professor Jaffe, to the
[14] consideration you have given respectively to BMI's approach to
[15] rate setting here for the adjustable fee blanket license and
[16] DMX', and I know you have prepared demonstratives appearing at
[17] tabs 5 and 6 of your binder.
[18] **A.** That's correct.
[19] **Q.** Would you like to provide the Court with your
[20] interpretation and analysis of the respective parties'
[21] positions from those demonstratives which are also on the
[22] screen?
[23] **A.** Yes, just quickly because --
[24]     **MR. RICH:** Pardon me. It is tabs 4 and 5. I
[25] misspoke.

[1] **A.** I think a lot of this has been talked about this week but,
[2] quickly, to try to summarize the differences between the two
[3] approaches, looking first at the BMI approach, they start with
[4] the Muzak --
[5] **Q.** This is tab 4 in the binder, Professor Jaffe?
[6] **A.** This is tab --
[7] **Q.** To make sure we are on the same page.
[8] **A.** That's correct. It is tab 4.
[9] **Q.** Please, go ahead.
[10] **A.** BMI starts with the Muzak benchmark which implicitly has
[11] wrapped in it, in a combined way, both the music fee and the
[12] floor fee. They then, first thing that they do conceptually is
[13] they increase that amount 15 percent to reflect the so-called
[14] option value. They then take that overall increased level of
[15] blanket fee and identify a portion of it which they call a base
[16] fee and we have called a floor fee which they calculated at
[17] 17.2 percent of the overall total. Later in my testimony I
[18] will comment specifically on the 17.2 percent.
[19]     They then add to that 17 percent an additional amount.
[20]     **THE COURT:** In short, you think it should be 11
[21] percent?
[22]     **THE WITNESS:** That's correct, 11.7; correct.
[23]     That leaves residual which is an amount subject to
[24] carve-out and the licensee can get some savings in that
[25] portion, the amount subject to carve-out portion on the basis

Page 1332

[1] of direct licensing.

[2]     And if we can go to the next one to make sure we are

[3] clear --

[4] **Q.** Tab 5.

[5] **A.** Tab 5.

[6]     Aside from the disagreements on the numbers, there is

[7] two important conceptual differences in DMX' approach. We

[8] start not from a benchmark in which the music fee and the floor

[9] fee are already combined, we start from a benchmark which is a

[10] benchmark specifically for the music fee component standing

[11] alone, and then we do not increase it for option value because

[12] I believe that to be economically inappropriate. We then add

[13] on the floor fee in a sense underneath because we do agree that

[14] that should be part of it. We recognize that there could be as

[15] well incremental costs and accept that to the extent that those

[16] incremental costs are proven and properly allocated, that DMX

[17] would pay for those as well. And then the last step is the

[18] same, there would then be the music portion would be subject to

[19] savings through direct licensing.

[20] **Q.** Now, with respect to the DMX approach, I take it you have

[21] created a formula by which fees under this conceptualization

[22] would be established; is that correct?

[23] **A.** Yes.

[24] **Q.** Is that reflected in tab 6 of the binder?

[25] **A.** Yes.

Page 1333

[1] **Q.** So, the bottom formula is the way DMX has done it based on

[2] my conceptualization of this which is that there is basically

[3] two pieces; there is the floor fee and then there is a second

[4] term which is the music fee times the share of BMI which

[5] corresponds to that additional white part in the diagram.

[6]     The formula up above which is the formula that is

[7] actually in your interim order in the court, your Honor, is

[8] mathematically equivalent. It contains the same elements. The

[9] rearrangement in the form in the second line really makes it

[10] easier to see the relationship between the components of the

[11] formula and the direct license benchmark and the cost elements

[12] with respect to the floor fee. There is no difference

[13] conceptually between the formulas and I don't believe the

[14] parties -- either party has suggested that there is

[15] mathematically a difference between the two formulas. It is

[16] just a different way of arranging the terms algebraically to

[17] make it easier to do the reference.

[18]     **THE COURT:** To use the --

[19]     **THE WITNESS:** To do the reference to the benchmarks.

[20] It makes it clear how the formula relates to the benchmark.

[21] **BY MR. RICH:**

[22] **Q.** So, let's focus on conceptually your thinking with respect

[23] to how one should arrive at focusing on the bottom equivalent

[24] formula, how the Court you would recommend should think about

[25] arriving at a reasonable music fee, and then after that we will

Page 1334

[1] come to your thought as to how the Court might correctly and

[2] reasonably think about the concept of the floor fee.

[3]     So, if you would start, please, with your thoughts

[4] about determining the most appropriate benchmark to value the

[5] music fee?

[6] **A.** So, the music fee, as I have indicated, corresponds to the

[7] portion of the blanket license package which really is, in some

[8] sense, the raw rights to perform specific works. And as I have

[9] indicated, where possible, we would like to set those at what

[10] we think would prevail or approximating what we think would

[11] prevail in a competitive market. We now, really for the first

[12] time in rate court history, have an extensive experience with

[13] actual competitive market transactions for music performances

[14] in the form of the direct license agreements and so I believe

[15] that those direct license agreements are the best benchmark for

[16] the reasonable music fee.

[17] **Q.** How relevant, in your consideration of those benchmarks,

[18] was the numerosity of those agreements? Do you have an

[19] understanding of approximately how many exist at this moment?

[20] **A.** My understanding is it is something over 500. That has

[21] some relevance. We would want it to be enough agreements that

[22] it seems to be significant market activity. Those 500

[23] agreements represent, as I understand it, something like a

[24] third of all performances on DMX and something like 40 percent

[25] of BMI performances, so it is a substantial body with respect

Page 1335

[1] to the activity that's being licensed. There is no magic

[2] number that's enough but I think it is important that it be

[3] substantial.

[4] **Q.** What relevance do you ascribe to the fact that a

[5] significant number of music publishers who were offered direct

[6] licenses have thus far at least declined to enter into them?

[7] **A.** So, there is two issues that conceptually one might worry

[8] about from the fact that it doesn't include all publishers.

[9] One is just the absolute number. Is it a big enough number?

[10] And there I really think there is no issue.

[11]     I come from Massachusetts where two weeks ago a poll

[12] of 400 voters three days before the election basically

[13] accurately predicted the outcome of how 2 million Massachusetts

[14] voters were going to vote. So, the absolute number that are

[15] included in the sample was really not a significant issue.

[16]     The second issue is a more complicated issue and goes

[17] to the question of whether the publishers that are represented

[18] in the direct license agreements are in some ways -- in some

[19] way not representative, that there is some bias inherent in the

[20] set of publishers that are represented relative to the

[21] universe, and that's a more complicated question.

[22]     I think the evidence suggests that on balance they are

[23] a representative sample. We heard from both Mr. Knittel about

[24] the range of publishers that were licensed and from Ms. Hilburn

[25] about how the music, actual playlists are put together, the

Page 1336

[1] breadth of material that is covered in them from the
[2] perspective of genre, the fact that we have one big publisher
[3] and a variety of different kinds of small publishers.
[4]     Now, it is true that the publishers who chose not to
[5] sign a direct license agreement, it is possible that the reason
[6] they didn't sign was because they have, in their heads, some
[7] higher value than the publishers who did sign. But, on the
[8] other hand, we also know that those publishers are making that
[9] decision with reference to their likely distribution from BMI
[10] and those distributions are potentially the result of them
[11] being part of this collective organization and are priced
[12] reflecting the market power of that organization. And there is
[13] also the fact that BMI took explicit action, at least with the
[14] case of Universal, to induce them not to sign by offering them
[15] a payment that, based on the record, appears to be almost
[16] surely greater than they would have been entitled to under
[17] BMI's normal distribution.
[18]     So, I think, on balance, while there is a lot of
[19] moving parts and there is some reasons why the publishers who
[20] didn't sign might have had a higher value, there is other
[21] reasons why they might have been affected in ways that aren't
[22] really part of the determination of a competitive fee level, I
[23] think on balance the direct license compilation of licenses is
[24] a reasonable benchmark for the competitive rate.
[25]     THE COURT: As a matter of economic doctrine -- and

Page 1337

[1] I'm not trying to suggest this, I'm really just asking if it is
[2] true or not because it just occurred to me -- is one of the
[3] definitions of reasonable price the fact that a certain number
[4] of potential buyers don't pay it? In other words, if every
[5] buyer bought at that price it might show that the price was too
[6] low?
[7]     THE WITNESS: I think that's an important insight in
[8] most markets so in most regular markets, talking about the car
[9] market or the potato market, the market price is going to be
[10] one at which some people choose not to buy. I think it is more
[11] complicated in this case because of the presence of the
[12] compulsory license.
[13]     THE COURT: Yes, it is, but I am asking whether it
[14] exists independently as one of the indices of a reasonable
[15] price --
[16]     THE WITNESS: Yes.
[17]     THE COURT: -- without regard to the characteristics
[18] of the specific market.
[19]     THE WITNESS: Yes. In a competitive market it will be
[20] the case that some potential buyers choose not to buy at the
[21] market price.
[22]     THE COURT: And is that considered in economic
[23] doctrine, a necessary element? Would its absence indicate that
[24] the reasonableness of the price was in greater doubt?
[25]     THE WITNESS: I'm thinking on the fly here.

Page 1338

[1]     THE COURT: So am I.
[2]     THE WITNESS: First of all, I answered your first
[3] question with respect to the buyers and, in fact, what we've
[4] been talking about are actually the sellers. So, the question
[5] really is are there some sellers who are choosing not to sell
[6] at a market price? And in many markets that is surely the
[7] case.
[8]     I don't know that I would say that if that's not true,
[9] that if all of the potential sellers are in fact selling, that
[10] that means it's not reasonable because it could be that they
[11] all have very close to the same cost in which case at the
[12] market price they would presumably all be selling, at least to
[13] some extent.
[14]     THE COURT: So it is a concept that shouldn't be taken
[15] too far?
[16]     THE WITNESS: I think that's right.
[17]     THE COURT: I think you're right.
[18] BY MR. RICH:
[19] Q. Did you review the portion of Dr. Owen's testimony in which
[20] he described the so-called cream skimming phenomenon?
[21] A. Yes.
[22] Q. Are there responses that you provided just before the
[23] colloquy with his Honor, your in essence response to that in
[24] terms of the dynamics of the marketplace, or is there more that
[25] you want to say or do you have any further reaction to the

Page 1339

[1] cream skimming argument?
[2] A. Well, as I understand Dr. Owen's cream skimming argument
[3] there is two parts to it. One is the part we've been
[4] discussing which is just to say that there are publishers out
[5] there potentially whose intrinsic valuation of their own music
[6] is just higher than others and they're the ones that didn't
[7] sign. The other has to do with transactions costs and the
[8] assertion that somehow DMX systematically went about looking
[9] for those publishers where the transactions costs were the
[10] lowest and that that, in some way, is a sort of second source
[11] of bias, if you will, in the direct licenses relative to the
[12] universe of possible licenses.
[13]     On the transactions cost point, there is no empirical
[14] evidence that that's true. In fact, Mr. Knittel's testimony
[15] about how they chose to decide who to go after is really the
[16] opposite. They went after the ones that they thought were most
[17] valuable to them which would suggest that, if anything, the
[18] bias would be that the fees in the transactions for the most
[19] valuable works would be higher than the others, not lower.
[20]     And, conceptually, I just don't understand why DMX'
[21] transactions costs are relevant at all. If it is true that it
[22] would have been very expensive for DMX to find some particular
[23] publisher, that is not a reason why that publisher would have
[24] necessarily insisted on a higher fee if there were a direct
[25] license signed. So, I just don't see it as relevant.

Page 1340

[1] **Q.** In the front pocket of the binder we have placed a copy of
[2] a demonstrative that was used by Dr. Owen during his direct
[3] examination which is styled errors in using DMX direct licenses
[4] as benchmarks for AFBL.
[5]     Do you have a copy of that in front of you?
[6] **A.** I do.
[7] **Q.** Would you please tick through these quickly to the extent
[8] you have not already addressed them -- and several you have --
[9] and provide the Court with your analysis and response to these,
[10] please?
[11] **A.** So, the first three points are really all just the same
[12] point, they're all saying that the set of direct licenses is
[13] somehow biased because it is not representative of the universe
[14] of potential transactions and that's what we've just been
[15] talking about.
[16]     Points 4 and 5 with regard to the no insurance feature
[17] or no indemnity feature, there is two possible things that one
[18] might mean by that. If what you mean by that is that the
[19] contracts do not provide insurance and indemnity with respect
[20] to the specific works being licensed in those contracts, my
[21] understanding is that that's just false, that the contracts do
[22] in fact contain such provisions.
[23] **Q.** By contracts you are referring to the direct license
[24] agreements?
[25] **A.** The direct license agreements.

Page 1341

[1] **Q.** Yes.
[2] **A.** If what Dr. Owen meant by 4 and 5, which I think is more
[3] plausible, that they don't provide the broader insurance and
[4] indemnity feature that a blanket license provides, my response
[5] to that is, that's correct, they don't. And we are not using
[6] them as a benchmark for that portion of the license. After we
[7] construct the music fee based on the direct license we add an
[8] additional cost to be born by DMX which is explicitly intended
[9] to represent the insurance and indemnity features of the
[10] blanket license.
[11]     So, the fact that the direct licenses don't provide
[12] that is not a criticism of them as a benchmark for the music
[13] fee.
[14] **Q.** And those added costs would come in in the floor fee part
[15] of the analysis?
[16] **A.** That's correct.
[17] **Q.** Please, go on.
[18] **A.** With respect to number 6, my answer would be the second
[19] half of my answer to 4 and 5. There is no issue there with
[20] regard to the wording of the contract, but if what he is saying
[21] is that they don't provide the benefit that a blanket license
[22] provides which is that you have this immediate access for new
[23] works, again, that's why there is a floor fee. That's a
[24] broader benefit of the blanket license. And the floor fee
[25] compensates BMI for the provision of that benefit. It would be

Page 1342

[1] wrong to include that as something that needs to be in the
[2] benchmark for the music fee.
[3]     Now, with respect to the direct license rates being
[4] circular, there is a more complicated issue and I have prepared
[5] a pair of demonstratives to address that point.
[6] **Q.** Would you like to proceed with those at this point?
[7] **A.** Yes, please.
[8] **Q.** Just identify which tabs in the book you are addressing. I
[9] believe you are now referring to tabs 7 and 8.
[10] **A.** Yes. Let's start with tab 7.
[11]     So, this is a chart which is derived from one prepared
[12] by Dr. Owen where he argued that because publishers'
[13] reservation prices, which is what they would think about in
[14] deciding whether or not to sign the direct license, he argued
[15] were determined by 1987 negotiations and that that created a
[16] circularity in the direct licenses. I believe, as a matter of
[17] economics, that rational publishers would not have reservation
[18] prices based on 1987 rates. Their reservation prices would be
[19] based, as I have tried to indicate by adding this extra box, on
[20] the expected payments by BMI in the future in the term to be
[21] covered by the direct license and that they were perfectly
[22] capable of thinking about what that would be, and in fact what
[23] they would think and know is that those rates would be either
[24] reasonable by virtue of negotiation between BMI and DMX or
[25] reasonable by virtue of being set in rate court.

Page 1343

[1]     And so, their reservation prices would be based on
[2] what they think the reasonable rates are likely to be set by
[3] the rate court and so that does not, in some way, infect or
[4] undermine the use of that benchmark with respect to the direct
[5] license.
[6] **Q.** And what point are you making through the illustrative in
[7] tab 8?
[8] **A.** Tab 8 makes a different point which is on some level more
[9] important, which is to say when publishers are thinking about
[10] whether or not to sign a direct license, they're not just
[11] thinking about is this going to give me more or less or the
[12] same money I would get from BMI under the status quo. They're
[13] thinking about the fact that DMX is going to have a blanket
[14] license with carve-out and is going to be deciding which titles
[15] to perform in part based on the direct licenses. And they're
[16] going to want to play in that game. They're going to want to
[17] either increase their plays or possibly avoid a decrease in
[18] their plays as DMX shifts to those titles that are direct
[19] licenses.
[20]     And that's what competition is about, is these owners
[21] of these titles worrying about whether if they hold out for too
[22] high a price they're going to lose out because DMX is going to
[23] perform someone else's music.
[24]     So, you have competition coming directly into play in
[25] setting these rates and therefore much stronger conceptual

[1] basis for believing that this benchmark reflects competitive
[2] market forces than with respect to the traditional benchmarks
[3] of by lateral agreements between BMI or another PRO and users.
[4] **Q.** Just picking up on this point, is there anything distorting
[5] or aberrant in the nature of a licensing program that rewards
[6] those who participate with a greater portion of the business of
[7] the soliciting purchaser?
[8] **A.** No. That's what competition is all about, is people
[9] lowering their price either to try to increase their share or
[10] to prevent their share from falling. And in a competitive
[11] market everybody tries to do that. They may not succeed. They
[12] may lower their prices and still see their share fall but
[13] that's what competition drives them to do.
[14] **Q.** I think you used as the launching point for this last
[15] discussion item 7 on Dr. Owen's list of 10, is that right?
[16] **A.** Yes.
[17] **Q.** Can you complete your analysis of the remaining items on
[18] his list?
[19] **A.** Yes.
[20]     In number 8 I mentioned this already, that Owen had
[21] argued that somehow DMX transactions costs distort the direct
[22] license benchmark and I just don't think that's true because
[23] they have -- the DMX transactions costs have no effect on what
[24] a publisher would be willing to agree to pay for direct
[25] license.

[1]     With respect to 9, I think the bargaining power
[2] between the two parties is complicated. I don't think it is
[3] clear that DMX has more bargaining power. We know, for
[4] example, with respect to Universal, that Universal was able to
[5] go to BMI and get an increase in their payments and that
[6] possibility is always in the background. So, I think on
[7] balance there really is no clear case that one party or the
[8] other has the greater bargaining power in that negotiation.
[9]     And then finally, point 10 I'm not quite sure what
[10] this is about, but it appears to be a reference to DMX'
[11] communications with publishers in which they suggested that by
[12] signing the direct license they, the publisher who signs would
[13] enjoy, perhaps, an increase in the number of plays. As I have
[14] indicated, that's a good thing, not a bad thing. That's
[15] competition at work.
[16] **Q.** I want to ask you, as the last part of this segment,
[17] whether you agree with one of Dr. Owen's apparent premises in
[18] his testimony which is that the adjustable fee blanket license
[19] shouldn't be priced so as to allow it to be overused and
[20] thereby risk too much direct licensing from the standpoint of
[21] the efficiency gains and losses that he identifies.
[22]     Could you comment on that, please?
[23] **A.** Yes.
[24]     I mean, on some level I would agree that it shouldn't
[25] be designed to distort the market in favor of direct licensing,

[1] but if we think about what exactly does that mean, what I would
[2] argue it means is that the structure should be appropriate, you
[3] shouldn't load into the floor fee or the base fee costs that
[4] don't belong there, but I'm not arguing you should take costs
[5] out in order to make the blanket license cheaper. And to the
[6] extent that you are really worried about an inefficient
[7] increase in transactions costs, I would have two responses:
[8] One is markets figure out all the time how much they're willing
[9] to spend on transactions costs to do one thing or another and
[10] what the blanket license with carve-out does is assign that
[11] problem to the market and let the market decide is it going to
[12] be worth it to DMX to pay money to MRI to direct license or
[13] not. They will decide once the appropriate structures are in
[14] place.
[15]     If you really think that transactions costs are a bad
[16] thing and you want to give DMX an incentive to do, in some
[17] sense, as little direct licensing as, you know, can be arranged
[18] consistent with requirements of the consent decree, the
[19] implication of that is that you should set the music fee as
[20] close to $10 as you conclude is reasonable. Because if the fee
[21] in the blanket license is above $10, that creates the incentive
[22] for DMX to direct license more and the larger is the gap
[23] between the music fee in the adjustable blanket license and the
[24] $10 that prevails in the direct license market. The larger
[25] that gap is the more you are going to be encouraging DMX to

[1] direct license.
[2]     So, if you are worried about that for its own sake,
[3] the implication of that is that the reasonable fee should be as
[4] close to $10 as possible.
[5] **Q.** Have you reviewed Dr. Candell's calculation of the rate
[6] implied by these direct licenses for use in this proceeding?
[7] **A.** Yes.
[8] **Q.** And, do you agree with her calculations and analysis?
[9] **A.** I agree with her analysis. I have not gone with my own
[10] calculator to reproduce the arithmetic.
[11] **Q.** Fair enough.
[12] **A.** But the analysis is consistent with the framework I have
[13] articulated.
[14] **Q.** So, we have concluded our direct examination of the music
[15] fee portion of the blanket license. Let's turn to the second
[16] component which you believe should be and can be valued
[17] separately which is the floor fee.
[18] **A.** Okay.
[19] **Q.** How do you think about, as an economist, calculating the
[20] price for --
[21]     **THE COURT:** Before you do that, maybe it would be
[22] useful if you explained one more time why setting the music fee
[23] at $10 is the most competitive measure for me.
[24]     **THE WITNESS:** Sure.
[25]     I mean, I wouldn't exactly say it is the most

Page 1348

[1] competitive. I think that the fair reading of the evidence is
[2] that the competitive market transactions, as we've testified,
[3] are in a range from about $10 to about $19. And if we are
[4] going to try to ask the question what does the competitive
[5] market yield, I believe that any answer in that range is
[6] consistent with that.
[7]     I was making a slightly different point in response to
[8] Dr. Owen. My own view is I don't care what the direct license
[9] ratio ends up being. I actually don't think it matters from an
[10] economic perspective whether in the end DMX licenses 40 percent
[11] of its music, 90 percent of its music, 99 percent of its music.
[12] I think the market should determine that.
[13]     But if you do care, if for some reason, as Dr. Owen
[14] has suggested, because of the transactions costs it would be
[15] better if DMX used relatively less direct licensing and relied
[16] relatively more heavily on the blanket license, if you do care
[17] about that because you think somehow the transactions costs are
[18] a bad thing in and of themselves, then the logical consequence
[19] of that is you should choose the lower end of the range because
[20] the higher you set the -- DMX is sitting there saying should I
[21] go after another direct license or should you pay BMI?
[22] Well, if we set the blanket music fee at $10 what DMX is going
[23] to say·is, well, if I pay for this title that I would like to
[24] have through BMI it costs me $10. If I go out and direct
[25] license it, it is going to cost me $10 so I don't feel any

Page 1349

[1] strong incentive to go out and direct license it.
[2]     If you set the music fee portion of the adjusted
[3] blanket license fee at $19, then DMX is going to be sitting
[4] there saying, okay, on the margin for this title, which I would
[5] kind of like to have or this set of titles which I would kind
[6] of like to have, I could pay through BMI through the adjusted
[7] blanket license, it will cost me $19; or I can go to the direct
[8] license market it is going to cost me $10. DMX is then going
[9] to have more incentive to go on the margin and increase the
[10] extent to which it relied on the market.
[11]     That's the point I was trying to make.
[12] BY MR. RICH:
[13] Q. So we are clear, Professor Jaffe, you are not advocating
[14] minimizing access to the direct license marketplace. This is a
[15] response to the approach adopted by Dr. Owen and its logical
[16] implications as you would think about it?
[17] A. That's correct. I'm agnostic as to whether it is a good
[18] thing to have DMX license a lot of music or less music, as long
[19] as they have the option to do so in a reasonable framework.
[20]     MR. RICH: Your Honor, did you want to continue your
[21] own colloquy or should I move on?
[22]     THE COURT: It comes down to saying that the higher
[23] the music fee component in the BMI license the greater the
[24] incentive to DMX to pursue the direct license.
[25]     THE WITNESS: That's exactly correct.

Page 1350

[1]     THE COURT: Okay.
[2] BY MR. RICH:
[3] Q. Can you walk us through the analytic framework you would
[4] propose for determining an appropriate floor fee? And if it
[5] helps, by reference, back to demonstrative tab 5.
[6] A. Well, it may not be necessary because I think your Honor
[7] actually has already shown you are on top of this, but --
[8]     THE COURT: Don't be deceived.
[9]     THE WITNESS: As I mentioned, the idea of the floor
[10] fee is this is the appropriate compensation to BMI for the
[11] aggregation, convenience, insurance attributes of the blanket
[12] license which are maintained in the adjustable fee blanket
[13] license, it is carried over from the traditional blanket
[14] license.
[15]     Now, in a competitive market, if one could
[16] hypothetically imagine a competitive market for the provision
[17] of that service, we can think of BMI as providing a service to
[18] DMX over and above the individual music performance rights that
[19] are conveyed, BMI is providing a service by aggregating them
[20] together and providing them in this particular form.
[21]     Now, if there were a competitive market for that
[22] service, the price for the service alone, that aggregation
[23] function would be the cost of delivering it because, in
[24] competitive markets, prices are driven by the force of
[25] competition to cost.

Page 1351

[1]     So, the floor fee should be based on an estimate of
[2] BMI's costs for delivering the blanket license function.
[3] Q. And given the data with which you are familiar and with
[4] which the Court has to work with, what is the best way to
[5] measure that here?
[6] A. So, if we put aside for a second the incremental costs that
[7] are sort of the different costs of providing the adjustable
[8] license relative to the traditional product and I will come
[9] back --
[10]     THE COURT: When you use cost in that sense are you
[11] referring to something different from overhead?
[12]     THE WITNESS: I was just going to get to that.
[13]     THE COURT: Oh. I'm sorry.
[14]     THE WITNESS: I was going to say, without the·
[15] incremental costs what we are talking about is basically BMI's
[16] overall costs of its operation which are frequently referred to
[17] as overhead.
[18]     Now, there is no magic, according to economists, way
[19] to charge for overhead. But, a common way of doing it is as a
[20] percentage of the overall fee for the revenue where what you
[21] just do is you take all of your businesses, all of your
[22] services and you calculate the total costs over all of those
[23] and the ratio of those total costs to the total revenues and
[24] you say I'm going to ask every customer to bear that
[25] proportional share of those costs and that's the 11.7 percent,

[1] it is a number from a BMI press release from the summer of
[2] 2008, regarding their costs of administration relative to the
[3] overall revenues in the aggregate that they collected in that
[4] year.

[5]     THE COURT: And the 17 is domestic revenues?

[6]     THE WITNESS: Well, the 17 is a different kind of
[7] number. 17 is an internal allocation mechanism that they use
[8] when they're dividing up the money after it has come in their
[9] door.

[10]     THE COURT: Assuming they did that correctly, then the
[11] difference is between domestic including foreign or not, isn't
[12] it?

[13]     THE WITNESS: If they did follow a strategy of
[14] identifying a particular set of customers and correctly
[15] identifying which costs are attributable to those customers and
[16] taking the ratio of those identified costs to a corresponding
[17] and parallel set of revenues and if that produces 17 percent,
[18] that might be an alternative way of doing it.

[19]     THE COURT: Well, it might, but to decide whether it
[20] did or not, I suppose you would look at the purpose of the
[21] exclusion of other customers refining the group of customers
[22] you examined. How would you analyze that?

[23]     THE WITNESS: Well, as I said at the beginning of my
[24] answer, there is no perfect way to do this. So, you can start
[25] at the top and just say the costs are really complicated and,

[1] you know, they have a general counsel and the general counsel
[2] works on everything and so in some sense it is really hard to
[3] figure out how to take that salary and divide it up into many
[4] things so we take the total cost of total revenue.

[5]     An alternative approach is to say we would like to be
[6] more fine tuned. We would like to identify more specifically
[7] the costs for a particular sector or a particular set of
[8] customers and to do that you need to go through a cost
[9] allocation exercise and you need to really analyze the costs
[10] that are involved, figure out which ones are directly
[11] attributable to the set of customers you are talking about, and
[12] then you are still going to have some costs which really can't
[13] be directly attributed to any customer and would have to be
[14] allocated and you are going to have to have some formula for
[15] doing that.

[16]     And I -- as a matter of economics, that would not be
[17] an unreasonable thing to do. I haven't seen, in the record as
[18] it stands now, a description of how the 17 percent was
[19] calculated that would really show that it is an appropriately
[20] calculated ratio where the things in the numerator really
[21] correspond to the right set of things in the denominator and
[22] the things that have to be allocated because they really can't
[23] be directly attributed to any one set of users, have been dealt
[24] with in some appropriate way.

[25]     THE COURT: So, you conclude that it is better to take

[1] the grander overall figure which is 11 percent, correct, and
[2] say that the competition is extant on both sides, foreign as
[3] well as domestic?

[4]     THE WITNESS: Yes.

[5]     BY MR. RICH:

[6]     Q. Now, you indicated that's the overhead component but also
[7] indicated, as does the illustrative, that one has to give
[8] thought to what you describe as incremental costs, correct?

[9]     A. That's correct.

[10]     Q. Can you provide, with your analytic framework for thinking,
[11] about how one would assess and the degree to which one would
[12] assess any incremental costs?

[13]     A. Yes.

[14]     Q. First define what you mean by incremental cost.

[15]     A. The incremental cost here corresponds to costs that BMI has
[16] to incur in order to deliver and then administer the carve-out
[17] license which are greater than its costs would be if DMX was
[18] just a blanket license customer. That's what I mean by
[19] incremental.

[20]     And my view is, as a matter of economics, that to the
[21] extent those costs really are incremental and appropriately
[22] allocated to DMX, DMX should pay for those costs because
[23] they're in a competitive market, there is an additional service
[24] there being provided which in a competitive market would be
[25] paid for.

[1]     Now, there is two kinds of incremental costs that have
[2] been talked about in the proceeding, one is a sort of setup
[3] cost or a one-time cost for creating the systems necessary to
[4] administer this, and then separately there may be costs that
[5] are ongoing and specific to DMX that have to do specifically
[6] with the DMX license itself. To start with that second group,
[7] I think that's the most straight forward. To the extent there
[8] there are two incremental costs and BMI has proven that those
[9] costs are real and are reasonable, they're not inflated in any
[10] way and are attributable to DMX, DMX should pay those costs.

[11]     With respect to the setup costs, that's a harder
[12] problem because that's an investment which, as Mr. Laughlin
[13] testified, actually both -- most likely will allow BMI to
[14] provide new services to other customers besides DMX. And so,
[15] it would not be appropriate and a competitive market would not
[16] charge DMX that full cost.

[17]     In a competitive market it might be that a seller
[18] would simply absorb those costs itself and simply say that's
[19] the cost of getting into the market, somewhat like the cost
[20] that DMX -- the risk that DMX took when it agreed to pay Sony a
[21] guarantee, which was sort of an investment on getting into
[22] direct licensing and it wasn't sure whether it was going to
[23] necessarily get that back.

[24]     The problem in this case is I don't really know
[25] whether or not or to what extent BMI could be expected, in the

Page 1356

[1] future, to recoup those costs from its licensing activities so
[2] I don't think it is appropriate for me as an expert simply to
[3] say forget about them because they might recoup them. So, I
[4] think it would be appropriate for some portion of those setup
[5] costs to be allocated to DMX and that DMX would be required to
[6] pay a portion of those costs.

[7] **Q.** Have you given any consideration -- you seem to be
[8] suggesting this is getting to the edge of your expertise, but
[9] have you given any thought to how the Court·might reasonably
[10] think about how or what percentage of that, of any allocation
[11] of those upfront costs reasonably could be apportioned to DMX?

[12] **A.** Yes.

[13]     Well, to start with, the cost that has been incurred
[14] as a capital cost so it should be amortized over a number of
[15] years and not charged all in one year. But, if it were spread
[16] out, say, over five years, I think the obvious, if you will
[17] pardon the expression, benchmark for a share of those that
[18] perhaps could be allocated to DMX, would be the fraction of
[19] commercial music service locations which are DMX locations
[20] which is a number something like about 25 percent or so. There
[21] is an exhibit in the record that gives the exact number.

[22]     Now, you could argue that that's too low because it
[23] may well be that not everybody in the commercial music service
[24] business is going to want the adjustable fee license, in which
[25] case DMX' share of those that actually want it would be

Page 1357

[1] somewhat higher than its share of locations.

[2]     But, on the other hand, it is clear that this
[3] investment, the value of this investment is not limited to the
[4] commercial music service. Mr. Laughlin's testimony talked
[5] about this, that they expect that this investment that they've
[6] made, at least a portion of it, would be useful with respect to
[7] other segments, and since the CMS segment is a tiny fraction of
[8] BMI's overall business, that's very likely to be a huge effect
[9] much larger the effect from the fact that not all
[10] commercial music services may use this license.

[11]     So, those two things could be viewed as cancelling
[12] each other out leaving you with a share of locations as a
[13] proxy.

[14]     (Continued on next page)

Page 1358

[1] **BY MR. RICH:**

[2] **Q.** Now, in constructing the fee formula, am I correct that the
[3] totality of the blanket fee in your approach would be to total
[4] up whatever music fee the Court determined to be reasonable
[5] plus whatever floor fee the Court determined to be reasonable,
[6] with the floor fee, if I understand you, based on a
[7] determination of what you discussed as the overhead, the
[8] reasonable overhead percentage of other number of BMI, correct?

[9] **A.** Yes.

[10] **Q.** If the Court were to determine to also award BMI certain
[11] amounts of incremental fees, do those fit inside the formula or
[12] outside the formula?  What is your proposal?

[13] **A.** As long as the music fee component is kept separate,
[14] because that's the part that's subject to carveout, it doesn't
[15] make a huge difference whether you think of it as an addition
[16] to the floor fee or a separate charge which would not be part
[17] of the blanket license fee at all but another line on the bill,
[18] as you will.  It really doesn't matter either way.

[19] **Q.** But mathematically you could get to the same place by
[20] treating any incremental cost as a separately-incurred cost
[21] outside of the formula itself which otherwise drives fee
[22] setting, is that correct?

[23] **A.** That is correct.

[24] **Q.** Now, let's turn to the option value issue.  You're familiar
[25] that BMI and its economist --

Page 1359

[1]     **THE COURT:** If you keep them in a floor fee, rather
[2] than direct -- I'm thinking now of the so-called development
[3] costs.  If you keep them in the floor fee, you amortize them
[4] better as others take carveout licenses than if you just bill
[5] them all to DMX?

[6]     **THE WITNESS:** I guess the point I was making is, if --
[7] let's be concrete.

[8]     **THE COURT:** Yes.

[9]     **THE WITNESS:** If we identify incremental costs of --
[10] let's say for the sake of argument that DMX's share of the
[11] overhead is $50,000 a year, and its share of the -- and there's
[12] also direct costs incurred by BMI for those, for DMX, of
[13] $10,000 a year, so there's $60,000 of incremental costs that
[14] we're talking about.  If you say DMX just gets a bill for
[15] $60,000 each year, they would pay that amount.  If you say I'm
[16] going to take 60,000, divide it by the number of locations and
[17] that works out to some number of dollars --

[18]     **THE COURT:** I wasn't thinking of bill each year.  I
[19] was thinking of those costs, those costs of developing the form
[20] of the license.  With the nice question should you include
[21] litigation costs.  Which seem properly attributable to DMX
[22] itself rather than the population later to use carveout
[23] licenses.  But then that is a finite present lump sum and it
[24] doesn't have to be included in the lease.

[25]     **THE WITNESS:** I see.

Page 1360

THE COURT: It could be sent by bill and leave the lease pure for the other users as well as DMX. That wouldn't be an annual, it would be a count stated in the present.

THE WITNESS: You could do it that way. Because it is a capital cost, it is an investment cost for creating this system, and DMX is going to get the benefits of that over a number of years, it would be a common thing to then spread out DMX's payment for that over a number of years.

THE COURT: That would simply be a deal between you and DMX about a method of payment.

THE WITNESS: Between DMX and BMI. Yes, that's possible, yes.

THE COURT: In any event, it separates whatever that amount is from the machinery of calculating the annual effect on users who are not BMI, but who are getting the benefit of the -- who are not DMX, but who are getting the benefit of DMX's courage in taking the position for the work done in creating the carveout.

THE WITNESS: That's correct.

Q. Let's talk a few minutes about option value. You're familiar with BMI's position as to that in this case, correct?

A. Yes.

Q. Have you given consideration to that position?

A. I have.

Q. Could you provide the Court with your analysis in reaction,

Page 1361

please?

A. So what Dr. Owen's argument is basically the flexibility that the blanket license affords, creates a value for DMX. It makes the license more valuable to DMX. He calls that increasing value option value. It's actually not the way the term option value is used as a term of art in economics, but that's what he calls it.

But the basic point here is just that the new thing is more valuable to the customer than the old thing, and under his formulation they should pay for that.

Now, in a competitive market, if you develop something new, unless you have a monopoly, for example, because you've got a patent or some other way to protect your monopoly on your new thing, if you improve your product, the only extent to which you get to get more money is if the new better widget is more expensive to produce than the old widget, so if there is an increasing cost associated with the better more valuable product, a competitive market will see an increase in the price associated with that cost.

Now, I've already agreed that to the extent that there is an increasing cost from BMI's perspective of differing the adjustable license rather than the traditional one, DMX should pay for that. So that's really not an issue. The issue here is that Dr. Owen would say there's this intrinsic value that has to be captured that may be related to cost, but is a

Page 1362

separate thing, and in competitive markets that just doesn't happen.

Q. Could you give a few examples where it doesn't happen in competitive markets?

A. The most obvious one is computers, where we all know every year computers get faster and they have more memory and better widgets and better pictures and yet they're cheaper year in and year out. They're not more expensive. They're much more valuable to us than they used to be, but we don't pay more for them, we pay less for them. You might say that's a special case because technology and computers is just advancing so rapidly that that's really unique, but it's not. If you think about automobiles, a traditional technology area, today's 2010 Toyota Camry gets better mileage, it's more reliable, it has more air bags, so it's safer, it has all kinds of features that the 2000 didn't have and the 1990 didn't have, and yet other than maybe some basic inflation, the price of cars has not gone up to reflect those improvements. What's happened is that the competition among the car makers forces them every year to try to make their product better than it was before, and that improvement in how good they are is reflected in the price of cars only to the extent that it's costly to produce those improvements. It's not, you don't --car companies don't get to capture just the fact that consumers value the car more. And this isn't some matter sort of theoretical perfect competition,

Page 1363

we're talking about the auto industry where there's maybe a dozen companies worldwide. So this is not a perfectly competitive textbook market. This is a market with, you know, a relatively small number of big companies, but nonetheless they're competing with each other and that competition forces them every year to deliver more value to their customers without charging for it.

THE COURT: And here you're taking the product as the form of license?

THE WITNESS: Mm-hmm. That's correct.

THE COURT: We started with the product being music.

THE WITNESS: Right, but Owen's argument about option value is not about just the music portion of it, it's about the whole package of the blanket license as a product. That's his concept.

THE COURT: Is that a valid concept or does it blur two separate costs that should be treated separately?

THE WITNESS: I think for some purposes it's okay to recognize that in the traditional setting these two things are combined into one product. In sort of the language of economists they're bundled into one product, and it's not wrong in some sense to think about that bundled product for some purposes. My point is not really criticizing him for thinking about that bundled product, it's for the very premise of the option value being something that would be captured by the

Page 1364

[1] seller in a competitive market.

[2] In a monopoly market, you got a patent, you get to
[3] exclude others. Yes, if you create a better mouse trap you can
[4] charge whatever the market will bear because you're a
[5] monopolist and people will pay and they'll pay what the thing
[6] is worth to them. But if we agree that the benchmark is a
[7] reasonable price, a competitive market price, then you're going
[8] to get more for your better mouse trap only to the extent that
[9] it's more expensive to manufacture.

[10] Now, Dr. Owen gave us a couple examples.

[11] **Q.** Yes, I was going to ask you. The a la carte menu?

[12] **A.** Subway tokens and a la carte menus versus fixed price
[13] menus. I think those examples are not about option value.
[14] Those examples are about a straightforward volume discount.
[15] There are many things which if you buy in large volume you pay
[16] less per unit than if you buy in small volume. Whether it's
[17] the 25-pound sack of flour not costing five times as much as a
[18] 5-pound sack of flour or the monthly subway pass being cheaper
[19] per ride than the individual subway tokens. But that's not
[20] what's at issue here. DMX is not proposing under the flexible
[21] blanket license, the adjustable blanket license, it's not
[22] proposing to perform less music. It's going to perform the
[23] same amount of music either way. It's just going to get the
[24] rights for some of it by a different mechanism. That's not the
[25] same as buying less music, and so I don't think that his

Page 1365

[1] examples really go to the point of option value at all.

[2] **Q.** So just to close out this point, you are separating out the
[3] intrinsic value notion and how it ought to be captured and the
[4] extent to which it's properly captured by BMI from any
[5] legitimate costs which may be incurred by BMI associated with
[6] the offer of the license, correct?

[7] **A.** That's right. And I think those costs are the only issue.
[8] To recognize the relevance of those costs, you don't need the
[9] concept of option value. Those costs are there, and both sides
[10] agree that they should be dealt with. So the issue of the
[11] option value is either a red herring or it's an inappropriate
[12] increase in the value of the license.

[13] **THE COURT:** I hate arguing that analogy. I think it's
[14] so slippery. But since you've opened it up, how do you know
[15] that the a la carte ordering is more expensive? Because fewer
[16] items on it will be sold, and thus the fixed price gets a
[17] volume discount?

[18] **THE WITNESS:** I guess I'm presuming --

[19] **THE COURT:** Or is that not the thing that you look
[20] for?

[21] **THE WITNESS:** Well, I mean, I think it's a problematic
[22] analogy in a number of ways.

[23] **THE COURT:** Terrible.

[24] **THE WITNESS:** Because I think there's a lot of reasons
[25] why --

Page 1366

[1] **THE COURT:** Like all analogies, it's destructive and
[2] evil.

[3] **THE WITNESS:** I think there's a lot of reasons
[4] restaurants use prix fixe menus that have to do with price
[5] discrimination and marketing and all kinds of things that have
[6] nothing to do with what we're talking about. But if you take
[7] it at its face value, as presented by Dr. Owen, I'm was
[8] assuming, and you're right, I don't really know this, but I'm
[9] assuming on average that people that order a la carte don't
[10] order as many portions as in the fixed price menu. I don't
[11] really know that's true, but that's my assumption.

[12] I think there's other reasons why the analogy isn't
[13] really apt, but I was just trying to deal with it on its own
[14] terms.

[15] **Q.** Are you familiar with Dr. Owen ascribing some option value
[16] to the television per-program license?

[17] **A.** Yes.

[18] **Q.** Is that a license you have some familiarity with?

[19] **A.** Yes, it is.

[20] **Q.** How do you -- do you agree with his analysis?

[21] **THE COURT:** Wait a minute. If that distinction about
[22] they order fewer items too unsupportable to be reliable,
[23] then are you left with his conclusion that the difference is
[24] because of the value of being able to choose?

[25] **THE WITNESS:** I don't think so. I think actually what

Page 1367

[1] prix fixe versus a la carte has to do with is something that
[2] neither of us have talked about yet. It has to do with the
[3] fact that restaurants are in the business of marketing their
[4] restaurant and what they'd like to do is they'd like to charge
[5] a lot of money to people who don't really care how much the
[6] final bill is, while keeping their prices lower for people who
[7] are most sensitive to the bill. They would like to be able to
[8] do that. But they don't actually know which customers are
[9] which, so they can't, like, look at me and hand me the
[10] cheapskate menu and give you the spendthrift menu, because they
[11] don't know who is who. So what they do is put these two
[12] different things on the menu, suspecting that in many cases the
[13] cheapskates like me will go for the prix fixe.

[14] **THE COURT:** It's simply an optimal pricing technique?

[15] **THE WITNESS:** That's right. It really has nothing to
[16] do with the kinds of issues that are at issue here at all.

[17] **Q.** Turning to the per-program license, how do you respond to
[18] Dr. Owen's citation to the per-program pricing practices as
[19] evidence of option value?

[20] **A.** Basically, he has it backwards. The per-program license
[21] mechanism was designed by Judge Dolinger to avoid any
[22] difference in either direction, positive or negative, between
[23] the basic price of the per-program license and the blanket
[24] license.

[25] **Q.** Can you explain a little bit more about that analysis,

[1] please?

[2] **A.** So what's important about the per-program license is that
[3] it is not a carveout license. It is a per-program license.
[4] There is a separate fee for each program and the way it works
[5] is you pay that fee if the program has any music and you pay
[6] nothing if the program has no music. And so what Judge
[7] Dolinger realized when he was first setting up this formula is
[8] that if you took the blanket fee and just distributed it over
[9] the programs and then said that's the per-program fee, that
[10] there would be a windfall for the television stations.

[11] Think about a really simple example, where you got a
[12] television station that only has three programs. And suppose
[13] the blanket fee is $12. So if you allocated it equally to each
[14] program, you'd say each program costs $4 and if the station
[15] clears any one of those programs it saves $4. It pays $4 for
[16] each program that ends up having in the original case ASCAP
[17] music, in this case it would be BMI music.

[18] Now, just because of the random fluctuations of how
[19] songs appear in programs, there were programs that at the
[20] beginning just didn't have any ASCAP music, just by accident.
[21] So if I go back to my station with three programs, if it just
[22] turned out that one of the three from the beginning had no
[23] ASCAP music, and we set the fee at $4 per program trying to
[24] reproduce the 12, what would happen is the station from day one
[25] would say, oh, this is great, I'm going to pay $8, I don't have

[1] to do anything. I don't have to get any additional rights
[2] because that first program has no ASCAP music in it anyway,
[3] I'll pay $8 rather than $12, go for program, save $4 when I
[4] haven't actually put in music.

[5] So what Judge Dolinger said is that's not right. We
[6] should increase the fee. We should say it's $6 per-program or
[7] it would have been 18 if you had to pay on all three, but of
[8] course you won't pay on the one that has no music, you'll pay
[9] $6 each on the two programs that do have music, you'll pay the
[10] same $12 in the per-program license as you would have paid
[11] under the blanket license, you would only get a reduction if
[12] you go below that and get rid of the music from one of those
[13] programs.

[14] So Dolinger calculated a multiplier which was intended
[15] on average to reflect that phenomenon so that collectively --
[16] and this was a collective license setting where the stations as
[17] a whole were negotiating in rate court with ASCAP on average
[18] over all the stations, the multiplier was precisely calculated
[19] to keep the blanket fee and the total per-program fee if no
[20] music was cleared at the same level with the exception of an
[21] administration fee which was added which corresponds to the
[22] whole discussion we've had about floor fee and costs. So I
[23] agree, to the extent there's incremental costs, they should be
[24] paid for, but there's nothing about option value in the
[25] per-program license.

[1] Now, over time, that multiplier has been adjusted.
[2] It's not still at the level that was set by Judge Dolinger.
[3] Those adjustments have been based in part, I mean, they're in
[4] part negotiated, but they're in part based on data collected by
[5] both sides that shows that this ratio, this fraction of
[6] programs that just happen to have no ASCAP music has changed
[7] over time. So they've adjusted the multiplier to reflect the
[8] data, but there has never at any point been in the per-program
[9] structure an option value, an attempt to make the per-program
[10] license more expensive than the blanket license on a
[11] no-behavior-change basis.

[12] **Q.** I'd like to conclude the direct examination with a few
[13] questions concerning BMI's proposed benchmark in this case.
[14] Are you familiar with the proposed commercial music service
[15] benchmark that BMI has put forward?

[16] **A.** Yes.

[17] **Q.** Have you identified any problems with that approach to rate
[18] setting, and if so, would you please tell us what you have
[19] discerned?

[20] **A.** Yes. The fundamental problem with that is that the
[21] benchmark that is being put forward is basically inapplicable
[22] to DMX, and you have to go through a sort of convoluted sort of
[23] thinking about it in order to get to that point. So this is an
[24] exhibit that just gives two examples of two of the commercial
[25] music services.

[1] **MR. RICH:** Tab 10 in the binder, your Honor.

[2] **A.** Right, tab 10, and on the screen. Two services, Q Music
[3] USA, Carolina Georgia Sound, which are similar in the number of
[4] locations that they have, which under the benchmark put forward
[5] by BMI pay very different per-location rates. And that
[6] peculiar fact, basically what it shows is that the benchmark
[7] that BMI has put forward is really not appropriate as a
[8] benchmark for a fixed per-location license, which is what we're
[9] trying to price in this case.

[10] It would be as if, by analogy, suppose I -- I know you
[11] don't like analogies, but I'll try one anyway.

[12] **THE COURT:** I don't like them because they scare me.

[13] **A.** I'm going to try one anyway. Suppose I developed a new
[14] software program and I'm trying to sell this software program
[15] to the companies of America. So I'm going to charge them some
[16] amount of money for using my new program. Now, I could just
[17] set a flat fee. I could just say, you know, it's a thousand
[18] dollars a year and you can use it as much as you want, but I
[19] might not want to do that because I might want to try to figure
[20] out and the market would generally support that larger
[21] companies would pay more because they're going to have more
[22] computers and more people using this program than smaller
[23] companies. So what I could do is I could say instead of a flat
[24] fee, you can pay per computer on which the program is
[25] installed, and I could for the sake of the analogy say it's

Page 1372

[1] going to cost you $36.36 for each computer that you put my
[2] program on. And that might be a sensible way of doing things.
[3] On the other hand, it's common in competitive markets
[4] for the largest buyers -- we were talking about volume
[5] discounts earlier -- for the largest buyers to get a discount
[6] per unit. The largest buyers pay more than the smaller buyers,
[7] but not proportionally. So I could license my software by
[8] saying, okay, you got a thousand computers, it's 36 -- sorry,
[9] yes, it's $36.36 per computer, but if you've got a million
[10] computers, it's going to be $24 per computer, something like
[11] that. And that would be something that you might well see in a
[12] competitive market.
[13] What you wouldn't see in a competitive market is for
[14] me to go out and say, okay, what you pay per computer depends
[15] not on how many computers you have, but what it depends on is
[16] how many computers you have today compared to how many
[17] computers you happen to have had in 2004. And I don't care if
[18] you've grown or shrunk, I don't care if you've grown or shrunk
[19] before or after you sign the license, you pay more if you
[20] happen to have fewer computers today than you had in 2004, and
[21] you pay less if you happen to have more computers than you had
[22] in 2004. You'd never see that in the competitive market.
[23] We've gotten that here because BMI took a deal which
[24] it originally made with Muzak which had this organic growth
[25] provision for reasons that made sense at the time, I have to

Page 1373

[1] presume, to both BMI and Muzak, and then they took that deal
[2] and because of what I think is really a crazy interpretation of
[3] non-discrimination, they sort of mechanically applied it to a
[4] bunch of other people with this same 2004 benchmark,
[5] irrespective of the size of those companies, what had happened
[6] to them since 2004, and some of them said this doesn't make
[7] sense to us, because we're actually, we've already got fewer
[8] locations than we had in 2004, they really were not -- they
[9] were told, well, you can go to rate court if you don't like it,
[10] but many of them were small enough that that wasn't a practical
[11] alternative.
[12] So the fundamental problem we have is this is really
[13] kind of a very confusing benchmark that really doesn't directly
[14] apply to DMX. It's not, by its very nature, it is not a
[15] per-location benchmark. It's a very stylized, flat fee with a
[16] particular kind of adjustment for growth that was chosen by BMI
[17] and Muzak, but really doesn't make sense in any other context.
[18] So I think the fundamental problem with the Muzak
[19] benchmark or the CMS industry benchmark is that you have to go
[20] through hoops to apply it to DMX, and that's quite problematic.
[21] THE COURT: I think you said at the beginning and if
[22] you didn't, I simply misheard it, but I want to be sure what
[23] you intended. I thought you said BMI's benchmark has nothing
[24] to do with BMI? You certainly must mean it has nothing to do
[25] with DMX.

Page 1374

[1] THE WITNESS: If I said that, that was certainly my
[2] misspeaking. It has nothing to do with DMX.
[3] THE COURT: You may not have said it.
[4] Q. Dr. Jaffe, assuming notwithstanding that critique you
[5] provided, consideration were to be given by this Court to one
[6] or more CMS industry agreements, is it your view that any
[7] adjustments to those facial agreements would be appropriate on
[8] the record as you understand it?
[9] A. Yes.
[10] Q. Could you please describe your opinions on that?
[11] THE COURT: Let me first just interrupt before you get
[12] to that. I'm always a little bit behind you, because I take
[13] notes.
[14] MR. RICH: Please. We're only, your Honor, we're two
[15] questions from the end, so I'm in no rush.
[16] THE COURT: Well, I don't allow jurors to take notes
[17] because they slow down your comprehension, you miss something.
[18] That's what happens to me.
[19] I think that the comparison, the use of the
[20] per-location factor in this case started with its utility in
[21] showing that the concept that a per-location price might come
[22] down as low as $25 was acceptable to BMI as illustrated in the
[23] fact that it was a possibility under a license agreement
[24] because of the machinery of that license agreement.
[25] THE WITNESS: Yes.

Page 1375

[1] THE COURT: And it may be that trying to apply it to
[2] DMX any further than that is analytically wrong. But it was, I
[3] think, used for and to some extent accepted by me in the
[4] interim fee setting for that purpose.
[5] THE WITNESS: Mm-hmm.
[6] THE COURT: Is it not valid for that purpose?
[7] THE WITNESS: Well, I think you could make the
[8] argument that because the industry benchmark for some users
[9] goes as low as about $25, 24 and change, that that's the
[10] appropriate inference to draw from that benchmark. I think
[11] that is one way of dealing with this confusion that's created
[12] by the fact that the underlying benchmark is not really per
[13] location. I think that's right. Now, there are some other
[14] issues with Muzak that I may get to in a second which are
[15] conceptually separate, but I think with respect to this
[16] specific issue that I've been talking about, the fact that the
[17] benchmark is very hard to interpret on a per-location basis,
[18] essentially what the industry benchmark does is give us rates
[19] that range from $25 to as we've seen here $400. If what you
[20] want to take from that is, well, okay, that means that the $24
[21] number is reasonable, I think that's one way of dealing with
[22] that confusion.
[23] THE COURT: I don't know whether BMI would have the
[24] heart to say that the $400 one is therefore equally reasonable.
[25] THE WITNESS: I won't speak to that.

Page 1376

[1]     THE COURT: But your point is that it shouldn't be
[2] carried over to the carveout sought by DMX. Does that mean,
[3] and I don't think it's unreasonable in this case at all, that
[4] the license agreement with the carveout should or should not be
[5] required to contain the 8 percent growth factor?
[6]     THE WITNESS: I think it should not be required to
[7] contain it.
[8]     THE COURT: Nobody has suggested that it should, but
[9] looking at the situation, of course it occurs.
[10]     THE WITNESS: My view is, you could start from the
[11] question should the license be a flat fee, X million dollars
[12] per year, or should it be per location. I think the market
[13] through the direct license agreements has shown that there is a
[14] market for a per-location license. So that is compelling to me
[15] as a structure. Then the question is, if you want to find --
[16] you want to think about the CMS industry agreements with BMI as
[17] somehow telling you what a per-location rate would be, what I'm
[18] saying is that's actually quite hard to do, because that's not
[19] how they're structured. They're structured as a fixed fee,
[20] which is based on a sort of arbitrary number of locations, the
[21] number of locations the firm happened to have had in 2004
[22] combined with this growth factor. And my view is that that
[23] idiosyncratic structure was chosen by Muzak and BMI for
[24] whatever reasons they chose it for in their negotiations, but
[25] there's nothing intrinsically superior about that structure.

Page 1377

[1]     THE COURT: As a benchmark.
[2]     THE WITNESS: As benchmark and it makes it very
[3] difficult to translate, to try to say, okay, we're not going to
[4] use that same structure, we're going to use a different
[5] structure, but we're going to try to infer from the licenses
[6] under that other structure the appropriate fee in our fixed
[7] per-location structure. I'm not saying that's completely
[8] impossible, but it's a very hard thing to do. It's inherently
[9] quite confusing.
[10]     Now, you've struggled with that, and one way to do it
[11] would be to say, well, it is very confusing and there's this
[12] range, but BMI has in effect accepted that $24 and change is
[13] within the range of reasonable, and so we'll use that. That
[14] would be one way of dealing with this confusion. It doesn't
[15] really -- you're just, you're picking one way to deal with what
[16] is intrinsically a very difficult benchmark to apply in this
[17] case.
[18]     THE COURT: Well, logically, you could say that the
[19] DMX 500 transaction at $25 benchmark is independently a better
[20] benchmark and the outcome of it has been accepted as a tacit
[21] possibility in an entirely different setting by BMI.
[22]     THE WITNESS: I think you could say that, yes.
[23]     THE COURT: Well, I think I did say, or something very
[24] much like it. It's pretty much what I intended to say in the
[25] interim fee. The question is, is it right.

Page 1378

[1]     THE WITNESS: The DMX direct license $25 fee is a fee
[2] for ASCAP, BMI and SESAC. So that fee, if it's going to be
[3] thought about as a benchmark for this case, is what corresponds
[4] to the $10, the BMI 40 percent of 25, and I've argued that that
[5] is in fact a reasonable benchmark.
[6]     THE COURT: Ten.
[7]     THE WITNESS: Correct.
[8]     THE COURT: You do. Okay. Back to Muzak.
[9]     MR. RICH: Thank you very much.
[10] Q. Ten on the low end and 19 and change on the high end.
[11] A. Right. And the 19 and change comes in to factoring a
[12] larger value on the Sony agreement on the assumption that they
[13] won't really have enough performances for it to work
[14] out to the $10. That's how you get the 19.
[15] Q. Now, are there adjustments that you believe would
[16] appropriately need to be made to one or more of the CMS license
[17] agreements if they were used as a window into finding
[18] appropriate benchmarks here?
[19] A. Yes.
[20] Q. Can you discuss your conclusions as to that?
[21] A. So the first is an adjustment for this complicated
[22] difference in structure. Now, in Dr. Candell's report, based
[23] on my instructions, she actually was more conservative than
[24] your Honor has suggested. She actually didn't say because some
[25] people under that structure are paying as low as $24, that the

Page 1379

[1] appropriate Muzak benchmark if you were to use it here was that
[2] low. She simply took a more conservative approach and did a
[3] calculational adjustment based on what the Muzak agreement
[4] could have worked out to on a per-location basis, averaged over
[5] the whole period. So recognizing that they might have gotten
[6] to the $24 figure by the end of the period, but they would have
[7] paid at a higher rate in the earlier years. So her calculation
[8] is more conservative than adjusting all the way down from 36 to
[9] 24 and change, but at least some kind of adjustment for that
[10] peculiar interaction of the 2004 date and the growth factor I
[11] do believe is necessary. But, unfortunately, that's only the
[12] first of several adjustments that are necessary.
[13] Q. What other adjustments are necessary?
[14] A. So a second adjustment, which is completely independent of
[15] that, which if, for example, you were to conclude just based on
[16] the structure of the agreement that the 24 and change was the
[17] right number, I would argue you still need to make an
[18] adjustment for the fact that Muzak uses BMI music, Muzak uses
[19] BMI music more than DMX does, and so it's typical in rate court
[20] contexts where you have a clear difference between the
[21] benchmark music use and the music use in consideration in the
[22] rate case to make an adjustment for that.
[23] Q. And I take it you have nothing -- do you have anything to
[24] add to Dr. Candell's analysis as to how that adjustment should
[25] properly be made?

[1] **A.** No, she has done that appropriately based on the BMI
[2] distribution information.
[3] **Q.** Are you aware that BMI has taken the position that since
[4] the parties did not explicitly, the parties to the Muzak
[5] agreement did not explicitly place any value on the
[6] simultaneously resolved past period, no further adjustments are
[7] necessary? Are you familiar with that?
[8] **A.** I am.
[9] **Q.** Do you agree with that?
[10] **A.** No.
[11] **Q.** Why?
[12] **A.** I think economically it makes no sense. First of all, it
[13] has the implication if no adjustment was agreed to be necessary
[14] for the prior period and the $36.16 is the right rate for the
[15] 2004 period going forward, it has the implication that for some
[16] mysterious reason the value of BMI performances on Muzak went
[17] from $12 in 2003 to $36 in 2004, and that is just not
[18] economically plausible. What's much more likely is that
[19] implicitly the value in 2003 was considerably more than $12 and
[20] the value in 2004 was considerably less than $36. So for
[21] starters it just doesn't make economic sense.
[22]     More fundamentally, when a deal is made, the parties
[23] to a deal think about all of the attributes of that deal, and
[24] the argument that Dr. Owen and BMI are making about the
[25] separation of these two things is, and I'm going to tremble a

[1] little here, I'm going say it's analogous to if I were thinking
[2] about a house and a developer is trying to sell me a house,
[3] it's a four-bedroom house on a quarter-acre lot and the
[4] developer says this house is worth a million dollars. So I'm
[5] not sure it's worth a million dollars, so I hire a real estate
[6] appraiser and I say tell me what you think would be a
[7] reasonable price to pay for this four-bedroom house on a
[8] quarter-acre lot, and the real estate appraiser goes and finds
[9] that that same developer sold a house a few blocks away,
[10] four-bedroom house on a two-acre lot and sold it for a million
[11] dollars and in the purchase and sale agreement it says the
[12] parties to this agreement agree that this million dollars is
[13] just for the house, that none of this million dollars is for
[14] the land. I don't think my real estate appraiser would come
[15] back to me and say, yeah, you should pay a million dollars for
[16] that four-bedroom house on a quarter-acre lot because land
[17] isn't worth anything, they said the land wasn't worth anything,
[18] the house is worth a million dollars, you should buy it. I
[19] think no real estate appraiser would take that approach, and
[20] that's essentially what Dr. Owen and BMI is suggesting to us.
[21] That because the parties -- with the incentives that BMI had to
[22] state the going-forward rate as high as possible precisely
[23] because it would be a precedent and a benchmark, that because
[24] the parties said there was no value associated with settling
[25] the previous period we should take that at face value and

[1] assign all the money that changed hands to the 2004 period
[2] going forward.
[3] **Q.** As my final question, could you please summarize the
[4] combined effects of the analysis you put structurally, and the
[5] implementation of that mathematically by Dr. Candell into the
[6] range of possible reasonable fee outcomes here if the Court
[7] were to adopt either the direct license benchmark or the CMS
[8] industry benchmark adjusted in the fashion that you two
[9] economists recommend?
[10] **A.** So as we've been discussing, the direct license benchmark
[11] corresponds to a range, if you add together the music fee and
[12] the floor fee, a range of $11 and change to $19 and change.
[13] Dr. Candell's adjustment of the music fee, which includes three
[14] things; it includes a conservative adjustment for the
[15] difficulty of converting the Muzak structure to the DMX
[16] structure, it includes a music use adjustment and it includes
[17] an adjustment for the prior period, results in a rate of about
[18] $22.
[19]     **MR. RICH:** Your Honor, that concludes my direct
[20] examination.
[21]     **THE COURT:** Okay. We'll take the mid-morning recess.
[22] (Recess)
[23] (Continued next page)
[24]
[25]

[1]     **THE COURT:** All right, Mr. Salzman.
[2]     **MR. SALZMAN:** Thank you, your Honor.
[3] **CROSS EXAMINATION**
[4] **BY MR. SALZMAN:**
[5] **Q.** Good afternoon, Dr. Jaffe.
[6] **A.** Good afternoon, Mr. Salzman.
[7] **Q.** First, let's begin by briefly reviewing the things we seem
[8] to have in common about the fee and what is reasonable.
[9]     You agree with BMI that there should be a base fee
[10] paid regardless of how much or how little licensing is actually
[11] done, right?
[12] **A.** Correct.
[13] **Q.** And you agree that the base fee should be based on a proper
[14] measure of BMI's costs, correct?
[15] **A.** Yes.
[16] **Q.** So that in this case you are not challenging, in any way,
[17] the actual incurrence of BMI's ordinary overhead, right?
[18] **A.** I'm not challenging -- I'm not challenging that they incur
[19] overhead.
[20] **Q.** And that it should be your proposal, like BMI's, to
[21] allocate it based on a percentage of the license fee?
[22] **A.** That's correct.
[23] **Q.** And you agree that the mechanism for crediting in this case
[24] should at least be a portion of how much the BMI used music is
[25] directly licensed compared to all BMI music being used?

Page 1384

[1] **A.** That's correct.

[2] **Q.** And you also agree, we heard today, I think, that DMX

[3] should pay its share of incremental costs because the

[4] adjustable fee blanket license does require additional expenses

[5] on BMI's part, right?

[6] **A.** Yes.

[7] **Q.** And you have no view as to whether BMI has or has not

[8] demonstrated what those costs are here, right?

[9] **A.** That's correct.

[10] **Q.** And I think it was your testimony this morning that that

[11] would be both setup costs and ongoing costs, right?

[12] **A.** Yes.

[13] **Q.** And as to ongoing costs, those attributable to DMX should

[14] be paid, right?

[15] **A.** Those that can be shown to be reasonable should be paid by

[16] DMX.

[17] **Q.** And for setup costs you were proposing an amortized

[18] allocation based on DMX' locations relative to the rest of the

[19] industry, right?

[20] **A.** That's correct.

[21] **Q.** And in doing that you acknowledge that that idea was based,

[22] in part, on the assumption that all the other CMS licensees

[23] would choose this license, right?

[24] **A.** I don't think that's what I said.

[25] **Q.** Well, you said that that was one factor leading you to that

Page 1385

[1] conclusion, right?

[2] **A.** I said that that was a crude guideline and that there was a

[3] reason why it might be too low and a reason why it might be too

[4] high and that I don't actually know how those reasons cancel

[5] out.

[6] **Q.** Or when they cancel out?

[7] **A.** Correct.

[8] **Q.** Just so we are clear, it is not your view that BMI should

[9] simply stop offering traditional blanket licenses, right?

[10] **A.** That is correct.

[11] **Q.** And you believe that if the two different forms of license

[12] are appropriately priced, music users will choose whether to

[13] take a traditional blanket license or carve-out blanket license

[14] based on their own view of what will save them money, right?

[15] **A.** I would say based on their own view of what's best for

[16] them, all things considered.

[17] **Q.** You wouldn't want a situation where a licensee chose the

[18] adjustable fee blanket license, the carve-out license, simply

[19] because it had this additional carve-out feature can cost them

[20] no more than taking a traditional blanket license, right?

[21] **A.** I don't understand the question.

[22] **Q.** Sure.

[23]     The traditional blanket license has advantages that

[24] the adjustable fee blanket license does not, correct?

[25] **A.** For some users it might.

Page 1386

[1] **Q.** For example, if a restaurant had no intention of directly

[2] licensing any music and simply wanted a blanket license for its

[3] use of music, there is no reason why it ought to take an

[4] adjustable fee blanket license, right?

[5] **A.** I agree.

[6] **Q.** And that would be true for a television station equally,

[7] right?

[8] **A.** Yes.

[9] **Q.** And similarly for a commercial music service that had no

[10] intention of directly licensing?

[11] **A.** That's correct.

[12] **Q.** And you wouldn't want a situation, would you, as an

[13] economist, where music users chose the adjustable fee blanket

[14] license in preference to the traditional blanket license simply

[15] because they cost the same amount and so why not take this

[16] option, which I might or might not ever use, right?

[17] **A.** I guess I don't understand that question.

[18]     The users are going to choose what's best for them and

[19] as long as both are offered, I frankly don't care what they do.

[20] **Q.** But if they're both priced at the same number, there is no

[21] reason why a rational music user would choose the traditional

[22] blanket license, right?

[23] **A.** I don't know.

[24] **Q.** Well, if this feature of being able to take credits for

[25] direct licensing were thrown in and there was no additional

Page 1387

[1] cost for it, why wouldn't any music user simply choose that

[2] license because it was, cost as much with that feature as

[3] without it?

[4] **A.** So, you are saying if contrary to my testimony there was no

[5] incremental cost aspect to the license and therefore there was

[6] no additional cost to the adjustable license, might

[7] hypothetically someone choose the adjustable license with no

[8] intention of actually direct licensing anything?  Is that the

[9] question?

[10] **Q.** No.

[11] **A.** Okay.

[12] **Q.** But we will explore this a little bit more.

[13]     Are you saying that the starting place, the full fee

[14] under your license proposal, is greater than or equal to the

[15] traditional blanket license benchmark, whatever that is?

[16] **A.** Assuming the Court determines that there are incremental

[17] costs that it is appropriate, to add the cost of the adjustable

[18] license is going to be greater than the cost of traditional

[19] license if no music is directly licensed.

[20] **Q.** And that's not just because it is in the base but because

[21] the full fee rises above the blanket license benchmark, right?

[22] **A.** I don't really understand the question.

[23]     The music fee is what it is.  It doesn't change.  Then

[24] there is a floor fee and the floor fee that corresponds to BMI

[25] overhead.  Plus, the music fee is equal to the blanket fee.

**A-591**

Page 1388

[1] And then there is an additional charge for incremental costs
[2] under my proposal, assuming those costs are determined by the
[3] Court to be real.
[4] **Q.** Just so we are clear on that, let's draw a picture.
[5] **MR. RICH:** Your Honor, may I come closer?
[6] **THE COURT:** Yes.
[7] **BY MR. SALZMAN:**
[8] **Q.** So, suppose the traditional blanket license for a given
[9] user, instead of $36.36 here, let's say is $100, okay?
[10] **A.** Okay.
[11] **Q.** And you will accept my hypothesis that of this, $17 goes to
[12] overhead and $83 goes to the composers and publishers. Okay?
[13] **A.** Okay.
[14] **Q.** Under the adjustable fee blanket license let's see where we
[15] are at. We have also $17 in ordinary overhead and we have,
[16] accept my hypothesis, $5 in incremental costs?
[17] **A.** Okay.
[18] **Q.** Okay. Do they go over here or do they go up here?
[19] **A.** Well, I actually put them down below, but either way they
[20] are not part of the $100. They are separate and they are
[21] additional and incremental to the $100 that you would still
[22] have in my language $83 for the music fee.
[23] **Q.** Okay. That's what I wanted to see if that's right.
[24] $83 would still go to the music fee and if the costs
[25] were, let's say $5 you put them, you say, you prefer them below

Page 1389

[1] here but they could equally go up here, right?
[2] **A.** They could, yes.
[3] **Q.** And under your proposal they are not part of the crediting
[4] mechanism, right?
[5] **A.** That is correct.
[6] **Q.** So, you do agree with BMI to the extent that if $36.36 were
[7] the right benchmark, the adjustable fee blanket license does
[8] start at a place where the music user, DMX, does pay more for
[9] the adjustable fee blanket license than for the traditional
[10] blanket license, correct?
[11] **A.** Yes.
[12] **Q.** Okay. Thank you.
[13] **THE COURT:** But he does that because of the
[14] incremental costs.
[15] **MR. SALZMAN:** Right.
[16] **THE COURT:** Not because of some intrinsic value of
[17] having the extra option.
[18] **MR. SALZMAN:** That's the hypothesis.
[19] **THE COURT:** That is his hypothesis.
[20] **MR. SALZMAN:** That it is cost-based rather than
[21] value-based.
[22] **THE COURT:** Right?
[23] **THE WITNESS:** That's correct.
[24] **BY MR. SALZMAN:**
[25] **Q.** I have a few more questions just on your basic approach to

Page 1390

[1] the task here.
[2] You would agree with me, would you not, that
[3] copyrights, by definition, are not fungible goods, right?
[4] **A.** Yes.
[5] **Q.** And the price of a copyright license cannot equal its cost,
[6] right?
[7] **A.** It could equal its cost but I would certainly not assert
[8] that it ought to or that it would necessarily in a competitive
[9] market.
[10] **Q.** And as I understand your approach, you were not seeking, in
[11] your analysis, to find the fair market value of the blanket
[12] license as a whole, the actual license being requested, right?
[13] **A.** There is two parts to that question. There is fair market
[14] value and what does that mean, and then there is the question
[15] about the license as a whole. Which part were you focusing on?
[16] **Q.** Well, if you want me to break it down I will.
[17] **A.** I don't use fair market value so I wasn't trying to find
[18] the fair market value of anything.
[19] **Q.** You told us at your deposition, I believe, that the willing
[20] buyer/willing seller test for determining the reasonable price
[21] here was a vacuous test, right?
[22] **A.** Yes.
[23] **Q.** And you did that knowing that that's exactly the phrase
[24] that has been used by the Courts in the past to describe what a
[25] reasonable fee is supposed to mean under the consent decree,

Page 1391

[1] right?
[2] **A.** It is a phrase that has been used by courts, yes.
[3] **Q.** And you didn't go about looking for what a willing buyer
[4] would pay for an adjustable fee blanket license, correct?
[5] **A.** Well, the set of transactions or benchmarks that meet the
[6] willing buyer test is, includes the set which are competitive
[7] market transactions. So, my benchmark is a willing
[8] buyer/willing seller benchmark, it is just that's like saying
[9] my benchmark comes from agreements written on paper. Saying
[10] that a benchmark should be from an agreement written on paper
[11] may be true, it describes all the benchmarks anyone has ever
[12] used, but it is vacuous because it doesn't help you distinguish
[13] between good benchmarks and bad benchmarks.
[14] So, I'm not saying that my benchmark does not meet the
[15] willing buyer/willing seller test. It does. It is just that
[16] the fact that it does is completely uninteresting because
[17] virtually any benchmark that anyone would put forward meets
[18] that test. That's the sense in which it is vacuous.
[19] **Q.** But let me ask a different question.
[20] The benchmarks you propose you do separately for what
[21] you call the music fee and separately for the aggregate of
[22] function, right?
[23] **A.** That's correct.
[24] **Q.** And you never do come to a view as to what the willing
[25] buyer would pay and willing seller would sell the combined

[1] license that constitutes the BMI blanket license. Isn't that
[2] true?

[3] A. No, I don't think that is true. It just requires
[4] arithmetic to add the two to allegedly say a willing buyer and
[5] willing seller in a competitive market would reach agreement at
[6] that combined level.

[7] Q. And without looking at actual blanket license transactions,
[8] right?

[9] A. I have looked at actual blanket license transactions. I
[10] don't think it is necessary to do so to come to that conclusion
[11] and it is not a basis for that conclusion.

[12] Q. Now, I think you agree with BMI and I think you actually
[13] just testified to the effect that the floor fee here is based
[14] on BMI costs, right?

[15] A. Yes.

[16] Q. And BMI cost does not -- is not -- does not represent the
[17] value of the BMI license, it is just the cost to the BMI
[18] license, right? The aggregate of function?

[19] A. Though in a competitive market it would also correspond to
[20] the value.

[21] Q. That would be in a perfectly competitive market, right?

[22] A. Not necessarily, no.

[23] Q. Well, ordinarily people are in business to make a profit,
[24] correct?

[25] A. As we discussed in my deposition, I include profit within

[1] cost.

[2] Q. Okay, so BMI's accounting cost which does not include
[3] profit, right?

[4] A. I don't know.

[5] Q. Well, BMI doesn't -- withdrawn.

[6] When you say that cost includes profit you were
[7] talking about, for example, a cost of capital, right?

[8] A. Yes.

[9] Q. And so, if you are assuming that that is in BMI's cost,
[10] that implied cost of capital and BMI's accounting records don't
[11] include that, then that would be in addition to what ought to
[12] be paid to BMI above its accounting cost, right?

[13] A. Could you read that back?

[14] MR. SALZMAN: Sure.

[15] (Record read)

[16] A. I guess, you know, I have not -- I think I was clear that I
[17] was not independently saying that I actually know that BMI's
[18] costs as a percent of its overall revenues is 11.7 percent.
[19] All I said was that's the only number I could find that had
[20] been publicly reported.

[21] If you are telling me that when BMI reports that
[22] number it excludes elements of true cost like interest on its
[23] bank loans or bonds it may have issued or whatever or
[24] depreciation, yes, then that number is too low because they've
[25] been reporting their overhead to the public as a portion of the

[1] revenues and leaving out some of the costs.

[2] Q. Your theory is that the base fee being equal to BMI's costs
[3] and just adding that to the music fee is justified because in a
[4] competitive market for blanket licenses cost would equal price,
[5] right?

[6] A. Yes.

[7] Q. Are you familiar with Judge Conner's decision in the
[8] Capital Cities case?

[9] A. Not as I sit here, no.

[10] Q. Let me just read an excerpt from it and see if you agree
[11] with this.

[12] A. Okay.

[13] Q. The market for blanket licenses appears to be one whose
[14] natural consequence is the lack of broad-based competition. To
[15] postulate what prices would prevail were such a market
[16] competitive is perplexing in theory, impractical in practice
[17] and dubious in outcome given the efficiencies obtained given
[18] the nature of the service rendered. Little can be adduced as
[19] to the expected behavior of such a market were it populated by
[20] multiple sellers. It is questionable whether such a market
[21] could sustain many sellers; whether the market would function
[22] efficiently and the price levels at which its supply and demand
[23] would converge are even more uncertain.

[24] Do you agree with that?

[25] A. I do not.

[1] Q. Why not?

[2] A. Because I think economists frequently think about things
[3] conceptually and hypothetically and can, in fact, reach
[4] reasonable conclusions based on that analysis.

[5] Q. And in this case you have attempted to find the competitive
[6] price for the BMI blanket license taken as a whole, right?

[7] A. Well, indirectly.

[8] I found the competitive price for the floor fee based
[9] on this hypothetical about competition and just the conclusion
[10] from that that it should be based on cost. The portion that
[11] corresponds to the music fee is not at all hypothetical, it is
[12] based on actual competitive market transactions.

[13] Q. Thank you. We will get to the individual components of the
[14] direct transactions in a little while.

[15] But, you would agree with me that what you propose to
[16] do here as the way to find the price is not something that the
[17] BMI or ASCAP rate court has ever done before, right?

[18] A. That is correct.

[19] Q. It is your view, is it not, that the prior decisions of the
[20] ASCAP and BMI rate court that relied on blanket licenses as
[21] benchmarks did not find reasonable fees. Isn't that true?

[22] A. My opinion is that they did the best they could with the
[23] information that they had available, that there is reason to
[24] think that there were severe limitations on how good that
[25] information was so that, in effect, in the past what the rate

Page 1396

[1] court has done is to produce rates that are internally
[2] consistent. Each benchmark, each case is consistent with other
[3] cases but each one of the agreements that is used as a
[4] reference for a new case and reasonable is only reasonable by
[5] virtue of the fact that people thought that was consistent with
[6] what would come out of rate court so that there was really
[7] nothing more than internal consistency of those decisions.
[8]     We now, for the first time, have the ability to see
[9] actual data -- it is not at all hypothetical -- actual data
[10] about competitive transactions and what rates those present.
[11] **Q.** Those actual transactions you are referring to are the
[12] direct licenses that DMX entered into with some publishers?
[13] **A.** That's correct.
[14] **Q.** And you would agree, would you not, that having access to
[15] not just those 500 publishers who have direct licenses or 500
[16] plus, but to all the publishers in the BMI repertoire is
[17] valuable to DMX, right?
[18] **A.** Yes.
[19] **Q.** How many different publishers' music does DMX use in a
[20] year?
[21] **A.** I've seen that number. It is thousands, but I don't
[22] remember the exact number.
[23] **Q.** You would accept if I said it was more than 14,000?
[24] **A.** I have no reason to doubt that.
[25] **Q.** So, in your viewing the 500-some direct licenses you did

Page 1397

[1] not consider what proportion of all publishers' works that was
[2] when you considered them to be a valid benchmark, right?
[3] **A.** I absolutely did consider it. That was the point of my
[4] observation about the 400 voters in Massachusetts, a poll of
[5] them accurately predicting what the 2 million were going to do.
[6]     So, the fact that you have a small fraction of the
[7] total does not mean, unless there is bias which is a different
[8] issue, having a small fraction of the total does not mean that
[9] that cannot be used reliably for an estimate of the total.
[10] **Q.** I guess my question really was since you didn't know how
[11] many publishers' works they actually needed, that wasn't part
[12] of your analysis in concluding that the 500-some were
[13] representative?
[14] **A.** I told you I knew it was thousands and I didn't remember
[15] the exact number so, yes, it was part of my analysis.
[16]     **THE COURT:** Mr. Salzman, whenever you come to a point
[17] at which you can fairly suspend I can go ahead with the other
[18] conference.
[19]     **MR. SALZMAN:** Thank you, your Honor. I think probably
[20] in a minute or so.
[21]     **THE COURT:** Okay.
[22] **BY MR. SALZMAN:**
[23] **Q.** And, since DMX first began its direct licensing campaign,
[24] it has not cut back on the number of different publishers whose
[25] works it relies on, correct?

Page 1398

[1] **A.** I don't know.
[2] **Q.** And you are aware, also, that DMX promotes itself to
[3] customers as having a wider selection of music than any of its
[4] competitors, right?
[5] **A.** I don't remember.
[6] **Q.** And you're aware, are you not, that part of DMX's service
[7] is the ability to -- withdrawn.
[8]     Part of its service includes sending its customers the
[9] latest hits, right?
[10] **A.** Yes.
[11] **Q.** And you are aware also that DMX cannot identify the
[12] publishers of approximately 20 percent of all the music it
[13] plays, right?
[14] **A.** I don't remember the percentage but there is certainly some
[15] number.
[16] **Q.** And, am I correct that under your schema, the value of the
[17] aggregating function, the value of the insurance, the value of
[18] the indemnity is not part of your consideration of the fair
[19] market value of the blanket license as a whole, you just want
[20] to pay BMI its cost for that, right?
[21] **A.** Your question doesn't make sense to me.
[22]     My value of the whole is two pieces. One of those
[23] pieces takes account of the value of the aggregation and
[24] indemnity features you are talking about so I don't know what
[25] it means to say that my value of the whole doesn't take that

Page 1399

[1] into account.
[2] **Q.** Well, you just value it at cost?
[3] **A.** That is correct, which is what a competitive market would
[4] do.
[5] **Q.** Perfectly competitive market?
[6] **A.** A workably competitive market.
[7]     **MR. SALZMAN:** Let's suspend now.
[8]     **THE COURT:** Okay. Fine.
[9]     We will resume, I think for planning purposes it is
[10] safe to say, at 2:15. It may be modified by developments
[11] between now and then. All things being equal, 2:15.
[12]     (Luncheon recess)
[13]     (Continued next page)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 1400

[1] A F T E R N O O N   S E S S I O N
[2] 2:23 p.m.
[3] (Trial resumed)
[4] THE COURT: Mr. Salzman.
[5] MR. SALZMAN: Thank you, your Honor.
[6] ADAM B. JAFFE, resumed.
[7] CROSS-EXAMINATION (cont'd)
[8] BY MR. SALZMAN:
[9] Q. Good afternoon, Dr. Jaffe.
[10] A. Good afternoon.
[11] Q. On direct examination you told us that it was a complicated
[12] question whether the direct license transactions contained any
[13] bias as compared to the rest of the BMI repertoire that's in
[14] issue here today, right?
[15] A. Yes.
[16] Q. And you talked about, by analogy, a political poll where a
[17] small sample could be representative and predictive of what a
[18] larger set of people might do, right?
[19] A. Yes, although that answer was not related to the bias
[20] question.
[21] Q. But bias is an important question as to whether that set of
[22] 500-some direct licenses are representative of what the rest of
[23] the BMI repertoire publishers would do, right?
[24] A. Yes.
[25] Q. And you would agree, would you not, that self-selection in

Page 1401

[1] polling is a danger in terms of whether you get a
[2] representative sample, right?
[3] A. I don't know what you mean exactly.
[4] Q. Well, if someone were seeking a representative sample you
[5] wouldn't just accept volunteers, right, you would have to go
[6] ask not only volunteers but people who don't want to
[7] participate in order to make sure you have a random sample,
[8] right?
[9] A. It would depend on the circumstance.
[10] Q. But self-selection can be a source of bias?
[11] A. You haven't defined self-selection. I don't know how to
[12] answer that question.
[13] Q. Volunteering to participate in a poll?
[14] A. Under some circumstances that could be a source of bias,
[15] yes.
[16] THE COURT: On that general topic, can you count the
[17] transactions which took place after the setting of an interim
[18] price as being valid evidence of what is a reasonable price?
[19] THE WITNESS: Yes, I think you can, because there are
[20] a lot of things that are going into the publisher's
[21] determination as to whether they want to agree to this
[22] transaction. They are, in their minds, forming --
[23] THE COURT: But one of them will not be price
[24] negotiation.
[25] THE WITNESS: I'm sorry?

Page 1402

[1] THE COURT: One of those factors will not be price
[2] negotiation.
[3] THE WITNESS: I don't know what you mean by that.
[4] THE COURT: Price is set by an interim ruling.
[5] THE WITNESS: But only for the interim period. And
[6] the direct license is a forward-looking transaction that covers
[7] the entire period presumably including the expectation that
[8] when a final fee is set they will pay the final fee rather than
[9] interim fee.
[10] THE COURT: Yes.
[11] Still, for the time between they have no option if
[12] they want a direct lease.
[13] THE WITNESS: They have no option other than the
[14] direct license?
[15] THE COURT: Other than the price set for the interim
[16] period.
[17] THE WITNESS: If they wished -- I mean, if they wished
[18] to stay with BMI rather than signing the direct license.
[19] THE COURT: Oh. I was thinking of the ones who made
[20] licenses with DMX.
[21] THE WITNESS: Right. So, I'm saying they have two
[22] choices at that point. They're deciding do I go with DMX and
[23] do I pay the fee that DMX has suggested, or do I stay with BMI
[24] can in which case I'm going to get a distribution from BMI?
[25] And they're thinking about that with a couple of different

Page 1403

[1] considerations. One is, is there expectation over the life of
[2] the direct license about their distribution from BMI, the other
[3] is the competitive forces that I talked about this morning in
[4] terms of the concern that if they don't sign the direct license
[5] they may not get, on a going forward basis, the distribution
[6] they've gotten in the past from BMI because DMX may decide to
[7] play somebody else's music.
[8] So, I think you are still in an environment in which
[9] that fee and that agreement is very much determined by
[10] competitive forces.
[11] BY MR. SALZMAN:
[12] Q. Now, the set of 500-some direct licenses is the product of,
[13] in part, of who DMX chooses to solicit, correct?
[14] A. Yes.
[15] Q. And it is also, in part, a function of who, among those it
[16] chose to solicit, that agreed to the $25 bargain, right?
[17] A. Yes.
[18] Q. Now, in terms of who DMX chose to solicit, you are aware
[19] that the testimony was that DMX sought out certain publishers
[20] whose music is believed it used a lot, right?
[21] A. Yes.
[22] Q. And of those some said yes initially and some said no,
[23] right?
[24] A. Yes.
[25] Q. And some DMX chose to follow up with and some DMX chose not

[1] to follow up with if they didn't respond in the first instance,
right?

[3] **A.** I don't know.

[4] **Q.** Would you agree that it would be rational for DMX to seek
[5] direct licenses where it is easiest and cheapest to do so, per
[6] performance?

[7] **A.** All else equal?

[8] **Q.** Yes.

[9] **A.** All else equal, I would agree.

[10] **Q.** And I think you talked this morning about cream skimming as
[11] a possibility based on that, right?

[12] **A.** Yes.

[13] **Q.** Let's take a look at the demonstrative that was shown in
[14] BMI's case, it is titled illustration of cream skimming.

[15]        When you read Dr. Owen's testimony, did you have an
[16] opportunity at that time to see this demonstrative that was
[17] shown to Dr. Owen?

[18] **A.** Yes.

[19] **Q.** So you are familiar with it before today?

[20] **A.** I have seen it before today. I don't completely understand
[21] it.

[22] **Q.** You understand that on the horizontal axis the performances
[23] by DMX are ranged from lowest cost on the left to highest cost
[24] on the right, performance; right?

[25] **A.** Where cost is defined as the cost to DMX including

[1] transactions costs.

[2] **Q.** Right.

[3] **A.** As I understand it.

[4] **Q.** Yes.

[5] **A.** Yes.

[6] **Q.** So, that would be both the price that DMX would actually
[7] pay the publisher plus the search and negotiation costs of
[8] dealing with the publisher, right?

[9] **A.** Yes.

[10] **Q.** On the vertical axis the marginal per performance cost to
[11] DMX to acquire those licenses, right?

[12] **A.** That's what it says.

[13] **Q.** And you see that there is a blue part of the curve and an
[14] orange part of the curve, right?

[15] **A.** Yes.

[16] **Q.** And the blue part of the curve, as you understand the chart
[17] is, says that as DMX goes from left to right acquiring
[18] performing rights it is going to reach a point where its cost
[19] per performance exceeds the amount of the credit available from
[20] BMI, right?

[21] **A.** Theoretically, yes.

[22] **Q.** And that's the dotted line and then where the blue line
[23] keeps going to the right, correct?

[24] **A.** The chart is what it is. Yes.

[25] **Q.** I just wanted to make sure we were understanding the chart

[1] the same way.

[2]        And you would agree, would you not, that it would be
[3] rational for DMX, under the adjustable fee blanket license, to
[4] use direct licensing up until the point where its expected
[5] credit from BMI exceeds the cost of acquiring the direct
[6] license, right?

[7] **A.** Not necessarily, no.

[8] **Q.** That's the import of the chart, right?

[9] **A.** Right. The chart was made by Dr. Owen. I don't accept
[10] that it represents reality.

[11] **Q.** I understand.

[12]        Now, we will talk about your disagreement from it but
[13] that's the chart, as you understand it, that there comes a
[14] point where DMX decides should I grow for one more direct
[15] license or not? How much will that cost? I'm better off under
[16] the blanket license. I will keep going. I will use the
[17] blanket license for the hard, the more expensive and the direct
[18] license for the less expensive, right? That's the point of the
[19] chart anyway.

[20] **A.** It is not my chart so I'm not going to testify as to --

[21] **Q.** So far we are just talking about what the meaning of the
[22] chart is.

[23] **A.** So what is the question you are asking me? Is that the
[24] meaning of the chart? I'm not sure.

[25] **Q.** Do you understand it that way?

[1] **A.** I didn't create it.

[2] **Q.** Do you understand it that way?

[3] **A.** Maybe. I guess. I don't know.

[4] **Q.** Are you familiar with the term "cream skimming"?

[5] **A.** I am.

[6] **Q.** And that's a recognized economic phenomenon?

[7] **A.** It is.

[8] **Q.** And would you agree that DMX rationally would continue to
[9] directly license up until the point where its blanket license
[10] credits are greater than the cost of direct licensing?

[11] **A.** Not necessarily, no.

[12] **Q.** Why not?

[13] **A.** Well, the testimony we've had is that DMX thought about who
[14] to direct license based on their strategies in terms of the
[15] music and, you know, one of the things they're going to think
[16] about is they want to direct license title that they might be
[17] able to increase the plays of and there are some things that
[18] might be very easy to get but they're not going to want to play
[19] them very often so they may not bother to go after those even
[20] if the transactions costs are very low because it is just not
[21] stuff that they want to be increasing their plays of. There
[22] may be other things which, on an all else equal basis, would
[23] require a lot of work to get, but if it is something that's
[24] very valuable to them and which once they had it, they could
[25] greatly increase the plays of, they could then spread those

Page 1408

[1] higher transactions costs over many, many different plays and
[2] that may well be something that would be rational for them to
[3] go after.
[4]     So, this chart is based on an assumption about the
[5] main factor driving DMX' choices which the testimony says was
[6] not actually their main consideration.
[7] Q. Did DMX pursue any direct licensing from foreign
[8] publishers?
[9] A. I know they have a Chinese channel. I'm not sure exactly
[10] who the publisher is -- Chinese music.
[11] Q. And are you not aware of their having done that though,
[12] right?
[13] A. I don't know one way or the other.
[14] Q. If DMX did not pursue direct licensing from foreign
[15] publishers, wouldn't that be an indication that they were
[16] trying to save costs by relying on BMI blanket licensing for
[17] foreign works?
[18] A. Not necessarily, no.
[19] Q. You would agree it would be rational to, on a per
[20] performance basis, go after the cheapest works themselves and
[21] rely on BMI for the others, right?
[22] A. I think that's the same question that you asked me earlier
[23] and I said if all else was held equal.
[24] Q. Right.
[25] A. Which, of course, it isn't.

Page 1409

[1] Q. And you mentioned after that that, well, they would also
[2] focus on works that they expected to expand the number of plays
[3] on, right, directly?
[4] A. Works that they would play a lot or that they could
[5] increase the number of plays of? Or both?
[6] Q. So, when I asked the prior question about on a per
[7] performance basis, go after the cheaper ones first, if you took
[8] into account their ability to increase the plays of the ones
[9] they directly licensed, aren't you really agreeing with me that
[10] that is exactly what they were doing, going after the ones
[11] which, on a per performance basis, they could most cheaply
[12] directly license?
[13] A. I don't agree with that.
[14] Q. Now, you understand that the testimony is that except for
[15] the four so-called major publishers DMX didn't offer anybody
[16] more than $25 as a royalty pool, right?
[17] A. That's my -- well, they didn't offer anybody more than $25
[18] as a royalty pool. They did have some other provisions with
[19] respect to some of the major publishers.
[20] Q. And those other things offered to those majors was
[21] additional consideration apart from the $25 royalty pool,
[22] right?
[23] A. It was potentially additional consideration, yes.
[24] Q. And the part of your testimony where you admit the
[25] possibility that the Sony non-refundable advance won't be

Page 1410

[1] recouped is an acknowledgment on your part that that was value
[2] to Sony, right?
[3] A. Yes.
[4] Q. Now, one of the reasons you told us before that it was a
[5] complicated question whether the 550 direct licenses are
[6] representative sample for the entire repertoire was that that
[7] did not take into account publishers who rejected the $25 as
[8] insufficient, right?
[9] A. Yes.
[10] Q. And, ideally, you would want to know who those publishers
[11] are, right?
[12] A. I mean, ideally you would want to know everything so I
[13] don't really know -- I mean, the answer is yes but I don't
[14] quite know what to make of that.
[15] Q. Well, you told us before it was a complicated question
[16] whether the fact that some people said no should impact whether
[17] the direct licenses are representative, right?
[18] A. Yes.
[19] Q. And you would expect, ordinarily, that different publishers
[20] would have different values for their catalogs, right?
[21] A. They might.
[22] Q. And it is possible, is it not, that some of the BMI
[23] publishers would have taken $25 or, right, as a royalty pool?
[24] A. I suppose.
[25] Q. And that would include, for example, people on the low end

Page 1411

[1] who for maybe had never had their music played on DMX before?
[2] A. It's theoretically possible.
[3] Q. And, similarly, there would be some publishers who would
[4] have responded positively to the offer from DMX if DMX had
[5] offered $30 but found $25 insufficient, right?
[6] A. That's theoretically possible.
[7] Q. And, similarly $40?
[8] A. Yes.
[9] Q. And similarly $100?
[10] A. Yes.
[11] Q. And, right now we don't know whether the people who
[12] accepted the $25 are below, above, or at the average of what
[13] all the BMI publishers would have done; isn't that true?
[14] A. Would have done under what assumptions?
[15] Q. Had they been offered the possibility of direct licensing
[16] by DMX?
[17] A. And are you including in this that their recourse is to BMI
[18] and that it includes BMI taking actions to influence their
[19] decisions?
[20] Q. Sure.
[21] A. Then, yes, I guess that's true.
[22] Q. And, similarly, if you take out those assumptions and say
[23] in the free market if BMI didn't even exist, you don't know
[24] whether the BMI publishers offered direct licensing, that more
[25] of them would have demanded $30, $40, $50 or $100 than the 550

Page 1412

[1] who took the direct licenses in this case?

[2] A. Well, what would have happened if BMI didn't exist is not

[3] something I have given any thought to so I have no answers with

[4] respect to that hypothetical.

[5] Q. So, when you are talking about the competitive price for

[6] direct licenses you are talking about that in the context of

[7] BMI being in the marketplace, right?

[8] A. In the abstract one could analyze the competitive market in

[9] the absence of BMI. What I did was analyze the competitive

[10] market that actually exists which is one in which BMI sits in

[11] the background.

[12] Q. And, the compulsory license also sits in the background,

[13] right?

[14] A. Yes.

[15] Q. And you're not testifying here that the prices achieved by

[16] DMX for those 550 licenses are the price that would prevail

[17] without BMI in the market, right?

[18] A. I haven't thought about that.

[19] Q. Suppose the evidence were that if DMX had gone back to the

[20] people who had turned down the $25 offer and offered them $50

[21] and as a result got 1,000 direct licenses at $50; under those

[22] circumstances wouldn't the benchmark, in your view, be above

[23] $25?

[24] A. So you're asking me to assume that DMX would have chosen to

[25] offer more than $25?

Page 1414

[1] license, everything would have been different. They would have

[2] had a higher direct license ratio over all and that all of the

[3] calculations would have been different.

[4] Q. And so, you didn't use that information --

[5] A. I had no basis to calculate in a world we didn't observe

[6] what the average actual direct license would have been.

[7] Q. You are aware, are you not, that DMX continues to use music

[8] from the other major publishers Warner and EMI, right?

[9] A. I have no direct knowledge of it. I would be surprised if

[10] it were not true.

[11] Q. And DMX continues to use the music of Universal, right?

[12] A. Yes, although less than they used to because they're moving

[13] towards using the direct license publishers more.

[14]    (Continued on next page)

Page 1413

[1] Q. Exactly.

[2] A. Based on their own analysis of the market, and if more

[3] people -- if that had been widely accepted in the marketplace,

[4] I would have calculated or Dr. Candell would have calculated a

[5] different level for the benchmark.

[6] Q. And it would have been above $25?

[7] A. Under your hypothetical that DMX was willing to pay more

[8] than $25 for these licenses then the appropriate benchmark

[9] would be higher than $25.

[10] Q. If, hypothetically, there were 550 people who took $25 and

[11] 14,000 people who got $50, the benchmark price you would be

[12] advocating here would be closer to $50, right? Or quite close

[13] to $50, right?

[14] A. Under the assumption that in a competitive market DMX was

[15] willing to offer $50 to 10,000 publishers we would have

[16] calculated it ---that would have resulted in a different set of

[17] facts than we have before us.

[18] Q. In your calculation did you take into account what DMX had

[19] been offering to Universal?

[20] A. Not from the perspective of calculation, no.

[21] Q. And you would agree, would you not, that DMX' offer to

[22] Universal is a marketplace fact as to what DMX was willing to

[23] pay for direct licensing, right?

[24] A. It is a piece of information but it would be complicated to

[25] factor that into the analysis because if they had the Universal

Page 1415

[1] BY MR. SALZMAN:

[2] Q. Now, when DMX went to the different publishers and offered

[3] them the $25 royalty pool, the only information those

[4] publishers had as to what the appropriate price is for a

[5] commercial music service like DMX to use its music, what had

[6] previously been, they had previously received from BMI or

[7] ASCAP, right?

[8] A. I would not agree with that, no.

[9] Q. Well, there had never been any direct licensing

[10] transactions for this market before, right?

[11] A. That is correct.

[12] Q. So in terms of point of reference, what would the

[13] publishers look at other than prior distributions from BMI or

[14] ASCAP as to what the going price was for their catalog for this

[15] use?

[16] A. Well, they may well have some notion of their own about

[17] what their own music is worth, and that that would be surely a

[18] factor that they would consider. And they have the ability to

[19] have knowledge about rate court proceedings, how they evolved,

[20] what people ask for, what people get, what they might get,

[21] what's being asked for, what kind of things are judged to be

[22] reasonable. They have all kinds of information available to

[23] them about the likely royalty level on a going-forward basis.

[24] Q. Is it your testimony that a small publisher receiving from

[25] DMX, let's say $200 or more a year now as a distribution was in

**Page 1416**

[1] a position when DMX came to it and proposed direct licensing to
[2] consider the possibilities of a rate court case and what the
[3] outcome of it might be?
[4] **A.** I have no specific information about any publishers.
[5] Mr. Knittel talked about the publishers that they've dealt
[6] with. In general, I tend to think that business people think
[7] about the decisions they make. The information we're talking
[8] about is not exactly buried in Fort Knox, but I have no
[9] specific knowledge about how much research they would do or how
[10] they would undertake that.
[11] **Q.** Do you have any estimation of the 550 publishers how many
[12] received any direct licensing royalties from DMX at all since
[13] giving their licenses to DMX?
[14] **A.** I don't recall.
[15] **Q.** So it didn't take any weight in your thinking as to which
[16] of these publishers really had substantial money at stake in
[17] doing these transactions, right?
[18] **A.** I know that the distribution of distributions, if you will,
[19] is very skewed. That's typically true in this arena. So a
[20] small number of publishers receive a disproportionate share of
[21] the revenues. That's quite typical and I was certainly aware
[22] of that as I was thinking about this.
[23] **Q.** Now, in a competitive marketplace, you would expect DMX in
[24] offering a direct licensing to have some give and take with the
[25] publishers with whom it was negotiating, right?

**Page 1417**

[1] **A.** I don't know.
[2] **Q.** Now, your proposition for the Court is that the people who
[3] accepted the $25 offer represent a benchmark price for the rest
[4] of the BMI repertoire that's going to be licensed through the
[5] BMI blanket license, right?
[6] **A.** Yes.
[7] **Q.** So another way of saying that, you would agree, is that the
[8] people who said yes are now the proxy or benchmark for the
[9] people who said no, right?
[10] **A.** They're the proxy or benchmark for everyone, which may, to
[11] some extent, to some extent does include some number of people
[12] who said no.
[13] **Q.** Now, you read Mr. Knittel's testimony, did you not?
[14] **A.** Yes.
[15] **Q.** And so you know that according to him, the $25 price that
[16] he offered to pay was itself based on a prior BMI license,
[17] right?
[18] **A.** I don't remember specifically what he said. I read a lot
[19] of testimony in a very short period of time.
[20] **Q.** Now, you're aware, are you not, that at the time
[21] Mr. Knittel was making those offers DMX was -- sorry, that the
[22] governing price for the ASCAP license was in the 40 plus dollar
[23] range, right?
[24] **A.** Yes.
[25] **Q.** And if Mr. Knittel had used $40 as the price instead of

**Page 1418**

[1] $25, you would have gotten a different set of people saying
[2] yes, right?
[3] **A.** I don't know.
[4] **Q.** Now, I think you may have already said this, but you would
[5] agree that in the world we now live in with the BMI consent
[6] decree and the compulsory license, music publishers have
[7] different bargaining ability than they would absent the
[8] compulsory license, right?
[9] **A.** Is the comparison you're asking me to make the real world
[10] to a world in which they're allowed to get together and
[11] collectively set prices, but there's no compulsory license, or
[12] to a world in which there are no PRO's?
[13] **Q.** Let me ask a different way. Up until 1994, BMI sold
[14] blanket licenses and there were no compulsory licenses, right?
[15] **A.** I don't know the history back that far.
[16] **Q.** Let me ask you this: You're aware of how the copyright law
[17] works in the sense that ordinarily a copyright owner has the
[18] right to say no to someone who wants to use his music, right?
[19] **A.** Yes.
[20] **Q.** And it's an infringement if that music user goes ahead and
[21] uses the music without permission, right?
[22] **A.** Yes.
[23] **Q.** It's the theory of the copyright law, like the patent law
[24] which you have written about, that the ability to say no and
[25] withhold the use of the product is what gives value to the

**Page 1419**

[1] creation, right?
[2] **A.** Yes.
[3] **Q.** And you would agree that it's a different set of
[4] considerations that a BMI affiliate now faces with the
[5] compulsory license in place than would be in place if a direct
[6] license request were made without that compulsory license, and
[7] we can assume that BMI is out there or not, as you prefer.
[8] **A.** Well, once the rights holder makes the decision to join the
[9] collective organization and get the benefits of the collective
[10] organization along with the effects of compulsory license,
[11] which they know is part of the package, that's a different
[12] situation than if they did not make that choice.
[13] **Q.** Is it commercially feasible for a small music publisher to
[14] not belong to a PRO in the United States?
[15] **A.** It would depend on the publisher, I would think.
[16] **Q.** Well, are there any that are not signed up with BMI, ASCAP
[17] or SESAC?
[18] **A.** I don't know of any.
[19] **Q.** And the big music users like radio and television stations
[20] rely on blanket licenses from the PRO's, right?
[21] **A.** They do.
[22] **Q.** So it's not your testimony that the direct licenses in this
[23] case that you point to as a benchmark represent a competitive
[24] price uninfluenced by the compulsory licenses, right?
[25] **A.** That's correct.

Page 1420

[1] **Q.** Now, absent the compulsory license --
[2] **THE COURT:** I didn't hear the answer.
[3] **THE WITNESS:** I just said that's correct. I'm sorry.
[4] **Q.** It's common in copyright industries other than music to
[5] have exclusive licenses for copyrighted property, right?
[6] **A.** It's certainly not uncommon.
[7] **Q.** For example, if a television program is on ABC, it's not
[8] also on NBC at the same time, right?
[9] **A.** Typically that's correct.
[10] **Q.** And similarly other copyrighted property can be sold on an
[11] executive basis, right?
[12] **A.** It can be.
[13] **Q.** So, for example, musical works are typically licensed to
[14] single record companies, not to multiple record companies,
[15] right?
[16] **A.** I would think that that would vary.
[17] **Q.** Sometimes it is and sometimes it's not.
[18] **A.** I think so.
[19] **Q.** And absent the BMI blanket license, it would be open to a
[20] music publisher such as Sony or Universal to conduct an auction
[21] between DMX and Muzak to decide which one of those two would
[22] have the rights to its catalog, correct?
[23] **A.** What you're saying is if a publisher had not joined a PRO
[24] that was subject to a consent decree, could it choose which of
[25] the two to license to and decline to license to the other?

Page 1421

[1] Yes, that's correct.
[2] **Q.** And that could have the effect of driving up the price of
[3] music to DMX, right?
[4] **A.** I don't know what the effect would be.
[5] **Q.** I think you agreed before that the $25 royalty pool does
[6] not itself reflect what DMX's transaction costs are in
[7] obtaining those licenses, right?
[8] **A.** That's correct.
[9] **Q.** And in terms of what DMX would be willing to pay for a
[10] blanket license under the willing buyer/willing seller formula,
[11] its own avoided transaction costs would be taken into account
[12] in terms of what it would be willing to pay for a blanket
[13] license, right?
[14] **A.** Absent any consideration of reasonableness, if you have a
[15] monopolist offer the license, yes, DMX would have no other
[16] choice, could be willing to pay more to avoid transactions
[17] costs.
[18] **Q.** I think you told us on direct examination that from the
[19] point of view of the music publishers who agreed to the $5
[20] royalty pool price, that their primary consideration was the
[21] possibility of getting more absolute dollars, right?
[22] **A.** Yes.
[23] **Q.** And from their point of view, it was not relevant to any
[24] given publisher whether the price was expressed as a $25
[25] royalty pool or any other number. It was the prospect of

Page 1422

[1] getting more or the fear of getting less that was motivating
[2] them, right?
[3] **A.** I think so.
[4] **Q.** Now, from the point of view of a music publisher, the
[5] simple question of whether they will get more or less plays is
[6] not by itself relevant, right? It's the total amount of money
[7] they get that they care about.
[8] **A.** I mean, that's a little like saying GM doesn't care how
[9] many cars it sells, as long as it makes the same amount of
[10] money. Yes, in some abstract sense, all they care about is how
[11] much money they make.
[12] **Q.** And music performing rights are a little different from
[13] cars in that music performing rights have no marginal cost,
[14] whereas GM actually has to make a new car in order to sell an
[15] extra car, right?
[16] **A.** That is true.
[17] **Q.** And so from the point of view of a music publisher such as
[18] Sony, raising its share of performances from 6 percent to
[19] 30 percent or any other number really doesn't matter, it's the
[20] prospect of gaining that $2.7 million that mattered to it,
[21] right?
[22] **A.** Well, in general the number of performances is not
[23] unrelated to the amount of money received. And even in the
[24] case of Sony, while it's true that in the short run that
[25] increase in their number of plays was not affecting the amount

Page 1423

[1] of money they received, I would be very surprised to learn that
[2] they were uninterested in the consequences on DMX in terms of
[3] the increase in the number of plays, because in the long run
[4] that is likely to have a significant effect on the revenues
[5] they're going to get.
[6] **Q.** If the non-refundable advance were recouped and DMX went
[7] beyond, right?
[8] **A.** Correct.
[9] **Q.** Now, you're aware, are you not, that the direct licenses
[10] are on a form which contains a most favored nations clause,
[11] right?
[12] **A.** That is my understanding.
[13] **Q.** And that's a factor that entered into the consideration of
[14] the licensors when they agreed to the $25 pool, that if
[15] somebody else got more, they would get more, correct?
[16] **A.** It may have.
[17] **Q.** And that's indicative, at least in part, of the fact that
[18] this sort of a transaction, direct licensing in the CMS market,
[19] had never been done before and they didn't really have
[20] confidence in what the correct price was, right?
[21] **A.** That's a theoretical possibility.
[22] **Q.** And assume hypothetically that the Sony deal, the Sony
[23] non-recoupable advance, would be something that the other
[24] publishers would be entitled to under their most favored
[25] nations clauses. Can you assume that?

Page 1424

[1] **A.** As a hypothetical, yes.

[2] **Q.** And so proportionally they would each be entitled to an
[3] advance that constituted 150 percent of what they had gotten
[4] from BMI in the past. You can assume that.

[5] **A.** Well, if you tell me that that's what it would mean if they
[6] did have -- if the most favored nations clause did apply to an
[7] advance, and you ask me to assume that if it did apply that's
[8] how it would apply, I would assume that.

[9] **Q.** And under those assumptions, wouldn't you agree that the
[10] $25 pool price would no longer be the actual agreement of those
[11] publishers?

[12] **A.** It would certainly worry me, and I'd have to think about
[13] it. As I sit here, I don't quite know how to figure out where
[14] it would take you.

[15] **Q.** Well, you're aware, are you not, that Sony was offered an
[16] amount that was contended to be 150 percent of what it had been
[17] receiving previously from BMI, right?

[18] **A.** Yes, but how that translates into an equivalent calculation
[19] in terms of royalty pool, if you believe that it should be
[20] translated, is a complicated matter.

[21] **Q.** Well, let me ask a different question. Assume that DMX had
[22] decided to go to the different publishers and instead of making
[23] an offer of a $25 royalty pool, it had said to them each show
[24] me what you got from BMI last year, I will pay you 150 percent
[25] of that. Under those circumstances, that would be the

Page 1425

[1] benchmark you would be here espousing, not the $25 royalty
[2] pool, right?

[3] **A.** So if you ask me to assume that DMX had done something they
[4] didn't do, and that something then happened in the marketplace
[5] that we don't know what it is, I guess then, yes, that would
[6] have been the data that I would have had available to do the
[7] calculations.

[8] **Q.** Now, you've made some reference this morning and we've also
[9] discussed a little bit this afternoon the fact that DMX had
[10] made an offer to Universal Music Publishing that didn't
[11] eventuate in a transaction, right?

[12] **A.** Yes.

[13] **Q.** And that offer from DMX to Universal was also predicated on
[14] the proposition that DMX was offering a non-recoupable advance
[15] to Universal at 150 percent of what it had received from BMI in
[16] the prior year, correct?

[17] **A.** Of what it thought it had received based on DMX. That's my
[18] understanding.

[19] **Q.** Right. And it's also your understanding that what happened
[20] was that Universal came to BMI and asked if it would meet the
[21] offer from DMX, right?

[22] **A.** Yes.

[23] **Q.** There was nothing wrong with Universal coming to BMI and
[24] asking whether BMI would do that, right?

[25] **A.** I'm an economist. I don't talk about right and wrong as an

Page 1426

[1] expert.

[2] **Q.** Well, as an economist in talking about antitrust law, which
[3] you said -- and antitrust economics, I should say, there was
[4] nothing anticompetitive in Universal's coming to BMI and asking
[5] for BMI to respond to that DMX offer, right?

[6] **A.** Correct.

[7] **Q.** And similarly, there was nothing wrong with BMI agreeing to
[8] match that DMX offer, from an antitrust economics point of
[9] view, right?

[10] **A.** Nothing wrong with it, no.

[11] **Q.** Now, you told us on direct examination that you found the
[12] Muzak agreement with BMI to be an inappropriate benchmark or a
[13] problematic benchmark, I should say, because it had the
[14] 8 percent cushion in it, right?

[15] **A.** Well, it's more complicated than that. It's because it was
[16] really a fixed fee contract with this 8 percent formula, rather
[17] than a per location agreement, which is what we're talking
[18] about here.

[19] **Q.** Well, but for the 8 percent cushion -- withdrawn. Let me
[20] start over. The way the agreement worked between BMI and Muzak
[21] above the 8 percent threshold, BMI would start getting paid
[22] additional amounts at $36.36 per location, right?

[23] **A.** That is correct.

[24] **Q.** So except for the cushion, it was a per-location deal,
[25] right?

Page 1427

[1] **A.** I guess I'm having trouble with the "except for the
[2] cushion" language, because there are a number of different ways
[3] one could have imagined what the deal would have been had there
[4] not been the cushion. So it is what it is. It's a complicated
[5] agreement which is in part fixed fee and in part per location.

[6] **Q.** Or it could be thought of and could equally be expressed as
[7] 36.36 per location with an 8 percent cushion, right?

[8] **A.** You can describe it that way, yes.

[9] **Q.** You've testified at some length about how the Muzak deal
[10] could be used as a benchmark if the direct licenses were not
[11] used that way, right?

[12] **A.** Yes.

[13] **Q.** And would you agree that the Muzak agreement with the
[14] adjustments you propose would be a usable benchmark for setting
[15] a reasonable fee in this case?

[16] **A.** Yes. I think for the reasons that I've explained it's not
[17] the best benchmark that we have available, but it is a
[18] benchmark that could be looked at.

[19] **Q.** And the way it ought to be looked at, if that's where we're
[20] going, is with the adjustments you propose, right?

[21] **A.** Yes.

[22] **Q.** I take it that you did not independently review the
[23] negotiating history of the BMI Muzak agreement but rather
[24] relied on Dr. Candell for that work, right?

[25] **A.** Yes.

Page 1428

[1] Q. And similarly, you relied on Dr. Candell for the study of
[2] differential music use asserted between DMX and Muzak, correct?
[3] A. Yes, although she and I had extensive discussions about the
[4] data and about how to do it, and the issues with respect to
[5] that. So I was part of the decisions about that work. I
[6] didn't do any of the calculations.
[7] Q. Now, you agree, do you not, that BMI pricing was
[8] constrained by the existence of the rate court at the time it
[9] made its deal with Muzak in 2004, right?
[10] A. It was constrained to some extent, yes.
[11]     THE COURT: What difference in the opinion that you
[12] ultimately expressed results from the fact that part of the
[13] work was performed by Dr. Candell?
[14]     THE WITNESS: I think it makes no difference. I'm
[15] just telling the truth, which is that I didn't actually punch
[16] any of the numbers. We thought about it together, we worked
[17] out the framework.
[18]     THE COURT: But in effect you delegated the
[19] calculations to her?
[20]     THE WITNESS: That's correct.
[21] Q. Not to repeat too much, but it wasn't just the
[22] calculations. It was she who looked at the bid and asked in
[23] terms of how BMI and Muzak reached its agreement and what the
[24] tradeoffs either were or weren't reaching that agreement. You
[25] didn't do that, correct?

Page 1429

[1] A. That is correct.
[2] Q. Is it your contention that BMI exercised market power over
[3] Muzak at the time they reached agreement in 2004?
[4] A. It's hard to know with any precision, but I think it's
[5] likely. I think that's the most reasonable inference from all
[6] of the facts that we have available.
[7] Q. And those facts include the negotiating history between the
[8] parties?
[9] A. Less negotiating history between the parties than the fact
[10] that when we have seen competitive transactions it's resulted
[11] in much lower fees. So it seems to me reasonable to conclude
[12] that the higher fees, since they're higher than competitive
[13] fees, the only explanation for that from an economist is that
[14] market power was in play.
[15] Q. That opinion you've just expressed turns on your
[16] fundamental opinion that the 550 direct licenses are the
[17] competitive price?
[18] A. Yes.
[19] Q. And ignores the people who said no to that price, right?
[20] A. I would not say it ignores them, no.
[21] Q. But it doesn't -- no amount of the $25 takes into account
[22] whatever reservation prices those other publishers had if they
[23] were higher than $25, right?
[24] A. We've been over this territory.
[25] Q. Right.

Page 1430

[1] A. They were not in some way part of the numerical
[2] calculation.
[3] Q. Now, in the history of the Muzak BMI deal, you're aware,
[4] are you not, that those negotiations took place on and off over
[5] the ten-year period, right?
[6] A. I recall that it was an extended period. I don't know as I
[7] sit here the number of years.
[8] Q. And you're aware, are you not, that BMI made very
[9] substantial compromises from what it had originally sought from
[10] Muzak in that negotiation, correct?
[11] A. I don't know.
[12] Q. And you're aware, are you not, that Muzak had previously
[13] taken advantage of the ASCAP rate court several times over the
[14] last decade or two and was familiar with doing that, right?
[15] A. Yes.
[16] Q. And you're aware, are you not, that Muzak also had a
[17] proceeding going in this court at the time that negotiation was
[18] reached -- sorry, that negotiation occurred?
[19] A. I don't remember.
[20] Q. And you're aware, are you not, that Muzak had outside
[21] counsel advising it with respect to music licensing with BMI at
[22] the time it reached that agreement?
[23] A. I don't know. I would be surprised if they didn't, but I
[24] don't know.
[25] Q. And you would agree, would you not, that in reaching the

Page 1431

[1] BMI Muzak agreement, both sides would rationally have taken
[2] into account what their likelihood of success was in the BMI
[3] rate court if they couldn't reach agreement?
[4] A. Their likelihood of success and the cost of doing so.
[5] Q. So if I'm hearing you correctly, the only indicator to you
[6] that BMI exercised market power over Muzak in that negotiation
[7] is the fact that the end product, the price, was higher than
[8] the benchmark you're proposing, is that right?
[9] A. Well, that combined with the fact that rate court is
[10] costly. And so Muzak would have rationally agreed to
[11] something, some amount above reasonable in order to avoid that
[12] cost.
[13] Q. And similarly, BMI would have agreed to something less than
[14] reasonable to avoid that cost, isn't that true?
[15] A. I don't think it's symmetric. Because as we have the
[16] evidence before us today, BMI would have also been worried
[17] about the consequences of the rate for future cases when it was
[18] then used as a benchmark. So for BMI, whatever costs it would
[19] suffer if it went to rate court would be amortized not just
[20] over the BMI deal, but all related and subsequent deals that
[21] would be affected by that outcome. Whereas for Muzak, they
[22] would not get any benefit from a reduction except what was
[23] inherent in that one transaction.
[24] Q. Let's explore that a little bit. Muzak represented more
[25] than half of the CMS industry at that time, right?

**A.** I don't recall.

**Q.** And BMI -- sorry -- and Muzak would have also been concerned at that time as to what it would have to pay the next time around, isn't that true?

**A.** Yes.

**Q.** And so that would be part of its calculation as to whether to go to rate court or not as to what precedent that might be set that could be favorable to it if it were right in its negotiating position, right?

**A.** Yes.

**Q.** Now, of all the different CMS providers in the industry, and some of them are small and Muzak, you know, is the largest, you would agree that DMX has certain characteristics that make it quite similar to Muzak, right?

**A.** Yes.

**Q.** DMX is second in size to Muzak?

**A.** I believe so, yes.

**Q.** And DMX has both off-premise and on-premise customers?

**A.** That's correct.

**Q.** And it has a national footprint as Muzak does?

**A.** Yes.

**Q.** And over the course of the period 2005 to 2009, we know now that Muzak lost some customers, right?

**A.** I believe so, yes.

**Q.** And we know also that DMX lost some customers over that

time too, right?

**A.** It lost some customers, yes.

**Q.** And in that respect, DMX is more like Muzak than it's like TruSonic or Play Network, right?

**A.** Yes.

**Q.** Those are two relatively small startups that grew quickly over that period, right?

**A.** I believe so, yes.

**THE COURT:** As far as the rate court is concerned, would an economist say that resort to the rate court would only occur when one or both sides to the price negotiation feel that they cannot obtain a price which is not only reasonable but reasonable plus or minus the cost of resort to the rate court?

**THE WITNESS:** I think that's right, yes.

**THE COURT:** If that's true, how does it affect the calculus that the shadow of the rate court imposes an element of reason on the negotiation?

**THE WITNESS:** I think that what is going on is that for the licensee the shadow of the rate court means that there's a band around what they think is the truly reasonable rate that they will agree to, and they will potentially agree to a rate that is higher than the reasonable us rate.

For BMI the same is true, but I think I explained in my answer to Mr. Salzman, the band is likely to be much narrower. Because when BMI thinks about, okay, I think

reasonable is really 20 and this guy is holding out for 19, is it going to be worth it to me to go to rate court to get that last dollar.

**THE COURT:** But that last dollar isn't only with that licensee, but would be spread over all those and will increase or decrease the receipts from all similarly situated.

**THE WITNESS:** That's my point. So the cost of rate court, whatever it is, $1 million, $3 million, whatever it is, for DMX or Muzak, the only savings that they have over which to kind of amortize that --

**THE COURT:** Is their own.

**THE WITNESS:** Is their own. Whereas for BMI it is a much larger pool of transactions. And so there is a band, in theory, for BMI as well, but I think it would be much narrower.

**THE COURT:** It may simply result in the stakes being higher.

**Q.** Now, your point, Dr. Jaffe, does not hold in the case of all industry negotiating committees, right?

**A.** Well, it depends on the extent to which, to some extent, proxies from one industry have some effect on rates in other industries. BMI and I and Judge Stanton have been in a proceeding where a radio industry rate was put forward at a benchmark for a residential music service. So in that sense BMI has to think about every rate court proceeding as potentially, at least to some extent, affecting every one of

its licensees.

**Q.** You would agree that centrally if BMI is facing an entire industry, the incentives to fight or settle are close to symmetrical, right?

**A.** They're closer to symmetrical.

**Q.** And in the case of the commercial music service industry, both Muzak and AEI, the predecessor of DMX, were in rate court together in the case that led to the carveout decision by the Second Circuit, right?

**A.** I actually don't know that.

**Q.** So there's nothing that would have stopped the commercial music services from jointly negotiating with BMI, right?

**A.** I don't know.

**Q.** And you know that in the BMI negotiation with Muzak, all the separately owned independent Muzak affiliates had their own counsel at the negotiating table also, right?

**A.** I don't know.

**Q.** Now, you told us on direct examination that one possible view of the cushion part of the BMI Muzak agreement was to take that and simply make an adjustment from the $36.36 down to the lowest available price, the 8 percent compounded down to the fifth year. You said that was possible, right?

**A.** Yes.

**Q.** And you said that you did something more conservative, which was just to have Dr. Candell find the average of those

Page 1436

[1] five years, right?

[2] **A.** That's correct.

[3] **Q.** But you also would agree, would you not, that the real
[4] issue in the negotiation between BMI and DMX was not what could
[5] have happened or what actually happened, but what the parties
[6] expected would happen, isn't that true?

[7] **A.** You said DMX. Is that what you meant to say?

[8] **Q.** I didn't. I meant Muzak. And I'll ask the question again,
[9] if that's confusing.

[10] **A.** That's probably better. Get the record clear.

[11] **Q.** Good, thanks.

[12]      You would agree that the issue in determining what to
[13] do with that organic growth cushion is not what actually
[14] happened, in other words, did Muzak take advantage of that
[15] cushion or didn't it, nor what could have happened
[16] theoretically if Muzak had grown at 8 percent per year
[17] compounded, but rather what BMI and Muzak expected when they
[18] entered into the agreement, isn't that true?

[19] **A.** If your goal is to understand the economics of the Muzak
[20] agreement itself --

[21] **Q.** Yes.

[22] **A.** -- as opposed to this broader CMS benchmark which includes
[23] the other deals as well, but just the Muzak agreement, I would
[24] agree with that. I think that if your goal is to then take
[25] that and translate it to what does it mean for the license

Page 1437

[1] being proposed for DMX, for the reasons we discussed this
[2] morning that's a very messy thing.

[3] **Q.** Well, both -- the way that agreement was negotiated, both
[4] BMI and Muzak had to make an estimate of what the significance
[5] was of the 8 percent cushion, right?

[6] **A.** Yes.

[7] **Q.** And if the evidence in the record is that both parties
[8] expected 2 to 3 percent growth, then that's a more appropriate
[9] way of looking at that agreement and the significance of the
[10] cushion than 8 percent compound, isn't that true?

[11] **A.** For what purpose?

[12] **Q.** For purpose of understanding what that deal is if it's the
[13] benchmark.

[14]      **THE COURT:** Of understanding what the deal was?

[15]      **MR. SALZMAN:** What the deal between BMI and Muzak,
[16] what it meant to the parties.

[17]      **THE COURT:** I'm interested in what that question
[18] means. Does it mean on the one hand what the deal is as
[19] expressed in the documents which comprehends what will happen
[20] under a variety of circumstances, or does it represent not what
[21] it actually is as defined that way, but simply what the parties
[22] expected would actually happen? It seems to me that at least
[23] philosophically and probably factually, those may be two quite
[24] different things.

[25]      **MR. SALZMAN:** I'll explore that. I'm happy to answer

Page 1438

[1] if you intended me to answer that question.

[2]      **THE COURT:** But the law may look at them differently.

[3]      **MR. SALZMAN:** Well, let me -- I'm not sure whether
[4] your Honor is asking me to answer that or just to explore that
[5] with the witness.

[6]      **THE COURT:** I'm just asking for my own clarification
[7] of what question it is that the witness is asked to answer,
[8] which?

[9]      **MR. SALZMAN:** The latter, the latter.

[10]      **THE COURT:** The latter.

[11]      **MR. SALZMAN:** Not what the document says.

[12]      **THE COURT:** Then I'm not sure that it's material.

[13]      **MR. SALZMAN:** Okay, well, I'll withdraw the question.

[14]      **THE COURT:** It may be. I just have my doubts.

[15]      **MR. SALZMAN:** I'll ask a slightly different question
[16] that may help clarify.

[17] **Q.** From your point of view as an economist, you would
[18] understand the deal between BMI and Muzak as representing in
[19] addition to the $36.36 price that was put on each additional
[20] location gain above the 8 percent cushion, and also
[21] representing an allocation of the risk that there would be
[22] growth above the existing amount of locations that Muzak had
[23] then, right?

[24] **A.** Yes.

[25] **Q.** And similarly, the parties each took a chance as to the

Page 1439

[1] possibility that Muzak might actually decline in locations,
[2] right?

[3] **A.** Yes.

[4] **Q.** And so I hope I'm not repeating when I ask you whether the
[5] way to understand the cushion and how it affects the $36.36
[6] price is that it revolves around the expectation of the
[7] parties, not the most extreme example on either side of what
[8] could have happened?

[9] **A.** So, again, for your question you're asking me to ignore,
[10] for example, the other companies where a decline had already
[11] occurred.

[12] **Q.** Right.

[13] **A.** Just with Muzak, if that were the only experience we had.

[14] **Q.** Right.

[15] **A.** And we wanted to understand the economics of that deal in
[16] isolation I would agree with you, you would try in some sense
[17] to understand the economics of the deal based on the
[18] expectations of the parties.

[19] **Q.** I'm informed, and so I stand corrected, that the way the
[20] Muzak agreement worked, once the 8 percent trip wire went into
[21] effect, the additional subscribers were not at $36.36, they
[22] were at lesser amounts, but they were -- but additional
[23] payments did become due for each additional subscriber.

[24] **A.** Right. But that just reinforces my point. That to think
[25] of this as a per-location deal is a very complicated endeavor.

Page 1440

[1] **Q.** You made allusion before, a minute ago, to the fact that
[2] other CMS companies got what you imply, I think, are better
[3] terms than Muzak, right?
[4] **A.** I don't think I implied that, no.
[5] **Q.** Okay. Actually, TruSonic and Play Network got the same
[6] deal as Muzak, correct?
[7] **A.** Well, I don't remember the specifics of specific companies,
[8] but what I was alluding to earlier that struck me as
[9] economically complicating further the interpretation of this
[10] was that there were companies that signed later whose license
[11] prices were nonetheless based on their number of locations as
[12] of 2004. So your whole point about expectations becomes very
[13] murky when deals were signed based on facts which wasn't a
[14] matter of expectations which were known to be false, but
[15] somehow that was still the way the deal was implemented.
[16] **Q.** Is it your view that BMI exercised market power over those
[17] companies, too?
[18] **A.** Yes.
[19] **Q.** And if that were the case, why did BMI give those companies
[20] those concessions?
[21] **A.** I don't know which concessions you're referring to.
[22] **Q.** Looking back --
[23]     **THE COURT:** What was the answer?
[24]     **THE WITNESS:** I said I don't know which concessions
[25] he's referring to.

Page 1441

[1] **Q.** And I'm referring to the point I thought you were making
[2] that some of those companies got the benefit of knowing what
[3] their subscriber count had been.
[4] **A.** I'm saying the opposite. Some of those companies were
[5] charged based on their 2004 location count, even though they
[6] already had fewer locations than that, and had no choice but to
[7] accept that.
[8] **Q.** Which companies are those?
[9] **A.** I don't remember.
[10] **Q.** Okay. Some companies got the benefit of earlier subscriber
[11] counts even though they had grown.
[12] **A.** That's true. So BMI was not administering a per-location
[13] license in the CMS industry. They were administering something
[14] else.
[15] **Q.** But you don't know what it was.
[16] **A.** Well, we know what it was. It was this very complicated
[17] mixture of a fixed fee, but based on a 2004 location count.
[18] **Q.** You don't quarrel with the evidence that taken all in the
[19] per subscriber rate for the entire industry for the entire
[20] period was $34.32, right?
[21] **A.** As an arithmetic calculation, I don't quarrel with that.
[22] **Q.** Or in any other way?
[23] **A.** I quarrel with it being meaningful as a benchmark for a per
[24] location rate.
[25] **Q.** Okay, but you're not quarreling with the fact.

Page 1442

[1] **A.** I'm not quarreling with the fact that that was the average.
[2] **Q.** With respect to the music use adjustment to the Muzak deal
[3] benchmark, I think you told us that you had considerable
[4] discussion with Dr. Candell about that, right?
[5] **A.** Yes.
[6] **Q.** And you're aware, are you not, that in other industries the
[7] entire industry pays on the same basis even though there are
[8] variations between competitors as to their actual BMI Muzak use
[9] relative to ASCAP, right?
[10] **A.** Yes.
[11] **Q.** That's the way of the world in the radio industry, right?
[12] **A.** Yes.
[13] **Q.** And similarly in the television industry?
[14] **A.** In the local television industry, yes.
[15] **Q.** And it's also true in the basic cable television industry?
[16] **A.** I don't --
[17] **Q.** Except for --
[18] **A.** I'm sorry, I don't recall.
[19] **Q.** Except for bands of general entertainment versus news and
[20] sports, versus music intensive within those three bands,
[21] variations between cable networks are not observed, right?
[22] **A.** The last time I was involved in the cable industry, which
[23] was over ten years ago, that was true. I don't know what's
[24] going on today.
[25] **Q.** It's true, is it not, that it's only Muzak and not any

Page 1443

[1] other commercial music service whose data form the basis for
[2] your contention that there should be an adjustment to the 36.36
[3] rate for music use, right?
[4] **A.** That's correct. It was the only data we had.
[5] **Q.** Now, with respect to the fact that BMI and Muzak had
[6] reached agreement to settle the past period at the same time
[7] they entered into the forward-looking license, your contention
[8] is there must be an adjustment, right?
[9] **A.** Yes.
[10] **Q.** And that's based on the proposition that surely the value
[11] of the license did not escalate by more than double on a single
[12] day, right?
[13] **A.** That was one factor I cited.
[14] **Q.** Now, you would agree, would you not, that Muzak would have
[15] the incentive to try to keep its license fee on a going-forward
[16] basis reasonable, so that when it expired the precedent between
[17] the parties would be at a lower rate rather than a higher one,
[18] right?
[19] **A.** Yes.
[20] **Q.** So from Muzak's point of view in negotiating with BMI for
[21] the 2004 agreement that went through in 2009, Muzak did have a
[22] reason not to take money from the past and move it into the
[23] future, right?
[24] **A.** Yes, but it also had a reason why it would want to do that,
[25] which is that it probably had an expectation that its

Page 1444

[1] competitors fees would be affected by this deal, and if it
[2] could state the going-forward rate as higher, that would all
[3] else equal might lead to a higher rate for its competitors.
[4] **Q.** And you don't know as between those two incentives which
[5] one would carry the day in fact, right?
[6] **A.** With respect to Muzak, no.
[7] **Q.** And apart from whatever Dr. Candell knows on this point,
[8] you don't know anything additional on the subject of whether in
[9] fact Muzak did take value that it believed belonged to the past
[10] and move it into the future, right?
[11] **A.** Well, I mean, we've already established that the basis for
[12] my opinion is essentially economic analysis which is
[13] independent of Dr. Candell. But it's in terms of what do the
[14] documents say, I have not done any independent analysis of that
[15] of Dr. Candell.
[16] **Q.** Okay. Let's talk --
[17] **THE COURT:** Let me ask both of you whether on a grand
[18] scale in the licensing of a copyright the normal compensation
[19] is a royalty, which means so much payment per unit of
[20] production under the copyright, and that is so well
[21] embedded in the copyright concept that an application which
[22] disregards intensity of use should be regarded as aberrant
[23] rather than a normal course of business.
[24] **MR. SALZMAN:** My response in the music performing
[25] rights area would be that the blanket license forever has never

Page 1445

[1] been paid for on a per-use basis. The whole point of the
[2] license is that you can use as much music as you want and you
[3] don't pay additional cost per use. In fact, I think Dr. Owen
[4] testified, and I think it's a pretty well accepted economic
[5] proposition that a benefit of the blanket license is that there
[6] is no marginal cost for a use and that's a benefit because
[7] there is no marginal cost in producing the performance; that
[8] the price is zero and the cost is zero at the margin. That
[9] music performances are not concert, music has already been
[10] written, it's out there, it's in a library, and to charge per
[11] use would create an incentive to use less music, even though
[12] society doesn't have to create more songs. They're out there,
[13] they should be used, there's no marginal cost.
[14] So in the music performing rights area, it's never
[15] been true under the traditional blanket license and we would
[16] argue that one of the down sides of the per-program license and
[17] the adjustable fee blanket license is that it does create this
[18] marginal cost.
[19] That's not to say that the intensity of music use is
[20] irrelevant. Far from it. The negotiations are always about
[21] music use, BMI's share relative to ASCAP, is radio or
[22] television using more or less music than it used to do. The
[23] case law reflects that, the Capital City case, Judge Connor
[24] looked at one network versus another in terms of how many ASCAP
[25] credits they used historically, so it figures in, but not in a

Page 1446

[1] marginal way.
[2] **THE WITNESS:** Yeah, I mean, I think that I would agree
[3] with Mr. Salzman that under the traditional blanket license
[4] there's no charge on the margin for more music. But it has
[5] been very much the case in every either rate proceeding or
[6] negotiation in the shadow of rate proceedings that I've been
[7] involved in that the, in some way the expected intensity of
[8] music use is a major factor in the pricing of a license.
[9] **THE COURT:** And the blanket license is itself a rather
[10] unusual phenomenon, isn't it?
[11] **THE WITNESS:** It is. And it's been created as really
[12] an anomaly within the licensing world in which we have this
[13] trade-off of transactions costs and collective pricing that was
[14] made a long time ago to decide that we would allow the
[15] collective pricing in order to try to economize on the
[16] transactions cost. A decision that was originally made, by the
[17] way, when technology was not what it is today and transactions
[18] costs were in some sense much higher than they are now. I
[19] mean, one of the realities of the digital world is that all
[20] kinds of transactions are now much easier to do and much less
[21] costly than they used to be.
[22] **Q.** I guess one footnote to what I said before was that in
[23] terms of this music use adjustment, I would say that whether
[24] it's because of the non-discrimination clause in the consent
[25] decree and/or because of the economy of negotiating with

Page 1447

[1] industries as a whole and some combination of that, in general
[2] within a customer class there haven't been distinctions based
[3] on music use. And I think in terms of whether an adjustment is
[4] justified here the issue between the parties is whether
[5] assuming that DMX had proved a difference in music use, whether
[6] that would be a reason to make them different from Muzak on
[7] that basis, even though they're arguably similarly situated to
[8] them and to Play Network, TruSonic and so on, where there's no
[9] data about their music use. So I think that's the issue.
[10] Am I correct, your Honor, to understand that there's
[11] another proceeding at 4:00?
[12] **THE COURT:** Yes, that's ten minutes from now.
[13] **MR. SALZMAN:** Okay.
[14] **THE COURT:** Is that a good time to recess anyhow?
[15] **MR. SALZMAN:** Well, I think the situation is that I
[16] only have a few more minutes, so whether --
[17] **THE COURT:** You may have?
[18] **MR. SALZMAN:** Only a few more minutes, so therefore
[19] whether we get done --
[20] **THE COURT:** Let's forge ahead.
[21] **MR. SALZMAN:** Thank you.
[22] (Continued next page)

[1] **MR. RICH:** Your Honor, I may have a very modest amount
[2] of redirect.
[3] **THE COURT:** Okay. Well, let's use the time we have.
[4] **MR. SALZMAN:** Thank you.
[5] **BY MR. SALZMAN:**
[6] **Q.** You agree, do you not Dr. Jaffe, that the cashout feature
[7] of the adjustable fee blanket license makes it more valuable to
[8] DMX than the traditional blanket license, correct?
[9] **A.** Yes.
[10] **Q.** And someone in DMX' position would be willing to pay more
[11] for it than for a traditional blanket license, correct?
[12] **A.** Absent any competitive market considerations or
[13] reasonableness considerations, yes.
[14] **Q.** And, I think you've also told us that BMI would have
[15] additional costs for supplying that, correct?
[16] **A.** Conceptually, yes.
[17] **Q.** Well, you have no reason to doubt the testimony in this
[18] case from BMI about that it would have additional costs, right?
[19] **A.** I have not evaluated that testimony one way or the other.
[20] **Q.** And, ordinarily, if a buyer values one product more than
[21] another and the seller would have additional costs, you would
[22] expect that product to cost more, right?
[23] **A.** What do you mean by ordinarily? Are we talking about a
[24] competitive market? Or are we talking about a case where the
[25] seller has market power?

[1] **Q.** Both.
[2] **A.** Well, in a competitive market, as I've testified, the
[3] greater costs of the seller would be reflected in the
[4] competitive market price. The valuation of the buyer would be
[5] irrelevant. In a market power situation both would be relevant
[6] and the price would be higher for both reasons.
[7] **Q.** It's common throughout our economy for superior products to
[8] command higher prices that don't directly relate to their cost,
[9] right?
[10] **A.** It is not common for that to occur in the absence of some
[11] kind of source of market power such as a patent or a strong
[12] brand that is recognized or some other barrier to entry that
[13] prevents competition from eroding the excess of price over
[14] cost.
[15] **Q.** Well, companies all over America do research and
[16] development and innovate in order to get higher prices for
[17] their product as compared to their competitors, right?
[18] **A.** They try to, yes.
[19] **Q.** And it is not futile, some of them succeed, right?
[20] **A.** Some of them succeed and some of them manage because of
[21] patents or other kinds of barriers to competition to charge
[22] higher prices for better products.
[23] **Q.** So, for example, the cell phone industry is very
[24] competitive, right?
[25] **A.** I don't actually know.

[1] **Q.** You know that iPhones command a premium price as compared
[2] to other types of cell phones?
[3] **A.** I don't know.
[4] **THE COURT:** Isn't a great deal of advertising devoted
[5] to stimulating the consumer's interest in bells and whistles of
[6] rather little actual value to induce him or her to pay a price
[7] higher based on the consumer's valuation of what he is getting
[8] rather than the cost of production?
[9] **THE WITNESS:** Well, advertising is actually a subject
[10] that economists struggle to come to an agreement as to how to
[11] explain, but one way of thinking about advertising is that it
[12] is intended exactly to, in some sense, keep competition at bay
[13] and to induce customers to buy my version of the product
[14] without really allowing in the competition from other versions
[15] of the same product.
[16] **BY MR. SALZMAN:**
[17] **Q.** Well, in ordinary discourse, you would agree that when a
[18] seller sells at cost that's a bargain, right?
[19] **A.** I don't know what that means. I mean, to an economist cost
[20] is always, as we've discussed earlier, inclusive of all the
[21] economic costs. And if that's the price at which they're
[22] selling, that's not a bargain, that's a competitive price.
[23] **Q.** Okay, but when non-economists talk about selling at cost,
[24] they don't mean including return on investment, they mean the
[25] cost -- the short run cost of producing that product, right?

[1] **THE COURT:** They mean foregoing a profit.
[2] **Q.** Right. That's exactly what I'm asking.
[3] **A.** So, a product is sold without a reasonable return on the
[4] investment, that's a bargain.
[5] **Q.** And here you're proposing that there be no premium for the
[6] adjustable fee blanket license, that all the features that BMI
[7] puts into the product, you say, should be delivered to DMX at
[8] cost?
[9] **A.** At cost, inclusive of a reasonable return on investment.
[10] **Q.** And you've done no calculation as to how BMI has invested,
[11] over the years in developing its repertoire, developing its
[12] systems to derive what those costs are; isn't that true?
[13] **A.** I have no data that would allow me to do that.
[14] **Q.** And so, when you say that there should be no premium, BMI
[15] should charge its cost, you mean cost in the sense of whatever
[16] BMI has invested over the years, correct?
[17] **A.** What I mean is appropriately calculated costs which would
[18] include both the short run costs and a reasonable return on its
[19] investments over the years.
[20] **Q.** And you've done no calculation as to what that might be,
[21] right?
[22] **A.** I have had no ability to do that calculation.
[23] **Q.** And what I think is my last set of questions has to deal
[24] with your choosing the 11.7 percent figure from the BMI press
[25] release as to its -- which is the fraction derived from taking

Page 1452

[1] all BMI's costs and dividing it by all of BMI's revenue, right?
[2] **A.** Yes.
[3] **Q.** And you are aware, are you not, that BMI takes in royalties
[4] both from domestic users and from foreign performing rights
[5] organizations, correct?
[6] **A.** Yes.
[7] **Q.** And you are aware that those foreign performing rights
[8] organizations get the money to pay over the BMI from music
[9] users in those foreign countries, correct?
[10] **A.** Yes.
[11] **Q.** And you would agree with me, would you not, that those
[12] foreign rights organizations have expenses of their own in
[13] dealing with music users and their respective territories?
[14] **A.** Yes.
[15] **Q.** And they have their own costs involved in assembling their
[16] repertoires, correct?
[17] **A.** Yes.
[18] **Q.** And, you would agree with me, that whatever money BMI takes
[19] in from those foreign performing rights organizations is net of
[20] the overhead of those performing rights organizations, correct?
[21] **A.** Yes.
[22] **Q.** And, you would also agree with me, that BMI charges DMX'
[23] competitors in the United States, or rather not -- let me
[24] withdraw that.
[25]      You would agree with me, would you not, that BMI, in

Page 1453

[1] distributing money to its affiliates for performances from DMX'
[2] competitors in the United States, deducts 17 percent from the
[3] royalties received before paying it over to those songwriters
[4] and publishers, right?
[5] **A.** That's been the testimony, yes.
[6] **Q.** And you have no reason to dispute that?
[7] **A.** I have no knowledge other than the record.
[8] **Q.** And you would agree with me, would you not, that it would
[9] be not appropriate for DMX to cross-subsidize its competitors
[10] by paying less than its fair share of BMI's costs, right?
[11] **A.** I don't know the answer to that question.  I don't know
[12] what you mean by cross-subsidy and I don't know what
[13] circumstance you are describing.
[14] **Q.** Let me just ask you last, did you testify in the Copyright
[15] Royalty Board in Washington in a proceeding adverse to the
[16] music record labels?
[17] **A.** Yes.
[18] **Q.** And, on whose behalf did you testify?
[19] **A.** A number of web broadcasters and radio stations with
[20] webcasts.
[21] **Q.** And, in that proceeding isn't it true that you proposed a
[22] benchmark for the Copyright Royalty Board to consider?
[23] **A.** I did.
[24] **Q.** And that was music performing rights blanket licenses
[25] issued by BMI and ASCAP?

Page 1454

[1] **A.** It was.
[2]      **MR. SALZMAN:** No further questions.
[3]      **MR. RICH:** Your Honor, I have 10 to 12 minutes and I
[4] don't know if it fits your schedule to do that now.
[5]      **THE COURT:** In the 4:00 conference I'm told that only
[6] the defendant is here, the plaintiff hasn't shown up yet.
[7]      If you really going to be that short then I think
[8] we'll proceed.
[9]      **MR. RICH:** I believe I can be.
[10]      **THE COURT:** Okay.
[11] REDIRECT EXAMINATION
[12] BY MR. RICH:
[13] **Q.** Professor Jaffe, throughout your cross-examination you were
[14] asked a number of questions about a variety of hypothesized
[15] willing buyer/willing seller transactions, and since you went
[16] to the trouble of preparing it, could you turn to tab 3 in your
[17] binder, a demonstrative we did not talk about on direct, and
[18] explain what that demonstrative has to say on the subject of
[19] the relevance of willing buyer/willing seller transactions to
[20] this proceeding?
[21] **A.** Yes.
[22] **Q.** Can we get it up on the screen, please?
[23] **A.** So, with this demonstrative I was just trying to make the
[24] point of what is the relationship between competitive market
[25] transactions on the one hand and the willing buyer/willing

Page 1455

[1] seller transactions that are sometimes talked about in these
[2] cases.  What I'm trying to show here is that the set of things
[3] that we call willing buyer/willing seller includes competitive
[4] market transactions, it includes within it some theoretical
[5] perfect competition, it includes within it workable
[6] competition, but it also includes transactions where the seller
[7] has some degree of market power, and it also includes a
[8] monopoly seller transaction.
[9]      So, when I say I prefer the competitive market
[10] benchmark to the willing buyer/willing seller benchmark, I am
[11] not saying that I am not looking at willing buyer/willing
[12] seller transactions; I am, but there are another set of willing
[13] buyer/willing seller transactions that I believe are
[14] inappropriate and should not be considered because they reflect
[15] market power, that extra width in the middle of the screen or
[16] the middle of the exhibit which is part of the set of willing
[17] buyer/willing seller transactions but not the competitive
[18] transactions.
[19] **Q.** Where do the BMI transactions with the commercial music
[20] service industry fit along this spectrum?
[21]      **THE COURT:** Sort of in the sense that a criminal plea
[22] of guilty might be totally voluntary except in the sense that
[23] he prefer not to have it make it at all.
[24]      **THE WITNESS:** Yes.  Yes.
[25]      I would say that BMI, you know, falls somewhere in the

Page 1456

[1] seller with market power to monopoly range. They are actually
[2] a monopoly but we've had the issue about their discipline by
[3] the rate court.
[4]     THE COURT: I think I understand the concept.
[5]     THE WITNESS: Okay.
[6] BY MR. RICH:
[7] Q. If you turn to tab 9 quickly, you had also prepared a
[8] demonstrative which we passed on direct but which implicates, I
[9] think, a number of questions that came up on cross-examination
[10] about the interplay of the rate court and its availability on
[11] what are willing buyer/willing seller transactions in fact
[12] between BMI and users.
[13]     Could you explain what you were depicting here?
[14] A. Well, here I was just trying to make the point related to
[15] issues we've discussed, that when we look at a benchmark like
[16] the BMI Muzak benchmark, the actual numbers we see are going to
[17] be affected by the party's expectations about what a rate court
[18] would do. When we then use that ourselves possibly as a
[19] benchmark for the rate court, we are in this circular situation
[20] where the rate court determines people's expectations which, in
[21] turn, determine the benchmarks that are used by the rate court
[22] to determine the next case. And I'm not saying there is
[23] anything bad or evil about that, but it is limited in its
[24] probative value because there is no real external information
[25] that's brought into it whereas the direct license benchmark

Page 1457

[1] brings in additional information about what really happens
[2] under competition.
[3] Q. You gave an answer to Mr. Salzman that as a matter of
[4] antitrust economics you didn't find any fault with BMI's
[5] dealings with Universal.
[6]     Do you remember that?
[7] A. Yes.
[8] Q. Would you advise us, please, what relevance you do find to
[9] this rate-making exercise of the dealings between BMI and
[10] Universal?
[11] A. What they're relevant to is this question of bias. Do we
[12] need to worry that the direct license transactions are somehow
[13] below the correct market value because some people said no.
[14] And an important party that said no was Universal and it is
[15] clear they didn't say no because they thought that the DMX
[16] proposal was below the competitive market level. They said no
[17] because BMI promised to give them an amount of money which,
[18] based on the record, appears to be most likely to be in excess
[19] of what they could actually expect to get under normal
[20] distributions from BMI.
[21]     So, it is relevant to that issue of is there a bias
[22] from the fact that these other publishers said no. And I think it
[23] implies that that bias is not likely to be present.
[24] Q. You were asked a few questions about music intensity and
[25] BMI's practice with respect to all industry committees such as

Page 1458

[1] radio and television.
[2]     Do you recall that?
[3] A. Yes.
[4] Q. To your knowledge, was BMI's negotiation and conclusion of
[5] its deal with Muzak done as part of an all-industry
[6] negotiation?
[7] A. No, it was not.
[8] Q. Do you understand BMI to operate as a for-profit or a
[9] not-for-profit organization?
[10] A. I understand it to be a not-for-profit organization.
[11] Q. Finally, with respect to foreign expenses, what is your
[12] understanding of what the record shows about BMI's actual
[13] allocations of expenses associated with its administration of
[14] foreign royalty collections as opposed to domestic collections?
[15]     MR. SALZMAN: Objection.
[16]     THE COURT: Overruled.
[17] A. I don't think I have an understanding.
[18] Q. Are you aware -- have you, in your review of the record,
[19] have you identified any evidence proffered by BMI reflecting
[20] the actual expenses it incurs in administering its foreign, as
[21] opposed to domestic, collection?
[22] A. No. There is no such evidence.
[23]     MR. RICH: I have no further questions. Thank you.
[24]     MR. SALZMAN: We're done.
[25]     THE COURT: Either side have anything further?

Page 1459

[1]     MR. FITZPATRICK: We do not have anything in rebuttal,
[2] your Honor.
[3]     The only thing that remains open is we had moved the
[4] admission of Petitioner's Exhibits 200 and 201. I believe your
[5] Honor put it to the end of the case whether there would be
[6] motion to strike or whether those exhibits would be admitted.
[7]     MR. RICH: Your Honor, Mr. Larson would like to
[8] address that issue for us, please.
[9]     MR. LARSON: Yes, and I believe the exhibits were
[10] never admitted. Actually, the ruling on whether it would be
[11] admitted was held in abeyance.
[12]     MR. FITZPATRICK: I agree.
[13]     MR. LARSON: As far as Exhibit PX 200 goes, which
[14] purports to show the number of unique songs played on DMX'
[15] on-premise and off-premise services, we withdraw our objection
[16] on that particular one to entering it into evidence. It seems
[17] thus that the one page that Mr. Laughlin presented is an
[18] accurate summary or fair summary of the underlying data.
[19]     With respect to PX 201, which purports to analyze the
[20] actual number of performances on the off-premise and on-premise
[21] services of DMX, we would maintain our objection for a couple
[22] reasons. Most importantly, it seems to us that PX 201 is
[23] actually inaccurate and internally inconsistent in terms of how
[24] it presents the data.
[25]     The testimony of Mr. Knittel made clear that with

Page 1460

[1] respect to the off-premise service, that the DMX reporting
[2] provides a total listing of all the songs broadcast over the
[3] satellite and notably includes the frequency which those are
[4] played, whereas with respect to DMX on-premise reporting it
[5] just shows the unique number of songs included on the programs
[6] that are distributed without any indication of frequency.
[7]     So PX 201, in terms of to the extent it describes the
[8] data as showing performances off-premise and performances
[9] on-premise, is actually inconsistent in its use of
[10] performances.
[11]     **THE COURT:** Is.
[12]     **MR. LARSON:** It is inconsistent in the way it uses the
[13] term performances. We don't think it -- the data doesn't show
[14] the number of on-premise performances as the exhibit suggests
[15] it shows the number of BMI distributed on-premise and so it is
[16] misleading. And, the upshot of that is that the sheet is not
[17] an accurate summary of the underlying data. And our other
[18] objection which I think still holds is that the exhibit is
[19] hearsay. Mr. Laughlin, who presented it, hadn't done the study
[20] himself and really didn't know the details of the underlying
[21] data.
[22]     So, for both reasons, we maintain our objection.
[23]     **MR. FITZPATRICK:** Well, your Honor, I don't think
[24] there is any basis to the objection. Mr. Laughlin was
[25] perfectly familiar with and capable of describing the data.

Page 1461

[1]     With respect to the first point, I think that's a
[2] perfectly fair argument for DMX to make about what your Honor
[3] should make of this exhibit but it doesn't go to the
[4] admissibility. The data are not inaccurate. Mr. Larson is
[5] just -- Mr. Larson is making the point that they take a
[6] different view of what the data means but that's not a reason
[7] to keep the document out. We understand that --
[8]     **THE COURT:** Well, he says the data do not, even
[9] undertake to represent performances. They represent being
[10] listed but not performed.
[11]     **MR. FITZPATRICK:** The data undertake -- the data
[12] represent the data we are given from DMX and if Mr. Knittel is
[13] correct that the data we get from DMX lists performances, then
[14] that's a perfectly valid argument for DMX to make about them.
[15] But, I agree, the data represent the data we are given by DMX
[16] and calculate what percentage of those data are directly
[17] licensed. We argue about what that means but that doesn't go
[18] to the admissibility of the document.
[19]     **MR. LARSON:** I would respectfully disagree. I think
[20] to the extent that these pages we have been given is a one-page
[21] summary of the underlying analysis. Under the best evidence
[22] rule, a summary is allowed but the summary has to be an
[23] accurate summary.
[24]     **THE COURT:** What were the figures called by DMX when
[25] it gave them to BMI?

Page 1462

[1]     **MR. LARSON:** Within the initial report -- I don't know
[2] that they're actually given a label as to performance or not.
[3] A song title is listed in the reports with a time code but I
[4] think the evidence from Mr. Knittel makes clear that it is just
[5] a listing of unique songs, it doesn't provide a number of --
[6]     **THE COURT:** My question is what were they called when
[7] they were produced to BMI.
[8]     **MR. LARSON:** I think they're distribution reports,
[9] your Honor.
[10]     **THE COURT:** And what did they say the figures
[11] represented?
[12]     **MR. LARSON:** Well, they don't provide a heading as far
[13] as I know. My understanding is they provide a list of the
[14] songs.
[15]     **THE COURT:** Bring up the document so I can see it.
[16]     I have 201 but I don't have the reports on which it
[17] rests.
[18]     **MR. LARSON:** And your Honor, that's the point. The
[19] reports are a massive database as they're provided from --
[20]     **THE COURT:** What is the caption of the database? What
[21] were they produced in response to?
[22]     **MR. LARSON:** This is data that is provided from DMX to
[23] BMI in the ordinary course of business, it's a massive data
[24] file just listing every song that's distributed on the
[25] on-premise media that is provided to DMX' customers. It is a

Page 1463

[1] giant database, a text file that's identified --
[2]     **THE COURT:** This says in original format.
[3]     **MR. LARSON:** Yes. It is a database format of millions
[4] of records.
[5]     **THE COURT:** With no captions?
[6]     **MR. LARSON:** Your Honor, I just don't know how the --
[7] what the name of the file itself is.
[8]     **MR. DiMONA:** Your Honor, if I may speak about this for
[9] BMI?
[10]     **THE COURT:** Yes.
[11]     **MR. DiMONA:** This is data that we received in the
[12] ordinary course of business from DMX every quarter and it is in
[13] the form of on-premise playlists and there are many, many of
[14] them each quarter and there is a change in Universal but there
[15] is -- each playlist is a list of songs and what accompanies
[16] that is what's called a distribution report that shows how
[17] many customers took that playlist. And that's the data that
[18] BMI has used for many years to distribute royalties and how we
[19] calculate performances that we distribute royalties on. It is
[20] a proxy for performances because we use the distribution
[21] information to, as a measurement of the actual delivery and
[22] receipt of these particular titles. The on-premise play lists
[23] themselves just have a name and a list but they don't have
[24] any -- they're not much more than that but the important point
[25] is the distribution of the location is count information is

Page 1464

[1] very important.

[2] **THE COURT:** The fact that you've been using them for
[3] the distribution of royalties sounds as though it validated as
[4] being performances. But here the issue isn't the distribution
[5] of royalties, it is a question of what is actually measured,
[6] and what is actually measured is the play list appearing on the
[7] play list, not their number of performances, as this exhibit
[8] would have a careless reader assume.

[9] **MR. DiMONA:** If I may speak to that it is true, your
[10] Honor, that in neither the on-premise situation nor the
[11] off-premise situation do we know what is actually performed at
[12] the location. That information is not available. It is not
[13] available for the satellite channels because you don't know
[14] what channel they're tuned into. You know it is not all 100
[15] channels, it is typically one or two channels by each customer,
[16] and, similarly, in the on-premise data you don't know what
[17] program they actually performed but it is the best available
[18] proxy information that we have. And we have it and we think
[19] it's the only proxy information that really shows some sort of
[20] popularity indication.

[21] **THE COURT:** I understand. Nevertheless, the caption
[22] is inadequate and it is excluded without prejudice to
[23] resubmission with a caption which actually states what the
[24] figures represent.

[25] **MR. FITZPATRICK:** Understood, your Honor. Thank you.

Page 1465

[1] **THE COURT:** You can do that on consent. We are
[2] adjourned until, I think, 3:00 Monday afternoon.

[3] (Adjourned to 3:00 p.m., February 1, 2010.)

Page 1466

[1] INDEX OF EXAMINATION
[2] Examination of:                           Page
[3] ADAM B. JAFFE
[4] Direct By Mr. Rich . . . . . . . . . . . . . .1321
[5] Cross By Mr. Salzman . . . . . . . . . . . .1383
[6] ADAM B. JAFFE
[7] Cross By Mr. Salzman . . . . . . . . . . . .1400
[8] Redirect By Mr. Rich . . . . . . . . . . . .1454
[9] RESPONDENT EXHIBITS
[10] Exhibit No.                            Received
[11] 163   . . . . . . . . . . . . . . . . . . . .1324

A-611

# In The Matter Of:

*BROADCAST MUSIC INC., v.*
*DMX, INC.*

---

*VOLUME 10*
*February 1, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 0215bmif.txt, Pages 1467-1534 (68)

**Word Index included with this Min-U-Script®**

```
                    021FBMI1            Trial
[1]    UNITED STATES DISTRICT COURT
[2]    SOUTHERN DISTRICT OF NEW YORK
       ------------------------------x
[3]
       BROADCAST MUSIC INC.,
[4]
                 Petitioner,
[5]
            v.                        08 Civ. 216 (LLS)
[6]
       DMX, INC.,,
[7]
                 Respondent.
[8]
       ------------------------------x
[9]
                                     February 1, 2010
                                          3:00 p.m.
[10]
       Before:
[11]
                     HON. LOUIS L. STANTON,
[12]
                                        District Judge
[13]
                        APPEARANCES
[14]
       HUGHES, HUBBARD & REED, LLP
[15]        Attorneys for Petitioner
       BY:  JAMES C. FITZPATRICK
[16]        MICHAEL E. SALZMAN
            JASON C. BENTON
[17]        MARGARET J. HOAG
                 AND
[18]        JOSEPH DiMONA, In-house counsel, BMI, Inc.,
[19]   WEIL, GOTSHAL & MANGES, LLP
            Attorneys for Respondent
[20]   BY:  R. BRUCE RICH
            BENJAMIN E. MARKS
[21]        TODD D. LARSON
[22]
[23]
[24]
[25]
```

```
[1]              (Trial resumed)
[2]         THE COURT:  Good afternoon.  Sorry to have delayed you
[3]    briefly.  Mr. Rich?
[4]         MR. RICH:  Good afternoon.  This case pits old,
[5]    entrenched, insular competition foreclosing practice against
[6]    the process of competition.  It affords the Court two very
[7]    dramatically different visions of how the music performing
[8]    rights marketplace should operate.  BMI's vision is a world of
[9]    continued user dependence on blanket licenses in which to
[10]   escape antitrust condemnation the availability of direct
[11]   licensing alternatives is a theoretically available but
[12]   commercially impractical option; a world in which BMI holds
[13]   itself out as protector of commercial interests of its
[14]   countless thousands of affiliates with the goal of insulating
[15]   those affiliates to the maximum extent possible from the rigors
[16]   of competition.
[17]        DMX's vision is a world in which it is not beholden to
[18]   the blanket license, and the huge expense of rate court
[19]   litigation to gain reasonable license fees.  It's a world
[20]   instead in which the undoubted market power reflected in BMI's
[21]   blanket license is placed in check by the availability of a
[22]   license alternative that affords DMX meaningful access to a
[23]   competitive market.
[24]        Now, BMI dresses its case up with economic euphemisms
[25]   for its interests in blockading the inroads of competition;
```

```
[1]    arguments to the effect that the asserted economic efficiencies
[2]    of the traditional competition-smothering blanket license
[3]    somehow warrant discouraging affording DMX access to a
[4]    competitive market.  That overuse of the adjustable credit
[5]    blanket license with a proliferation of direct licensing would
[6]    somehow produce undesirable social and economic results insofar
[7]    as it would reduce BMI's dominance in its self-licensing music
[8]    performing rights, and that it is somehow BMI's role to protect
[9]    publishers, the ilk of Sony/ATV, Universal, Lieber & Stoller,
[10]   Williamson Music, among others, from undervaluing their music
[11]   copyrights by being placed at the negotiating mercy of a
[12]   company, DMX, that is tiny in relation to the size of a
[13]   Universal or a Sony.
[14]        DMX's conception, fully consistent with the
[15]   overarching purposes of BMI's consent decree and the cases
[16]   construing it and that of its sister organization, ASCAP, is
[17]   that it's the role of free markets, not monopoly suppliers of
[18]   goods, to make efficiency decisions.  That if DMX prefers and
[19]   is able to secure a large percentage of its music rights needs
[20]   through direct dealings with BMI-affiliated music publishers,
[21]   it is both its right and entitlement to do so and to do so free
[22]   of economic or legal interference from BMI.  That if it chooses
[23]   to make an investment in direct licensing, whether in the form
[24]   of advances necessary to pry open a new market or to establish
[25]   through MRI a mechanism for administering such licenses, those
```

```
[1]    determinations should not be thrown back at it as supposed
[2]    evidence of the inherent costliness and inefficiency of
[3]    competitive pricing, nor should it form a basis for BMI to pile
[4]    on with a bill to DMX for significant additional expenses of
[5]    its own owning to BMI's fulfilling a decree mandate.  Nor
[6]    should it be lost on the Court the circumstances in which DMX
[7]    has made this investment in direct licensing, as Mr. Seton
[8]    testified, a highly competitive market, an economic recession,
[9]    steadily declining revenue per location for DMX and
[10]   across-the-board cost cutting mandates by the organization.
[11]        Now, BMI of course recognizes that it's forced to
[12]   offer a blanket carveout license.  It also realizes, as does
[13]   its trial expert, Dr. Owen, that direct licensing is directly
[14]   competitive with BMI's own traditional blanket license.
[15]   Dr. Owen so testified at pages 769 and 770 of the transcript.
[16]   Consistent with that recognition and its self-interest, BMI in
[17]   advance of trial tried to slow down, if not thwart completely,
[18]   DMX's direct license program.  If we could hand out a binder, a
[19]   couple of demonstratives to show.
[20]        In a December 3 board memo which appears at the first
[21]   tab of this binder, your Honor, BMI senior management
[22]   recommended paying BMI's largest affiliate, Universal, what
[23]   Universal itself, Mr. Arrow, the deposition read into the
[24]   record acknowledges, was an extraordinary guarantee.  If you
[25]   look at this excerpt from that memo at tab 1, it makes clear
```

VOLUME 10
February 1, 2010

Case: 10-3429   Document: 64-2   Page: 87   01/05/2011   BROADCAST MUSIC INC., v.
DMX, INC.

[1] that this guarantee was being made at a time when, quote, "more
[2] and more publishers are being asked by DMX to directly
[3] license," unquote, and when, quote, "at least one major
[4] publisher has entered into a direct license with DMX," unquote.
[5]   Given, as BMI's Alison Smith conceded at trial,
[6] Universal's leadership in the industry and the fact that a,
[7] quote from her transcript at page 614, "Other people look to
[8] Universal to see what they do and don't do," unquote, the memo
[9] appearing at the tab here concludes that, quote, "Having the
[10] ability to license Universal's music will help solidify BMI's
[11] position not only for this negotiation, but for the background
[12] music industry as a whole," unquote.
[13]   In other words, by paying, in Ms. Smith's words, a
[14] quote "premium" to Universal, that's at the transcript 573, BMI
[15] was hoping to prevent the many other publishers that look to
[16] Universal for guidance similarly from entering into direct
[17] licenses, and a sizable premium it was.  At nearly
[18] $1.9 million, even accepting Ms. Smith's version of the
[19] anticipated best case scenario in which BMI would quadruple its
[20] per location earnings from DMX and DMX were to grow to 100,000
[21] customer locations, BMI would at most recoup some $1.2 million
[22] of that $1.9 million over the three-year term of that guarantee
[23] or scarcely two-thirds of the guarantee.  So intent was BMI on
[24] plugging the hole springing up in its blanket-license-only
[25] dike, that it was willing to break its compact with its writer

[1] had to work from imperfect proxies and a dearth of evidence as
[2] to how music performing rights would be valued if composers and
[3] music publishers actually competed head to head to license
[4] their works, this case is different.  DMX's courageous
[5] determination to break a generations-old blanket license
[6] system, to make a risky investment in acquiring direct
[7] licenses, to open up a new market that has not heretofore
[8] existed, indeed, to spend enormous sums to litigate to gain the
[9] benefits of those investments, provides this Court for the
[10] first time with robust evidence of the competitive market value
[11] for performing rights here in the context of a commercial music
[12] service industry service.  As Professor Jaffe explained, in
[13] attempting to estimate the reasonable value of blanket license,
[14] it's useful to consider the two essential attributes of that
[15] license separately:  One, the value that license provides in
[16] conveying the rights needed by DMX to run its service, and the
[17] second, the insurance and aggregation features provided by the
[18] license, the combination of these two yields a fair
[19] approximation of the value of the license as a whole.
[20]   DMX's direct license experience provides the necessary
[21] data for resolving the first of these components, the value of
[22] the rights themselves.  The trial record provides actual data
[23] from more than 550 individualized licensed transactions across
[24] the spectrum of music publishers large and small, and across
[25] music genres and styles of all types as used by DMX.  All of

[1] members that they will never receive from BMI less than
[2] one-half of all distributions on account of the performances of
[3] their music.
[4]   BMI's trial position reflects this continuing aversion
[5] to direct licensing, though dressed up in different clothing.
[6] BMI would price the carveout license expressly to penalize DMX
[7] for using it through the so-called option value.  It would
[8] freight the license down with exorbitant and special costs that
[9] BMI would tax exclusively to DMX, despite their long
[10] application, their long-term application to other carveout
[11] licensees.  BMI would require DMX to report to BMI as to the
[12] incidence of direct license usage in a burdensome fashion, not
[13] justified by increased accuracy in calculation of the direct
[14] license ratio, and BMI would, your Honor, impose arbitrary
[15] arbitrary requirements related to reporting and validation of
[16] direct licenses as detailed at pages 60 to 65 of our trial
[17] brief.
[18]   All this, all this for a user representing less than
[19] two tenths of 1 percent of BMI's annual domestic revenues.
[20] There must be something to this competition thing.
[21]   Now, I'd like to talk about our affirmative case,
[22] please.  It's by now well established that the role of this
[23] Court is to arrive at a reasonable fee in terms for a blanket
[24] carveout license that approximate those that would be set in a
[25] competitive market.  Now, whereas past rate court cases have

[1] these licenses carry a royalty pool of $25 per DMX location.
[2] Try as it might to diminish the force of this data, BMI could
[3] not succeed at trial.  The trial testimony of BMI's and DMX's
[4] witnesses alike attested to BMI's recognition that these
[5] licenses, these direct licenses in fact reflect head to head
[6] competition with BMI's own licenses.  What better evidence,
[7] your Honor, can there be of the probative value of the direct
[8] licenses.
[9]   The evidence shows the rational price point of these
[10] licenses reflecting the considered views of music industry
[11] professionals such as Mr. Knittle and Mr. Gertz with more than
[12] 75 years between them of experience in the music business.
[13] More importantly, the record reflects the acceptance of that
[14] price point by highly sophisticated music publishers, including
[15] those with seats on ASCAP's board of directors, publishers with
[16] extensive and well-known catalogs of music like Lieber and
[17] Stoller, "Jailhouse Rock," "Hound Dog," "Stand by Me," just to
[18] name a couple.  Williamson Music, the works of Irving Berlin,
[19] Rogers and Hammerstein.  Smaller quality catalogs such as
[20] RealSongs and Diane Warren.  Publishers who are active in
[21] enforcing copyrights in the music publishing industry such as
[22] Lieber and Stoller.  Publishers who write leading texts on the
[23] music publishing business such as Randy Poe at Lieber and
[24] Stoller.
[25]   The record provides a complete documentation of the

[1] premise that DMX sought out only the low-hanging fruit either
[2] by seeking the lowest value compositions or those catalogs
[3] entailing the lowest transactions cost. On the contrary, the
[4] record establishes that DMX went out to establish those musical
[5] works that were most important to their business. So testified
[6] Mr. Knittle and so testified Mr. Gertz, and it got them, your
[7] Honor, 5,500 catalogs to date, covering the wide breadth of
[8] musical genres and styles, including many Grammy Award-winning
[9] songwriters. By coincidence, last night was the Grammy Awards,
[10] your Honor, and that list of awards won by artists last night,
[11] song of the year, album of the year, record of the year,
[12] lifetime achievement, so on and so forth, each of those winners
[13] are represented in DMX's direct license catalog.
[14]     The overall results to date are impressive. Already
[15] some one-third of all of DMX's transmissions are directly
[16] licensed and more than 40 percent of BMI licensed compositions
[17] are directly licensed. Notably the licenses also cover every
[18] type of DMX customer, including bowling centers, subject of a
[19] fair amount of testimony, contrary to BMI's attempt to exclude
[20] those locations from the CMS industry license.
[21]     Now, BMI contends that some publishers didn't enter
[22] into agreements with DMX and therefore the valuation of their
[23] music must have been higher. Putting aside the many potential
[24] explanations apart from price, while not every publisher
[25] actually signed these licenses as reviewed by Dr. Jaffe at the

[1] transcript at 1335 to 36 and Mr. Knittle at 956-57, among
[2] others, one has to ask if in fact that is the case, why didn't
[3] a single such publisher appear here to testify to that effect?
[4]     (Continued next page)

[1]     **MR. RICH:** Your Honor heard the testimony, very
[2] different testimony from the two publishers who did appear for
[3] BMI. One said, oh my gosh, I was negligent, I didn't read it.
[4] I shouldn't have signed it. And the other, frankly to me at
[5] least, was incomprehensible claiming she didn't know that she
[6] was signing a public performing license. But, no publisher
[7] came forward saying $25 systematically understates the fair
[8] market price of these music performing rights.
[9]     Now, Dr. Candell testified as to the proper manner of
[10] determining the value solely of the BMI portion of this $25
[11] royalty pool, your Honor, because you will recall that that
[12] pool comprehends ASCAP, BMI and SESAC compositions. As
[13] Dr. Candell explained, the best approximation of BMI's share of
[14] the music performed by DMX was 40 percent which, when you apply
[15] that to the $25 per location royalty provision, yields a
[16] BMI-only royalty of $10 of a location.
[17]     Now, addressing BMI's argument that the true value of
[18] a direct license is something higher than their nominal $25
[19] rate given the Sony advance. Dr. Candell performed additional
[20] and alternative calculations based on a conservative set of
[21] assumptions, that the Sony guarantee would not in fact earn out
[22] over its 57-month term. If it did, of course, it would require
[23] no modification at all of the $10 fee as she testified, but
[24] even taking the conservative assumptions which she testified to
[25] at 1247 to 1254 of the transcript, the $10 fee rises to a fee

[1] instead of $17.28 per location.
[2]     So, therefore, as Ms. Candell and -- Dr. Candell and
[3] Professor Jaffe testified, the appropriate range of reasonable
[4] fees covering the first of these two components, the valuation
[5] of music using DMX' direct market experience, up further in the
[6] next tab in the book, your Honor, the music fee, as it were, is
[7] $10 on the low end and $17.28 on the high end to which, of
[8] course, the so-called floor fee needs to be added. This is the
[9] aspect of the blanket license which covers its insurance and
[10] aggregation functions.
[11]     Now, as Professor Jaffe testified, there isn't any
[12] perfect data to rely on to perform this next piece of estimate.
[13] And in the absence of such data, DMX has proposed and Dr. Jaffe
[14] supported the option of the same overhead rate as BMI publishes
[15] to the world, 11.7 percent.
[16]     Now, BMI contends that the appropriate overhead rate
[17] is something like 17 percent, a claim which results from, in
[18] BMI's view, needing to account for the lower cost of collecting
[19] money from associated with foreign royalties.
[20]     But, Professor Jaffe testified as to the absence of
[21] any data supporting that figure beyond the mere fact that the
[22] 17 percent happens to be the percentage which BMI adopts and
[23] uses across the range of its domestic licensing programs. It's
[24] a number they selected. But, when pressed on cross-examination
[25] for the basis for that, BMI witnesses like Professor Owen

[1] confessed they had no understanding whatsoever of the
[2] derivation of the 17 percent let alone the basis for the 3.6
[3] percent deduction that's taken with respect solely to the
[4] foreign collections. And so, insofar, your Honor, as BMI bears
[5] the burden of proving the reasonableness of the fees that it
[6] seeks in this proceeding, this glaring absence of record
[7] support for an overhead allowance as high as 17 percent
[8] requires its rejection.
[9]     Dr. Candell performed the mathematical computations
[10] involved in adding the overhead calculated rate at 11.7 percent
[11] on top of either the $10 or $17.28 royalty rates yielding to
[12] the right there fees in the range of $11.32 to $19.57 for the
[13] full blanket fee value. I should point out that these are
[14] conservative valuations for at least two reasons: One, the
[15] direct licenses cover more than simply music performance
[16] rights, they cover other copyright rights including the rights
[17] of distribution, so-called mechanical rights which are valued
[18] at zero therefore in BMI's favor and, as noted,
[19] the licenses -- the direct licenses from which this model is
[20] derived also license a broader array of locations than the
[21] locations which BMI believes should be covered by the
[22] commercial music service license. Just like bowling centers
[23] which BMI claims charged a premium. All of those are wrapped
[24] into the direct licensing in fact conveying more value than the
[25] commercial music service license which BMI argues should be the

[1] subject of this proceeding.
[2]     Now, we should turn to the right yellow box which is
[3] incremental costs and what to do about that issue. These can
[4] be divided into two categories, your Honor, the up front
[5] capital expenses in developing software so that BMI can process
[6] reports from users like DMX and ongoing costs above and beyond
[7] those BMI would ordinarily incur in dealing with the CMS
[8] licensee.
[9]     Initially we believe, as a legal matter, that there is
[10] a significant question whether such costs are properly
[11] chargeable to DMX at all under the BMI consent decree.
[12]     BMI writer and publisher affiliates must accept that
[13] the privilege of entering into a joint licensing arrangement
[14] with others, through BMI, carries certain costs and
[15] obligations. One of those, it would seem, is bearing the fair
[16] share of the costs that BMI incurs in offering the variety of
[17] license forms that are mandated under its consent decree. We
[18] would urge the Court should view skeptically and attempt to
[19] push the cost of a license that BMI is required to offer onto a
[20] pioneer that has taken the risk of direct licensing and
[21] invested in costly litigation, to be the first to put the
[22] system in place.
[23]     Notably, BMI does not charge different licensees under
[24] its traditional blanket license whether different licensees
[25] within an industry sector, let alone across licensee sectors

[1] additional or variable fees depending on actual costs of
[2] administering their particular licensing even though those
[3] costs surely vary. There would seem no justification for doing
[4] so here just because DMX happens to be the first to take
[5] advantage of the blanket carve-out license.
[6]     Now, should the Court determine otherwise and conclude
[7] that DMX should shoulder some share of such costs, we would
[8] offer the following observations. First, these costs should be
[9] treated separately from the floor fee as our demonstrative
[10] indicates. They shouldn't be wrapped into the floor fee for at
[11] least two reasons:
[12]     First, is that if that floor fee were to grow, then
[13] the incremental savings available to DMX as it goes through
[14] direct licensing, that is the remaining space of savings under
[15] the music fee would be proportionally reduced.
[16]     Secondly, to work costs specific to DMX into a formula
[17] which presumably would be an industry formula that other
[18] commercial music service licensees would be able to adopt would
[19] distort that formula by costs that would be specific to DMX so
[20] that the suggestion would be any costs should be separately
[21] taxed to DMX and not made formally a part of the license
[22] formula.
[23]     Second, your Honor, any such costs should be allocated
[24] among all licensees who would use the license. The evidence
[25] shows that the up front investment in the BMI system is and has

[1] been viewed by BMI as a capital expense, that BMI views as,
[2] quote, mandatory under its consent decree, quote, necessary to
[3] compete in the marketplace, and a change to the system that
[4] will have potential use across a range of blanket carve-out
[5] licensees -- that's Mr. Laughlin's testimony at 476 to 480 of
[6] the transcript -- and that that license has potential for use
[7] both in and outside of the commercial music service industry.
[8]     So that if another, for example, commercial music
[9] service industry licensee took essentially the same license
[10] form as that which will be set for DMX here, little additional
[11] work on BMI's part is likely to implement that license.
[12] That's, again, Mr. Laughlin at 480 and 481. It would seem to
[13] be unfair and economically unjustified to charge all
[14] development costs to DMX, particularly given DMX's investment
[15] in litigation to get the carve-out license in place in the
[16] first place and the hundreds of thousands of dollars that DMX
[17] has spent on its own end putting its program in place.
[18]     Third, any taxing of costs should be proven costs
[19] only. The evidence at trial showed that almost all of the
[20] costs that BMI proposes to charge DMX are speculative, quote,
[21] guesstimates about costs not yet borne.
[22]     Mr. O'Neill so admitted at 190, Mr. Laughlin so
[23] admitted at 466 to 469 of the transcript. This is true both as
[24] to up front and so-called ongoing costs of administration.
[25]     Mr. Laughlin testified concerning up front costs, less

[1] than half of the budgeted 3,800 hours of work have actually
[2] been completed and only $120,000 out of an alleged $340,000 has
[3] been actually incurred and documented to date.  There is
[4] similar lack of solid documentation and actual work concerning
[5] ongoing expenses.
[6]     In light of the frequent downward revisions of
[7] previous estimates by BMI that were seriatim provided to DMX
[8] and its counsel, the Court should view skeptically charged for
[9] as yet uncompleted work not supported by auditable data,
[10] invoices and the like.
[11]     So, how should the Court at the end of the day think
[12] about any taxing costs?  Your Honor, the demonstrated up-front
[13] costs to date are only $120,000.  At most, BMI estimates they
[14] will grow to $340,000.  At best then DMX' share of that total,
[15] using its pro-rata share of industry locations which would be
[16] about 25 percent, should be about $17,000 a year times the five
[17] years of the license.  So, if you did the math and you assumed
[18] that BMI will actually incur the full $340,000, 25 percent of
[19] that amount is about $85,000.  And divided by five years that
[20] would be a bill of about $17,000 a year.  This would seem
[21] particularly fair, your Honor, given that the adjustable fee
[22] blanket license is likely to take hold and be rooted for uses
[23] outside of solely the commercial music service industry.  And
[24] BMI testified that at least one entity, I think they mentioned
[25] ABC, has already expressed interest.

[1]     With respect to ongoing costs, these are, for the most
[2] part, unproven guesstimates and it seems to me that the right
[3] answer here is let's have BMI come back, document them, submit
[4] a bill and if it is reasonable, those fees will be paid.  And
[5] if not, presumably, we would find some manner of resolution.
[6]     Let me turn to the BMI benchmark having talked about
[7] the DMX benchmark, and I want to come back to the concept, your
[8] Honor, of option value.  I would like to discuss first the
[9] notion that beyond reimbursement for additional proveable costs
[10] BMI should be entitled to price the adjustable fee blanket
[11] license at a 15 percent premium to reflect the greater value
[12] that license is said to afford DMX.
[13]     As I argued in my opening, BMI would like nothing more
[14] than to place a tax on DMX for exercising its decree guaranteed
[15] right to pursue direct licenses.  The very idea that BMI, which
[16] for generations chose to structure its blanket license in a
[17] fashion that foreclosed meaningful access to a competitive
[18] market, should receive an economic reward for now having been
[19] judicially mandated to offer a variant of that license that can
[20] finally pry open the doors to competition seems repugnant.  It
[21] would turn the antitrust policy underpinnings of the BMI
[22] consent decree, as interpreted by the Second Circuit's AEI
[23] decision, on its head were this Court to permit BMI to penalize
[24] DMX' and, by extension, other users, resort to the sole form of
[25] license that can reign in BMI's market power.

[1]     What is more, as Professor Jaffe testified, the buyer
[2] would not have to pay an option value in a competitive market.
[3] That's Jaffe at 1361-62.  While improvements in the value to
[4] the user are captured by monopolists, improvements in value to
[5] the user in competitive markets, he testified, are captured by
[6] the seller only to the extent the improved product is more
[7] expensive to produce.
[8]     Now, since the role of the Court here is to
[9] approximate the outcome of a competitive market and since BMI's
[10] fee proposal already contemplates paying BMI for its reasonably
[11] incurred incremental expenses from offering a blanket carve-out
[12] license, there would be no basis whatsoever for also tacking on
[13] additional fees to reflect so-called option value.  Nor is
[14] there evidentiary support for a 15 percent option value
[15] premium.  The local television per program licenses cited by
[16] Dr. Owen as supposed evidence of an embodiment of such a
[17] premium are not comparable in the least to the adjustable fee
[18] blanket license here.  They're a different form of license with
[19] a different industry and the formula measures and credits music
[20] use differently.
[21]     Respectfully, Dr. Owen doesn't understand either the
[22] genesis or the role of the per program license.  As the experts
[23] in the conceptualization and administration of that license
[24] form, Professor Jaffe and Mr. Gertz testified the per program
[25] multiplier is designed to make the per program and blanket

[1] license options price neutral for the typical local television
[2] station neither rewarding that station with a windfall in
[3] license savings without its having engaged in any self-help by
[4] way of source or direct licensing, but neither penalizing the
[5] station for selecting the per program option.
[6]     BMI, in its economist conception of the relative
[7] pricing of the traditional blanket license and the blanket
[8] carve-out license, is exactly the opposite.  It is explicitly
[9] designed to make resort to the latter more expensive day one.
[10] Dr. Owen could not have been more explicit in stating the view
[11] that the Court should price the adjustable fee blanket license
[12] so as to discourage its use relative to the traditional blanket
[13] license.
[14]     With the Court's indulgence, I would like to read a
[15] couple of passages from his examination.  This is at page 773
[16] of the transcript:
[17] "Q  If the adjustable fee blanket license were priced the same,
[18] the same full fee as the blanket license being, the traditional
[19] blanket license, what effect would that have?
[20] "A  Well, it would have the effect that every single CMS
[21] provider that had that license available would simply opt for
[22] the adjustable fee license because they would have the option
[23] to have exactly the same thing they have with a blanket license
[24] plus the option to license some of their music directly and to
[25] save money.  So, why wouldn't you take that if it is the same

VOLUME 10
February 1, 2010

Case: 10-3429    Document: 64-2    Page: 91    01/05/2011    BROADCAST MUSIC INC., v.
DMX, INC.

[1] price as the blanket license by itself?

[2] "Q Would that be a good or bad thing?

[3] "A It would be a bad thing, because it would mean that the per
program license was under value.

[5] "Q I'm sorry. Did you say the per program license?

[6] "A Per program license.

[7] "Q Per program license?

[8] "A Adjustable fee blanket license was being undervalued
relative to the blanket license, therefore it would be
overused.

[11] "Q Overused in what sense?

[12] "A Too many CMS operators would take the adjustable fee
blanket license instead of the blanket license resulting in
higher aggregate transactions costs and probably a reduction in
the output of music."

[16] Now, your Honor, in addressing precisely the same
sorts of arguments that were put forward not by BMI but by
ASCAP in a similar effort to discourage the use of the
malapropism by Dr. Owen, the per program license, here is what
Magistrate Judge Dolinger later affirmed to this issue by Judge
Conner had to say in the Buffalo Broadcasting opinion. It is
literally directly in response to the very same economic
proffer.

[24] Said the Court: ASCAP cites its expert's opinions
that, from a general economic point of view, the blanket

[1] license is preferable because it is more efficient and that,
because it sets the marginal cost of music at zero, it is
socially desirable. According to ASCAP, these views support
its proposal as to the relative pricing of the per program
license because this ratio will discourage the use of the
per-program license.

[7] The Court went on to say: There are several short
answers to this. First, in the service of its underlying
antitrust policies, the consent decree -- there the ASCAP
decree -- plainly seeks to ensure the general viability of the
per program license as an alternative to the blanket license.
Whether that is wise or foolish policy, it is embedded in the
decree and must be honored.

[14] Second, even if we view these efficiency concerns as
relevant considerations in conducting a reasonableness
inquiry -- and I do -- they do not dictate a ratio designed to
ensure that the per program license remains a museum artifact
rather than a practical alternative in appropriate situations.

[19] We turn next to the Muzak benchmark.

[20] Your Honor, as the trial testimony of Professors Jaffe
and Dr. Candell elucidated, the purported CMS industry
benchmark suffers from numerous crippling flaws beginning with
the recognition that these agreements are not agreements
entered into between a willing buyer and a willing seller are
in a competitive marketplace. To suggest, as BMI and its

[1] economists do, that the licenses that BMI has entered into with
other CMS competitors presumptively meet the governing
reasonableness test, notwithstanding BMI's acknowledged market
power which Dr. Owen concedes at 728 of the transcript, for the
sole and exclusive reason that these agreements were reached in
a shadow of the rate court, that seems to defy logic and common
sense and, indeed, it runs contrary to the very conclusion on
this point reached by the Second Circuit in its Showtime
opinion which I cited in my opening argument.

[10] As Professor Jaffe explained, BMI, a $900 million a
year organization whose very raison d'etre is to maximize
license income for its collective of affiliates, has hugely
greater resources than any single CMS industry entity to resort
to rate court litigation, and far greater stakes in the outcome
of that litigation than any single CMS entity.

[16] I would submit that it is a red herring for BMI to
cite other industries where all industry efforts have, from
time to time, been mounted by users or industries of users.
There isn't any parallel here. BMI negotiated individually
with Muzak and then individually with succeeding CMS
enterprises and then hid behind the nondiscrimination rationale
of its decree to force a form of agreement which it desired to,
having reached it with Muzak, on the rest of the industry.

[24] And even were it otherwise in terms of all industry
efforts, it is simply inept to compare the resources of a radio

[1] industry or broadcast television industry or a cable television
industry with that of the much smaller CMS industry which the
information BMI supplied your Honor demonstrates that it is a
very small portion of the revenues. Their fees are a very
small portion of the revenues of BMI.

[6] Now, beyond this basic recognition is the fact that
BMI's failure to make necessary adjustments to the benchmark to
account for the entirety of what Professor Owen of BMI conceded
was a single transaction between the parties including
settlement of the retroactive tenure period had no additional
fees. That's Professor Owen at 118-119 of the transcript.

[12] Further, to make adjustments for the contemplated
benefit to Muzak of what Professor Owen aptly described as a
built-in cushion in the nature of the 8 percent organic growth
provisions. That's Professor Owen at 149 and 150. And lastly,
an adjustment for the relative use of BMI music by Muzak on the
one hand and DMX on the other. I would like to discuss each of
these in turn.

[19] With respect to the retroactive or settlement period,
the record indicates clearly that the 1994 to 2004 period and
the 2004 to 2009 periods were settled as part of one
transaction. It is improper to cherry pick part of a single
agreement when analyzing its overall economics; so testified
Dr. Candell at 1257 of the transcript and Professor Jaffe at
1380-82 of the transcript.

Case: 10-3429   Document: 64-2   Page: 92   01/05/2011   180349   102

Page 1491

[1] There is no evidence that Muzak would have agreed to
[2] pay $30 million over five years for the 2004 to 2009 period
[3] absent settlement of the prior 10-year period at the $12 to
[4] $14, effectively, per location rate. And, in fact, the
[5] evidence is to the contrary. Muzak did not pony up money for
[6] the past period. It indicated it would pay ever increasing
[7] amounts for prospective periods but not for the past. And
[8] that's -- I'm not going to spend any time on it but at tab 5 is
[9] the documentation which the record shows the give and take of
[10] the parties over time and reflecting that BMI consistently
[11] assessed the settlement period as having a multi-million dollar
[12] value. The most contemporaneous BMI documents ascribed a
[13] relative value to the settlement period somewhere in the
[14] neighborhood of 14 to 16.7 percent.
[15] So, taking the various proposals over time, there was
[16] always a significant allocation by BMI of the value of the 15
[17] year period in the range of 14 to 16.7 percent out of it all to
[18] the prior period.
[19] Now, while BMI tries to portray the negotiations as
[20] entirely disconnected as if they occurred in separate
[21] universes, its subsequent negotiations with other CMS services
[22] demonstrate precisely the opposite. The settlement period
[23] itself was used as leverage to force other CMS services to
[24] agree to the Muzak framework. Thus, Mr. Annastas of BMI who
[25] testified flatly admitted that, quote, the past license

Page 1493

[1] Per the next tab in the binder, your Honor, from JX
[2] 1293, take two small services, Q Music and Carolina-Georgia
[3] Sound, several hundred locations. By the serendipity of the
[4] formula, one paying a location rate of under $25 and another a
[5] location rate of over $400, and take the bigger players, Muzak,
[6] the biggest because it failed to grow, paying a per location
[7] rate nearly 50 percent higher than did Play Network even though
[8] Play Network is considerably smaller.
[9] Now, if the benchmark is to be used, it stands to
[10] reason that DMX should be afforded the benefit of the lowest
[11] outcomes afforded its competitors. Dr. Owen, at 874-875 of the
[12] transcript, conceded that any economic result actually coming
[13] out of this formula was a reasonable one. And if you look at
[14] the BMI decree in Section 8A, it allows no different result.
[15] It prohibits BMI from discriminating in rates between similarly
[16] situated users, and yet that's precisely what BMI has done and
[17] proposes to do here, your Honor, on the, I submit, absurd
[18] premise that so long as a rate formula applied to DMX in 2010
[19] reaching all the way back in DMX' case to 2005, is the same
[20] formula as that which years ago BMI entered into with Muzak,
[21] everything is hunky-dory in terms of its nondiscrimination
[22] obligations.
[23] I would submit that this literally and impermissibly
[24] exults license form over economic substance.
[25] Looking at actual per location outcomes attained by a

Page 1492

[1] exposure was used as leverage by BMI to get commercial music
[2] services to sign on to the new deal going forward. That's
[3] Mr. Annastas at 326 of the transcript.
[4] Thus, a form letter was sent by BMI to all of the
[5] recalcitrant CMS services. That's at tab 6 of the binder, your
[6] Honor. After the Muzak deal was culminating in informing users
[7] per the highlighted text here that unless they took the new
[8] deal going forward, BMI would continue to seek higher fees for
[9] the past in rate litigation which none of these other services
[10] could scarcely afford. That's in evidence as RX 157, your
[11] Honor.
[12] Now, the only CMS services with no settlement period
[13] were uniformly small. The average number of locations for
[14] those companies by our math off of the joint exhibit that lists
[15] all of this was about 272 locations for the group -- the small
[16] group of CMS industry players who had no past exposure but
[17] still signed the so-called $36.36 agreement.
[18] Now, what about the organic growth feature of the
[19] license? The muzak deal is not a per location deal and it is
[20] complicated, as Dr. Jaffe indicated, to try to treat it as if
[21] it were. There is no economic rationale for the growth factor
[22] that worked into the Muzak deal being applied to other users.
[23] Forcing that framework on the rest of the industry, frankly,
[24] generates arbitrary and in some cases absurd results for large
[25] and small licensees alike.

Page 1494

[1] number of DMX' more significant competitors, again from JX
[2] 1293, we see that other primary competitors of DMX entered into
[3] the deal with BMI only after enjoying considerable growth and
[4] securing fees significantly lower over the course of their
[5] agreements than $36.36. These, of course, included TruSonic
[6] and Play Network as well as Music Choice which had an extra
[7] adjustment in its favor made by BMI when it lost its DirectTV
[8] accounts to avoid being caught on an ongoing basis with paying
[9] fees at or higher than $36.36. There is no reason we can
[10] understand that BMI, having determined to play lotto with this
[11] formula and distribute its result out in any old way in terms
[12] of its bottom line per location fees, should here be able to
[13] assess DMX at the highest end of that fee range, $36.36.
[14] (Continued on next page)

VOLUME 10
February 1, 2010

Case: 10-3429    Document: 64-2    Page: 93    01/05/2011    BROADCAST MUSIC INC., v. DMX, INC.

[1] **MR. RICH:** Briefly, the music use adjustment, all
[2] economists agree, your Honor, that music use is a relevant
[3] consideration in determining a blanket license fee. The
[4] dispute here is over Dr. Candell's adjustment insofar as
[5] assertedly there's some lack of comparability in the data
[6] reported by Muzak and by BMI, which made her proposed
[7] adjustment factor here questionable. The difference, I want to
[8] emphasize, is limited to off-premise data and Dr. Candell found
[9] a comparably large difference in music use at on-premise
[10] locations about which there's no dispute, 89 percent versus
[11] 92 percent, virtually identical. But in any event, your Honor,
[12] Dr. Candell's analysis is based on the same data that BMI
[13] itself uses to pay its composers, so BMI at least implicitly is
[14] making comparisons across Muzak and DMX data when it pays
[15] royalties no differently than Dr. Candell did.
[16] Now, if you account for all of the necessary
[17] adjustments, the settlement period, the organic growth
[18] allowance and the music use adjustment as our next
[19] demonstrative indicates, and as you've seen before, your Honor,
[20] the math gets you to alternatively $21.40 using a 16.7 personal
[21] location of fees to the past. Alternatively, $22.08 using a
[22] somewhat lower 14 percent allocation to the retroactive period.
[23] I'm nearing the end. Let me just talk about the
[24] off-premise proxy. BMI proposes to use its reporting of
[25] off-premise performances for reporting and calculating the

[1] direct license ratio. Your Honor, it's market proven. More
[2] than 550 publishers have accepted the proxy. Mr. Gertz
[3] testified at 1116 to 1119. They find it simple, transparent,
[4] easily monitored. It's the best measure of performances. It
[5] includes every song transmitted on each satellite channel,
[6] including their frequency within a given program. As your
[7] Honor heard the testimony, the on-premise data by comparison
[8] constitutes essentially a song list without frequency of use
[9] data. That Mr. Gertz at 1116 to 1118. The BMI claim that
[10] the off-premise data somehow misrepresents the overall direct
[11] license ratio is supported only by a last-minute study that's
[12] PX 201. That study, however, was fatally flawed. Unlike the
[13] satellite data, the on-premise data on which the analysis was
[14] based does not reflect increased frequency of spins of directly
[15] licensed material relative to other songs on programs. There's
[16] no reason to think, on this record anyway, that adding the
[17] considerable burden and cost of including the on-premise data
[18] in the reporting and calculation of the direct license ratio is
[19] going to have any meaningful influence on its accuracy.
[20] Turning to tab 9 and in summation, BMI proposes a base
[21] blanket license fee on a per-location basis for the period
[22] June 1, 2005 through December 31, 2012 in a range between
[23] $11.32 and $19.57. If the Court were to consider the CMS
[24] industry benchmark in the alternative, the proper adjustments
[25] to the benchmark would yield per location fees in the $21.40 to

[1] $22.08 range. The direct license ratio we submit should be
[2] calculated using the off-premise distribution data furnished by
[3] DMX both to BMI and to participating direct license publishers.
[4] Barring any questions from the Court, that concludes
[5] my closing. Thank you.
[6] **THE COURT:** Thank you, Mr. Rich. Mr. Fitzpatrick?
[7] **MR. FITZPATRICK:** Thank you, your Honor. We have a
[8] binder as well, if we could hand that up.
[9] Your Honor, as your Honor is aware, the consent
[10] decree, the BMI consent decree sets the framework for the
[11] proceeding that we are involved in before your Honor, and
[12] Article 14A of the decree says that when an applicant requests
[13] a license, BMI is obligated to propose a fee for that license
[14] that BMI deems reasonable. When we then come before your
[15] Honor, BMI bears the burden of proof to show that the license
[16] that it proposed was in fact reasonable, and if BMI meets that
[17] burden of proof, that is the license fee that your Honor should
[18] set. If BMI does not meet that burden of proof, your Honor can
[19] set a license fee, a different license fee taking into account
[20] all of the evidence.
[21] In terms of the question of whether or not we've met
[22] our burden of proof in this case, if I could direct your Honor
[23] to what we consider to be the most important evidence. It's
[24] the evidence that was summarized in a bar graph that was shown
[25] during Dr. Owen's testimony and it is at page 1 of your Honor's

[1] binder. What this bar graph depicts is the per location
[2] license fee paid by every one of DMX's competitors in the
[3] commercial music services industry. It takes into account the
[4] effect of the 8 percent organic growth provision, it includes
[5] licensees that settled the past, that did not settle the past,
[6] that had no past to settle or that had less than the ten years
[7] of interim fees to settle. And as your Honor can see, the
[8] place where BMI would propose to put DMX is very much in the
[9] middle of this chart, at the $36.36 range.
[10] Now, I wouldn't propose to your Honor that it is so
[11] simple that this ends the case. I'm not asking your Honor to
[12] presume based on this chart that our proposal is necessarily
[13] reasonable. But I would submit that placing DMX squarely
[14] within the per location rate paid by every one of its
[15] competitors is at least a strong indicia of the reasonability
[16] of BMI's proposal.
[17] Now, to be sure, if this fee is nothing more than the
[18] exercise of BMI's market power over the entire commercial music
[19] services industry, your Honor should reject it, and we don't
[20] dispute that. But the evidence in this case is not that this
[21] was an exercise of market power by BMI. In fact, it was a rate
[22] that was negotiated with Muzak over a decade. There was a rate
[23] court case pending. Muzak and other members of the industry
[24] had shown their ability to go to both BMI and ASCAP rate
[25] courts. There was a great deal of movement by both sides. BMI

Page 1499

[1] obviously did not get everything it wanted in the negotiation.
[2] In fact, DMX itself has pointed to numerous concessions that
[3] BMI was required to make to Muzak in order to finally get this
[4] deal done.
[5]     The evidence that DMX points to and specifically
[6] Dr. Jaffe points to to say that this was an exercise of market
[7] power is simply the rate that was set by this agreement was
[8] much higher than the $10 rate that DMX's experts believe is
[9] imputed by the direct licenses in this case. So we would
[10] submit, your Honor, that the question of whether this was a
[11] reasonable willing buyer/willing seller fair market value
[12] transaction really rises and falls on the question of whether
[13] or not the direct licenses entered into by DMX in fact support
[14] a $10 rate. Of course, if they do, we agree, the rates are
[15] very different. But if they don't, then this marketplace
[16] transaction between BMI and the entire industry that DMX is a
[17] part of does in fact meet all of the requirements of a
[18] benchmark that rate courts have traditionally relied upon.
[19]     So, your Honor, if I could briefly turn to tab 2 in
[20] your binder, I've just listed the issues that I'll cover in
[21] this closing, given time. This is just a guideline for your
[22] Honor to see --
[23]     THE COURT: But is this chart based on the money
[24] actually paid by each of the companies divided by the number of
[25] locations or is it based on the initial rate in the contract

Page 1500

[1] which they signed?
[2]     MR. FITZPATRICK: The former, your Honor, the rate
[3] actually paid. It's taken off of Joint Exhibit 1293, where for
[4] each year we average the amount actually paid divided by the
[5] total number of locations.
[6]     So at tab 2, your Honor, it's an outline of the points
[7] I'll cover in the closing. It's also, we would respectfully
[8] submit, the key issues that we would ask your Honor to address
[9] in your Honor's ruling in this case.
[10]     So the first point: As I mentioned, the reasonability
[11] of the $36.36 rate is very much determined by the question of
[12] whether or not the direct licenses form the basis for a finding
[13] that the reasonable per location rate in this case is $10 or
[14] when costs are added something just over $11 per location. And
[15] if I could start, your Honor, by respectfully submitting that
[16] this isn't a case where your Honor can use the direct license
[17] rate --
[18]     THE COURT: But it's not $10 as though that were the
[19] only payment during the year. It's $25, but divided up among
[20] different licensors.
[21]     MR. FITZPATRICK: Your Honor, we could agree, we're on
[22] common ground with DMX, that if the direct licenses were a
[23] benchmark for the BMI rate, the rate it would suggest would be
[24] $10.
[25]     THE COURT: For BMI.

Page 1501

[1]     MR. FITZPATRICK: For BMI, exactly. And so the
[2] relevant rates we're comparing here are, and I'm excluding
[3] costs, it's $11, but $11 versus the 36 -- the apples to apples
[4] comparison would be the approximately $11 to the $36.36 rate
[5] that BMI agreed to with the commercial music services industry.
[6]     THE COURT: Yes.
[7]     MR. FITZPATRICK: And because of that, your Honor,
[8] we'd submit that this isn't a situation where your Honor can
[9] triangulate between the two rates. The two rates don't point
[10] in the same direction. They point in vastly different
[11] directions. If the direct licenses were the reasonable rate,
[12] BMI's rate to the entire industry was three-fold higher than
[13] that for the entire period. So it's really an either-or
[14] situation we would submit, your Honor.
[15]     And on the question of which is right, your Honor
[16] heard a great deal of evidence about that. Our expert,
[17] Dr. Owen, testified about it and we would submit the list that
[18] was in his binder at tab 16 where he actually listed his ten
[19] reasons why he didn't believe direct licenses were an
[20] appropriate benchmark for the blanket license fee, but if I
[21] could focus on just a few of the ones that I would consider to
[22] be the most important, and what I consider to be most
[23] important, your Honor, is that we've heard the suggestion in
[24] this case that the direct licenses are the first time we can
[25] see into the competitive marketplace and that that marketplace

Page 1502

[1] spoke and said that the $25 royalty pool and hence a $10 rate
[2] for BMI is the competitive rate in the marketplace and is a
[3] reasonable one. We submit the evidence does not support
[4] anything of that sort, your Honor.
[5]     First, if I could start by addressing the major
[6] publishers, Sony, EMI, Warner and Universal. They're the most
[7] sophisticated publishers in the industry and they have
[8] significant repertoires, which there's no dispute that DMX
[9] needs in order to run its commercial music services. We know
[10] what happened when those publishers were approached with the
[11] $25 royalty pool. None of them were interested. That's
[12] undisputed. And so the testimony that we've heard is that
[13] Mr. Knittel went back and formulated the idea that, well, we'll
[14] offer them guaranteed money, 150 percent of what they had been
[15] getting from BMI and ASCAP.
[16]     We also submit that right there, your Honor, you can
[17] see the logical flaw in using these licenses to lower the BMI
[18] benchmark in this case. These publishers were approached,
[19] promised more money than they had been getting from BMI and
[20] ASCAP, and we'd submit there's no way that such a promise could
[21] form the basis of lowering BMI's benchmark in this case. If we
[22] look at the actual evidence of what was offered and what was
[23] agreed to, we have the situation with Sony, where Sony agreed
[24] to a direct license with DMX for a total of $2.7 million
[25] guaranteed up front, 300,000 of which was for administrative

VOLUME 10
February 1, 2010

Case: 10-3429    Document: 64-2    Page: 95    01/05/2011   BROADCAST MUSIC INC., v.
DMX, INC.

[1] costs. So we could say 2.4 million was for the royalties, and
[2] we have evidence of what the offer to Universal was. The last
[3] e-mail at JX 1190 showed that Mr. Knittel had offered Universal
[4] in excess of $2 million a year up front guaranteed money for
[5] the direct license.

[6] If I could pause for a second here, we heard a lot in
[7] the case about BMI's matching that guarantee to Universal and
[8] offering its own guarantee to Universal. I think we also heard
[9] from Professor Jaffe, DMX's own expert, that there was nothing
[10] wrong with BMI doing that from his perspective and your Honor
[11] was also referred to the section of the consent decree where
[12] guarantees were contemplated in BMI's own consent decree. So
[13] to the extent there's ever been any suggestion that BMI was
[14] doing anything wrong by matching the guarantee, that issue
[15] should be off the table, your Honor.

[16] If we look at the amounts that were offered to Sony
[17] and Universal together, we did this to Mr. Knittel, the total
[18] amount offered to Universal and Sony together actually exceeded
[19] the entire royalty pool that was contemplated by the contract
[20] to the direct licenses. So of course there's no way had both
[21] Universal and Sony accepted these offers that the amounts could
[22] have been recouped. That's just not physically possible
[23] because the amount was greater than the royalty pool itself.
[24] Even in the case of Sony, we've seen evidence that DMX has a
[25] difficult road ahead of it if it wants to attempt to recoup the

[1] is allowed to use the $25 rate in the Sony license to set the
[2] rate for the BMI license, they'll be getting the Universal,
[3] Warner and EMI music based on that same $25 royalty pool or for
[4] BMI a $10 rate as we just discussed. So DMX will effectively,
[5] because it got a license with Sony through a $12.7 million
[6] guarantee, be getting a license from Universal, Warner and EMI
[7] at the $25 royalty pool or $10 BMI rate, despite the fact that
[8] the evidence is undisputed that none of those three publishers
[9] were interested in agreeing to a license at that rate.

[10] And that's really the biggest logical flaw from our
[11] perspective with using the direct licenses to set the BMI rate.
[12] There's nothing wrong with DMX entering into the direct
[13] licenses, and Mr. Rich is correct, we're in agreement that they
[14] have every right to do so and if they can save money by doing
[15] so, that's exactly what the Second Circuit contemplates. But
[16] using that to set the BMI rate has the logical flaw that you
[17] can get the direct licenses by promising more plays and then
[18] under DMX's logic use that to force everybody else to take that
[19] same rate.

[20] So those are the majors, your Honor. We can talk
[21] briefly about the non-major publishers. We heard what happened
[22] with them. We know Mr. Knittel and Mr. Gertz go through
[23] different methodologies that your Honor heard about, arrived at
[24] the $25 rate, sent that out through the industry, some
[25] accepted, some didn't. Now, that's important because we heard

[1] guaranteed money paid to Sony using the $25 royalty pool, but
[2] we'd submit, your Honor, that it really doesn't matter whether
[3] or not DMX does recoup it for our purposes, because the value
[4] to Sony is that the money was guaranteed up front. So if DMX
[5] is able to recoup it by vastly increasing the amount that it
[6] performs Sony Music, Sony doesn't care, there's no additional
[7] cost to Sony in DMX playing its music that much more, Sony has
[8] the money up front. And there is the value of the deal to
[9] Sony, the $2.7 million paid according to the royalty payment
[10] schedule which is at JX 1149.

[11] So we'd submit that what these deals show is not
[12] particularly surprising. They show that if a publisher is
[13] offered more money than they could otherwise expect to get,
[14] they may very well accept it. We didn't need any doors pried
[15] opened or any lights shined on competition to see that. It
[16] isn't a surprising proposition at all. The flaw, the logical
[17] flow, though is illustrated exactly by these major publishers.
[18] Because under DMX's logic, they have a direct license with
[19] Sony. They have an up front guarantee, but the direct license
[20] also does contain the $25 royalty pool language. Under DMX's
[21] logic, that royalty pool language would be used to set the rate
[22] for the BMI blanket license. Now, what that means, because
[23] there's no dispute that DMX continues to need the music of the
[24] other three majors, is that DMX would get the music from
[25] Universal, EMI and Warner through its BMI license. But if DMX

[1] from Professor Jaffe that he doesn't know what one happened or
[2] indeed if many more publishers would have signed on if that
[3] rate had been raised to 30, 40 or $50. So we have a sample.
[4] We have people who agreed to the $25. We heard the number 550,
[5] we know hundreds of them never had their music performed or at
[6] least there's no evidence that they have, but there are a
[7] couple of hundred that had their music performed. We had the
[8] sample that were willing to take the 125. The almost 13,500
[9] other licensees, we have no idea what they would have valued
[10] the license at, and there's no basis to think that the small
[11] sample that we have is the correct rate for everybody else.

[12] If I could also address briefly here, your Honor, the
[13] issue of cream skimming. Your Honor heard about that concept
[14] from both experts, and I do just want to clarify one thing
[15] about it. We are not arguing that the music that DMX has
[16] directly licensed is any worse, worse music, less valuable
[17] music than the music in the BMI repertoire. That's not the
[18] cream-skimming argument, so I just want to put that to rest.
[19] The cream-skimming argument has to take into account the per
[20] performance transactions costs. We agree with DMX that they
[21] went out and licensed the music or attempted to directly
[22] license the music first than they played the most, that was
[23] most valuable to them. But that's exactly our point. They got
[24] the licenses up front from the music that they played the most
[25] and therefore on a transaction cost basis per performance, the

Page 1507

[1] rate was lower. To go out and get the music from the 13,500 or
[2] approximate other publishers that they use is going to entail
[3] significant additional transaction costs and therein is the
[4] value of the aggregate of function of the BMI license, the fact
[5] that they don't have to do that is a huge transaction cost
[6] savings. And that is the cream-skimming argument, your Honor.
[7] So to be clear, we agree, the directly licensed music that they
[8] have won a lot of Grammys last night and that's not a dispute
[9] between the parties.
[10]     What else do we know about the non-major publishers.
[11] Well, we heard directly from Ms. Blue and Ms. Levin about that.
[12] They both testified they didn't know they were signing
[13] performance rights licenses and if I could just pause here
[14] again for a moment, I think there was at least the suggestion
[15] that either BMI or its legal team did something wrong in
[16] soliciting their testimony. I don't believe there was any
[17] evidence of that, and so again, to the extent there was that
[18] suggestion, we think it should be disregarded. But what
[19] shouldn't be disregarded is their testimony. Here we have two
[20] non-major publishers who didn't know they were signing
[21] performing rights licenses.
[22]     Now, the question that raises, were those two isolated
[23] incidents, did we happen to bring the two publishers that
[24] didn't know that or were they evidence of a major confusion
[25] among the non-major publishers in the industry. Well, the

Page 1508

[1] evidence we have to address that, we know from Ms. Blue and Ms.
[2] Levin and indeed from Mr. Arrow at Universal that publishers
[3] are rarely approached to license the performing right. That's
[4] not something they have experience in. They typically deal
[5] through the performing rights organizations. We know at least
[6] from Ms. Levin that she found one portion of the contract
[7] confusing, the no-double-payment provision of the direct
[8] license contract. She testified about that and Mr. Gertz
[9] testified about that provision, your Honor.
[10]     We also know there was a most favored nations clause
[11] in every direct license that DMX entered into. Many of them
[12] were standard, some of them were specifically negotiated and we
[13] saw documents where people actually negotiated it, where people
[14] expressed the importance of being on an MFN basis.
[15]     Now, and we also heard from Mr. Knittel that
[16] publishers do find it important to be treated the same as other
[17] publishers and particularly as major publishers. Now, the
[18] question of whether the Sony guarantee triggers either the
[19] traditional most favored nations clause or the one that was
[20] negotiated with additional language by some of the publishers
[21] could probably be the subject of a completely different
[22] contract case. And it's not something we would urge that your
[23] Honor has to find here, because the relevant question here is
[24] did that most favored nations clause or the discussion of the
[25] clause give some of the publishers false comfort that a major

Page 1509

[1] had evaluated that $25 royalty rate and found it to be
[2] reasonable, and we'd submit that regardless of the legal
[3] interpretation of the most favored nations clause, there's
[4] certainly evidence that people were confused and believed that
[5] the most favored nations clause meant that they were on the
[6] same terms as a major.
[7]     And just as an example of that, your Honor, at tab 3
[8] in the binder, we have Joint Exhibits 827 and 828, and to be
[9] clear, this is just an illustration. It's one e-mail to one
[10] publisher, but it's an e-mail from Mr. Hanson at DMX attaching
[11] a term sheet, and as your Honor can see in the e-mail, the
[12] third sentence down, these are the terms that 150 other
[13] publishers, including one of the majors, have agreed to. And
[14] of course those terms make no mention of the $2.7 million Sony
[15] guarantee.
[16]     The question of whether that voids the contract or
[17] not, I think is an entirely separate one, but the question of
[18] whether or not publishers can be confused by discussions like
[19] that I think is very relevant to the use of these direct
[20] licenses as benchmarks.
[21]     Last thing we know about the non-major publishers, and
[22] there was a lot of discussion about this, is that they were
[23] promised that one of the benefits of entering into the direct
[24] line would be the incentive for DMX to play their music more
[25] and therefore they'd get more money. Or conversely, they were

Page 1510

[1] threatened, not in a bad way, but threatened with the idea that
[2] their music would be played less if they didn't enter into the
[3] direct license. I think we heard from Professor Jaffe,
[4] Professor Jaffe called that competition. That was the essence
[5] of why Professor Jaffe believed these direct licenses set the
[6] competitive market.
[7]     But again, that has to be looked at a little bit more
[8] closely. There's nothing wrong with promising publishers that
[9] DMX would have the incentive to use their music more if they
[10] directly license, but again, that's fine. That's the same
[11] thing we saw with the majors, it's just that these people
[12] weren't sophisticated or powerful enough to get the use of
[13] their music guaranteed the way Sony was. They just got the
[14] promise that there would be the incentive there. So again,
[15] this is the not surprising proposition that publishers with the
[16] promise of potentially more money might very well enter into a
[17] direct license. The same logical flaw applies. The flaw is
[18] then using the royalty pool in that direct license, which is
[19] not what the publishers were agreeing to, they were agreeing to
[20] the hope of more money. The flaw is using that royalty pool to
[21] set the rate for the people who remained with BMI and do not
[22] get the promise of increased plays.
[23]     Let's look at the flip side of the coin, the threat
[24] that DMX will use your music less if you don't enter into the
[25] direct. Professor Jaffe would call that competition. That's

VOLUME 10
February 1, 2010

Case: 10-3429     Document: 64-2     Page: 97     01/05/2011     BROADCAST MUSIC INC., v.
DMX, INC.

## Page 1511

[1] what happens in a competitive market. But, again, looking at

[2] that closely, in a truly competitive market, DMX would go to a

[3] publisher like Universal and say if you don't sign this direct

[4] license, I'm going to play your music less. But without BMI

[5] and its consent decree, Universal could say, actually, you

[6] don't play my music at all. Because if you do, I'll sue you

[7] for infringement, and they would have that ability. That would

[8] be the negotiation between the parties. Here Universal doesn't

[9] have that ability. DMX could say I'm going to drop you from 15

[10] to 10 percent if you don't sign the direct license, but I'm

[11] still going to play your 10 percent and there's nothing you can

[12] do about it. Again, nothing wrong with that. That's what

[13] Universal agrees to when it enters into its arrangement with

[14] BMI, but that doesn't mean it's not a factor that should be

[15] considered when we're trying to think about whether in fact

[16] these are competitive transactions, the direct licenses are

[17] competitive transactions that should be used to set the BMI

[18] rate.

[19]     So that, your Honor, is our position on the direct

[20] licenses. If you leave aside the direct licenses, as I said

[21] before, there's only one benchmark that we have left to talk

[22] about, which is the $36.36 agreement that BMI entered into with

[23] the rest of the industry. It's worth considering briefly the

[24] history of that rate. Back in the late 1980's, there's

[25] evidence in the case, we had a -- ASCAP licensed the industry

## Page 1512

[1] in the $40 range, the high $40 range per location. BMI had

[2] that three-tiered rate structure where it depended whether you

[3] were off or on-premise or storecasting, but it worked out as

[4] Mr. Rich said, correctly I think, in the low teens, somewhere

[5] in the 12 to $14 range per location.

[6]     When that BMI license expired in 1993, BMI's goal in

[7] its negotiations was to get closer to parity with ASCAP,

[8] because at least from BMI's perspective its music share had

[9] increased greatly, it was approaching parity with ASCAP and its

[10] goal was to get closer to parity with ASCAP. Ten years and a

[11] rate court case later BMI didn't get parity, but it got closer.

[12] It got to $36.36 and shortly after that, as you'd expect,

[13] ASCAP's rate came down a little bit. Because as BMI's share

[14] goes up, ASCAP's share comes down and ASCAP's rate comes down

[15] to $41, so that's the history.

[16]     It's also important to put this rate in a little bit

[17] of context because the commercial music services is I think

[18] it's undisputed if not the most intensive user of BMI's

[19] repertoire, it's among the most intensive users of BMI's

[20] repertoire in terms of the number of plays and the importance

[21] of music to its business. And DMX is no exception. If

[22] anything, DMX markets itself as having even a wider spectrum of

[23] music at its disposal than its competitors.

[24]     Another thing about the commercial music industry,

[25] it's not getting the license for itself. It's getting the

## Page 1513

[1] license for its customers, the stores, the bars, etc. As the

[2] evidence has shown, BMI would have otherwise licensed those

[3] establishments at the rates under the agreements that your

[4] Honor has seen, starting in the hundreds of dollars per year.

[5] I think, for example, the minimum fee of the restaurant license

[6] was $320 per year. Even under -- not for DMX, but even under

[7] the rest of the commercial music services industry they would

[8] pay $36.36 for that same location.

[9]         (Continued next page)

## Page 1514

[1]     MR. FITZPATRICK: Now, what have DMX' criticisms of

[2] this industrywide rate been? Well, we started with the

[3] proposition that it really wasn't a willing buyer/willing

[4] seller arm's length transaction at all, it was an exercise of

[5] BMI's market power. But, again, citing to Professor Jaffe and

[6] this is at 1431 at the transcript, his main evidence for that

[7] was that it was much higher than the direct license rates. So,

[8] if your Honor agrees that the direct licenses do not suggest

[9] the rate for the BMI blanket license, the attack on the $36.36

[10] rate really falls away.

[11]     Now, there is still, of course, the question of

[12] whether adjustments are necessary to that rate. We've heard

[13] about the 8 percent organic growth, the settlement of the past

[14] and the music use adjustment. I will turn to that now.

[15]     With respect to the 8 percent organic growth

[16] provision, there is no dispute how the deal is structured. It

[17] is true. It is not a per location deal, it is a flat fee, $6

[18] million a year deal with Muzak where they would -- the fee

[19] doesn't change unless they grow by more than 8 percent, in

[20] which case BMI gets incrementally more. But, the question then

[21] is of course BMI has to apply that to the rest of the industry,

[22] or at least has to attempt to do so and, more importantly, the

[23] question is how do you apply it to DMX. Obviously you can't

[24] just take the dollar figure, you can't take $6 million and say

[25] that's DMX' rate. It has to be adjusted to account for the

[1] fact that Muzak is much bigger than DMX. The way that BMI
[2] chose to apply it to the industry was to translate it into a
[3] per location rate and both sides are in agreement here that the
[4] appropriate metric to license DMX as a per location rate. So,
[5] what did Muzak's rate work out to as per location rate? It
[6] started at $36.36 because $6 million divided by the 165,000
[7] locations is $36.36 so we would submit that's a reasonable
[8] place for DMX' rate it start as well.
[9]      Now, the effective per location rate, as your Honor
[10] has seen, could of course change depending on whether you gain
[11] or lost locations. What's the most reasonable way to apply
[12] that to DMX? We would submit the most reasonable way to do it
[13] would have been to just give them that license and to see how
[14] it would operate for them under that license. Had they grown,
[15] their per location effective rate would have gone down, and had
[16] they shrunk it would have gone up. But, the difference here is
[17] that we're five years later. We know what happened to DMX'
[18] locations. They went down. And so, effectively, had they
[19] taken that license their per-location effective rate would have
[20] gone up. And, to address that concern -- and DMX has addressed
[21] that concern by showing examples of certain small commercial
[22] music services who have rates in the hundreds of dollars per
[23] location. To be frank, your Honor, those commercial music
[24] services might have a complaint but it is a red herring in this
[25] case, your Honor, because we're not proposing that DMX pay

[1] Mr. Annastas, and what he explained is that he thought it
[2] was -- he thought it was certainly at least possible that Muzak
[3] would grow, but the testimony was that he didn't think they'd
[4] grow very much. And of course the deal wasn't just for Muzak,
[5] the deal was for the whole industry, and Mr. Annastas testified
[6] that he thought the industry would grow little, if at all.
[7]      We don't have to rely just on his oral testimony
[8] because there is contemporaneous documentation supporting
[9] Mr. Annastas' statements, Joint Exhibits 743 and 745. Both
[10] reflect that Muzak represented to BMI that its historical
[11] growth rate at least had been between 2 percent and 3 percent.
[12] So, that's the best evidence of expectations.
[13]      You could also look at what actually did happen and
[14] that showed that Mr. Annastas was right in what his
[15] expectations were. The industry grew very modestly during that
[16] time and that's as reflected on Joint Exhibit 1293, that's the
[17] reason that the average rate that your Honor has heard so much
[18] about, the $34.32 which is the average rate that everyone ended
[19] up paying, the reason that that's slightly below $36.36 is
[20] because Mr. Annastas' expectations were right. Muzak in fact
[21] didn't grow at all, the industry as a whole grew at a very
[22] modest rate.
[23]      Moving on to the settlement in the past, your Honor.
[24]      In the beginning of this case there was the promise
[25] that we would have identified for us money that moved from the

[1] hundreds of dollars per location. We're not even proposing
[2] that they pay approximately $40 per location or whatever their
[3] license would have worked out to. We've addressed their
[4] concern by suggesting a $36.36 per location rate which is a
[5] rate more favorable than they would have had had they actually
[6] taken the license that the rest of the industry had agreed to.
[7]      Now, contrast that with what DMX wants to do. They
[8] just want to take the best case scenario. They want to take
[9] the lowest per location effective rate that could have happened
[10] under the agreement, solely for services that grew 8 percent or
[11] more every year and pretend that that's what happened to them.
[12] There is no basis to do that. No one had that deal. That's
[13] simply isolating one part of the deal, the most favorable to
[14] DMX, and taking it to them and applying it to them. It ignores
[15] the fact that structuring the deal as it was allocated some
[16] risk between BMI and the service as to whether they would grow
[17] or whether they would shrink. DMX wants to ignore that
[18] entirely, get rid of the risk and just take the lowest
[19] effective per location rate that possibly could have happened
[20] and apply it to itself. We submit that's not reasonable.
[21]      Another way to look at the question would be what were
[22] the parties' expectations when they entered into the deal, and
[23] specifically that's BMI and Muzak. So, what's the best
[24] evidence of that? Well, your Honor heard -- we didn't hear
[25] from Muzak in this case but we did hear from BMI's negotiator

[1] past to the present during the negotiations, moved from the '94
[2] to '04 period, to the '04 to '09 period. We would submit that
[3] money has never been identified. In fact, we would submit that
[4] that's not even what DMX' expert attempted to do. DMX' expert
[5] didn't try to find money moving, DMX' expert simply took one
[6] offer or a series of offers that BMI was considering that had
[7] both a past and a future component and then assume without
[8] evidence that the relative percentage in those proposals must
[9] have applied to the final deal. So, if in one proposal that
[10] BMI was considering 14 percent of the total deal was
[11] retroactive, that that must mean that when BMI agreed to the
[12] final deal, 14 percent of the final deal was retroactive.
[13]      We would submit the evidence doesn't support that.
[14] But, if your Honor would, your Honor did identify a document
[15] that is important in this process and that's at -- Mr. Rich
[16] showed it to you as well, it is at tab 4 of our binder. This
[17] is the document that there was some effort put into locating,
[18] your Honor, so if I could take a moment just to address it.
[19]      The first proposal of the document is a proposal that BMI
[20] was at least considering making but the second page is, I
[21] believe, the page that interested your Honor where it detailed
[22] some of the history of the offers and, importantly, if we could
[23] start at BMI proposal A to the bottom of the page, the relevant
[24] numbers, your Honor, are the far right-hand column of each of
[25] those offers, the 2004 to 2008 period. And so, for example, if

VOLUME 10
February 1, 2010

Case: 10-3429   Document: 64-2   Page: 99   01/05/2011   BROADCAST MUSIC INC., v. DMX, INC.

[1] you look at BMI proposal A, the annual fee for the '04 to '08
[2] period is 27.5. That refers to $27.5 million. The 4.5 below
[3] it is the retro fee. And so, for each of those offers, A, A1,
[4] B, and C, your Honor can see that the relevant numbers are
[5] 27.5, 27.5, 29.5 and 29.5.
[6] So, two things about this, your Honor: First of all,
[7] if this document could be used to identify moving money from
[8] the retro to the license term, the most that would be
[9] identified is the difference between 27.5 and the 30 million
[10] that was ultimately agreed to. So, the most that would have
[11] moved from the past to the present is $2.5 million to get the
[12] 27.5 unto 30. That's under the top two offers. Under the
[13] bottom two offers it would just be $500,000.
[14] So, that's how the document would be used if your
[15] Honor could use it that way but there is a problem in using it
[16] that way and we went over this on the redirect of Mr. Annastas,
[17] and that's the fact that this offer history doesn't reflect all
[18] of the differences between the offers and the final deal and
[19] that can be illustrated by flipping back to the first page
[20] which is BMI proposal A1. I think we've established that in
[21] addition to the difference in 27.5 million total and 30 million
[22] total in the final deal, the other differences between this
[23] proposal and the final deal include this proposal had a growth
[24] rate of 2.5 percent, as your Honor can see at the bottom.
[25] Ultimately, the deal had a growth rate -- a growth provision of

[1] 8 percent. Here it is organic or existing affiliate growth.
[2] In the final deal it was organic only.
[3] Here, looking at the number of locations column, there
[4] are 164,000 locations estimated. We know in the final deal it
[5] was 165,000. Here the term is from '04 to '08. We know that
[6] in the final deal the term went from mid-'04 to mid-'09, so a
[7] six-month shift. And finally and importantly, this deal --
[8] this offer shows escalating fees so that by 2008 the offer
[9] was -- this proposal would have Muzak paying BMI $6.9 million
[10] or a rate of $42 per location. In the final deal the numbers
[11] were just set as flat amounts of $6 million per year.
[12] So, if this were the final offer this would
[13] contemplate an escalating rate up to $42 per location by 2008
[14] and the license at issue in this case goes out to 2012. So,
[15] even if you did -- even if your Honor did want to use this as
[16] evidence of what BMI would agree to, one thing it is evidence
[17] of is that by 2008, if this were the offer, BMI would have
[18] wanted $4.42 per location. Of course, that's not what
[19] ultimately happened. BMI got a flat location rate of $36.36 or
[20] $6 million a year which translates into that.
[21] When this question was put to Professor Candell, your
[22] Honor, I think this is the one part of the testimony that I
[23] think is important enough to read during the closing. At page
[24] 1316 of the transcript Mr. Salzman was questioning Dr. Candell
[25] about exactly this problem: Can you isolate any value moving

[1] from the retro period to the current period? And in relevant
[2] part, starting at line 6, question:
[3] "Q And you can't tell whether the movement from proposal A1 to
[4] the final agreement was attributable to the retro difference,
[5] the annual fee difference, or the organic growth difference or
[6] any combination of them? Correct?
[7] "A That's correct. Although I see that Muzak paid a higher
[8] amount than BMI was requesting on this document. Final.
[9] "Q And got several different benefits in excess of what was
[10] proposed on this document, correct?
[11] "A There were -- I mean there were various tradeoffs between
[12] the parties.
[13] "Q And you haven't isolated how much, if any, was specifically
[14] traded off for the retro period, isn't that true?
[15] "A Between this document and the final agreement, no, I
[16] haven't."
[17] So, in light of that, your Honor, the ability to
[18] identify any moving money, we would submit, it is reasonable to
[19] look at some of the agreements themselves. The agreement in
[20] principal between BMI and Muzak, JX 1234, the actual license
[21] agreement itself, and the whereas clause therein at JX 0132 and
[22] the letter setting the past at J 0123, all of which cite the
[23] fact that the 6 million per year for fees were reasonable going
[24] forward.
[25] Did that reflect what the parties actually intended?

[1] Here is what we know. We know Muzak believed it owed nothing
[2] for the past. You can see Petitioner's Exhibit 0011 where they
[3] took that position in negotiations and I believe Dr. Candell
[4] agreed with that.
[5] As for BMI, we know that Mr. Annastas believed that
[6] the amount was for the future. He testified to that, he
[7] testified that he agreed with the language in the agreement
[8] itself which put the deal at $6 million per year.
[9] So, where the situation is we can't identify money
[10] moving we have Muzak not believing it owed anything for the
[11] past, we have BMI believing that the full $30 million was for
[12] the future and we have the documents agreeing with BMI and
[13] Muzak on that point, we would submit there is no reason to
[14] adjust for the settlement of the past.
[15] The music use adjustment, your Honor, just briefly on
[16] that point. The problem with making any music use adjustment
[17] here is that I think, as we have heard, we don't know what is
[18] actually being played in the stores there, the customers of the
[19] commercial music services industry. We know on the satellite
[20] what songs they get through the satellite, we know from
[21] on-premise what songs they put on CDs or hard drives. But we
[22] don't know what is being played by a drive or also no reason to
[23] believe that Muzak customers, that store licensed by Muzak or
[24] store licensed by DMX would play meaningfully different
[25] percentages of BMI versus ASCAP or any other music. That

[1] problem is compounded by the fact that there are differences in
[2] the way Muzak and DMX report their music to BMI.
[3]     And, finally, I would say that regardless of the small
[4] difference that we do see with that flawed data, it is common
[5] for both BMI and ASCAP to license industries with an
[6] industrywide agreement that doesn't adjust for the relative BMI
[7] and ASCAP music use among every single participant in the
[8] industry. The approximately 10,000 radio stations, 1,400 local
[9] televisions stations, they don't all pay different BMI and
[10] ASCAP rates just because some might have more of one music than
[11] the other. They all paid the same BMI and ASCAP rate and it
[12] all essentially washes out and the same is true here, your
[13] Honor.
[14]     If I could briefly address the premium. I think one
[15] of the most important points about the premium for your Honor
[16] to consider is places where the parties are actually on common
[17] ground. With respect -- the premium from BMI's perspective is
[18] designed to cover two elements of the license. One is that
[19] there is higher incremental costs to BMI to administer this
[20] license and the second is that there is greater value to DMX in
[21] taking the license.
[22]     With respect to the incremental costs, the parties are
[23] in agreement BMI should get its incremental costs and that
[24] those are separate and either on top of in BMI's case or below
[25] in Professor Jaffe's case, the bar that represented the license

[1] fees but there is no dispute that they should be added to the
[2] license.
[3]     So, in that sense, whether DMX wants to call it a
[4] premium or simply wants to call it a cost, the fact is that the
[5] adjustable fee blanket license, the parties are in agreement,
[6] should cost more than the traditional blanket license at least
[7] to the extent that that's necessary to cover BMI's incremental
[8] costs.
[9]     The disputed area relates to whether BMI should get
[10] any money for the additional value of the license to DMX. It
[11] is not disputed that there is value. Professor Jaffe, at 1448
[12] to 1449, and obviously Dr. Owen, are both in agreement that
[13] there is value. The question is should DMX have to pay for it
[14] or not. Professor Owen thinks yes. Professor Jaffe thinks no,
[15] or at least no to the extent that whatever value there is
[16] should be competed down to the level of cost.
[17]     Two problems with Professor Jaffe's position there,
[18] one is his definition of costs which are not, as we understand
[19] it, simply the accounting costs, what costs BMI actually incurs
[20] out-of-pocket in administering the license; but Professor Jaffe
[21] included at least return on investment in his definition of
[22] cost but made no effort to calculate what that would be for
[23] BMI.
[24]     More importantly, Professor Jaffe's view of
[25] competition doesn't comport with the real world, and the real

[1] world companies make better products all the time. They are
[2] successfully able to charge more for those products and not
[3] simply to the extent that the products cost more for them to
[4] make. If a company makes a better car, it can charge more for
[5] that car. And so, Professor Jaffe's view might be from
[6] competition but, as the Showtime case that we cited in our
[7] pretrial brief showed, we don't have to approximate a world of
[8] perfect competition, we just have to look for adequate
[9] competition. And there is no reason that in the world of
[10] adequate competition a company can't be rewarded for offering a
[11] better product by recovering at least some of the value for
[12] that product.
[13]     How did Professor Owen compute that value? He looked
[14] at the television per program licenses as a benchmark. As
[15] we've heard, looking at those license agreements and using
[16] Magistrate Judge Dolinger's music use assumption, those
[17] licenses support a premium of anywhere between 18 and 38
[18] percent.
[19]     BMI, we heard from Michael O'Neill, was willing to go
[20] below that, was willing to go below the 18 to 38 percent range.
[21] It is a new license, we recognize there is uncertainty here and
[22] in effort to be reasonable, he was willing to go below that
[23] benchmark and accept 15 percent.
[24]     I do want to be clear what is in that 15 percent.
[25] That 15 percent is not just a value, that 15 percent is to

[1] account for the cost and the value. All of that is in the 15
[2] percent. So, what BMI does is take its traditional blanket
[3] rate of $36.36 and ask for a 15 percent increase to account for
[4] both the hundreds of thousands of dollars of incremental costs
[5] that BMI will incur each year and also a modest amount for DMX
[6] to pay for the additional value that it is receiving.
[7]     With respect to the base fee, your Honor, parties are
[8] in agreement that -- BMI calls it the base fee, DMX calls it
[9] the floor fee, but the parties are in agreement that the idea
[10] here is to cover BMI's costs. Parties are also in agreement
[11] that there is two components to the cost, one is the cost that
[12] BMI would incur if this were just a regular blanket license,
[13] the other is incremental costs.
[14]     With respect to the first part, the dispute is really
[15] between 11.7 and 17 percent. The evidence is undisputed that
[16] 17 percent is the domestic overhead rate that BMI takes out
[17] traditionally from its domestic license fees. It is also the
[18] 17 percent rate that's applied to the license fees of all of
[19] DMX' competitors. Professor Jaffe, for his part, doesn't take
[20] issue with the concept of using BMI's domestic overhead rate.
[21] His issue is that he's not satisfied that the 17 percent has
[22] been proven with sufficient certainty.
[23]     What we say to that, your Honor, is that the 17
[24] percent rate is a derived rate based on the fact that the
[25] overhead rate used for the foreign royalties is much lower at

**Page 1527**

[1] 3.6 percent. Now, it is true, we did not submit a dollar for
[2] dollar accounting of the 3.6 percent overhead rate for foreign,
[3] but what we did submit is an explanation -- and it is
[4] undisputed -- of why the foreign overhead rate would be so much
[5] lower than our domestic overhead rate, the reason being the
[6] foreign performing rights societies do the work for us there,
[7] your Honor, simply put. They identify the performance, collect
[8] the fee, negotiate the license, send us the money and tell us
[9] who to send it to.
[10] Now, there is some work involved for that, we are not
[11] saying we don't do any work, but it is certainly far less than
[12] what we do on the domestic front where we negotiate or litigate
[13] the license fee, identify the performance, collect the money
[14] and distribute the royalties.
[15] So, while it is true we haven't submitted a dollar for
[16] dollar accounting, I submit we have certainly met our burden of
[17] showing that the foreign overhead rate is far lower than the
[18] domestic overhead rate and it is reasonable to apply the
[19] domestic overhead rate of 17 percent here.
[20] On the issue of incremental costs, we also agree with
[21] DMX that these can be divided into two areas, upfront and
[22] ongoing. Of the up front we submit $339,000 of
[23] Mr. Laughlin's -- from Mr. Laughlin's testimony haven't been
[24] meaningfully challenged. DMX hasn't disputed that we needed to
[25] do all of those things or that our costs were reasonable in

**Page 1528**

[1] doing them. DMX' issue is that it shouldn't have to pay for
[2] all of them because it is possible that some of them could be
[3] used for the benefit of other licensees. We submit on that
[4] point, your Honor, no one else -- no one else is making use of
[5] the license right now. No once else has shown that it entered
[6] into the direct license program. And, frankly, your Honor, I
[7] would just have to leave it to your Honor's decision at that
[8] point. I don't -- it is not clear what the right answer is.
[9] If no one else takes the license, BMI will be forced to eat all
[10] those costs. If someone else does take the license, it would
[11] be reasonable to share that -- for DMX to share that with
[12] someone else that takes the license but I think that's the
[13] state of the evidence, your Honor.
[14] With respect to the ongoing costs, again, DMX hasn't
[15] disputed the reasonableness of them other than to say that I
[16] remember estimates. That's true the work hasn't been done yet,
[17] your Honor, it wouldn't be possible for us to do anything more
[18] than estimate the costs. We submit that both Mr. O'Neill and
[19] Mr. Laughlin went through a great deal of effort to attempt to
[20] submit reasonable estimates of what those costs would be and
[21] those are laid out -- those have been testified to by
[22] Mr. Laughlin and Mr. O'Neill, they're laid out in tabular form
[23] in Laughlin binder 2 and O'Neill binder 8.
[24] If I could just touch briefly on the issue of what has
[25] been called the on or off-premise proxy?

**Page 1529**

[1] The issue here really is accuracy, your Honor, and the
[2] question is DMX -- two thirds of DMX' business currently is its
[3] on-premise business where it sends music via CD or hard drive,
[4] one third is satellite. We all agree we should use the one
[5] third satellite. No one wants to throw that out. The question
[6] is do we use the two thirds as BMI proposes or do we discard it
[7] as DMX proposes?
[8] Ignoring it would be problematic for a couple of
[9] reasons. First of all, as Petitioner's 200 and 201 show, it is
[10] not the same music. 201 shows that there are songs that are on
[11] one and not the other and vice versa; and 200 shows that at
[12] least based on the way that data is reported to us, the direct
[13] license percentage is very different, it is approximately 36
[14] percent on the satellite and only 21 on the on-premise. We
[15] submit also it is not surprising that you see disparity because
[16] pursuant to your Honor's interim fee ruling only the
[17] off-premise has been used to calculate the credit.
[18] So, nothing nefarious about it but just responding to
[19] normal incentives there would be far more incentive to increase
[20] the direct license percentage on the off-premise and gain the
[21] credit rather than on the on-premise where it has no effect on
[22] the music fees that you are paying.
[23] It would be a mistake to discard the on-premise data
[24] for another reason as Ms. Hilburn testified at 1183 of the
[25] transcript, the on-premises data is really the only data we

**Page 1530**

[1] have about the popularity about different types of DMX music
[2] because off-premise everyone gets -- almost everybody gets a
[3] hundred channels and we don't know which one they're listening
[4] to. On-premise they order specific programs and so it is a
[5] much smaller universe that they get of genres or types of
[6] music. And so, there is at least a fair presumption that
[7] because they're actually ordering it, they have some interest
[8] if listening to it as opposed to the satellite where we know
[9] that's not true.
[10] Here is what we submit, your Honor. What BMI wants
[11] here is accuracy. We submit that the most reasonable outcome
[12] would be for your Honor to order the parties to attempt to
[13] create a crediting mechanism that takes into account both the
[14] off and the on-premises data. Now, in doing that I do want to
[15] be clear, DMX has identified an issue with the on-premise data.
[16] To the extent that the on-premise data is just a list of songs
[17] that could be played with no information about the frequency
[18] that they actually are played, we agree, that's a flaw in the
[19] data and that could be included in your Honor's order as well,
[20] that that factor should be taken into account and addressed by
[21] the parties.
[22] We believe that with that kind of direction, the
[23] parties could reach an agreement and create a formula that
[24] doesn't discard two thirds of the data but reaches an accurate
[25] direct license mechanism that both parties could agree to.

Page 1531

[1]      Your Honor, in the interest of time, I won't cover
[2]  bowling, I would refer your Honor to Mr. Cleve Murphy's
[3]  testimony on that.  In short, none of DMX' competitors have a
[4]  license that covers bowling.  DMX wants one, it certainly is
[5]  entitled to one, but the reasonable fee for that should be the
[6]  agreement that BMI negotiated with the Bowling Proprietors'
[7]  Association of America.
[8]      And the last thing I will do, your Honor, is answer a
[9]  question that your Honor posed to us in the beginning of the
[10]  case which was to look at the United Shoe Machinery case --
[11]  which we did.  Your Honor first described the case and asked
[12]  whether your recollection of it was correct.  It is.
[13]      The second question was:  Is it applicable here?  And
[14]  I think actually that your Honor subsequently answered that
[15]  question.  We would submit it is not applicable here.  United
[16]  Shoe Machinery, first of all, was not a consent decree as your
[17]  Honor said, it was an adjudicated decree after a finding of
[18]  violation of antitrust law.  And the issue in that case was
[19]  under what showing was necessary was in order to amend that
[20]  decree.  Here, of course, we have a consent decree which no one
[21]  is proposing to amend but what we have is a consent decree
[22]  which is essentially an agreement between BMI and the cover,
[23]  and it establishes a rate setting mechanism and that rate
[24]  setting mechanism lays out the guidelines for your Honor which
[25]  is that when the applicant requests a license that your Honor

Page 1532

[1]  should determine whether or not the fee that BMI has proposed
[2]  for that license is reasonable and for all the reasons I have
[3]  just been discussing, we submit that BMI's proposal is.
[4]      Thank you, your Honor.
[5]      THE COURT:  Thank you, Mr. Fitzpatrick.
[6]      Decision is reserved.
[7]      MR. LARSON:  Your Honor, if we could handle just two
[8]  housekeeping matters very briefly?
[9]      THE COURT:  Yes.
[10]      MR. LARSON:  The first is that during the read-in of
[11]  Ms. Stafford-Scherer's deposition testimony, page 1040 of the
[12]  transcript, an exhibit that was entered was identified at JX
[13]  221, should actually be JX 1321.  And then, secondly, during
[14]  the examination of Dr. Candell, the Court was provided with a
[15]  binder of several exhibits underlying one of her charts of
[16]  several JX exhibits and we just inadvertently failed to read
[17]  into the record two of the exhibits in that binder and I just
[18]  want to note that JX 927 and JX 1050 were in the binder and
[19]  admitted in evidence.
[20]      THE COURT: We have no objection to that, your Honor.
[21]      MR. FITZPATRICK:  And, I would just add that with
[22]  respect to Petitioner's Exhibit 201, after your Honor's ruling
[23]  on Friday afternoon, the parties conferred and agreed upon a
[24]  caption so we do resubmit Petitioner's Exhibit 201.
[25]      THE COURT:  What is the final caption?  I have a copy

Page 1533

[1]  of it now but I don't know whether it was just handed up or it
[2]  was the original one.
[3]      MR. FITZPATRICK:  This is the correct one.
[4]      THE COURT:  So, the word "performances" was taken out?
[5]      MR. FITZPATRICK:  Yes, your Honor, that's right.
[6]      THE COURT:  That's fine.  It is so received.
[7]    (Petitioner's Exhibit 201 received in evidence)
[8]      THE COURT:  Thank you all very much.
[9]      MR. FITZPATRICK:  Thank you.
[10]      MR. RICH:  Thank you.
[11]      THE COURT:  It was as clear as a trial governing this
[12]  material could hopefully be.
[13]      Thank you very much.
[14]         o0o
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 1534

PETITIONER'S EXHIBITS

| Exhibit No. | | Received |
|---|---|---|
| 201 | . . . . . . . . . . . . . . . . . . . . . | .1533 |